**Kathleen E. Brody – 026331**
**Molly Brizgys – 029216**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: kbrody@acluaz.org
Email: mbrizgys@acluaz.org

**Joshua A. Block\*\***
**Leslie Cooper\*\***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*\*\*Admitted Pro hac vice*

**James Burr Shields - 011711**
**Heather A. Macre - 026625**
**Natalie B. Virden - 031609**
**AIKEN SCHENK HAWKINS & RICCIARDI P.C.**
2390 East Camelback Road, Suite 400
Phoenix, Arizona  85016
Telephone:  (602) 248-8203
E-Mail: burr@aikenschenk.com
E-Mail: ham@aikenschenk.com
E-Mail: nbv@aikenschenk.com

*Attorneys for Plaintiff Russell B. Toomey*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Russell B. Toomey,** | Case No. 4:19-cv-00035 LCK |
| Plaintiff, | |
| v. | |
| **State of Arizona; Arizona Board of Regents, d/b/a University of Arizona,** a governmental body of the State of Arizona; **Ron Shoopman,** in his official capacity as chair of the Arizona Board Of Regents; **Larry Penley,** in his official capacity as Member of the Arizona Board of Regents; **Ram Krishna,** in his official capacity as Secretary of the Arizona Board of Regents; **Bill Ridenour,** in his official capacity as Treasurer of the Arizona Board of Regents; **Lyndel Manson,** in her official capacity as Member of the Arizona Board of Regents; **Karrin Taylor Robson,** in her official capacity as Member of the Arizona Board of Regents; **Jay Heiler,** in his official capacity as Member of the Arizona Board of Regents; **Fred Duval**, in his official capacity as Member of the Arizona Board of Regents; **Gilbert Davidson**, in his official capacity as Interim Director of the Arizona Department of Administration; **Paul Shannon**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration, | **PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| Defendants. | |

2

# INTRODUCTION

Plaintiff moves the Court for an order certifying this case as a class action under Fed. R. Civ. P. 23(b)(2) and appointing Plaintiff's counsel as class counsel under Rule 23(g). The State of Arizona provides health care coverage to its employees through a self-funded healthcare plan controlled by the Arizona Department of Administration. (Complaint, Exhibit A, Doc. 1-2). The Plan categorically excludes "gender reassignment surgery," regardless of whether the surgery qualifies as medically necessary. (Complaint, Exhibit A at pg. 56). Plaintiff asserts that this categorical exclusion discriminates on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Equal Protection Clause of the Fourteenth Amendment. (Complaint at pg. 5, Doc. 1). Like Dr. Toomey, other transgender individuals enrolled in the State's Plan do not have the opportunity to demonstrate that their transition related care is medically necessary. In support of this Motion, Plaintiff submits his own declaration about his medical claim, as well as information about his connections to the transgender community in Arizona that make him uniquely well-situated to represent the interests of the classes.

# BACKGROUND

### Transgender individuals and gender dysphoria

Gender identity is a well-established medical concept, referring to one's sense of oneself as belonging to a particular gender. Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. For transgender individuals, however, the sense of one's gender identity differs from the sex assigned to them at birth. Transgender men are men who were assigned "female" at birth, but have a male gender identity. Transgender women are women who were assigned "male" at birth, but have a female

gender identity. Although the precise origins of each person's gender identity is not fully understood, experts agree that it likely results from a combination of biological factors as well as social, cultural, and behavioral factors.

Being transgender is not a mental disorder. Men and women who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status. Transgender men and women may require treatment for "gender dysphoria," the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex. The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) (302.85).

The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH").[1] Under the WPATH standards, medically necessary treatment for gender dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to another. This treatment, often referred to as transition-related care, may include hormone therapy, surgery (sometimes called "sex reassignment surgery" or "gender confirmation surgery"), and other medical services that align individuals' bodies with their gender identities. Under the WPATH standards, the exact medical treatment varies based on the individualized needs of the person. Under each patient's treatment plan, the goal is to enable the individual to live all aspects of one's life consistent with one's gender identity, thereby eliminating the distress associated with the incongruence.

---

[1] Eli Coleman Et. Al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-nonconforming People* (2012), The World Professional Association for Transgender Health, *available at* https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf.

4

In the past, public and private insurance companies excluded coverage for transition-related care based on the assumption that such treatments were cosmetic or experimental. Today, however, transition-related surgical care is routinely covered by private insurance programs. The American Medical Association, the American Psychological Association, the American Psychiatric Association, the American College of Obstetricians and Gynecologists, and other major medical organizations have issued policy statements and guidelines supporting healthcare coverage for transition-related care as medically necessary under contemporary standards of care. (*See* Exhibits 1 to 4). No major medical organization has taken the position that transition-related care is not medically necessary or advocated in favor of a categorical ban on insurance coverage for transition-related procedures.

**The Self-Funded Health Plan's "Gender Reassignment" Exclusion**

Dr. Toomey is a man who is transgender, which means that he has a male gender identity, but the sex assigned to him at birth was female. (Declaration of Russell Toomey, pg. 3). Dr. Toomey transitioned to live consistently with his male identity in 2003. (*Id*). Since 2003, Dr. Toomey has received testosterone as a medically necessary treatment for gender dysphoria. (*Id*.). He also received medically necessary chest reconstruction surgery in 2004. (*Id*.). In accordance with the WPATH Standards of Care, Dr. Toomey's treating physicians have recommended that he receive a hysterectomy as a medically necessary treatment for gender dysphoria. (*Id*. at 4).

Dr. Toomey's healthcare coverage is provided and paid for by the State of Arizona through the Plan. (Complaint, Exhibit A, pg. 1-3). Individuals enrolled in the Plan must choose to receive benefits through a Network Provider. (Complaint, Exhibit A pg. 101). The Plan generally provides coverage for medically necessary care, which the Plan defines as "services, supplies and prescriptions, meeting all of the following criteria": (1) ordered

by a physician; (2) not more extensive than required to meet the basic health needs; (3) consistent with the diagnosis of the condition for which they are being utilized; (4) consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; (5) required for purposes other than the comfort and convenience of the patient or provider; (6) rendered in the least intensive setting that is appropriate for their delivery; and (7) have demonstrated medical value. (Complaint, Exhibit A, pg.100). In the event that the Plan denies coverage for a treatment based on purported lack of medical necessity, the Plan provides a right to appeal the decision to an independent reviewer at the third-party claims administrator and, if necessary, to further appeal to an external independent review organization. If an independent reviewer concludes that the treatment is medically necessary, that decision is binding, and the Plan must immediately authorize coverage for the treatment. (Complaint, Exhibit A pg. 69-72).

The Plan does not apply these generally applicable standards and procedures to surgical care for gender dysphoria. Instead, the Plan categorically denies all coverage for "[g]ender reassignment surgery" regardless of whether the surgery qualifies as medically necessary. (Complaint Exhibit A pg. 56). Transgender individuals enrolled in the Plan have no meaningful opportunity to demonstrate that their transition-related care is medically necessary as it is specifically excepted from the terms of the Plan. Likewise, those same individuals also lack a meaningful opportunity to appeal any adverse determination to an independent reviewer as it isn't clear that the Plan's independent review organization can overrule an exception to the Plan, particularly as the independent review may come from Arizona's Department of Insurance, which promulgates the Plan.[2]

---

[2] Blue Cross and Blue Shield of Arizona, *Member Appeal and Grievance Process*, https://www.azblue.com/~/media/azblue/files/about/standardappealpacket.pdf (last visited April 4, 2019).

As a result of the Plan's categorical exclusion for "gender reassignment surgery," Dr. Toomey was denied preauthorization for a hysterectomy on August 10, 2018. (Complaint, Exhibit G.). The denial was based solely on the Plan's exclusion for "gender reassignment surgery."

**Claims for Relief**

Dr. Toomey challenges the facial validity of the Plan's "gender reassignment surgery" exclusion, which denies transgender individuals an equal opportunity to demonstrate that their transition-related surgical care is medically necessary. As alleged in the Complaint, Dr. Toomey contends that the "gender reassignment surgery" exclusion facially violates Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment.

Dr. Toomey seeks class-wide injunctive and declaratory relief on behalf of two classes. The first class is defined as:

> Employees of the Arizona Board of Regents enrolled in the self-funded Plan controlled by the Arizona Department of Administration who have or will have medical claims for transition-related surgical care.

Dr. Toomey asserts a Title VII claim against the State of Arizona and the Arizona Board of Regents and an equal protection claim against officers and members of the Arizona Board of Regents in their official capacities on behalf of this class.

The second class is defined as:

> Individuals (including Arizona State employees and their dependents) enrolled in the self-funded Plan controlled by the Arizona Department of Administration who have medical claims or will have claims for transition-related surgical care.

Dr. Toomey asserts an equal protection claim against Gilbert Davidson and Paul Shannon in their official capacity on behalf of this class.

7

**ARGUMENT**

This is the paradigmatic case for class certification, as it challenges the Plan's blanket exclusion for transition related surgery that results in unlawful discrimination against Dr. Toomey and all the class members he seeks to represent. The Plan's "gender reassignment exclusion" applies across the board to all Plan members seeking this kind of medical care and removing the exclusion would provide relief to all class members, regardless of their individual circumstances.

I.   **The Proposed Class Meets All the Rule 23(a) Requirements.**

   A.   **Numerosity**

"A proposed class satisfies the numerosity requirement if members are so numerous that joinder would be impracticable. There is no fixed threshold, but courts in this circuit generally have held that classes of 40 or more satisfy the numerosity requirement." *Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *4 (D. Ariz. Dec. 6, 2017) (internal quotation marks and citations omitted). "Where 'the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'" 1 Alba Cone & Herbert B. Newberg, Newberg on Class Actions § 3.3 (4th ed. 2002); *see Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *5 (D. Ariz. Dec. 6, 2017); *see also Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982).

Plaintiff does not know the precise number of transgender individuals who are employed by the Arizona Board of Regents or who are enrolled in Arizona's self-funded health plan. But, the Plaintiff does not need not state the exact number of potential class members, nor is a specific number of class members required for numerosity. *Arnold v. United Artists Theater Circuit Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994). Dr. Toomey is personally aware of at least six employees who are currently ineligible for gender

reassignment surgery because of the exclusion. (Declaration of Russell Toomey, pg.4). Demographic data indicates that the total number of class-members could be over 1,000. According to a 2016 study from the Williams Institute, approximately 0.62% of Arizonans identify as transgender.[3] As of 2016, the Board of Regents employed 35,612 individuals working at Arizona's public universities.[4] According to the Arizona Department of Administration, approximately 136,000 individuals receive healthcare through the State's self-funded plan.[5] If those groups of individuals identify as transgender at the same rate as the rest of the Arizona population, then approximately 220 transgender individuals work for the Board of Regents and 843 transgender individuals receive healthcare through the State's self-funded Plan.

Moreover, class certification is particularly appropriate in this case because the class includes both current and future members. *See Ali v. Ashcroft*, 213 F.R.D. 390, 408 (W.D. Wash.), aff'd, 346 F.3d 873 (9th Cir. 2003), *opinion withdrawn on denial of reh'g sub nom. Ali v. Gonzales*, 421 F.3d 795 (9th Cir. 2005), *as amended on reh'g* (Oct. 20, 2005) (citations omitted); *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000) ("the fact that the class includes unknown, unnamed future members also weighs in favor of certification"); *Henderson v. Thomas*, 289 F.R.D. 506, 510 (M.D. Ala. 2012) ("[T]he

---

[3] Andrew R. Flores Et. Al., *How Many Adults Identify as Transgender in the United States* (2016), The Williams Institute, *available at* http://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf.

[4] Arizona Board of Regents, University System Quick Facts, https://www.azregents.edu/universtiy-system-quick-facts (last visited April 4, 2019).

[5] Arizona Department of Administration Benefits, *Health Insurance Trust Fund Annual 2017 Report* (2017), *available at* http://www.benefitoptions.az.gov/sites/default/files/media/LEGI_HITF_2017_Annual_Report.pdf.

9

fluid nature of a plaintiff class—as in the prison-litigation context—counsels in favor of certification of all present and future members.") (citing *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986).

### B.     Commonality

The proposed class also satisfies the requirement of commonality. "In a civil rights suit, 'commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.'" *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)), *aff'd*, 695 F.3d 990 (9th Cir. 2012).

Dr. Toomey's challenge easily meets that test. He brings a facial challenge, which does not depend on whether each class member's medical claim is ultimately proven to be medically necessary. Instead, Dr. Toomey merely seeks declaratory and injunctive relief to provide that all class members have the opportunity to have their claims for transition-related surgery evaluated for medical necessity under the same standards and procedures that the Plan applies to other medical treatments. The denial of that equal opportunity is an injury in fact that can be resolved on a class-wide basis. As the Supreme Court has explained: "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the "injury in fact" is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). *See Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *5 (D. Ariz. Dec. 6, 2017) (granting class certification "the relevant injury is not the denial of driver's licenses, but the fact that the State imposes requirements on class members that it does not impose on other[s]"); *Wit v. United Behavioral Health*, 317 F.R.D. 106, 127 (N.D. Cal. 2016)

10

(granting class certification in challenge to insurance company's mental health coverage guidelines because "Plaintiffs do not ask the Court to make determinations as to whether class members were *actually* entitled to benefits. Instead, Plaintiffs seek only an order that [the insurance company] develop guidelines that are consistent with generally accepted standards and reprocess claims for coverage that were denied under the allegedly faulty guidelines.").[6]

### C.    Typicality

Under Rule 23(a)(3) the representative party must have claims or defenses that are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Rodriguez v. Hayes,* 591 F.3d 1105, 1124 (9th Cir. 2010) (citations omitted). This requirement is "permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp., 150* F.3d 1011, 1020 (9th Cir. 1998). Reasonably coextensive claims with absent class members will satisfy the typicality requirement, but the class must be limited to "those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011). In this case Dr. Toomey is challenging the blanket exclusion for all "gender reassignment

---

[6] In analogous cases, courts have routinely held that prisoners may bring class actions challenging unlawful class-wide policies regarding inadequate medical treatment.  *See*, *e.g.*, *Gray v. Cnty. of Riverside*, No. EDCV 13-00444-VAP (OPx), 2014 U.S. Dist. LEXIS 150884, at *109 (C.D. Cal. Sept. 2, 2014) (commonality satisfied where class challenged systemic policies —both written and unwritten—that governed the provision of medical and mental health care in County jails; *see also Brown v. Plata*, 131 S. Ct. 1910 (2011) (affirming class-wide injunctive relief to remedy inadequate medical and mental health care in all California prisons).

11

surgery," and merely seeks the opportunity to demonstrate that transition related surgical care is medically necessary. It is not relevant what kind of treatment each class member is seeking, nor whether each individual's surgical care is ultimately deemed medically necessary, because it is the chance to demonstrate that need that is being categorically denied to class members under the Plan's discriminatory policy. For this reason, Dr. Toomey's claim is not only typical of the class claims, but is exactly the same as each class member's claim for relief.

### D. Adequacy of Representation

#### 1. The class representative's interests are not antagonistic to the interests of the class

Dr. Toomey is a transgender male who is a tenured professor at the University of Arizona in the department of Family Studies and Human Development. (Declaration of Dr. Russell Toomey pg. 3). Dr. Toomey's academic research focuses on the discrimination LGBTQ youth face in their families, schools, and communities and seeks to identify ways to mitigate the association between LGBTQ discrimination and poor health outcomes. (*Id*.). Dr. Toomey is a member of the Transgender Studies Research Cluster at the University of Arizona and serves as a faculty fellow at the University of Arizona's LGBTQ Resource Center. (*Id*.). Dr. Toomey is also deeply connected to the wider transgender community in Arizona. He is on the steering committee of Camp Born this Way, an Arizona camp for transgender youth and their families. (*Id*. at 3-4). He has served on the Board of the Southern Arizona Gender Alliance (SAGA) which provides support, education, resources, and advocacy for Southern Arizona's community of transgender and gender non-conforming individuals. (*Id*. at 4). Given his academic expertise on these issues as well as a deep personal connection to many of the foremost transgender community groups in Arizona, Dr. Toomey is well situated to represent the interests of the class and to communicate with them about issues in the case.

Dr. Toomey's interests are aligned with all members of the class. Because the complaint does not turn on each individual medical treatment but instead turns on the opportunity for each class member to demonstrate that their transition-related care is medically necessary or to appeal any adverse determination to an independent reviewer, the class members' interests are commensurate with each other.

### 2. Counsel are well qualified to represent the class

Plaintiff's counsel are experienced class action and civil rights practitioners. The litigation team includes (1) Kathleen Brody, legal director of the ACLU of Arizona, who represents classes in at least four other matters, (2) Molly Brizgys of the ACLU of Arizona, who represents a class in one matter, (3) Joshua Block of the ACLU who has represented several classes challenging discrimination against LGBT people and has represented other transgender individuals in discrimination suits regarding access to transition-related health care, and (4) James Burr Shields, Heather Macre, and Natalie Virden of Aiken Schenk Hawkins & Ricciardi P.C. who have extensive employment discrimination litigation and healthcare law experience. (*See* Declarations of Brody, Block and Shields).

## II. Dr. Toomey's Claims Should Be Certified Under Rule 23(b)(2).

Dr. Toomey brings this action on behalf of himself and a class of similarly situated individuals pursuant to Fed. R. Civ. P. 23(b)(2), which authorizes class actions when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.

13

*Dukes*, 564 U.S. at 360-61 (quotation marks and citations omitted). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases suitable for certification under Rule 23(b)(2). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Dr. Toomey's facial challenge under Title VII and the Equal Protection Clause falls squarely within the scope of Rule 23(b)(2). Through the "gender reassignment surgery" exclusion, Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2). As discussed above, class certification is appropriate because Dr. Toomey challenges the facial validity of the Plan's "gender reassignment surgery" exclusion, which denies transgender individuals an equal opportunity to demonstrate that their transition-related surgical care is medically necessary. The denial of that equal opportunity is an injury in fact that can be resolved on a class-wide basis. *Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *5 (D. Ariz. Dec. 6, 2017); *see also Parsons v. Ryan*, 754 F. 3d 657, 688 (9th Cir. 2014)(classes that were proposed were a paradigmatic example of (b)(2) classes because they primarily 'seek uniform injunctive [and] declaratory relief from policies or practices that are generally applicable to the class[es] as a whole.'").

### III. Conclusion

Plaintiff has satisfied all prerequisites to and requirements of Rule 23 and, therefore, respectfully requests that the Court certify the proposed classes, approve the named Plaintiff as a class representative, and appoint Plaintiff's counsel to represent the class.

DATED this 5th day of April, 2019.

                ACLU FOUNDATION OF ARIZONA

                By <u>/s/ *Molly Brizgys*</u>
                   Kathleen E. Brody
                   Molly Brizgys

                   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                   Joshua A. Block
                   Leslie Cooper

                   AIKEN SCHENK HAWKINS & RICCIARDI P.C.
                   James Burr Shields
                   Heather A. Macre
                   Natalie B. Virden

                   Attorneys for Plaintiff Russell B. Toomey

15

# CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2019 I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

/s/ *Molly Brizgys*
Molly Brizgys