**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B. Toomey,                                    ) | CV 19-0035-TUC-RM (LAB) |
| Plaintiff,                          ) | |
| v.                                                         ) | **REPORT AND** |
| State of Arizona;  Arizona Board of Regents,) | **RECOMMENDATION** |
| d/b/a University of Arizona, a governmental) | |
| body of the State of Arizona; et al.,        ) | |
| Defendants.                        ) | |
| _____ ) | |

Pending before the court is the plaintiff's motion, filed on March 6, 2020, that the court certify this case as a class action pursuant to Fed.R.Civ.P 23(b)(2) and appoint his counsel as class counsel under Rule 23(g).  (Doc. 88)

The plaintiff in this action, Russell B. Toomey, is an associate professor employed at the University of Arizona.  (Doc. 86, p. 5)  He receives health insurance from a self-funded health plan (The Plan) provided by the State of Arizona.  (Doc. 86, pp. 3, 8)  The Plan generally provides coverage for medically necessary care.  (Doc. 86, p. 8) There are coverage exclusions, however, one of which is for "gender reassignment surgery."  (Doc. 86, p. 9)

Toomey is a transgendered man.  (Doc. 86, p. 9)  "[H]e has a male gender identity, but the sex assigned to him at birth was female."  (Doc. 86, p. 9)  Toomey has been living as a male since 2003.  (Doc. 86, p. 9)  His treating physicians have recommended he receive a hysterectomy as a medically necessary treatment for his gender dysphoria.  (Doc. 86, p. 9) Toomey sought medical preauthorization for a total hysterectomy, but he was denied under the Plan's exclusion for "gender reassignment surgery."  (Doc. 86, p. 10)

1    On January 23, 2019, Toomey brought the pending action in which he argues the Plan's

2    exclusion is sex discrimination under Title VII of the Civil Rights Act of 1964 and a violation

3    of the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 1);  (Doc. 86)  In the

4    pending motion, Toomey moves that the court certify this case as a class action pursuant to Rule

5    23(b)(2) and appoint his counsel as class counsel under Rule 23(g).  Fed.R.Civ.P;  (Doc. 88)

6    He proposes the following class for the Title VII claim:

7           Current and future employees of the Arizona Board of Regents who are or will
            be enrolled in the self-funded Plan controlled by the Arizona Department of
8           Administration, and who have or will have medical claims for transition related
            surgical care.
9

10   (Doc. 88, p. 4)  He proposes the following class for the Equal Protection claim:

11          Current and future individuals (including Arizona State employees and their
            dependents), who are or will be enrolled in the self-funded Plan controlled
12          by the Arizona Department of Administration, and who have or will have
            medical claims for transition-related surgical care.

13   (Doc. 88, p. 4)

14   The defendants State of Arizona, Andy Tobin, and Paul Shannon (The State Defendants)

15   filed a response opposing the motion on April 20, 2020.  (Doc. 99)  The State Defendants

16   challenge Toomey's showing on the numerosity requirement and argue that a class action is not

17   necessary.  (Doc. 99)  The remaining defendants (The University Defendants)  filed a response

18   taking no position on the motion.  (Doc. 100)  Toomey filed a reply brief on April 29, 2020.

19   (Doc. 104)

20

21   Discussion

22   "As the party seeking class certification, [Toomey] bears the burden of demonstrating

23   that [he] has met each of the four requirements of Rule 23(a) and at least one of the

24   requirements of Rule 23(b)." *Zinser v. Accufix Research Institute, Inc.*,  253 F.3d 1180, 1186

25   (9th Cir. 2001), *amended,* 273 F.3d 1266 (9th Cir. 2001).  The four preliminary requirements are

26   as follows:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

27   Fed.R.Civ.P. 23(a).  In addition to these requirements, Toomey asserts that "the party opposing

28                                        - 2 -

1  the class has acted or refused to act on grounds that apply generally to the class, so that final

2  injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

3  whole." Fed.R.Civ.P.23(b)(2).

4  　　　"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine

5  whether the party seeking certification has met the prerequisites of Rule 23." *Zinser*, 253 F.3d

6  at 1186.  "While the trial court has broad discretion to certify a class, its discretion must be

7  exercised within the framework of Rule 23." *Id.*

8  　　　Class certification is a preliminary procedure, not an adjudication of the plaintiff's claims

9  on the merits. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004-1005 (9th Cir. 2018).  Class

10  certification may not be denied simply because the plaintiff might not be able to prove his

11  allegations at trial. *Id.* It is enough if the court has "material sufficient to form a reasonable

12  judgment on each Rule 23(a) requirement." *Id.* at 1005.  When considering a motion to certify,

13  the court may accept proffered evidence without determining its admissibility at trial. *Id.* at

14  1004.

15

16  　　　<u>Numerosity</u>

17  　　　A proposed class action satisfies the numerosity prerequisite if "the class is so numerous

18  that joinder of all members is impracticable."  FED.R.CIV.P. 23(a)(1).  "Generally, 40 or more

19  members will satisfy the numerosity requirement." *Perez v. First American Title Ins. Co.*, 2009

20  WL 2486003, *2 (D.Ariz. 2009).  "The party seeking class certification need not identify the

21  precise number of potential class members." *Id.*  However, "rank speculation untethered to real

22  facts" will not do. *National Federation of Blind v. Target Corp.*, 582 F.Supp.2d 1185, 1200

23  (N.D.Cal. 2007).

24  　　　In this case, Toomey argues numerosity is satisfied based on demographic studies.  He

25  notes that "[a]s of 2017, the Board of Regents employed 35,614 individuals at Arizona's public

26  universities."  (Doc. 88, p. 6)  Moreover, "[a]s of 2018, approximately 137,700 individuals

27  receive healthcare through the States's self-funded plan." *Id.*  He then directs the court to a

28  　　　　　　　　　　　　　　　　　　　- 3 -

study that concludes that "approximately 0.62% of Arizonans identify as transgender."  *Id*. (citing Andrew R. Flores, Jody L. Herman, Gary J. Gates, and Taylor N.T. Brown, *How Many Adults Identify as Transgender in the United States*, The Williams Institute, June 2016) He then calculates that "*approximately* 221 transgender individuals currently work for the Board of Regents and *approximately* 854 transgender individuals currently receive healthcare through the State's self-funded Plan."  (Doc. 88, p. 7)  (emphasis in original)

Toomey further explains that surveys "reflect that an estimated 25% to 35% of individuals who identify as transgender or gender non-binary have undergone some form of gender conforming surgery . . . [a]nd an additional 61% of transgender men and 54% of transgender women report wanting some form of gender conforming surgery in the future." (Doc. 88, p. 6)  He then "conservative[ly]" estimates that 82% of individuals either have had or want to have surgery and arrives at the conclusion that "*approximately* 181 such transgender individuals work for the Board of Regents and *approximately* 700 such transgender individuals receive health care through the State's self-funded Plan." *Id*., p. 7  (emphasis in original)

The court finds that Toomey's efforts at approximating the size of the class are generally reasonable.  The court finds the percentage of transgender individuals reported by the Williams Institute study to be sufficiently reliable based on the description of that study's methodology. (Doc. 99-2, pp. 2-14)  Toomey does, however, overestimate the size of the class by neglecting to account for the probability that a transgender individual will seek surgery *while covered by the State's health plan*.  Toomey describes a study in which approximately 25% of transgender individuals reported having had surgery and approximately 57% report wanting surgery in the future. That gives approximately 82% of transgender individuals who have surgery during their lifetime.  He also gives us the number of transgender individuals covered by the State health plan.  What we do not know is how many of those individuals have had or will have their surgery *while being covered by the State health plan*.  Some of those 82% had surgery before becoming State employees.  Some will have surgery after leaving State employment.  Those individuals do not fall within the class.

1    The court recognizes that this is a difficult calculation to make.  One might have to

2 estimate the age of the "typical" State employee, the number of years he or she stays on the job,

3 and the age at which the "typical" transgender individual has his or her surgery.

4    Toomey has not made this calculation, but the court does not find its omission fatal to

5 his motion.  Even if Toomey is overestimating the size of his class by a factor of four, his class

6 is still too numerous for joinder to be practicable.  The evidence proffered by the plaintiff is

7 sufficient for the court to form a reasonable judgment.  *See Sali v. Corona Reg'l Med. Ctr.*, 909

8 F.3d 996, 1005 (9th Cir. 2018).  The numerosity prerequisite has been satisfied.

9    The State Defendants argue to the contrary that Toomey's  showing on numerosity is

10 insufficient.  (Doc. 99, pp. 3-7)  They note that the Williams Institute's estimate that 0.62% of

11 Arizonans are transgender is based on a survey given in 19 states other than Arizona, and in

12 those states the average number of transgender individuals was only 0.52%.  However, as the

13 authors of the study explain, it is possible to use that data combined with other demographic

14 information to estimate[1] the number of transgender individuals in the states that did not take part

15 in the survey.  (Doc. 99-2, pp. 8-14)  The court finds the authors' methodology sufficiently

16 reliable to establish numerosity here.

17    The State Defendants further argue that the Williams Institute's estimate should be

18 discounted based on certain information available from the World Professional Association for

19 Transgender Health (WPATH).   That organization reports, for example, that "[f]ormal

20 epidemiologic studies on the incidence and prevalence of transsexualism specifically or

21 transgender and gender-nonconforming identities in general have not been conducted and

22 efforts to achieve realistic estimates are fraught with enormous difficulties (Institute of

23 Medicine, 2011; Zucker & Lawrence, 2009)."  (Doc. 99-1, p. 4)  The court finds that while this

24 

_____

25    [1] The authors quantify the uncertainty in their calculation and report that there is a 95%

26 probability that the correct number lies between 0.35% and 1.09%.  (Doc. 99-2, p. 9)  The fact
that the authors considered and specified the amount of uncertainty in their calculations gives

27 the court added confidence in the reliability of their methodology.

28                                              - 5 -

1    statement might have been true in 2011, by 2016 a reliable study had been published,  the

2    Williams Institute study.

3          The State Defendants further question the reliability of the Williams Institute study in

4    light of the "far lower" population estimates obtained by other studies.  (Doc. 99, pp. 6-7)

5    Specifically they note that "ten studies discussed by the WPATH standards ranged from

6    1:11,900 to 1:45,000 for male-to-female individuals (MtF) and 1:30,400 to 1:200,000 for

7    female-to-male (FtM) individuals." (Doc. 99, p. 6)  (citing WPATH Standards of Care for the

8    Health of Transsexual, Transgender, and Gender-Nonconforming People);  (Doc. 99-1, p. 2)

9    The court acknowledges that those studies disagree with the study reported by the Williams

10   Institute, but the court finds that this disagreement does not necessarily mean that the latter

11   study is unreliable.  First, it appears that those studies were taken in countries other than the

12   United States.  (Doc. 99-1, pp. 4-5)  Second, "those studies span 39 years," and as the authors

13   of the WPATH report note, the number of persons identifying as transgender has been steadily

14   increasing no doubt due to a lessening of the social stigma associated with that status.  (Doc.

15   99-1, p. 5)  It is therefore not surprising that a study published in 2016 should find a higher

16   percentage of transgender individuals than earlier studies.  *See* (Doc. 99-2, p. 7)  Finally, the

17   WPATH report cited by the State Defendants does not discuss the methodologies of those

18   earlier studies so it is impossible to evaluate their reliability.  *Id.*

19

20       Commonality

21       A proposed class action satisfies the commonality prerequisite if "there are questions of

22   law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The rule is construed permissively.

23   *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir.1998), *overruled on other grounds by*

24   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541 (2011).  "The existence of shared

25   legal issues with divergent factual predicates is sufficient, as is a common core of salient facts

26   coupled with disparate legal remedies within the class." *Id.*

27

28                                          - 6 -

1    In this case, Toomey brings a facial challenge to the "gender reassignment surgery"

2    exclusion under Title VII and the Fourteenth Amendment Equal Protection Clause.  The legal

3    issues in this case are the same for all class members.  The court finds the commonality

4    prerequisite is satisfied.  The State Defendants do not contest this issue.

5

6    <u>Typicality</u>

7    A proposed class action satisfies the typicality prerequisite if "the claims or defenses of

8    the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)

9    (3). "[U]nder the rule's permissive standards, representative claims are 'typical' if they are

10   reasonably coextensive with those of absent class members; they need not be substantially

11   identical." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003).

12   Toomey's claims as to the facial illegality of the State's health plan exclusion are

13   "coextensive with those of the absent class members."  *Id*.  The court finds the typicality

14   prerequisite is satisfied.  The State Defendants do not contest this issue.

15

16   <u>Adequacy</u>

17   Rule 23(a)(4) permits the certification of a class action only if "the representative parties

18   will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4) "To

19   determine whether the representation meets this standard, we ask two questions: (1) Do the

20   representative plaintiffs and their counsel have any conflicts of interest with other class

21   members, and (2) will the representative plaintiffs and their counsel prosecute the action

22   vigorously on behalf of the class?" *Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir.2003).

23   There does not appear to be any conflict of interest present here.  Moreover, the

24   plaintiff's counsel have a demonstrated history of representing the interests of transgender

25   individuals and prosecuting civil rights class actions.   (Doc. 88, p. 11)  The court finds the

26   adequacy prerequisite is satisfied.  The State Defendants do not contest this issue.

27

28

1    Certification

2    The court finds that Toomey has established all four prerequisites for class certification.

3    Fed.R.Civ.P. 23(a).  Moreover, the court finds that the State's health plan exclusion for "gender

4    reassignment surgery" applies generally to the class and injunctive relief would be appropriate

5    if that exclusion is shown to be in violation of Title VII or the Fourteenth Amendment Equal

6    Protection Clause.  *See* Fed.R.Civ.P. 23(a)(2).  The motion for class certification should be

7    granted.

8    The State Defendants argue that this court should exercise its discretion and refuse to

9    certify a class citing *James v. Ball*, 613 F.2d 180, 186 (9th Cir. 1979).  In *James*, the plaintiffs

10   challenged "the constitutionality of Arizona statutes which provide that voting in elections for

11   directors of the Salt River Project Agricultural and Improvement and Power District (the

12   District) is limited to landowners, with votes essentially apportioned to owned acreage." *James*,

13   613 F.2d at 181, *reversed on other grounds*, 451 U.S. 355, 101 S. Ct. 1811 (1981).  The Ninth

14   Circuit held that the District Court did not abuse its discretion by denying class certification

15   because "[h]ere, the relief sought will, as a practical matter, produce the same result as formal

16   class-wide relief." *Id*., p. 186.  It bears noting that in this case, the appellate court did not have

17   to speculate as to what form the judgement would take.

18   It is important to distinguish between what *James* holds and what it does not hold.  It

19   holds that a court *may* exercise its discretion and withhold certification if the relief sought by

20   the plaintiff will produce the same result as would a class action.  It does not hold that the court

21   *must* deny class certification where these special circumstances are present.  Assuming without

22   deciding that Toomey will get the relief he seeks and final judgment will enure to the benefit

23   of his proposed class, the court nevertheless should grant his motion for certification.  *But see*,

24   *e.g*., *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)  ("On remand, the injunction must

25   be limited to apply only to the individual plaintiffs unless the district judge certifies a class of

26   plaintiffs.");  *Workman v. Mitchell*, 502 F.2d 1201, 1207 (9th Cir. 1974)  (Denial of class status

27   was error where the final judgment failed to enure to the benefit of the proposed class.).  Class

28

actions provide certain advantages for the prospective class members. "Class actions enable unidentified class members to enforce court orders with contempt proceedings, rather than relying on the res judicata in a subsequent lawsuit." *Nehmer v. U.S. Veterans' Admin.*, 118 F.R.D. 113, 119 (N.D. Cal. 1987). And certifying a class would prevent the action from becoming moot should there be a change in Toomey's medical or employment situation. *See Id*.; *see also*, *Additional Certification Issues—The Need for Class Relief*, 7AA Fed. Prac. & Proc. Civ. § 1785.2 (3d ed.).

RECOMMENDATION:

The Magistrate Judge recommends the District Court, after its independent review of the record, enter an order

GRANTING the plaintiff's pending motion to certify this case as a class action pursuant to Fed.R.Civ.P 23(b)(2) and appoint his counsel as class counsel under Rule 23(g). (Doc. 88)

Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within 14 days of being served with a copy of this report and recommendation. If objections are not timely filed, the party's right to de novo review may be waived. The Local Rules permit the filing of a response to an objection. They do not permit the filing of a reply to a response without the permission of the District Court.

DATED this 12th day of May, 2020.

*Leslie A. Bowman*

Leslie A. Bowman
United States Magistrate Judge