**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email**:** cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*Admitted Pro hac vice*

**Wesley R. Powell***
**Matthew S. Friemuth***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: wpowell@willkie.com
E-Mail: mfriemuth@willkie.com
*Admitted Pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **RUSSELL B. TOOMEY,** | |
| Plaintiff, | Case No. 4:19-cv-00035-TUC-RM (LAB) |
| v. | |
| **STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, D/B/A UNIVERSITY OF ARIZONA**, a governmental body of the State of Arizona; **RON SHOOPMAN**, in his official capacity as Chair of the **Arizona Board of Regents;** **LARRY PENLEY**, in his official capacity as Member of the Arizona Board of Regents; **RAM KRISHNA**, in his official capacity as Secretary of the Arizona Board of Regents; **BILL RIDENOUR**, in his official capacity as Treasurer of the Arizona Board of Regents; **LYNDEL MANSON**, in her official capacity as Member of the Arizona Board of Regents; **KARRIN TAYLOR ROBSON**, in her official capacity as Member of the Arizona Board of Regents; **JAY HEILER**, in his official capacity as Member of the Arizona Board of Regents; **FRED DUVAL**, in his official capacity as Member of the Arizona Board of Regents; **ANDY TOBIN**, in his official capacity as Director of the Arizona Department of Administration; **PAUL SHANNON**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration, | **MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff Russell B. Toomey, Ph.D., on behalf of himself and the certified Classes, files this Motion for Preliminary Injunction (i) barring Defendants from enforcing the categorical exclusion of coverage for "[g]ender reassignment surgery" from the self-funded health plan controlled by the Arizona Department of Administration; (ii) requiring Defendants to evaluate, on a case by case basis, whether Dr. Toomey's and/or any other Class members' prescribed surgical care for gender dysphoria is "medically necessary" in accordance with the Plan's generally applicable standards and procedures; and (iii) providing notice of the preliminary injunction to individuals enrolled in the Plan.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Factual Background

Dr. Toomey is a man who is transgender, which means that he has a male gender identity, but the sex assigned to him at birth was female. (Decl. of Russell Toomey, Doc. 88-1, pg. 2, para. 3). Being transgender is not a mental disorder. But transgender men and women may require treatment for "gender dysphoria," the diagnostic term for the clinically significant distress experienced as a result of the incongruence of one's gender with their assigned sex and the physiological developments associated with that sex. The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (302.85). *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 768-69 (9th Cir. 2019).

The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH").[1] Under the WPATH standards, medically necessary treatment for gender dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to

---

[1] Available at: https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf.

another. This treatment, often referred to as gender-affirming care or transition-related care, may include hormone therapy, surgery (sometimes called "sex reassignment surgery" or "transition related surgery"), and other medical services that align individuals' bodies with their gender identities. Under the WPATH standards, the exact medical treatment varies based on the individualized needs of the person. Under each patient's treatment plan, the goal is to enable the individual to live all aspects of one's life consistent with one's gender identity, thereby eliminating the distress associated with the incongruence. *Edmo*, 935 F.3d at 769-71.

In accordance with the WPATH Standards of Care, Dr. Toomey's treating physicians have recommended that he receive a hysterectomy as a medically necessary treatment for gender dysphoria. (Decl. of Russell Toomey, Doc. 88-1 at pg. 3, para. 12). In the past, public and private insurance companies excluded coverage for transition-related care based on the assumption that such treatments were cosmetic or experimental. Today, however, transition-related surgical care is routinely covered by private insurance programs. The American Medical Association,[2] the American Psychological Association,[3] the American Psychiatric[4]

---

[2] *See* American Medical Association House of Delegates, *Resolution H-185.950: Removing Financial Barriers to Care for Transgender Patients* (2016), https://policysearch.ama-assn.org/policyfinder/detail/financial%20barriers%20transgender?uri=%2FAMADoc%2FHOD.xml-0-1128.xml.

[3] American Psychological *Association, Policy on Transgender, Gender Identity & Gender Expression Non-Discrimination* (2008), https://www.apa.org/about/policy/resolution-gender-identity.pdf

[4] *See* American Psychiatric Association, *Position Statement on Access to Care for Transgender and Gender Diverse Individuals* (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-DocumentsPolicies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

Association, the American College of Obstetricians and Gynecologists,[5] and other major medical organizations have issued policy statements and guidelines supporting healthcare coverage for transition-related care as medically necessary under contemporary standards of care. No major medical organization has taken the position that transition-related care categorically is not medically necessary or advocated in favor of a categorical ban on insurance coverage for transition-related procedures.

Dr. Toomey's healthcare coverage is provided and paid for by the State of Arizona through the Plan. (Amended Complaint, Doc. 86 at pg. 1-3; Exhibit A, 86-1). The Plan generally provides coverage for medically necessary care. (Doc. 86-1 at pg.100). In the event that the Plan denies coverage for a treatment based on purported lack of medical necessity, the Plan provides a right to appeal the decision to an independent reviewer at the third-party claims administrator and, if necessary, to further appeal to an external independent review organization. (*Id.* at pg. 69-72).

The Plan does not apply these generally applicable standards and procedures to surgical care for gender dysphoria. Instead, the Plan categorically denies all coverage for "[g]ender reassignment surgery" regardless of whether the surgery qualifies as medically necessary. (*Id.* at pg. 56). All four of the health insurance companies who serve as Network Providers for the Plan have adopted internal policies and standards for determining when transition-related surgery for gender dysphoria is medically necessary and, thus, covered. (Amended Complaint Exhibits C – F, Doc, 86-3; 86-4; 86-5; 86-6). But, as a result of the Plan's "gender reassignment" exclusion, the Network Providers do not apply those internal policies and standards when administering the Plan to Arizona State employees and, instead, automatically deny coverage of transition-related surgery.

---

[5] The American College of Obstetricians and Gynecologists, *Committee Opinion No. 512: Health Care for Transgender Individuals* (2011), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2011/12/health-care-for-transgender-individuals.

As a result of the Plan's categorical exclusion for "gender reassignment surgery," Dr. Toomey was denied preauthorization for a hysterectomy on August 10, 2018. (Amended Complaint Exhibit G, Doc. 86-7.). The denial was based solely on the Plan's exclusion for "gender reassignment surgery."

## II. Procedural History

Dr. Toomey filed his original Complaint on January 23, 2019, on behalf of himself and two proposed classes of similarly situated persons. (Complaint, Doc. 1.) The Complaint alleged that the Plan's categorical exclusion of "gender reassignment surgery" discriminated against transgender individuals violated Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. The Complaint sought, *inter alia*, a permanent injunction "requiring Defendants to remove the Plan's categorical exclusion of coverage for '[g]ender reassignment surgery' and evaluate whether Dr. Toomey and the proposed classes' surgical care for gender dysphoria is 'medically necessary'" in accordance with the Plan's generally applicable standards and procedures." (Complaint, Doc. 1 at pg. 22.)

On December 23, 2019, this Court denied the State Defendants' Motion to Dismiss and held that the Complaint stated valid claims under Title VII and the Equal Protection Clause. (Doc. 69) Dr. Toomey then filed an Amended Complaint with slightly new definitions for the proposed classes, along with a Motion for Class Certification. (Doc. 86 and 88, respectively) On May 12, 2020, the Magistrate Judge issued a Report and Recommendation to certify the following classes for injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2).

> For the Equal Protection claim: Current and future employees of the Arizona Board of Regents who are or will be enrolled in the self-funded Plan controlled by the Arizona Department of Administration, and who have or will have medical claims for transition related surgical care.
>
> For the Title VII claim: Current and future individuals (including Arizona State employees and their dependents), who are or will be enrolled in the self-funded Plan controlled by the Arizona Department of Administration, and who have or will have medical claims for transition-related surgical care.

4

(Doc. 105.) This Court adopted the Magistrate Judge's Report and Recommendation and issued an order certifying the proposed classes on June 15, 2020. (Doc. 108).

On the same day that the Court certified the Classes, the Supreme Court issued its decision in *Bostock v. Clayton Cty., Georgia*, holding that discriminating against a person for being transgender is discrimination based on sex under Title VII. 140 S. Ct. 1731, 1741 (2020). In light of *Bostock*, the parties informed the Court that they were engaging in settlement discussions. (Joint Status Report and Proposed Schedule, Doc. 110.) Those discussions have now ended without a settlement agreement.

Accordingly, on behalf of himself and the newly certified Classes, Dr. Toomey files this Motion for Preliminary Injunction to protect Dr. Toomey and other class members from irreparable harm while the case proceeds to discovery.

### III.   Legal Standard

"In determining whether to grant preliminary injunctive relief, the Court considers: (1) whether the movant is likely to succeed on the merits; (2) whether the movant is likely to suffer irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties; and (4) the public interest." *Ocean Garden Prod. Inc. v. Blessings Inc.*, No. CV-18-00322-TUC-RM, 2019 WL 4752096, at *3 (D. Ariz. Sept. 27, 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### IV.   Dr. Toomey and the Class Have Demonstrated a Likelihood of Success on the Merits on Their Title VII Claim.

Dr. Toomey and the Title VII Class are likely to prevail on the merits of their Title VII claim. This Court has already held that Dr. Toomey and the Class have stated valid claims that the "gender reassignment surgery" exclusion facially violates Title VII of the Civil Rights Act of 1964. As this Court explained:

> Discrimination based on transgender status or identity is discrimination based on sex because, but for the individual's sex [assigned at birth], the employer's treatment of the individual would be different. The sex characteristic is inseparable from transgender identity: had Plaintiff been

5

>born a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery.

(Doc. 69 at pg. 10) (citation omitted). In the two months since this Court issued its ruling, another two courts have joined this national consensus. *See Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) (granting summary judgment to plaintiffs before discovery because categorical exclusion violated Title VII on its face); *Kadel v. Folwell*, No. 1:19CV272, 2020 WL 1169271 (M.D.N.C. Mar. 11, 2020) (holding that plaintiff stated valid claim that categorical exclusion violated Title IX, Section 1557 of the ACA, and the Fourteenth Amendment), *appeal filed,* No. 20-1409 (4th Cir. Apr. 9, 2020).

The Supreme Court's recent decision in *Bostock* has now removed any doubt that Dr. Toomey and the Title VII Class are likely to succeed on the merits of their claims. The Supreme Course explained that "[t]ransgender status [is] inextricably bound up with sex. Not because . . . transgender status [is] related to sex in some vague sense or because discrimination on thi[is] bas[i]s has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Bostock,* 140 S. Ct. at 1742. "By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today." *Id.* at1746.

Dr. Toomey and the Title VII Class have also established that they are likely to prevail in demonstrating that the Plan's categorical exclusion of gender-affirming surgery "discriminate[s] against [them] with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C § 2000e–2(a)(1). The Ninth Circuit has recognized that "[t]he weight of opinion in the medical and mental health communities agrees that [gender-affirming surgery] is safe, effective, and medically necessary in appropriate circumstances." *Edmo*, 935 F.3d at 770. And Defendants do not dispute that all four of the health insurance companies who serve as Network Providers for the Plan have adopted internal policies and standards for determining when transition-related surgery for gender dysphoria is medically necessary and, thus, covered. The Plan's discriminatory exclusion

thus discriminates against transgender employees by singling out a particular form of medically necessary surgery for exclusion based solely on the fact that the surgery is performed for purposes of "gender reassignment."

**V.    Dr. Toomey and the Equal Protection Class Have Demonstrated a Likelihood of Success on the Merits on Their Equal Protection Claim.**

Dr. Toomey and the Equal Protection Class are also likely to prevail on the merits of their equal protection claim. This Court has already held that Dr. Toomey and the Class have stated valid claims that the "gender reassignment surgery" exclusion facially violates the Fourteenth Amendment. (Doc. 69 at pg. 15-16.) The Court concluded that the Complaint alleged sufficient facts that, if true, would require heightened scrutiny. (*Id.* at pg. 15.) Indeed, heightened scrutiny is *required* as a matter of law under Ninth Circuit precedent. *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); *see Hecox v. Little*, No. 1:20-CV-00184-DCN, 2020 WL 4760138, at *26 (D. Idaho Aug. 17, 2020) ("The Ninth Circuit has also held that heightened scrutiny applies if a law or policy treats transgender persons in a less favorable way than all others."); *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430, at *16 (4th Cir. Aug. 26, 2020) (joining Ninth Circuit in holding that heightened scrutiny applies).

Because heightened scrutiny applies, Defendants bear the burden of proof to demonstrate that the categorical exclusion serves an important governmental interest and "that the discriminatory means employed" "are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). "Moreover, the classification must substantially serve an important governmental interest today, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Id.* (quoting *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015)) (cleaned up). "The burden of justification is demanding and it rests entirely on the [government]." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The only justification that Defendants have provided is that the categorical exclusion

serves a governmental interest in reducing costs, but this Court has already concluded—as a matter of law—that cost savings is not a constitutionally sufficient justification for treating similarly situated groups differently under *any* standard of scrutiny. (Doc. 69 at pg. 16.) Defendants therefore are, unlikely to carry their burden under heightened scrutiny, and Dr. Toomey and the Class are likely to prevail on the merits of their equal protection claim.

## VI. Dr. Toomey and Both Classes Will Suffer Irreparable Harm Without an Injunction.

Now that the Court has certified Dr. Toomey's claims as class actions, Dr. Toomey is able to seek a preliminary injunction and receive his medically necessary surgery without the risk that doing so would moot the Classes' claims. *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) (explaining that "when the claim of the named plaintiff becomes moot after class certification, a 'live controversy may continue to exist' based on the ongoing interests of the remaining unnamed class members").

Without an injunction, Dr. Toomey and the Classes will continue to suffer irreparable harm each day the Plan's discriminatory exclusion remains in place. As the Ninth Circuit held in *Beltran v. Myers*, 677 F.2d 1317 (9th Cir. 1982), the denial of medically necessary care is irreparable harm warranting injunctive relief. "Plaintiffs have shown a risk of irreparable injury, since enforcement of the California rule may deny them needed medical care. That is a sufficient showing." *Id.* at 1322; *accord Edmo*, 935 F.3d at 797 (finding irreparable harm from denial of medically necessary gender-affirming surgery to prisoner). Courts in the Ninth Circuit thus routinely hold the denial of medically necessary care is irreparable harm regardless of whether the defendant is a governmental entity or a private insurance company. *See Rodde v. Bonta,* 357 F.3d 988, 999 (9th Cir. 2004); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004); *K.M. v. Regence Blueshield*, No. C13-1214 RAJ, 2014 WL 801204, at *9 (W.D. Wash. Feb. 27, 2014); *Z.D. ex rel. J.D. v. Grp. Health Co-op.*, No. C11-1119RSL, 2012 WL 1997705, at *13 (W.D. Wash. June 1, 2012).

Moreover, it is well-settled in the Ninth Circuit that discrimination against transgender individuals in violation of the Equal Protection Clause constitutes irreparable

8

harm as a matter of law. *See Hecox*, 2020 WL 4760138, at *37; *Stockman v. Trump*, No. ED-CV-17-1799-JGB-KKX, 2017 WL 9732572, at *15 (C.D. Cal. Dec. 22, 2017); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017).

### VII. The Remaining Preliminary Injunction Factors Weigh in Plaintiff and the Classes' Favor.

Under Ninth Circuit precedent, "by establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). "It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available. On the contrary, the public interest and the balance of the equities favor preventing the violation of a party's constitutional rights." *Id.* (internal quotation marks, brackets, and citations omitted).

Moreover, courts in this Circuit routinely hold that the balance of hardships and public interest weigh in favor of plaintiffs challenging the denial of medically necessary care: "[F]aced with[ ] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Rodde*, 357 F.3d at 999; *accord Newton-Nations*, 316 F. Supp. 2d at 888. Similarly, when plaintiffs are denied medically necessary care, "[s]ociety's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required." *Lopez v. Heckler*, 713 F.2d 1432, 1437–38 (9th Cir. 1983); *accord Newton-Nations*, 316 F. Supp. 2d at 889-90.

### VIII. Conclusion

For the foregoing reasons, the Motion for Preliminary Injunction should be granted.

Respectfully submitted this 1st day of September, 2020.

    ACLU FOUNDATION F ARIZONA
    By */s/ Christine K. Wee*
     Christine K. Wee

    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
     Joshua A. Block*
     Leslie Cooper*

    WILLKIE FARR & GALLAGHER LLP
     Wesley R. Powell*
     Matthew S. Friemuth*

(*admitted *pro hac vice*)

*Attorneys for Plaintiff Russell B. Toomey*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2020, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

*/s/Christine K. Wee*
Christine K. Wee