```
FENNEMORE CRAIG, P.C.
Timothy J. Berg (No. 004170)
Amy Abdo (No. 016346)
Ryan Curtis (No. 025133)
Shannon Cohan (No. 034429)
2394 E. Camelback Road
Suite 600
Phoenix, Arizona  85016
Telephone:  (602) 916-5000
Email:  tberg@fclaw.com
Email:  amy@fclaw.com
Email:  rcurtis@fclaw.com
Email:  scohan@fclaw.com
```

*Attorneys for Defendants*
*State of Arizona, Andy Tobin, and Paul Shannon*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| RUSSELL B. TOOMEY,<br><br>                    Plaintiff,<br><br>         v.<br><br>STATE OF ARIZONA; ARIZONA BOARD OF REGENTS D/B/A UNIVERSITY OF ARIZONA, a governmental body of the State of Arizona; RON SHOOPMAN, in his official capacity as Chair of the Arizona Board of Regents; LARRY PENLEY, in his official capacity as Member of the Arizona Board of Regents; RAM KRISHNA, in his official capacity as Secretary of the Arizona Board of Regents; BILL RIDENOUR, in his official capacity as Treasurer of the Arizona Board of Regents; LYNDEL MANSON, in her official capacity as Member of the Arizona Board of Regents; KARRIN TAYLOR ROBSON, in her official capacity as Member of the Arizona Board of Regents; JAY HEILER, in his official capacity as Member of the Arizona Board of Regents; FRED DUVAL, in his official capacity as Member of the Arizona Board of Regents; ANDY TOBIN, in his official capacity as Director of the Arizona | No. 4:19-cv-00035<br><br>**DEFENDANTS STATE OF ARIZONA'S, ANDY TOBIN'S, AND PAUL SHANNON'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Department of Administration; PAUL SHANNON, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration,

Defendants.

## I. INTRODUCTION

Defendants State of Arizona, Andy Tobin as Director of the Arizona Department of Administration, and Paul Shannon as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration (collectively, the "State Defendants") file this Opposition to Plaintiff's Motion for Preliminary Injunction.

The Court should not grant Plaintiff's motion because the relief sought would effectively decide the case at this point in the litigation as it would result in all the relief Plaintiff seeks in this case—a highly disfavored result. Plaintiff seeks a *mandatory* injunction, which orders a party to take action rather than refrain from taking action, but such injunctions should only be granted when the moving party demonstrates that the facts and law clearly favor that party and granting the relief. Plaintiff fails to meet this standard. Further, Plaintiff is not likely to succeed on his claim for protection under Title VII of the Civil Rights Act or under the Equal Protection clause of the Fourteenth Amendment. Even considering the Supreme Court's recent decision in *Bostock v. Clayton Cty., Georgia*, case law does not support the relief Plaintiff seeks under either of those laws. Finally, Plaintiff fails to meet the necessary standards of demonstrating that he or the Plaintiff Class will suffer irreparable harm if the Motion is not granted. The Court should deny the Motion.

## II. A PRELIMINARY INJUNCTION IS NOT APPROPRIATE TO GRANT THE RELIEF REQUESTED.

Courts specifically disfavor preliminary injunctions that "give the movant all the relief it would be entitled to if it prevailed in a full trial." *RoDa Drilling Co. v. Siegal*, 552

F.3d 1203, 1209 n.3 (10th Cir. 2009); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 780–81 (9th Cir. 2019) (due in part to "the nature of the relief requested," an injunction ordering the defendant to perform gender reassignment surgery was a permanent injunction).

That is exactly what Plaintiff requests here. Through his Motion, Plaintiff seeks an injunction that (1) bars Defendants from enforcing the exclusion and (2) requires Defendants to evaluate, on a case-by-case basis, whether a request for gender reassignment surgery is "medically necessary." (Doc. 115 at 1:1–9.) In his Amended Complaint, Plaintiff sought identical injunctive relief. (Doc. 86 at 15:10-15) (seeking injunctive relief "requiring Defendants to remove the [Health] Plan's categorical exclusion of coverage for '[g]ender reassignment surgery' and evaluate whether Dr. Toomey and the proposed class's surgical care for gender dysphoria is 'medically necessary' in accordance with the Plan's generally applicable standards and procedures"). Ultimately, Plaintiff's requested injunction would require Defendants to evaluate, on a case-by-case basis, whether Plaintiff's and the Plaintiff Class's prescribed care for gender dysphoria is medically necessary in accordance with the Plan, and provide coverage for requested gender reassignment surgeries when medically necessary. Such an order would resolve Plaintiff's claims at issue in this case as well as any employee who has sought the same procedure and would render the action moot as there would be no further relief the Court could grant to Plaintiff.

For this reason alone, Plaintiff's requested injunction should be denied.

### III. PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.

#### A. Plaintiff Must Meet A Higher Standard.

A preliminary injunction can take two forms. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). There can be either a

1  "prohibitory" injunction, which prohibits a party from taking action, or a "mandatory"
2  injunction, which "orders a responsible party to 'take action.'" *Id.* (citations omitted).

3  Mandatory injunctions are "particularly disfavored" by courts. *Id.*; *see also O
4  Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 975; *RoDa Drilling*, 552 F.3d
5  at 1209 n.3. Requests for mandatory injunctions are "subject to heightened scrutiny." *Dahl
6  v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir.1993); *Marlyn Nutraceuticals*,
7  571 F.3d at 878–79; *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 975;
8  *RoDa Drilling*, 552 F.3d at 1209 n.3. Mandatory injunctions should not be issued unless
9  "the facts and law *clearly favor* the moving party." *Id.* (emphasis added).

10  Plaintiff's requested injunction is a mandatory injunction. The injunction, if issued,
11  would require Defendants to take certain actions—namely begin evaluating whether gender
12  reassignment surgery is medically necessary and providing coverage for that procedure if it
13  is. (Doc. 115 at 1:1–9.) As such, Plaintiff is required to meet the higher burden of showing
14  that the facts and law *clearly favor* granting such an injunction. However, as detailed below,
15  Plaintiff cannot meet this burden.

16  **B.**     **Plaintiff Is Not Likely To Succeed On His Claims.**

17  **1.**     **Plaintiff's Title VII Claim**

18  Title VII makes it an "unlawful employment practice for an employer . . . to fail or
19  refuse to hire or to discharge any individual, or otherwise to discriminate against any
20  individual with respect to his compensation, terms, conditions, or privileges of employment,
21  because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

22  Plaintiff alleges the Plan exclusion discriminates against him "based on transgender
23  status and gender nonconformity." Through this lawsuit, Plaintiff seeks to use Title VII to
24  require employer-sponsored benefit plans to cover gender reassignment surgery—a

procedure that governing law does not require plans to cover.[1]  In his Motion, Plaintiff asserts that he is likely to succeed on this claim based on *Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020).  (Doc. 115 at 6:10–18.)  However, Plaintiff reads *Bostock* too broadly.[2]

*Bostock* is not dispositive here.  In *Bostock*, the Court determined that an employer who fires an employee for being homosexual or transgender discriminates against the employee in violation of Title VII. *Id.* at 1737.  In reaching this conclusion, *Bostock* relied on the traditional meaning of "sex" as "biological distinctions between male and female." *Id.* at 1739.   *Bostock*, thus, restates the well-established understanding that Title VII protects employees from discrimination if they are treated differently based on their sex, and further states that it is impossible to separate an employee's sex as a factor when considering their sexual orientation or transgender status. *Id.* at 1741–42.  *Bostock* does not create a new protected class for transgender employees. That is, Title VII protects a person from discrimination not because he or she is gay or transgender but because he or she is treated differently based on his or her sex as male or female.

The dissent in *Bostock* identifies several areas of Title VII law that remain unsettled. *Id.* at 1778–1783 (Alito, J., dissenting).  These include sports, housing, freedom of speech,

---

[1] On June 12, 2020, the Office for Civil Rights of the Department of Health and Human Services issued new final rules that revised the agency's prior rules addressing nondiscrimination provisions set forth in § 1557 of the Affordable Care Act.  The new rules eliminate the requirement that certain plans cover gender reassignment surgery.  Although the new rules have been challenged and the U.S. District Court for the Eastern District of New York issued a preliminary injunction against HHS's repeal of its prior rules (*see Walker v. Azar*, 20CV2834FBSMG, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020), there currently is no requirement that plans cover gender transition surgeries.

[2] Plaintiff also relies heavily on this Court's Order denying the State Defendants' Motion to Dismiss.  (*See* Doc. 115 at 5:21–6:3.)  However, in considering a motion to dismiss, courts only consider whether the plaintiff has stated a claim "that is plausible on its face," accepting all allegations and reasonable inferences as true (*see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)), not whether a claim is likely to succeed or supported by the evidence.

and healthcare benefits. *Id.* (Alito, J., dissenting). As to healthcare, Justices Alito and Thomas note that, due to *Bostock*, "healthcare benefits may emerge as an intense battleground under the Court's ruling." *Id.* at 1781 (Alito, J., dissenting). Neither the dissent nor the majority suggest that the provision of any specific healthcare benefits to transgender persons is conclusively determined by *Bostock*. *See, e.g., id.* at 1778 (Alito, J., dissenting) (refusing to "suggest how any of these issues should necessarily play out under the Court's reasoning"). No court has determined *Bostock*'s effect on medical plans.[3]

The Plan does not violate Title VII. A medical plan, even one provided by a state, is not required to cover all "medically necessary" procedures. *See, e.g.*, *Lenox v. Healthwise of Kentucky, Ltd.*, 149 F.3d 453 (6th Cir. 1998) (exclusion for organ transplants); *Saks v. Franklin Covey Co.*, 117 F. Supp. 2d 318 (S.D.N.Y. 2000), *aff'd in part, remanded in part*, 316 F.3d 337 (2d Cir. 2003) (exclusion for infertility treatment); *Mullen v. Boyd Gaming Corp.*, 182 F.3d 914 (5th Cir. 1999) (exclusion of medically necessary weight loss treatment); *Martin v. Masco Indus. Employees' Benefit Plan*, 747 F. Supp. 1150 (W.D. Pa. 1990) (exclusion of medically necessary breast reduction). Aside from certain minimum requirements, health plans have broad discretion to exclude treatments or procedures even if they are medically necessary. For example, a plan can exclude all breast augmentation or reduction, including some that are medically necessary. *See Milone v. Exclusive Healthcare, Inc.*, 244 F.3d 615, 619 (8th Cir. 2001) (noting that a plan provision excluding breast augmentation or reduction surgeries for any purposes except for cancer-related reasons was allowable, but ultimately holding that the plan acted arbitrarily and capriciously in denying coverage in the case at issue), *abrogated on other grounds by Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966 (8th Cir. 2002).

---

[3] The health plan cases cited by Plaintiff—*Fletcher v. Alaska*, 443 F.Supp. 3d 1024 (D. Alaska 2020) and *Kadel v. Folwell*, 446 F.Supp. 3d 1 (M.D.N.C. 2020)—were decided prior to the Supreme Court's ruling in *Bostock*.

FENNEMORE CRAIG, P.C.

PHOENIX

The Plan does not provide coverage or benefits for "gender reassignment surgeries," regardless of the employee's sex. Under the Plan, a "Covered Service" is "a service which is Medically Necessary *and* eligible for payment under the Plan." (Doc 86-1, Exhibit A at 93) (emphasis added). Coverage, thus, can be denied either because a service is not medically necessary or because it is an excluded service regardless of whether it is medically necessary. Indeed, the Plan excludes several procedures, many of which might be considered "medically necessary," including certain bariatric procedures, surgery to treat hyperhidrosis (excessive sweating), and phase 3 cardiac rehabilitation, among others. (Doc. 86-1 at pp. 55-58.) Similar to these procedures, the Plan excludes gender reassignment surgery, regardless of whether it is medically necessary. Admittedly, such an exclusion may only affect transgender individuals (both male and female), but plans have consistently been allowed to exclude services that may only affect one sex such as breast reduction surgery that is medically necessary to relieve pain and discomfort. *See Martin*, 474 F. Supp at 1151. Therefore, the State Defendants' exclusion of gender reassignment surgery, similar to the other non-covered procedures, is not discrimination on the "basis of sex."[4]

None of the cases cited by Plaintiff support that the State Defendants must cover all "medically necessary" procedures that treat gender dysphoria. In *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785–797 (9th Cir. 2019), the only Ninth Circuit case cited by Plaintiff, the court analyzed whether denying medically necessary gender transition surgery to an imprisoned person constituted cruel and unusual punishment under the Eighth Amendment. *Edmo* did not analyze a medical benefits plan, and, further, did not hold that a medical plan exclusion for gender reassignment surgery violates Title VII. In fact, the *Edmo* court repeatedly states that such surgery ***can be*** medically necessary ***in certain circumstances***,

---

[4] In fact, the Plan provides coverage for some gender transition services, including mental health counseling and hormone therapy to treat gender dysphoria—demonstrating that the Plan does not discriminate against transgender persons or eliminate coverage for all gender transition treatment.

not that it always is.  *See* 935 F.3d at 767, 769.  That is, a plan may exclude procedures even when the procedure is medically necessary.  Similarly, *Kadel v. Folwell*—a District Court case outside of this circuit—analyzed discrimination under Title IX of the Education Amendments and ACA § 1557, not Title VII, and does not hold that a medical benefits plan must provide coverage for gender reassignment surgery.  446 F. Supp. 3d 1 (M.D.N.C. 2020).  Finally, *Fletcher v. Alaska* is a non-precedential District Court case, which has not been affirmed by the Ninth Circuit, and was decided prior to the Supreme Court's ruling in *Bostock*.  443 F. Supp. 3d 1024 (D. Alaska 2020). Again, *Fletcher* does not hold that medical plans must cover all "medically necessary" procedures to treat gender dysphoria.

It makes sense that employers are not required to cover all "medically necessary" procedures in light of the fact that both the cost of health care and overall health care spending continues to increase each year.  The Centers for Medicare and Medicaid report that national health care expenses grew by 4.6% in 2018 and are expected to grow at an annual average rate of 5.4% for the period of 2019 through 2028, which is 1.1 percentage points faster than the expected annual growth in gross domestic product per year on average for that same time period.[5]  Consequently, employers have strived to contain costs using a variety of tools.  Those have included (i) shifting to high deductible health plans, (ii) implementing wellness programs to improve employee health and reduce claims, (iii) shifting more costs to employees by increasing premiums, co-pays, and the cost of obtaining out-of-network services, (iv) using technology such as telemedicine, and (v) excluding certain expensive specialty drugs or procedures as allowed by law—even if those services, treatments, or procedures may be considered to be medically necessary.  Plans are allowed to take these steps to control health care spending.  The Plan's exclusion for gender-

---

[5] Centers for Medicare and Medicaid Services. (2016, December 2) available at https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html, last visited September 23, 2020.

FENNEMORE CRAIG, P.C.

PHOENIX

transition surgeries is allowable and consistent with health plans' ability to limit what they cover. Mandating that plans cover all medically necessary services could have the effect of discouraging employers from providing any health coverage at all or increasing the cost that employers pass on to employees to levels that impair the ability of employees to take advantage of their employer-sponsored plans. Under the Affordable Care Act, employers with at least 50 full-time employees (or the equivalent), are required to offer health coverage to full-time employees and their dependents that meet certain minimum coverage standards or make a tax payment called the Employer Share Responsibility Payment ("ESRP"). *See* 26 U.S.C. § 4980H. In recent years, as health expenses have increased, some employers have opted to drop coverage and instead pay the ESRP.

Finally, Plaintiff misstates and misrepresents the Plan's claims and appeals process by suggesting that the Plan provides coverage for any and all medically necessary treatments. (*See* Doc. 115 at 3:8-9) (citing the Plan's claims and appeals procedures at Doc. 86-1 at p. 100). While it is correct to state that the Plan can deny a claim because it is not medically necessary, it is incorrect to suggest that all medically necessary services, treatments, and procedures must be covered. Some treatments or procedures are denied because they are excluded under the terms of the Plan. *See supra*, 7:4-10 (discussion of "Covered Service" under the Plan).

For the reasons set forth above, Plaintiff has failed to meet his high burden to show that he is likely to succeed on his Title VII claim or that the law *clearly favors* granting the injunction.

### 2. Plaintiff's Equal Protection Claim

The Equal Protection Clause of the 14th Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause "does not forbid classifications. It simply

keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). A "classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity" and is subject to minimum scrutiny—rational basis review. *Heller v. Doe*, 509 U.S. 312, 319–21 (1993). On a rational basis review, a classification "is accorded a strong presumption of validity." *Heller*, 509 U.S. at 319. "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. State of Md.*, 366 U.S. 420, 425-26 (1961).

Numerous courts have held that transgender persons are not a suspect or quasi-suspect class and, as a result, applied the rational basis test to classifications based on transgender status. *Druley v. Patton*, 601 F.App'x 632, 635 (10th Cir. 2015) ("To date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims"); *Murillo v. Parkinson*, 2015 WL 3791450, *12 (C.D. Cal. 2015); *Kaeo–Tomaselli v. Butts*, 2013 WL 399184, *5 (D. Haw. 2013) ("Nor has this court discovered any cases in which transgendered individuals constitute a 'suspect' class"); *Jamison v. Davue*, 2012 WL 996383, *4 (E.D.Cal. 2012) ("transgender individuals do not constitute a 'suspect' class, so allegations that defendants discriminated against him based on his transgender status are subject to a mere rational basis review"); *Brainburg v. Coalinga State Hosp.*, 2012 WL 3911910, *8 (E.D. Cal. 2012); *Stevens v. Williams*, 2008 WL 916991, *13 (D. Or. 2008) ("Transsexuals are not a suspect class for purposes of the equal protection clause" and thus "classifications based upon these grounds must only be reasonably related to legitimate penological interests"); *see also Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) ("rational basis standard" for "allegations of discrimination by transgender individuals").

Neither *Bostock* nor the other cases cited by Plaintiff change this standard. First, *Bostock* did not create a new protected class for transgender persons or hold that they constitute a suspect or quasi-suspect class for equal protection purposes. Instead, *Bostock* involved a matter of pure statutory interpretation. (*See* Doc. 66 at 5) (noting that a then upcoming Supreme Court case (*Harris Funeral Homes*) may provide guidance regarding Title VII but not Equal Protection claims). *See also Bollfrass v. City of Phoenix*, No. CV-19-04014-PHX-MTL, 2020 WL 4284370, at *1 (D. Ariz. July 27, 2020) (noting that *Bostock* "involved a matter of statutory interpretation" of Title VII and does not affect Equal Protection claims). Therefore, *Bostock* does not support applying a heightened standard of review here. Second, Plaintiff cites *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) and two non-binding cases citing *Karnoski*: *Hecox v. Little*, No. 1:20-CV-00184-DCN, 2020 WL 4760138 (D. Idaho Aug. 17, 2020), and *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430, at *16 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020). However, *Karnoski* does **not** find that transgender persons are a quasi-suspect class. 926 F.3d at 1200–01; *see also Hecox*, 2020 WL 4760138, at *26 (stating that *Karnoski* did not hold that transgender individuals constitute a quasi-suspect class). Instead, the *Karnoski* court applied heightened scrutiny because the policy at issue *facially* discriminated against transgender persons. 926 F.3d at 1201.

Moreover, *Karnoski* is distinguishable from the facts of this case. In *Karnoski*, the Court was evaluating a federal policy ("2018 Policy") that disqualified only transgender persons from military service; that same policy did not disqualify non-transgender (cisgender) individuals from military service. 926 F.3d at 1199. Thus, the 2018 Policy in *Karnoski* specifically targeted transgender individuals: "On its face, the 2018 Policy regulates on the basis of transgender persons," as the policy itself disqualified "transgender persons" from military service. *Id*. at 1201. Further, the 2018 Policy effectively served as an almost complete exclusion of transgender persons from military service: "Beyond the

narrow reliance exception, transgender individuals who wish to serve openly in their gender identity are altogether barred from service." *Id.* at 1199, n.15. Thus, the Court "conclude[d] that the 2018 Policy on its face treats transgender persons differently than other persons, and consequently something more than rational basis but less than strict scrutiny applies" (which was "intermediate scrutiny"). *Id.* at 1201.

Here, in contrast to *Karnoski*, the Plan does not specifically target transgender persons. The gender reassignment surgery exclusion is just one of *many* different exclusions in the Plan that apply to various individuals (both transgender and cisgender) regardless of medical necessity. Transgender individuals are covered under the Plan, and they receive coverage for medically necessary treatments in the vast majority of cases—like all other individuals. All persons—transgender and cisgender—are subject to numerous exclusions for various treatments, procedures, and surgeries within the Plan, even if a physician has designated such treatment, procedure, or surgery as "medically necessary." Further, the Plan provides coverage for some gender transition services, including mental health counseling and hormone therapy. Thus, the Plan does not eliminate coverage for all gender transition treatment. In contrast to the policy at issue in *Karnoski*, the Plan here does not specifically target transgender individuals; it does not "regulate on the basis of transgender status" or constitute discrimination or a classification based on transgender status or the basis of sex. Thus, the heightened scrutiny applied in *Karnoski* is not warranted based on the facts of the instant case.

Applying rational basis review, Dr. Toomey cannot overcome the "strong presumption of validity." *Heller*, 509 U.S. at 319. Specifically, Dr. Toomey has not alleged any facts suggesting that the exclusion does not bear a rational relation to a legitimate state purpose. "Where, as here, there are plausible reasons for [the state] action, [the court's] inquiry is at an end." *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (Supreme Court recognizing the "task of classifying persons for benefits inevitably requires

FENNEMORE CRAIG, P.C.
PHOENIX

- 12 -

that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line").

Furthermore, courts, including this one, have recognized that the government's interests in cost containment and reducing health costs are legitimate and substantial. (Doc. 69 at 16:12–14.) *See, e.g., Harris v. Lexington-Fayette Urban County Gov't*, 685 Fed. App'x 470, 473 (6th Cir. 2017); *IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010). Contrary to Plaintiff's assertion, this Court stated that "[l]imiting health care costs **is a legitimate state interest**" that could satisfy rational basis review. (Doc. 69 at 15:28–16:14) (emphasis added). Relying on *Romer v. Evans*, 517 U.S. 620 (1996), the Court stated that a government interest in reducing costs may not be sufficient under rational basis review where the policy was "motivated by animosity toward [a protected group]." (Doc. 69 at 16:4–11.) However, Plaintiff has presented no evidence that the exclusion for gender reassignment surgery in the Plan was motivated by any animosity or ill-will. (*See* Doc. 115 at 7:6–8:5.). Rather, applying the presumption of validity where there is a "plausible reason" supporting the challenged classification, the Court should uphold the exclusion as rationally related to healthcare cost containment.

Plaintiff has failed to meet his high burden to show that he is likely to succeed on his Equal Protection claim or that the law *clearly favors* granting the requested injunction. He is not entitled to a preliminary injunction.

### C. Plaintiff Will Not Suffer Irreparable Harm.

Plaintiff contends that he will suffer irreparable harm absent an injunction because he and other similarly-situated persons will be denied "medically necessary" care. (Doc. 115 at 8:14–9:3.) However, the fact that Plaintiff may not receive "medically necessary" care does not conclusively determine that he will be irreparably harmed in the legal sense. As established above, the Plan does not have to cover all medically necessary procedures and is not required by law to do so. *Supra*, 6:9-7:3. Indeed, the Plan permissibly does not

cover a variety of procedures that could be considered "medically necessary," gender reassignment surgery is only one such procedure.

The cases cited by Plaintiff do not support his argument that a non-discriminatory exclusion that results in the denial of healthcare constitutes *de facto* irreparable harm. In *Beltran v. Myers*, 677 F.2d 1317 (9th Cir. 1982), the Ninth Circuit considered a California rule that denied Medicaid benefits to elderly, blind, and disabled individuals. The court, upon those facts and in a single sentence, stated that there was a "sufficient showing" of harm because the rule may deny plaintiffs needed medical care.[6] *Id*. at 1322. The court provided no explanation, support, or citation for this finding. *Id.* In *Edmo*, 935 F.3d at 797, *K.M. v. Regence Blueshield*, No. C13-1214 RAJ, 2014 WL 801204, at *9 (W.D. Wash. Feb. 27, 2014), *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004), and *Z.D. ex rel. J.D. v. Grp. Health Co-op.*, No. C11-1119RSL, 2012 WL 1997705, at *13 (W.D. Wash. June 1, 2012), each court considered the unique circumstances of the plaintiffs and the evidence presented to determine if irreparable harm would result from the denial of medical care. Here, in contrast to each of these cases, Plaintiff has presented no evidence that he, or any member of the class, will suffer if they do not receive the requested surgery. (Doc. 115 at 8:7–9:3.)

Further, in cases such as *Beltran* and *Edmo* cited by Plaintiff, any irreparable harm was also based, in part, on the fact that the individual plaintiffs had no other means to obtain the medical services they sought. In *Beltran*, the plaintiff was on Medicaid due to plaintiff's economic status and in *Edmo*, the plaintiff was an incarcerated individual totally dependent on the government for any and all healthcare needs. *Beltran*, 677 F.2d at 1319; *Edmo*, 935 F. 3d at 784 ("Because 'society takes from prisoners the means to provide for their own needs' the government has an 'obligation to provide medical care for those who it is

---

[6] Similar to *Beltran*, *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004), provided no explanation for its finding that plaintiffs would suffer irreparable injury and, instead, cites only to *Beltran*.

punishing by incarceration.'") (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) and *Brown v. Plata*, 563 U.S. 493, 510 (2011)).  There is no such claim that Dr. Toomey or the Plaintiff class is entirely dependent on the State for any and all medical care.  Indeed, upon information and belief, Dr. Toomey, a university professor, has paid for other gender-transition procedures using his own resources.[7]

Moreover, irreparable harm requires a showing of harm that cannot be redressed by payment of money damages or by another legal remedy.  *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)).  Plaintiff is seeking coverage for a procedure and if he were to obtain the surgery, and the Court eventually rules that the exclusion was improper, monetary damages would remedy his loss.  He has not demonstrated that he cannot obtain a hysterectomy using his own resources and seek reimbursement if the Court provides such relief.  Plaintiff has failed to demonstrate irreparable harm.

Finally, as established above, Plaintiff has not shown that he is likely to succeed on his Equal Protection claim.  As such, Plaintiff cannot utilize that claim of constitutional violation in and of itself as proof of his purported irreparable injury.

## IV.  CONCLUSION

Because Plaintiff is not likely to succeed on his claims and cannot establish that he will be irreparably harmed absent an injunction, Defendants State of Arizona, Andy Tobin, and Paul Shannon respectfully request that the Court deny Plaintiff's requested preliminary injunction.

---

[7] Dr. Toomey notes in an article he authored on the ACLU's website dated January 24, 2019, that he previously paid for a double mastectomy using his own resources. https://www.aclu.org/blog/lgbt-rights/transgender-rights/arizona-provides-me-unequal-healthcare-because-im-transgender (last viewed September 18, 2020).

DATED this 25th day of September, 2020.

                FENNEMORE CRAIG, P.C.

By: *s/ Ryan Curtis*
    Timothy J. Berg
    Amy Abdo
    Ryan Curtis
    Shannon Cohan
    Attorneys for Defendants State of Arizona, Andy Tobin, and Paul Shannon

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of September, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Victoria Lopez
Christine K. Wee
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
vlopez@acluaz.org
cwee@acluaz.org
*Attorneys for Plaintiff*


Joshua A. Block
Leslie Cooper
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
jblock@aclu.org
lcooper@aclu.org
*Attorneys for Plaintiff*


Wesley R. Powell
Matthew S. Friemuth
WILLKIE FARR & GALLAGHER LLP
787 Seventh Ave.
New York, NY 10019
wpowell@willkie.com
mfriemuth@willkie.com
*Attorneys for Plaintiff*


Paul F. Eckstein
Austin C. Yost
PERKINS COIE, LLP
2901 N. Central Ave., Ste. 2000
Phoenix, AZ 85012
PEckstein@perkinscoie.com
AYost@perkinscoie.com
*Attorneys for Defendants Arizona Board of Regents
dba University of Arizona; Ron Shoopman; Larry Penley; Ram Krishna; Bill Ridenour;
Lyndel Manson; Karrin Taylor Robson; Jay Heiler; and Fred Duval*

*/s/ Lynn M. Marble*

16197522.7