
**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email**:** cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*Admitted pro hac vice*

**Wesley R. Powell***
**Matthew S. Friemuth***
**Nicholas Reddick****
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: wpowell@willkie.com
E-Mail: mfriemuth@willkie.com
*Admitted pro hac vice*
**Admission pro hac vice forthcoming*

*Attorneys for Plaintiff Russell B. Toomey*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **RUSSELL B. TOOMEY,** | Case No. 4:19-cv-00035-TUC-RM (LAB) |
| Plaintiff, | |
| v. | |
| **STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, D/B/A UNIVERSITY OF ARIZONA**, a governmental body of the State of Arizona; **RON SHOOPMAN**, in his official capacity as Chair of the **Arizona Board of Regents; LARRY PENLEY**, in his official capacity as Member of the Arizona Board of Regents; **RAM KRISHNA**, in his official capacity as Secretary of the Arizona Board of Regents; **BILL RIDENOUR**, in his official capacity as Treasurer of the Arizona Board of Regents; **LYNDEL MANSON**, in her official capacity as Member of the Arizona Board of Regents; **KARRIN TAYLOR ROBSON**, in her official capacity as Member of the Arizona Board of Regents; **JAY HEILER**, in his official capacity as Member of the Arizona Board of Regents; **FRED DUVAL**, in his official capacity as Member of the Arizona Board of Regents; **ANDY TOBIN**, in his official capacity as Director of the Arizona Department of Administration; **PAUL SHANNON**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration, | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff Russell B. Toomey, Ph.D., on behalf of himself and the certified Classes, files this Reply in further support of his Motion for Preliminary Injunction (Doc. 115).

**I.   No Heightened Standard Applies to the Motion for Preliminary Injunction**

State Defendants argue that Dr. Toomey and the Class are seeking a "disfavored" type of preliminary injunction because (a) the requested relief would effectively resolve the case on the merits and moot the case (Doc. 123 at 2-3) and (b) the injunction is "mandatory" instead of "prohibitory" (Doc. 123 at 3-4). State Defendants are wrong on both counts.

First, because the claims in this case have been certified as a class action there is no risk that granting the preliminary injunction "would render the action moot." (Doc. 123 at 3). Dr. Toomey would continue to represent a class of "current *and future*" employees and beneficiaries who "have *or will have* medical claims for transition-related surgical care." (Doc. 105 at 2) (emphases added). *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) (explaining that "when the claim of the named plaintiff becomes moot after class certification, a 'live controversy may continue to exist' based on the ongoing interests of the remaining unnamed class members").[1]

Second, State Defendants argue that Dr. Toomey and the Class are seeking a disfavored "mandatory" injunction. But the Ninth Circuit has warned that the distinction between "mandatory" and "prohibitory" injunctions is a "somewhat artificial legal construct" filled with "inherent contradictions." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017). Thus, in *Hernandez*, the Ninth Circuit held that an injunction that required

---

[1] Moreover, it is not clear that the Ninth Circuit even applies a heightened standard to preliminary injunctions that would render an action moot. The only cases that State Defendants cite for such a proposition are from the Tenth Circuit. (Doc. 123 at 3). State Defendants also cite to *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), but the cited portion merely describes the procedural history in which the district court concluded that "the nature of the relief requested in this case, *coupled with the extensive evidence presented by the parties over a 3-day evidentiary hearing* [may have] effectively converted these proceedings into a final trial on the merits of the plaintiff's request for permanent injunctive relief." *Id.* at 780-81 (emphasis added). No such trial has occurred here.

1

the government to provide heightened due process protections in future bond hearings for immigrants in detention was properly characterized as a "prohibitory" injunction—not a mandatory one—because the injunction "prohibit[ed] the government from conducting new bond hearings under procedures that will likely result in unconstitutional detentions." *Id.* at 998. The Ninth Circuit explained that an injunction to "prevent[] future constitutional violations" is "a classic form of prohibitory injunction." *Id.*

The reasoning of *Hernandez* applies here. In this case, the preliminary injunction sought is *prohibitory*: it would prevent the State Defendants from enforcing an unconstitutional and discriminatory policy when it processes future claims for gender affirming surgery. The requested injunction does not mandate that the State Defendants cover the surgical procedures sought by Dr. Toomey or any other particular individual—or even to provide a health care plan at all. But if State Defendants continue to provide a health care plan, the injunction would prohibit State Defendants from doing so in a discriminatory manner by enforcing an illegal exclusion of coverage. By barring enforcement of the discriminatory exclusion, the proposed injunction would permit the Plan's third-party administrators to evaluate claims for transition-related surgeries for medical necessity as they would claims for coverage of other forms of care pending resolution of plaintiffs' claims on the merits.

In any event, even if the injunction were characterized as "mandatory," Dr. Toomey and the Class can meet that heightened standard too. As discussed below, the merits of the claims in this case "are not doubtful" and, without a preliminary injunction, Dr. Toomey and the Class will continue to experience "very serious damage" that is not "capable of compensation." *Hernandez*, 872 F.3d at 999 (internal quotation marks omitted).

## II. Plaintiffs Have Demonstrated a Likelihood of Success on the Title VII Claims.

### A. The "Gender Reassignment Surgery" Exclusion Facially Discriminates Based on Sex.

This Court has already held that Dr. Toomey and the Class have stated a valid claim under Title VII. (Doc. 69 at 10-11). In opposing the Motion for Preliminary Injunction, the

2

State Defendants offer two reasons for disregarding this Court's prior reasoning when it denied their motion to dismiss. First, State Defendants note that motions to dismiss and motions for summary judgment are governed by different evidentiary standards. (Doc. 123 at 5 n.2). But that distinction is irrelevant here because State Defendants have not submitted any evidence in opposition to the motion or contradicted any of Plaintiff's evidence. As a result, "all of the well-pleaded allegations of [the] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction [are] taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 (1976).

Second, State Defendants argue that this Court's ruling on the motion to dismiss—and the decisions of all the other federal courts holding that categorical exclusions of transition-related care unlawfully discriminate on the basis of sex—should be disregarded because they were decided before *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020). (Doc. 123 at 6 n.3). But that is a *non sequitur*. Instead of disturbing this Court's prior decision, the Supreme Court in *Bostock* agreed with this Court that sex discrimination under Title VII occurs whenever an employee's sex is a but-for cause of their employer's treatment of them. As this Court already explained, a policy excluding medically necessary healthcare based on the fact that the care is performed for purposes of "gender transition" discriminates against transgender employees because of their sex: "[H]ad Plaintiff been born a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery." (Doc. 69 at 10).[2] Nothing in *Bostock* calls the Court's reasoning into question.

---

[2] *Accord* Pls.' Objection to R&R (Doc. 49 at 9-10) (explaining that the Plan denied coverage for Dr. Toomey's hysterectomy but would have covered a hysterectomy for someone who had been assigned a male sex at birth and was born with a uterus and fallopian tubes as a result of Persistent Mullerian Duct Syndrome ("PMDS")); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) ("AlaskaCare covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex. That is discrimination because of sex and makes defendant's formal policy, as expressed in the provisions of AlaskaCare, facially discriminatory."); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020) ("The

3

In addition, nothing in *Bostock* calls into question this Court's conclusion that the "gender reassignment" exclusion unlawfully discriminates based on sex stereotypes and gender nonconformity under *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000). (Doc. 69 at 10-11). Discrimination based on gender nonconformity violates Title VII because it "penalizes a person identified as male at birth for traits or actions that [the employer] tolerates in an employee identified as female at birth," and vice versa. *Bostock*, 140 S. Ct. at 1741. Thus, an employer violates Title VII if it "fires a woman, . . . because she is insufficiently feminine and also fires a man . . . for being insufficiently masculine." *Id.*

The "gender reassignment" exclusion discriminates in precisely the same manner by denying medically necessary care to individuals "who do not conform to the gender identity typically associated with the sex they were assigned at birth." (Doc. 69 at 11). The exclusion prohibits an employee assigned the female sex at birth from receiving care that masculinizes their body in accordance with their male gender identity; and the exclusion prohibits a person assigned the male sex at birth from receiving care to feminize their body in accordance with their female gender identity. "This narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity" and, therefore, "implicates the gender stereotyping prohibited by Title VII." (Doc. 69 at 10-11). *Accord Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018) (explaining that excluding transition-related "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex"). On its face, the "gender reassignment surgery" exclusion at issue in Arizona's State employee health plan explicitly targets surgery being provided for a gender non-conforming purpose of gender transition.[3]

---

Exclusion also discriminates on the basis of natal sex—that is, the sex one was assigned at birth—by denying equal access to certain medical procedures, depending on whether an individual's assigned sex is male or female.").

[3] State Defendants note that Justice Alito's dissent in *Bostock* predicted that "healthcare benefits may emerge as an intense battleground under the Court's ruling." 140

4

### B.  Reducing Costs Is No Defense to a Facially Discriminatory Policy.

Instead of providing a legal basis for departing from this Court's prior analysis, State Defendants simply repeat arguments this Court has already rejected. State Defendants' primary argument is that they have a legitimate interest in controlling health care costs and are "not required to cover all 'medically necessary' procedures." (Doc. 123 at 6). But even if the exclusion were sincerely motivated by a desire to reduce costs,[4] the Supreme Court has explicitly—and repeatedly—held that Title VII does not provide a "cost justification defense" for employers offering facially discriminatory insurance policies. *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 716 (1978); *accord Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1086 n.14 (1983).

As discussed above, the "gender reassignment surgery" exclusion facially discriminates based on sex, and the fact that the "gender reassignment surgery" exclusion is

---

S. Ct. at 1781 (Alito, J., dissenting). But even Justice Alito did not dispute that discriminatory exclusions of coverage would constitute discrimination because of sex. Instead, he expressed concern that challenges to health care exclusions could present "religious liberty issues because some employers and healthcare providers have strong religious objections to sex reassignment procedures." *Id.* Whatever religious defenses may or may not be available to a private employer, such concerns are not present here because State Defendants are part of the Arizona State government. Indeed, the Constitution *prohibits* State Defendants from discriminating against transgender employees based on religious or moral disapproval. *See Obergefell v. Hodges*, 576 U.S. 644, 672 (2015) ("[W]hen . . . sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied.").

[4] State Defendants have not introduced any evidence regarding their actual motivations for enacting and maintaining the discriminatory exclusion. Nor have State Defendants introduced evidence that excluding medically necessary surgery for gender dysphoria, and thus leaving the gender dysphoria untreated, actually reduces health care costs for the self-funded Plan or for Arizona more generally. *Compare* Padula, W.V., Heru, S. & Campbell, J.D. *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, J GEN INTERN MED 31, 394–401 (2016). https://doi.org/10.1007/s11606-015-3529-6.

just one of many different exclusions in the Health Plan," (Doc. 123 at 12), does not make the exclusion any less discriminatory. As this Court already explained in denying the motion to dismiss, the State may "engage in line-drawing in order to contain health care costs," but may not draw that line in a way that discriminates based on sex in violation of Title VII. (Doc. 69 at 11). *Accord Boyden*, 341 F. Supp. 3d at 1000 n.4 ("The fact that not all medically necessary procedures are covered . . . does not relieve defendants of their duty to ensure that the insurance coverage offered to state employees does not discriminate on the basis of sex or some other protected status.").[5]

### III. Plaintiffs Have Demonstrated a Likelihood of Success on the Equal Protection Claims.

Incredibly, State Defendants persist in arguing that discrimination against transgender individuals is subject only to rational basis review, notwithstanding that the argument is foreclosed by *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019), which explicitly held that discrimination against transgender individuals is *not* subject to rational-

---

[5] Defendants argue that it is legal for health care plans to create exclusions that discriminate on the basis of sex because "a plan can exclude all breast augmentation or reduction, including some that are medically necessary." (Doc. 123 at 6) (citing *Milone v. Exclusive Healthcare, Inc.*, 244 F.3d 615, 619 (8th Cir. 2001), and *Martin v. Masco Indus. Employees' Benefit Plan*, 747 F. Supp. 1150 (W.D. Pa. 1990)). But the cases cited in support of that assertion say nothing of the kind. *Milone* and *Martin* were ERISA challenges in which the courts analyzed a poorly drafted insurance policy that appeared to limit coverage for medically necessary breast surgery to treatments related to cancer. The only issue in the cases was whether the Plan did or did not cover medically necessary breast surgeries unrelated to cancer. The plaintiffs did not argue that exclusions discriminated on the basis of sex, and the courts did not analyze that question.

Indeed, *Milone* and *Martin* strongly suggest that excluding coverage for medically necessary breast surgeries while covering other medically necessary reconstructive surgeries would lack even a rational basis. *See Milone*, 244 F.3d at 619 ("We do not believe that the many women who have breast disease unrelated to cancer were intended to be excluded from the Plan where it was medically necessary to have such corrective surgery."); *Martin*, 747 F. Supp. at 1154 ("[O]ne could hardly believe a medical plan would exclude coverage for reconstructive plastic surgery or similar medically necessary procedures.").

basis review. State Defendants' continued citation to district court opinions pre-dating *Karnoski* is inappropriate.[6]

The State Defendants attempt to distinguish *Karnoski* and evade heightened scrutiny by arguing that the "gender reassignment surgery" exclusion "does not specifically target transgender persons." (Doc. 123 at 12). But discrimination based on gender "transition clearly discriminates on the basis of transgender identity." *Stone v. Trump*, 356 F. Supp. 3d 505, 513 (D. Md. 2018); *accord McQueen v. Brown*, No. 215CV2544JAMACP, 2018 WL 1875631, at *3 (C.D. Cal. Apr. 19, 2018). As this Court already explained, "[t]his narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity," which is the defining hallmark of being transgender. (Doc. 69 at 10).; *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

Moreover, even if *Karnoski* did not independently require heightened scrutiny, the "gender reassignment surgery" exclusion would still be subject to heightened scrutiny as discrimination based on sex. *See Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430, at *14 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020) (collecting cases).

Under heightened scrutiny—or any standard of scrutiny—State Defendants' asserted interest in reducing costs is insufficient as a matter of law to justify a facially discriminatory policy. Although "a state has a valid interest in preserving the fiscal integrity of its programs" and "may legitimately attempt to limit its expenditures . . . a State may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). Concerns about costs are insufficient to "justify

---

[6] The district court in *Karnoski* had held that discrimination based on transgender status is subject to the same strict scrutiny that applies to racial discrimination, but the Ninth Circuit held that discrimination based on transgender status should instead be held to the same "heightened scrutiny" standard used for sex discrimination. *Karnoski*, 926 F.3d 1199-1200.

7

gender-based discrimination in the distribution of employment-related benefits" under heightened scrutiny. *Califano v. Goldfarb*, 430 U.S. 199, 217 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 647 (1975). And even under rational-basis review, the government may not reduce costs by arbitrarily discriminating between two similarly situated groups. *See Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (finding costs concerns cannot justify denying insurance coverage to same-sex couples under rational basis review). "Limiting health care costs is a legitimate state interest, but that interest cannot be furthered by arbitrary classifications or by harming a politically unpopular or vulnerable group." (Doc. 69 at 16).

## IV. Plaintiffs Have Demonstrated a Likelihood of Irreparable Harm.

State Defendants speculate that Dr. Toomey and the Class will not suffer irreparable harm from the continued denial of medically necessary care because Dr. Toomey—and other transgender employees and beneficiaries throughout Arizona—may be able to pay out of pocket for their health care and then be compensated in the form of damages. (Doc. 123 at 15). As discussed below, even if the Court credited Defendants' bare speculation that all the transgender class members and their families could pay these out-of-pocket costs in the middle of an ongoing pandemic, this does not negate the ongoing irreparable harm all Class members continue to suffer.

*First*, money damages are not available for violations of the Equal Protection Clause because State Defendants have not waived sovereign immunity for constitutional claims. Thus, for Class members with only equal protection claims (such as families in which the transgender individual is the employee's beneficiary), injunctive relief is the only available option.

*Second*, and even more fundamentally, money damages cannot redress the inherent dignitary injury that accompanies invidious discrimination. As the Supreme Court has repeatedly explained, "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-

economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (citations omitted). These "[d]ignitary wounds cannot always be healed with the stroke of a pen." *Obergefell*, 576 U.S. at 678.

Because the dignitary harm from discrimination is irreparable, the possibility that some Class members may eventually receive compensation after paying out-of-pocket does not fully redress their injuries. Indeed, Arizona's argument about irreparable harm in this case is precisely the same argument that the court rejected ten years ago in *Collins v. Brewer*, 727 F. Supp. 2d 797, 813 (D. Ariz. 2010), when it issued a preliminary injunction against Arizona's discriminatory exclusion of same-sex couples from employment benefits:

> The State argues that plaintiffs will not suffer irreparable harm because they will likely be able to obtain coverage for their domestic partners and their children either through private insurance coverage, the Arizona Medicaid agency, or through the employers of their domestic partners. Even assuming that is true, the Ninth Circuit [in *In re Golinski*, 587 F.3d 956, 960 (9th Cir. 2009)] has recognized there is an inherent inequality in allowing some employees to participate fully in the State's health plan, while expecting other employees to rely on other sources, such as private insurance or Medicaid. This "back of the bus" treatment relegates Plaintiffs to a second-class status by imposing inferior workplace treatment on them, inflicting serious constitutional and dignitary harms that after-the-fact damages cannot adequately redress.

*Collins*, 727 F. Supp. 2d at 813 (quotation marks omitted).

The court's words in *Collins* apply with equal force here. The discriminatory exclusion of "gender reassignment" surgery not only deprives transgender individuals of critically important care, but it also stigmatizes those individuals as second-class employees whose medical care is less valid than the medical care of others. These "serious non-economic injuries" are irreparable. *Heckler*, 465 U.S. at 739-40,

## V. Conclusion

For the foregoing reasons, and the reasons set form in Plaintiff's previous filing (Doc. 115), the Motion for Preliminary Injunction should be granted.

Respectfully submitted this 1st day of October, 2020.

ACLU FOUNDATION OF ARIZONA
By /s/ *Christine K. Wee*
    Christine K. Wee

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    Joshua A. Block*
    Leslie Cooper*

WILLKIE FARR & GALLAGHER LLP
    Wesley R. Powell*
    Matthew S. Friemuth*
    Nicholas Reddick**

*admitted pro hac vice
**admission pro hac vice forthcoming

*Attorneys for Plaintiff Russell B. Toomey*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2020, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

*/s/Christine K. Wee*
Christine K. Wee