**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B. Toomey,<br><br>　　　　　Plaintiff,<br>v.<br><br>State of Arizona; Arizona Board of Regents, d/b/a University of Arizona, a governmental body of the State of Arizona; et al.,<br><br>　　　　　Defendants. | CV 19-0035-TUC-RM (LAB)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the court is the plaintiff's motion, filed on September 1, 2020, for a preliminary injunction pursuant to Fed.R.Civ.P 65(a). (Doc. 115) The defendants filed responses on September 25, 2020. (Doc. 122); (Doc. 123) The plaintiff filed a reply on October 1, 2020. (Doc. 126)

The plaintiff in this action, Russell B. Toomey, is an associate professor employed at the University of Arizona. (Doc. 86, p. 5) He receives health insurance from a self-funded health plan (The Plan) provided by the State of Arizona. (Doc. 86, pp. 3, 8) The Plan generally provides coverage for medically necessary care. (Doc. 86, p. 8) There are coverage exclusions, however, one of which is for "gender reassignment surgery." (Doc. 86, p. 9)

Toomey is a transgendered man. (Doc. 86, p. 9) "[H]e has a male gender identity, but the sex assigned to him at birth was female." (Doc. 86, p. 9) Toomey has been living as a male since 2003. (Doc. 86, p. 9) His treating physicians have recommended he receive a hysterectomy as a medically necessary treatment for his gender dysphoria. (Doc. 86, p. 9)

1  Toomey sought medical preauthorization for a total hysterectomy, but he was denied under the
2  Plan's exclusion for "gender reassignment surgery." (Doc. 86, p. 10)

3      On January 23, 2019, Toomey brought the pending class action in which he argues the
4  Plan's exclusion is sex discrimination under Title VII of the Civil Rights Act of 1964 and a
5  violation of the Equal Protection Clause of the Fourteenth Amendment. (Doc. 1); (Doc. 86)
6  In the pending motion, Toomey moves that the court issue a preliminary injunction pursuant to
7  Fed.R.Civ.P 65(a) voiding the Plan's exclusion for gender reassignment surgery. (Doc. 115)

8      The Board of Regents defendants filed a response on September 25, 2020 explaining that
9  they do not oppose the motion provided that the injunction operates against all defendants and
10 does not name the Board members individually. (Doc. 122) The State of Arizona defendants
11 filed a response on September 25, 2020 opposing the motion. (Doc. 123) The plaintiff filed a
12 reply on October 1, 2020. (Doc. 126)

14 Discussion

15     "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*
16 *v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008). "A plaintiff seeking
17 a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely
18 to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips
19 in his favor, and that an injunction is in the public interest." *Winter,* 555 U.S. at 20, 129 S. Ct.
20 at 374; *see* (Doc. 115, p. 7) (citing the *Winter* standard) In this case, Toomey's burden of
21 proof is heightened due to the nature of the injunction that he seeks.

22     Often a party will seek a preliminary injunction to maintain the status quo pendente lite.
23 *See Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979). This type of injunction
24 keeps the parties in the posture that they held prior to the lawsuit. Otherwise, it might become
25 impossible for the plaintiff to obtain the relief he seeks and the action might become moot. *See*
26 *Sierra On-Line, Inc. v. Phoenix Software, Inc*., 739 F.2d 1415, 1422 (9th Cir. 1984) ("A
27 preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a

- 2 -

1 device for preserving the status quo and preventing the irreparable loss of rights before
2 judgment."). This case is different. Toomey seeks an injunction from the court ordering the
3 defendants to grant him the relief that he seeks in his complaint. Injunctions of this type,
4 sometimes called "mandatory" injunctions as opposed to "prohibitory" injunctions, are
5 "particularly disfavored, and should not be issued unless the facts and law clearly favor the
6 moving party." *Id.* at 1115; *see Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th
7 Cir. 1963) ("[I]t is not usually proper to grant the moving party the full relief to which he might
8 be entitled if successful at the conclusion of a trial."). Mandatory injunctions "are not granted
9 unless extreme or very serious damage will result and are not issued in doubtful cases or where
10 the injury complained of is capable of compensation in damages." *Anderson* , 612 F.2d at 1115.

11 Toomey asserts to the contrary that he seeks a "prohibitory" injunction, not a
12 "mandatory" injunction, because he seeks to "prohibit" the defendants from acting in an
13 unconstitutional manner. (Doc. 126, p. 4) The court, however, uses the term "prohibitory" to
14 denote an injunction that "prohibits" a party from changing the status quo pendente lite. *See*
15 *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994) ("A prohibitory injunction
16 preserves the status quo."). This is the type of injunction that is favored. *See Anderson*, 612
17 F.2d at 1114-1115; *but see Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017). In the
18 pending motion, Toomey seeks an injunction that goes beyond maintaining the status quo. This
19 type of injunction is not favored. *See Anderson*, 612 F.2d at 1114-1115.

20 Addressing the merits of the motion, Toomey argues that he is likely to succeed on his
21 claim pursuant to Title VII, which "makes it unlawful for an employer to fail or refuse to hire
22 or to discharge any individual, or otherwise to discriminate against any individual with respect
23 to his compensation, terms, conditions, or privileges of employment, because of such
24 individual's race, color, religion, sex, or national origin." *Ricci v. DeStefano,* 557 U.S. 557,
25 577, 129 S. Ct. 2658, 2672 (2009) (punctuation modified); (Doc. 115, p. 8) (citing §

2000e–2(a)(1))  This type of Title VII action is referred to as a "disparate-treatment" case[1]. *Ricci*, 557 U.S. at 577, 129 S. Ct. at 2672.  "Disparate-treatment cases present the most easily understood type of discrimination . . . and occur where an employer has treated a particular person less favorably than others because of a protected trait." *Ricci*, 557 U.S. at 577, 129 S. Ct. at 2672  (punctuation modified).  "A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Id.*  "It is insufficient for a plaintiff alleging discrimination under the disparate treatment theory to show the employer was merely aware of the adverse consequences the policy would have on a protected group." *Am. Fed'n of State, Cty., & Mun. Employees, AFL-CIO (AFSCME) v. State of Wash.*, 770 F.2d 1401, 1405 (9th Cir. 1985).

Toomey argues that he is likely to prevail on the merits because this court, in denying the defendants' motion to dismiss, held that "[d]iscrimination based on transgender status is discrimination based on sex because, but for the individual's sex assigned at birth, the employer's treatment of the individual would be different." (Doc. 115, p. 7)  "[H]ad Plaintiff been born a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery." *Id.*

Toomey is correct when he says that discrimination based on transgender status is discrimination on the basis of sex in violation of Title VII.  *See also Bostock v. Clayton Cty., Ga.*, ––– U.S. ––––, 140 S.Ct. 1731, 1737 (2020).  But to succeed on the merits he must first show that the Plan exclusion is indeed discrimination on the basis of transgender status.  As a practical matter, this exclusion adversely affects only transgender people, but that fact alone is not sufficient to prove discriminatory intent.  It is instructive to examine a similar case: *Gen.*

---

[1] A Title VII plaintiff asserting "disparate-impact" claim establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(k)(1)(A)(i);  *Ricci v. DeStefano*, 557 U.S. 557, 578, 129 S. Ct. 2658, 2673 (2009).  Toomey's Amended Complaint does not raise this type of claim. (Doc. 86, pp. 14-17)

- 4 -

*Elec. Co. v. Gilbert*, 429 U.S. 125, 134, 97 S. Ct. 401, 407 (1976) (superseded by statute as explained in footnote 2).

In *Gilbert*, the employer provided a disability insurance plan that excluded from coverage disabilities arising out of pregnancy. *Id.* at 404, 127. The plaintiffs, a class of women employees, claimed that the coverage exclusion violated Title VII. *Id.* at 404, 128. After all, the exclusion only affected women. The Supreme Court held to the contrary that "[w]hile it is true that only women can become pregnant," without more, the fact that the employer has chosen to exclude from coverage a condition that only affects one sex is not proof that the exclusion was created with the *intent* to discriminate against women in general. *Id.* The most that could be said for sure is that the exclusion discriminated against pregnant people. *Id.* And while all pregnant people are women, not all women become pregnant. *Id.* The exclusion therefore was not proof of discrimination against all women[2] in violation of Title VII. *Id.*

This case is similar. While it is true that only transgender persons are affected by the exclusion for gender transition surgery, without more, the fact that the State has chosen to exclude this procedure from its health plan is not proof that the State intended to discriminate against transgender people in general. The most that can be said is that the exclusion discriminates against persons seeking gender transition surgery. And while all persons seeking gender transition surgery are transgender, not all transgender persons seek gender transition surgery. The coverage exclusion, by itself, is not proof of intentional discrimination against all

---

[2] Congress subsequently amended Title VII by passing the Pregnancy Discrimination Act, 42 U.S.C. ¶ 2000e(k), that amended the phrase "because of sex" or "on the basis of sex" to also mean "because of pregnancy" or "on the basis of pregnancy." Discrimination based on pregnancy is now, by statute, discrimination against all women, and the Court's holding to the contrary in *Gilbert* is no longer good law. The Court's analysis, however, is still controlling. *See also Lange v. Houston Cty., Georgia*, 2020 WL 6372702, at *11 (M.D. Ga. 2020) (commenting that the Supreme Court's analysis in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485 (1974), which was adopted by the *Gilbert* Court, "may seem a bit strained today, but it nonetheless remains intact.").

1 transgender persons in violation of Title VII. After discovery, the plaintiff may be able to prove
2 that this coverage exclusion *was* created with the intent to discriminate against transgender
3 persons. But at present, the plaintiff has not shown he is likely to prevail on the merits on this
4 claim. *See, e.g., In re Union Pac. R.R. Employment Practices Litig.*, 479 F.3d 936, 944 (8th Cir.
5 2007) (Employee health insurance plan's failure to cover oral contraception was not a violation
6 of Title VII); *Coleman v. Bobby Dodd Inst., Inc.*, 2017 WL 2486080, at *2 (M.D. Ga. 2017)
7 (rejecting the plaintiff's theory that "the fact that her termination would not have occurred but
8 for a uniquely feminine condition [excessive menstruation] is alone sufficient to show that she
9 was terminated because of her sex.").

10 In his motion, Toomey asserts that "gender transition surgery" is excluded from coverage
11 "based solely on the fact that the surgery is performed for the purposes of gender reassignment."
12 (Doc. 115, p. 9) (punctuation modified) And while that statement is literally true, the court
13 assumes that Toomey means something more significant. He is apparently arguing that the Plan
14 exclusion exists because the Plan authors do not like gender transition and have created this
15 exclusion specifically to burden transgender individuals. If that were true, then the exclusion
16 would indeed be intentional discrimination. Toomey, however, has not presented sufficient
17 evidence at this stage to support his argument. He notes that gender transition surgery is "safe,
18 effective, and medically necessary in appropriate circumstance" but that fact alone does not
19 mean that the Plan exclusion is evidence of intentional discrimination. *See* (Doc. 115, p. 8) The
20 Plan apparently excludes from coverage other "safe, effective, and medically necessary"
21 treatments. Moreover, the Plan *does* provide coverage for other transition-related medical care,
22 just not surgery. (Doc. 123, p. 7, n. 4) It is therefore unclear whether the Plan authors
23 intentionally tried to burden transgender individuals.

24 Toomey insists that transition-related surgical care is now routinely covered by private
25 insurance programs. He argues that if gender transition surgery is the standard of care, then the
26 Plan's exclusion must be proof of intentional discrimination. Toomey does not, however,
27 provide evidence that the Plan always, or almost always, adopts the standard of care except

where transgender individuals are involved. Moreover, Toomey concedes that "in the past," coverage for transition-related care was excluded "based on the assumption that such treatments were cosmetic or experimental." (Doc. 115, p. 4) If the Plan exclusion dates from that time, then the exclusion might simply be evidence that the Plan authors were suspicious of "experimental" treatments. Toomey does not explain when the Plan exclusion was created or the circumstances surrounding its adoption.

The State defendants suggest that the exclusion could be justified as a cost-saving measure. (Doc. 123, p. 8) But they do not affirmatively state that this *was* the reason behind the exclusion. *See also* (Doc. 126, p. 7, n. 4) At this stage of the litigation, it would be premature to address reasons that the State *might* raise in the future after discovery.

Toomey directs the court to the case *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) in support of his argument. (Doc. 115, pp. 7-8) In that case, the district court held on summary judgment that a health care plan that excludes from coverage gender transition surgery is discrimination on the basis of sex. The court explained that the "defendant's policy of excluding coverage for medically necessary surgery such as vaginoplasty and mammoplasty for employees, such a plaintiff, whose natal sex is male while providing coverage for such medically necessary surgery for employees whose natal sex is female is discriminatory on its face and is direct evidence of sex discrimination." *Id.* at 1030. It does not appear, however, that the reasoning in *Fletcher* would apply to the present case.

In this case, Toomey seeks a hysterectomy to treat his gender dysphoria. His surgery is precluded because of the Plan exclusion for gender transition surgery. Toomey cannot argue as the plaintiff in *Fletcher* did, that the Plan exclusion is facially discriminatory because he is being denied a surgical procedure due to his natal sex that would be permitted if his natal sex were different. Toomey's natal sex is female and the surgical procedure he seeks, a

hysterectomy, is ordinarily allowed for natal females.[3] The Plan exclusion only applies to natal females who seek a hysterectomy for the purpose of gender transition. The exclusion discriminates against some natal females but not all. It is not, on its face, discrimination on the basis of sex.

Toomey further argues that he is likely to succeed on his Equal Protection claim. The Fourteenth Amendment provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.Const.Amend.XIV, § 1. At first blush, it may appear that this Clause guarantees to all persons *equal treatment*. It does not. States may, from time to time, create classifications that result in disadvantages for various groups or persons. *See Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627 (1996). But if they do so, they must provide a justification commensurate with the gravity of inequitable treatment. *Id*. "[I]f a law neither burdens a fundamental right nor targets a suspect class, [it will be upheld] so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627 (1996). If, on the other hand, the State's classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," the law will fail unless the State can provide a justification sufficient to survive the court's "strict scrutiny." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312, 96 S. Ct. 2562, 2566 (1976).

Toomey argues that he is likely to succeed on his Equal Protection claim because the Plan exclusion is facially discriminatory[4]. *See* (Doc. 86, p. 15) He explains that because

---

[3] In fact, natal males are not forbidden from having a hysterectomy either. As Toomey notes, a person suffering from Persistent Mullerian Duct Syndrome is a natal male who is born with a uterus and fallopian tubes. (Doc. 126, p. 5, n 3) Such a person presumably could get a hysterectomy without running afoul of the Plan exclusion. Hysterectomies in general are not precluded, only hysterectomies for the purpose of gender transition.

[4] "There are three types of equal protection claims: (i) that a statute or policy discriminates on its face against the plaintiff's group, (ii) that neutral application of a facially neutral statute or policy has a disparate impact, and (iii) that the defendants are unequally

- 8 -

1 transgender persons are members of a protected class, the Plan exclusion must survive
2 heightened scrutiny, and, he asserts, it cannot.

3 The court will assume that Toomey is correct about the court's scrutiny[5], but as the court
4 explained above, the Plan exclusion is not facially discriminatory against all transgender
5 individuals. *See also Geduldig v. Aiello*, 417 U.S. 484, 494, 94 S. Ct. 2485, 2491 (1974) (An
6 exclusion from disability insurance coverage for disability caused by normal pregnancy did not
7 "amount[] to invidious discrimination under the Equal Protection Clause"); *Lange v. Houston
8 Cty., Georgia*, 2020 WL 6372702, at *1, 11 (M.D. Ga. 2020) (Healthcare Plan Exclusion for
9 "sex change surgery" appeared to be facially neutral for the purposes of the Equal Protection
10 Clause under the analysis in *Geduldig*.). And if Toomey cannot prove that the exclusion
11 discriminates against transgender individuals as a class, the court will not apply heightened
12 scrutiny.

13 After discovery, Toomey may be able to show that the Plan exclusion is a "mere pretext
14 designed to effect an invidious discrimination against the members of [his suspect class]."
15 *Lange*, 2020 WL 6372702, at *11. But until then, he has not shown a likelihood to succeed on
16 the merits. *See also Lange,* 2020 WL 6372702 at *1, 11 (Healthcare Plan Exclusion for "sex
17 change surgery" did not appear to be facially discriminatory for the purposes of the Equal
18 Protection Clause, but motion to dismiss was not granted where the plaintiff "plausibly alleged
19 that the adoption of the Exclusion was motivated by [a] discriminatory purpose.").

---

administering a facially neutral statute." *Lange v. Houston Cty., Georgia*, 2020 WL 6372702, at *10 (M.D. Ga. 2020). Toomey brings the first type of claim.

[5] *See Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) ("We conclude that the 2018 Policy on its face treats transgender persons differently than other persons, and consequently something more than rational basis but less than strict scrutiny applies.").

1 The court agrees that Toomey has shown "that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter,* 555 U.S. at 20, 129 S. Ct. at 374. Without preliminary relief, Toomey will be denied timely medical care. A denial such as this is not amenable to monetary relief. *Beltran v. Myers*, 677 F.2d 1317, 1321 (9th Cir. 1982) ("Plaintiffs have shown a risk of irreparable injury, since enforcement of the California rule may deny them needed medical care.")

The State defendants argue to the contrary that Toomey and the class members will not suffer irreparable harm because they can pay for the surgery now and get reimbursed later if they win on the merits. The State defendants, however, do not provide any evidence that Toomey or the class members have the ability to pay for their surgery out of pocket. And as Toomey explains, members of the Equal Protection class cannot get monetary damages from the State. (Doc. 126, p. 10)

Toomey further argues that "the public interest and the balance of the equities favor a preliminary injunction" because he has established a likelihood that the Plan exclusion violates the U.S. Constitution. (Doc. 115, p. 11) But as the court explained above, Toomey has not established at this point that the exclusion violates either Title VII or the Equal Protection clause. He suggests that this is "a conflict between financial concerns and preventable human suffering," and in such a situation, the public interest favors the reduction of suffering. (Doc. 115, p. 11) The court agrees that this is a good general principle, but it is difficult to apply in practice. There is no evidence before the court about how much the surgery costs, how many class members would seek surgery, or how financially sound the Plan currently is. Moreover, there is presently no evidence before the court as to how much "human suffering" would be alleviated should be motion be granted, assuming it is possible to offer meaningful evidence on such an issue. Without more, it is difficult to see where the balance of the equities lies. *See, e.g., Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (concluding that the balance of interests favored maintaining specialized health care services for the disabled, in part, because "[t]he County currently has a surplus and does not expect to experience a deficit until fiscal year

2006–2007" and it was "unclear" whether implementing the County's plan to close the medical facility would produce the cost savings that the County was expecting.).

Having balanced the various *Winter* factors in light of the heightened showing that must be made here, the court finds that a preliminary injunction should not issue and the motion should be denied. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008).

RECOMMENDATION

The Magistrate Judge recommends the District Court, after its independent review of the record, enter an order DENYING the plaintiff's motion, filed on September 1, 2020, for a preliminary injunction pursuant to Fed.R.Civ.P 65(a).  (Doc. 115)

Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within 14 days of being served with a copy of this report and recommendation.   If objections are not timely filed, the party's right to de novo review may be waived.  The Local Rules permit the filing of a response to an objection.  They do not permit the filing of a reply to a response without the permission of the District Court.

DATED this 30th day of November, 2020.

_Leslie A. Bowman_
Leslie A. Bowman
United States Magistrate Judge