**Victoria Lopez- 330042**
**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: vlopez@acluaz.org
Email**:** cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*Admitted pro hac vice*

**Wesley R. Powell***
**Matthew S. Friemuth***
**Nicholas Reddick***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: wpowell@willkie.com
E-Mail: mfriemuth@willkie.com
E-Mail: nreddick@willkie.com
*Admitted pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **RUSSELL B. TOOMEY,**<br><br>            Plaintiff,<br><br>v.<br><br>**STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, D/B/A UNIVERSITY OF ARIZONA**, a governmental body of the State of Arizona; **RON SHOOPMAN**, in his official capacity as Chair of the **Arizona Board of Regents; LARRY PENLEY**, in his official capacity as Member of the Arizona Board of Regents; **RAM KRISHNA**, in his official capacity as Secretary of the Arizona Board of Regents; **BILL RIDENOUR**, in his official capacity as Treasurer of the Arizona Board of Regents; **LYNDEL MANSON**, in her official capacity as Member of the Arizona Board of Regents; **KARRIN TAYLOR ROBSON**, in her official capacity as Member of the Arizona Board of Regents; **JAY HEILER**, in his official capacity as Member of the Arizona Board of Regents; **FRED DUVAL**, in his official capacity as Member of the Arizona Board of Regents; **ANDY TOBIN**, in his official capacity as Director of the Arizona Department of Administration; **PAUL SHANNON**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration,<br><br>            Defendants. | CV 19-0035-TUC-RM (LAB)<br><br>**PLAINTIFF AND THE CLASSES' OBJECTIONS TO REPORT & RECOMMENDATION** |

Plaintiff Russell B. Toomey, Ph.D., on behalf of himself and the certified Classes, respectfully submits these Objections to the Magistrate Judge's Report and Recommendation (the "R&R") (Doc. 134) regarding his Motion for Preliminary Injunction (Doc. 115).

By separate motion, Plaintiff also seeks expedited consideration of these Objections.

**Objection 1: The R&R Erred in Concluding that Dr. Toomey and the Classes Are Unlikely to Succeed on the Merits**

Although the R&R agreed that Dr. Toomey and the Classes will suffer irreparable harm without a preliminary injunction (Doc. 134 at 10), the R&R concluded that Dr. Toomey and the Classes had not established a likelihood of success on the merits of their Title VII or equal protection claims (Doc. 134 at 4-9). In reaching that conclusion, the R&R ignored recent Supreme Court precedent and relied exclusively on a pair of Supreme Court cases from over 40 years ago about pregnancy discrimination. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) (Title VII); *Geduldig v. Aiello*, 417 U.S. 484 (1974) (equal protection). Without the benefit of briefing from either party on the precedential force or relevance of these two cases, the R&R cited *Geduldig* and *Gilbert* for the erroneous proposition that a policy does not facially discriminate based on sex or transgender status unless the policy affects *all* women, *all* men, or *all* transgender people. The R&R's reliance on *Geduldig* and *Gilbert* conflicts with decades of Supreme Court precedent, including *Bostock v. Clayton Cty*. 140 S. Ct. 1731 (2020), and with this Court's prior decision in this case (Doc. 69 at 10-11).

**I.   Plaintiff and the Class Are Likely to Succeed on Their Title VII Claim.**

**A. A Defendant's Motivation Is Irrelevant When an Employment Policy Is Discriminatory on Its Face.**

The R&R erred from the outset by assuming that Title VII claims for disparate treatment require proof that defendants are subjectively motivated by a discriminatory intent or animus. According to the R&R, Dr. Toomey could prevail on his Title VII claim only by producing evidence that "the Plan authors do not like gender transition and have created this

exclusion specifically to burden transgender individuals." (Doc. 134 at 6).

That was error. "Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). As *Bostock* explained, the only relevant "intention" under Title VII is the intention to use an employee's sex as a "but for" cause of an employment action. "An employer who discriminates against homosexual or transgender employees necessarily and intentionally applies sex-based rules," and "nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct." *Bostock*, 140 S. Ct. at 1745-46.[1]

### B. The "Gender Reassignment Surgery" Exclusion Facially Discriminates Based on Sex.

As virtually every other court to consider the question has recognized, excluding coverage for medically necessary surgery because the surgery is performed for purposes of "gender reassignment" facially discriminates on the basis of "sex" in violation of Title VII and other civil rights statutes. *Kadel v. Folwell*, 446 F. Supp. 3d 1 (M.D.N.C. 2020); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018); *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931 (W.D. Wis. 2018).

*Bostock* made clear that an employment policy discriminates because of "sex" whenever the policy treats an individual employee differently based on that employee's sex. Under this standard, discriminating against an employee based on transgender status violates Title VII "because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Bostock,* 140 S. Ct. at 1742. For

---

[1] The R&R cited *Ricci v. DeStefano*, 557 U.S. 557 (2009) (Doc. 134 at 4), but the relevant intent in that case was the intent to make an employment decision based on race, not the Defendant's motive for doing so.  *See Ricci*, 557 U.S. at 579-80 ("Whatever the City's ultimate aim—however well intentioned or benevolent it might have seemed—the City made its employment decision because of race.").

example, "an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female . . . intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 1741. "By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today." *Id.* at 1746.

The Plan's "gender reassignment surgery" exclusion discriminates based on sex in precisely the same way. On its face, the exclusion refers to "gender" reassignment. "The characteristics of sex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them." *Kadel*, 446 F. Supp. 3d at 18; *cf. Bostock*, 140 S. Ct. at 1746 ("[T]ry writing out instructions for" discriminating against transgender employees "without using the words man, woman, or sex (or some synonym). It can't be done.").

As with the definition of "transgender" itself, the exclusion of coverage for "gender reassignment surgery" inherently rests on a sex classification because "the diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned *sex* and *gender* identity." *Kadel*, 446 F. Supp. 3d at 18. Thus—as with the definition of transgender itself—an employer who excludes coverage for medically necessary surgery because the surgery is performed for the purposes of "gender reassignment" "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock,* 140 S. Ct. at 1746.  For example, if Dr. Toomey had been assigned a male sex at birth and had been born with a uterus and fallopian tubes as a result of Persistent Mullerian Duct Syndrome ("PMDS"), the Plan would cover the medically necessary surgery to align his anatomy with his identity as a man. *See* (Amended Complaint; Exhibit A, Doc. 86-1 at 55) (exclusion of coverage for "cosmetic surgery" does not exclude "necessary care and treatment of medically diagnosed congenital defects and birth abnormalities" or "surgery required to repair bodily damage a person receives from an injury").  But because Dr. Toomey was assigned a female sex at birth, his surgery to align his anatomy with his identity as a man is excluded as "gender reassignment."

The "gender reassignment surgery" exclusion also discriminates based on gender

3

nonconformity, which—under *Bostock*—is another example of disparate treatment based on sex assigned at birth. Discrimination based on gender nonconformity "penalizes a person identified as male at birth for traits or actions that [the employer] tolerates in an employee identified as female at birth," and vice versa. *Bostock*, 140 S. Ct. at 1741. Thus, an employer violates Title VII if it "fires a woman, . . . because she is insufficiently feminine and also fires a man . . . for being insufficiently masculine." *Id.*

Once again, the "gender reassignment surgery" exclusion discriminates in precisely the same way. The exclusion prohibits an employee assigned a female sex at birth from receiving medically necessary care that masculinizes his body in accordance with his male gender identity; and the exclusion prohibits a person assigned a male sex at birth from receiving medically necessary care to feminize her body in accordance with her female gender identity. As this Court already explained, "[t]his narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity" and, therefore, "implicates the gender stereotyping prohibited by Title VII." (Doc. 69 at 10-11). *Accord Boyden*, 341 F. Supp. 3d at 997 (explaining that excluding transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex").

**C. The R&R Erred in Analogizing This Case to *Gilbert*.**

Instead of following the straightforward analysis set forth in *Bostock*, the R&R applied a different test that it derived by analogizing this case to the disability insurance policy upheld in *Gilbert*, which excluded coverage for pregnancy-related disability. (Doc. 134 at 5). *Gilbert* held that the pregnancy exclusion did not facially discriminate on the basis of sex because "[t]he program divides potential recipients into two groups: pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes." *Gilbert*, 429 U.S. at 135.

From *Gilbert*, the R&R derived a general principle that a policy is not facially discriminatory unless it discriminates against *all* members of a particular group. (Doc. 134 at 5-6, 8). The R&R then concluded that the "gender reassignment surgery" exclusion "is

4

not, on its face, discrimination on the basis of sex" because "[t]he Plan exclusion only applies to natal females who seek a hysterectomy for the purpose of gender transition. The exclusion discriminates against some natal females but not all." (Doc. 134 at 8).

The R&R's reliance on *Gilbert* was misplaced. Despite the R&R's assumption to the contrary, the Court's analysis in *Gilbert* is not "still controlling." (Doc. 134 at 5 n.2). When Congress overruled *Gilbert* by passing the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), "it unambiguously expressed its disapproval of both the holding *and the reasoning* of the Court in the *Gilbert* decision." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79 (1983) (emphasis added). "The House Report stated, 'It is the Committee's view that the dissenting Justices correctly interpreted the Act.' Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they 'correctly express both the principle and the meaning of [T]itle VII.'" *Id.* at 679 (footnotes omitted).[2]

Far from adhering to *Gilbert*, Supreme Court decisions before and after *Gilbert* have recognized that the critical question under Title VII is not whether a policy discriminates against *all* women or *all* men. Rather, the focus of the statutory text is on discrimination against "individuals, not groups." *Bostock*, 140 S. Ct. at 1741. Thus, an employer violates Title VII when it discriminates against just the subset of women with young children. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (per curiam). An employer violates

---

[2] None of the decisions cited by the R&R supports the assertion that *Gilbert*'s reasoning is still controlling. *Lange v. Houston Cty., Georgia*, 2020 WL 6372702, at *11 (M.D. Ga. Oct. 30, 2020), was referring to the Supreme Court's interpretation of the Equal Protection Clause in *Geduldig*, not to the statutory interpretation in *Gilbert*. *In re Union Pac. R.R. Employment Practices Litig.*, 479 F.3d 936, 944 (8th Cir. 2007), held that an exclusion of contraception services was facially neutral because it excluded coverage for all forms of contraception for both men and women, including vasectomies. And *Coleman v. Bobby Dodd Inst., Inc.*, 2017 WL 2486080, at *2 (M.D. Ga. June 8, 2017), dismissed a complaint because it failed to allege that the employer " treat[ed] a uniquely feminine condition, such as excessive menstruation, less favorably than similar conditions affecting both sexes, such as incontinence." Neither case purported to hold that an exclusion is not facially discriminatory if it does not affect all members of a group.

Title VII when it discriminates against just the subset of women who act macho. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). And an employer violates Title VII when it discriminates against just the subset of women who are lesbians or transgender. *See Bostock*, 140 S. Ct. 1731; *accord EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 578 (6th Cir. 2018), *aff'd sub nom. Bostock*, 140 S. Ct. 1731 ("[A]n employer need not discriminate based on a trait common to all men or women to violate Title VII.").

The "controlling" standard for identifying a facially discriminatory policy is the standard employed in *Phillips*, *Price Waterhouse*, and *Bostock*. The R&R erred by ignoring all these decisions and focusing exclusively on an anomalous and abrogated decision from over 40 years ago.

**II.   Plaintiff and the Class Are Likely to Succeed on the Equal Protection Claim.**

   **A. The Exclusion Facially Discriminates Based on Sex and Transgender Status.**

The "gender reassignment surgery" exclusion facially discriminates against people who are transgender.[3] Discrimination based on gender "transition clearly discriminates on the basis of transgender identity." *Stone v. Trump*, 356 F. Supp. 3d 505, 513 (D. Md. 2018). By providing medically necessary surgery for other medical conditions but excluding medically necessary gender-affirming surgery for transgender patients, Defendants' policy "creates a different rule governing the medical treatment of transgender people." *Flack*, 328 F. Supp. 3d at 950. As this Court already explained in its prior decision in this case:

> Plaintiff's alleged harm occurred because his natal sex does not match his gender identity. The Plan at issue covers cisgender individuals requiring medically necessary hysterectomies but does not cover transgender individuals requiring medically necessary hysterectomies for the purpose of gender reassignment. Had Plaintiff required a hysterectomy for any medically necessary purpose other than gender reassignment, the Plan would have covered the procedure. This narrow exclusion of coverage for "gender reassignment surgery" is directly connected to the incongruence between Plaintiff's natal sex and his gender identity . . . .which transgender individuals by definition experience and display.

---

[3] For the same reasons that the "gender reassignment surgery" exclusion discriminates based on sex under Title VII, the exclusion also discriminates based on sex under the Equal Protection Clause. *See Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).

(Doc. 69 at 10-11). This Court also explicitly rejected the argument that the exclusion merely "targets a 'service' rather than transgender individuals": "[T]ransgender individuals are the only people who would ever seek gender reassignment surgery. No cisgender person would seek, or medically require, gender reassignment. Therefore, as a practical matter, the exclusion singles out transgender individuals for different treatment." (Doc. 69 at 11).

The R&R reached a different conclusion by repeating the same errors it made when analyzing the Title VII claim. According to the R&R, "while all persons seeking gender transition surgery are transgender, not all transgender persons seek gender transition surgery." (Doc. 134 at 5). As a result, according to the R&R, "the Plan exclusion is not facially discriminatory against all transgender individuals," and "if [Dr.] Toomey cannot prove that the exclusion discriminates against transgender individuals as a class, the court will not apply heightened scrutiny." (Doc. 134 at 9).

The R&R adopted this unusual standard by, once again, relying on a Supreme Court decision from over 40 years ago that distinguished between discrimination based on sex and discrimination based on pregnancy. *Geduldig*, 417 U.S. 484. As with the Supreme Court's Title VII decision in *Gilbert*, the Supreme Court's equal protection decision in *Geduldig* is neither controlling nor relevant here. *Geduldig* predates the Court's modern equal protection jurisprudence and has not been cited by a majority opinion in an equal protection case since the mid-70s. *See generally* Reva B. Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 108 Georgetown L.J. 167, 208 n.229 (2020). And even if *Geduldig* were still controlling in the context of pregnancy, there is no basis to extend its reasoning to discrimination against transgender people in the face of more recent precedent.

There is no rule that a facially discriminatory policy must affect every member of a particular group in order to trigger heightened scrutiny. Supreme Court precedent says the opposite. *See Rice v. Cayetano*, 528 U.S. 495, 516-17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *Nyquist v. Mauclet*, 432 U.S. 1, 8 (1977) (rejecting argument that law was facially

7

neutral with respect to alienage because it discriminated against only a subset of resident aliens, and explaining that "[t]he important points are that [the statute] is directed at aliens and that only aliens are harmed by it"). Modern precedents from the Ninth Circuit and the Supreme Court also recognize that when a "defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group," the discrimination is treated as a facial classification. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). Thus, discrimination based on the conduct of having relationships with a same-sex partner is discrimination based on sexual orientation, even though some gay people may choose to be celibate. *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class.").

This Court's prior reasoning adheres to these precedents. The "narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity." (Doc. 69 at 10). The exclusion thus discriminates based on "criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination." *Pac. Shores Properties*, 730 F.3d at 1160 n.23. The R&R erred by disregarding this Court's previous reasoning and replacing it with a strained analogy to *Geduldig*.

### B. The Exclusion Fails Heightened Scrutiny.

In the Ninth Circuit, discrimination based on sex and transgender status is subject to heightened scrutiny. *See Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Morris v. Pompeo*, 2020 WL 6875208, at *7 (D. Nev. Nov. 23, 2020); *Hecox v. Little*, 2020 WL 4760138, at *26 (D. Idaho Aug. 17, 2020); *Vuz v. Dcss III, Inc.*, 2020 WL 4366023, at *11 (S.D. Cal. July 30, 2020). In light of these precedents, it is not clear why the R&R merely

"assume[d] that [Dr.] Toomey is correct about the court's scrutiny." (Doc. 134 at 9)

Under heightened scrutiny, Defendants must demonstrate that the exclusion serves an important governmental interest and "that the discriminatory means employed" "are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). "The burden of justification is demanding and it rests entirely on the [government]." *United States v. Virginia*, 518 U.S. 515 533 (1996).

The R&R turned heightened scrutiny on its head. Instead of placing the burden on Defendants to establish that the "gender reassignment surgery" was substantially related to an important governmental interest, the R&R stated that "[a]t this stage of the litigation, it would be premature to address reasons that the State might raise in the future after discovery." (Doc. 134 at 7). But Defendants do not need discovery to identify *their own reasons* for adopting and maintaining the "gender reassignment surgery" exclusion. Defendants already have that information, and Defendants bear the burden of proof.

In opposing the motion for preliminary injunction, Defendants failed to present *any* evidence to carry their burden under heightened scrutiny. The only justification that Defendants have provided is that the categorical exclusion serves a governmental interest in reducing costs, but this Court has already concluded—as a matter of law—that cost savings is not a constitutionally sufficient justification for treating similarly situated groups differently under *any* standard of scrutiny. (Doc. 69 at 16.) Defendants therefore are unlikely to carry their burden under heightened scrutiny, and Dr. Toomey and the Class are likely to prevail on the merits of their equal protection claim.

**Objection 2: The R&R Erred in Balancing the Equities and the Public Interest**

Because Dr. Toomey and the Classes are likely to succeed on the merits of their claims, the balance of hardships and the public interest tip in their favor. (Doc. 115 at 9).

In analyzing the balance of hardships, the R&R stated that "there is presently no evidence before the court as to how much 'human suffering' would be alleviated should be motion be granted," while conceding it may not be "possible to offer meaningful evidence on such an issue." (Doc. 134 at 10). It is impossible to identify the range of negative

9

consequences for every current or future class member, but the Ninth Circuit has already held that the suffering can be great enough to violate the Eighth Amendment. *See Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), *cert. denied sub nom. ID DOC v. Edmo*, No. 19-1280, 2020 WL 6037411 (U.S. Oct. 13, 2020). That should be enough.

The R&R also faulted Plaintiffs for failing to provide information about what the financial impact on the Plan would be if the exclusion of coverage for "gender reassignment surgery" were removed. (Doc. 134 at 10). But, once again, Defendants are the ones in possession of that information. The absence of information in the record simply reflects Defendants' own failure to carry their burden of proof.

**Objection 3: The R&R Erred in Applying the Standard for "Mandatory Injunctions"**

Although the preliminary injunction should be granted under any standard, the R&R erred when it applied the heightened standard for "mandatory" injunctions. The R&R defined mandatory injunctions as injunctions that change the status quo. (Doc. 134 at 3). But, as explained in Dr. Toomey's reply brief (Doc. 126 at 1-2), the Ninth Circuit held in *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017), that an injunction to "prevent[] future constitutional violations" is "a classic form of "prohibitory injunction," and should not be subjected to the heightened "mandatory injunction" standard. The R&R acknowledged that its reasoning conflicted with *Hernandez* with a "but see" citation (Doc. 134 at 3), but gave no explanation for relying on decisions from 1979 and 1994 over the Ninth Circuit's more recent binding precedent.

Respectfully submitted this 4th day of December, 2020.

                ACLU FOUNDATION OF ARIZONA
                By */s/ Christine K. Wee*
                   Christine K. Wee
                   Victoria Lopez

                AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                   Joshua A. Block*
                   Leslie Cooper*

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell*
Matthew S. Friemuth*
Nicholas Reddick*

*admitted pro hac vice

*Attorneys for Plaintiff Russell B. Toomey*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2020, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

*/s/Christine K. Wee*
Christine K. Wee