FENNEMORE CRAIG, P.C.
Timothy J. Berg (No. 004170)
Amy Abdo (No. 016346)
Ryan Curtis (No. 025133)
Shannon Cohan (No. 034429)
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: tberg@fennemorelaw.com
Email: amy@fennemorelaw.com
Email: rcurtis@fennemorelaw.com
Email: scohan@fennemorelaw.com

*Attorneys for Defendants*
*State of Arizona, Andy Tobin, and Paul Shannon*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B. Toomey, | No. 4:19-cv-00035 |
| Plaintiff, | **DEFENDANTS STATE OF ARIZONA'S, ANDY TOBIN'S, AND PAUL SHANNON'S OPPOSITION TO PLAINTIFF'S (SECOND) MOTION TO COMPEL** |
| v. | |
| State of Arizona, *et al.* | |
| Defendants. | |

Defendants State of Arizona, Andy Tobin, and Paul Shannon (collectively, the "State Defendants") hereby oppose Plaintiff Russell B. Toomey's Motion to Compel the production of documents withheld under the attorney-client privilege (the "Motion"), filed May 20, 2021.

Plaintiff's Motion misconstrues the facts and law regarding the attorney-client privilege and waiver, and is wholly inaccurate regarding the nature of communications at issue and the relationship between the Arizona Department of Administration ("ADOA") and the Governor's Office. The State Defendants have not waived the privilege—intentionally or unintentionally. Plaintiff incorrectly argues the State Defendants asserted an advice of counsel defense through interrogatory responses and deposition testimony. A proper reading of the interrogatory responses shows there was no such assertion of a defense of advice of legal counsel. Alternatively, Plaintiff argues the State Defendants waived the privilege by disclosing the content of legal advice through the deposition testimony of a *former* ADOA employee or through disclosures to the Governor's Office. Plaintiff fails to recognize the powers and duties of Arizona's Governor under Arizona's Constitution and state law. ADOA and the Governor's Office easily meet the requirements of the common interest doctrine that expands the scope of the attorney-client privilege.

The attorney-client privilege is important for all clients but is critical for governmental entities to seek legal advice without fear of consequences or the apprehension of disclosure. However, Plaintiff's argument puts the State Defendants in a no-win situation. Plaintiff suggests that because the State Defendants acknowledge they wanted to follow the law, obtained legal advice, and made a decision addressing new non-discrimination rules issued in 2016 under the Affordable Care Act ("ACA") § 1557,[1] that the State Defendants broadly waived the attorney-client privilege. However, had the State Defendants *not* sought

---

[1] ACA § 1557 is codified at 42 U.S.C. § 18116.

legal advice about those new rules, Plaintiff certainly would be condemning them for failing to do so. Under Plaintiff's arguments, the State Defendants are damned if they do and damned if they don't. The effect of such reasoning is that government officials will be discouraged from seeking legal counsel, which undermines good public policy and the purpose of the attorney-client privilege.

The attorney-client privilege is not overcome. The Court should deny the Motion.

I. **THE COURT SHOULD DENY PLAINTIFF'S MOTION TO COMPEL.**

Parties may obtain discovery about any *nonprivileged* matter. Fed. R. Civ. P. 26(b)(1). Nothing in the Federal Rules of Civil Procedure authorizes a party to demand the production of privileged documents, but that is what Plaintiff seeks. A party may move the Court for an order compelling disclosure or discovery. Fed. R. Civ. Pro. 37. The burden falls on the moving party to demonstrate the non-moving party's objection is unjustified. *Ocean Garden Prod. Inc. v. Blessings Inc.*, No. CV-18-00322-TUC-RM, 2020 WL 4284383, at *2 (D. Ariz. July 27, 2020). As the moving party, Plaintiff further bears the burden of identifying (i) the specific documents that are the subject of his motion and (ii) why the State Defendants' assertions of privilege as to those documents are not justified. *See, e.g.*, *Hawkins v. Winkfield*, 219CV1228TLNKJNP, 2021 WL 1193421, *1–2 (E.D. Cal. March 30, 2021). Plaintiff fails in both regards. Plaintiff's Motion does not identify the specific documents at issue. *See id.* ("generalized identification" of the discovery requests is insufficient). And Plaintiff fails to demonstrate that there has been any waiver of the attorney-client privilege. Moreover, the State Defendants demonstrate herein that they have not waived the privilege.

A. **The Attorney-Client Privilege.**

"The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677 (1981) (citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961).

Its purpose is to "encourage full and frank communications between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice." *Id*. The privilege is necessary because proper legal assistance can only be given when it is free from "consequences or the apprehension of disclosure." *Id.* (quoting *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)).

The privilege is not restricted to clients who are individuals. It applies to clients that are corporations and other entities. *Id*. at 389–90 (citing *United States v. Louisville & Nashville R. Co.*, 236 U.S. 318, 336 (1915)); *see also*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985) (inanimate entities can assert the attorney client privilege just as an individual can). Government entities are no different. Under Arizona law, communications between a lawyer for a governmental entity and that entity's employees or agents are privileged when the communications are for obtaining or providing legal advice. A.R.S. § 12-2234(B). Allowing the government to engage in privileged communications with legal counsel is important. As the Second Circuit explained,

> In the context of legal advice to government officials, the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest.

*Am. C.L. Union v. Nat'l Sec. Agency*, 925 F.3d 576, 589 (2d Cir. 2019) (internal quotations omitted). The privilege applies with "special force" in the government context because the privilege encourages government officials formulating policies in the public interest to consult with counsel. *Modesto Irrigation Dist. v. Gutierrez*, 1:06-CV00453 OWWDLB, 2007 WL 763370 (E. D. Cal. Mar. 9, 2007).

The privilege is not absolute. There are conditions where the privilege can be overcome including when advice of counsel is used as an affirmative defense, or when the privileged is waived through disclosure. Neither of those has happened in this case.

### B. State Defendants Have Not Asserted An Advice of Counsel Defense.

Plaintiff argues that the attorney-client privilege is overcome because the State Defendants have asserted the "advice of counsel defense." This is not accurate. The State Defendants have not asserted advice of counsel as an affirmative defense in its Answer to the Amended Complaint. (Doc. 89 at 27:9–29:9.) The advice of counsel defense need not be asserted in a pleading, but it must be done through some affirmative act by a party to the case. *U.S. v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999). A court must examine whether the party, "through this affirmative act," puts the privileged information at issue. *Id*.

#### 1. Interrogatory Responses Did Not Waive the Privilege.

Plaintiff claims the State Defendants affirmatively asserted an advice of counsel defense in responses to Interrogatory Nos. 1, 4, and 7. (Doc. 195 at 4:2-7.) As discussed below, the State Defendants did not affirmatively assert an advice of counsel defense nor did they imply one in any of those responses.

"In general, disclosing that legal counsel was consulted, the subject about which advice [was] received, or that action was taken based on that advice, does not necessarily waive the privilege protection." *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2015 WL 12911719, at *3 (D. Ariz. May 14, 2015). In their interrogatory responses, the State Defendants disclosed that legal counsel was consulted and the subject for which advice it received. (Doc. 195-3, Ex. 3 at 3, 5, 7-8.) That is insufficient to waive the privilege. The State Defendants did not state: (i) what the legal advice was; (ii) whether there was any recommendation from legal counsel; (iii) whether they relied upon legal counsel's advice; (iv) whether actions were based on or justified by legal advice; or (v) what attorneys gave legal advice—whether outside legal counsel, in-house counsel at ADOA or the Governor's Office, or the Attorney General's Office. *Id.*

In some cases, when the subjective intent of the of a party is at issue, a party may waive the privilege by stating that its decision or actions were justified by the legal advice

it received. *Melendres*, 2015 WL 12911719, at *3. Nothing in the interrogatory responses indicate that legal advice justified any decision by the State Defendants. (Doc. 195-3, Ex. 3 at 3, 5, 7-8.) An analysis of the State Defendants' responses cited by Plaintiff demonstrates there was no advice of counsel defense asserted.

### a. Response to Interrogatory No. 1.

Plaintiff incorrectly suggests the State Defendants asserted advice of counsel defense and waived the privilege when explaining why the State Health Plan does not cover gender reassignment surgery. (Doc. 195-3, Ex. 3. at 4:4-14.) The State Defendants did not put the legal advice they received at issue, but only stated what the law was at the time of the decision to expand transgender benefits while continuing to exclude surgeries. The State Defendants did not state what the legal advice was and did not even state that they relied on advice from legal counsel. The State Defendants further stated that the legal advice received is privileged. (*Id.* at 3:17-18.) This was an *assertion* of the privilege, not a *waiver*.

Plaintiff wants the privileged communication in hopes of showing discriminatory intent. Plaintiff's desire does not make the privileged communications discoverable. Plaintiff and the Court need only consider the facts stated in the response to the Interrogatory regarding the status of the law that provided a backdrop to the State Defendants' consideration of changes to the Health Plan. At that time (in 2016), health plans were not required under Title VII of the Civil Rights Act or the Equal Protection Clause to cover transgender benefits. Discrimination on the basis of sex under Title VII or Equal Protection did not include transgender status. State Defendants' 2016 decision to expand coverage but keep the exclusion for "gender reassignment surgery" came four years prior to the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020). Even *Bostock* was not dispositive on the issue of transgender benefit coverage.[2]

---

[2] *Id.* at 1741 (Alito, J., dissenting) ("Healthcare benefits may emerge as an intense battleground under the Court's holding.").

ADOA reviewed and *expanded* coverage for transgender services shortly after new rules had been issued by the Office of Civil Rights ("OCR") of the United States Department of Health and Human Services ("HHS"). HHS issued a final rule implementing non-discrimination provisions under § 1557 on May 18, 2016 (the "2016 Rules").[3] Notably, the 2016 Rules prohibited entities subject to the rules from including categorical exclusions or limitations for health services related to "gender transition." 45 CFR § 92.207(b)(4) (2016). However, the 2016 Rules did not affirmatively require coverage of any particular procedure or treatment for gender transition-related care. *Id*. at § 92.207(d) ("Nothing in this section is intended to determine, or restrict a covered entity from determining, whether a particular health service is medically necessary or otherwise meets applicable coverage requirements in any individual case"). Further, even if the 2016 Rules required that all transition-related surgeries be covered, they were then being challenged in court to determine if they were valid or whether they exceeded what is meant by "on the basis of sex" under the law.

The language of § 1557 is concise. Regarding discrimination on different bases, § 1557 incorporates different federal discrimination laws. *See* 42 U.S.C. § 18116 (A). For discrimination on the basis of sex, § 1557 incorporates Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.). *Id*.[4] Challenges to the validity of the 2016 Rules occurring when the State Defendants were considering changes to the State Health Plan focused on whether the 2016 Rules improperly exceeded the scope of what is meant by discrimination on the basis of sex in Title IX.[5]

---

[3] *See*, Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 96, 31376 (May 18, 2016) (codified at 45 C.F.R. pt. 92).

[4] Section 1557 does not incorporate Title VII of the Civil Rights Act to define discrimination "on the basis of sex."

[5] The purpose of Title IX, when passed into law in 1972, was to establish equal educational opportunities for women and men. *Lothes v. Butler Cnty. Juvenile Rehab. Ct.*, 243 Fed. App'x. 950, 955 (6th Cir. 2007). Discrimination on the basis of sex under Title IX originally

On December 31, 2016, the United States District Court for the Northern District of Texas granted a motion for preliminary injunction enjoining HHS from enforcing § 1557 prohibitions against discrimination on the basis of gender identity because the definition of sex under the 2016 Rules exceeded the scope of Title IX. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016). This case and related motions were pending when the ADOA was evaluating how it would address § 1557. In fact, the day after Texas District Court's ruling, the State Health Plan *expanded* transgender benefits to include hormone and counseling treatment, effective January 1, 2017.[6]

There has continued to be uncertainty regarding the validity and enforcement of § 1557. HHS issued new rules under § 1557 on June 19, 2020. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020). A few months later, the Federal District Court for the Eastern District of New York issued a preliminary injunction against the enforcement of those new rules. *Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020). Only recently (May 10, 2021), HHS announced that OCR would begin enforcing § 1557 and Title IX's prohibition on discrimination based on sex including discrimination

---

meant male and female under traditional binary concepts of sex that is consistent with a person's birth or biological sex. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007). For many years, including shortly prior to the ADOA's decision to modify the Exclusion, courts held that discrimination on the basis of gender identity was not covered by Title IX. *See e.g.*, *Johnston v. Univ. Pittsburgh*, 97 F.Supp. 3d 657 (W.D. Penn 2015).

[6] Other cases challenging the meaning of "on the basis of sex" under Title IX were also occurring in 2016 when the State Defendants were considering changes to the Exclusion. On August 21, 2016, the Federal District Court for the District of Northern Texas issued a preliminary injunction enjoining the Department of Education from enforcing guidance it had issued regarding transgender student access to school facilities including restrooms. *Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016). The guidance, which included gender identity under Title IX protections against discrimination on the basis of sex, exceeded the scope and plain meaning of Title IX. *Id*. at 832-33. ("It cannot be disputed that the plain meaning of the term sex as used in § 106.33 when it was enacted . . . following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth.").

on the basis of gender identity.[7]

In summary, regarding the State Defendants' response to Interrogatory No. 1, it only explained the context behind the State Defendants' 2016 decision as to the scope of their obligations. The State Defendants did not assert an advice of counsel defense, did not state what the legal advice was, did not indicate from whom any advice was received, and did not even state that they relied on advice from legal counsel. There was no waiver. Plaintiff's unexplained skepticism of the "State Defendants' actual understanding of the legality of the Exclusion" is no basis to force a governmental entity to divulge privileged communications. (Doc. 195 at 4, n. 2.) Plaintiff's logic would leave the attorney-client privilege susceptible to the unchecked skepticism of litigants or their counsel.

b. <u>Response to Interrogatory No. 4.</u>

Plaintiff next asserts that when the State Defendants identified persons who participated in "formulating, adopting, maintaining, reviewing, approving or deciding to continue" the Exclusion, the State Defendants somehow waived the privilege because three of the six people identified were lawyers. The notion is baseless. Plaintiff would have the Court hold that a waiver of privileged communications occurs whenever a party acknowledges that a lawyer was present at a meeting. This simply undercuts the privilege entirely since privileged communications can only occur when the conversation at issue involved the lawyer and his or her client. Indeed, if there were no lawyers listed as being present at the meeting, Plaintiff would have undoubtedly argued that the State Defendants were negligent in making a decision about the 2016 Rules without the assistance of lawyers and would have accused the State Defendants of discriminatory intent for *not* consulting with lawyers about the scope of their obligations. There was no statement in the

---

[7] *See* https://www.hhs.gov/about/news/2021/05/10/hhs-announces-prohibition-sex-discrimination-includes-discrimination-basis-sexual-orientation-gender-identity.html (last visited June 1, 2021).

1  interrogatory response about any legal advice.

2      Interrogatory No. 4 was also a compound question. A person listed could have been involved in reviewing the Exclusion, but might not have been involved in any other way such as formulating, adopting, maintaining, approving, or deciding anything about the Exclusion. Plaintiff's clearly overreaching argument is no basis for the Court to determine the State Defendants waived the privilege.

        c.    <u>Response to Interrogatory No. 7.</u>

    Plaintiff argues that the State Defendants asserted an advice of counsel defense and thereby waived the attorney-client privilege by noting that the State Defendants "considered" two memos regarding § 1557. One memo was from outside legal counsel and the other was a memo to legal counsel at the Governor's Office about the memo from outside legal counsel. (Doc. 195-3, Ex. 3 at 7:17–8:1.) The State Defendants did not disclose any legal advice contained therein, did not indicate there was a recommendation from legal counsel, and did not state that the State Defendants relied on any advice of legal counsel. (*Id.*) The input of outside legal counsel was only described as a summary concerning implications of § 1557 and transgender coverage requirements. (*Id.*) The response only said the State Defendants "considered" counsel's summary among various other information ADOA gathered, including information from insurers and other entities regarding their experience providing transgender benefits. (*Id.*) The only other reference to the identified communications was that they are covered by the attorney-client privilege. (*Id.* at 7:22-23.) This was an assertion of the privilege—not a waiver. State Defendant's response to Interrogatory No. 7 is no basis for the Court to determine that the State Defendants have asserted an advice of counsel defense and no reason to conclude the State Defendants waived the privilege.

**C.**     <u>**Deponent Testimony Did Not Waive The Privilege.**</u>

    Plaintiff next argues that deposition testimony of two deponents were affirmative

acts by a party resulting in the assertion of the advice of counsel defense and the waiver of the privilege. This is wrong for two reasons.

### 1. Deponents Had No Authority To Waive Attorney-Client Privilege.

When the client at issue is a corporation or other entity, only those in authority to speak for the entity can assert or waive the privilege. *Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 348 (1985). Inanimate entities do not speak directly to lawyers, but act through their agents. *Id*. Likewise, entities cannot directly assert or waive a privilege, but may do so through individuals "empowered to act on behalf of" the entity. *Id*.[8] Those without authority to speak on behalf of an entity cannot waive the privilege. *Id*. As the United States Supreme Court explained,

> [W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Id*. at 349.

No statement by Scott Bender or former ADOA employee Marie Isaacson can waive the privilege because neither of them have authority to speak on behalf of Defendants Andy Tobin or Paul Shannon in their official capacities or on behalf of Defendant State of Arizona. Director Tobin and Mr. Shannon can speak for themselves in their official capacities, and neither Ms. Isaacson as a former ADOA employee (Declaration of Ryan Curtis ("Curtis Decl."), Ex. 14 at 87:19–88:9, filed concurrently, incorporated by reference), nor Mr. Bender as a benefits manager (Curtis Decl., Ex. 15 at 16:20–17:12) has authority

---

[8] As discussed above, governmental entities are not different than corporations or other entities when it comes to the attorney-client privilege.

to speak on behalf of the State of Arizona.

Plaintiff relies almost exclusively on testimony given by former ADOA employee Marie Isaacson. Ms. Isaacson retired from State employment in 2018. (Curtis Decl., Ex. 14 at 87:19–88:9.) When she testified at her deposition on March 26, 2021, she was a former employee and had no authority to speak on behalf of the State Defendants. She could not waive the privilege any more than she could assert the privilege. *Smith v. Ergo Sols., LLC*, No. CV 14-382 (JDB), 2017 WL 2656096, at *4 (D.D.C. June 20, 2017). "[A]ny privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation and not the officer." *U.S. v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010) (quoting *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986)). This all means that after Ms. Isaacson left ADOA, she had no authority to speak on behalf of ADOA. Any authority she had to waive the privilege ended when she left ADOA.

### 2. No Statements By Deponents Asserted An Advice of Counsel Defense.

Even if Ms. Isaacson or Mr. Bender had authority to waive the attorney-client privilege, nothing they said during their depositions asserted an advice of counsel defense or waived the privilege. The Motion mischaracterizes deposition testimony, describing Ms. Isaacson's and Mr. Bender's testimony as stating that "legal advice" and "advice about what ADOA was required or not required to cover was the primary basis of ADOA's decision." (Doc. 195 at n.4.) The referenced deposition testimony, however, does not contain any reference to "legal advice" or even "advice." (Doc. 195-3, Ex. 6 at 31:8-13); (Doc. 195-3, Ex. 7 at 167:12–168:3.)

Moreover, despite Mr. Bender sitting through a full day of deposition questions, Plaintiff only referred to a few lines of Mr. Bender's deposition transcript to suggest he asserted an advice of counsel defense on behalf of the State Defendants. (Doc. 195-3, Ex. 7 at 167:12–168:3.) Mr. Bender testified, regarding the reasons for maintaining the Exclusion,

that "I *believe* there are several reasons, one being cost and the other being we didn't *feel* it was required for us to include -- or to eliminate the exclusion . . . ." (*Id.* (emphasis added).) Mr. Bender made no reference to legal advice or anything definitive about the laws at issue. He only said ADOA *felt* it was not required to cover reassignment surgery. Mr. Bender, recalling in 2021, *beliefs* and *feelings* he may have had five years prior in 2016 about what level of transgender benefits had to be covered is no basis to find that the privilege is waived.

### D. The Privilege Was Not Waived Based On Any Voluntary Disclosure.

Plaintiff's final alternate argument is that the privilege was waived based on voluntary disclosures. First, Plaintiff again asserts that Ms. Isaacson volunteered the content of legal advice during her deposition and thereby waived the privilege for all communications under that subject matter. Second, Plaintiff argues that the privilege was waived by Ms. Isaacson providing a copy of a legal memo the ADOA had received from outside legal counsel to the Governor's Office. Both of these arguments are flawed.

#### 1. Only Parties Can Waive The Privilege.

Plaintiff once again turns to deposition testimony by Ms. Isaacson to argue that she waived the privilege by divulging the content of the advice of legal counsel.[9] Plaintiff's argument is again flawed because Ms. Isaacson is not a party.

First, Plaintiff repeatedly mischaracterizes Ms. Isaacson's deposition testimony to argue that she disclosed "the content" and "the substance of the legal advice provided to State Defendants regarding the Exclusion." The deposition testimony attached to Plaintiff's Motion does not support these assertions. Plaintiff states, for example, "Ms. Isaacson disclosed the content of this legal advice to Ms. Christina Corieri, a representative of the Governor's Office, in telephone calls." (Doc. 195 at 6:11-13.) Ms. Isaacson actually testified, however, not that she disclosed the content of the legal advice to Ms. Corieri, but

---

[9] Plaintiff makes no reference to any deposition testimony Mr. Bender gave that divulged the content of legal advice ADOA received regarding the Exclusion.

that she simply shared the fact that ADOA engaged legal counsel to research the legal requirements. (Curtis Decl., Ex. 14 at 42:6-18.) Plaintiff later characterizes Ms. Isaacson as "forthrightly disclos[ing] some of the content of legal advice received by State Defendants regarding the legality of the Exclusion . . . without prompting from the examining counsel." (Doc. 195 at 13:11–15.) Yet the cited portion of Ms. Isaacson's testimony, which was made in response to questions from examining counsel, does not reference legal advice. (Doc. 195-3, Ex. 6 at 19:6–24.)

Second, as Plaintiff noted, "[t]he Ninth Circuit has adopted a three-prong test to evaluate whether a *party* has waived the attorney-client privilege." (Doc. 195 at 8:10-13 (emphasis added).) The first prong is that "the court considers whether the *party* is asserting the privilege as the result of some affirmative act." *Amlani*, 169 F.3d at 1195 (emphasis added). Ms. Isaacson is not a party and was not affiliated with any party once she retired in 2018. She cannot waive the privilege on behalf of a party.

Plaintiff cites to numerous cases as examples of waiver of the privilege. In each of those cases, parties, who held the privilege, took some action to waive the privilege. *Amlani*, 169 F.3d at 1191 (criminal defendant and party to the case, Altaf Amlani, waived the privilege); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1163 (9th Cir. 1992) (defendant and party Pennzoil waived the privilege); *Weil v. Investment/Indicators, Research and Management, Inc.,* 647 F.2d 18, 7 (9th Cir. 1981) ("We conclude, therefore, that the Fund [Investment/Indicators] has waived its attorney-client privilege"); *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2015 WL 12911719, at *2 (D. Ariz. May 14, 2015) ("Defendant Sheriff Arpaio implicitly invoked the defense of advice of counsel by testifying that he had delegated MCSO's compliance with Preliminary Injunction to "counsel and relied on them to abide by this order"); *State Farm Mut. Auto. Ins. Co., v. Lee*, 13 P.3d 1169 (Ariz. 2011) ("State Farm implicitly asserted the advice of counsel as a defense when it made its claim of good-faith conduct turn on its legal research."); *U.S. v. Sanmina Corporation*, 958 F.3d

1107, 1125 (9th Cir. 2020) ("Sanmina waived the attorney-client privilege when it disclosed the Attorney Memos to DLA Piper"); *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) ("the district did not clearly err by concluding that Hernandez waived both privileges as they pertained to the conspiracy claim").

Plaintiff has cited to no authority in which a non-party witness, including a witness who is a former employee, could waive the attorney-client privilege for her former employer. Plaintiff never addresses the fact Ms. Isaacson is a non-party former employee who cannot waive the privilege even though the State Defendants provided contrary authorities to Plaintiff by email on May 10, 2021. (Doc. 195-3, Ex. 12 at p. 2.)

**2. Communications With the Governor's Office Are Attorney-Client Privileged Under the Common Interest Doctrine.**

Plaintiff next argues that the State Defendants waived the attorney-client privilege by disclosing legal research they received from their counsel to the Governor's Office. Voluntary disclosure to a third party will generally defeat privilege claims. *Sanmina Corp.*, 968 F.3d at 1116. However, Plaintiff's arguments fail to consider the relationship between ADOA and the Governor's Office.

The Governor has the power and duty under the Arizona Constitution and State law to transact *all* executive business with the officers of Arizona's government and to supervise the official conduct of *all* executive officers. *See* A.R.S. Const. Art. 5 § 4; A.R.S. § 41-101(A)(1). The Governor appoints the director of ADOA. A.R.S. § 41-701. Suggesting that sharing legal advice ADOA receives about the State Health Plan with the Governor's Office waives the attorney-client privilege is comparable to suggesting that the United States Secretary of State waives any privilege by sharing information with the White House. While ADOA and the Governor's Office are separate entities and have their own legal counsel for different matters, that does not mean (as Plaintiff suggests) they are unrelated parties with incongruent interests that defeat the common interest doctrine.

The common interest doctrine allows ADOA to share legal advice it receives related to the State Health Plan with the Governor's Office. The attorney-client privilege covers "common interest" situations and provides "an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). The common interest privilege is not limited to "joint defense" situations "or even situations in which litigation has commenced." *See, e.g., U.S. v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (holding that common interest agreement "may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are *or potentially may be codefendants* or have common interests in litigation") (emphasis added); *see also, e.g., id.* at 980 (noting that there is no requirement that parties asserting a common interest privilege be defendants in the same action, explaining that "parties in separate actions might nonetheless have reasons to work together toward a common objective, and there is no requirement that actual litigation even be in progress").

Moreover, the "common interests" to which the privilege extends are not limited to "legal" interests, but may also be "factual or strategic in character." *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76, cmt. e; *see also, e.g., Hunydee v. U.S.*, 355 F.2d 183, 185 (9th Cir. 1965) (affirming that communications may be protected by the common interest privilege, "even though exchanged between attorneys . . . to the extent they concern common issues and are intended to facilitate representation in *possible* subsequent proceedings") (emphasis added). Because the need to protect the free flow of information from client to attorney logically exists whenever multiple parties share a common interest about a legal matter, courts have extended the joint defense or common interest doctrine to numerous relationships among different parties. *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990). This includes parties to <u>potential</u> litigation. *Gonzales*, 669 F.3d at 980 ("there is no requirement that actual

litigation even be in progress"); *see also United States v. Schwimmer*, 892 F.2d 237, 243–44 (2d Cir. 1989) ("it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply"). It also includes related governmental agencies "engaged in a common effort" to fulfill their legal obligations. *See Modesto Irrigation Dist.*, 2007 WL 763370 at *16.

Plaintiff argues that there is no evidence of any potential litigation surrounding communications between ADOA and the Governor's Office at the time of the disclosure. This is incorrect.

First, as noted above, there were numerous legal challenges to the 2016 Rules occurring when the State Defendants were considering changes to the State Health Plan.

Second, litigation against health plans seeking coverage for transgender benefits under § 1557 was not some remote possibility, but was a likelihood the State Defendants had to consider. On June 6, 2016, a transgender man and employee of Dignity Health's Chandler Regional Medical Center in Arizona filed suit against his employer under Title VII and § 1557 seeking coverage to treat his gender dysphoria.[10]

Third, and perhaps most importantly, the Court only needs to consider that litigation did in fact occur—this very case. ADOA and the Governor's Office are right now involved in the litigation brought by Plaintiff with respect to the Exclusion. ADOA's Director and its Acting Assistant Director of the Benefits Services Division are Defendants in this case and Plaintiff has subpoenaed the Governor's Office seeking evidence to use in this case. (Doc. 161 (Plaintiff's Notice of Subpoena to the Governor's Office)). The State Defendants also understand Plaintiff may be filing a third Motion to Compel, this time against the Governor's Office. It is certainly understandable that ADOA and the Governor's Office had a common interest, that would have involved considerations about possible litigation, when

---

[10] *Robinson v. Dignity Health d/b/a Chandler Regional Medical Center*, Case No. 4:16-cv-03035 (N.D. Calif. Filed June 6, 2016)

exchanging information in 2016 about transgender benefits.

Plaintiff seems to be suggesting ADOA and the Governor's Office should have to demonstrate they had a common interest in this very suit (filed on January 23, 2019 (Doc. 1)) when exchanging information in 2016. (Doc. 195 at 12:16-19.) Plaintiff's argument makes no sense. Plaintiff also makes misleading references to testimony by Ms. Isaacson who confirmed she had prior discussions with the Governor's Office that were not about this lawsuit and that she did not specifically discuss costs of litigation. (Doc. 195-3, Ex. 6 at 72:16–25; 179:24–180:1.) Neither of those statements indicates there was no consideration about potential litigation.

There was no disclosure through deposition testimony by Ms. Isaacson or to the Governor's Office that waived the important privilege.

### E. Plaintiff's Motion Fails To State What Documents Plaintiff Demands.

Plaintiff's Motion is further flawed because it does not identify which documents Plaintiff seeks to compel. Plaintiff makes reference to 85 documents on the State Defendants' privilege log dated May 10, 2021, but Plaintiff never identifies which of those documents he purports was improperly withheld. Even if there was a waiver of the attorney-client privilege (there was not), Plaintiff has not explained to which documents such a waiver would apply. Plaintiff's failure makes it impossible for the State Defendants to properly oppose the Motion or for the Court to grant it.

## II. CONCLUSION.

For the foregoing reasons, the attorney-client privilege and the common interest doctrine apply to the withheld documents. The Court should deny Plaintiff's Motion to Compel. Alternatively, the Court should review the individual documents that are the subject of the Motion to determine which are still privileged and only order disclosure of those that are not.

FENNEMORE CRAIG, P.C.
PHOENIX

DATED this 3rd day of June, 2021.

           FENNEMORE CRAIG, P.C.

           By: *s/ Ryan Curtis*
              Timothy J. Berg
              Amy Abdo
              Ryan Curtis
              Shannon Cohan
              Attorneys for Defendants State of Arizona, Andy Tobin, and Paul Shannon

18456665

FENNEMORE CRAIG, P.C.
PHOENIX

- 18 -