COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400

Daniel G. Dowd (012115)
Email: ddowd@CDQLaw.com
Betsy J. Lamm (025587)
Email: blamm@CDQLaw.com
Kaysey L. Fung (032585)
Email: kfung@CDQLaw.com
   Attorneys for non-party The Office of
   Governor Douglas A. Ducey

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Russell B. Toomey,<br><br>            Plaintiff,<br><br>vs.<br><br>State of Arizona; The Arizona Board of Regents, D/B/A University of Arizona, a governmental body of the State of Arizona; et al.,<br><br>           Defendants. | Case No. 4:19-CV-00035-RM-LAB<br><br>**NON-PARTY THE OFFICE OF GOVERNOR DOUGLAS A. DUCEY'S RESPONSE IN OPPOSITION TO MOTION TO COMPEL**<br><br>**(Oral Argument Requested)** |

Pursuant to Federal Rule of Civil Procedure ("Rule") 45 and LRCiv 7.2(c), non-party The Office of Governor Douglas A. Ducey (the "Governor's Office") hereby responds in opposition to Plaintiff Russell B. Toomey's Motion for Entry of an Order Compelling the Production of Documents (Doc. 202) (the "Motion"). The Motion fails because it rests entirely on the false foundation that the subject documents are relevant to the State's intent. Moreover, given the subject matter of the documents, Plaintiff's need for these privileged materials pales in comparison to the Governor's Office's interests in nondisclosure. The Motion should be denied.

**I.      SALIENT FACTUAL AND PROCEDURAL HISTORY.**

On January 23, 2019, Plaintiff initiated this lawsuit against the State of Arizona (the "State"), the Arizona Board of Regents, and certain individuals in their official capacity as regents or officers of the Arizona Department of Administration. (*See* Doc. 1; *see also* Doc. 86.) In Plaintiff's own words, his lawsuit "challenges the State of Arizona's categorical exclusion for 'gender reassignment surgery' (the 'Exclusion') from coverage under the self-funded health care plan (the 'Plan') controlled by the Arizona Department of Administration ('ADOA')." (Doc. 202, pp. 1-2.) Plaintiff did not sue the Governor of Arizona or any advisors within the Governor's Office. (*Id.*) The Governor's Office is not "pretending" to be a non-party; it is a non-party to this litigation.[1]

In February 2021, two years after filing this action, Plaintiff served a Subpoena on the Governor's Office demanding the production of all documents referencing surgery to treat gender dysphoria. (*See* Doc. 202-3, Ex. 2, p. 4.) The Subpoena literally sought production of documents over a more than ten-year period that contain any reference, no matter the context, to gender affirming surgery, regardless of whether the document relates to the challenged Exclusion. (*Id.*) On March 10, 2021, the Governor's Office responded to the Subpoena, serving detailed objections, producing documents, and producing a document-by-document privilege log, consistent with Rule

---

[1] Plaintiff states the Governor's Office "was integral to the decision to maintain the Exclusion." (Doc. 202, p. 5.) Neither the citations on page 2 of the Motion, nor the deposition transcripts attached in the exhibits describe the Governor's Office as "integral" to the decision. Instead, the testimony indicates that the Governor's Office was among several participants involved in the decision concerning the Exclusion. Moreover, contrary to Plaintiff's erroneous assertion, Mr. Fry and Ms. Ong were not "from the Governor's Office." (Doc. 202, p. 3.)

45. (Doc. 202-3, Exs. 3 & 4.) Following lengthy meet and confer discussions, the Governor's Office served an Amended and Supplemental Privilege Log ("Privilege Log") (*see* Doc. 202-3, Ex. 7). As reflected on the Privilege Log, the Governor's Office withheld certain documents as privileged under the executive communications and deliberative process privileges.[2] (*See* Declaration of Christina Corieri, dated June 17, 2021, attached at **Exhibit A** ("Corieri Declaration"), ¶ 5; *see also id.*, ¶¶ 6-8, 11.)

## II. PLAINTIFF'S MOTION TO COMPEL MUST BE DENIED, AS PLAINTIFF IS NOT ENTITLED TO A NON-PARTY'S IRRELEVANT AND PRIVILEGED DOCUMENTS.

As the party seeking to compel discovery from a non-party, Plaintiff must demonstrate not only relevance of the demanded materials, but that his "'need for discovery outweighs the nonparty's interest in nondisclosure.'" *AmSurg Holdings Inc. v. Anireddy*, 2020 WL 1703617, at *2 (D. Ariz. Apr. 8, 2020) (*quoting R. Prasad Indus. v. Flat Iron Env't. Sols. Corp.*, 2014 WL 2804276, at *2 (D. Ariz. June 20, 2014)). If Plaintiff meets his burden, the Court then considers the executive privileges the Governor's Office holds with respect to the 17 documents at issue in the Motion. In view of the separation of powers and sovereignty issues at the core of Plaintiff's demand for the Governor's Office's privileged documents, the Court must first explore all other avenues for resolving Plaintiff's Motion before reaching the executive privilege issue. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389–90 (2004) (explaining that, because the executive privilege forces the judiciary into the "awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances[,]" the confrontation "should be avoided whenever possible") (citations omitted); *Karnoski v. Trump*, 926 F.3d 1180, 1204 (9th Cir. 2019) ("[C]ourts are urged to 'explore other avenues, short of forcing the Executive to invoke privilege, when they are asked to enforce against the Executive

---

[2] The Governor's Office withheld additional documents as attorney-client privileged and work-product protected. These documents are not at issue in the Motion. (*See* Doc. 202-3, Ex. 7.) In a footnote, Plaintiff attempts to "reserve[] all rights to later challenge" these privilege assertions. Plaintiff's resort to serial motions is wasteful and inefficient. If Plaintiff directs another motion to compel against the Governor's Office, the Governor's Office will seek reimbursement of its legal fees and costs given the undue burden being placed on a non-party.

Branch unnecessarily broad subpoenas'" (*quoting Cheney*, 926 U.S. at 390)).  The same logic applies to the Governor's Office's assertion of executive communications privilege, which involves principles of comity between the State's chief executive and the federal court.

Here, the Court need not reach the complex privilege issues.  The documents Plaintiff seeks are not relevant and Plaintiff's Motion may be denied on that basis alone.  If, however, the Court finds relevance, the documents are protected from disclosure under the executive communications privilege or, at minimum, the related deliberative process privilege.

### A. Plaintiff Seeks Documents Not Relevant To The Decision To Maintain The Exclusion Under The Plan.

The scope of discovery is well-settled and non-controversial:  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case…."  Fed. R. Civ. P. 26(b).  Limitations on the permissible scope of discovery under Rule 26(b), including relevancy and privilege, extend to discovery sought from a non-party under Rule 45.  *See Evanston Ins. Co. v. Murphy*, 2020 WL 6869292, *2 (D. Ariz. Nov. 23, 2020).  Although relevancy is determined broadly, discovery is not boundless.  *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (recognizing that the 2015 amendments to Rule 26 were "intended to restrict, not broaden, the scope of discovery" and that "discovery, like all matters of procedure, has ultimate and necessary boundaries" (citations omitted)).  Discovery is not permitted based on speculation or a wishful hope that inquiry might reveal something to support otherwise conclusory allegations of wrongdoing.  *See, e.g.*, *Mil. Audit Project v. Casey*, 656 F.2d 724, 751-52 (D.C. Cir. 1981) (holding that trial court did not abuse discretion in denying discovery that "would only have afforded an opportunity to pursue a 'bare hope of falling upon something that might impugn the [government's] affidavits'" (citation omitted)); *Nei v. Travelers Home & Marine Ins. Co.*, 326 F.R.D. 652, 660 (D. Mont. 2018) (stating that the proportionality requirement "must mean that burdensome, tangential discovery should not be permitted based on the mere possibility that something may turn up to support what is otherwise only speculation" (citation omitted)); *cf. Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in 'fishing expedition[s].'" (citation omitted)); *LNS Enters. LLC v. Cont'l Motors*

*Inc.*, 464 F. Supp. 3d 1065, 1077-78 (D. Ariz. 2020) (denying request for jurisdictional discovery "based on little more than a hunch that it might yield jurisdictionally relevant facts.'" (citation omitted)). This is precisely what Plaintiff is doing here.

Courts in the Ninth Circuit and Arizona repeatedly recognize the additional protections and heightened relevancy requirements for discovery sought from non-parties. *See Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980) ("While discovery is a valuable right and should not be unnecessarily restricted … the 'necessary' restriction may be broader when a nonparty is the target of discovery." (internal citation omitted)); *AmSurg Holdings*, 2020 WL 1703617, at *2 ("'The mere "relevance" standard, however, does not apply to non-parties . . . . To obtain discovery from a nonparty, a party must demonstrate that its need for discovery outweighs the nonparty's interest in nondisclosure.'" (*quoting R. Prasad Indus.*, 2014 WL 2804276, at *2)); *BBK Tobacco & Foods LLP v. Skunk Inc.*, 2020 WL 2395104, at *2 (D. Ariz. May 12, 2020) ("Rule 26 usually allows parties to obtain discovery on any nonprivileged matter that is relevant to a claim or defense…. In the third-party subpoena context, however, courts have often demanded a stronger-than-usual showing of relevance[.]" (citation omitted)).

Plaintiff has not met his burden of demonstrating the relevance of the documents at issue in the Motion. Plaintiff simply speculates in proclaiming the demanded documents "are relevant to establish whether Christina Corieri and other members of the Governor's Office acted with discriminatory intent when they made the decision to maintain the Exclusion challenged in this case." (Doc. 202, p. 7.) As the Governor's Office has repeatedly explained to Plaintiff's counsel (in attempting to avoid the burden and expense of this very Motion), the documents do **not** address the decision regarding the Exclusion at issue in this lawsuit. (*See, e.g.*, Doc. 202-3, Ex. 6, p. 10 & Ex. 7, n.1; Corieri Declaration, ¶¶ 6, 11.) Moreover, seven of the 17 documents at issue do **not** include Ms. Corieri or Mr. Liburdi, the only two advisors from the Governor's Office identified as having any involvement with the Exclusion.[3] (*See* Doc. 202, pp. 2-3, n.1 (docs. 4, 5, 6, 8, 13, 14 and 15);

---

[3]   At page 2 of the Motion, Plaintiff identifies John Fry and Nicole Ong as "from the Governor's Office" and "persons with knowledge of the genesis, formulation, adoption, maintenance, or continuation of (a) the Challenged Exclusion and (b) any earlier versions …." (Doc. 202, p. 2.) This characterization misleadingly suggests that the Governor's Office had a larger

Corieri Declaration, ¶ 11(4-6), (8), (13-15).)  As such, they necessarily cannot establish whether Ms. Corieri or any other members of the Governor's Office acted with discriminatory intent in connection with the Exclusion.

Plaintiff next states, as purported fact:  "All of the documents, identified as responsive to the Subpoena, discuss gender reassignment surgery."  (Doc. 202, p. 7.)  Having not seen the documents, Plaintiff's assertion is by definition unfounded.  It rests on a false premise created by his overbroad Subpoena.  If Plaintiff narrowly tailored the Subpoena to request documents actually discussing gender reassignment surgery, his assertion in the Motion might be correct.  Plaintiff, however, wrote the Subpoena broadly, demanding all documents created or transmitted over a ten-year period "regarding surgery to treat gender dysphoria[.]"  (Doc 202-3, Ex. 2, p. 4.)  The Subpoena demands any document that contains any reference to surgery to treat gender dysphoria, regardless of whether the document actually **discusses** such surgery and regardless of whether the document relates in any way to the decision to maintain the Exclusion at issue in this litigation.  A document's responsiveness to the overbroad Subpoena does not equate to relevance to this action.

To be clear, Plaintiff has already received copies of responsive documents that actually pertain to the Exclusion or Plan.[4]  He, thus, has already received the relevant materials.  Plaintiff is not entitled to receive additional documents not pertaining to the Exclusion, based on a wishful hope that they might contain evidence of a "discriminatory attitude" or reflect some "personal" or "ideological opposition" to gender reassignment surgery generally.  *Heyne v. Caruso* does not change the result.  *See* 69 F.3d 1475 (9th Cir. 1995).  *Heyne* involved quid-pro-quo sexual harassment and wrongful termination claims against the Plaintiff's employer.  *Id.* at 1478-49.  While the *Heyne* court cautioned against using evidence of other sexual harassment to support the quid-pro-quo claim, the court found such evidence "tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason

---

role in the discussions and decision concerning the Exclusion.  Mr. Fry and Ms. Ong, however, were not from the Governor's Office.  (*See* Doc. 202-3, p. 4 (identifying Mr. Fry as from the Attorney General's Office and Ms. Ong as former General Counsel of ADOA).)

[4]   The only exception is a single attorney-client privileged communication (not at issue in the Motion) between Ms. Corieri and Mr. Liburdi on November 28, 2016.  (*See* Doc. 202-3, Ex. 7, p. 3.)

behind firing an employee who is a member of that group." *Id.* at 1479.  Critically, unlike *Heyne*, the Governor's Office is not Plaintiff's employer and is not even a party to this litigation.  Additionally, as the 17 documents at issue in the Motion to Compel do not address the Exclusion and do not involve Plaintiff's employer (the Arizona Board of Regents), the documents necessarily cannot demonstrate his "employer's general hostility" toward a protected group.[5]

Plaintiff has no meaningful evidence to support his accusations against the Governor's Office.[6]  His speculation is plainly insufficient to establish that his need for the documents outweighs the Governor's Office's interests in nondisclosure.  The Motion must be denied because the subject documents are not relevant.  At minimum, if the Court believes helpful to confirm the irrelevancy of the 17 documents at issue in the Motion, the Court should exercise her discretion to conduct an *in camera* review before ruling.  *See, e.g.*, *Wilson v. Larson*, 2019 WL 9078642, *10–11 (D. Ariz. Nov. 14, 2019) (confirming, after *in camera* review, that the documents involved an unrelated investigation and did not contain material evidence relating to petitioner's claims), *report and recommendation adopted*, 2020 WL 3129691 (D. Ariz. June 12, 2020).

---

[5]   Plaintiff falsely points to Magistrate Bowman's November 30, 2020 Report and Recommendation to suggest any evidence that the "Plan authors do not like gender transition" is relevant. (Doc. 202, p. 8.)  The Report is not so broad.  Rather, the Report stated: "[Plaintiff] is apparently arguing that the Plan exclusion exists because the Plan authors do not like gender transition **and have created this exclusion specifically to burden transgender individuals**. If that were true then the exclusion would indeed be intentional discrimination." (Doc. 134, p. 6 (emphasis added).)  The Report does not justify Plaintiff's sweeping demands.  Plaintiff has **no evidence** "the Plan exclusion exists because the Plan authors do not like gender transition." And, as Plaintiff demands documents that do not address the Exclusion, they are not evidence the Exclusion was created "specifically to burden transgender individuals."

[6]   Plaintiff relies on a single unremarkable "tweet" from **2013** to brand Ms. Corieri as a person "oppos[ed] to government insurance coverage for transition-related surgery."  From this false foundation, Plaintiff states he has "good reason to suspect that the documents at issue in this motion may bear on this exact issue." (Doc. 202, p. 8.)  Yet the tweet at issue, written more than three years before Ms. Corieri began work at the Governor's Office, does not express any opinion, personal opposition, or ideological stance on gender affirming surgery.  (*See* Doc. 202-3, Ex. 11.)  And, even if it did (it does not), a years-old stray remark is not evidence of discriminatory intent. *Bauer v. Metz Baking Co.*, 59 F. Supp. 2d 896, 909 (N.D. Iowa 1999) (noting that stray remarks remote in time or unrelated to the decisional process are insufficient to demonstrate discrimination).  One innocuous 2013 tweet is too thin a reed upon which to allow Plaintiff's desired fishing expedition.  And, Plaintiff's gross mischaracterization undermines the credibility of its entire brief.

**B.  The Documents At Issue Are Protected By The Executive Communications Privilege.**

If the Court considers issues beyond relevance, Plaintiff's Motion further improperly demands the production of documents protected by executive privilege, including the executive communications privilege or, at minimum, the deliberative process privilege. *See Karnoski*, 926 F.3d at 1204 (recognizing the executive communications privilege and deliberative process privilege are both forms of executive privilege). As Plaintiff recognizes, executive communications privilege is rooted in the separation of powers doctrine. The privilege "recognizes that a chief executive has a qualified power to keep confidential certain internal governmental communications so as to protect the deliberative and mental processes of decision-makers." *Doe v. Alaska Superior Ct., Third Jud. Dist.*, 721 P.2d 617, 622–23 (Ala. 1986); *see also United States v. Nixon*, 418 U.S. 683, 708 (1974). The executive communications privilege is founded upon "the necessity of candor" from advisors in order to provide the chief executive "and those who assist him [or her] ... [with] freedom to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Am. C.L. Union v. Dep't of Just.*, 2011 WL 10657342, *10 (D.D.C. Feb. 14, 2011) (*quoting Nixon,* 418 U.S. at 708); *accord Nixon*, 418 U.S. at 708 (addressing the expectation of confidentiality of communications with the President, which has "all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking"); *In re Sealed Case*, 121 F.3d 729, 741, 747-53 (D.D. Cir. 1997) (addressing purpose of executive privilege to facilitate governmental decision-making and ensure executives are informed by candid advice); *Cap. Info. Grp. v. Off. of Governor*, 923 P.2d 29, 33–34 (Alaska 1996) ("[A] chief executive has a qualified power to" maintain confidentiality of "certain internal governmental communications so as to protect deliberative and mental processes of decision-makers." (citation omitted)). At bottom, the privilege facilitates the chief executive's ability to obtain candid advice, to explore policy alternatives and to make considered decisions.

Plaintiff asserts that that there is no basis in federal common law to apply the executive communications privilege to a state governor and that the Governor's Office is "invit[ing] this

7

Court to create new federal common law." (Doc. 202, p. 8.) To the contrary, the Governor's Office is not arguing for the pronouncement of new legal doctrine. Rather, applying the executive communications privilege here is a natural extension of existing federal common law regarding federal privileges. Federal and state courts across the country recognize the executive communications privilege as a form of executive privilege. *E.g.*, *Karnoski*, 926 F.3d at 1204-05 (addressing the unique features that distinguish the executive communications privilege from the deliberative process privilege and recognizing that both privileges are "forms of executive privilege"); *In re Sealed Case*, 121 F.3d at 744 (recognizing "presidential communications privilege" over "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential"); *Jud. Watch, Inc. v. Dep't of Just.,* 365 F.3d 1108, 1114 (D.C. Cir. 2004) (recognizing the privilege extends to White House advisors formulating policy for the executive); *Doe*, 721 P.2d at 623 ("the public policy rationale upon which the Supreme Court relied in *United States v. Nixon* is equally applicable to our state government"); *Freedom Found. v. Gregoire*, 310 P.3d 1252, 1261-62 (Wash. 2013) (reasoning that the executive privilege, rooted in separation of powers concerns, ensures a governor's access to frank advice in order to execute his constitutional duties); *Republican Party of N. M. v. N. M. Tax'n & Revenue Dep't*, 283 P.3d 853, 868 (N.M. 2012) (extending executive communications privilege to policy communications about activities or matters before the Governor's Office).[7]

---

[7] While federal common law applies to privilege claims in connection with the federal causes of action Plaintiff has asserted, *see, e.g.*, Fed. R. Evid. 501; *Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992), state court decisions bear on the analysis. *See, e.g., Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340 (9th Cir. 1996) (noting that the court "may also look to state privilege law … if it is enlightening"); *Lewis v. United States*, 517 F.2d 236, 237 (9th Cir. 1975) ("In determining the federal law of privilege in a federal question case, absent a controlling statute, a federal court may consider state privilege law."); *United States v. McKesson Corp.*, 2021 WL 2037965, at *15, 19 (N.D. Cal. May 21, 2021) (finding arguments that the court should ignore California privilege law altogether to be unavailing); *see also Trammel v. United States*, 445 U.S. 40, 47-53 (1980) (explaining that, in enacting Rule 501, Congress manifested an affirmative intent to afford courts the flexibility to develop rules of privilege on a case-by-case basis and to leave the door open to change, not to freeze the law of privilege). *In re TFT-LCD (Flat Panel) Antitrust Litig.*, upon which Plaintiff relies to suggest the Court may not look at state privilege law, is inapposite. *See* 835 F.3d 1155, 1158-59 (9th Cir. 2016) (rejecting court's reliance on the California Evidence Code alone, to the exclusion of federal privilege law).

Federal district courts have similarly recognized that the privilege extends to governors as the chief executives of their states. *See, e.g., JM through Foley v. N.M. Dep't of Health*, 2009 WL 10698414, at *3, 6 (D.N.M. Aug. 20, 2009) (applying executive privilege to the New Mexico Governor's Office to shield executive branch communications); *Merritt v. State*, CV17-04540-PHX-DGC, ¶ 2(b) (D. Ariz. March 19, 2018) (allowing the Governor's Office to assert executive communications privilege and permitting privileged information to be withheld subject to preparation of a privilege log) (attached to the Motion at Doc. 202-3, Ex. 13-F)[8]; *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 385 F. Supp. 3d 130, 134-35 (D.P.R. 2019) (recognizing existence of executive privilege protecting communications between governor and his advisors; permitting Puerto Rico Fiscal Agency and Financial Advisory Authority to claim the executive privilege "as an advisor to the Governor"), *objections overruled*, 390 F. Supp. 3d 311 (D.P.R. 2019); *Hayes v. Reed*, 1997 WL 125742, *9 n.8 (E.D. Pa. Mar. 13, 1997) (recognizing executive privilege for state governors); *Haber v. Evans*, 2004 WL 963995, *4 (E.D. Pa. May 4, 2004) (holding that the executive privilege applies to state inspector general; describing the privilege as protecting and insulating "the sensitive decisional and consultative responsibilities of the Governor"); *cf. Marisol ex rel. Forbes v. Giuliani*, 1998 WL 158948, *1 (S.D.N.Y. Apr. 1, 1998) (granting in part order to quash discovery concerning Governor of the State of New York, finding discovery proper "except in the limited instances where they involve executive privilege").

As recognized by these decisions, the purpose of (and rationale for) the executive communications privilege applies with equal force to communications with the Governor and those assisting the Governor in making decisions and shaping policy. As one court aptly explained:

> Plaintiffs also overlook the fact that the executive privilege serves an important public function. **The Governor, as chief executive, must be accorded a qualified power to protect the confidentiality of communications pertaining to the function of the executive branch. This power is analogous to the qualified**

---

[8] Plaintiff disparages *Merritt* as a "one-off order" primarily concerned with the disclosure of "personal identifying information." To the contrary, the Order in *Merritt* allowed the Governor's Office, a non-party to the litigation, to withhold documents under the executive communications privilege, subject to the preparation of a privilege log. That is wholly consistent with the Governor's Office assertion of executive privilege in response to the Subpoena.

> **constitutionally-based privilege of the President, which is "fundamental to the operation of government and inextricably rooted in the separation of powers**...." *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Confidentiality is vital not only because it serves to protect government sources of information but also because it enhances the effectiveness of investigative techniques and procedures…. More importantly, this executive privilege protects and insulates the sensitive decisional and consultative responsibilities of the Governor which can be discharged most effectively with privacy and security.

*Hayes*, 1997 WL 125742, at n.8 (emphasis added). Moreover, similar to the United States Constitution, the Arizona Constitution firmly embraces, indeed firmly compels, separation of powers. *See Mecham v. Gordon*, 751 P.2d 957, 960 (Ariz. 1988) ("Nowhere in the United States is [separation of powers] more explicitly and firmly expressed than in Arizona."). As Ms. Corieri's Declaration establishes, the communications at issue are precisely the type that are made to "foster informed and sound gubernatorial deliberations, policymaking, or decision-making[,]" *see Gregoire*, 310 P.3d at 1256, and are communications expressly within the Governor's obligations under the Arizona Constitution, *see* Ariz. Const. art. 5, § 4. (*See* Corieri Declaration, ¶¶ 3-5, 7-9.) *Cf. United States v. Irvin*, 127 F.R.D. 169, 172 (C.D. Ca. 1989) (finding "no principled distinction" between state and federal government officials in the context of deliberative process privilege: "If there exists a need to protect candid, private communications among federal executive officials and their staff, the need to protect candid, private communications among county officials and their staff is no less compelling").

Plaintiff's reliance on two decisions from the Northern District of Illinois to argue "[t]here is simply 'no federal authority for extending' the executive communications privilege 'to a state governor'" is unavailing. (*See* Doc. 202, p. 9.) As set forth above, there **is** federal authority for applying the executive communications privilege to the Governor's Office. Moreover, considering the purpose of the privilege and the multiple cases recognizing the privilege applies to state governors, the decisions from Illinois should be rejected.[9] Indeed, Arizona district courts have declined to follow decisions from the Northern District of Illinois concerning executive privilege. *See Wilson v. Maricopa Cnty.*, 2006 WL 842247, at *1 (D. Ariz. Mar. 29, 2006) (recognizing that the

---

[9] *Child. First Found., Inc. v. Martinez*, 2007 WL 4344915, at *6 n.11 (N.D.N.Y. Dec. 10, 2007) and 98 C.J.S. Witnesses § 423 n.3 (Mar. 2021), which rely on *Hobley*, are similarly inapposite.

deliberative process privilege extends to local governments; distinguishing 2001 decision from the Northern District of Illinois that declined to extend the privilege).

Plaintiff's reliance on Arizona's "strong policy favoring open disclosure and access" to public records is a *non sequitur* that does not aid his stance. (Doc. 202, p. 10 (*citing Ariz. Dream Act Coal. v. Brewer*, 2014 WL 171923, at *3 (D. Ariz. Jan. 15, 2014)). While the court in *Brewer* stated that "persons giving advice to Arizona government officials should ordinarily assume that their advice will not be hidden from the public gaze," 2014 WL 171923, at *3, Arizona's open public records policy does have limits and, of course, does not require disclosure of privileged documents.[10] *See, e.g.*, *Carlson v. Pima Cnty.*, 687 P.2d 1242, 1245 (Ariz. 1984) (citing, *inter alia*, Am. Jur. 2d *Records and Recording Laws*); *Mathews v. Pyle*, 75 Ariz. 76, 80 (1952) ("documents received by the Governor in his official capacity" are "subject to inspection by an interested citizen unless they are confidential or of such a nature that it would be against the best interests of the state to permit a disclosure of their contents"); *accord* 66 Am. Jur. 2d *Records and Recording Laws* § 31 (1973) ("The right of inspection of public records is not absolute or unlimited, and does not extend to public records or documents which public policy demands remain secret, such as … documents within the scope of a privilege, such as the attorney-client or attorney-work-product privilege, the judicial deliberations privilege, a medical deliberative materials privilege, or the executive privilege."). Public records laws in and of themselves do not overcome executive privilege. *See Gregoire*, 310 P.3d at 1257-58 (rejecting argument that public records laws enacted to "ensure governmental transparency" can overcome executive communications privilege; reasoning that executive communications privilege is a constitutional privilege that supersedes such laws); *Wilson v. Brown*, 962 A.2d 1122, 1136 (N.J. App. Div. 2009) ("A general assertion of a need for full disclosure of the basis for governmental decision making, such as presented here by Wilson, does not establish a specific or focused need sufficient to overcome the executive privilege.").

---

[10] Judge Campbell's discussion in *Brewer* does not erase his **later** Order in *Merritt* recognizing the Governor's Office's ability to invoke the executive privilege. Indeed, like *Merritt* and unlike *Brewer*, the Governor's Office is not a party to the underlying litigation and is asserting not only the deliberative process privilege, but also the more robust executive communications privilege.

11

As set forth in the attached Declaration, the Governor's Office has invoked the executive privilege with respect to the 17 documents at issue in the Motion, asserting both the executive communications privilege and deliberative process privilege. (*See* Corieri Decl., ¶ 5.) These documents reflect confidential communications between and among senior advisors in the Governor's Office, made in the course and performance of their duties in advising the Governor and to foster sound, candid and informed deliberations, explanations of alternatives, decisions, and policies. (*Id.*, ¶¶ 7-9.) These documents fall within the heart of the executive communications privilege. *In re Sealed Case*, 121 F.3d at 751-52 ("[C]ommunications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President."); *Gregoire*, 310 P.3d at 1262 (privilege encompasses communications authored, solicited or received by the governor and senior policy advisors "for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking"). Once invoked by the Governor's Office, the Court "should give due deference" to the privilege. *Karnoski*, 926 F.3d at 1205.

Plaintiff cannot overcome the privilege unless he makes a "showing of need demonstrating 'that the evidence sought [is] directly relevant to issues that are expected to be central to the trial' and 'is not available with due diligence elsewhere.'" *Id.* (citation omitted); *see also, e.g.*, *In re Sealed Case*, 121 F.3d at 746 ("a party seeking to overcome the presidential privilege seemingly must always provide a focused demonstration of need, even when there are allegations of misconduct by high-level officials"). Recognizing this appropriately high burden, Plaintiff suggests that his "need" and the relevance of the documents he demands is met "so long as his 'discovery requests are narrowly tailored to seek evidence that is directly relevant to the central issues in the litigation and is not available with due diligence elsewhere.'" (Doc. 202, pp. 11-12 (*citing Karnoski*, 926 F.3d at 1205).) Plaintiff then conspicuously avoids addressing this critical inquiry. Fatal to Plaintiff's argument, his Subpoena is **not** "narrowly tailored" to seek evidence "**directly relevant to the central issues in the litigation**." Instead, the Subpoena demands ten years' worth of documents that contain any reference to gender affirming surgery regardless of context or whether they pertain to the central issue in the litigation: the decision to maintain the Exclusion under the Plan. (Doc. 202-3, Ex. 2, p.

12

4.) Indeed, as the Governor's Office has repeatedly informed Plaintiff and Plaintiff appears to acknowledge, the documents at issue in the Motion do **not** involve this decision. (*See* Corieri Decl., ¶¶ 6, 11.) Plaintiff has already received the documents relating to the Exclusion (the only documents Plaintiff can in good faith claim to "need").[11] Plaintiff has not met and cannot meet his burden of showing a "focused demonstration of need" for documents unrelated to the decision regarding the Exclusion at issue in this litigation. *See, e.g.*, *Moore v. Valder*, 2001 WL 37120629, at *2–4 (D.D.C. July 31, 2001) (rejecting effort to overcome executive privilege, in context of deliberative process privilege, where the documents at issue are "collateral to Plaintiff's suit"). In any event, the Governor's Office's interest in nondisclosure of these materials outweighs Plaintiff's need for irrelevant documents. (*See* Corieri Decl., ¶¶ 6-9.)

Finally, even if Plaintiff were able somehow to provide a "focused demonstration of need" (a standard Plaintiff has not met) and overcome the privilege, he is not entitled to simply receive the documents. (*See* Doc. 202-4.) Rather, if the Court believes that Plaintiff has satisfied his burden and finds the privilege overcome, the Court should conduct an *in camera* review of the documents to first excise irrelevant material and ensure the executive privilege "is not unnecessarily breached." *See Karnoski*, 926 F.3d at 1205-06 (*quoting In re Sealed Case*, 121 F.3d at 759); *accord Protect Democracy Project, Inc. v. U.S. Nat'l Sec. Agency*, 453 F. Supp. 3d 339, 349 (D.D.C. 2020), *hearing in banc denied sub nom. Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 2020 WL 4135125 (D.C. Cir. July 7, 2020).

### C.     The Documents Are Also Protected By The Deliberative Process Privilege.

A form of executive privilege, the deliberative process privilege protects from disclosure communications relating to the decision-making process of governmental agencies. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148-53 (1975); *Karnoski*, 926 F.3d at 1203-04. Like the executive communications privilege, the deliberative process privilege "protect[s] agencies from being 'forced to operate in a fishbowl.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021)

---

[11] Plaintiff cannot rely on the Court's April 20, 2021 Order to meet his burden. The Order addressed only the deliberative process privilege and documents relating specifically to the Exclusion at issue. (*See* Doc. 187, pp. 4-5.) Plaintiff has already received those documents. Plaintiff's "ability to litigate this case" is not "compromised" (*see* Doc. 202, p. 11) by the Governor's Office's protection of its privileges.

13

(citation omitted). The Supreme Court recently explained: "'The privilege is rooted in "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." To encourage candor, which improves agency decisionmaking, the privilege blunts the chilling effect that accompanies the prospect of disclosure.'" *Id.* (citations omitted). "The 'ultimate purpose' of the privilege is to 'prevent injury to the quality of agency decisions.'" *Cause of Action Inst. v. U.S. Dep't of Com.*, 2021 WL 148386, at *4 (D.D.C. Jan. 14, 2021) (*quoting NLRB*, 421 U.S. at 150–51)). While "not as robust" as the executive communications privilege, *Karnoski*, 926 F.3d at 1206, the "deliberative process privilege[] protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* at 1203-04 (*quoting Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)); *accord U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 783 (recognizing the deliberative process privilege "protects from disclosure documents generated during an agency's deliberations about a policy, as opposed to documents that embody or explain a policy that the agency adopts"; holding the privilege protects "drafts that proved to be the agencies' last word" on an issue). Plaintiff concedes that the deliberative process privilege extends as a matter of established common law to the Governor's Office. (*See, e.g.*, Doc. 202-3, Ex. 5, p. 5.)

To qualify for the deliberative process privilege, documents must be predecisional and deliberative. *Karnoski*, 926 F.3d at 1204. "Documents are 'predecisional' if they were generated before the agency's final decision on [a] matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786. Moreover, documents may be predecisional and deliberative even when they relate to decisions or policies that are not ultimately effectuated. *Id.* (explaining documents are "not final solely because nothing else follows it," as a proposal sometimes "dies on the vine," languishes or is abandoned). The Governor's Office may invoke the privilege through the declaration of a responsible officer. *See, e.g., Landry v. FDIC*, 204 F.3d 1125, 1135-36 (D.C. Cir. 2000) (*citing In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988)); *Unknown Parties v. Johnson*, 2016 WL 8199308, at *4 (D. Ariz. July 21, 2016) . . .

14

(the privilege may be invoked by the agency head or his/her delegate). Contrary to Plaintiff's suggestion, the declaration need not precede the Governor's Office's response to Plaintiff's Motion.

As set forth in Senior Policy Advisor Corieri's Declaration, the documents at issue in the Motion are predecisional and deliberative. (Corieri Decl., ¶ 11.) The documents fall within a few general categories, with the largest number of documents pertaining to proposed legislation. (*See id.*) These documents are predecisional and deliberative. They pertain to the Governor's Office's monitoring and formulation of policy regarding proposed legislation (not addressing the Plan or the Exclusion), which the Governor's Office would ultimately be responsible for signing and implementing or vetoing if passed by the Legislature. (*Id.*, ¶¶ 3, 6, 7, 11.) Whether the proposed legislation ultimately reached the Governor's desk does not change the documents' predecisional nature. *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786. Critically, the documents do not relate to the decision at the heart of Plaintiff's claims – whether to modify or retain the Exclusion. (*See* Corieri Decl., ¶¶ 6, 11.) Plaintiff's Motion conspicuously ignores this fact.

While the deliberative process privilege is a qualified privilege, it is not overcome unless Plaintiff can demonstrate that his "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). In evaluating whether the privilege is overcome, courts consider "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion[s] regarding contemplated policies and decisions." *Id.* Each of these factors weighs in favor of upholding the privilege asserted here. *First*, the documents are not relevant to the decision at the core of Plaintiff's claims. (*See* Section II(A), *supra*; *see also* Corieri Decl., ¶¶ 6, 11.) The documents do **not** address the decision to maintain the Exclusion under the Plan. (*See* Corieri Decl., ¶¶ 6, 11.) To the extent they reference gender affirming surgery, they do so in the context of other decisions and policies not at issue in Plaintiff's case.[12] (*Id.*) *Second*, Plaintiff has in fact received other evidence

---

[12] Plaintiff argues the documents "bear directly on the issue of intent" and "concerns an indispensable element of Plaintiff's causes of action." (Doc. 202, p. 12.) Plaintiff impermissibly tries to import language from the Court's prior analysis of State documents **actually addressing**

15

– actual relevant evidence – that Plaintiff contends "bear directly on the issue of intent." Indeed, following Plaintiff's first Motion to Compel against the State Defendants, the Court ordered and the State Defendants produced the documents and communications relating to the Exclusion. (*See generally* Doc. 187.) If any documents are the "most reliable evidence" relating to the Exclusion, it is the documents actually addressing the Exclusion and **not** the documents sought by the present Motion. *Third*, although the State and several individual officers of the State are defendants in this action, the Governor's Office is a non-party. Plaintiff's accusations of misconduct by the State are insufficient to overcome the privilege, particularly as applied to the non-party documents at issue in the Motion. *See, e.g.*, *ICM Registry, LLC v. U.S. Dep't of Com.*, 538 F.Supp.2d 130, 133 (D.D.C. 2008) ("If every hint of marginal misconduct sufficed to erase the [deliberative process] privilege, the exception would swallow the rule."); *Breakthrough Towing, LLC v. Hall*, 2017 WL 1164523, at *5–6 (E.D. Mich. Mar. 29, 2017) (denying motion to compel, despite allegations of improper conduct by the government, reasoning that the information sought was of marginal relevance and could not overcome the city's interest in preventing "future timidity" of its officers).

*Fourth*, disclosure of the scope demanded here is virtually limitless, *i.e.* exceeding the actual decision/Exclusion/Plan at issue and extending to executive communications and deliberative documents relating to **other decisions and policies** simply because those documents contain a reference to "gender affirming surgery." Permitting such an expansive and over-reaching request to defeat the deliberative process privilege would hinder open and candid discussion, chill debate and impact the quality of decisions from the Governor's Office.[13] (*See, e.g.*, Corieri Declaration, ¶¶ 3-4, 9.) *See also, e.g.*, *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 785. The exception would swallow the rule. In similar circumstances where the scope of documents demanded exceeds or is tangential to the decision or policy at issue, courts have not hesitated to uphold the privilege. *See, e.g.*, *Convertino v. U.S. Dep't of Just.*, 669 F. Supp. 2d 1, 4 (D.D.C. 2009) (government misconduct exception did not

---

**the Exclusion** to the present analysis. As documents at issue in this Motion do not address the Exclusion, they do not "bear directly on the issue of intent" behind the Exclusion.

[13] The Subpoena and Motion demand documents if they reference gender affirming surgery. Responsive documents are not limited to "the construction of a healthcare plan and exceptions to coverage." (*See* Doc. 187, p. 7; Doc. 202, pp. 12-13.)

apply to "various decisions defendant made" that were "collateral to [the] plaintiff's cause of action"); *Moore*, 2001 WL 37120629 at *2–3 (upholding the deliberative process privilege where the documents pertaining to the actions and decisions directly challenged in Plaintiff's suit were already produced and the motion to compel sought documents addressing other "governmental decision-making processes … collateral to Plaintiff's suit").

Again, without reasoned analysis or recognition of the material distinction between the documents at issue in the present Motion and the documents subject to Plaintiff's prior Motion to Compel documents from the State Defendants, Plaintiff seeks to superimpose the Magistrate's April 20, 2021 Order on the Governor's Office. (*See* Doc. 202, pp. 11 (asserting "the same arguments from the Motion to Compel filed on March 18, 2021 (Doc. 168) apply to the Governor's Office"), 12-13 (arguing that "this Court's prior analysis and holding is equally applicable here").) Plaintiff's overreach is mistaken. The Governor's Office is not a party to this action and did not brief the deliberative process privilege challenges at issue in Plaintiff's prior Motion to Compel. The prior Motion to Compel further sought documents actually addressing the Exclusion. The Court, in analyzing the parties' arguments as to those documents, found the deliberative process privilege overcome. (*See* Doc. 187.) The Court's Order did not address the documents at issue in this Motion. Application of the four *FTC* factors to the documents at issue in this Motion compels the opposite conclusion: each factor weighs in favor of the Governor's Office and the Plaintiff has not satisfied his burden of demonstrating that his "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *FTC*, 742 F.2d at 1161. The Motion must be denied.

### III.  CONCLUSION.

Plaintiff demands the Governor produce privileged documents that do not concern the decision at issue in Plaintiff's pending claims against the State of Arizona and the Arizona Board of Regents. Plaintiff's desire for the documents is supported only by his speculation regarding their content. The Motion should be denied because the documents are not relevant. Alternatively, they are privileged. At minimum, the Court should review the subject documents *in camera* to confirm their irrelevance and ensure that the executive privilege is "not unnecessarily breached."

17

DATED: June 18, 2021

COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
  Attorneys for Defendants

By:    */s/Betsy J. Lamm*
       Daniel G. Dowd
       Betsy J. Lamm
       Kaysey L. Fung

COHEN DOWD QUIGLEY