**Victoria Lopez – 330042**
**Christine K Wee – 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email**:** vlopez@acluaz.org
Email**:** cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*\*Admitted pro hac vice*

**Wesley R. Powell***
**Matthew S. Freimuth***
**Nicholas Reddick***
**Jordan C. Wall***
**Victoria A. Sheets***
**Justin Garbacz***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: wpowell@willkie.com
E-Mail: mfreimuth@willkie.com
E-Mail: nreddick@willkie.com
E-Mail: jwall@willkie.com
E-Mail: vsheets@willkie.com
E-Mail: jgarbacz@willkie.com
*\*Admitted Pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

**Russell B. Toomey,**

      Plaintiff,

v.

**State of Arizona; Arizona Board of Regents, D/B/A University of Arizona**, a governmental body of the State of Arizona; et al.,

      Defendants.

Case No.19-cv-00035-TUC-RM (LAB)

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER COMPELLING THE PRODUCTION OF DOCUMENTS**

Plaintiff, Dr. Russell B. Toomey, on behalf of himself and the certified classes ("Plaintiff"), hereby submits through the undersigned counsel the following Memorandum of Law in support of his Motion For Entry Of An Order Compelling The Production Of Documents (the "Motion") from the Office of the Governor of the State of Arizona (the "Governor") in response to Plaintiff's Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, dated February 17, 2021 (the "Subpoena"). This Motion and exhibits hereto are accompanied by the Transmittal Declaration of Christine K. Wee ("Wee Decl.").

## THE COURT SHOULD GRANT PLAINTIFF'S MOTION TO COMPEL

The Governor protests that Plaintiff seeks a sea of documents, entirely unrelated to this case. This is false. Plaintiff's Motion seeks production of just 17 documents, all of which are responsive to the Subpoena carefully tailored to speak directly to the intent of the decision-makers at issue in this case. This Court has reiterated that the intent of these decision-makers remains a critical issue in the case. And the Governor has failed to credibly defend that any privilege protects these 17 documents from disclosure under either federal

common law or Arizona state law.  Given the broad scope of discovery, these documents cannot and should not be withheld.

## ARGUMENT

I.  **ALL POTENTIAL EVIDENCE OF DISCRIMINATORY INTENT IS RELEVANT, REGARDLESS OF ITS SOURCE**

   A.  **The Governor Cannot Exploit the Executive Branch's Organizational Structure to Impose a Heightened Standard of Relevance.**

As the Governor acknowledges, the scope of discovery under the federal rules is broad. (Opp. 5) *E.g.,* Fed. R. Civ. P. 26(b); *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981) (holding that there are "liberal discovery rules applicable to any civil suit in federal court"); *Sullivan v. Bank of Am*. NA, No. CV-13-01166, 2016 WL 2940013, at *3 (D. Ariz. May 20, 2016).  Discovery should be permitted "unless the information sought has no conceivable bearing on the case." *Sullivan*, 2016 WL 294013, at *3.

The Governor nevertheless seeks to unilaterally gatekeep discovery based on its current status as a third party, arguing that Plaintiff fails to meet some heightened standard of relevancy and/or are privileged. (Opp. 3-7)  This is plainly incorrect and improper.  The Governor is not a stranger to these proceedings[1] or the underlying dispute, having admitted it was involved in the decision-making surrounding the Exclusion  (Opp. 2, n. 1 ("the testimony indicates that the Governor was among several participants involved in the decision concerning the Exclusion")).  That the Governor remains a third party owes less to its lack of involvement, as it does the strictures of sovereign immunity.[2]  As Plaintiff

---

[1]   State Defendants previously represented to this Court positions/requests from the Governor's Office regarding then-pending motions in this matter. (Doc. 176 at 2, n. 1 ("If the Court is inclined to order production of these documents, [State Defendants] understand that the Governor's Office requests the opportunity to address its independent assertion of the privilege with the Court, if the Court so desires."))

[2]   Plaintiff neither concedes, nor waives any right or opportunity to challenge at a later date, the Governor's Office immunity from suit.  Plaintiff merely raises the complexities of sovereign immunity to provide context to the Governor's Office's current third-party status.  *See Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015) (dismissing Governor Ducey as named defendant under *Ex Parte Young* doctrine

2

previously raised however, neither State Defendants nor the Governor should be permitted to abuse the latter's current third-party status, especially where they have sought to use such separateness as both sword and shield. (Doc. 180 at 9)

**B.  The Governor Seeks To Improperly Gatekeep Discovery By Substituting The Sufficiency Of Evidence For Relevance**

The Governor argues that Plaintiff is not entitled to discovery because he either lack the evidence to establish, presumably preliminarily, that the 17 sought documents are relevant (Opp. 4-5), or the 17 documents would be insufficient to establish Plaintiff's claims. (Opp. 6)[3] The Governor is wrong. Plaintiff is entitled to discovery so long as his "requests are narrowly tailored to seek evidence that is directly relevant to central issues in the litigation and is not available with due diligence elsewhere." *Karnoski v. Trump*, 926 F.3d 1180, 1205 (9th Cir. 2019). Plaintiff has done so. Plaintiff tailored his requests to the Governor to those records relevant to whether decision-makers in the Governor's Office directed ADOA to maintain its exclusion of coverage for gender-affirming surgery because those decision-makers are ideologically opposed to having the government pay for such procedures. (Mot. 8-9) And Plaintiff now seeks to compel documents, almost exclusively in the Governor's possession, in light of consistent testimony from State Defendants witnesses pointing to the Governor as the key decision-maker about the Exclusion. (Mot.

---

as "general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit").

[3] The Governor most succinctly makes these arguments in attempting to distinguish Magistrate Bowman's November 30, 2020 Report & Recommendation, which acknowledges the need for discovery regarding intent. (Opp. 7, n. 5 (arguing (1) "Plaintiff has *no evidence* 'the Plan exclusion exists because the Plan authors do not like gender transition'" (emphasis original) and (2) "as Plaintiff demands documents that do not address the Exclusion, they are not evidence the Exclusion was created specifically to burden transgender individuals.")) Although Plaintiff argues the Exclusion is facially discriminatory, the Governor cannot avoid that discovery regarding the Governor's intent as one of the decision-makers on the Exclusion is plainly relevant. (Doc. 134 at 6, 9; Doc. 187 at 5)

3)[4]  The Governor's complaints about the overbreadth of Plaintiff's requests—*i.e.*, their "virtually limitless" scope (Opp. 17)—ring hollow given that the Motion pursues just 17 documents (Mot. 3, n.1).

Relevant evidence is not limited to documents specifically discussing the ADOA exclusion. If the evidence shows that the Governor had a policy of opposing all forms of state-subsidized coverage for transition-related surgery—whether through private insurance, through Medicaid, or through health care for prisoners—that evidence would help demonstrate that the ADOA exclusion was maintained based on ideological opposition, and not based on factors traditionally considered in making insurance coverage decisions. Such evidence could also undermine the Governor's credibility, to the extent he relies on alternative explanations for the Exclusion. *See Burdine*, 450 U.S. at 256 (Title VII gender discrimination case "may succeed . . . by showing that the employer's proffered explanation is unworthy of credence."); *Heyne v. Caruso*, 69 F.3d 1475, 1479–80 (9th Cir. 1995) ("evidence of the employer's discriminatory attitude *in general* is relevant and admissible to prove . . . discrimination.") (emphasis in original).

The Governor, through Ms. Corieri's supporting declaration, singles out as non-relevant four categories of documents within the 17 documents Plaintiff seeks—documents relating to (1) the "state Affordable Care Act benchmark plan"; (2) the "healthcare available through the Arizona Health Care Cost Containment System (AHCCCS)"; (3) "healthcare available through the Arizona Department of Corrections (ADC)"; and (4) "proposed legislation relating to healthcare." (Opp., Ex. 1 at No. 6) (internal quotations omitted) Ms. Corieri claims these documents "do not relate to the Exclusion decision at issue in this action." (*Id.*)  But they are relevant, and potentially dispositive. Starting with the fourth category, Ms. Corieri presumably refers here to documents listed on the Governor's

---

[4]  Additionally, one of the documents Plaintiff successfully moved to compel State Defendants to produce indicates that the Governor's Office, speaking through Ms. Corieri, had final, or near final, authorization on the scope and language of the Exclusion.  (Wee Decl., Ex. 1, AZSTATE246062.)

4

privilege log regarding "proposed legislation," "House Bill" or "Administrative Code." (Mot., Ex. 7 at 4-5, emails dated January 18, 23, 24 and 25, 2017)  At the time these documents were apparently created in 2017, the Arizona Legislature was considering legislation to exclude funding for gender affirming surgery for Medicaid recipients and incarcerated people.[5]  The Governor's discussions about these bills is entirely relevant to determining if discriminatory intent informs his decision-making on the topic of transgender individuals and their healthcare.

The other categories are relevant too.  The first category regarding the Affordable Care Act is directly relevant, as it was the Plan's compliance with Section 1557 of the Affordable Care Act that prompted its reconsideration of the Exclusion in 2015.  (Doc. 195 & 205) The second and third categories are directly relevant as both the current language of the Exclusion is apparently based on R9-22-205(B)(4) of the Arizona Administrative Code that excludes "gender reassignment surgeries" from coverage for AHCCCS members. Similarly, the Arizona Department of Corrections Medical Services Technical Manual also excludes "gender-reassignment surgery."[6]  It is disingenuous to argue as the Governor does that its discussions about AHCCCS's and ADC's exclusions on the exact topic of this dispute (and language of the Exclusion) could not provide evidence of discriminatory intent.

In arguing that Corieri's prior statements on Twitter are irrelevant to Dr. Toomey's claims (Doc. 208, at 7, n.6), the Governor improperly confuses the <u>relevance</u> of potential evidence with the <u>sufficiency</u> of such evidence.  Fed. R. Evid. 401.  *Vita Zahnfabrik H.*

---

[5] Maria Polletta, "Arizona bills would ban coverage for gender-reassignment surgeries already denied by state," THE REPUBLIC (Jan. 24, 2017 2:04 P.M.), https://www.azcentral.com/story/news/politics/legislature/2017/01/24/arizona-bills-ban-state-coverage-gender-reassignment-surgeries-medicaid-prison-inmates/96966272/

[6] Arizona Department of Corrections, Rehabilitation & Reentry, *Medical Services Technical Manual*, 115 ¶ 6.2 (June 3, 2021), https://corrections.az.gov/sites/default/files/documents/PDFs/tech_manuals/adcrr-healthservicestechnicalmanual_060321.pdf
 ("Due to limitations inherent in being incarcerated, gender-reassignment surgery is not possible for inmates who reside within a correctional facility.")

5

*Rauter GmbH & Co. KG v. Dentsply Int'l, Inc.*, No. SACV 04-0729, 2006 WL 8437644, at *2 (C.D. Cal. June 21, 2006), aff'd, 278 F. App'x 1013 (Fed. Cir. 2008) ("Evidence does not need to be correct, however, to be relevant or admissible. Relevance does not measure the sufficiency of the evidence, but merely whether the evidence tends to make the existence of a fact more or less probable.") *Majors v. Warden*, No. 2:99-CV-00493 MCEKJN, 2010 WL 3341593, at *3 (E.D. Cal. Aug. 23, 2010) ("Petitioner need not show this discovery alone will prove his claims. Rather petitioner shows good cause for the discovery when he shows the information sought is relevant to the subject matter of his claims and that if the facts are fully developed he "may" be entitled to relief.") Whether the evidence sought will be sufficient by itself to conclusively prove the Governor's discriminatory intent, remains an issue for the ultimate trier of fact. Not the Governor, playing goalie over which discovery Plaintiff is entitled.[7]

### C. Ms. Corieri's Prior Remarks Regarding Transition-Related Surgery Are Relevant and Important.

Documents discussing Ms. Corieri's decisions and opinions regarding gender reassignment, even if they do not discuss the Exclusion itself, are plainly relevant here. Plaintiff has uncovered a public statement from Ms. Christina Corieri, one of the Governor's Senior Policy Advisors, and one of the direct liaisons between the Governor and State Defendants in discussions about transgender benefits under the Plan, expressing discontent with the expenditure of government funds for gender-affirming surgery. (Doc. 202, Ex. 11) ("advocates now demanding taxpayer dollars for gender reassignment surgery

---

[7] Plaintiff asks that the Court reject the Governor's requests that the Court conduct an *in camera* review of the 17 documents for relevance, as it appears intended merely to delay Plaintiff's receipt of the documents if successful on the motion, rather than preserve or protect highly confidential/sensitive information, as normally required for *in camera* review. (Opp. 7) If the Court indulges this request, then Plaintiff requests that the Court identify as relevant those documents that speak to discriminatory intent *in general* (*Heyne*, 69 F.3d at 1479–80) regardless of whether or not a document mentions the Exclusion at issue, as well as documents that speak to intent *in maintaining* the Exclusion (*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) or similar exclusion, and not just the intent in creating it.

6

under Medicare – bet Medicaid is next.")  Far from "a years-old stray remark" as the Governor contends (Opp. 7, n.6), Ms. Corieri demonstrated a particular interest in the topic at the heart of this dispute, and then years later was herself a key decision-maker on the very topic.  (Opp. 7, n.6).  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2439 (2018) ("discriminatory intent does tend to persist through time" (quotations and citations omitted)); *Fordice*, 505 U.S. at 747 (holding that where "a policy remains in force, without adequate justification . . . the State has failed to disprove discriminatory intent.").[8]

## II. THE EXECUTIVE COMMUNICATIONS PRIVILEGE TO STATE GOVERNORS UNDER BOTH FEDERAL AND ARIZONA STATE LAW

Because the only claims at issue in this case are federal claims, the Governor's applicable privileges are determined by federal common law.  The Governor grasps at cases from New Mexico, New York, Pennsylvania, and Puerto Rico, to support its demand that this Court create new federal law extending the "executive communications privilege" here in Arizona.[9]  The Governor confuses the issue by referring interchangeably between "executive privilege" and the more specific "executive communications privilege" which

---

[8] Discovery has revealed that Ms. Corieri received at her governmental email address newsletters regularly providing her with inflammatory content regarding gender-affirming surgery.  (Wee Decl., Ex. 2, AZ_GOV_00003120 ("Daily Signal" newsletter sent to Corieri, including article titled, "This Man Received 167 Sex-Change Surgeries. He Lives in a World of Regret"); Ex. 3, AZ_GOV_00003123 ("Daily Signal" newsletter sent to Corieri with an article titled "My 'Sex Change' Was a Myth. Why Trying to Change One's Sex Will Always Fail")).

[9] The Governor admits that the executive (or presidential) communications privilege is based upon separation of powers concerns between two coordinate branches of government. (Opp. 3, 7-10)  However, there are no separation of powers concerns when a federal court enforces federal law against a state official.  *United States v. Gillock*, 445 U.S. 360, 370 (1980) (finding that "under our federal structure, we do not have the struggles for power between the federal and state systems such as inspired the need for the Speech or Debate Clause as a restraint on the Federal Executive to protect federal legislators" and that "federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch.")

7

he seeks to extend in Arizona.[10] But none of the cases cited by the Governor clearly recognize and extend this specific privilege to state governors.

In *JM through Foley,* the Governor invoked "executive privilege" to prevent disclosure of certain documents in an investigation he requested and testimony of certain state officials who had been involved in such investigation. *JM through Foley v. N.M. Dep't of Health*, No. CV 07-604 RB/ACT, 2009 WL 10698414, at *2 (D.N.M. Aug. 20, 2009). The case is distinguishable not only because the context and the documents are substantially different—Plaintiff here seeks governmental communications to prove discriminatory intent by the government, rather than the government's shielding certain records in its own internal investigation—but most importantly because the Court there relied on the state law of New Mexico supporting a general "executive privilege," rather than federal common law.[11] *JM through Foley*, 2009 WL 10698414, at *3. Likewise in *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, the "executive privilege" was based on state law, rather than federal law. 385 F. Supp. 3d 130, 134 (D.P.R.), *objections overruled*, 390 F. Supp. 3d 311 (D.P.R. 2019) (citing to *Bhatia Gautier v. Gobernador*, 199 D.P.R. 59, 89 (2017), a decision issued by the *Tribunal Supremo de Puerto Rico*).

The Governor's other cases are also distinguishable. In both *Haber v. Evans* and *Marisol ex rel. Forbes v. Giuliani*, the court did not discuss the executive communications privilege, but rather other forms of executive privilege or related concerns (such as burden on elected officials). *Haber v. Evans*, No. 03-CV-3376, 2004 WL 963995 (E.D. Pa. May

---

[10] Opp. 9 (citing *JM through Foley*, *Hayes*, *Haber*, and *Giuliani* as recognizing an "executive privilege," but citing *Merritt* and *In re Fin. Oversight & Mgmt. Bd. for P.R.* as explicitly recognizing "executive communications privilege" or "executive privilege protecting communications". As noted in the Motion, *Merritt* does not support the Governor's contention. (Mot. 10-11) *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Plaintiff addresses further below.

[11] Also important to note that unlike here, plaintiffs in *JM through Foley* did not dispute whether the presidential communications privilege was applicable to State Governors under federal common law. *JM through Foley, WL 4993481 (D.N.M. 2009)* Therefore, the Court was never prompted to review such argument.

8

4, 2004); *Marisol ex rel. Forbes v. Giuliani*, No. 95 CIV. 10533, 1998 WL 158948 (S.D.N.Y. Apr. 1, 1998). In *Hayes v. Reed*, the court reasoned, hypothetically in a footnote, that the presidential communications privilege (as a form of executive privilege) <u>could</u> possibly apply to state governors, but did not apply the privilege. No. CIV.A. 96-4941, 1997 WL 125742, at *9, *9 n.8 (E.D. Pa. Mar. 13, 1997). In short, none of the Governor's cases support recognition of an "executive communications privilege" as a matter of federal common law.

In any event, even if Arizona state law were relevant, Arizona does not recognize an executive communications privilege either. The Governor largely avoids citing Arizona cases for this reason, and the one he does, *Mathews v. Pyle*, again recognizes the general concept of "executive privilege" but interprets it narrowly. 75 Ariz. 76, 80–81 (1952) (holding that "[i]t rests within the jurisdiction of the courts of the state to determine" questions of privilege (citations omitted)). *Mathews* is old however, and Arizona courts have historically refrained from recognizing privileges that have not been specifically adopted by the legislature. *Rigel Corp. v. State*, 225 Ariz. 65, 73, 234 P.3d 633, 641 (Ct. App. 2010) (finding that "government agencies do not ordinarily have a privilege to refuse to produce evidence unless a statute has specifically created an exemption.")

Even assuming, *arguendo*, an executive communications privilege applies to the Governor of Arizona, the privilege would still not protect the 17 documents sought because (i) Plaintiff has shown that the need for disclosure outweighs the government's (lack of) reasons for withholding; and (ii) there is no evidence that the Governor has actually viewed any of these documents, nor solicited or received them. *See Karnoski*, 926 F.3d at 1203 (finding that the privilege protects "communications directly involving and documents actually viewed by the President, as well as documents solicited and received by the President or his immediate White House advisers.")

**III.   THE GOVERNOR HAS NOT CARRIED ITS BURDEN ON ITS**

**DELIBERATIVE PROCESS PRIVILEGE CLAIMS, WHICH WOULD BE OVERCOME IN ALL EVENTS**

As the Governor admits (Opp. 15), it bears the burden of establishing that the withheld 17 documents are both (1) "predecisional," i.e., "generated before the adoption of an agency's policy or decision"; and (2) "deliberative," i.e., reflecting "opinions, recommendations, or advice about agency policies." *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1121 (N.D. Cal. 2003).

The Governor has failed to "assert with <u>precision</u> the reason why each document is subject to the asserted [deliberative process] privilege." *E.E.O.C. v. Swissport Fueling, Inc.*, No. CV-10-2101-PHX-GMS, 2012 WL 1648416, at *15 (D. Ariz. May 10, 2012) (emphasis added). Ms. Corieri's declaration provides rote, high-level summaries of the documents explaining how they are deliberative,[12] which is insufficient. *Cal. Native Plant Soc'y v. U.S. E.P.A.*, 251 F.R.D 408, 413 (N.D. Cal. 2008) ("an index of documents, providing just basic information and a brief description, is inadequate even when accompanied by conclusory affidavits") (emphasis added); Fed. R. Civ. P. 26(b)(5)(A)(ii). Ms. Corieri provides similarly sparse details as to the "predecisional" nature of the documents, relying more on theories and hypotheticals than the facts of each supposed deliberation.[13]

Even if the Governor had asserted its deliberative process privilege claim with the requisite specificity, the privilege would be overcome in all events under the *Warner*

---

[12] For example, "These documents were deliberative as they were made to assist a senior policy advisor in the Governor's Office's formulation of healthcare policy and decision-making concerning the proposed legislation." (Corieri Decl. 6). Ms. Corieri repeats this description almost verbatim for each of the documents she discusses.

[13] For example, "The information was predecisional, as it preceded the selection of an Affordable Care Act benchmark plan" with no details as to when a decision was made. (Corieri Decl. 1) Or, that the documents are predecisional on the theory that "the Governor would ultimately be responsible for signing or vetoing the legislation if passed by the Legislature" rather than the actual facts of the Government's discussions and when it actual deliberated or made a decision in each instance. (*Id.* 2-7)

factors. (Mot. 12-14)  The Governor has argued nothing to reasonably rebut the relevance of the 17 documents sought (factor one), that there is any other source of the particular evidence of discriminatory intent <u>of the Governor's Office</u> these documents might contain (factor two), that the Governor is not intimately tied to the decision-making around the Exclusion (factor three), and that disclosure of these years old documents would somehow chill discussion in the Governor's Office (factor four).[14]

      Finally, the Governor mischaracterizes Plaintiff's reliance on this Court's grant of its prior motion to compel State Defendants to produce documents withheld on the basis of deliberative process privilege.  Plaintiff was not arguing estoppel, as the Governor seems to think, but rather the reasoning and logic of the Court remained sound in the instant context.  The Governor's response to that reasoning is effectively that the 17 documents sought do not directly focus on the Exclusion. (Opp. 16-18).  These 17 documents might directly evidence discriminatory intent of the Governor's Office, and could be the most reliable evidence thereof.  If, as the Governor claims, its decision-making on the Exclusion, and indeed on all issues involving transgender individuals and their healthcare, has been made "for entirely prosaic reasons, such as cost containment, there is little reason to fear that future health insurance decision would be adversely affected if predecisional opinions were disclosed to the public." (Doc. 187 at 7).  The Governor offers no response to this simple logic.[15]

---

[14] Out of the 17 sought documents, two are emails between Corieri and Jami Snyder, Director of AHCCCS, dated August 2020, and concern healthcare coverage likely related to transgender (because responsive to the Subpoena).  Even if the fact of being more recent communications could be considered a factor weighing against disclosure for these two specific documents, the outcome would remain the same as the other three factors still weigh in favor of disclosure.

[15] For these same reasons, the Governor's requests that the Court conduct an *in camera* review of the 17 documents should be rejected. (Opp. 7)  If the Court indulges this request, then Plaintiff requests that the Court identify as relevant those documents that speak to discriminatory intent *in general* (*Heyne*, 69 F.3d at 1479–80) regardless of whether or not a document mentions the Exclusion at issue, as well as documents that speak to intent *in maintaining* the Exclusion (*Pers. Adm'r of Mass.*, 442 U.S. at 279) or similar exclusion, and not just the intent in creating it.

11

# CONCLUSION

For all the reasons discussed above, Plaintiff's Motion should be granted.

Dated: June 25, 2021

ACLU FOUNDATION OF ARIZONA

By /s/ *Christine Wee*
    Victoria Lopez - 330042
    Christine K. Wee - 028535
    3707 North 7th Street, Suite 235
    Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    Joshua A. Block*
    Leslie Cooper*
    125 Broad Street, Floor 18
    New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
    Wesley R. Powell*
    Matthew S. Freimuth*
    Nicholas Reddick*
    Jordan C. Wall*
    Victoria A. Sheets*
    Justin Garbacz*
    787 Seventh Avenue
    New York, New York 10019

*admitted pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2021, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

I, further hereby certify that on June 25, 2021, I emailed the attached document to:

>Betsy Lamm
>Daniel Dowd
>Kaysey L. Fung
>Cohen Dowd Quigley
>The Camelback Esplanade One
>2425 East Camelback Road, Suite 1100
>Phoenix, Arizona 85016
>BLamm@CDQLaw.com
>DDowd@CDQLaw.com
>KFung@CDQLaw.com
>
>*Attorneys for Office of Governor Douglas A. Ducey*

>/s/ *Christine K. Wee*
>Christine K. Wee

13