# EXHIBIT A

EXHIBIT A

1      IN THE UNITED STATES DISTRICT COURT

2           DISTRICT OF ARIZONA

3

4  Russell B. Toomey,                    CV-19-00035-TUC-RM(LAB)

5           Plaintiff,
   vs.

6
   State of Arizona; Arizona Board of Regents,
7  D/B/A University of Arizona, a governmental
   body of the State of Arizona; et al.,        August 11, 2021
8                                                11:00 a.m.
            Defendants.                          Tucson, Arizona
9  _____

10

11
            OFFICIAL TRANSCRIPT OF PROCEEDINGS
12
            TELEPHONIC MOTION HEARING
13
       BEFORE THE HONORABLE LESLIE A. BOWMAN
14           UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22       PROCEEDINGS WERE DIGITALLY RECORDED

23

24     TRANSCRIBED BY:  ERICA R. McQUILLEN, RDR, CRR
            405 West Congress, Suite 1500
25            Tucson, Arizona 85701
               (520) 205-4267

```
 1                    A P P E A R A N C E S

 2    On behalf of the Plaintiff:

 3         Jordan C. Wall
           Justin Garbacz
 4         Victoria A. Sheets
           Wesley R. Powell
 5         Willkie Farr & Gallagher, LLP
           787 Seventh Avenue
 6         New York, New York 10019

 7         Christine Keeyeh Wee
           Joshua A. Block
 8         American Civil Liberties Union
           125 Broad Street
 9         18th Floor
           New York, New York 10004
10

11    On behalf of the Office of Governor Douglas A. Ducey:

12         Daniel G. Dowd
           Betsy Jean Lamm
13         Cohen Dowd Quigley, PC
           Camelback Esplanade I
14         2425 East Camelback Road
           Suite 1100
15         Phoenix, Arizona 85016

16    On behalf of the State of Arizona:

17         Ryan Cannon Curtis
           Fennemore Craig PC
18         One South Church Avenue
           Suite 1010
19         Tucson, Arizona 85701

20    On behalf of the Arizona Board of Regents:

21         Austin Clark Yost
           Paul F. Eckstein
22         Perkins Coie, LLP
           2901 North Central Avenue
23         Suite 2000
           Phoenix, Arizona 85012
24

25
```

1                       A P P E A R A N C E S

2    Stephanie S. Rosenberg

3          University of Arizona Office of the General Counsel
           103 Administration Building
4          1401 East University Boulevard
           Tucson, Arizona 85701
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2              THE CLERK:  Now going on the record with civil
 3  matter Russell B. Toomey vs. State of Arizona.  I would like
 4  to call what counsel I know is appearing for the plaintiff.
 5              Do we have Jordan Wall on the phone?
 6              MR. WALL:  Yes, ma'am.  This is Jordan Wall over at
 7  Willkie Farr & Gallagher.
 8              THE CLERK:  Thank you so much.
 9              How about Joshua Block?
10              MR. WALL:  I should clarify, ma'am.  I'll be
11  presenting on behalf of plaintiff.  I believe my co-counsel
12  Joshua Block and Christine Wee of the ACLU are going to join
13  me on this call, as well as my colleagues from Willkie Farr &
14  Gallagher:  Wesley Powell, Victoria Sheets, and Justin
15  Garbacz.
16              THE CLERK:  Okay.  Fantastic.  Thank you.
17              Then how about our parties for the defendants.  Do
18  we have Danielle Dowd on the phone?
19              MR. DOWD:  Good morning, yes.
20              THE CLERK:  Thank you, Mr. Dowd.
21              How about Betsy Lamm?
22              MS. LAMM:  Good morning, yes, Betsy Lamm is also on
23  the phone.  And just to clarify, Mr. Dowd and I are counsel
24  for the Office of the Governor, who is not a defendant.
25              THE CLERK:  Okay.  Okay.  Perfect.  Thank you.
```

1          And what about Ryan Curtis for the State of Arizona?

2          MR. CURTIS:  Good morning, yes.  This is Ryan Curtis

3    on behalf of the State defendants.

4          THE CLERK:  Perfect.  Thank you so much.

5          Betsy, thank you for clarifying that.  I apologize.

6    I wrote it down incorrectly.

7          Is there anyone else that needs to state their

8    presence for this hearing?

9          MR. YOST:  Yes, Your Honor.  This is Austin Yost on

10   behalf of the Arizona Board of Regents.  I'm joined by Paul

11   Eckstein from Perkins Coie and Stephanie Rosenberg from the

12   University of Arizona's General Counsel's Office.

13         THE CLERK:  Okay.

14         THE COURT:  I didn't catch -- I didn't catch that.

15         (A discussion was had off the record between the

16             clerk and the Court.)

17         THE CLERK:  I'm sorry.  And then you said, Paul --

18   Paul.  Did you say Stephanie is also appearing?

19         MR. YOST:  Yes, Paul Eckstein from Perkins Coie and

20   Stephanie Rosenberg from the University of Arizona's General

21   Counsel's Office is here.

22         THE CLERK:  Okay.  Thank you.  Stephanie Rosenberg.

23         Okay.  And is there anyone else?  Just one more

24   call:  Anyone else that needs to state their presence?

25         Okay.  Fantastic.  Then we are on for this motion

1   hearing.

2          Judge?

3          THE COURT:  Are we on the record?

4          THE CLERK:  Yes, we are.

5          THE COURT:  Oh, okay.  Great.

6          Good morning, counsel.  This is Leslie Bowman.  I'm

7   the magistrate judge who's assigned to this case, and I'll be

8   conducting the motion hearing this morning.

9          So I think it's a little bit of an unusual position

10  that we're in because there was already a ruling made, but

11  that was before the Governor's Office filed their -- filed

12  their motion.  So I think what I would like to do, unless the

13  parties have a strong preference otherwise, is to let counsel

14  from the Governor's Office begin.

15         MR. WALL:  So Your Honor, this is Mr. Wall on behalf

16  of plaintiff.

17         THE COURT:  Yes.

18         MR. WALL:  I believe we're before Your Honor on

19  plaintiff's motion to compel the Governor's Office to produce

20  documents.

21         THE COURT:  Oh, okay.  That's a good way of putting

22  it.  So -- so you'd like to make your argument first and then

23  allow the Governor's Office to respond?

24         MR. WALL:  I would, Your Honor.

25         THE COURT:  Okay.  That's fine.  Go ahead, please,

 1  Mr. Wall.

 2          MR. WALL:  Thank you, Your Honor, for this

 3  opportunity to be heard.

 4          In his lawsuit, plaintiff challenges the State of

 5  Arizona's categorical exclusion of gender reassignment surgery

 6  from coverage under the self-funded state employee health care

 7  plan administered by the Arizona Department of Administration

 8  or ADOA.

 9          Plaintiff reasonably seeks from the Arizona

10  Governor's Office, which was directly involved in the

11  decisionmaking about that exclusion, including through its

12  Senior Policy Advisor Ms. Christina Corieri, among others, to

13  produce just 17 documents.  These 17 documents are, number

14  one, responsive to the single request for production plaintiff

15  made of the Governor's Office for documents regarding surgery

16  to treat gender dysphoria, and number two, by the Governor's

17  own admission, concerning health care plans, health care

18  coverage, or a former Arizona House bill that sought to

19  statutorily exclude coverage for gender reassignment surgery

20  by other Arizona state entities administering public health

21  benefits.

22          Notably, that health bill was introduced in January

23  of 2017 and died on the House Floor on that same month, just a

24  short time after the Governor and the ADOA appear to have

25  concluded their decisionmaking on the exclusion in November

1    and December of 2016, as reflected in Exhibit 1 to my

2    co-counsel Ms. Christine Wee's second declaration, Bates

3    Number AZ State 246062, which was filed under seal with your

4    chambers.

5          Contrary to the Governor's assertion, plaintiff's

6    request here is no mere fishing contest.  Rather, plaintiff

7    has made a narrowly tailored request for just 17 documents

8    that are both relevant and proportional to the needs of this

9    specific case.

10          The parties here have agreed that disputed factual

11    -- that the factual question in dispute is whether the

12    decision to exclude gender reassignment surgery in the health

13    care plan was actually motivated by a legitimate governmental

14    interest, and while plaintiff argues that the exclusion

15    facially discriminates based on sex and transgender status, in

16    violation of Title VII and the Equal Protection Clause, Your

17    Honor has held in this matter that the related issue of

18    whether the exclusion was adopted or maintained based on the

19    discriminatory intent of the decisionmakers towards

20    transgender and gender nonconforming groups and individuals

21    may be a dispositive issue in this case.

22          The Governor's Office does not dispute its

23    involvement in the decisionmaking to maintain the State of

24    Arizona's categorical exclusion of gender reassignment

25    surgery, and the State's written discovery also identifies

 1   that the Governor's Office was involved in that

 2   decisionmaking.

 3        These 17 documents may reflect specific bias towards

 4   transgender and gender nonconforming groups and individuals on

 5   the part of the Governor's Office or they may reflect a

 6   general policy of the Governor opposing all forms of state-

 7   subsidized coverage for transition-related surgery.  Given

 8   that the permissible scope of discovery here is broad and

 9   relevant evidence is not limited, as the Governor suggests,

10   just to those documents specifically discussing exclusion,

11   plaintiff thinks this request is more than reasonable.

12        By way of example, if you were to adopt the

13   Governor's logic that plaintiff is only entitled to discovery

14   of documents specifically addressing the exclusion,

15   Ms. Corieri's tweet expressing discontent with the expenditure

16   of government funds for gender affirming surgery in which she

17   stated, "Advocates now demanding taxpayer dollars for gender

18   reassignment surgery under Medicare -- bet Medicaid is next,"

19   would be irrelevant.  It would be nondiscoverable if in the

20   possession and custody and control of the Governor's  Office,

21   and that's plainly incorrect.

22        Lastly, on this topic of relevance, I will say the

23   Governor's request for in camera review to determine the

24   relevance of the documents, the 17 documents requested, is

25   improper, and Ms. Corieri's tweet is a great example of why

1  such a review would be inappropriate.

2          If the Court were to review that tweet about

3  coverage for gender reassignment surgery in the abstract, it

4  might very well or theoretically conclude that it's unrelated

5  or irrelevant to the instant dispute about the State health

6  plan.  However, discovery has revealed thus far in this matter

7  that Ms. Corieri received at her governmental email address

8  newsletters that were regularly providing her with

9  inflammatory content regarding gender affirming surgery, and

10  those documents are included in the second declaration of my

11  co-counsel Ms. Christine Wee at Exhibits 2 and 3.

12          Taken into context with this additional evidence,

13  Ms. Corieri's tweet is all the more relevant because this is

14  just a pattern of behavior and interest opposing

15  state-subsidized coverage for transition-related care.

16          We think, therefore, the Governor's request for in

17  camera review to determine relevance is inappropriate because

18  outside of this context of the additional evidence adduced

19  thus far in the case, it would be difficult for the Court to

20  judge whether these documents are relevant or not.

21          THE COURT:  Okay.

22          MR. WALL:  Additionally, I will say, if I may be

23  given just a few moments --

24          THE COURT:  Yes.

25          MR. WALL:  There is no other basis for the

1  withholding of these documents on the part of the Governor's

2  Office.  There is no reasonable claim of privilege that

3  protects these documents, and the privileges asserted by the

4  Governor, including the executive communications privilege,

5  which is more appropriately called the presidential

6  communications privilege, and the deliberative process

7  privilege, are inapplicable here for several reasons.

8          I would say with respect to the presidential

9  communications privilege, that privilege is simply

10  inapplicable here as it has not been recognized under federal

11  common laws extending to a state governor and should not be

12  here.  And even it were applicable to a state governor, the

13  Governor's Office has failed to state that privilege with the

14  requisite particularity supporting the need to maintain the

15  secrecy of these documents.

16          And even if the Governor's Office had stated --

17  asserted the privilege with the requisite particularity, it

18  isn't absolute, and it would be overcome in all events because

19  the Governor's Office's decisionmaking here is directly at

20  issue in this dispute.

21          The Governor's Office admits that federal common law

22  controls the question of the existence or applicability of the

23  privilege, and the Governor's Office acknowledges that this

24  Court would need to extend the federal court's recognition of

25  other executive privileges, such as the deliberative process

1   privilege, to this particular privilege for it to apply.

2          And the Governor cites no authority recognizing the

3   presidential communications privilege as applicable to a state

4   governor a matter of federal common law.  At best the Governor

5   relies on Merritt v. the State of Arizona in which an order of

6   Judge Campbell asserted that the Governor's Office in that

7   case may assert that executive privilege generally, it makes

8   no mention of the presidential communications privilege or

9   executive communications privilege, but that executive

10  privilege generally may apply to withhold certain documents.

11         Importantly, Judge Campbell did not decide or

12  preemptively rule that that privilege applied or is

13  applicable.  Judge Campbell merely recognized that the

14  Governor's Office may assert that claim, and it would

15  therefore need to provide a privilege log asserting that claim

16  of privilege, ostensibly to allow further review of that claim

17  later on.

18         And even if the Court -- even if the Governor's

19  Office admitted that there is no federal common law

20  recognizing this, there is also no Arizona state law

21  recognizing the existence of this presidential communications

22  privilege.  This is not a trivial mistake on the Governor's

23  Office's part.  Each of the cases that the Governor's Office

24  cites to and relies on for the recognition of this

25  presidential communications privilege is recognizing that

privilege is a matter of state law in those particular cases.

JM through Foley recognizes it's matter of Puerto Rican law,

Cap. Info Group v. the State of Governor recognizes it's a

matter of Alaskan law, Republican Party of New Mexico

recognizes it's a matter of New Mexican law, and the Freedom

Foundation v. Gregoire recognizes it's matter of Washington

state law.

For reasons that this -- Your Honor has already

cited in this case, there is good reason to believe that an

Arizona state court would not recognize this presidential

communications privilege, precisely because there are statutes

in Arizona requiring the open inspection of public records in

state officials' custody, and that includes Arizona Statute --

Revised Statute 39-121, as well as case law that Your Honor

has previously relied on to make this point, including Arizona

Dream Act Coal. v. Brewer.

This Court should reject any invitation to create

new federal law and extend the presidential communications

privilege to the Arizona Governor's Office for three reasons.

First, the issues that are animating that privilege, the

separations of powers doctrine, do not apply here.  Second,

the Governor, again, failed to make particularized objections

demonstrating why these documents need to be maintained

secretly or prevented from disclosure, and again, even if they

were to do so, it would be overcome in this context because

1   that privilege is not absolute and would clearly be overcome.

2          It's important I think to note on that first point,

3   too, that the presidential communications privilege, it's not

4   a mistake to use that terminology.  That privilege arises out

5   of the unique conditions of the President's role as the

6   federal executive and in constitutional functions, a point

7   that has both been recognized by the United States Supreme

8   Court in U.S. v. Gillock, as well as the In re Sealed case

9   upon which the Governor's Office relies.

10          Those same considerations do not apply here to the

11   Arizona Governor, and they certainly don't apply in the

12   context of this case, which is a case in federal court

13   applying federal law, constitutional and statutory law, to

14   enforce federal rights against a state entity.

15          As to the Governor's Office's failure to state these

16   privileged records with particularity, they rely on

17   Ms. Corieri's declaration, which only provides a generalized

18   statement of why these 17 documents should remain secret in

19   its paragraph 9.  Ms. Corieri otherwise goes through certain

20   categories of documents and repeats almost verbatim the same

21   blanket statement that these documents are both -- should be

22   withheld from discovery because they reflect communications

23   that might inform advice given to the Governor.

24          Nowhere does she state that any of these documents

25   were actually a part or informed the advice she gave to the

1  Governor or that they would need to be withheld from

2  disclosure because they somehow would impede the Governor's

3  decisionmaking.  And it's not a matter of course or logic

4  intuitive to us that these documents would, in fact, impede

5  upon the Governor's ability to make a decision on entirely

6  unrelated legislation that occurs either today or years after

7  the documents that we're talking about.  As I said earlier,

8  the majority of these documents concern their discussions of a

9  bill proposed in January 2017 that lived and died within that

10  month.

11        And then, finally, I would say, on the overcoming of

12  this privilege, which are largely similar reasons as to why

13  the deliberative process privilege doesn't apply, these

14  documents clearly evidence -- are evidence that are necessary

15  and needed here and cannot be obtained from another source.

16  As I stated earlier, the Governor's Office does not contest

17  that it was involved in the decisionmaking of the decision

18  whether to maintain the exclusion.

19        To the extent these documents reflect internal

20  deliberations within the Governor's Office, there is no other

21  source of this information.  It has not been obtained from the

22  State of -- the Arizona Department of Administration, nor can

23  it be obtained from other entities outside of the Arizona

24  Governor's Office.

25        In fact, these documents are all the more important

1    because, from our depositions thus far of representatives from

2    those offices, including Ms. Marie Isaacson, who was largely

3    in charge of the decision whether to maintain this exclusion

4    in 2016 and 2017, she stated that there was no discussion

5    between the Arizona Governor's -- between the Governor's

6    Office and the ADOA about the decision to maintain this

7    exclusion.  Rather, she attended a meeting where that decision

8    was announced by Ms. Corieri, and there was no deliberations,

9    and that's reflected in the excerpts of the transcripts that

10   we submitted from Ms. Isaacson's deposition.  Those are

11   Exhibit 9 to my co-counsel Ms. Christine Wee's first

12   declaration in this motion.

13          And I think it's crucially important we talk about,

14   not only are these documents needed for their potential

15   evidentiary weight, but also to assist us in acquiring

16   additional evidence and discovery in this matter.  We have

17   held in abeyance pending the resolution of this motion the

18   depositions of Ms. Corieri, as well as the depositions of the

19   director, current director, of the ADOA, Mr. Andy Tobin.

20   These documents would obviously be, the topics on which they

21   are, deliberations of the Governor's Office about health care

22   plans relating to gender reassignment surgery or a bill

23   intended to exclude coverage of gender reassignment surgery,

24   these would naturally be topics or areas of discussion in

25   those depositions, and absent these documents, we would not be

1  able to explore these fully or question Ms. Corieri about the

2  analysis that occurred in the Governor's Office there.

3          And I think for those same reasons I'll conclude

4  that the deliberative process privilege is also overcome here

5  if it was even applicable.  Again, we think the Governor has

6  failed to state or assert that privilege with the requisite

7  particularity.  Again, Ms. Corieri only states in a very

8  perfunctory manner that these documents are both predecisional

9  and deliberative, as is required by that privilege, but even

10  if she had stated or the Governor's Office otherwise made that

11  privilege claim out, these would be overcome if you apply the

12  four factors recognized in F.T.C. v. Warner.

13          First, the 17 documents are clearly relevant for the

14  reasons I stated above, which goes to the first factor.

15  Second, they are the only source of evidence of potentially

16  the discriminatory intent of the Governor's Office.  And

17  third, the Governor's Office is intimately involved in

18  decisionmaking here.  And fourth, the disclosure of these

19  years-old documents do not in any way suggest they would show

20  discussion within the Governor's Office as to its policymaking

21  to other unrelated pieces of legislation or decisionmaking.

22          And finally, I will say I think the chief argument

23  that the Governor's Office relies on here is that these

24  documents are not directly -- do not directly speak to

25  exclusion, and as I've stated above, that it's perfectly

1   acceptable within the broad scope of discovery for the

2   plaintiff to seek documents that might evidence both a

3   specific bias towards transgender individuals and groups but

4   also a policy of general opposition to the coverage of

5   transition-related-care, of which these documents very well

6   may reflect.

7           Thank you, Your Honor.

8           THE COURT:  All right.  Thank you, Mr. Wall.  I

9   appreciate that.

10          And which counsel will be responding?

11          MR. DOWD:  Good morning, Your Honor.  This is Dan

12  Dowd on behalf of the Office of Arizona Governor Douglas A.

13  Ducey, a nonparty to this action, and with the Court's

14  permission, I'll proceed.

15          THE COURT:  Okay.  Yes, thank you.  Please go ahead.

16          MR. DOWD:  Your Honor, we appreciate the opportunity

17  to be heard.  We had hoped beyond hope that we could be in a

18  courtroom in person, but perhaps next time.

19          THE COURT:  Yes, that would be so nice.

20          MR. DOWD:  Boy, wouldn't it?

21          Your Honor, you have a lot of paper in front of you,

22  and we have done our due diligence and know your penchant for

23  preparation, so it's not my intent to repeat what is in the

24  briefs but instead to try to give light to that cold paper and

25  respond to the arguments of my colleague Mr. Wall.

1          If I do my job, I hope to establish that the motion

2    to compel must be denied for the following three reasons.

3    First, the 17 requested documents are not relevant to

4    plaintiff's claims, and really, the analysis can start and

5    stop there.  If it proceeds, the documents are privileged

6    under both the executive communications and deliberative

7    process privileges, and I will show to you that the

8    irrelevance of the documents actually derails plaintiff's

9    effort to overcome those privileges or to credibly claim a

10   focused need for them.

11         And third, if the Court somehow gets past relevance

12   and privilege, it must conduct an in camera review to confirm

13   relevancy and to ensure that the privileges are not

14   unnecessarily breached, especially when dealing with the

15   executive branch of the state government.

16         These are important issues, Your Honor, but I'm

17   going to start first with a bit of context that my colleague

18   left out.  Since receiving the subpoena in February, the

19   Governor's Office has worked diligently to produce all

20   nonprivileged documents responsive to a very broad subpoena.

21   We haven't stiff-armed the plaintiff, nor have we drawn

22   arbitrary lines in the sand.  Rather, through significant

23   effort, we produced over 3,500 pages of responsive material,

24   including the very documents that Mr. Wall summarized for you

25   during his argument.

1          We've also withheld a small subset of technically

2    responsive but privileged documents, including the 17 emails

3    at issue today.  We did that consistent with the Governor's

4    Office's long history of rigorously protecting the

5    confidentiality of the manner in which it considers

6    legislation and formulates policy.  Those 17 emails are both

7    irrelevant and privileged, and I'll start with relevance,

8    because that's where Mr. Wall started.

9          Now, while the plaintiff has contended over and

10   over, as if saying it enough times will somehow make it true,

11   that the 17 documents are relevant to the intent of the

12   Governor's Office regarding the exclusion of gender

13   reassignment surgery under the State health plan, in

14   plaintiff's reply, he goes so far as to say that those 17

15   documents might be the most reliable evidence of

16   discriminatory intent, but what Mr. Wall must concede is

17   that's sheer speculation.  There is not a shred of support in

18   the record for an argument that the documents at issue today

19   bear on any fact that's at issue in the lawsuit.  Rather, that

20   is an entirely false premise stringing from an overbroad

21   subpoena.

22         The plaintiff also repeatedly repeats in his papers

23   that the subpoena is, quote, narrowly tailored to seek records

24   directly relevant to the central issue in this litigation: the

25   intent of the decisionmakers.  I'd ask the Court to recall

1    that phrase "narrowly tailored" as it considers the rest of

2    this argument.  That's a shockingly false statement and one

3    that undermines the credibility of plaintiff's entire

4    argument.

5            Here's what the subpoena actually seeks:  10 years

6    worth of documents.  It's not limited to the exclusion at

7    issue.  Rather, that subpoena seeks any single document in the

8    Governor's Office that contains a reference to surgery for

9    gender dysphoria, no matter how remote, no matter how

10   disconnected to the claims plaintiff has brought not against

11   the Governor but against the State.  That subpoena's not even

12   limited to the State health plan that's at issue here.

13           THE COURT:  Does it --

14           MR. DOWD:  It extends to Medicaid --

15           THE COURT:  Can I interrupt?  Does it have to --

16   does it have to be limited to the insurance policy at issue

17   here if the plaintiffs are looking for pattern and practice?

18           MR. DOWD:  Well, no, but I guess, Your Honor, it

19   needs to be -- the scope of the subpoena to surmount the

20   privileges that I'm going to talk about in a moment has to be,

21   in the words of the Supreme Court, narrowly tailored, and when

22   Mr. Wall says this is narrowly tailored, we're only fighting

23   about 17 documents, that's a misstatement of what's going on

24   here.

25           That subpoena is as broad as you could imagine.

It's any document that floated across the desk at the

Governor's Office over 10 years.  An unsolicited newsletter,

spam, you name it, that has the words "gender dysphoria" in

it, that's what that subpoena seeks.  And that's important as

you consider whether the plaintiff has provided the kind of

showing necessary to surmount the privileges that apply.

            THE COURT:  So Mr. Dowd, here's my question about

that, because from what you mentioned, the Governor's Office

has done a thorough job, a good job, of providing over 3,500

relevant documents, but today we are only talking about 17

documents.  Isn't that a fair analysis?

            MR. DOWD:  Yes.  They've moved on 17 documents.  Our

privilege log was longer.  They chose 17 that were withheld

based on executive communication privilege to be the subject

of this motion.

            THE COURT:  Okay.

            MR. DOWD:  Correct.

            THE COURT:  And that -- the privilege log, I'm

trying to remember the exact number, which I won't be able to,

but it was in the 600s or something, wasn't it?

            MR. DOWD:  No, I believe it's 67.

            THE COURT:  Oh, 67.  I'm sorry.  Okay.

            MR. DOWD:  And the others were obviously withheld on

grounds other than executive communications.

            THE COURT:  Oh, I see what you're saying.  Okay.

1    Thank you for clarifying that.

2          MR. DOWD:  So what happened here is that we have

3    documents that were technically responsive to the subpoena,

4    they would have the word or the phrase "gender dysphoria" or

5    any of its cousins, as identified in the subpoena, but they

6    had nothing to do with the issues in the case, and those are

7    the 17 that we analyzed, but not only do they have nothing to

8    do with the issues in the case, they also invaded on the

9    privileges that I'm going to talk about in just a moment.

10          And we detailed that in Ms. Corieri's declaration,

11    and you know, we're both using adjectives to describe it, the

12    Court will read it and draw her own opinions, but she goes

13    through all 17 documents.  None of them address the exclusion

14    at issue or the intent behind the exclusion, none of them

15    involve plaintiff's actual employer, the Board of Regents, and

16    they're not evidence of an intent to burden transgender

17    individuals, and that's a problem entirely of plaintiff's own

18    making through the overbreadth of the subpoena.

19          A mere reference in a document to gender

20    reassignment surgery cannot through the ipse dixit of counsel

21    be automatically evidence of intent.  And it's within the

22    prerogative of the Governor's Office that, when documents come

23    back from that search, if they don't bear on the issue in the

24    case, the fact that it's technically responsive to the scope

25    of an overbroad subpoena doesn't swing the door wide open,

1  especially when there are privileges.

2  THE COURT:  Now, but what if they lead to

3  information?  In other words, do they have to -- do they have

4  to be exactly on point, or is it enough if they discuss or

5  infer something that would lead to evidence?

6  MR. DOWD:  Yeah, I need to right, Your Honor, it is

7  not our position that, if they don't mention the exclusion,

8  they're not relevant.  That's -- we've never taken that

9  position.  That's not the law.  But when you're subpoenaing

10  documents from the executive branch, and you've got issues

11  like policy formation, deliberations, and all of the things

12  attendant, again, to the privileges that I promise I'll get to

13  right away, that that just doesn't surmount it.

14  You can't say -- you can't say, gee, intent's an

15  issue, give me everything, and I'll determine whether it bears

16  on intent when you have other larger or at least equal issues

17  of importance at play.  And there's certainly no law that

18  suggests we have to turn over irrelevant documents.  If they

19  send a subpoena -- in any case, if you send a subpoena that is

20  overbroad, and the yield from that subpoena brings back stuff

21  that in a good-faith estimation is not relevant to the case,

22  you don't have to produce it.

23  And I do agree with Your Honor that evidence on the

24  issue of intent can be found in materials other than those

25  that specifically mention the exclusion that's framed by this

 1   complaint, but as you see in Ms. Corieri's declaration, which

 2   is the only recitation of the content of those documents that

 3   exist, these don't, and that's why I'm going to end the

 4   relevance argument where I'm going to end the privilege

 5   arguments, as to the extent you have any concern, we're

 6   talking about 17 documents here, they should be reviewed by

 7   you in camera, especially when on the other side of the

 8   balance are things like executive privilege and deliberative

 9   process privilege and a federal district court instructing the

10   chief executive of a state on what he or she should be doing

11   in the way that it communicates in formulating policy.

12          It's really a cheap date, to provide you with the 17

13   so you can make these decisions yourself.  We provided as much

14   detail as we could without waiving the privilege in

15   Ms. Corieri's declaration.  And it is not a summary, as

16   Mr. Wall decides.  She goes through each document and provides

17   a paragraph as to its general nature and what its role was in

18   connection with the actions of senior advisors of the

19   Governor's Office in formulating policy, considering

20   legislation, et cetera.

21          So maybe that's where I should end the relevance

22   discussion, Your Honor.  We think, through the Corieri

23   declaration, we satisfied our obligation to establish that

24   they're not relevant, and if they're not relevant, they

25   shouldn't be produced, but if there's any debate, you should

1   review them in camera.  You have the plaintiff's recitation of

2   what he believes they might be, you have Ms. Corieri's

3   declaration of what she believes they actually are, and you

4   should make that decision after looking at them.  It's a very

5   thin notebook of materials.

6          But that's relevance, Your Honor, and really, that's

7   where you should stop, is once you do that, you should stop

8   and deny the motion, because these 17 simply aren't relevant.

9   Technically responsive to the subpoena, yes.  Relevant to the

10  claims and defenses asserted with particularity, no chance.

11         And if you do that, you don't even have to reach the

12  privilege issues that I'm now going to talk about.  We know

13  from Justice Kennedy in the Cheney case, where he said a court

14  must first explore all other avenues for resolving a motion to

15  compel before reaching the executive privilege issue when

16  asked to enforce a broad subpoena.  That was reiterated in the

17  Karnoski case by the Ninth Circuit two years ago.  So you

18  shouldn't even get there.  You should review them in camera,

19  make a decision on relevance, and that, we believe, will cause

20  the motion to be denied.  If you do move forward, the

21  documents are privileged.

22         Now, I'll start with the executive communications

23  privilege because we understand your familiarity with

24  deliberative process through your prior ruling, but the

25  executive communication privilege that applies to executive

1    branch communications involving decisionmaking and policy

2    formulation, its purpose is well settled.  I don't think

3    there's any debate.  It's to facilitate governmental

4    decisionmaking and ensure executives are informed by candid

5    advice.

6              And court after court has said that the importance

7    of getting candid advice is that it improves decisionmaking

8    and it protects a public interest, and that's going to be

9    important here as you weigh whether the federal common law

10   reaches a state governor.  But there's a public interest that

11   the Courts have announced in candid, objective, and even blunt

12   conversations in policy formulation, consideration of

13   alternatives, and decisionmaking.  That first came from

14   Justice Burger in the Nixon case.

15             Now, Justice Burger also said something very

16   important, and that is that the executive communication

17   privilege is fundamental to the operation of government.  It

18   fosters frank communications.  And contrary to Mr. Wall's

19   argument, we're not seeking the creation of a new legal

20   doctrine.  We're simply seeking the application of the

21   existing federal common law in light of reason and experience,

22   which is exactly what Federal Rule of Evidence 501 directs you

23   to do.

24             Mr. Wall says that the executive communication

25   privilege under federal common law does not extend to

governors and that there's no federal case so saying.  We

disagree.  There are state and federal courts across the

country that have applied the privilege to state governors,

and while the state cases are not binding on you, there's a

plethora of federal authority that says state law can be

informative to a federal court on federal common law privilege

issues.

And again, contrary to the plaintiff's assertion in

the briefs, both the motion and the reply, multiple district

courts have extended that privilege to governors as the chief

executives of their state.  We cited five for six cases in our

papers.  The most important one from our view is Merritt v.

State, decided in 2018 by your colleague Judge Campbell.  And

in that case he ruled that the Governor, who was a nonparty to

that litigation, was allowed to redact information protected

by the executive privilege and to produce a privilege log

identifying said documents, very familiar and very analogous

to what has happened here.

The purpose of the privilege and the public policy

rationale applies with equal force to communications between a

governor and senior advisors as it does to the President and

his or her senior advisors because that public policy goal,

ensure candid advice and policy formulation and fostering

sound executive decisionmaking, applies with equal force to

the federal executive branch as it does to the state executive

1    branch.

2           There's brief reference in the briefs, and Mr. Wall

3    mentioned it today, that Arizona wouldn't adopt such a

4    privilege because of its strong policy favoring open

5    disclosure and access to records.  That was a part of the

6    rationale that you articulated on your ruling to the State's

7    opposition under the deliberative process privilege.

8           And they cite to the Brewer case.  Now, in Brewer,

9    the court found that there the state agency involved simply

10   didn't meet its burden, applying the elements of the

11   privilege.  There were 174 documents, and they said they

12   didn't show why those documents fell within the scope of the

13   articulated privilege.

14          And of course Arizona's open record law has limits.

15   You can't say Arizona has open records in a public records

16   statute, ergo, there is nothing that is privileged.  That

17   would fly in the face of Mathews v. Pyle decided almost 60

18   years ago, 70 years ago, saying that even that disclosure has

19   limits.  Confidential information and information where it's

20   in the best interests of the State to not disclose it is not

21   subject to those open records laws.

22          So like Merritt, where the Governor was a nonparty,

23   here the Governor's Office is a nonparty, and here, where the

24   executive privilege is being asserted, just as it was there,

25   the appropriate response by a federal district court or a

1   magistrate is to recognize the privilege and make sure that

2   there is a privilege log and a supporting declaration that

3   substantiates it.

4          Well, here, the Governor's Office certainly properly

5   invoked the privilege, followed the rules that have been set

6   forth in the decisions.  Again, you have Christina Corieri,

7   the senior policy advisor's declaration.  And as that

8   declaration articulates -- and again, we just disagree with

9   plaintiff's characterization or disparagement of that

10   declaration.  She identified each communication, shows how

11   they're among senior advisors in the Governor's Office.  They

12   were carried out in the course and scope of advising the

13   Governor or formulating policy.  They were made to foster

14   sound, candid, and informed deliberations, policymaking and

15   decisionmaking.  They fall within the wheelhouse of the types

16   of communications protected by this privilege.

17          And importantly, as the Ninth Circuit recently said

18   in the Karnoski decision, once that privilege is invoked by

19   the chief executive, the Court should give it due deference,

20   and that's what we're asking here, that due deference be given

21   to it based on the strength of the declaration.

22          Now, plaintiff argues that, even if it applies, it

23   would be overcome here, and he attempts to pierce the

24   privilege.  Well, that standard, which again, is well

25   established in federal case law, to overcome the executive

1   communication privilege, the plaintiff has to make a focused

2   showing of need demonstrating that the evidence sought is

3   directly relevant to central issues and not available with

4   diligence elsewhere.

5           The plaintiff says that he has satisfied this

6   requirement, but the briefs are bereft of any reasoned

7   analysis as support.  The plaintiff presumes the relevance of

8   the documents by saying that we need documents on intent,

9   intent's an issue in this case, we think, it hasn't been

10  completely decided yet, but because we need documents on

11  intent, we get these documents.  Well, that in no way is the

12  standard, and it in no way gives the proper deference to the

13  state agency that's asserting the privilege.

14          And as I said, the subpoena here wasn't narrowly

15  tailored.  We're down to 17 documents on this issue.  They

16  asked for 10 years of information that had that term in any

17  document.  And as Ms. Corieri states, the documents don't

18  relate to the exclusion or the decision.

19          Absent something, something more than a tweet from

20  2013 by a member of the private sector, something, the

21  plaintiff has not established that there's a focused showing

22  of need for documents that are collateral to the issues that

23  bring us all here.  He hasn't met his burden.

24          And I know this is going to sound familiar, but if

25  you have concern on that issue and concern as to whether

1  plaintiff has met his clear burden to overcome the privilege,

2  you should conduct an in camera review.  We don't believe

3  there's any authority that says the outcome of this motion

4  should be a turnover of the documents.  There has to be the

5  step of an in camera review by this Court to excise the

6  relevant material and ensure that the executive communication

7  privilege is not unnecessarily breached.

8          Now, I'll be quick on the deliberative process

9  privilege given your familiarity with that and there's full

10 briefing on it, but the same result is compelled there.

11 Everyone knows that privilege protects communications relating

12 to decisionmaking and the process of formulating policy by

13 government agencies.  Here the plaintiff concedes that that

14 privilege exists at federal common law.  Whether it exists

15 under Arizona state law really isn't at issue, because under

16 Rule 501 you're guided by federal common law.

17         Requirements are very straightforward as to the

18 documents or communications have to be predecisional and

19 deliberative, "deliberative" meaning prepared to help an

20 agency formulate its position, and it has to be invoked by a

21 responsible officer of the agency asserting the privilege.

22         So I'll return to the declaration.  She explains

23 each document, she explains its role in deliberations, and she

24 also says that the communications embodied in those documents

25 assisted the Governor's Office in making informed decisions

 1   regarding proposed legislation or formulating policy.  That

 2   fulfills the Governor's constitutional mandate to sign or veto

 3   legislation presented to him or her and to ensure that the

 4   laws are faithfully executed.

 5        We also describe what those documents discuss.

 6   Plaintiff has broken that down into four categories, which are

 7   generally accurate.  None of them have anything to do with the

 8   decision or the intent behind the decision.  So let's get to

 9   whether that privilege can be overcome under the Warner

10   factors, which this Court is very familiar with and for which

11   no one debates the plaintiff has the clear burden.

12        The first and most important element under Warner is

13   the relevance of the evidence.  And in the reply, the

14   plaintiff somehow felt comfortable signing a brief that says

15   the Governor has argued nothing to rebut the relevance of the

16   17 documents.  We've provided you a 17-page brief and a

17   lengthy declaration of Ms. Corieri that were almost

18   exclusively focused on the irrelevance of the documents at

19   issue.  It's a gross mischaracterization.

20        You also have uncontroverted evidence that the

21   documents do not address the decision to maintain the

22   exclusion or the intent behind that, and if they reference

23   gender reassignment surgery, they do it in a completely

24   different context.

25        And Your Honor, this is where this motion diverges

1   materially from the Court's prior ruling on the State's

2   assertion of the deliberative process privilege.  There was no

3   debate as we understand that dispute that the documents for

4   which the State asserted the deliberative process privilege

5   actually dealt with the exclusion or the intent behind the

6   exclusion.  That was not at issue in that debate, and those

7   documents were provided.  We don't have that here.  It is not

8   central to their claim, these documents.  We've identified why

9   in a declaration, and there's really nothing to respond to it.

10          The second factor is the availability of other

11   evidence.  Well, as I just said, the plaintiff received from

12   the State the actual relevant evidence on the issue of intent

13   and the issue of the exclusion.

14          THE COURT:  But if they -- if they -- if they needed

15   the information in these 17 documents, they could not get that

16   information in any other way but this; correct?

17          MR. DOWD:  Correct, with an emphasis on "if."  And

18   again, that's where the in camera review comes down.  Because

19   the premise here is, it's really a -- it's really a false

20   syllogism, Your Honor.  It's that, one, plaintiff has to show

21   intent.  Two, plaintiff has requested documents that have the

22   phrase "gender dysphoria" embedded in them somewhere.  Ergo,

23   the documents responsive to that search are relevant to the

24   issue of intent.  And that just -- that just can't be.  That

25   just does not hold water.

1        And I know everyone on this call except the

2   Governor's Office is operating in a vacuum because we've seen

3   the documents and you haven't, which ties in to the importance

4   of your in camera review, but just because they respond to a

5   search term does not mean they're relevant, and it doesn't

6   mean that they bear on intent, and parties responding to

7   subpoenas and requests for productions have to make those

8   judgment calls every single day.  It's just rare that you have

9   to make them run the other side of the balance as a privilege

10  being asserted by the chief executive of the State of Arizona.

11       So I'll end quickly, Your Honor.  The third factor

12  under the Warner analysis is the Governor's Office's role in

13  the litigation.  Now, an immutable fact in this case is the

14  Governor's Office is a nonparty.  That matters.  We provided

15  you with the case law showing that that matters in this

16  analysis, and they can't get around that by making unsupported

17  accusations of misconduct.

18       Now, Mr. Wall said that Ms. Corieri sent a tweet

19  that expressed discontent with state-funded gender

20  reassignment surgery.  That's the characterization of the

21  tweet.  The tweet's from 2013, when she worked in the private

22  sector, and here it is.  "Advocates now demanding taxpayer

23  dollars for gender reassignment surgery under Medicare -- bet

24  Medicaid is next."

25         That's the entirety of it, and that is the entire

1    toehold upon which they're trying to break down the door and

2    say, once we've alleged intent and once we give you a neutral

3    statement from 2013, we get all these documents because

4    somewhere in them they say "gender dysphoria."  There is no

5    way to connect those dots.

6            And lastly, Your Honor, Ms. Corieri talks about the

7    impact of breaching this privilege in response to a subpoena

8    of this nature, seeking documents that relate to issues

9    unrelated to the actual issues that remain in this case and

10   seeking them because they contain some reference to, quote,

11   gender affirming surgery, closed quote.

12           As she says, in her experience, and there's nothing

13   to controvert it, that to permit such an overreaching

14   subpoena, defeat the privilege that protects the deliberations

15   by which the Governor's Office operates, would hinder candid

16   debate and go right to the very heart of the public policy

17   concern that court after court after court has recognized in

18   finding the existence of these privileges.  The plaintiff has

19   not met his burden on these 17 documents, and again if the

20   Court has any question, we would beg of you to conduct an in

21   camera review.

22           So let me close, Your Honor.  The plaintiff's motion

23   rises and ultimately falls on the reality that he's seeking to

24   compel production from the executive branch of documents that

25   do not concern issues of the exclusion or intent, and the only

 1   thing he's offered in response is sheer speculation as to

 2   their content.  That's not enough for many salient reasons,

 3   and you can deny the motion on that ground alone.  They're

 4   also privileged, but for the reasons set forth in the

 5   authorities briefed in the papers, you really don't need to go

 6   there.

 7          And lastly, if you remain unconvinced, we would urge

 8   you to conduct the in camera examination required by court

 9   after court that has addressed these issues.

10          Thank you.

11          THE COURT:  All right.  Thank you, Mr. Dowd.

12          MR. WALL:  Your Honor, may I be allowed a brief

13   opportunity to respond to just a few points?

14          THE COURT:  Absolutely.

15          MR. WALL:  Thank you, Your Honor.

16          First, I'd like to provide some more context, as

17   Mr. Dowd alluded to, to clarify how it is that we arrived at

18   the motion today, and I'd also like to correct some

19   misconceptions and misstatements that Mr. Dowd failed to do so

20   in his presentation.

21          First, I think, Your Honor, he said earlier that the

22   Governor's Office has produced 3,500 documents in this case,

23   and that is not correct, unfortunately.  They have produced

24   3,500 pages of documents but in actuality have produced only

25   about 340 documents responsive to plaintiff's subpoena, and I

1   think that's a critical factor for Your Honor to consider.

2          Again, the Governor's Office does not dispute that

3   it was intimately involved in the decisionmaking on the

4   decision whether to maintain this exclusion.  We put before

5   Your Honor in that document I referenced as Exhibit 1 to

6   Ms. Wee's second declaration an email correspondence showing

7   the involvement and ultimate approval by the Governor's Office

8   of this decision to maintain the exclusion.

9          So that's the first point.  The second point, I

10  would say, is the Governor's focus on the nature of the

11  subpoena is entirely misplaced.  The plaintiff moved to compel

12  the Governor's Office to respond to and produce 17 documents

13  out of the 66 it withheld on the basis of privilege.

14          It's important to note that we are here on

15  plaintiff's motion to compel, not the Governor's Office motion

16  to quash the subpoena.  The argument it makes about the nature

17  of the requests in the subpoena are larger, relevant, and a

18  red herring.  We are here talking about 17 documents that

19  plaintiff looked through and reviewed from the privilege log

20  to ascertain whether they were relevant to the claims and

21  defenses and issues in this case, and it believes fairly they

22  are.

23          And that leads me to my third point, which is you

24  can very, I think, quickly dispense of this matter by relying

25  on the parties' papers.  Mr. Dowd and the Governor's Office of

 1    course is free to make whatever argument they want to make,

 2    but I would note that the argument they're making today is

 3    entirely inconsistent or largely inconsistent with the

 4    argument that they made in their papers.

 5              In particular, Mr. Dowd said earlier, we have never

 6    said that if they do not address the exclusion, these

 7    documents aren't relevant, and I think from Mr. Dowd's

 8    presentation where he continued to reference throughout

 9    whether the documents refer to the exclusion or the plan

10    itself as the basis for his argument as to nonrelevance of the

11    documents, that's telling in and of itself.

12              But you need only look to their opposition itself

13    where on I believe page 4 it says:  Plaintiff has not met his

14    burden demonstrating the relevance of the documents at issue

15    in this motion.  Plaintiff simply speculates in proclaiming

16    the demanded documents are relevant to establish whether

17    Christine Corieri and other members of the Governor's Office

18    acted with discriminatory intent when they made the decision

19    to maintain the exclusion challenged in this case.  As the

20    Governor's Office has repeatedly explained to plaintiff's

21    counsel in attempting to avoid the burden and expense of this

22    very motion, the documents do not address the decision

23    regarding the exclusion at issue in this lawsuit.

24              I think if you then look at Ms. Corieri's

25    declaration, throughout she repeats this same argument.  On

1    paragraph 6 she states broadly -- and again, this is document

2    208-1:  I have personally reviewed each of the documents.

3    They do not discuss or relate to the decision regarding the

4    exclusion at issue in the plaintiff's complaint.  She then

5    goes through in paragraph 11 categories of the 17 documents,

6    not each document, as Mr. Dowd stated, and says within each of

7    those descriptions that they do not relate to the plan or the

8    exclusion.

9         The Governor's Office's arguments as to relevance

10   are entirely premised on the mistaken assumption that

11   discovery here is limited only to those documents that

12   specifically address the exclusion and that documents that

13   relate more broadly to the Governor's either policy that is

14   adverse to transition-related care or that evidence bias

15   without discussing the exclusion are irrelevant.

16        They say that we have provided no evidence that

17   these documents in fact meet those qualifications.  Again, you

18   can look at the documents submitted and the papers of the

19   parties.

20        You referenced earlier that you did not have the

21   privilege log before you, and that privilege log has been

22   provided to you as Exhibit 7 to Ms. Wee's first declaration,

23   which is document 202-3, beginning at page 70.

24        And I think it's important that we go through and

25   look at each of the requests there, each of the entries on

 1   that privilege log, to ascertain what information the

 2   Governor's Office has provided itself that leads us to

 3   conclude that these 17 documents are relevant to the question

 4   of whether there is discriminatory intent, potentially

 5   relevant to the question of whether there's discriminatory

 6   intent that animated its decisionmaking on the exclusion or

 7   whether there is a policy of general opposition to

 8   transition-related care.

 9           I don't know, Your Honor, if you have that in front

10   of you, but I'm happy to go through it just very quickly.

11           THE COURT:  Yes.

12           MR. WALL:  If you look at that revised privilege

13   log, the 17 documents at issue, the first of which appears on

14   page 1 is a document dated July 17, 2015.  It is an email from

15   Gerrie Marks to Christina Corieri, and the subject matter is

16   "Health Care Plans."

17           The plaintiff thinks it is entirely reasonable for

18   it and this Court to assume that the fact that this document's

19   both responsive to its request for production concerning

20   documents related to transition-related care, and a document

21   whose subject matter is "Health Care Plans," that this is a

22   document that is relevant to the claims and issues in this

23   case.

24           If you look on page 4 and 5 of that privilege log,

25   the next I believe 14 documents that are at issue in this

motion are included halfway down page 4 to the top of page 5.
You will see that all of those documents concern for the most
part the proposed legislation which I referenced earlier,
which was a bill specifically to exclude gender reassignment
surgery and related care from being covered as matter of
Arizona statute by other Arizona entities administering public
health benefits, specifically AHCCCS, which administers the
State's Medicaid program, I believe, and the Department of
Corrections in its administration of public health care for
inmates.

Those documents, that legislation, again, was
revealed or introduced to the legislature in January 2017, a
mere few weeks after the Governor's Office, along with the
ADOA, concluded its decisionmaking maintaining the exclusion
here.  Those documents are clearly relevant and discussions
about that legislation are clearly relevant to the claims at
issue in this case where we are discussing whether the
decisionmaking around the exclusion was born of legitimate
government interest or based on discriminatory intent or a
policy of general opposition to transition-related care or
transgender individuals.

And I think parsing through this privilege log, Your
Honor, it goes to the point that Mr. Dowd continually made,
that these requests are not narrowly tailored.  If you review
this privilege log, you'll notice that there, again, are 66

1   documents here, all of which are responsive to plaintiff's

2   request.  Plaintiff has focused on just 17 because they

3   explicitly relate to health care coverage and policies.

4           If you again look at the papers provided by the

5   parties, including Ms. Corieri's deposition, I mean

6   Ms. Corieri's declaration, you will notice that, when she

7   reviewed, goes through the categories of these documents, she

8   in almost every instance concludes, and this is paragraph 11

9   of her declaration, and I'm reading paragraph -- subparagraph

10  1 in paragraph 11 of her declaration:  This communication and

11  the attached materials were also deliberative as they were

12  made in the course of preparing to advise the Governor and to

13  assist in the Governor's Office's formulation of health care

14  policy.

15          It defies logic and reason to assume that documents

16  that are about the formulation of health care policies that

17  include a discussion or reference "transition-related care"

18  are not relevant to the claims and issues in this dispute.

19          Finally, just briefly, on the presidential

20  communications privilege and deliberative process privilege, I

21  think what's notable here is that Mr. Dowd had an ample

22  opportunity to respond to plaintiff's arguments that are made

23  distinctly in both his opening and reply brief, and he failed

24  to do so.

25          There is no dispute that what animates the

1   presidential communications privilege, the separations of

2   power doctrine, does not apply to a federal court enforcing

3   federal law against a state individual.  That case, which we

4   set out in our reply brief, United States v. Gillock is very

5   clear on this point, and that is from the United States

6   Supreme Court.

7          And you can look to footnote 9 in that reply brief

8   where -- and I'm quoting this case that says:  Under our

9   federal structure, we do not have a struggle for power between

10  the federal and state systems such as inspired the need for

11  the Speech and Debate Clause as a restraint on the federal

12  executive to protect federal legislators.  And further, the

13  federal interference in the state legislative process is not

14  on the same constitutional footing with the interference of

15  one branch of the federal government in the affairs of a

16  coequal branch.

17          I think it's critically important that the Court

18  bear this in mind and bear in mind what is the seminal case on

19  this topic in the Ninth Circuit, which is Karnoski.  That case

20  specifically refers to the history of the presidential

21  communications privilege, which is not in dispute here, and it

22  explains why it is inapplicable to a state governor,

23  specifically, and I believe I referenced this in my earlier

24  presentation, that it talks about the unique conditions of the

25  presidential communications privilege only to the

1   constitutional role that the president has under our federal

2   system.

3          Those same concerns are not at issue with respect to

4   an Arizona governor, and if they were, you would expect an

5   Arizona court to have recognized such a privilege under

6   Arizona law.  The Governor's Office cannot point to any such a

7   decision by an Arizona court making that point.

8          Thank you.

9          THE COURT:  Thank you, Mr. Wall.

10          So I just want to make sure I understand a couple of

11   things that you said.  I think that maybe the difference in

12   the arguments are that the Governor's Office takes the

13   position that, if the emails or the documents don't relate

14   specifically to this exclusion in this insurance policy, that

15   they're not relevant, whereas the plaintiff's position is

16   that, if they relate to any discussions around any kind of

17   similar exclusions in any State of Arizona health care

18   policies, that that could show intent or pattern and practice

19   or something like that, and that's why they would be relevant.

20          Did I understand that correctly?

21          MR. WALL:  Yes, Your Honor.  I think that's a fair

22   characterization of the parties' position.

23          MR. DOWD:  Your Honor, this is Dan Dowd.  I don't

24   think that's accurate with respect to the Governor's Office

25   position.  We're not --

1          THE COURT:  Okay.

2          MR. DOWD:  We're not saying, if it doesn't mention

3   the exclusion, it can't be relevant.  What we're saying is the

4   exclusion and the intent behind it are what we have been told

5   is what is relevant, and these documents don't mention the

6   exclusion, and from it you can't glean any information that

7   would bear on intent.

8          THE COURT:  Or any -- or any information that would

9   lead to discovery of information that would bear on intent.

10  Is that --

11         MR. DOWD:  Correct.

12         THE COURT:  Okay.  All right.  Thank you.  I think

13  -- I think I understand both sides' positions.

14         And let's see.  I just want to make sure -- I'm

15  looking through my notes to see if there was anything else.  I

16  think I've got it.  Between the briefings and the really

17  informative oral arguments today, I feel pretty clear on both

18  parties' positions, so I will take this under advisement, and

19  we will issue a written order.

20         Is there anything else that we need to address

21  today?

22         MR. WALL:  No, Your Honor.  From plaintiff's

23  perspective, that covers it.  Thank you.

24         THE COURT:  All right.  Thank you.

25         Mr. Dowd?

1        MR. DOWD:  Thank you for your time today, Your

2   Honor.  Nothing more from the Governor's Office.

3        THE COURT:  Of course.  And just to make sure, there

4   were no other counsel that wanted to be heard today or are

5   there?

6        MR. CURTIS:  Your Honor, this is Ryan Curtis on

7   behalf of State defendants.  We do not have any comments to

8   make.

9        THE COURT:  All right.  Thank you.

10        MR. YOST:  Your Honor, this is Austin Yost on behalf

11   of the Arizona Board of Regents, and we don't have any

12   comments today.  Thank you.

13        THE COURT:  Thank you very much.

14        All right.  So I think everyone's had their

15   opportunity.  I really appreciate it.  These are -- they are

16   complicated and interesting issues, and we'll get to work on

17   this and get the order issued as soon as possible.

18        MR. WALL:  Thank you, Your Honor.

19        MR. DOWD:  Thank you, Your Honor.

20        THE COURT:  Thank you, counsel.  Hope I get to meet

21   you in person at some point and that, you know, we can have

22   oral argument in court again some day.

23        All right.  Thank you.  And enjoy the rest of your

24   day.

25        MR. WALL:  Thank you.  Bye.

UNITED STATES DISTRICT COURT

1            THE COURT:  Bye.

2            (Proceedings concluded in this matter at 12:03 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, do hereby certify that the

4   preceding pages of typewritten matter are a true, correct, and

5   complete transcription of the digital recording of proceedings

6   in the above-entitled matter.

7          Dated this 12th day of August, 2021.

8

9                        s/Erica R. McQuillen
                    Erica R. McQuillen, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25