# EXHIBIT 1

2021 WL 2012667
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Edward Lee JONES, Sr., Plaintiff,

v.

R. DAVIS, et al., Defendants.

No. CV 19-08055-PCT-MTL (JZB)
|
Signed 05/19/2021
|
Filed 05/20/2021

**Attorneys and Law Firms**

Edward Lee Jones, Sr., Florence, AZ, Pro Se.

Pari Komalahiranya Scroggin, Grasso Law Firm PC, Chandler, AZ, for Defendants R. Davis, Y. Rydren.

**ORDER**

Michael T. Liburdi, United States District Judge

 **\*1**  Plaintiff Edward Lee Jones, Sr., who is currently confined in the Arizona State Prison Complex-Eyman, brought this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court are Defendants' Motion for Summary Judgment[1] (Doc. 107) and Plaintiff's Objections to the Magistrate Judge's Orders (Docs. 138 and 140).[2]

**I. Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment excessive force claim against Defendant Davis based on Plaintiff's allegations that while handcuffed, he was "abruptly slammed into a bar on a fence, resulting in a laceration" to his chin, and "at the time the altercation occurred, Plaintiff was compliant and did not resist being handcuffed or walked by Defendant Davis through the intake door" (Doc. 30 at 8), and a First Amendment retaliation claim against Defendant Rydgren based on the following allegations. (Doc. 30 at 9; Doc. 9 at 8-9.)

On June 15, 2018, Defendant Rydgren issued a disciplinary infraction charging Plaintiff with filing a vexatious grievance in retaliation for Plaintiff filing 26 grievances since arriving at the facility on April 25, 2018, and filing an informal complaint on June 13, 2018, accusing Defendant Rydgren's subordinate of failing to do her job. (Doc. 9 at 8-9.) Plaintiff asserts Defendant Rydgren's charge related to a May 2018 grievance Plaintiff filed against Defendant Tyler, but Defendant Rydgren assigned a case number to that grievance and requested an "extension of time frames [until] June 5, 2018," to address it, which "clearly demonstrated that Defendant Rydgren had previously reviewed the grievance and had already determined the grievance was made in good faith and would be processed." (*Id.*) Plaintiff alleges he was kept in maximum custody approximately three weeks longer than necessary while the disciplinary charge was processed, and the disciplinary infraction was ultimately "modified and resolved informally." (*Id.*)

The Court dismissed the remaining claims and Defendants. (Doc. 30.)

**II. Plaintiff's Objections (Docs. 138 and 140)**
Plaintiff objects to the Magistrate Judge's March 25, 2021 Order denying Plaintiff's Motion for Sanctions and to Hold ADC and Centurion in Contempt (Doc. 126) and objects to the Magistrate Judge's April 19, 2021 Order denying Plaintiff's Motions for Subpoenas (Doc. 135). (Docs. 138 and 140.)

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, parties may file objections to a magistrate judge order within fourteen days after being served with a copy of the order. The Court must then consider these objections and "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

 **\*2**  Plaintiff's objections consist of rambling narratives about the history of the case, and unfounded accusations that the Magistrate Judge is biased against him. Plaintiff identifies no portion of the Magistrate Judge's Orders that are "clearly erroneous" or "contrary to law." The Court has reviewed Plaintiff's Motions and the Magistrate Judge's Orders and the Orders are neither clearly erroneous or contrary to law. Accordingly, the Magistrate Judge's Orders will be affirmed and Plaintiff's objections will be overruled.

**III. Defendants' Motion for Summary Judgment**

Defendants assert that they are entitled to summary judgment because they did not violate Plaintiff's constitutional rights.

### A. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### B. Defendant Davis

Defendant Davis asserts that he is entitled to summary judgment on Plaintiff's Eighth Amendment excessive force claim because he acted to maintain order when Plaintiff and other prisoners became disruptive and verbally abusive to staff during the intake process.

### 1. Facts

#### a. Plaintiff's Version

Plaintiff asserts that immediately following the intake process at Kingman Prison, Officer Tyler began giving prisoners their property, but would not return Plaintiff's identification card to him because of an alleged "change of appearance." (Doc. 127 at 6.) Plaintiff explained to Tyler that he did not need a new identification card and had a religious shaving waiver allowing him to have a beard, but Tyler told Plaintiff that his current identification card did not match his appearance. (*Id.*) Tyler told Plaintiff that she threw away his religious shaving waiver. (*Id.*)

\*3  When the other prisoners began to leave intake to go to their housing, Tyler asked Plaintiff if he wanted to stay behind to address his issue with a sergeant and when Plaintiff said yes, Tyler locked him in a holding tank. (*Id.* at 8.) Tyler then returned to the holding tank with Davis and Plaintiff handed Davis his legal documents, but Davis tossed the documents into the air and told Plaintiff to sit down and that Plaintiff could not "say anything to women" and accused Plaintiff of calling Tyler "satan" and a "harlot." (*Id.* at 9.)

Davis then told Plaintiff to apologize to Tyler and to shave his beard within 24 hours "or be held down [while his] beard [was] forcefully shaved off." (*Id.* at 10.) Plaintiff refused to apologize, but told Davis that he would explain to the COO that he could not shave his beard for religious reasons and would contact his attorneys. (*Id.*)

Plaintiff then stood up "in a non-aggressive manner" and turned around in order to be handcuffed, and after Davis handcuffed Plaintiff, he walked Plaintiff a short distance and then abruptly slammed Plaintiff into a fence causing a laceration on Plaintiff's chin and then lifted Plaintiff by his handcuffs, which were still behind his back. (*Id.* at 10-11.) Plaintiff was then taken to the health unit for treatment of his injuries. (*Id.* at 11.)

#### b. Defendant's Version

Defendant Davis was employed at Kingman Prison as a correctional officer, and asserts that while Plaintiff and the other prisoners were being processed for intake on April 25, 2018, the prisoners, including Plaintiff, became disruptive —yelling and verbally abusive to the staff members. (Doc. 108 ¶¶ 12, 14.) Defendant Davis, along with other officers, handcuffed and restrained the prisoners and Defendant Davis restrained and handcuffed Plaintiff. (*Id.*) Defendant Davis asserts that he did not engage in specific verbal exchanges with Plaintiff, other than to get him to be cooperative during the restraint process. (*Id.* ¶ 15.) Defendant Davis does not recall if Plaintiff was holding any paperwork in his hands at the time, but Defendant Davis asserts that he did not specifically take any papers from Plaintiff. (*Id.*)

Defendant Davis asserts that his only interaction with Plaintiff was to place him in restraints and cuff him due to his disruptive behavior during the intake process. (*Id.*)

Defendant Davis asserts that he used only the needed force to place Plaintiff in restraints as he was disruptive during the intake process, applying only the necessary force to restrain Plaintiff. Defendant Davis asserts that he does not have personal knowledge about any actions taken or not taken regarding the shaving of Plaintiff's beard. (*Id.* ¶ 18.)

## 2. Legal Standard

Use of excessive force against a prisoner violates the prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989). The use of force is constitutional if it is used in a good faith effort to keep or restore discipline; it is unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. 312, 320-21 (1986).

A court considers five factors in determining whether a defendant's use of force was sadistic and malicious for the purpose of causing harm: (1) the extent of the injury, (2) the need to use the force, (3) the relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force. *Hudson v. McMillan*, 503 U.S. 1, 7 (1992) (citing *Whitley*, 475 U.S. at 321).

## 3. Discussion

**\*4** Here, nearly every fact leading to the use of force is disputed by the Parties. The Court must accept Plaintiff's facts as true when ruling on Defendants' Motion for Summary Judgment, and Defendant Davis makes no argument that he is entitled to summary judgment under Plaintiff's version of facts. The Court cannot decide credibility disputes at the summary stage.

Defendants argue that Plaintiff's testimony is self-serving. Generally, "[t]hat an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). Here, Plaintiff's Response is signed under penalty of perjury, and he has personal knowledge to testify as to facts in his personal knowledge and, therefore, his testimony is admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). While there are certain circumstances where testimony may be so self-serving that the testimony cannot defeat summary judgment, such circumstances are not present with regard to Plaintiff's version of events. *See Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

Here, Plaintiff provides detailed facts within his personal knowledge to support his excessive force claim. That his testimony is also self-serving is to be expected since it is offered in support of his claims. *See Shumway*, 199 F. 3d at 1104 (Defendant's "affidavit was of course 'self-serving,' ... [a]nd properly so, because otherwise there would be no point in submitting it."); *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (same). As such, Defendants' argument that Plaintiff's testimony cannot create a genuine issue of material fact is simply incorrect under the circumstances of this case.

Under Plaintiff's version of events, Defendant threw him against a fence resulting in a cut to Plaintiff's chin and then lifted him up by handcuffs while the handcuffs restrained Plaintiff's arms behind his back. It is undisputed that Plaintiff sustained a cut to his chin during this interaction. Plaintiff asserts that he was complying with Defendant Davis's orders and there was no need for any force. Under this version of facts, a reasonable jury could find in Plaintiff's favor. In his Reply, Defendant Davis suggests that he was permitted to use force because Plaintiff refused to apologize to Tyler.

(Doc. 139 at 3 ("Defendant Davis stepped up to maintain order during the intake process and to curb Plaintiff's behavior towards another correctional officer (Officer Tyler). [*See, e.g.,* Doc. 122/127 at ¶ 28, Plaintiff admits he told Davis he refused to apologize to Officer Tyler].")) A reasonable jury could find that Plaintiff refusing to apologize did not justify the use of force under the circumstances.

For the foregoing reasons, the Motion for Summary Judgment will be denied as to the Eighth Amendment excessive force claim asserted against Defendant Davis.

### C. Defendant Rydgren

Defendants assert that although Plaintiff claims that Defendant Rydgren retaliated against Plaintiff by issuing a ticket following a May 2018 grievance against Officer Tyler, because the ticket was processed by a hearing officer for the unit and resolved informally,[3] the ticket was not a basis for Plaintiff's maximum custody classification as Defendant Rydgren was not involved in any classification determinations related to Plaintiff.

**\*5** Defendants further argue that by allowing Plaintiff and other prisoners additional time in which to process grievances, and by processing Plaintiff's grievance (M62-113-08), Defendant Rydgren did not act in retaliation to Plaintiff's First Amendment rights, but rather she processed his paperwork in accordance with policy.

### 1. Facts

At the time of the incident alleged in Plaintiff's Complaint, Defendant Rydgren was employed at GEO Group, Inc. (Geo) at Kingman Prison, a private prison contracted with the State of Arizona. (Doc. 108 ¶ 3.) Rydgren was a Programs Manager and part of her duties involved administrative processing of inmate grievances. (*Id.*) Plaintiff, who was incarcerated beginning in 2008, was transferred from Arizona State Prison Complex-Florence to the Kingman Prison from April 25, 2018 until July 5, 2018 (approximately 2.5 months). (*Id.* ¶ 5.)

Throughout his time at Kingman Prison, Plaintiff was classified as medium/high custody. (*Id.* ¶ 6.)

On June 14, 2018, Defendant Rydgren issued a disciplinary report regarding Plaintiff with a charge of 17 A "Filing of Vexatious Grievances" stating that

On 6/14/18 at approximately 1700 hours I, CPS Rydgren, completed a review of all twenty-six processed and unprocessed grievances submitted by inmate Jones, Edward #190298 since his arrival at ASP-Kingman on 4/24/18. During this review, I found that at least one grievance submitted by inmate Jones ... met the criteria of vexatious grievance by being groundless, not made in good faith and/or being submitted with the intent to harass staff. Inmate Jones ... was verbally placed on report by Officer Hernandez....

(Doc. 127-5 at 2.) After a disciplinary hearing on June 21, 2018, the Disciplinary Hearing Officer found an informal resolution was appropriate. (*Id.* at 3.)

Because of the influx of prisoners while Plaintiff was housed in Kingman Prison, and in accordance with ADC Policy 802.01, Defendant Rydgren permitted additional times to process grievances to many prisoners, including Plaintiff. (Doc. 108 ¶ 8.) The additional time was not determinative of any basis for the grievance. (*Id.*) Rather, the additional time frame provided was allowed to provide an extension not to exceed 15 workdays, as permitted by ADC Policy 802.01. (*Id.*)

Defendant Rydgren processed Plaintiff's grievance (dated June 6, 2018 and assigned Case No. M63-113-018), which alleges he had issues with Officer Tyler and Defendant Davis, who was at the time a correctional officer, at intake on April 25, 2018. (*Id.* ¶ 9.) Grievance, M63-113-018 was processed and responded to by the Deputy Warden, who determined on July 9, 2018 that there was no support for the Grievance. (*Id.*) When the response was issued, Plaintiff was no longer housed at Kingman Prison. (*Id.*) Plaintiff appealed the Grievance (M62-113-08) to the Director of the ADC, who affirmed the Deputy Warden's Response to the grievance. (*Id.*)

### 2. Legal Standard

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a [government] actor took some adverse action against an inmate (2) because of (3) that inmate's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

### 3. Discussion

**\*6** Defendant does not address Plaintiff's argument that Defendant Rydgren issued a false disciplinary ticket in retaliation for Plaintiff filing a grievance against her subordinate. Defendant argues that because a disciplinary hearing officer was in charge of the hearing on the disciplinary ticket, Defendant Rydgren was not responsible for any punishment suffered by Plaintiff as a result of the issuance of the ticket. Defendant cites to no law supporting this position and the Court is not aware of any law supporting this position.

Rather, Defendant has the burden of coming forward with evidence demonstrating that there are no disputed issues of material fact, but Defendant does not provide any evidence that Defendant Rydgren issued the disciplinary ticket to advance a legitimate correctional goal. Although Defendant Rydgren submitted a declaration with her Motion for Summary Judgment, she does not address Plaintiff's allegations regarding the June 15, 2018 disciplinary ticket. Defendant also argues that because Plaintiff continued to file grievances, his First Amendment rights were not "chilled." However, the Court must not examine whether Plaintiff was actually chilled; rather, an objective standard governs the chilling inquiry, and the question is whether the adverse action at issue "would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation omitted). Defendant does not explain the possible consequences of a guilty charge on this allegedly false disciplinary ticket from which the Court could conclude that issuing this false disciplinary charge would not have chilled a person of ordinary firmness from filing future grievances.

Accordingly, the Motion for Summary Judgment will be denied as to Plaintiff's claim that Defendant Rydgren retaliated against Plaintiff for filing a grievance against Defendant Rydgren's subordinate by issuing a false disciplinary ticket on June 15, 2018.

The Motion for Summary Judgment will be granted as to Plaintiff's claim that Defendant Rydgren retaliated against him by extending the time frames for prison officials to respond to his grievances. There is no evidence suggesting that allowing an extension of time frames for a response to a grievance would "chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim*, 584 F.3d at 1271. Accordingly, to the extent Plaintiff's First Amendment retaliation claim is premised on Defendant Rydgren extending the time frames for prison officials to respond to his grievances, that claims is dismissed.

### 4. Successive Motion for Summary Judgment

In the Court's discretion, the Court will allow Defendant Rydgren to file an additional motion for summary judgment as to Plaintiff's First Amendment retaliation claim. *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911-12 (9th Cir. 2010) (district courts have discretion to permit successive motions for summary judgment).[4]

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 107) and Plaintiff's Objections to the Magistrate Judge's Orders (Docs. 138 and 140).

(2) Plaintiff's Objections (Docs. 138 and 140) are **overruled** and the Magistrate Judge's Orders (Docs. 126 and 135) are **affirmed**.

**\*7** (3) Defendants' Motion for Summary Judgment (Doc. 107) is **granted in part and denied in part** as follows:

(a) Defendants' Motion is **granted** to the extent Plaintiff's First Amendment retaliation claim is based on Defendant Rydgren extending the time for responses to grievances.

(b) The Motion for Summary Judgment is otherwise **denied**.

(4) Within **20 days** of the date of this Order, Defendant Rydgren may file a second Motion for Summary Judgment as to Plaintiff's First Amendment retaliation claim.

(5) The remaining claims in this action are a First Amendment retaliation against Defendant Rydgren based on Defendant Rydgren allegedly issuing a false disciplinary ticket on June 14, 2018 in retaliation for Plaintiff filing a grievance against her subordinate and an Eighth Amendment excessive force claim against Defendant Davis.

**All Citations**

Slip Copy, 2021 WL 2012667

Footnotes

1   Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 79), and he opposes the Motion. (Doc. 127.)

2   Plaintiff's filings are nearly illegible because they are not dark enough for the Court to read all of the words, rendering the process of deciphering Plaintiff's filings unnecessarily laborious. Plaintiff is warned that if his future filings are difficult to read in the future, they will be stricken from the record and will not be considered when ruling on future Motions.

3   The Parties do not address the nature of the "informal resolution."

4   Because there are credibility disputes that cannot be resolved at the summary judgment stage, there is no reason to permit another motion for summary judgment as to the excessive force claim.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9    Deshawn Briggs, et al.,                    No. CV-18-02684-PHX-EJM

10              Plaintiffs,                      **ORDER**

11   v.

12   County of Maricopa, et al.,

13              Defendants.

14

15         Pending before the Court is Plaintiffs' Motion to Quash Defendant TASC's

16   Subpoena to Slepian Smith, PLLC. (Doc. 220). TASC filed a Response (Doc. 230), and

17   Plaintiffs filed a Reply (Doc. 235). The Court finds this matter suitable for decision

18   without oral argument. For the reasons explained below, the undersigned will grant

19   Plaintiffs' motion in part.

20        **I.    FACTUAL AND PROCEDURAL BACKGROUND**

21         Named Plaintiffs Antonio Pascale,[1] Deshawn Briggs, and Lucia Soria[2] filed this

22   class action lawsuit on behalf of themselves and other similarly situated individuals

23   against Defendants Maricopa County, Allister Adel in her official capacity as Maricopa

24   County Attorney,[3] and Treatment Assessment Screening Center, Inc. ("TASC"). (Doc.

25   _____

     [1] The original named plaintiff, Mark Pascale, is now deceased. Upon motion by
26   Plaintiffs, the Court ordered the substitution of Mark Pascale's son, Antonio Pascale, as
     the named party and personal representative of Mark Pascale's estate. (Doc. 171).
27   [2] This action also originally included as named plaintiffs Taja Collier and McKenna
     Stephens. (Doc. 110 ¶¶ 320–457). Upon stipulation by the parties, Collier and McKenna
28   were dismissed with prejudice. (Docs. 137, 138).
     [3] Allister Adel was substituted as successor for former Maricopa County Attorney
     William Montgomery. (Doc. 115).

110). Plaintiffs filed their initial complaint on August 23, 2018, alleging claims under § 1983 for wealth-based discrimination in violation of Plaintiffs' Fourteenth Amendment rights, (Doc. 1 ¶¶ 351–56, 363–70), and unreasonable search and seizure in violation of Plaintiffs' Fourth and Fourteenth Amendment rights, *id.* ¶¶ 357–62. Defendants conducted the Marijuana Deferred Prosecution Program ("MDPP") in which Plaintiffs were enrolled. (Doc. 110 ¶ 1). Plaintiffs allege that their participation in the program was involuntarily extended solely because they were too poor to pay required program fees, thus violating their constitutional rights. *Id.* ¶¶ 487–522. This case is now proceeding on the second amended complaint filed by Plaintiffs on September 23, 2019. (Doc. 110). Plaintiffs are seeking compensatory damages, punitive damages, damages for pain and suffering, and declaratory and injunctive relief. *Id.* ¶¶ 489–90, 514–15.

Plaintiff Soria is a 38-year-old resident of Maricopa County. (Doc. 110 at 31). As stated in Plaintiffs' complaint, Soria is "unemployed and without income because her ability to work is severely limited by her medical conditions, which include diabetes and neuropathy." *Id.* In November 2018, Soria's doctor advised her to stop working because of her medical conditions, and she ended her employment as an assistant manager at Dollar Tree. *Id.* On December 28, 2018, Soria filed an application for Social Security disability insurance benefits. (Doc. 235-4).

In December 2018, Soria was pulled over by a police officer who alleged that he found marijuana in her car. (Doc. 110 at 31.). She chose to be placed in TASC's MDPP rather than face a fine or prison sentence. *Id.* at 32. In March 2019, Soria told the TASC employee facilitating the program orientation class that she had no income and could not afford the $950 program fee and $15 for each drug and alcohol test. *Id.* at 32–33. Soria's caseworker stated that her anticipated MDPP completion date was July 29, 2019, if she had a zero balance. *Id.* at 33. However, by July 29, 2019, Soria could still not pay the program fees and remained in MDPP. *Id.* at 34. Soria received her certificate of completion from TASC on September 4, 2019. (Doc. 230 Ex. 7).

On December 11, 2020, TASC served Plaintiffs' counsel with a Notice of Intent to

Serve a Subpoena on Slepian Smith, PLLC, the law firm representing Soria in her application for Social Security disability insurance benefits. (Doc. 220-1 at 1). The subpoena requests 11 categories of documents:

1. Soria's application for Social Security Disability Insurance benefits filed on December 28, 2018. . . .

2. All communications related to Soria's application for Social Security Disability Insurance benefits.

3. All documents relating to Soria's application for Social Security Disability Insurance benefits.

4. All communications relating to any hearing relating to Soria's application for Social Security Disability Insurance benefits.

5. All documents related to any hearing relating to Soria's application for Social Security Disability Insurance benefits.

6. All communications you had with the Social Security Administration relating to Soria.

7. All communications you had with medical personnel regarding any medical or health condition that affected Soria's ability to work.

8. All communications you had with any current, former, or prospective employer for Soria relating to Soria's ability to work.

9. All documents relating to Soria's ability to work.

10. All communications you had with Soria's attorneys in this Action relating to Soria's application for Social Security Disability Insurance benefits.

11. All communications you had with Soria's attorney in this Action relating to Soria's ability to work.

*Id.* at 9–10.

On December 29, 2020, Plaintiffs filed their motion to quash TASC's subpoena to Slepian Smith. (Doc. 220). Plaintiffs contend that the subpoenaed documents are confidential and that Soria has a privacy interest in them. Plaintiffs further argue that the subpoena is overbroad, that it seeks information protected by the attorney work product doctrine, and that it seeks information protected by the attorney-client privilege.

TASC contends that: (1) the documents sought by the subpoena are relevant and Soria has placed them in issue; (2) Plaintiffs have not met their burden to demonstrate that either the attorney-client privilege or the work product doctrine apply to protect any of the documents or communications at issue; (3) even if Plaintiffs had met their burden, documents transmitted between Slepian Smith and the SSA are not protected by the attorney-client privilege or the work product doctrine; (4) Soria has placed her disability status and ability to work at issue such that any privilege or protection that might have applied is waived; and (5) any confidential or otherwise private documents can be disclosed pursuant to the Court's protective order. (Doc. 230).

## II. STANDARD OF REVIEW

As an initial matter, "[t]he general rule is that a party has no standing to quash a subpoena served upon a third party, except as to claims of privilege relating to the documents being sought." *Orthoflex, Inc. v. Thermotek, Inc.*, 2012 WL 1038801, at *1 (D. Ariz. Mar. 28, 2012) (citation omitted); *see also Ocean Garden Prod. Inc. v. Blessings Inc.*, 2020 WL 4933646, at *2 (D. Ariz. Aug. 24, 2020) ("A party normally does not have standing to seek to quash a subpoena issued to a nonparty unless it has some personal right or privilege with regard to the documents sought." (internal quotations and citations omitted)). "Standing exists, however, if a party claims privilege or a privacy interest in the documents being sought." *Id.*

"On timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . ." Fed. R. Civ. P. 45(d)(3)(A)(iii). "A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents [or] communications . . . in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A). "The party seeking quashal bears the burden of persuasion." *BBK Tobacco & Foods LLP v. Skunk Inc.*, 2020 WL 2395104, at

*2 (D. Ariz. May 12, 2020).

Finally, it is within the district court's discretion whether to quash or modify an overly broad subpoena. *See, e.g.*, *Tiberi v. CIGNA Ins. Co.*, 40 F.3d 110, 112 (5th Cir. 1994 ("Though modification of an overbroad subpoena might be preferable to quashing, courts are not required to use that lesser remedy first.").

## III.   DISCUSSION

### A. Relevancy and Overbreadth

Although Rule 45 does not list relevancy or overbreadth as reasons to quash a subpoena, the scope of discovery allowed by a subpoena is identical to the scope of discovery under Rule 26. *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) ("courts have incorporated relevance as a factor when determining motions to quash a subpoena"); *see also  Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) (applying both Rule 45 and Rule 26 standards to rule on a motion to quash a subpoena). Rule 26(b) allows discovery of:

> [A]ny nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Thus, the Court may quash a subpoena as overbroad if the documents requested are not relevant to the underlying action. *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006) ("Overbroad subpoenas seeking irrelevant information may be quashed or modified"); *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 241 (E.D. Va. 2012) (finding subpoenas that were overbroad and not tailored to a particular purpose imposed an undue burden); *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008).

"The limitations set forth in Rule 26(b)(2)(C) apply to discovery served on non-

- 5 -

parties." *Evanston Ins. Co. v. Murphy*, 2020 WL 6869292, at *2 (D. Ariz. Nov. 23, 2020). "In the third-party subpoena context, however, courts have often demanded a stronger-than-usual showing of relevance, requiring the requesting party to demonstrate that its need for discovery outweighs the nonparty's interest in nondisclosure*." BBK Tobacco*, 2020 WL 2395104 at *2 (internal quotations and citation omitted).

When a claim involves the plaintiff's alleged disability and ability to work, a social security disability application and supporting documentation may be relevant. *Morris v. Sequa Corp.*, 275 F.R.D. 562, 570 (N.D. Ala. 2011). In *Morris*, the plaintiff sued his former employer after being terminated for taking prescribed medication and alleged that he was eligible for benefits under his employer's short-term and long-term disability policy. The employer sought the plaintiff's social security disability file, which the plaintiff opposed as containing personal and private information that was largely irrelevant to the case. The employer argued that the plaintiff's application for DIB benefits and sworn statements as to the extent of his disability and alleged onset date were relevant to determining his eligibility for benefits under the employer's policy and his claim for past and future wages. The court agreed and found that the file was relevant and discoverable, and therefore denied the plaintiff's motion to quash the subpoena. *Id.*; *see also Nyanjom v. Hawker Beechcraft, Inc.*, 2014 WL 782740, at *1 (D. Kan. Feb. 25, 2014) (denying a motion to quash a subpoena for social security disability application records where the plaintiff's ability to work was at issue); *Meade v. Parsley*, 2010 WL 1506970, at *3 (S.D. W.Va. Apr. 14, 2010) (denying motion to quash subpoena where social security disability records were reasonably related to claims and defenses at issue).

However, where only some of the information contained in a file is relevant to the action, the court may find that the subpoena is overly broad. *Singletary*, 289 F.R.D. at 241. In *Singletary*, a breach of contract and Fair Labor Standards Act dispute between a truck driver and his former employer, the employer sought the plaintiff's complete employment files from four of the plaintiff's previous employers. The subpoena requests included the employment "application, evaluations, payroll records, correspondence,

notes, [and] records, omitting nothing." *Id.* at 239. In holding the subpoenas to be overbroad, the court recognized that the requested files "could lead to the production of medical information, social security numbers, payroll information, income tax information, information about family members, and other documents completely extraneous to this litigation," and were therefore not sufficiently tailored to seek only documents relevant to the plaintiff's compensation and contract claims before the court. *Id.* at 241; *see also Lewin v. Nackard Bottling Co.*, 2010 WL 4607402, at *1 (D. Ariz. Nov. 4, 2010) ("defendant's request to obtain plaintiff's entire personnel file from five former employers is, on its face, overbroad and not reasonably calculated to lead to the discovery of admissible evidence").

Finally, while use of the phrases "regarding" or "relating to" may indicate overbreadth, the use of such phrases alone does not automatically make a subpoena overly broad. *Stewart v. Mitchell Transp.*, 2002 WL 1558210, at *4 (D. Kan. July 11, 2002). Rather, whether a subpoena containing these phrases is overbroad is again determined if the documents sought are relevant and proportional to a claim or defense. *See Gonzales*, 234 F.R.D. at 680. In other words, what follows "regarding" or "relating to" is more important than those specific words. Where the court finds that the use of such phrases is overly broad, the court is not required to quash the entire subpoena and may instead modify the subpoena. *Stewart*, 2002 WL 1558210 at *4. In *Stewart*, the subpoenas at issue sought "all records, documents, and information in your possession *regarding* Larry G. Ramsey, including, but not limited to, your complete personnel file, job applications, job description and performance evaluations." *Id.* The court found that "use of the term 'regarding' makes this request overly broad on its face[,]" noting that "[t]he use of such omnibus phrases as 'regarding' or 'pertaining to' requires the answering party 'to engage in mental gymnastics to determine what information may or may not be remotely responsive.'" *Id.* (citation omitted). However, the court also found that use of "regarding" did not invalidate the entire subpoena as overbroad because specific documents were also listed. The court thus allowed discovery of the personnel

- 7 -

file, job application, job description, and performance evaluations. *Id.*; *see also Richards v. Covergys Corp.*, 2007 WL 474012, *4 (D. Utah Feb. 7, 2007) (quashing subpoenas as overly broad that requested "all documents in your possession or control regarding the employment of [plaintiff]" but allowing the requesting party to "redraft subpoenas which are narrower in scope and reasonably calculated to lead to the discovery of admissible evidence"); *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 255–56 (S.D. Ohio 2011) (quashing as overly broad subpoenas seeking "any and all personnel documents" because although the subpoenas sought relevant information, "compliance with the subpoenas will result in defendants receiving a plethora of documents, the vast majority of which would be completely unrelated to any possible issue in this case[,]" and stating "defendants must draft a far more narrow set of subpoenas" if they desire relevant information from plaintiffs' employers ).

Here, the Court must determine whether the information sought by the subpoena is relevant to the underlying action and whether the requests are sufficiently tailored to identify and produce responsive information. As an initial matter, whether Soria had the ability to work is relevant to her claims and TASC's defenses. In a wealth discrimination claim, the question of whether a person made "sufficient bona fide efforts legally to acquire the resources to pay" is critical to the claim. *Bearden v. Georgia*, 461 U.S. 660, 672 (1983). Thus, whether Soria had the ability to earn income to pay TASC's fees is relevant to this action. However, the pertinent inquiry is much more nuanced: The question in this case is not just whether Soria was disabled during the time period that she was enrolled in MDPP and therefore unable to work, but also whether she made any other efforts to pay TASC's fees, such as using money in savings or borrowing from family members. Further, this Court adjudicates many social security disability appeals and is intimately familiar with SSA standards and processes. Whether the SSA ultimately determines Soria to be disabled or not does not necessarily correlate with whether Soria was physically able to work and earn money to pay TASC's fees during the relevant time period, or whether Soria was reasonable in her belief that she was unable to work due to

- 8 -

1  her medical conditions. The present case is thus distinguishable from *Morris*, where the
2  plaintiff's social security disability file was central to resolving his claim for benefits
3  under his employer's short-term and long-term disability policies.

4      While some of the documents TASC seeks potentially help to answer the question
5  of whether Soria was able work and earn money while enrolled in MDPP and are thus
6  relevant to this action, the subpoena also seeks broad categories of information such as
7  "all communications related to" and "all documents relating to" Soria's application for
8  Social Security DIB, "all communications relating to" and "all documents related to" any
9  hearing on Soria's application for DIB, "all communications" Slepian Smith had with the
10 SSA "relating to" Soria, "all documents relating to Soria's ability to work,"[4] and "all
11 communications" Slepian Smith had with Soria's attorneys in the present action "relating
12 to" Soria's application for DIB. (*See* categories 2, 3, 4, 5, 6, 9, and 10). The Court finds
13 that these requests are overly broad and not sufficiently tailored to request specific
14 documents or communications, thus requiring Slepian Smith "to engage in mental
15 gymnastics to determine what information may or may not be remotely responsive."
16 *Stewart*, 2002 WL 1558210 at *4. Here, as in *Singletary*, TASC essentially seeks Soria's
17 complete social security disability file. Vague requests such as "all communications
18 related to" and "all documents relating to" Soria's application for Social Security DIB
19 may yield some information pertinent to the claims and defenses at issue, but will also
20 lead to the production of medical information and other sensitive documents that are
21 largely irrelevant to answering the question of whether Soria made sufficient bona fide
22 efforts to pay TASC's fees.[5] TASC may not simply ask for everything falling into the

---

[4] The Court notes that category 9 fails to narrow the request to any specific party and places no limitations on the scope of the documents sought. Further, it is redundant, as other categories already request communications from specific parties relating to Soria's ability to work.
[5] The Court notes that to the extent medical and other sensitive documents requested by the subpoena are relevant to this action, Soria cannot object simply because the documents are of a private and confidential nature, as the documents may still be properly disclosed pursuant to the protective order entered in this case. *See Ocean Garden Prod. Inc*., 2020 WL 4933646 at *3 ("Assuming further that Defendants have standing to challenge the third-party subpoenas on the grounds that they seek personal, confidential information, the Court finds that any privacy concerns are adequately addressed by the Court's protective order."); s*ee also Stewart*, 2002 WL 1558210 at *5

- 9 -

1  social security disability file basket and then peruse the documents at its leisure in hopes
2  of finding something relevant.

3      To be clear, the Court does find that categories 1, 7, 8, and 11 are relevant and
4  sufficiently tailored to produce relevant information. These categories request documents
5  and communications that specifically address the question of whether Soria's medical
6  conditions affected her ability to work and earn money to pay TASC's fees. Because
7  these requests lay out a clear subject of the communications and specific recipients, they
8  are not overbroad.

9      Plaintiffs aver that they "have already produced evidence substantiating that
10 [Soria] applied for disability benefits shortly before she began diversion supervision, as
11 well as voluminous medical records documenting the medical conditions that led her to
12 do so." (Doc. 220 at 7).[6] TASC contends that discovery conducted to date fails to
13 substantiate Soria's claims, and further notes several apparent contradictions in the
14 medical records that have already been provided. (Doc. 230 at 4–5).[7] In an attempt to

---

("a party may not rely on the confidential nature of documents as a basis for refusing to produce them, because '[c]onfidentiality does not equate to privilege'" (citation omitted)); *Federal Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 362 (1979) ("there is no absolute privilege for . . . confidential information").

[6] Plaintiffs state that they have produced approximately 650 pages of Soria's medical records, including a "Medical Assessment of Ability to Do Work-Related Physical Activities" form completed by Dr. Kahlon opining that Soria's impairments "preclude an 8 hour work day." (Doc. 220 at 3; Doc. 235 at 4). Plaintiffs also produced a letter dated October 9, 2020 from Slepian Smith stating that Soria applied for DIB on December 28, 2018, that a request for hearing was made on August 26, 2019, and that it generally takes 14–18 months for a decision to be made. (Doc. 220 Ex. A at 33).). At her deposition on November 13, 2020, Soria testified that her DIB application was still in process and that she had not received a denial of benefits. (Doc. 230 Ex. 4 at 86:1–10).

[7] TASC asserts that "certain discovery has revealed that Ms. Soria's claim that she is unable to work due to a disability may be false[,]" noting that the records do not actually contain the doctor's statements advising Soria to quit her job. (Doc. 230 at 4). TASC also notes that the SSA sent Soria paperwork for physical therapy, perhaps suggesting that the SSA has determined that she is not disabled because her condition can be managed by PT. *Id.* TASC also notes contradictory answers on various forms completed by Soria asking whether she was unable to work due to a disability, and a PT note stating that Soria was "actively seeking employment." *Id.* at 5.

This Court has presided over numerous social security disability appeals and has yet to come across a doctor's note specifically advising a patient to quit their job due to their medical conditions. Indeed, at her deposition on November 13, 2020, Soria testified that Dr. Kahlon did not give her anything in writing stating that she should stop working; it was just verbal. (Doc. 230 Ex. 4 at 116:19–24).

Though none of the examples TASC points to are necessarily dispositive to the

1   resolve the parties' dispute, Plaintiffs previously offered to withdraw their objections to

2   several of the subpoena categories and produce documents responsive to the issues TASC

3   raised in its response to Plaintiffs' motion to quash. (Doc. 235 at 1–2). Though TASC

4   rejected this offer, Plaintiffs are willing to provide Soria's application for social security

5   DIB, documentation of Soria's efforts to schedule a hearing on her disability claim (to

6   confirm that it remains pending), and any additional medical records that Soria submitted

7   to the SSA that have not already been provided to TASC. *Id.* at 2–3. The Court finds that

8   disclosure of these materials is appropriate and the Court will order Plaintiffs to provide

9   the relevant documents to TASC.

10      Accordingly, the Court will next consider whether any of the documents or

11  communications in the categories that the Court finds are relevant and not overly broad

12  are protected by the attorney-client privilege or the work product doctrine.[8]

### B. Attorney-Client Privilege

14      The attorney-client privilege protects confidential communications between

15  attorneys and clients that are made for the purpose of obtaining legal advice. *Upjohn Co.*

16  *v. United States*, 449 U.S. 383, 389 (1981). "Because it impedes full and free discovery

17  of the truth, [this privilege] is strictly construed." *United States v. Ruehle*, 583 F.3d 600,

18  607 (9th Cir. 2009). Attorney-client privilege exists:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Id.* The party asserting the privilege bears the burden to establish the privileged nature of

---

SSA's ultimate disability determination, they do shed additional light on the question of whether Soria made sufficient bona fide efforts to obtain funds to pay TASC's fees. Thus, while it is valid for TASC to subpoena documents to help determine Soria's disability status and her ability to work (or whether Soria "was reasonable in her purported understanding that she could not work due to her medical status" (Doc. 230 at 5)), the subpoena requests must still be tailored and specific.
[8] The Court notes that although Plaintiffs originally disputed the timeframe of the subpoena requests, the parties have since agreed to limit the timeframe from December 2018 to September 2019. (Doc. 230 Ex. 1 at 2).

the communications sought. *Id.*; *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). "Further, the proponent has the obligation of establishing for *each and every* communication all the elements of the privilege. There is no blanket claim of the privilege." *S. Union Co. v. Sw. Gas Corp.*, 205 F.R.D. 542, 551 (D. Ariz. 2002); *Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992) ("blanket assertions of the privilege are extremely disfavored [and t]he privilege must ordinarily be raised as to each record sought to allow the court to rule with specificity" (internal quotations and citation omitted)).

"A person withholding subpoenaed information under a claim that it is privileged . . . must expressly make the claim and 'describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.'" *Games2U, Inc. v. Game Truck Licensing, LLC*, 2013 WL 4046655, at *5 (D. Ariz. Aug. 9, 2013) (quoting Fed. R. Civ. P. 45(d)(2)(A)); *see also* Fed. R. Civ. P. 26(b)(5)(A). As this Court noted in *Games2U, Inc.*,

> In *In re Grand Jury Investigation*, the Ninth Circuit held that a party met its burden to demonstrate the applicability of the protections by providing a privilege log that identified the following: (1) the attorney and client involved; (2) the nature of the document (i.e., letter, memorandum); (3) all persons or entities shown on the document to have received or sent the document; (4) the date the document was generated, prepared, or dated; and (5) information on the subject matter of each document.

2013 WL 4046655, at *5 (citing *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992)). The Court further stated that, "[a]lthough sufficient, this list of identifiers are neither exhaustive nor necessary to carry the burden to describe the nature of the withheld documents and enable the parties to assess the claim of privilege." *Id.*

"Attorney-client communications 'made in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality.'" *Regents of Univ. of California v. Affymetrix, Inc.*, 326 F.R.D. 275, 279 (S.D. Cal. 2018) (citation omitted); *see also United States v.*

1    *Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) ("voluntarily disclosing privileged

2    documents to third parties will generally destroy the privilege" (citation omitted));

3    *Richey*, 632 F.3d at 566 ("Voluntary disclosure of privileged communications constitutes

4    waiver of the privilege for all other communications on the same subject."); *S. Union Co.*,

5    205 F.R.D. at 548 ("Because the attorney-client privilege is based on the idea of

6    encouraging open communications between the attorney and the client, the

7    confidentiality of the communications must be maintained. Accordingly, if the documents

8    containing confidential communications are disclosed to third parties, the privileged

9    status of the communications within the documents is lost." (citations omitted)). "The

10   reason behind this rule is that, [i]f clients themselves divulge such information to third

11   parties, chances are that they would also have divulged it to their attorneys, even without

12   the protection of the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th

13   Cir. 2012) (internal quotations and citation omitted). Thus, "[a]ny exception to this rule

14   must be construed narrowly to avoid 'creating an entirely new privilege.'" *Regents of*

15   *Univ. of California*, 326 F.R.D. at 279 (quoting *In re Pac. Pictures Corp.*, 679 F.3d 1121,

16   1128 (9th Cir. 2012)). For example, in *Pac. Pictures Corp.*, the court held that a party's

17   disclosure of documents to the U.S. Attorney waived the attorney-client privilege. 679

18   F.3d at 1127–28. In rejecting the petitioners' theory of selective waiver and refusing to

19   grant the privilege to these communications, the court reasoned that voluntary disclosure

20   of the documents, whether to a civil litigant or the government, breaches confidentiality

21   and undermines the intended purpose of the privilege. *Id.*; *see also In re Horn*, 976 F.2d

22   1314, 1316 (9th Cir. 1992) ("The purpose of the attorney-client privilege is to protect

23   every person's right to confide in counsel free from apprehension of disclosure of

24   confidential communications." (citation omitted)). Accordingly, "the proponent of the

25   privilege must establish that it has not been waived." *S. Union Co.*, 205 F.R.D. at 551.

26        Here, Plaintiffs have failed to meet their burden to establish the privileged nature

27   of the communications sought. While Plaintiffs' opposition to the subpoena is based

28   primarily on relevancy and overbreadth, to the extent that Plaintiffs contend any of the

requested items are protected by the attorney-client privilege, it is Plaintiffs' burden to establish the privilege by providing a privilege log or affidavit describing the nature of the withheld documents. Yet Plaintiffs have not produced anything, instead stating that they "need not submit a privilege log in response to an overly broad request." (Doc. 235 at 9).[9] Without some kind of evidence, the Court is unable to assess whether the privilege applies to any specific document, just as TASC is unable to properly challenge the propriety of Plaintiffs' privilege claims. *See Ruehle*, 583 F.3d at 609 (Ruehle "made no effort to identify with particularity which of his communications to the Irell attorneys are within his claim of privilege" and "failure to define the scope of his claim of privilege weighs in favor of disclosure"); *see also In re Horn*, 976 F.2d at 1318 ("Blanket assertions of attorney-client privilege in response to a subpoena duces tecum are strongly disfavored."); *McCormick v. United States*, 2006 WL 8440318, at *3 (D. Ariz. Feb. 6, 2006) ("Failure to provide sufficient information may constitute a waiver of the privilege."). Because the Court finds that categories 1, 7, 8, and 11 are relevant and not overly broad, Plaintiffs would need to submit a privilege log or other documentation to establish the privileged nature of the communications sought. Furthermore, because categories 7, 8, and 11 involve communications with third parties and do not specifically request confidential communications between Soria and her attorneys at Slepian Smith, to the extent that the attorney-client privilege applies, it is waived.[10]

---

[9] Plaintiffs note that they have offered to consult with Slepian Smith about the creation of a privilege log, limited to the time period of when Soria submitted her application for DIB and when she completed MDPP. (Doc. 235 at 10).

[10] The Court further notes that Soria's statements to her attorneys at Slepian Smith were not "made in confidence," but rather for the purpose of disclosure to the SSA in her efforts to obtain DIB benefits. *See Ruehle*, 583 F.3d at 611 ("The salient point from a privilege perspective is that Ruehle readily admits his understanding that all factual information would be communicated to third parties, which undermines his claim of confidentiality to support invoking the privilege.") .

Further, "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield . . . [and w]here a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992); *see also Solito v. Direct Capital Corp.*, 2018 WL 2283410, at *4 (N.H. Super. May 17, 2018) ("Ultimately, the issue is one of fairness; privilege is implicitly waived when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion." (internal quotations and citation omitted)).

## C. Work Product Doctrine

"In contrast to the attorney-client privilege, the work-product doctrine can protect documents and tangible things that are both non-privileged and relevant if prepared in anticipation of litigation by or for another party or its representative." *Games2U, Inc.*, 2013 WL 4046655 at *5; *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 906 (9th Cir. 2004); *see also* Fed. R. Civ. P. 26(b)(3). This doctrine, "like other privilege rules, [is] narrowly construed because its application can derogate from the search for the truth." *U.S. v. 22.80 Acres of Land*, 107 F.R.D. 20, 22 (N.D. Cal. 1985). Like the attorney-client privilege, "[t]he burden of establishing protection of materials as work product is on the proponent, and it must be specifically raised and demonstrated rather than asserted in a blanket fashion." *S. Union Co.*, 205 F.R.D. at 549; *see also Games2U, Inc.*, 2013 WL 4046655 at *5 ("A person withholding subpoenaed information under a claim that it is . . . subject to protection as trial preparation material must expressly make the claim . . . [and] may make a prima facie showing that the . . . work-product doctrine protects information by providing a 'privilege log' . . . ."); *see also Evanston Ins. Co.*, 2020 WL 4429022 at *3 (citing the lack of affidavit or other supporting document to prove attorney work product); *Callwave Commc'ns, LLC v. Wavemarket, Inc.*, 2015 WL 831539, at *3 (N.D. Cal. Feb. 23, 2015) (using a privilege log to determine whether the work product burden had been met). If the party seeking protection meets its initial burden, the "documents may only be ordered produced upon an adverse party's demonstration of 'substantial need [for] the materials' and 'undue hardship [in obtaining] the substantial equivalent of the materials by other means.'" *In re Grand Jury Subpoena*, 357 F.3d at 906 (quoting Fed. R. Civ. P. 26(b)(3)).

Here, Plaintiffs did not submit a privilege log, affidavit, or other documentation to support their argument that the documents sought are protected by the attorney work product doctrine.[11] Rather, Plaintiffs assert that the attorney work product doctrine applies because the documents sought by the subpoena were prepared for litigation. (Doc.

---

[11] *See infra* n. 9

220 at 8). But "[c]onclusory statements of privilege, without affidavits or other competent support, are not enough for the Court to find privilege." *Evanston Ins. Co.*, 2020 WL 4429022 at *3 (rejecting claim that work product doctrine applied where defendant had "not provided any affidavits from knowledgeable parties, any supporting case law, or any other competent indication that the materials were created 'because of' anticipated litigation and would not have otherwise been created, in substantially similar form, in anticipation of settlement between the adverse parties in the Underlying Action"). Further, not every legal matter constitutes litigation. An attorney's work drafting a contract or preparing an individual's tax return is not litigious in nature. While Slepian Smith represents Soria in her efforts to obtain social security disability benefits, it is questionable whether documents prepared in the course of this representation would be considered "in preparation for litigation" when benefits may be granted or denied without an administrative hearing. *See In re Grand Jury Subpoena*, 357 F.3d at 907 (adopting the "because of" standard, which "states that a document should be deemed prepared 'in anticipation of litigation' and thus eligible for work product protection under Rule 26(b)(3) if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024 (2d ed. 1994)); *22.80 Acres of Land*, 107 F.R.D. at 25 (the doctrine "was designed to offer limited protection to materials that are prepared *because* litigation is anticipated *and for the purpose* of helping a party prepare to effectively litigate its side of a lawsuit").[12] Nor does either party

---

[12] As the court explained in *22.80 Acres of Land*,

> The work product doctrine was developed in order to discourage counsel for one side from taking advantage of the trial preparation undertaken by opposing counsel, and thus both to protect the morale of the profession and to encourage both sides to a dispute to conduct thorough, independent investigations in preparation for trial. These purposes would not be advanced by extending the protection of the work product doctrine to materials that are prepared in the ordinary course of business or primarily for a purpose other than use in

provide case law stating whether documents prepared for DIB proceedings are, or are not, "work product" prepared "in preparation of litigation." Regardless, the only category that this objection applies to is category 1, Soria's application for social security disability insurance benefits, which Plaintiffs have already offered to disclose, making this point moot.[13]

## IV.   CONCLUSION

In sum, the Court finds that categories 1, 7, 8, and 11 are not overly broad. To the extent that Plaintiffs argue any of the requests in categories 1, 7, 8, and 11 are protected by the attorney-client privilege or the work product doctrine, Plaintiffs have failed to meet their burden to establish the privileged nature of the documents or communications sought. The Court further finds that categories 2, 3, 4, 5, 6, 9, and 10 are overly broad and not sufficiently tailored to the issues at hand. Accordingly,

IT IS HEREBY ORDERED:

1. Granting Plaintiffs' Motion to Quash as to subpoena categories 2, 3, 4, 5, 6, 9, and 10.

2. Denying Plaintiffs' Motion to Quash as to categories 7, 8, and 11.

3. Plaintiffs' objection to category 1 is moot, as Plaintiffs have offered to disclose Soria's application for Social Security DIB.

4. Within ten (10) days of the date of this Order, Plaintiffs shall disclose to TASC: (a) Soria's application for Social Security DIB; (b) documentation of Soria's efforts to schedule a hearing on her disability claim (to confirm that it remains pending); and (c) any additional medical records that Soria submitted

---

litigation. Thus, in determining whether given documents ought to be protected by this doctrine, it is important to ask whether they would have been prepared in the normal course of events, even if there were no meaningful prospect of litigation.

107 F.R.D. at 24 (internal citation omitted).
[13] The attorney work product doctrine would not protect the communications at issue in categories 7, 8, or 11. The Court has determined the remaining categories to be overly broad and it is thus unnecessary to consider whether any privilege applies.

to the SSA that have not already been provided to TASC.

5. Defendant TASC may draft a new subpoena to Slepian Smith as to categories 2, 3, 4, 5, 6, 9, and 10 that is narrower in scope and reasonably calculated to lead to the discovery of admissible evidence.

Dated this 30th day of March, 2021.

Eric J. Markovich
United States Magistrate Judge

- 18 -