# EXHIBIT 1

1
2

**Victoria Lopez – 330042**
**Christine K Wee – 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: **vlopez@acluaz.org**
Email: **cwee@acluaz.org**

3
4
5
6

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail:**jblock@aclu.org**
E-Mail: **lcooper@aclu.org**
*Admitted Pro hac vice*

7
8
9
10
11
12

**Wesley R. Powell***
**Matthew S. Freimuth***
**Nicholas Reddick***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: **wpowell@willkie.com**
E-Mail: **mfreimuth@willkie.com**
E-Mail: **nreddick@willkie.com**
*Admitted Pro hac vice*

13
14
15
16
17
18
19

*Attorneys for Plaintiff Russell B. Toomey*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| **RUSSELL B. TOOMEY**, | No. 4:19-cv-00035 |
| Plaintiff, | **PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS** |
| v. | |
| **STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, D/B/A UNIVERSITY OF ARIZONA**, a governmental body of the State of Arizona; **RON SHOOPMAN**, in his official capacity as chair of the Arizona Board Of Regents; **LARRY PENLEY**, in his official capacity as Member of the Arizona Board of Regents; **RAM KRISHNA**, in his official capacity as Secretary of the Arizona Board of Regents; **BILL RIDENOUR**, in his official capacity as Treasurer of the Arizona Board of Regents; **LYNDEL MANSON**, in her official capacity as Member of the Arizona Board of Regents; **KARRIN TAYLOR ROBSON**, in her official capacity as Member of the Arizona Board of Regents; **JAY HEILER**, in his official capacity as Member of the Arizona Board of Regents; **FRED DUVAL**, in his official capacity as Member of the Arizona Board of Regents; **ANDY TOBIN**, in his official capacity as Director of the Arizona Department of Administration; **PAUL SHANNON**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration, | |
| Defendants. | |

Pursuant to the Federal Rules of Civil Procedure Rule 26 and 34 (together, the "Rules"), Plaintiff Russell B. Toomey, on behalf of himself and the certified Classes, hereby requests the Defendants produce the following documents and tangible things at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, within 30 days of service hereof.

## **DEFINITIONS**

1.      The term "communication," as used herein, means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether orally or in writing, or by any other means or medium.

2.      The terms "concerning," "relating to," "referring to," "arising out of," and their cognates are to be understood in their broadest sense and each means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing or comprising the subject matter identified.

3.      The terms "describe" and "description," as used herein, mean to give a detailed written account or representation of the subject matter – including, but not limited to, when used with respect to any act, action, accounting, activity, audit, practice, process, occurrence, occasion, course of conduct, happening, negotiation, relationship, scheme, communication, conference, discussion, development, circumstances, service, transaction, instance, incident, or event – setting forth the following: (a) its general nature; (b) the time and place thereof; (c) a chronological account setting forth each element thereof, what such element consisted of and what transpired as part thereof; (d) the identity (as defined herein) of each person who performed any function or had any role in connection therewith (*i.e.*, speaker, participant, contributor of information, witness, etc.) or who has any knowledge thereof, together with a description of such person's function, role or knowledge; (e) the identity (as defined herein) of each document that refers thereto or that was used, referred to or prepared in the course of or as a result thereof; and (f) the identity (as defined herein) of each oral communication that was a part thereof or referred thereto.

4.      The terms "document" and "documents" shall have the broadest meaning allowable under the Rules and applicable case law, and shall include without limitation, electronically stored information and written, printed, typed, recorded, or graphic matter of every kind and description, both originals and copies and all attachments and appendices thereto. Without limiting the foregoing, the terms "document" and "documents" shall include all agreements, contracts, applications, communications, interoffice or intraoffice correspondence, books, letters, telegrams, telexes, messages, memoranda, records, reports, books, summaries, electronic mail, texts, chats, records of telephone conversations or interviews, summaries or other records of personal conversations, minutes or summaries or other records of personal meetings and conferences, summaries or other records of meetings and conferences, summaries, entries, calendars, appointment books, time records, instructions, work assignments, visitor records, forecasts, statistical data, statistical statements, work sheets, drafts, graphs, maps, charts, tables, marginal notations, notebooks, telephone bills or records, bills, statements and records of obligation and expenditure, invoices, lists, journals, advertising, recommendations, files, printouts, compilations, tabulations, purchase orders, receipts, sell orders, confirmations, checks, letters of credit, envelopes or folders or similar containers, vouchers, analyses, studies, surveys, transcripts of hearings, transcripts of testimony, expense reports, microfilm, microfiche, articles, speeches, tape or disc recordings, sound recordings, video recordings, film, tapes, photographs, punch cards, programs, data compilations from which information can be obtained (including matter used in data processing), and other printed, written, handwritten, typewritten, recorded, stenographic, computer-generated, or electronically stored matter (or printouts thereof), however and by whomever produced, prepared, reproduced, disseminated, or made.

5.     "Draft(s)" shall mean any formulation, outline, sketch, conceptualization, or version of a document created prior to the final version of that document.

6.     The term "factual and/or legal bases" includes, but is not limited to, any and all documents, facts, communications or contentions.

7.     The terms "identify," "specify" and "state" mean to refer to the subject matter by providing a detailed account or description of the subject matter, including, but not limited to, the following:

a.     when applicable to a document, to set forth in writing at a minimum and in the following order: (i) the name of the document; (ii) the nature of the document (*e.g.*, letter, contract, memorandum) and any other information (*i.e.*, its title, index or file number) which would facilitate in the identification thereof; (iii) the date the document was prepared or created; (iv) the identity of each person who performed any function or had any role in connection therewith (*i.e.*, author, contributor of information, recipient, etc.) or who has any knowledge thereof, together with a description of each such person's function, role or knowledge; (v) its subject matter and substance, or, in lieu thereof, annex a legible copy of the document to Your answers to these interrogatories; (vi) identification of all persons who are in possession of the original and any copy of the document; (vii) its present location and the identity of its present custodian, or, if its present location and custodian are not known, a descript of its last known disposition; (viii) where a document is other than a paper (*i.e.*, computer or recording tape, microfilm disk, microfiche, etc.), a full description of the tangible thing on which the information is recorded, and the device or the devices needed to read or listen to the document; and (ix) if the

document has been destroyed or is otherwise no longer in existence or cannot be found, the reason why such document no longer exists, the identity of the person(s) responsible for document no longer being in existence and the identity of the document's last custodian.

b.   when applicable to a natural person, to set forth in writing at a minimum and in the following order: (i) his/her full name; (ii) his/her present and/or last known business and residence address and telephone number, or an undertaking that the person may be contacted through responding counsel; (iii) his/her present or last known business affiliation; and (iv) his/her present or last known business position (including job title and a description of job functions, duties and responsibilities);

c.   when applicable to any entity or person other than a natural person, to set forth in writing at a minimum and in the following order: (i) its full name; (ii) the address and telephone number of its principal place of business; (iii) the jurisdiction under the laws of which it has been organized or incorporated and the date of such organization or incorporation; (iv) the identity of all individuals who acted and/or authorized another to act on its behalf in connection with the matters referred to; (v) in the case of a corporation, the names of its directors and principal officers; and (vi) in the case of an entity other than a corporation, the identities of its partners or principals or all individuals who acted or who authorized another to act on its behalf in connection with the matters referred to;

d.   when applicable to an oral communication, to set forth in writing at a minimum and in the following order: (i) the date, time, place, manner and substance of such communication; (ii) the identity of all persons who participated in, listened to, or

had access to transcripts or summaries of such communication or copies thereof; (iii) each such person's function, role, or knowledge; and (iv) the identity of all documents which memorialize, commemorate, summarize, record or directly refer or relate, in whole or in part, to such communication.

8.      The term "including" means "including, but not limited to," and shall not be construed to limit the scope of any definition or request herein.

9.      The term "person" means any natural person, corporation, partnership, proprietorship, association, joint venture, group, governmental or public entity, or any other form or organization of legal entity, and all of their directors, officers, employees, representatives, and agents.  The term "person" specifically includes, but is not limited to, any interest or lobbying group, or any employee or representative thereof, such as the Center for Arizona Policy, the Alliance Defending Freedom, the American Legislative Exchange Council, the Christian Medical and Dental Society, and the Franciscan Alliance, Inc.

10.      "Defendants" mean Defendants State of Arizona, Arizona Board of Regents, d/b/a University of Arizona, Ron Shoopman, Larry Penley, Ram Krishna, Bill Ridenour, Lyndel Manson, Karrin Taylor Robson, Jay Heiler, Fred DuVal, Andy Tobin, and Paul Shannon and all of their predecessors and successors in interest, and all of their representatives, attorneys, and agents.  The Defendant, State of Arizona, includes the current and prior administrations of the Office of the Arizona Governor, the Arizona Attorney General's Office, as well as current and former members and employees of the Arizona Legislature, in their official capacities.

11.      The "Plan" means the State of Arizona's self-funded health plan controlled by the Arizona Department of Administration.

12.     The "Transgender Healthcare Exclusion" means the policy contained within the Plan to exclude from coverage "gender reassignment surgery," and any and all current or prior iterations of any policy in the Plan that excludes or excluded coverage for any additional medical or surgical treatment or services to treat gender dysphoria ("transition-related care"), including the earliest iteration of the Plan's Transgender Healthcare Exclusion.

13.     "You" and "Your" refer to Defendants individually and collectively.

## **INSTRUCTIONS**

1.     If You object to any specific request in whole or in part, state with particularity each objection, the basis for it, and the categories of information to which the objection applies. You must respond to any portion of a request to which You do not object.

2.     If You fail to produce a document or provide information requested on the grounds that such document or information is no longer in Your possession, custody, or control, You shall state what disposition was made of that document or information, including, when applicable, the circumstances of any loss or destruction of such document or information.

3.     Each document requested should be produced in its entirety without deletion or redactions, except as subject to applicable privileges, regardless of whether You consider the entire document to be responsive to these requests or relevant to the claims.

4.     You are required to respond to this Request by drawing upon all materials in Your possession, custody, or control. These sources include, but are not limited to, Your employees, successors, assigns, agents, advisors, accountants, experts, representatives, attorneys and/or consultants, or anyone else acting or purporting to act on Your behalf or remote computing system (such as SharePoint or  Gmail) with whom You maintain or maintained an account.

- 8 -

5.     If any document requested is withheld on the grounds of privilege or otherwise, You shall provide a log with the following information relating to each document or portion of a document withheld:

    a.    the kind of document (e.g., memorandum, letter, notes, etc.);

    b.    the date of the document or, if no date appears thereon, the approximate date the document was prepared;

    c.    the identity of the author(s);

    d.    the identity of the Person(s) to whom the document is addressed;

    e.    the identity of any other recipients of the document that appear on the document as having received a copy;

    f.    the identity of any attachments to the documents and whether the attachments have been produced;

    g.    the subject matter or the information contained in the document;

    h.    the nature of the privilege or immunity asserted, including the attorney and client involved, and the grounds for withholding the document; and

    i.    the number of pages of the document.

If You fail to set forth a sufficient factual basis for the assertion of any claim of privilege or protection, then any arguable claim or privilege or protection shall be waived.  Compliance with the above instructions is not to be construed as an admission by Plaintiff that such privilege or protection is valid, and Plaintiff reserves their right to challenge any purported claim of privilege or protection.

6.     If You believe that only a portion of a document is protected by an applicable privilege, the non-privileged portion shall be produced with the allegedly privileged portion

redacted and indicated as such. You shall provide the information set forth in Instruction No. 6 for each such redaction. Any attachment to an allegedly privileged document shall be produced unless You also contend that the attachment is privileged, in which case the information required in Instruction No. 6 shall be provided separately for each such attachment.

7.     If any documents requested were at one time in existence but no longer are, please so state, specifying in detail for each document: (a) the document type, (b) a specific description of the subject matter of the document, (c) the date upon which the document ceased to exist, (d) the identity of each Person having knowledge of the circumstances under which the document ceased to exist, and (e) the identity of each Person having knowledge or who had knowledge of the contents thereof.

8.     Each Request for Production set forth herein is a request for the original (or copy when the original is not available) of the final version of such document(s), as well as non-identical copies by reason of notations or markings.

9.     More than one Request for Production set forth herein may call for production of the same document. The presence of such duplication is not intended and shall not be interpreted to narrow or limit in any way the scope of each individual Request for Production set forth herein.

10.     The documents or tangible things produced in response hereto shall be segregated and clearly marked or labeled so as to correspond to the specific production request to which such documents or tangible things are responsive and are being produced.   Alternatively, such documents or tangible things shall be produced as they are kept in the usual course of business, including the production of files from which such documents or tangible things are taken.

11.     Information shall not be withheld merely because such information is stored electronically (e.g., word processing files, electronic mail, databases, accounting information, and spreadsheets).

12.     In addition to physical documents or objects, each Request for Production set forth herein specifically calls for the production of electronic or magnetic data responsive to the Request, including data that has been deleted.

13.     Each Request for Production set forth herein calls for the following methods of production:

a.      *Hard Copy Documents.* (i) All black and white hard copy documents will be scanned and produced in electronic form. The hard copy documents shall be converted to a single page TIFF images and produced following the same protocol set forth herein or otherwise agreed to by the parties. (ii) Images of all file labels, file headings, and file folders associated with any hard copy document will be produced with the images of the hard copy documents. (iii) Document breaks for paper documents shall be based on Logical Document Determination (or "LDD") rather than on physical document breaks. (iv) The database load file shall include the following fields: BEGBATES, ENDBATES, BEGATTACH, ENDATTACH, CUSTODIAN, REDACTED, and CDVOLUME.

b.      *Metadata Fields and Processing.* Each of the metadata and coding fields set forth in **Appendix 1** that can be extracted shall be produced for that document. The parties are not obligated to manually populate any of the fields in **Appendix 1** if such fields cannot be extracted from a document, with the exception of the following: BEGBATES, ENDBATES, BEGATTACH, ENDATTACH, and

CUSTODIAN. The parties will make reasonable efforts to ensure that metadata fields automatically extracted from the documents are correct.

c.     *TIFFs.* Single page Group IV TIFFs should be provided, at least 300 dots per inch (dpi). Single page TIFF images should be named according to the unique bates number, followed by the extension ".TIF". Original document orientation should be maintained (*i.e.*, portrait to portrait and landscape to landscape).

d.     *Text Files.* For each document originating in electronic format, a separate text file containing the full text of each document should be provided with a file with the TIFF images and a file with the document metadata. Text of native files should be extracted directly from the native file. The text file should be named according to the unique bates number, followed by the extension ".TXT." The parties agree that the full text and/or OCR of any document will not be contained within a database load file, but rather as a standalone file with each text file containing the text for an entire single document.

e.     *Database Load Files.* An ASCII delimited data file (.txt, .dat, or .csv) that can be loaded into commercially acceptable database software (*e.g.*, Concordance). The first line of each text file must contain a header row identifying each data field by name. Each document within the database load file must contain the same number of fields as identified in the header row.

f.     *Cross-Reference Image File Registration.* An image load file that can be loaded into commercially acceptable production software (*e.g.*, Opticon, iPro). Each TIFF in a production must be referenced in the corresponding image load file. An exemplar load file format is below.

ABC0000001,PROD001,\\IMAGES\001\ABC0000001.tif,Y,,,2
ABC0000002,PROD001,\\IMAGES\001\ABC0000002.tif,,,,
ABC0000003,PROD001,\\IMAGES\001\ABC0000003.tif,Y,,,1

g.  *Bates Numbering.* All images must be assigned a unique and sequential Bates Number. Each party agrees to use the same Bates Numbering format through its entire production unless a new Bates format is necessary, at which point the party using the new Bates Numbering format will inform the other party of the change.

h.  *Protective Order Designations.* Any document(s) determined by the producing party to fall within the scope of a protective order shall have the appropriate level of designated language (*i.e.*, CONFIDENTIAL, ATTORNEYS' EYES ONLY, OUTSIDE COUNSEL RESTRICTED, etc.) afforded by the protective order endorsed on each tiff image of said document(s).

i.  *Native File Productions.* The parties agree that when producing a native file, they will include a TIFF image as a placeholder for the file to represent the file in the production set. The TIFF image placeholder for a native file should be branded with a unique Bates number and state "See Native Document" on the TIFF image. The native file should then be renamed to match the Bates number assigned to the document with its original file extension. The filename field produced in the production load file that reflects the original metadata should maintain the original file name. If a native file falls within the scope of a protective order (*see* paragraph (h), above), then the appropriate designation is to be included in the filename along with the assigned Bates number (*i.e.*, ABC000001_CONFIDENTIAL.xls).

j.  *Microsoft Office files, WordPerfect, and other standard documents (e.g., Google Docs and PDF documents).* MS Office files, WordPerfect, other standard documents, such as PDF documents, will be converted to single-page TIFF images

- 13 -

and produced consistent with the specifications herein. If the document contains comments or tracked changes, then the TIFF images shall be generated to include the comments or track changes contained in the file.

k.    *Email and attachments.* E-mail and attachments should be converted to single-page TIFF images and produced consistent with the specifications provided herein. Attachments shall be processed as separate documents, and the text database load file shall include a field in which the producing party shall identify the production range of all attachments of each e-mail.

l.    *Microsoft PowerPoint and other Presentation Files.* The parties shall process presentations (*e.g.*, MS PowerPoint, Google Presently) to include hidden slides and speaker's notes by imaging in a way that both the slide and the speaker's notes display on the TIFF image.

m.    *Spreadsheets.* The parties shall produce spreadsheets (*e.g.*, MS Excel, Google Trix) in native format where available. *See paragraph (i) above.* If a spreadsheet requires redaction, the parties will use native file redaction applications (*e.g.*, Blackout).

n.    *Good Cause for Additional Native Files.* If good cause exists to request production of specified files in native format, then the party may request such production and provide an explanation of the need for native file review.

o.    *Other Documents or Data.* If production of certain structured or other electronic data that is not easily converted to static TIFF images, such as databases, CAD drawings, GIS data, videos, audio files, websites, social media, then the parties will meet and confer to discuss an appropriate form of production.

p.  *Social media and other web-based content.* The production of social media or other web-based content should be converted to single-page TIFF images and produced consistent with the specifications provided herein. If the social media and/or web-based content cannot be produced in single-page TIFF images, then the parties shall meet and confer to discuss a form of production.  Further, the parties will also confer regarding the specific web location of the social media or other web-based content and agree upon the available metadata that can be produced therewith.

q.  *Color Documents.* Parties will produce documents in black and white, unless to do so would alter or obscure the substance of the document. A party may request that a reasonable number of documents be produced in a color format upon review of the other party's production.in single page JPEG format.

r.  *Redactions.* In the event that a document requires redaction, the parties agree the native file, if applicable, will be excluded from the production.  In addition, any redacted text will be omitted from the full text and/or OCR, and any corresponding metadata fields from the production. The TIFF image will readily identify the redactions.

s.  *Production Media.* Documents and electronically stored information ("ESI") shall be produced on optical media (CD or DVD), external hard drives, or via an FTP site, or similar, readily accessible electronic media.

t.  *Encryption.* Industry-standard encryption tools and practices must be used when transferring data between parties. Passwords must be at least 8 characters with a mix of character sets and sent in a separate communication from the encrypted data.

Among other places, You shall search for electronic documents stored on all servers, networks, hard drives, desktop computers, notebook computers, personal digital devices, all back-up storage media or devices, and with any third-party cloud providers. Each responsive Document shall be produced in its entirety. In producing documents, if an identical copy appears in more than one Person's files, You shall either (1) produce each copy or (2) provide the names of each Custodian in the "Custodian" field.

14.     Documents not otherwise responsive to these requests shall be produced if such documents concern the documents that are responsive to the requests or if such documents are attached to documents called for by these requests and constitute routing slips, transmittal memoranda, letters, emails, comments, evaluations, or similar materials.

15.     Your response to these Requests for Production should not be delayed if they cannot be fully complied with by the date set for the presentation of documents for any reason, including, but not limited to, the assertion of any privilege, interposition of any objection, ongoing investigation, or current unavailability of documents. All available documents should be produced on the date set for presentation, and any unavailable documents should be produced as soon as they become available.

16.     These Requests for Production are deemed to be continuing in nature so as to require that You supplement Your response if You obtain or discover additional information or documents between the time of the initial response and the time of hearing or trial herein. This paragraph shall not be construed to alter any obligation to comply with all other instructions in these Requests for Production.

17.     Plaintiffs hereby expressly reserve the right to supplement these Requests for Production and to propound new requests, to the extent permitted by applicable law and rules.

18.     In construing any request, instruction or definition, the singular form of a word shall include the plural and the plural form of a word shall include the singular.

19.     The connectives "and" and "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

20.     The terms "all" and "each" shall be construed as all and each, as necessary to bring within the scope of the request all information that might otherwise be construed to be outside of its scope.

21.     Plaintiff is willing to meet and confer in good faith with respect to any objections set forth by You.

## RELEVANT TIME PERIOD

1.     The relevant Time Period for these Requests for Production shall be through the date of production, unless otherwise specified.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**   Please produce all documents related to the Plan's current or prior Transgender Healthcare Exclusion, including, but not limited to

(a) all drafts and previous versions of the Transgender Healthcare Exclusion, including the earliest iteration of the Transgender Health Exclusion, and any amendments or supplements thereto (whether actual or proposed);

(b) all documents (to include any formal or informal financial or budgetary or other analyses, actuarial reports, or other reports or memoranda) and communications between Defendants and all internal and external persons (including, but not limited to, any insurance company, any consultant, the Alliance Defending Freedom, the Center for Arizona Policy, or any

lobbying or interest group regarding whether any form of transition-related care or the Transgender Health Exclusion should be adopted, modified, retained, or eliminated, and the rationale provided or discussed.

(c) all documents and communications with internal and external persons pertaining to Defendants' initial decision to exclude transition-related care, as well as any subsequent decisions to adopt, amend, retain, or eliminate any form of transition-related care or the Transgender Health Exclusion, including minutes or recordings of meetings where coverage for or exclusion of any form of transition-related care was discussed.

**REQUEST FOR PRODUCTION NO. 2:**   Please produce all documents and communications between Defendants and internal and external persons relating to and regarding the State of Arizona's decision to join the litigation in the Northern District of Texas bearing Case No. 7:16-cv-00108 (originally filed as *Franciscan Alliance, Inc. et al v. Burwell et al*, later re-designated as *Franciscan Alliance, Inc. et al v. Price et al* and *Franciscan Alliance, Inc. et al v. Azar II et al*), and the State of Arizona's participation in that litigation.

**REQUEST FOR PRODUCTION NO. 3:**  Please produce all versions and iterations of the Plan's policies/lists of Exclusions and General Limitations (*e.g.*, Article 9.1 of ADOA's PPO and EPO Plans, Article 10.1 of ADOA's HSA Plan) from the years 2010 through the present, as well as all documents and communications between Defendants and internal or external persons regarding creating, amending, continuing, or eliminating any exclusion of coverage contained in any version/iteration of the Plan's Exclusions and General Limitations policy, including, but not limited to, the potential costs of enforcing, amending, or eliminating such excluded coverage, the medical necessity, safety, and efficacy (including whether a procedure is deemed experimental or cosmetic) of excluded treatments and services; or the public health effects of enforcing, amending,

- 18 -

or eliminating such excluded coverage.  Such documents should include any and all actuarial reports, analyses, or memorandums pertaining to such exclusions of coverage.

**REQUEST FOR PRODUCTION NO. 4:**   Please produce all documents and communications between the Defendants and internal or external persons regarding whether any treatment of gender dysphoria is "Medically Necessary."

**REQUEST FOR PRODUCTION NO. 5:** Please produce all documents and communications between the Defendants and internal or external persons concerning (a) transgender people, (b) gender transition, (c) change of sex, (d) sex reassignment, (e) transsexualism; or (f) gender reassignment.

**REQUEST FOR PRODUCTION NO. 6:**  Please produce documents sufficient to show, from 2010 to the present:

(a) the number of hysterectomies paid for by the Plan each year, the medical reason for the surgery, and the individual and aggregate cost of the surgeries; and

(b) the number of medically necessary cosmetic or reconstructive surgical procedures paid for by the Plan each year (including but not limited to chest-reconstruction surgery, vaginoplasty, or phalloplasty, or other surgery related to the reproductive or urogenital system) the medical reason for the surgery, and the individual and aggregate cost of the surgeries.

**REQUEST FOR PRODUCTION NO. 7:**  Please produce all documents (to include any formal or informal financial or budgetary or other analyses, plans, actuarial reports, or other reports or memoranda) to show (1) the total annual expenses (*i.e.*, the amounts paid by the Plan to medical providers) for all treatment and services provided under the Plan from 2010 to the present, including a cost breakdown of the total expenses for each type of treatment or service; and (2) the

total annual amounts paid by the Defendants to pay for the Plan for all Plan recipients from 2010 to the present, including an itemized breakdown of the total amounts paid, to the extent possible, and (3) budget projections and actuarial analyses of the Plan's fiscal soundness.

**REQUEST FOR PRODUCTION NO. 8:** All documents or communications you intend to rely on at trial.

**REQUEST FOR PRODUCTION NO. 9:** Please produce all documents supporting Your responses to Plaintiff's First Set Of Interrogatories provided to Defendants on June 5, 2020.

DATED this 8th day of December, 2020.

By */s/ Nicholas Reddick*

ACLU FOUNDATION OF ARIZONA
Victoria Lopez – 330042
Christine K Wee – 028535
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Joshua A. Block
Leslie Cooper
125 Broad Street, Floor 18
New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell
Matthew S. Freimuth
Nicholas Reddick
787 Seventh Avenue
New York, New York 10019

*Attorneys for Plaintiff Russell B. Toomey*

## **CERTIFICATE OF SERVICE**

I, Nicholas Reddick, hereby certify that on December 8, 2020 I served the foregoing *Plaintiff's First Request for Production of Documents and Tangible Things* to Defendants via email:

Timothy J. Berg tberg@fclaw.com
Amy Abdo amy@fclaw.com
Ryan Curtis rcurtis@fclaw.com
Shannon Cohan scohan@fclaw.com
FENNEMORE CRAIG, P.C.
2394 E. Camelback Road Suite 600
Phoenix, Arizona 85016

*Attorneys for Defendants State of Arizona, Andy Tobin, and Paul Shannon*

Paul F. Eckstein PEckstein@perkinscoie.com
Austin C. Yost AYost@perkinscoie.com
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, Arizona 85012-2788
DocketPHX@perkinscoie.com

*Attorneys for Defendants Arizona Board of Regents, d/b/a University of Arizona; Ron Shoopman; Larry Penley; Ram Krishna; Bill Ridenour; Lyndel Manson; Karrin Taylor Robson; Jay Heiler; and Fred Duval*

*/s/ Nicholas Reddick*

# EXHIBIT 2

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 1 | EML00006426 | EML00006426 | 6/27/2016 | Marie Isaacson | Erwin Kratz; Scott Bender | Rose Bernal; Jennifer Bowling; Gail Goodman; Ryan Curtis | Attorney-Client Communication | RE: Memorandum regarding leave, premiums, termination dates, and ACA Hours of Service (ADOA Benefits questions) |
| 2 | EML00006427 | EML00006428 | 6/24/2016 | Jennifer Bowling | Marie Isaacson; Scott Bender; Rose Bernal | Jennifer Bowling | Attorney-Client Communication | RE: State of AZ benefit plan forms and documents |
| 3 | EML00007337 | EML00007337 | 8/2/2016 | Elizabeth Schafer | Marie Isaacson | | Attorney-Client Communication | re: draft cover memo 1557 Rule |
| 4, 5 | EML00007338 | EML00007339 | 8/2/2016 | Elizabeth Schafer | Marie Isaacson | Yvette Medina | Attorney-Client Communication | re: draft cover memo 1557 Rule |
| 6 | AZSTATE.005551 | AZSTATE.005554 | 1/13/2017 | Marie Isaacson | Nicolette A Schultz | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | re: plan document updates |
| 7 | AZSTATE.246030 | AZSTATE.246033 | 1/13/2017 | Nicolette A Schultz | Marie Isaacson | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | re: plan document updates |
| 8 | EML00012642 | EML00012644 | 10/19/2016 | Ryan Curtis | Marie Isaacson | Nicole Ong; John Fry; Erwin Kratz | Attorney-Client Communication | ACA 1557 Implementation [FC-Email.FID7081187] |
| 9 | EML00012648 | EML00012648 | 10/18/2016 | Marie Isaacson | Ryan Curtis | Nicole Ong; John Fry | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 10 | EML00012649 | EML00012650 | 10/18/2016 | Ryan Curtis | Marie Isaacson | Nicole Ong; John Fry | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 11 | EML00012651 | EML00012651 | 10/18/2016 | Nicole Ong | Marie Isaacson | | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 12 | EML00012656 | EML00012656 | 10/17/2016 | Marie Isaacson | Ryan Curtis; John Fry | Nicole Ong; Nicolette A Schultz | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 13 | EML00012660 | EML00012660 | 10/17/2016 | Marie Isaacson | John Fry; Ryan Curtis | Nicole Ong | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 14 | EML00012661 | EML00012661 | 10/17/2016 | Fry, John | Marie Isaacson; Ryan Curtis | Nicole Ong | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 15 | EML00012662 | EML00012662 | 10/17/2016 | Marie Isaacson | Ryan Curtis; John Fry | Nicole Ong | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 16 | EML00012663 | EML00012663 | 10/17/2016 | Ryan Curtis | Fry, John; Marie Isaacson | Nicole Ong | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |

Toomey v. State of Arizona, et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 17 | EML00012664 | EML00012664 | 10/17/2016 | John Fry | Marie Isaacson; Ryan Curtis | Nicole Ong | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 18 | EML00012665 | EML00012665 | 10/17/2016 | Marie Isaacson | Ryan Curtis | John Fry; Nicole Ong | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 19 | EML00012676 | EML00012676 | 10/11/2016 | Ryan Curtis | Marie Isaacson | John Fry; Erwin Kratz | Attorney-Client Communication | RE: ACA § 1557 - Short update call [FC-Email.FID7081187] |
| 20 | EML00012867 | EML00012868 | 8/3/2016 | Marie Isaacson | Elizabeth Schafer | | Attorney-Client Communication; Deliberative Process Privilege | Draft cover memo 1557 Rule |
| 21 | EML00012874 | EML00012875 | 8/2/2016 | Marie Isaacson | Elizabeth Schafer, Yvette Medina | | Attorney-Client Communication; Deliberative Process Privilege | Draft cover memo 1557 Rule |
| 22, 23 | EML00012878 | EML00012888 | 8/1/2016 | Marie Isaacson | Yvette Medina; Scott Bender; Elizabeth Schafer | | Attorney-Client Communication | FW: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 24 | EML00012889 | EML00012889 | 7/27/2016 | Nicolette A Schultz | Ryan Curtis; Marie Isaacson | Cindy Shupe; Erwin Kratz | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 25 | EML00012890 | EML00012890 | 7/27/2016 | Ryan Curtis | Marie Isaacson | Cindy Shupe; Erwin Kratz; Nicolette A Schultz | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 26 | EML00012891 | EML00012891 | 7/27/2016 | Marie Isaacson | Ryan Curtis | Cindy Shupe; Erwin Kratz; Nicolette A Schultz | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 27 | EML00012893 | EML00012898 | 7/26/2016 | John Fry | Marie Isaacson | | Attorney-Client Communication | Re: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 28, 29 | EML00012899 | EML00012908 | 7/25/2016 | Marie Isaacson | John Fry | Nicolette A Schultz | Attorney-Client Communication | FW: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 30 | EML00012909 | EML00012909 | 7/22/2016 | Marie Isaacson | Ryan Curtis | Cindy Shupe; Erwin Kratz | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 31, 32 | EML00012910 | EML00012919 | 7/22/2016 | Ryan Curtis | Marie Isaacson | Cindy Shupe; Erwin Kratz | Attorney-Client Communication | ACA 1557 - Discrimination and Gender Identity |
| 33 | EML00013079 | EML00013098 | 5/25/2016 | Marie Isaacson | Erwin Kratz | | Attorney-Client Communication | FW: Materials regarding our Health Plans |
| 34 | EML00014080 | EML00014080 | 11/20/2019 | Michael Meisner | Scott Bender | Paul Shannon | Attorney-Client Communication | Re: draft - Gender dysphoria issues to Kate King CONFIDENTIAL 11-20-19 - Invitation to edit |
| 35 | EML00014082 | EML00014082 | 11/19/2019 | Scott Bender | Paul Shannon | Michael Meisner | Attorney-Client Communication | Re: draft - Gender dysphoria issues to Kate King CONFIDENTIAL 11-20-19 - Invitation to edit |
| 36 | EML00014083 | EML00014083 | 11/19/2019 | Paul Shannon | Michael Meisner | Scott Bender | Attorney-Client Communication | draft - Gender dysphoria issues to Kate King CONFIDENTIAL 11-20-19 - Invitation to edit |
| 37 | EML00014130 | EML00014130 | 10/30/2019 | Michael Meisner | Paul Shannon | Scott Bender | Attorney-Client Communication | Re: United Healthcare - Gender Dysphoria Treatment |
| 38 | EML00014131 | EML00014131 | 10/29/2019 | Paul Shannon | Michael Meisner; Scott Bender | | Attorney-Client Communication | Fwd: United Healthcare - Gender Dysphoria Treatment |

Toomey v. State of Arizona, et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 39 | EML00014160 | EML00014160 | 10/8/2019 | Michael Meisner | Scott Bender | | Attorney-Client Communication | Re: Toomey v. State of AZ |
| 40 | EML00014161 | EML00014161 | 10/8/2019 | Scott Bender | Michael Meisner | | Attorney-Client Communication | Fwd: Toomey v. State of AZ |
| 41 | EML00014186 | EML00014186 | 10/1/2019 | Michael Meisner | Scott Bender | | Attorney-Client Communication | Re: United Healthcare transgender benefit |
| 42 | EML00014196 | EML00014196 | 9/30/2019 | Scott Bender | Michael Meisner | | Attorney-Client Communication | Fwd: United Healthcare transgender benefit |
| 43 | EML00014200 | EML00014200 | 9/26/2019 | Scott Bender | Michael Meisner | | Attorney-Client Communication | Fwd: United Healthcare transgender benefit |
| 44 | EML00014201 | EML00014201 | 9/26/2019 | Michael Meisner | Scott Bender | | Attorney-Client Communication | Re: United Healthcare transgender benefit |
| 45 | EML00014202 | EML00014202 | 9/26/2019 | Scott Bender | Michael Meisner | | Attorney-Client Communication | Fwd: United Healthcare transgender benefit |
| 46, 47 | EML00014215 | EML00014216 | 9/23/2019 | Michael Meisner | Scott.Bender; Paul Shannon | | Work-Product | Re: Estimated annual costs to included transgender benefits: $11 million per year |
| 48 | EML00014218 | EML00014218 | 9/23/2019 | Michael Meisner | Scott.Bender; Paul Shannon | | Work-Product | Estimated annual costs to included transgender benefits: $11 million per year |
| 49 | EML00018839 | EML00018839 | | | | | | **DOCUMENT PRODUCED OFF OF PRIVILEGE LOG** |
| 50 | AZSTATE.246049 | AZSTATE.246052 | 1/13/2017 | Yvette Medina | Nicolette A Schultz | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | FW: ACA §1557 Non-Discrimination |
| 51 | EML00019822 | EML00019822 | 7/27/2016 | Nicolette A Schultz | Ryan Curtis | | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 52 | EML00019823 | EML00019823 | 7/27/2016 | Ryan Curtis | Nicolette A Schultz | | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 53 | EML00019824 | EML00019824 | 7/27/2016 | Nicolette A Schultz | Ryan Curtis | | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 54 | EML00019825 | EML00019825 | 7/27/2016 | Ryan Curtis | Nicolette A Schultz | | Attorney-Client Communication | RE: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 55 | EML00019829 | EML00019829 | 7/27/2016 | Nicolette A Schultz | John Fry | | Attorney-Client Communication | RE: Scheduling meeting for ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 56 | EML00019830 | EML00019830 | 7/27/2016 | Nicolette A Schultz | John Fry | | Attorney-Client Communication | RE: Scheduling meeting for ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 57 | EML00019831 | EML00019836 | 7/27/2016 | John Fry | Nicolette A Schultz | | Attorney-Client Communication | Re: Scheduling meeting for ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |

Toomey v. State of Arizona, et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 58 | EML00019837 | EML00019837 | 7/27/2016 | Nicolette A Schultz | John Fry | | Attorney-Client Communication | RE: Scheduling meeting for ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 59 | EML00019838 | EML00019838 | 7/26/2016 | John Fry | Nicolette A Schultz | | Attorney-Client Communication | RE: Scheduling meeting for ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 60 | EML00019839 | EML00019839 | 7/26/2016 | Nicolette A Schultz | John Fry | | Attorney-Client Communication | Scheduling meeting for ACA 1557 - Discrimination and Gender Identity |
| 61 | EML00021020 | EML00021020 | 1/8/2016 | Michael Bailey | Marc Lamber | Marie Isaacson; Rex Nowlan | Attorney-Client Communication | Authorization for Outside Counsel to Provide Periodic Advice to the Arizoan Department of Administration on Health and Employee Welfare Questions |
| 62 | EML00021053 | EML00021053 | 12/11/2019 | Scott Bender | Nicole Sornsin; Kimberly Suciu; Paul Shannon | | Attorney-Client Communication | Gender Reassignment services appeal |
| 63 | EML00021133 | EML00021133 | | | | | **DOCUMENT PRODUCED OFF OF PRIVILEGE LOG** | |
| 64, 65 | EML00021178 | EML00021179 | 9/23/2019 | Michael Meisner | Scott.Bender; Paul Shannon | | Work-Product | Re: Estimated annual costs to included transgender benefits: $11 million per year |
| 66 | EML00021181 | EML00021181 | 9/23/2019 | Michael Meisner | Scott.Bender; Paul Shannon | | Work-Product | ADOA Estimated annual costs |
| 67 | AZSTATE.246062 | AZSTATE.246067 | 2/19/2019 | Scott Bender | Paul Shannon | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | Fwd: FW: ACA §1557 Non-Discrimination |
| 68 | EML00021298 | EML00021298 | | | | | **DOCUMENT PRODUCED OFF OF PRIVILEGE LOG** | |
| 69 | EML00021303 | EML00021303 | | | | | **DOCUMENT PRODUCED OFF OF PRIVILEGE LOG** | |
| 70 | AZSTATE.246068 | AZSTATE.246072 | 10/25/2018 | Yvette Medina | Scott Bender | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | Fwd: FW: ACA §1557 Non-Discrimination |
| 71 | AZSTATE.246097 | AZSTATE.246101 | 10/25/2018 | Yvette Medina | Scott Bender | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | Fwd: FW: ACA §1557 Non-Discrimination |
| 72 | ESI00000686 | ESI00000686 | 7/20/2016 | Ryan Curtis | Marie Isaacson | | Attorney-Client Communication | Summary and Implications of ACA § 1557 and Transgender Coverage Requirements |
| 73 | ESI00000688 | ESI00000688 | 2/5/2019 | Paul Shannon | Nicole Sornsin | | Attorney-Client Communication | Re: Plan Exceptions |
| 74 | ESI00000689 | ESI00000689 | 2/5/2019 | Paul Shannon | Nicole Sornsin | | Attorney-Client Communication | Re: Plan Exceptions |
| 75 | ESI00000690 | ESI00000690 | 8/3/2016 | Marie Isaacson | Mike Liburdi | | Attorney-Client Communication; Deliberative Process Privilege | Affordable Care Act § 1557, Non-discrimination - Transgender Coverage |
| 76 | AZSTATE.246104 | AZSTATE.246108 | 12/15/2016 | Marie Isaacson | Christina Corieri | Scott Bender; Nicole Ong | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | RE: ACA §1557 Non-Discrimination |
| 77 | | | | | | | ENTRY NUMBER INADVERTENTLY OMITTED | |
| 78 | ESI00000700 | ESI00000700 | 7/20/2016 | Ryan Curtis | Marie Isaacson | | Attorney-Client Communication | Summary and Implications of ACA § 1557 and Transgender Coverage Requirements |

Toomey v. State of Arizona , et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 79 | ESI00000701 | ESI00000701 | 7/20/2016 | Ryan Curtis | Marie Isaacson | | Attorney-Client Communication | Summary and Implications of ACA § 1557 and Transgender Coverage Requirements |
| 80 | ESI00000702 | ESI00000702 | 8/1/2016 | Marie Isaacson | Yvette Medina; Scott Bender; Elizabeth Schafer | | Attorney-Client Communication | FW: ACA 1557 - Discrimination and Gender Identity [FC-Email.FID7081187] |
| 81 | ESI00000703 | ESI00000703 | 7/6/2016 | Marie Isaacson | Erwin Kratz | Ryan Curtis; Cindy Shupe; Scott Bender | Attorney-Client Communication | RE: The Plan Participation Chart we Discussed [FC-Email.FID7081187] |
| 82 | ESI00000772 | ESI00000772 | 7/20/2016 | Ryan Curtis | Marie Isaacson | | Attorney-Client Communication | Summary and Implications of ACA § 1557 and Transgender Coverage Requirements |
| 83 | ESI00000773 | ESI00000773 | 2/5/2019 | Paul Shannon | Nicole Sornsin | | Attorney-Client Communication | Re: Plan Exceptions |
| 84 | AZSTATE.000784 | AZSTATE.001365 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 85 | AZSTATE.001366 | AZSTATE.001678 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 86 | AZSTATE.001679 | AZSTATE.001695 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 87 | AZSTATE.001696 | AZSTATE.001778 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 88 | AZSTATE.001779 | AZSTATE.002089 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 89 | AZSTATE.002090 | AZSTATE.002751 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 90 | AZSTATE.003186 | AZSTATE.003188 | 1/17/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 91 | AZSTATE.003438 | AZSTATE.003454 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 92 | AZSTATE.003466 | AZSTATE.003467 | 1/17/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 93 | AZSTATE.005416 | AZSTATE.005418 | 1/17/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 94 | AZSTATE.005541 | AZSTATE.005541 | 1/26/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 95 | AZSTATE.005547 | AZSTATE.005548 | 1/17/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 96 | AZSTATE.006534 | AZSTATE.006536 | 1/13/2020 | Scott Bender | Paul Shannon | | HIPAA/Personally Identifiable Information | Fwd: Harmful exclusions from state healthcare plan.msg |
| 97 | AZSTATE.006880 | AZSTATE.006880 | 8/23/2017 | Rose Bernal | Scott Bender; Erin King; Kayla Stivason | | HIPAA/Personally Identifiable Information | FW: Additional Information - Appeal.msg |
| 98 | AZSTATE.007001 | AZSTATE.007001 | 8/23/2017 | Rose Bernal | Staci Wilson | [REDACTED] | HIPAA/Personally Identifiable Information | RE: Additional Information - Appeal.msg |
| 99 | AZSTATE.007002 | AZSTATE.007003 | 8/21/2017 | Rose Bernal | [REDACTED] | Staci R. Wilson; Helena A. Rodrigues; Kayla Stivason | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure.msg |
| 100 | AZSTATE.007004 | AZSTATE.007005 | 8/1/2017 | Staci Wilson | Rose Bernal | | HIPAA/Personally Identifiable Information | RE: Transgender coverage - hormone therapy.msg |
| 101 | AZSTATE.007006 | AZSTATE.007007 | 8/1/2017 | Shannon Daniel | Rose Bernal | Yvette Medina; Scott Bender | HIPAA/Personally Identifiable Information | RE: Transgender coverage - hormone therapy.msg |
| 102 | AZSTATE.009655 | AZSTATE.009659 | | | | | | **DOCUMENT PRODUCED IN UNREDACTED FORMAT** |
| 103 | AZSTATE.010325 | AZSTATE.010325 | 4/22/2019 | | | | HIPAA/Personally Identifiable Information | Report of ADOA transgender services from Aetna |
| 104 | AZSTATE.010904 | AZSTATE.010904 | 1/26/2017 | | | | Confidential, non-relevant information | Draft meeting Agenda |
| 105 | AZSTATE.011038 | AZSTATE.011045 | 9/29/2016 | | | | Confidential, non-relevant information | Draft Medical Director Meeting Minutes |
| 106 | AZSTATE.011046 | AZSTATE.011049 | 9/28/2016 | Eveleth, Ray G <EvelethR@aetna.com> | Scott Bender <Scott.Bender@azdoa.gov>; Yvette Medina <Yvette.Medina@azdoa.gov> | Dash, Jay A. | Confidential, non-relevant information | RE: Medical director meeting.msg |
| 107 | AZSTATE.080734 | AZSTATE.080738 | 1/25/2017 | | | | HIPAA/Personally Identifiable Information | Session Roster - 2017 Benefits Liaison Training |
| 108 | AZSTATE.080739 | AZSTATE.080739 | 1/25/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |

Toomey v. State of Arizona , et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 109 | AZSTATE.083158 | AZSTATE.083159 | 1/17/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 110 | AZSTATE.083937 | AZSTATE.083940 | 6/24/2016 | Marie Isaacson | Jennifer Bowling; Scott Bender; Rose Bernal | | Attorney-Client Communication | RE: State of AZ benefit plan forms and documents [FC-Email.FID7081187] |
| 111 | AZSTATE.083941 | AZSTATE.083944 | 6/24/2016 | Marie Isaacson | Scott Bender; Jennifer Bowling; Rose Bernal | | Attorney-Client Communication | FW: State of AZ benefit plan forms and documents [FC-Email.FID7081187] |
| 112 | AZSTATE.084769 | AZSTATE.084769 | 5/22/2017 | Elizabeth Schafer | | | HIPAA/Personally Identifiable Information | Blue Cross Blue Shield of Arizona member Satisfaction Survey Results |
| 113 | AZSTATE.085648 | AZSTATE.085649 | 6/8/2016 | Elizabeth Schafer | Scott Bender | | Attorney-Client Communication | Re: Transgender benefits |
| 114 | AZSTATE.085875 | AZSTATE.085875 | 5/27/2016 | Elizabeth Schafer | | | HIPAA/Personally Identifiable Information | UnitedHealthcare member Satisfaction Survey Results |
| 115 | AZSTATE.085877 | AZSTATE.085877 | 5/11/2016 | Elizabeth Schafer | | | HIPAA/Personally Identifiable Information | UnitedHealthcare member Satisfaction Survey Results |
| 116 | AZSTATE.088316 | AZSTATE.088316 | 6/28/2018 | | | | HIPAA/Personally Identifiable Information | UnitedHealthcare member Satisfaction Survey Results |
| 117 | AZSTATE.088872 | AZSTATE.088878 | 8/25/2017 | Scott Bender | Mary Cappabianco; Erin Russell; Kayla Stivason; Rose Bernal | Sean Kirwan | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 118 | AZSTATE.088879 | AZSTATE.088885 | 8/25/2017 | Mary Cappabianco | Scott Bender; Erin Russell; Kayla Stivason; Rose Bernal | Sean Kirwan | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 119 | AZSTATE.088886 | AZSTATE.088891 | 8/25/2017 | Scott Bender | Erin Russell; Kayla Stivason; Rose Bernal | Sean Kirwan; Mary Cappabianco | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 120 | AZSTATE.088892 | AZSTATE.088897 | 8/24/2017 | Erin Russell | Kayla Stivason; Rose Bernal | Scott Bender; Sean Kirwan; Mary Cappabianco | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 121 | AZSTATE.088898 | AZSTATE.088902 | 8/23/2017 | Kayla Stivason | Erin Russell; Rose Bernal | Scott Bender; Sean Kirwan | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 122 | AZSTATE.089023 | AZSTATE.089026 | 8/22/2017 | Erin Russell | Rose Bernal; Kayla Stivason | Scott Bender; Sean Kirwan | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 123 | AZSTATE.094671 | AZSTATE.094675 | 1/25/2017 | | | | HIPAA/Personally Identifiable Information | Session Roster - 2017 Benefits Liaison Training |
| 124 | AZSTATE.094676 | AZSTATE.094676 | 1/26/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 125 | AZSTATE.095605 | AZSTATE.095608 | 1/13/2017 | Marie Isaacson | Nicolette A Schultz | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | Re: Plan document updates |
| 126 | AZSTATE.100639 | AZSTATE.100640 | 6/8/2016 | Nicolette A Schultz | Marie Isaacson | | Attorney-Client Communication | Re: fyi |
| 127 | AZSTATE.129503 | AZSTATE.129504 | 1/31/2020 | Scott Bender | Kimberly Suciu; Nicole Sornsin; Paul Shannon | | Attorney-Client Communication | Fwd: Members' using Hormone Replacement Drug Therapy |
| 128 | AZSTATE.129505 | AZSTATE.129507 | 1/13/2020 | Paul Shannon | Nicole Sornsin; Kimberly Suciu | | Attorney-Client Communication | Fwd: Harmful exclusions from state healthcare plan. |
| 129 | AZSTATE.129508 | AZSTATE.129509 | 1/7/2020 | Kimberly Suciu | Paul Shannon | Nicole Sornsin | Attorney-Client Communication | Re: Transgender benefits |
| 130 | AZSTATE.129510 | AZSTATE.129510 | 1/7/2020 | Paul Shannon | Kimberly Suciu | | Attorney-Client Communication | Fwd: Transgender benefits |
| 131 | AZSTATE.129678 | AZSTATE.129681 | 11/6/2019 | Paul Shannon | Nicole Sornsin | | Attorney-Client Communication | Re: Harmful exclusions from state healthcare plan. |

Toomey v. State of Arizona , et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 132 | AZSTATE.129682 | AZSTATE.129684 | 11/6/2019 | Nicole Sornsin | Paul Shannon | | Attorney-Client Communication | Re: Harmful exclusions from state healthcare plan. |
| 133 | AZSTATE.129685 | AZSTATE.129687 | 11/6/2019 | Paul Shannon | Nicole Sornsin | | Attorney-Client Communication | Re: Harmful exclusions from state healthcare plan. |
| 134 | AZSTATE.129688 | AZSTATE.129690 | 11/6/2019 | Nicole Sornsin | Paul Shannon | Kimberly Suciu | Attorney-Client Communication | Re: Harmful exclusions from state healthcare plan. |
| 135 | AZSTATE.129691 | AZSTATE.129693 | 11/6/2019 | Paul Shannon | Nicole Sornsin; Kimberly Suciu | | Attorney-Client Communication | Fwd: Harmful exclusions from state healthcare plan. |
| 136 | AZSTATE.129694 | AZSTATE.129695 | 11/6/2019 | Scott Bender | Paul Shannon | | HIPAA/Personally Identifiable Information | Fwd: Harmful exclusions from state healthcare plan. |
| 137 | AZSTATE.129696 | AZSTATE.129696 | 10/25/2019 | Paul Shannon | Nicole Sornsin; Kimberly Suciu | | Attorney-Client Communication | Fwd: Providers and payers get new court ruling on ACA protections for transgender patients |
| 138 | AZSTATE.129813 | AZSTATE.129814 | 10/15/2018 | Paul Shannon | John Fry | | Attorney-Client Communication | Fwd: Interesting Governing article... |
| 139 | AZSTATE.129815 | AZSTATE.129817 | 10/10/2018 | Paul Shannon | Yvette Medina; Scott Bender | | Attorney-Client Communication | Fwd: Request for documentation regarding ADOA's medical coverage |
| 140 | AZSTATE.129818 | AZSTATE.129819 | 10/6/2018 | John Fry | Paul Shannon | | Attorney-Client Communication | RE: Request for documentation regarding ADOA's medical coverage |
| 141 | AZSTATE.129820 | AZSTATE.129821 | 10/2/2018 | Paul Shannon | John Fry | | Attorney-Client Communication | Re: Request for documentation regarding ADOA's medical coverage |
| 142 | AZSTATE.129936 | AZSTATE.129937 | 1/13/2020 | Noah Munoz | Rose Bernal | | HIPAA/Personally Identifiable Information | Fwd: Harmful exclusions from state healthcare plan. |
| 143 | AZSTATE.129942 | AZSTATE.129942 | 11/6/2019 | Noah Munoz | Scott Bender | Yvette Medina; Rose Bernal | HIPAA/Personally Identifiable Information | Fwd: Harmful exclusions from state healthcare plan. |
| 144 | AZSTATE.130286 | AZSTATE.130286 | 8/23/2017 | Staci Wilson | Rose Bernal | [REDACTED] | HIPAA/Personally Identifiable Information | Additional Information - Appeal |
| 145 | AZSTATE.130407 | AZSTATE.130407 | 8/21/2017 | [REDACTED] | Rose Bernal | Staci R. Wilson; Helena A. Rodrigues | HIPAA/Personally Identifiable Information | Appeal Denied |
| 146 | AZSTATE.130408 | AZSTATE.130409 | 8/1/2017 | Rose Bernal | Staci Wilson | | HIPAA/Personally Identifiable Information | RE: Transgender coverage - hormone therapy |
| 147 | AZSTATE.130410 | AZSTATE.130411 | 8/1/2017 | Rose Bernal | Shannon Daniel | Scott Bender; Yvette Medina | HIPAA/Personally Identifiable Information | FW: Transgender coverage - hormone therapy |
| 148 | AZSTATE.136595 | AZSTATE.136595 | 8/1/2017 | Staci Wilson | Yvette Medina; Rose Bernal; Scott Bender | | HIPAA/Personally Identifiable Information | Transgender coverage - hormone therapy |
| 149 | AZSTATE.136602 | AZSTATE.136602 | 6/2/2017 | Elizabeth Schafer | | | HIPAA/Personally Identifiable Information | Blue Cross Blue Shield of Arizona member Satisfaction Survey Results |
| 150 | AZSTATE.139839 | AZSTATE.139839 | 4/22/2019 | Peter Chiappa | | | HIPAA/Personally Identifiable Information | Report of ADOA transgender services from Aetna |
| 151 | AZSTATE.143577 | AZSTATE.143581 | 1/25/2017 | | | | HIPAA/Personally Identifiable Information | Session Roster - 2017 Benefits Liaison Training |
| 152 | AZSTATE.143582 | AZSTATE.143582 | 1/26/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 153 | AZSTATE.151751 | AZSTATE.151761 | 2/3/2020 | | | | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | Various notes from Ms. Isaacson |
| 154 | AZSTATE.188313 | AZSTATE.188313 | 3/27/2020 | | | | HIPAA/Personally Identifiable Information | UnitedHealthcare member Satisfaction Survey Results |
| 155 | AZSTATE.189467 | AZSTATE.189467 | 4/6/2020 | | | | HIPAA/Personally Identifiable Information | UnitedHealthcare member Satisfaction Survey Results |

Toomey v. State of Arizona, et al., Case No. 4:19-CV-00035

State of Arizona Privilege/ Redaction Log

| No. | DocID/ Beg Bates No. | DocID/ End Bates No. | Date | From/ Author | To | CC | Privilege Type | Subject/ Description |
|---|---|---|---|---|---|---|---|---|
| 156 | AZSTATE.190624 | AZSTATE.190624 | 4/10/2020 | | | | HIPAA/Personally Identifiable Information | UnitedHealthcare member Satisfaction Survey Results |
| 157 | AZSTATE.207655 | AZSTATE.207656 | 8/22/2017 | Rose Bernal | Kayla Stivason | | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 158 | AZSTATE.207657 | AZSTATE.207659 | 8/22/2017 | Kayla Stivason | Erin Russell | Scott Bender | HIPAA/Personally Identifiable Information | FW: Appeal Denied secure |
| 159 | AZSTATE.207660 | AZSTATE.207662 | 8/22/2017 | Kayla Stivason | Rose Bernal | | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 160 | AZSTATE.207663 | AZSTATE.207665 | 8/22/2017 | Rose Bernal | Kayla Stivason | | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 161 | AZSTATE.207666 | AZSTATE.207668 | 8/22/2017 | Kayla Stivason | Rose Bernal | Erin Russell; Scott Bender | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 162 | AZSTATE.207669 | AZSTATE.207672 | 8/22/2017 | Rose Bernal | Kayla Stivason | Erin Russell; Scott Bender | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 163 | AZSTATE.207673 | AZSTATE.207676 | 8/22/2017 | Erin Russell | Rose Bernal; Kayla Stivason | Scott Bender | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 164 | AZSTATE.207677 | AZSTATE.207684 | 8/25/2017 | Scott Bender | Mary Cappabianco; Erin Russell; Kayla Stivason; Rose Bernal | Sean Kirwan | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 165 | AZSTATE.207685 | AZSTATE.207693 | 8/25/2017 | Erin Russell | Scott Bender; Mary Cappabianco; Kayla Stivason; Rose Bernal | Sean Kirwan | HIPAA/Personally Identifiable Information | RE: Appeal Denied secure |
| 166 | AZSTATE.207722 | AZSTATE.207724 | 2/3/2017 | Stu Wilbur | | | Confidential, non-relevant information | Benefits Services Division - Meeting Agenda |
| 167 | AZSTATE.235593 | AZSTATE.235597 | 10/29/2020 | Rose Bernal | Rose Bernal; Amy Kenney-Hudson | | HIPAA/Personally Identifiable Information | 2020.10.29 |
| 168 | EML00007556 | EML00007557 | 10/6/2018 | John Fry | Elizabeth Thorson | | Attorney-Client Communication | Attorney-Client Privileged Communication |
| 169 | EML00012453 | EML00012453 | 1/3/2017 | Nicole Ong | Marie Isaacson | | Attorney-Client Communication | Federal judge halts transgender protections in Obamacare |
| 170 | AZSTATE.246034 | AZSTATE.246036 | 12/15/2016 | Marie Isaacson | Christina Corieri | Scott Bender; Nicole Ong | Deliberative Process Privilege - **PRODUCED PURSUANT TO COURT ORDER** | RE: ACA §1557 Non-Discrimination |

# EXHIBIT 3

**Victoria Lopez\***
**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: **vlopez@acluaz.org**
Email: **cwee@acluaz.org**

**(\*admission under Arizona Rule 38(f) pending)**

**Joshua A. Block\*\***
**Leslie Cooper\*\***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: **jblock@aclu.org**
E-Mail: **lcooper@aclu.org**
**\*\*Admitted Pro hac vice**

**Wesley R. Powell\*\***
**Matthew S. Friemuth\*\***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: **wpowell@willkie.com**
E-Mail: **mfriemuth@willkie.com**
**\*\*Admitted Pro hac vice**

*Attorneys for Plaintiff Russell B. Toomey*

1

2                          **UNITED STATES DISTRICT COURT**

3                              **DISTRICT OF ARIZONA**

4   **Russell B. Toomey**,                        4:19-cv-00035-TUC-RM (LCK)

5                          Plaintiff,             **PLAINTIFF'S FIRST SET OF**
                                                  **INTERROGATORIES**
6   v.

7
    **State of Arizona; Arizona Board of Regents,**
8   **d/b/a University of Arizona**, a governmental
    body of the State of Arizona; **Ron Shoopman**, in
9   his official capacity as chair of the Arizona Board
    Of Regents; **Larry Penley**, in his official
10  capacity as Member of the Arizona Board of
    Regents; **Ram Krishna**, in his official capacity as
11  Secretary of the Arizona Board of Regents; **Bill**
    **Ridenour**, in his official capacity as Treasurer of
12  the Arizona Board of Regents; **Lyndel Manson**,
    in her official capacity as Member of the Arizona
13  Board of Regents; **Karrin Taylor Robson**, in her
    official capacity as Member of the Arizona Board
14  of Regents; **Jay Heiler**, in his official capacity as
    Member of the Arizona Board of Regents; **Fred**
15  **Duval**, in his official capacity as Member of the
    Arizona Board of Regents; **Andy Tobin**, in his
16  official capacity as Director of the Arizona
    Department of Administration; **Paul Shannon**, in
17  his official capacity as Acting Assistant Director
    of the Benefits Services Division of the Arizona
18  Department of Administration,

19
                           Defendants.
20

21

22

23
            Pursuant to the Rules of Practice and Procedure of the United States District Court for
24
    the District of Arizona Rule 33 and the Federal Rules of Civil Procedure Rule 26 (together, the
25
    "Rules"), Plaintiff Russell B. Toomey, by and through counsel undersigned, hereby requests
26
    the Defendants answer the following interrogatories (the "Interrogatories," and each an
27
    "Interrogatory") in writing and under oath within 14 days of service hereof.
28

                                              - 1 -

**DEFINITIONS**

1.     The term "communication," as used herein, means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether orally or in writing, or by any other means or medium.

2.     The terms "concerning," "relating to," "referring to," "arising out of," and their cognates are to be understood in their broadest sense and each means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing or comprising the subject matter identified.

3.     The terms "describe" and "description," as used herein, mean to give a detailed written account or representation of the subject matter – including, but not limited to, when used with respect to any act, action, accounting, activity, audit, practice, process, occurrence, occasion, course of conduct, happening, negotiation, relationship, scheme, communication, conference, discussion, development, circumstances, service, transaction, instance, incident, or event – setting forth the following:  (a) its general nature; (b) the time and place thereof; (c) a chronological account setting forth each element thereof, what such element consisted of and what transpired as part thereof; (d) the identity (as defined herein) of each person who performed any function or had any role in connection therewith (*i.e.*, speaker, participant, contributor of information, witness, etc.) or who has any knowledge thereof, together with a description of such person's function, role or knowledge; (e) the identity (as defined herein) of each document that refers thereto or that was used, referred to or prepared in the course of or as a result thereof; and (f) the identity (as defined herein) of each oral communication that was a part thereof or referred thereto.

4.     The terms "document" and "documents" shall have the broadest meaning allowable under the Rules and applicable case law, and shall include without limitation, electronically stored information and written, printed, typed, recorded, or graphic matter of every kind and description, both originals and copies and all attachments and appendices thereto.

Without limiting the foregoing, the terms "document" and "documents" shall include all agreements, contracts, applications, communications, interoffice or intraoffice correspondence, books, letters, telegrams, telexes, messages, memoranda, records, reports, books, summaries, electronic mail, texts, chats, records of telephone conversations or interviews, summaries or other records of personal conversations, minutes or summaries or other records of personal meetings and conferences, summaries or other records of meetings and conferences, summaries, entries, calendars, appointment books, time records, instructions, work assignments, visitor records, forecasts, statistical data, statistical statements, work sheets, drafts, graphs, maps, charts, tables, marginal notations, notebooks, telephone bills or records, bills, statements and records of obligation and expenditure, invoices, lists, journals, advertising, recommendations, files, printouts, compilations, tabulations, purchase orders, receipts, sell orders, confirmations, checks, letters of credit, envelopes or folders or similar containers, vouchers, analyses, studies, surveys, transcripts of hearings, transcripts of testimony, expense reports, microfilm, microfiche, articles, speeches, tape or disc recordings, sound recordings, video recordings, film, tapes, photographs, punch cards, programs, data compilations from which information can be obtained (including matter used in data processing), and other printed, written, handwritten, typewritten, recorded, stenographic, computer-generated, or electronically stored matter (or printouts thereof), however and by whomever produced, prepared, reproduced, disseminated, or made.

5.    "Draft(s)" shall mean any formulation, outline, sketch, conceptualization, or version of a document created prior to the final version of that document.

6.    The term "factual and/or legal bases" includes, but is not limited to, any and all documents, facts, communications or contentions.

7.    The terms "identify," "specify" and "state" mean to refer to the subject matter by providing a detailed account or description of the subject matter, including, but not limited to, the following:

      a.    when applicable to a document, to set forth in writing at a minimum and in the following order: (i) the name of the document; (ii) the nature of the document

- 3 -

(*e.g.*, letter, contract, memorandum) and any other information (*i.e.*, its title, index or file number) which would facilitate in the identification thereof; (iii) the date the document was prepared or created; (iv) the identity of each person who performed any function or had any role in connection therewith (*i.e.*, author, contributor of information, recipient, etc.) or who has any knowledge thereof, together with a description of each such person's function, role or knowledge; (v) its subject matter and substance, or, in lieu thereof, annex a legible copy of the document to Your answers to these interrogatories; (vi) identification of all persons who are in possession of the original and any copy of the document; (vii) its present location and the identity of its present custodian, or, if its present location and custodian are not known, a descript of its last known disposition; (viii) where a document is other than a paper (*i.e.*, computer or recording tape, microfilm disk, microfiche, etc.), a full description of the tangible thing on which the information is recorded, and the device or the devices needed to read or listen to the document; and (ix) if the document has been destroyed or is otherwise no longer in existence or cannot be found, the reason why such document no longer exists, the identity of the person(s) responsible for document no longer being in existence and the identity of the document's last custodian.

b.  when applicable to a natural person, to set forth in writing at a minimum and in the following order:  (i) his/her full name; (ii) his/her present and/or last known business and residence address and telephone number, or an undertaking that the person may be contacted through responding counsel; (iii) his/her present or last known business affiliation; and (iv) his/her present or last known business position (including job title and a description of job functions, duties and responsibilities);

c.  when applicable to any entity or person other than a natural person, to set forth in writing at a minimum and in the following order:  (i) its full name; (ii) the address and telephone number of its principal place of business; (iii) the jurisdiction under the laws of which it has been organized or incorporated and the date of such

organization or incorporation; (iv) the identity of all individuals who acted and/or authorized another to act on its behalf in connection with the matters referred to; (v) in the case of a corporation, the names of its directors and principal officers; and (vi) in the case of an entity other than a corporation, the identities of its partners or principals or all individuals who acted or who authorized another to act on its behalf in connection with the matters referred to;

d.   when applicable to an oral communication, to set forth in writing at a minimum and in the following order:  (i) the date, time, place, manner and substance of such communication; (ii) the identity of all persons who participated in, listened to, or had access to transcripts or summaries of such communication or copies thereof; (iii) each such person's function, role, or knowledge; and (iv) the identity of all documents which memorialize, commemorate, summarize, record or directly refer or relate, in whole or in part, to such communication.

8.   The term "including" means "including, but not limited to," and shall not be construed to limit the scope of any definition or request herein.

9.   The term "person" means any natural person, corporation, partnership, proprietorship, association, joint venture, group, governmental or public entity, or any other form or organization of legal entity, and all of their directors, officers, employees, representatives, and agents.

10.   "Defendants" mean Defendants State of Arizona, Arizona Board of Regents, d/b/a University of Arizona, Ron Shoopman, Larry Penley, Ram Krishna, Bill Ridenour, Lyndel Manson, Karrin Taylor Robson, Jay Heiler, Fred DuVal, Andy Tobin, and Paul Shannon and all of their predecessors and successors in interest, and all of their representatives, attorneys, and agents.

11.   "You" and "Your" refer to Defendants individually and collectively.

**INSTRUCTIONS**

1.      If You object to any of the Interrogatories in whole or in part, state with particularity each objection, the basis for it, and the categories of information to which the objection applies.  You must respond to any portion of the Interrogatory to which You do not object.

2.      Each interrogatory shall be answered separately, and Your answer shall set forth verbatim the interrogatory to which it is in response.  The answer to an interrogatory shall not be supplied by referring to the answer to another interrogatory unless the answer to the interrogatory being referred to supplies a complete and accurate answer to the interrogatory being answered.

3.      You are required to answer each interrogatory set forth below, regardless of whether the information is possessed by You or by any successors, assigns, agents, accountants, experts, representatives, attorneys and/or consultants or anyone else acting or purporting to act on Your behalf.

4.      If You withhold any information or decline to fully identify any person, document or communication in response to any of the interrogatories set forth below on grounds of privilege or pursuant to the work product doctrine, provide the basis for Your claim of privilege or attorney work product and answer the interrogatory to the extent You do not claim a privilege.

5.      The interrogatories set forth below shall be deemed to be continuing in nature in accordance with Rule 26 so as to require supplementation in the event that You obtain or become aware of any additional information responsive to these interrogatories.

6.      In construing any interrogatory, instruction or definition, the singular form of a word shall include the plural and the plural form of a word shall include the singular.

7.      The connectives "and" and "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

8.      The terms "all" and "each" shall be construed as all and each, as necessary to bring within the scope of the request all information that might otherwise be construed to be outside

of its scope.

## RELEVANT TIME PERIOD

The relevant Time Period for these Requests shall be through the date in which the interrogatories are answered, unless otherwise specified.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Identify and describe all reasons why the State of Arizona's self-funded health plan controlled by the Arizona Department of Administration (the "Plan") excludes coverage for "[g]ender reassignment surgery" (the "Challenged Exclusion") including, but not limited to, (a) each and every State or governmental interest that you contend is advanced by the exclusion, (b) a detailed explanation for why you contend that the exclusion furthers that state interest, and (c) all facts in support of your explanation.

**INTERROGATORY NO. 2:** Identify all persons with knowledge of the reasons why the Plan excludes coverage for ""[g]ender reassignment surgery," and state what each such person knows.

**INTERROGATORY NO. 3:** Identify all persons with knowledge of the genesis, formulation, adoption, maintenance, or continuation of (a) the Challenged Exclusion and (b) any earlier versions of the exclusion before the current language was adopted, and state what each such person knows.

**INTERROGATORY NO. 4:** Identify all persons who participated in formulating, adopting, maintaining, reviewing, approving, or deciding to continue the exclusion of coverage for ""[g]ender reassignment surgery" from the Plan, including any experts consulted, and state what each such person knows.

**INTERROGATORY NO. 5:** Identify all persons who assisted in preparing the answers to these Interrogatories or provided information contained in the answers, and state his or her title, duties, role in preparing the answers, and the interrogatory answer(s) to which he or she provided information or assistance. This identification should also indicate whether the information provided is within his or her knowledge or was obtained from some other person or source; if the information was obtained from another person or source, that person or source

should also be identified.

**INTERROGATORY NO. 6:** Identify all public or non-public meetings of Defendants in which the Challenged Exclusion and/or the Plan's coverage for medical or surgical treatments or services to treat gender dysphoria (or "transition-related care") was discussed, listing the date of each meeting, the nature of each meeting, and the attendees of the meeting; and identifying any documents or other materials relating to those meetings in Defendants' custody or control.

**INTERROGATORY NO. 7:** Identify all research, studies, data, reports, publications, testimony, or other documents considered, reviewed, or relied on by Defendants relating to the Challenged Exclusion, including identifying the date or approximate date of consideration, review, or reliance by the Arizona Board of Regents ("ABOR") and the Arizona Department of Administration (the "ADOA"); and the ADOA and ABOR employee(s) who considered, reviewed, or relied on such documents and their role(s). A complete answer to this interrogatory should include documents relating to the medical necessity, safety, and efficacy (including whether a procedure is deemed experimental) of excluded treatments and services; the public health effects of enforcing, amending, or eliminating the Challenged Exclusion; and the cost/fiscal impact to ADOA or ABOR of enforcing, amending, or eliminating the Challenged Exclusion.

**INTERROGATORY NO. 8:** Identify and describe any formal or informal consideration by Defendants of amending or eliminating the Challenged Exclusion, including identifying the date or approximate date of consideration, the ADOA and ABOR employees or offices involved in such consideration and their role(s), the nature of the considered changes, and what (if any) actions were taken by ADOA and ABOR.

DATED this 5th day of June, 2020.


ACLU FOUNDATION OF ARIZONA

By */s/ Christine K. Wee*
    Victoria Lopez
    Christine K. Wee
    3707 North 7th Street, Suite 235
    Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block
Leslie Cooper
125 Broad Street, Floor 18
New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell
Matthew S. Friemuth
787 Seventh Avenue
New York, New York 10019

*Attorneys for Plaintiff Russell B. Toomey*

**CERTIFICATE OF SERVICE**

I, Christine K. Wee, hereby certify that on June 5, 2020 I served the foregoing *Plaintiff's First*

*Set of Interrogatories* to Defendants via email:

Peter C. Prynkiewicz pprynkiewicz@littler.com
Robert S. Oller soller@littler.com
Littler Mendelson PC - Phoenix, AZ
2425 E Camelback Rd., Ste. 900
Phoenix, AZ 85016-2907
*Attorneys for Defendants State of Arizona,*
*Andy Tobin, and Paul Shannon*

Paul F. Eckstein PEckstein@perkinscoie.com
Austin C. Yost AYost@perkinscoie.com
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, Arizona 85012-2788
DocketPHX@perkinscoie.com
*Attorneys for Defendants Arizona Board of Regents,*
*d/b/a University of Arizona; Ron Shoopman; Larry Penley;*
*Ram Krishna; Bill Ridenour; Lyndel Manson; Karrin*
*Taylor Robson; Jay Heiler; and Fred Duval*

*/s/ Christine K. Wee*

# EXHIBIT 4

1   FENNEMORE CRAIG, P.C.
    Timothy J. Berg (No. 004170)
2   Amy Abdo (No. 016346)
    Ryan Curtis (No. 025133)
3   Shannon Cohan (No. 034429)
    2394 E. Camelback Road
4   Suite 600
    Phoenix, Arizona  85016
5   Telephone:  (602) 916-5000
    Email:  tberg@fennemorelaw.com
6   Email:  amy@fennemorelaw.com
    Email:  rcurtis@fennemorelaw.com
7   Email:  scohan@fennemorelaw.com

8   *Attorneys for Defendants*
    *State of Arizona, Andy Tobin, and Paul Shannon*
9

10              UNITED STATES DISTRICT COURT

11                  DISTRICT OF ARIZONA

12  Russell B. Toomey,                          No. 4:19-cv-00035

13              Plaintiff,                       **DEFENDANTS STATE OF
                                                 ARIZONA'S, ANDY TOBIN'S, AND
14          v.                                   PAUL SHANNON'S FIRST
                                                 SUPPLEMENTAL RESPONSES TO
15  State of Arizona; Arizona Board of Regents   PLAINTIFF'S FIRST SET OF
    d/b/a University of Arizona, a               INTERROGATORIES**
16  governmental body of the State of Arizona;
    Ron Shoopman, in his official capacity as
17  Chair of the Arizona Board of Regents;
    Larry Penley, in his official capacity as
18  Member of the Arizona Board of Regents;
    Ram Krishna, in his official capacity as
19  Secretary of the Arizona Board of Regents;
    Bill Ridenour, in his official capacity as
20  Treasurer of the Arizona Board of Regents;
    Lyndel Manson, in her official capacity as
21  Member of the Arizona Board of Regents;
    Karrin Taylor Robson, in her official
22  capacity as Member of the Arizona Board
    of Regents; Jay Heiler, in his official
23  capacity as Member of the Arizona Board
    of Regents; Fred Duval, in his official
24  capacity as Member of the Arizona Board
    of Regents; Andy Tobin, in his official
25  capacity as Director of the Arizona
    Department of Administration; Paul
26

FENNEMORE CRAIG, P.C.
PHOENIX

Shannon, in his official capacity as Acting
Assistant Director of the Benefits Services
Division of the Arizona Department of
Administration,

Defendants.

Propounding Party:  Russell B. Toomey

Answering Parties:  State of Arizona, Andy Tobin, and Paul Shannon

Set No.:        One

## GENERAL STATEMENT AND OBJECTIONS

1.      Defendants object to each interrogatory to the extent that it is vague and/or ambiguous and agrees to respond to Plaintiff's interrogatories based solely on their interpretation of any vague or ambiguous language.

2.      Defendants object to each interrogatory to the extent that it is overly broad, unduly burdensome, or oppressive.

3.      Defendants object to each interrogatory to the extent that it seeks confidential, proprietary, private, or privileged information and will respond to any such interrogatory, if otherwise discoverable, after the parties have agreed to a protective order.

4.      Defendants object to each interrogatory to the extent that it seeks information that is irrelevant to Plaintiff's claims or Defendants' defenses and is not reasonably calculated to lead to the discovery of admissible evidence.

5.      Defendants object to each interrogatory to the extent that it requires any action or response beyond that required by the Federal Rules of Civil Procedure, the Scheduling Order, or the Local Rules.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**  Identify and describe all reasons why the State of Arizona's self-funded health plan controlled by the Arizona Department of Administration (the "Plan") excludes coverage for "[g]ender reassignment surgery" (the "Challenged

Exclusion") including, but not limited to, (a) each and every State or governmental interest that you contend is advanced by the exclusion, (b) a detailed explanation for why you contend that the exclusion furthers that state interest, and (c) all facts in support of your explanation.

**ANSWER**:  The State of Arizona's self-funded health plan excludes coverage for gender reassignment surgery because the State concluded, under the law, that it was not legally required to change its health plan to provide such coverage under either Title VII of the Civil Rights Act or under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Specifically, prior to the Supreme Court's ruling in *Bostock v. Clayton County*, Title VII protections on the basis of sex had not been applied to individuals based on their sexual orientation or transgender status.  Further, rules promulgated by the Department of Health and Human Services ("HHS") regarding nondiscrimination provisions under Section 1557 of the Affordable Care Act prohibited blanket exclusions of all treatments of gender dysphoria, but did not require plans subject to the law to cover all treatments for gender dysphoria or gender transition services.  The legal advice that the State received regarding this issue is covered by the attorney-client privilege.

The State or governmental interests advanced by the exclusion are cost containment and reducing health care costs.  The State gathered information from private insurers and public entities who did provide coverage for gender reassignment surgery in an effort to determine how its own health care costs would be impacted.  Although the cost estimates varied, they unquestionably showed that removing the exclusion for gender reassignment surgery would increase costs and that such increases could be significant.

**FIRST SUPPLEMENTAL ANSWER**:  At some point prior to 2005, the State of Arizona moved its healthcare coverage for employees to a self-funded health plan.  At that time, the State maintained the same plan documents, including the same exclusions, as was

1   utilized by the prior insurance providers.  The plan documents included an exclusion for

2   "transsexual surgery including medical or psychological counseling and hormonal therapy

3   in preparation for, or subsequent to, any such surgery."

4       **INTERROGATORY NO. 2:**  Identify all persons with knowledge of the reasons

5   why the Plan excludes coverage for ""[g]ender reassignment surgery," and state what each

6   such person knows.

7       **ANSWER**:  Defendants object to this interrogatory because it seeks information

8   covered by the attorney-client privilege. Subject to and without waiving this objection,

9   Defendants state that Michael T. Liburdi, the former General Counsel for the Office of the

10   Arizona Governor, John M. Fry of the Arizona Attorney General's Office, Nicole A. Ong,

11   the former General Counsel of the ADOA, Christina Corieri, a licensed attorney and Senior

12   Policy Advisor Office of the Arizona Governor, Marie Isaacson, the former Director of the

13   Benefits Services Division of the ADOA, and Scott Bender, the Plan Administrator for the

14   ADOA have knowledge of why the Plan excludes coverage for gender reassignment surgery

15   as described in the response to Interrogatory No. 1 above.  ADOA also received attorney-

16   client privileged legal advice from Ryan C. Curtis at Fennemore Craig, P.C., as well as now

17   former Fennemore Craig attorney Erwin Kratz.

18       **INTERROGATORY NO. 3:**  Identify all persons with knowledge of the genesis,

19   formulation, adoption, maintenance, or continuation of (a) the Challenged Exclusion and

20   (b) any earlier versions of the exclusion before the current language was adopted, and state

21   what each such person knows.

22       **ANSWER**:  Defendants object to this interrogatory because it seeks information

23   covered by the attorney-client privilege. Subject to and without waiving this objection,

24   Defendants state that Michael T. Liburdi, the former General Counsel for the Office of the

25   Arizona Governor, John M. Fry of the Arizona Attorney General's Office, Nicole A. Ong,

26   the former General Counsel of the ADOA, Christina Corieri, Senior Policy Advisor Office

of the Arizona Governor, Marie Isaacson, the former Director of the Benefits Services Division of the ADOA, and Scott Bender, the Plan Administrator for the ADOA have knowledge regarding the Challenged Exclusion.  ADOA also received attorney-client privileged legal advice from Ryan C. Curtis at Fennemore Craig, P.C., as well as now former Fennemore Craig attorney Erwin Kratz.

**INTERROGATORY NO. 4:**  Identify all persons who participated in formulating, adopting, maintaining, reviewing, approving, or deciding to continue the exclusion of coverage for ""[g]ender reassignment surgery" from the Plan, including any experts consulted, and state what each such person knows.

**ANSWER**:  Defendants object to this interrogatory because it seeks information covered by the attorney-client privilege. Subject to and without waiving this objection, Defendants state that Michael T. Liburdi, the former General Counsel for the Office of the Arizona Governor, John M. Fry of the Arizona Attorney General's Office, Nicole A. Ong, the former General Counsel of the ADOA, Christina Corieri, Senior Policy Advisor Office of the Arizona Governor, Marie Isaacson, the former Director of the Benefits Services Division of the ADOA, and Paul Shannon, the Director of the Benefits Services Division of the ADOA participated in these decisions.

**INTERROGATORY NO. 5:**  Identify all persons who assisted in preparing the answers to these Interrogatories or provided information contained in the answers, and state his or her title, duties, role in preparing the answers, and the interrogatory answer(s) to which he or she provided information or assistance. This identification should also indicate whether the information provided is within his or her knowledge or was obtained from some other person or source; if the information was obtained from another person or source, that person or source should also be identified.

**ANSWER**:  Defendants object to this interrogatory because it violates the work-product doctrine as set forth in *Hickman v. Taylor*, 329 U.S. 495 (1947).  Several courts

have held that the work product doctrine covers various aspects of an attorney's investigation, including the witnesses who were interviewed, how long they were interviewed, and when they were interviewed. *See, e.g., Commonwealth of Massachusetts v. First Nat'l Supermarkets, Inc.*, 112 F.R.D. 149, 153 (D. Mass. 1986) (holding it was improper to seek disclosure of "the names of persons interviewed by an adverse party's attorney together with the dates and places of such interviews."); *Board of Ed. of Evanston TP v. Admiral Heating*, 104 F.R.D. 23, 32 (N.D. Ill. 1984) (to tell plaintiffs whom defendants have interviewed, where and when such interviews took place, and whether or not a record was made is to give plaintiffs no more knowledge of substantive relevant facts, but rather to afford them the potential for significant insights into the defendant lawyers' preparation of their case and their mental processes); *Besley-Welles Corp. v. Balax, Inc.*, 43 F.R.D. 368, 371 (E.D. Wis. 1968) (interrogatory seeking statement as to adverse party's efforts to locate witnesses goes to attorney's preparation for trial and comes under the *Hickman* rule that gives an attorney's work product qualified immunity from discovery); *Uinta Oil Refining Co. v. Continental Oil Co.*, 226 F. Supp. 495, 506 (D. Utah 1964) (sustaining objection to interrogatory seeking names of all persons from whom plaintiffs had taken or requested statements, explaining that "[t]he detailed pattern of investigation and exploration in and of itself is not a proper subject for discovery.").

**INTERROGATORY NO. 6:**   Identify all public or non-public meetings of Defendants in which the Challenged Exclusion and/or the Plan's coverage for medical or surgical treatments or services to treat gender dysphoria (or "transition-related care") was discussed, listing the date of each meeting, the nature of each meeting, and the attendees of the meeting; and identifying any documents or other materials relating to those meetings in Defendants' custody or control.

**ANSWER**:  Defendants object to this interrogatory because it seeks information covered by the attorney-client privilege. Subject to and without waiving this objection,

1   Defendants state that the individuals identified in response to Interrogatory No. 2 who were
2   employees of ADOA or the Governor's Office above held meetings and discussions
3   regarding the Plan's surgical treatments or services to treat gender dysphoria between June
4   and November 2016, some of which included the participation of outside counsel from
5   Fennemore Craig, P.C.  Defendants possess documents regarding these meetings that will
6   be identified in their privilege log.

7       **FIRST SUPPLEMENTAL ANSWER**:  No meetings were held regarding the prior
8   iteration of the exclusion for gender reassignment surgery.  The exclusion was adopted
9   when the State of Arizona transferred its healthcare coverage to a self-funded health plan.
10  However, at that time, the State merely continued the coverages and exclusions utilized by
11  its prior insurance providers.  No known meetings were held to discuss the transgender care
12  exclusion until the issuance of Patient Protection and Affordable Care Act ("ACA") Rule
13  1557.

14      **INTERROGATORY NO. 7:**   Identify all research, studies, data, reports,
15  publications, testimony, or other documents considered, reviewed, or relied on by
16  Defendants relating to the Challenged Exclusion, including identifying the date or
17  approximate date of consideration, review, or reliance by the Arizona Board of Regents
18  ("ABOR") and the Arizona Department of Administration (the "ADOA"); and the ADOA
19  and ABOR employee(s) who considered, reviewed, or relied on such documents and their
20  role(s). A complete answer to this interrogatory should include documents relating to the
21  medical necessity, safety, and efficacy (including whether a procedure is deemed
22  experimental) of excluded treatments and services; the public health effects of enforcing,
23  amending, or eliminating the Challenged Exclusion; and the cost/fiscal impact to ADOA or
24  ABOR of enforcing, amending, or eliminating the Challenged Exclusion.

25      **ANSWER**:  Defendants considered a Memorandum from Marie Isaacson to Mike
26  Liburdi, General Counsel at the Governor's Office dated August 3, 2016 regarding

Affordable Care Act § 1557, and a Memorandum regarding Non-discrimination—Transgender Coverage and a Memorandum from outside legal counsel at Fennemore Craig to Marie Isaacson dated July 20, 2016 regarding Summary and Implications of § 1557 and Transgender Coverage Requirements.  Both of these documents are covered by the attorney-client privilege. Defendants also gathered information and data from insurers and other entities regarding their experience providing transgender benefits, including reassignment surgery.   Plaintiffs may ascertain the non-privileged information requested in this Interrogatory from the documents that Defendants have produced in this action.

**FIRST SUPPLEMENTAL ANSWER**:  When the State of Arizona transferred its healthcare coverage to a self-funded health plan, it adopted the coverages and exclusions utilized by its prior insurance providers, which included the prior iteration of the exclusion for gender reassignment surgery.  No known additional documents were reviewed in relation to the transgender care exclusion until the issuance of ACA Rule 1557.

**INTERROGATORY NO. 8:**   Identify and describe any formal or informal consideration by Defendants of amending or eliminating the Challenged Exclusion, including identifying the date or approximate date of consideration, the ADOA and ABOR employees or offices involved in such consideration and their role(s), the nature of the considered changes, and what (if any) actions were taken by ADOA and ABOR.

**ANSWER**:  Defendants object to this interrogatory because it seeks information covered by the attorney-client privilege.  Subject to and without waiving this objection, Defendants state that they have informally considered amending or eliminating the Challenged Exclusion after Plaintiff filed this action and since the Supreme Court's decision in *Bostock v. Clayton County*.  Paul Shannon, Scott Bender, and Defendants' counsel have

. . .

. . .

. . .

1    been involved in such considerations.

2           DATED this 21st day of January, 2021.

3                                                FENNEMORE CRAIG, P.C.

4

5                                         By:   *s/ Ryan Curtis*
                                                Timothy J. Berg
6                                               Amy Abdo
                                                Ryan Curtis
7                                               Shannon Cohan
                                                Attorneys for Defendants State of
8                                               Arizona, Andy Tobin, and Paul
                                                Shannon
9

10   COPY of the foregoing e-mailed this
     21st day of January, 2021 to:
11

12   Victoria Lopez
     Christine K. Wee
13   ACLU FOUNDATION OF ARIZONA
     3707 North 7th Street, Suite 235
14   Phoenix, Arizona 85014
     *Attorneys for Plaintiff*
15
     Joshua A. Block
16   Leslie Cooper
     AMERICAN CIVIL LIBERTIES
17   UNION FOUNDATION
     125 Broad Street, Floor 18
18   New York, New York 10004
     *Attorneys for Plaintiff*
19
     Wesley R. Powell
20   Matthew S. Friemuth
     Jordan Wall
21   Victoria Sheets
     WILLKIE FARR & GALLAGHER LLP
22   787 Seventh Avenue
     New York, New York 10019
23   *Attorneys for Plaintiff*

24

25

26

1   Paul F. Eckstein
    Austin C. Yost
2   Perkins Coie LLP
    2901 North Central Ave., Suite 2000
3   Phoenix, Arizona 85012-2788
    *Attorneys for Defendants Arizona*
4   *Board of Regents d/b/a University of*
    *Arizona; Ron Shoopman; Larry*
5   *Penley; Ram Krishna; Bill Ridenour;*
    *Lyndel Manson; Karrin Taylor*
6   *Robson; Jay Heiler; and Fred Duval*

7   *s/ Ryan Curtis*_____

8   17734350

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FENNEMORE CRAIG, P.C.

PHOENIX

# EXHIBIT 5

2021 WL 2105610
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Michael Isidoro SANCHEZ, Petitioner,
v.
ATTORNEY GENERAL OF the State
of ARIZONA, et al., Respondents.

No. CV-17-00224-TUC-RM
|
Signed 05/25/2021

**Attorneys and Law Firms**

Michael Isidoro Sanchez, Kingman, AZ, Pro Se.

Andrew Stuart Reilly, Office of the Attorney General,
Phoenix, AZ, Kathryn Ann Damstra, Office of the
Arizona General Criminal Appeals Section, Tucson, AZ, for
Respondents Attorney General of the State of Arizona, David
Shinn.


**ORDER**

Rosemary Márquez, United States District Judge

**\*1** Pending before the Court is Respondents' Motion to Stay
Judgment. (Doc. 92.) Petitioner filed a response (Doc. 93) and
Respondents replied (Doc. 98). The Motion to Stay will be
denied.


**I. Background**

On March 30, 2021, the Court issued an Order partially
sustaining and partially overruling Petitioner's Objection
to Magistrate Judge D. Thomas Ferraro's Report and
Recommendation ("R&R"), which the Court partially
rejected and partially accepted. (Doc. 86.) The Court
conditionally granted Petitioner's Amended Petition for Writ
of Habeas Corpus (Doc. 41) as to the *Anders* claim in Ground
One, and otherwise denied the Petition. (*Id.*) The Court then
ordered Petitioner released from custody unless, within ninety
(90) days, Petitioner was permitted to file a new of-right Rule
33 Post-Conviction Relief ("PCR") proceeding, including the
filing of either a merits brief by counsel or a substantive brief
consistent with *Anders v. California*, 386 U.S. 738 (1967),

and an independent review of the record by the court. (*Id.*)
On April 9, 2021, Respondents filed a notice of appeal to the
Ninth Circuit Court of Appeals. (Doc. 89.)


**II. Motion to Stay**

Respondents seek a stay of the Court's March 30, 2021 Order
pending resolution of their appeal of the Order to the Ninth
Circuit Court of Appeals and, if necessary, the Supreme Court
of the United States, pursuant to Federal Rule of Appellate
Procedure 8(a)(1)(A). (Doc. 92.) Respondents argue that (1)
they are likely to succeed on the merits of their appeal; (2) the
balance of hardships tips in their favor; (3) the State will suffer
irreparable injury if a stay is not granted; and (4) the public
interest favors a stay. (*Id.*) In response, Petitioner argues that
Respondents are not likely to succeed on the merits of their
appeal and the request for a stay should therefore be denied.

(Doc. 93; *see also* Doc. 99.)[1]


**III. Applicable Law**

Federal Rule of Appellate Procedure 8(a)(1)(A) provides that
a party must first move in the district court for a stay of a
judgment or order of a district court pending appeal.

"A stay is not a matter of right, even if irreparable injury might
otherwise result." *Nken v. Holder*, 556 U.S. 418, 433–34
(2009) (internal citation omitted). "It is instead an exercise of
judicial discretion, and the propriety of its issue is dependent
upon the circumstances of the particular case." *Id.* "The
party requesting a stay bears the burden of showing that the
circumstances justify an exercise of that discretion." *Id.*

The test for whether a stay should be granted pending appeal
of an order requires the Court to consider four factors:
"(1) whether the stay applicant has made a strong showing
that he is likely to succeed on the merits; (2) whether the
applicant will be irreparably injured absent a stay; (3) whether
issuance of the stay will substantially injure the other parties
interested in the proceeding; and (4) where the public interest
lies." *Id.*; *see also Hilton v. Braunskill*, 481 U.S. 770, 776
(1987). The balance among the factors "may depend to a
large extent upon determination of the State's prospects of
success in its appeal. Where the State establishes that it has
a strong likelihood of success on appeal, or where, failing
that, it can nonetheless demonstrate a substantial case on the
merits, continued custody is permissible if the second and
fourth factors in the traditional stay analysis militate against
release." *Hilton*, 481 U.S. at 778 (discussing stay of release
pending appeal in habeas corpus context).

**\*2**  In ruling on a motion for stay pending an appeal, courts employ " 'two interrelated legal tests' that 'represent the outer reaches of a single continuum.' " *Golden Gate Rest. Ass'n v. City and Cty. of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983)). "At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury" if a stay is not granted. *Id.* (internal citation and quotation omitted). "At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Id.* "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* (citing *Natural Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007)). Further, courts "consider where the public interest lies separately from and in addition to" whether irreparable injury will result absent a stay. *Id.*

**IV. Analysis**

First, Respondents argue that they are likely to succeed on the merits of their appeal. (Doc. 92 at 2-6.) Respondents argue that the Court erred by rejecting the R&R's conclusion that Petitioner's *Anders* claim was procedurally defaulted because the Arizona Court of Appeals found all of Petitioner's claims, including his *Anders* claim, procedurally barred from review. (*Id.* at 2-3.) Respondents then argue that the Court also erred in determining that the Arizona Court of Appeals' reliance on *State v. Chavez*, 407 P.3d 85 (Ariz. App. 2017), was an unreasonable application of clearly established federal law because, according to Respondents, the Court of Appeals properly concluded that an independent, fundamental-error review by the trial court is not required in of-right post-conviction proceedings in order to meet the constitutional requirements of *Anders*. (*Id.* at 3.) Respondents contend that the Court's conclusion that the State's procedures were not equivalent to *Anders* procedures and were therefore constitutionally deficient was in error because it failed to defer to the Arizona Court of Appeals' reasonable application of federal law as required by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). (*Id.* at 4-5.) Respondents argue that because the Supreme Court has not held that an independent, fundamental error review is constitutionally required when reviewing a pleading defendant's of-right appeal, the Arizona Court of Appeals' *Chavez* decision cannot be found to be contrary to or an unreasonable application of clearly established federal law. (*Id.* at 5-6.) Respondents

maintain that there is no requirement that procedures for a pleading defendant like Sanchez be the same as those for a non-pleading defendant like the defendant in *Anders*. (*Id.* at 6.)

Next, Respondents argue that their interests in (1) the finality of convictions that have survived direct review in the state court system; (2) crime victims' entitlement to resolution of criminal cases without unreasonable delay; and (3) the resolution of a serious legal question with significant consequence would all be irreparably harmed by Petitioner's return to state court absent a stay pending resolution of Respondents' appeal. (Doc. 92 at 6-7.) Respondents further contend that the temporary postponement of Petitioner's filing of a new of-right post-conviction proceeding will not cause Petitioner significant hardship because his conviction and sentence remain undisturbed and he will therefore remain incarcerated until 2038 regardless. (*Id.*; Doc. 98.) Thus, Respondents contend that the balance of hardships tips in their favor. (*Id.*)

Lastly, Respondents argue that the public interest favors a stay. (*Id.* at 7.) Respondents contend that enforcing the Order during the pendency of appeal proceedings would harm the public interest, including the victim' interest, in the finality of criminal convictions. (*Id.*) Respondents further contend that the principles of comity and federalism that underlie AEDPA would be served by a stay. (*Id.* at 7-8.)

**\*3**  Respondents have not satisfied their burden of showing that the circumstances present here justify an exercise of the Court's discretion to grant the requested stay. The Court's Order permits Petitioner to file a new of-right Rule 33 PCR proceeding consistent with *Anders* and to have that brief and the record independently reviewed by the state court. (Doc. 41.) If the stay is granted, then Petitioner will remain incarcerated until both the appellate process and the state court review conclude. If, as Respondents contend, there is no appealable issue in Petitioner's criminal proceedings, then no harm will accrue to Respondents by permitting Petitioner to file a new *Anders* brief during the pendency of the appeal. If, however, Petitioner prevails on appeal and on review of his *Anders* brief, then he will have been harmed by his unlawfully prolonged incarceration. The Court finds that the hardship posed by the possibility of Petitioner's unlawfully prolonged incarceration outweighs any hardship Respondents may sustain by allowing Petitioner to file his *Anders* brief and have it reviewed by the state court while the appeal is ongoing.

Accordingly, the Court finds that the balance of hardships tips in Petitioner's favor.

The remaining factors do not shift the balance in favor of a stay. While Respondents have demonstrated "a substantial case on the merits" on appeal, *Hilton*, 481 U.S. at 778, they have not made a "strong showing" that they are likely to succeed on the merits. *Holder*, 556 U.S. at 433–34. Nor does the public interest justify granting a stay, as Petitioner will remain incarcerated unless and until the state court finds that his new *Anders* brief has merit. Considering the four factors for issuance of a stay, the Court finds that a stay is not warranted.

Accordingly,

**IT IS ORDERED** that Petitioner's Motion to Supplement Response (Doc. 99) is **granted**.

**IT IS FURTHER ORDERED** that the Motion to Stay Judgment (Doc. 92) is **denied**.

**All Citations**

Slip Copy, 2021 WL 2105610

Footnotes

1    The Court will grant Petitioner's Motion to Supplement Response. (Doc. 99.)

End of Document                                                          © 2021 Thomson Reuters. No claim to original U.S.
                                                                                     Government Works.

# EXHIBIT 6

2008 WL 11441997
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Frances ALDAY et al., Plaintiffs,

v.

RAYTHEON COMPANY, a
Delaware Corporation, Defendant,

CV 06-32 TUC DCB
|
Signed 10/01/2008
|
Filed 10/02/2008

**Attorneys and Law Firms**

Robert Miles Gregory, Gregory & Hadlock PC, Chandler,
AZ, for Plaintiffs.

Christopher Landau, Daniel A. Bress, James P. Gillespie,
Kirkland & Ellis LLP, Washington, DC, Ronald J. Stolkin,
Fennemore Craig PC, Phoenix, AZ, for Defendant.

**ORDER**

David C. Bury, United States District Judge

 *1  On August 5, 2008, the Court granted summary judgment
for Plaintiffs and entered Judgment in this class action law
suit. The Court ordered Defendant Raytheon to restore retiree
health care benefits to the levels that existed prior to July
1, 2004 and to compensate the class members for premiums
paid since July 1, 2004. The Court enjoined the Defendant
from eliminating or reducing retiree health care benefits for
the class members contrary to the Collective Bargaining
Agreements.

On August 19, 2008, Raytheon filed a Notice of Appeal,
and Plaintiffs have filed a cross appeal. The Court has
granted Defendant's Emergency Motion to Expedite the
Court's Approval of Supersedeas Bond under Rule 62(d) in
respect to the monetary award for Plaintiffs. The Court now
considers the merits of Defendant's request that the Court stay
enforcement of the Judgment in respect to the injunctive relief
ordered by the Court.

Standard of Review

Rule 62(c) of the Federal Rules of Civil Procedure allows
a district court to stay enforcement of a judgment while an
appeal is pending from a final judgment that grants, dissolves,
or denies an injunction. The Court may also suspend, modify,
restore, or grant an injunction on terms for bond or other terms
that secure the opposing party's rights.

A stay under Rule 62(c) is discretionary and should be based
on four factors: 1) whether the stay applicant has made a
strong showing that he is likely to succeed on the merits;
2) whether the applicant will be irreparably injured absent a
stay; 3) whether issuance of a stay will substantially injure
the other parties interested in the proceeding; and 4) where
the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770,
776 (1987); *accord Stormans, Inc. v. Selecky*, 526 F.3d 406,
408 (9th Cir. 2008); *Lopez v. Heckler*, 713 F.2d 1432 1435-36
(9th Cir. 1983). The analysis of the public's interest is not the
same as the assessment of the hardship to the parties. *Natural
Resources Defense Council v. Winter*, 502 F.3d 859, 863 (9th
Cir. 2007).

Where the second and fourth factors favor the applicant, a
stay may be warranted even if the applicant fails to establish
a strong likelihood of success on the merits if it makes a
substantial case on the merits. *Id.* (citing *Hilton v. Braunskill*,
481 U.S. 770, 778 (1987) ). In the Ninth Circuit, the courts
apply a sliding scale to test the relative harm to the parties so
that the required degree of irreparable harm increases as the
probability of success decreases. *Id.* at 862 (citing *Taylor v.
Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007) ).

Irreparable Injury

Raytheon argues that if it provides health care coverage for
the Plaintiffs and prevails on appeal, it will be "unable to
effectively and efficiently sue each of the numerous class
members to collect the unpaid premiums for coverage they
have already obtained." (Motion for Stay (Motion) at 3.)
Raytheon argues that given the class size, it is unreasonable
to make it sue each Plaintiff to recover the missed premiums
because the cost of prosecuting such litigation would exceed
the amounts at issue and, even if successful, there is no
guarantee the class members would have money to pay a
judgment. *Id.* 4-5.

**\*2** Unwillingness or inability to pay missed premiums is especially injurious to Raytheon because, under ERISA, it is questionable whether plan participants can be sued for unpaid premiums unless premiums are segregated into a separate trust over which the plan participants have control. *Id.* at 4 (citing *Sereboff v. Mid-Atlantic Medical Services Inc.*, 126 S. Ct. 1869 (2006); *Great-West Life & Annuity Insurance Co., v. Knudson*, 534 U.S. 204 (2002) ).

In both cases, plan fiduciaries sued plan beneficiaries for specific performance under plan reimbursement provisions to compel restitution of plan benefits after they recovered settlements from third-party tortfeasors.

In *Great-West Life*, the Court held that ERISA's equitable remedies did not authorize the suit because it was in essence an imposition of personal liability on a contract. The Court explained that not all restitution falls under the rubric of equity because it may be a legal remedy when ordered in a case at law. Generally, restitution lies in equity if the action seeks to restore to the plaintiff particular funds or property in the defendant's possession. *Great-West Life*, 534 U.S. at 212-214.

In *Sereboff*, the Court held that the plan fiduciary could proceed in equity under ERISA against the plan beneficiary because the settlement proceeds were placed in an escrow account pending resolution of the merits of the fiduciaries claim for restitution. *Id.* at 361-65.

Without discussing the applicability of these cases to restitution of premiums paid pursuant to a Court order, Raytheon simply concludes it stands to lose approximately $457,066.01, which is the estimated amount of premiums that will accrue during the pendency of the appeal. (Motion at 4-5 (citations omitted) ). Raytheon's injury is based on its assumption that every Plaintiff will refuse or be unable to pay the missed premiums should Raytheon prevail on appeal. This ignores payment of premiums by Plaintiffs since July 1, 2004, even though they believed they were entitled to health care coverage free of cost, because their health care benefits would have been forfeited otherwise. Plaintiffs will be similarly situated should Raytheon prevail on appeal. Plaintiffs argue that the possibility of their benefits being forfeited is a strong incentive for paying the missed premiums.

Raytheon argues that it will be irreparably harmed if the injunction is not stayed because the Court's injunction used ambiguous language "which arguably may cover conduct that was never at issue in this litigation." (Motion at 6.) Raytheon refers to the Court's directive to restore health care benefits to the levels that existed prior to July 1, 2004, and to not eliminate or reduce retiree health care benefits for the class members contrary to the CBA's. The Court is not clear why this language would extend to "conduct never at issue in this litigation," but in the event there is such a possibility this Court retains jurisdiction to amend or modify its injunctive relief to limit it by a stay as to any conduct not at issue in this litigation.

For clarification, the only question presented to this Court and addressed by this Court was Raytheon's decision to begin charging retirees part of the premium costs for health care coverage beginning in July 2004. The injunction is limited to Raytheon's reinstatement of no-cost premiums for the retirees' medical benefit plans, as existed before July 1, 2004, and compliance with corresponding CBA provisions. Accordingly, denying the stay may result in financial loss to Raytheon at the improbable highest estimate of $457,066.01.

**\*3** In the Ninth Circuit, when there is a conflict between financial concerns of a defendant and preventable human suffering by plaintiffs, the courts have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor. *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (citing *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ).

Raytheon argues that "[c]lass members are not being deprived of their health benefits. They are simply being asked to pay a portion of the cost of those benefits, pending appeal, just like other current and former employees of Raytheon." (Motion at 6.) Consequently, there is no irreparable injury to Plaintiffs if they "simply" continue to pay their premiums during the pendency of the appeal either directly or into an interest-bearing escrow account or registry of the Court. In the event Plaintiffs pay their premiums directly, Raytheon will tender a bond to cover the amount which will adequately protect the Plaintiffs.

Raytheon's argument ignores the Amended Complaint, which specifically challenges the requirement that class members pay a portion of the health care premiums as allegedly causing injury to Plaintiffs since 2004. Raytheon refuses to recognize that unless a Plaintiff is independently wealthy, he or she will necessarily have to redirect financial resources from other expenditures to pay the health care premium. The only alternative would be to go without health care coverage.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  2

Going without health care coverage is one possible injury caused by the premium requirement.

Granting a stay would be like denying the Plaintiffs' request for a preliminary injunction, which became moot when this Court granted summary judgment for Plaintiffs and entered the permanent injunction against Defendant. The Plaintiffs submitted affidavits from several class representatives attesting that they are suffering irreparable harm as a result of coverage costs ranging from $547 to $1,607 per month. (Motion for Preliminary Injunction at 20-21.) Here, there is no evidence that any Plaintiffs are independently wealthy. Instead, most of the retirees live on fixed incomes consisting of social security and pension distributions. *Id.* at 21.

Specifically, the Plaintiffs Argraves had to sell their dream home and purchase a double-wide manufactured home to cut expenses to account for an increase in their medical costs from $860 in 2003 to $27,701 in 2004; Mr. Argraves had to secure full time employment, and his wife worked part time cleaning houses until 2006 when her deteriorating health condition no longer allowed her to work; they do not go on vacations, travel or even occasionally go out for dinner or other entertainment due to the financial burden of their health care. The Argraves suffer from extreme stress, frustration, mood-swings, depression and anxiety as a direct result of Raytheon's premium charges. *Id.* Ex. 11: Argraves Affidavit.

Plaintiff Geuder had to drop his grandson from the Raytheon policy and his wife has continued to work instead of retiring. Both suffer from stress related to their health care situation. *Id.* Ex. 12: Geuders Affidavit.

Plaintiff L'Armee attests that she continued to work after retiring and refinanced her home twice to pay medical bills. She changed from a full coverage plan to a catastrophic plan, with a $2000 deductible and, consequently, did not see a doctor after July 2003 until she became Medicare eligible. She discontinued her Raytheon coverage in January 2007 because she could not afford it and became eligible for Medicare in March 2007. She describes the stress related to her health care as unbearable. *Id.* Ex. 13: L'Armee Affidavit.

 **\*4** Plaintiff Lillie describes how he and his wife, both retired, enjoyed visiting their grandchildren in California and Washington and relatives in Texas. Mr. Lillie describes outings with the Studebaker Drivers Club and playing golf. He attests that this all changed in July 2004, when Raytheon began charging premiums for their coverage. Due to the new

cost of their medical insurance they could no longer afford to make as many trips and they could not maintain and keep the Studebaker, much less pay for gas to travel. Weekly golf games dwindled away to no games in more than two years. The Lillie's dreams for retirement ended, and they have been extremely frustrated, stressed, and anxious regarding the following premium charges: 2004 ($309.11); 2005 ($414.85), and 2006 ($535.61). Mr. Lillie describes the premiums as 13% of his pension in 2004, 17% of his pension in 2005, and 21% of his pension in 2006. *Id.*, Ex. 14: Lillie Affidavit.

In response to Plaintiffs' requested preliminary injunction, Raytheon argued the Plaintiffs failed to demonstrate a significant threat of irreparable injury because the Plaintiffs all appeared to currently have medical coverage and were able to afford any required healthcare. (SurReply at 4.) Raytheon submitted that any health care coverage changes made by Plaintiffs from the HMO/EPA Plan to the Value Plan did not change their coverage because both provide the same medical coverage and only differ in cost structure: the Value Plan has a higher deductible, but lower monthly premiums than the HMO/EPO. This coincides with the precise reason given by Plaintiffs Argraves for their shift to the Value Plan, and accordingly supports rather than challenges the Plaintiffs assertions of injury.

Raytheon alleges that the Value Plan is the coverage option most widely elected by Raytheon's retirees under age 65, *id.* at 5, but fails to inform the Court as to whether this was the case prior to the advent of the premium charges. If not, this too would support Plaintiffs' assertions of injury. Raytheon complains that L'Armee is now covered by Medicare and thus ineligible for any Raytheon plan and so faces no risk of irreparable harm. Raytheon complains that the Geuders' grandson has suffered no harm because he is now being covered through a State public assistance program, and the Geuders can afford health coverage because they have savings totaling almost $500,000. Nevertheless, L'Armee and the Geuders are class representatives and there may be others like them who are not yet eligible for Medicare or not eligible for public assistance.

The Court feels compelled to respond to Raytheon's assertion that there is no injury to the Geuders because their grandson is eligible for and is receiving medical benefits under a state health care program. The Court does not agree with Raytheon that there is no harm to an individual from having to accept public assistance. Additionally, shifting corporate responsibility to the public coffers suggests the public's

Case 4:19-cv-00035-RM-LAB Document 243-2 Filed 10/05/21 Page 63 of 79

Alday v. Raytheon Company, Not Reported in Fed. Supp. (2008)

interest lies in denying the stay and enforcing the obligations this Court found exist under the CBAs.

Lastly, Raytheon argues there is no evidence of financial duress and the Court rejected Plaintiffs' claim for extracontractual damages under ERISA and LMRA. *Id.* at 5-7. Stress and anxiety do not need to be compensable under ERISA or LMRA for the Court to consider financial duress a harm to the Plaintiffs, and because it is not compensable it will most certainly be irreparable.

Raytheon calculates Plaintiffs' recovery as the amount of premiums paid by them to Raytheon. This does not account for out-of-pocket expenses Plaintiffs allege they have paid under some of the more sparse Raytheon benefit plans they allegedly selected due to the challenged premiums or if they ended Raytheon coverage and either paid or went without coverage. These damages too might be irreparable.[1]

[1]    Post appeal, on September 16, 2008, Plaintiffs filed a Motion for Declaratory Judgment seeking clarification of the scope of the Court's injunctive relief. Plaintiffs seek monetary reimbursement for retirees who could not afford Raytheon coverage or any coverage at all and who, therefore incurred the payment of premiums to other insurers and/or out of pocket health care costs. In other words, Plaintiffs ask the Court to order reimbursement for all retirees who incurred health care costs as a result of Raytheon's July 1, 2004 change in benefits. Given Plaintiffs' choice to proceed as a class with this action, certain damages may or may not be appropriate. The question of damages beyond the straightforward recovery of premiums paid by Plaintiffs to Raytheon has not been presented to the Court. Accordingly, the Court's August Order was limited in this regard. Given the pending appeal, the Court denies the Plaintiffs' Motion for Declaratory Judgment.

**\*5** Numerous courts have found reductions in retiree insurance coverage to constitute irreparable harm meriting a preliminary injunction. See eg., *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987) (retirees as a group have fewer resources and are more vulnerable to emotional distress due to the imposition of additional insurance costs); *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261 (Mich. 1990) (retirees live on fixed incomes so small increases in expenses create extreme financial hardship, and they are more likely to suffer uncertainty and worry over the new costs associated with a modified plan) *aff'd per curium* 948 F.2d 1290 (6th Cir.); *Golden v. Kelsey-Hayes Company*, 845 F. Supp. 410, 415 (Mich. 1994) (irreparable injury

results when retirees are forced to choose between paying for medical procedures and basic necessities). "Surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury.' " *United Steel Workers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3rd Cir. 1979).

In the Ninth Circuit, the denial of needed medical care is serious and a sufficient showing of irreparable harm for a preliminary injunction. In *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir. 1982), the court affirmed a preliminary injunction against enforcement of a California rule as a basis for denial of Medicaid benefits. In *Newton-Nations v. Rogers*, 316 F.Supp.2d 883, 888 (Ariz. 2004), the court enjoined implementation of a copayment for state Medicaid benefits. In both cases, the plaintiffs were by definition so poor that they could not otherwise afford any medical care and, therefore, it was reasonable to infer they faced irreparable harm. Here, the Court applies no such inference, but finds that the Plaintiffs have shown, with some specificity, that they are exposed to irreparable harm.

Through the affidavits of the Plaintiffs they have shown that the premium charges have caused, and if the stay is granted will continue to cause, particularized and irreparable harm. The severity of that harm varies depending on the individual and ranges from severe for Plaintiffs like L'Armee, who have foregone routine medical care to avoid deductibles or copayments, as compared to serious injury like that experienced by the Geuders, who were forced to seek public assistance for a family member, or the Lillies, who have foregone many pleasurable experiences they could have otherwise afforded. The Court finds that the Plaintiffs have shown they will suffer serious, and in some instances severe, hardship. In comparison, Raytheon shows no other hardship than its potential financial losses. The Court has little difficulty concluding that the balance of hardship tips decidedly in Plaintiffs' favor.

Likely Success on the Merits

Raytheon, respectfully, argues that the Court's decision contains errors of law that will likely require reversal. (Motion for Stay at 7.) Raytheon reurges the arguments made in its dispositive motion, which to some extent were also argued in its Motion to Dismiss.

First, under Raytheon's ERISA Plan the Plaintiffs have no vested right to free medical coverage because the Plan

authorized premium changes, and therefore the Plaintiffs were not entitled to "free" medical benefits under the Plan. Because ERISA only provides for recovery of benefits due under the Plan, the Court erred when it held that the benefits due Plaintiffs under the CBAs are the benefits due them under ERISA.

Second, the Court confused coverage with premiums. The CBAs did not require "free" medical coverage, therefore, Raytheon did not breach provisions of the CBAs because it provided, and continues to provide, medical coverage for its retirees. The statement that there would be no weekly premium charge was not contained in the same section of the CBA granting Plaintiffs coverage. The CBAs are subject to the Plan in every respect, including any benefit modifications or changes. CBA provisions ensuring that employees shall not suffer a loss of benefits did not apply to retired employees.

**\*6** The Court rejected all of these arguments.

First, the Court held that the "no-cost" premiums were a vested entitlement, and were consequently not subject to the Plan provisions relied on by the Defendant. In other words, the Plan did not, because it could not, authorize Raytheon to begin charging the premiums at issue in this case.

Second, the Court ruled that Plaintiffs' right to "free" benefit coverage was vested based on express language in the CBAs. The Court found no ambiguity in the CBA terms and provisions granting health care benefits at "no cost" to employees retiring under them. The Court rejected Raytheon's attempt to create post-hoc ambiguities. The Court also rejected Raytheon's application of the law. The benefits being granted in the CBAs were retirement benefits for active employees as distinguishable from CBA provisions that are negotiated to benefit retirees. The Court also rejected Raytheon's attempt to preempt Plaintiff's rights under the LMRA with ERISA case law.

This was not a close case. Contrary to Raytheon's assertion, the CBAs were not subject to the Plan "in every respect" because an ERISA Plan is by law always subject to rights granted employees under a collective bargaining agreement. *See* (Order, filed 8/5/2008, at 5 (citations omitted) ). Raytheon could not terminate the collective bargained for right to health care benefits at no cost by modifying its welfare benefit plan. The Court finds that Defendant is not likely to prevail on appeal.

Since ruling in this case, the Ninth Circuit Court of Appeals issued an opinion in *Poore v. Simpson Paper Co.,* 2008 WL 4291174 (September 22, 2008), an action filed by early retiree plan participants against a former employer alleging breach of duty under ERISA and breach of contract under LMRA due to the employer's termination of health care benefits. The district court ruled for the employer, and the retirees appealed. While no party challenged the jurisdiction of the court, the appellate court was obligated to raise it independently to ensure its existence. *Id.* at \*2 (citing *Hernandez v. Campbell,* 2004 F.3d 861, 865 (9th Cir. 2000) (per curiam) ). The appellate court held that the plan participants lacked standing to bring the action under ERISA and the district court lacked subject matter jurisdiction over the LMRA claim.

The court explained that to have standing to sue under ERISA, the early retirees must show they are plan participants, which is defined as "any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan...." *Id.* (quoting 29 U.S.C. § 10002(7) ). The Supreme Court has clarified that former employees satisfy this definition if they have " 'a reasonable expectation of returning to covered employment; or ... 'a colorable claim' to vested benefits." *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117 (1989) ) (quoting *Kuntz v. Reese,* 785 F.2d 1410, 1411 (9th Cir. 1986) ).

Like this Court, the court in *Poore* recognized that ERISA does not require welfare benefits, including health benefits, to actually vest. Instead, such benefits are vested only as a matter of private contract. Vesting welfare benefits is an "extra-ERISA commitment," which therefore must be stated in clear and express language. *Id.* at \* 2-3 (citations omitted). ERISA equates "vested" with "nonforfeitable," which is a right that is legally enforceable against the plan. *Id.* (citing 29 U.S.C. § 1002(19) ). This Court held that Plaintiffs' entitlement to medical coverage, without paying a premium, was a vested right under the CBAs and, therefore, is legally enforceable against the plan. Plaintiffs have standing to proceed under ERISA.

**\*7** In *Poore,* the CBA incorporated the plan document, which contained an express reservation of "the right to alter, amend, delete, cancel or otherwise change welfare ... plan benefits at any time, subject to negotiation with the Union." The plan also contained a specific duration for the benefits, which was "until the retiree became eligible for Medicare, attained age 65, or until ... death, whichever occurs first." *Id.*

at *1. The court noted that in some instances a durational provision indicates vesting, but explained that the presence of a reservation of rights clause fundamentally alters the interpretation of durational language because both must be read together. This creates a tension that is best relieved by finding the benefits are not vested for the stated duration but the entitlement is subject to change at the employer's will. *Id.* at *3.

Consequently, the court held the plan did not create vested benefits and the retirees did not have standing to proceed under ERISA. *Id.* at *4. For the same reason, the court held the retirees' rights did not vest under the CBAs and the court lacked subject matter jurisdiction over the LMRA claim. *Id.* at 4.

The distinctions between this case and *Poore* are important. In this case the Court found vested the right to medical coverage at "no cost" are contained in the CBAs not the Plan documents. The reservation of right provision relied on by Raytheon is in its Plan documents and not in the CBAs. Raytheon is correct that the CBAs contain an incorporation clause, which provides: "All benefits of employees, retired employees, laid off employees and insured dependents are subject in every respect to the terms of the applicable Plan documents under which payment is claimed." This incorporation provision is found in subsection J of the 1990 CBA, which contains six paragraphs. In pertinent part, subsection J includes paragraphs one through five, as follows:

The first paragraph provides that the employer agrees to pay the premiums for the Comprehensive Medical Plan for eligible employees. The second paragraph provides that the employer agrees to pay the premiums for the Comprehensive Medical Plan for eligible dependents. The third paragraph provides that employees may elect between different levels of benefit coverage, such as employee only, employee and spouse, employee and children, etc., The fourth paragraph provides that nothing herein shall change any provisions of the Group Benefit Plans[2] provided under Article XIII as currently in effect, other than those changes specifically referred to herein. Paragraph five provides that all benefits of employees, retired employees, ... are subject in every respect to the terms of the applicable plan documents. In context, the fifth paragraph incorporates into the CBA the specific medical benefits to be provided by the respective Group Benefit Plans; it does not reach the coverage provisions[3] in the CBAs which provide that the medical benefits provided by the plans will be at no cost. See (Order, August 5, 2008 at 16 (citing Article

XIII, section A) ). In other words, paragraph five subjects the medical benefits, being provided at no cost, "in every respect to the terms of the applicable plan documents." This case is distinguishable from *Poore* because under the CBAs at issue, here, the right to "no cost" coverage was vested. The Court has subject matter jurisdiction over Plaintiffs' LMRA claim.

[2]  The Group Benefit Plans included the Comprehensive Medical Plan and alternative Group Medical Plans, such as Partners Plan, Intergroup Plan and CIGNA Plan. (See Article XIII: Group Benefits, Section A.)

[3]  This Court was not persuaded by expert testimony regarding the insurance industry's meaning of the term "coverage" to not include the charges, costs or premiums paid for such coverage. The CBAs are not health care plans or insurance documents.

Public Interest

 **\*8**  Raytheon asserts there is a public interest in creating greater parity between this group of retirees and other Raytheon employees and retirees who pay a portion or all of the cost of retiree medical coverage. (Motion for Stay at 15.) The Court is not persuaded that there is any public interest in this goal which seems only to serve the interests of Raytheon.

Raytheon also argues that the public interest is served by ERISA's careful balancing of the benefits and burdens of benefit programs to encourage the formation of employee benefit plans by employers. ERISA is " 'an enormously complex and detailed statute that resolve[s] innumerable disputes between powerful competing interests – not all in favor of potential plaintiffs.' " *Id.* (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ). Raytheon argues that an adverse ruling, disallowing the premium change, will deter employers from offering retiree benefits in the first place. Raytheon ignores the part of ERISA's carefully crafted structure that protects contractually defined benefits, including those granted under collective bargaining agreements.

The Court finds that there is a strong public interest favoring the enforcement of collective bargaining agreements to protect the legitimate expectations of retirees in their health insurance as agreed to in CBAs negotiated when they were active employees. *Golden v. Kelsey-Hayes*, 845 F. Supp. 410, 416 (Mich. 1994) (citing *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1268 (Mich. 1990) ). The LMRA establishes a process of negotiation between employers on one side and employees, as represented by their unions, on the other side, which only

Alday v. Raytheon Company, Not Reported in Fed. Supp. (2008)

Case 4:19-cv-00035-RM-LAB   Document 243-2   Filed 10/05/21   Page 66 of 79

works if promises are kept. (Order filed August 5, 2008 at 8 (citations omitted) ).

The public's interest is distinct from the harm to the Plaintiffs caused by delaying reinstatement of "free" health care coverage and the harm to the Defendant if it prevails on appeal and is unable to recover premiums it paid on behalf of the Plaintiffs. The public's interest lies in denying the stay.

**Accordingly,**

**IT IS ORDERED** that the Defendant's Motion to Stay Enforcement of Judgment (document 129) is DENIED.

**IT IS FURTHER ORDERED** that the Plaintiffs' Motion for Declaratory Judgment (document 142) is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11441997

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

Case 4:19-cv-00035-RM-LAB Document 243-2 Filed 10/05/21 Page 68 of 79

One Unnamed Deputy District Attorney v. County of Los Angeles, Not Reported in Fed....

2010 WL 11463169
Only the Westlaw citation is currently available.
United States District Court, C.D.
California, Western Division.

ONE UNNAMED DEPUTY DISTRICT
ATTORNEY, et al., Plaintiffs,

v.

COUNTY OF LOS ANGELES,
et al., Defendants.

CASE NO. CV 09-7931 ODW (SSx)
|
Signed 03/02/2010

**Attorneys and Law Firms**

Matthew Gerald Monforton, Monforton Law Offices PLLC, Bozeman, MT, Robert J. Frank, Robert J. Frank and Associates LLC, Lewisburg, WV, Bradley C. Gage, Milad Sadr, Law Offices of Goldberg and Gage, Marla Anne Brown, Gregory W. Smith Law Offices, Woodland Hills, CA, for Plaintiffs.

Steven J. Ipsen, Los Angeles, CA, pro se.

Brian D. Hershman, Elwood G. Lui, John S. Sasaki, Jones Day, John K. Ly, Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP, Los Angeles, CA, Brian M. Hoffstadt, Jones Day, Irvine, CA, for Defendants.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

OTIS D. WRIGHT II, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTORY BACKGROUND

**\*1** The Association of Deputy District Attorneys ("ADDA") is an employee organization formed through procedures established by Los Angeles County's Employee Relations Ordinance. (Compl. ¶ 8; Answer ¶ 8.) Along with an unnamed deputy district attorney, the ADDA brings this action to protect Plaintiffs' "First Amendment rights of speech and association to engage in union-related activities without being subjected to Defendants' policy of discrimination and intimidation." (Compl. ¶ 5.) Among other things, Plaintiffs allege that Defendants punitively transferred several deputy

district attorneys associated with ADDA, demoted them, awarded them undeserved, mediocre performance reviews and otherwise discriminated against them.

The ADDA's certification as a union began with employees returning union cards indicating their desire to unionize. (Mot. at 2.) "When ADDA supporters were collecting union cards in early 2008, ADDA Board Member Frank Tavelman asked Assistant District Attorney Jacquelyn Lacey, one of the top officials in the DA's Office, to issue a memorandum to all prosecutors stating the DA's office would be neutral regarding union organization and would refrain from retaliating against any prosecutor for exercising his or her right to join ADDA." (Id.) (citing Tavelman Decl., Exh. 1 ¶ 3). Lacey informed Tavelman that Defendants would not comply with this request. (Exh. 1 ¶ 4.) Despite the lack of any promise by the DA's office to remain neutral, enough prosecutors returned union cards to the Los Angeles County Employee Relations Commission ("ERCOM") to certify ADDA as a county employees union on March 24, 2008. (Id.) (citing Compl. ¶¶ 8, 16; Answer, ¶¶ 8, 16). ADDA is now the representative of Bargaining Unit 801, which consists of approximately 1000 deputy district attorneys in Grades I through IV. (Id.) (citing Exh. 2 ¶ 17).

"On October 17, 2008, District Attorney Steve Cooley ["Cooley"] met with Robert Dver, a prosecutor with 24 years of experience in the DA's Office." (Id.) During that meeting, Cooley told Dver that ADDA President Steve Ipsen was a "crook," and that the prosecutors who signed union cards leading to ADDA's certification were "contaminated." (Id.) Plaintiffs also allege, and Defendants do not dispute that Cooley instructed Dver to "undermine" the ADDA. (Id. at 2-3.) After Dver refused to follow Cooley's directions, "Cooley transferred Dver and stripped him of his supervisory tasks." (Id. at 3) (citing Exhibit 3, pp. 23-24). One of Cooley's top officials, Assistant District Attorney Jacquelyn Lacey, corroborated Dver's testimony, admitted to warning Dver not to join ADDA's contract negotiating team and not to even discuss ADDA matters with Cooley, as it would negatively impact his career. (Id.) (citing Exh. 4.) Lacey also provided that being associated with ADDA would "definitely" hurt Dver's career. (Id.)

Defendants also subjected other ADDA Board Members to forced transfers and other forms of retaliation for their union activities. Steve Ipsen, the president of ADDA, who had consistently received "Outstanding" performance evaluations during his twenty-year career, was suspended without pay for

Case 4:19-cv-00035-RM-LAB Document 243-2 Filed 10/05/21 Page 69 of 79

One Unnamed Deputy District Attorney v. County of Los Angeles, Not Reported in Fed....

two days following a meeting with an Inglewood supervisor concerning mistreatment of a deputy district attorney, whose contested demotion was rescinded by Defendants due to an unfair performance evaluation. (Mot. at 4) (citations omitted.) Ipsen was then transferred to Compton and, after he elicited damaging testimony from Lacey during an ERCOM hearing, he was issued a rating of "Needs Improvement" on his performance evaluation. (Mot at 4) (citing Exh. 2 ¶ 29.) "This rating was based substantially on the Inglewood supervisor's allegations relating to Ipsen's intervention in December 2008 on behalf of the young prosecutor that the Inglewood supervisor had falsely maligned." (Id) (citing Exh. 2 ¶ 29.) "None of the other 1000 deputy district attorneys received such a rebuke during 2009." (Id.)

**\*2** ADDA's Vice President Marc Debbaudt has been a prosecutor in the DA's office for over 20 years and, until ADDA's certification in 2008, all of his performance evaluations had been "Outstanding." (Mot at 5) (citing Exh. 5 ¶ 4.) His supervisor described him as the "best calendar deputy I have ever seen in the office." (Id.) (citations omitted). "In September 2008 Defendants transferred Debbaudt for his role in drafting an ERCOM complaint as well as for other acts taken in his capacity as an ADDA member." (Id. at 6.) Lacey admitted that Defendants first decided to transfer Debbaudt to an entry-level position in the Eastlake Juvenile Court, but later revised their plan and transferred Debbaudt to an entry-level assignment in Pomona Juvenile Court, which required a much longer commute. (Id) (citations omitted). Lacey explained that Cooley himself ordered Debbaudt's transfer and that such orders were "infrequent." (Id.) ("In fact, Grade IV deputy district attorneys such as Debbaudt are never transferred to entry-level juvenile assignments."). Debbaudt was transferred to yet another entry-level assignment and, for the first time, his evaluations dropped below "Outstanding." (Id.)

Hyatt Seligman is another ADDA Board Member with over 30 years of experience in the DA's office. (Id.) (citing Seligman Decl. Exh. 6 ¶ 2.) He has received glowing evaluations throughout his career and is one of the state's foremost experts on the use of mental defenses in criminal prosecutions. (Id.) (citations omitted). Two days after questioning defendants about "punitive transfers of prosecutors" during a bargaining session between ADDA and Defendants, Seligman was transferred to the Long Beach Courthouse. (Id. at 7.) "Defendants' transfers of Seligman and Dver from the Training Division [ ] ensured that no active ADDA members remain in the Training Division." (Id.)

(citing Exh. 6 ¶ 22). Seligman's supervisor at the Training Division from which he was transferred was upset at the move and his new supervisor in Long Beach did not need him or have any office space for him, but attempted to somehow accommodate him. (Id.) After his transfer to Long Beach, Seligman received a rating of "Met Expectations" from his supervisor, which was two levels below the "Outstanding" ratings Seligman had previously received throughout his career. (Id) (citations omitted). "When Seligman asked [his supervisor] about the [evaluation], [the supervisor] explained that a 'Met Expectations' rating was the highest rating he was allowed to give to Seligman and, if he had given a higher rating, Defendants would have 'kicked it back' [to the supervisor] and made him revise it." (Id. at 7-8) (citations omitted).

ADDA commenced contract negotiations with Defendants in December 2008 for its first collective bargaining agreement, but filed "an unfair labor practices charge with ERCOM on May 13, 2009" after it became clear that Defendants' negotiators had only authority to prolong negotiations. (Id. at 8) (citations omitted). In September 2009, Defendants informed all County employees of a substantial increase in monthly fees for the County's health benefit plans for 2010, but explained in October 2009 that they were reducing those costs. (Id. at 8-9) (citations omitted). "The October 2009 notice also contained a paragraph notifying ADDA members that they were *excluded* from the County's reduced rate structure." (Id.) (citation omitted) (emphasis in original).

Defendants admit that the "difference in treatment is between all the employees in the ADDA bargaining unit versus County employees who are not represented by a union." (Opp'n at 6.) They contend, however, without citation to authority, that certain "statutes and rules regarding labor negotiations require the County not" to alter an employee's benefits based on whether that employee is represented by a union. (Id. at 2.) Defendants' argument, and Plaintiffs' other allegations, shall be further discussed below as necessary.

## II. DISCUSSION

### A. Legal Standard: Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)

Case 4:19-cv-00035-RM-LAB Document 243-2 Filed 10/05/21 Page 70 of 79

One Unnamed Deputy District Attorney v. County of Los Angeles, Not Reported in Fed....

(quoting *Winter v. Natural Res. Def. Council, ___ U.S. ____,* 129 S. Ct. 365, 374 (2008)). While Plaintiffs bear the burden of establishing their entitlement to the requested relief, the "court may [ ] consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier,* 572 F.3d 1067, 1083 (9th Cir. 2009) (citing *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc)); *see also Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir. 1984) ("The district court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

B. Plaintiffs' Motion for Preliminary Injunction

**\*3** Plaintiffs seek a preliminary injunction prohibiting Defendants from discriminating or otherwise taking adverse employment actions against deputy district attorneys based upon their union status. Plaintiffs' request is premised on Defendants' alleged violations of their First Amendment rights and their rights to equal protection under the Fourteenth Amendment. Establishing a likelihood of success as to either claim is sufficient to satisfy Plaintiffs' burden under the first prong of the preliminary injunction inquiry.

*Likelihood of Success*

The supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees,* 468 U.S. 609, 622 (1984). Such "protected First Amendment rights flow to unions...." *Allee v. Medrano,* 416 U.S. 802, 820 n.13 (1974). "If, as alleged by the union in its complaint, its members were subject to unlawful [actions] and intimidation for engaging in union organizational activity protected by the First Amendment, the union's capacity to communicate is unlawfully impeded, since the union can act only through its members." *Id.* As Plaintiffs point out, moreover, the "threat of sanctions may deter [the exercise of] First Amendment freedoms] almost as potently as the actual application of sanctions." (Mot. at 12) (quoting *N.A.A.C.P. v. Button,* 371 U.S. 315, 433 (1963)). Government actions may unconstitutionally infringe upon this associational freedom through various forms. "Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group." *Roberts,* 468 U.S. at 622-23.

Here, Plaintiffs have alleged several violations of their First Amendment rights, which are largely undisputed by Defendants. Defendants do not deny, for example, that Cooley instructed Robert Dver to "undermine" or otherwise interfere with the union. Nor do they dispute that Cooley demoted Dver when he refused to do so. Similarly undisputed is Lacey's admission that being associated with ADDA would "definitely" hurt one's career so far as Cooley was concerned. Such actions unquestionably interfere with the union's function and chill the free exercise of Plaintiffs' First Amendment rights. *See, e.g., Coszalter v. City of Salem,* 320 F.3d 968, 974-75 (9th Cir. 2003) ("The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights.") (citation omitted).

Nevertheless, Plaintiffs have established a course of explicit retaliation by Defendants that is both striking and rampant. The habitual transfers of ADDA organizers cannot be excused, as Defendants contend, by reliance on John K. Spillane's declaration that the transfers fall "within the written policy of the District Attorney's office, and that none of them were done for the purpose of retaliating for union activity." (Opp'n at 8.) Even a proper procedure, after all, can be employed to accomplish an improper purpose. The extent, timing and impact of such transfers evince such a purpose in this case.

Steve Ipsen, the president of ADDA, was transferred to the Inglewood Courthouse shortly after he investigated a complaint by a Lancaster deputy district attorney who was unfairly treated "for seeking to disclose exculpatory evidence to a defense attorney as required under *Brady v. Maryland,* 373 U.S. 83 (1963)." (Mot. at 4) (citation omitted). And, after Ipsen helped achieve the rescission of a deputy's questionable demotion at his new location, he was transferred again, this time to the Compton Courthouse. (Id.)

**\*4** ADDA's Vice President Marc Debbaudt was "transferred [ ] for his role in drafting an ERCOM complaint as well as for other acts taken in his capacity as an ADDA member." (Mot. at 6.) As Lacey admitted, Defendants first decided to transfer Debbaudt to an entry-level position in the Eastlake Juvenile Court, but later revised their plan and transferred him to an entry-level assignment in Pomona Juvenile Court, which required a much longer commute. (Id.) (citations omitted).

Case 4:19-cv-00035-RM-LAB Document 243-2 Filed 10/05/21 Page 71 of 79

One Unnamed Deputy District Attorney v. County of Los Angeles, Not Reported in Fed....

According to Lacey, Cooley himself ordered Debbaudt's transfer, noting that such orders were "infrequent." (Id.)

ADDA Board Member Hyatt Seligman was transferred two days after questioning Defendants about "punitive transfers of prosecutors" during a bargaining session between ADDA and Defendants. (Id. at 7.) Robert Dver was warned by Lacey that being associated with ADDA would "definitely" hurt his career, and was later transferred after he refused Cooley's instruction to undermine ADDA. "Defendants' transfers of Seligman and Dver from the Training Division [ ] ensured that no active ADDA members remain[ed] in the Training Division." (Mot. at 7) (citing Exh. 6 ¶ 22).

While the foregoing is but a sample of Defendants' actionable conduct, (*see* mot. at 2-10), it sufficiently establishes that Defendants have not only made it difficult for ADDA to carry out its objectives, but have also deterred prospective members from joining the union. "Indeed, several prosecutors have already said as much to ADDA Board Members." (Reply at 2) (citing Exh. 2 ¶ 37).

Defendants argue these actions are not actionable because there was no reduction in the transferred individuals' pay. (Opp'n at 8-10.) As Plaintiffs point out, however, this argument misstates the law. (Reply at 3.) When based upon a retaliatory motive, as Defendants' actions were, "a transfer to another job of the same pay and status may constitute an adverse employment action." *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000). And, the sole case cited by the Defendants, *Benach v. County of Los Angeles*, 149 Cal.App.4th 836, 57 Cal.Rptr.3d 363 (2007), "is not on point because the plaintiff in that action offered no evidence [ ] showing his transfer was based upon improper motives." (Reply at 3.) In any event, it cannot be said that the transfers were for a job of similar status where the transferees were either stripped of their supervisory duties or otherwise demoted.

This brings us to the disparity in health care costs between unionized employees and others. First, the fact that two other bargaining units face the same disparity as ADDA does not somehow establish that the practice is proper, as Defendants suggest. As stated above, secondly, Defendants *concede* that the "difference in treatment is between all [ ] employees in the ADDA bargaining unit versus County employees who are not represented by a union." (Opp'n at 6.) Defendants contend, however, that this disparity is compelled by certain "statutes and rules regarding labor negotiations." (Id.

at 2.) Yet the statutes and ordinances offered by Defendants do not support this contention, and their legal authority, *Oakland Unified School Dist. v. Public Employment Relations Bd.*, 120 Cal. App. 3d 1007 (1981), is inapplicable. Absent such a valid and compelling directive, this Court finds that such a disparity likely infringes upon Plaintiffs' associational freedom by seeking "to impose penalties or withhold benefits from individuals because of their membership in a disfavored group." *Roberts*, 468 U.S. at 622-23.

Indeed, contrary to Defendants' unsubstantiated assertions, the California Legislature enacted a statute specifically *prohibiting* Los Angeles County from "discriminat[ing] against employees by removing or disqualifying them from a health benefit plan, or otherwise restricting their ability to participate in a health benefit plan, on the basis that the employees have selected or supported a recognized employee organization." (Reply at 8) (quoting Cal. Govt. Code § 3504.5(c)).

**\*5** In sum, the Court finds that Plaintiffs' largely undisputed allegations sufficiently establish their likelihood of success on their constitutional claims.

*Irreparable Harm*

"Unlike monetary injuries, constitutional violations [including the disparity in health care costs] cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. National Aeronautics and Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) (citation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Even aside from the constitutional nature of Defendants' violations, Plaintiffs have established a high likelihood of irreparable harm. Defendants' far-reaching actions have pushed the union to the brink and, as Plaintiffs point out, "ADDA's ability to recruit new members, and retain current ones, has been severely strained by the pressures from Defendants' harassment and intimidation." (Mot. at 21.) Indeed, given the fear instilled by Defendants, and the union hesitancy and defections resulting therefrom, it is very likely that ADDA will not even exist by the time this action concludes. (*See* Mot. at 21-22) ("Not surprisingly, Defendants[ ] ... have reduced ADDA's membership and

Case 4:19-cv-00035-RM-LAB Document 243-2 Filed 10/05/21 Page 72 of 79

One Unnamed Deputy District Attorney v. County of Los Angeles, Not Reported in Fed....

chilled the enthusiasm of many of its remaining members. Several non-ADDA members ... have told ADDA Board Members that they support ADDA's efforts and would be interested in joining the union but will not do so because of fear of retaliation by Defendants.") (citation omitted). Plaintiffs thus clearly satisfy this prong of the preliminary injunction inquiry.

*Balance of Equities and Public Interest*

The balance of equities tips sharply in favor of Plaintiffs, who face an onslaught of retaliation and constitutional violations. Plaintiffs seek merely to exercise their First Amendment rights and perform their duties without harm or consternation. On the other side of the balance, Defendants cannot seriously suffer any harm if they are preliminarily enjoined from engaging in their questionable conduct; they need merely obey the law.

An injunction in this case also serves the public interest by protecting the constitutional principles underlying this very society. This is especially true where, as here, those officials entrusted with upholding those values could likely be found to have abrogated their duty. The public surely has a vested interest not only in abating such violations but also in ensuring that those responsible cease their abuse. (*See also* Mot. at 24) ("it is always in the public interest to protect First Amendment liberties") (quoting *Joelner v. Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

Before concluding, it bears emphasizing that, while the foregoing sufficiently establishes Plaintiffs' entitlement to a preliminary injunction, Defendants' abuses far exceed the specific examples illustrated above. (*See* Mot. at 2-10.) Plaintiffs' allegations are mostly undisputed, moreover, and Defendants offer no persuasive reason why Plaintiffs' arguments should not be sustained. Plaintiffs do offer some hearsay evidence in support of their motion but, as mentioned above, such evidence is acceptable at this juncture. And, to the extent Defendants object to the authentication of certain exhibits, such deficiencies are remedied by Plaintiffs' Reply documents. (*See* Reply at 2 n.2.)

**\*6** Finally, the Court disagrees with Defendants' assertion that Plaintiffs' "proposed order regarding transfers is unworkably vague." (Opp'n at 12.) While the injunction only prohibits transfers made with an improper purpose, it would not be "virtually impossible to comply with." (Id.) The timing

and nature of the transfers is quite telling, and this Court will carefully consider all relevant evidence should contempt proceedings ensue. Such a premature concern is simply no reason to deny the requested relief.

## III. CONCLUSION and ORDER

Plaintiffs are likely to succeed on the merits of their claims, they will likely suffer irreparable harm absent injunctive relief, the balance of equities tips greatly in Plaintiffs' favor and an injunction is in the public interest. Plaintiffs' motion for a preliminary injunction is therefore GRANTED.[1]

[1]     As discussed above, Defendants' evidentiary objections are overruled to the extent pertinent to the Court's decision. Defendants' timely objections to Plaintiffs' proposed order are also overruled, but Defendants' newly filed objections are disregarded as improper. (*See* Docket No. 36.) All other objections to the scope of the injunction are rejected, as the injunction aims to quell all discrimination and retaliation against ADDA members. As to transfers, should contempt proceedings ensue, the Court will carefully review the parties' respective arguments in light of the nature and timing of the transfers, in conjunction with the identity and activities of the persons transferred. (*See* Opp'n at 12.) Defendants' concern that Plaintiffs will challenge every transfer is thus of no moment.

**IT IS HEREBY ORDERED** that Defendants, their officers, agents, servants, employees, or persons in active concert with any of them, are restrained and enjoined from discriminating or retaliating against members of the Association of Deputy District Attorneys on the basis of their membership in ADDA. This Order includes, but is not limited to, a prohibition of punitive transfers, demotions, discriminatory distribution of benefits and discipline on the basis of membership in the ADDA. Defendants are also enjoined and restrained from utilizing rates for medical or health benefit plans that are based upon a deputy district attorney's representation by ADDA.

This Order shall remain in full force and effect until such time as a final judgment has issued in this matter or until further order of this Court.

**IT IS SO ORDERED**.

DATED: March 2, 2010.

One Unnamed Deputy District Attorney v. County of Los Angeles, Not Reported in Fed....

Case 4:19-cv-00035-RM-LAB   Document 243-2   Filed 10/05/21   Page 73 of 79

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11463169

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

2009 WL 2515618
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. Arizona.

Manuel De Jesus Ortega
MELENDRES, et al., Plaintiffs,
v.
MARICOPA COUNTY, et al., Defendants.

No. 07–CV–02513–PHX–GMS.
|
Aug. 13, 2009.

**Attorneys and Law Firms**

David Jeremy Bodney, Peter Shawn Kozinets, Aaron James Lockwood, Isaac Pasaret Hernandez, Steptoe & Johnson LLP, Daniel Joseph Pochoda, Immigrants Rights Project, Phoenix, AZ, Nancy Anne Ramirez, Maldef, Los Angeles, CA, Cecillia D. Wang, Robin Lisa Goldfaden, Immigrants Rights Project, San Francisco, CA, for Plaintiffs.

Charitie L. Hartsig, John Michael Fry, Michael D. Moberly, Thomas George Stack, Ryley Carlock & Applewhite PA, Lawrence Drew Metcalf, Schmitt Schneck Smyth & Herrod PC, Phoenix, AZ, Jeyon Jung, US Dept of Justice, Washington, DC, for Defendants.

**ORDER**

G. MURRAY SNOW, District Judge.

*1 Pending before the Court is the Motion to Stay Proceedings of Defendant Maricopa County ("the County") (Dkt.# 105); the Responses in Opposition filed by Plaintiffs (Dkt.# 114) and Defendants Joseph M. Arpaio, Sheriff of Maricopa County, and the Maricopa County Sheriff's Office ("MCSO") (Dkt.# 115); the County's Reply (Dkt.# 122); and the Amicus Curiae Brief of the United States, which argues that a stay is not necessary (Dkt.# 113–1). The Court has also received the Motion for Leave to File a Supplemental Brief of Sheriff Arpaio and the MCSO. (Dkt.# 134.) For the following reasons, the Court denies the motion to file a supplemental brief and denies the motion to stay.[1]

[1]  Plaintiffs, Arpaio, and the MCSO have requested oral argument. Those requests are denied because the parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.,* 933 F.2d 724, 729 (9th Cir.1991).

**BACKGROUND**

The factual and procedural history of this case has been spelled out at length in previous orders (*see, e.g.,* Dkt. # 60), and it will not be recapitulated here. Plaintiffs have sued Defendants Arpaio, the MCSO, and the County for alleged violations of their federal and state constitutional and statutory rights. (Dkt.# 26.) Plaintiffs are Hispanic citizens of either the United States or Mexico, each of whom has been stopped and detained at some point by MCSO officers, and Somos America, an immigrant advocacy group. Plaintiffs seek both a declaration that Defendants have engaged in discriminatory and illegal practices and an injunction preventing Defendants from engaging in such practices in the future.[2]

[2]  The named Plaintiffs seek this relief on behalf of themselves and others who are similarly situated. A motion for class certification is currently pending before the Court. (Dkt.# 93.)

**DISCUSSION**

One of the motions pending when this case was reassigned (*see* Dkt.63, 138, 144) was the County's request that this matter be stayed pending resolution of an investigation of the MCSO and Sheriff Arpaio by the United States Department of Justice ("DOJ"). (Dkt.# 105.) After briefing on this motion was completed, Defendants Arpaio and the MCSO requested leave to file a supplemental brief on the matter. (Dkt.# 134.) The Court will address these motions in turn.

**I. Motion for Stay**

The County argues that the Court should stay this matter for reasons of convenience to itself and to other parties. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254, 57

S.Ct. 163, 81 L.Ed. 153 (1936). In deciding whether to stay a case, the Court should generally consider five factors:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; an(5) the interest of the public in the pending civil and criminal litigation.

*Keating v. Office of Thrift Supervision,* 45 F.3d 322, 325 (9th Cir.1995). Upon consideration of these factors as they apply to this case, the Court concludes that a stay is not appropriate.

### (1) The Non–Moving Parties' Interests in Proceeding Expeditiously

**\*2** Plaintiffs argue that their interest in proceeding expeditiously with this litigation will be greatly compromised if the Court grants a stay. (Dkt. # 114.) Defendants Arpaio and the MCSO likewise argue that they would be burdened by a stay because it would delay their ability to clear themselves of Plaintiffs' claims. (Dkt.# 115.) Both are correct. Plaintiffs have a strong interest in resolving their claims expeditiously and in vindicating any constitutional or statutory violations to which they may have been subjected. *See Harris v. United States,* 933 F.Supp. 972, 976 (D.Idaho 1995) (recognizing the importance of "the Plaintiff's interest in an expeditious resolution of his civil dispute"); *Klaver Constr. Co., Inc. v. Kan. Dep't of Transp.,* No. 99–2510, 2001 WL 1000679, at \*2–3 (D.Kan. Aug.23, 2001) (recognizing a "plaintiff's interest in seeking vindication for alleged constitutional violations" and denying a request for a stay). Defendants have an equally strong interest in expeditiously clearing themselves of serious allegations of illegal activity. *See Kemin Foods v. Pigmentos Vegetales,* 384 F.Supp.2d 1334, 1343 (S.D.Iowa 2005) (explaining that "serious allegations" can prejudice a party, that "[i]t is reasonable that [a party] seeks to clear up these allegations as soon as possible," and finding that this consideration weighed against granting a stay). Moreover, the fact that Plaintiffs here seek injunctive relief against ongoing and future harm further counsels against a stay. *See Lockyer v. Mirant Corp.,* 398 F.3d 1098, 1112 (9th Cir.2005) (finding that a stay was not warranted where, "[u]nlike the plaintiffs in [other cases], who sought only damages for past harm, the [plaintiff] seeks injunctive relief against ongoing and future harm.").

The County argues that, despite these burdens, the other parties will actually be benefitted by a stay because the DOJ investigation will help to simplify this case. (Dkt. # 105 at 8–9.) For the reasons discussed below in factor three, however, it is doubtful that the DOJ investigation will necessarily overlap with the issues of this case sufficient to prove markedly beneficial. Even if they did, the length of the stay proposed by the County undercuts any such utility. "Generally, stays should not be indefinite in nature ." *Dependable Highway Express, Inc. v. Navigators Ins. Co.,* 498 F.3d 1059, 1066 (9th Cir.2007). The County requests that this matter be stayed "pending the outcome of the [DOJ] investigation" (Dkt. # 105 at 12), but, as the United States points out, its investigation "only began in March 2009" and "it is premature and impossible to predict the timeline or the outcome of [its] investigation" (Dkt. # 113–1 at 3). Because it is impossible for even the United States to predict when there will be an outcome to the DOJ investigation, any stay the Court were to issue contingent upon such outcome would be indefinite.

That reality does not change simply because any party is "free to petition this Court to lift or modify the stay" if "the investigation proves excessively long and does not yield cost-saving benefits." (Dkt. # 122 at 8–9.) The absence of certainty about the nature and length of the DOJ's investigative process, and the possibility that the DOJ would not seek to disclose the details of an ongoing investigation, suggest that such a stay would ultimately serve no purpose. Moreover, the County's argument misplaces the burden of demonstrating that a stay is proper. "A stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time ...." *Leyva v. Certified Grocers of Cal., Ltd.,* 593 F.2d 857, 864 (9th Cir.1979). The County has not even attempted to establish any such likelihood. Thus, this factor weighs against a stay.

### (2) The Burden on the County

**\*3** The County argues that it will be burdened if it is forced to proceed with this litigation. However, "if there is even a fair possibility that the stay for which [a party] prays will work damage to some one else," then "the suppliant for a stay must make out a clear case of hardship or inequity" to justify staying the case. *Landis,* 299 U.S. at 255. The County first argues that it would be burdened if the case is not stayed because "[t]he plaintiffs' allegations are fact intensive" and "are not likely to be resolved without extensive discovery and other protracted investigative processes." (Dkt. # 105 at 9.) Nevertheless, the mere litigation of a case, even a complex

one, is not so burdensome as to justify staying that case. *Lockyer,* 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis.*") (quoting 299 U.S. at 255). If it were otherwise, a stay would be available simply upon request.

The County also suggests that it would be burdened by having to litigate this case and cooperate with the DOJ investigation at the same time. (Dkt. # 105 at 10.) However, it is not clear that the County itself would play a major role in the DOJ's investigation, for that investigation appears directed at Sheriff Arpaio and the MCSO. (*See* Dkt. # 105 Ex. A.) The County offers no reason to believe that it would be significantly burdened by responding to the DOJ's investigation and participating in this lawsuit. The County thus has not articulated the "clear case of hardship" necessary to justify a stay of this case. *See Landis,* 299 U.S. at 255. Therefore, this factor weighs against a stay.

**(3) The Efficient Use of Judicial Resources**
The bulk of the County's argument is directed to the notion that staying this case makes the best use of judicial resources under the reasoning that the matters at issue in this case and the DOJ's investigation are the same. Specifically, the County argues that "[t]he results of the [DOJ's] investigation will inevitably assist the parties and the Court in structuring their litigation activities in this case, and could even obviate the need for further litigation in the event the [DOJ] effectively provides the plaintiffs the relief they are seeking here." (Dkt. # 105 at 8.)

Plaintiffs are seeking a judicial determination that certain activities undertaken by Defendants violate the Fourth and Fourteenth Amendments to the United States Constitution; Article II, Section 8 of the Arizona Constitution; and Title VI of the Civil Rights Act of 1964. (Dkt.# 26.) These claimed violations are based on alleged racial profiling and discriminatory treatment of Hispanic persons through illegal stops, detentions, questioning, searches, and arrests. (*Id.*) The DOJ's investigation, on the other hand, is being undertaken pursuant to provisions of the Violent Crime Control and Law Enforcement Act, the Omnibus Crime Control and Safe Streets Act, and Title VI of the Civil Rights Act. (Dkt. # 105 Ex. A at 1.)

**\*4** To be sure, the DOJ undertook its investigation with particular purposes in mind, but it is powerless to make judicial determinations for the benefit of either party. While there may be some overlap on legal and factual issues between this case and the DOJ's investigation, the fact that the DOJ's investigation is only in its formative stages means that there is simply no way to know whether that investigation will be coextensive with this case. The United States has opined that, in its view, "[t]he United States' and the *Melendres* private plaintiffs' causes of action are distinct." (Dkt. # 113–1 at 3.) Thus, the DOJ does not appear to be tailoring its investigation to the claims of these specific Plaintiffs. It also seems plain from the way the DOJ has described its investigation that it will not focus on alleged violations of the Arizona Constitution, which are among Plaintiffs' claims. (*See* Dkt. # 105 Ex. A.) Even if the DOJ were to tailor its investigation to Plaintiffs' claims, however, the focus of the DOJ investigation could change over time, or the DOJ could terminate its investigation for any number of reasons, or the DOJ's ultimate findings could be inconclusive. In any of these cases, there would have been no benefit to the stay and the parties would have needlessly suffered the harm of delay.

Finally, the Court disagrees that granting the stay would "obviate the need for further litigation." (Dkt. # 105 at 8.) Even if the DOJ were to pursue precisely the line of legal argument that Plaintiffs advance, this case would still not necessarily be resolved. Plaintiffs could disagree with the DOJ and seek to bring their claims in a judicial forum, and Defendants could likewise disagree with the DOJ and choose to have their day in court. The scope of the County's argument concedes as much. (*See* Dkt. # 122 at 3–4.)

Because there are insufficient indicia that this case and the DOJ investigation are the same, or that resolution of the latter would dispose of the former, the Court rejects the County's argument that staying this case throughout the pendency of the DOJ investigation would make the best use of judicial resources. Judicial resources would be better spent resolving this case in a timely fashion, rather than suspending litigation that has been proceeding for over a year and a half. Thus, this factor weighs against a stay.

**(4) The Interests of Non–Parties**
The County's argument regarding the interests of non-parties is that the Court should stay this matter out of deference to the DOJ's executive branch investigation under the doctrine of the separation of powers. The County rests its entire argument on *Kurtz v. Kennickell,* 622 F.Supp. 1414 (D.D.C.1985). In *Kurtz,* a taxpayer sued the Public Printer, the Secretary of the Treasury, and the Treasurer of the United States, challenging their use of public funds for the publication of

compilations of prayers offered by Congressional Chaplains. *Id.* at 1415. Rather than rule on the plaintiff's Establishment Clause challenge, the court, citing a number of considerations, dismissed the case without prejudice. *Id.* at 1420. In doing so, the court emphasized that the case was near-moot because most of the prayer compilations had already been distributed, the House of Representatives had discontinued the practice of printing such prayers, and the Chairman of the relevant Senate Committees had voiced his desire to terminate the Senate publications once the matter was brought before his committees. *Id.* at 1418–19. The plaintiff in *Kurtz* was simultaneously pursuing just such a petition before the Senate, and he even suggested that the Senate "might well be able to act on it before a court decision could be announced." *Id.* at 1419. The court also relied on the fact that the Senate, as amicus curiae, "strongly urge[d] that [it] be provided with an opportunity to consider whether it will direct the printing of future collections of the Chaplain's prayers." *Id.* Reasoning that the challenged practice was "undergoing significant modification so that its ultimate form cannot be confidently predicted," the court declined to rule on the plaintiff's claims in order to avoid the "problems inherent in judicial involvement in the inner workings of Congress." *Id.* at 1419–20.

**\*5** This case is distinguishable from *Kurtz*. Far from being near-moot, the issues in this case are not close to being resolved by any non-judicial action. It is not even clear that the DOJ's investigation could resolve Plaintiffs' claims, much less is it apparent that any such resolution is both likely and imminent. Moreover, Plaintiffs are not seeking any kind of relief from the DOJ that would satisfy their claims. Indeed, the activity Plaintiffs have challenged is not controlled by the DOJ (the coordinate federal branch), but rather is being implemented by state actors. The DOJ is simply investigating the matter to determine if it should take any independent action with respect to those state actors. Thus, the "problems inherent in judicial involvement in the inner workings of Congress" are not present. *See id.* Finally, unlike the Senate in *Kurtz,* the DOJ here is not seeking any deference, much less does it "strongly urge[ ]" that the Court delay this case. To the contrary, the United States is of the opinion that a stay is neither necessary nor desirable for any of the parties involved. (Dkt. # 113–1 at 3.) The DOJ investigation is seeking the cooperation of Sheriff Arpaio and the MCSO, and the United States explains that it "does not intend, through the conduct of its investigation, to delay, interfere with, or limit a private plaintiff's rights or abilities to seek timely redress in a private cause of action." (*Id.*) Thus, unlike *Kurtz,* granting a stay

will not avert a "head on confrontation[ ] between the life-tenured branch and the representative branch[.]" 622 F.Supp. at 1420 (quoting *United States v. Richardson,* 418 U.S. 166, 188, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974)). The doctrine of the separation of powers therefore does not suggest that a stay is proper. The County offers no other argument as to how staying this case would benefit nonparties, and it does not appear to the Court that there would be any such benefit. Thus, this factor does not weigh in favor of a stay.

**(5) The Interests of the Public**
The parties do not discuss the interests of the public. However, the Court notes that the public has a strong interest not only in the resolution of litigation, *see Wyatt ex rel. Rawlins v. Sawyer,* 190 F.R.D. 685, 692 (M.D.Ala.1999) ("[T]he public's primary interests in this matter [include] ensuring that the parties continue to make progress toward resolution of this case ...."), but also in making sure that such resolution is expeditious, *see Digital Equip. Corp. v. Currie Enters.,* 142 F.R.D. 8, 14 (D.Mass.1991) ("The public has an interest in ... the prompt resolution of civil cases...."). A stay of the kind proposed here would compromise these interests. Thus, this factor weighs against the granting of a stay.

In sum, all of the factors that carry weight counsel against granting the requested stay. Thus, the Court will deny the County's request to stay this case.

## II. Motion to File a Supplemental Brief
**\*6** Defendants Arpaio and the MCSO have requested leave to file a supplemental brief on this issue. (Dkt.# 134.) They offer this motion for the sole purpose of providing the Court with an article from *National Review Online.* The Court will limit its considerations in this case to: (1) legal authority, (2) admissible facts, and (3) argument based on legal authority and/or admissible facts. The proposed supplement constitutes none of the above, and it does not assist the Court in the resolution of this issue. The Court therefore denies the request for leave to file a supplemental brief.

## CONCLUSION

The County has not provided a sufficient basis on which the Court could stay this case pending the outcome of the DOJ investigation.

**IT IS THEREFORE ORDERED** that the County's Motion to Stay Proceedings (Dkt. # 105) is **DENIED.**

**IT IS FURTHER ORDERED** that the Motion for Leave to File a Supplemental Brief of Defendants Arpaio and the MCSO (Dkt.# 134) is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2515618

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.