# Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                     )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )   4:19-CV-00035
                                       )
STATE OF ARIZONA; ARIZONA BOARD        )
OF REGENTS, d/b/a UNIVERSITY OF        )
ARIZONA, a governmental body of        )
the State of Arizona; et al.,          )
                                       )
            Defendants.                )
_____)

VIDEOTAPED DEPOSITION OF CHRISTINA CORIERI

(Via Zoom Videoconference)
July 13, 2022
8:30 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535
www.glennie-reporting.com

Prepared by:
Robin L. B. Osterode
CSR, RPR
CA CSR No. 7750
AZ CR No. 50695

1     Q.    Do you recall sending any other e-mail to
2  Ms. Isaacson or anyone else at the AD -- AD -- ADOA of
3  the decision of the governor's office on that?
4     A.    I don't recall if anyone else was copied on
5  that e-mail, but that was the only e-mail I recall
6  sending.
7     Q.    Did you ever have a phone conversation with her
8  about the governor -- governor's office's decision on
9  that?
10         MS. LAMM:  Object to the form.
11         THE WITNESS:  I don't recall having a phone
12  conversation.
13  BY MR. POWELL:
14     Q.    And did you ever have an in-person meeting with
15  Ms. Isaacson or anyone else at the ADOA about the
16  governor's office's decision with respect to the
17  amendment of the plan?
18         MS. LAMM:  Object to the form of the question.
19         THE WITNESS:  I don't recall any other
20  meetings, other than the one we've already discussed.
21  BY MR. POWELL:
22     Q.    To go back briefly to the what you've described
23  as the August meeting among you and -- drawing a blank on
24  your general counsel's name, Liburdi -- Liburdi, excuse
25  me, you and Mr. Liburdi, met with others from ADOA in

```
 1   August of 2016, in which you sought legal advice on this
 2   issue of what the ACA 1557 provision and the new
 3   rulemaking would require in terms of the amendment of the
 4   plan.
 5            Do you recall that discussion?
 6        A.   Yes.
 7        Q.   Apart from that discussion, had you done your
 8   own review analysis of what were the implications of
 9   Section 1557 of the ACA and at that time recent changes
10   to -- or recent rulemaking with respect to the
11   discrimination provision?
12            MS. LAMM:  Object to the form of the question.
13            THE WITNESS:  Yes.
14   BY MR. POWELL:
15        Q.   Tell me about what you had done in that regard.
16        A.   I read the rules and regulations that had come
17   out and that included the comments and responses to and
18   from HHS in that publication of their final rulemaking.
19        Q.   And why did you do that, review all of that?
20        A.   Because we were going to be discussing it.
21        Q.   And when did you do that review?
22        A.   The -- I'm not sure if I did it the day before,
23   two days before.  I did it before that meeting.
24        Q.   Oh, so you did it in preparation for that
25   meeting?
```

1  A. Yes.
2  Q. And -- and based on your review of that
3 material, did you reach your own conclusion as to what,
4 if anything, the new rulemaking would require in terms of
5 an amendment of the plan with respect to gender
6 reassignment services?
7    MS. COHAN:  Form.
8    THE WITNESS:  Yes.
9 BY MR. POWELL:
10  Q. And what was your conclusion?
11    MS. COHAN:  Form.
12    THE WITNESS:  That the current plan was not in
13 compliance, because it had a complete bar on all services
14 for gender dysphoria.
15 BY MR. POWELL:
16  Q. Had you reached a conclusion as to what changes
17 would be required in order to come into compliance with
18 the rulemaking?
19  A. I understood that the plain language of the --
20 of the rules stated that a plan may not have a bar on all
21 services for gender dysphoria.  And that to come into
22 compliance, they had to provide some services to treat
23 gender dysphoria.
24  Q. And did you reach a conclusion as to which
25 gender dysphoria services would need to be included in

1  the plan?
2     A.    The rules were not specific as to which
3  services needed to be provided.
4     Q.    Did you go to that meeting with your own view
5  of how the plan should be amended to come into
6  compliance?
7     A.    I don't know what you mean by my own view.
8     Q.    I mean, had -- based on your own review and
9  analysis of the materials you've described shortly ago,
10 did you go to the meeting with ADOA and Mr. Liburdi
11 having reached your own conclusion about how the plan
12 would need to be amended in order to comply with the
13 rulemaking?
14    A.    Not specifically how, but that it would need to
15 be amended to cover at least some services for gender
16 dysphoria.
17    Q.    Had you at that point reached a conclusion that
18 it would not be necessary to cover gender reassignment
19 surgeries in order to become in compliance?
20    A.    I believe by the plain reading of the statutes
21 and the comments from HHS, that there were no specific
22 services that were required to be covered, simply that a
23 plan must cover some.
24    Q.    And as to that some, had you reached a view as
25 to what the State of Arizona should be covering in order

1  to get into compliance?
2      A.   Not specifically which ones, that's when you
3  look at, okay, we have to cover some, which ones would
4  place less money on -- on the plan.
5      Q.   But did you do any analysis of which of
6  the -- let me back up.
7           At that time the plan, in the August 2016 time
8  frame, the plan excluded essentially all care for gender
9  dysphoria.  Did you do any of your own analysis to
10 determine the cost implications of electing to cover some
11 of those previously excluded services versus others, in
12 order to get into compliance?
13          MS. COHAN:  Form.
14          THE WITNESS:  I did not do cost analysis, but
15 from a long history of seeing costs related to coverage
16 and coverage mandates, inpatient hospitalizations and
17 surgeries are always among the very most expensive.
18 BY MR. POWELL:
19     Q.   But you did nothing to try to quantify that at
20 the time?
21     A.   I did not.
22     Q.   Correct.  And you've never received from any of
23 your colleagues in the governor's office or from ADOA or
24 anyone else any sort of quantification of what any of
25 those services that would be potentially restored would

```
 1   cost.  Correct?
 2        A.    Well, first, you said "restored."  They were
 3   never there.  We did not take anything out.
 4        Q.    So -- so I'm happy to amend the question.  As
 5   part of your pre-meeting with Mr. Liburdi, analysis of
 6   the rulemaking and the need to come into compliance, did
 7   you do any form of calculation quantification of the
 8   likely costs of amending the plan to cover any of the
 9   previously excluded services?
10        A.    I did not.  And that is not my job.  I am not
11   an actuary.
12        Q.    And -- and you did not, as part of your own
13   analysis ask anyone -- anyone else to supply you with
14   calculations as to the cost implications of choosing, you
15   know, one -- one of those previously excluded services
16   versus the other to amend?
17        A.    I think that everyone is aware that therapy and
18   pharmaceuticals are always cheaper than surgeries and
19   hospitalizations.  I -- I don't know of a situation where
20   that wasn't true, other than maybe some new specialty
21   drug that was just approved by the FDA that has an
22   outrageously high price, which is not the case here.
23        Q.    But -- but my question was whether you asked
24   anyone to help you quantify that for these purposes?
25        A.    I did not ask anyone, but I know from
```

1   experience that hospitalizations and surgeries cost more
2   than therapies and pharmaceuticals.
3       Q.   But you didn't -- that's fine.  Did you discuss
4   your own -- after preparing or in conjunction with
5   preparing for the meeting in which you read the thing you
6   described earlier, did you discuss it with anyone -- the
7   subject matter with anyone in the governor's office or
8   elsewhere as part of your preparation for the meeting?
9       A.   I did not have any discussions in preparation
10  for that meeting, except for the discussion with Mike,
11  when he asked me to come to the meeting and provided
12  the -- the background on what the meeting was for.
13      Q.   During the meeting, did you share with the
14  participants your own view of what the ACA rulemaking
15  required in terms of an amendment of the plan?
16           MS. LAMM:  Objection to the extent Ms. Corieri
17  shared her view for the purposes of seeking legal advice,
18  then I would instruct her not to answer that question.
19           THE WITNESS:  I shared my interpretation for
20  the purpose of receiving legal advice.
21  BY MR. POWELL:
22      Q.   You had formed your -- your interpretation
23  prior to the meeting.  Correct?
24      A.   I prepared for the meeting by reading the
25  documents, so I could ask an appropriate question.  And I

1  had to form an opinion in order to ask if that was
2  correct and their legal interpretation of that.
3      Q.   And is the opinion that you formed what you
4  described to me earlier as to what the ACA, the language
5  of the ACA did or didn't provide?
6      A.   I'm sorry, was there a question?
7      Q.   Yes, I'm asking you if -- what I'm asking you
8  is if, when you referred to an opinion that you reached
9  prior to the meeting, and what I'm asking you is, is that
10 opinion that you referred to in that answer essentially
11 what you just described to me earlier as to how you read
12 the contents of the ACA with respect to this issue?
13     A.   Yes, I read the rules and understood that two
14 things were required.  The first, which is not at issue
15 here, is that if a plan covers treatment for something,
16 say, ovarian cancer or testicular cancer, then it can't
17 deny coverage for that treatment based on somebody's
18 gender identity.  And then the second requirement was
19 that a plan cannot have a categorical exclusion for
20 treatment of gender dysphoria.  And so I understood that
21 we needed to -- to make an amendment to the plan.
22     Q.   And that was the opinion -- the only opinion
23 that you reached --
24     A.   Yes.
25     Q.   -- on the basis of the preparation you

1  described?

2  A. Yes.

3  Q. As of the time of this meeting with Mr. Liburdi
4  and others in August of 2016, there were other
5  State-affiliated health plans that had exclusions for
6  certain categories of gender dysphoria and care; is that
7  correct?

8  A. What do you mean "other State-affiliated health
9  plans"?

10  Q. Fair enough. I had two in mind, one is the
11  Medicaid policy of the State of Arizona had -- it
12  included a certain coverage with respect to gender
13  dysphoria care. Correct?

14  A. Correct. And that exclusion went back to the
15  1980s.

16  Q. And what is -- what was the exclusion?

17  A. My understanding is that it excluded gender
18  reassignment surgery for Medicaid beneficiaries.

19  Q. And am I correct that it did not exclude
20  hormones or other types of ancillary treatment for gender
21  dysphoria?

22  A. It did not. I don't know when that -- I don't
23  know the history of amending that. I was not part of
24  that.

25  Q. And am I also correct that the Department of