1  FENNEMORE CRAIG, P.C.
   Timothy J. Berg (No. 004170)
2  Amy Abdo (No. 016346)
   Ryan Curtis (No. 025133)
3  Shannon Cohan (No. 034429)
   2394 E. Camelback Road, Suite 600
4  Phoenix, Arizona 85016
   Telephone: (602) 916-5000
5  Email: tberg@fennemorelaw.com
   Email: amy@fennemorelaw.com
6  Email: rcurtis@fennemorelaw.com
   Email: scohan@fennemorelaw.com
7
   *Attorneys for Defendants*
8  *State of Arizona, Andy Tobin, and Paul Shannon*

9                 UNITED STATES DISTRICT COURT

10                     DISTRICT OF ARIZONA

11  Russell B. Toomey,                  | CV-19-00035-TUC-RM

12            Plaintiff,                 | **DEFENDANTS STATE OF ARIZONA'S, AND**
                                          **ANDY TOBIN'S, AND**
13         v.                            | **PAUL SHANNON'S MOTION FOR**
                                          **SUMMARY JUDGMENT**
14  State of Arizona, *et al.*

15            Defendants.                | **(ORAL ARGUMENT REQUESTED)**

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................. 2

       A.     Gender Dysphoria and Plaintiff's Request for Surgery ............................... 2

       B.     Process for Revising the Plan ..................................................................... 3

       C.     History of the Exclusion ............................................................................. 3

              1.     Origination of the Exclusion ............................................................. 3

              2.     The 2017 Expansion of Coverage for Transgender Persons ............. 4

III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ............................ 5

       A.     Summary Judgment Standard ...................................................................... 5

       B.     State Defendants Are Entitled to Summary Judgment on Plaintiff's
              Count I – Violation of Title VII .................................................................. 5

              1.     The Plan Is Not Facially Discriminatory ........................................... 6

              2.     Plaintiff Cannot Prove a Disparate Treatment Claim ..................... 11

                     a.     There Is No Evidence of Discrimination ............................. 12

                     b.     Plaintiff Cannot Satisfy the McDonnell-Douglas
                            Framework ......................................................................... 16

       C.     State Defendants Are Entitled to Summary Judgment on Plaintiff's
              Count II – Violation of Equal Protection Clause ....................................... 22

              1.     The Plan Is Not Facially Discriminatory ......................................... 23

              2.     The Exclusion Rationally Relates to a Legitimate State
                     Interest .......................................................................................... 23

              3.     The Exclusion Substantially Relates to an Important
                     Government Interest ....................................................................... 25

IV.    CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                          <u>**PAGE**</u>

*Am. Coll. of Pediatricians v. Becerra*,
    No. 1:21–cv–00195 (E.D. Tenn. Aug. 27, 2021) ........................................ 20

*Am. Fed'n of State, Cnty., & Mun. Employees, AFL-CIO (AFSCME) v.*
    *State of Wash.*, 770 F.2d 1401 (9th Cir. 1985) ...................................... 12,13

*Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, 140 S. Ct. 1731 (2020) ....... 8,9,20

*Bucklew v. Precythe*, ___ U.S. ___, 139 S. Ct. 1112 (2019) ................................... 23

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir. 1987) ........................................................... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 5

*Christian Emp'rs All. v. EEOC*, No. 21–cv– 00195 (D.N.D. Oct. 18, 2021) ........ 20

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) .............. 22,24

*City of Los Angeles, Dept. of Water & Power v. Manhart*,
    435 U.S. 702 (1978) ........................................................................ 6

*Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145 (9th Cir. 1997) .................... 12,13

*Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*,
    642 F.3d 728 (9th Cir. 2011) ........................................................ 21

*Dobbs v. Jackson Women's Health Org.*, ___ U.S. ___,
    142 S. Ct. 2228 (2022) ................................................................. 8,24

*Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007) ........................... 19

*Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ............. 19

*Geduldig v. Aiello*, 417 U.S. 484 (1974) .............................................. 6,7,8,23,24

*Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) ................................................. 6,7,8

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998) ............... 12,13,16,21

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ................................................... 6

*Harris v. Lexington-Fayette Urban County Gov't*,
    685 Fed. App'x 470 (6th Cir. 2017) ........................................... 24,25

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) ................................................ 16

*Heller v. Doe by Doe*, 509 U.S. 312 (1993) ........................................................... 24

*IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010) .................................. 24,25

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

*Int'l Broth. of Teamsters v. United States*, 431 U.S. 324 (1977) .......................... 11

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ................................. 6

*Johnston v. Univ. Pittsburgh,* 97 F.Supp.3d 657 (W.D. Penn. 2015) .................. 19

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019)................................................ 25

*Lenox v. Healthwise of Kentucky, Ltd.*, 149 F.3d 453 (6th Cir. 1998).................. 10

*Lierboe v. State Farm Mut. Auto. Ins. Co.,* 350 F.3d 1018 (9th Cir. 2003) ............ 3

*Lothes v. Butler Cnty. Juvenile Rehab. Ct.*, 243 Fed. App'x. 950 (6th Cir. 2007) 19

*Martin v. Masco Indus. Employees' Benefit Plan,*
747 F. Supp. 1150 (W.D. Pa. 1990) ............................................................. 10

*Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274 (9th Cir. 2017)...................... 12,13

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).............................. 12,16

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004).............................. 12

*McGowan v. State of Md.*, 366 U.S. 420 (1961) .................................................. 24

*Moran v. Selig*, 447 F.3d 748 (9th Cir. 2006) ..................................................... 17

*Mullen v. Boyd Gaming Corp.*, 182 F.3d 914 (5th Cir. 1999) .............................. 10

*Munoz v. Mabus*, 630 F.3d 856 (9th Cir. 2010) .................................................. 21

*NEI Contracting & Engineering, Inc. v. Hanson Aggregates Pac. Sw., Inc.,*
926 F.3d 528 (9th Cir. 2019) 2010).............................................................. 3

*Nashville Gas Co. v. Satty*, 434 U.S. 136 (1977) .................................................. 15

*Neese v. Becerra*, No. 2:21–cv–00163–Z (N.D. Tex. Aug. 25, 2021) ................... 20

*Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.,*
462 U.S. 669 (1983) ..................................................................................... 6

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ........................ 6

*Ricci v. DeStefano*, 557 U.S. 557 (2009)................................................................ 11

*Romer v. Evans*, 517 U.S. 620 (1996) .............................................................. 22,24

*Saks v. Franklin Covey Co.*, 117 F. Supp. 2d 318 (S.D.N.Y. 2000) ...................... 10

*In re: State of Arizona*, No. 21-71312 (9th Cir. Dec. 14, 2021)........................... 11

*Surrell v. Calif. Water Service Co.*, 518 F.3d 1097 (9th Cir. 2008)................. 12,16

*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) ........................... 20

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- iii -

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ........................ 11,12

*In re Union Pac. R.R. Emp. Practices Litig.*, 479 F.3d 936 (8th Cir. 2007) .... 6,7,18

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ................ 11,13

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) ..................... 21

*Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859, at *10
   (E.D.N.Y. Aug. 17, 2020) ........................................................................... 20

*Wood v. City of San Diego*, 678 F.3d 1075 (9th Cir. 2012) .............................. 12,13

## **STATUTES**

20 U.S.C. § 1681 ................................................................................................. 19

42 U.S.C. § 2000e-2(a)(1) ..................................................................................... 5

42 U.S.C. § 18116 (A) ......................................................................................... 19

## **RULES**

Rule 56(a), Fed. R. Civ. P. ..................................................................................... 5

## **OTHER**

45 CFR § 92.207(b)(4) (2016) ....................................................................... 4,19,20

45 CFR § 92.207(d) (2016) ................................................................................. 19

85 Fed. Reg. 37 (June 19, 2020) .......................................................................... 20

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

1   Pursuant to Federal Rule of Civil Procedure 56, Defendants State of Arizona, Andy
2   Tobin, and Paul Shannon (collectively, "State Defendants") move for summary judgment
3   on Plaintiff's Count I and Count II.

4   ## I.   INTRODUCTION

5   This case is about whether the self-funded health plan the State of Arizona (the
6   "State") provides for its employees and their dependents (the "Plan") is required to cover
7   "gender reassignment surgery." Beginning January 1, 2017, State Defendants expanded
8   Plan coverage to include counseling services and hormone treatment for gender dysphoria.
9   However, due to cost implications, State Defendants maintained a long-standing exclusion
10  for "gender reassignment surgery" (the "Exclusion"). Any cost increase for the Plan
11  would be paid by premium increases owed by State employees, or in some cases, be paid
12  by supplemental contributions from the State's General Fund. For these reasons, State
13  Defendants approach increases in coverage very carefully and generally add coverage
14  only when legally required to do so or when the increased coverage does not result in
15  increased costs. State Defendants' decision to maintain the Exclusion was consistent with
16  this important government purpose.

17  Plaintiff alleges, however, that State Defendants' decision to maintain the
18  Exclusion is discriminatory on the basis of sex and violates Title VII of the Civil Rights
19  Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment to the U.S.
20  Constitution. The Exclusion is not discriminatory on the basis of sex on its face or in how
21  it treats any members of any particular class. The exclusion is facially neutral and treats
22  individuals the same regardless of their sex. It excludes gender reassignment surgery for
23  all individuals regardless of their sex or transgender status. Any transgender person can
24  get the same coverage that any cisgender person may receive, and all individuals are
25  subject to the same coverage exclusions regardless of their sex. Further, Plaintiff has
26  presented no evidence demonstrating any discriminatory intent, animus, or ill-will on
27  behalf of State Defendants towards transgender persons.

28  Accordingly, State Defendants are entitled to summary judgment in their favor on

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 1 -

all counts set forth in Plaintiff's Amended Complaint (Doc. 86).

## II.    STATEMENT OF FACTS

### A.    Gender Dysphoria and Plaintiff's Request for Surgery

Plaintiff Russell B. Toomey, Ph.D. is employed as an Associate Professor at the University of Arizona. (Statement of Facts In Support of State Defendants' Motion for Summary Judgment ("SOF"), concurrently filed, at ¶ 1.) As a State employee, Dr. Toomey is eligible for health coverage through the Plan, which is administered by the Arizona Department of Administration ("ADOA"). (*Id.*, ¶ 2.) In 2018, Dr. Toomey was enrolled in the Plan. (*Id.*, ¶ 3.) In 2018, Dr. Toomey's healthcare coverage claims under the Plan were administered by BlueCrossBlueShield of Arizona ("BCBS"). (*Id.*)

Dr. Toomey is a transgender man diagnosed with "gender dysphoria." (*Id.*, ¶ 4.) A transgender man is a natal female who has a male gender identity. (*Id.*, ¶ 5.)

Transgender persons may experience "gender dysphoria." (*Id.*, ¶ 6.) "Gender dysphoria" is the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender identity with their assigned sex and bodily developments associated with that sex. (*Id.*) The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). (*Id.*) If a transgender person experiences "gender dysphoria," he or she may seek medical treatment, including "gender reassignment surgery." (*Id.*) However, not all transgender persons want or receive "gender reassignment surgery." (*Id.*, ¶ 13.)

In July 2018, Dr. Toomey requested a hysterectomy from his physician to treat his gender dysphoria. (*Id.*, ¶ 7.) BCBS initially approved Dr. Toomey's hysterectomy. (*See id.*, ¶ 8.) After Dr. Toomey contacted BCBS to notify it that the hysterectomy was for the purpose of gender reassignment, BCBS denied pre-authorization for the requested hysterectomy based on the Exclusion. (*Id.*, ¶ 9.) Dr. Toomey could receive coverage for a hysterectomy for other medically necessary reasons, including all the same medically necessary reasons for which a cisgender person could receive coverage for a hysterectomy under the Plan. (*Id.*, ¶¶ 10, 12.) For example, Dr. Toomey indicated that he has received

abnormal pap smear results, which could justify coverage for a hysterectomy under the Plan.[1] (*Id.*) In addition, Dr. Toomey may be eligible for coverage for a hysterectomy under the Plan to treat an increased risk of cancers due to his long-term hormone treatment for gender dysphoria. (*Id.*)

### B.   Process for Revising the Plan

ADOA reevaluates its plan design every year. (*Id.*, ¶ 19.) ADOA conducted annual meetings with the medical directors of its insurance vendors to discuss potential revisions to the Plan design. (*Id.*, ¶ 22.) When reevaluating its plan design, ADOA considered: (1) Recommendations from its insurance vendors; (2) Market trends; (3) Interests of the Plan members; (4) Cost; (5) Legal requirements; and (6) Clinical effectiveness. (*Id.*, ¶ 20.) Of these, cost is one of the most important factors. (*Id.*, ¶ 21.)

ADOA generally only removed exclusions from the Plan if it was legally required or if the revision would not increase the cost of the Plan. (*Id.*, ¶ 26.)

### C.   History of the Exclusion

#### 1.   Origination of the Exclusion

Prior to 2004, ADOA provided health insurance to State employees through a fully-insured health insurance plan provided by Cigna. (*Id.*, ¶ 27.)

In October 2004, the State instituted a self-funded health plan. (*Id.*, ¶ 28.) At that time, the State copied the plan document and terms its insurance carrier Cigna previously provided. (*Id.*, ¶ 29.) That plan document included an exclusion for "transsexual surgery including medical or psychological counseling and hormonal therapy in preparation for, or subsequent to, any such surgery." (*Id.*, ¶ 30.) Such an exclusion was common in health plans at the time on the rationale that such treatments were cosmetic or experimental. (*Id.*, ¶ 31.)

---

[1] Because Dr. Toomey may be able to receive the requested hysterectomy to treat other conditions, he may lack standing to both bring his claims and act as the class representative. *See NEI Contracting & Engineering, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019); *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023, 1023 n.6 (9th Cir. 2003).

### 2.    The 2017 Expansion of Coverage for Transgender Persons

Beginning in September 2015, ADOA contacted its insurance vendors to research industry standards for coverage of transgender benefits. (*Id.*, ¶ 32.) The majority of ADOA's insurance vendors did not provide coverage for such benefits. (*Id.*, ¶ 33.)

On September 8, 2015, the United States Department of Health and Human Services ("HHS") issued a proposed rule on Section 1557 of the Affordable Care Act ("ACA"). (*Id.*, ¶ 34.) Those rules disallowed categorical exclusions or limitations of all transgender services but did not require that plans cover any particular procedure or treatment for gender-transition related care. 45 CFR § 92.207(b)(4), (d) (2016). ADOA contacted its insurance vendors to research how the proposed rule would affect that Plan. (SOF, ¶ 35.) ADOA also reviewed whether other states and governmental entities provided coverage for transgender benefits. (*Id.*, ¶ 39.) ADOA considered the cost of removing the exclusion for transgender benefits. (*Id.*, ¶¶ 36–38.) ADOA's research indicated that providing coverage for transgender benefits under the Plan would increase costs. (*Id.*, ¶ 37.)

HHS issued final Section 1557 rules on May 18, 2016 (the "2016 Rules"). (*Id.*, ¶ 40.) ADOA contacted its insurance vendors to research how the 2016 Rules would affect the Plan. (*Id.*, ¶ 41.) ADOA also reviewed publicly available information about the 2016 Rules, including news bulletins, legal presentations, and articles. (*Id.*, ¶ 42.)

In March and September 2016, ADOA discussed coverage of transgender benefits with the medical directors of its insurance vendors. (*Id.*, ¶ 44.) This discussion included the cost associated with coverage for transgender benefits. (*Id.*) Cost reductions and efficiencies are one of the State's primary focuses. (*Id.*, ¶ 52.) When there is an increase to the Plan, ADOA must increase employee premiums. (*Id.*, ¶ 55.) Cost weighed into most decisions by ADOA, including those relating to the Plan. (*See id.*, ¶ 56.)

ADOA's consideration of coverage for transgender benefits was no different than its consideration of other exclusions. (*Id.*, ¶ 45.) No one at ADOA or the Governor's Office has expressed a negative opinion about transgender persons. (*Id.*, ¶¶ 49–50.)

1   Ultimately, ADOA decided to expand coverage for transgender benefits—
2   removing the Plan's exclusions for hormone therapy and medical or psychological
3   counseling—effective for the Plan year beginning January 1, 2017. (*Id.*, ¶ 46.) Beginning
4   in plan year 2017, the Plan's exclusion was revised to exclude only "gender reassignment
5   surgery." (*Id.*, ¶ 48.) ADOA made this decision to minimize increased Plan costs and
6   because the new rules did not mandate coverage for any procedure or treatment but only
7   prohibited a categorical exclusion of all gender transition-related care.[2] (*See id.*, ¶ 47.)

8   **III.     THE COURT SHOULD GRANT SUMMARY JUDGMENT**

9          **A.      Summary Judgment Standard**

10          A party is entitled to summary judgment if it "shows that there is no genuine
11   dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R.
12   Civ. P. 56(a). The moving party has the burden of showing the legal basis for its motion
13   "and identifying those portions of [the record] which it believes demonstrate the absence
14   of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If
15   the moving party satisfies its burden, the nonmoving party must then "go beyond the
16   pleadings" and produce evidence "that there is a genuine issue for trial." *Id.* at 324. To
17   withstand a motion for summary judgment, the non-moving party must show that there are
18   genuine factual issues that "may reasonably be resolved in favor of either party." *Cal.*
19   *Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th
20   Cir. 1987) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

21          **B.      State Defendants Are Entitled to Summary Judgment on Plaintiff's**
22          **Count I – Violation of Title VII**

23          Title VII makes it an "unlawful employment practice for an employer . . . to fail or
24   refuse to hire or to discharge any individual, or otherwise to discriminate against any
25   individual with respect to his compensation, terms, conditions, or privileges of
26   employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Health

27

28   ---
[2] Pursuant to this Court's Order (Doc. 278 (Order granting Motion for Reconsideration)), State Defendants will not argue that their good-faith understanding of the law is a defense.

insurance and other fringe benefits are 'privileges of employment.'" *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also City of Los Angeles, Dept. of Water & Power v. Manhart*, 435 U.S. 702, 710 (1978) ("[T]here is no reason to believe that Congress intended a special definition of discrimination in the context of employee group insurance coverage.").

### 1.    The Plan Is Not Facially Discriminatory

Plaintiff argues that the Plan is facially discriminatory. (Declaration of Ryan Curtis ("Curtis Decl."), filed concurrently, Ex. 5 (Plaintiff's Amended Initial Discovery Responses ("MIDR")), at 14:14–17.) A facially discriminatory policy is one that explicitly treats persons differently based on a suspect category. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (*citing Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 24 (1993) (Ginsburg, J., concurring)).

Neither the Plan nor the Exclusion is facially discriminatory. The Plan excludes "gender reassignment surgery." (SOF, ¶ 48.) This Exclusion does not explicitly reference one sex, gender, or other suspect classification. (*Id.*; *see also* Curtis Decl., Ex. 1 (Deposition of Russell Toomey, Ph.D. ("Toomey Depo.")) at 61:6–17, 120:16–17 (admitting that the Exclusion is not specific to transgender persons and does not identify a particular sex).) The Plan excludes gender reassignment surgery for all Plan participants, regardless of their gender, sex, or diagnosis. (*See* SOF, ¶ 48; *see also* Curtis Decl., Ex. 1 (Toomey Depo.) at 61:6–9, 61: 18–21, 120:24–121:2.) This is characteristic of facially neutral health plans. *See, e.g., Geduldig v. Aiello*, 417 U.S. 484, 497 n.20 (1974); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 139 (1976); *In re Union Pac. R.R. Emp. Practices Litig.*, 479 F.3d 936, 945 (8th Cir. 2007).

In *Geduldig*, the Supreme Court held a state-run insurance policy that excluded coverage for certain pregnancy-related disabilities did not discriminate on the basis of

sex.[3] 417 U.S. at 495–97. Rather, the Supreme Court found that the insurance policy merely created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively female," the Court reasoned "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.* The Court noted that there was "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496.

In *Gilbert*, the Supreme Court held a private employer's disability insurance plan that excluded coverage for pregnancy-related disabilities did not discriminate on the basis of sex. 429 U.S. at 136. The Supreme Court held that "[w]hile it is true that only women can become pregnant," without more, the fact that the employer excluded from coverage a condition that only affects one sex is not proof that the exclusion was discriminatory. *Id.* at 134 (citing *Geduldig*, 417 U.S. at 496–97 n.20). The most that could be said is that the exclusion discriminated against pregnant people. *Id.*

In *Union Pac. R.R.*, the Eighth Circuit held that a private employer's health plan that excluded coverage for oral contraceptives did not discriminate on the basis of sex. 479 F.3d at 944–45. Recognizing the fact that only women can utilize oral contraception, the Eighth Circuit focused its analysis on the fact that the health plan did not cover any contraception utilized by women or men. *Id.* "Therefore, the coverage provided to women is not less favorable than that provided to men [and] there is no violation of Title VII." *Id.*

Applying the logic of *Geduldig*, *Gilbert*, and *Union Pac. R.R.*, the Exclusion is not facially discriminatory. Plaintiff has the same coverage under the Plan as all other State employees because the Exclusion applies equally to transgender men, transgender women, and cisgender persons.[4] In other words, the Exclusion creates two groups—those that want

---

[3] While *Geduldig* analyzed pregnancy discrimination under the Equal Protection Clause, its logic applies equally to a Title VII discrimination claim. *See Gilbert*, 429 U.S. at 133.

[4] Plaintiff may argue *Geduldig* and *Gilbert* were overruled when Congress enacted the Pregnancy Discrimination Act of 1978 ("PDA"), which changed the scope Title VII regarding pregnancy. This, however, does not mean that *Geduldig* and *Gilbert* are not applicable to exclusions in health plans that may affect only one sex. Indeed, courts have continued to apply the logic of *Geduldig* and *Gilbert* after the PDA. *See Union Pac. R.R.*, 479 F.3d 936. Rather, Congress's enactment of the PDA indicates that an act of Congress

gender reassignment surgery and those that do not. A transgender person could fall within either group (*see* SOF, ¶¶ 13), such that a "lack of identity" exists between the Exclusion and transgender status. *See Geduldig*, 417 U.S. at 496–97 n.20; *Gilbert*, 429 U.S. at 135. Thus, the Exclusion does not facially discriminate on the basis of sex.

Plaintiff argues the Exclusion is facially discriminatory because, in practice, it purportedly only affects transgender individuals. However, health plan exclusions for conditions experienced by one sex do not necessarily discriminate on the basis of sex. *See Id.; Union Pac. R.R.*, 479 F.3d at 944–45; *see also Dobbs v. Jackson Women's Health Org.*, ___ U.S. ___, 142 S. Ct. 2228, 2245–46 (2022) ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'") (citing *Geduldig*). Just as not all women are pregnant, not all transgender persons seek "gender reassignment surgery." (SOF, ¶ 13.) Indeed, not all transgender persons have gender dysphoria (s*ee* Gender Dysphoria, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H14) and there is no allegation that gender reassignment surgery is medically necessary without a diagnosis of gender dysphoria. Therefore, excluding coverage for gender reassignment surgery is not discrimination against transgender persons on the basis of sex.

*Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, 140 S. Ct. 1731 (2020) does not alter this analysis. In *Bostock*, the Supreme Court decided that an employer who fires an employee based on sexual orientation or transgender status discriminates against the employee in violation of Title VII. *Id*. at 1737. In reaching this conclusion, *Bostock* relied on the traditional meaning of "sex" as "only [] biological distinctions between male and female." *Id.* at 1739. *Bostock*, thus, restates the well-established understanding that Title VII protects employees from discrimination if they are treated differently based on their

_____

is the appropriate method of expanding Title VII protections to new groups or traits of individuals, which Congress has not done for transgender individuals. As discussed below, Congress has exercised that prerogative through the ACA Section 1557. Plaintiff contends, incorrectly, that Section 1557 has no bearing on this case.

sex, and further states that it is impossible to separate an employee's sex as a factor when considering their sexual orientation or transgender status. *Id.* at 1741–42. "[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id*. at 1741. However, Justice Alito's dissent in *Bostock* identified several areas of Title VII law that remain unsettled, including healthcare benefits. *Id.* at 1778–1783 (Alito, J., dissenting). As to healthcare, Justices Alito and Thomas noted that, due to *Bostock*, "healthcare benefits may emerge as an intense battleground under the Court's ruling." *Id.* at 1781 (Alito, J., dissenting). Indeed, Justices Alito and Thomas specifically referenced this litigation. *Id.* at 1781, n.56. Neither the dissent nor the majority suggest that the provision of any specific healthcare benefit to transgender persons is conclusively determined by *Bostock*.

Consistent with *Bostock*, the Plan does not treat any Plan participant differently based on their sex or transgender status. The Plan excludes various treatments for all Plan participants. (SOF, ¶ 18.) One such excluded treatment is "gender reassignment surgery." (*Id.*, ¶ 48.) All Plan participants are subject to the Exclusion. Simply, gender reassignment surgery is excluded for any person who seeks it, regardless of their gender. (*Id.*; *see also* Curtis Decl., Ex. 1 (Toomey Depo.) at 61:6–9, 61:18–21, 120:24–121:2.) Specifically as to this matter, Plaintiff requested a hysterectomy to treat his gender dysphoria. (SOF, ¶ 7.) The Plan does not provide coverage for hysterectomies to treat gender dysphoria for any Plan participant, regardless of their sex, gender, or gender identity. (*See id.*, ¶ 48.) However, the Plan provides coverage for hysterectomies for other conditions and diagnoses. (*Id.*, ¶ 11.) Transgender individuals, including Plaintiff, can obtain coverage for a hysterectomy for any of the same conditions that a cisgender person can receive coverage for a hysterectomy. (*See* SOF, ¶ 12.) As a result, a person's sex or gender identity has no effect on the ultimate outcome. The determining factor is the *reason* for the surgery, not the employee's sex, gender, or gender identity. Under *Bostock*'s reasoning, therefore, the Plan does not discriminate on the basis of sex.

Plaintiff also argues that the Plan is discriminatory because gender reassignment

surgery is medically necessary for transgender persons. This argument fails for two reasons. First, gender reassignment surgery is not medically necessary in all situations for all transgender persons. (*See id.*, ¶ 13; Doc. 86 (Amended Complaint) at ¶¶ 27–29.) Second, a medical plan, even one provided by a state, is not required to cover all "medically necessary" procedures. *See, e.g.*, *Lenox v. Healthwise of Kentucky, Ltd.*, 149 F.3d 453 (6th Cir. 1998) (organ transplants); *Saks v. Franklin Covey Co.*, 117 F. Supp. 2d 318 (S.D.N.Y. 2000), *aff'd in part, remanded in part*, 316 F.3d 337 (2d Cir. 2003) (infertility treatment); *Mullen v. Boyd Gaming Corp.*, 182 F.3d 914 (5th Cir. 1999) (medically necessary weight loss treatment); *Martin v. Masco Indus. Employees' Benefit Plan*, 747 F. Supp. 1150 (W.D. Pa. 1990) (medically necessary breast reduction).

The Plan excludes various procedures for all plan participants which may be considered "medically necessary." Under the Plan, a "Covered Service" is "a service which is Medically Necessary *and* eligible for payment under the Plan." (SOF, ¶ 16 (emphasis added).) "Medically Necessary" is defined under the Plan as a treatment or service that meets seven specific criteria.[5] (*Id.*, ¶ 17.) Each of ADOA's insurance vendors has its own guidelines for determining whether a treatment is "Medically Necessary" under the Plan.[6] (*See* Doc. 86 (Amended Complaint), Ex. C–F; *see also* Curtis Decl., Ex. 13 (Deposition of Elizabeth Schafer ("Schafer Depo.")) at 215:22–216:14.) A doctor's recommendation is only one factor. ((SOF, ¶ 17; Doc. 86, Exs. C–F; *see also* Curtis Decl., Ex. 13 (Schafer Depo.) at 209:18–210:4 (just because a doctor recommends a procedure does not mean that it is considered medically necessary under the Plan); *Id.*, Ex. 2 (Deposition of Loren Schechter, M.D. ("Schechter Depo.")) at 116:8–15 (whether a procedure is "medically necessary" from a doctor's perspective is not always the same as from an insurer's perspective).) Several "medically necessary" treatments are not eligible for coverage under the Plan, including certain bariatric procedures, treatment for erectile

---

[5] Plaintiff acknowledges and has not challenged the Plan's definition. (Doc. 86, ¶ 34.)

[6] The Parties agreed that medical necessity "will not be an issue in this case." (Doc. 128 (Joint Status Report) at 11:11–20.)

and sexual dysfunction, orthotics, compression garments, dentures, hair transplants and treatment for alopecia, surgery to treat hyperhidrosis (excessive sweating), phase 3 cardiac rehabilitation, infertility, sensory integration therapy, and LOVAAS therapy. (Curtis Decl., Ex. 6 at AZSTATE.01048–51.) As a result, the fact that the Exclusion may prevent coverage of some medically necessary surgeries has no bearing upon whether the Plan is discriminatory.

### 2.     Plaintiff Cannot Prove a Disparate Treatment Claim

Plaintiff has never alleged or disclosed a claim for recovery under a disparate treatment theory. (*See* Doc. 86 (Amended Complaint), ¶¶ 60–64; Curtis Decl., Ex. 5 (MIDR) at 14:7–15:7; *see also* Doc. 135 (Plaintiff and the Classes' Objections to Report and Recommendation) at 1:22–4:17; Doc. 287 (Response to State Defendants' Motion for Clarification) at 3:2–4 ("The ultimate issue presented by this lawsuit is whether the Exclusion is lawful today . . . .").)

In briefing in this matter, however, Plaintiff argued that discriminatory intent is relevant to this dispute. (*See* Doc. 180 (Reply Memorandum of Law In Support of Motion For Entry of an Order Compelling the Production of Documents), 4:8–20; Opposition to Petition for A Writ of Mandamus (Dkt. 10) at 21–23, *In re: State of Arizona*, No. 21-71312 (9th Cir. Dec. 14, 2021); *see also* Doc. 134 (Report and Recommendation) at 4:1–10.) Therefore, State Defendants will address this theory as well.

Sex discrimination can occur in the context of "disparate treatment" *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Disparate treatment occurs when an employer treats people less favorably than others because of their race, color, religion, or sex. *Id.*; *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci*, 557 U.S. at 577. A disparate treatment claim cannot succeed unless the employee's protected trait played a role in the employer's decision-making process and had a determinative influence on the outcome. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983); *Texas Dept. of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 256 (1981); *Am. Fed'n of State, Cnty., & Mun. Employees, AFL-CIO (AFSCME) v. State of Wash.*, 770 F.2d 1401, 1405 (9th Cir. 1985); *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) ("liability depends on whether the protected trait actually motivated the employer's decision") (citation omitted). This burden is not met by showing that "the employer was merely aware of the adverse consequences the policy would have on a protected group." *AFSCME*, 770 F.2d at 1405.[7]

A plaintiff asserting disparate treatment may prove that claim in two ways: by producing evidence of discrimination or through the *McDonnell Douglas* burden-shifting framework. Here, Plaintiff cannot satisfy either standard.

### a.     There Is No Evidence of Discrimination

A Title VII plaintiff may proceed by "simply produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Surrell v. Calif. Water Service Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008); *see also Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997).

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), *as amended* (Aug. 11, 1998). Direct evidence typically consists of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *See Cordova*, 124 F.3d at 1149; *Godwin*, 150 F.3d at 1221. For example, in *Cordova*, the plaintiff introduced evidence that the employer made comments that he "was a 'dumb Mexican' and that he was hired because he was a minority." 124 F.3d at 1149. Similarly, in *Godwin*, the plaintiff presented evidence that her manager said he "did not want to deal with another female." 150 F.3d at 1221. Likewise, in *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017), the plaintiff offered evidence that her employer stated "a

---

[7] *See also* Doc. 134 at 5:13–6:1 ("[T]he fact that the State has chosen to exclude this procedure from its health plan is not proof that the State intended to discriminate against transgender people in general. The most that can be said is that the [E]xclusion discriminates against persons seeking gender transition surgery. And while all persons seeking [] surgery are transgender, not all transgender persons seek [] surgery.").

man 'would be better'" in the job and she "did not like 'a girl' running the [] crew."

Unlike *Cordova*, *Godwin*, and *Mayes*, there is no direct evidence of discriminatory animus here. In fact, all of the available evidence shows that no one at ADOA or the Governor's Office made any discriminatory remarks regarding transgender persons, the Exclusion, or this litigation. (*See* SOF, ¶¶ 49–50.)

Plaintiff relies on six points of purported circumstantial evidence to attempt to prove discriminatory motive: (1) ADOA allegedly understood that the Exclusion would affect transgender persons; (2) ADOA maintained the Exclusion without knowing the reason(s) for the original iteration of the Exclusion; (3) ADOA purportedly departed from its usual decision-making process when analyzing the Exclusion; (4) ADOA expanded the Exclusion to cover no more than what was legally required; (5) ADOA covers similar procedures for cisgender persons for treating other medical conditions; and (6) the cost impact of removing the Exclusion was allegedly minimal.[8] (Curtis Decl., Ex. 35 (Plaintiff's Supplemental Responses and Objections to State Defendants' First Set of Interrogatories) at 6:5-7:18.) However, the evidence contradicts Plaintiff's arguments and, instead, demonstrates that the State acted without any motive to discriminate.

First, the fact that ADOA may have understood the Exclusion might affect transgender people is insufficient to prove discriminatory motive. Courts recognize that a plaintiff's burden is not met by showing that "the employer was merely aware of the adverse consequences the policy would have on a protected group." *AFSCME*, 770 F.2d at 1405. (*See also* Doc. 134 (Report and Recommendation) at 5:13-6:1.)

Second, the fact that ADOA does not know the rationale for the original iteration of the Exclusion has no impact on its motive in 2016. The Exclusion had been part of the Plan documents from insurance carriers when the Plan was fully-insured, dating as far back as 2004. (SOF, ¶¶ 27–30.) ADOA did not often remove exclusions from the Plan

---

[8] Plaintiff also asserts that a post-litigation cost analysis for removing the Exclusion is inaccurate. (Curtis Decl., Ex. 35 at 7:16-19.) A cost analysis completed three years after ADOA's decision regarding the Exclusion cannot have "actually motivated" the decision. Therefore, any such evidence is irrelevant to discriminatory motive. *See Aikens*, 460 U.S. at 716; *Burdine*, 450 U.S. at 256; *AFSCME*, 770 F.2d at 1405; *Wood*, 678 F.3d at 1081.

unless it was legally required to do so or if removing the exclusion would not impact the overall cost of the Plan. (*Id.*, ¶ 26.) The original rationale behind any specific exclusion was not a factor traditionally considered by ADOA. (*See id.*, ¶ 20.) Plaintiff's suggestion that failing to analyze the original rationale for the Exclusion is significant is baseless.

Third, ADOA did not depart from its traditional decision-making process when making its decision to revise the Plan and maintain the narrowed Exclusion. In general, ADOA reevaluates the care provided under the Plan each year. (*Id.*, ¶ 19.) When conducting this evaluation, ADOA considers insurance vendor recommendations , market and industry trends, the interest of Plan participants, cost, legal requirements, and clinical effectiveness. (*Id.*, ¶ 20.) ADOA also conducts an annual meeting with its insurance vendors to discuss revisions to the Plan. (*Id.*, ¶ 22.) After considering all of this information, ADOA makes its Plan decisions. On occasion, ADOA will consult with the Governor's Office regarding proposed revisions. (*Id.*, ¶ 23.)

ADOA followed this process when it evaluated the Exclusion. ADOA sought recommendations from insurance vendors.[9] (*Id.*, ¶¶ 32–33, 35.) ADOA researched cost, clinical effectiveness, the interests of Plan members, market and industry trends, and legal requirements. (*Id.*, ¶¶ 32–42.) ADOA also met with the medical directors of its insurance vendors to discuss the Exclusion. (*Id.*, ¶ 44.) ADOA then reviewed this compiled information and, in consultation with the Governor's Office, made its decision to expand coverage and to exclude only "gender reassignment surgery." ADOA's consideration of the Exclusion was consistent with its consideration of other exclusions in the Plan.

Fourth, ADOA's revision of the Exclusion to only what was legally required is consistent with its treatment of other exclusions. In 2016, the State was deeply concerned about costs, both for the Plan and generally. (*See id.*, ¶ 52.) Cost was a factor in most decisions made by ADOA. (*Id.*, ¶ 56.) This included decisions relating to the Plan. (*See*

---

[9] If ADOA did anything differently when evaluating the Exclusion in 2016, it is that ADOA affirmatively contacted its insurance vendors earlier than usual to discuss potential revisions to the Exclusion. (*See* SOF, ¶ 32.) This certainly does not support any finding of discriminatory motive.

*id.*, ¶¶ 20, 36.) In fact, cost was one of the most important factors in any decision to revise coverage under the Plan. (*Id.*, ¶ 21.) As a result, ADOA did not often remove an exclusion from the Plan unless it was legally required to do so or if removing the exclusion would not increase costs. (*Id.*, ¶ 26.) In fact, from 2015-2021, ADOA removed only five exclusions from the Plan (including removing the exclusions for counseling and hormone therapy for the treatment of gender dysphoria).[10] (*Id.*, ¶ 25.)

Fifth, the fact that that Plan covers hysterectomies for cisgender females in some situations is not evidence of discriminatory motive. First, the term "gender reassignment surgery" encompasses multiple surgeries, not just hysterectomies. (Curtis Decl., Ex. 2 (Schechter Depo.) at 79:24-80:7, 84:22-85:19, 87:1-6.) Many of those surgeries would not be performed on a cisgender person. (*See* Curtis Decl., Ex. 2 (Schechter Depo.) at 103:5-9, 105:15-18, 113:15-21.) Many other of those surgeries would not be eligible for coverage under the Plan because they are cosmetic. (*See* Curtis Decl., Ex. 6 at AZSTATE.010149; Curtis Decl., Ex. 2 (Schechter Depo.) at 29:8-19, 35:4-10, 35:24-36:5.) Moreover, a transgender person, including Plaintiff, can receive coverage under the Plan for a hysterectomy for any reason that a cisgender person can. (SOF, ¶ 12.) "When confronted by a facially neutral plan, whose only fault is underinclusiveness, the burden is on the plaintiff to show that the plan discriminates on the basis of sex in violation of Title VII." *Nashville Gas Co. v. Satty*, 434 U.S. 136, 144 (1977).

Finally, while State Defendants admit that the cost for removing the Exclusion may appear minimal when compared with the total Plan expenses, any cost increase to the Plan was problematic, especially in 2016. In 2016, reducing costs was one of the State's primary focuses. (SOF, ¶ 52.) The State had a large budget deficit, the Plan's expenses exceeded its revenues, and ADOA had to utilize reserve funds to pay Plan expenses. (*Id.*, ¶¶ 51, 53.) In addition, any cost increase would be paid by Plan participants, including

---

[10] In 2017, ADOA also removed an exclusion for treatments when the healthcare provider is a family member of the insured. (Shannon Decl., ¶ 6.) The removal of this exclusion did not provide coverage for any treatments or services which would not have been covered previously if provided by an unrelated healthcare provider. (*Id.*)

low-income workers who had not received raises in years. (*Id.*, ¶ 55; *see* Curtis Decl., Ex. 32 (Corieri Depo.) at 35:12–36:10.) As a result, ADOA would decline a revision to the Plan that resulted in ***any*** cost increase, unless it was legally required. (*See* SOF, ¶ 26.)

Therefore, Plaintiff has no circumstantial evidence of discriminatory motive.

> b.  Plaintiff Cannot Satisfy the *McDonnell-Douglas* Framework

A plaintiff may proceed under "the familiar *McDonnell Douglas* burden shifting framework for Title VII . . . claims." *Surrell*, 518 F.3d at 1105. Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of demonstrating discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). The burden then shifts to the defendant to provide a legitimate, nondiscriminatory purpose for the alleged conduct. *Id.* Finally, the burden then shifts back to the plaintiff to show that the defendant's stated purpose is merely pretext for prohibited discrimination. *Id.* at 804.

> (1)  *Plaintiff Cannot Prove Discrimination*

Plaintiff cannot meet his burden of proving discrimination. To do so, Plaintiff must demonstrate that he: (1) is a member of a protected class; (2) met his employer's legitimate job performance expectations; (3) suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from the employer. *See id.* at 802; *Godwin*, 150 F.3d at 1220. State Defendants assume solely for the sake of this motion that Plaintiff can adequately demonstrate that he is a member of a quasi-suspect class, met his job expectations, and suffered an adverse employment action (i.e., denial of pre-authorization for his hysterectomy).

Plaintiff, however, cannot demonstrate that cisgender employees receive better treatment under the Plan. The Exclusion is one of many limitations under the Plan. (SOF, ¶ 18.) All Plan participants are subject to every exclusion in the Plan, regardless of their gender, sex, or diagnosis. Simply, gender reassignment surgery is excluded for any person who seeks it, man or woman. (*Id.*, ¶ 48.; *see also* Curtis Decl., Ex. 1 (Toomey Depo.) at 61:6–9, 61:18–21, 120:24–121:2.) The Plan does not treat any Plan participant differently

based on sex, gender, or transgender status. Transgender persons can receive coverage for surgeries under the Plan for all the same reasons as cisgender persons. (*See* SOF, ¶ 12.) For example, Plaintiff may be eligible to receive coverage for his requested hysterectomy under the Plan due to his abnormal pap smear results or an increased risk of cancer from his long-term hormone treatments, which Plaintiff acknowledged in his deposition. (*Id*.) The Plan provides the same coverage to all persons.

Plaintiff may argue that cisgender persons receive better treatment because they can receive coverage for medically necessary treatments or because the Plan provides coverage for hysterectomies for other conditions. Both arguments fail. First, the Plan does not cover all procedures a Plan participant (or even a doctor) may consider "medically necessary." Under the Plan, a "Covered Service" is "a service which is Medically Necessary *and* eligible for payment under the Plan." (*Id*., ¶ 16 (emphasis added).) The term "Medically Necessary" is defined in the Plan and each of ADOA's insurance vendors have guidelines for determining medical necessity. (*Id*., ¶ 17; Doc. 86 (Amended Complaint) at Exs. C–F.) Even if a procedure is deemed "Medically Necessary" under the Plan and by insurance vendors, it may still be excluded. Indeed, several medically necessary treatments are excluded. (Curtis Decl., Ex. 6 at AZSTATE.010148–51.) Thus, both transgender and cisgender persons may not receive coverage for treatments they believe are "medically necessary." Plaintiff suggests cisgender individuals get all medically necessary care, so transgender individuals should likewise be entitled to any medically necessary care they want. Both the premise and conclusion are incorrect.

Second, Plan participants suffering from cancer and gender dysphoria are not similarly situated "in all material respects," as required for a Title VII comparator analysis. *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) ("In order to show that the 'employees' allegedly receiving more favorable treatment are similarly situated . . . , the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects."). The Eighth Circuit applied a narrow rationale to comparator conditions when analyzing health insurance benefits under Title VII. In

*Union Pac. R.R.*, a health plan exclusion for contraceptives was challenged by female plaintiffs as discrimination based on sex. 479 F.3d at 943-45. The district court looked at the plan's coverage of "medicines or medical services [that] prevent employees from developing diseases and found that the health plans treated men more favorably because the plans covered preventive medicines and services for male-pattern baldness, routine physical exams, tetanus shots, and drug and alcohol treatments." *Id*. at 944. The Eighth Circuit reversed, holding that the comparison category—preventative medicines—was too broad. *Id.* Instead, the proper comparison was the provision of the medical benefit in question—contraception—and because the plan also excluded contraceptives used by men, it was not discriminatory. *Id*. at 944–45. Similarly, here, the appropriate comparator analysis is persons seeking "gender reassignment surgery," not persons seeking hysterectomies. "Gender reassignment surgery" encompasses several different surgical procedures and a hysterectomy is only one of such surgeries. (*See* Curtis Decl., Ex. 2 (Schechter Depo.) at 79:24-80:7, 84:22-85:19, 87:1-6.) Plaintiff's suggested comparator of hysterectomies to treat other conditions is not appropriate, similar to the comparison category of "preventative medicines" in *Union Pac. R.R.* Therefore, providing coverage for hysterectomies in some circumstances but not for gender reassignment surgery does not make the Plan discriminatory.

(2)     *State Defendants Have Legitimate, Non-Discriminatory Reasons for the Exclusion*

State Defendants maintained the Exclusion for two reasons: (1) they were not legally required to provide such coverage[11]; and (2) to control cost increases to the Plan.

In 2016, ADOA reviewed and *expanded* coverage for transgender benefits shortly after new rules had been issued by the Office of Civil Rights ("OCR") of HHS. HHS issued the 2016 Rules, which implemented non-discrimination provisions under Section 1557 on May 18, 2016. (SOF, ¶ 40.) Notably, the 2016 Rules prohibited entities subject to

---

[11] State Defendants are precluded from arguing as a defense that they had a good-faith belief that the Exclusion was legal. (*See* Doc. 278.)

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

the rules from including categorical exclusions or limitations for health services related to "gender transition." 45 CFR § 92.207(b)(4) (2016). However, the 2016 Rules did not affirmatively require coverage of any particular procedure or treatment for gender transition-related care. *Id*. at § 92.207(d) ("Nothing in this section is intended to determine, or restrict a covered entity from determining, whether a particular health service is medically necessary or otherwise meets applicable coverage requirements in any individual case"). Further, even if the 2016 Rules required that all "gender reassignment" surgeries be covered, the 2016 Rules were then being challenged in court to determine if they were valid or whether they exceeded what is meant by "on the basis of sex" under the law.

The language of Section 1557 is concise. Regarding discrimination on different bases, Section 1557 incorporates different federal discrimination laws. *See* 42 U.S.C. § 18116 (A). For discrimination on the basis of sex, Section 1557 incorporates Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq*.). *Id*.[12] Challenges to the validity of the 2016 Rules occurring when the State Defendants were considering changes to the Plan focused on whether the 2016 Rules improperly exceeded the scope of what is meant by discrimination on the basis of sex in Title IX.[13]

On December 31, 2016, the United States District Court for the Northern District of Texas granted a motion for preliminary injunction enjoining HHS from enforcing Section 1557 prohibitions against discrimination on the basis of gender identity because the definition of sex under the 2016 Rules exceeded the scope of Title IX. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016).[14] *Franciscan All.* and related

---

[12] § 1557 does not incorporate Title VII to define discrimination "on the basis of sex."

[13] The purpose of Title IX was to establish equal educational opportunities for women and men. *Lothes v. Butler Cnty. Juvenile Rehab. Ct.*, 243 Fed. App'x. 950, 955 (6th Cir. 2007). Discrimination on the basis of sex under Title IX originally meant male and female under traditional binary concepts of sex that is consistent with a person's birth or biological sex. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007). For many years, including shortly prior to the ADOA's decision to modify the Exclusion, courts held that discrimination on the basis of gender identity was not covered by Title IX. *See e.g.*, *Johnston v. Univ. Pittsburgh*, 97 F.Supp. 3d 657 (W.D. Penn 2015).

[14] Other cases challenging the meaning of "on the basis of sex" under Title IX were also

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

similar cases were pending when the ADOA was evaluating how it would address Section 1557. In fact, the day *after* the Texas District Court's ruling, the State Health Plan *expanded* transgender benefits to include hormone therapy and counseling.[15]

However, ADOA needed to balance expanding coverage under the Plan with increasing costs. It is undisputed that adding coverage for gender reassignment surgery would increase costs. (SOF, ¶ 37.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in costs to the Plan annually. (*Id.*) These costs calculations must be qualified, however, because it is unknown how many Plan members are transgender, how many would seek "gender reassignment surgery," or what specific surgical procedures transgender Plan participants would seek. (*Id.*, ¶ 38.)

Further complicating this analysis is the fact that, in 2016, the State had a large

occurring in 2016. On August 21, 2016, the District of Northern Texas issued a preliminary injunction enjoining the Department of Education from enforcing guidance it had issued regarding transgender student access to school facilities including restrooms. *Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016). The guidance, which included gender identity under Title IX protections against discrimination on the basis of sex, exceeded the scope and plain meaning of Title IX. *Id.* at 832-33. ("It cannot be disputed that the plain meaning of the term sex as used in § 106.33 when it was enacted . . . following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth.").

[15] Uncertainty regarding the validity and enforcement of Section 1557 continues. HHS issued new rules under Section 1557 on June 19, 2020. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020). A few months later, the Eastern District of New York issued a preliminary injunction against the enforcement of those new rules. *Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020). On May 10, 2021, HHS announced OCR would begin enforcing Section 1557 and Title IX's prohibition on discrimination based on sex including discrimination on the basis of gender identity in light of *Bostock*. *See* https://www.hhs.gov/about/news/2021/05/10/hhs-announces-prohibition-sex-discrimination-includes-discrimination-basis-sexual-orientation-gender-identity.html (last visited September 16, 2022). There are three currently-pending court challenges to HHS's May 10, 2021 Notice. *See Neese v. Becerra*, No. 2:21–cv–00163–Z (N.D. Tex. Aug. 25, 2021); *Am. Coll. of Pediatricians v. Becerra*, No. 1:21–cv–00195 (E.D. Tenn. Aug. 27, 2021); *Christian Emp'rs All. v. EEOC*, No. 21–cv– 00195 (D.N.D. Oct. 18, 2021). On August 4, 2022, HHS issued new proposed rules regarding Section 1557 ("2022 Rules"). *See* Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. No. 149 (August 4, 2022). Consistent with the 2016 Rules, the 2022 Rules do not require coverage for specific procedures, and would prohibit a covered entity from having or implementing a categorical coverage exclusion or limitation for *all* health services related to gender affirming care. *Id.* at p. 47871–72. A proposed rule, to be codified at 45 C.F.R. § 92.207(b)(4), would not allow a covered entity's health plan to "Have or implement a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care."

budget deficit and was focused on reducing costs. (*Id.*, ¶¶ 51–52.) At that time, the Plan was "under water" and ADOA had to utilize reserve funds to pay Plan expenses. (*Id.*, ¶ 53; Curtis Decl., Ex. 32 (Corieri Depo.) at 66:14-23.) ADOA did not remove exclusions from the Plan if there was any cost increase, unless revision was legally required. ADOA complied with the rules under Section 1557 by removing the categorical exclusion, while minimizing cost increases.

In sum, there is a legitimate, non-discriminatory reason for the Exclusion.

(3)     *State Defendants' Reasons Are Not a Pretext*

Plaintiff must show that State Defendants' articulated non-discriminatory reason for the Exclusion is pretextual either directly—showing that discrimination more likely motivated State Defendants—or indirectly—showing that State Defendants explanation is unworthy of credence. *Godwin*, 150 F.3d at 1220–22; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). Plaintiff must produce "specific and substantial" evidence of pretext to survive summary judgment. *See Godwin*, 150 F.3d at 1222.

It does not matter if an employer's stated rationale is objectively false; rather, courts only require that the employer honestly believed its reasons for its actions, even if the reasons are foolish, trivial, or baseless. *Villiarimo*, 281 F.3d at 1063. "Merely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment." *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010). A plaintiff cannot simply demonstrate that the employer's decision was "wrong, mistaken, or unwise." *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011). Plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* When an employee claims the employer's reference to cost management is pretextual, the claim must be sufficiently specific and substantial to show discriminatory motive "where it is the employer's prerogative to determine how best to allocate its limited . . . funds." *Munoz*, 630 F.3d at 865.

Plaintiff has no evidence that ADOA did not honestly believe its cost rationale. Indeed, all available evidence demonstrates that the State was very concerned about costs in 2016. (SOF, ¶ 52.) ADOA considered cost as a factor in every decision it made, including revisions it was considering making to the Plan. (*See id.*, ¶¶ 20, 36, 56.)

Plaintiff may argue that deposition testimony demonstrates that ADOA was only concerned about the legal requirements under Section 1557. However, these two discussions are intertwined. ADOA conducted research on every Plan revision it considered. (*Id.*, ¶ 20.) If a revision would increase costs, ADOA considered whether such coverage was legally required. (*See id.*, ¶ 26.) Generally, ADOA did not expand coverage unless legally required to do so or if there was no cost increase that resulted from the revision. (*Id.*) It is undisputed that ADOA conducted cost analyses relating to the Exclusion and relied upon those calculations during its deliberations. (*Id.*, ¶¶ 36–37.)

Moreover, any argument that State Defendants' stated rationale is a pretext is implausible and contradicted by the evidence. It is undisputed ADOA actually **expanded** coverage for transgender Plan participants in 2016. Prior to 2016, the Plan excluded all treatment for gender dysphoria, including hormone therapy and counseling. (*Id.*, ¶ 30.) In 2016, ADOA made the decision to modify the Exclusion and *add* coverage to hormone therapy and counseling. (*Id.*, ¶ 46.) If ADOA's cost concerns were a pretext for discrimination, it would not have *expanded* coverage for gender dysphoria in 2016.

State Defendants are entitled to summary judgment on Plaintiff's Count I.

**C.   State Defendants Are Entitled to Summary Judgment on Plaintiff's Count II – Violation of Equal Protection Clause**

The Equal Protection Clause requires that all persons similarly-situated be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). However, States may create classifications that result in disadvantages for various groups. *See Romer v. Evans*, 517 U.S. 620, 631 (1996). If so, they must provide a justification commensurate with the gravity of inequitable treatment. *Id.* There are three types of equal protection claims: (i) a statute or policy discriminates on its face against the plaintiff's

group; (ii) neutral application of a facially neutral statute or policy has a disparate impact; and (iii) the defendants are unequally administering a facially neutral statute. Toomey brings the first type of claim—facial discrimination. (Doc. 86 (Amended Complaint) at ¶¶ 72–77; Curtis Decl., Ex. 5 (MIDR) at 15:8–17:10.)

### 1.    The Plan Is Not Facially Discriminatory

"A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, __ U.S. __, 139 S. Ct. 1112, 1127 (2019). The Court looks to the language of the policy to determine whether it is facially discriminatory. For example, in *Geduldig*, the Supreme Court held a state insurance policy that excluded coverage for a medical procedure that only one sex can undergo did not classify on the basis of sex. 417 U.S. at 495-97. Rather, the classification was based on a medical condition. *Id*. at 496-97. The classification created two groups—pregnant and nonpregnant people. *Id*. at 496 n.20. Although "the first group is exclusively female," the Court reasoned "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id*. The Court noted that there was "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id*. at 496.

The Exclusion is not facially discriminatory. The Exclusion is just one of *many* different exclusions in the Plan that apply to all participants. (SOF, ¶ 18.) The text of the Exclusion—"gender reassignment surgery"—does not reference a single sex, gender, or transgender status. (*Id*., ¶ 48; *see also* Curtis Decl., Ex. 1 (Toomey Depo.) at 61:6–17, 120:16–17 (admitting that the Exclusion is not specific to transgender persons and does not identify a particular sex).) All individuals enrolled in the Plan are subject to the Exclusion, regardless of gender or sex. At most, the Exclusion creates two groups—those who seek gender reassignment surgery and those who do not. Both groups contain transgender members. (*See* SOF, ¶ 13.)

### 2.    The Exclusion Rationally Relates to a Legitimate State Interest

The regulation of a medical procedure that may affect only one sex or gender does

not trigger heightened constitutional scrutiny unless the regulation is a "mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022); *see also Geduldig*, 417 U. S. at 496 , n. 20. As outlined above, the Exclusion is not a "mere pretext" for discrimination. (*Supra*, § III.B.2.b.3.)

"[L]egislation is presumed to be valid and will be sustained if the classification [] is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 439; *Romer*, 517 U.S. at 631. There must be "a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993).

The burden rests with the party attacking the classification to "negative every conceivable basis which might support it." *Id.* A classification "is accorded a strong presumption of validity." *Id.* at 319. "State legislatures are presumed to have acted within their constitutional power" and a law "will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. State of Md.*, 366 U.S. 420, 425 (1961).

State Defendants' interests in cost containment and reducing health costs are legitimate and substantial state interests. (*See* Doc. 69 (Order denying Motion to Dismiss) at 16:12–14.) *See, e.g., Harris v. Lexington-Fayette Urban County Gov't*, 685 Fed. App'x 470, 473 (6th Cir. 2017); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010) (state has a "substantial interest" in lowering health care costs).

The Exclusion is rationally related to State Defendants' interests in cost containment. It is undisputed that ADOA researched the cost associated with removing the Exclusion, and determined that removing the Exclusion would increase Plan costs. (SOF, ¶¶ 36–37.) Plaintiff does not dispute that removing the Exclusion would increase costs. Those costs would primarily be paid by the Plan participants, through premium increases. (*Id.*, ¶ 55.) For that reason, ADOA generally only removes exclusions from the Plan if legally required or if there is no cost associated with the revision to the Plan. (*Id.*, ¶ 26.) This is especially so because, in 2016, the Plan was "under water" and ADOA had to utilize reserve funds to pay Plan expenses. (*Id.*, ¶ 53; Curtis Decl., Ex. 32 (Corieri Depo.)

at 66:14-23.) ADOA furthered its legitimate interests in cost containment and reducing costs to the Plan by maintaining the Exclusion.

        **3.**      **The Exclusion Substantially Relates to an Important Government Interest**

If the Court applies intermediate scrutiny, State Defendants can meet this burden. A classification of a quasi-suspect class fails unless it is "substantially related to the achievement of an important governmental interest." *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019). An "exceedingly persuasive" justification is required. *Id.* at 1200.

State Defendants meet these standards. First, State Defendants' interests in cost containment and reducing health costs are an important state interest. (Doc. 69 at 16:12–14.) *See, e.g., Harris*, 685 Fed. App'x at 473; *IMS Health*, 630 F.3d at 276. Second, as outlined above, State Defendants' cost concerns are substantially related to the Exclusion.

State Defendants are entitled to summary judgment on Plaintiff's Count II.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, State Defendants respectfully request that the Court grant summary judgment in their favor on Plaintiff's Count One and Count Two.

DATED this 26th day of September, 2022.

FENNEMORE CRAIG, P.C.

By: *s/ Ryan Curtis*
                Timothy J. Berg
                Amy Abdo
                Ryan Curtis
                Shannon Cohan
                Attorneys for Defendants State of Arizona, Andy Tobin, and Paul Shannon

28027557