1  FENNEMORE CRAIG, P.C.
   Timothy J. Berg (No. 004170)
2  Amy Abdo (No. 016346)
   Ryan Curtis (No. 025133)
3  Shannon Cohan (No. 034429)
   2394 E. Camelback Road, Suite 600
4  Phoenix, Arizona 85016
   Telephone: (602) 916-5000
5  Email: tberg@fennemorelaw.com
   Email: amy@fennemorelaw.com
6  Email: rcurtis@fennemorelaw.com
   Email: scohan@fennemorelaw.com
7
   *Attorneys for Defendants*
8  *State of Arizona, Andy Tobin, and Paul Shannon*

9              UNITED STATES DISTRICT COURT

10                  DISTRICT OF ARIZONA

11 | Russell B. Toomey,                    | CV-19-00035-TUC-RM
12 |                   Plaintiff,           | **DEFENDANTS STATE OF
13 |         v.                             | ARIZONA'S, ANDY TOBIN'S, AND
   |                                        | PAUL SHANNON'S SEPARATE
14 | State of Arizona, *et al.*             | STATEMENT OF FACTS IN
   |                                        | SUPPORT OF MOTION FOR
15 |                   Defendants.          | SUMMARY JUDGMENT**

16        **A.    Gender Dysphoria and Plaintiff's Request for Surgery**

17        1.     Plaintiff Russell B. Toomey, Ph.D. is employed as an Associate Professor at

18 the University of Arizona. (Doc. 86 (Amended Complaint), ¶ 4.)

19        2.     As an employee of the State of Arizona (the "State"), Dr. Toomey is eligible

20 for health coverage through a self-funded health insurance plan (the "Plan") administered

21 by the Arizona Department of Administration ("ADOA"). (*See id.*, ¶ 1.)

22        3.     In 2018, Dr. Toomey was enrolled in the Plan. (*See id.*, ¶ 33.) In 2018, Dr.

23 Toomey's   health   coverage   claims   under   the   Plan   were   administered   by

24 BlueCrossBlueShield of Arizona ("BCBS"). (*Id.*)

25        4.     Dr. Toomey is a transgender man who has been diagnosed with "gender

26 dysphoria." (*See id.*, ¶¶ 4, 38; Declaration of Ryan Curtis ("Curtis Decl."), filed

27 concurrently, at Ex. 1 (Deposition of Russell B. Toomey, Ph.D. ("Toomey Depo.")) at

28

18:11-14.)

5.     A transgender man is a natal female who has a male gender identity. (*See* Doc. 86 (Amended Complaint), ¶ 25.)

6.     Transgender persons may experience "gender dysphoria." (Doc. 86 (Amended Complaint), ¶ 27.) "Gender dysphoria" is the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender identity with their assigned sex and bodily developments associated with that sex. (*Id.*; *see also* Curtis Decl., Ex. 2 (Deposition of Loren Schechter, M.D. ("Schechter Depo.")) at 31:8-13.) The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). (*Id.*; Gender Dysphoria, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H14.) If a transgender person experiences "gender dysphoria," he or she may seek medical treatment, including "gender reassignment surgery." (Doc. 86 (Amended Complaint), ¶¶ 27–28.)

7.     In July 2018, Dr. Toomey requested a hysterectomy from his physician to treat his gender dysphoria. (*See* Doc. 86 (Amended Complaint), ¶ 39 & Ex. G.)

8.     BCBS initially notified Dr. Toomey's healthcare provider that the hysterectomy would be "covered 100% after a $100 co-pay." (Curtis Decl., at Ex. 3 (TOOMEY000378–79).)

9.     On August 10, 2018, after Dr. Toomey contacted BCBS to notify BCBS that the sought hysterectomy was for the treatment of gender dysphoria, BCBS denied pre-authorization for the requested hysterectomy based on an exclusion for "gender reassignment surgery." (*Id.*; Curtis Decl., Ex. 4 (Transcript of Phone Call between Plaintiff and BCBS) at 3:7–24; *see also* Doc. 86 (Amended Complaint), ¶ 43 & Ex. G; Curtis Decl., Ex. 5 (Plaintiff's Amended Initial Discovery Responses ("MIDR")) at 13:11–14.)

10.     Although BCBS denied Dr. Toomey's request for pre-authorization, Dr. Toomey could potentially receive coverage for a hysterectomy under the Plan for other medically-necessary reasons. (*See* Curtis Decl., Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2, 168:8–13.)

11. The Plan provides coverage for hysterectomies for other conditions and diagnoses, including cancer. (*See generally* Curtis Decl., Ex. 6 (AZSTATE.010093).)

12. Dr. Toomey can receive coverage for a hysterectomy for all the same medically necessary reasons for which a cisgender female could receive coverage for a hysterectomy under the Plan. (Curtis Decl., Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2.) For example, Dr. Toomey indicated that he has received abnormal pap smear results, which could justify coverage for a hysterectomy under the Plan. (*See* Curtis Decl., Ex. 1 (Toomey Depo.) at 40:2–11, 49:25–50:2, 50:20–24.) In addition, Dr. Toomey may be eligible for coverage for a hysterectomy under the Plan to treat an increased risk of cervical, uterine, or ovarian cancers due to his long-term hormone treatment for gender dysphoria. (*See* Curtis Decl., Ex. 1 (Toomey Depo.) at 49:4–21, 75:1–3).

13. Not all transgender persons want or receive "gender reassignment surgery." (Curtis Decl., Ex. 1 (Toomey Depo.) at 124:16–18; Curtis Decl., Ex. 2 (Schechter Depo.) at 30:12-16, 32:1-12, 39:1–5.)

**B.     The Plan**

14. The Plan is self-funded. (Curtis Decl., Ex. 6 at AZSTATE.010183; Curtis Decl., Ex. 8 (Deposition of Marie Isaacson ("Isaacson Depo.")) at 46:16–19; Curtis Decl., Ex. 9 (Deposition of Paul Shannon ("Shannon Depo.")) at 38:5–39:4.)

15. The Plan defines "Covered Expenses" as "expenses incurred by or on behalf of a person, if they are incurred after he [or she] becomes insured for these benefits and prior to the date coverage ends." (Curtis Decl., Ex. 6 at AZSTATE.010121.[1])

16. "Covered Expenses" are available to Plan participants "only if: (1) they are Medically Necessary and not specifically excluded in this Article or any other Article; and (2) Pre-Certification/Prior Authorization is obtained from the Plan by the Member or provider, for those services that require Pre-Certification/prior Authorization." (*Id.*; *see also*

---

[1] State Defendants attached the Exclusive Provider Organization ("EPO") Plan document to this briefing. Dr. Toomey was enrolled in the EPO plan in 2018. (Curtis Decl., Ex. 1 (Toomey Depo.) at 54:17-21.) In 2018, ADOA also provided a Preferred Provider Organization Plan, and a High Deductible Plan. (Declaration of Paul Shannon, ¶ 4.) The coverage provided, and the applicable exclusions, under each plan is identical. (*Id.*)

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

1    *id.* at AZSTATE.010186 ("COVERED SERVICE shall mean a service which is Medically

2    Necessary and eligible for payment under the Plan.").)

3         17.    A service is "Medically Necessary" if it meets "all of the following criteria:

4    (1) Ordered by a physician; (2) Not more extensive than required to meet the basic health

5    needs; (3) Consistent with the diagnosis of the condition for which they are being utilized;

6    (4) Consistent in type, frequency and duration of treatment with scientifically based

7    guidelines by the medical-scientific community in the United States of America; (5)

8    Required for purposes other than the comfort and convenience of the patient or provider;

9    (6) Rendered in the least intensive setting that is appropriate for their delivery; and (7) Have

10   demonstrated medical value." (*Id.* at AZSTATE.010192–93; *see also* Doc. 86 (Amended

11   Complaint), ¶ 34.)[2]

12        18.    The Plan contains several Exclusions and Limitations. (Curtis Decl., Ex. 6 at

13   AZSTATE.01048–51.)

14   **C.    Process for Revising the Plan**

15        19.    ADOA reevaluates its plan design every year. (Curtis Decl., Ex. 10

16   (Deposition of Scott Bender ("Bender Depo.")) at 37:11-23.)

17        20.    When reevaluating its plan design, ADOA considered:

18            a.  Recommendations from its insurance vendors (Curtis Decl., Ex. 8

19                (Isaacson Depo.) at 100:1–5; Curtis Decl., Ex. 9 (Shannon Depo.) at

20                124:1-21; Curtis Decl., Ex. 11 (Deposition Transcript of Kelly

21                Sharritts ("Sharritts Depo.")) at 56:11–14; Curtis Decl., Ex. 12

22                (Deposition Transcript of Craig Brown ("Brown Depo.")) at 178:24-

23                179:19);

24            b.  Market trends (Curtis Decl., Ex. 13 (Deposition of Elizabeth Schafer

25                ("Schafer Depo.")) at 54:8–14; Curtis Decl., Ex. 10 (Bender Depo.) at

26

27   [2] The Parties agreed that "the medically necessity of gender affirming surgery will not be
     an issue in this case" but that State Defendants "do not concede that Plaintiff's requested
28   procedure (or those that other members of the Classes may request) is medically necessary."
     (Doc. 128 (Joint Status Report) at 11:11–20.)

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 4 -

1    41:18–42:7; Curtis Decl., Ex. 14 (Deposition of Yvette Medina
2    ("Medina Depo.")) at 84:15–85:1);

3    c. Interests of the Plan members (Curtis Decl., Ex. 13 (Schafer Depo.) at
4    54:15–20; Curtis Decl., Ex. 11 (Sharritts Depo.) at 149:25–150:10;
5    Curtis Decl., Ex. 10 (Bender Depo.) at 37:24–38:9);

6    d. Cost (Curtis Decl., Ex. 9 (Shannon Depo.) at 124:1-21; Curtis Decl.,
7    Ex. 13 (Schafer Depo.) at 53:10-12, 55:9–14, 101:19–102:2; Curtis
8    Decl., Ex. 10 (Bender Depo.) at 37:24–38:9);

9    e. Legal requirements (Curtis Decl., Ex. 9 (Shannon Depo.) at 124:1-21);
10    and

11    f. Clinical effectiveness (*Id.*).

12    21.    Of these, cost is one of the most important factors. (*See* Curtis Decl., Ex. 10
13    (Bender Depo.) at 56:2–10, 58:4–14; Curtis Decl., Ex. 9 (Shannon Depo.) at 128:22–
14    129:22.)

15    22.    ADOA conducted annual meetings with the medical directors of its insurance
16    vendors to discuss potential revisions to the Plan design. (Curtis Decl., Ex. 10 (Bender
17    Depo.) at 103:12–104:6; Curtis Decl., Ex. 9 (Shannon Depo.) at 138:16–24.)

18    23.    On occasion, ADOA will consult with the Governor's Office regarding
19    proposed revisions to the Plan. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 119:11–120:15;
20    Curtis Decl., Ex. 10 (Bender Depo.) at 71:7–11, 81:4–20.)

21    24.    ADOA did not often remove exclusions from the Plan. (Curtis Decl., Ex. 10
22    (Bender Depo.) at 116:24–117:9.)

23    25.    From 2015-2021, ADOA removed only five exclusions for treatments or
24    services from the Plan, including:

25    a. 2015 – compression garments for treatment of burns;

26    b. 2016 – none;

27    c. 2017 – manipulations under anesthesia, counseling and hormone
28    therapy for the treatment of gender dysphoria;

       d.  2018 – midwife services;

       e.  2019 – none;

       f.  2020 – none; and

       g.  2021 – treatment for benign gynecomastia. (Declaration of Paul Shannon ("Shannon Decl.") at ¶ 5.)

26.    ADOA only removed exclusions from the Plan if it was legally required or if the revision would not increase the cost of the Plan. (*See* Curtis Decl., Ex. 10 (Bender Depo.) at 116:24–117:9, 167:12-24.)

**D.**    <u>History of the Exclusion</u>

**1.**    **Origination of the Exclusion**

27.    Prior to 2004, ADOA provided health insurance to State employees through a fully-insured health insurance plan provided by Cigna. (Curtis Decl., Ex. 15 (AZSTATE.244065) at AZSTATE.244071.)

28.    In October 2004, the State instituted a self-funded health insurance plan. (Curtis Decl., Ex. 15 at AZSTATE.244071.)

29.    At that time, the State copied the plan document and terms previously provided by its insurance companies, including Cigna. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 195:16–20, 197:7–15, 200:11–15.)

30.    That plan document included an exclusion for "transsexual surgery including medical or psychological counseling and hormonal therapy in preparation for, or subsequent to, any such surgery." (*See* Curtis Decl., Ex. 16 (AZSTATE.010905) at AZSTATE.010973.)

31.    In the past, both public and private institutions excluded healthcare coverage for gender dysphoria on the rationale that such treatments were cosmetic or experimental. (*See* Doc. 86 (Amended Complaint), ¶ 3; Curtis Decl., Ex. 1 (Toomey Depo.) at 146:3–13.)

**2.**    **The 2017 Expansion of Coverage for Transgender Persons**

32.    Beginning in September 2015, ADOA contacted its insurance vendors specifically to research industry standards for coverage of transgender benefits. (Curtis

Decl., Ex. 17 (AZSTATE.000639); *see also* Curtis Decl., Ex. 11 (Sharritts Depo.) at 45:3-6; Curtis Decl., Ex. 14 (Medina Depo.) at 119:6-16.)

33.     In 2015, the majority of ADOA's insurance vendors did not provide coverage for transgender benefits. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 26:13–17, 29:15–19; Curtis Decl., Ex. 14 (Medina Depo.) at 119:17–120:4; Curtis Decl., Ex. 18 (AZSTATE.006325); Curtis Decl., Ex. 19 (AZSTATE.006198); Curtis Decl., Ex. 20 (AZSTATE.006129); *see also* Curtis Decl., Ex. 7 (Deposition of Joan C. Barrett ("Barrett Depo.")) at 28:1–6.)

34.     On September 8, 2015, the United States Department of Health and Human Services ("HHS") issued a proposed rule on Section 1557 of the Affordable Care Act ("ACA"). (Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 92, 54172-01 (September 8, 2015).)

35.     ADOA contacted its insurance vendors to research how the proposed rule would affect that Plan. (Curtis Decl., Ex. 21 (AZSTATE.000637).)

36.     ADOA also considered the cost of removing the exclusion for transgender benefits. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 30:6-13; Curtis Decl., Ex. 13 (Schafer Depo.) at 102:23–25; Curtis Decl., Ex. 11 (Sharritts Depo.) at 78:14-20.

37.     Providing coverage for transgender benefits under the Plan would increase costs to the Plan. (*See* Curtis Decl., Ex. 22 (AZSTATE.006095); Curtis Decl., Ex. 20 (AZSTATE.006129); Curtis Decl., Ex 23 (ABOR-TOOMEY003459); Curtis Decl., Ex. 7 (Barrett Depo.) at 103:3-6.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in annual costs to the Plan. (Curtis Decl., Ex. 24 (AZSTATE.151707); Curtis Decl., Ex. 22 (AZSTATE.006095).)

38.     It is unknown how many Plan members are transgender, how many would seek "gender reassignment surgery," or what specific surgical procedures transgender Plan participants would seek. (*See* Curtis Decl., Ex. 10 (Bender Depo.) at 158:7–159:1; Curtis Decl., Ex. 24 (AZSTATE.151707).)

39.     ADOA also reviewed whether other states and governmental entities provided

1    coverage for gender reassignment surgery for their employees. (Curtis Decl., Ex. 25

2    (AZSTATE.004345); Curtis Decl., Ex. 8 (Isaacson Depo.) at 60:25-61:4.)

3        40.    HHS issued its final rule on Section 1557 on May 18, 2016 (the "2016

4    Rules"). (Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 96, 31376

5    (May 18, 2016) (codified at 45 C.F.R. pt. 92).)

6        41.    Again, ADOA contacted its insurance vendors to research how the 2016

7    Rules would affect the Plan. (Curtis Decl., Ex. 26 (AZSTATE.005674); Curtis Decl., Ex.

8    27 (AZSTATE.136334); Curtis Decl., Ex. 28 (AZSTATE.009210).)

9        42.    ADOA also reviewed publicly available information about the 2016 Rules,

10    including news bulletins. (Curtis Decl., Ex. 29 (AZSTATE.005677).)

11        43.    ADOA compiled all of this information into a coverage summary chart.

12    (Curtis Decl., Ex. 24 (AZSTATE.151707).)

13        44.    In March and September 2016, ADOA discussed coverage of gender

14    reassignment surgery with the medical directors of its insurance vendors. (Curtis Decl., Ex.

15    30 (AZSTATE.000385); Curtis Decl., Ex. 31 (AZSTATE.144146).) This discussion

16    included the cost associated with coverage for gender reassignment surgery. (*Id.*)

17        45.    ADOA's consideration of coverage for transgender benefits was no different

18    than its consideration of other procedures or conditions. (*See* Curtis Decl., Ex. 9 (Shannon

19    Depo.) at 231:20–24; Curtis Decl., Ex. 11 (Sharritts Depo.) at 90:24-91:12.)

20        46.    Ultimately, ADOA decided to expand coverage for transgender benefits

21    under the Plan—removing the exclusion for hormone therapy and medical or psychological

22    counseling—effective for the Plan year beginning January 1, 2017. (*See* Curtis Decl., Ex. 6

23    at AZSTATE.01049.)

24        47.    ADOA made this decision in order to minimize increased costs to the Plan

25    and because it believed that the modified exclusion was legal.[3] (Curtis Decl., Ex. 10 (Bender

26    Depo.) at 167:12-24.)

27

28

---

[3] Pursuant to this Court's Order (Doc. 278 (Order granting Motion for Reconsideration)), State Defendants will not argue that their good-faith understanding of the law is a defense in this litigation.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

48.     Beginning in plan year 2017, the Plan only excludes "gender reassignment surgery" and does not exclude counseling or hormone therapy for gender dysphoria. (Curtis Decl., Ex. 6 at AZSTATE.01049.)

49.     No one at ADOA has expressed a negative opinion about transgender persons. (Curtis Decl., Ex. 9 (Shannon Depo.) at 98:1–5, 224:12–15, 243:24–244:9; Curtis Decl., Ex. 13 (Schafer Depo.) at 181:9–20, 184:10–185:7, 185:24–186:6; Curtis Decl., Ex. 10 (Bender Depo.) at 98:19-21, 286:9-14.)

50.     No one at the Governor's Office has expressed a negative opinion about transgender persons. (*See* Curtis Decl., Ex. 8 (Isaacson Depo.) at 43:4-6; Curtis Decl., Ex. 9 (Shannon Depo.) at 224:16–21, 243:24–244:9; Curtis Decl., Ex. 32 (Deposition of Christina Corieri ("Corieri Depo.") at 55:21–56:8.)

**E.      The State's Cost Concerns**

51.     In 2016, the State had a large budget deficit.  (Curtis Decl., Ex. 33 (FY 2016 JLBC Baseline Summary); *see also* Curtis Decl., Ex. 32 (Corieri Depo.) at 35:12–36:10.)

52.     Cost reductions and efficiencies are one of the State's primary focuses. (Curtis Decl., Ex. 12 (Brown Depo.) at 47:20–49:4.)

53.     In 2016, the Plan's expenses exceeded its revenues, and ADOA had to pay Plan expenses from a reserve fund. (Curtis Decl., Ex. 15 at AZSTATE.244074–75.)

54.     In 2017, the Plan's expenses exceeded its revenues, and ADOA had to pay Plan expenses from a reserve fund. (Curtis Decl., Ex. 34 (AZSTATE.244113) at AZSTATE.244121–23.)

55.     When there is an increase to the Plan, ADOA must increase employee premiums. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 331:11–13.)

56.     Cost weighed into most decisions by ADOA. (Curtis Decl., Ex. 9 (Shannon Depo.) at 128:22–129:22; Curtis Decl., Ex. 13 (Schafer Depo.) at 83:7-10, 101:19–102:2.)

1

DATED this 26th day of September, 2022.

2

FENNEMORE CRAIG, P.C.

3

4

By: *s/ Ryan Curtis*

Timothy J. Berg

5

Amy Abdo

Ryan Curtis

6

Shannon Cohan

Attorneys for Defendants State of

7

Arizona, Andy Tobin, and Paul

Shannon

8

28107788

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 10 -