# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Russell B. Toomey,          )Case No.CV19-0035-TUC-RM (LAB)
                            )
          Plaintiff,        )
                            )
              vs.           )
                            )
State of Arizona, et al.,)
                            )
          Defendants.       )
_____)


DEPOSITION OF RUSSELL B. TOOMEY, Ph.D.


Phoenix, Arizona
May 26, 2021
9:00 a.m.


REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165


PREPARED FOR:
CONDENSED/ASCII

(Certified Copy)

1    physician who recommended it?

2        A.    Yes.

3        Q.    What discipline did that physician practice in?

4        A.    I do not know.

5        Q.    Was it -- did you say it was a doctor at the

6    Ohio University student medical center?

7        A.    Yes.

8        Q.    And what were you treating with that physician

9    for?

10       A.    Gender dysphoria.

11       Q.    Have you been diagnosed with gender dysphoria?

12       A.    Yes.

13       Q.    When were you first diagnosed?

14       A.    2003.

15       Q.    And was it by this physician whose name you

16   cannot recall?

17       A.    Yes.

18       Q.    Has anyone else diagnosed you with gender

19   dysphoria?

20       A.    Yes.

21       Q.    Who else?

22       A.    The psychologist that I was seeing in 2003 at

23   the student health center.

24       Q.    Do you know that psychologist's name?

25       A.    Her first name was Susan.  I cannot remember

40

1    A.    No.

2    Q.    And did you have any discussions with that

3  physician about the possibility of a hysterectomy?

4    A.    Yes.

5    Q.    And what was discussed?

6    A.    She walked through the different results that

7  were possible from the biopsy and the different

8  treatments that would be provided for the different

9  results.

10    Q.    And one of those treatments was a hysterectomy?

11    A.    Yes.

12    Q.    Is it your understanding that you could have

13  obtained a hysterectomy under your BlueCross plan if

14  your provider had used a different diagnosis code?

15    A.    Can you clarify when you're -- the time frame?

16    Q.    From the time that you sought coverage to the

17  present.

18    A.    No, that's not my understanding.

19    Q.    Do you understand -- is it your understanding

20  that if you had -- if your provider had determined that

21  you were precancerous, for example, in any of the parts

22  in which a hysterectomy removes, that that might be a

23  proper basis for a hysterectomy?

24    A.    Yes.

25    Q.    And so had your provider used that diagnosis

49

1   a cancer that would be present in the organs that are

2   involved in a hysterectomy?

3       A.    Yes.

4       Q.    Okay.  So just so that we're clear on the

5   record, it's your understanding that due to the hormones

6   you're taking, you are at higher risk for cancer present

7   in the organs that would be involved in a hysterectomy?

8       A.    The physician that stated that, it was in 2003,

9   and the science at the time stated that in 2003.  More

10  recent physicians have not stated that specifically to

11  me.

12      Q.    Was the physician who stated that to you the

13  physician who first put you on hormones?

14      A.    Yes.

15      Q.    And have you been on hormones continuously

16  since that time?

17      A.    Yes.

18      Q.    And have you been informed that one of the

19  potential risks of -- risks or side effects of hormones

20  is cancer?

21      A.    Again, yes, in 2003, that was provided.

22      Q.    And as I understand, you recently had an

23  abnormal Pap smear?

24      A.    Yes.

25      Q.    You also had a biopsy done due to that abnormal

50

1    Pap smear; correct?

2        A.    Yes.

3        Q.    Have you sought a second opinion as to whether

4    those indicators I'll call them, the potential risk of

5    cancer due to hormones and an abnormal Pap and a biopsy,

6    would entitle you to a hysterectomy under your BlueCross

7    benefit plan?

8        A.    I'm not sure I understand your question.

9        Q.    Have you sought an opinion from any physician

10   as to whether your current health status, which includes

11   the potential risk of cancer due to hormone therapy,

12   history of an abnormal Pap and your recent biopsy, would

13   indicate that a hysterectomy would be appropriate for

14   you?

15              MR. BLOCK:   Objection to form.

16       A.    Is the question about the second opinion or the

17   physician that I saw?

18       Q.    BY MS. ABDO:  Well, it was about a second

19   opinion, but we can start with the physician that you

20   saw.  Did you discuss with that physician whether the

21   history that I've just described would indicate that

22   you're a candidate for a hysterectomy?

23       A.    She discussed that when she was discussing the

24   options that would come back with a diagnosis.

25       Q.    And since you received the results of your

54

1     A.     Yes.

2     Q.     BY MS. ABDO:  And would it be fair to say also

3   that you don't have any idea what the cost of such

4   coverage, if it were available, would be to you;

5   correct?

6     A.     Correct.

7            MS. ABDO:  Let's go ahead and mark

8   Exhibit 2, which will be Tab 2.

9              (Exhibit No. 2 was marked.)

10           MR. BLOCK:  I'm sorry, which tab is that?

11           MS. ABDO:  2.

12           MR. BLOCK:  Thanks.

13     Q.     BY MS. ABDO:  Sir, you have in front of you

14   what's been marked as Exhibit 2 to your deposition.

15   Have you seen this document before?

16     A.     I believe so.

17     Q.     Is the EPO plan the plan under which you

18   receive benefits?

19     A.     Yes, until -- from 2015 until 2020.

20     Q.     And then after 2020, what plan --

21     A.     Or 2021, excuse me.

22     Q.     So just recently, your plan changed?

23     A.     I switched from the EPO to the HDP plan offered

24   by ADOA.

25     Q.     And why did you switch?

61

1     Q.    And when you look at Exhibit 3, is this the

2   plan, the Benefit Options EPO Plan Effective

3   January 1, 2017, is this the plan that you claim is

4   discriminatory?

5     A.    Yes.

6     Q.    And when you look at the exclusion number 16 on

7   page 55, it excludes gender reassignment surgery for all

8   persons; correct?

9     A.    Correct.

10    Q.    And it does not reference in any form

11  transgender persons; right?

12              MR. BLOCK:  Object to form.

13    A.    Gender reassignment surgery is specific to

14  transgender people.

15    Q.    BY MS. ABDO:  The plan does not state that,

16  does it?

17    A.    No.

18    Q.    Okay.  And it excludes gender reassignment

19  surgery for any person who would seek to receive that

20  surgery; correct?

21    A.    Correct.

22    Q.    Why did you think it was important to get a

23  denial from BlueCross/BlueShield in order to help your

24  lawsuit that brings us here today?

25    A.    Can you rephrase that or reword that question?

75

1    Q.    And if you had the presence of cancer, you

2  would also be entitled to a hysterectomy; correct?

3    A.    Correct.

4    Q.    So for any of the reasons that a cisgender

5  person could seek a hysterectomy under the plan, you

6  also, as a transgender person, could seek a hysterectomy

7  under the plan; correct?

8    A.    No.

9    Q.    What basis could a cisgender person get a

10  hysterectomy that you could not?

11    A.    For a medically necessary reason.

12    Q.    What would be the reason?

13    A.    Any medically necessary reason.

14    Q.    Right.  And any medically necessary reason that

15  a cisgender person could get a hysterectomy, you also

16  could get one, couldn't you, if it was the same reason?

17    A.    If it's the same reason as a cisgender person,

18  is that what you're asking?

19    Q.    Yes.

20    A.    Yes.

21    Q.    Is there any other reason you believe the

22  presence of the exclusion is discriminatory towards

23  transgender persons?

24    A.    Not other than what I've already shared.

25                MS. ABDO:  Let's go ahead and mark

98

1   cisgender person would be entitled to a hysterectomy

2   that a transgender person would not be?

3       A.    For a medically necessary condition.

4       Q.    Okay.  Can you identify any medically necessary

5   condition that would entitle a cisgender person to a

6   hysterectomy that would not entitle a transgender person

7   to a hysterectomy?

8       A.    No.

9       Q.    During the meeting, did anyone, and I'm

10  referring to the meeting that you identified as having

11  with Jared Jorde, Staci and Helena, during that meeting,

12  did anyone make any statement that led you to believe

13  the State of Arizona had any discriminatory intent in

14  including Exclusion 16 in the plan?

15      A.    Intent was not discussed.

16      Q.    Okay.  So then is your answer that no one made

17  any reference to any intent with respect to the

18  exclusion in the plan document?

19      A.    Correct.

20      Q.    Okay.  Did anyone at the meeting provide any

21  opinions as to whether they believed that Exclusion 16

22  was discriminatory in the plan?

23      A.    Yes.

24      Q.    Who did?

25      A.    All parties that were in the room.

1    A.    Discriminates against employees based on sex.

2    Q.    Anything else?

3    A.    And provides unfair treatment to a specific

4  group of people.

5              MR. BLOCK:  Can we move the microphone a

6  little closer or can you lean up?  Thank you.

7    Q.    BY MS. ABDO:  And you said that it

8  discriminates against employees based on sex; correct?

9    A.    Correct.

10    Q.    And you understand that the Exclusion 16

11  applies to everyone, correct, to all sexes?

12    A.    I do not understand the exclusion to mean that.

13    Q.    Well, does any of the wording in the exclusion

14  differentiate based on sex?

15    A.    Can you clarify your question?

16    Q.    Does the exclusion identify any particular sex?

17    A.    No.

18    Q.    And then I think you said it results in unfair

19  treatment to a specific group of people; correct?

20    A.    Yes.

21    Q.    And you understand that the exclusion applies

22  to all persons?

23    A.    That is not my understanding of the exclusion.

24    Q.    Okay.  Would you agree that all persons who

25  seek gender reassignment surgery under the plan would be

121

1   denied coverage based on the exclusion?

2       A.    Yes.

3       Q.    The next paragraph you say, "That means

4   hundreds, if not thousands, of transgender State

5   employees or transgender dependents of State employees

6   cannot receive medically necessary care recommended by

7   their doctors, such as a mastectomy or a hysterectomy."

8   Do you see that?

9       A.    Yes.

10      Q.    And I think we covered this, but for all the

11  reasons a cisgender person could get a mastectomy or

12  hysterectomy, you would agree that a transgender person

13  could also get one; correct?

14      A.    Again, I do not agree with that statement.

15      Q.    But I asked you earlier to identify any basis

16  on which a cisgender person could get a hysterectomy,

17  but we can include a mastectomy too, and you were unable

18  to identify any basis that a transgender person could

19  not also get one; correct?

20      A.    Are you asking if a cisgender person has that

21  covered, transgender people --

22      Q.    I'm trying to find out is there any basis on

23  which a cisgender person would be entitled to a

24  mastectomy or hysterectomy that a transgender person

25  would not also be entitled to a hysterectomy or a

1    mastectomy?

2        A.    For the same diagnosis, no.

3        Q.    And where did you get the number of hundreds,

4    if not thousands, of employees?

5        A.    It's an estimate based on a Williams Institute

6    report about the size of the transgender population.

7        Q.    So it's not an estimate based on the state of

8    Arizona; correct?

9        A.    Correct.

10       Q.    It's a generalization from that study that

11   you've applied in Arizona?

12       A.    They did actually provide by state their

13   estimated prevalence rate.

14       Q.    And do you know the process that they utilized

15   in order to provide -- did they include the state of

16   Arizona?

17       A.    They included data from the state of Arizona.

18       Q.    And do you know the process by which they

19   conducted their study?

20       A.    I cannot remember all the details.

21       Q.    Did you rely on anything other than that study?

22       A.    No.

23       Q.    And I would assume, as you sit here today,

24   you're not able to identify hundreds or thousands of

25   people who are impacted by the Exclusion 16 in the plan;

1   you've had?

2       A.    Yes.

3       Q.    Are you considering any other surgeries related

4   to transition outside of a hysterectomy?

5       A.    At this time, no.

6       Q.    I know you indicated you're currently in

7   counseling for gender dysphoria; correct?

8       A.    Yes.

9       Q.    Are there currently any other treatments or

10  services you're receiving for gender dysphoria?

11      A.    Testosterone.

12      Q.    The hormone therapy?

13      A.    Hormone therapy, yes.

14      Q.    Anything else?

15      A.    No.

16      Q.    Would you agree that not every transgender

17  person wants gender-affirming surgery?

18      A.    Yes.

19      Q.    Is it your expectation that you'll be on

20  hormone therapy for life?

21      A.    Yes.

22      Q.    And is that based on what your -- what is that

23  based on?

24      A.    My understanding of what transitions look like.

25      Q.    Is that what you've been told by physicians

146

1     Q.    Did you make any changes to it?

2     A.    I don't remember.

3     Q.    If you look at paragraph 3 of the Amended

4   Complaint, the first sentence reads, "In the past, some

5   public and private insurance companies excluded coverage

6   for treatment of gender dysphoria (also called

7   transition-related care or gender-affirming care)

8   including surgical treatments, based on the erroneous

9   assumption that such treatments were cosmetic or

10  experimental."  Do you see that?

11    A.    Yes.

12    Q.    Do you believe that to be true?

13    A.    Yes.

14    Q.    And I'd asked you about that earlier and I

15  think that you indicated you were not aware of this; is

16  that right?

17              MR. BLOCK:  Objection, form.

18    A.    I do not believe that the wording was the same.

19    Q.    BY MS. ABDO:  Okay.  Did you ever have any

20  conversations with anyone from the governor's office

21  about the exclusion?

22    A.    No.

23    Q.    And I apologize if I asked you this earlier.

24  Did you ever have any conversations with the ADOA about

25  the exclusion?

1  questions where there's already been asked and answered

2  and that's part of the form objection.  And also I think

3  the wording of the question is misleading when you're

4  asking questions about cisgender versus transgender

5  being able to get hysterectomies under the plan because

6  transgender people can get hysterectomies under the plan

7  when it's medically necessary.

8     Q.   BY MR. YOST:  Dr. Toomey, you understand that

9  transgender employees can get a hysterectomy covered

10  under the plan; right?

11              MS. ABDO:  Form.

12    A.    Yes, for diagnoses not related to gender

13  dysphoria.

14    Q.   BY MR. YOST:  If a transgender person is

15  diagnosed with gender dysphoria, is it your

16  understanding, based on your review of the plan, that a

17  transgender person would get coverage for a

18  hysterectomy?

19              MS. ABDO:  Form.

20    A.    No.

21    Q.   BY MR. YOST:  As treatment for -- is it your

22  understanding that a transgender person who suffers from

23  gender dysphoria who seeks a hysterectomy to treat

24  gender dysphoria would get coverage for the hysterectomy

25  under the plan?

1  debt.

2            MS. ABDO:  We very much appreciate your

3  time and patience with us today.  I don't know if anyone

4  else has questions.

5            Josh, do you?

6            MR. BLOCK:  Austin, do you have anything

7  further?

8            MR. YOST:  No questions.  Thank you for

9  your time, Dr. Toomey.

10           MR. BLOCK:  I have no questions.

11  Dr. Toomey would like to read and review the transcript.

12           MS. ABDO:  All right.  No problem.  Thank

13  you so much.

14           (4:04 p.m.)

15

16

17

18           _____

19                RUSSELL B. TOOMEY, Ph.D.

20

21

22

23

24

25

1  STATE OF ARIZONA      )
                         )  ss.
2  COUNTY OF MARICOPA    )

3          BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   foregoing pages are a full, true and accurate record of
5  the proceedings, all done to the best of my skill and
   ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
   direction.

7

8          I CERTIFY that I am in no way related to any of
   the parties hereto nor am I in any way interested in
9  the outcome hereof.

10              [X]  Review and signature was requested.
                []   Review and signature was waived/not
11 requested.

12

13          I CERTIFY that I have complied with the ethical
   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14 J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 7th
   of June, 2021.

15                  /s/ Jennifer Hanssen

16                  Jennifer Hanssen, RPR
                    Certified Reporter
17                  Arizona CR No. 50165

18              *         *         *         *

19          I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
   complied with the ethical obligations set forth in ACJA
20 7-206 (J)(1)(g)(1) through (6).

21

                    _____
22                  GRIFFIN GROUP INTERNATIONAL
                    Registered Reporting Firm
23                  Arizona RRF No. R1005

24
                    25

# EXHIBIT 2

1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF ARIZONA

3
   Russell B. Toomey,      )Case No.CV19-0035-TUC-RM (LAB)
4                 )
        Plaintiff,   )
5                 )
           vs.     )
6                 )
   State of Arizona, et al.,)
7                 )
        Defendants.  )
8  _____)

9

10

11         VIDEOCONFERENCE DEPOSITION OF
           LOREN S. SCHECHTER, M.D.
12

13

            Highland Park, Illinois
14           June 15, 2021
            11:00 a.m. CDT
15

16

17

18

19

20  REPORTED BY:
   JENNIFER HANSSEN, RPR
21  Certified Reporter
   Certificate No. 50165

22

23  PREPARED FOR:
   ASCII/CONDENSED
24
   (Certified Copy)
25



29

1  similar way as a reconstructive procedure, depending on

2  the particular procedure.

3     Q.    So the payor if it's a case of medical plans,

4  like in this case, or insurance companies distinguish in

5  terms of whether they'll pay for a procedure as to

6  whether it's cosmetic versus medically necessary?

7     A.    Typically.

8     Q.    Given the individualized nature of

9  gender-confirming or affirming surgeries, am I correct

10  to understand that some of those would be considered

11  medically necessary and some of them would be considered

12  cosmetic or elective?

13    A.    Well, I would say like most of medicine and

14  surgery, care is provided in an individualized manner.

15  People's choice -- people have choices as to treatments

16  in which they choose to undertake or choose to forego.

17  But, yes, as with cisgender individuals, transgender

18  individuals may also have cosmetic or aesthetic

19  interventions or procedures.

20    Q.    For example, in surgeries that you do on

21  transgender males, there are some people who undergo the

22  top, the upper surgery on the breasts, that you would

23  opine is medically necessary, and there are some of

24  those that, depending on the circumstances, you might

25  determine were not medically necessary; is that correct?



30

1    A.    If we're speaking specifically for chest

2  surgery, which, to me, refers to mastectomy, those are

3  considered medically necessary procedures.

4    Q.    In every case?

5    A.    I would have to see -- again, assess each case

6  independently, but I can't recall, at least recently in

7  my practice, a chest surgery that I would not consider

8  medically necessary that I have performed.

9    Q.    Right.  And I'm not talking about ones that

10 you've performed.  Is it correct that -- I mean, let me

11 back up.

12        Not all transgender males undergo chest

13 surgery to alleviate gender dysphoria; correct?

14    A.    Well, it is true that not all transgender men

15 undergo chest surgery.  There may be a variety of

16 reasons why they do not.

17    Q.    Right.  But the WPATH guidelines talk about

18 persons who are able to address, alleviate their gender

19 dysphoria without the need for surgical intervention at

20 all; is that accurate?

21    A.    Not all transgender individuals undergo or

22 request surgical intervention.  As to why, there are

23 numerous reasons.

24    Q.    And what are the reasons that you're aware of?

25    A.    Well, it may be financial.  So in cases where



Toomey vs.                                                    Loren Schechter
State of Arizona                                                June 15, 2021

31

1  there's a lack of access or difficulty in access to

2  care, such as insurance companies not covering it, they

3  may not have the financial means to access surgery.

4              There may be personal reasons depending on

5  how they weigh the risk or the benefit, just as whether

6  you're cisgender or transgender, how you weigh a benefit

7  of any particular intervention.

8      Q.    Gender dysphoria, as I understand it, is

9  defined as clinically significant distress caused by a

10  discrepancy between a person's gender identity and that

11  person's primary and/or secondary sexual

12  characteristics.  Is that the definition you apply?

13      A.    Yes.

14      Q.    And isn't a reason why transgender males don't

15  undergo any gender-affirming surgery because some of

16  them feel that their gender dysphoria is appropriately

17  addressed with a noninvasive treatment?

18      A.    So the -- are you speaking specifically for the

19  diagnosed condition of gender dysphoria?

20      Q.    Yes.

21      A.    So, again, as to whether or not someone

22  accesses surgical care or why they choose not to access

23  it or proceed with it depends upon the individual

24  circumstances, and as we've just discussed, there may be

25  many reasons for that.



32

1    Q.   You've seen patients, though, Doctor, haven't

2   you, who were transgender males whose gender dysphoria

3   was alleviated sufficiently by a treatment that did not

4   involve surgery such that that patient did not seek

5   surgical intervention; is that accurate?

6    A.   Well, I've seen patients who have chosen not to

7   proceed with surgical interventions based on discussions

8   of the procedure, the risks and benefits of that

9   procedure.  That does not mean necessarily that they've

10  alleviated or reduced their dysphoria, but they're

11  making a decision based upon the risks and benefits of a

12  procedure.

13   Q.   Is it your testimony that every transgender

14  male should undergo chest surgery if they are really

15  going to alleviate gender dysphoria?

16   A.   That would be an individual decision for that

17  person based upon their understanding of the risks and

18  benefits.

19   Q.   But from a medical standpoint, is it your

20  opinion that every transgender male, in order to

21  alleviate gender dysphoria, not a choice they make, but

22  from a medical standpoint, should have chest surgery?

23   A.   I don't counsel patients, regardless of whether

24  they're cisgender or transgender, or talk them into any

25  particular procedure.  It's a shared decision-making



Toomey vs.                                                      Loren Schechter
State of Arizona                                                 June 15, 2021

35

1    A.    I would have to understand what the patient --

2  why the patient wanted the procedure in that case so --

3  to better answer that question.

4    Q.    So do you agree, Doctor, that some transgender

5  patients who want gender-affirming surgery would not

6  meet your definition of the surgery being medically

7  necessary?

8    A.    So as we said before, some transgender people

9  and some cisgender people request certain aesthetic

10  interventions so -- or cosmetic interventions.

11   Q.    So just as with a cisgender person who might

12  want cosmetic intervention, you could have a transgender

13  person seeking one of the surgeries discussed in the

14  WPATH guidelines that you would also consider cosmetic

15  and not medically necessary; is that correct?

16         MR. BLOCK:  Objection to form again.

17   A.    No, I think you'd have to specify which --

18  which procedure.  As we said earlier, I don't think I've

19  had a patient or I don't think I've performed, for

20  example, a chest surgery, meaning mastectomy, recently

21  that I did not feel was medically necessary.

22   Q.    BY MR. NORTHUP:  And, again, I'm not talking

23  about surgeries that you've done.  I'm talking about

24  your opinions generally.  Is it your testimony that

25  every person who wants a gender-affirming surgery and



**Griffin Group International**
888.529.9990 | 602.264.2230

Toomey vs.                                                    Loren Schechter
State of Arizona                                              June 15, 2021

36

1   that person is transgender, every one of those

2   procedures is always medically necessary?

3          MR. BLOCK:  Objection.

4      A.    There are cosmetic procedures that transgender

5   individuals request.

6      Q.    BY MR. NORTHUP:  Let's talk about, for example,

7   a chest surgery.  Do you agree that a transgender male

8   seeking chest surgery could be doing that for a reason

9   other than to alleviate gender dysphoria?

10     A.    Well, there may be many reasons.  I mean, it

11  could be improvement of quality of life, reduction of

12  negative health outcomes, improved body image, but

13  gender dysphoria remains the most common indication.

14     Q.    And if a patient was seeking -- a transgender

15  male was seeking chest surgery and it wasn't to treat

16  gender dysphoria and it wasn't to treat a physical

17  malady or address a risk of cancer or something like

18  that, there are circumstances where you would deem that

19  surgery to be cosmetic; isn't that right, Doctor?

20     A.    I can't say that I've seen a case of someone

21  requesting a mastectomy -- or I don't recall at least

22  recently seeing a case of a person requesting -- a

23  transgender man requesting mastectomy where gender

24  dysphoria was not a component of that request.

25     Q.    And it sounds like you can't conceive of a



Toomey vs.                                                          Loren Schechter
State of Arizona                                                   June 15, 2021

39

1      Q.    Okay.   What percentage of transgender patients

2  actually have some form of gender-affirming surgical

3  procedure?

4      A.    I would estimate on the order of somewhere

5  between 30 to 60 percent or so.

6      Q.    And from your testimony earlier, my

7  understanding is that there could be myriad reasons why

8  the 40 to 70 percent of people who don't have some form

9  of surgical procedure do not take that step and have

10 some type of gender-assignment surgical procedure;

11 correct?

12     A.    Some form of gender-affirming or confirming

13 surgery.

14     Q.    And, I'm sorry, I meant to say "affirming."  I

15 believe I said "assignment."

16            Doctor, back to Exhibit 2, which is the

17 second page of your billings, these we got June 11th --

18 well, it's actually dated June 11th, 2021, to Wesley

19 Powell of Willkie Farr & Gallagher, and this has a

20 summary of services that start on March 19th and go

21 through June 2nd, 2021?

22     A.    Yes.

23     Q.    And it shows a total of 2.75 hours?

24     A.    Can you just scroll down?

25     Q.    Yeah, I'm sorry.



79

1  might be covered by the plan in terms of pectoral

2  implants?

3      **A.     It would have to go through the typical process**

4  **of precertification, but I can envision cases where it**

5  **would be medically necessary, yes.**

6      Q.     Have you seen cases, Doctor, where a cisgender

7  male had pectoral implants that were to improve

8  appearance, but wasn't to correct a congenital

9  abnormality?

10     **A.     Yes.**

11     Q.     And is it your experience that in that

12 situation, insurance plans typically would not cover

13 that surgery because they would consider it cosmetic?

14     **A.     Possible.**

15     Q.     What are the -- again, talking top surgeries,

16 chest surgeries, that are options in a transgender

17 female that would be used to treat gender dysphoria?

18     **A.     So you're talking about --**

19             MR. BLOCK:  Objection.

20     **A.     I'm sorry.  Talking about -- pardon me?**

21             MR. NORTHUP:  I'm sorry.  We're talking

22 over each other.  I apologize.

23     **A.     And the question was again, I'm sorry?**

24     Q.     BY MR. NORTHUP:  The question was if we're

25 talking top surgery, chest surgery, in a transgender

Toomey vs.                                                    Loren Schechter
State of Arizona                                              June 15, 2021

80

1   female, what are the surgical options that are treatment
2   for gender dysphoria?
3       A.    So there may be a number of surgical options,
4   but generally, they would involve some form of
5   augmentation, mammoplasty, breast enlargement.  How that
6   specifically is done, again, would depend on the
7   particulars of the case.
8       Q.    So if someone was biologically male, but was
9   transgender female, that part of what could be done
10  would be breast enlargement; is that -- am I following
11  you?
12      A.    Well, so if someone were assigned male at birth
13  and identified as a transgender woman, they could have a
14  breast augmentation, yes.
15      Q.    And does that involve placement of some type of
16  implants?
17      A.    It could involve an implant.  It could involve
18  their own fatty tissue.  It could involve transfer of
19  tissue from other parts of their body.
20      Q.    Now, in a cisgender female, that type of
21  implantation of fatty tissue or some other type of
22  implant, in some circumstances, do you have any
23  understanding as to whether that would be considered
24  medically necessary?
25      A.    Most often, that is considered cosmetic.



Toomey vs.                                                          Loren Schechter
State of Arizona                                                    June 15, 2021

84

1    A.    So I would estimate probably before -- before

2  most people have their services covered by insurance, we

3  had self-pay rates where the patient was responsible for

4  surgical fees and facility fees.  That's probably now a

5  number of years ago, and if I'm recalling correctly, it

6  was probably on the order of about 8 to $10,000 for the

7  mastectomy, including surgical and facility fees, and

8  that's a rough -- a rough estimate.

9    Q.    And are there other fees, then, on top of the

10  surgical, facility fees?

11    A.    So typically, for top surgery, meaning

12  mastectomy, there are three -- generally speaking, three

13  components, the surgical fee, the facility fee and then

14  the anesthesia fee.  There may be some other fees such

15  as compression garments, bandages, topical ointments and

16  so forth.

17    Q.    I've seen referred to in transgender surgical

18  procedures what's referred to as bottom surgery.  Is

19  that a term that doctors use or a term that you use?

20    A.    It's more of a colloquial term referring

21  typically to genital surgeries.

22    Q.    And what are the available genital surgeries

23  for transgender males?

24    A.    So in addition to the hysterectomy and

25  salpingo-oophorectomy, individuals may undergo



85

1   colpectomy and colpocleisis, so removal of the vaginal

2   lining and closure of the vaginal canal.

3           They may undergo lengthening of the

4   hormonally hypertrophied clitoris, referred to as a

5   metoidioplasty.  That's M-E-T-O-I-D-I-O plasty.  That

6   may be done with or without urethral lengthening.  That

7   may be done with or without construction of the scrotum

8   and placement of testicular implants.

9           And then there's phalloplasty, P-H-A-L-L-O

10  plasty, again, which may be done in a number of

11  different ways ranging from construction of the penis,

12  also to include lengthening of the urethra and

13  subsequent placement of prosthesis to include erectile

14  prothesis for the penis and testicular implants for the

15  scrotum.

16          That may also be done, either of those

17  procedures, in conjunction with removal of the mons,

18  M-O-N-S, fat pad, which is the skin and fatty tissue

19  overlying the pubic bone.

20      Q.   Do you know what percentage of transgender

21  males undergo a hysterectomy, salpingo-oophorectomy?

22      A.   I would estimate, again, somewhere between 30

23  to 60 percent or so.

24      Q.   And just so I'm clear, the hysterectomy

25  salpingo-oophorectomy is categorized as genital surgery



Toomey vs.
State of Arizona

Loren Schechter
June 15, 2021

87

1    Q.    And what are the options for what we would
2    consider genital surgery for a transgender female?
3    A.    So that can be orchiectomy, so removal of the
4    testicles.  It can be vaginoplasty, different types
5    of -- and there are different types of vaginoplasty, but
6    those would be the two main categories.
7    Q.    And what percentage of transgender women have
8    one or both of those procedures?
9    A.    I would estimate probably somewhere between
10    about 40 to 60 percent.
11    Q.    Do you know -- we talked earlier about the
12    Complaint focusing on Dr. Toomey wanting a hysterectomy,
13    salpingo -- bilateral salpingo-oophorectomy.  Do you
14    have any idea why Dr. Toomey is seeking that treatment?
15    Is it solely for gender dysphoria?  Are there other
16    reasons that you're aware of?  Do you have any
17    information in that regard?
18    A.    Nothing outside of what is in the Amended
19    Complaint.
20    Q.    Is there a -- again, I know it varies, but we
21    were talking about the transgender male surgeries that
22    go beyond the hysterectomy, oophorectomy cost.  What's a
23    cost range for those other procedures that you talked
24    about?
25                    MR. BLOCK:  Objection.



Toomey vs.                                          Loren Schechter
State of Arizona                                     June 15, 2021

103

1  with lengthening of the urethra and may also be done

2  with closure of the vaginal canal and may be done with

3  construction of the scrotum and placement of testicular

4  implants.

5      Q.    Are you aware of metoidioplasty being performed

6  on a cisgender person?

7      A.    I cannot say that I have performed

8  metoidioplasty on a cisgender individual.  I have

9  performed the procedure on intersex individuals.

10     Q.    And what is an intersex individual?

11     A.    Again, they may have various congenital

12  conditions which relate to either overproduction of

13  hormones, for example, that lead to hypertrophy or

14  virilization of the clitoris.  It involves an entire

15  spectrum of conditions, but the one that I'm referencing

16  would typically be something along those lines of

17  congenital adrenal hyperplasia or something to that

18  effect.

19     Q.    Also, we have been using the term "cisgender,"

20  and I believe I understand what it means, and you

21  certainly do, but just for a record, if somebody's

22  reading this who might not, how would you define

23  "cisgender"?

24     A.    Yeah, thank you.  So cisgender would be someone

25  whose physical anatomy is consistent with their gender



Toomey vs.                                                                          Loren Schechter
State of Arizona                                                                    June 15, 2021

105

1  result of speech therapy, individuals may or may not

2  choose to proceed with some form of modification of

3  their laryngeal structures.

4      Q.    When voice modification surgery is performed on

5  a transgender individual, what condition is that surgery

6  treating?

7      A.    Most often, the indication is gender dysphoria.

8      Q.    And when it's not gender dysphoria, what are

9  conditions you're aware of that are being treated?

10     A.    I'm not aware of voice modification -- well,

11  I'm aware of surgery on the laryngeal structures for any

12  number of reasons, but not specifically for voice

13  modification outside of the realm of gender-affirming

14  intervention.

15     Q.    So you're not aware of voice modification being

16  performed on cisgender persons?

17     A.    I don't have personal experience with voice

18  modification in cisgender individuals.

19     Q.    We talked a little bit earlier about

20  vaginectomy, I believe, but I want to make sure I

21  understand what that involves.  Could you give us just a

22  brief explanation, please.

23     A.    So yeah.  Most often, the procedure is removal

24  of the lining of the vagina, oftentimes referred to as

25  colpectomy, with closure of the vaginal canal referred



1  performed on cisgender persons?

2    **A.    Yes.**

3    Q.    And what are the conditions you're aware of

4  that would necessitate the orchiectomy on a cisgender

5  person?

6    **A.    Most commonly, tumor, torsion where the**

7  **testicle becomes twisted and the blood supply is lost,**

8  **infection, trauma, again, birth-related conditions.**

9    Q.    You're familiar with penal inversion

10 vaginoplasty?

11   **A.    I am.**

12   Q.    And what is that, Doctor, just for the record?

13   **A.    Sure.  So that's the most common technique used**

14 **to create a vagina for transgender women.**

15   Q.    Can you think of a situation where penal

16 inversion vaginoplasty would be performed on a cisgender

17 person?

18   **A.    Components of that procedure may be performed**

19 **on cisgender individuals, but the vaginoplasty as a**

20 **whole would typically not be performed on a cisgender**

21 **individual.**

22   Q.    And then I think we talked a little bit, at

23 least alluded to this earlier.  Clitoroplasty, what is

24 that?

25   **A.    Well, it means adjustment of the clitoris.**



Toomey vs.                                              Loren Schechter
State of Arizona                                          June 15, 2021

116

1    A.    Well, again, similar to other discussion, there

2    are -- I may have considered the intervention medically

3    necessary.  Insurance may not have covered it, but that

4    wouldn't necessarily -- although the people have chosen

5    to proceed on a self-pay basis, again, wouldn't affect

6    my decision or my feeling that it was medically

7    necessary.

8    Q.    So it sounds like from a surgeon's perspective,

9    what is medically necessary is not necessarily the same

10   as medical necessity under an insurance plan; is that

11   accurate?

12   A.    I would say, yes, it would not be uncommon to

13   have a surgeon and an insurance company have a differing

14   opinion, which is often why there's some form of appeal

15   or adjudication process.

16   Q.    And also depends, doesn't it, on the

17   definitions and coverages that are provided under the

18   plan?

19   A.    It may, with the distinction in this case is

20   Dr. Toomey didn't have the ability to avail himself of

21   the appeal process because it was an exclusion.  The

22   question wasn't medical necessity.  The issue was simply

23   the blanket exclusion.

24   Q.    What makes you say Dr. Toomey didn't have the

25   ability to appeal?



130

1  follow-up questions that counsel might ask you, that's

2  all I have.

3      **A.    Thank you.**

4              MR. NORTHUP:  Are we done?

5              (Discussion off the record.)

6              MS. COHAN:  Austin, do you have any

7  questions for Dr. Schechter?

8              MR. YOST:  I do not have any questions.

9              (Discussion off the record.)

10             MR. NORTHUP:  Okay.  So looks like no

11  questions.  He said you'll read and sign.  Doctor, I

12  appreciate your time.

13     **A.    Thank you very much.  Appreciate it.**

14             (3:40 p.m.)

15

16

17

18             _____

19                  LOREN SCHECHTER, M.D.

20

21

22

23

24

25

131

1   STATE OF ARIZONA      )
                          )  ss.
2   COUNTY OF MARICOPA    )

3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.

7

8        I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in
9   the outcome hereof.

10       [X]  Review and signature was requested.
         []   Review and signature was waived/not
11  requested.

12

13       I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14  J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 28th
    of June, 2021.

15              /s/ Jennifer Hanssen
                Jennifer Hanssen, RPR
16              Certified Reporter
                Arizona CR No. 50165

17              *       *       *       *

18       I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
19  complied with the ethical obligations set forth in ACJA
    7-206 (J)(1)(g)(1) through (6).

20

21              /s/ Pamela A. Griffin
                _____
22              GRIFFIN GROUP INTERNATIONAL
                Registered Reporting Firm
23              Arizona RRF No. R1005

24

25

# EXHIBIT 3

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Arizona Civil Rights Division and EEOC |
|---|
| State or local Agency, if any |

| Name (*Indicate Mr., Ms., Mrs.*)<br>Mr. Russell B. Toomey, Ph.D. | Home Phone No. (*Include Area Code*)<br>(520) 429-6496 | |
|---|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br>5901 E. Ryan Place          Tucson, Arizona 85712 | | Date of Birth<br>09/28/1981 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name<br>The Board of Regents of the University of Arizona | No. Employees, Members<br>500 + | Phone No. (*Include Area Code*)<br>(520) 621-2211 |
|---|---|---|
| Street Address          City, State and ZIP Code<br>Arizona Board of Regents, Attention Secretary, 2020 N. Central Ave., Suite 230, Phoenix, AZ 85004-4593 | | |
| Name | No. Employees, Members | Phone No. (*Include Area Code*) |
| Street Address          City, State and ZIP Code | | |

| CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (*Specify*) | EARLIEST          LATEST<br>7/19/18          7/19/18<br>X CONTINUING ACTION |

THE PARTICULARS ARE (*If additional space is needed, attach extra sheet(s)*):

I have been employed by The Board of Regents of the University of Arizona ("U of A") since August 17, 2015, most recently as an Associate Professor. I have received health insurance through the U of A since August 17, 2015. The U of A provides its employees with health insurance through a self-funded health plan controlled by the Arizona Department of Administration ("the Plan"). The Plan generally provides coverage for medically necessary care, which the plan defines as "services, supplies and prescriptions, meeting all of the following criteria": (1) ordered by a physician; (2) not more extensive than required to meet the basic health needs; (3) consistent with the diagnosis of the condition for which they are being utilized; (4) consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; (5) required for purposes other than the comfort and convenience of the patient or provider; (6) rendered in the least intensive setting that is appropriate for their delivery; and (7) have demonstrated medical value.

I am a transgender male, which means that my gender identity is male, but the sex I was assigned at birth was female. I have been living as a male since 2003, when I legally changed my name, began dressing and living as a man, and began taking gender affirming hormones. I have consistently received hormone therapy since 2003. I received gender affirming "top" surgery in 2004. Despite these actions, I suffer from anxiety, depression, and distress due to my experience of dysphoria. I have been in counseling for several years and have been diagnosed with Gender Dysphoria.

Based on this diagnosis, I met with Dr. Tiffany Karsten, an OB/GYN, in June 2018. Dr. Karsten recommended that I have a hysterectomy in order to treat my Gender Dysphoria. Dr. Karsten's office then submitted a preauthorization request for the hysterectomy to the health insurance provided by the Plan, Blue Cross Blue Shield of Arizona ("BCBSAZ"). Dr. Karsten's office left me a voicemail about the preauthorization and told me that based on the information they received, BCBSAZ did not require preauthorization for the hysterectomy and that the surgery would be covered 100% after a $100.00 co-pay. However, I later called BCBSAZ and asked them what the coverage would be if the hysterectomy was submitted with a code for Gender Dysphoria. I was told that there would be $0 in coverage and that the entire procedure would be out of pocket.

Surgical care to treat Gender Dysphoria (sometimes referred to as "transition related surgery," "gender confirming surgery," or "gender reassignment surgery") can be medically necessary treatment for Gender Dysphoria under the Plan's generally applicable criteria. The Plan provides coverage for hysterectomies when prescribed as medically necessary treatment for medical conditions, however the Plan categorically excludes coverage for the same hysterectomies when they are medically necessary to treat Gender Dysphoria. The Plan's exclusion is discriminatory and subjects me to different treatment on the basis of sex.

TOOMEY000378

I believe I have been discriminated against due to my sex in violation of Title VII of The Civil Rights Act, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (*When necessary for State and Local Requirements*) |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Date           Charging Party (*Signature*)<br>9/15/18 | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Month, day and year) |

907297.1

TOOMEY000379

# EXHIBIT 4

# In the Matter of:

*Toomey*

*vs*

**State of Arizona**

---

*Reporter's Transcript of Recorded Phone Call*

*May 26, 2021*

---



GRIFFIN GROUP INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Russell B. Toomey,          )Case No.CV19-0035-TUC-RM (LAB)
                            )
           Plaintiff,       )
                            )
              vs.           )
                            )
State of Arizona, et al.,)
                            )
           Defendants.      )
_____)

TRANSCRIPT OF TELEPHONE CALL

REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

2

1                     TRANSCRIPT OF TELEPHONE CALL

2

                      VIRGINIA:  Hello.  Thank you for calling
3
   BlueCross/BlueShield.  This is Virginia.  How may I
4
   assist you?
5
                      DR. TOOMEY.  Yes.  I'm calling about a
6
   surgery that I plan to have and I just wanted to check
7
   about whether it would be covered by the plan or not.
8
                      VIRGINIA:  I'll be more than happy to
9
   assist you with that.  May I have your name?
10
                      DR. TOOMEY:  Russell Toomey, T-O-O --
11
                      VIRGINIA:  And I do see that you verified
12
   your date of birth through the system so thank you so
13
   much for that.
14
                      Is this surgery inpatient or outpatient?
15
                      DR. TOOMEY:  It is inpatient.
16
                      VIRGINIA:  And who is your surgeon?
17
                      DR. TOOMEY:  It is Dr. Tiffany Karsten.
18
                      VIRGINIA:  Bear with me one second here.
19
   I'm going to pull up your benefits for the inpatient
20
   services here.
21
                      DR. TOOMEY:  Okay.
22
                      VIRGINIA:  Okay.  You said that your
23
   provider is Tiffany Karsten?
24
                      DR. TOOMEY:  Yeah.  K-A-R-S-T-E-N.
25
                      VIRGINIA:  Okay.  It looks like she's



Toomey vs
State of Arizona

Reporter's Transcript of Recorded Phone Call

3

1   contacted our office, but she's telling us it's for

2   outpatient.  Is this for a -- let's see.  She gave us a

3   procedure code.  Is the surgery for you --

4                   DR. TOOMEY:  Yes.

5                   VIRGINIA:  -- you said?  Okay.  I'm trying

6   to get a little bit of information off of that contact

7   here.  What type of surgery is it?

8                   DR. TOOMEY:  It's a hysterectomy.

9                   VIRGINIA:  Okay.

10                   DR. TOOMEY:  And, specifically, like the

11  code, the diagnosis code, would be gender dysphoria for

12  that.

13                   VIRGINIA:  Okay.  So they did give a

14  procedure code here.  It says it is for removal of tubes

15  and ovaries.  Let's take a look here.

16                   Now, there are medical coverage guidelines

17  for that.  There are -- oh, you know, you mentioned that

18  they gave you -- did they give you the diagnosis code as

19  well?

20                   DR. TOOMEY:  Yes.  Well, they didn't give

21  me the --

22                   VIRGINIA:  What is --

23                   DR. TOOMEY:  -- the numbers, but gender

24  dysphoria.

25                   VIRGINIA:  Okay.  Bear with me for just

4

1  one moment here; okay?  I'm just going to take a look

2  into this a little further.

3             DR. TOOMEY:  Okay, great.  Thank you.

4             VIRGINIA:  Okay.  And then just one other

5  thing.  She told you -- their office told you that they

6  were going to schedule it for inpatient?

7             DR. TOOMEY:  Yeah, when I met with the

8  surgeon, she said it would be a one-night stay in the

9  hospital.

10             VIRGINIA:  Well, I mean, it could be a

11  one-night stay, but, I mean, is your -- is it going to

12  be a total of more than 24 hours?

13             DR. TOOMEY:  No.

14             VIRGINIA:  Oh, okay.  So then it would be

15  outpatient.  Okay.  So let's put the informed as

16  outpatient.

17             DR. TOOMEY:  Great.

18             VIRGINIA:  I'm going to put you on hold

19  for just a moment here and I'll take a look into that a

20  little further; okay?

21             DR. TOOMEY:  Okay.  Thank you.

22             VIRGINIA:  You're welcome.

23             Thank you so much for your patience in

24  holding.

25             DR. TOOMEY:  No problem.

5

1              VIRGINIA:  Okay.  So with the code, the

2   procedure code that they gave to us, you know, it will

3   cover medical coverage guidelines, but when I take a

4   look over your plan benefits, it does tell me that

5   trans -- that all transgender services are excluded

6   which means any transgender services would not be

7   covered.  So if they bill with a diagnosis that's

8   related to transgender services, it will deny as no

9   coverage.

10             DR. TOOMEY:  Okay.  And that would mean

11   that I would need to pay out of pocket, then, for the

12   surgery?

13             VIRGINIA:  Correct.

14             DR. TOOMEY:  Okay.

15             VIRGINIA:  Correct.

16             DR. TOOMEY:  Is there a way to get

17   documentation of that prior to surgery rather than after

18   the surgery?

19             VIRGINIA:  What do you mean, of what

20   they're going to be submitting on the claim?

21             DR. TOOMEY:  Or the denial of that.

22             VIRGINIA:  It would actually be in your

23   plan benefit book.

24             DR. TOOMEY:  Okay.

25             VIRGINIA:  Do you have a copy of that?

6

1            DR. TOOMEY:  I think I could probably

2   access it online, yeah.

3            VIRGINIA:  Okay.  Because in your plan

4   benefit book, it will provide you with the information

5   regarded to the transgender services being excluded.

6            DR. TOOMEY:  Okay.  Okay.  Thank you.

7            VIRGINIA:  You're welcome.  Anything else

8   that I can assist you with?

9            DR. TOOMEY:  That's all.

10            VIRGINIA:  Okay.  Thank you so much for

11   calling.  You have a great day.

12            DR. TOOMEY:  You too.

13            VIRGINIA:  Thank you.  Bye.

14

15

16

17

18

19

20

21

22

23

24

25

7

```
1                   CERTIFICATE OF CERTIFIED REPORTER

2

3

4               BE IT KNOWN that the foregoing audio/video

5   recording was transcribed by me; that the foregoing

6   pages are a full, true, and accurate record of the audio

7   recording, all done to the best of my skill and ability.

8

9               I CERTIFY that I am in no way related to

10  any of the parties hereo, nor am I in any way interested

11  in the outcome hereof.

12

13                   []  Review and signature was requested.
                     []  Review and signature was waived.
14                   [X] Review and signature not required.

15

16              I FURTHER CERTIFY that I am in no way

17  related to nor employed by any of the parties hereto nor

18  am I in any way interested in the outcome hereof.

19              DATED this 19th day of September, 2022.

20

21                   /s/ Jennifer Hanssen
                     Jennifer Hanssen, RPR
22                   Certified Reporter
                     Arizona CR No. 50165
23

24

25
```

**1**

19th
7:19

**2**

2022
7:19
24
4:12

**5**

50165
7:22

**A**

ability
7:7
access
6:2
accurate
7:6
Arizona
7:22
assist
2:4,9 6:8
audio
7:6
audio/video
7:4

**B**

Bear
2:18 3:25
benefit
5:23 6:4
benefits
2:19 5:4
bill
5:7
birth
2:12

bit
3:6
Bluecross/
blueshield
2:3
book
5:23 6:4
Bye
6:13

**C**

CALL
2:1
calling
2:2,5 6:11
CERTIFICATE
7:1
Certified
7:1,22
CERTIFY
7:9,16
check
2:6
claim
5:20
code
3:3,11,14,18 5:1,2
contact
3:6
contacted
3:1
copy
5:25
Correct
5:13,15
cover
5:3
coverage
3:16 5:3,9
covered
2:7 5:7
CR
7:22

**D**

date
2:12
DATED
7:19
day
6:11 7:19
denial
5:21
deny
5:8
diagnosis
3:11,18 5:7
documentation
5:17
dysphoria
3:11,24

**E**

employed
7:17
excluded
5:5 6:5

**F**

foregoing
7:4,5
full
7:6

**G**

gave
3:2,18 5:2
gender
3:11,23
give
3:13,18,20
great
4:3,17 6:11
guidelines
3:16 5:3

**H**

Hanssen
7:21
happy
2:8
hereo
7:10
hereof
7:11,18
hereto
7:17
hold
4:18
holding
4:24
hospital
4:9
hours
4:12
hysterectomy
3:8

**I**

information
3:6 6:4
informed
4:15
inpatient
2:14,15,19 4:6
interested
7:10,18

**J**

Jennifer
7:21

**K**

K-A-R-S-T-E-N
2:24
Karsten
2:17,23

**M**

means
5:6
medical
3:16 5:3
mentioned
3:17
met
4:7
moment
4:1,19

**N**

numbers
3:23

**O**

office
3:1 4:5
one-night
4:8,11
online
6:2
outcome
7:11,18
outpatient
2:14 3:2 4:15,16
ovaries
3:15

**P**

pages
7:6
parties
7:10,17
patience
4:23
pay
5:11
plan
2:6,7 5:4,23 6:3
pocket



5:11

**prior**
5:17

**problem**
4:25

**procedure**
3:3,14 5:2

**provide**
6:4

**provider**
2:23

**pull**
2:19

**put**
4:15,18

---

**R**

**record**
7:6

**recording**
7:5,7

**regarded**
6:5

**related**
5:8 7:9,17

**removal**
3:14

**Reporter**
7:1,22

**requested**
7:13

**required**
7:14

**Review**
7:13,14

**RPR**
7:21

**Russell**
2:10

---

**S**

**schedule**
4:6

**September**
7:19

**services**
2:20 5:5,6,8 6:5

**signature**
7:13,14

**skill**
7:7

**specifically**
3:10

**stay**
4:8,11

**submitting**
5:20

**surgeon**
2:16 4:8

**surgery**
2:6,14 3:3,7 5:12,
17,18

**system**
2:12

---

**T**

**T-O-O**
2:10

**TELEPHONE**
2:1

**telling**
3:1

**thing**
4:5

**Tiffany**
2:17,23

**told**
4:5

**Toomey**
2:5,10,15,17,21,24
3:4,8,10,20,23 4:3,
7,13,17,21,25
5:10,14,16,21,24
6:1,6,9,12

**total**
4:12

**trans**
5:5

**transcribed**
7:5

**TRANSCRIPT**
2:1

**transgender**
5:5,6,8 6:5

**true**
7:6

**tubes**
3:14

**type**
3:7

---

**V**

**verified**
2:11

**Virginia**
2:2,3,8,11,16,18,
22,25 3:5,9,13,22,
25 4:4,10,14,18,22
5:1,13,15,19,22,25
6:3,7,10,13

---

**W**

**waived**
7:13

**wanted**
2:6



# EXHIBIT 5

**Victoria Lopez***
**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: **vlopez@acluaz.org**
Email: **cwee@acluaz.org**
**(*admission under Arizona Rule 38(f) pending)**

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail:**jblock@aclu.org**
E-Mail: **lcooper@aclu.org**
***Admitted Pro hac vice*

**Wesley R. Powell***
**Matthew S. Friemuth***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: **wpowell@willkie.com**
E-Mail: **mfriemuth@willkie.com**
***Admitted Pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

**Russell B. Toomey**,

               Plaintiff,

v.

**State of Arizona; Arizona Board of Regents, d/b/a University of Arizona**, a governmental body of the State of Arizona; **Ron Shoopman**, in his official capacity as chair of the Arizona Board Of Regents; **Larry Penley**, in his official capacity as Member of the Arizona Board of Regents; **Ram Krishna**, in his official capacity as Secretary of the Arizona Board of Regents; **Bill Ridenour**, in his official capacity as Treasurer of the Arizona Board of Regents; **Lyndel Manson**, in her official capacity as Member of the Arizona Board of Regents; **Karrin Taylor Robson**, in her official capacity as Member of the Arizona Board of Regents; **Jay Heiler**, in his official capacity as Member of the Arizona Board of Regents; **Fred Duval**, in his official capacity as Member of the Arizona Board of Regents; **Andy Tobin**, in his official capacity as Director of the Arizona Department of Administration; **Paul Shannon**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration,

               Defendants.

4:19-cv-00035-TUC-RM (LCK)

**PLAINTIFF'S AMENDED INITIAL DISCOVERY RESPONSES**

- 1 -

Plaintiff Russell B. Toomey, by and through counsel undersigned, hereby submits his Amended Mandatory Initial Discovery Responses.

**A.**    Amended Mandatory Initial Discovery Requests.

**1.    State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.**

> a.    Russell B. Toomey
> c/o Victoria Lopez and Christine K. Wee
> ACLU FOUNDATION OF ARIZONA
> 3707 North 7th Street, Suite 235
> Phoenix, Arizona 85014
> Telephone: (602) 650-1854

Dr. Toomey is the Plaintiff in this matter and has discoverable information relating to all facts in the Complaint.

> b.    Dr. Tiffany Woods Karsten
> El Rio - OB/GYN Associates
> 225 W. Irvington Rd.
> Tucson, Arizona 85714
> (520) 884-7304

Dr. Woods Karsten is Plaintiff's OB/GYN. Dr. Woods Karsten has discoverable information regarding Plaintiff's medical diagnoses, as well as her prescribed treatment plan for Plaintiff.

> c.    E.J. Millstone
> 4265 E. Broadway, Suite #212
> Tucson, Arizona 85711
> (520) 394-6519

Ms. Millstone is Plaintiff's counselor. Ms. Millstone has discoverable information regarding Plaintiffs medical diagnoses, as well as her prescribed treatment plan for Plaintiff.

d.      Kate Kincaid
        738 N. 5th Avenue, Suite 204
        Tucson, Arizona 85705
        (520) 873-8633

Ms. Kincaid is a Licensed Professional Counselor who has met with Plaintiff regarding his surgical transition. Ms. Kincaid has discoverable information regarding Plaintiff's medical diagnoses.

e.      Paul Shannon
        c/o Kate King
        BurnsBarton, PLC
        2201 E. Camelback Rd., Suite 360
        Phoenix, Arizona 85016
        (602) 753-4500

        c/o R. Shawn Oller
        Littler Mendelson, P.C.
        2425 E. Camelback Rd., Suite 900
        Phoenix, AZ 85016
        (602) 474-3600

Mr. Shannon is the Acting Assistant Director of Benefit Services Division of the Arizona Department of Administration. Mr. Shannon has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

f.      Ron Shoopman
        c/o Paul Eckstein Perkins Coie, LLP
        2901 North Central Avenue, Suite 2000
        Phoenix, Arizona 85012-2788
        (602) 351-8000

Mr. Shoopman is sued in his official capacity as Chair of the Arizona Board of Regents. Mr. Shoopman has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

g.    Larry Penley
c/o Paul Eckstein Perkins Coie, LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
(602) 351-8000

Mr. Penley is sued in his official capacity as a member of the Arizona Board of Regents. Mr. Penley has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

h.    Ram Krishna
*c/*o Paul Eckstein Perkins Coie, LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
(602) 351-8000

Mr. Krishna is sued in his official capacity as a member of the Arizona Board of Regents. Mr. Krishna has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

i.    Bill Ridenour
c/o Paul Eckstein Perkins Coie, LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
(602) 351-8000

Mr. Ridenour is sued in his official capacity as a member of the Arizona Board of Regents. Mr. Ridenour has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

j.    Lyndel Manson
c/o Paul Eckstein Perkins Coie, LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
(602) 351-8000

Ms. Manson is sued in her official capacity as a member of the Arizona Board of Regents. Ms. Manson has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

        k.        Karrin Taylor Robson
                  c/o Paul Eckstein
                  Perkins Coie, LLP
                  2901 North Central Avenue, Suite 2000
                  Phoenix, Arizona 85012-2788
                  (602) 351-8000

Ms. Taylor Robson is sued in her official capacity as a member of the Arizona Board of Regents. Ms. Taylor Robson has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

        l.        Jay Heiler
                  c/o Paul Eckstein
                  Perkins Coie, LLP
                  2901 North Central Avenue, Suite 2000
                  Phoenix, Arizona 85012-2788
                  (602) 351-8000

Mr. Heiler is sued in his official capacity as a member of the Arizona Board of Regents. Mr. Heiler has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

        m.       Fred DuVal
                  c/o Paul Eckstein
                  Perkins Coie, LLP
                  290I North Central Avenue, Suite 2000
                  Phoenix, Arizona 85012-2788
                  (602) 351-8000

Mr. DuVal is sued in his official capacity as a member of the Arizona Board of Regents. Mr. DuVal has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

   n. Authorized Representative of the Arizona Department of
     Administration
     c/o Kate King
     BurnsBarton, PLC
     2201 E. Camelback Rd., Suite 360
     Phoenix, Arizona 85016
     (602) 753-4500

     c/o R. Shawn Oller
     Littler Mendelson, P.C.
     2425 E Camelback Rd., Suite 900
     Phoenix, AZ 85016
     (602) 474-3600

This representative has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

   o. Authorized Representative of the Benefit Services Division of the
     Arizona Department of Administration
     c/o Kate King
     BurnsBarton, PLC
     2201 E. Camelback Rd., Suite 360
     Phoenix, Arizona 85016
     (602) 753-4500

     c/o R. Shawn Oller
     Littler Mendelson, P.C.
     2425 E Camelback Rd., Suite 900
     Phoenix, AZ 85016
     (602) 474-3600

This representative has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

**<u>SUPPLEMENTAL RESPONSE MARCH 26, 2020</u>**

    p.  Andy Tobin
       c/o Kate King
       BurnsBarton, PLC
       2201 E. Camelback Rd., Suite 360
       Phoenix, Arizona 85016

       c/o R. Shawn Oller
       Littler Mendelson, P.C.
       2425 E. Camelback Rd., Suite 900
       Phoenix, AZ 85016
       (602) 474-3600

  Mr. Tobin is the Director of the Arizona Department of Administration. Mr. Tobin has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

    q.  Scott Bender
       c/o Kate King
       BurnsBarton, PLC
       2201 E. Camelback Rd., Suite 360
       Phoenix, Arizona 85016
       (602) 753-4500

       c/o R. Shawn Oller
       Littler Mendelson, P.C.
       2425 E. Camelback Rd., Suite 900
       Phoenix, AZ 85016
       (602) 474-3600

  Mr. Bender is the Plan Administration Manager of the Benefit Services Division of the Arizona Department of Administration. Ms. Alvarado-Thorson has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

r.     Marie Isaacson
c/o Kate King
BurnsBarton, PLC
2201 E. Camelback Rd., Suite 360
Phoenix, Arizona 85016
(602) 753-4500

c/o R. Shawn Oller
Littler Mendelson, P.C.,
2425 E. Camelback Rd.Suite 900
Phoenix, AZ 85016
(602) 474-3600

Ms. Isaacson is the former Director of the Benefit Services Division of the Arizona Department of Administration. Ms. Isaacson has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

s.     Yvette Medina
c/o Kate King
BurnsBarton, PLC
2201 E. Camelback Rd., Suite 360
Phoenix, Arizona 85016
(602) 753-4500

c/o R. Shawn Oller
Littler Mendelson, P.C.
2425 E. Camelback Rd., Suite 900
Phoenix, AZ 85016
(602) 474-3600

Ms. Medina is employed by the Arizona Department of Administration. Ms. Medina has discoverable information regarding the self-funded health plan provided to Arizona State employees, including its exclusions.

t.     Helena Rodrigues
c/o Paul Eckstein
Perkins Coie, LLP
290I North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
(602) 351-8000

Ms. Rodrigues is the Vice President and Chief Human Resources Officer at the University of Arizona. Ms. Rodrigues has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

u.    Allison Vaillancourt
      c/o Paul Eckstein
      Perkins Coie, LLP
      290I North Central Avenue, Suite 2000
      Phoenix, Arizona 85012-2788
      (602) 351-8000

Ms. Vaillancourt is the Vice President of Business Affairs & Human Resources at the University of Arizona. Ms. Vaillancourt has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

v.    Staci Wilson
      c/o Paul Eckstein Perkins Coie, LLP
      290I North Central Avenue, Suite 2000
      Phoenix, Arizona 85012-2788
      (602) 351-8000

Ms. Wilson is the Assistant Vice President of Human Resources at the University of Arizona. Ms. Wilson has discoverable information regarding the Board of Regents' communications with the Arizona Department of Administration ("ADOA") urging the ADOA to remove the coverage exclusion for gender reassignment surgery.

**2.    State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such**

- 9 -

**statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.**

Plaintiff is not aware of any persons who have given written or recorded statements.

**3.     List the documents, electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control. For documents and tangible things in your possession, custody, or control, you may produce them with your response, or make them available for inspection on the date of the response, instead of listing them.**

a.     Arizona Department of Benefits Administration - Benefit Options - Exclusive Provider Organization Summary Plan Description. *See* TOOMEY00000 1-109, produced herewith.

b.     Notice of Right to Sue from Department of Justice, dated December 14, 2018. *See* TOOMEY000110, produced herewith.

c.     Aetna Gender Reassignment Surgery policies and standards. *See* TOOMEY000I 11-133, produced herewith.

d.     Blue Cross Blue Shield of Arizona Gender Dysphoria policies and standards. *See* TOOMEY000134-148, produced herewith.

e.     Cigna Treatment of Gender Dysphoria policies and standards. *See* TOOMEY000149-161, produced herewith.

f.     UnitedHealthcare Gender Dysphoria Treatment policies and standards. *See* TOOMEY000 162-174, produced herewith.

g.    Preauthorization Denial dated August 10, 2018. *See* TOOMEY000I 75- 179, produced herewith.

h.    WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People. *See* TOOMEY000180-299, produced herewith.

i.    Blue Cross Blue Shield of Arizona Member Appeal and Grievance Process. *See* TOOMEY000300-315, produced herewith.

j.    The Williams Institute -How Many Adults Identify as Transgender in the United States? *See* TOOMEY000316-328, produced herewith.

k.    2017 Annual Report for the Health Insurance Trust Fund. See TOOMEY000329-377, produced herewith.

l.    EEOC Charge dated August 15, 2018. *See* TOOMEY000378-379, produced herewith.

m.    Correspondence to the EEOC dated August 22, 2018, enclosing coverage denial letter. *See* TOOMEY000380-384, produced herewith.

n.    Letter from Kate Kincaid dated June 1, 2018. *See* TOOMEY000385, produced herewith.

o.    Letter from EJ Millstone dated May 7, 2018. *See* TOOMEY000386, produced herewith.

p.    The American College of Obstetricians and Gynecologists Committee Opinion: Health Care for Transgender Individuals. *See* TOOMEY000387- 391, produced herewith.

q.    Lesbian, Gay, Bisexual, and Transgender Health Disparities: Executive Summary of a Policy Position Paper From the American College of Physicians. *See* TOOMEY000392-405, produced herewith.

r.    Removing Financial Barriers to Care for Transgender Patients H-185.950. *See* TOOMEY000406, produced herewith.

s.    Transgender, Gender Identity, & Gender Expression Non-Discrimination. *See* TOOMEY000407-413, produced herewith.

t.    Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A. *See* TOOMEY000414-421, produced herewith.

u.    APA Official Actions Position Statement on Access to Care for Transgender and Gender Diverse Individuals. *See* TOOMEY000422-423, produced herewith.

**4.     For each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based.**

### a.     Relevant Factual Background

Dr. Toomey is a man who is transgender, which means that he has a male gender identity, but the sex assigned to him at birth was female. Dr. Toomey transitioned to live consistently with his male identity in 2003. Since 2003, Dr. Toomey has received testosterone as a medically necessary treatment for gender dysphoria. He also received medically necessary chest reconstruction surgery in 2004. In accordance with the WPATH Standards of Care, Dr. Toomey's treating physicians have recommended that he receive a hysterectomy as a medically necessary treatment for gender dysphoria.

Dr. Toomey's healthcare coverage is provided and paid for by the State of Arizona through its self-funded healthcare plan controlled by the Arizona Department of Administration (the "Plan"). Individuals enrolled in the Plan must choose to receive benefits through a Network Provider. The Plan generally provides coverage for medically necessary care, which the Plan defines as "services, supplies and prescriptions, meeting all of the following criteria": (1) ordered by a physician; (2) not more extensive than required to meet the basic health needs; (3) consistent with the diagnosis of the condition for which they are being utilized; (4) consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical- scientific community in the United States of America; (5) required for purposes other than the comfort and convenience of the patient or provider; (6) rendered in the least intensive setting that is appropriate for their delivery; and (7) have demonstrated medical value. In the event that the Plan denies coverage for a treatment based on purported lack of medical necessity, the Plan provides a right to appeal the decision to an independent reviewer at the third-party claims administrator and, if necessary, to further appeal to an external independent review organization. If an independent reviewer concludes that the treatment is medically necessary, that decision is binding, and the Plan must immediately authorize

coverage for the treatment.

The Plan does not apply these generally applicable standards and procedures to surgical care for gender dysphoria. Instead, the Plan categorically denies all coverage for "[g]ender reassignment surgery" regardless of whether the surgery qualifies as medically necessary. Transgender individuals enrolled in the Plan have no meaningful opportunity to demonstrate that their transition-related care is medically necessary as it is specifically excepted from the terms of the Plan. Likewise, those same individuals also lack a meaningful opportunity to appeal any adverse determination to an independent reviewer as it isn't clear that the Plan's independent review organization can overrule an exception to the Plan, particularly as the independent review may come from Arizona's Department of Insurance, which promulgates the Plan.[1] As a result of the Plan's categorical exclusion for "gender reassignment surgery," Dr. Toomey was denied preauthorization for a hysterectomy on August 10, 2018. The denial was based solely on the Plan's exclusion for "gender reassignment surgery."

Dr. Toomey brings this action on behalf of himself and a class of similarly situated individuals pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. The demographic data shows that the total number of class members could be over 1,000. Individuals who *have* received (25%) or *wish* to receive gender conforming surgery (57%), *approximately 181* such transgender individuals work for the Board of Regents and *approximately 700* such transgender individuals receive healthcare through the State's self-funded Plan.[2]

---

[1]   Available at:
https://www.azblue.com/~/media/azblue/files/about/standardappealpacket.pdf
[2] Ian T. Nolan, et al., *Demographic and temporal trends in transgender identities and gender confirming surgery,* 8 Translational Andrology and Urology 3 (2019); James, S.E., Herman, J.L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016), *The*

Specifically, Dr. Toomey seeks a declaratory judgment and injunction requiring Defendants to remove the Plan's categorical exclusion of coverage for "[g]ender reassignment surgery" and evaluate whether transgender individuals' surgical care for gender dysphoria is "medically necessary" m accordance with the Plan's generally applicable standards and procedures.

### b.      Legal Claims

### I.      Violations of Title VII

Dr. Toomey is bringing a claim for violations of Title VII of the Civil Rights Act of 1964 against the State of Arizona and the Arizona Board of Regents. The State of Arizona and the Arizona Board of Regents are employers as that term is defined in Title VII, 42 U.S.C. § 2000e-(a) and (b). An employer-sponsored health plan is part of the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(l).

The employer-sponsored health plan provided by the State of Arizona and the Arizona Board of Regents facially discriminates based on transgender status and gender nonconformity by categorically excluding coverage for all medically necessary "gender reassignment surger[ies]."

Discrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of "sex" under Title VII. Because medical transition from one sex to another inherently transgresses gender stereotypes, denying medically necessary coverage based on whether surgery is performed for purposes of "gender reassignment" constitutes impermissible discrimination based on gender nonconformity. Because the need to undergo gender transition is a defining aspect of transgender status,

---

*Report of the 2015 U.S. Transgender Survey,* Washington DC: National Center for Transgender Equality, pp. 105-106, *available at* https:// transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

discrimination based on gender transition is discrimination against transgender individuals as a class.

By providing a facially discriminatory employer-sponsored health plan, the State of Arizona and the Arizona Board of Regents have unlawfully discriminated-and continue to unlawfully discriminate-against Dr. Toomey and members of the proposed class "with respect to [their] compensation, terms, conditions, or privileges of employment, because of ... sex." 42 U.S.C. § 2000e-2(a)(l).

## II.   Violations of the Equal Protection Clause

Dr. Toomey is bringing a claim for violations of the Equal Protection Clause of the Fourteenth Amendment against the individual members of the Board of Regents and against Andy Tobin, Director of the Arizona Department of Administration, and Paul Shannon, Assistant Director of the Benefit Services Division of the Arizona Department of Administration.

At all relevant times, Defendants Shoopman, Krishna, Ridenour, Penley, Manson, Robson, Heiler, DuVal, Shannon and Tobin have acted under color of State law. Pursuant to 42 U.S.C. § 1983, Defendants Shoopman, Krishna, Ridenour, Penley, Manson, Robson, Heiler, DuVal, Shannon and Tobin in their official capacities, are liable for declaratory and injunctive relief for violations of the Equal Protection Clause.

In their official capacity as officers and members of the Arizona Board of Regents, Defendants Shoopman, Krishna, Ridenour, Penley, Manson, Robson, Heiler, and DuVal are responsible for the terms and conditions of employment at the University of Arizona.

In his official capacity as Director of the Arizona Department of Administration, Defendant Andy Tobin is responsible for "determin[ing] the type, structure, and components of the insurance plans made available by the Department [of Administration]." Ariz. Admin. Code R2-6-103.

In his official capacity as Acting Assistant Director of Benefit Services Division of the Arizona Department of Administration, Defendant Paul Shannon has direct

oversight and responsibility for administering the benefits insurance programs for State employees, including employees of the Arizona Board of Regents.

The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall…deny to any person within its jurisdiction the equal protection of the laws." Arizona State employees are protected by the Equal Protection Clause. The employer-sponsored health plan provided by the State of Arizona and the Arizona Board of Regents facially discriminates based on transgender status and gender nonconformity by categorically excluding coverage for all medically necessary "gender reassignment surgery."

Because medical transition from one sex to another inherently transgresses gender stereotypes, denying medically necessary coverage for based on whether surgery is performed for purposes of "gender reassignment" constitutes impermissible discrimination based on gender nonconformity.

Because the need to undergo gender transition is a defining aspect of transgender status, discrimination based on gender transition is discrimination against transgender individuals as a class.

By categorically excluding all coverage for "[g]ender reassignment surgery," the Plan deprives Dr. Toomey and other transgender employees of an equal opportunity to prove that their transition-related surgery is medically necessary under the same standards and procedures that apply to other medical conditions.

By providing a facially discriminatory employer-sponsored health plan, the State of Arizona and the Arizona Board of Regents, by and through Defendants Shoopman, Krishna, Ridenour, Penley, Manson, Robson, Heiler, DuVal, Tobin and Shannon, acting in their respective official capacities, have unlawfully discriminated-and continue to unlawfully discriminate-against Dr. Toomey and members of the proposed class on the basis of gender, which is subject to heightened scrutiny under the Equal Protection Clause.

The Plan's discriminatory exclusion is not narrowly tailored to serve a compelling governmental interest. The Plan's discriminatory exclusion is not substantially related to an important governmental interest. The discriminatory exclusion cannot be justified by a governmental interest in limiting coverage to medically necessary treatments because the Plan's general provisions limiting healthcare to "medically necessary" treatments already serves that interest. The only function of the categorical exclusion is to exclude medical care that would otherwise qualify as medically necessary under the Plan's generally applicable standards. The Plan's discriminatory exclusion lacks any rational basis and is grounded in sex stereotypes, discomfort with gender nonconformity and gender transition, and moral disapproval of people who are transgender.

**5.      Provide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered. You may produce the documents or other evidentiary materials with your response instead of describing them.**

Plaintiff does not seek to recover any monetary damages at this time but is seeking reasonable attorneys' fees and costs pursuant to Title VII and 42 U.S.C. § 1988.

**6.      Specifically identify and describe any insurance or other agreement under which an insurance business or other person or entity may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse a party for payments made by the party to satisfy the judgment. You may produce a copy of the agreement with your response instead of describing it.**

Not applicable.

- 17 -

Dated this 26th day of March, 2020.

ACLU FOUNDATION OF ARIZONA
By /s/Christine K. Wee
Victoria Lopez
Christine K. Wee
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block
Leslie Cooper
125 Broad Street, Floor 18
New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell
Matthew S. Friemuth
787 Seventh Avenue
New York, New York 10019

*Attorneys for Plaintiff Russell B. Toomey*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2020, I emailed the attached document to:

C. Christine Burns
Kathryn Hackett King
Alison Pulaski Carter
BURNSBARTON PLC
2201 E. Camelback Rd., Suite 360
Phoenix, AZ 85016
christine@burnsbarton.com
kate@burnsbarton.com
alison@burnsbarton.com

R. Shawn Oller
Peter C. Prynkiewicz
Littler Mendelson, P.C.
2425 E. Camelback Rd., Suite 900
Phoenix, AZ 85016
soller@littler.com
pprynkiewicz@littler.com

*Attorneys for Defendants State of Arizona,*
*Andy Tobin and Paul Shannon*

Paul F. Eckstein
Austin C. Yost
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, Arizona 85012-2788
PEckstein@perkinscoie.com
AYost@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Defendants Arizona Board of Regents,*
*d/b/a University of Arizona; Ron Shoopman; Larry Penley;*
*Ram Krishna; Bill Ridenour; Lyndel Manson; Karrin*
*Taylor Robson; Jay Heiler; and Fred Duval*

*/s/ Christine K. Wee*
Christine K. Wee