# EXHIBIT 7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Russell B. Toomey,           )Case No.CV19-0035-TUC-RM (LAB)
                             )
            Plaintiff,       )
                             )
                 vs.         )
                             )
State of Arizona, et al.,)
                             )
            Defendants.      )
_____)

VIDEOCONFERENCE DEPOSITION OF JOAN BARRETT, FSA, MAAA

Tolland, Connecticut
June 24, 2021
12:00 p.m. EDT

REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Toomey vs.
State of Arizona

Joan Barrett
June 24, 2021

28

1    Q.    Okay.  So did UnitedHealthcare prior to June of

2    2015 cover transgender healthcare benefits for its fully

3    insured clients?

4    A.    Not across the board.  They may have had a few

5    state mandates or riders, but they did not cover it

6    across the board.

7    Q.    Did you advise UnitedHealthcare in your

8    employment there during the course of your employment

9    there that it should cover transgender healthcare

10   benefits for its fully insured clients?

11   A.    No.

12   Q.    During the course of your employment at

13   UnitedHealthcare, did you advise UnitedHealthcare that

14   covering transgender healthcare benefits for its fully

15   insured clients would result in immaterial cost

16   increases?

17   A.    No.

18   Q.    Do you know why UnitedHealthcare did not cover

19   transgender healthcare benefits during the course of

20   your employment there for its fully insured clients?

21   A.    No, I don't know.

22   Q.    In your opinion, was it unreasonable that

23   UnitedHealthcare did not cover transgender healthcare

24   benefits for its fully insured clients during the course

25   of your employment?



103

1    Q.    Yes.

2    **A.    Okay.  Yes, that's my understanding.**

3    Q.    If the State of Arizona removed that exclusion,

4    is it likely that the State of Arizona would realize an

5    increase in cost to the health plan?

6    A.    Yes.

7                MS. COHAN:  I'm going to mark now an

8    amended version of the Exhibit E to your report and that

9    will be Exhibit 3.

10               (Exhibit No. 3 was marked.)

11   Q.    BY MS. COHAN:  Can you see that document?

12   **A.    Yes.**

13   Q.    Can you explain to me what this Exhibit E

14   reflects?

15   **A.    It is references to documents that I relied on**

16   **in doing my report.**

17   Q.    How did you rely upon the report that you

18   authored from Boyden versus the State of Wisconsin?

19   **A.    To me, that was the anchor point of the**

20   **analysis.  The methods used in the Williams report that**

21   **I reviewed was as good as I thought we could get at that**

22   **period of time in terms of an estimate so, to me, that**

23   **was the best source of data, the best source of truth**

24   **for the cost of the estimate.**

25   Q.    And if I understood you correctly earlier, your



123

1              MR. GARBACZ:  That's all the questions I

2  have.

3              MS. COHAN:  Okay.

4              MR. GARBACZ:  Joan will want to take a

5  look at the transcript and make sure so I don't -- is

6  that -- how is that going to work this time?  Are we

7  going to have that send around?

8              MS. COHAN:  Are you requesting to read and

9  sign?

10              MR. GARBACZ:  Yes.

11              MS. COHAN:  Okay.  Then we can have you

12  read and sign.  That's fine.

13              MR. GARBACZ:  By read and sign, I mean

14  Miss Barrett, yes.

15              MS. COHAN:  Thank you very much, everyone.

16              (5:14 p.m.)

17

18

19

20        _____

21              JOAN BARRETT, FSA, MAAA

22

23

24

25

124

```
 1  STATE OF ARIZONA     )
                         )  ss.
 2  COUNTY OF MARICOPA   )

 3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
 4  duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true and accurate record of
 5  the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
 6  shorthand and thereafter reduced to print under my
    direction.

 7

 8        I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in
 9  the outcome hereof.

10             [X]  Review and signature was requested.
               []   Review and signature was waived/not
11  requested.

12

13        I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
    J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 9th
14  of July, 2021.

15                  /s/ Jennifer Hanssen
                    Jennifer Hanssen, RPR
16                  Certified Reporter
                    Arizona CR No. 50165

17            *         *         *         *

18

          I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
19  complied with the ethical obligations set forth in ACJA
    7-206 (J)(1)(g)(1) through (6).

20

21                  /s/ Pamela A. Griffin
                  _____
22                GRIFFIN GROUP INTERNATIONAL
                  Registered Reporting Firm
23                Arizona RRF No. R1005

24

25
```

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                    )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )      4:19-cv-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,         )
                                      )
                Defendants.           )
                                      )

VIDEOTAPED DEPOSITION OF MARIE FRANCES ISAACSON

Via Zoom videoconference
March 26, 2021
8:21 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

26

1    Q.   And what did you say in response to those

2 conversations?

3    A.   Currently not covered by our plan.

4    Q.   Did you tell them ADOA was exploring the

5 possibility of covering surgery for gender dysphoria?

6    A.   I said we were researching it.

7    Q.   And did you research it?

8    A.   Yes.

9    Q.   And I think the research took place around this

10 time, starting in September of 2015 and went through -- at

11 least through November of 2015.  We can look at the

12 documents, and will, as time allows.

13         What did the research tell you about

14 coverage for gender dysphoria surgery?

15    A.   I think the majority of our plans said that it

16 was not covered and, you know, confirmation that some

17 states did cover it.

18    Q.   So were you looking to see whether other states

19 covered it to determine whether the ADOA should cover it?

20    A.   I was researching what -- what existed as far as

21 in the benefits world, reached out to Mercer, reached out

22 to all of our health plans, trying to gather as much

23 information as possible about it to help inform a

24 decision.

25    Q.   Well, one of the things that the ADOA health plan

Marie Frances Isaacson - 03/26/2021

29

1    Q.   Could you tell us what they are?

2    A.   Aetna, Cigna, Blue Cross Blue Shield of Arizona,

3    and UnitedHealthcare.

4    Q.   Did any of those companies offer surgery --

5    surgery for gender dysphoria, on any of their commercial

6    plans or any plans at all?

7    A.   You know, I know we received the emails, but I

8    don't remember what the response was.

9    Q.   You don't remember whether you could have asked

10   Aetna, for example, whether they covered gender dysphoria

11   surgery and what answer they gave you?

12   A.   I remember asking the question of all four plans.

13   I don't remember which -- what plan responded with what

14   answer.

15   Q.   Okay.  But you do remember that some of the plans

16   told you, yes, and we do cover gender dysphoria surgery?

17   A.   My biggest recollection is that it was not

18   covered, the majority of the response was it was not

19   covered.

20   Q.   Majority.  So that -- Was there a minority that

21   did cover it?

22   A.   I think so.  I --

23   Q.   Okay.  Well, we can -- we can look at exhibits to

24   ferret that out.

25             Do you recall any states offering surgery

1   for gender -- gender dysphoria under their State plans?

2       A.   Well, just based on the email from Chanelle that

3   we just looked at, those states do offer transgender

4   benefits.  But I guess based on this I don't know whether

5   it's surgery or what the benefits are.

6       Q.   Okay.  Was one of the issues in determining

7   whether the plan offered by the Arizona Department of

8   Administration for employees of the State of Arizona,

9   which included the faculty and staff at -- at the

10  universities, based on the cost of that benefit?

11      A.   I would say that in researching it that was one

12  of the items that we did research, was the cost of the

13  benefit.

14      Q.   And you determined that the cost was de minimis,

15  didn't you?

16      A.   As I recall there was a range of costs.

17      Q.   And based on additions to premiums for those who

18  participated in the plan, what was the range?  Cents per

19  premium.

20      A.   I -- I know we just reviewed that last Sunday,

21  but I can't -- I don't remember what the range was.

22      Q.   Well, it was as low as three cents.  Do you

23  recall that?

24      A.   I don't recall.

25      Q.   Okay.  But you recall that all the additions were

43

1    at which Mike Liburdi and you and others attended say that

2    they had discussed this matter with the governor?

3         A.   Not that I recall.

4         Q.   Did anyone there say that the governor had a

5    point of view on this issue?

6         A.   Not that I recall.

7         Q.   What position did Scott Bender have at the -- in

8    September of '16 at or around the time this meeting took

9    place?

10        A.   Plan administration manager.

11        Q.   And did he report to you?

12        A.   Yes.

13        Q.   Let's turn to Tab 26.  We'll mark that, if it

14   hasn't been marked, as ABOR Exhibit 102.  And if you will

15   go to Bates Page Number 119501 of that exhibit, which is

16   the last -- or the first, the first email in this string.

17   You'll see an email from Nicolette Schultz to Jill

18   Metzinger, with a copy of Christina Corieri.

19             See that?

20        A.   Yes.

21        Q.   It doesn't appear that you got a copy of that

22   email when it was sent in September of 2016.  And I'm

23   looking to see whether you were copied on any of the other

24   emails, but I'm not sure that you were.

25             Do you recall seeing this string of emails

46

1    all the different vendors but I don't know if this was one

2    or not.

3              The one that we just went over with Nickie,

4    I do remember that one specifically.

5         Q.   Okay.  Well, what I want to get at in this email

6    is, in the second email, on Page 5656, where Eveleth Ray

7    at Aetna writes to Scott Bender reporting from Aetna

8    legal, in the first sentence under that, quote, generally,

9    employer self-funded plans are not affected.

10             Did you know what that meant?

11        A.   I'm assuming that it means that self-funded plans

12   are not impacted, based on Aetna legal.

13        Q.   Impacted by some federal law?  Impacted by what?

14        A.   I'm just looking at -- It just says the final

15   rule, so I'm assuming that's what he's referring to.

16        Q.   Okay.  And the ADOA plan is at least partially

17   self-funded; is that correct?  Or is it totally

18   self-funded?

19        A.   It is totally self-funded.

20        Q.   Okay.  So let's go to --

21        A.   Or it was.

22        Q.   Hmm?  What?

23        A.   I said, or it was.  I'm not sure what's happening

24   now.

25        Q.   Well, as they used to say, the times they are

**Marie Frances Isaacson - 03/26/2021**

1     Q.   Do you recall what was the occasion to write this

2  down?

3     A.   I don't.  May have been training.  I'm not sure.

4     Q.   You don't recall who -- if this is notes from a

5  telephone conversation or notes from a meeting?  Do you

6  recall that?

7     A.   It could be.  I -- I don't know.  I don't

8  remember.

9     Q.   Do you know --

10     A.   It could be training.  It could be a phone

11  conversation.

12     Q.   So on the right-hand side in the middle it

13  says[as read]:  AHCCCS, A-H-C-C-C-S, equals hormone

14  therapy for others.  Why not cover it?

15           So hormone therapy was not covered in

16  October of 2015; right?

17     A.   That's right.

18     Q.   Wasn't covered till January 1, 2017.

19           But do you mean by this that AHCCCS covered

20  hormone therapy as of October 2015?

21     A.   I don't know what I meant by it.

22     Q.   Okay.  Do you know independently whether AHCCCS

23  covered hormone therapy?

24     A.   I don't.

25     Q.   Was it important to you to know what AHCCCS

1    covered?

2        A.   I -- I was looking at everything.  Like I said,

3    all the plans, other states, what was AHCCCS doing,

4    just -- just gathering information.

5        Q.   So AHCCCS stands for Arizona Healthcare Cost

6    Containment System.  Which is the Arizona implementation

7    of Arizona Medicaid; correct?

8        A.   Yes.

9        Q.   And the wheel has come full circle because that's

10   how I met your husband.  I think.  At least we had a heavy

11   involvement in that program at one time.

12               You will see a reference to -- underneath

13   that -- Section 1557, impos [sic] recipients of

14   discrimination on -- Maybe you can read that for me.

15       A.   [As read]:  Section 1557 equals imposes

16   recipients of discrimination on -- Not a very good

17   notetaker, I guess.

18               Do you want me to keep reading?

19       Q.   Yeah, I -- I want you to interpret for me.  The

20   next sentence I think says [as read]:  Blanket disallow

21   not allowed equals transgender.

22               Does that refresh your recollection as to

23   what the -- what you meant by that and what you heard?

24       A.   I'm -- I'm reading the blanket disallow not

25   allowed.

1      Q.   Is it typical for the health plans to come to the

2   ADOA recommending that coverage be extended for treatment?

3      A.   I -- I would say it's typical that the health

4   plans come to DOA with various recommendations:  what to

5   cover, what not to cover, changes to make.

6      Q.   How often would you say, in your time working at

7   ADOA, this happened?

8      A.   That they recommended changes?

9      Q.   Yes.

10      A.   We met -- we met regularly.  We met -- I -- I

11   can't remember how often.  Quarterly at least with the

12   health plans.  I can't say that each of those meetings

13   resulted in recommendations of change.  It was more how

14   the -- how the plan was doing, a review of -- of the plan

15   and utilization.

16      Q.   So continuing to focus on this gastric sleeve for

17   bariatric surgery, do you recall the outcome of that

18   inquiry?

19      A.   It was added as a benefit.

20           Or I should say, to be clear, extended a

21   benefit.  So for the type of surgery.

22      Q.   Does that make a difference, whether a benefit is

23   being added or extended?

24      A.   I just wanted to be clear.  It wasn't new, it was

25   just an extension of the type of surgery we would cover.

Marie Frances Isaacson - 03/26/2021

1    cover it or not.

2        A.   Correct.

3        Q.   And then the -- these managers would then do

4    research about the cost of that coverage?

5        A.   I think it was reversed.  I think they would have

6    done the research first and then brought it to me.

7        Q.   And there could have been other -- other research

8    along with that, including, you know, considering what

9    other states are covering?

10       A.   Maybe.

11       Q.   And then you would bring that information to the

12   director's office?

13       A.   Right.

14       Q.   And what would happen after that?

15       A.   Then it was presented to the governor's office.

16   It was all part of the contribution strategy discussion,

17   and any changes in the plan and whether or not there

18   needed to be a change in the contribution strategy.

19       Q.   So for any change to the plan it was ultimately

20   presented to the governor's office at some point.

21       A.   At some point, yes.

22       Q.   Were there any changes to the plan you can make a

23   decision on by yourself?

24       A.   Not that I recall.  I mean -- Not that I recall,

25   no.

120

1      Q.   Were there any changes to the plan that the

2   director's office can make themselves?

3      A.   You know, there -- As an example, a pharmacy

4   change, to change from one type of drug to a different

5   drug to save money, that would be recommended by the

6   pharmacy benefit manager.  And that -- that wasn't,

7   though, a contribution strategy discussion.  That was --

8   that could have been midyear.  And that -- I would have

9   brought that to the director's office and they would make

10  a determination as to whether or not the governor's office

11  would be notified of that.  I'm not sure when they did or

12  didn't notify the governor's office of those types of

13  decisions.

14          For plan design and the contribution

15  strategy the governor's office was always involved.

16     Q.   So to be clear, yes, there were some decisions

17  that the director's office can make themselves.

18     A.   I -- I don't know because I don't know every

19  decision that was run by the governor's office or not.

20     Q.   But do you know whether the governor -- the

21  director's office could make a decision, for example, on

22  pharmacy benefits by themselves?

23     A.   I don't know the answer to that.

24     Q.   Was there anyone else beyond the director's

25  office and the governor's office who was involved in

195

```
 1   plan excludes that the ADOA receives multiple claims for
 2   it to cover, does the ADOA then assess whether to cover
 3   that procedure?
 4       A.   Not if it's excluded, no.
 5       Q.   So must there be some other external factor that
 6   causes the ADOA to consider whether to maintain an
 7   exclusion or not?
 8       A.   As I mentioned before, the medical directors from
 9   the plans come forward with ideas.  That is one way that a
10   recommendation comes forward.
11       Q.   So if the medical directors came forward with
12   a -- a treatment that they thought was medically
13   necessary, would that factor into the ADOA's decision of
14   whether to cover that treatment?
15       A.   Yes, I -- I guess it would.
16       Q.   What are the origins of the exclusions in
17   general?
18       A.   My understanding is that when the State went
19   self-insured they took the plan design that was in place
20   and adopted that as their plan design.
21       Q.   When did the State go self-insured?
22       A.   I -- I don't remember exactly.  Maybe 2000 -- I
23   don't know the time frame, honestly.
24       Q.   Were you then employed by the State?
25       A.   I was.
```

1    secretary.

2              MR. CURTIS:  I concur, Paul.

3         Q.  BY MR. WALL:  So Ms. Isaacson, was the -- did the

4    State's plan go self-insured sometime between 2002 and

5    2009?

6         A.  Closer to 2002, I would say.

7         Q.  And I believe you said that the State adopted the

8    plan design that had been in place.  Is that right?

9         A.  Yes.  That's my understanding.

10        Q.  Where did that plan design originate?

11        A.  I believe it was Cigna, but I don't know.

12        Q.  Do you know if the plan's exclusion of

13   transgender benefits was in place when the State went to a

14   self-insured plan?

15        A.  I believe it was.

16        Q.  So when you became the benefits director the plan

17   excluded transgender benefits.

18        A.  Yes.

19        Q.  Would you turn for me, please, to Tab 40 of that

20   binder.

21              THE COURT REPORTER:  And mark it as an

22   exhibit?

23              MR. WALL:  Yes, ma'am.

24        Q.  BY MR. WALL:  So Ms. Isaacson, this is a very

25   long document so I won't ask you to review it.  But do you

200

1   exclusion of transgender benefits in 2016, is this what

2   you have -- is this what you have in mind when we talk

3   about that topic?

4       A.   Yes.

5       Q.   And is this the language you believe was in place

6   when the plan went self-funded?

7       A.   I believe so.

8       Q.   You don't recall any other version of this

9   exclusion prior to 2016, do you?

10      A.   No.

11      Q.   Do you know the original rationale for this

12  exclusion, Ms. Isaacson?

13      A.   I think the State -- My understanding is the

14  State just adopted the plan that was the fully insured

15  plan design.

16      Q.   Did the State undertake any review of the plan

17  design when it adopted it?

18      A.   I was not involved in that decision.  I don't

19  know.

20      Q.   Did the ADOA undertake any review while you were

21  the benefits director of the plan design?

22      A.   Those -- Yes.

23      Q.   Did it -- did it review -- How did it go about

24  that review?

25      A.   Based on recommendations on an annual basis

1      A.   800 million for the medical side.

2      Q.   And -- and you are saying that 3.6 out of

3   800 million is significant?

4      A.   Seems significant.

5      Q.   I'm sorry?

6      A.   It seems significant.

7      Q.   Did you consider the cost in -- increase in

8   premium per employee to be significant that it set out

9   there in the last bullet?

10     A.   No.

11     Q.   Under the plan, the premiums would have been

12  raised to cover the costs.  Isn't that the way it's done?

13     A.   Yes, that is the way it's done.

14     Q.   So ultimately it's the people who receive the

15  benefits, the employees who are covered, who will pay the

16  cost.

17     A.   And the State.

18     Q.   Well, how --

19     A.   The State agencies.

20     Q.   How does the State end up paying it if the

21  employees are paying the extra cost by an increase in the

22  premium?

23     A.   It's a split.  The contribution strategy is a

24  split between what the State pays and what the employee

25  pays.

343

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF YAVAPAI       )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7        I CERTIFY that I am in no way related to, nor
     employed by any of the parties hereto, and have no
 8   interest in the outcome thereof.

 9        [X] Review and signature was requested.
          [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
     this 8th day of April, 2021.

13

14

15
     _____
16                  JILL MARNELL
               Certified Reporter #50021
17          Registered Professional Reporter

18        *     *     *     *     *     *

19        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
     complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22

23   _____
             GLENNIE REPORTING SERVICES, LLC
24              Registered Reporting Firm
                Arizona RRF No. R1035
25
```

344

1                     SIGNATURE OF WITNESS

2

3        I, MARIE FRANCES ISAACSON, the witness in the above
    deposition, do hereby certify that I have read the
4    foregoing deposition, and that the said deposition is a
    true and correct record of my testimony, with such
5    corrections and changes, if necessary, listed below.

6                    _____
                              WITNESS

7    PAGE: LINE: SHOULD READ:          REASON FOR CHANGE:

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24

25

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                    )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )      4:19-cv-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,        )
                                      )
                Defendants.           )
                                      )


VIDEOTAPED DEPOSITION OF PAUL JAMES SHANNON
(EXCLUDING CONFIDENTIAL FOR ATTORNEYS' EYES ONLY PORTION)

Via Zoom videoconference
June 25, 2021
8:30 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

38

1    problems, but yes.

2        Q.   And lots of huddles also --

3        A.   Right.

4        Q.   -- sounds like.

5                  Do you typically interact with insurers in

6    your role?

7        A.   So you are using a term and I don't know how

8    you're using it.  We refer to them as carriers.  We are a

9    self-insured program.  So what we purchase from a carrier,

10   which is what you probably would call an insurer, and --

11   and I'll use UnitedHealthcare as an example.

12                  We have a contract with UnitedHealthcare

13   that pays on a per member, per month administrative basis.

14   Access to UnitedHealthcare's network of providers and

15   access to their claims processing systems, which is -- You

16   know, those are -- those are extremely complicated and

17   robust systems, okay?  We -- The actual claims that are

18   incurred by our members are paid out of what's called the

19   special Employee Health Insurance Trust Fund.  And it's

20   a -- it's a State fund that accumulates all the premiums

21   that -- that, you know, State employees, the State

22   agencies, the retirees, and COBRA people pay into the --

23   into this fund, and then from that fund we pay the claims

24   as they are submitted to us by the carrier, okay?

25                  So we are not actually insured by anyone.

Paul Shannon, Videotaped - 06/25/2021

39

1    And we do not maintain any -- any other kind of stop-loss

2    insurance.  We are fully self-insured and all the claims

3    are our responsibility to pay.  But we use the systems

4    that are provided by the carrier to do that.

5       Q.   I see.

6                 So you mentioned UHC being one of the

7    carriers.  Is Aetna another carrier?

8       A.   Aetna and Cigna were carriers up until

9    January 1st of this year.  They did -- we did a

10   procurement, a very lengthy procurement to do a new

11   medical carrier contract, and Aetna and Cigna were not

12   successful.  Blue Cross and UnitedHealthcare were, were

13   successful.

14      Q.   So the current carriers are UnitedHealthcare and

15   Blue Cross Blue Shield of Arizona?

16      A.   That's correct.

17      Q.   Any others?

18      A.   We have other carriers for dental insurance.  We

19   have a fully insured dental product.  We have a life

20   insurance.  We have vision insurance.  And those are also

21   fully insured.  We have short-term disability insurance;

22   we have long-term disability insurance which are also

23   fully insured.

24      Q.   But for medical benefits, UHC and Blue Cross?

25      A.   That's correct.

98

1      Q.   In response to telling coworkers at the ADOA that

2  you had been named a defendant in this lawsuit, did anyone

3  respond with a comment or a sentiment about transgender

4  rights or individuals?

5      A.   I don't recall any conversations about that.

6      Q.   Did you have a conversation with Scott Bender

7  specifically about sending information to you so that you

8  could better understand what happened when the decision

9  was made to maintain the exclusion in 2016?

10     A.   I think my conversations with Scott Bender at

11  that point were to try to understand the validity of the

12  lawsuit and our exposure under the law to the allegations

13  of the lawsuit.

14     Q.   So did you -- So why would Scott Bender have been

15  sending you this exchange with the governor's office?

16     A.   You'd have to ask Scott that.

17     Q.   Did you ask him to send you information about the

18  decision that was made in 2016?

19     A.   I don't recall asking him to -- about how the

20  decision was made.

21          MS. SHEETS:   I think we should take a

22  ten-minute break here and go off the record.

23          THE VIDEOGRAPHER:   Off the record at

24  11:23 a.m.

25          (Recess.)

124

1   the ADOA.  So at a high level, I'll just ask you, what, in

2   your experience, typically goes into a consideration when

3   the ADOA is deciding whether to cover a benefit?

4       A.   Well, the first and most obvious would be if

5   there's some law that compels the benefit to be provided

6   or prohibits a benefit from being provided.

7               The second and more -- much more common way

8   is that annually we meet with the medical directors from

9   our carriers and ask them for advice on how to change our

10  benefit plan.  And that's -- that would be around the cost

11  effectiveness and -- and clinical effectiveness of

12  particular treatments or -- or medications.  And those

13  medical directors will typically give us the advice of how

14  they are -- you know, how they believe those benefits

15  should be added or deleted.

16      Q.   Do you -- Well, so I heard cost effectiveness,

17  clinical effectiveness, and the legal aspects of when

18  something's prohibited or required.  Are there other

19  considerations that you can think of that the ADOA

20  typically considers in making these decisions?

21      A.   I can't think of any, no.

22      Q.   Does the ADOA, in your experience, always take

23  into account those three categories of information:  the

24  cost effectiveness, the clinical effectiveness, and the

25  law?

128

1    reserves to fund those because we had made no plan design

2    decisions or benefit design decisions that would -- that

3    would account for those costs.

4        Q.   And so when you are dealing with an issue where

5    there is no or very little historical data on how that

6    benefit will be used would you put more weight on the cost

7    analysis in that instance where there's less data, or

8    less?

9        A.   Well, I -- You know, that's why I mentioned the

10   reserve, is that I -- At some point you have to -- you

11   have to move into the future, right?  I mean, the plan

12   continues.  And -- and what will be will be.  Just because

13   you have a cost estimate doesn't mean that's how much it's

14   going to cost, right?  That -- or cost projection.  That's

15   a projection.  You hope it's accurate.  If you make

16   mistakes that are -- that are significantly wrong, then

17   you correct for that going forward and hopefully you learn

18   from -- from those errors or -- or misjudgments.  And --

19   and those errors -- you know, learning from those errors

20   will help you avoid making them in the future.

21       Q.   When you are considering -- and by you I mean

22   the -- When the ADOA is considering whether or not to add

23   a new benefit or extend a benefit, does it always consider

24   the cost as a factor?

25       A.    I believe that we try and make sure all of our

Paul Shannon, Videotaped - 06/25/2021

129

1   estimates include an understanding of what the cost will

2   be.

3       Q.   But there are some benefits where cost is not the

4   driving factor; right?

5       A.   Cost -- I don't know that that's true.  Cost is

6   always a factor when you are -- when you are dealing with

7   public moneys, okay?

8                Cost is also a factor in that we need to,

9   you know, weigh the -- the -- the projected cost of a

10  benefit versus the utility of that benefit in maintaining

11  the health of our -- of our members or in -- in providing

12  a generous enough benefit that we're competitive in the

13  job market in recruiting and retaining employees.  It's

14  more complicated than it would appear.  Sometimes spending

15  money on one thing, like a wellness program, can

16  actually -- which has an expense, can actually decrease

17  the expenses on the -- on the health insurance side

18  because you have healthier employees who need less medical

19  treatment.

20               So -- so I don't think we ever make

21  decisions without the -- without understanding the

22  implications of cost.

23      Q.   And when you're taking cost into consideration

24  and making decisions about adding or extending benefits is

25  there a -- an instance you can think of of cost being

**Paul Shannon, Videotaped - 06/25/2021**

138

1   you know, covered -- you know, covered procedures and --

2   and drugs.  But I can't remember ever saying, you know,

3   we're not going to do that because it costs too much or --

4   or we have to do this because, you know, people are going

5   to die if we don't.  That -- that -- I don't remember that

6   happening that way.

7           Pharmaceuticals are a little bit different

8   because we take the -- the advice of the medical -- the

9   pharmacists that -- that are with our pharmacy benefit

10  manager.  And typically we will follow their

11  recommendations on those just because, you know, getting

12  more into that -- making decisions about that is beyond

13  our expertise in -- you know, as administrators.  We rely

14  on medical professionals and pharmaceutical professionals

15  to make those recommendations.

16      Q.   And when you are making decisions about medical

17  benefits that are not pharmaceuticals, do you look to

18  experts from your fully insured book of business carriers?

19      A.   Right.  That's -- that's the medical directors

20  meeting that I referred to earlier.  That's when they

21  provide those recommendations.

22      Q.   And how often do those medical director meetings

23  happen?

24      A.   Once per year.

25      Q.   Do you attend those meetings?

224

1    Q.   When did you counsel him about it?

2    A.   To that point, it was at some -- at some point in

3    the past.  It was before the pandemic, because it was in

4    person.  And I haven't seen Michael in person since before

5    March 13th, 2020.

6    Q.   And to be clear, you -- your testimony today is

7    that you never heard Michael Meisner make personal --

8    Excuse me.  You've never heard Michael Meisner make a

9    statement of a personal view that he might have on

10   coverage of transgender benefits; is that right?

11   A.   I can't recall any statement that way, no.

12   Q.   Can you recall a statement by anyone at the ADOA

13   that would express a personal view on whether transgender

14   benefits should be covered?

15   A.   Honestly, no.

16   Q.   What about anyone from the governor's office?

17   A.   No.

18   Q.   You never heard any conversations with people

19   from the governor's office expressing a view about whether

20   transgender benefits should be covered?

21   A.   No.

22   Q.   Have you ever discussed the subject with

23   Christina Corieri?

24   A.   No.

25   Q.   Are you aware of Ms. Corieri's personal views on

231

1    Q.   You have seen during that time a lot of benefits

2    added to the ADOA plan; right?

3    A.   Well, I've watched medical technology advance

4    and -- and -- and, you know, treatments be added.  But I

5    would say in general the -- the plan has not been as

6    generous over time as one would have hoped.  In fact, in

7    many ways it's become less generous.  The premiums are

8    higher, the deductibles are higher, the cost sharing is

9    higher.  So it's sort of a mixed bag about whether or not

10   it's more generous or not.

11   Q.   But Mr. Shannon, I guess my question is, in your

12   opinion has this decision by the ADOA to maintain the

13   exclusion for gender reassignment surgery been treated

14   differently than other decisions that you have seen made

15   over years?

16   A.   As I mentioned earlier, there hasn't been a

17   decision to exclude it, there's been a decision to not

18   include it.  Because we don't include all of the possible

19   benefits that we could offer.

20   Q.   And has the decision by the ADOA to not include

21   gender reassignment surgery in your opinion been different

22   than the process that the ADOA goes through when it

23   decides what to do about other benefits?

24   A.   No.

25            MS. SHEETS:  We have no further questions.

243

1      A.   That's correct.

2      Q.   And I'm wondering where -- what led you to

3  believe that there is a stigma associated with being

4  transgender.

5      A.   My experience with the popular culture.  But also

6  more specifically, that's literally the -- that's

7  literally the medical definition of gender dysphoria.

8      Q.   What -- what do you believe is the medical

9  definition of gender dysphoria?

10      A.   Gender dysphoria is the feeling of -- the ill

11  feelings that a transgender person feels from the society

12  around them.

13      Q.   Do you believe that every transgender person

14  suffers from gender dysphoria?

15      A.   I don't believe that, no.  Every -- every would

16  mean every single individual feels that.

17      Q.   So what in the popular culture led you to believe

18  that there was a negative stigma associated with being

19  transgender?

20      A.   Well, in my lifetime transgender individuals have

21  been assaulted on the street and beaten up for being

22  transgender.  So that's -- that's one, you know, glaring

23  example.

24      Q.   Have you had any conversations with anybody where

25  somebody has expressed a negative or adverse reaction to

Paul Shannon, Videotaped - 06/25/2021

244

1    transgender people?

2        A.   Yes.  Although those conversations have

3    diminished over time as transgender people have been more

4    accepted into society.

5        Q.   Were any of those conversations with anybody

6    employed by ADOA?

7        A.   No.

8        Q.   What about the Arizona governor's office?

9        A.   No.

10       Q.   Have you ever spoken with any transgender

11   employee of the State of Arizona, as far as you know?

12       A.   As far as I know I don't know of any transgender

13   employees -- you know, with the exception of Dr. Toomey, I

14   don't know of any transgender individuals employed by the

15   State.

16       Q.   And you have never spoken with Dr. Toomey; right?

17       A.   No.

18               MR. YOST:  That's all the questions I have.

19               MR. CURTIS:  State defendants do not have

20   questions on redirect.  I suppose, Victoria, if you have

21   redirect questions for what ABOR asked.

22               MS. SHEETS:  We do not.

23               MR. CURTIS:  Okay.

24               MS. SHEETS:  But I just want to thank you,

25   Mr. Shannon, for being here today and taking the time.

246

1   STATE OF ARIZONA        )
                            )  ss.
2   COUNTY OF YAVAPAI       )

3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true, and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.
7        I CERTIFY that I am in no way related to, nor
    employed by any of the parties hereto, and have no
8   interest in the outcome thereof.

9        [X] Review and signature was requested.
         [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11       I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
    this 11th day of ̲July, 2021

13

14   _____

15             JILL MARNELL
           Certified Reporter #50021
16        Registered Professional Reporter

17        *     *     *     *     *     *

18       I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
    complied with the ethical obligations set forth in ACJA
19   7-206(J)(1)(g)(1) through (6).

20

21

22

23   _____

24        GLENNIE REPORTING SERVICES, LLC
            Registered Reporting Firm
25           Arizona RRF No. R1035

247

1                          SIGNATURE OF WITNESS

2

3      I, PAUL JAMES SHANNON, the witness in the above
   deposition, do hereby certify that I have read the
4  foregoing deposition, and that the said deposition is a
   true and correct record of my testimony, with such
5  corrections and changes, if necessary, listed below.

6                      _____
                                    WITNESS

7  PAGE: LINE: SHOULD READ:              REASON FOR CHANGE:

8  _____  _____  _____

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24

25

# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                    )
                                      )
                Plaintiff,            )
                                      )
vs.                                   ) 4:19-CV-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD       )
OF REGENTS, d/b/a UNIVERSITY OF       )
ARIZONA, a governmental body of       )
the State of Arizona; et al.,         )
                                      )
                Defendants.           )
_____)

VIDEOTAPED DEPOSITION OF SCOTT BENDER

Via Zoom Videoconference
March 31, 2021
8:00 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535                    Prepared by:
www.glennie-reporting.com       Robin L. B. Osterode
                                CSR, RPR
                                CA CSR No. 7750
                                AZ CR No. 50695

Scott Bender, Videotaped - 03/31/2021

37

1    plan changes, what does that work entail?

2        A.    It's varied.  On the union side all changes had

3    to be negotiated, and I was part of the team that put

4    together various proposals, and actually made proposals

5    in one organization to the -- to the local union, which

6    was the Teamsters.  And on the nonunion side just sort of

7    evaluating what's -- what's happening in the marketplace;

8    obviously with the battle for talent, you want to keep

9    your employee benefits as rich as possible, yet still

10   affordable.

11       Q.    Was there a process that you had for assessing

12   whether to implement or change the health plan?

13       A.    It was more informal.  Based on -- on budget

14   and what we felt we needed to offer to our employees to

15   maintain competitiveness, we would propose changes to

16   copays or deductibles or cost sharing, you know, the

17   amount that you pay through your paycheck for your

18   employee benefits.  We would make those proposals each

19   year, do the evaluation of what that's going to cost.  It

20   was a fairly small organization, so I think there was

21   around 2,500 active employees.  So it was not as robust

22   as the State, as you can imagine.  But that -- there was

23   no definitive process; it was more informal.

24       Q.    So when you would propose changes to copays or

25   deductibles, for example, what work would you do to

38

1    evaluate that proposed change?

2       A.    You would determine what is your claims

3    experience, what the impact would be to the -- to the

4    organization.  What would the impact be to the employees,

5    you know, what portion of the -- the increase, if you

6    will, would be borne by both sides.  And that was

7    reviewed by management, they determined, you know, what

8    their -- their tolerance for any level of change.  At

9    some --

10       Q.    And would you measure that impact to employees

11   or the organization through an analysis of cost?

12       A.    Yes.

13       Q.    And would your analysis of cost, would that be

14   informal or a formal analysis?

15       A.    It was data.  So I would say formal.  You know,

16   you take your -- your claims experience and you include

17   sort of an expected trend.  And then, based on whatever

18   changes that you're proposing, you sort of extrapolate

19   what is -- what is the cost impact going to be.

20       Q.    Would you involve an actuary?

21       A.    No actuary.  There was a finance manager.

22       Q.    And so why did you -- why did you need an

23   actuary?  Let me clarify.  Is there a reason you relied

24   on your finance manager rather than an actuary?

25       A.    We didn't have an actuary on staff.  And,

Scott Bender, Videotaped - 03/31/2021

41

1      A.     Yes, I had staff and I was responsible for

2   managing the program.

3      Q.     So let's start with your management of the

4   staff.  When you're managing staff in the benefits

5   department, and we'll keep it to the Dial company, how

6   did that work?  Did you -- did you, say, assign

7   assignments to members of your staff to investigate?

8      A.     Yes.  They typically managed member issues,

9   day-to-day work managing eligibility files, making sure

10   that it was processed properly.

11      Q.     Would that staff manage, say, a proposed change

12   to the health plan?

13      A.     Not necessarily manage it.  I guess they would

14   assist in the implementation of that.

15      Q.     Would that -- that would have still fallen to

16   you as being responsible for managing?

17      A.     Right.

18      Q.     So aside from a cost analysis, and we're --

19   let's -- we're still talking about changes to a health

20   plan, what other information might you gather or did you

21   gather in that role to help you evaluate a proposed

22   change to the plan?

23      A.     In that role, it was more -- half the

24   organization was unionized, so your hands were sort of

25   tied there.  The others were simply determining what --

42

1   what trends are in the marketplace, what could you do

2   from a wellness perspective to get people to take better

3   care of themselves.  You know, what -- what are some

4   emerging trends, for example.  So sort of flipped over

5   every rock to figure out, you know, what is the future,

6   where do you want to be, and then set forth and

7   implement.

8   　　Q.　　Would you consult with -- for that particular

9   plan, did you have a dedicated network provider or

10   multiple?

11   　　A.　　We had multiple.  It was more based on regions.

12   　　Q.　　Do you recall who those network providers were?

13   　　A.　　Gosh, there was a bunch.  United Healthcare,

14   Aetna.  There were some regional ones, Penn State

15   Geisinger, in Pennsylvania.  There's the John Deere

16   Network, in Ft. Madison, Iowa.  Kaiser Permanente, in

17   California.

18   　　Q.　　What about Blue Cross Blue Shield?

19   　　A.　　I don't recall them being a provider at Dial.

20   　　Q.　　And what about Cigna?

21   　　A.　　They were not a medical provider.  They were a

22   disability carrier for us.

23   　　Q.　　So at least when you were working with the Dial

24   Soap company, you were working with United Healthcare and

25   Aetna; is that right?

Scott Bender, Videotaped - 03/31/2021

56

1   going to pay what.

2       Q.     Is who is going to pay what the most important

3   factor for the Arizona health plan?

4       A.     It is an extremely important factor.

5       Q.     Are there any other factors that are more

6   important?

7       A.     Than the cost?

8       Q.     Yes.

9       A.     Well, you need to make sure you have sufficient

10  coverage, a sufficient number of providers.

11      Q.     So when you say "sufficient coverage" or

12  "number of providers," what exactly do you mean?

13      A.     The State of Arizona has employees in all parts

14  of the state, and even some out of state.  You need to

15  ensure that everybody has sufficient access to the

16  doctors that they need.  Even if you live in a rural

17  area, you still need to have some level of access.

18      Q.     So, for instance, the Arizona -- the --

19  Arizona's health plan has four network providers; is that

20  right?

21      A.     Up until this year, yes, that was correct.

22      Q.     And what happened this year?

23      A.     We were under the process of redesigning the

24  health plans for the last two years, and that involved

25  moving to a different type of network arrangement; it

Scott Bender, Videotaped - 03/31/2021

58

1    Q.    So just in terms of setting out the important

2  factors, there's cost and sufficient coverage -- I'm

3  sorry, actually, before you answer that, I need you to

4  give a verbal answer, Mr. Bender.  So in terms of the

5  most important factors for the ADOA, there's cost.

6  Correct?

7    A.    Yes.

8    Q.    Coverage?

9    A.    Yes.

10   Q.    And is there anything else?

11   A.    And when I say "coverage," I mean that covers

12  all different kinds of things, network adequacy,

13  primarily.  I think those are the two most important

14  factors.

15   Q.    What about the best interests of the members?

16   A.    It's a factor.

17   Q.    But it's not as important a factor as cost and

18  coverage?

19   A.    In my opinion, probably not.

20   Q.    And when you say your opinion, what about for

21  the ADOA?

22   A.    I can't speak for the ADOA.

23   Q.    But in your work with the ADOA, you haven't

24  seen it as -- you haven't seen it prioritized as high a

25  factor as cost and coverage?

Scott Bender, Videotaped - 03/31/2021

71

1  BY MR. WALL:

2      Q.    So, Mr. Bender, before we took a break, we were

3  talking about the involvement of the governor's office

4  with respect to proposed changes to the plan.

5          Do you recall that conversation?

6      A.    Yes.

7      Q.    So I believe you said that the governor's

8  office is involved whenever there is a major change to

9  the plan?

10      A.    That's correct.  And also annually to approve

11  the contribution strategy.

12      Q.    What counts as a major change?

13          MR. CURTIS:  Object to the form of the

14  question.

15          THE WITNESS:  Significant plan design, where we

16  might be eliminating a type of plan or adding a type of

17  plan that occurred for 2021.

18  BY MR. WALL:

19      Q.    So a significant plan design would entail, you

20  know, a change in the number of network providers?

21      A.    Not necessarily.  That's as the result of a

22  procurement process.  But a significant change with

23  regard to whether you offer a PPO-style plan or eliminate

24  a PPO-style plan, which we have done, and adopt more

25  value-based network contracting arrangements.  And they

Scott Bender, Videotaped - 03/31/2021

81

1      Q.    So no, you have not seen any other factors at
2   work?

3      A.    No.

4      Q.    You also mentioned that the governor's office
5   is involved -- I think you said in two other instances,
6   but let me make sure I understand -- the governor's
7   office is involved in the annual approval of the State
8   health plan?

9      A.    Yes, they -- we work with them on the
10   contribution strategy.

11     Q.    So this is what I want to clarify.  Is the
12   governor's office involved as the part of an annual
13   review of the plan or only when there are changes to the
14   contribution strategy?

15     A.    Both.  So if there's significant proposals like
16   we initiated for 2021, they were involved in that
17   process.  And they were involved in the annual
18   contribution strategy, our recommendations for what we
19   think we should do to control the cost of the -- the
20   health plans.

21     Q.    What could cause a change in a contribution
22   strategy for the State's health plan?

23     A.    What could cause a change?  Gosh, any number of
24   factors.  We only have a small -- well, we have an
25   insufficient budget to manage the plan as it is today.

98

1  of it yet, would the governor's office be likely to get

2  involved in that process?

3      A.    I doubt it.  I know that there are lobbyists

4  all over the Capitol, you know, that try to assert

5  influence for various different things, but typically any

6  plan design change or coverage of benefits comes from us.

7      Q.    So the governor's office is typically not

8  involved in the process of evaluating the plan change?

9      A.    Before we do, no.

10     Q.    The governor's office gets involved once the

11 ADOA has done its research on the plan change and

12 presented the change to it?

13     A.    Correct.

14     Q.    So, Mr. Bender, you mentioned earlier that

15 everyone has an opinion that you -- that you -- that

16 everyone has an opinion in these layers of leadership; is

17 that right?

18     A.    Yes.

19     Q.    Have you ever heard any opinions about

20 transgender benefits?

21     A.    No.

22     Q.    Are you familiar with transgender benefits --

23     A.    Yes.

24     Q.    -- and what they entail?

25     A.    Yes, I am.

Scott Bender, Videotaped - 03/31/2021

101

1  not as -- it's certainly not advantageous from an

2  administrative standpoint, but it also reduces -- it

3  increases your costs, because you don't have as many

4  employees in each program.  It's based on volume.  You

5  pay administrative fees based on the number of people you

6  cover.  The more people you cover, the less the rate.

7      Q.    So when was the last time that the State

8  undertook a redesign of the plan.

9      A.    This -- well, I want to say probably in -- I

10  believe it was when the State went self-insured from a

11  fully insured program.  And that would have been in the

12  2008-2009 time frame, I believe.  Well before my time.

13      Q.    And, Mr. Bender, I believe you testified that

14  the State was undergoing this redesign over the last two

15  years?

16      A.    Yes, it took approximately two years from the

17  start of our discussions around the plan redesign to

18  actual implementation in the effective date of those

19  changes.

20      Q.    So when did that process start?

21      A.    I want to say it started late 2018 or early

22  2019 is my guess.

23      Q.    As you will have probably surmised, this is

24  something I do to help orientate people: Do you know if

25  that started before or after Christmas 2018?

103

1   the other was Segal.

2       Q.    And could you spell "Segal" for -- I don't know

3   if it's like the bird or if it's like --

4       A.    It's S-e-g-a-l.

5       Q.    And during that process with the two consulting

6   firms, did -- does the ADOA examine every aspect of the

7   plan?

8       A.    I would say probably so.  I -- that process was

9   focused more on the overall structure of the program, as

10  opposed to any specific exclusions or other things, if

11  you will.

12      Q.    But did the ADOA review the plan exclusions

13  during that process?

14      A.    I don't recall if we did or not, but we

15  typically review our exclusions each year with our

16  medical director community.

17      Q.    And what is that medical director community?

18      A.    So at least once a year the medical directors

19  from the four health plans, Blue Cross, United, Cigna,

20  and Aetna, we would host a meeting with them, and in

21  advance provide them with here's our plan design, here's

22  our list of exclusions for the benefit programs, and they

23  would go through and evaluate those versus their book of

24  business and how we compare, and we would consider any

25  recommendations they have from that.  And then just talk

104

1   through any emerging trends in the marketplace, you know,

2   what kind of drugs are hitting -- are coming down the

3   pipeline that we need to be aware of from a cost

4   perspective.  So it was more just an open sharing of

5   information and ideas rather than an analysis of our

6   plan.

7       Q.    Would you typically take those medical

8   directors' recommendations?

9       A.    Sometimes, yes.  It depends on -- on cost and

10  things like that.  The dental plans were also included in

11  those analyses.

12      Q.    So when you say "sometimes," is it more often

13  than not?

14      A.    I couldn't say.  I don't know if it's 50/50 or,

15  you know, all one way or the other.

16      Q.    And I think you said the ADOA looked at its

17  plan exclusions with this medical director community

18  every year.  Correct?

19      A.    That's right.

20      Q.    So has the ADOA looked at the plan's exclusion

21  of gender reassignment surgery every year that you've

22  been employed there?

23      A.    I believe so, yes.  That's listed in the

24  exclusions, so yes, it would have been reviewed.

25      Q.    So starting at the beginning, again, of your

Scott Bender, Videotaped - 03/31/2021

116

1    her on.  Gosh, I can't remember.  It was right when I
2    started.  We had conversations with her on something.
3    I'm sorry, I don't remember.  And I know that she was
4    involved in the discussion in our redesign of our new
5    wellness program, and what the governor's office would be
6    interested in from the perspective of a new vendor and
7    what kind of capabilities they wanted for the wellness
8    program, but my -- my interaction with her is very
9    limited.
10       Q.    Have you ever interacted with her with respect
11   to the plan's coverage of transgender benefits?
12       A.    I have not, no.
13       Q.    So I think I understand now, you know, the
14   structure of who reports to who.  I'd like to understand
15   it better, the decision-making process at the ADOA.  So
16   with respect to the plan's exclusion, a change to a plan
17   exclusion, a removal of a plan exclusion, which is what
18   is at issue in this case, how would you first
19   learn -- how would it come to the ADOA's attention a
20   proposal about removing a plan exclusion?
21       A.    I'm trying to -- could you rephrase your
22   question?  I think -- this is not something that happens
23   often.
24       Q.    Sure.  Well, let me ask you about that.  How
25   often does -- is a proposal to remove a plan exclusion,

Scott Bender, Videotaped - 03/31/2021

117

1    how often does that occur?

2        A.    Not very frequently.

3        Q.    Twice a year?

4        A.    No, not even that often.

5        Q.    Once every two years?

6        A.    I'd say that's probably more -- more likely.

7    And, typically, it's done in conjunction with change in

8    law that we have to, you know, cover something in

9    particular.

10       Q.    Was the removal of the plan's exclusion of 3-D

11   mammography the last plan exclusion you dealt with?

12       A.    No, it was the -- the clinical cancer trial.

13   And that was something that we had to cover.  3-D

14   mammography was more of a change in medical coverage

15   guidelines.

16       Q.    So what do you mean it -- what do you mean by

17   it was a "change in medical coverage guidelines"?

18       A.    The vendors themselves determine what is

19   considered a medically necessary service.  As I

20   mentioned, Aetna was the first organization to make the

21   determination that 3-D mammography was an appropriate

22   service and not experimental.  They had seen enough

23   evidence to determine that that is something that should

24   be covered.  And they were covering it on their -- on

25   their medical guidelines.  And slowly, but surely, the

Scott Bender, Videotaped - 03/31/2021

158

1    Q.    And other considerations around the plan's

2    exclusion of transgender benefits -- let me clarify.

3    Were other considerations about the plan's exclusion or

4    the removal of that exclusion around transgender benefits

5    more clear?

6    A.    Could you rephrase that?

7    Q.    Sure.  Was there any question about the cost of

8    covering transgender benefits amongst your team?

9    A.    Oh, yes.

10   Q.    What were those questions?

11   A.    The -- determining the actual impact, we had

12   queried all of our -- all four of the health plans to

13   give us sort of their estimate as to what it would be to

14   our health plan.  You know, if we were to implement these

15   things, what would the -- the annual cost be to -- to the

16   State of Arizona.

17         And the -- the responses were fairly all over

18   the place, to put it bluntly.  They were very

19   wide-ranging.  And, in addition, I know our actuary went

20   and did sort of his own benchmarking, if you will, just

21   by looking at, within his industry, doing some research

22   as to cost impact for transgender benefits.  And the cost

23   impacts were all over the place.

24         So it was very difficult to determine exactly

25   what that would be, but the worst-case scenario was

Scott Bender, Videotaped - 03/31/2021

1   extremely expensive.

2        Q.    What would you consider as "extremely

3   expensive"?

4        A.    I think one estimate that we saw was upwards of

5   $20 million.  And that was the extreme outlier, but

6   certainly something to pay attention to.

7        Q.    And when you say "our actuary," you're

8   referring to Mr. Meisner?

9        A.    That's right.

10       Q.    And when did you see that estimate?

11       A.    It would have been sometime in 2016.

12       Q.    So aside from cost, was there a consensus

13  amongst the network providers of whether to extend

14  coverage for transgender benefits?

15       A.    There was consensus as to what they were doing

16  on their fully insured book of business.

17       Q.    And what was that consensus?

18       A.    They were going to cover it.

19       Q.    So each of the then four network providers were

20  going to pro -- were -- uh, let me restate that.

21            So each of the four network providers were

22  going to cover transgender benefits?

23       A.    For their fully insured book of business, yes.

24  Self-insured plans had the option to add that benefit.

25       Q.    Did the ADOA request that the network providers

167

1    or deleted the exclusions and absorbed the costs

2    associated with that, for sure.

3    BY MR. WALL:

4        Q.    So if the ADOA had removed the exclusion listed

5    in paragraph 16, would there have been any other question

6    about the ADOA's compliance with Section 1557?

7        A.    From a compliance standpoint, no.  If we

8    voluntarily opted in, there's no compliance issue.

9        Q.    So why didn't the ADOA remove the exclusion for

10   all transgender benefits under the plan?

11       A.    Can you rephrase?

12       Q.    Why didn't the ADOA remove the plan's exclusion

13   of transgender benefits, inclusive of gender reassignment

14   surgery?

15       A.    I believe there are several reasons, one being

16   cost and the other being we didn't feel it was required

17   for us to include -- or to eliminate the exclusion for.

18       Q.    So the ADOA did not remove the plan's exclusion

19   of gender reassignment surgery because of cost, and it

20   didn't feel it was required to remove that exclusion?

21       A.    Those are both reasons.  I think, primarily, is

22   we weren't required to, and if we're not required to,

23   then we weren't interested in taking on additional costs

24   in a plan that's already under water.

25       Q.    The ADOA's primary reason for not removing the

286

1    the decision maker?

2        A.    I -- I couldn't do so, definitively.  I don't

3    know if she decided that or not.

4        Q.    And you testified earlier that you think that

5    Marie is a bit conservative --

6        A.    Uh-huh.

7        Q.    -- is that right?

8        A.    I would say so.

9        Q.    Did she ever express any opposition to

10   providing coverage for gender reassignment surgeries, in

11   ADOA's health insurance plan to you?

12       A.    No, I never heard her express a personal

13   opinion about it, other than really what are we required

14   to do.

15       Q.    And so she was neutral about her own personal

16   view on the issue?

17       A.    If she wasn't neutral, she hid it very well,

18   and, you know, played it close to the vest, so -- you

19   know, I didn't get any violent reaction one way or the

20   other.

21       Q.    And you testified that Michael Meisner is quite

22   a bit more conservative than --

23       A.    Right.

24       Q.    -- Marie.  Right?

25       A.    Right.

298

1                        SIGNATURE PAGE

2

3           I, SCOTT BENDER, a deponent exercising my
   right to read and sign my deposition taken on March 31,
4    2021, place my signature hereon and make the following
   changes on this _____ day of _____, 2021.
5
                (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                        _____

8                             SCOTT BENDER

9

10    PAGE      LINE      READS         CHANGE TO          REASON

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25   _____     _____     _____

299

```
1   STATE OF ARIZONA    )
    COUNTY OF MARICOPA  )
2
            BE IT KNOWN that the foregoing proceedings
3   were taken before me; that the witness before testifying
    was duly sworn by me to testify to the whole truth; that
4   the foregoing pages are a full, true, and accurate record
    of the proceedings all done to the best of my skill and
5   ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
6   direction.

7           [X] Review and signature was requested.

8           [ ] Review and signature was waived.

9           [ ] Review and signature not required.

10          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in the ACJA 7-206(F)(3)
11  and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
    Arizona, this 13th day of April, 2021.

12

13

14

15  _____

16          ROBIN L. B. OSTERODE, RPR
            CA CSR No. 7750
17          AZ CR No. 50695

18              *   *   *   *   *

19          I CERTIFY that Glennie Reporting Services,
    LLC, has complied with the ethical obligations set forth
20  in ACJA 7-206(J)(1)(g)(1) through (6).

21

22

23
    _____
24  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
25  Arizona RRF No. R1035
```

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                )
                                  )
                 Plaintiff,       )
                                  )
vs.                               )      4:19-cv-00035
                                  )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,     )
                                  )
                 Defendants.      )
                                  )

VIDEOTAPED DEPOSITION OF KELLY SHARRITTS

Via Zoom videoconference
April 22, 2021
8:34 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

1   know what the exact trickle was.  But Marie reached out to

2   our department -- or to our team to look into it.

3       Q.   Do you remember around when Marie Isaacson

4   reached out to your team to look into coverage of this

5   exclusion?

6       A.   It was, I would say, mid to late 2015.

7       Q.   Do you remember how long you had been working at

8   the ADOA when you were first approached about this issue?

9       A.   I would say roughly six months.  Somewhere in

10  that range.

11      Q.   Now -- Oh, before we move on, do you remember

12  learning about the history of how this exclusion first

13  came to exist in the ADOA plan?

14      A.   I don't recall knowing how it started.  I just

15  was looking at does it stay.

16      Q.   Did you know how long it had been part of the

17  ADOA plan?

18      A.   I don't recall that answer.

19      Q.   Did it seem like something that had just been

20  added, from the conversations you were having?

21      A.   I wouldn't be able to infer that.  I don't know.

22      Q.   And when Marie Isaacson reached out to your team

23  to assess whether the ADOA should maintain this exclusion

24  as written in the 2016 plan, what specifically did you

25  take her to be asking for?

56

1          And it was states that were covering it, to

2     understand why they were covering it, if they felt it was

3     required and discrimination not to, and what sources they

4     had to support that so we could look at those same

5     sources, and what the cost impact to their plan was by

6     doing it.

7          Q.   But this was not a step that the ADOA usually

8     took in the course of deciding whether to maintain an

9     exclusion; right?

10         A.   Correct.  In my time there, I will clarify that.

11         Q.   You mentioned some insurers:  UnitedHealthcare,

12    Aetna, Blue Cross Blue Shield.  Was it typical to reach

13    out to them when making a decision like this?

14         A.   Yes.

15         Q.   Do you remember reaching out to them in this

16    instance?

17         A.   I don't know if I specifically reached out, but

18    our team reached out to get their opinion and their

19    information on it.

20         Q.   Who on your team would have been responsible for

21    reaching out to insurers?

22         A.   I believe it would have been Chanelle.  I believe

23    she is the one who was -- had the relationship with them.

24    I forget her actual title and role -- or her team.  I

25    think Yvette reported to her.  So they probably would have

78

1           THE WITNESS:  Yes.

2              And on the second page behind the charts is

3     where I have the information -- inflation estimates from

4     the Milliman's health cost index --

5     Q.   BY MS. SHEETS:  Do you remember --

6     A.   -- (indecipherable due to simultaneous

7     crosstalk).

8              Go ahead.

9     Q.   Do you remember whether Michael Meisner was

10    involved in putting together these numbers?

11    A.   I believe I -- I believe he helped me with the

12    inflation number.  But I believe that's all he helped me

13    with on this.

14    Q.   Do you remember why you put this analysis

15    together?

16    A.   To understand the cost impact if we were to cover

17    it.  Would it hurt the plan?  Would we have to get

18    additional funding?  Could it impact taxes or premiums

19    that employees were paying?  What that -- what it meant

20    financially to cover it.

21    Q.   And did anyone ask you to put this cost analysis

22    together?

23    A.   It would have been Marie asking me to understand

24    the cost impacts.

25    Q.   And would Marie Isaacson have asked anyone else

90

1     A.    Yes.

2     Q.    And do you remember what the conclusion was on

3  the first question of whether or not the ADOA was required

4  to cover transgender benefits?

5     A.    I believe from the documents that we looked at

6  today that Mercer had come back and said that there was

7  not a -- it did not fall under the -- the -- Can't think

8  of the word.  That we weren't required to.  That it wasn't

9  legally required.  That we weren't being discriminatory by

10 not covering it, therefore there wasn't a requirement to

11 have to.  Things evolved I think, as we saw from that

12 email that Marie sent, that HCC or HHS was trying to push

13 that that law was clarifying that it was discriminatory.

14 I think at the end of the day it was resolved that it was

15 a grey area and no one really had a clear answer on yes or

16 no.  And we believed, since others were not, it wasn't

17 something that was a clear black-and-white we had to do

18 it.

19    Q.    You say others were not.  Do you mean other state

20 plans were not covering transgender benefits?

21    A.    Correct.  There were state plans out there not

22 covering it.

23    Q.    Did Ms. Isaacson -- Let me rephrase.

24          In approaching this analysis where the first

25 question was, are we required to cover this or not, is

1    that approach unique to this exclusion?

2        A.   No.  Only in the sense that when other things

3    would come up, like dental plans and seeing your dentist

4    every six months, are you required to have that coverage

5    or not, it was more of what's required in the standard

6    treatment in the field.  And we would get that advice from

7    UHC and Aetna and Blue Cross and the other health plans

8    and their physicians on what was typically required and

9    should be done and we should be doing.  This was more

10   specific to is it discriminatory to not.  And so, what is

11   our legal obligation on the discrimination front on

12   whether it's required for discrimination purposes?

13       Q.   And when you say this decision on whether or not

14   to maintain the exclusion was more specific to whether it

15   was discriminatory or not, was that a unique approach in

16   deciding coverage?

17       A.   Yes.  In my time there.

18       Q.   And why do you think there was such emphasis on

19   approaching this exclusion with the question of whether

20   ADOA was required to cover these benefits?

21       A.   Because it was such a grey area and had such a --

22   I mean, it was a big topic in society at the time and it

23   was a big change to things.  That before we just changed

24   something in the State plan and State tax dollars we

25   wanted to make sure it was fully understood and vetted.

1  they weren't proposed in the sense that they would have

2  any questions -- any reason to be illegal to change.

3     Q.   When you say it was more of a question with

4  vision or dental on what you're supposed to cover, what do

5  you mean?  Supposed to why?

6     A.   How often are you supposed to get your eyes

7  checked?  Once every year?  Once every two years?  How

8  often should you go to the dentist?

9     Q.   And who was making recommendations on how often

10  you should get your eyes checked or --

11     A.   The insurance providers would provide their

12  recommendation.  They brought it up.  And since it was

13  coming from them, I think there was no question on -- They

14  wouldn't be proposing something that would not be legal to

15  change, so there wasn't a need to question if it should

16  be.

17     Q.   So if insurance providers that the ADOA reached

18  out to had recommended covering a benefit, would you

19  expect that the ADOA would cover that benefit?

20          MR. CURTIS:  Objection; form of the

21  question.

22          THE WITNESS:  I wouldn't expect that they

23  would cover the benefit.  I would expect that they

24  wouldn't question the legality of that change to the plan.

25     Q.   BY MS. SHEETS:  When looking at whether a benefit

1    should or should not be covered, so that second question,

2    taking legality out of the picture, does the ADOA consider

3    the best interests of the patients in making that

4    decision?

5        A.   I believe they did.

6        Q.   Is it standard for them to take the benefits of

7    the patients into consideration?

8        A.   I believe that was always a question of, why

9    would we want to cover it or not cover it?  Is it giving

10   the proper care to the employee and their member?

11       Q.   In the instance of 3D mammography were you -- or

12   the ADOA taking into account the best interests of the

13   patients who would be affected?

14       A.   I believe so.

15       Q.   Was the ADOA also taking into account costs of

16   what it would take to cover the 3D mammography?

17       A.   I believe that it was a part of the discussion.

18   And the increased cost in the 3D compared to the decreased

19   cost of cancer treatment was a clear deciding factor.

20       Q.   And when considering -- After it was decided that

21   it was a grey area or the ADOA was not legally required to

22   cover transgender benefits, did the ADOA consider the best

23   interests of the patient in making the decision to

24   maintain the exclusion on transgender surgery, hormone

25   therapy, and psychological therapy?

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF YAVAPAI       )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7        I CERTIFY that I am in no way related to, nor
     employed by any of the parties hereto, and have no
 8   interest in the outcome thereof.

 9        [X] Review and signature was requested.
          [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
     this 6th day of May, 2021.

13

14

15
          _____
16                    JILL MARNELL
                Certified Reporter #50021
17             Registered Professional Reporter

18        *      *      *      *      *      *

19        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
     complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22

23       _____
               GLENNIE REPORTING SERVICES, LLC
24                Registered Reporting Firm
                  Arizona RRF No. R1035
25
```

196

1                     SIGNATURE OF WITNESS

2

3   I, KELLY SHARRITTS, the witness in the above deposition,
do hereby certify that I have read the foregoing
4 deposition, and that the said deposition is a true and
correct record of my testimony, with such corrections and
5 changes, if necessary, listed below.

6            _____
                  WITNESS

7 PAGE: LINE: SHOULD READ:      REASON FOR CHANGE:

8 _____ _____ _____

9 _____ _____ _____

10 _____ _____ _____

11 _____ _____ _____

12 _____ _____ _____

13 _____ _____ _____

14 _____ _____ _____

15 _____ _____ _____

16 _____ _____ _____

17 _____ _____ _____

18 _____ _____ _____

19 _____ _____ _____

20 _____ _____ _____

21 _____ _____ _____

22 _____ _____ _____

23 _____ _____ _____

24

25

# EXHIBIT 12

```
                                                        Page 1

 1                  UNITED STATES DISTRICT COURT
 2                       DISTRICT OF ARIZONA
 3
      RUSSELL B. TOOMEY,
 4
              Plaintiff,
 5
      v.
 6
      STATE OF ARIZONA; ARIZONA BOARD
 7    OF REGENTS, D/B/A UNIVERSITY OF
      ARIZONA, a governmental body of
 8    the State of Arizona; RON              Cause No.
      SHOOPMAN,in his official
 9    capacity as chair of the Arizona      No.
      Board Of Regents; LARRY PENLEY,
10    in his official capacity as           4:19-cv-00035
      Member of the Arizona Board of
11    Regents; RAM KRISHNA, in his
      official capacity as Secretary
12    of the Arizona Board of Regents;
      BILL RIDENOUR,in his official
13    capacity as Treasurer of the
      Arizona Board of Regents; LYNDEL
14    MANSON, in her official capacity
      as Member of the Arizona Board
15    of Regents; KARRIN TAYLOR
      ROBSON, in her official capacity
16    as Member of the Arizona Board
      of Regents; JAY HEILER, in his
17    official capacity as Member of
      the Arizona Board of Regents;
18    FRED DUVAL, in his official
      capacity as Member of the
19    Arizona Board of Regents; ANDY
      TOBIN, in his official capacity
20    as Director of the Arizona
      Department of Administration;
21    PAUL SHANNON, in his official
      capacity as Acting Assistant
22    Director of the Benefit Services
      Division of the Arizona
23    Department of Administration,
24                    Defendants.
25
```

Page 2

1

2

3

4

5

6

7

8

9              VIDEOTAPED VIDEOCONFERENCE DEPOSITION

10                     OF CRAIG BROWN

11

12        BE IT REMEMBERED, the Deposition Under Oath of CRAIG

13   BROWN was taken by MR. JORDAN C. WALL, Attorney at Law,

14   for the Plaintiff, at the offices of Hazlett Reporting &

15   Legal Video Services at 140 Second Avenue West, Suite B,

16   Kalispell, Montana, on Tuesday, June 22, 2021, beginning

17   at the hour of 9:35 A.M.  Reported by Stacy M. Baldwin,

18   Registered Merit Reporter and Notary Public.

19

20

21

22

23

24

25

Page 47

```
1    don't.  The state did not know how to do that, and that's

2    why I took the job.

3         Q   When you say "the state," are you referring to

4    the State of Arizona?

5         A   Yes, I am.

6         Q   And when you say that's why you took the job,

7    are you referring to your role as the director of the

8    ADOA?

9         A   That's correct.

10        Q   So did you take that job specifically because

11   of -- do you believe you acquired that job specifically

12   because of your expertise with respect to obtaining

13   savings?

14        A   No, I don't.  I think I brought that as my want

15   to do to the list.  They were looking for a senior

16   manager, someone with experience, broad experience, to

17   manage, you know, the eight areas, not just procurement,

18   and I think that's why I was hired.  But I'm the one that

19   had the savings agenda, largely.

20        Q   So, Mr. Brown, you said you had an agenda with

21   respect to savings when you came into the role as

22   director of the ADOA; is that right?

23        A   That was my -- one of my two primary focuses of

24   coming in the state, was that, and the other one was

25   building -- getting people to move back to the state
```

Page 48

```
1    office area.  Because people were vacating buildings, and
2    it was rundown.  The area of Arizona where the state
3    government resides, we wanted to move people back,
4    rebuild state government in that area.  Those were my two
5    wanna-dos as I took the job.
6        Q   And just so I'm clear, how would you describe
7    that first wanna-dos with respect to savings?
8        A   The first one being the procurement one or the
9    building one?  Sorry.
10       Q   The procurement one.
11       A   Okay.  I believed that the state had a large
12   budget and was spending a lot of money, and they were.
13   But I wanted to implement strategy, which I had at least
14   28 years of experience with, of getting better cost
15   reductions so that the state could use that money for
16   other things, free up money and be more efficient.  And
17   that was in more line very much so with Henry Darwin's
18   lean initiative, you know, he was all driving and stuff.
19           And so, for example, the state -- I couldn't
20   believe the State of Arizona owned 7,000 cars.  You know,
21   why does a state of 35,000 employees need 7,000 cars?
22   Right?  So, we questioned the number of cars.  They would
23   buy them willy-nilly when they needed them , and we got
24   to buying them once a year in an auction.  So, we
25   developed a strategy and we had, like, 20 percent
```

Page 49

1    reduction in car costs, for example.

2           So that's my deal.  That's what I do.  And

3    that's what I was trying to implement at the state,

4    across various the categories.

5         Q    So, you would describe yourself as an expert in

6    corporation procurement and supply chain experience to

7    small businesses and state government, correct?

8         A    That's correct.

9         Q    And you would say you're an expert at helping

10   small businesses and state government achieve lower costs

11   and higher value?

12        A    Yeah, with the key caveat, if they want to do

13   it.  And what I mean by that is, sometimes people act

14   like they want to do it, but it requires change.  So,

15   back to that car example, no, you can't have that car.

16   We're not buying that model of car anymore.  We're buying

17   something else.  So, it does require the user to change

18   or give in to some of the things that they, you know, may

19   want to do, put more controls around them.  So, they have

20   to play.

21        Q    During your time as the director of the ADOA,

22   did you find that the State of Arizona wanted to achieve

23   lower costs and higher value?

24        A    It was mixed between -- there was some 23

25   agencies, large and small, biggest one being, for

```
                                              Page 178
 1    that in member benefits, but other than that, no.
 2         Q    So, Mr. Brown, do you know what the original
 3    rationale for the exclusion of transsexual surgery was?
 4         A    I do not.
 5         Q    Did you and Ms. Isaacson ever discuss what the
 6    rationale for that exclusion was?
 7         A    We did not.
 8         Q    Did Ms. Isaacson ever discuss with you the cost
 9    rationale for such an exclusion?
10         A    She did not.
11         Q    What about a rationale that it was viewed as
12    cosmetic?
13         A    I don't think we ever talked about how we got
14    there.  I think she was talking about with the claim,
15    like, what to do, that's -- our conversations were more
16    in the current space, not how we got there.
17         Q    So, in sum, you don't know why the plan
18    excluded coverage for transsexual surgery in 2015,
19    correct?
20         A    Correct, I do not know.
21         Q    Do you know why the plan excluded coverage for
22    transsexual surgery in 2016?
23         A    Because it didn't change from the prior plan.
24         Q    What it is the ADOA's process for considering
25    changes to the plan's coverage of benefits?
```

Page 179

1       A   There's kind of a gathering of input from the

2   governor's office and the agencies about what they're

3   hearing, what people want, what the hot points are.  And

4   then there's also looking at the market, the healthcare

5   providers, TPAs, what are the new offerings, what's out

6   there, whatever.

7           It all comes together and then benefit services

8   group determines what they would like to do and provide

9   that.  And I think there might even be some surveys to

10  employees about, you know, we're looking at designing

11  this, what's in, what's out, what do you think.  And then

12  they go through impact budgetary process, after they do

13  some work on the finances and say this is what it's going

14  to cost, if we implement this plan.  Then they work the

15  budget angle, can we increase rates, member contribution

16  rates this amount, will JLBC give us the rest, you know.

17          So, once they kind of have all that together

18  they make a proposal and say this is the plan we want to

19  submit covering all those bases.

20      Q   So, let's break that down a bit, Mr. Brown.  To

21  start with, I believe you said that there's a gathering

22  from the governor's office and agencies about what

23  they're hearing and what people want, what the hot points

24  are, and is also looking to the market; is that right?

25      A   Yes, about -- what TPAs are telling us, you

```
                                                   Page 256

 1                  DEPONENT'S CERTIFICATE

 2

 3        I, CRAIG BROWN, the deponent in the foregoing

 4    deposition, DO HEREBY CERTIFY, that I have read the

 5    foregoing 255 pages of typewritten material and that the

 6    same is, with any changes thereon made in ink on the

 7    corrections sheet, and signed by me, a full, true and

 8    correct transcript of my oral deposition given at the

 9    time and place hereinbefore mentioned.

10

11

12                      CRAIG BROWN, Deponent.

13

14        Subscribed and sworn to before me this

15    day of                        , 2021.

16

17

18                      PRINT NAME:

19                      Notary Public, State of

20                      Residing at:

21                      My commission expires:

22

23    TOOMEY vs. ADOA

24

25
```

Page 257

1                      REPORTER'S CERTIFICATE

2

3    STATE OF MONTANA          )
                                : ss
4    COUNTY OF Flathead    )

5    I, Stacy M. Baldwin, RMR, and Notary Public for the State
     of Montana, residing in Bigfork, do hereby certify:

6

     That I was duly authorized to and did swear in the
7    witness and report the deposition of CRAIG BROWN in the
     above-entitled cause; that the foregoing pages of this
8    deposition constitute a true and accurate transcription
     of my stenotype notes of the testimony of said witness,
9    all done to the best of my skill and ability; that the
     reading and signing of the deposition by the witness have
10   been expressly reserved.
11   I further certify that I am not an attorney nor counsel
     of any of the parties, nor a relative or employee of any
12   attorney or counsel connected with the action, nor
     financially interested in the action.

13

            IN WITNESS WHEREOF, I have hereunto set my hand
14   and affixed my notarial seal on this day of
     June 28, 2021.

15

16

17

18

19

20                      STACY M. BALDWIN

21

22

23

24

25

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,              )
                               )
                Plaintiff,     )
                               )
vs.                            )      4:19-cv-00035
                               )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,   )
                               )
                Defendants.    )
                               )


VIDEOTAPED DEPOSITION OF ELIZABETH MARIE SCHAFER

Via Zoom videoconference
April 28, 2021
8:33 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue        Prepared by:
Phoenix, Arizona 85020
                                   Jill Marnell, RPR
602.266.6535                       Arizona Certified
www.glennie-reporting.com          Reporter No. 50021

53

1      A.    It would have to -- It would depend on what do --

2  what kind of a benefit it is.  Is it really going to help

3  very many people?  Just because, you know, your market

4  research shows that everyone's covering something, that

5  you're not going to cover it unless there's a reason to

6  cover it.

7      Q.    Okay.  So just to be a little bit more specific,

8  so I have factors that ADOA considers when deciding

9  whether or not to cover something.  So we have cost;

10 right?  Is cost a factor in whether or not ADOA covers

11 something?

12     A.    Yes.

13     Q.    Is it fair to say that generally ADOA would tend

14 to cover things that are less expensive and be more

15 skeptical -- skeptical about covering benefits that are

16 more expensive?

17     A.    Again, the Department of Administration's plan is

18 a very generous plan.  So it's not -- it doesn't have huge

19 holes in it like some employer benefit plans do.  So they

20 weren't always looking to just add coverages.  I mean,

21 it's a very generous benefit plan.

22     Q.    But cost is one of the factors?

23     A.    Cost --

24     Q.    It may not be the only factor but just to get all

25 the -- just to get -- I want to get the cost-benefit

54

1   analysis on the table and understand how ADOA decides

2   whether or not to cover something.

3            So I understand that costs may not be the

4   only factor but I just want to understand, is it a factor

5   that ADOA considers when deciding whether or not to cover

6   something?

7       A.   Yes.

8       Q.   Okay.  Other than cost I think you mentioned

9   trend.  So ADOA wants to be competitive and if the trend

10  is there's a new benefit and other providers are starting

11  to cover that benefit, and the trend is to cover, in order

12  to be competitive, ADOA would at least consider the trend

13  of coverage; correct?

14      A.   Yes.

15      Q.   Okay.  And I think you mentioned something about

16  the actual need.  So another factor that ADOA would

17  consider would be whether or not the benefit was something

18  that actually benefited members of the plan; is that

19  right?

20      A.   Sounds correct, yes.

21      Q.   So in other words, ADOA would consider the

22  medical necessity of the proposed benefit.

23            MR. CURTIS:  Objection; form of the

24  question.

25            MR. GARBACZ:  You can answer, Ms. Schafer.

Elizabeth Schafer, Videotaped - 04/28/2021

1      THE WITNESS:  Yes.

2      Q.   BY MR. GARBACZ:  Okay.  So so far I have cost,

3  and I'm -- I'm generalizing but I'm trying to make sure I

4  have everything on the table here.  So we have cost, we

5  have trend.  So cost, ADOA covers things generally when

6  they are less expensive.  Trend, ADOA covers things

7  generally when other providers are starting to cover that

8  benefit.  We have medical necessity.  Generally ADOA

9  covers things that are medically necessary.  What other

10  factors would weigh into the equation?

11      A.   The only thing I can think of is like return on

12  investment so that you can prove that, you know, covering

13  certain types of claims might ultimately -- but again,

14  that's cost.

15      Q.   So for example, if you covered a specific benefit

16  and that covering that benefit prevented you from having

17  to cover other medical conditions down the line, you would

18  take that into consideration?

19      A.   Correct.

20      Q.   Okay.  So I have cost, trend, medical necessity,

21  and return on investment.  Other than those four factors,

22  in your 11 years of working at the ADOA can you think of

23  any other factors that ADOA would take into consideration

24  when deciding whether or not to cover a new proposed

25  benefit?

Elizabeth Schafer, Videotaped - 04/28/2021

83

1    Q.   So sitting here today you do not know whether 3D

2    mammography was considered an expensive benefit to the

3    ADOA?

4    A.   My assumption is it's probably more expensive

5    than a 2D, but I don't think it was hugely more expensive

6    but I do not know.  I've never looked at the claim.

7    Q.   So to your knowledge did cost weigh into the

8    decision-making at all?

9    A.   Cost usually weighed into most decisions at ADOA.

10   So I would say it probably did.

11   Q.   What about trend; was the trend to cover 3D

12   mammography?

13   A.   It was becoming more common in the industry, yes.

14   Q.   And do you think that that might have had an

15   influence on the ADOA's decision?

16   A.   Possibly, yes.

17   Q.   But you're not sure?

18   A.   No.

19   Q.   Okay.  Medical necessity; do you think or is it

20   your understanding that a 3D mammography can be medically

21   necessary?

22   A.   Yes.

23   Q.   And did the fact that a 3D mammography can be

24   medically necessary weigh into the decision-making, to

25   your knowledge?

101

1  was considering changes in -- in the plan that would

2  affect drugs?

3      A.    Yeah.

4      Q.    Can you think of any other instances where the

5  ADOA reached out to MedImpact regarding a change to the

6  plan?

7      A.    Not specifically.  I know we did it.

8      Q.    Okay.  If you look at the -- the email from you

9  to Erin Russell, so the second email down, you are

10  reaching out to MedImpact for information and then in the

11  last sentence you say [as read]:  Do you have any idea of

12  potential costs to a plan for making any necessary

13  changes?

14          Do you see that?

15     A.    I do.

16     Q.    Why were you reaching out about cost?

17     A.    Because every change pretty much has to have a

18  cost analysis done.

19     Q.    Would you say that was standard procedure to have

20  a cost analysis done?

21     A.    Well, for most changes.  I mean, there are some

22  changes you have to make because, you know, we still had

23  to do a cost analysis.  I mean, the change that I always

24  think of is covering children to the age of 26.  So we had

25  no choice but we had to add them.  But, yeah, somebody had

Elizabeth Schafer, Videotaped - 04/28/2021

102

1  to calculate how much was that going to cost the plan a

2  year.

3      Q.   So you had no choice to cover -- what -- What was

4  it exactly that you had no choice?

5      A.   When the ACA passed and they added coverage till

6  you were the age of 26 for dependents.

7      Q.   So you had to cover that as part of the ACA?

8      A.   Correct.

9      Q.   But you still did a cost analysis?

10     A.   I can't swear on a Bible but I'm pretty sure --

11 Yes.  I -- No, actually I can.  I know we knew how much

12 that was going to cost the plan.

13     Q.   And the purpose of that cost analysis was not to

14 figure out whether or not you were going to cover the

15 benefit, because you had to cover the benefit; right?

16     A.   Correct.

17     Q.   So the reason you did the -- the reason ADOA did

18 the cost analysis was to understand what the cost

19 implications would be for this new benefit that it was

20 required to cover.

21     A.   Right.  And we would have to make a determination

22 on like, do we need to increase premiums?

23     Q.   So ADOA did a cost analysis with respect to

24 transgender reassignment; is that right?

25     A.   Yes.

1        A.   I don't remember.

2        Q.   Did Kelly Sharritts ever express any views as to

3    whether gender reassignment surgery should be covered

4    under the plan?

5        A.   Not that I remember.

6        Q.   Did Kelly Sharritts ever express any views about

7    transgender individuals generally?

8        A.   Not that I remember.

9        Q.   Let's go to Marie Isaacson.  Do you ever remember

10   Marie Isaacson expressing any political views in your time

11   at the ADOA?

12       A.   No.

13       Q.   Do you remember Ms. Isaacson ever expressing any

14   personal or political views about whether transgender

15   benefits should be covered?

16       A.   No.

17       Q.   Do you remember Ms. Isaacson ever expressing any

18   personal or political views about transgender individuals

19   in general?

20       A.   No.

21       Q.   If you had to guess would you say that

22   Ms. Isaacson was politically liberal?  Yes or no?

23                MR. CURTIS:  Objection; form of the

24   question.

25                THE WITNESS:  I know her husband is a

1     A.   Based on discussions we had.

2     Q.   What specifically about those discussions made

3   you think he was conservative?

4     A.   I -- I just remember a conversation where NPR he

5   told me was a liberal media organization.

6     Q.   Okay.  And other than this comment about NPR, was

7   there any other reason why you think Mr. Meisner was

8   conservative?

9     A.   I can't remember any specifics.

10    Q.   Did Mr. Meisner ever express any political

11  views -- any personal or political views about whether

12  transgender benefits should be covered?

13    A.   No.

14    Q.   Did he ever express any views about the cost of

15  them?

16    A.   No.

17    Q.   So in your knowledge -- to your knowledge,

18  Mr. Meisner never expressed any opinion one way or another

19  about gender reassignment surgery?

20    A.   Correct.

21    Q.   Okay.  Let's go to Scott Bender.  Did Mr. Bender

22  ever express any political views in your time of knowing

23  him either at the ADOA or outside of the ADOA?

24    A.   I don't remember him having any political

25  conversation.

185

1      Q.   And do you remember him ever having or expressing
2   an opinion about transgender benefits?
3      A.   No.
4      Q.   You never remember him ever expressing an opinion
5   one way or another about whether gender reassignment
6   surgery should be covered?
7      A.   Correct.
8      Q.   Let's go to Yvette Medina.  Did Yvette Medina
9   ever express any political views in your time of knowing
10   her?
11      A.   Yes.
12      Q.   I'm sorry?
13      A.   Yes.
14      Q.   And what were those views?
15      A.   We worked together for ten years, so you're
16   talking about a myriad of different topics.  Just whatever
17   happens to be in the news that day.
18      Q.   Did you get the sense that Ms. Medina was
19   conservative?
20      A.   She's tricky.  She's very middle of the road.
21      Q.   When it came to social issues was Ms. Medina more
22   conservative or more liberal?
23      A.   You know, she was -- you can't peg that down.
24      Q.   Did she, and by she I mean Yvette Medina, ever
25   express any personal or political views about transgender

1    benefits?

2        A.   No.

3        Q.   Did Ms. Medina ever express a view one way or

4    another regarding whether gender reassignment surgery

5    should be covered under the plan?

6        A.   No.

7        Q.   Let's talk about the governor's office.   In your

8    view is the Arizona governor's office generally

9    conservative or liberal?

10              MR. CURTIS:   Objection; form of the

11   question.

12              THE WITNESS:   They are -- What was the exact

13   wording you used?

14       Q.   BY MR. GARBACZ:   Sorry.   Let me rephrase.

15              Is the Arizona governor's office

16   conservative in your view?

17       A.   Yes.

18              MR. CURTIS:   Objection; form of the

19   question.

20              THE WITNESS:   Yes.

21       Q.   BY MR. GARBACZ:   And why do you say that?

22       A.   Because of the environment we live in today.

23       Q.   Would you say that Arizona governor's office is

24   conservative when it comes to social issues?

25       A.   I'd say they're conservative no matter what the

209

1    it from their plans, they are removing it from their fully

2    insured plans?

3        A.   Correct.

4        Q.   We talked quite a bit about medical necessity.

5    What's -- If someone just asks you if something is

6    medically necessary, what -- what does that mean to you as

7    someone who's worked in employee benefits?

8        A.   I -- Personally I am thankful it's not my

9    decision to make usually.  And that's another thing we

10   need the medical plans for, is to determine the

11   appropriate procedures for treatment of certain things,

12   diseases and such.

13       Q.   Okay.  I guess in one context if I go to a doctor

14   who says it's required for you to have this surgery, I

15   suppose you could say that that doctor told me it's

16   medically necessary; correct?

17       A.   Correct.

18       Q.   But then in a plan is -- is that what medical

19   necessity means or does medical necessity mean something

20   else in a plan?

21       A.   Yeah, that -- they it would not meet the

22   definition of being medically necessary just because a

23   doctor says you need to do something.

24       Q.   Okay.  And -- and why is that?

25       A.   Because doctors don't always have the same ideas

1    on the treatment of diseases and treatments, and sometimes
2    their motivation is selfish and they want you to like get
3    a surgery for your back because that will reward them, not
4    necessarily make it so you can walk better.

5        Q.   Okay.  Well, what -- what if, for example, I go

6    to the doctor and he tells me that I have high cholesterol

7    and that I need to take medication and he tells me that I

8    need some name-brand prescription?  Is that medically

9    necessary because the doctor tells me so?

10       A.   No.

11       Q.   And you were talking before that maybe just

12   because a doctor says so, it's not medically necessary

13   under the plan.  Is that correct?

14       A.   Correct.

15       Q.   What if the plan comes to me and says, okay, we

16   see that you have high cholesterol and that you need

17   medication.  Here is an equally effective generic that's

18   much -- much cheaper?  Could a plan tell me that?

19       A.   Yes.

20       Q.   Okay.  And so by the plan standards the

21   name-brand prescription for cholesterol would not be

22   medically necessary?

23       A.   Correct.

24       Q.   Because there's another -- another treatment that

25   would address the -- the circumstance?

1    right?

2        A.   No, I do not.

3        Q.   Okay.  The -- the -- the last set of questions I

4    had is, I believe you testified earlier that since you

5    left ADOA you've remained in some contact with Michael

6    Meisner.  Is that right?

7        A.   I -- I have contacted him a couple times.

8        Q.   Have you ever talked with him about this case?

9        A.   Never.

10                   MR. YOST:  That's all the questions I have.

11                   MR. GARBACZ:  I just have a few follow-up

12    questions, so we'll keep this pretty brief.

13

14                        FURTHER EXAMINATION

15    BY MR. GARBACZ:

16        Q.   Ms. Schafer, you're not a medical expert, are

17    you?

18        A.   No, I am not.

19        Q.   And you're not an expert on what is considered

20    medically necessary, are you?

21        A.   No, I am not.

22        Q.   And when it comes to what is medically necessary

23    for purposes of the ADOA's healthcare plan, the best place

24    to look is probably the plan document itself which defines

25    medically necessary; right?

Elizabeth Schafer, Videotaped - 04/28/2021

216

1    A.   Not necessarily.

2    Q.   And why is that?

3    A.   Because medically necessary, there are -- there

4  are guidelines that -- that all plans have to follow for

5  every single condition that's out there in the world.

6  There are medical procedures and guidelines that these

7  companies have to follow.  And because I've been out of

8  this for a couple years I don't remember what those set of

9  rules are.  But every -- You know, whether you twist an

10 ankle or you have -- you know, you have ovarian cancer,

11 everything has a list of medically appropriate procedures

12 that -- and that's why you would only contract with a

13 vendor that agrees to administer their medical decisions

14 based on these -- these criteria.

15   Q.   So it's generally the vendor, the third-party

16 administrator who determines what is medically necessary?

17   A.    Well, it's actually a -- it's not the vendor

18 themselves in most cases, it's -- And I'm sorry, I feel

19 like I haven't done my homework for this assignment.  But

20 there are -- there are rules out there and I want to --

21 and I can't remember what they're called.  But they are

22 basic guidelines for disease management and they -- they

23 usually all follow the basic criteria.  There might be

24 small tweaks, but for the most part that's what you're --

25 you know, that's the expertise you're paying for.

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF YAVAPAI       )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7        I CERTIFY that I am in no way related to, nor
     employed by any of the parties hereto, and have no
 8   interest in the outcome thereof.

 9        [X] Review and signature was requested.
          [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
     this 10th day of May, 2021.

13

14

15

16                _____
                        JILL MARNELL
17                 Certified Reporter #50021
                 Registered Professional Reporter

18           *     *     *     *     *     *

19        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
     complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22

23                _____
                  GLENNIE REPORTING SERVICES, LLC
24                   Registered Reporting Firm
                     Arizona RRF No. R1035

25
```

226

1                        SIGNATURE OF WITNESS

2

3       I, ELIZABETH MARIE SCHAFER, the witness in the above
     deposition, do hereby certify that I have read the
4    foregoing deposition, and that the said deposition is a
     true and correct record of my testimony, with such
5    corrections and changes, if necessary, listed below.

6       _____
                              WITNESS

7    PAGE: LINE: SHOULD READ:          REASON FOR CHANGE:

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24

25

# EXHIBIT 14

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                    )
                                      )
              Plaintiff,              )
                                      )
vs.                                   ) 4:19-CV-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD       )
OF REGENTS, d/b/a UNIVERSITY OF       )
ARIZONA, a governmental body of       )
the State of Arizona; et al.,         )
                                      )
              Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF YVETTE MEDINA

Via Zoom Videoconference
February 18, 2021
8:30 a.m. (MST)
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535                    Prepared by:
www.glennie-reporting.com       Robin L. B. Osterode
                                CSR, RPR
                                CA CSR No. 7750
                                AZ CR No. 50695

84

 1    know, too, if we're covering something and there are some

 2    changes, they would tell us.  Like, our vendors are very

 3    good about letting us know what is happening in the

 4    industry as far as coverage is concerned.

11:38:22  5         Q.    You mentioned that the vendors who, it sounds

 6    like, are very on it would mention to you, especially if

 7    you were not in line or -- excuse me, especially if you

 8    were not covering a certain benefit that was being

 9    covered by others.  Why would that be?

11:38:45 10         A.    As -- just as a general information, because we

11    are -- because we are self-funded.  If they're covering

12    something, that doesn't necessarily mean we have to cover

13    it, but we do look for their guidance on that, just to

14    let us know.

11:39:02 15         Q.    When you say you look for their guidance on

16    that, what do you mean?

17         A.    You know, if there's changes that are happening

18    to coverages, they would at least tell us.  And, you

19    know, you showed the change log, that's where they would

11:39:22 20    kind of let us know when there's something happening on

21    their end that they would normally do, or even a process,

22    not even necessarily a benefit coverage; if there's

23    something that's happening in the market that they

24    normally do, they inform us to help us, you know, make

11:39:37 25    better decisions and knowing whether we are going to

**Yvette Medina, Videotaped - 02/18/2021**

85

1  follow.

2      Q.    When vendors raise this type of issue where

3  there's a benefit that is largely covered, but it's not

4  yet covered under your plan, how is that usually

11:40:10  5  resolved?

6      A.    Usually we will take that into concern --

7  consideration and, actually, it depends, really, on -- we

8  take the information and we ask -- if one vendor just

9  tells us something, then we ask all four of ours to see

11:40:34 10  if it is truly across the board on coverage.  So, you

11  know, if one vendor came to us and said, "We are covering

12  this," and the other three are not, we try and figure out

13  why aren't the other three, and why is only one vendor

14  covering it, and then we will just take everybody's

11:40:53 15  coverage guidelines and policies and review them to make

16  sure that -- why is one person an outlier.

17          So we don't want to be -- you know, not that we

18  don't want to be an outlier, but we don't want to cover

19  something if not everybody is covering it, or it could be

11:41:10 20  that we might cover something.  So we just take their

21  recommendations and review them, but that doesn't

22  necessarily mean that we are going to follow their

23  recommendation.

24      Q.    That makes sense.  So if there's an instance

11:41:28 25  where all four did cover something that was not currently

Yvette Medina, Videotaped - 02/18/2021

119

1    specifics, the plans you used when they're thinking about

2    covering transgender reassignment surgery, and I want to

3    take a step back and talk about the evolution of the

4    transgender surgery exclusion over the course of your

01:41:21    5    time at ADOA.

6         So in 2015, around the time of the e-mails that

7    we were looking at, Exhibit 2, September of 2015, was

8    that the first time that it came to your attention that

9    the transgender exclusion might be removed from the plan?

01:42:03    10    A.   That was the first time that we had to do

11    research on transgender -- it wasn't to exclude something

12    from the plan, it was to do the research on it.

13    Q.   And the first time that you remembered doing

14    research on the transgender benefits portion of the plan

01:42:30    15    was around 2015; is that right?

16    A.   Right.

17    Q.   And when you sent out these e-mails to vendors

18    asking what their coverage was going to be, what

19    responses did you get back from those vendors?

01:42:56    20    A.   I would say they were -- they responded in

21    letting me know whether it's covered on their end and how

22    their book of -- book of business, meaning other

23    companies were, what decided whether they were going to

24    cover it.  And from what I remember, that it was not a

01:43:21    25    standard coverage at that time.

Yvette Medina, Videotaped - 02/18/2021

120

1      Q.   So at that time, around 2015, from the

2  responses you received from vendors, it didn't seem like

3  it was standard to cover transgender surgery?

4      A.   Right.

01:43:42  5      Q.   Who did you report that information to at the

6  ADOA?

7      A.   That would have been reported to

8  Marie (inaudible) --

9         THE REPORTER:  I'm sorry, who?

01:44:14 10        THE WITNESS:  Marie Isaacson.  Sorry.

11  BY MS. SHEETS:

12      Q.   At the time, she was the director of BSD for

13  ADOA?

14      A.   Yes.

01:44:21 15      Q.   And why would you be reporting that information

16  to her?

17      A.   We shared the information with the director at

18  the time that we know, especially if we're doing

19  research.

01:44:46 20      Q.   Do you know -- let me rephrase.

21         What was Marie Isaacson's reaction to the

22  information that most vendors were reporting not

23  including coverage for transgender surgery?

24      A.   A reaction?  I don't know her reaction, but she

01:45:16 25  just, I guess, would -- I don't know what you mean by her

236

1                        SIGNATURE PAGE

2

3           I, YVETTE MEDINA, a deponent exercising my
    right to read and sign my deposition taken on February
4   18, 2021, place my signature hereon and make the
    following changes on this _____day
5   of_____, 2021.

6           (IF THERE ARE NO CHANGES, WRITE "NONE.")

7

8                        _____
                         YVETTE MEDINA

9

10   PAGE      LINE      READS        CHANGE TO        REASON

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____    _____    _____

25   _____    _____    _____

1  STATE OF ARIZONA      )
   COUNTY OF MARICOPA    )
2
            BE IT KNOWN that the foregoing proceedings
3  were taken before me; that the witness before testifying
   was duly sworn by me to testify to the whole truth; that
4  the foregoing pages are a full, true, and accurate record
   of the proceedings all done to the best of my skill and
5  ability; that the proceedings were taken down by me in
   shorthand and thereafter reduced to print under my
6  direction.

7          [X] Review and signature was requested.

8          [ ] Review and signature was waived.

9          [ ] Review and signature not required.

10          I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in the ACJA 7-206(F)(3)
11  and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
   Arizona, this 1st day of March, 2021.

12

13

14

15
                   _____
16                  ROBIN L. B. OSTERODE, RPR
                    CA CSR No. 7750
17                  AZ CR No. 50695

18              *    *    *    *    *

19          I CERTIFY that Glennie Reporting Services,
   LLC, has complied with the ethical obligations set forth
20  in ACJA 7-206(J)(1)(g)(1) through (6).

21

22

23
   _____
24  GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
25  Arizona RRF No. R1035

# EXHIBIT 15



**Douglas A. Ducey**
Governor

**Craig C. Brown**
Director

## ARIZONA DEPARTMENT OF ADMINISTRATION

### OFFICE OF THE DIRECTOR

100 NORTH FIFTEENTH AVENUE • SUITE 401
PHOENIX, ARIZONA 85007

(602) 542-1500

June 27, 2017

The Honorable Douglas A. Ducey, Governor, State of Arizona
The Honorable Steve Yarbrough, President, Arizona State Senate
The Honorable J.D. Mesnard, Speaker, House of Representatives
1700 West Washington Street
Phoenix, AZ 85007

Dear Governor Ducey, President Yarbrough, and Speaker Mesnard:

Pursuant to A.R.S. § 38-652 (G) and A.R.S. § 38-658 (B), we are pleased to present the *2016 Annual Report for the Health Insurance Trust Fund*, including a report on the performance standards for the health and dental plans.

Sincerely,

Craig C. Brown
Director

c:  Richard Stavneak, Director, Joint Legislative Budget Committee
    Geoffrey Paulsen, Staff, Joint Legislative Budget Committee
    Rebecca Perrera, Staff, Joint Legislative Budget Committee
    William Greeney, Acting Director, Office of Strategic Planning and Budgeting
    Ashley Beason, Budget Analyst, Office of Strategic Planning and Budgeting
    Derik Leavitt, Assistant Director, ADOA Budget and Resource Planning
    Holly Henley, State Librarian and Director, Arizona Department of Library and Archives
    Marie Isaacson, Director, ADOA Benefit Services Administration

Confidential

ARIZONA **BENEFIT SERVICES** DIVISION

ARIZONA DEPARTMENT OF ADMINISTRATION

# Annual Report | 2016

## Health Insurance Trust Fund

**Doug Ducey**
**Governor**

**Craig C. Brown**
**Director**

# FOREWARD

The Arizona Department of Administration ("ADOA") offers health, dental, life, and disability insurance as well as medical and dependent care flexible spending accounts to the State of Arizona ("State") employees and Retirees.  These combined group of benefits offered is referred to as Benefit Options.  This report provides a broad overview of the Benefit Options program, and meets the requirements of the A.R.S. §38-652 (G) and A.R.S. §38-658 (B).

The data shown is presented for the period January 1, 2016 through December 31, 2016.  The Active and Retiree plans were concurrent for this period.

Any questions relating to the contents of this report should be addressed to:

Arizona Department of Administration
Benefit Services Division
100 N. 15th Ave, Suite 260
Phoenix, AZ 85007

Telephone: 602-542-5008

Health Insurance Trust Fund                                   January 1, 2016 to
Annual Report                                                   December 31, 2016

# Table of Contents and Figures

## Table of Contents

Report Background ........................................................................................................ 1

Executive Summary ...................................................................................................... 3

Health Insurance Trust Fund Review & Summary ...................................................... 4

Medical Plan Enrollment ............................................................................................. 6

Medical Premiums ........................................................................................................ 8

Medical Premium vs. Plan Cost ................................................................................... 9

Expenses for Self-Insured Medical Plans .................................................................... 9

Medical Expenses Associated with Medical Diagnoses ............................................ 10

    Hospital Care ........................................................................................................ 12

    Place of Service .................................................................................................... 16

        Emergency ..................................................................................................... 17

        Urgent Care Visits ......................................................................................... 17

        Physician Visits ............................................................................................. 17

Annual Prescription Use ............................................................................................. 17

    Generic and Brand-Name Prescription Utilization ............................................. 19

    Prescription Use by Therapeutic Class ............................................................... 20

    Prescription Use by Type of Drug ...................................................................... 20

Dental Plan Enrollment .............................................................................................. 21

Dental Premiums ........................................................................................................ 22

Dental Premium vs. Plan Cost ................................................................................... 23

Expenses for Self-Insured Dental Plan ...................................................................... 24

Wellness ...................................................................................................................... 24

Life, Disability, Vision Insurance and Flexible Spending Accounts ......................... 28

Vendor Performance Standards .................................................................................. 30

    Aetna .................................................................................................................... 30

    Cigna .................................................................................................................... 31

    UnitedHealthcare ................................................................................................. 32

    Blue Cross Blue Shield (BCBS) of Arizona ...................................................... 32

    MedImpact ........................................................................................................... 33

    Delta Dental ......................................................................................................... 33

Confidential                                                       AZSTATE.244068

Total Dental Administrators ............................................................................................ 34

Compsych .................................................................................................................... 34

Avesis.......................................................................................................................... 34

Application Software, Inc. ("ASI") ............................................................................ 34

The Hartford................................................................................................................ 35

Audit Services ...................................................................................................................... 36

Appendix............................................................................................................................... 38

Glossary of Terms................................................................................................................. 39

## Table of Figures

Figure 1: Health Insurance Trust Fund Summary.......................................................................... 4
Figure 2: Average Monthly Enrollment by Plan & Network ......................................................... 7
Figure 3: Active Employee Medical Premiums.............................................................................. 8
Figure 4: Retiree Medical Premiums .............................................................................................. 8
Figure 5: Average Monthly Medical Premium vs Expense............................................................ 9
Figure 6: Self-Insured Expenses by Active, Retiree, and Plan ................................................... 10
Figure 7: Self-Insured Expenses by Plan for Actives and Retirees ............................................ 10
Figure 8: Top Ten Active Medical Expense by Diagnosis ........................................................... 11
Figure 9: Top Ten Retiree Medical Expense by Diagnosis .......................................................... 12
Figure 10: Hospital Admissions per 1,000 Members ................................................................... 13
Figure 11: Average Inpatient Length of Stay ............................................................................... 13
Figure 12: Average Cost per Admission - Active & Retiree ........................................................ 14
Figure 13: Allowed PMPM Per Hospital Admission - Active & Retiree..................................... 15
Figure 14: Average Cost per Admission - EPO, PPO, & HDHP ................................................. 15
Figure 15: Medical Expense by Place of Service – Actives ........................................................ 16
Figure 16: Medical Expense by Place of Service - Retirees ........................................................ 17
Figure 17: Average # of Prescriptions by Member....................................................................... 18
Figure 18: Pharmacy Cost and Count by Utilizer ........................................................................ 19
Figure 19: Pharmacy Count and Distribution by Tier ................................................................. 19
Figure 20: Spend by Top 10 Therapeutic Class by Year ............................................................. 20
Figure 21: Spend by Top 10 Drugs by Year ................................................................................ 21
Figure 22: Average Dental Enrollment by Plan............................................................................ 22
Figure 23: Active Dental Premiums ............................................................................................. 22
Figure 24: Retiree Dental Premiums............................................................................................. 23
Figure 25: Average Dental Premiums and Expenses per Member ............................................... 23
Figure 26: Self-Insured Dental Expenses by Active and Retiree ................................................ 24
Figure 27: Healthy Living Registrations and Completions .......................................................... 25
Figure 28: Health Screenings........................................................................................................ 25
Figure 29: Flu Vaccines ................................................................................................................ 26
Figure 30: Distribution of Points .................................................................................................. 26

Health Insurance Trust Fund                                          January 1, 2016 to
Annual Report                                                    December 31, 2016

Figure 31: EAP Utilization ............................................................................................. 27
Figure 32: Online Course Participation ......................................................................... 27
Figure 33: ERE/Benefits Administration Fund 3035 Summary ................................... 29
Figure 34: Audit Recommendation Summary ............................................................... 36
Figure 35: Audit Functional Area and Methodology.................................................... 36
Figure 36: Special Employee Health Fund Cash Statement ......................................... 38

Health Insurance Trust Fund                                    January 1, 2016 to
Annual Report                                                  December 31, 2016

# Report Background

This document reports the financial status of the Employee Health Insurance Trust Fund pursuant to A.R.S. §38-652 (G), which reads:

> The department of administration shall annually report the financial status of the trust account to officers and employees who have paid premiums under one of the insurance plans from which monies were received for deposit in the trust account since the inception of the health and accident coverage program or since submission of the last such report, whichever is later.

The Annual Report also reports the performance standards for the health plans pursuant to A.R.S. §38-658 (B), which reads:

> On or before October 1 of each year, the director of the department of administration shall report to the joint legislative budget committee on the performance standards of health plans, including indemnity health insurance, hospital and medical service plans, dental plans and health maintenance organizations.

Benefit Services Division accounts for the Benefit Options program in two different funds. The Special Employee Health Fund, also known as Fund 3015 of the Health Insurance Trust Fund ("HITF") encompasses the medical and dental programs and the appropriated expenditures for ADOA, Benefit Services Division operations. The ERE/Benefits Administration Fund, of Fund 3035, is primarily a "pass through" fund for other benefits including, vision, life, and disability insurance as well as flexible spending accounts.

The benefits offered are either self-insured or fully-insured. For year 2016, the medical and dental PPO plans were self-insured, whereas the dental HMO, vision, life and disability insurance plans were fully-insured.

The State's self-insured medical plan began on October 1, 2004. The State contracts with the medical and pharmacy vendors to provide network access and related discounts, claim adjudication and payment, and medical management including utilization management, case management and disease management. The State is responsible for the full cost of all claims and programs offered by the vendors.

The State's self-insured dental PPO began on January 1, 2013.

Schedules of premiums received and accounted for in Fund 3015, distributions by enrollments, incurred and paid medical/drug claims, and expenses related to the medical and dental plans are included within this Annual Report. Also included is a summary of premiums collected and paid for the life insurance, disability insurance, vision insurance, and flexible spending accounts for Fund 3035.
quick

| | |
|---|---|
| Health Insurance Trust Fund | January 1, 2016 to |
| Annual Report                          1 | December 31, 2016 |

All data provided herein is for Plan Year ("PY") 2016 running January 1, 2016 through December 31, 2016.

Please note statistics will vary from previous annual reports due to the late receipt of program data following the completion of the previous annual report.  Further, the Benefit Services Division has moved to using a new data-mining platform called MedInsight to extract the data which further explains some of the variances in reported statistics.  In no case does the variation represent a substantive change in trend.

Confidential                                                                                                      AZSTATE.244072

# Executive Summary

During PY 2016, ADOA offered a comprehensive insurance package through Benefit Options to approximately 134,000 members consisting of Active state and university employees, Retirees and their qualified dependents.  The benefits offered in the package include medical, pharmaceutical, dental, flexible spending, vision, wellness, an employee assistance program (EAP), life and disability insurance.

For PY 2016 the sum of health and dental premiums collected was $804M with total plan expenses and transfers of $893.3M.  Expenses include claims incurred in 2016 and prior plan years paid in PY 2016.

**Health Plan**
- The average annual plan expense, including claims, administrative costs and fees, per member was $6,255
  - Average Active member expense was $6,051; average Retiree member expense was $8,958
- The medical claims expense was $547.4M, excluding IBNR liability
  - The leading diagnosis category by cost remains to be the musculoskeletal system at 13% of total medical spend
  - Claims indicate that members are seeking appropriate level of care by seeking the majority of care from physicians or specialists
    - 4,059 physician visits per 1,000 members (slightly lower than prior years)
    - 209 urgent care visits per 1,000 members (slightly lower than prior years)
    - 215 emergency room visits per 1,000 members (slightly higher than prior years)
- The pharmacy claims expense was $181.8M
  - The leading therapeutic drug class by cost was diabetes at 12% of total pharmaceutical spend
  - Over 1.4M prescriptions were filled in PY 2016
    - Active employees filled an average of 9 prescriptions per year while Retirees filled an average of 29

**Wellness Program**
- Administered over 14,842 flu vaccines through 405 worksite or public events
- Administered over 7,871 screenings through 89 statewide worksite events resulting in 517 referrals to physicians for various health issues, which is a 34% increase in referrals over the prior year
- Paid out over $400k in incentive pay to 2,039 employees participating in the HIP program

**Performance Measures**
Financial guarantees are in place to manage the performance of the contracted vendors.  Most vendors met the majority or all of the agreed-upon performance measures.  However, estimated penalties of approximately $360K will be collected in PY 2017 from vendors failing to meet agreed upon PY 2016 performance targets in customer service, claims processing, appeals, reporting,

Health Insurance Trust Fund                                                              January 1, 2016 to
Annual Report                                      3                              December 31, 2016

Confidential                                                                                    AZSTATE.244073

survey, and network management.   During PY 2016, $385K of performance penalties were collected related to the PY 2015 performance period.

# Health Insurance Trust Fund Review & Summary

PY 2016 expenses were covered by revenues collected and the unrestricted reserve.

Figure 1 is a cash statement of receipts received and expenses paid during PY 2016 that relate to PY 2016 as well as prior plan years.

ADOA Health Plan is the self- insured medical program and includes Aetna, Blue Cross Blue Shield ("BCBS") of Arizona, Cigna, and United Healthcare (UHC) networks. State and university Active employees and Retirees choose coverage from one of the self-insured networks. BCBS NAU is a fully-insured option available only to NAU Active employees and Retirees.

Effective January 1, 2014, all Medicare eligible participants covered under the State of Arizona Benefit Services Division health plans were transitioned from the Medicare Part D Drug Subsidy program to a Medicare Employer Group Prescription Drug Plan ("EGWP"). The EGWP program is a prescription drug plan that combines a standard Medicare Part D plan with additional

| Special Employee Health Trust Fund Summary | |
|---|---|
| | Plan Year 2016 |
| **Beginning Fund Balance January 01, 2016^** | **$369,000,031** |
| | |
| **Revenues** | |
| ADOA Benefit Options | $715,996,255 |
| BCBS (NAU) | 41,919,123 |
| ADOA Dental Plan | 42,138,298 |
| PrePaid Dental Plan | 3,671,871 |
| Other Revenue | 239,160 |
| **Total Revenues** | **$803,964,707** |
| | |
| **Expenditures** | |
| Administrative Fees | $34,280,126 |
| Medical Claims | 592,607,960 |
| Drug Claims | 181,527,151 |
| Dental Claims | 37,154,528 |
| Medicare Part D Retiree Drug Subsidy | (11,481,947) |
| BCBS (NAU) Premiums | 40,427,829 |
| Fully Insured Dental Premiums | 3,599,246 |
| Appropriated Expenses | 4,968,834 |
| Administrative/Cash Adjustments | 30,306 |
| Fund Transfers Out ^^ | 4,076,000 |
| Federal Participation Reimbursement | 6,158,416 |
| **Total Expenditures and Transfers** | **$893,348,449** |
| | |
| **Ending Fund Balance December 31, 2016** | **$279,616,289** |
| | |
| **Reserves** | |
| IBNR Liability (Medical & Dental) | $98,663,139 |
| Contigency Reserve (Medical & Dental) | 98,663,139 |
| **Total Reserves** | **$197,326,278** |
| | |
| **Unrestricted Balance December 31,2016** | **$82,290,011** |

^  The ending balance from PY 2015 report equals to the beginning balance for PY 2016.  PY 2015 ending balance was overstated by $53,565.

*Figure 1: Health Insurance Trust Fund Summary*

Confidential                                                                                 AZSTATE.244074

prescription drug coverage provided by the Benefit Services Division health plan.  The EGWP program achieved savings of $11.5M in PY 2016.

Benefit Services Division holds reserves for paying claims that have been incurred but not reported ("IBNR") and for a contingency to cover any insufficiencies that may develop, such as actual medical trend exceeding assumed medical trend during rate setting, unplanned shifts in plan membership, unexpected catastrophic claims, and changes in provider reimbursement rates that may occur during each plan year.

Confidential                                                                                    AZSTATE.244075

# Medical Plan Enrollment

Benefits Services Division offers medical coverage to the following employees and their dependents:

- Eligible state employees and university staff, officers, and elected officials
- State Retirees receiving pension benefits through any of the State retirement systems
- State employees or university staff accepted for long-term disability benefits
- State employees or university staff eligible for COBRA benefits

The three types of medical plans offered to eligible participants are the Exclusive Provider Organization (EPO), the Preferred Provider Organization (PPO) and the High Deductible Health Plan (HDHP) with Health Savings Account (HSA).

**The EPO Plan**
Within the EPO plan, services must be obtained from an in-network provider; out-of-network services are only covered in emergency situations.  The employee pays the monthly premium and any required copay at the time of service.  Employees who select the EPO plan may choose from four networks: Aetna, BCBS of Arizona, Cigna or UHC.

**The PPO Plan**
Within the PPO plan, services may be obtained from an in- or out-of-network provider.  There is a separate in- and out-of-network deductible that must be met before copays or coinsurance (percent of the cost) are allowed.  The employee pays the monthly premium and at the time of service pays 100% of the allowed amount of service until the deductible is met.  After the deductible is met, the employee pays copays if the provider is in-network and co-insurance if the provider is out-of-network until the out of pocket maximum (OOP) is met.  Once the OOP is met the plan pays 100% of services for the remaining plan year, with a few exceptions, e.g. pharmacy copays.  Employees who select the PPO plan may choose from four networks: Aetna, BCBS of Arizona, Cigna or UHC.  Employees at NAU also have the option of participating in their fully-insured BCBS NAU plan.

**The HDHP with HSA Plan**
Within the HDHP, services may be obtained from both in- and out-of-network providers.  There is a separate in- and out-of-network deductible that must be met before coinsurance is allowed.  The employee pays the monthly premium and at the time of service pays 100% of the allowed amount of service (except for qualified preventative services that are covered 100% by the plan) until the deductible is met.  After the deductible is met, the employee pays co-insurance up to the out of pocket maximum at which time the plan pays 100% of any additional costs for the year.

Employees who enroll in the HDHP and are under the age of 65 are eligible to open an HSA.  This account allows employees to make pre-tax contributions into the account and withdraw the monies to pay for healthcare related expenses.  When the employee opens the HSA with the State HDHP, the State makes bi-weekly deposits to the account.
The HDHP is only available to Active employees and under the Aetna network.

Confidential                                                                                          AZSTATE.244076

The figure below shows how enrollment was distributed by plan and network between active, retired, university, and COBRA members.  The subscriber references the employee and the member references the employee plus dependents.

| Average Monthly Medical Enrollment by Plan & Network | | | | | |
|---|---|---|---|---|---|
| | | 2016 | | 2015 | |
| Network | Plan Type | Subscribers | Members | Subscribers | Members |
| Active | EPO | 2,001 | 4,464 | 1,947 | 4,407 |
| Retiree | EPO | 252 | 329 | 247 | 318 |
| University | EPO | 2,170 | 4,189 | 2,161 | 4,109 |
| COBRA | EPO | 18 | 29 | 11 | 14 |
| Active | PPO | 240 | 454 | 158 | 253 |
| Retiree | PPO | 26 | 30 | 30 | 38 |
| University | PPO | 307 | 609 | 239 | 458 |
| COBRA | PPO | 3 | 5 | 1 | 1 |
| Active | HDHP | 502 | 1,063 | 409 | 830 |
| Retiree | HDHP | 0 | 0 | 0 | 0 |
| University | HDHP | 660 | 1,284 | 560 | 1,067 |
| COBRA | HDHP | 7 | 11 | 2 | 5 |
| **Total AETNA** | | **6,185** | **12,467** | **5,765** | **11,500** |
| Active | EPO | 7,489 | 18,623 | 7,337 | 18,276 |
| Retiree | EPO | 1,197 | 1,635 | 1,149 | 1,549 |
| University | EPO | 3,317 | 7,014 | 2,967 | 6,243 |
| COBRA | EPO | 46 | 67 | 32 | 43 |
| Active | PPO | 863 | 1,907 | 545 | 1,108 |
| Retiree | PPO | 65 | 82 | 65 | 79 |
| University | PPO | 678 | 1,407 | 490 | 907 |
| COBRA | PPO | 12 | 21 | 3 | 4 |
| **Total Blue Cross Blue Shield AZ** | | **13,667** | **30,756** | **12,588** | **28,209** |
| Active | EPO | 3,083 | 7,574 | 3,229 | 7,862 |
| Retiree | EPO | 595 | 776 | 588 | 767 |
| University | EPO | 1,364 | 2,959 | 1,368 | 2,957 |
| COBRA | EPO | 21 | 30 | 20 | 26 |
| **Total CIGNA** | | **5,062** | **11,339** | **5,205** | **11,612** |
| Active | EPO | 18,541 | 45,156 | 19,704 | 47,698 |
| Retiree | EPO | 4,930 | 6,424 | 4,789 | 6,224 |
| University | EPO | 10,210 | 23,419 | 10,736 | 24,623 |
| COBRA | EPO | 88 | 138 | 81 | 115 |
| Active | PPO | 979 | 2,131 | 748 | 1,479 |
| Retiree | PPO | 94 | 114 | 97 | 119 |
| University | PPO | 849 | 1,846 | 789 | 1,637 |
| COBRA | PPO | 16 | 24 | 3 | 3 |
| **Total UnitedHealthcare** | | **35,707** | **79,252** | **36,947** | **81,898** |
| NAU only* | PPO | 3,035 | 5,594 | 3,100 | 5,722 |
| **Total Blue Cross Blue Shield NAU** | | **3,035** | **5,594** | **3,100** | **5,722** |
| **Total** | | **63,656** | **139,408** | **63,605** | **138,941** |

*Figure 2: Average Monthly Enrollment by Plan & Network*

Health Insurance Trust Fund                                                    January 1, 2016 to
Annual Report                              7                       December 31, 2016

Confidential                                                                                     AZSTATE.244077

# Medical Premiums

The tables below show the medical premium by plan and coverage tier per pay period for Active employees and Retirees. Retirees have two different tier structures: 1) those who are not enrolled in Medicare and have no dependents enrolled in Medicare and 2) those who either are enrolled in Medicare themselves or have a dependent who is enrolled in Medicare.

| Active Medical Premiums per Pay Period (26 pay periods)* | | | | | |
|---|---|---|---|---|---|
| Plan | Tier | Employee Premium | State Premium | Total Premium | State HSA Contribution |
| EPO | Employee only | $18.46 | $253.85 | $272.31 | - |
| | Employee + adult | $54.92 | $521.54 | $576.46 | - |
| | Employee + child | $46.62 | $338.77 | $385.38 | - |
| | Family | $102.00 | $571.38 | $673.38 | - |
| PPO | Employee only | $47.08 | $258.00 | $305.08 | - |
| | Employee + adult | $99.23 | $545.54 | $644.77 | - |
| | Employee + child | $66.46 | $365.08 | $431.54 | - |
| | Family | $115.85 | $636.46 | $752.31 | - |
| HDHP | Employee only | $9.23 | $171.69 | $180.92 | $27.69 |
| | Employee + adult | $27.69 | $355.85 | $383.54 | $55.38 |
| | Employee + child | $23.54 | $232.62 | $256.15 | $55.38 |
| | Family | $51.23 | $396.46 | $447.69 | $55.38 |

\* University of Arizona has 24 pay period deductions

*Figure 3: Active Employee Medical Premiums*

| Monthly Retiree Medical Premiums | | | | |
|---|---|---|---|---|
| Plan | Without Medicare | | With Medicare | |
| | Tier | Premium | Tier | Premium |
| EPO | Retiree only | $593 | Retiree only | $442 |
| | Retiree +1 | $1,387 | Retiree +1 (Both Medicare) | $878 |
| | | | Retiree +1 (One Medicare) | $1,024 |
| | Family | $1,869 | Family (Two Medicare) | $1,166 |
| PPO | Retiree only | $825 | Retiree only | $789 |
| | Retiree +1 | $2,009 | Retiree +1 (Both Medicare) | $1,576 |
| | | | Retiree +1 (One Medicare) | $1,740 |
| | Family | $2,197 | Family (Two Medicare) | $1,980 |

*Figure 4: Retiree Medical Premiums*

Confidential

AZSTATE.244078

## Medical Premium vs. Plan Cost

The 2016 contribution strategy for the self-insured medical plan resulted in employees paying 12% of the average monthly premium while the state paid the remaining 88%. This ratio remains unchanged from PY 2015. The overall premium revenue collected was not sufficient to cover expenses in PY 2016 and the fund was not structurally balanced. However, the fund had sufficient carry-over balance from prior years to cover all expenses in the fund in PY 2016.

The figure below shows how the average monthly premium compared to the average monthly plan cost for Active employees and Retirees and their dependents (Active and Retiree members). Pursuant to A.R.S. §38.651.01 (B), Retiree and Active medical expenses shall be grouped together to "obtain health and accident coverage at favorable rates." This requirement results in lower Retiree premiums and higher active premiums than what their experiences would otherwise dictate.



*Figure 5: Average Monthly Medical Premium vs Expense*

## Expenses for Self-Insured Medical Plans

Confidential                                                                        AZSTATE.244079

The figures below show the distribution of claims and expenses incurred in PY 2016 and the average annual cost to insure each type of subscriber/member.

| 2016 Incurred and Paid Self-funded Medical Expenses by Active, Retiree, and Plan | | | | | | |
|---|---|---|---|---|---|---|
| **Expenses** | **Overall** | **Active** | **Retiree** | **EPO** | **PPO** | **HDHP** |
| Medical Claims | $547,440,001 | $503,423,754 | $44,016,247 | $503,886,978 | $39,503,952 | $4,049,071 |
| Drug Claims | $181,800,403 | $139,544,275 | $42,256,127 | $164,944,282 | $15,963,783 | $892,337 |
| Medicare Part D Subsidy | ($11,481,947) | $0 | ($11,481,947) | ($10,468,751) | ($1,013,196) | $0 |
| Rebates & Recoveries | ($11,054,801) | ($8,485,318) | ($2,569,483) | ($10,029,825) | ($970,715) | ($54,261) |
| Administration Fees | $32,550,574 | $28,684,794 | $3,865,781 | $29,787,045 | $2,222,732 | $540,798 |
| Appropriated Expenses | $4,737,194 | $4,176,090 | $561,103 | $4,323,477 | $322,621 | $91,096 |
|    Total Expenses | $743,991,423 | $667,343,595 | $76,647,828 | $682,443,205 | $56,029,177 | $5,519,041 |
| IBNR Liability | $93,005,139 | $85,527,174 | $7,477,965 | $85,605,872 | $6,711,367 | $687,901 |
| Total | $836,996,562 | $752,870,769 | $84,125,793 | $768,049,077 | $62,740,543 | $6,206,942 |
| **Enrollment in self-funded plans** | | | | | | |
| Subscribers | 60,431 | 53,273 | 7,158 | 55,153 | 4,116 | 1,162 |
| Members | 133,813 | 124,421 | 9,392 | 122,769 | 8,684 | 2,360 |
| **Annual cost** | | | | | | |
| Per subscriber | $13,850 | $14,132 | $11,753 | $13,926 | $15,245 | $5,341 |
| Per member | $6,255 | $6,051 | $8,958 | $6,256 | $7,225 | $2,631 |

*Figure 6: Self-Insured Expenses by Active, Retiree, and Plan*

| 2016 Incurred and Paid Self-funded Medical Expenses by Plan for Active & Retiree | | | | | | |
|---|---|---|---|---|---|---|
| | | **Active** | **Active** | **Active** | **Retiree** | **Retiree** |
| **Expenses (in dollars)** | **Overall** | **EPO** | **PPO** | **HDHP** | **EPO** | **PPO** |
| Medical Claims | $547,440,001 | $460,975,139 | $38,399,544 | $4,049,071 | $42,911,839 | $1,104,408 |
| Drug Claims | $181,800,403 | $123,800,490 | $14,851,448 | $892,337 | $41,143,792 | $1,112,336 |
| Medicare Part D Subsidy | ($11,481,947) | $0 | $0 | $0 | ($10,468,751) | ($1,013,196) |
| Rebates & Recoveries | ($11,054,801) | ($7,527,980) | ($903,077) | ($54,261) | ($2,501,845) | ($67,638) |
| Administration Fees | $32,550,574 | $26,020,683 | $2,123,313 | $540,798 | $3,766,362 | $99,419 |
| Appropriated Expenses | $4,737,194 | $3,776,804 | $308,191 | $91,096 | $546,673 | $14,430 |
|    Total Expenses | $743,991,423 | $607,045,135 | $54,779,418 | $5,519,041 | $75,398,070 | $1,249,759 |
| IBNR Liability | $93,005,139 | $78,315,536 | $6,523,738 | $687,901 | $7,290,336 | $187,629 |
| Total | $836,996,562 | $685,360,671 | $61,303,156 | $6,206,942 | $82,688,406 | $1,437,387 |
| **Enrollment in self-funded plans** | | | | | | |
| Subscribers | 60,431 | 48,180 | 3,932 | 1,162 | 6,974 | 184 |
| Members | 133,813 | 113,602 | 8,460 | 2,360 | 9,167 | 224 |
| **Annual cost** | | | | | | |
| Per subscriber | $13,850 | $14,225 | $15,593 | $5,341 | $11,857 | $7,808 |
| Per member | $6,255 | $6,033 | $7,246 | $2,631 | $9,020 | $6,407 |

*Figure 7: Self-Insured Expenses by Plan for Actives and Retirees*

# Medical Expenses Associated with Medical Diagnoses

The tables below show the trend in cost by diagnosis for Actives and Retirees. For Actives, the first five categories make up approximately 45.0% ($264.2M) of the total PY 2016 medical spend. Further, the top five medical categories for Actives have decreased by 2.7% ($7M) since PY 2015.

Confidential        AZSTATE.244080

Circulatory diagnosis group has experienced the largest percentage growth for the Active population in PY 2016 over PY 2015 with 14.1% increase while the Neoplasms treatment group has experienced the largest drop from PY 2015 to PY 2016 of 9.6% in the top ten categories.

For Retirees, spending on the top five categories has increased in PY 2016 over PY 2015 by 11.84% ($2.7M). Thus, the increase in Retiree spend is increasing the amount that the Active employees subsidize the Retiree premiums. The top five categories make up approximately 48.6% ($25.1M) of the total PY 2016 Retiree medical spend. Musculoskeletal System/Connective Tissue treatment group continues as the largest spend category for both the Active and Retiree populations. The highest percentage growth for the Retiree population can be seen in the Nervous System and Sensory Organs diagnosis group with a 70.4% increase in expenditures in PY 2016 over PY 2015.



*Figure 8: Top Ten Active Medical Expense by Diagnosis*

Confidential

AZSTATE.244081



*Figure 9: Top Ten Retiree Medical Expense by Diagnosis*

**Hospital Care**

Inpatient hospital care represents a significant portion of total medical expenses.  The tables below show the Hospital Admissions per 1,000 members and average length of stay.   Retirees are admitted more often and longer than active employees which is in line with their higher overall costs.  When comparing plans, PPO members are admitted more often than EPO members which are admitted more often than HDHP members. This is all in line with the average costs of these members in each plan.  The length of stay is similar between the EPO and PPO, however, the active employees in the HDHP tend to have a shorter length of stay.

The number of hospital admissions is holding steady; however, the length of stay has seen a slight increase.

Health Insurance Trust Fund                                          January 1, 2016 to
Annual Report                          12                     December 31, 2016

Confidential                                                                    AZSTATE.244082



*Figure 10: Hospital Admissions per 1,000 Members*

The tables below represent the PY 2016 cost share of the inpatient stays.



*Figure 11: Average Inpatient Length of Stay*

Confidential                                                                          AZSTATE.244083

There is greater cost sharing with the Retirees because approximately two-thirds of Retirees have Medicare paying as primary for their claims.  Overall, the Plan paid approximately 98% ($136.9M of $139.6M total) of Active in-patient costs and 15% ($10.1M of $66.2M total) of Retiree in-patient costs during 2016.  This cost sharing experience has been about the same over the last four years.  The chart below indicates that retirees cost slightly less than actives, however, the cost per admission does include the cost of skilled nursing facilities.  Retirees more often than not require additional medical care following hospital admission and therefore cost more on a per member per month basis. Retirees' greater utilization of skilled nursing facilities drives down the average cost per hospital admission. However, on a per member per month basis, allowed hospital costs for retirees are substantially higher than for actives.



*Figure 12: Average Cost per Admission - Active & Retiree*
* Includes copay, co-insurance, Medicare, and other insurance

Confidential                                                                    AZSTATE.244084



*Figure 13: Allowed PMPM Per Hospital Admission - Active & Retiree*
\* Includes copay, co-insurance, Medicare, and other insurance

When looking at the cost by plan, there is greater cost share for the EPO and PPO than the HDHP due to Retirees in the EPO and PPO plans utilizing Medicare as the primary payer and not eligible for the HDHP.  Overall, the Plan paid approximately 87% ($135.3M of $155.1M total) of EPO, 87% ($10.5M of $12.0M total) of PPO and 95% ($1.2M of $1.3M total) of HDHP inpatient costs during PY 2016 which is consistent with the prior three years network claims.



*Figure 14: Average Cost per Admission - EPO, PPO, & HDHP*
\* Includes copay, co-insurance, Medicare, and other insurance

Health Insurance Trust Fund                                              January 1, 2016 to
Annual Report                              15                            December 31, 2016

Confidential

**Place of Service**

The figures below show the total cost by place of care for Active and Retirees over the past three years.  Increasing medical costs consistent with the industry trend as well as a slight increase in both Active and Retiree membership are the main causes of the increase in costs for most service settings.



*Figure 15: Medical Expense by Place of Service – Actives*

Confidential                                                                                                    AZSTATE.244086



*Figure 16: Medical Expense by Place of Service - Retirees*

Emergency

During PY 2016 there were approximately 215 emergency room visits per 1,000 members of the self-funded plan.  The average plan cost per visit was $1,224 (inclusive of both facility and professional costs).  This is consistent with the prior two years ranging between 217 and 219 in utilization and between $1,147 and $1,161 in costs.

Urgent Care Visits

During PY 2016 there were approximately 209 urgent care visits per 1,000 members of the self-funded plan.  The average plan costs per urgent care visit was $117.  Utilization has increased from 181 in 2014 to 203 in 2015 and then to 209 in 2016.  Costs have increased from $112 in PY 2014 to $117 in PY 2017.

Physician Visits

During PY 2016 there were approximately 4,059 physician visits per 1,000 members of the self-funded plan (or each member of the plan visited a physician's office approximately four times on average).  The average plan costs per office visit in PY 2016 was $99.  Utilization is slightly higher than the prior two years ranging from 3,952 in PY 2014 to 3,956 in PY 2015.  Costs have increased over the last three years from $94 in PY 2014, to $95 in PY 2015 and to $99 in PY 2016.

# Annual Prescription Use

Confidential                                                                          AZSTATE.244087

The table below show the average number of prescriptions filled by Active and Retiree members, including those that did not utilize the pharmacy benefit at all during the year.  This shows a slight positive downward trend for the retiree population; meaning as new people are coming on the plan, they are utilizing the pharmacy benefit at a lower rate than those already on the plan.  The Active population's utilization has been steady between PY 2014 and PY 2016 at an average of 9.4 filled prescriptions per year.



*Figure 17: Average # of Prescriptions by Member*

When examining the utilization of the pharmacy benefit, it shows those utilizing the pharmacy benefit are overall maintaining or even decreasing the number of prescriptions filled but the cost per utilizing member is steadily increasing.   This indicates an increasing overall cost in the pharmacy benefit.



Confidential                                                                                                        AZSTATE.244088



*Figure 18: Pharmacy Cost and Count by Utilizer*

## Generic and Brand-Name Prescription Utilization

The table below shows a positive trend in the utilization of the lower cost drugs. Generic drugs tend to have the lower overall cost to the plan, preferred have a higher cost to the plan and non-preferred tend to have the highest cost to the plan. The trend shown below indicates a slight increase in the utilization of the generic drugs with a slight decrease in preferred and non-preferred drugs and that generic drugs make up an increasing count of total drugs (just under 83% in PY 2016).



*Figure 19: Pharmacy Count and Distribution by Tier*

Health Insurance Trust Fund                                    January 1, 2016 to
Annual Report                          19                      December 31, 2016

**Prescription Use by Therapeutic Class**

The graph below shows spend by therapeutic class by year. In over half of top ten classes, expenses have increased which is driving the overall increase in pharmaceutical spend. The top ten classes make up approximately 53.3% ($96.9M) of the total spend ($181.8M) in PY 2016 which is slightly up from 51.8% in PY 2015. Diabetes and inflammatory disease appear to be the highest cost drivers.



*Figure 20: Spend by Top 10 Therapeutic Class by Year*

**Prescription Use by Type of Drug**

The graph below shows spend for top ten drug by year. In almost all of the top ten drugs, expenses have increased which is driving the overall increase in pharmaceutical spend. The top ten drugs make up approximately 15.4% ($28M) of the total $181.8M drug spend in PY 2016 which is slightly up from the prior year of 14.8%. The top two drugs in 2016 are Humira Pen and Enbrel (both are drugs used to treat inflammation). The top three drugs make up more than half ($14.7M) of the spend for the top ten drugs ($28M).

Confidential                                                                AZSTATE.244090



*Figure 21: Spend by Top 10 Drugs by Year*

## Dental Plan Enrollment

Benefits Services Division offers two different types of dental plans: a fully-insured Dental Health Maintenance Organization (DHMO) plan administered by Total Dental Administrators and a self-insured Dental Preferred Provider Organization (DPPO) plan administered by Delta Dental.

### DHMO Plan

Within the DHMO plan, services must be obtained from a participating dental provider (PDP). There is no annual deductible or out of pocket maximum.  The plan coverage maximums include a $200 maximum reimbursement for non-PDP emergency services, $50 for emergency services less member cost share for the service and a $1,500 per person lifetime maximum for orthodontia. This plan is administered by Total Dental Administrators.

### DPPO Plan

Within the DPPO plan, services may be obtained from any dentist and deductibles and out of pocket maximum apply.  Benefits may be based on reasonable and customary charges.  The plan coverage maximums include a $2,000 maximum per person per year and a $1,500 per person lifetime maximum for orthodontia.  This plan is administered by Delta Dental.

The figure below shows how enrollment was distributed by plan and network between active, retired, university, and COBRA members.  The subscriber references the employee and the member references the employee plus dependents.

Confidential                                                                                    AZSTATE.244091

| Average Monthly Dental Enrollment by Plan | | | | | |
|---|---|---|---|---|---|
| | | **2016** | | **2015** | |
| **Network** | **Plan Type** | **Subscribers** | **Members** | **Subscribers** | **Members** |
| Active | DPPO | 22,220 | 52,403 | 22,478 | 52,508 |
| Retiree | DPPO | 14,183 | 22,457 | 13,267 | 20,910 |
| University | DPPO | 16,646 | 33,292 | 14,967 | 31,226 |
| COBRA | DPPO | 206 | 296 | 174 | 243 |
| **Total Delta Dental** | | **53,255** | **108,448** | **50,885** | **104,887** |
| Active | DHMO | 9,820 | 23,169 | 10,095 | 24,061 |
| Retiree | DHMO | 2,388 | 3,661 | 2,258 | 3,437 |
| University | DHMO | 6,060 | 12,717 | 5,979 | 12,578 |
| COBRA | DHMO | 71 | 104 | 73 | 102 |
| **Total Dental Administrators** | | **18,339** | **39,652** | **18,405** | **40,178** |
| **Total** | | **71,594** | **148,099** | **69,290** | **145,065** |

*Figure 22: Average Dental Enrollment by Plan*

## Dental Premiums

The below tables show the dental premiums by plan and coverage tier per pay period for Active employees and Retirees.

| Active Dental Premiums per Pay Period (26 pay periods)* | | | | |
|---|---|---|---|---|
| **Plan** | **Tier** | **Employee Premium** | **State Premium** | **Total Premium** |
| **DPPO** | Employee only | $14.30 | $2.29 | $16.59 |
| | Employee + adult | $30.33 | $4.58 | $34.91 |
| | Employee + child | $23.34 | $4.58 | $27.92 |
| | Family | $48.26 | $6.32 | $54.58 |
| **DHMO** | Employee only | $1.86 | $2.29 | $4.15 |
| | Employee + adult | $3.72 | $4.58 | $8.30 |
| | Employee + child | $3.50 | $4.58 | $8.08 |
| | Family | $6.12 | $6.32 | $12.44 |

*University of Arizona has 24 pay period deductions

*Figure 23: Active Dental Premiums*

Confidential                                                                                                    AZSTATE.244092

| Retiree Monthly Dental Premiums | | |
|---|---|---|
| Plan | Tier | Premium |
| DPPO | Employee only | $35.94 |
| | Employee + adult | $75.63 |
| | Employee + child | $60.48 |
| | Family | $118.26 |
| DHMO | Employee only | $8.99 |
| | Employee + adult | $17.99 |
| | Employee + child | $17.51 |
| | Family | $26.97 |

*Figure 24: Retiree Dental Premiums*

## Dental Premium vs. Plan Cost

The PY 2016 contribution strategy for the self-insured dental plan resulted in employees paying 87% of the average monthly premium while the state paid the remaining 13%. The figure below shows how the average monthly premium compared to the average monthly plan cost for Active employees and Retirees and their dependents (Active and Retiree members).



*Figure 25: Average Dental Premiums and Expenses per Member*

Confidential

AZSTATE.244093

# Expenses for Self-Insured Dental Plan

The figure below show the distribution of claims and expenses incurred in PY 2016 and the average annual cost to insure each type of subscriber/member.

| 2016 Self-Insured Dental Expenses by Active, Retiree | | | |
|---|---|---|---|
| **Expenses** | **Overall** | **Active** | **Retiree** |
| Dental Claims | $35,379,067 | $26,349,427 | $9,029,641 |
| Rebates & Recoveries | $0 | $0 | $0 |
| Administration Fees | $1,729,552 | $1,254,336 | $475,215 |
| Appropriated Expenses | $231,641 | $167,994 | $63,646 |
| Total Expenses | $37,340,259 | $27,771,757 | $9,568,502 |
| IBNR Liability | $5,658,000 | $4,213,934 | $1,444,066 |
| Total | $42,998,259 | $31,985,691 | $11,012,568 |
| **Enrollment in self-funded plans** | | | |
| Subscribers | 51,718 | 37,508 | 14,210 |
| Members | 107,573 | 85,121 | 22,452 |
| **Annual cost** | | | |
| Per subscriber | $831 | $853 | $775 |
| Per member | $400 | $376 | $490 |

*Figure 26: Self-Insured Dental Expenses by Active and Retiree*

# Wellness

Benefits Services Division provides wellness programs and services to Active State employees. Members have access to preventive health screenings, health management and health education courses, annual flu vaccines, online lifestyle management programs, onsite seminars, and Employee Assistance Program (EAP) benefits.

The Health Impact Program (HIP) offers an incentive based employee wellness program for benefits eligible State of Arizona employees, and was first launched October 1, 2014 through September 30, 2015. In 2016, the program began in January and ran through October 31, 2016. The mission of HIP is to promote prevention as the first line of defense against chronic disease and encourage employees to participate in disease management so they can manage pre-existing conditions and enjoy greater total health and well-being.

Employees who successfully completed the program by engaging in a variety of wellness activities while accumulating and logging progress towards an end goal of 500 points, were eligible to receive up to a $200 incentive payout at the of the year.

**Engagement**

The PY 2016 data graph below shows that of the 60,000 eligible members, there were 2,440 new employees in addition to the 7,955 employees registered in 2015, totaling 10,395 registered or

Confidential

17% of the eligible population. 4,091 employees of those registered, completed the online Healthy Assessment which translates to a 39% completion rate.



*Figure 27: Healthy Living Registrations and Completions*

## Screening Utilization

The chart below shows the total utilization of health screening benefits during the PY 2016 and the number of at-risk employees referred to follow-up care.

| PY 2016 Health Screenings | | | |
|---|---|---|---|
| | **Events** | **Participant** | **Referrals** |
| **Mini Health Screening\*** | 89 | 3,417 | |
|   Osteoporosis Screening | | 1,490 | 361 |
|   Prostate Specific Antigen (PSA)\*\* | | 500 | 18 |
|   Hemoglobin A1C \*\* | | 884 | 83 |
| **Mobile Onsite Mammography** | 70 | 1,091 | 27 |
| **Prostate Onsite Projects** | 30 | 489 | 28 |
| Total | 189 | 7,871 | 517 |

  \* The basic Mini Health Screening includes: full lipid panel, fasting blood glucose, blood pressure, BMI, and body composition.

  \*\* New tests offered as a package with the basic Mini Health Screening.

*Figure 28: Health Screenings*

The table below shows the total utilization for the PY 2016 State Wellness Annual Flu Vaccine Program held September 1 through December 31, 2016. A total of 14,842 vaccines were given to benefits Active members, Retirees and their dependents. Members had access to the flu vaccine at 405 locations throughout the state. 94% of members who received a flu vaccine did so at a worksite or open enrollment clinic. To contrast, a total of 20,142 members and their dependents received flu vaccines through the medical plan in PY 2016.

Confidential                                                                    AZSTATE.244095

| PY 2016 Flu Vaccines | | |
|---|---|---|
| | **Locations** | **Participants** |
| State Agency Worksite | 198 | 7,729 |
| University Worksite | 35 | 4,700 |
| Combined Worksite (Wesley Bolin) | 3 | 821 |
| Open Enrollment Clinics | 10 | 709 |
| Public Clinics | 159 | 883 |
| Total | 405 | 14,842 |

*Figure 29: Flu Vaccines*

CDC estimates flu shot savings of between $15 and $84 per vaccinated person, or $2.58 per dollar spent on vaccination; a possible $4,000 savings for every averted illness.   Approximate maximum ROI of 3:1.

**Incentives**

The graph below shows the distribution of points of program participants comparing PY 2016 to PY 2015. 4,327 (42%) of registered participants logged points; 2,039 of the 2,053 logging 500 points earned the incentive for an estimated payout of $407k (20% of total registered).   This represents a 13.50% increase in those earning the reward from PY 2015. A 3.85% of total eligible employees earned incentive.



*Figure 30: Distribution of Points*

By providing the Health Impact Program (HIP) Framework and incentive component, the year over year participation metrics showed an increase in employee engagement in preventive services, screening referrals, and educational/behavior change activities.

**Employee Assistance Program**

The table below shows the utilization for the Employee Assistance Program (EAP) and support services offered to agencies covered under the Benefits Services Division.  Total utilization for PY

Confidential                                                                                              AZSTATE.244096

2016 reached 31%, an increase from 29% in PY 2015, showing sustained high usage especially when compared to the 18.6% national standard for government entities.  Benefit Services Division covered agencies continue to show utilization higher than our EAP vendor's Book of Business.

The Department of Education was added to the Benefit Services Division program effective January 1st, 2016.

| PY 2016 EAP Utilization | | | |
|---|---|---|---|
| | Eligible Population | Users | Utilization Rate |
| **Live Telephonic Access** | | 2,737 | 7.2% |
| EAP | | 2,172 | 5.8% |
| FamilySource | | 126 | 0.3% |
| FinancialConnect | | 88 | 0.2% |
| LegalConnect | | 351 | 0.9% |
| **Online Access** | | 8,042 | 21.3% |
| EAP | | 1,639 | 4.3% |
| FamilySource | | 1,855 | 4.9% |
| FinancialConnect | | 742 | 2.0% |
| GlobalConnect | | 0 | 0.0% |
| Health & Wellness | | 1,633 | 4.3% |
| LegalConnect | | 2,004 | 5.3% |
| **Critical Incident Stress Debriefing** | | 379 | 1.0% |
| **Trainings** | | 544 | 1.4% |
| Overall Utilization | 37,705 | 11,702 | 31.0% |

*Figure 31: EAP Utilization*

In addition to health screenings, vaccines, and EAP services, the strategic plan for PY 2016 continued to provide employees with increased access to online mindfulness and stress reduction by enhancing the options for participation in the sessions through eMindful, Inc.

| PY 2016 Online Courses | | |
|---|---|---|
| | Classes | Participants |
| Mindfulness at Work 1-hr webinars | 24 | 3,261 |

*Figure 32: Online Course Participation*

Confidential                                                                                     AZSTATE.244097

## Life, Disability, Vision Insurance and Flexible Spending Accounts

Fund 3035, ERE/Benefits Administration, is used to pay Fully Insured premiums and administer State employees benefit plans other than health and dental.  These include basis, supplemental, and dependent life insurance, short-term and non-ASRS long term disability insurance, vision insurance, and medical and dependent care flexible spending accounts.  Basic life and non-ASRS long term disability insurance is funded solely by State agency premiums (employer premiums) while all others are funded solely be employee premiums.  Fund 3035 is primarily a pass-through fund with collections funding the premiums payments.  The table above is a cash statement of receipts received and expenses paid during PY 2016 that related to PY 2016 incurred revenues and expenditures as well as prior.

Confidential                                                                                          AZSTATE.244098

| ERE/Benefits Administration Fund Summary | | | |
|---|---|---|---|
| | | | **Plan Year 2016** |
| **Beginning Fund Balance January 01, 2016** | | | **$3,967,635** |
| | | | |
| **Revenues** | | | |
| **Insurance Product** | **Amount** | | |
| Basic Life | $1,128,853 | | |
| Supplemental Life | 10,366,183 | | |
| Dependent Life | 2,733,133 | | |
| Short Term Disability | 7,052,965 | | |
| Long Term Disability | 3,418,727 | | |
| **Total Life & Disability** | | **$24,699,861** | |
| | | | |
| **Vision** | | **5,261,996** | |
| | | | |
| Health Care FSA | $3,365,647 | | |
| Dependent Care FSA | 1,282,072 | | |
| **Total Flex Spending** | | **$4,647,719** | |
| | | | |
| **Total Revenues** | | | **$34,609,576** |
| | | | |
| **Expenditures** | | | |
| **Insurance Product** | **Amount** | **Penalties** | |
| Basic Life | 1,127,417 | (13,497) | |
| Supplemental Life | 10,308,070 | (128,912) | |
| Dependent Life | 2,786,573 | (35,685) | |
| Short Term Disability | 7,055,783 | (110,037) | |
| Long Term Disability | 3,412,014 | (35,665) | |
| Total Life & Disability* | | | $24,366,060 |
| | | | |
| Vision* | 5,248,314 | (77,658) | $5,170,656 |
| | | | |
| Health Care FSA | 3,392,166 | | |
| Dependent Care FSA | 1,255,299 | | |
| Administrative Fees* | 106,611 | | |
| Total Flex Spending | | | $4,754,075 |
| | | | |
| **Total Expenditures** | **$34,692,246** | **(401,455)** | **$34,290,791** |
| | | | |
| **Ending Fund Balance December 31, 2016** | | | **$4,286,420** |

*Vendor administrative fees and fully insured premiums are paid 55 days in arrears per contract.

*Figure 33: ERE/Benefits Administration Fund 3035 Summary*

| Health Insurance Trust Fund | | January 1, 2016 to |
|---|---|---|
| Annual Report | 29 | December 31, 2016 |

AZSTATE.244099

# Vendor Performance Standards

Pursuant to A.R.S. § 38-658(B), "On or before October 1 of each year, the Director of the Department of Administration shall report to the Joint Legislative Budget Committee on the performance standards for health plans, including indemnity health insurance, hospital and medical service plans, dental plans, and health maintenance organizations."

Among the terms of the self-insured health insurance contracts and other contracts the Benefit Services Division administers are several ADOA-negotiated performance measures with specific financial guarantees tied to vendor performance of the contracted services.  If a vendor fails to meet any of the measures within the specified performance range, the vendor is required to submit a Corrective Action Plan detailing why the measure was missed and any actions taken to address the issue and improve performance to meet the standard of the measure.  A percentage of the vendor's annual payment, or previously agreed upon amount, is then withheld by ADOA as a performance penalty per the terms of the vendor contract.  This percentage is allocated among the more critical measures of the contract.

The following is a report of the agreed-upon performance standards both met and missed by contracted vendors during PY 2016.  In each case, performance penalties for measures missed are assessed per the terms of the individual vendor contract.  As some performance metrics are yet to be finalized, the estimated performance penalty paid to Benefit Services Division related to PY 2016 will be approximately $360,000.

## Aetna

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 190<br>Targets successfully met = 178<br>Targets missed resulting in penalties = 8<br>Targets Pending = 4 | Approximately $13,901 |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| **Customer Service – Phone Line**: Call abandonment rate is ≤ 3%; average speed to answer for all phone calls is 30 seconds or less | 1.00% of Total Administrative Fee | Missed 1 of 12 months measured = 0.08% |
| **Appeals –** At least 95% of urgent pre-service appeals are resolved within 15 calendar days of receipt; post-service appeals resolved within 30 days. | 1.50% of Total Administrative Fee | Missed 2 of 12 months measured = 0.25% |
| **Claims – Processing Turnaround Time**: At least 98% of all fully-documented claims will | 1.00% of Total Administrative Fee | Missed 1 of 12 months measured = 0.08% |

Confidential                    AZSTATE.244100

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| be processed within 30 calendar days of receipt | | |
| **HSA Administration – Quality Member Phone Services**: Call abandonment rate is ≤ 3%; average speed to answer for all phone calls is 30 seconds or less | 3.00% of HSA Fees | Missed 3 of 12 months measured = 0.75% |
| **Case Management and Disease Management Customer Service – Quality nurse line phone services**: Call abandonment rate is ≤ 3%; average speed to answer for all phone calls will 30 seconds or less; and 90% of all calls must be appropriately triaged | 1.00% of Total Administrative Fee | Missed annual measurement = 1.00% |
| **Case Management – Post Discharge Outreach:** 95% of identified post discharge cases receive an outreach call within 7 business days of discharge | .50% of Total Administrative Fee | Missed annual measurement = .50% |

## Cigna

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 198<br>Targets successfully met = 176<br>Targets missed resulting in penalties = 15<br>Targets Pending = 7 | Approximately $10,132 |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| **Appeals -** Accurate and timely response to member request for review; urgent appeals resolved within three (3) business days of request, pre-service resolved within 15 calendar days of request and post-service resolved within 30 calendar days of request | 0.75% of Total Administrative Fee | Missed 9 of 12 months measured = 0.56% |
| **Customer Service Nurse Line -** Cigna will provide Nurse Line phone service to members with no more than 3% abandonment rate, an average speed to answer of 30 seconds or less, and 90% of all calls must be appropriately triaged | 0.66% of Total Administrative Fee | Missed 4 of 12 months measured = 0.22% |
| **Claims – Processing Accuracy:** At least 99% of claims will be processed accurately | 1.34% of Total Administrative Fee | Missed 2 of 12 months measured = 0.22% |

Health Insurance Trust Fund
Annual Report

31

January 1, 2016 to
December 31, 2016

AZSTATE.244101

**UnitedHealthcare**

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 198<br>Targets successfully met = 184<br>Targets missed resulting in penalties = 6<br>Targets Pending = 8 | Approximately $36,007 |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| **Customer Service -** UHC will provide phone service to members with no more than 3% abandonment rates and average speed to answer of 30 seconds or less | 1.00% of Total Administrative Fee | Missed 2 of 12 months measured = 0.16% |
| **Case Management and Disease Management - Phone Line**: Call abandonment rate is ≤ 3%; average speed to answer for all phone calls will 30 seconds or less | 0.50% of Total Administrative Fee | Missed 2 of 12 months measured = 0.08% |
| | | |

**Blue Cross Blue Shield (BCBS) of Arizona**

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 198<br>Targets successfully met = 171<br>Targets missed resulting in penalties = 19<br>Targets Pending = 8 | Approximately $56,863 |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| **Claims -** At least 99% of all fully documented claims will be processed within 30 calendar days of receipt | 2.00% of Total Administrative Fee | Missed 2 of 12 months measured = 0.33% |
| **Claims –** At least 98% of claims dollars submitted for payment will be accurately processed and paid | | Missed 1 of 12 months measured = 0.16%=016% |
| **Claims –** At least 99% of all claims will be processed accurately | 1.00% of Total Administrative Fee | Missed 9 of 12 measured = 0.75% |
| **Appeals -** Accurate and timely response to member request for review; urgent appeals resolved within three (3) business days of request, pre-service resolved within 15 | 0.75% of Total Administrative Fee | Missed 1 of 12 measured = 0.06% |

Confidential                                                                                    AZSTATE.244102

| Performance Measures Not Met | | |
|---|---|---|
| Performance Measure | Fees At Risk | Total % Assessed |
| calendar days of request and post-service resolved within 30 calendar days of request | | |
| **Reporting Timeliness** – Agreed upon reporting packages must be submitted within stated timeframes | 0.50% of Total Administrative Fee | Missed 2 of 12 months measured = 0.08% |
| **Case Management/Disease Management Customer Service** - BCBS will provide Nurse Line (demand management) phone service to members with no more than 3% abandonment rate, an average speed to answer of 30 seconds or less | 1.00% of Total Administrative Fee | Missed 2 of 12 months measured = 0.16% |
| **Disease Management** - At least 50% of members identified and screened must participate | 0.50% of Total Administrative Fee | Missed 2 of 4 quarters measured = 0.25% |

## MedImpact

| Performance Measures | |
|---|---|
| Performance Measure | Fees At Risk |
| Total Performance Measures = 113 Targets successfully met = 111 | Approximately $25,000 |

| Performance Measures Not Met | | |
|---|---|---|
| Performance Measure | Fees At Risk | Total % Assessed |
| **Reporting Timeliness** – Agreed upon reporting packages must be submitted within stated timeframes | $50,000 annually | Missed 2 of 4 quarters measured = 50% |

## Delta Dental

| Performance Measures | |
|---|---|
| Performance Measure | Fees At Risk |
| Total Performance Measures = 262 Targets successfully met = 261 Targets Pending = 1 | No penalties |

| Performance Measures Not Met | | |
|---|---|---|
| Performance Measure | Fees At Risk | Total % Assessed |
| No targets missed | | |

Confidential                                                                                           AZSTATE.244103

**Total Dental Administrators**

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 136<br>Targets successfully met = 135<br>Targets missed resulting in penalties = 0<br>Targets Pending = 1 | No penalties |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| No Targets Missed | | |

**Compsych**

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 38<br>Targets successfully met = 38<br>Targets missed resulting in penalties = 0 | No penalties |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| Less than 3% of calls abandoned. This is a Customer Service metric for the Guidance Resources Unit only. | 3.00% of Total Administrative Fee | Missed 2 of 4 quarters measured = 1.50% |

**Avesis**

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 182<br>Targets successfully met = 181<br>Targets missed resulting in penalties = 0<br>Targets Pending = 1 | No penalties |

| Performance Measures Not Met | | |
|---|---|---|
| **Performance Measure** | **Fees At Risk** | **Total % Assessed** |
| N/A | N/A | N/A |

**Application Software, Inc. ("ASI")**

| Performance Measures | |
|---|---|
| **Performance Measure** | **Fees At Risk** |
| Total Performance Measures = 49<br>Targets successfully met = 42<br>Targets missed resulting in penalties = 7 | Approximately $3,793.42 |

Confidential                                                             AZSTATE.244104

| Performance Measures Not Met | | |
|---|---|---|
| Performance Measure | Fees At Risk | Total % Assessed |
| **Account Management/Customer Service -** At least 80% of calls will be answered within 30 seconds or less. | 2.00% of Total Administrative Fees | Missed 3 of 4 quarters measured = 1.50% |
| **Account Management/Customer Service -** No more than 3% of calls abandoned. | 2.00% of Total Administrative Fees | Missed 3 of 4 quarters measured = 1.50% |
| **Program/Claim Administration -**All fully documented claims received will be processed within 2 business days. | 2.50% of Total Administrative Fees | Missed 1 of 4 quarters measured = .625% |

**The Hartford**

| Performance Measures | |
|---|---|
| Performance Measure | Fees At Risk |
| Total Performance Measures = 136 Targets successfully met = 135 Targets missed resulting in penalties = 0 Targets pending = 1 | No penalties |

| Performance Measures Not Met | | |
|---|---|---|
| Performance Measure | Fees At Risk | Total % Assessed |
| No targets missed | | |

| | | |
|---|---|---|
| Health Insurance Trust Fund Annual Report | 35 | January 1, 2016 to December 31, 2016 |

Confidential

# Audit Services

The Benefit Services Division-Audit Services Unit provides assurances that add value and improve the operations of Benefit Services. Audit Services performs systematic evaluations of contract compliance, operational controls, risk management, and the implementation of best practices to support BSD objectives.

During PY 2016, four audit projects were completed to ensure the health plan vendors appropriately provided contracted services. The audit schedule for the plan year was developed using a combination of contract elements and risk analysis. An overview of the completed project results for the 2016 plan year is shown below including recommendations made, implemented recommendations*, identified savings, and health plan recovery dollars.

| Recommendations | Implemented Recommendations * | Identified Savings | Recovery Dollars | Pending Recovery |
|---|---|---|---|---|
| 3 | 1 | $9,719.23 | $0 | $0 |

*Figure 34: Audit Recommendation Summary*
* Implementation of recommendations may vary based on the completion of all corrective action plan directives. In many cases, directives may still be in progress and may roll over to the new plan year.

Individual audit objectives were developed with the consideration of dollar value, complexity of operations, changes in personnel or operations, loss exposure, and previous audit results. Audits were completed, but were not limited to the following functional areas:

| Functional Area | Audit Methodology |
|---|---|
| Vendor operating transactions | Statement on Standards for Attestation Engagements No. 16 Audits (SSAE 16) |
| ADOA accuracy of shared data | Dependent Eligibility Audits (DEA) |
| Audit program improvement initiatives | Administrative functions and program-specific   improvements |

*Figure 35: Audit Functional Area and Methodology*

**Vendor Operating Transactions**

All health plan contracted vendors that pay claims are required to provide a copy of a SSAE 16, which is an independently assessed operational annual or semi-annual audit. SSAE 16 audits evaluate the internal controls of the vendor's systems utilized to process claims and identify deficiencies. Audit services reviewed the SSAE 16 reports provided by each of the vendor's external auditors. There were no instances of significant operating failure noted and no corrective action was required. In addition, audits performed by external or third party vendors are evaluated and considered for the development of the audit schedule when there is significant impact the on the health plan and contract compliance (i.e. large medical and/or pharmacy claims audit).

Confidential                                                                                                                    AZSTATE.244106

**ADOA Accuracy of Shared Data**

Dependent Eligibility audits are performed annually on the health plan's membership. The eligibility audits provide assurance that dependent eligibility is monitored effectively and the risk of claims paid on behalf of ineligible dependents is minimized. The results of the eligibility audit indicated that two ineligible dependents were enrolled in the plan. One dependent erroneously received total benefits of $2,301.95 due to an unreported qualified life event. Appropriate documentation was not received for one dependent, however, no erroneous payments of benefits were made on the dependent's behalf. Additionally, during the Plan Year, documentation was reviewed for a member and dependent who were not included in the annual Dependent Eligibility Audit. Suspicion of inappropriate conduct by the member was based on contact from the member's agency or peers. It was determined that one dependent was not married to the member at the time of enrollment. A total of $5,654.50 in benefits was paid in error on behalf of the dependent. Eligibility documentation and review results for members not selected for the audit, are included as Additional Information in the findings of Dependent Eligibility Audit.

**Audit Program Improvement Initiatives**

In addition to the regularly scheduled audits, reviews, and evaluations listed above, Audit Services assisted in performing a review of HITF members with premiums in a collections status. Claims paid during the non-payment of premium period on behalf of these members were identified and used to assist in determining the remediation of the unpaid premiums.

Audit Services continues to strive towards improvement and efficiency; the focus during the PY 2016 was to streamline administrative functions to improve audit program initiatives.

Confidential                                                                    AZSTATE.244107

# Appendix

| Special Employee Health Fund Cash Statement | | | |
|---|---|---|---|
| | | | Plan Year 2016 |
| **Beginning Fund Balance January 01, 2016^** | | | **$369,000,031** |
| **Revenues** | | | |
| Source | Premiums | | |
| ADOA Health Plan (EE) | $129,470,673 | | |
| ADOA Health Plan (ER) | 586,525,582 | | |
| BCBS NAU Plan (EE) | 8,391,168 | | |
| BCBS NAU Plan (ER) | 33,527,955 | | |
| ADOA Dental Plan (EE) | 29,014,701 | | |
| ADOA Dental Plan (ER) | 13,123,597 | | |
| PrePaid Dental Plan (EE) | 1,578,360 | | |
| PrePaid Dental Plan (ER) | 2,093,511 | | |
| Other Revenue | 239,160 | | |
| **Net Revenue** | **$803,964,707** | | **$803,964,707** |
| | | | |
| **Expenditures** | | | |
| Vendor | Admin Fees | Penalties | |
| Aetna | 2,912,532 | (139,209) | |
| AHH Medical Management | 60 | - | |
| AmeriBen | 3,610 | - | |
| Blue Cross Blue Sheild AZ | 5,909,318 | (115,065) | |
| Cigna | 2,361,877 | (16,905) | |
| UnitedHealthcare | 13,700,011 | (38,501) | |
| MedImpact | 1,651,309 | - | |
| HSA Funding (EE and ER) | 982,888 | - | |
| Delta Dental | 1,729,552 | - | |
| HIP Payout | 430,357 | - | |
| ACA Related Taxes/Fees | 4,906,327 | - | |
| AG Collection Fees | 1,965 | - | |
| Net Administrative Fees*** | $34,589,807 | ($309,681) | $34,280,126 |
| | | | |
| | Claims | Recoveries* | |
| Aetna | $39,805,443 | - | |
| AmeriBen | 6,592 | (266,587) | |
| Blue Cross Blue Shield AZ | 132,313,036 | (169,059) | |
| Cigna | 57,105,475 | - | |
| UnitedHealthcare | 363,326,031 | (150,453) | |
| Other Medical** | - | (959) | |
| MedImpact | 191,685,214 | (10,158,063) | |
| Medicare Part D Retiree Drug Subsidy | - | (11,481,947) | |
| Delta Dental | 37,154,528 | - | |
| Other Wellness | 638,441 | - | |
| Net Claims | $822,034,760 | ($22,227,068) | $799,807,692 |
| | | | |
| **Self-Insured Expenditures** | **$856,624,566** | **($22,536,749)** | **$834,087,818** |
| | | | |
| | Premiums | Penalties | |
| BCBS (NAU Only) | $40,427,829 | - | |
| Total Dental Administrators | 3,674,549 | ($75,302) | |
| **Fully Insured Expenditures***** | **$44,102,378** | **($75,302)** | **$44,027,076** |
| | | | |
| HITF Operating | $4,968,834 | - | |
| Fund Transfers Out^^ | 4,076,000 | - | |
| Federal Participation Reimbursement | 6,158,416 | - | |
| Administrative/Cash Adjustments | 30,306 | - | |
| **Operating Expenes and Transfers** | **$15,233,556** | **$0** | **$15,233,556** |
| | | | |
| **Net Expenditures and Transfers** | **$915,960,500** | **($22,612,051)** | **$893,348,449** |
| | | | |
| **Ending Fund Balance December 31, 2016** | | | **$279,616,289** |
| | | | |
| **IBNR Liability (Medical & Dental)** | | | **$98,663,139** |
| **Contingency Reserve (Medical & Dental)** | | | **$98,663,139** |
| | | | |
| **Unrestricted Cash Balance As Of December 31, 2016** | | | **$82,290,011** |

\* Recoveries include Medicare Part D Retiree Drug Subsidy reimbursement, prescription drug rebates, overpayment recoveries (including stop payments and voids), subrogation recoveries, workers compensation recoveries from Risk Management, etc.

\*\* Other Medical includes recoveries from Risk Management for Worker Comp claims and UMR.

\*\*\* Vendor administrative fees and fully insured premiums are paid 55 days in arrears per contract.

^ The ending balance from PY 2015 report equals to the beginning balance for PY 2016. PY 2015 ending balance was overstated by $53,565.

^^ Fund transfers from HITF to other State funds.

*Figure 36: Special Employee Health Fund Cash Statement*

Confidential

AZSTATE.244108

# Glossary of Terms

**Active member(s)** – An employee and their eligible dependents, as defined in the Arizona Administrative Code, who are enrolled in one of the health plan options offered by the State. (Also referred to as "actives".)

**Administrative fees** – Fees paid to third-party vendors for plan administration, network rental, transplant network access fees, shared savings for negotiated discounted rates with other providers, COBRA administration, direct pay billing, additional reporting billing, State fees (MA, MI and NY), and bank reconciliation fees.

**Case management** – A collaborative process that facilitates recommended treatment plans to ensure that appropriate medical care is provided to disabled, ill, or injured individuals.

**Claim** – A provider's demand upon the payer for payment for medical services or products.

**Claim appeal** – A request by an insured member for a review of the denial of coverage for a specific medical procedure contemplated or performed.

**COBRA, Consolidated Omnibus Budget Reconciliation Act of 1985** – A federal law that requires an employer to allow eligible employees, retirees, and their dependents to continue their health coverage after they have terminated their employment or are no longer eligible for the health plan - COBRA enrollees must pay the total premium, in addition to an administrative fee of 2%.

**Contribution strategy** – A premium structure that includes both the employer's financial contribution and the employee's financial contribution towards the total plan cost.

**Copayment** – A form of medical cost-sharing in the health plan that requires the member to pay a fixed dollar amount for a medical service or prescription.

**Deductible** – A fixed dollar amount that a member pays during the plan year, before the health plan starts to make payments for covered medical services.

**Dependent** – An unmarried child or a spouse of the employee who meets the conditions established by the relevant plan description.

**DHMO/Pre-Paid Dental** – A dental plan that offers members dental services with no annual maximums or claim forms, and services based on a discounted rate.  Total Dental is the current prepaid dental vendor.

**DPPO** – A dental plan, with an in-network and out-of-network coinsurance structure, that allows members to visit any dentist. There is an annual deductible, and maximum annual benefit of $2,000 per member per year for dental services.  The current administrator for the DPPO plan is Delta Dental.

Confidential                                                                                                        AZSTATE.244109

**Disease management** – A comprehensive, ongoing, and coordinated approach to achieving desired outcomes for a population of patients. These outcomes include improving members' clinical conditions and qualities of life as well as reducing unnecessary healthcare costs. These objectives require rigorous, protocol-based, clinical management in conjunction with intensive patient education, coaching, and monitoring.

**Eligibility appeal** – The process for a member to request a review of a health plan decision regarding a claimant's qualifications for, or entitlement to, benefits under a plan.

**Employee** – As defined in the Arizona Administrative Code who works for the State of Arizona or a State university.

**Employee Group Waiver Program (EGWP)** – An employer group Medicare Prescription D drug plan.

**Exclusive Provider Organization (EPO)** – A health plan designed with an exclusive provider organization or network. Enrollees are limited to access in-network providers and are subject to co-pays. Any exceptions require prior authorization.

**Flexible spending account (FSA)** – An account that can be set up through the State's Benefit Options program, an FSA allows an employee to set aside a portion of his/her earnings to pay for qualified medical and dependent care expenses. Money deducted from an employee's pay and put into an FSA is not subject to payroll taxes.

**Formulary** – A list of preferred medications covered by the health plan. The list contains generic and brand-name drugs. The most cost-effective brand-name drugs are placed in the "preferred" category and all other brand-name drugs are placed in the "non-preferred" category.

**Fully-insured** – An insurance model wherein a commercial insurer collects premiums, pays claims for services, and takes the risk of revenue to expense. Benefit Options may collect the premiums for transfer to the commercial insurer.

**High Deductible Health Plan (HDHP)** – A health plan designed with an open access provider organization or network. Enrollees have access to in-network and out-of-network providers, and are subject to co-insurance and higher annual deductibles than traditional plans. Out-of-network providers require greater co-insurance.

**Health Savings Account (HSA)** – An account that allows individuals to pay for current health expenses and save for future health expenses on a tax-free basis. Only high deductive health plans are HSA-eligible.

**Integrated** – A health plan operation administered by one entity. Such operations include: claims processing and payment, a network of medical providers, utilization management, case management, and disease management services.

Confidential                                                                                                       AZSTATE.244110

**Medicare** – The federal health insurance program provided to those who are age 65 and older, or those with disabilities, who are eligible for Social Security benefits.  Medicare has four parts: Part A, which covers hospitalization; Part B, which covers physicians and medical providers; Part C, which expands the availability of managed care arrangements for Medicare recipients; and Part D, which provides a prescription drug benefit.  Retirees signing up for ADOA insurance must enroll in Parts A and B, but not C or D.

**Member** – A health plan participant.  This individual can be an employee, retiree, spouse, or dependent.

**Network** – An organization that contracts with providers (hospitals, physicians, and other health care professionals) to provide health care services to members.  Contract terms include agreed upon fee arrangements for services and performance standards.

**Non-integrated** – A health plan with operations administered by multiple entities.  These operations include claims processing and payments, a network of medical providers, and disease management services.

**Payer** – The entity responsible for paying a claim.

**Pharmacy Benefit Manager (PBM)** – An organization that provides a pharmacy network, processes and pays for all pharmacy claims, and negotiates discounts on medicines directly from the pharmaceutical manufacturers.  These discounts are passed to the employer/payer in the form of rebates and reduced costs in the formulary.

**Plan Year (PY)** – Defined as the period of January 1 through December 31 of a given year.

**Preferred Provider Organization (PPO)** – A health plan designed with a preferred provider organization or network.  Enrollees have access to in-network and out-of-network providers, and are subject to co-pays, or co-insurance, and annual deductibles.  Out-of-network providers require greater co-pays.

**Premium** – The agreed-upon fees paid for medical insurance coverage.  Premiums are paid by both the employer and the health plan member.

**Retiree** – A former State of Arizona employee, State university employee, officer, or elected official who is retired under a State-sponsored retirement plan.  For reporting purposes, this term encompasses both actual retirees and their dependents.

**Self-funded** – An insurance program wherein Benefit Options collects premiums, pays claims, and assumes the risk of revenues to expenses.

**Self-insured** – A plan that is funded by the employer who is financially responsible for all medical claims and administrative expenses.

Confidential                                                                                                  AZSTATE.244111

**Spouse** – A dependent legally married to an employee or a retiree, as defined by the Arizona Revised Statutes.

**Subscriber –** An employee, officer, elected official, or retiree who is eligible and enrolls in the health plan.

**Third party administrator** – An organization that handles all administrative functions of a health plan including: processing and paying claims, compiling and producing management reports, and providing customer service.

**Utilization management** – The evaluation of appropriateness and efficiency of health care services procedures and facilities according to established criteria or guidelines and under the provisions of an applicable health benefits plan.

**Utilization review** – A process whereby an insurer evaluates the appropriateness, necessity, and cost of services provided.

**Utilizer** – A member who receives a specific service.

Confidential                                                                      AZSTATE.244112