# EXHIBIT 29

| Message | |
|---|---|
| **From:** | Scott Bender [Scott.Bender@azdoa.gov] |
| on behalf of | Scott Bender <Scott.Bender@azdoa.gov> [Scott.Bender@azdoa.gov] |
| **Sent:** | 6/8/2016 7:08:11 PM |
| **To:** | Marie Isaacson [Marie.Isaacson@azdoa.gov] |
| **Subject:** | FW: Final Rule on Nondiscrimination in Health Programs and Activities |

**From:** Emmons, Erica 654 [mailto:Erica.Emmons@Cigna.com]
**Sent:** Wednesday, May 18, 2016 9:56 AM
**To:** Amanda Accatino <Amanda.Accatino@azdoa.gov>; Elizabeth Schafer <Elizabeth.Schafer@azdoa.gov>; Kelly Sharritts <Kelly.Sharritts@azdoa.gov>; Michael Meisner <Michael.Meisner@azdoa.gov>; Rose Bernal <Rose.Bernal@azdoa.gov>; Scott Bender <Scott.Bender@azdoa.gov>; Yvette Medina <Yvette.Medina@azdoa.gov>
**Cc:** Maddalena, Diana M 646 <Diana.Maddalena@Cigna.com>
**Subject:** Final Rule on Nondiscrimination in Health Programs and Activities



# INFORMED ON REFORM

KEEPING YOU UP-TO-DATE ON THE PPACA

**Health Care Reform Alert**

**May 17, 2016**

## Final Rule on Nondiscrimination in Health Programs and Activities

On May 13, the Department of Health and Human Services (HHS), and specifically the Office of Civil Rights (OCR), issued a final rule on nondiscrimination in health programs and activities under Section 1557 of the Affordable Care Act (ACA). This section of the ACA serves protected classes of individuals whose health coverage may not be denied, cancelled, limited or refused on the basis of race, color, national origin, sex, age, or disability. The final rule clarifies existing nondiscrimination requirements, and sets new implementation standards for Section 1557.

This rule is effective July 18, 2016. However, health plans that require changes in benefits design are required to comply on the first day of the plan or policy year beginning on or after January 1, 2017.

The broad application of this final rule will affect the federal and state Marketplaces, all health care providers and health insurance issuers and employers that receive federal

AZSTATE.005677

financial assistance. Financial assistance from HHS includes Medicare Part A, student health plans, advanced premium tax credits and many other programs.

**The final rule is broad in scope. Any entity that is subject to the nondiscrimination requirements must also ensure that its own employer-sponsored plans are compliant.**

**Key provisions and clarifications in the final rules include:**

- **Expanded protection for transgender individuals**
Insurers and group health plans cannot limit accessibility to health services typically or exclusively available to one gender. In other words, certain services cannot be denied or limited due to an individual's sex assigned at birth, gender identity, or recorded gender. With that, plans are not required to cover any specific item or service.

- **Required language assistance**
Insurers, employers and other entities sponsoring group health plans must provide nondiscrimination notices and "taglines" to their employees and the general public that explain how individuals can obtain language services. These notices must be provided in at least the top 15 non-English languages spoken in a given state, and must be made available on physical premises, on the web and in significant documents, such as a Summary of Benefits and Coverage (SBC).

Sample tagline provided in regulations: ATTENTION: If you speak [insert language], language assistance services, free of charge, are available to you. Call 1-xxx-xxx-xxxx (TTY: 1-xxx-xxx-xxxx).

- **Communication assistance for individuals with disabilities**
Notices must also be readily available for individuals and the general public that confirm how individuals with disabilities can receive auxiliary aids and communication services without charge and in a timely manner. These services include qualified interpreters and information in alternate formats, to ensure equal participation opportunity.

- **Application to administrative services only (ASO) self-insured employer plans** Complaints that involve self-insured plans will be reviewed on a case-by-case basis to determine liability for discriminatory activity between the employer, insurer and/or third party administrators. Third party administrators of self-insured plans will generally be liable only for their own discriminatory actions, such as discriminatory denial of claim. This is in contrast to insured plans, where insurers are liable for any discriminatory benefit design. As a result, benefits design changes in both types of plans may be appropriate to ensure compliance with the final rule.

**Expatriate Plans**

The final regulations confirm that Section 1557 of the ACA and the final rule do not apply to expatriate health plans, expatriate health insurance issuers, or employer plan sponsors of expatriate plans, as defined in the Expatriate Health Coverage Clarification Act (EHCCA).

**Reference Materials**

HHS has established a web page with links to their press release, fact sheets, sample notices and FAQs.

AZSTATE.005678

We encourage you to bookmark Cigna's health care reform website, www.InformedonReform.com, where we continuously update information as it becomes available.

**Together, all the way.®**

This document is for general informational purposes only. While we have attempted to provide current, accurate and clearly expressed information, this information is provided "as is" and Cigna makes no representations or warranties regarding its accuracy or completeness. The information provided should not be construed as legal or tax advice or as a recommendation of any kind. External users should seek professional advice from their own attorneys and tax and benefit plan advisers with respect to their individual circumstances and needs.

© 2016 Cigna. All rights reserved

**Erica Emmons** | Strategic Account Executive | Government and Education | Cigna | 5310 East High Street, Suite 200 | Phoenix, AZ 85054 | Direct: 480.426.6761 | Mobile: 480.622.0899 | erica.emmons@cigna.com



*Confidential, unpublished property of Cigna. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel. © Copyright 2016 Cigna.*

-------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2016 Cigna
===============================================================================

AZSTATE.005679

# EXHIBIT 30
# LODGED
# UNDER SEAL

# EXHIBIT 31

Message

**From:**            Leslie Feldman [Leslie.Feldman@azdoa.gov]
on behalf of      Leslie Feldman <Leslie.Feldman@azdoa.gov> [Leslie.Feldman@azdoa.gov]
**Sent:**            10/14/2016 10:13:51 AM
**To:**              Yvette Medina [Yvette.Medina@azdoa.gov]
**Subject:**         Medical Director's
**Attachments:**     Med Dir Mtg Minutes 10.13.16_draft.docx


Please see attached.

**Leslie Feldman, PHR**
Plan Administrator
ADOA – Benefit Services Division | State of Arizona
100 North 15th Avenue, Suite 260, Phoenix AZ  85007
p: 602.542.4320  | f: 602.542.4048 | leslie.feldman@azdoa.gov

**Arizona Department of Administration**

**Benefit Services Division**

**Medical Directors Meeting**

**ADOA First Floor Conference Room**

**September 29, 2016**

**1:30 pm - 3:30 pm**

**MINUTES**

| Invitees: | State of Arizona | Aetna | BCBSAZ | CIGNA | UHC |
|---|---|---|---|---|---|
| | Marie Isaacson<br>Scott Bender<br>Yvette Medina<br>Michael Meisner<br>Monika Luksikova-Hickcox<br>Rose Bernal<br>Kayla Stivason<br>Amanda Accatino<br>Nickie Schultz<br>Leslie Feldman | Dr. Jim Krominga<br>Ray Eveleth | Dr. James Napoli<br>Ken Muth<br>Sharon Tucker | Dr. Rudolph Cane<br>Wilson Rodgers<br>Erica Emmons | Dr. Thomas Biuso<br>Heather Gallegos<br>Stephanie Martin |
| | MedImpact<br>Erin Russell | Delta Dental<br>Dr. John Mehlem<br>Ann Coupland | TDA<br>Dr. Ock Peterson<br>Jeff Wilkinson | | |

I. **Meeting Review**

   A.  Agenda

II. **Discussion Items**

   A.  2018 Plan Design Considerations

      1.  Medical Recommendations

        (1)  Item #1: Adult immunizations; All plans recommending to remove grandfathered status to include free preventive care and preventive immunizations

AZSTATE.144147

(2) Item #10: Urgent Care Center; UHC proposed an increase in urgent care copayment, which would put their copayment in line with the other plans who are already at the $50-$75 range.

(3) Item #17: Hospital Admission; UHC recommending an increase from $150 to $250 to make the plan competitive among the other plans and avoid Cadillac tax; all other plans recommend a $250 copay

(4) Item #28: Mental/Nervous, and Substance Abuse Inpatient services; All plans recommending a $250 copay to create parity with the medical outpatient benefit.

(5) Item #30: Contraceptive appliances; UHC proposes removing the copayment for preventive services to be in line with HCR

(6) Item #39: Organ and Tissue Transplant; UHC recommends for PPO plan to remove coverage out of network to ensure members utilize Centers of Excellence for Organ Transplants. If out-of-network benefit will not be removed, consider limiting the benefit to a dollar amount, which is allowable under HCR. Most benchmark plans do not allow out-of-network coverage.

**PRE-CERTIFICATION/PRIOR AUTHORIZATION**

(7) Item #9: Non-emergency ambulance transportation; UHC suggests removing requirement for pre-cert for non-emergency ground transportation. This is common amongst book of business. Potential for the plan to be charged additional days for inpatient hospital care. The risk inherent is that if a member needs a pre-cert for ground transportation, they could be waiting at the hospital longer than necessary for the pre-cert to be approved. Cigna and Aetna require a pre-cert. It is rare that an ambulance will be called spontaneously as it is typically part of care. There is no pre-cert between participating medical facilities.

(8) Item #13: Infusion/IV Therapy in an Outpatient setting; UHC recommends removing the reference to specific drug names and require pre-cert/prior-auth for infusion/IV therapy for drugs required by TPA. Treatment would not be limited to the clarified list and would

AZSTATE.144148

**Redacted**

AZSTATE.144149

# Redacted

AZSTATE.144150



C.  Transgender Benefits, ruling on requirements

1.  What vendors are doing for their fully insured products

AZSTATE.144151

(1) Cigna – for fully insured plans, complying with law and adding the benefit; if ASO plans receive federal funding, they must comply. Most of the clients are taking steps to not have to add the benefit.

(2) BCBS – exclusion for cosmetic services; coverage area is psychotherapy, reassignment surgery, and medication. Generally the recommendation is conservative because of concern for litigation (but it's more of a legal issue rather than a benefit issue)

(3) Aetna – has had some customers who have had the benefit for a couple of years; most of the surgeons who perform reassignment surgery tend not to contract with health plans at present. There may be more to come as definitions are more clearly defined and the benefit becomes more common.

(4) UHC – benefit is being added for 1/1/17 for fully insured plans. One of their plans in book of business had to add the plan on an off cycle to prevent EEOC complaints and adopted UHC standard language (examples provided in a separate document)

2. Costs

(1) Cigna – cost is fairly minimal, less than 1/10th of a percentage, unless you have known people who are asking about the benefit, in which case add $35,000 per person.

(2) BCBS - Actuarially had a .3% impact including medication.

(3) Aetna – it is not unusual to see costs over $50,000 for the surgery alone

(4) UHC - $.09/pmpm and $.01/pmpm prescriptions cost

3. Recommendations

(1) Cosmetic procedures are not part of the typical covered procedures (i.e. chest, facial..etc). The cost is mostly associated with hormone therapy, reassignment surgery, and post-op therapy.

(2) BCBS – had several groups that wanted to voluntarily add the benefit before litigation. Previously had dollar limits, but the recommendation is not to have a maximum.

(3) Aetna – Currently it is a very costly procedure since there are few providers who contract with insurance

(4) UHC – Review with legal counsel as to requirements of offering the benefit

AZSTATE.144152

**Redacted**

AZSTATE.144153



Redacted

AZSTATE.144154

# EXHIBIT 32

**Christina Corieri - 07/13/2022**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


RUSSELL B. TOOMEY,                       )
                                         )
                 Plaintiff,              )
                                         )
vs.                                      )  4:19-CV-00035
                                         )
STATE OF ARIZONA; ARIZONA BOARD          )
OF REGENTS, d/b/a UNIVERSITY OF          )
ARIZONA, a governmental body of          )
the State of Arizona; et al.,            )
                                         )
                 Defendants.             )
_____)




VIDEOTAPED DEPOSITION OF CHRISTINA CORIERI

(Via Zoom Videoconference)
July 13, 2022
8:30 a.m.
Phoenix, Arizona






Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020               Robin L. B. Osterode
602.266.6535                         CSR, RPR
www.glennie-reporting.com            CA CSR No. 7750
                                     AZ CR No. 50695

35

1      Q.    For example, was the cost of including gender

2   reassignment surgery discussed at that meeting?

3      A.    I do not recall it being discussed at that

4   meeting.

5      Q.    Did you discuss the cost of gender reassignment

6   surgery with anyone at any time during the time you have

7   been at the Office of the Governor?

8            MS. LAMM:  Object to the form of the question.

9            THE WITNESS:  I -- I don't recall specific

10   discussions about the cost.

11   BY MR. ECKSTEIN:

12      Q.    Did anyone -- anyone ever tell you that gender

13   reassignment surgery was not going to be covered by the

14   State of Arizona, by the Arizona Department of

15   Administration healthcare plan because of its cost?

16      A.    I know that cost is something that we look at

17   for everything.  Especially in the context of adding cost

18   to the State Health Insurance Trust Fund or to State

19   employees.  So our position, in general at that time, was

20   that the State was in a very bad economic situation.  In

21   2015, we had something like a billion dollar deficit and

22   had to cut across the board in agencies.  The State

23   health insurance plan was in trouble and had to be bailed

24   out.  We still had to put dollars into the health

25   insurance trust fund because it's under water, our State

Christina Corieri - 07/13/2022

36

1    employees had not had a raise since 2008, and every time

2    we add anything to the plan or do anything that would

3    change their cost structure, we hear from employees.  So

4    our position, in general, is that we don't add things

5    that we are not required to add to the plan that would

6    affect the trust fund cost or the cost to employees.

7    Again, because of the impact it would have on a fund that

8    is not -- that is not in good financial shape or the

9    impact on employees, many of whom don't make a lot of

10   money and had not had a raise for many, many years.

11        Q.    Did the State employees get a raise this year?

12        A.    They received a raise on January 1st, 2022 --

13   I'm sorry, not January 1st, July 1st, 2022.  That was the

14   first raise since, I believe, 2007.  Yeah.

15        Q.    Is -- did the State end the fiscal year,

16   June 30 -- it was really -- yeah, June 30, 2021, with a

17   surplus?

18        A.    June -- last fiscal year, I believe we did, but

19   I don't know how much.

20        Q.    You never heard the figure 4 million -- 4

21   billion -- $5 billion, you didn't hear that?

22        A.    I'm sorry, that's for this fiscal year, 2022,

23   you asked 2021.

24        Q.    Okay.  And what -- so what is it with respect

25   to this fiscal year?  I'm sorry, yes, I did get my -- I

1      A.    No.

2      Q.    What do you disagree with?

3            MS. LAMM:  Object to the form of the question.

4            THE WITNESS:  Well, some of it I don't even

5    know what she's referring to.  I don't know what the mass

6    resistance is.  I don't know what the Alfred Kinsey

7    occultic faux science is.  I don't even know what she's

8    talking about.

9    BY MR. ECKSTEIN:

10     Q.    Okay.  You've never heard of Alfred Kinsey?

11     A.    I think I have vaguely heard of him as a

12   university professor.  I've never read anything --

13     Q.    I guess --

14     A.    I'm sorry?

15     Q.    I guess that's the difference -- the difference

16   in our generations.  You've never heard of the Kinsey

17   Reports --

18     A.    I never --

19     Q.    -- in the 1940s?

20           All right.  That's fine.

21           I want to ask you, do you agree that gender

22   reassignment surgery was not welcome in the governor's

23   office?

24           MS. LAMM:  Object to the form of the question.

25           THE WITNESS:  We -- we have never had a

56

1    conversation about this, so I have no objection to

2    decisions that -- that people make.

3    BY MR. ECKSTEIN:

4        Q.    Okay.  And so you don't know whether it was

5    welcome or not welcome.  Correct?

6        A.    We don't have a position on this.

7        Q.    Or -- no position at all?

8        A.    No, this is an individual decision.

9        Q.    All right.  When you're saying individual

10   decision, what do you mean by that?

11       A.    I mean it's a decision for somebody to make for

12   themselves.  I -- I do not have a position on feelings on

13   whether or not somebody, you know, gets it or not.  It

14   just doesn't --

15       Q.    But if a person is employed by the State of

16   Arizona, say by the University of Arizona and wants to

17   have gender reassignment surgery, that person could not

18   have it at any time during the time you've been employed

19   by that office.  Correct?

20             MS. COHAN:  Form.

21             MS. LAMM:  Object to the form of the question.

22             THE WITNESS:  That's not true.

23   BY MR. ECKSTEIN:

24       Q.    Oh, tell me why it's not true.

25       A.    Because you can always get it if you are

1    A.    No, but I know the cost of surgeries simply

2    varies, and I've seen, you know, every year we have bills

3    in the legislature to add specific benefits to the AHCCCS

4    program, and each one of those carries with it a cost.

5    The costs vary depending on what that particular benefit

6    is.

7    Q.    But, again, you -- that's with respect to other

8    types of coverage, you, as you sit here today, have no

9    knowledge one way or the other about the cost of adding

10   gender reassignment surgery to the ADOA plan?

11   A.    I do not know specifically on that, but I have

12   never seen a benefit added to any plan that didn't

13   involve costs.

14   Q.    But you don't know whether that cost was a

15   dollar or some other number in this context?

16   A.    I don't know what that is for that individual

17   one.  I do know that the health insurance trust fund was

18   deeply under water and had to be bailed out at that time,

19   so any costs would make a bad situation in the State

20   employee health trust fund worse, and that every dollar

21   that we add to employees' costs made it difficult for

22   employees who, again, had not had a raise in many years,

23   and many are not high-paid employees.

24   Q.    Well, let me ask you, in -- in -- when you had

25   any of these meetings in 2000- -- in the fall of 2016,

**Christina Corieri - 07/13/2022**

137

1                          SIGNATURE PAGE

2

3          I, CHRISTINA CORIERI, a deponent exercising my
   right to read and sign my deposition taken on July 13,
4  2022, place my signature hereon and make the following
   changes on this _____day of_____, 2022.
5
                  (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                          _____

8                          CHRISTINA CORIERI

9

10  PAGE      LINE      READS        CHANGE TO        REASON

11  _____     _____     _____

12  _____     _____     _____

13  _____     _____     _____

14  _____     _____     _____

15  _____     _____     _____

16  _____     _____     _____

17  _____     _____     _____

18  _____     _____     _____

19  _____     _____     _____

20  _____     _____     _____

21  _____     _____     _____

22  _____     _____     _____

23  _____     _____     _____

24  _____     _____     _____

25  _____     _____     _____

138

```
1   STATE OF ARIZONA     )
    COUNTY OF MARICOPA   )
2
            BE IT KNOWN that the foregoing proceedings
3   were taken before me; that the witness before testifying
    was duly sworn by me to testify to the whole truth; that
4   the foregoing pages are a full, true, and accurate record
    of the proceedings all done to the best of my skill and
5   ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
6   direction.

7           [X] Review and signature was requested.

8           [ ] Review and signature was waived.

9           [ ] Review and signature not required.

10          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in the ACJA 7-206(F)(3)
11  and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
    Arizona, this 23rd day of July, 2022.

12

13

14

15  _____
            ROBIN L. B. OSTERODE, RPR
16          CA CSR No. 7750
            AZ CR No. 50695
17
                *   *   *   *   *
18          I CERTIFY that Glennie Reporting Services,
    LLC, has complied with the ethical obligations set forth
19  in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23  _____
24  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
25  Arizona RRF No. R1035
```

# EXHIBIT 33

# FY 2016 BASELINE SUMMARY

| Overview |
|---|

The FY 2016 Baseline provides an estimate of the state's General Fund balances.  The revenue projections reflect a consensus economic forecast while the spending estimates represent active funding formula requirements and other obligations.  The Baseline does not represent a budget proposal, but an estimate of available resources after statutory requirements.

A.R.S. § 35-125 requires that the General Appropriation Act annually delineate the revenue and expenditure projections for 3 years.  The budget, however, would only provide actual appropriations for FY 2016.

In terms of the budget outlook:

- Total FY 2016 General Fund revenue is projected to be $8.77 billion.  Revenues would be $(440) million less than in FY 2015.  While the 4-sector consensus base revenues are forecast to grow by $300 million, or 3.3%, the decline in the balance forward, annualization of prior year tax law changes and the loss of one-time fund transfers offset those gains.
- In comparison, FY 2016 spending is projected to be $9.45 billion.  This amount reflects $90 million, or 1.0%, growth in expenditures, which is limited to current funding formulas.  K-12 growth of $181 million is offset by declines in one-time information technology, capital, Department of Child Safety spending, and technical adjustments for administrative adjustments and revertments.
- The projected FY 2016 ending balance shortfall is $(678) million prior to any resolution of the K-12 inflation litigation and assuming that the FY 2015 shortfall is solved with one-time measures.  The shortfall would increase slightly to $(690) million in FY 2017, then decline to $(581) million in FY 2018.
- The litigation regarding unfunded K-12 inflation could significantly affect the projected shortfall.  The additional cost per year to "reset" the Basic State Aid weight at the level sought by the plaintiffs is $337 million in FY 2016, with similar costs in subsequent years.  If the state were ultimately required to reset the rate at that level, the FY 2016 shortfall would increase to $(1.02) billion.  These figures do not include the impact of back payments for years without the additional inflation payments.  The plaintiffs seeking back payments have suggested the state pay an additional $1.26 billion total over a 5-year period.
- The projected FY 2015 ending balance shortfall is now projected to be $(148) million, primarily the result of a decrease in forecasted FY 2015 revenues.  This figure does not include additional obligations that might be required pursuant to resolution of the K-12 inflation litigation.
- These cash balance estimates do not include $464 million in the state's Rainy Day reserve (Budget Stabilization Fund).

| The Path from a Healthy Surplus to a Large Shortfall |
|---|

At the end of FY 2013, the state had a balance of $895 million.  The following factors lead to the projected FY 2016 shortfall of $(678) million (or $(1.02) billion with the K-12 litigation):

- The state had a $300 million to $400 million underlying structural shortfall in the past several years as ongoing spending exceeded ongoing revenue.  These budgets were balanced with one-time monies such as the temporary 1-cent sales tax.
- When the $900 million 1-cent sales tax ended in FY 2013, the FY 2014 budget replaced it with a nearly equivalent carry forward.  By the end of FY 2015, however, the carry forward will have been eliminated.
- Lower-than-expected revenue growth.
- Phase-in of tax law changes enacted in 2011 and 2012.
- K-12 inflation litigation.

The current shortfall is not unexpected.  The FY 2015 budget was enacted last spring with project shortfalls of $(237) million in FY 2016 and $(489) million in FY 2017.

## FY 2015

The FY 2015 ending balance is currently projected to be a shortfall of $(148) million, a decrease of $(278) million from the original budget estimate of a $130 million balance.  Total revenues, including the beginning balance, are forecast to be $9.21 billion compared to spending of $9.36 billion.  The $(278) million adjustment has 3 components:

- A decrease of $(175) million in ongoing revenues under the updated January consensus forecast, the result of lower-than-budgeted FY 2014 revenues and a decrease in the FY 2015 growth rate from 5.3% to 4.3%.
- Decreased balance forward from FY 2014.  The original budget assumed an ending balance of $596 million for FY 2014. The actual balance carried forward into FY 2015 was $577 million, a decrease of $(18) million.
- An increase of $85 million in FY 2015 expenditures, including $36 million for an expected decrease in unspent FY 2015 appropriations, $29 million for higher-than-expected administrative adjustments (expenditures for FY 2014 bills received in FY 2015), and $17 million to reflect the actual timing of capital expenditures delayed from FY 2014.  These increases are partially offset by $(7) million of net ex-appropriations.

## FY 2016 Baseline Revenues

While base revenues are forecast to grow in FY 2016, the growth is insufficient to fully offset the loss of carry-forward balances and declines in other sources of revenues.  Overall FY 2016 collections would decline to $8.77 billion, or $(440) million below the revised FY 2015 estimate for the following reasons:

- Based on JLBC's 4-sector consensus, FY 2016 base revenues are projected to grow by $300 million, or 3.3%.  Base revenues reflect the underlying growth in the economy and exclude one-time adjustments, urban revenue sharing and new tax law changes.
- The primary reason for the decline in overall FY 2016 revenues is a $(577) million loss in the balance forward as the FY 2014 carry forward is fully expended in FY 2015.
- The state set-aside for urban revenue sharing formula distributions would decline slightly from $609 million to $606 million, thereby increasing state revenue by $3 million.
- Previously enacted legislative changes would reduce state revenue by $(112) million, primarily from the continued phase-in of a corporate income tax rate reduction from 6.968% to 4.9%, the phase-in of a change in how multi-state corporations are permitted to treat sales in calculating tax liability ("corporate sales factor"), and a reduction of long term capital gain taxation.
- Discontinuing fund transfers would reduce revenue by $(54) million.

The 4-sector estimate was developed using a consensus forecasting process.  This consensus equally weights the results of 4 forecasts:

- The Finance Advisory Committee (FAC), an independent 13-member group of public and private sector economists;
- The University of Arizona Economic and Business Research (EBR) Center's econometric forecasting baseline model;
- The EBR's conservative forecast model; and
- The JLBC Staff forecast.

The FY 2016 growth rate of 3.3% reflects sluggish growth.  There are a number of reasons for the slow growth, including:

- Slowdown in housing permits and a decline in construction jobs, which is particularly noticeable amidst growth in the construction sector nationally
- Federal defense contract reductions
- Lingering effects of the "housing bubble" that led to the 2007-2009 recession.

*(See the General Fund Revenue section for more information.)*

## FY 2016 Baseline Spending

Based on statutory funding formulas and other obligations, FY 2016 Baseline spending is projected to be $9.45 billion, a $90 million, or a 1.0%, increase above FY 2015 prior to any potential spending associated with the K-12 inflation litigation.  The major adjustments are:

- Department of Education spending would increase by $181 million due to a 1.4% increase in student enrollment, base support level inflation increase of 1.6%, an increase in the state share of homeowner K-12 property taxes, and an offset from new construction property taxes.  Since charter school and special education pupils are a larger proportion of student growth (and are more expensive per student), the Baseline includes a higher cost per pupil.
- AHCCCS and Department of Health Services Medicaid spending would increase by $7 million, reflecting modest caseload growth and a 3% capitation rate increase offset by an increase in the federal matching rate.  Costs of Medicaid expansion authorized in the FY 2014 budget are primarily offset by the hospital assessment.
- The Department of Economic Security (DES) budget would also increase by $22 million for Developmental Disabilities Medicaid growth.
- Department of Corrections spending would increase $8 million to annualize the costs of opening 500 medium-security private beds and 500 maximum-security state-operated beds in the middle of FY 2015.  The Baseline excludes funding to address the recent prison health litigation settlement.
- One-time spending for capital, information technology and establishing the Department of Child Safety would not be repeated in FY 2016, reducing spending by $(86) million.

The $9.45 billion spending level would support a Full-Time Equivalent (FTE) Position ceiling of 50,733 state employees.

---

## Forecast Risks

As an estimate of state revenues and spending obligations, there are both positive and negative risks to the JLBC Baseline estimates.  Because small percent changes in growth assumptions can have a substantial impact – over 3 years, a 1% change in base revenue growth could change available revenues by $575 million through FY 2018 – these risks could significantly change the final results of these budgets.

The potential gains to the forecast include:

- Improving national economic recovery: The national economy has been improving since the second quarter of 2014.  Stronger economic growth, better job prospects, and an increase in consumer confidence could translate into increased net migration to the state, which would also result in more demand for housing and an overall boost to the Arizona economy and related revenue growth.
- The "windfall" from the sharp reduction in gasoline prices:  If gas prices remain at the current level for the next 12 months, it could free up an estimated $2 billion for Arizona households.  While consumers are likely to save part of this windfall, they will also spend of a portion of their gains.  Considering the volatility of energy prices, however, any related windfall in state revenues from such a shift in consumer spending should be regarded as one-time.

The potential losses to the forecast include:

- Uncertainty of international events: As Arizona's economy has become increasingly tied to the international economy, so has the potential for economic disruptions from global events.  Adverse weather events, terrorist actions, and a sluggish worldwide economic situation could dampen the economic recovery nationally and in Arizona.
- Litigation expenses:  Beyond the K-12 inflation litigation, the state faces other resolved and potential litigation impacts that have not been incorporated into the Baseline.  These impacts include the following:
  - Prison health care settlement (a potential $26 million impact).
  - Higher state employer contribution rates related to retirement litigation (a potential $2 million or $21 million impact, depending on whether higher rates are phased-in).
  - Hospital assessment litigation (a potential minimum impact of $64 million):  If the hospital assessment was eliminated, the state would at least have the cost of backfilling the assessment used to fund the mandatory Proposition 204 parents program.  The cost would be substantially higher if childless adults were retained on the program.

---

## JLBC Staff Suggested Budget Reforms and Process Improvements

Based on its review of agency requests in preparing this Baseline, the JLBC Staff has developed several suggestions to improve legislative oversight and transparency of government spending, including:

---

<u>Align Ongoing Revenues and Spending Over Several Years</u>:  While the state can operate with a structural shortfall in the short term if it has one-time balances, the current structural shortfall does not significantly shrink in subsequent years.  As a result, a fiscal policy goal should be to bring permanent revenues and expenditures into alignment.

<u>Develop Multi-Year Targets and Formalize in General Appropriation Act</u>:  The Legislature may not be able to eliminate the structural shortfall in a single year.  As a result, the JLBC Staff recommends that the General Appropriation Act include a multi-year plan for resolving budget shortfalls with specific out-year targets.

<u>Dedicate One-Time Revenues for One-Time Spending</u>:  The Legislature may want to consider whether to deposit one-time revenues into a new special initiatives fund for one-time purposes.  One-time revenues would include higher-than-expected General Fund balances and unusually large income tax collections from capital gains.  The latter would require developing a reporting mechanism for "excess" capital gain tax growth so as to permit the deposit of these monies into the one-time special initiatives fund.

While the tax base for most General Fund revenue categories is fairly stable over time, other revenue sources are inherently volatile.  For example, it is not unusual for capital gains and corporate income tax to grow at double-digit rates in one year only to be followed by double-digit rate declines in the next year.  Such large swings in revenue collections make the budgeting process more difficult.  One-time revenue windfalls can also come from non-recurring events such as the recent decline in gas prices.  Since energy prices can rise and fall in a short span of time, any revenue windfall associated with such shift in spending patterns is likely to be short-lived.

Voters in California recently approved a ballot measure ("Proposition 2") that requires the state to deposit any "excess" revenue from capital gains taxes into its Rainy Day Fund.  In addition, the state would deposit 1.5% of its General Fund revenue into the fund.  Half of the fund will remain in reserve while the other half will be used to buy down state debts, including unfunded retirement and operating loans.

<u>Better Tax Reporting</u>:  Estimating General Fund revenues is made more difficult by not having current information of tax credit usage.  The Baseline includes statutory provisions requiring more timely fiscal year tax credit reporting by the Department of Revenue and insurance premium tax reporting by the Department of Insurance.

<u>Annual Retirement Report</u>:  The current budget structure does not give a full picture of retirement expenditures by system, agency, and fund source.  The JLBC Staff recommends a new statutory report separately delineating the state's retirement expenses.  The JLBC Staff begins this initiative by incorporating a new section, the Consolidated Retirement Report, in the *FY 2016 Baseline Book* which provides this information.

<u>Review of Acute and Behavioral Health Services Integration</u>:  AHCCCS and the Department of Health Services have begun to implement smaller scale integration projects.  The JLBC Staff suggests that the Legislature evaluate accountability measures as it considers further consolidation of the acute and behavioral health services systems.

In addition to these items which affect overall budget or multiple agencies, the Baseline also includes these agency-specific suggestions:

- Contracted Health Care Rates (Arizona Department of Corrections): The Baseline includes a provision requiring increases in ADC contracted health per diem rates to be reviewed by JLBC, similar to the current process used in the Medicaid program.  In the past year, ADC raised contracted health per diem, which may have a budget impact.
- Divisional of Developmental Disabilities (DDD) Budget Transparency (Department of Economic Security): The Baseline separately delineates DDD administrative expenditures to help provide a total budget picture of DDD services.  These administrative expenditures had previously been displayed in DES' overall administrative costs.
- 1% Property Tax Cap Subsidy (Arizona Department of Education):  The Baseline delineates the state subsidy to local districts which exceed the 1% property tax cap; these costs are currently incorporated into a larger line item.  The Arizona Constitution prohibits homeowners from paying more than 1% of their assessed value in primary property taxes from all sources.  The Constitution does not specify the solution if a local jurisdiction exceeds 1%, but the state has effectively paid the difference.  The projected FY 2016 cost to the state is $28 million.
- Proposition 301 0.6% Sales Tax Planning (Arizona Department of Education):  The Proposition 301 sales tax expires after FY 2021.  The JLBC Staff recommends that the Legislature begin a planning process to accommodate this expiration.
- Intergovernmental Agreement Funding Transparency (Department of Health Services):  The Baseline includes a provision to divide DHS' Intergovernmental Agreements/Interagency Service Agreements Fund into 4 separate funds to ensure that monies are not inappropriately comingled.

- Probation and Automation Transparency (Judiciary):  The Baseline shifts funding within the Judiciary's budget in order to better align expenditures with appropriations and bring transparency to how much money the Judiciary transfers to counties for probation activities and how much money the Judiciary spends on other activities.
- Local K-12 Bonding Report (School Facilities Board):  The Baseline includes a provision requiring SFB to report annually on capital bond approvals by school districts to provide a better understanding of bond issuances and school construction occurring outside of state funding.
- University Tuition Collections:  Tuition collections are split between appropriated and non-appropriated amounts.  To increase transparency, the JLBC Staff recommends that tuition collections either be fully appropriated or fully non-appropriated.
- Displaying Rio Nuevo Expenditures (Revenues):  The Baseline shifts the display of Rio Nuevo expenditures from being an offset to General Fund revenue to being an operating budget expenditure, increasing transparency and conforming its display with that of the Phoenix Civic Center payment.

Further details on the issues raised here can be found in the relevant agency narrative.

## Debt

In FY 2016, the state's projected level of lease-purchase and bonding obligations is $7.5 billion.  This amount includes:

- $3.2 billion, state and university office buildings
- $1.7 billion, state highway construction projects
- $1.1 billion, school district projects
- $1.2 billion, state operating debt from FY 2011
- $260 million, Phoenix Convention Center

The associated annual debt service payment is $913 million.

Of the $7.5 billion in total obligations, the General Fund share is $2.8 billion.  The General Fund annual debt service is projected to be $365 million in FY 2016.

As a remnant of the Great Recession, the state pays $1.2 billion of current year obligations in the next year (the "rollover").  The $7.5 billion estimate of total obligations also does not include any unfunded retirement liability.

With both major credit rating agencies, Arizona has the fourth highest rating out of 10 possible levels (Standard & Poor's: AA- and Moody's: Aa3).  In comparison to other states, Arizona is tied for fourth worst, with only New Jersey, California and Illinois having a lower rating from both firms.  Along with an overall rating, credit agencies also provide an outlook in terms of the future direction of rating changes.  Both major agencies have a positive outlook for Arizona; while the rating is positive, that outlook was released a year ago.

## Other Funds

Besides the General Fund, the state has dedicated special revenue funds.  Only a portion of these monies is subject to legislative appropriation.  The Baseline includes a FY 2016 Other Fund appropriated spending level of $3.5 billion, or (0.8)% below FY 2015.

The level of FY 2016 non-appropriated state funds is expected to be $8.0 billion, while non-appropriated Federal Funds are forecast to be $12.3 billion.  When all appropriated and non-appropriated fund sources are combined, total FY 2016 state spending would be $33.2 billion.