**Christine K Wee – 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email**:** cwee@acluaz.org

**Joshua A. Block\***
**Leslie Cooper\***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*Admitted pro hac vice*

**Wesley R. Powell\***
**Matthew S. Freimuth\***
**Jordan C. Wall\***
**Justin Garbacz\***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
E-Mail: wpowell@willkie.com
E-Mail: mfreimuth@willkie.com
E-Mail: jwall@willkie.com
E-Mail: jgarbacz@willkie.com
*Admitted pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **Russell B. Toomey,**<br><br>                    Plaintiff,<br><br>          v.<br><br>**State of Arizona; Arizona Board of Regents, D/B/A University of Arizona**, a governmental body of the State of Arizona; et al.,<br><br>                    Defendants. | Case No.19-cv-00035-TUC-RM (LAB)<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Dr. Russell B. Toomey, on behalf of himself and the certified classes ("Plaintiff" or "Dr. Toomey"), submits the following Memorandum of Law in support of his Motion for Summary Judgment (the "Motion").   This Motion is accompanied by the Declaration of Russel B. Toomey, the Transmittal Declaration of Christine K. Wee and the exhibits thereto, and Plaintiff's LRCiv 56.1 Statement Of Fact ("PSOF").

## INTRODUCTION

The State of Arizona's ("Arizona" or the "State") self-funded health plan for State employees (the "Plan") categorically excludes coverage for any "gender reassignment surgery"[1] even when the surgery otherwise qualifies as "medically necessary" under the Plan's generally applicable standard.   On behalf of himself and the certified classes, Dr. Toomey seeks: (1) a declaration that the "Gender Reassignment Surgery" Exclusion (defined below in Background Section II.B) violates Title VII of the 1964 Civil Rights Act and the Equal Protection Clause of the Fourteenth Amendment and (2) an injunction barring Defendants from enforcing the "Gender Reassignment Surgery" Exclusion and requiring them to assess gender affirming surgeries for medical necessity in accordance with the Plan's generally applicable standards and procedures.

After nearly four years of discovery and motion practice, Dr. Toomey now seeks summary judgment to stop Defendants' ongoing and irreparable harm.   Because the "Gender Reassignment Surgery" Exclusion facially discriminates on the basis of sex and transgender status, and because Defendants' only justification for the Exclusion—cost control—fails to satisfy any standard of scrutiny, there are no triable questions of fact in this case, and Dr. Toomey and the Classes are entitled to judgment as a matter of law.

## BACKGROUND

## I.   GENDER DYSPHORIA AND GENDER AFFIRMING SURGERY

Dr. Toomey is a man who is transgender: he is a man with a male gender identity,

---

[1]   Plaintiff uses the term "gender reassignment surgery" to mirror the language of the Exclusion.   The more appropriate terminology for such surgery today is "gender confirming surgery," "transition related surgery," or "gender affirming surgery."

but the sex assigned to him at birth was female.  PSOF ¶ 1.[2]  Although being transgender is not a mental disorder, transgender men and women may require treatment for "gender dysphoria," a "serious but treatable medical condition" characterized by "[d]istress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2019) (quoting World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People 2 (7th ed. 2011) ("WPATH SOC")); PSOF ¶ 2.  The World Professional Association for Transgender Health ("WPATH") publishes widely accepted standards of care for treating gender dysphoria.  *Edmo*, 935 F.3d at 769, 788 n.16 (recognizing WPATH standards as "the internationally recognized guidelines for the treatment of individuals with gender dysphoria" and the "gold standard on this issue"); PSOF ¶ 3.  Under those standards, medically necessary[3] treatment for gender dysphoria may require steps to affirm one's gender identity and transition from living as one gender to another.  *Id*. ¶ 4.  This treatment may include hormone therapy, surgery, and other medical services.  *Id*.  For some individuals, "surgery is essential and medically necessary to alleviate their gender dysphoria."  *Edmo*, 935 F.3d at 770 (quoting WPATH SOC at 54); PSOF ¶ 5.

Today, transition-related surgical care is routinely covered by private insurance, and "[t]he weight of opinion in the medical and mental health communities agrees that [gender affirming surgery] is safe, effective, and medically necessary in appropriate circumstances." *Edmo*, 935 F.3d at 770; PSOF ¶ 7.  In order to narrow the issue in dispute in this litigation, the Parties have stipulated "that the medical necessity of gender affirming surgery will not

---

[2]   The facts in this section are drawn primarily from Plaintiff's expert report from Dr. Loren Schechter.  Wee Decl. Ex. 1.  Defendants did not designate an expert witness on these topics, leaving Dr. Schechter's testimony undisputed.

[3]   The medical community and insurers recognize a distinction between (i) medically necessary procedures, which are performed for the purpose of curing or preventing progression of a medical condition, and (ii) cosmetic procedures, which are not performed for a medical purpose.  PSOF ¶ 6.

be an issue in this case," and that "if it is determined that the exclusion violates Title VII or the Equal Protection Clause of the Fourteenth Amendment, the Plan will then need to determine medical necessity on a case by case basis."  PSOF. ¶ 8; Doc. 128 at 11:11-16.

## II.   THE STATE'S HEALTHCARE PLAN AND ITS EXCLUSION OF GENDER REASSIGNMENT SURGERY

### A.   The Plan And Its Administration

Arizona provides healthcare to State employees through a self-funded healthcare plan (the "Plan"). PSOF ¶ 9.  The Plan is "self-funded" by the State, meaning the State ultimately controls its design and which benefits it covers or excludes.  *Id*. ¶ 10.  The Plan is administered by the Arizona Department of Administration (the "ADOA").  *Id*. ¶ 11.  Healthcare policy decisions are customarily delegated to the Benefits Services Division, the sub-agency of the ADOA that is specifically tasked with maintaining and administering the State's Plan. *Id*. ¶ 12.  Substantive determinations regarding Plan design are typically made by administrative professionals at the ADOA.  *Id*. ¶¶ 12, 13.  ADOA also contracts with third-party administrators, such as Blue Cross Blue Shield ("Blue Cross"), which handle claims administration for State employees who are covered by the Plan.  *Id*. ¶¶ 14, 15.

The Plan generally provides coverage for medically necessary care, which is defined in the Plan as treatment that is

> 1. Ordered by a physician; 2. Not more extensive than required to meet the basic health needs; 3. Consistent with the diagnosis of the condition for which they are being utilized; 4. Consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; 5. Required for purposes other than the comfort and convenience of the patient or provider; 6. Rendered in the least intensive setting that is appropriate for their delivery; and 7. Have demonstrated medical value.

*Id*. ¶ 16.  When a claim is submitted, ADOA's third-party administrators are responsible for making an initial determination of whether the treatment is medically necessary under the Plan.  *Id*. ¶ 17.  If one of ADOA's third-party administrators denies coverage for a treatment based on purported lack of medical necessity, the Plan provides a right to appeal the decision to an independent reviewer and, if necessary, to further appeal to an external independent

4

review organization.  *Id*. ¶ 18.

The Plan covers far more than the bare minimum of what is legally required.  *Id*. ¶¶ 21, 22.  For example, the Plan covers many high-cost prescription drugs even when low-cost generic alternatives are available.  *Id*.  ADOA has also *added* coverage for previously excluded medical procedures once they became accepted by insurers as standard care, despite the cost increase associated with the expanded coverage.  *Id*. ¶ 23 (summarizing new benefits recently added to Plan).  For example, in 2014, the ADOA voluntarily added coverage for a new type of bariatric surgery for weight-loss, and in 2016 it added coverage for 3-D Mammography.  *Id*. ¶ 23(b)–(f).  Both procedures imposed some cost, and neither was required by law.  *Id*.  As another example, ADOA Plan Administrator Elizabeth Schafer testified that before her departure in 2018, ADOA added coverage for new hepatitis-C drug, which is "extremely expensive."  *Id*. ¶ 23 (g).

Before expanding coverage, Benefits Services Division professionals consider the projected cost increase of a benefit by looking to existing cost data from third-party administrators and other self-funded insurance providers who cover the procedure.  *Id*. ¶ 19.  When the projected cost is minimal or non-significant, that ordinarily weighs in favor of ADOA covering the proposed benefit.  *Id*. ¶ 20.

## B.    The "Gender Reassignment Surgery" Exclusion

The Plan's broad coverage of medically necessary care is subject to a list of discrete exclusions.  PSOF ¶ 24.  In one of those exclusions, the Plan categorically denies all coverage for "[g]ender reassignment surgery" regardless of medical necessity (the "'Gender Reassignment Surgery' Exclusion," or the "Exclusion").  *Id*. ¶ 25.  Under the Exclusion, transgender individuals are denied even the opportunity to demonstrate that their transition-related surgery is medically necessary under the Plan's generally applicable definitions and procedures.  *Id*. ¶ 26.

The "Gender Reassignment Surgery" Exclusion categorically denies coverage for procedures such as hysterectomies, chest surgery, vaginoplasties, and phalloplasties when performed for the purpose of "gender reassignment" even though the Plan covers similar or

identical surgical procedures used to treat other diagnoses, and which are otherwise covered under the Plan. *Id*. ¶¶ 25, 27. These procedures do not become more expensive simply because they are being performed for the purpose of treating gender dysphoria. *Id*. ¶ 29.

The original version of the Exclusion barred coverage for "transsexual surgery" and "medical or psychological counseling" and "hormonal therapy" attendant to such surgery (the "Prior Exclusion"). PSOF ¶ 31. Neither the Defendants nor any fact witnesses have been able to identify the rationale for the Prior Exclusion. *Id*. ¶ 32. In 2017, after decision-making that occurred in 2015-16 (*see infra* at Background Section II.C, D), the Exclusion was changed to its current language. *Id*. ¶ 54.

## C.  ADOA's Consideration of Whether to Remove the Exclusion in 2015-16

In 2015, in response to inquiries from State university employees and a proposed rule from the U.S. Department of Health and Human Services implementing Section 1557 of the Affordable Care Act, ADOA gathered information to address whether it should keep, remove, or modify the Prior Exclusion. PSOF ¶¶ 33, 34.

The results of ADOA's research were compiled into a comprehensive chart prepared by ADOA Plan Administrator Elizabeth Schafer, which incorporated input from other ADOA employees, including a cost analysis prepared by Finance Manager Kelly Sharritts (the "ADOA Research Summary"). *Id*. ¶¶ 36, 37. Summarizing available cost studies, the ADOA Research Summary concluded that ███████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ *Id*. ¶ 38 (emphasis added). Then, using available cost data, the ADOA Research Summary estimated that that ADOA would experience between ███████████ claims per year for "transgender coverage," and that the cost of covering the benefits would ███████████████████████████ *Id.* ¶ 39. ADOA employees deposed in this litigation, including Kelly Sharritts (who performed the cost analysis) agreed that in light of the Plan's size and the cost of other covered benefits, this estimated cost was insignificant. *Id*. ¶ 40 (ADOA witnesses describing estimated cost as "low," "miniscule" or "not significant"). No other cost assessment was performed by

ADOA in 2015 or 2016, and the ADOA Benefits Services Division Director in 2016, Marie Isaacson, agreed that there was no reason to doubt the accuracy of Ms. Sharritts' cost estimate, as reflected in the ADOA Research Summary. *Id*. ¶¶ 41, 42.

ADOA's internal cost projection was supported by external analysis that ADOA reviewed in 2015-16. *Id*. ¶ 43. For example, ADOA reviewed a cost report by the Williams Institute, which "support[ed] a very low utilization and cost associated with adding [the] benefit and [would have] no real impact" on the Plan. *Id*. ¶ 43(a). ADOA also gathered information from other states with employee health plans, which advised that covering gender affirming care did not significantly impact the finances of their healthcare plans. *Id*. ¶ 43(b). For example, the State of Washington reported to ADOA that in its experience, ███████████████████████████████████████████████████████ ██████████ *Id*. (emphasis added). The State of Colorado likewise indicated that it had experienced no cost increase associated with coverage of transgender benefits. *Id*.

Ms. Sharritts' estimate of immaterial cost is also bolstered by an expert witness report from Joan Barrett, a certified actuary who specializes in healthcare cost projection. *Id*. ¶ 44. Ms. Barrett reviewed the cost information collected by ADOA in 2015-16 and summarized in the ADOA Research Summary. *Id*. She testified that the cost increase associated with covering gender affirming surgery in 2016 was less than 0.1%, an "amount so small that it would be considered immaterial from an actuarial perspective," meaning that it would not impact the ordinary decision-making of a health insurance provider. *Id*. Defendants have not designated any expert witness to dispute Ms. Barrett's analysis.

### D.    Closed-Door Meeting With the Governor's Office

Despite its own findings that the costs of coverage would be immaterial, ADOA ultimately maintained its Exclusion after a closed-door meeting with the Arizona governor's office (the "Governor's Office") in the fall of 2016. PSOF ¶ 45. The meeting was attended by Marie Isaacson (the Director of ADOA Benefits Service Division in 2016), Christine Corieri (Healthcare Policy Advisor in the Governor's Office), and legal counsel. *Id*. ¶ 46. Ms. Isaacson testified that "[t]here wasn't really a discussion" at the meeting. *Id*. ¶ 47. Ms.

Isaacson did not provide a recommendation about whether ADOA should remove the Exclusion because she did not think the decision was hers to make. *Id*. ¶ 48.

After reviewing the advice of legal counsel, Ms. Corieri announced that ADOA would cover gender affirming hormones and counseling, but would continue to exclude gender affirming surgery. *Id*. ¶ 50. The decision was not based on cost, but on the purported conclusion that coverage was not legally mandated. *Id*. at ¶¶ 49, 51. Ms. Corieri testified at her deposition that she did not recall being presented with ADOA's cost analysis, and that she did not recall asking for or receiving any cost-assessment related to the Exclusion. *Id*. ¶ 52. After the closed-door meeting, Ms. Corieri approved the new language of the Exclusion on behalf of the Governor's Office. *Id*. ¶ 53. The Exclusion (as modified) went into effect for the 2017 Plan year. *Id*. ¶ 54.

As part of discovery, Dr. Toomey filed a motion to compel production of documents regarding the legal advice that formed the basis of ADOA's 2016 decision not to provide coverage for "gender reassignment surgery." Doc 195. After Defendants disclaimed reliance on any advice-of-counsel defense, this Court denied the motion to compel but precluded Defendants "from arguing that they held a good-faith subjective belief that their decision to maintain the exclusion for gender reassignment surgery was legal." Doc. 278.

When questioned about the circumstances surrounding the 2016 closed-door meeting, State witnesses testified that it was rare for the Governor's Office to be involved in Plan decisions. PSOF ¶ 55(a) (current Benefits Services Division Director Shannon confirming that it is "not very common" that he even meets with anyone in the Governor's Office); *see also id.* ¶ 55(b) (Plan Administration Manager Scott Bender unable to recall a single instance in which the Governor's Office was involved in a Plan change before the ADOA made a recommendation). ADOA's Lead Plan Administrator Yvette Medina only recalls two instances in which the Governor's Office proposed Plan language: "same-sex or domestic partners" and "the nondiscrimination transgender item." *Id.* ¶ 55(c).

**E.    ADOA Responds to Dr. Toomey's Lawsuit**

In response to Dr. Toomey's lawsuit, and at the request of Defendants' attorneys, ADOA's actuary, Michael Meisner, performed a new cost analysis regarding "transgender benefits" in 2019 (the "Meisner Analysis").  PSOF ¶ 56.  Meisner's 2019 analysis conflicts with ADOA's 2015-16 analysis, and predicts a higher cost increase.  *Id*. ¶ 57.  The Meisner analysis cites just two sources, including "cheatsheets.com," which Meisner found by searching yahoo.com.  *Id*. ¶ 58.

Joan Barrett, a certified actuary who specializes in healthcare cost projection, reviewed Mr. Meisner's 2019 analysis and concluded that it was "deeply flawed," "inconsistent with the [Actuarial Standards of Practice], as well as basic principles of estimation and statistics," and that it results in a "material overstatement of the cost for ADOA to cover gender reassignment surgery."  *Id*. ¶ 60.  Among other flaws, Ms. Barrett noted that Meisner's analysis (i) erroneously assumes that all transgender individuals would seek to have gender reassignment surgery every year, year after year; (ii) erroneously conflates utilization rate with the prevalence of transgender identity; and (iii) fails to consider publicly available data sources, which the ADOA had previously considered in 2016.  *Id*. ¶¶ 61, 62.  Ms. Barrett also notes that Mr. Meisner "misinterpret[ed] the sources he relied on," for example conflating average cost per claim with a quality-adjusted-life year (QALY), "an entirely different measurement."  *Id*. ¶ 63.  Defendants have not designated Mr. Meisner as an expert witness in this litigation or provided any other expert testimony to support his analysis.

## F.    Application of the "Gender Reassignment Surgery" Exclusion to Dr. Toomey.

Dr. Toomey is a tenured professor at the University of Arizona.  PSOF ¶ 64.  As an employee of the Arizona Board of Regents, Dr. Toomey receives healthcare through the State's self-funded Plan.  PSOF ¶ 65.  Although Dr. Toomey's medical providers have recommended for many years that he undergo a hysterectomy as medically necessary treatment for his gender dysphoria, Dr. Toomey did not feel that he had enough job security to challenge the "Gender Reassignment Surgery" Exclusion until he received tenure in 2017.

PSOF ¶ 66.  To comply with WPATH standards, Dr. Toomey obtained a letter of referral to undergo the hysterectomy from two licensed mental health professionals.  *Id*. ¶ 67.  Dr. Toomey then met with Dr. Tiffany Karsten, a surgeon who specializes in treating gender dysphoria who agreed that performing a hysterectomy was medically necessary.  *Id*. ¶ 68. But when Dr. Toomey's surgeon requested pre-authorization from Blue Cross Blue Shield— the third-party administrator for Dr. Toomey's Plan—it refused to pre-approve the procedure because "laparoscopic total hysterectomy with removal of tubes and ovaries surgery for a diagnosis of transsexualism and gender identity disorder is considered gender reassignment surgery, which is a benefit exclusion." *Id*. ¶ 69.[4]

At the time that Blue Cross denied preauthorization, Blue Cross—and all the other third-party administrators for the ADOA Plan—had adopted internal coverage guidelines recognizing hysterectomies and other gender affirming surgeries as medically necessary treatment for gender dysphoria.  *Id*. ¶ 71.  But for purposes of administering ADOA's Plan, the third-party administrators were required to deny Dr. Toomey's procedure pursuant to the "Gender Reassignment Surgery" Exclusion instead of applying their own internal coverage guidelines.  *Id*. ¶ 69.

## PROCEDURAL HISTORY

Dr. Toomey filed an Equal Employment Opportunity Commission ("EEOC") Charge against his employer on August 15, 2018, alleging sex discrimination under Title VII.  PSOF ¶ 72.  After receiving a right-to-sue notice from the EEOC, he filed this lawsuit on January 23, 2019.  *See generally* Doc. 1.

On December 23, 2019, this Court denied the State Defendants' motion to dismiss, finding that Dr. Toomey had adequately pled claims of unlawful discrimination under both

---

[4]  A representative from Blue Cross initially told Dr. Toomey's surgeon that hysterectomies do not require pre-authorization, but Dr. Toomey was concerned that the surgeon had been provided incorrect information and that he would ultimately be held financially responsible.  When Dr. Toomey called Blue Cross to clarify that the hysterectomy would be for the purpose of treating gender dysphoria, Blue Cross confirmed that the surgery would not be covered.  PSOF ¶ 70.

Title VII and the Equal Protection Clause.  Doc. 69.  In doing so, this Court rejected the Magistrate Judge's report and recommendation to dismiss Dr. Toomey's Title VII claim.

On June 15, 2020, this Court granted Dr. Toomey's motion for class certification. Doc. 108.  On September 1, 2020, Dr. Toomey filed a motion for preliminary injunction. Doc. 115.   On November 30, 2020, the Magistrate Judge issued a Report and Recommendation recommending denial of the motion for preliminary injunction (Doc. 134) (the "PI R&R").  The PI R&R found that Dr. Toomey had not met the heightened standard for a mandatory injunction, and that the Exclusion did not constitute facial discrimination on the basis of sex or transgender status under Title VII or the Equal Protection Clause.  *Id*. On February 26, 2021, this Court adopted the PI R&R but "only to the extent that it recommends denying the Motion for Preliminary Injunction on the grounds that Plaintiff has not met the heightened standard for obtaining mandatory injunctive relief," and otherwise rejected the PI R&R.  Doc. 162 at 11.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The opposing party may not rest upon the mere allegations or denials of the moving party's pleading, but must present significant and probative evidence to support its claim.  *Intel Corp. v. Hartford Accident & Indem. Co*., 952 F.2d 1551, 1558 (9th Cir. 1991).

## ARGUMENT

The undisputed facts unequivocally show that the "Gender Reassignment Surgery" Exclusion singles out gender affirming surgery for uniquely different treatment.  The Plan covers hysterectomies, vaginoplasties, phalloplasties, mastectomies, and mammoplasties when medically necessary to treat other conditions, but denies coverage for the same procedures when they are necessary to treat gender dysphoria.  *See supra* at Background Section II.B.  The plain terms of the "Gender Reassignment Surgery" Exclusion (which

refers to "gender" on its face) applies sex-based rules and enforces sex stereotypes that transgender people should maintain physical features consistent with their sex assigned at birth. Thus, the Exclusion violates Title VII under the controlling standard articulated in *Bostock v. Clayton Cty., Ga*., 140 S. Ct. 1731, 1742 (2020). The PI R&R's contrary conclusion that the Exclusion is facially neutral under *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), conflicts with this Court's ruling on the motion to dismiss and with the recognition of other courts that "*Geduldig*-based reasoning had no place in Title VII analysis." *Lange v. Houston Cnty., Ga.*, No. 5:19-CV-392 (MTT), 2022 WL 1812306, at *13 n.14 (M.D. Ga. June 2, 2022).

Because the Exclusion facially discriminates based on sex and transgender status, it also implicates heightened scrutiny under the Equal Protection Clause. The PI R&R's recommendation to the contrary conflicts with this Court's prior decision, which explicitly rejected the argument that the "Gender Reassignment Surgery" Exclusion merely "targets a 'service' rather than transgender individuals." Doc. 69 at 10-11. Moreover, although *Geduldig* applies to equal protection claims, the "Gender Reassignment Surgery" Exclusion is critically different from restrictions related to pregnancy or abortion. Unlike pregnancy and abortion, the "Gender Reassignment Surgery" Exclusion incorporates explicit sex classifications. *See Fain v. Crouch*, No. CV 3:20-0740, 2022 WL 3051015, at *14 (S.D.W.Va. Aug. 2, 2022); *Kadel v. Folwell*, No. 1:19CV272, 2022 WL 2106270 ("*Kadel II*"), at *21 (M.D.N.C. June 10, 2022); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999-1000 (W.D. Wis. 2018). And, unlike abortion or pregnancy, discrimination based on "gender reassignment" or gender dysphoria is facially discriminatory as a form of proxy discrimination under *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273–274 (1993), and *Davis v. Guam*, 932 F.3d 822, 837-838 (9th Cir. 2019).

The undisputed facts establish that the Exclusion does not survive heightened scrutiny—or even rational basis review. In response to this lawsuit, State Defendants have only offered one rationale for maintaining the sex-based discrimination enshrined in the Exclusion: cost containment. But cost containment is not recognized as a permissible basis

for sex-based line drawing. And, even it were, the record establishes that, at the time of the State's decision-making in 2016, the cost of covering gender affirming surgery was immaterial, which would ordinarily favor coverage, not exclusion. Moreover, the State's own witnesses have conceded that the Exclusion was *not* maintained because of cost. Because Defendants have failed to provide any explanation for treating the costs associated with transition-related surgery differently from the costs associated with other medically necessary treatments, Defendants' reliance on "cost control" fails even rational basis review. *See Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011).

## I. THE "GENDER REASSIGNMENT SURGERY" EXCLUSION VIOLATES TITLE VII.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. "Health insurance is a term, condition, or privilege of employment under Title VII." Doc. 69 at 7 (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983)). Discrimination based on transgender status violates Title VII "because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Bostock*, 140 S. Ct. at 1742; *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022).

To establish a claim for "disparate treatment" under Title VII, a plaintiff must show that the employer has "intentionally treat[ed] a person worse because of sex." *Bostock*, 140 S. Ct. at 1740. The undisputed facts establish that Dr. Toomey has met the *Bostock* standard. And Defendants' asserted rationale for the Exclusion does not provide a defense that can sustain their facially discriminatory policy. Further, contrary to the PI R&R's assumption, Dr. Toomey does not have to prove that "the Plan exclusion exists because the Plan authors do not like gender transition and have created this exclusion specifically to burden transgender individuals." PI R&R at 6.[5] An employer who "intentionally applies sex-based

---

[5] Although there is more than sufficient evidence for a reasonable factfinder to conclude that Defendants maintained the "Gender Reassignment Surgery" Exclusion because of

rules" necessarily engages in "intentional" discrimination, regardless of the employer's motivations or reasons for doing so. *Bostock*, 140 S. Ct. at 1745.

### A.   The Exclusion Facially Discriminates On The Basis Of Sex.

As virtually every other court to consider the question has recognized, excluding insurance coverage for medically necessary surgery because the surgery is performed for purposes of "gender reassignment" facially discriminates on the basis of "sex" in violation of Title VII and other civil rights statutes.[6]

By definition, excluding coverage for medically necessary surgery because the surgery is performed for the purposes of "gender reassignment" "unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock,* 140 S. Ct. at

---

dislike and disapproval of gender transition, Dr. Toomey does not seek summary judgment on that basis.

[6]   *See, e.g.*, *Fain v. Crouch*, No. CV 3:20-0740, 2022 WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022) (granting summary judgment for  Section 1557); *Kadel II*, No. 1:19CV272, 2022 WL 2106270, at *28 (granting summary judgment for Title VII); *Lange v. Houston Cnty., Ga.*, No. 5:19-CV-392 (MTT), 2022 WL 1812306, at *10 (M.D. Ga. June 2, 2022) (granting summary judgment for Title VII); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 589 (D. Md. 2021) (denying motion to dismiss for Section 1557); *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791, 797 (W.D. Wash. 2021) (denying motion to dismiss for Section 1557); *Kadel v. Folwell*, 446 F. Supp. 3d 1 (M.D.N.C. 2020) ("*Kadel I*") (denying motion to dismiss for Title VII); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020) (granting summary judgment for Title VII); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018) (denying motion to dismiss for Section 1557); *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) (granting summary judgment for Title VII and Section 1557); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931 (W.D. Wis. 2018) (issuing preliminary injunction for Title VII and Section 1557).

The two outlier exceptions to that consensus are the PI R&R in this case, which was rejected in relevant part by this Court (Doc. 162 at 11), and the decision in *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1044 (D. Ariz. 2021), which erroneously distinguished Title VII precedent from claims brought under Section 1557 of the Affordable Care Act. *But see Doe v. Snyder*, 28 F.4th 103, 113 (9th Cir. 2022) (affirming denial of preliminary injunction on other grounds but holding that the district court's reasoning was "based on an erroneous reading of *Bostock*").

1746.  "The characteristics of sex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them."  *Kadel I*, 446 F. Supp. 3d at 18 (M.D.N.C. 2020).   As this Court already held in denying the Defendants' motion to dismiss, the Exclusion treats Dr. Toomey in a manner that, but for his sex assigned at birth, would be different: "[H]ad Plaintiff been born a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery."  Doc 69 at 10; *accord Hammons*, 551 F. Supp. 3d at 591 (explaining that "gender dysphoria [is] a condition inextricably linked to being transgender," and plaintiff was denied a hysterectomy "specifically because it [is] linked to this condition").

The "Gender Reassignment Surgery" Exclusion also discriminates based on gender nonconformity and sex stereotyping, which—under *Bostock*—is another example of disparate treatment based on sex assigned at birth.   Discrimination based on gender nonconformity "penalizes a person identified as male at birth for traits or actions that [the employer] tolerates in an employee identified as female at birth," and vice versa.  *Bostock*, 140 S. Ct. at 1741.  As this Court already explained in denying the motion to dismiss, "[t]his narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity," which "implicates the gender stereotyping prohibited by Title VII."  Doc. 69 at 10-11;  *accord Boyden*, 341 F. Supp. 3d at 997 (explaining that excluding transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex"); *Kadel I*, 446 F. Supp. 3d at 14 ("By denying coverage for gender-confirming treatment, the Exclusion tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject.")[7]

---

[7]   For example, if Dr. Toomey had been assigned a male sex at birth and had been born with a uterus and fallopian tubes as a result of Persistent Mullerian Duct Syndrome ("PMDS"), the Plan would cover the medically necessary surgery to align his anatomy with his identity as a man.  Amended Complaint; Exhibit A, Doc. 86-1 at 55 (exclusion of coverage for "cosmetic surgery" does not exclude "necessary care and treatment of medically diagnosed congenital defects and birth abnormalities" or "surgery required to

1
2

**B.      The PI R&R Erred in Concluding that the Exclusion Is Facially Neutral Under Gilbert.**

3

4

Against the overwhelming weight of authority, and the Court's prior reasoning in its motion to dismiss, the PI R&R concluded that the Exclusion was facially neutral.  Doc 134 (the "PI R&R").  To reach that conclusion, the PI R&R relied on *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), which held that discrimination based on pregnancy is not discrimination based on sex under Title VII.  The PI R&R reasoned that, under *Gilbert*, discrimination based on pregnancy is not sex discrimination because "while all pregnant people are women, not all women become pregnant." PI R&R at 5.  The PI R&R concluded that "[t]his case is similar" because "while all persons seeking gender transition surgery are transgender, not all transgender persons seek gender transition surgery."  *Id*.  Although Congress subsequently overruled *Gilbert* by passing the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), the PI R&R stated that the *Gilbert* Court's underlying method of "analysis . . . is still controlling." *Id*. at 5 n.2.

5

6

7

8

9

10

11

12

13

14

15

That was error.  When Congress overruled *Gilbert*, "it unambiguously expressed its disapproval of both the holding *and the reasoning* of the Court in the *Gilbert* decision." *Newport News*, 462 U.S. at 678 (emphasis added).  "The House Report stated, 'It is the Committee's view that the dissenting Justices correctly interpreted the Act.'  Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they 'correctly express both the principle and the meaning of [T]itle VII.'" *Id*. at 678-679 (footnotes omitted).  Because Congress abrogated the holding *and the reasoning* of *Gilbert*, *Bostock*—not *Gilbert*—sets the "controlling" analysis.  *See Lange*, 2022 WL 1812306, at *13 n.14 (applying *Geduldig* to equal protection claim but refusing to apply *Gilbert* to Title VII claim because Congress "not only overturned *Gilbert*, but it also made clear that its *Geduldig*-

16

17

18

19

20

21

22

23

24

25

26

27

28

repair bodily damage a person receives from an injury").  But because Dr. Toomey was assigned a female sex at birth, his surgery to align his anatomy with his identity as a man is excluded as "gender reassignment."

based reasoning had no place in Title VII analysis").[8]

*Bostock* makes clear why *Gilbert*'s reasoning has no application here.  The PI R&R concluded that the Exclusion "is not, on its face, discrimination on the basis of sex" because it "only applies to natal females who seek a hysterectomy for the purpose of gender transition. The exclusion discriminates against some natal females but not all."  PI R&R at 8.  That is precisely the argument repudiated by *Bostock* itself, which emphasized that "[Title VII] focuses on discrimination against individuals, not groups."  140 S. Ct. at 1745.  Under *Bostock*, "[i]t's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall.  The employer is liable for treating this woman worse in part because of her sex."  *Id.* at 1741.  Similarly, discriminating against transgender men does not discriminate against *all* people with a female sex assigned at birth, but just the subset of people who were assigned a female sex at birth and have a male gender identity.  Under *Bostock*, however, discrimination against a transgender man still violates Title VII because it treats that person in a manner that, but for his sex assigned at birth, would be different. The same is true here.  The Exclusion does not harm every person with a female sex assigned at birth or every person with a male gender identity, but every individual harmed by the Exclusion is still harmed based on the incongruity between their sex assigned at birth and their gender identity.

Similarly, the Exclusion facially discriminates based on transgender status even

---

[8]  The PI R&R cited *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 943 (8th Cir. 2007), and *Coleman v. Bobby Dodd Inst., Inc.*, No. 4:17-CV-29, 2017 WL 2486080, at *2 (M.D. Ga. June 8, 2017), but neither case purported to apply *Gilbert*'s reasoning.  To the contrary, *Coleman* specifically recognized that the plaintiff might have been able to state a claim if she had alleged that Defendants had "treat[ed] a uniquely feminine condition, such as excessive menstruation, less favorably than similar conditions affecting both sexes, such as incontinence." 2017 WL 2486080, at *2.  Similarly, the court in *In re Union* held that excluding coverage for contraception is nondiscriminatory if a policy excludes all contraception treatments for both men and women; the court did not hold that Title VII allowed employers to exclude coverage for a condition unique to a particular sex.  479 F.3d at 944-945.

17

though (as the PI R&R noted) it harms just a subset of transgender "persons seeking gender reassignment surgery" and not all "transgender people in general."  PI R&R at 5.  Under *Bostock*, when a particular transgender individual is denied coverage under the Exclusion, that individual has been discriminated against because of their sex in violation of Title VII even if other transgender people are not harmed.  *See Lange*, 2022 WL 1812306, at *11 (rejecting argument that policy was facially neutral under Title VII because it discriminates against only the subset of transgender people who need transition-related surgery); *Boyden* 341 F. Supp. 3d at 996 ("[T]he Exclusion need not injure all members of a protected class for it to constitute sex discrimination.").

Moreover, the fact that the Plan covers *other* treatments for gender dysphoria does not make the "Gender Reassignment Surgery" Exclusion facially neutral.  Courts have repeatedly rejected the identical argument. *See Fain*, 2022 WL 3051015, at *7 (rejecting argument that surgery exclusion is not facially discriminatory because other gender dysphoria treatments are covered); *Lange*, 2022 WL 1812306, at *13 (rejecting defendants' argument that surgery exclusion is not facially discriminatory because "the plan covers some treatment relating to [plaintiff's] transgender status"); *contra* PI R&R at 6 (appearing to accept the argument rejected in *Lange*).  "An employer that offers one fringe benefit on a discriminatory basis cannot escape liability because he also offers other benefits on a nondiscriminatory basis." *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Compen. Plans v. Norris*, 463 U.S. 1073, 1081 n.10 (1983).

## C.   Defendants' Purported Cost Rationale Is Not a Defense Under Title VII.

Defendants only assert one alleged rationale for maintaining the "Gender Reassignment Surgery" Exclusion: cost control.  But "cost savings cannot justify a facially discriminatory policy."  *Lange*, 2022 WL 1812306, at *13 n.15 (citing *Manhart*, 435 U.S. at 717) ("[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII."); *see also Newport News*, 462 U.S. at 685 n.26 ("[No cost justification] is recognized under Title VII once discrimination has been shown.").  Even if cost savings

could justify a discriminatory policy, the record establishes that the cost of providing coverage would have been immaterial.  *Supra* at Background Sections II.C, D, E.  Because Defendants have no legal defense for their facially discriminatory policy, Dr. Toomey and the Class are entitled to judgment as a matter of law.

## II.   THE "GENDER REASSIGNMENT SURGERY" EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE.

The "Gender Reassignment Surgery" Exclusion also violates the Equal Protection Clause of the Fourteenth Amendment.  As discussed below, the Exclusion facially discriminates on the basis of sex and transgender status, automatically triggering heightened scrutiny under the Equal Protection Clause.  The State Defendants' proffered cost rationale for the "Gender Reassignment Surgery" Exclusion fails to satisfy heightened scrutiny—or even rational basis review.

### A.   The Exclusion Facially Discriminates Based On Sex and Transgender Status.

When the government draws distinctions based on quasi-suspect classifications such sex or transgender status, those distinctions are subject to heightened scrutiny under the Equal Protection Clause.  *See Snyder*, 28 F.4th at 113. "[P]laintiffs challenging policies that facially discriminate on the basis of sex [or transgender status] need not separately show either 'intent' or 'purpose' to discriminate."  *Latta v. Otter*, 771 F.3d 456, 481 (9th Cir. 2014) (Berzon, J., concurring); *accord Shaw v. Reno*, 509 U.S. 630, 642 ("No inquiry into legislative purpose is necessary when the [suspect or quasi-suspect] classification appears on the face of the statute.").

For all the same reasons that the "Gender Reassignment Surgery" Exclusion discriminates on the basis of sex and transgender status under Title VII, it also discriminates based on sex and transgender status under the Equal Protection Clause.[9]  As this Court

---

[9]   *See, e.g.*, *Fain*, 2022 WL 3051015, at *8 (granting summary judgment for equal protection claim); *Kadel*, 2022 WL 2106270, at *17-18 (same); *Boyden*, 341 F. Supp. 3d at 1001 (same); *Flack*, 328 F. Supp. 3d at 931 (issuing preliminary injunction for equal protection claim).

explained, the Exclusion "is directly connected to the incongruence between Plaintiff's natal sex and his gender identity . . . which transgender individuals by definition experience and display." Doc. 69 at 10-11. In reaching that conclusion, this Court explicitly rejected the argument that the "Gender Reassignment Surgery" Exclusion merely "targets a 'service' rather than transgender individuals": "[T]ransgender individuals are the only people who would ever seek gender reassignment surgery. No cisgender person would seek, or medically require, gender reassignment. Therefore, as a practical matter, the Exclusion singles out transgender individuals for different treatment." *Id*. at 11.

This Court's conclusion is consistent with the overwhelming majority of courts inside and outside the Ninth Circuit. For example, Judge Soto in *D.T. v. Christ*, 552 F.Supp.3d 888 (D. Ariz. Aug. 5, 2021), recently held that a policy requiring people to undergo a "sex change operation" to change their birth certificates facially discriminated based on transgender status. As *D.T.* explained, "[w]hile the statute and regulation do not explicitly use the phrase 'transgender' or explicitly state that these laws are aimed directly at 'transgender' people, any logical reading of the statute and regulation reflects that it applies nearly exclusively to transgender people; who else is going to voluntarily seek out a 'sex change operation?'" *Id.* at 895-96; *accord Morris v. Pompeo*, No. 219-CV-00569-GMN-DJA, 2020 WL 6875208, at *7 (D. Nev. Nov. 23, 2020) ("Any person who has undergone a 'gender transition' to a new gender is, by definition, transgender."); *Stone v. Trump*, 356 F. Supp. 3d 505, 513 (D. Md. 2018) (discrimination based on gender "transition clearly discriminates on the basis of transgender identity").

**B.    The PI R&R Erred in Concluding that the Exclusion Is Facially Neutral Under *Geduldig*.**

Instead of following the Court's prior ruling with respect to the motion to dismiss, and without acknowledging contrary authority, the PI R&R adopted a theory that had not been briefed by either party and concluded that the "Gender Reassignment Surgery" Exclusion was facially neutral under *Geduldig v. Aiello*, 417 U.S. 484 (1974). In that case, the Supreme Court held that discrimination on the basis of pregnancy is not discrimination

on the basis of sex because not all women are pregnant.  *See id.* at 496-97.  The Supreme Court recently cited *Geduldig* with respect to the Equal Protection Clause, finding that the "regulation of abortion is not a sex-based classification and is thus not subject to [] heightened scrutiny[.]"  *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022) (quoting *Geduldig*, 417 U.S. at 496, n.20).

But the "Gender Reassignment Surgery" Exclusion is critically different from restrictions related to pregnancy or abortion, and constitutes a sex-based classification that triggers heightened scrutiny, for at least four reasons.  *First*, unlike pregnancy and abortion, the "Gender Reassignment Surgery" Exclusion incorporates explicit sex classifications.  *See Fain*, 2022 WL 3051015, at *8 (rejecting argument that exclusion of treatments for gender dysphoria are facially neutral under *Geduldig*); *Kadel II*, 2022 WL 3226731, at *20 (same); *Boyden*, 341 F. Supp. 3d 979, 999-1000 (same); *but see Lange*, 2022 WL 1812306, at *10. As these courts have explained, "even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria, it would still receive intermediate scrutiny" because "one cannot explain gender dysphoria without referencing sex." *Kadel II*, 2022 WL 2106270, at *20; *Kadel I*, 446 F. Supp. 3d at 18 ("[T]he diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned *sex* and *gender* identity."  (emphasis in original)).

*Second*, the "Gender Reassignment Surgery" Exclusion does not merely "regulat[e] a medical procedure that only [transgender people] can undergo."  *Dobbs*, 142 S. Ct. at 2245-46.  The Plan provides coverage for the same surgeries when used to treat medical conditions experienced by cisgender people, but denies coverage for the same procedures when provided for "gender reassignment."  As this Court previously recognized, "had Plaintiff required a hysterectomy for any medically necessary purpose other than gender reassignment, the Plan would have covered the procedure. This narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity."  Doc. 69 at 10.  The Exclusion thus explicitly denies coverage to transgender people that the Plan provides to cisgender

people—and does so based on criteria directly connected to their transgender status.

*Third*, unlike abortion or pregnancy, discrimination based on "gender reassignment" or gender dysphoria is facially discriminatory as a form of proxy discrimination. The Supreme Court has stated that "the goal of preventing abortion does not constitute 'invidiously discriminatory animus' against women." *Dobbs*, 142 S. Ct. at 2246 (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273–274 (1993)). But the Court has simultaneously recognized that—unlike abortion—"[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews." *Bray*, 506 U.S. at 270. In accordance with *Bray*, Ninth Circuit precedent recognizes that "[p]roxy discrimination is a form of facial discrimination" that "arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019). Thus, when a "defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group," the discrimination is treated as a facial classification. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013).[10]

Just as a tax on wearing yarmulkes is a tax on Jews, discrimination against "gender reassignment" and gender dysphoria is a proxy for discrimination against transgender people. Indeed, ADOA personnel routinely described the excluded treatments as "transgender benefits" or "transgender coverage" during their 2016 discussions regarding

---

[10]  Supreme Court and Ninth Circuit precedent recognizing "proxy discrimination" remain good law following the Supreme Court's decision in *Marietta Memorial Hospital Employee Health Benefit Plan v. DaVita Inc.*, which rejected a "proxy discrimination" theory when applying a "coordination-of-benefits statute" but confirmed that "proxy discrimination" applies to "traditional antidiscrimination statute[s]." 142 S. Ct. 1968, 1974 n.2 (2022).

whether to maintain the Exclusion.  PSOF ¶ 35.  And despite the PI R&R's assumption to the contrary, there is no general rule that a discriminatory policy must affect every member of a group in order to constitute facial discrimination.  In fact, Supreme Court precedent says the opposite.  *Rice v. Cayetano*, 528 U.S. 495, 516-17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *Nyquist v. Mauclet*, 432 U.S. 1, 8 (1977) (rejecting argument that law was facially neutral with respect to alienage because it applied only to a subset of resident aliens).  Thus, a tax on yarmulkes is a tax on Jews even though not every Jew wears a yarmulke, and discrimination based on "gender reassignment" is discrimination against transgender people even though not every transgender person undergoes gender affirming surgery.

*Fourth*, the "Gender Reassignment Surgery" Exclusion also facially discriminates based on gender nonconformity and sex stereotypes, which independently constitutes sex discrimination under the Equal Protection Clause.  Excluding coverage for transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex." *Boyden*, 341 F. Supp. 3d at 997; *accord* Doc. 69 at 10-11; *Kadel I*, 446 F. Supp. 3d at 14 ("[T]he Exclusion tethers [transgender persons] to sex stereotypes which, as a matter of medical necessity, they seek to reject.")  Heightened scrutiny therefore applies.

### C.    The Exclusion Does Not Survive Heightened Scrutiny

Defendants bear the burden of proving that the Exclusion serves an important governmental interest and "that the discriminatory means employed" "are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).  "Moreover, the classification must substantially serve an important governmental interest today, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Id.* (quoting *Obergefell v. Hodges*, 576 U.S. 644, 647 (2015)).  "The burden of justification is demanding and it rests entirely on the [government]." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

23

In response to Plaintiff's lawsuit, State Defendants have offered one purported State interest for maintaining the Exclusion: cost control.  PSOF ¶ 74.  But the Supreme Court has been clear that cost control can never be a sufficient reason to "justify a gender-based discrimination in the distribution of employment-related benefits" under heightened scrutiny.  *Califano v. Goldfarb*, 430 U.S. 199, 217 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 647 (1975).  "[A] State may not protect the public fisc by drawing an invidious distinction between classes of its citizens" rather the State must do more than show that a policy "saves money."  *Meml. Hosp. v. Maricopa County*, 415 U.S. 250, 263 (1974).

Even if cost control were a constitutionally adequate justification, the justification must be genuine, rather than a hypothesized or *post hoc* justification created in response to litigation.  *Virginia*, 518 U.S. at 533.  Yet the State's own witnesses admitted that the cost of coverage was *not* the actual reason for ADOA's decision to maintain the Exclusion in 2016.[11]  *Supra* at Background Section II.C, D.  ADOA's 2016 cost analysis, as reflected in the ADOA Research Summary, showed that the cost of covering gender affirming surgery would be minimal, which for any other treatment, would have favored coverage under ADOA's usual practice.  *Supra* at Background Section II. A, C.  This is substantiated by Joan Barrett, a healthcare actuary who reviewed the cost information that was available to ADOA in 2016, and confirmed that the projected cost increase posed by covering gender reassignment surgery was less than 0.1%, "an amount so low that it would be considered immaterial from an actuarial perspective."  *Supra* at Background Section II.C.  The State has offered no rebuttal to Ms. Barrett's thorough and peer-reviewed report.  And the ADOA's own witnesses concede that the cost of coverage was so low that it would not "have mattered" in the decision-making process (PSOF ¶ 40(d)), and that cost was not what drove

_____

[11]  State Defendants made the final decision to maintain the Exclusion in 2016.  *Supra* at Background Section II.D.  The 2019 Meisner Analysis—which is "deeply flawed" according to Ms. Barrett's unrebutted expert testimony (*supra* at Background Section II.B)—constitutes a post-hoc justification, "invented in response to litigation," and does not create a material issue of fact as to the State's rationale for maintaining the Exclusion in 2016.  *See Virginia*, 518 U.S. at 533.

1   the decision to maintain the Exclusion.  *Supra* at Background Section II.C, D.

2        **D.**    **The Exclusion Does Not Survive Even Rational Basis Review**

3        Even if the "Gender Reassignment Surgery" Exclusion were considered to be facially

4   neutral, it would still fail rational basis review.  When a plaintiff "has been intentionally

5   treated differently from others similarly situated and that there is no rational basis for the

6   difference in treatment" the differential treatment violates equal protection regardless of the

7   defendants' "subjective motivation."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65

8   (2000).  The government may not reduce costs by arbitrarily discriminating between two

9   similarly situated groups.  *See Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (costs

10  concerns cannot justify denying insurance coverage to same-sex couples under rational basis

11  review).  As this Court previously held, "[l]imiting health care costs is a legitimate state

12  interest, but that interest cannot be furthered by arbitrary classifications."  Doc. 69 at 16.

13       The State has failed to provide any rational explanation for treating the costs

14  associated with transition-related surgery differently from the costs associated with other

15  medically necessary treatments.  "[T]here is no evidence in the record to show that surgeries

16  to treat gender dysphoria are any more or less costly than those similar surgeries to treat

17  other diagnoses."  *Fain*, 2022 WL 3051015, at *5; PSOF ¶ 29.  Indeed, the record reveals

18  that the costs associated with coverage of gender reassignment surgery in 2016 were—

19  according to ADOA's own cost assessment—immaterial.  *Supra* at Background Section II.

20  C.  An immaterial projection of cost by ADOA's administrative professionals normally

21  favors coverage, not exclusion.  *Supra* at Background Section II.A.  And ADOA has added

22  coverage for other procedures, despite the cost-increase associated with them.  *Id*.  ADOA's

23  arbitrary Exclusion fails even rational basis review.

                                                 **CONCLUSION**

25       Plaintiff's Motion for Summary Judgment should be granted.

26       Respectfully submitted this 26th day of September, 2022.

ACLU FOUNDATION OF ARIZONA

By /s/ *Christine K. Wee*
Christine K. Wee
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block*
Leslie Cooper*
125 Broad Street, Floor 18
New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell*
Matthew S. Freimuth*
Jordan C. Wall*
Justin Garbacz*
787 Seventh Avenue
New York, New York 10019

*Admitted pro hac vice

*Attorneys for Plaintiff Russell B. Toomey and the certified classes*

1

2

**CERTIFICATE OF SERVICE**

3         I hereby certify that on September 26, 2022, I electronically transmitted the attached

4    document to the Clerk's office using the CM/ECF System for filing. Notice of this filing

5    will be sent by email to all parties by operation of the Court's electronic filing system.

6

7                             */s/ Christine K. Wee*

                              Christine K. Wee

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28