**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail:jblock@aclu.org
E-Mail: lcooper@aclu.org

*Admitted Pro hac vice

**Wesley R. Powell***
**Matthew S. Freimuth***
**Jordan C. Wall***
**Justin Garbacz***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: wpowell@willkie.com
E-Mail: mfreimuth@willkie.com
E-Mail: jwall@willkie.com
E-Mail: jgarbacz@willkie.com

*Admitted Pro hac vice

*Attorneys for Plaintiff Russell B. Toomey*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

**Russell B. Toomey**,

        Plaintiff,

v.

**State of Arizona; Arizona Board of Regents, D/B/A University of Arizona**, a governmental body of the State of Arizona; et al.,

        Defendants.

4:19-cv-00035-TUC-RM (LAB)

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dr. Russell B. Toomey on behalf of himself and the certified Classes ("Plaintiff" or "Dr. Toomey"), pursuant to LRCiv 56.1, submits the following statement of undisputed material facts (the "PSOF") in support of his Motion for Summary Judgment (the "Motion"). This PSOF and the Motion are accompanied by the Declaration of Dr. Russell B. Toomey (the "Toomey Decl."), Transmittal Declaration of Christine K. Wee (the "Wee Decl."), and the exhibits thereto.

## I.     GENDER DYSPHORIA AND GENDER AFFIRMING SURGERY

1. Dr. Toomey is a man who is transgender: he is a man with a male gender identity, but the sex assigned to him at birth was female. Toomey Decl. ¶ 5.

2. Many transgender individuals experience gender dysphoria, a serious medical condition recognized by the International Classification of Diseases-10 ("ICD-10") and the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") published by the American Psychiatric Association. Individuals diagnosed with gender dysphoria have an intense and persistent discomfort with the primary and/or secondary sex characteristics of the sex they were assigned at birth. Wee Decl., Ex. 1 (Schechter expert report) at ¶¶ 20-21.

3. The World Professional Association for Transgender Health ("WPATH") publishes

widely-accepted standards of care for treating gender dysphoria.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 22.

4. Under the WPATH standards, medically necessary treatment for gender dysphoria may require steps to affirm one's gender identity and transition from living as one gender to another.  This treatment may include hormone therapy, surgery and other medical services.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 23.

5. Under the WPATH standards, surgery is often the last and most considered of the treatment options for gender dysphoria.  Evidence shows that while some transgender individuals do not require surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 29.

6. The medical community and insurance providers recognize a distinction between a surgery that is medically necessary and a cosmetic surgery, which generally is not. Medically necessary surgery is performed for medical conditions with the goal of either curing or preventing progression of medical conditions.  Medically necessary surgery can also include reconstructive surgery to repair injuries or to address a congenital condition.  No particular procedure is inherently cosmetic or inherently medically necessary; rather, the underlying diagnosis determines whether the procedure is considered cosmetic or medically necessary.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 32.

7. Gender affirming surgery is safe, effective, and medically necessary in appropriate circumstances.  Wee Decl., Ex. 1 (Schechter expert report) at ¶¶ 23; 29.

8. In order to narrow the issues in dispute in this litigation, the Parties have stipulated that "the medical necessity of gender affirming surgery will not be an issue in this case," and that "if it is determined that the exclusion violates Title VII or the Equal Protection Clause of the Fourteenth Amendment, the Plan will then need to determine medical necessity on a case by case basis."  Doc 128 (Joint Status Report

submitted on October 23, 2020) at 11:11-16.

## II.    THE STATE'S HEALTHCARE PLAN AND ITS EXCLUSION OF GENDER REASSINGMENT SURGERY

### A.    The Plan and Its Administration

9.  Arizona provides healthcare to State employees through a self-funded healthcare plan (the "Plan").   Doc. 89 (Answer to Am. Compl.) at 2:13-18 ("The State Defendants admit the State of Arizona provides health insurance coverage to State of Arizona employees through a self-funded health plan administered by the Arizona Department of Administration.").

10. The Plan is "self-funded" by the State, meaning the State controls the plan design and contribution strategy.  Doc. 89 (Answer to Am. Compl.) at 23:3-6 ("The State Defendants admit Ariz. Admin. Code R2-6-103(A) provides, 'Within the limits prescribed by law, the Director [of ADOA] shall determine the type, structure, and components of the insurance plans made available by the Department.'").[1]

11. The Plan is administered by the Arizona Department of Administration (the "ADOA").  Doc. 89 (Answer to Am. Compl.) at 2:13-18, 23:3-6.

12. Healthcare policy decisions are customarily delegated to the Benefits Services Division, a sub-agency of the ADOA that is specifically tasked with maintaining and administering the State's Plan.  Doc. 89 (Answer to Am. Compl.) at 23:13-18 (admitting that director of Benefits Services Division "has certain oversight and responsibility for administering the benefits insurance programs for State employees"); Doc. 86-1 (2018 EPO Plan) at pg. 79[2] § 13.1 (describing "Plan Sponsor's Responsibilities," including "[e]stablishing the policies, interpretations,

---

[1]   Employer healthcare plans are typically either "fully-insured" or "self-funded."  For an overview of the distinction between fully-insured and self-funded plans, *see generally* https://www.hfbenefits.com/sites/default/files/fully-insured-vs-self-funded.pdf.

[2]   When citing to Doc 86-1 (2018 EPO Plan), page number citations refer to the ECF generated page number, located at the top of the page.

practices and procedures of this Plan and issuing interpretations thereof"), pg. 110 § 17 (defining Plan Sponsor as the "Benefits Services Division of the [ADOA]"); Wee Decl., Ex. 3 (Brown Depo. Tr.) at 88:3-90:1.

13. Substantive determinations regarding Plan design are typically made by administrative professionals at the ADOA.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 21:19-22:2.

14. ADOA also contracts with third party administrators, such as Blue Cross Blue Shield of Arizona ("Blue Cross"), which handle claims administration for State employees covered by the Plan. Wee Decl., Ex. 5 (Shannon Depo. Tr.) at 38:4-39:25 (referring to third-party administrators as "carriers"); Doc. 86-1 (2018 EPO Plan) at pg. 69 § 12.1; 12.2.

15. In 2018, ADOA's third-party administrators were: United Health Care, Blue Cross, Aetna, and Cigna.  Doc. 89 (Answer to Am. Compl.) at 12:7-13; Wee Decl., Ex. 5 (Shannon Depo. Tr.) at 40:6-13.

16. The Plan generally provides coverage for medically necessary care, which is defined in the Plan as treatment that is:

    1. Ordered by a physician;

    2. Not more extensive than required to meet the basic health needs;

    3. Consistent with the diagnosis of the condition for which they are being utilized;

    4. Consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America;

    5. Required for purposes other than the comfort and convenience of the patient or provider;

    6. Rendered in the least intensive setting that is appropriate for their delivery; and

    7. Have demonstrated medical value.

Doc. 86-1 (2018 EPO Plan) at pg. 103 § 17 (defining "Medically Necessary"); Doc. 89 (Answer to Am. Compl.) at 12:22-13:7.

17. When a claim is submitted, ADOA's third-party administrators are responsible for making an initial determination of whether the treatment is medically necessary under the Plan.  Doc. 86-1 (2018 EPO Plan) at pg. 69 § 12.1 ("The Plan Sponsor delegates to the Third Party Claim Administrator the discretionary authority to apply Plan terms and to make factual determinations in connection with its review of claims under the Plan.").

18. In the event a third-party administrator denies coverage for a treatment because it is deemed to be not medically necessary, Sections 12.9 and 12.10 of the Plan provide a right to appeal the third-party administrator's decision to an independent reviewer, and, if necessary, a right to further appeal to an external independent review organization.  Wee Decl., Doc. 86-1 (2018 EPO Plan) at pg. 72-77 §§ 12.9; 12.10.

19. Before expanding coverage to new benefits, Benefits Services Division professionals consider the projected cost increase of expanded coverage by looking to existing cost data from third-party administrators and other self-funded insurance providers that provide such coverage.  Wee Decl., Ex. 6 (Meisner  Depo. Tr.) at 109:21-110:1; *id*., Ex. 7 (Isaacson Depo. Tr.) at 110:2-9; *id.*, Ex. 4 (Schafer Depo. Tr.) at 83:7-10, 120:4-18.

20. When a benefit's projected cost is minimal or non-significant, that ordinarily weighs in favor of ADOA covering the proposed benefit.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 120:4-18.

**B.      The Plan Covers Services That Are Not Mandated By Law**

21. ADOA does not have a policy of only covering benefits that are mandated by law.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 218:20-219:6; *Id*., Ex. 7 (Isaacson Depo. Tr.) at 41:1-13.

22. The Plan covers a wide array of procedures and services, including ones that are not legally required.  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 41:14-17; *id.*, Ex. 4 (Schafer Depo. Tr.) at 43:17-19.  For example:

a.   The Plan covers accidental dental care, which ADOA is not required to cover. Doc. 86-1 (2018 EPO Plan) at pg. 36 § 8.21; Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 44:17-22.

b.   The Plan covers chiropractic and osteopathic services, which it is not required to cover.  Doc. 86-1 (2018 EPO Plan) at pg. 35 § 8.17; Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 42:18-25.

c.   The Plan voluntarily covers expensive, brand-name prescription drugs, even when cheaper generic alternatives are available.  Doc. 86-1 (2018 EPO Plan) at pg. 52-57 § 9.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 47:7 - 51:19 (testifying that ADOA voluntarily covers most prescription drugs, including brand name drugs, even when coverage is not mandated and when generic alternatives are available) (stating that unlike other self-funded plans, that cover only a minimal amount of prescription drugs, "ADOA's [P]lan is very generous on the types of mediation they cover"); *Id.*  Ex. 8 (Bender Depo. Tr.) at 82:24-83:7 (testifying that "specialty drugs" have "become an extremely expensive part of the [Plan].").

23. The ADOA has added coverage for new medical services, despite the cost increase associated with coverage.  For example:

a.   A Plan change log produced by State Defendants shows ADOA added coverage for orthognathic surgery in 2012.  Wee. Decl., Ex. 10 (ADOA Plan Change Log 2012) at AZSTATE.111909;  *See also id.*, Ex. 11 (Medina Depo. Tr.) at 63:1-65:21 (confirming that ADOA added coverage for orthognathic surgery in 2012 by removing a prior Plan exclusion).

b.   In the 2013/ 2014 time period, the ADOA added coverage for a type of bariatric surgery.  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 98:13-99:3, 100:16-19.

c.   A plan change log produced by State Defendants also shows that the exclusion for this type of bariatric surgery, called laproscopic sleeve gastrectomy, was

removed from the Plan in 2014.  Wee Decl., Ex. 9 (2014 ADOA Change Log) at AZSTATE.124801.

d.  ADOA was not under any legal requirement or mandate to add coverage for laproscopic sleeve gastrectomy in 2014.  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 136:16-24.

e.  Between 2017 and 2019, ADOA decided to add coverage for 3-D Mammography, which was not previously covered under the Plan.  *See* Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 80:9-81:2; *id.*, Ex. 8 (Bender Depo. Tr.) at 119:10-120:3; *id.*, Ex. 2 (Sharritts Depo. Tr.) at 114:13-23.

f.  ADOA was not under any legal requirement or mandate to add coverage for 3-D Mammography.  Wee Decl., Ex. 8 (Bender Depo. Tr.) at 137:3-8; *id.*, Ex. 2 (Sharritts Depo. Tr.) at 114:13-23.

g.  Before Plan Administrator Elizabeth Schafer's departure in 2018, ADOA added coverage for a new hepatitis-C drug, which was "extremely expensive."  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 20:14-20, 161:8-14.

**C.    The "Gender Reassignment Surgery" Exclusion**

24. The Plan's broad coverage of medically necessary care is subject to a list of exclusions.  Doc. 86-1 (2018 EPO Plan) at pg. 58 § 10.

25. The Plan categorically denies all coverage for "[g]ender reassignment surgery," regardless of medical necessity (the "'Gender Reassignment Surgery' Exclusion," or the "Exclusion").  Doc. 86-1 (2018 EPO Plan) at pg. 59 § 10; Doc. 89 (Answer to Am. Compl.) at 2:26-3:4.

26. Because of the Exclusion, transgender individuals cannot demonstrate that their transition-related surgery is medically necessary under the Plan's generally applicable definitions and procedures.  Doc. 86-1 (2018 EPO Plan) at pg. 58-59 § 10; Doc. 86-7 (August 2018 Blue Cross Letter to Dr. Toomey denying coverage) at 2; Doc. 89 (Answer to Am. Compl.) at 13:23-28.

27. Surgical procedures to treat gender dysphoria are similar to surgical procedures that are widely recognized as medically necessary to treat other medical conditions that are not excluded from the Plan. Wee Decl., Ex. 1 (Schechter expert report) at ¶¶ 33-36; Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 59:5-64:6.  For example:

  a.  Surgeons perform hysterectomies/salpingo-oophorectomies and orchiectomies to treat individuals with cancer, or a genetic predisposition to cancer.  Surgeons may also perform surgery to remove internal sex organs resulting for congenital differences of sexual development such as Persistent Müllerian Duct Syndrome. Other reasons for performing hysterectomies include fibroids, prolapse, endometriosis, endometrial hyperplasia, and postpartum hemorrhage.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 34.

  b.  Surgeons perform mastectomies to treat individuals with cancer or a genetic predisposition to cancer.  Following a mastectomy or trauma, surgeons perform reconstructive surgeries on the affected breast, including the insertion of breast implants, to repair the injury, and surgeons perform augmentation or reduction surgeries on the unaffected breast for purposes of creating symmetry.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 35.

  c.  Surgeons perform procedures to reconstruct genitalia—including phalloplasties and vaginoplasties—following oncologic resection, traumatic injury, or infection.  Surgeons also perform genital reconstruction surgeries to correct congenital conditions such as hypospadias (a disorder in which the urinary opening is not in the typical location on the glans penis), epispadias (a condition where the urethra is not properly developed), exstrophy (where the bladder develops outside the fetus), or congenital absence of the vagina. Wee Decl., Ex. 1 (Schechter expert report)  at ¶ 36.

28. The medical community and insurance providers recognize a distinction between a reconstructive surgery that is medically necessary and a cosmetic surgery, which

generally is not.  Medically necessary surgery is performed for medical conditions with the goal of either curing or preventing progression of medical conditions. Medically necessary surgery can also include reconstructive surgery to repair injuries or to address a congenital condition.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 32.

29. The cost of surgical procedures does not become more expensive simply because those surgeries are being performed for the purpose of treating gender dysphoria. Wee Decl., Ex. 1 (Schechter expert report) ¶ 33.

30. When billing insurers for reimbursement, health care providers use Current Procedural Terminology ("CPT") codes, which are developed and maintained by the American Medical Association.  The same code or codes may apply to a particular procedure regardless of whether the procedure is performed on a transgender patient or a cisgender patient.  For example, a hysterectomy/salpingo-oophorectomy may be performed for a cisgender woman to reduce her risk of uterine or ovarian cancer or for a transgender man with gender dysphoria.  The same CPT codes are used for both procedures.  Wee Decl., Ex. 1 (Schechter expert report) at ¶ 33.

31. The original version of the Exclusion excluded coverage for "transsexual surgery" and any "medical or psychological counseling" and "hormonal therapy" related to such surgery (the "Prior Exclusion").  Wee Decl., Ex. 12 (2016 EPO Plan) at AZSTATE.010973.

32. Neither State Defendants nor any fact witnesses have been able to identify the rationale behind the Prior Exclusion.  For example:

a. ADOA's Benefit Services Division Director in 2016, Marie Isaacson, testified that, to her knowledge, the Prior Exclusion was carried over from terms of a fully-insured plan that the State used prior to implementing its self-funded Plan, and that she was "not involved" in the State's adoption of the terms of the fully-

insured plan.  Wee Decl., Ex. 7 (Isaacson Depo Tr.) at 199:6 – 200:19.

b. Former ADOA Plan Administrator Elizabeth Schafer had "no idea" why the Prior Exclusion was in the Plan, and confirmed that she was not aware of the initial rationale behind it.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 71:17-72:7.

c. Former ADOA Finance Manager Kelly Sharritts confirmed that she did not know the history of the Prior Exclusion or how it came into the Plan.  Wee Decl., Ex. 2 (Sharritts Depo. Tr.) at 45:11-15.

d. Former ADOA Director Craig Brown testified that he did not have any conversation or knowledge of the Prior Exclusion in 2015, when he started at the ADOA.  Wee Decl., Ex. 3 (Brown Depo. Tr.) at 156:24-157:18.  His first introduction to this topic was in 2016.  *Id.*

**D. ADOA's Consideration of Whether to Remove the Exclusion in 2015-16**

33. In 2015, in response to inquiries from State university employees and a proposed rule from the U.S. Department of Health and Human Services implementing Section 1557 of the Affordable Care Act, the ADOA gathered information to address whether to keep, remove or modify the Prior Exclusion.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 86:17-88:10.

34. This analysis was prepared in response to inquiries from State university employees and a proposed rule from the U.S. Department of Health and Human Services implementing Section 1557 of the Affordable Care Act.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 86:17-88:10; *id.*, Ex. 7 (Isaacson Depo. Tr.) at 24:8-26:8; *id.*, Ex. 2 (Sharritts Depo. Tr.) at 44:3-45:6.

35. When discussing whether to remove or alter the Prior Exclusion, ADOA personnel referred to the excluded coverage as "transgender benefits" or "transgender coverage."  *See e.g.* Wee Decl., Ex. 13 (ADOA Research Summary) at AZSTATE.151707, AZSTATE.151718-19; *id.*, Ex. 14 (October 28, 2015 email between ADOA employees regarding "Transgender Coverage," and attaching "Transgender Coverage Analysis"); *id.*, Ex. 15 (March 10, 2016 ADOA meeting

agenda, listing "Transgender Benefits" as discussion item); *id.*, Ex. 16 (February 2016 email between ADOA employees discussing research regarding "transgender benefits").

36. The results of ADOA's research and analysis were compiled into a comprehensive chart prepared by ADOA Plan Administrator Elizabeth Schafer, which incorporated input of other ADOA employees (the "ADOA Research Summary"). Wee Decl., Ex. 13 (ADOA Research Summary); *id.*, Ex. 4 (Schafer Depo. Tr.) at 89:13-90:13 (Schafer testifying that former ADOA Benefit Services Division Director Marie Isaacson directed her to prepare a chart to "centralize" all of the "information that was being collected" by ADOA regarding transgender benefits); *id.*, Ex. 4 (Schafer Depo. Tr.) at 152-53 (confirming that Wee Decl., Ex 13 (the ADOA Research Summary), is a final version of the summary chart that ADOA prepared in 2016).

37. The ADOA Research Summary includes a cost analysis prepared by then Finance Manager Kelly Sharritts. Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 158:21-159:17 (confirming that ADOA Research Summary incorporated a cost analysis prepared by Kelly Sharritts); *id.*, Ex. 14 (October 28, 2015 Email from K. Sharritts to M. Isaacson Re Transgender Coverage, attaching "Transgender Coverage Analysis"); *id.*, Ex. 2 (Sharritts Depo. Tr.) at 72:16-75:1 (Finance Manager Kelly Sharritts confirming that her "Transgender Coverage Analysis" of cost was incorporated into the ADOA Research Summary).

38. Summarizing available cost studies, the ADOA Research Summary concluded that "████████████████████████████████████████████ ████████████████████████████████████████████ ████" Wee Decl., Ex. 13 (ADOA Research Summary) at AZSTATE.151718.

39. Then, using available cost data, the ADOA Research Summary estimated that ADOA would experience between one and eleven claims per year for transgender benefits, and that the cost of covering the benefits would "████████████████

████████████████ Wee Decl., Ex. 13 (ADOA Research Summary) at AZSTATE.151719.

40. ADOA employees deposed in this litigation agreed that this estimated cost of ████ ████████████████ was insignificant.  For example:

   a. Ms. Sharritts testified that the cost was "minuscule" as it was "potentially pennies, to the plan on a per-person basis.  So [she] didn't feel like that was a driver to make a decision on."  Wee Decl., Ex. 2 (Sharritts Depo. Tr.) at 123:21-124:18.  She noted that other states also said that it was a "negligible impact to their plan when it came to cost".  *Id.* at 124:19-24.

   b. Mr. Brown testified that a $0.17 - $0.77 per month per employee increase was not significant.  Wee Decl., Ex. 3 (Brown Depo. Tr.) at 227:6-15.

   c. Plan Administration Manager Scott Bender testified that a dollar per month per employee, or 50 cents per month per employee was "not a high cost[.]"  Wee Decl., Ex. 8 (Bender Depo. Tr.) at 190:12-191:7.

   d. When Ms. Isaacson was asked about Ms. Sharritts' cost analysis during her deposition, Ms. Isaacson agreed that Ms. Sharritts' estimate of ████████ ████████████████ was not high. Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 276:9-279:23.  Ms. Isaacson further agreed that Ms. Sharritts' cost estimate was "not significant," that it would not "have mattered" to the ADOA, and that it would not "have been a factor that ADOA considered."  *Id.* at 279:9-23.

   e. Ms. Schafer confirmed that her impression at the time was that the cost would be relatively low.  Wee Decl., Ex. 4 (Schafer Depo. Tr.) at 147:17-19.  When presented with the ADOA Research Summary and its projection of cost between ████████████████, Ms. Schafer again confirmed that this was a "low" cost estimate.  *Id.* at 155:8-19.

41. Other than the cost assessment performed by Ms. Sharritts (*i.e.*, the cost analysis included in the ADOA Research Summary), ADOA witnesses testified that no other

cost assessment was performed by ADOA in 2015 or 2016. Wee Decl., Ex. 5 (Shannon Depo. Tr.) at 174:9-16 (Paul Shannon, then Budget Manager of the Benefit Services Division, did not conduct any cost analysis); *id.*, Ex. 6 Meisner Depo. Tr.) at 142:3-24 (Michael Meisner, ADOA's current actuary, did not perform a cost analysis for transgender benefits in 2015, 2016, or 2017, and only performed a cost analysis later, in 2019).

42. Ms. Isaacson testified that there was no reason to doubt the accuracy of Ms. Sharritts' cost analysis, as reflected in the ADOA Research Summary. Wee Decl., Ex. 2 (Isaacson Depo. Tr.) at 280:22.

43. ADOA's internal cost projection was supported by external analyses that the ADOA reviewed in 2015-16. For example:

   a. ADOA reviewed a cost report by the Williams Institute, which "support[ed] a very low utilization and cost associated with adding [the] benefit and no real impact" on the Plan. Wee Decl., Ex. 17 (December 2015 email chain between Marie Isaacson and Kelly Sharritts regarding Williams Institute cost analysis); *id.*, Ex 18 (lower email in chain, attaching "Williams Institute Cost Report").

      i. The Williams Institute Cost Report concluded that "Employers report very low costs, if any, from adding transition-related coverage to their health plans or from actual utilization of the benefit after it has been added – with many employers reporting no costs at all." Wee Decl., Ex. 18 (December 2015 email attaching Williams Institute Cost Report).

   b. ADOA also gathered information from the administrators of other states' employee health plans, who advised that covering gender affirming care did not significantly impact the finances of their healthcare plans. Wee Decl., Ex. 13 (ADOA Research Summary) at AZSTATE.151718-19. For example:

      i. The State of Washington reported to ADOA that "███████████
████████████████████████████████████████████████

██████" *Id.*

    ii.   The State of Colorado reported to ADOA that it was "████████████

████████████████████████" and

that their self-insured plans "████████████." *Id.*

44. Expert witness Joan Barrett, a certified actuary who specializes in healthcare cost projection, confirmed that, based on the cost information collected by ADOA in 2015/2016 and summarized in the ADOA Research Summary, the estimated cost of covering gender affirming surgery in 2016 was less than 0.1%, an "amount so small that it would be considered immaterial from an actuarial perspective."  Wee Decl., Ex. 19 (Barrett expert report) at ¶¶ 9, 45.

**E.**     **Meeting With the Governor's Office**

45. The ADOA ultimately maintained the "Gender Reassignment Surgery" Exclusion after a meeting with the Arizona governor's office (the "Governor's Office") in the fall of 2016 (the "Fall 2016 Meeting").  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 19:6-15, 37:20-40:1, 52:15-24.

46. The Fall 2016 Meeting was attended by Ms. Isaacson (then Director of ADOA Benefit Services Division), Christine Corieri (Healthcare Policy Advisor in the Governor's Office), and legal counsel inside and outside ADOA and the Governor's Office.  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 38:12-15.

47. Ms. Isaacson testified that "[t]here wasn't really a discussion" at the Fall 2016 Meeting.  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 324:19-22.

48. Ms. Isaacson did not provide a recommendation about whether ADOA should remove the Exclusion at the Fall 2016 Meeting because she did not think the decision was hers to make.  Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 49:8-15.

49. Ms. Corieri does not recall cost being discussed at the Fall 2016 Meeting.  Wee Decl., Ex. 20 (Corieri Depo. Tr.) 29-31, 35:1-4.  Instead, the purpose of the Fall

2016 Meeting was to "discuss the ADOA exclusion on gender reassignment surgery, and making sure that it was compliant with the regulations that came down under the ACA." *Id*. at 32:4-7, 34:20-21 (the "purpose of that meeting was to seek legal advice regarding the exclusion"). Beyond discussion of legal advice, Ms. Corieri testified that she did not recall "anything else [being] discussed" at the Fall 2016 Meeting. *Id*. at 34:23-25.

50. After reviewing the advice of legal counsel, Ms. Corieri announced at the Fall 2016 Meeting that the ADOA would continue to exclude gender affirming surgery. Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 324:2-18.

51. The "deciding factor" for the decision to exclude gender affirming surgery at the Fall 2016 Meeting was not cost, but: "what was required by law. What was required by law for [the State] to cover." Wee Decl., Ex. 7 (Isaacson Depo. Tr.) at 31:8-18; *accord* 58:4-7 (testifying that it was "not a cost issue" but instead an "issue of whether it was legally required").

52. Ms. Corieri testified at her deposition that she did not recall being presented with ADOA's cost analysis at or prior to the Fall 2016 Meeting, and that she did not recall ever asking for or receiving any cost assessment related to the Exclusion. Wee Decl., Ex. 20 (Corieri Depo. Tr.) at 63:19-64:21

53. After the Fall 2016 Meeting, Ms. Corieri approved the language of the current Exclusion on behalf of the Governor's Office, which was modeled off of the surgery exclusion used by the State's Medicaid agency. Wee Decl., Ex. 21 (December 2016 email chain between Ms. Corieri and Ms. Isaacson, and other Governor's Office or ADOA employees).

54. The Exclusion went into effect for the 2017 Plan year. Wee Decl., Ex. 22 (2017 EPO Plan) at AZSTATE.010149, Exclusion No. 16.

55. It was rare for the Governor's Office to be involved in Plan decisions. For example:

   a. Mr. Shannon confirmed that it "doesn't happen very often" that he meets with

anyone in the Governor's Office regarding a coverage decision.  Wee Decl., Ex. 5 (Shannon Depo. Tr.) at 89:9-20.

b. Mr. Bender testified that he could not remember a case where the Governor's Office got involved in the decision-making process before the ADOA presented the change to them.  Wee Decl., Ex. 8 (Bender Depo. Tr.) at 97:19-22.

c. The ADOA's Lead Plan Administrator Yvette Medina only recalls two instances in which the Governor's Office proposed Plan language: "same-sex or domestic partners" and "the nondiscrimination transgender item."  Wee Decl., Ex. 11 (Medina Depo. Tr.) at 52:1-21.

**F.     ADOA Responds to Dr. Toomey's Lawsuit**

56. In response to Dr. Toomey's lawsuit, and at the direction of counsel, ADOA's actuary, Michael Meisner, performed a new cost analysis regarding transgender benefits in 2019 (the "Meisner Analysis").  Wee Decl., Ex. 11 (Meisner Depo. Tr.) at 143:12–22; 183:1-4); *id.*, Ex. 23 (Meisner Analysis); *id.*, Ex. 5 (Shannon Depo. Tr.) at 191:9–24.

57. The Meisner Analysis conflicts with ADOA 2016 cost analysis, predicting  a higher cost increase of $10,827,164.  Wee Decl., Ex. 23 (Meisner Analysis); *id.*, Ex. 19 (Barrett expert report) at ¶ 58.

58. The Meisner Analysis cites just two sources, including "cheatsheets.com," which Mr. Meisner concedes he found by searching yahoo.com.  Wee Decl., Ex. 23 (Meisner Analysis); *id.*, Ex. 6 (Meisner Depo. Tr.) at 170:14-15.

59. Ms. Barrett reviewed the Meisner Analysis.  Wee Decl., Ex. 19 (Barrett expert report) at ¶¶ 9(b), 50.

60. According to Ms. Barrett's unrebutted report, the Meisner Analysis is "deeply flawed" and "inconsistent with the [Actuarial Standards of Practice], as well as basic principles of estimation and statistics," and that it results in a "material overstatement of the cost for ADOA to cover gender reassignment surgery."  Wee

Decl., Ex. 19 (Barrett expert report) at ¶¶ 9(b), 50.

61. The Meisner Analysis erroneously assumes that all transgender individuals would seek to have gender reassignment surgery every year.  Wee Decl., Ex. 19 (Barrett expert report) at ¶ 53.

62. The Meisner Analysis fails to consider publicly available data sources, which the ADOA had previously considered in 2016.  Wee Decl., Ex. 19 (Barrett expert report) at ¶ 57.

63. Mr. Meisner "misinterpret[ed] the sources he relied on," for example conflating average cost per claim with a quality-adjusted-life year (QALY), "an entirely different measurement."  Wee Decl., Ex. 19 (Barrett expert report) at ¶ 54.

**G.      Application of the "Gender Reassignment Surgery" Exclusion to Dr. Toomey**

64. Dr. Toomey is a tenured professor at the University of Arizona.  Toomey Decl. ¶ 14.

65. As an employee of the Arizona Board of Regents, Dr. Toomey receives healthcare through the State's self-funded Plan.  Doc. 89 (Answer to Am. Compl.) at 2:13-18; Doc. 28-2 (Dr. Toomey's Declaration) at ¶ 13; Wee Decl., Ex. 24 (ABOR's Fifth Supplemental Disclosure Statement) at 2:26-27.

66. Although Dr. Toomey's medical providers have recommended for years that he undergo a hysterectomy as medically necessary treatment for his gender dysphoria, Dr. Toomey did not feel that he had enough job security to challenge the "Gender Reassignment Surgery" Exclusion until he received tenure in 2017.  Toomey Decl. ¶ 14.

67. To comply with WPATH standards, Dr. Toomey obtained a letter of referral to undergo the hysterectomy from two licensed mental health professionals.  Toomey Decl. ¶ 15.

68. Dr. Toomey then met with Dr. Tiffany Karsten, a surgeon who specializes in

treating gender dysphoria, who agreed that performing a hysterectomy was medically necessary.  Toomey Decl. ¶ 15.

69. But when Dr. Toomey's surgeon requested pre-authorization from Blue Cross—the third-party administrator for Dr. Toomey's Plan—it refused to pre-approve the procedure because "laparoscopic total hysterectomy with removal of tubes and ovaries surgery for a diagnosis of transsexualism and gender identity disorder is considered gender reassignment surgery, which is a benefit exclusion." Doc. 86 (Am. Compl.) at 10:6-11:6; Doc. 86-7 (Ex. G to Am. Compl.- August 10, 2018 Blue Cross Denial Letter) at 2; Doc. 89 (Answer to Am. Compl.) at 16:21-17:9 (admitting that quote is contained in Exhibit G to Compl.); Toomey Decl. ¶¶ 15-16.

70. Prior to the formal denial of coverage from Blue Cross, a representative from Blue Cross initially told Dr. Toomey's surgeon that hysterectomies do not require pre-authorization, but Dr. Toomey was concerned that the surgeon had been provided incorrect information and that he would ultimately be held financially responsible. When Dr. Toomey called Blue Cross to clarify that the hysterectomy would be for the purpose of treating gender dysphoria, Blue Cross confirmed that the surgery would not be covered.  Wee Decl., Ex. 26 (Dr. Toomey Tr.) at 24:8–28-4; Doc. 89 (Answer to Am. Compl.) at 16:21-17:9 (admitting that quote is contained in Exhibit G to Compl.).

71. At the time that Blue Cross denied preauthorization, Blue Cross—and all the other third-party administrators for the ADOA Plan—had adopted internal coverage guidelines recognizing hysterectomies and other gender affirming surgeries as medically necessary treatment for gender dysphoria.  Doc. 86 (Am. Compl.) at 9:8–14; Doc. 86-3 (Ex. C to Am. Compl. – Aetna Guidelines); Doc. 86-4 (Ex. D to Am. Compl. – Blue Cross Guidelines); Doc. 86-5 (Ex. E to Am. Compl. – Cigna Guidelines); Doc. 86-6 (Ex. F to Am. Compl. – United Healthcare Guidelines); Doc. 89 (Answer to Am. Compl.) at 14:8-15.

72. Dr. Toomey filed an Equal Employment Opportunity Commission ("EEOC") Charge against his employer on August 15, 2018, alleging sex discrimination under Title VII.  Wee Decl., Ex. 25 (EEOC Filing); Doc. 86 (Am. Compl.) at 6:2-4; Doc. 89 (Answer to Am. Compl.) at 8:5-10.

73. Upon receiving a Notice of Right to Sue from the EEOC, he filed the present lawsuit on January 23, 2019.  *See generally* Doc. 1.

### H. The State Defendant's Sole Asserted Justification for the Exclusion

74. In response to Dr. Toomey's lawsuit, State Defendants have offered only one rationale for maintaining the Exclusion: cost control.  Wee Decl. Ex. 26 (State Defendants' Supplemental Interrogatory Responses) at Response No. 1.[3]

Dated: September 26, 2022

ACLU FOUNDATION OF ARIZONA

By /s/ *Christine K. Wee*
Christine K Wee – 028535
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block*
Leslie Cooper*
125 Broad Street, Floor 18
New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell*
Matthew S. Friemuth*
Jordan C. Wall*
Justin Garbacz*
787 Seventh Avenue
New York, New York 10019
*Admitted pro hac vice

*Attorneys for Plaintiff Russell B. Toomey*

---

[3] State Defendants are precluded from arguing their second asserted defense that "they held a good-faith subjective belief that their decision to maintain the exclusion for gender reassignment surgery was legal." Doc. 278.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2022, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

/s/  *Christine  K.  Wee*
Christine K. Wee