# Exhibit 16

Message
_____

**From:**           Scott Bender [Scott.Bender@azdoa.gov]
on behalf of        Scott Bender <Scott.Bender@azdoa.gov> [Scott.Bender@azdoa.gov]
**Sent:**           2/22/2016 9:07:09 AM
**To:**             Yvette Medina [Yvette.Medina@azdoa.gov]
**Subject:**        FW: Research on transgender employers

This would be a good project for Elizabeth as she's been working on the transgender legislation stuff, let's review in our one on one.

_____

**From:** Marie Isaacson
**Sent:** Sunday, February 21, 2016 3:19 PM
**To:** Scott Bender <Scott.Bender@azdoa.gov>
**Subject:** Research on transgender employers

Scott:
Will you work with your team to develop a list of employers that provide transgender benefits.  I am specifically looking at what states provide it.  I know WA does, but don't know if there are others.  Will you see what we can find on the internet before we start calling states.  This is somewhat of a rush, if you could see what you can come up with by Wednesday and add this to your log.,

Thank you,
Marie

AZSTATE.009256

# Exhibit 17

Message

| | |
|---|---|
| **From:** | Marie Isaacson [Marie.Isaacson@azdoa.gov] |
| **on behalf of** | Marie Isaacson <Marie.Isaacson@azdoa.gov> [Marie.Isaacson@azdoa.gov] |
| **Sent:** | 12/7/2015 12:56:14 PM |
| **To:** | Kelly Sharritts [Kelly.Sharritts@azdoa.gov] |
| **Subject:** | RE: Williams Institute cost analysis |

Thank you

**From:** Kelly Sharritts
**Sent:** Sunday, December 06, 2015 8:23 PM
**To:** Marie Isaacson
**Subject:** Re: Williams Institute cost analysis

This is pretty much the same information we already reviewed. It supports a very low utilization and cost associated with adding this benefit and no real impact.

Thank you!

**Kelly J Sharritts, CPA**
Audit and Budget Manager
ADOA – Benefit Services| State of Arizona
100 North 15th Avenue, Suite 103, Phoenix, AZ 85007
p: 602.542.4146 | m: 602.319.2652 | Kelly.Sharritts@azdoa.gov
http://www.hr.state.az.us/

**How am I doing?  Please take a few moments to answer a few questions.**
https://www.surveymonkey.com/r/VOCBenefits

NOTICE: This e-mail and any attachments to it may contain information that is PRIVILEGED and CONFIDENTIAL under State and Federal law and is intended only for the use of the specific individual(s) to whom it is addressed. This information may only be used or disclosed in accordance with law, and you may be subject to penalties under law for improper use or further disclosure of the information in this e-mail and its attachments. If you have received this e-mail in error, please immediately notify the person named above by reply e-mail, and then delete the one you received.

On Dec 6, 2015, at 7:44 PM, Marie Isaacson <Marie.Isaacson@azdoa.gov> wrote:

Does this information support your analysis or does it provide any information that you think changes what you think the impact would be?

Thank you,
Marie

**From:** Rodrigues, Helena A - (hrodrigu) [mailto:hrodrigu@email.arizona.edu]
**Sent:** Thursday, October 29, 2015 7:00 PM
**To:** Marie Isaacson
**Subject:** Fwd: Williams Institute cost analysis

Hi, Marie:

I thought I would share this summary my colleague Kirsteen prepared for me.  It's a look at the impact on cost when employers have added transgender coverage.  I need to take a closer look myself, but I thought I would share now.  Maybe we can talk about it when we next connect?


Helena

Sent from my iPad

Begin forwarded message:

**From:** "Anderson, Kirsteen E. - (keanderson)" <keanderson@email.arizona.edu>
**Date:** October 29, 2015 at 1:21:14 PM EDT
**To:** "Rodrigues, Helena A - (hrodrigu)" <hrodrigu@email.arizona.edu>
**Subject: RE: Williams Institute cost analysis**


Kirsteen E. Anderson
Program Coordinator
Division of Human Resources, Suite 113
(520) 621-0466
keanderson@email.arizona.edu

<WilliamsInst note.docx>

Exhibit 18

Message

---

| | |
|---|---|
| **From:** | Marie Isaacson [Marie.Isaacson@azdoa.gov] |
| **on behalf of** | Marie Isaacson <Marie.Isaacson@azdoa.gov> [Marie.Isaacson@azdoa.gov] |
| **Sent:** | 12/6/2015 7:44:50 PM |
| **To:** | Kelly Sharritts [Kelly.Sharritts@azdoa.gov] |
| **Subject:** | FW: Williams Institute cost analysis |

Does this information support your analysis or does it provide any information that you think changes what you think the impact would be?

Thank you,
Marie

---

**From:** Rodrigues, Helena A - (hrodrigu) [mailto:hrodrigu@email.arizona.edu]
**Sent:** Thursday, October 29, 2015 7:00 PM
**To:** Marie Isaacson
**Subject:** Fwd: Williams Institute cost analysis

Hi, Marie:

I thought I would share this summary my colleague Kirsteen prepared for me.  It's a look at the impact on cost when employers have added transgender coverage.  I need to take a closer look myself, but I thought I would share now.  Maybe we can talk about it when we next connect?

Helena

Sent from my iPad

Begin forwarded message:

**From:** "Anderson, Kirsteen E. - (keanderson)" <keanderson@email.arizona.edu>
**Date:** October 29, 2015 at 1:21:14 PM EDT
**To:** "Rodrigues, Helena A - (hrodrigu)" <hrodrigu@email.arizona.edu>
**Subject: RE: Williams Institute cost analysis**

Kirsteen E. Anderson
Program Coordinator
Division of Human Resources, Suite 113
(520) 621-0466
keanderson@email.arizona.edu

---

AZSTATE.006090

AZSTATE.006090

This 2013 study is a small study of the experiences of 34 employers who provide transition-related coverage in their health benefits plans.

Since 2008, the Human Rights Campaign has collected data for its Corporate Equality Index (CEI) on the provision of transition-related health care benefits by the largest U.S. employers (Fortune 1000 and AmLaw 200). A total of 49 employers reported providing this coverage in 2009. That number has grown to 287 as of the 2013 CEI, a nearly 600 percent increase over four years.

Beginning with the 2012 CEI, the Human Rights Campaign has required participating employers to make available to employees at least one transition-inclusive health benefits plan in order to receive full credit

Since 1979, the World Professional Association for Transgender Health (WPATH), formerly the Harry Benjamin International Gender Dysphoria Association, has established standards for appropriate and medically necessary care for the treatment of gender dysphoria.

The UC system has had transgender coverage since 2005 and would have probably the best information on experiences with insurance, if we have any contacts there. Insurers did not charge any additional premiums to add this insurance. CA Dept. of Insurance data show adding the benefit for one health plan represented a cost of $0.20 per member per month, or 0.05 percent of the total premium. The cost of individual claims ranged from $67 to $86,800, with an average cost per claimant of $29,929.

Beyond this information, the Executive Summary of the study is an excellent summation of the findings:

AZSTATE.006091

# EXECUTIVE SUMMARY

In order to inform employer-based decisions and current policy debates regarding provision of this coverage, this study describes the experiences of 34 employers who provide transition-related coverage in their health benefits plans. Overall, we find that transition-related health care benefits have zero or very low costs, have low utilization by employees, and yet can provide benefits for employers and employees alike.

**Employers report very low costs, if any, from adding transition-related coverage to their health benefits plans or from actual utilization of the benefit after it has been added – with many employers reporting no costs at all.**

Based on data collected in this study, costs of providing transition-related health care coverage are very low, including for employers that cover a wider range of medical treatments or surgical procedures for transition.

Twenty-six of the 34 employers in this study provided information about the cost of adding transition-related coverage to existing health care plans.

- Eighty-five percent (85%) of these 26 employers reported no costs associated with adding the coverage, such as increases in premiums in the first year.

- Four employers (15%) reported costs due to adding the coverage. Three employers provided information about the costs they incurred from adding the coverage based on projections of utilization. These costs based on projections seem high in light of the findings from prior research and this study regarding actual costs and utilization rates. These projections may reflect actuarial overestimates of the utilization of these benefits and subsequent cost of claims. For instance, two employers reported a 1 percent increase in total cost to their transition-inclusive plans, based on projected benefit utilization, whereas two similarly-sized employers reported lower costs due to actual benefit utilization.

Twenty-one of the 34 employers in the study provided information about the actual costs from employees utilizing the transition-related health care coverage.

- Two-thirds (14 employers) reported no actual costs resulting from employees utilizing the coverage.

- One-third (7 employers) reported some actual costs related to utilization by employees. However only three of the seven employers reported the actual costs with any degree of specificity. All three of these employers reported that their actual costs from utilization are very low:

- In one case, actual cost over two years was only $5500, only 0.004 percent of total health-care expenditures. The other two employers characterized the costs as "negligible" and "minimal" at less than 1 percent of total costs or total claims paid.

**Few people will utilize transition-related health-care benefits when they are provided.**

*Overall, we find that transition-related health care benefits have zero or very low costs, have low utilization by employees, and yet can provide benefits for employers and employees alike.*

AZSTATE.006092

When an employee utilizes transition-related health care benefits, their claims may result in costs to their employer.  The type, number and cost of services accessed by individuals will vary, yet as described above, the costs of these benefits, if any, are very low, as is the utilization of the benefit. While utilization rates depend on the size of the employer, estimates based on the best data gathered in the survey result in annual utilization rates of approximately:

- 1 out of 10,000 employees for employers with 1,000 to 10,000 employees, and

- 1 out of 20,000 employees for employers with 10,000 to 50,000 employees.

More specifically:

- Two employers with less than 1,000 employees reported zero transition-related claims over a combined six years of providing this type of coverage in their health benefits plans.

- For employers with 1,000 to 9,999 employees, average annualized utilization was 0.107, with a lower bound of 0.027 and an upper bound of 0.214 claimants per 1,000 employees.

- For employers with 10,000 to 49,999 employees, average annualized utilization was 0.044, with an upper bound of 0.054 claimants per thousand employees.

Employers reported that providing transition-related health care coverage benefits them in a variety of ways.  Employers reported that they provide the coverage in order to:

- Make them competitive as an employer within their industries and help them with recruitment and retention of employees (60%);

- Reflect their corporate values, including equality and fairness (60%);

- Provide for the health care needs of their employees and improve employee satisfaction and morale (48%); and Demonstrate their commitments to inclusion and diversity (44%).

Not surprisingly, then, a majority of employers also reported that they would encourage other employers to add the coverage, and none would advise against adding the coverage.

With regard to the scope of transition-related health care coverage that employers are providing, while many transition-related claims would be covered under these employers' plans, some do not provide coverage for many medical treatments or surgical procedures that the WPATH *Standards of Care* describe as medically necessary when clinically indicated for an individual.

- Employers provide coverage in their health benefits plans that cover many medical treatments and surgeries that an individual may need for treatment of gender dysphoria. For most of the hormone therapies and genital surgeries asked about in the survey, 100 percent of transition-related benefits plans provide coverage.

- Plans are less likely to cover certain reconstructive procedures such as breast/ chest surgeries, electrolysis, facial surgeries and related procedures, and voice-related care.

- Only 59 percent of employers cover breast or chest reconstruction, with only a quarter covering electrolysis, certain facial procedures, and voice-related procedures.

- Plans also have other specified limitations in coverage:

  Forty-eight percent (48%) of transition-inclusive plans have some type of restriction on access to transition-related healthcare provided out-of-network, including restrictions of services provided outside of the United  tates.  These restrictions may limit access to transition-related

AZSTATE.006093

care since providers in the United States may not participate in certain health benefits plans. In this case, employees may seek services outside of their plan, elsewhere in the U.S., or in another country.

However, twenty-five employers (74%) offer transition-related benefits with no dollar limit. Almost all employers with a limit reported a $75,000 lifetime limit or higher (21%).

In this sample, there was no relationship between the scope of the coverage provided and reported costs of adding the coverage, meaning providing broader coverage did not result in higher costs for surveyed employers.

Of the 33 employers responding to questions about the process of adding transition-related health care benefits, 94 percent (31 employers) reported that there were no significant barriers to adding the coverage.  Employers also provided practical guidance to other employers to aid them in adding the coverage for their employees.  Employers recommended that other employers:

- Work with their insurers and Third Party Administrators to discuss the coverage they can offer and to address any shortcomings in their medical guidelines.

- Conduct research and consult with other employers that provide the coverage to better understand costs they may incur and to be better informed to negotiate with their insurers.

- Work with benefits administrators to make sure they are providing competent customer service to employees who inquire about transition-related health care benefits.

Overall, we find that transition-related health care benefits have very low costs, have low utilization rates by employees, and yet can provide benefits for employers and employees alike.  Future research regarding transition-related health care coverage should consider the negative impact on employees, and therefore on employers, of not providing medically necessary care for treatment of gender dysphoria.  Future research should also consider the cost savings to employers over time that result from providing the health care that their employees need.

AZSTATE.006094

# Exhibit 19

**Victoria Lopez – 330042**
**Christine K Wee – 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: **vlopez@acluaz.org**
Email: **cwee@acluaz.org**


**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail:**jblock@aclu.org**
E-Mail: **lcooper@aclu.org**
***Admitted Pro hac vice***


**Wesley R. Powell***
**Matthew S. Freimuth***
**Nicholas Reddick***
**Jordan C. Wall***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: **wpowell@willkie.com**
E-Mail: **mfreimuth@willkie.com**
E-Mail: **nreddick@willkie.com**
E-Mail: **jwall@willkie.com**
***Admitted Pro hac vice***


*Attorneys for Plaintiff Russell B. Toomey*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **RUSSELL B. TOOMEY**, | No. 4:19-cv-00035 |
| Plaintiff, | **EXPERT REPORT AND DECLARATION** |
| v. | |
| **STATE OF ARIZONA; ARIZONA BOARD OF REGENTS, D/B/A UNIVERSITY OF ARIZONA**, a governmental body of the State of Arizona; **RON SHOOPMAN**, in his official capacity as chair of the Arizona Board of Regents; **LARRY PENLEY**, in his official capacity as Member of the Arizona Board of Regents; **RAM KRISHNA**, in his official capacity as Secretary of the Arizona Board of Regents; **BILL RIDENOUR**, in his official capacity as Treasurer of the Arizona Board of Regents; **LYNDEL MANSON**, in her official capacity as Member of the Arizona Board of Regents; **KARRIN TAYLOR ROBSON**, in her official capacity as Member of the Arizona Board of Regents; **JAY HEILER**, in his official capacity as Member of the Arizona Board of Regents; **FRED DUVAL**, in his official capacity as Member of the Arizona Board of Regents; **ANDY TOBIN**, in his official capacity as Director of the Arizona Department of Administration; **PAUL SHANNON**, in his official capacity as Acting Assistant Director of the Benefits Services Division of the Arizona Department of Administration, | |
| Defendants. | |

**EXPERT REPORT AND DECLARATION OF JOAN BARRETT, FSA, MAAA**

I, Joan C Barrett, FSA, MAAA, declare as follows:

1.       My name is Joan C. Barrett, FSA, MAAA. I am a credentialed actuary who specializes in actuarial analysis in the healthcare industry. I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries in good standing, and I am qualified to complete the analysis outlined in this report. Unless otherwise noted, I am responsible for the assumptions and methodologies presented in this report.

2.       I have been retained by counsel for Plaintiff and the Class to provide expert testimony in the above-captioned lawsuit.  I have personal knowledge of the matters stated in this expert report and declaration.

3.        In preparing this expert report and declaration, I have reviewed a copy of the Amended Complaint (Dkt. No. 86) and the self-funded health plan for Arizona employees attached to the Amended Complaint as Exhibit A  (the "**Arizona Plan**").

4.       In preparing this expert report and declaration, I have also reviewed a document created by the Arizona Department of Administration ("**ADOA**") in 2019 titled "Estimated annual cost to included [sic] transgender benefits" with bates number AZSTATE.151099 (the "**ADOA 2019 Cost Analysis,**" which is attached hereto as **Exhibit A**).

5.       In preparing this expert report and declaration, I have also reviewed a document created by the ADOA in 2016 titled "Transgender Reassignment Summary," bates numbers AZSTATE.151707 – AZSTATE151719 (the "**2016 ADOA Summary Chart,**" which is attached hereto as **Exhibit B**).

- 3 -

6. In preparing this expert report and declaration, I have also reviewed an August 18, 2016 email from United Health Care to various employees of the ADOA, and its attachment, bates numbers AZSTATE.009197-AZSTATE.009205 (the "**2016 UHC Email,**" which is attached hereto as **Exhibit C**).

7. The opinions and analyses I outline in this report and declaration have been prepared in accordance with the relevant Actuarial Standards of Practice ("**ASOP**s") promulgated by the Actuarial Standards Board of the American Academy of Actuaries (the "**AAA**"). ASOPs are binding on members of the U.S.-based actuarial organization when rendering services in the U.S. Those Practice Standards include, in relevant part, ASOP No. 1, Introductory Actuarial Standard of Practice; ASOP No. 17, regarding Expert Testimony by Actuaries; ASOP No. 23 regarding Data Quality; ASOP No.25 regarding Credibility Procedures; and ASOP 41, Actuarial Communications.

8. The opinions and analysis I outline in this report have been peer-reviewed by Stephanie Entzminger, FSA, MAAA. Ms. Entzminger has extensive experience as a pricing actuary, with a primary focus on long-term care. She regularly performs health care pricing and analytics services to her clients in her capacity as a consulting actuary.

9. Based on the foregoing, and as discussed further below, I offer the following expert opinions:

    a. The 2016 ADOA Summary Chart predicted that removing the categorical exclusion of transition-related surgery would result in a budgetary cost increase of less than 0.1%, an amount so small that it would be considered immaterial from an actuarial perspective. ADOA's prediction of an

immaterial increase in costs was consistent with the cost projections from similar analyses I have seen over the course of my career.

b. The ADOA 2019 Cost Analysis, which predicted an increase greater than 1.0%, a far greater increase in cost, is not consistent with methods recommended in the above referenced ASOPs and results in a material overstatement of the annual cost for ADOA to cover gender reassignment surgery.

## BACKGROUND AND QUALIFICATIONS

10. The information provided regarding my professional background, experiences, publications, and presentations are detailed in my curriculum vitae (CV). A true and correct copy of my CV is attached as **Exhibit D**.

11. I received my Bachelor of Arts is mathematics from Frederick College in Portsmouth Virginia in 1965. I then received my Master of Arts in mathematics from Miami University in Oxford Ohio in 1967.

12. I am currently a Fellow of the Society of Actuaries ("**SOA**") and have been a member of the SOA since 1978.  The SOA is an international professional organization for actuaries that provides education and research services. I earned my fellowship in the SOA by passing a series of examinations which demonstrated my knowledge and understanding of both general actuarial principles and principles of health insurance.

13. I am also currently a member of the American Academy of Actuaries ("**AAA**") and have been a member since 1978.  The AAA is a United States-based

organization for actuaries that, among other things, credentials actuaries based on their completion of the AAA's education requirements, including continuing education, and their adherence to both qualification and professional standards.  My membership in the AAA indicates that I am qualified to sign a Statement of Actuarial Opinions ("**SAO**").  As the name implies, an SAO is an opinion expressed by an actuary in rendering actuarial services that is intended to be relied on by the intended user.

14.   I am currently a Consulting Actuary at Axene Health Partners, LCC ("**Axene**"), and have held this role since 2015.  My work at Axene involves premium rate filings, benefit strategies for self-insured entities and process reviews for underwriting and actuarial departments.

15.   Before joining Axene, I lead the National Accounts Actuarial area for UnitedHealthcare.  In that role, I evaluated benefits strategy for large, self-insured health plans.  That work included recommending changes to current benefits plans.  Those recommendations were based on projecting the cost and risk associated with each proposed benefit design.

16.   I have been performing actuarial work for over 40 years.  That work has included cost and risk analysis, consumer analytics, preparing financial statements, product design, and network design for both traditional health insurance and long-term care insurance.  In 1987, I priced one of the first long-term insurance plans in the market for The Travelers Insurance Company.  This entailed predicting cost for a new insurance product with limited existing data.

17.     In addition, I have written several peer-reviewed publications regarding actuarial projections of future healthcare cost.  For example, in 2018 I published *Time to Update Your Trend Process?,* an article describing best practices in projecting future claims costs.  I have also spoken on that topic and related topics several times at industry meetings.  A full and complete list of my publications is included in my CV.

18.     I frequently peer-review actuarial work for my colleagues at Axene on topics like the ones described above.

19.     For many years, I was the Curriculum General Officer for the Group and Health Education Committee of the SOA.  In that capacity I was responsible for determining what every new health actuary needs to know.

20.     In 2018, I participated in the Steering Committee for Initiative 18/11: What Can We Do About the Cost of HealthCare?"  This group sponsored a conference with over 30 health industry leaders to discuss the cost of care and potential solutions.

21.     I am currently Chair of the SOA's Health Section Council, the group responsible for providing continuing education and thought leadership to all health actuaries.

22.     In 2020 I was named an SOA Lifetime Volunteer in recognition of the leadership I have demonstrated over the years.

23.     I am being compensated at an hourly rate of $400/hour plus expenses for my time spent preparing this declaration and providing local testimony (including deposition or providing hearing testimony by telephone or video-teleconference).  My

compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

24. Stephanie Entzminger is being compensated at an hourly rate of $315 per hour plus expense for her time spent peer-reviewing this report. Her compensation likewise does not depend on the outcome of this litigation, the opinions I express, her review of my opinions, or the testimony I may provide.

25. In the previous four years, I have given expert testimony on behalf of (i) the plaintiffs in *Flack v. Wisconsin Department of Health Services*, Case No. 3:18-CV-00309-WMC in the United States District Court for the Western District of Wisconsin (the "**Flack Case**") and (ii) the plaintiffs in *Boyden v. State of Wisconsin Department of Employee Trust funds et al*., Case No. 17-CV-264 in the United States District Court for the Western District of Wisconsin (the "**Boyden Case**").

26. My opinions in this report and declaration are based on all of the following: (1) my experience performing actuarial work for over 40 years, (2) my review and familiarity with the ASOPs, and (3) my review and familiarity with relevant actuarial studies of the cost of providing transgender benefits. The research I relied on in preparing this report is detailed in the reference list attached as **Exhibit E** to this report.

**DISCUSSION OF ACTUARIAL STANDARDS AND EXPERT OPINIONS**

## I.     <u>Actuarial Standards of Practice</u>

27.     The purpose of the ASOPs is to provide guidance to actuaries preparing SAOs, which users rely on to make informed decisions about the subject of the SAO.  This report is an SAO and the intended users for this report are those involved in the above referenced litigation process.  If the ADOA 2019 Cost Analysis had been prepared by a credentialed actuary, it would also be considered an SAO and the ASOPs would be binding upon it.  Even if a cost analysis does not meet the standards to be considered an SAO, the ASOPs represent best practices for all actuarial analyses.

28.     Key factors in determining if an SAO can be relied on by the intended user include the preparer's (i) care and due diligence used in preparing the SAO (ii) adherence to ASOPs, including the choice of reasonable methods and assumptions, and (iii) transparent communication with the user.

29.     Exercising care and due diligence is generally understood by actuaries to include checking for mathematical errors and following up on apparent inconsistencies.  Additionally, materiality is a key consideration in determining if reasonable care and diligence has been used in an actuarial analysis.  Materiality is defined in terms of how the analysis influences the decision-making process by the intended user.

30.     ASOP No. 41, Actuarial Communications, lays out the standards for communications between the actuary and the intended user.  These standards include identifying the responsible actuary, disclosing deviations from the ASOPs, and identifying

risks associated with the SAO. Of course, clarity is a key element of actuarial communications.

31.     The ASOPs call for the actuary to make "reasonable" steps to select assumptions or methods when rendering actuarial services. The intent is to call upon the actuary to exercise a reasonable level of care and diligence that, in the actuary's professional judgement, is necessary to complete the assignment in an appropriate manner.  This process of selecting assumptions and methods will differ depending on the purpose of the actuarial analysis.  However, estimating the cost of a new health care benefit is a common enough exercise that there is a generally accepted actuarial approach for it.  This approach is described in the paragraphs below.

32.     The generally accepted actuarial approach for estimating the budgetary impact of a change in benefits structure is to calculate the per member per month ("**PMPM**") cost of the new benefit.  A member is defined as anyone covered under the health plan. In the context of an employer, like ADOA, a member includes both employees and dependents. The PMPM cost is calculating using the following formula:

*PMPM cost of adding benefit = [expected number of claims for the benefit during the year] x [average cost per claim]*
*÷ [average number of members] ÷ 12*

33.     The expected number of claims can be calculated as the number of employees multiplied by the "utilization rate" per 1,000 employees, or (preferably), as the number of members multiplied by the utilization rate per 1,000 members.  Utilization rate is broadly defined as the number of times that a cohort is expected to claim a particular benefit. It is usually expressed on an annual basis per thousand members.  To illustrate, a

- 10 -

utilization rate of 1.0 per thousand members would mean that a group could expect 1 claim per year if they had 1,000 members, 2 claims per year if the group had 2,000 members, etc.

34.    The resulting PMPM cost can also be expressed as (i) total annual increase, or (ii) a total percentage increase, relative to current expected costs. To get the total annual increase, you multiply the PMPM cost by twelve months and then multiply that product by the average number of members. So:

**Total annual increase = [PMPM Cost] x 12 x [average number of members]**

To get the total percentage increase, you divide the total annual increase by the total expected cost of the plan prior to implementation of the proposed benefit. So:

**Total annual increase percentage = [total annual increase] ÷ [total annual expected cost of plan]**

35.    To illustrate, suppose a group with 10,000 members and a total annual expected cost of $60,000,000 wanted to add a new benefit.  This new benefit has an expected utilization rate of 0.012 (in other words, 12.0 per 1,000 members) and an expected cost of $5,000 per claim.  Given these assumptions, the expected number of annual claims for the new benefit would be 120 [0.012 x 10,000].  The PMPM cost of adding the benefit would then be $5.00 [120 x $5,000 ÷ 10,000 ÷ 12].  The total annual increase would be $600,000 [$5.00 x 12 x 10,000]. Finally, the total annual increase percentage is calculated to be 1.0% [$600,000 ÷ $60,000,000].

36.    Performing these PMPM cost calculations requires the actuary to estimate a number of key variables or inputs, including (i) the **utilization rate** and (ii) the **average**

**cost per claim**. Inputting informed estimates for these variables is critical to obtaining an accurate estimate of overall cost.  An overestimate of utilization or cost per claim will result in an inflated overall projection of cost, whereas an underestimate of either variable will result in a projection that is too low.

37.    Whenever possible, the starting point for the estimate of these inputs should be the self-insured plan's own historical experience, taking into account expected changes in clinical protocols, plan design, inflation and utilization.  This usually involves an extensive analysis of claims and membership data. Starting with the self-insured's own historical experience with a particular benefit is ideal because an entity's own past experiences with cost per claim and utilization are likely to be highly predictive of that entity's future experience with utilization and cost per claim.

38.    According to ASOP No. 25 on Credibility Procedures, if the self-insured health plan's data is not available or not credible, then data used to perform the analysis should be similar to the group in question in terms of "demographics, coverages, frequency [*i.e.*, utilization rates], severity, or other determinable risk characteristics. . ." *See* ASOP No. 25 at 3.3.  In other words, to the extent that historical data regarding average cost and utilization of the proposed benefit is not available from the self-funded plan itself, the experience of similar plans should be used, with appropriate adjustments to account for differences in benefits and other factors. If possible, the same in-depth analysis should be done for these similar plans as described above.

39.    Other sources of information, such as published papers and publicly available data, can also be used *if no other source of relevant information is readily*

*available or to test the reasonableness of the estimate for average cost or utilization.* However, as a general matter, data from the self-funded health plan itself, or from similarly structured plans with comparable membership population, are preferable to more general sources of data. There are two reasons for this. First, the more similar the data source, the more likely it is that the data will be predictive of the future costs. Second, the source data is more likely to include the detailed information needed to account for key differences like coverages and demographics.

40.    Regardless of the choice of data, the assumptions used in the analysis should reflect the benefit in question. In this case, the benefit in question is gender reassignment surgery, so the utilization rate should reflect the expected number of surgeries that will be performed going forward on an annual basis. Similarly, the average cost per claim should reflect the average cost of gender reassignment surgery. It is my understanding that the ADOA benefit plan currently covers mental health and hormone therapy services, but not gender reassignment surgery. Thus, an estimation of the overall cost to ADOA's plan that would likely result from adding gender reassignment surgery should only measure the *additional* average cost per qualifying surgery, not the cost of benefits that are already covered by the plan.

41.    Because there are often unknowns at the time an initial projection is made, it is not uncommon to overestimate the true costs when estimating the cost of a new benefit. For example, as discussed in a report by the Human Rights Commission, San Francisco Transgender Benefit: Actual Cost & Utilization (2001-2006) - HRC Foundation (the "**Human Rights Report**"), when the City of San Francisco began covering

transgender benefits, the estimated cost was $1.75 million per year.  The actual total claims, however, averaged $77,000 per year. The Human Rights Report demonstrates a tendency to overestimate utilization rates for gender reassignment surgery.

## II.    Opinion 1:  The 2016 ADOA Summary Chart Projected A Cost Increase In 2015/2016 That Was Less Than 0.1%, An Amount So Low That It Would Be Considered Immaterial From An Actuarial Perspective.

42.    I have reviewed cost data and projections that were provided to ADOA in 2015 and 2016 by its third party administrators ("**TPA**s") and other self-funded public plans.  Specifically, I have reviewed the 2016 ADOA Summary Chart (Exhibit B).  It is my understanding that the 2016 ADOA Summary Chart summarizes information that ADOA received from its TPAs and other self-funded public plans in 2015 and 2016, in the course of investigating potential changes to its plan.  I have also reviewed a 2016 email from UHC to ADOA, *i.e.* the 2016 UHC Email (Exhibit C), which provides additional information on cost which is not reflected in the 2016 ADOA Summary Chart.

43.    As outlined below, I used the data provided to ADOA in the 2016 ADOA Summary Chart and the 2016 UHC Email to perform reasonableness checks on ADOA's estimates of the cost of gender reassignment surgery for 2016.  In conducting this review, I reviewed the information contained in each document, but I have not audited the data or its sources, and do not attest to their accuracy.  In order to do this estimation, I needed to make certain assumptions, including the following:

- The number of members of the ADOA self-funded plan in 2016 is assumed to be 133,000. This is consistent with the 2016 membership total provided in the 2016 ADOA Summary Chart (Exhibit B) at page 10.

- 14 -

- The total annual medical cost of Arizona's self-funded plan in 2016, not including gender reassignment surgery, was $711 million. *See* 2016 ADOA Summary Chart (Exhibit B) at page 13.

44. Specifically, the 2016 ADOA Summary Chart includes data from the sources listed below. For each source of data, I translate the information provided to one uniform metric: percent increase of total annual cost.

- **The City of San Francisco**. The 2016 ADOA Summary Chart includes 2001 – 2006 data from the City of San Francisco. After adjusting for mathematical errors in the analysis, we find the expected annual cost for the State in 2016 would be between $80,000 and $470,000. *This translates to an impact of 0.01% and 0.07% of total annual costs*.

- **The University of California**. The 2016 ADOA Summary Chart includes data from the University of California (UC) which shows that UC's utilization rate was 0.084 per thousand covered lives, and that average cost of the benefit was $30,000 over the study period. Based on this data, the expected annual cost for the State in 2016 would be approximately $500,000. *This translates to an impact of 0.07% of total annual costs*.

- **The State of Colorado.** The 2016 ADOA Summary Chart notes that the State of Colorado included transgender benefits and experienced *no increase in the cost of their fully-insured or self-insured plans*.

- **The State of Washington**. The 2016 ADOA Summary Chart notes that the State of Washington likewise added transgender benefits and experienced an impact of less than $1 to premiums, *"in other words, no impact."*

- **United Health Care**. The 2016 ADOA Summary Chart refers to data from UHC that predicts a 0.5% increase in spending. However, as the 2016 ADOA Summary Chart notes, this projected increase is "much higher" than the estimates provided by other sources. In a subsequent email, UHC advised that UHC actuaries had calculated the expected cost of treatment for gender dysphoria (including surgical benefits) to be *$0.09 PMPM. See* the 2016 UHC Email. This translates to an expected annual cost to the State in 2016 of $150,000. *The corresponding percentage of budget impact is 0.02%*.

- 15 -

45.     Taken together, each of these sources of data supports an estimate that the annual cost increase of providing gender reassignment surgery in 2016 would have been between 0.01% and 0.07% of total annual costs, which translates into an annual increase to spend of between $80,000 and $500,000.  This estimate also includes a 10% load to account for a potentially richer plan design for ADOA relative to the City of San Francisco and University of California plans discussed above.  This 10% load was assumed in the 2016 ADOA Summary Chart on page 11.  An annual cost within this range is well below 0.1%, which is so small it is considered immaterial from an actuarial perspective.

46.     I have done or reviewed similar analyses of the budgetary cost of covering gender reassignment surgery over the course of my career.  The estimate of an immaterial cost increase of less than 0.1% is consistent with these analyses.  For example, the 2016 Rand Corporation report, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "**Rand Report**")*,* projected that the utilization rate for transition surgeries would be 0.022 to 0.0396 service members per year based on private health insurance data.  The Rand Report collected data from public employers and private firms that cover transition-related care.  Taking the average of this data, the Rand Report concluded that providing transition related care would increase the sponsor's healthcare spending by between 0.038% and 0.054% - *i.e.*, well under 0.1%.

47.     Additionally, in the Flack Case and the Boyden Case referenced above, I, along with another actuary who is also an FSA and MAAA, performed similar assessments of cost, reviewing actuarial work performed by Milliman Solutions, a consulting firm.  The results of these assessments show that the best estimate for cost of

covering gender-reassignment surgery is in the range of $0.04 to $0.15 PMPM in 2016 dollars.  This translates to a range of $60,000 to $240,000 for the ADOA plan in 2016, or 0.01% to 0.03% of total costs.  These estimates include additional hormone services and a considerable adjustment for risk and year over year variation.

### III. Opinion 2: The ADOA 2019 Cost Analysis Is Not Consistent With Actuarial Principals, And Results In An Increase Of Over 1.0%, A Material Overestimation Of The Cost For ADOA To Cover Gender Reassignment Surgery.

48.     I reviewed the cost analysis that Michael Meisner prepared in September of 2019, as reflected in the ADOA 2019 Cost Analysis.  In that cost analysis, Mr. Meisner assumed that annual utilization rate for the benefit would be 3 per thousand adult members and that the average additional cost per claim would be $34,620, which equals a **$8.66 PMPM** [3 x $34,620 ÷ 1,000 ÷ 12].  Applying that PMPM to population of 104,248 adults enrolled in the ADOA plan in 2019, yielded a total estimated annual addition cost of **$10,827,197**.

49.     It is my understanding that Mr. Meisner has testified that the *only* sources he relied on in creating the ADOA 2019 Cost Analysis are the sources referenced in footnotes of the document itself, and the sources that are navigable by clicking into the links within those sources.

50.     The ADOA 2019 Cost Analysis is deeply flawed, and is inconsistent with the ASOPs, as well as basic principles of estimation and statistics. Specifically, Mr. Meisner's report is flawed for the reasons detailed below.

51.    *First*, Mr. Meisner improperly estimated a utilization rate of 3 per thousand adults by using an unreliable source which does not even purport to predict utilization. Mr. Meisner's source for utilization rate was the website www.cheatsheet.com, which references a 2013 study by the Pew Research Center titled: "*Among transgender adults, stories about a 'difficult' transition*," (the "**2015 Fact Tank Article**").  Within the 2015 Fact Tank Article, there is a reference to a 2013 study by Pew Research titled: "*Among transgender adults, stories about a 'difficult' transition*," (the "**Pew Study**").

52.    The 2015 Fact Tank Article also includes a separate statement, unrelated to the Pew Study, that "transgender adults represent about 0.3% of the U.S. adult population," which is a citation to an April 2011 UCLA Williams Institute article titled, "How Many People are Lesbian, Gay, Bisexual, and Transgender?" (Cite to: https://www.pewresearch.org/fact-tank/2015/04/28/transgender-adults/).    It is my understanding that Mr. Meisner testified that this April 2011 UCLA Williams Institute article was the ultimate source of his data for estimating that 0.3 percent of ADOA members would be transgender.

53.    Relying on this April 2011 estimate that 0.3% of the adult U.S. population identifies as transgender, Mr. Meisner's analysis estimates that 313 ADOA members are transgender.   He then assumes all 313 estimated transgender members would have transition-related surgeries each year. This grossly overstates the number of surgeries expected in a year.  Not everyone who is transgender will elect to have the surgery, and they certainly will not have the surgery every year.  The fact that not all transgender-identifying individuals will utilize the benefit is supported by the 2016 ADOA Summary

Chart, which shows an estimated range of utilization of 1 to 11 claims per year for ADOA based on utilization data from similarly situated providers.  *See* 2016 Summary Chart at AZSTATE.0151718-19.[1]  Put another way, Mr. Meisner assumed that *100%* of ADOA's transgender-identifying members would elect to have gender reassignment surgery, and that all 100% would elect to have the surgery again and again *each year*.  This is an extreme and unfounded assumption that has a material impact on Mr. Meisner's analysis – increasing his cost projection dramatically.

54.    *Second*, Mr. Meisner appears to have estimated the cost of claims for surgery by misinterpreting the source he relied upon.  To estimate the cost of surgery, Mr. Meisner relied on a 2015 news release from Johns Hopkins Bloomberg School of Public Health announcing a study titled "*Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis,*" (the "Johns Hopkins Study").  As the name implies, the primary purpose of the Johns Hopkins Study was to measure cost-effectiveness, not to measure budgetary impact, which was the purpose of Mr. Meisner's analysis.  As a result, the Johns Hopkin Study did not rely on the actuarial methods described above, but instead relied a hypothetical mix of services related to the surgery rather than a mix of services based on actual experience.  In the press release accompanying the Johns Hopkins Study, the authors

---

[1] This is also consistent with the Rand Report, which describes the difference between (i) the prevalence of transgender individuals in a population and (ii) the utilization of transgender-related healthcare benefits by transgender individuals. *See* Rand Report at pp. 20 – 32.

stated that providing health care for transgender people would cost between $34,000 and $43,000 per quality-adjusted life year ("**QALY**").  To estimate the average cost of a claim for transition-related surgery, Mr. Meisner took the midpoint of the range provided in the study $38,500, subtracted his estimate of the cost ADOA is currently paying per adult member, $3,880, for a net of $34,620.

55.     But the average cost per QALY and the average cost per claim are not the same thing. QALYs are an artificial measure of cost-effectiveness that combine length of life and quality of life.  One QALY equates to one year in perfect health.  To put this in perspective, one QALY can be achieved if, as the result of a change in benefits or some other measure, an individual lives one year in perfect health instead of in a near-death state.  Similarly, one QALY can be achieved if two individuals live one year, but each one's health status moved from 50% of perfect health to 100% of perfect health.  QALYs are an entirely different measurement—they do not relate to the average cost per claim (which here is cost per average gender reassignment surgery).  Thus, Mr. Meisner improperly relied on the John Hopkins Study as a source of average cost per gender reassignment surgery, which it is not.

56.     Notably, the complete John Hopkins Study—as opposed to the press release cited by Mr. Meisner—*does* actually provide projections of the budgetary impact of average cost for transition related care, separate and apart from its QALY analysis. Specifically, the Johns Hopkins Study estimated the budgetary cost of medically necessary transitional care at $0.016 PMPM.  *See* Johns Hopkins Study at pp. 394, 398.  If that estimate of $0.016 PMPM were adjusted to 2019 dollars and applied to the 133,000

members assumed enrolled in the ADOA plan in 2019, the total annual cost would have been approximately $35,000 per year—not the $10,827,197 estimated by Mr. Meisner. That annual cost of $35,000 represents a percentage increase in annual budget of just .004%, assuming that ADOA's total plan spending in 2019 was $823 million.[2]  This percentage increase is well below 0.1%, and therefore would be considered immaterial in actuarial terms.

57.     In my professional opinion, Mr. Meisner did not perform this analysis with the care and due diligence required by the ASOPs.  Mr. Meisner should have tested his results using other sources of information, like the Rand Report and the Human Rights Report cited above, both of which were publicly available and provide comparable data on utilization and cost.  Additionally, Mr. Meisner did not even appear to fully utilize the sources he decided to reference; the study he used to obtain cost data provided a utilization estimate for gender reassignment surgery of 1 per 100,000 members, but he did not appear to use that estimate in his analysis to test his results or provide an alternate estimate. Similarly, he did not compare his estimates to the budgetary estimate included in the Johns Hopkins Study.

58.     Meisner's estimate of $10.8M likely exceeds 1.0% of 2019 ADOA medical costs based on the limited information provided in the ADOA 2019 Cost Analysis.  As discussed in Opinion 1 above, a reasonableness check based on publicly available studies suggests an estimate between 0.01% and 0.07% of total annual costs.  Moreover, using

---

[2] This represents assumed plan spending in 2016, adjusted for inflation.

the Johns Hopkins Study utilization and cost per surgery or cost PMPM estimates would result in an estimate less than 0.01% of total annual costs. Reasonableness checks such as these should always be performed in the course of actuarial work. There is no indication in the ADOA 2019 Cost Analysis that such reasonableness checks were performed.

59.     The net effect of Mr. Meisner's various deviations from the ASOPs is a significantly inflated projection of total cost to ADOA for providing gender reassignment surgery. To summarize, Mr. Meisner (i) selected variables from a small universe of sources that were not themselves consistent with the ASOPs; (ii) used a projection of average cost per claim that was higher than what was supported by even the single source he relied on for that variable and (iii) relied on a very high utilization rate that was premised on all transgender members at ADOA utilizing gender reassignment surgery every year. Each of these errors had the same impact on Mr. Meissner's analysis, pushing his cost estimate upward and resulting in a projection of total cost of gender reassignment surgery that grossly overestimates the actual likely cost to ADOA.

## CONCLUSION

This report is considered a Statement of Actuarial Opinion, which means that I have prepared the report following the actuarial standards of practice so that it can be relied on by the intended users. In this case, the intended users are the parties to above referenced litigation.

- 22 -

1    I declare under penalty of perjury under the laws of the United States that the

2  foregoing is true and correct.

3

4    Executed this 14th day of April, 2021 at Tolland, Connecticut.

5

6

7

8

9

10

11

12    _____

13                          Joan C. Barrett. FSA, MAAA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# Estimated annual costs to included transgender benefits
9/23/2019

|  | Data |
|---|---|
| PY 2019 ADOA adult membership (18+) | 104,248 |
| Estimated 0.3% of adults are transgender (1) | 0.30% |
| Estimated 0.3% transgender  individuals in ADOA membership | 313 |
| Estimated Health care cost per year for transgender people (2) | $38,500 |
| Current ADOA health benefits - average cost per adult  (3) | $3,880 |
| Estimated additional cost per transgender person | $34,620 |
| Estimated additional annual costs per year | $10,827,164 |

Notes:

(1) https://www.cheatsheet.com/money-career/these-insurers-offer-transgender-health-care-coverage.html/
(2) https://www.jhsph.edu/news/news-releases/2015/study-paying-for-transgender-health-care-cost-effective.html
(3) Based on year to date PY 2019 medical and pharmacy claims

...

AZSTATE.151099
AZSTATE.151099

Exhibit B

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Exhibit C

Message

| | |
|---|---|
| **From:** | Martin, Stephanie A [stephanie_martin@uhc.com] |
| on behalf of | Martin, Stephanie A <stephanie_martin@uhc.com> [stephanie_martin@uhc.com] |
| **Sent:** | 8/18/2016 5:18:20 PM |
| **To:** | Yvette.Medina@azdoa.gov; Scott Bender (Scott.Bender@azdoa.gov) [Scott.Bender@azdoa.gov] |
| **CC:** | Gallegos, Heather K [heather_gallegos@uhc.com] |
| **Subject:** | Nondiscrimination Section 1557 Gender Transformation Coverage |
| **Attachments:** | MMU_2017_GenderIdentityDisorder_Final- SAMPLE.doc |

Hi All,

Our organization recently announced how we will be handling the requirements of Section 1557 of the Affordable Care Act (ACA).  As an overview, Section 1557 is the civil rights provision of the Affordable Care Act (ACA) of 2010. Section 1557 prohibits discrimination on the grounds of race, color, national origin, sex, age, or disability in certain health programs and activities.

Protection against sex discrimination include:
• Individuals cannot be denied health care or health coverage based on their sex, including their gender identity and sex stereotyping.
• Women must be treated equally with men in the health care they receive and the insurance they obtain.
• Categorical coverage exclusions or limitations for all health care services related to gender transition are discriminatory.
• Individuals must be treated consistent with their gender identity. Treatment may not be denied or limited for any health services that are ordinarily or exclusively available to individuals of one gender based on the fact that a person seeking such services identifies as belonging to another gender.
• While the recent guidance prohibits broad categorical exclusion of gender transformation, it does not mandate coverage of specific medical services. However, when any benefits are covered, they may not be administered in a discriminatory manner.

I had previously mentioned that I would provide information related to how UnitedHealthcare would be handling our risk-based business (Fully Insured).  That is something that most Self-Funded clients will use as a guideline. However, I also need to advise that for our Self-Funded (ASO) customers it is up to the plan sponsor to consult with your legal department to determine whether or not you are a covered entity under Section 1557 and to review your plan for any changes that may be necessary.

For **fully insured plans**, UnitedHealthcare's 2017 Certificate of Coverage (COC) will include the following benefits and exclusions/limitations. Standard benefits for the treatment of gender dysphoria are limited to the following services when clinical criteria for eligibility are met:
• **Psychotherapy** and mental health services for gender dysphoria and associated co-morbid psychiatric diagnoses.
• **Certain drug therapies, including cross-sex hormone therapy,** administered by a medical provider during an office visit or dispensed from a pharmacy.
◦ **Puberty suppressing medications** for treatment of gender dysphoria, such as Lupron and Supprelin® LA, which are administered in the physician's office, have been added under the medical benefit.
• **Laboratory testing** to monitor the safety of continuous cross-sex hormone therapy.
• **Specified surgeries** including genital surgery for the treatment of gender dysphoria and breast surgery including bilateral mastectomies and breast reduction.
• **The exclusion for gender transformation surgery has been removed.**

Specific documentation and written psychological assessments from one or more qualified behavioral health providers experienced in treating gender dysphoria are required prior to approval for a bilateral mastectomy, breast reduction surgery or genital surgery.

Exclusions and limitations include surgeries and/or related services that are considered cosmetic, unproven and not medically necessary.

I am providing you with the Material Modification Update (MMU)/ Summary of Material Modifications that we are providing to our Self-Funded customers wishing to adopt UnitedHealthcare's standard benefit coverage. It's important to note that UnitedHealthcare's standard coverage aligns with scientifically-based clinical evidence and WPATH guidelines. WPATH is the **World Professional Association for Transgender Health.**  We can also support your custom program requests as well and they are identified in the sample MMU as Plan Design Variable.  Keep in mind this includes Rx language which may fall under your PBM contract for medications dispensed by the pharmacy.

**Expected costs from our actuaries are as follows:**
Medical coverage
$.09 per member per month (PMPM) / Based on UHC covered lives: Approximately $86K per year.

Let me know if you have any questions.

AZSTATE.009197

AZSTATE.009197

Thanks,
Stephanie


**Stephanie A. Martin**
Strategic Client Executive, Client Management
UnitedHealthcare National Accounts
1 E. Washington St., Suite 1700, AZ009-17TE, Phoenix, AZ 85004
(w) 602-255-8497 (m) 602-770-4711
stephanie_martin@uhc.com

**Helping People Live Healthier Lives**®
■ Integrity ■ Compassion ■ Relationships ■ Innovation ■ Performance


This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

AZSTATE.009198

AZSTATE.009197

## UnitedHealthcare Material Modification Updates
## January 2017 - Gender Dysphoria

Your Summary Plan Description is the core of the benefit plan informing participants as to what is and is not considered a covered treatment or service under your plan. This Summary of Material Modification (SMM) will serve as a resource to you in preparing and updating benefit plan information.  Please take the time to think about adding applicable clarifications to your Summary Plan Description. This information is not intended nor should it be construed as legal advice. Consult your own legal counsel for advice on your Plan and the proper timing for notice of material modifications, including material reductions in benefits, to plan members.

Identified in the attached SMM is sample language from UnitedHealthcare's most current product templates. If not stated, the language below applies to all standard products. Disregard bracketed text for treatments, services and programs that do NOT pertain to your plan designs.

### What is in this SMM?

This SMM provides model language describing Benefits for the treatment of Gender Dysphoria consistent with UnitedHealthcare Coverage Determination Guidelines. Plans may cover, or exclude, surgical or non-surgical treatment for gender dysphoria.  Note: Plan specific benefits may differ greatly from the standard benefit plan provided in this SMM.

This model language is provided for informational purposes. It does not constitute medical advice.

AZSTATE.009199

AZSTATE.009199

# SUMMARY OF MATERIAL MODIFICATIONS
## To the Summary Plan Description for [ERISA Plan Name]
### Plan change effective on: [effective date of this SMM]
### Group Number: [XX]

A Summary Plan Description (SPD) was published effective [date of Summary Plan Description to be amended]. The following are modifications and clarifications that are effective [effective date of amendment]. These modifications and clarifications are intended as a summary to supplement the SPD. It is important that you keep this summary with your SPD since this material plus the SPD is your complete SPD.

**In the event of any discrepancy between this Summary of Material Modifications (SMM) and the SPD, the provisions of this SMM shall govern.**

*A. This SMM provides Benefits for the treatment of Gender Dysphoria. Certain capitalized words have special meanings. [UnitedHealthcare][The Claims Administrator] has defined these words in the Summary Plan Description (SPD) in Section 14, Glossary and in this SMM below. The words "you" and "your" are referring to people who are Covered Persons, as the term is defined in the SPD in Section 14, Glossary.*

## SECTION 5 - PLAN HIGHLIGHTS

*B. The provision below for Gender Dysphoria is added to the Schedule of Benefits [and replaces Treatment of Gender Dysphoria in its entirety]:*

### Schedule of Benefits

| Covered Health Services | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | **Network** | **Non-Network** |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits*[.][ and in Section 15, *Outpatient Prescription Drugs*.] [ and in [Carve-out RX | [Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* [.][ and in Section 15, *Outpatient Prescription Drugs*.] [ and in [Carve-out |

AZSTATE.009200

AZSTATE.009199

January 2017 SMM Gender Dysphoria

| Covered Health Services | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | **Network** | **Non-Network** |
| | Plan name variable.] | RX Plan name variable.] ] [Non-Network Benefits are not available] ] |

| Covered Health Services | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* |
|---|---|
| | **Network** |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category the *Schedule of Benefits* [.][ and in Section 15, *Outpatient Prescription Drugs*.] [ and in [Carve-out RX Plan name variable.] |

## SECTION 6 - ADDITIONAL COVERAGE DETAILS

***C. The following provision is added to the SPD, Section 6, Additional Coverage Details, as a Covered Health Service [and replaces Treatment of Gender Identity Disorder/Dysphoria in its entirety]:***

## Gender Dysphoria

Benefits for the treatment of Gender Dysphoria limited to the following services:

Plan Design Variable for ASO

- ▪ [Psychotherapy for Gender Dysphoria and associated co-morbid psychiatric diagnoses are provided as described under *Mental Health Services* in your SPD].

- ▪ Cross-sex hormone therapy:

  - Cross-sex hormone therapy administered by a medical provider [(for example during an office visit) is provided as described under *Pharmaceutical Products – Outpatient* in your SPD].

Plan Design Variable for ASO

  - [Cross-sex hormone therapy dispensed from a pharmacy is provided as described under [Section 15, *Outpatient Prescription Drugs*.][Carve-out RX Plan Name Variable.]]

2

AZSTATE.009201

AZSTATE.009199

January 2017 SMM Gender Dysphoria

- Puberty suppressing medication injected or implanted by a medical provider in a clinical setting.

- Laboratory testing to monitor the safety of continuous cross-sex hormone therapy.

- [Surgery for the treatment for Gender Dysphoria, including the surgeries listed below:

  *Male to Female:*

  - Clitoroplasty (creation of clitoris)

  - Labiaplasty (creation of labia)

  - Orchiectomy (removal of testicles)

  - Penectomy (removal of penis)

  - Urethroplasty (reconstruction of female urethra)

  - Vaginoplasty (creation of vagina)

  *Female to Male:*

  - Bilateral mastectomy or breast reduction

  - Hysterectomy (removal of uterus)

  - Metoidioplasty (creation of penis, using clitoris)

  - Penile prosthesis

  - Phalloplasty (creation of penis)

  - Salpingo-oophorectomy (removal of fallopian tubes and ovaries)

  - Scrotoplasty (creation of scrotum)

  - Testicular prosthesis

  - Urethroplasty (reconstruction of male urethra)

  - Vaginectomy (removal of vagina)

  - Vulvectomy (removal of vulva)]

Plan Design Variable for ASO

**[Genital Surgery and Bilateral Mastectomy or Breast Reduction Surgery Documentation Requirements:**

The Covered Person must provide documentation of the following for breast surgery:

- A written psychological assessment from at least one qualified behavioral health provider experienced in treating Gender Dysphoria. The assessment must document that the Covered Person meets all of the following criteria:

  - Persistent, well-documented Gender Dysphoria.

  - Capacity to make a fully informed decision and to consent for treatment.

  - Must be 18 years or older.

3

AZSTATE.009202

AZSTATE.009199

January 2017 SMM Gender Dysphoria

- If significant medical or mental health concerns are present, they must be reasonably well controlled.

The Covered Person must provide documentation of the following for genital surgery:

- A written psychological assessment from at least two qualified behavioral health providers experienced in treating Gender Dysphoria, who have independently assessed the Covered Person. The assessment must document that the Covered Person meets all of the following criteria.

  - Persistent, well-documented Gender Dysphoria.

  - Capacity to make a fully informed decision and to consent for treatment.

  - Must 18 years or older.

  - If significant medical or mental health concerns are present, they must be reasonably well controlled.

  - Complete at least 12 months of successful continuous full-time real-life experience in the desired gender.

  - Complete 12 months of continuous cross-sex hormone therapy appropriate for the desired gender (unless medically contraindicated).]

Plan Design Variable for ASO. The following bullet contains language to satisfy a portion of the Corporate Equality Index (CEI) survey.

- [The treatment plan is based on identifiable external sources including the *World Professional Association for Transgender Health (WPATH)* standards, and/or evidence-based professional society guidance.]

## SECTION 8 – EXCLUSIONS AND LIMITATIONS: WHAT THE MEDICAL PLAN WILL NOT COVER

**D. The exclusion for sex transformation operations and related services in the SPD under Section 8, Exclusions and Limitations, Procedures and Treatments is deleted. In addition, the following exclusions apply:**

Plan Design Variable for ASO.

- [Cosmetic Procedures, including the following:

  - [Abdominoplasty.]

  - [Blepharoplasty.]

  - [Breast enlargement, including augmentation mammoplasty and breast implants.]

  - [Body contouring, such as lipoplasty.]

  - [Brow lift.]

  - [Calf implants.]

  - [Cheek, chin, and nose implants.]

  - [Injection of fillers or neurotoxins.]

4

AZSTATE.009203

AZSTATE.009199

- [Face lift, forehead lift, or neck tightening.]
- [Facial bone remodeling for facial feminizations.]
- [Hair removal.]
- [Hair transplantation.]
- [Lip augmentation.]
- [Lip reduction.]
- [Liposuction.]
- [Mastopexy.]
- [Pectoral implants for chest masculinization.]
- [Rhinoplasty.]
- [Skin resurfacing.]
- [Thyroid cartilage reduction; reduction thyroid chondroplasty; trachea shave (removal or reduction of the Adam's Apple).]
- [Voice modification surgery.]
- [Voice lessons and voice therapy.] **]**

## SECTION 14 – GLOSSARY

**E.  *The following definition of Gender Dysphoria is added to the SPD under Section 14, Glossary[:][and replaces Gender Identity Disorder:]***

**Gender Dysphoria** - A disorder characterized by the following diagnostic criteria classified in the current edition of the *Diagnostic and Statistical Manual of the American Psychiatric Association*:

- *Diagnostic criteria for adults and adolescents*:
  - A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:
    - A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
    - A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
    - A strong desire for the primary and/or secondary sex characteristics of the other gender.
    - A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5

AZSTATE.009204

AZSTATE.009199

- ♦ A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
- ♦ A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
  - The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

- ■ *Diagnostic criteria for children:*
  - A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least six of the following (one of which must be criterion as shown in the first bullet below):
    - ♦ A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).
    - ♦ In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.
    - ♦ A strong preference for cross-gender roles in make-believe play or fantasy play.
    - ♦ A strong preference for the toys, games or activities stereotypically used or engaged in by the other gender.
    - ♦ A strong preference for playmates of the other gender.
    - ♦ In boys (assigned gender), a strong rejection of typically masculine toys, games and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games and activities.
    - ♦ A strong dislike of ones' sexual anatomy.
    - ♦ A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.
- ■ The condition is associated with clinically significant distress or impairment in social, school or other important areas of functioning.

[UnitedDocID] DRAFT SET X – MM/DD/YEAR

6

AZSTATE.009205

AZSTATE.009199

Exhibit D

Curriculum Vitae

# JOAN C. BARRETT, FSA, MAAA

Axene Health Partners, LLC

C: 860.463.9484 | joan.barrett@axenehp.com

## Summary

Seasoned health actuary with recognized for technical experience, leadership, communication skills and professional integrity.

## Current Position

**Advisor to Insurers and Employers**

Consulting Actuary, Axene Health Partners, LLC, June 2015 – Present

Role: Consulting with health insurers and employers on a variety of actuarial assignments.

Recent projects:

- HDHP Task Force consulting
- Rate-making procedures and strategies
- Rate filing support
- Employee benefits pricing and strategy

## Previous Work Experience

**National Accounts Actuary**

Vice President, National Accounts, UnitedHealthcare.  February 1993 – June 2015

Roles: Providing actuarial support to senior management and employers

1. Actuarial support and risk management for senior management
2. Benefit design, pricing, and strategic consulting for Fortune 500 employers
3. Consumerism and actuarial research
4. Actuarial support for union negotiations
5. Analysis of self-funded network reimbursement methodologies
6. Rate-filings and pricing

## Qualifications and Designation

- FSA – Fellow of the Society of Actuaries (SOA)
- MAAA – Member of the American Academy of Actuaries (MAAA)

## Education

- Bachelor of Arts, Frederick College, Portsmouth Virginia (Mathematics)
- Master of Arts, Miami University, Oxford, Ohio (Mathematics)

## PUBLICATIONS

- <u>Shenoy, Sudha and Barrett, Joan</u> (2020). Managed Care 3.0 Technology. *The Actuary Magazine* (Society of Actuaries).
- <u>Warren, Gregory and Barrett, Joan</u>. (2020). Actuarial Perspectives on Prescription Drug Pricing. *The Actuary Magazine* (Society of Actuaries).
- <u>Barrett, Joan</u>. (2020).  Chairperson's Corner. *HealthWatch* (Society of Actuaries).
- <u>Barrett, Joan and Wrobel, Kurt</u>. (2020). The ACA@10. *The Actuary Magazine* (Society of Actuaries).
- <u>Barrett, Joan</u>. (2018). Time to Update Your Trend Process?.   *HealthWatch* (Society of Actuaries).
- <u>Barrett, Joan (2017)</u>.  Evolution of the Health Actuary:  A Health Section Strategic Initiative. *HealthWatch.*
- <u>Barrett, Joan.</u>  (2017) Accountability: Rates.   *Inspire Accountability Series*. (Axene Health Partners)
- <u>Barrett, Joan.</u>  (2017) The Chronic Disease Burden.   *Inspire Series on the U.S. Healthcare Sytem*. (Axene Health Partners)
- <u>Barrett, Joan</u>. (2016).  Making Predictive Analytics Our Own.   *Predictive Analytics and Futurism* (Society of Actuaries)
- <u>Barrett, Joan</u>. (2016).   Ch. 34:  Medical Claims Cost Trend Analysis.   *Group Insurance*, Skwire, Daniel D., 7th Edition.
- <u>Barrett, Joan and Kessler, Emily.</u>  (2015)  New Directions:  The SOA in China.   *The Actuary* (Society of Actuaries.
- <u>Barrett, Joan.</u>  (2010)  Chairperson's Corner.   *Expanding Horizons.*  (Society of Actuaries)
- <u>Barrett, Joan.</u>  (2009)  Chairperson's Corner.   *Expanding Horizons.*  (Society of Actuaries)
- <u>Barrett, Joan</u>.  (2008)  Timing's Everything:  The Impact of Benefit Rush (Society of Actuaries)

## EXPERT WITNESS EXPERIENCE

- Cody Flack, Sara Ann Makenzie, Marie Kelly and Courtney Sherwin, Plaintiffs v. Wisconsin Department of Health Services and Linda Seemeyer, in her official capacity as Secretary of the Wisconsin Department of Health Services, Defendants, Case No. 3:18-CV-00309-WMC (W.D. Wis.)
- Alina Boyden and Shannon Andrews, Plaintiffs, v. State of Wisconsin Department of Employee Trust funds et al., Defendants, Case No. 17-CV-264 in the United States District Court for the Western District of Wisconsin

## CURRENT AND RECENT SOCIETY OF ACTUARIES (SOA) ENGAGEMENTS, ACTIVITIES AND ACCOMPLISHMENTS

- Lifetime Volunteer Award Recipient
- Vice-President, 2015 to 2017
  - Chair, Value of the Credential Task Force
  - Member, Issues Advisory Committee
  - Member, Policy and Governance Committee
  - Member, Cultivating Opportunities Team
- Elected Board Member, 2011 to 2014
  - Chair, International Committee
  - Chair, Audit Committee

- o Member, Business Analytics Team
- o Academic Partner
- Initiative 18/11:  What Can We Do About the Cost of Health Care
  - o Planning Committee member
  - o Participant
- Section Experience
  - o Chair, Health Section Council
  - o Chair, Education and Research Section Council
  - o Board Partner, Health Section Council
  - o Board Partner, Predictive Analytics and Futurism Section Council
  - o Chair, Evolution of the Health Actuary Task Force, chartered by the Health Section Council
- Basic Education Experience
  - o General Officer, General Insurance Curriculum
  - o General Officer, Group and Health Curriculum
- Continuing Professional Development Experience
  - o Chair, Health Meeting
  - o Board Partner, Continuing Professional Development Committee
  - o Frequent speaker
- Research
  - o Chair, Project Oversight Group, "Enterprise Risk Management Practice as Applied to Health Insurers, Self-Insured Plans and Health Financial Professionals"
  - o Chair, Project Oversight Group, "Risk and Mitigation for Health Insurance Companies"
  - o Chair, Project Oversight Group, "Measurement of Healthcare Quality and Efficiency: Resources for Healthcare Professionals"

BRIEF BIOGRAPHY

**JOAN C. BARRETT, FSA, MAAA**

Axene Health Partners, LLC

O: 860.858.5654 | C: 860.463.9484 | joan.barrett@axenehp.com

Joan Barrett is a Consulting Actuary with Axene Health Partners, LLC.  She is a well-known and well-respected actuary. Joan brings great value to AHP clients with a knack for developing strong systems for analyzing network value and core actuarial functions, such as trends and pricing.
Joan joined AHP following a successful career at UnitedHealth Group, where she led the National Accounts Actuarial area for many years. In that role, she was instrumental in developing several innovative concepts in risk analysis and consumer analytics.

In 2017 she completed her service as a Society of Actuaries Vice-President. During her terms on the Board of Directors, she chaired both the International Committee and the Audit Committee. In 2011 she was named one of the Top Ten Volunteers for the Society of Actuaries. In part, this was because of her work as Chair of the Group and Health Curriculum Committee, the group that defines what every aspiring health actuary needs to know.

 Joan recently chaired the Evolution of the Health Actuary Task Force which was been charged with defining the needs of health actuaries in the years to come and recommending a path to meet these needs. She is also a frequent speaker and author.

Joan received her Bachelor of Arts in mathematics from Frederick College and her Master of Arts in mathematics from Miami University. She is a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries.

Joan lives in Tolland, Connecticut near her children and grandchildren.

# Second Amended Exhibit E

<strong>References</strong>

I. **Published Articles, Reports and Studies**

1. Barrett, Joan et al, Expert Report of Joan C. Barrett and Elaine T. Corrough Submitted on Behalf of the Plaintiffs in *Boyden v. State of Wisconsin Department of Employee Trust Funds et al*., Case No. 17-CV-264 (W.D. of Wisconsin), available at: http://files.eqcf.org/wp-content/uploads/2018/10/102-Barrett-Declaration.pdf

2. Barrett, Joan et al., Expert Report of Joan C. Barrett and Elaine T. Corrough Submitted on Behalf of the Plaintiffs in *Flack v. Wisconsin Department of Health Services*, Case No. 2:18-CV-00309-WMC (W.D. Wisconsin) (2019), available at: http://files.eqcf.org/wp-content/uploads/2019/04/172-Barrett_Corrough-Expert-Report.pdf

3. Goo, Sara Kehaulani Among transgender adults, stories about a 'difficult' transition, Pew Research Center (2015), available at: https://www.pewresearch.org/fact-tank/2015/04/28/transgender-adults/

4. Padula, William V., PhD MS MSC, Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis. J GEN INTERN MED 31, 394–401 (2016), available at: https://link.springer.com/article/10.1007/s11606-015-3529-6

5. San Francisco Transgender Benefit.: Actual Cost & Utilization (2001-2006), Human Rights Campaign Foundation, available at: https://www.thehrcfoundation.org/professional-resources/san-francisco-transgender-benefit-actual-cost-utilization-2001-2006

6. Schaefer, Ages Gereben, et al. Assessing the Implications of Allowing Transgender Personnel to Serve Openly, Rand Corporation (2016), available at: https://www.rand.org/pubs/research_reports/RR1530.html

7. World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, 7th Ed. (2011), available at: https://www.wpath.org/publications/soc

II. **Actuarial Standards of Practice**

1. Actuarial Standards Board, Actuarial Standard of Practice No. 1, Introductory Actuarial Standard of Practice, available at:
http://www.actuarialstandardsboard.org/asops/introductoryactuarialstandardpractice/

2. Actuarial Standards Board, Actuarial Standard of Practice No. 17, Expert Testimony by Actuaries, available at:
http://www.actuarialstandardsboard.org/asops/expert-testimony-by-actuaries/

3. Actuarial Standards Board, Actuarial Standard of Practice No. 23, Data Quality, available at:
http://www.actuarialstandardsboard.org/asops/data-quality/

4. Actuarial Standards Board, Actuarial Standard of Practice No. 25, Credibility Procedures, available at:
http://www.actuarialstandardsboard.org/asops/credibility-procedures/

5. Actuarial Standards Board, Actuarial Standard of Practice No. 41, Actuarial Communications, available at:
http://www.actuarialstandardsboard.org/asops/actuarial-communications/

III. **Documents Produced in Present Litigation**

1. AZSTATE.151099

2. AZSTATE.151707 - AZSTATE151719

3. AZSTATE.009197- AZSTATE.009205

IV. **Additional Documents**

1. Exhibit A to the Amended Complaint; ADOA's 2018 EPO Plan

## Additional Documents Reviewed But Not Relied On

1. Economic Impact Assessment, Gender Nondiscrimination In Health Insurance, State of California Department of Insurance, April 13, 2012, available at https://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf

2. "Gender Confirmation Surgery Is on the Rise in U.S.," TIME, available at: https://time.com/4787914/transgender-gender-confirmation-surgery/

3. "Here's how sex reassignment surgery works," The Washington Post, available at: https://www.washingtonpost.com/news/to-your-health/wp/2015/02/09/heres-how-sex-reassignment-surgery-works/

4. "Plastic Surgery Statistics," American Society of Plastic Surgeons (2020), available at: https://www.plasticsurgery.org/news/plastic-surgery-statistics

5. "Sex Reassignment Surgery Market To Hit USD 1.5 Bn by 2026," Global Market Insights, Inc., available at: https://www.globenewswire.com/news-release/2020/03/31/2009112/0/en/Sex-Reassignment-Surgery-Market-to-hit-USD-1-5-Bn-by-2026-Global-Market-Insights-Inc.html

6. "Transgender –Inclusive Benefits For Employees and Dependents," Human Rights Campaign, available at https://www.thehrcfoundation.org/professional-resources/transgender-inclusive-benefits-for-employees-and-dependents

7. Williams, David, Expert Report, Gender Reassignment Benefits, Wisconsin Medicaid Benefits, April 22, 2019, available at: https://affordablecareactlitigation.files.wordpress.com/2018/09/merged_28407_-1-1535030961.pdf

8. Williams, David, Expert Report of David V. Williams Submitted on Behalf of the Plaintiffs in *Boyden v. State of Wisconsin Department of Employee Trust Funds et al.*, Case No. 17-CV-264 (W.D. of Wisconsin).

9. AZSTATE.006538–AZSTATE.006539

10. AZSTATE.008193-AZSTATE.008198

11. AZSTATE.008204-AZSTATE.008206

12. AZSTATE.008213-AZSTATE.008215

13. AZSTATE.009199 – AZSTATE.009205

14. Exhibit C-F of the Amended Complaint

# Exhibit 20

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


RUSSELL B. TOOMEY,                    )
                                      )
               Plaintiff,             )
                                      )
vs.                                   ) 4:19-CV-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD       )
OF REGENTS, d/b/a UNIVERSITY OF       )
ARIZONA, a governmental body of       )
the State of Arizona; et al.,         )
                                      )
               Defendants.            )
_____)




VIDEOTAPED DEPOSITION OF CHRISTINA CORIERI

(Via Zoom Videoconference)
July 13, 2022
8:30 a.m.
Phoenix, Arizona




Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020               Robin L. B. Osterode
602.266.6535                         CSR, RPR
www.glennie-reporting.com            CA CSR No. 7750
                                     AZ CR No. 50695

29

1  me.

2      Q.    Were you reporting to Mr. Liburdi about new

3  policy concerns?

4           MS. LAMM:  Same objection if this relates to

5  attorney-client privileged communication, then I would

6  instruct the witness not to answer.  But if it -- I mean,

7  she can certainly say the general subject matter, but if

8  it -- if it gets to specific information requested by

9  Mr. Liburdi or provided in an effort to seek legal

10 advice, then witness cannot answer.

11          THE WITNESS:  Mr. Liburdi came to me to ask me

12 to participate in a meeting.

13 BY MR. ECKSTEIN:

14     Q.    Okay.  And you weren't seeking legal advice

15 from Mr. Liburdi, were you?

16     A.    At that point, Mr. Liburdi was just asking if I

17 would attend a meeting.

18     Q.    Okay.  And that was your first -- that was the

19 sum and substance of your first meeting with Mr. Liburdi?

20     A.    Yes.

21     Q.    Is it --

22     A.    He --

23     Q.    Not that it matters a whole lot, but was that

24 on the phone, e-mail, or in person?

25     A.    It was in person.  I believe he caught me in

30

1    the hallway or it was at the end of a discussion on

2    something else, basically said he was having a meeting

3    with ADOA, and outside counsel, and asked if I would

4    participate in that meeting.

5        Q.    Okay.  And you did participate in that second

6    meeting -- in that meeting?

7        A.    Yes, I participated in a meeting.

8        Q.    How long after your -- Mr. Liburdi requested

9    your presence at that second meeting did the second

10   meeting take place?

11       A.    To the best of my recollection, it was a couple

12   days, I don't -- I don't remember how many.

13       Q.    Do you remember where it was?

14       A.    Yes.

15       Q.    Mr. Liburdi's office.  Right?

16       A.    No.

17       Q.    Whose office?

18       A.    It was in a conference room.

19       Q.    On the 9th floor?

20       A.    No.

21       Q.    8th floor?

22       A.    Yes.

23       Q.    How many people were there?

24       A.    I don't recall the exact number.

25       Q.    Approximately how many?

31

1      A.    Less than 10, I think.

2      Q.    Okay.  Please tell us the names of the people

3  you remember being there.

4            Do you remember Marie Isaacson being there.

5  Correct?

6      A.    Yes, Marie was there.

7      Q.    And you remember Mike Liburdi being there?

8      A.    Yes.

9      Q.    And you remember you were there?

10      A.    Yes.  I --

11      Q.    And -- go ahead.

12      A.    There was outside counsel.

13      Q.    From -- from Fennemore Craig?

14      A.    Yes.  I don't remember how many or what their

15  names were.  And Marie may have brought somebody else

16  from ADOA, but I don't remember for sure if she did.

17      Q.    Okay.  And approximately when did this

18  discussion take place in 2016?

19      A.    It was in August of 2016.  I don't -- I don't

20  remember exactly when in August.

21      Q.    Okay.  Did Mr. Liburdi tell you either before

22  this meeting or at the meeting what the meeting was

23  about?

24      A.    Yes.

25      Q.    When did he tell you what the meeting was

32

1    about?

2        A.    When he asked me to join the meeting.

3        Q.    And what did he say?

4        A.    He said that it was a meeting to discuss the

5    ADOA exclusion on gender reassignment surgery, and making

6    sure that it was compliant with the regulations that came

7    down under the ACA.

8        Q.    Did you have a personal position on whether it

9    was a good idea, from a policy perspective, to cover

10   gender reassignment surgery or not?

11       A.    I had not ever thought about this issue with

12   the State plan before.

13       Q.    Your Tweet back in 2013 was different,

14   obviously, you were talking about Medicare and Medicaid.

15   Are you saying that it didn't occur to you that it could

16   possibly be part of the State plan?

17             MS. LAMM:  Object to the form of the question.

18             THE WITNESS:  In 2013, I had never worked for

19   the State government and I don't believe I had given any

20   thought to the State health insurance plan.

21   BY MR. ECKSTEIN:

22       Q.    Okay.  You knew in August of 2016, that

23   coverage in the State healthcare plan for gender

24   reassignment surgery was not popular in the Republican

25   party, didn't you?

33

1          MS. LAMM:  Object to the form of the question.

2          THE WITNESS:  Again, I'm not sure that I ever

3    had any conversations or had given that any thought prior

4    to -- prior --

5    BY MR. ECKSTEIN:

6       Q.    I didn't ask for conversations.  I asked for

7    what you knew.  And it could be that someone told you

8    that.  It could be that some -- that you read that.  It

9    could be that others in the governor's office said that

10   gender reassignment surgery, Christina, is not something

11   that's very popular in the Republican party.

12          You understood that.  Right?

13      A.    Nobody ever --

14          MS. LAMM:  Object to the form of the question.

15          THE WITNESS:  Nobody in the governor's office

16   ever said that to me.

17   BY MR. ECKSTEIN:

18      Q.    Did you hear them say that to anyone else?

19      A.    I have not said that to anyone else.  I don't

20   recall any conversations about this issue prior to that

21   meeting.

22      Q.    Okay.  But there was conversation about this

23   issue at that meeting?

24      A.    At that meeting, yes.

25      Q.    Okay.  So would you please -- who -- who

34

1    chaired the meeting?

2        A.    I -- I don't know that there was an official

3    chair to the meeting.

4        Q.    Do you recall someone opening the meeting

5    saying the purpose of this meeting is?

6        A.    I don't.  It wasn't me.  I don't remember if

7    somebody did that, maybe Mike or Marie, but I don't know.

8        Q.    Okay.  But as best you can now recall, tell us

9    what -- what was said and by whom at that meeting?

10            MS. LAMM:  Objection; this is Betsy.  I'm going

11   to object to the question to the extent the meeting

12   involved or was for the purposes of obtaining legal

13   advice, then I'm going to instruct the witness not to

14   disclose any attorney-client privileged communications

15   that would have occurred at that meeting.  If there were

16   communications that fall outside of the privilege or

17   that -- that were not for the purpose of seeking legal

18   advice, then she may answer.

19            MS. COHAN:  The defendants join.

20            THE WITNESS:  The -- the purpose of that

21   meeting was to seek legal advice regarding the exclusion.

22   BY MR. ECKSTEIN:

23       Q.    Was anything else discussed at that meeting

24   besides legal advice?

25       A.    Not that I recall.

1      Q.    For example, was the cost of including gender

2   reassignment surgery discussed at that meeting?

3      A.    I do not recall it being discussed at that

4   meeting.

5      Q.    Did you discuss the cost of gender reassignment

6   surgery with anyone at any time during the time you have

7   been at the Office of the Governor?

8           MS. LAMM:  Object to the form of the question.

9           THE WITNESS:  I -- I don't recall specific

10   discussions about the cost.

11   BY MR. ECKSTEIN:

12      Q.    Did anyone -- anyone ever tell you that gender

13   reassignment surgery was not going to be covered by the

14   State of Arizona, by the Arizona Department of

15   Administration healthcare plan because of its cost?

16      A.    I know that cost is something that we look at

17   for everything.  Especially in the context of adding cost

18   to the State Health Insurance Trust Fund or to State

19   employees.  So our position, in general at that time, was

20   that the State was in a very bad economic situation.  In

21   2015, we had something like a billion dollar deficit and

22   had to cut across the board in agencies.  The State

23   health insurance plan was in trouble and had to be bailed

24   out.  We still had to put dollars into the health

25   insurance trust fund because it's under water, our State

63

```
 1   during the meetings, if anything?
 2              MS. LAMM:  Again, to the extent this would
 3   entail or would require Ms. Corieri to disclose
 4   attorney-client privileged communications, then I'm going
 5   to instruct her not to answer, but -- but to the extent
 6   she can answer without disclosing attorney-client
 7   privileged communications, she can do so.
 8              MS. COHAN:  Join.
 9              THE WITNESS:  I -- again, I don't remember
10   specific discussions about costs in that meeting.
11   BY MR. POWELL:
12        Q.   Did you ask anyone who participated in this
13   meeting to provide you with cost information?
14        A.   I do not recall asking that, because I knew
15   that, again, adding a benefit, any benefit, adds cost.
16        Q.   But you didn't know what the costs would be?
17        A.   I don't recall asking for that specific cost.
18   I don't -- I don't remember if someone said it or not.
19        Q.   Did you ever, in the context of this
20   decision-making process, with respect to the exclusion of
21   gender reassignment surgery, did you -- did anyone
22   provide you a written analysis of the cost of eliminating
23   the surgery exclusion?
24        A.   I don't recall receiving a written analysis of
25   that.
```

64

1      Q.     Did you ask anyone to provide you with a

2   written analysis of what the cost implications would be

3   of eliminating the exclusion for surgery?

4      A.     No.

5      Q.     In any of these meetings that you have

6   described, and we'll get to specifics about them later,

7   did you hear anyone request an assessment, written or

8   otherwise, of the cost implications of eliminating the

9   exclusion for surgery?

10      A.     I don't recall if that was brought up in

11   this -- in this meeting.

12      Q.     And in this context or otherwise, have you ever

13   asked anyone within the governor's office, or otherwise,

14   for a quantification of the cost of covering gender?

15   re- -- reassignment surgery?

16      A.     I have not, no.

17      Q.     And has anyone in any context ever given you an

18   estimate of what the cost is for gender reassignment

19   surgery?

20           MS. LAMM:  Object to the form of the question.

21           THE WITNESS:  Not that I can recall.

22   BY MR. POWELL:

23      Q.     Did -- apart from what you've just described as

24   a general comment concerning the fact that any new

25   benefit might carry some cost to it, did -- did anyone