# Exhibit 28-A

2022 WL 1812306
United States District Court,
M.D. Georgia, Macon Division.

Anna LANGE, Plaintiff,

v.

HOUSTON COUNTY, GEORGIA, et al., Defendants.

CIVIL ACTION NO. 5:19-cv-392 (MTT)
|
Signed 06/02/2022

**Synopsis**
**Background:** Sheriff's deputy, who was transgender woman, brought action against county and sheriff in his official capacity, alleging that exclusion in county's health insurance plan, which precluded coverage for transition surgery, violated Title VII, the Equal Protection Clause, and the Americans with Disabilities Act (ADA). Parties cross-moved for summary judgment.

**Holdings:** The District Court, Marc T. Treadwell, J., held that:

county acted as agent of sheriff in administering health insurance plan;

sheriff functioned as arm of the state when he provided healthcare benefits to his employees;

genuine dispute of material fact existed as to whether adoption and maintenance of exclusion in county healthcare plan which precluded coverage for transition surgery was motivated by discriminatory intent, precluding summary judgment on claim that exclusion violated Equal Protection Clause;

exclusion plainly discriminated on basis of sex in violation of Title VII; and

there was no evidence that sheriff's deputy's gender dysphoria resulted from physical impairment under ADA.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

Kenneth E. Barton, III, Macon, GA, Michael Devlin Cooper, Macon, GA, Alejandra Caraballo, New York, NY, Catherine Fata, New York, NY, David Brown, New York, NY, Jill K. Grant, New York, NY, Mary Eaton, New York, NY, Noah E. Lewis, New York, NY, Noah Ethan Lewis, New York, NY, Wesley Powell, New York, NY, Z. Gabriel Arkles, New York, NY, Kevin Barry, Hamden, CT, Sarah Matlack Wastler, Washington, DC, for Plaintiff.

Sharon P. Morgan, Atlanta, GA, Patrick L. Lail, Atlanta, GA, William Drummond Deveney, Atlanta, GA, Richard Read Gignilliat, Elarbee, Thompson LLP, Atlanta, GA, for Defendants Houston County Georgia, Sheriff Cullen Talton.

Tyler P. Bishop, Atlanta, GA, for Defendant Blue Cross Blue Shield Healthcare Plan of Georgia Inc.

**ORDER**

MARC T. TREADWELL, CHIEF JUDGE

**\*1** Plaintiff Anna Lange—a transgender woman and sworn deputy with the Houston County Sheriff's Office—brings this action against her employer Defendant Sheriff Cullen Talton in his official capacity and Defendant Houston County, Georgia. Doc. 56. The County's health insurance plan, which Sheriff Talton elected to provide to his employees, excludes coverage for "sex change" surgery, which Lange contends violates Title VII of the Civil Rights Act of 1964, 🏳 42 U.S.C. § 2000e *et seq.*; the Equal Protection Clause of the United States Constitution; and Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* *Id.* Sheriff Talton, the County, and Lange have moved for summary judgment on all claims. Docs. 136; 137; 140. For the following reasons, the parties' motions are **GRANTED in part** and **DENIED in part**. Lange is entitled to partial summary judgment on her Title VII claim against both Sheriff Talton and the County. Lange's equal protection claim shall proceed against the County, and to the extent that Lange seeks prospective relief against Sheriff Talton under the Equal Protection Clause, that claim too shall proceed. Lange's ADA claim fails on the merits because she has not come forward with sufficient admissible evidence that her gender dysphoria is the result of a physical impairment.

# I. BACKGROUND

## A. Lange's Employment with the Houston County Sheriff's Office

Unless noted, the parties agree the following facts are undisputed.

### 1. Lange's Gender Dysphoria and Gender Transition

Lange is a twenty-five-year law enforcement veteran, the past fifteen of which have been with the Houston County Sheriff's Office. Docs. 179-3 ¶ 28; 195 ¶ 28. By all accounts, Lange is an exceptional employee who "has performed her duties as an investigator very well" throughout her tenure as a sheriff's deputy. *Id.* Lange is also a transgender woman, meaning that although she was assigned a male sex at birth, her internal knowledge of herself has always been that she is female. Docs. 179-3 ¶ 29; 195 ¶ 29. In medical parlance, this condition is called gender dysphoria. Docs. 179-3 ¶ 3; 195 ¶ 3. Left untreated, gender dysphoria can lead to clinically significant personal suffering and comorbidities, including anxiety, depression, self-harm, and suicidality. Docs. 179-3 ¶ 6; 195 ¶ 6.

Lange began her gender transition in 2017 after she was diagnosed with gender dysphoria. Docs. 179-3 ¶ 31; 195 ¶ 31. Lange now lives fully and consistently as a woman. Docs. 179-3 ¶ 33; 195 ¶ 33. To facilitate her transition, Lange receives hormone replacement therapy and has had "top surgery" to feminize her chest. Docs. 179-3 ¶¶ 34-35; 195 ¶¶ 34-35. Notwithstanding that treatment, Lange alleges she continues to suffer significant distress and anxiety due to the incongruence between her female gender identity and her remaining male physical characteristics, including her genitalia. Docs. 179-3 ¶ 36; 195 ¶ 36 (the defendants dispute that Lange is so distressed that she cannot work or engage in recreational activities). When such symptoms persist, gender-confirming surgery is considered "medically necessary." Docs. 179-3 ¶ 14; 195 ¶ 14. Following the recommendations of her endocrinologist, two psychologists, and a surgeon, Lange determined that a vaginoplasty, also known as "bottom surgery," was the next step in the treatment of her gender dysphoria. Docs. 179-3 ¶ 37; 195 ¶ 37.

### 2. The County's Health Insurance Plan and the Exclusion

**\*2** Pursuant to an informal intergovernmental agreement between the Sheriff and the County, the Sheriff's Office has participated in the County's health insurance plan since 1973.

Docs. 179-3 ¶ 60; 195 ¶ 60. As a Sheriff's deputy, Lange participates in the County's plan—which has about 1500 members in total—and contributes monthly premiums for the coverage. Docs. 179-3 ¶¶ 67, 70, 71; 195 ¶¶ 67, 70, 71. The health insurance plan is a self-funded or Administrative Services Only ("ASO") plan, which means that Anthem Blue Cross Blue Shield, the County's third-party administrator, administers claims using funds provided by the County and employee contributions. Docs. 179-3 ¶ 69; 195 ¶ 69.

The County's health insurance plan has 68 medical exclusions and 29 pharmacy benefit exclusions. Docs. 179-3 ¶¶ 74, 209; 195 ¶¶ 74, 209. Two of those exclusions, which have been in place since 1998, preclude coverage for "sex change" surgery. Docs. 179-3 ¶¶ 75, 76; 195 ¶¶ 75, 76. Specifically, exclusions 26 and 57 ("the Exclusion") exclude coverage for "[d]rugs for sex change surgery" and "[s]ervices and supplies for a sex change and/or the reversal of a sex change." Docs. 179-3 ¶ 76; 195 ¶ 76.

Kenneth Carter is the Director of Personnel for Houston County and responsible for the administration of the County's health insurance plan. Docs. 179-3 ¶ 47; 195 ¶ 47. During the renewal process in late 2016, the County's insurance broker, who acts as a liaison between the County and Anthem, informed Carter of Anthem's "Nondiscrimination in Health Programs and Activities Rule" which stated that "[i]n recognition of regulations issued under PPACA section 1557, the exclusion for Gender Identity Disorders and Sex Change Surgery will be removed from our plans (both Fully Insured and ASO)." Docs. 179-3 ¶¶ 81, 85, 86; 195 ¶¶ 81, 85, 86. Despite Anthem's recommendation to do so, the County chose not to accept the nondiscrimination mandate. Docs. 179-3 ¶ 91; 195 ¶ 91. Accordingly, the Exclusion remained in place.

For health insurance plans that accepted the nondiscrimination mandate and thus removed the exclusion for "sex change surgery," Anthem has a Guideline for when such surgery is "medically necessary" and covered by the plan. Docs. 179-3 ¶ 15; 195 ¶ 15. Under the Guideline, surgery is medically necessary if there is "significant functional impairment AND the procedure can be reasonably expected to improve the functional impairment." Docs. 179-3 ¶ 16; 195 ¶ 16. It is undisputed that Lange's prescribed vaginoplasty is medically necessary under Anthem's Guideline. Docs. 179-3 ¶ 38; 195 ¶ 38. No evidence disputes Lange's evidence that the prescribed vaginoplasty is medically necessary.

### 3. Lange Informs the County and the Sheriff's Office of her Transgender Status

Lange told Carter that she was transgender and intended to live openly as a woman on April 18, 2018. Docs. 179-3 ¶ 93; 195 ¶ 93. The purpose of this conversation was to determine whether Lange's medically necessary gender reassignment surgery would be covered by the County's health insurance plan. Docs. 179-3 ¶ 94; 195 ¶ 94. Citing the Exclusion, Carter told Lange that her surgery would not be covered. *Id.*

Later that day, Lange and Carter met with Sheriff Talton and told him Lange was transgender. Docs. 179-3 ¶ 98; 195 ¶ 98. During that meeting, Lange requested permission from Sheriff Talton to wear a female uniform at work and present herself as a female in the office. Docs. 179-3 ¶ 99; 195 ¶ 99. In response, Sheriff Talton looked at Carter and said, "[w]hat the hell is he talking about?" Docs. 179-3 ¶ 100; 195 ¶ 100. Carter then explained to Sheriff Talton that "what Sergeant Lange is trying to tell you is that she would like to start presenting herself as a woman and she wants you to understand that." Docs. 179-3 ¶ 101; 195 ¶ 101. Sheriff Talton initially thought Lange's revelation was a joke. Docs. 179-3 ¶ 102; 195 ¶ 102. Sheriff Talton then told Lange that he doesn't "believe in sex changes." Docs. 179-3 ¶ 103; 195 ¶ 103. Nonetheless, the Sheriff ultimately granted Lange permission to dress as a female but also warned her she would need "tough skin" to deal with her coworkers. Docs. 179-3 ¶¶ 106-107; 195 ¶¶ 106-107.

**\*3** The following day, Lange came out to her coworkers in the Criminal Investigation Division ("CID") during a meeting chaired by Sheriff Talton. Docs. 179-3 ¶¶ 111, 112; 195 ¶¶ 111, 112. Despite acknowledging that Lange's transition was "sensitive and a serious subject," Sheriff Talton repeated his sentiment that he "didn't believe in all this" during the meeting. Docs. 179-3 ¶ 112; 195 ¶ 112. And perhaps in tacit acknowledgement of the CID's boisterous atmosphere, Sheriff Talton told the group that what Lange did "takes big balls." Docs. 179-3 ¶ 113; 195 ¶ 113.

### B. Lange's "Sex Change" Surgery is Denied Pursuant to the County's Exclusion

#### 1. Lange's Gender Confirmation Surgery is Denied

Anthem initially told Lange that her gender confirmation surgery would be covered if it was "medically necessary" under Anthem's Guideline. Docs. 179-3 ¶ 115; 195 ¶ 115. This, the County contends, was a misunderstanding, due

to Anthem's failure to note the County's position on the 2017 plan year renewal document. Docs. 179-3 ¶ 92; 195 ¶ 92. According to Anthem's records, the County had not opted-out of the nondiscrimination mandate. Docs. 179-3 ¶ 126; 195 ¶ 126. In consultation with the County's insurance broker, Carter worked with Anthem to ensure the Exclusion remained intact.[1] Docs. 179-3 ¶ 128; 195 ¶ 128. The parties dispute whether this was a retroactive "opt-out" or whether the County was merely attempting to "correct the record." Docs. 179-3 ¶ 133; 195 ¶ 133. In any event, it is undisputed that cost was not a factor in the County's decision to opt out of the nondiscrimination mandate. Docs. 179-3 ¶ 135; 195 ¶ 135.

On November 30, 2018, Lange was denied pre-authorization for gender confirmation surgery in accordance with the Exclusion. Docs. 179-3 ¶ 129; 195 ¶ 129. Lange appealed, and that appeal was denied on January 23, 2019. Docs. 179-3 ¶ 145; 195 ¶ 145. In a final attempt to have the Exclusion removed and her surgery covered, Lange presented her case to the County Commissioners during a public meeting on February 19, 2019. Docs. 179-3 ¶¶ 167-170; 195 ¶¶ 167-170. The County Attorney, speaking for the County, informed Lange the Commissioners are "not considering any changes to the plan at this time" and that he further advised the Commission "not to discuss this matter due to the potential for litigation." Docs. 179-3 ¶ 173; 195 ¶ 173. The County did not consider any cost information prior to deciding not to consider Lange's request to remove the Exclusion. Docs. 179-3 ¶ 174; 195 ¶ 174.

#### 2. The County Decides to Keep the Exclusion

Lange filed EEOC charges against the County and was issued a right-to-sue letter on July 8, 2019. Docs. 179-3 ¶ 180; 195 ¶ 180. With potential litigation on the table, the County sought information from Anthem about the cost of gender reassignment surgery on September 30, 2019. Docs. 179-3 ¶¶ 186, 188; 195 ¶¶ 186, 188. Anthem responded that such costs could total $186,100, but that the specific procedure Lange sought—a genital vaginoplasty—was estimated only to cost $25,600. Docs. 179-3 ¶ 189; 195 ¶ 189. Anthem also concluded that that utilization of gender-confirming care was low. Docs. 179-3 ¶ 226; 195 ¶ 226.

On November 19, 2019, the County Commissioners voted "unanimously by all to approve the recommended cost-sharing to plan participants and the premium increases to retirees as presented and that the 68 plan exclusions and 29 pharmacy benefits exclusions remain in place." Docs. 179-3

¶ 209; 195 ¶ 209. The County contends this was done to keep down the overall costs of the plan. Doc. 179-3 ¶ 213. Specifically, the County was concerned that eliminating one exclusion would lead to requests or legal action to remove other exclusions. Doc. 179-3 ¶ 214.

### C. Procedural Summary

**\*4** Lange's operative complaint alleges the adoption and maintenance of the Exclusion violates the Equal Protection Clause of the U.S. Constitution, the Equal Protection guarantee of the Georgia Constitution, Title VII, Title I and Title II of the ADA, and the Rehabilitation Act of 1973. Doc. 56. On the defendants' motions, the Court dismissed Lange's ADA Title II claim, Georgia equal protection claim, and individual capacity federal equal protection claim against numerous defendants, including Sheriff Talton. Doc. 89 at 36. Accordingly, the only claims that remain are Lange's federal equal protection claim against the County and the Sheriff in his official capacity, Lange's Title VII claim against the County and the Sheriff in his official capacity, and Lange's ADA Title I claim against the County and the Sheriff in his official capacity. *Id.* at 37.

### II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.' " *Info. Sys. & Networks Corp. v. City of Atlanta,* 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Id.* The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Fed. R. Civ. P. 56(c)(1)(A).*

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony,* 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009)

(citing *Four Parcels of Real Prop.,* 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.,* 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.' " *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Thus, the Court " 'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.' " *Strickland v. Norfolk S. Ry. Co.,* 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.' " *Four Parcels of Real Prop.,* 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party "simply may show ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (cleaned up). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.,* 281 F.3d at 1224-25 (citing *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548).

**\*5** The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See* 📑 *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See* 📑 *Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

## III. DISCUSSION

The Court first addresses issues concerning the reach and scope of Lange's claims.

### A. Sheriff Talton's Immunity and the County's Agency

*1. The County is an "Agent" for Purposes of Title VII and the ADA*

Liability under Title VII and the ADA is the employer's. 📑 *Busby v. Cty. of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (Title VII); 📑 *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) (ADA). But Title VII and the ADA both define "employer" to include an employer's agents. 📑 42 U.S.C. §§ 12111(5)(A); 2000e(b). That definition must be construed liberally. *Cty. of* 📑 *Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 702, 718 n.33, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); 📑 *Williams v. Cty. of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985). "Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship." 📑 *Williams*, 742 F.2d at 589 (quoting Schlei & Grossman, *Employment Discrimination Law* at 1002 (2d ed. 1983)).[2] Lange contends that the Sheriff delegated to the County the authority to provide healthcare benefits to the Sheriff's employees, and thus, the County is an "employer."

In 📑 *Williams*, the Eleventh Circuit held that the City of Montgomery and its agent, the Montgomery City-County Personnel Board, were both liable for racial discrimination under 📑 Title VII. 742 F.2d. at 589. In that case, the Board exercised rights traditionally reserved to the employer. 📑 *Id.* Among other things, the Board established a pay plan, formulated minimum standards for jobs, evaluated employees, and reinstated employees in the competitive service. 📑 *Id.* Because these functions were traditionally exercised by an employer, the Eleventh Circuit held the Board was an agent of the City and Title VII liability applied to both entities. 📑 *Id.* Thus, when the Board allegedly violated Title VII by refusing to reinstate a black firefighter, it was liable as an agent of the City.

**\*6** Here, Sheriff Talton delegated the authority to the County to provide and administer healthcare benefits to his employees. Docs. 179-3 ¶ 60; 195 ¶ 60. The County—on behalf of the Sheriff—provided the Sheriff's employees a health insurance plan containing the Exclusion and, in the administration of that plan, it denied Lange's claim for medically necessary treatment. Docs. 179-3 ¶¶ 60, 75, 129; 195 ¶¶ 60, 75, 129. In short, the County acted as an agent of the Sheriff because the County provided a health insurance plan to the Sheriff's deputies—a function traditionally exercised by an employer. 📑 *Williams*, 742 F.2d at 589.

The County admits all of this. Docs. 137-2 at 8-11; 180 at 30. But it argues that Georgia law provides that sheriffs alone have the authority to decide whether and how to provide healthcare benefits to their employees. *Id.* True, but the County cites no law prohibiting what happened here—the Sheriff's delegation to the County the authority to provide and administer, on behalf of the Sheriff, healthcare benefits for his employees. The well-established law that a sheriff's employees are not county employees does not preclude a sheriff from outsourcing employer functions. In other words, just because Sheriff Talton alone chooses how a health insurance plan is provided to his employees does not mean the County does not act as an agent when it provides health coverage at the express delegation of the Sheriff. *See* 📑 *Williams*, 742 F.2d at 589.

In sum, it is undisputed that the County acted as the Sheriff's agent. If the County violated Title VII and the ADA, the County, as an agent, is liable.

### 2. Sheriff Talton Functions as an "Arm of the State" When Providing Healthcare Benefits to His Employees

Sheriff Talton argues he is entitled to Eleventh Amendment immunity from Lange's equal protection and ADA claims because a sheriff acts as an "arm of the state" when he pays "wages" to his employees, and healthcare benefits are wages as part of his "deputies' compensation package." Doc. 136-9 at 5-11. The Sheriff is correct—healthcare benefits are a form of compensation—and that much Lange does not dispute. Rather, Lange contends immunity is inappropriate because the State of Georgia would neither be responsible for a monetary judgment against the Sheriff nor does the State exercise control over the County's health insurance plan. Doc. 178 at 49-52.

First, it is not just the Eleventh Amendment that bars § 1983 claims for damages against sheriffs in their official capacities. [3] States—and, by extension, arms of the state—are not "persons" within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). And § 1983 subjects only "persons" to monetary liability for violations of constitutional rights. But the questions of whether Sheriff Talton is a "person" subject to § 1983 liability and whether Sheriff Talton is entitled to Eleventh Amendment immunity from the ADA both turn on whether the Sheriff functioned as an arm of the state when he provided healthcare benefits to his employees. In other words, the "personhood" analysis is the same as the Eleventh Amendment analysis. *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 606 n.9 (11th Cir. 2014). [4]

**\*7** "Under the traditional Eleventh Amendment paradigm, states are extended immunity, counties and similar municipal corporations are not, and entities that share characteristics of both require a case-by-case analysis." *Lesinski*, 739 F.3d at 601 (citing *Mt. Healthy Cty. Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In the Eleventh Circuit, this case-by-case analysis is conducted by applying the factors set forth in *Manders v. Lee*. 338 F.3d 1304, 1308-09 (11th Cir. 2003). [5] When a county or municipality is acting in concert with an agent

or instrumentally of the state, a *Manders* analysis is appropriate to determine the agency's status as either a state or local government actor when performing the specific function at issue. *Monroe v. Fort Valley State Univ.*, ---- F. Supp. 3d ----, ----, 2021 WL 5451145, at \*6 (M.D. Ga. Nov. 22, 2021) (citations omitted). But "when a state-created entity only serves the state, a *Manders* analysis is a pointless exercise." *Id.*

Both parties agree the function at issue is Sheriff Talton's provision of healthcare benefits to his employees. Docs. 136-9 at 5-11; 178 at 49-52. But with the benefit of discovery, Lange does not suggest that function was performed for or on behalf of the County. *See* Doc. 178 at 49-52. And during oral argument, Lange conceded Sheriff Talton was acting on his own behalf and not on behalf of the County. Doc. 197 at 16:24-17:8. Instead, Lange reasons that because Sheriff Talton was acting on his own behalf when he adopted the County's health insurance plan, he could not be acting as an arm of the state. *See id.* That is not how it works.

While a *Manders* analysis is frequently necessary when sheriffs are sued, it is only necessary when there is a colorable question of whether the sheriff acted in his capacity as a state officer or on behalf of some non-state governmental entity such as the county he serves. *See, e.g., Manders*, 338 F.3d at 1305-06 (whether the sheriff acts as an arm of the state when he establishes use-of-force policies at the county jail); *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Com'rs*, 405 F.3d 1298, 1309 (11th Cir. 2005) (whether the sheriff acts as an arm of the state when he enforces county ordinances). In this case, a *Manders* analysis is not required because Lange concedes the Sheriff was not providing a health insurance plan to his employees on behalf of the County. *Monroe*, ---- F. Supp. 3d at ----, 2021 WL 5451145, at \*6. In other words, Sheriff Talton never stepped outside his arm of the state position.

Accordingly, Lange's Equal Protection claim for damages pursuant to § 1983 fails because Sheriff Talton is an arm of the state and, thus, not a "person" for the purposes of that statute. [6] Similarly, as an arm of the state, Sheriff Talton is entitled to Eleventh Amendment immunity from Lange's ADA claim for monetary damages. [7] *Bd. of Trustees of*

*Univ. of Ala. v. Garrett*, 531 U.S. 356, 360, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

## B. Fact Issues Preclude Summary Judgment on Lange's Equal Protection Claim

**\*8** Section 1983 allows a plaintiff to seek relief when "deprived of a right 'secured by the Constitution and laws' " of the United States. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (quoting 42 U.S.C. § 1983). "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Graham v. Connor*, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Baker*, 443 U.S. at 144 n.3, 99 S.Ct. 2689). Lange seeks relief under the Equal Protection Clause of the Fourteenth Amendment which guarantees "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

### 1. The Exclusion Is Not Facially Discriminatory Under the Equal Protection Clause

There are three categories of equal protection claims. *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987) (citations omitted). First, a classification may violate the Equation Protection Clause if it discriminates "on its face." *Id.* "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, —— U.S. ——, 139 S. Ct. 1112, 1127, 203 L.Ed.2d 521 (2019). Second, a facially neutral classification may discriminate in its purpose or effect by having a "disparate impact" on a particular class. *E & T Realty*, 830 F.2d at 1112 n.5. Third, a facially neutral policy may be unequally administered as applied to the plaintiff. *Id.* Facially neutral classifications are unconstitutional when they are intended to affect a protected class and fail the applicable level of scrutiny.[8] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-73, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

Lange does not argue the Exclusion facially discriminates on the basis of sex. Doc. 187 at 20. Understandably so, the Supreme Court has foreclosed that argument. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In *Geduldig*, the Supreme Court held a state insurance policy that excluded coverage for a medical procedure that only one sex can undergo did not classify on the basis of sex. *Id.* at 495-97, 94 S.Ct. 2485. Rather, the classification was based on a medical condition. *Id.* at 496-97, 94 S.Ct. 2485. The classification created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20, 94 S.Ct. 2485. Although "the first group is exclusively female," the Court reasoned "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.* The Court noted that there was "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496, 94 S.Ct. 2485.

According to the logic of *Geduldig*, Lange has the same coverage as other employees because the Exclusion applies equally to a male seeking to become a woman or a woman seeking to become a man. And even if transgender individuals are entitled to protection under the Equal Protection Clause as a separate and distinct class from that of males and females, the same logic would apply. In other words, the Exclusion creates two groups—those that want a "sex change" and those that do not. Both groups contain transgender members and non-transgender members, so a "lack of identity" exists between the policy and transgender status. Thus, in the context of the Equal Protection Clause, the Exclusion does not facially discriminate on the basis of sex.[9]

### 2. Whether Lange Can Establish Invidious Discrimination is a Disputed Fact

**\*9** Lange argues the Exclusion, although facially neutral pursuant to *Geduldig*, nonetheless violates the Equal Protection Clause because it has "a disproportionate impact on transgender individuals and [was] motivated by discriminatory intent." Doc. 187 at 20. Determining discriminatory intent is guided by an eight-factor test: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; ... (5) the contemporary statements and actions of key legislators; ... (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (cleaned

up) (quoting *Greater Birmingham Ministries v. Sec'y State for Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021)).

The parties do not address all eight factors. But after a careful review of the record, it is clear material disputes of fact preclude summary judgment for any of the parties.

**The Impact of the Challenged Law**. The impact of the Exclusion is no secret—the defendants admit "that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change.' " Docs. 179-3 ¶ 78; 195 ¶ 78. And Lange is the only openly transgender member of the defendants' health insurance plan. Docs. 179-3 ¶ 30; 195 ¶ 30. But while "impact provides an important starting point, purposeful discrimination is the condition that offends the Constitution." *Feeney*, 442 U.S. at 274, 99 S.Ct. 2282 (cleaned up).

**The Historical Background and the Specific Sequence of Events Leading Up to the Exclusion**. There is no direct evidence shedding light on why the Exclusion was adopted in 1998. [10] One reason could have been cost control. Certainly, the County *now* professes concern about costs, but that argument is undercut by the undisputed fact that the County built its cost defense after the fact. *See* Docs. 179-3 ¶ 135; 195 ¶ 135. And the Exclusion impacts only transgender individuals—that provides some circumstantial evidence of intentional discrimination.

**Procedural and Substantive Departures**. The County chose not to accept the non-discrimination mandate and instead maintained the Exclusion notwithstanding Anthem's recommendation that it be removed. Docs. 179-3 ¶ 91; 195 ¶ 91. Of course, the mandate arose from § 1557 of the Affordable Care Act, and the County concluded that its self-funded plan did not fall within the mandate's scope. Doc. 180 at 3. Still, Lange contends the mandate, even if technically not applicable, substantively gave notice to the County that the Exclusion was discriminatory, yet the County maintained —or reinstated—the Exclusion nonetheless. Doc. 140-1 at 29. Similarly, Lange argues the County's refusal to consider an exception for Lange's "sex change" surgery demonstrates discriminatory intent. *Id.* at 30.

**The Contemporary Statements and Actions of Key Legislators**. Sheriff Talton didn't "believe in sex changes," and the County didn't consider the cost of removing the Exclusion before it declined to do so. Docs. 179-3 ¶¶ 103, 174; 195 ¶¶ 103, 174. On the other hand, because annual plan costs rose by over 17% in 2018–2019 it could be that the County wasn't interested in taking any action that would cause it to pay any more than it was already obligated to pay under the existing terms of the health insurance plan. *See* Docs. 137-1 ¶ 37; 178-1 ¶ 37.

**\*10 The Foreseeability of the Impact and Knowledge of the Impact**. These factors tend to favor Lange. It is undisputed the Exclusion affected only transgender members, Lange is the only openly transgender member, and the County, based on the Exclusion, has refused to authorize medically necessary treatment.

**The Availability of Less Discriminatory Alternatives**. There is no evidence the County considered less discriminatory alternatives.

In sum, the facts are hotly disputed. The Court cannot say as a matter of law whether, under the Equal Protection Clause, the adoption and maintenance of the Exclusion was motivated by discriminatory intent. The parties' motions for summary judgment (Docs. 136; 137; 140) on equal protection grounds are **DENIED**. [11]

**C. Lange is Entitled to Partial Summary Judgment on Her Title VII Claim**

At first look, it may seem odd that the question of whether the Exclusion violates the Equal Protection Clause is one of fact while the question of whether the Exclusion violates Title VII can be decided as a matter of law. Whether odd or not, the reason is clear— *Bostock v. Clayton Cnty., Georgia, —— U.S. ——*, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sex discrimination under Title VII includes discrimination based on sexual orientation and discrimination based on gender stereotyping because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. And as *Bostock* makes clear, "because of" sex means that "a particular outcome would not have happened 'but for' the purported cause." *Id.* at 1739. Denying healthcare

coverage "because of" sex unquestionably violates Title VII because those benefits are "compensation, terms, conditions, or privileges of employment" under the Act. *Newport News*, 462 U.S. at 682, 103 S.Ct. 2622 (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also Manhart*, 435 U.S. at 710, 98 S.Ct. 1370 ("[T]here is no reason to believe that Congress intended a special definition of discrimination in the context of employee group insurance coverage.").

A facially discriminatory employer action against a member of a protected class violates Title VII.[12] *Johnson Controls, Inc.*, 499 U.S. at 206, 111 S.Ct. 1196. And if an adverse employment action is facially discriminatory, the employer's intent is immaterial—"the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Id.* at 199, 111 S.Ct. 1196. Here, it is undisputed that the Exclusion is facially discriminatory.

**\*11**  The relevant facts are neatly summarized in Lange's Statements of Material Fact 77 and 78.

**77. The Exclusion denies coverage for procedures and treatments that would otherwise be covered if provided in connection with a different diagnosis.** *See* Grant Decl., Ex. A Carter Dep. at 6:7-13 (agreeing that "without an exclusion, gender confirmation surgery would be covered under a health plan administered by Anthem if it was medically necessary"); *id.* at 35:9-15 (Q: "Would exclusion 57 exclude a mastectomy sought for cancer treatment?" A: "No." Q: "But would exclusion 57 prevent coverage of a mastectomy if it was used to treat gender dysphoria?" A: "Yes."); 37:9-16 (Q: "Exclusion 26 would not exclude hormone replacement therapy to treat menopause?" A: "No, not as I understand it." Q: "But would exclusion 26 prevent hormone replacement therapy if used to treat gender dysphoria?" A: "As I understand it, yes."); 103:10-22 (Q: "Is mental healthcare generally covered under the plan?" A: "Yes." Q: "So it becomes not covered when it's related to transgender treatment?" A: "Well, yes [.] When it is because of transgender surgery or whatever it may be, then it is not covered."); Grant Decl., Ex. F Clark Dep. at 100:6-10 (Q: "So were you saying that if [mental health] counseling were done for the purpose of treating gender dysphoria, then it would not be covered because of the exclusion?" A: "Yes."); Grant Decl., Ex. H HC Dep. (B. Holland) at 27:16–20 (Q: "Would any mental health counseling around transitioning be excluded under this exclusion?" A: "I believe it would, if it was specific to transitioning, yes."); Grant Decl., Ex. B Sheriff Talton Dep. at 55: 6–12 (Q: "Do you know if ...mastectomy, you know, breast surgery ... in the context of breast cancer, whether that's covered by the policy?" A: "I understand [if] it is about breast cancer, things like that, yes.")

RESPONSE: Disputed to the extent Plaintiff suggests that all treatment for gender dysphoria is excluded. Plaintiff testified that her endocrinologist visits, psychological visits, and hormones and other medications have been covered by the Health Plan. (Doc. 137-3 at 48:19-49:15.)

Docs. 179-3 ¶ 77; 195 ¶ 77.

**78. Defendants admits "that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change.' "** Grant Decl., Ex. N Defs.' Resp. to First Set of RFAs at No. 5.

RESPONSE: Undisputed.

Docs. 179-3 ¶ 78; 195 ¶ 78.

The defendants' qualification of their admission of Statement of Fact 77 is well taken. Notwithstanding the County's apparent belief that the Exclusion bars all treatment for gender dysphoria (a belief providing some evidence of discriminatory intent), that plainly is not what the Exclusion says: it excludes coverage for sex change surgery and drugs related to sex change surgery. That qualification, however, is immaterial to the question of whether the Exclusion is facially discriminatory. The fact of the matter is, for example, that the plan pays for mastectomies when medically necessary for cancer treatment but not when mastectomies are medically necessary for sex change surgery. And the plan pays for hormone replacement therapy medically necessary for the treatment of menopause, but not hormone replacement therapy medically necessary for "sex change." The undisputed, ultimate point is that the Exclusion applies only to transgender members, and it applies to Lange because she is transgender.

**\*12**  The defendants' effort to mitigate the necessary implication of these admissions is damning.

> Since the plan covers some treatments related to her transgender status, it

> can only be said that the County's
> health plan differentiates on the basis
> of transgender individuals *who want
> transition surgery.*

Doc. 201 at 3.

Precisely. Transgender employees cannot get medically necessary treatment for "sex change" medical care because they are transgender. On these undisputed facts, the implication of 🚩 *Bostock* is clear.

In 🚩 *Bostock*, the Supreme Court recognized that Title VII delivers a message "equally simple and momentous: [a]n individual's ... transgender status is not relevant to employment decisions." 🚩 140 S. Ct. at 1741. Since the Supreme Court's decision, the defendants have struggled to marshal responses to this clear message. For example, 🚩 *Bostock* had not been decided when the defendants moved to dismiss Lange's complaint, but it had when the Court heard oral argument on the motions. At that hearing, the following exchange took place:

> THE COURT: So let me be sure. I think in your initial brief you raised the argument that this particular exclusion is not a Title VII violation because it impacts both male and female transgender people. You don't make that argument anymore?

> COUNSEL: Your Honor, I think 🚩 *Bostock* changes the landscape in that regard. I think that was a viable argument when we made it back in April or May, whenever that brief was filed initially, before 🚩 *Bostock* was decided in June.

Doc. 88 at 10:16-24.

But the defendants attempt to resurrect that argument to support their motions for summary judgment. Specifically, they argue, without even a nod this time to 🚩 *Bostock*, that the Exclusion cannot be discriminatory because it applies to "participants of both sexes (regardless of gender)." Docs. 136-9 at 16, 137-2 at 15. But, as defendants properly conceded initially, 🚩 *Bostock* precludes that argument:

> Nor is it a defense for an employer to say it discriminates against both men and women because of sex. This statute works to protect individuals of both sexes from discrimination, and does so equally. So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in *both* cases the employer fires an individual in part because of sex. Instead of avoiding Title VII exposure, this employer doubles it.

🚩 140 S. Ct. at 1741.

Ignoring 🚩 *Bostock* doesn't make it go away. Yet the defendants' main briefs relegate 🚩 *Bostock* to a footnote in which they argue that the Supreme Court did not create a new suspect class, but rather:

> the Supreme Court broadened the understanding of what amounts to "sex" discrimination. Thus, for purposes of her Title VII claim, the issue is not whether the sex reassignment surgery exclusion discriminates on the basis of transgender status; Plaintiff must show it discriminates on the basis of sex.

Docs. 136-9 at 16 n.10; 137-2 at 14-15 n.11.

The defendants' point is not clear, but 🚩 *Bostock* covers any possible intended point—discrimination on the basis of transgender status is discrimination on the basis of sex and is a violation of Title VII.

**\*13**  Given the import of the undisputed facts and the defendants' failure to address ⚑ *Bostock* in any meaningful way, the Court requested supplemental briefing on the following question:

> Whether an exclusion in an employee healthcare benefit plan that excludes medically necessary coverage because of transgender status necessarily is a violation of Title VII.

Doc. 200.

The defendants' supplemental brief is telling. They begin by acknowledging that sex "is deemed to include transgender status, and, therefore, an employer who takes an adverse employment action against 'an individual *merely for being* ... transgender defies [Title VII].' " Doc. 201 at 1. The defendants do not explain why they emphasize "merely," but the Court notes that ⚑ *Bostock* confirms that Title VII requires only "but for" causation. [13] As framed, the issue for supplemental briefing clearly encompasses but-for causation.

The defendants then argue that there are only two "sets of circumstances in which a health plan could discriminate on the basis of ... transgender status in violation of Title VII, neither of which is present in this case." Doc. 201 at 1-2. First, the defendants argue a plan violates Title VII if it "offer[s] a *different* coverage package to participants based on their sex or transgender status." *Id.* at 2. Second, "a plan violates Title VII if it *completely* excludes coverage for transgender care." *Id.* Because Lange has been offered the same coverage as other participants and the plan covers some treatment relating to Lange's transgender status, the defendants conclude the Exclusion is not facially discriminatory. *Id.* Under ⚑ *Bostock*, neither argument has merit.

The defendants' first argument fails on its face. The suggestion that an employer with a single health insurance plan could fill the plan with discriminatory exclusions and avoid Title VII liability because the employer offered that one "coverage package" to all employees lacks any merit. The two cases defendants cite to support their argument make that clear. In ⚑ *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, the Supreme Court held that a health insurance

plan that provided different pregnancy benefits to female employees than to spouses of male employees violated Title VII. ⚑ *462 U.S. at 685, 103 S.Ct. 2622*. And in ⚑ *City of Los Angeles v. Manhart*, the Supreme Court held that a pension plan requiring higher contributions from females because females live longer, violated Title VII notwithstanding the actuarial soundness of the scheme—charging women higher premiums because they are women violated Title VII. [14] ⚑ *435 U.S. at 709, 98 S.Ct. 1370*. Neither case remotely supports the proposition that health insurance plans run afoul of Title VII only if an employer provides "different coverage packages." As the Supreme Court said in ⚑ *Manhart*, there is no "special definition of discrimination" for employee benefits plans. [15] ⚑ *435 U.S. at 710, 98 S.Ct. 1370*.

**\*14**  The defendants' second argument—the Exclusion is lawful because it excludes only some treatment because of transgender status—has, if possible, even less merit. For authority, the defendants cite recent district court cases finding unlawful insurance plan exclusions for transgender healthcare but argue these cases turn on the blanket exclusion of benefits for transgender-related medical care. *See* Doc. 201 at 2-3. As Lange points out, they do no such thing. [16] Also, this argument is simply a rearranged version of the first argument—an employer, the defendants maintain, can lawfully refuse to pay benefits because of transgender status for some conditions as long as it pays benefits to transgenders for other services. Title VII does not exempt "partial" violations. *See* ⚑ *42 U.S.C. § 2000e-2(a)(1)*.

In short, the defendants can't find a ⚑ *Bostock* workaround. That is understandable. The Exclusion plainly discriminates because of transgender status. Accordingly, Lange's motion for summary judgment (Doc. 140) on Title VII grounds as to Sheriff Talton and the County is **GRANTED in part**. Lange does not address appropriate relief. That issue remains.

### D. Lange's ADA Claim Fails

Finally, Lange alleges the Exclusion discriminates on the basis of her gender dysphoria and thus violates Title I of the ADA. Doc. 140-1 at 21, 37-45. Congress enacted the ADA in 1990 to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *42 U.S.C. § 12101(b)(1)*. Title I of the ADA prohibits certain discrimination because of disability

in employment settings. *Id.* §§ 12111-12117. But the ADA does not cover all disabilities. Specifically, the ADA excludes from the definition of disability "gender identity disorders not resulting from physical impairments." *Id.* § 12211(b)(1). Lange contends that because the text of 42 U.S.C. § 12211(b) makes no express mention of gender dysphoria, that condition is not excluded. Doc. 178 at 38. And even if the ADA's gender identity disorders exclusion did apply to gender dysphoria, Lange argues she has sufficient evidence to demonstrate her condition resulted from a physical impairment. Both arguments are without merit.

*1. Gender Dysphoria is Subject to the ADA's Gender Identity Disorders Exclusion*

The exclusionary language of the ADA at issue has not been amended since it was enacted in 1990. 42 U.S.C. § 12211(b). While not explicitly mentioned by Lange, her argument that gender dysphoria is not subject to the exclusion appears to rest on the "interpretive canon, *expressio unius est exclusio alterius,* 'expressing one item of [an] associated group or series excludes another left unmentioned.' " *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 80, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (quoting *United States v. Vonn,* 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002)). In other words, because the ADA's exclusionary language makes no mention of gender dysphoria, gender dysphoria is not subject to the exclusion.

"The force of any negative implication, however, depends on context." *Marx v. Gen. Revenue Corp.,* 568 U.S. 371, 381, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013). Indeed, "the *expressio unius* canon does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.' " *Id.* (quoting *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003)). That didn't happen here because gender dysphoria first appeared as a diagnosis in 2013 when the American Psychiatric Association published the Fifth Edition of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition,* at 451 (2013). So regardless of whether gender dysphoria is a "replacement diagnosis," as the defendants argue, or a "new and distinct" diagnosis, as Lange contends, the fact that it was not mentioned in the exclusionary language of the ADA is not determinative

because the diagnosis did not exist at the time the Act was written. *See Marx,* 568 U.S. at 381, 133 S.Ct. 1166.

**\*15** More fundamentally, Lange's statutory construct builds on a false premise. She argues the diagnosis of gender dysphoria is not the same as the diagnosis of gender identity disorder. But Congress did not limit the exclusion to a single diagnosis or a single condition. Rather, Congress excluded from the coverage of the ADA "gender identity disorders." 42 U.S.C. § 12211(b)(1). There is no reason to think Congress's use of the descriptive term "gender identity disorders" was an accident. The Third Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-III")—the operative version at the time the ADA was drafted—used the same term. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders – Third Edition,* at 261 (1980). The DSM-III defined "gender identity disorders" as one of four groups of "psychosexual disorders." *Id.* Under the DSM-III, the "gender identity disorders" subclass of psychosexual disorders was "characterized by the individual's feelings of discomfort and inappropriateness about his or her anatomic sex and by persistent behaviors generally associated with the other sex." *Id.* The DSM-III further defined the "essential feature" of the gender identity disorders subclass as "an incongruence between anatomic sex and gender identity." *Id.* The descriptive term used in the DSM-III clearly includes the subsequently refined specific diagnosis of gender dysphoria.[17]

The DSM-V confirms this:

> Gender dysphoria refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and / or surgery are not available. The current term is more descriptive than the previous DSM-IV term gender identity disorder and focuses on dysphoria as the clinical problem, not identity per se.

*Id.* at 451.

Thus, the "more descriptive" gender dysphoria emphasizes the "clinical problem" rather than on the "identity per se." But the focus of the new term didn't change—"the incongruence between one's experienced or expressed gender and one's assigned gender." Clearly "gender identity disorders," as used in the ADA, and for that matter in the DSM-III, includes within its scope the condition the DSM-V calls "gender dysphoria."

Lange argues this conclusion must be avoided because doing so would raise "a serious doubt of constitutionality" under the Equal Protection Clause. Doc. 178 at 40 (citing 📄 *Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403, at *5-7 (D. Mass. June 14, 2018)). Not true. Aside from citing some legislative history in a footnote, Lange makes no real effort to show that the ADA's gender identity disorder exclusion violates the Equal Protection Clause and thus has not carried her burden necessary for the Court to make such a finding. Doc. 178 at 40 n.7; *see Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1547 (11th Cir. 1994). Accordingly, Lange's ADA claim only survives if her gender dysphoria is the result of a physical impairment.

*2. Lange Cannot Establish that her Gender Dysphoria Results from a Physical Impairment*

The DSM-V makes clear that gender dysphoria is a mental impairment, which Lange acknowledges. Doc. 140-1 at 38-39. But she argues gender dysphoria is also a "physical impairment." *Id.* at 38. "Specifically, the condition is the result of an atypical interaction of the endocrine system and the neurological system." *Id.* However, the "evidence" offered to support this conclusion is nothing more than an expert's recitation of literature suggesting a *possible* influence of sex hormones on the developing fetal brain as a factor in gender dysphoria. *See* Doc. 144-1 ¶¶ 18, 19. The expert's report acknowledges that "the specific mechanisms guiding the biological underpinnings of gender identity are not entirely understood." *Id.* ¶ 19. But based on that not

entirely understood mechanism(s), the expert's report cites an "evolving consensus that being transgender is not a mental health disorder." *Id.* This is not even an *ipse dixit*, it is an evolving possible *ipse dixit*.

**\*16** Even if the Court were to accept Lange's expert report at face value, there is nothing in that report or anywhere else in the record suggesting *Lange's* gender dysphoria results from a "physical impairment." *See* Doc. 144-1. Nor does Lange address the kind of "physical impairments" required by the ADA. [18]

In short, Lange has submitted no evidence that her gender dysphoria results from a physical impairment, and her ADA claim fails. Accordingly, the defendants' motions for summary judgment (Docs. 136; 137) as to Lange's ADA claim are **GRANTED**.

## IV. CONCLUSION

Based on the foregoing, Lange's motion for summary judgment (Doc. 140) is **GRANTED in part.** She has established as a matter of law that the Exclusion is facially discriminatory and thus violates Title VII, leaving only the issue of appropriate relief. The defendants' motions for summary judgment (Docs. 136; 137) are **GRANTED** as to Lange's ADA claim because she has not established her gender dysphoria is the result of a physical impairment. Lange's equal protection claim will proceed to trial because there are numerous disputes of fact as to whether the Exclusion was adopted and maintained with a discriminatory intent. Thus, the parties' cross motions for summary judgment on that claim (Docs. 136; 137; 140) are **DENIED**. [19]

**SO ORDERED**, this 2nd day of June, 2022.

**All Citations**

--- F.Supp.3d ----, 2022 WL 1812306, 65 NDLR P 93

---

## Footnotes

1    Anthem reinstated the Exclusion but required the County to agree that the County "will be responsible for any penalties that result if the plan is determined to be noncompliant." Docs. 179-3 ¶ 160; 195 ¶ 160.

2    *See also Tolar v. Bradley Arant Boult Cummings*, 2014 WL 12836011, at *7 (N.D. Ala. Nov. 18, 2014) (collecting cases in which agents' control of a specific employment practice, such as health care, determined employer status under Title VII); *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 728 (N.D. Ala. 1981), *aff'd*, 664 F.2d 295 (11th Cir. 1981) ("an agency relationship which establishes an 'employment nexus' " wherein one corporation is the "agent of the other with respect to employment practices" is sufficient to establish employer status under Title VII); *Ingber v. Ramada Inns, Inc.*, 1979 WL 280, at *3 (N.D. Ga. Aug. 7, 1979) (finding that the "ultimate question" for determining an agent's employer status under Title VII was whether one company functioned as the other's agent with respect to employment practices).

3    For the most part, it may only be of academic interest that courts repeatedly dismiss § 1983 claims against states and state agents, in their official capacities, on Eleventh Amendment grounds rather than because they are not "persons" subject to § 1983 liability for damages. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1301-02 (11th Cir. 2007); *Pellitteri v. Prine*, 776 F.3d 777, 779-80 (11th Cir. 2015). That is because the result is the same either way—the claims fail. But in some cases, this distinction can be significant, such as when a state removes an action to federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

4    *Lesinski*, which addressed whether a *qui tam* action could be brought against a state created agency, was not an Eleventh Amendment case. 739 F.3d at 602. Rather, it borrowed "Eleventh Amendment arm of the state analysis to determine whether a state entity is a 'person' subject to FCA liability." *Id.* Still, *Lesinski* is instructive because the Eleventh Circuit noted "that the analysis for the two questions is identical." *Id.* at 606 n.9.

5    *Manders* also notes that if a Sheriff is acting as an arm of the state when exercising certain functions, then the issue arises of whether any § 1983 suit is also "subject to dismissal on the independent ground that sheriffs are not 'persons' for purposes of § 1983." 338 F.3d at 1328 n.53 (citing *Will*, 491 U.S. at 71, 109 S.Ct. 2304). But because this statutory question was not briefed on appeal, *Manders* did not address it. *Id.*

6    Even if a *Manders* analysis were appropriate, it is well settled that a sheriff acts as an arm of the state when carrying out employment decisions. *See Pellitteri*, 776 F.3d at 779. Employment decisions include compensation. *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 757 (11th Cir. 2014); *see also Kicklighter v. Goodrich*, 162 F. Supp. 3d 1363, 1376 (S.D. Ga. 2016) ("Despite being distinguishable, [functions of hiring, firing, and compensation of employees] have been treated as one for purposes of *Manders* inquiry."). And while it has not been explicitly discussed in the *Manders* context, group health insurance plans are a form of compensation. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). Again, the parties do not dispute that.

7    Lange may seek injunctive and declaratory relief against Sheriff Talton under § 1983 and the ADA. *Ex Parte Young*, 209 U.S. 123, 159-160, 28 S.Ct. 441, 52 L.Ed. 714 (1908). When a state official in his official capacity is sued for such relief, that official "would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10, 109 S.Ct. 2304 (quotation omitted). Similarly, the Eleventh Amendment does not bar prospective relief. *Garrett*, 531

U.S. at 374 n.9, 121 S.Ct. 955. Sheriff Talton's Eleventh Amendment immunity does not, however, extend to the County as an agent of Sheriff Talton for the purposes of Lange's ADA claim. *See* 🚩 *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1334 (11th Cir. 2007) (finding that derivative sovereign immunity was not available to a government contractor because "status as a common law agent is not a sufficient condition for derivative sovereign immunity."); *see also* 🏳 *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 125 (2d Cir. 2021) (declining to extend the Federal Tort Claims Act combatant activities defense to government contractors).

8    Lange contends heightened scrutiny is appropriate because the Exclusion discriminates on the basis of sex, or in the alternative, that transgender status is a quasi-suspect class requiring heightened scrutiny. Doc. 140-1 at 34-35. In the Eleventh Circuit, controlling precedent holds "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." 🚩 *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011).

9    🚩 *Glenn* observed that the analysis to determine whether an employer's actions were sex discrimination is the same under the Equal Protection Clause and Title VII. 🚩 663 F.3d at 1321 ("If this were a Title VII case, the analysis would end here") (citing 🚩 *Lewis v. Smith*, 731 F.2d 1535, 1537-38 (11th Cir. 1984)). Certainly, there are cases where this may hold true. But 🚩 *Glenn* has no bearing on the issue of whether an insurance exclusion based on a medical procedure that only one sex can undergo is facially discriminatory under the Equal Protection Clause because 🚩 *Geduldig* already provides the answer. 🚩 417 U.S. at 496 n.20, 94 S.Ct. 2485.

10   The Court refers here to direct and circumstantial evidence in the general sense, not in the *McDonnell Douglas* sense. *See, e.g., Eleventh Circuit Pattern Jury Instructions (Civil Cases)* 3.3 (2022) ("There's no legal difference in the weight you may give to either direct or circumstantial evidence."); *see also* 🚩 *United States v. Barnette*, 800 F.2d 1558, 1566 (11th Cir. 1986), *reh'g denied*, 807 F.2d 999 (11th Cir. 1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987) (noting that the "test for evaluating circumstantial evidence is the same as in evaluating direct evidence") (citing *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982)).

11   Because there is a genuine dispute of material fact as to whether the adoption and maintenance of the Exclusion was done with discriminatory intent, the Court does not reach the question of whether the Exclusion would subsequently survive intermediate scrutiny.

12   The only exception is if the employer can establish a bona fide occupational qualification ("BFOQ") justifying the action. 🚩 *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). "To prove a BFOQ, the employer must show that [the protected characteristic] is a qualification 'reasonably necessary to the normal operation of that particular business or enterprise.' " *Garrett v. Okaloosa Cnty.*, 734 F.2d 621, 624 (11th Cir. 1984) (citation omitted). Neither Sheriff Talton nor the County argue that a BFOQ justifies the Exclusion.

13   "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." 🚩 *Bostock*, 140 S. Ct. at 1739. Indeed, if "the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." 🚩 *Id.*

14   The defendants' first argument actually appears to be a strained reading of 🚩*General Electric Company v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). It is instructive to examine 🚩*Gilbert.* There, the Court upheld an exclusion in a disability plan for women unable to work because of pregnancy or childbirth. The Court reasoned the plan did not classify by "gender as such," because one of the two groups comprised "non-pregnant persons" and thus "included members of both sexes." 🚩*Id.* at 134-35, 97 S.Ct. 401. The Court concluded the exclusion alone was not proof of discrimination against women. That reasoning, of course, is taken directly from 🚩*Geduldig's* equal protection analysis. The dissent in 🚩*Gilbert* took issue with the majority's assumption "that the Fourteenth Amendment standard of discrimination is coterminous with that applicable to Title VII," in part because the "word 'discriminate' does not appear in the Equal Protection Clause." 🚩*Id.* at 154 n.6, 97 S.Ct. 401 (Brennan, J., dissenting); 🚩*id.* at 160-61, 97 S.Ct. 401 (Stevens, J., dissenting). In other words, the 🚩*Gilbert* dissenters argued the majority improperly imported 🚩*Geduldig* into Title VII. Congress legislatively overruled 🚩*Gilbert,* and the Supreme Court in 🚩*Newport News* made clear the extent of 🚩*Gilbert's* abrogation. Congress, the Supreme Court concluded, not only overturned 🚩*Gilbert,* but it also made clear that its 🚩*Geduldig*-based reasoning had no place in Title VII analysis. Thus, a benefit plan that provides less coverage because of sex violates Title VII. That is precisely what the County's health insurance plan does.

15   To state the obvious, cost savings cannot justify a facially discriminatory policy. "[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII." 🚩*Manhart,* 435 U.S. at 717, 98 S.Ct. 1370; *see also* 🚩*Newport News,* 462 U.S. at 685 n.26, 103 S.Ct. 2622 ("[No cost justification] is recognized under Title VII once discrimination has been shown."). Although the parties debate whether the County's professed desire to save money is relevant to disprove discriminatory intent or to provide a legitimate nondiscriminatory reason appropriate in a *McDonnell Douglas* analysis, that debate has no place here.

16   For example, in 🚩*Fletcher v. Alaska*—a case decided three months before 🚩*Bostock*—the district court held a state health insurance policy that excluded coverage for sex reassignment surgery was facially discriminatory under Title VII. 🚩443 F. Supp. 3d 1024, 1030 (D. Alaska 2020). 🚩*Fletcher* did not turn on a partial versus a blanket exclusion, but rather on the simple principle that because the plaintiff "was treated differently because of her natal sex," that is "discrimination because of sex and makes defendant's formal policy ... facially discriminatory." 🚩*Id.*

17   The specific term "gender identity disorder" first appeared as an independent condition in the DSM-IV which was not published until 1994, four years after the ADA was enacted. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition,* at 532-38 (1994).

18   At least one commentator has suggested that "physical condition" means just that—a manifest physical condition that causes one's gender identity disorder. Thus, "the presence of a physical condition related to gender identity disorder, such as having undescended testicles, missing ovaries, hermaphroditic conditions, genetic anomalies, or an androgen receptor disorder" would qualify as a disability under the Act. Jones, "Section 504 of the Rehabilitation Act of 1973: A Double-Edged Sword for the Protection of Students with Gender Identity Disorder," 25 Wis. J.L. Gender & Soc'y 353 (2010).

19   Because this Order moots some, if not all, of the defendants' *Daubert* motions, those motions (Docs. 129; 130; 132; 133; 142) are **DENIED without prejudice**. The parties shall confer regarding what issues remain.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 28-B

2022 WL 3051015
United States District Court, S.D. West Virginia,
Huntington Division.

Christopher FAIN, Shauntae Anderson, individually
and on behalf of all others similarly situated, Plaintiffs,
v.
William CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia Department
of Health and Human Resources; Cynthia Beane,
in her official capacity as Commissioner for the
West Virginia Bureau for Medical Services;
West Virginia Departmentof Health and Human
Resources, Bureau for Medical Services, Defendants.

CIVIL ACTION NO. 3:20-0740
|
Signed August 2, 2022

**Synopsis**

**Background:** Transgender Medicaid participants brought action against West Virginia Department of Health and Human Resources, Department's cabinet secretary, state Bureau for Medical Services, and Bureau's commissioner, alleging denial of equal protection under Fourteenth Amendment and violations of Affordable Care Act (ACA) and Medicaid Act. Parties brought cross motions for summary judgment.

**Holdings:** The District Court, Robert C. Chambers, J., held that:

exclusion of medically necessary surgeries for treatment of gender dysphoria from state Medicaid program discriminated based on transgender status of Medicaid participants, as would trigger heightened scrutiny in equal protection claim;

exclusion was discriminatory on its face;

defendants did not put forward compelling governmental interest to support exclusion;

defendants violated anti-discrimination mandate of ACA by enforcing exclusion;

exclusion violated availability requirement of Medicaid Act;

exclusion violated comparability requirement of Medicaid Act; and

participants had standing.

Transgender participants' motion granted; defendants' motion denied.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

Anna P. Prakash, Nicole Jean Schladt, Nichols Kaster, Minneapolis, MN, Avatara Antoinette Smith-Carrington, Lambda Legal Defense and Education Fund, Dallas, TX, Carl Solomon Charles, Decatur, GA, Tara L. Borelli, Lamda Legal Defense and Education Fund, Decatur, GA, Nora Huppert, Chicago, IL, Sasha J. Buchert, Lambda Legal Defense and Education Fund, Washington, DC, Walt Auvil, The Employment Law Center, Parkersburg, WV, for Plaintiffs.

Caleb B. David, Kimberly M. Bandy, Lou Ann S. Cyrus, Roberta F. Green, Shuman McCuskey & Slicer, Charleston, WV, for Defendants.

**MEMORANDUM OPINION AND ORDER**

ROBERT C. CHAMBERS, UNITED STATES DISTRICT JUDGE

*1 Pending before the Court are cross motions for summary judgment filed by Plaintiffs (transgender individuals who receive healthcare through the West Virginia Medicaid Program) and Defendants (the State actors and agencies responsible for administering the Medicaid Program). ECF Nos. 250, 252. This case challenges the constitutionality of the West Virginia Medicaid Program's exclusion of the surgical treatment of gender dysphoria.

As it currently stands, the West Virginia State Medicaid Program does not afford coverage for gender-conforming surgical care as treatment for gender dysphoria. Ultimately, the exclusion in the healthcare plan precludes coverage for these surgical treatments when a person is diagnosed with gender dysphoria. However, the same or similar surgical treatments are available to persons when the diagnosis requiring that treatment is not gender dysphoria. It is undisputed that the criteria determining whether or not such

treatment is covered under the Medicaid Program hinges on a diagnosis—but when treatment is precluded for a diagnosis based on one's gender identity, such exclusion invidiously discriminates on the basis of sex and transgender status. Thus, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 250) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 252).

## BACKGROUND

The Plaintiffs in this case are transgender West Virginian Medicaid participants. Plaintiff Christopher Fain is a 46-year-old transgender man enrolled in West Virginia Medicaid. He receives hormone therapy for his gender dysphoria diagnosis. Because of this diagnosis, he seeks a bilateral mastectomy. Two physician letters recommend this treatment. *Fain Tr.*, ECF No. 252-5, at 22. However, he has not formally sought coverage for this surgical procedure or received a denial letter. *Id.* at 23. He felt such an exercise would be futile, knowing that the surgery is excluded under his insurance policy. *Id.*

Plaintiff Shauntae Anderson is a 45-year-old transgender woman enrolled in West Virginia Medicaid. She also receives hormone therapy for her gender dysphoria diagnosis. She seeks vaginoplasty and breast reconstruction surgery to relieve her gender dysphoria. *Anderson Tr.*, ECF No. 250-11, at 11–12. Plaintiff Anderson noted that she has not spoken with a doctor about these procedures because it is known such surgeries are not covered and speaking about the unavailable treatment would cause her distress. *Anderson Tr.*, ECF No. 252-4, at 43.

Medicaid is a federal-state program providing health insurance for eligible persons. 42 U.S.C. § 1396–1396w-5. West Virginia has participated in the Medicaid program since its inception in 1965. The purpose of the program is to "furnish [ ] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42 U.S.C. § 1396-1. Medicaid for West Virginia has an annual budget of between $4.5 and $5.1 billion. *Manning Tr.*, ECF No. 250-16, at 13. CMS subsidizes 74% to 81% of the state's program. *Beane Tr.*, Ex. 250-13, at 31, 40.

**\*2** Mountain Health Trust is West Virginia's Medicaid Program. Eligible Medicaid participants may choose a primary health provider and select one of three managed care

organizations (MCOs). Each plan provides participants with Medicaid-covered health services. While 85% of Medicaid participants receive coverage through Mountain Health Trust, the remaining 15% receive care through a fee for service model where Medicaid pays providers directly.

Defendants maintain a comprehensive state plan for medical assistance which is detailed in a Medicaid Policy Manual. *Beane Tr.*, ECF No. 250-13, at 28. The Policy Manual provides a blanket exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6. Additionally, BMS's contract with each of the three MCOs has an explicit exclusion of coverage for "transsexual surgery." *See Aetna Contract*, ECF No. 250-33; *see UniCare Contract*, ECF No. 250-34; *see The Health Plan Contract*, ECF No. 250-35. The exclusion for "transsexual surgery" was adopted around 2004 and has been maintained since without review. *See Becker Tr.*, ECF No. 250-14, at 11–12; *Beane Tr.*, ECF No. 250-13, at 43–44.

Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services (BMS) is a bureau of the West Virginia Department of Health and Human Resources (DHHR) and is the agency responsible for administering the Medicaid program in West Virginia. BMS receives funding from the U.S. Department of Health and Human Services—federal funds. Defendant Bill Crouch is the Cabinet Secretary of DHHR and is responsible for ensuring that BMS meets the federal requirements. He is also responsible for developing a managed care system to monitor the services provided by the Medicaid program. *See* W. Va. Code § 9-2-9(a)(1). Defendant Cynthia Beane is the Commissioner of BMS. She is responsible for administering the state Medicaid plan and ensuring that it complies with the Affordable Care Act (ACA) and Medicaid Act.

## STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light

most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## DISCUSSION

Plaintiffs bring the following claims against Defendants:

**\*3** 1. Denial of Equal Protection under the Fourteenth Amendment

2. Violation of the Affordable Care Act

3. Violation of the Comparability Requirement of the Medicaid Act

4. Violation of the Availability Requirement of the Medicaid Act

The Court will address each claim.

### 1. Equal Protection under the Fourteenth Amendment

Plaintiffs assert that the exclusion for the surgical treatment of gender dysphoria violates their rights under the Equal Protection clause of the Fourteenth Amendment. The Equal Protection Clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120

L.Ed.2d 1 (1992). A claim for an equal protection violation requires a plaintiff to show that they have "been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Once this demonstration is made, next the court must "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

a. Resolution of facts related to Equal Protection analysis

Important to the Court's review of the Equal Protection claim are some key factual findings.

*i. Policy exclusion and covered services*

The exclusion at issue here is the exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6. Nonetheless, the policy does cover other treatments related to transgender healthcare. The policy covers psychiatric diagnosis evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work when medically necessary even if the treatments are related to gender-confirming care. *Tr. of Proceedings*, ECF No. 269, at 32–33; *see Beane Tr.*, ECF No. 250-13, at 5, 50. Transgender individuals are covered for the same care as cisgender individuals when such treatment is not the surgical treatment for gender dysphoria.

The West Virginia Medicaid Program uses a utilization management vendor called Kepro to determine whether a service is covered. *See Sarah Young Dep.*, ECF No. 250-18, at 23. Kepro is a screening tool that determines the medical necessity of a treatment, and this system uses nationally accredited criteria established by InterQual. *Id.* at 24. The criteria are derived from a systematic and continuous review of current, evidence-based literature, and also include input from an independent panel of clinical experts. *Id.* at 26. InterQual relies on guidelines promulgated by the World Professional Association of Transgender Health (WPATH) and the Endocrine Society that provide guidance on transgender health treatments. *See generally InterQual*

*Composite*, ECF No. 250-30. Due to the exclusion, Medicaid does not follow the InterQual/Kepro guidance for surgical care to treat gender dysphoria.

### ii. Material differences between surgery for gender-confirming and surgeries for non-gender-confirming treatments

**\*4** Defendants assert that the surgical procedures provided to treat gender dysphoria are distinct from those provided to cisgender and transgender patients for non-gender-confirming purposes. To support this position, Defendants point to the InterQual guidelines for gender-affirming care, which are utilized by Kepro. Defendants argue that, because InterQual has guidelines that are specific to gender-affirming surgical services, they are distinct from the guidelines that relate to the surgeries covered by Medicaid. To Defendants, the fact that there are these separate and distinct InterQual guidelines relating to gender-affirming surgical services proves that the procedures are different. But this argument lacks merit. InterQual's guidelines to determine the medical necessity of surgery to treat gender dysphoria are based on the diagnosis of gender dysphoria; thus, the criteria to determine the medical necessity of surgery to treat a different diagnosis would be based on that different diagnosis. That does not make the actual surgical treatments materially different.

In fact, Defendants' assertion that the surgical services provided for gender dysphoria are fundamentally different from those provided for cisgender and transgender patients is unsupported by the expert and other evidence in the record. In his expert report, Dr. Loren Schechter explains that the same surgical treatments can be performed to address several different diagnoses. *Dr. Schechter Expert Report*, ECF No. 250-23, at 17–18. For example, a vaginoplasty can be performed for a transgender patient to treat gender dysphoria or for a non-transgender woman as a treatment for congenital absence of the vagina. *Id.* at 18. When documenting and billing for these surgical treatments, health care providers utilize Current Procedural Terminology (CPT) codes developed and maintained by the American Medical Association. *Id.* at 17–18. The same CPT codes are used to document and bill the same surgical treatment when performed for a transgender patient with gender dysphoria and for any patient for a different diagnosis.

Defendants also assert that the techniques used to perform gender-affirming surgeries and those used to perform non-

gender-confirming surgeries are different, supporting their argument that the procedures are distinct. But, to support this claim, Defendants offer no evidence themselves and instead mischaracterize Plaintiffs' expert testimony. It is true that there are many techniques used for the same kind of surgeries, and the specific technique used by a surgeon will "depend upon the specific situation" or would depend on "the clinical conditions" of the individual patient *Dr. Schechter Dep.*, ECF No. 252-15, at 40–41. For example, there "is a wide range of indications or techniques used to perform mastectomy, whether for gender-affirming mastectomy or for a mastectomy pertaining to oncologic reasons or for risk reduction mastectomies, meaning removing a breast that is not cancerous but may have an increased predilection or risk of breast [cancer.]" *Id.* at 40. However, the "technical act of a mastectomy" can be performed to treat both a non-gender dysphoria related diagnosis and a gender dysphoria related diagnosis. *Id.* Based on the expert opinion of Dr. Schechter, this Court finds that a surgery, such as a mastectomy, for a gender dysphoria diagnosis and the same surgery for a non-gender dysphoria diagnosis, are not materially different

### iii. Costs associated with the surgeries

In their memoranda, Defendants put forth cost considerations as a legitimate governmental interest to support the exclusion. Defendants assert that Medicaid is projecting a budget deficit within two years. *Beane Dep.*, ECF No. 252-3, at 46. Thus, their argument goes, if the program were to include coverage for surgical care for gender dysphoria, the program would have to "cut existing services or receive additional appropriations from the [L]egislature." *Id.* Defendants also note the Legislature's hesitancy to increase the Medicaid budget. *Id.*

But Defendant's cost-related argument is unsupported by the record. First, the Court notes that, puzzlingly, Defendants stipulated to the fact that there are "no documents of which they are aware that were considered in adopting and/or maintaining the Exclusion" in the Medicaid Program.[1] *Corrected Stipulation of Pls. and Defs.*, ECF No. 258. It is curious as to how, in the face of this stipulation, Defendants can assert that the exclusion was adopted with cost considerations in mind. Cost information could have been ascertained by Defendants, but it appears that there has been no direct cost analysis regarding surgical care to treat gender dysphoria at all.[2]

**\*5** Beyond Defendants' failure to rely on any cost-related documents in consideration of the exclusion, the information in the record that does pertain to costs shows that the cost of providing this coverage is not burdensome. There are a relatively small number of people affected by the exclusion. *See Dr. Karasic's Dep.*, ECF No. 252-8, at 4–5 (noting that around one person in 200 identifies as transgender, while around one in 1,000 is in clinical care for gender dysphoria);

*Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 594 (4th Cir. 2020) (noting that only "approximately 0.6% of the United States adult population" identifies as transgender). In fact, Defendants provided that, through September of 2021, there were 686 West Virginia Medicaid participants who have submitted one or more claims with a diagnosis code for gender dysphoria or gender incongruence. *Defs.' Resp. to Pls.' Second Set of Interrogs.*, ECF No. 250-6, at 5. Further, there is no evidence in the record to show that surgeries to treat gender dysphoria are any more or less costly than those similar surgeries to treat other diagnoses. *See Dr. Karasic's Expert Report*, ECF No. 252-8, at 65–66 ("[W]hen a form of treatment is covered for cisgender people under an insurance plan, it is generally not disproportionately costly to cover the same treatment for transgender people simply because it is provided to treat gender dysphoria."). As discussed above, such surgeries are in all relevant aspects the same, so it logically flows that a surgery to treat gender dysphoria will not be significantly more expensive than one for a different diagnosis. Given the fact that very few individuals will seek such treatment, the Court is unpersuaded that providing coverage for this treatment would be too burdensome of a cost.

Further, this assertion flies in the face of unrefuted expert testimony. Dr. Schechter's expert report discusses research of the cost-effectiveness of gender confirmation surgeries. *Dr. Schechter Expert Report*, ECF No. 250-23, at 17–18. Citing to research done at the John Hopkins Bloomberg School of Public Health, the Commonwealth of Massachusetts Group Insurance Commission, and the University of Colorado, Dr. Schechter opines that gender confirmation surgeries typically result in a "significant reduction of gender dysphoria," while those suffering from gender dysphoria without access to these surgeries tend to "have higher rates of negative health outcomes such as depression, HIV, drug abuse, and suicidality." *Id.* at 18. The research shows that "the one-time costs of gender confirmation surgeries coupled with standard post-operative care, primary and maintenance care, were overall less expensive at 5- and 10-year marks as compared to the long-term treatment of the negative health outcomes

associated with the lack of insurance and resulting healthcare access." *Id.* at 18–19. Thus, overall, Dr. Schechter notes that these surgeries are both affordable and a "nominal percentage of the care offered through group health plans." *Id.* at 19.

Defendants can point to no evidence in the record to support the assertion that providing coverage for surgical treatment of gender dysphoria is too costly. In fact, Defendants concede that they have not conducted or ever obtained any cost analysis information to rebut Plaintiffs' claims. The only evidence in the record points to the contrary—that the surgical treatment of gender dysphoria is ultimately cost-effective and comparable to surgery for other diagnoses.

b. The exclusion discriminates based on transgender status

"In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons." *Grimm*, 972 F.3d at 607 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234, (1938)). The classifications in most state policies are generally held to be valid when those classifications drawn are "rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. However, "[t]his general rule 'gives way' ... when the policy discriminates based on membership in certain suspect classes." *Kadel v. Folwell*, 1:19-cv-272, ——— F.Supp.3d ———, ———, 2022 WL 2106270, \*18 (M.D.N.C. June 10, 2022) (citing *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249). The Fourth Circuit has determined that policies that discriminate on sex or transgender status are reviewed under a heightened scrutiny. *Grimm*, 972 F.3d at 608–10.[3],[4] Policies that classify based on a quasi-suspect classification are found to be unconstitutional unless they are "substantially related to a sufficiently important governmental interest." *Cleburne*, 473 U.S. at 441, 105 S.Ct. 3249.

**\*6** Plaintiffs' Equal Protection claim is grounded in the assertion that transgender West Virginia Medicaid participants are denied the medically necessary surgeries that participants receiving those same surgeries for non-gender dysphoria related treatments are allowed—thus, the classification is based on transgender status. Defendants refute this assertion, claiming that the exclusion does not take into consideration gender status, but instead is

based on diagnosis, i.e., surgeries are excluded for the diagnosis of "gender dysphoria," not excluded for transgender people. Further, Defendants say that transgender Medicaid participants are not denied any coverage that similarly situated persons have. According to Defendants, the persons affected by the exclusion, transgender people suffering from gender dysphoria seeking surgery, are similarly situated only to other transgender people suffering from gender dysphoria seeking surgery—thus, there is no disparate treatment, as surgery for gender dysphoria is not covered for anyone. Defendants assert that Plaintiffs cannot seek comparison with cisgender persons who seek surgeries for reasons other than gender-confirmation, because those procedures sought by cisgender persons are not gender-confirmation procedures, making the groups not "in all relevant aspects alike." Defendants further assert that, because other gender-confirming treatments are made available under the West Virginia Medicaid Program, and that only a subgroup of transgender people will ever seek surgery, Defendants are not discriminating against transgender people.

The Court is not persuaded by Defendant's arguments. First, inherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender. *See* Kadel, --- F.Supp.3d at ----, 2022 WL 2106270, at *20 ("even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria, it would still receive intermediate scrutiny. Discrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status. As with the Plan's exclusions, one cannot explain gender dysphoria 'without referencing sex' or a synonym." (quoting Grimm, 972 F.3d at 608)). Transgender people have access to the same surgeries for other diagnosis—the exclusion is aimed specifically at a gender change procedure. Thus, the exclusion targets transgender people because they are transgender.

Second, the Court turns to the argument that transgender individuals with gender dysphoria seeking gender-confirmation surgery are not similarly situated to individuals seeking the same surgeries for reasons other than gender-confirmation. Defendant supports this position by relying on a report and recommendation out of the Eastern District of Louisiana, where a pro se prisoner filed a § 1983 action alleging that defendants were deliberately indifferent to her need for medical treatment for gender dysphoria and violated her right to equal protection. Williams v. Kelly, No.

17-12993, 2018 WL 4403381, at *1 (E.D. La. Aug. 27, 2018). The report found that plaintiff was not similarly situated to cisgender patients seeking vaginal surgeries, so her Equal Protection claim failed. Id. at *12. This Court is neither bound nor persuaded by this report. The Williams court was not bound by Grimm's sex discrimination analysis and decided that case before Bostock's guidance for analyzing sex discrimination against transgender people. *See* Bostock v. Clayton Cnty., Georgia, ---- U.S. ----, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020). Further, the majority of cases support this Court's analysis. [5]

The Court disagrees with Defendants' position. The exclusion at issue here denies coverage to transgender people with a gender dysphoria diagnosis seeking medically necessary surgeries. "Similarly situated persons in all relevant aspects alike" cannot refer only to people from the same exact group —the legal standard simply asks the Court to look to persons "in all *relevant* respects alike." Morrison, 239 F.3d at 654 (emphasis added). The Grimm court agreed, rejecting a similar argument where the school board contended that the plaintiff, a transgender boy, was not similarly situation to cisgender boys, but only to biological girls. Grimm, 972 F.3d at 609–10. The Fourth Circuit opined that embedded in this argument is the bias that gender identity is a choice, and that adopting this framing of the issue would give in to stereotyping. Id. at 610.

**\*7** The relevant comparison here is to persons who seek the same, medically necessary surgeries for non-gender dysphoria related treatments. The West Virginia Medicaid Program provides, for example, medically necessary mastectomies for non-gender dysphoria related diagnoses. The only difference between this scenario and the Plaintiffs' circumstances is that Plaintiffs seek these surgeries to treat gender dysphoria—thus, a distinction hinging on their transgender identity. There are InterQual standards, which are evidence-based standards, that determine the medical necessity of a procedure—these standards exist for both gender dysphoria treatment surgeries and non-gender-affirming surgeries, providing objective basis for determining when such treatments will be covered. Additionally, the surgeries for both gender-affirming and non-gender-affirming reasons utilize the same CPT codes in documenting and billing. The only difference, which results in the preclusion

of coverage for Plaintiffs, is that their diagnosis is for gender dysphoria, arising from their identity as transgender.

Lastly, the Court disagrees with Defendants' assertion that, because West Virginia Medicaid provides coverage for some treatments of gender dysphoria, excluding coverage for surgical treatments for gender dysphoria is not discriminatory, as only a subset of transgender individuals will seek this treatment. Defendant relies on *Toomey v. Arizona*, a report and recommendation that found that a policy exclusion which "discriminates against some natal females but not all ... is not, on its face, discrimination on the basis of sex." No. CV-19-0035-TUC-RM, 2020 WL 8459367, *4 (D. Ariz. Nov. 30, 2020). [6] This is an out-of-district case and is non-binding on this Court. The District Judge in this matter did not discuss the magistrate's report and recommendation regarding this analysis in detail, but rather, found that 1) plaintiffs had not met the heightened standard for such relief and 2) the preliminary injunctive relief sought by plaintiffs was the same as the ultimate relief sought in the case, and without a showing of extraordinary circumstances, such relief could not be granted at the preliminary injunction phase. *Toomey v. Arizona*, 19-cv-00035, 2021 WL 753721 *5–*6 (D. Ariz. Feb 26, 2021). The report was adopted only to the extent that it recommended denying the Motion for Preliminary Injunction on the grounds that Plaintiff had not met the heightened standard. *Id.* at *6. The rest of the report was rejected by the District Court. *Id.* Thus, this report and recommendation is not persuasive to this Court's analysis.

Further, the Supreme Court has made clear that it "does [not] matter if an employer discriminates against only a subset of men or women." *Bostock*, 140 S. Ct. at 1775; *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (finding that, even though only some women will become pregnant or have children, the refusal to hire women with preschool-aged children was facial sex discrimination). The exclusion here denies surgical care to all transgender people who may seek surgery to treat gender dysphoria—that subset of transgender people is equally protected against discrimination. Further, the narrow question addressed by this Court is the exclusion of surgical care. Simply because the West Virginia Medicaid Program does not discriminate in all aspects does not permit it to discriminate narrowly against transgender surgical care.

### c. The exclusion discriminates on its face

Generally, a plaintiff must show that a policy based on sex or transgender status had discriminatory intent. But such a showing is unnecessary when the policy tends to discriminate on its face. *Kadel*, ---- F.Supp.3d at ----, 2022 WL 2106270, at *18 (citing *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)). The Court looks to the language of the policy to determine whether it is facially neutral or whether it explicitly references gendered or sex-related terms. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982).

**\*8** In *Grimm*, the Fourth Circuit found that a bathroom policy that required students to use bathrooms according to their "biological genders" discriminated on the basis of sex. *Grimm*, 972 F.3d at 608–10. The court reasoned that the policy "necessarily rests on a sex classification" and "cannot be stated without referencing sex." *Id.* at 608. Further, the court found that the bathroom policy propagated sex stereotyping, as the transgender plaintiff was viewed as "failing to conform" to sex stereotypes. *Id.* The *Grimm* court also found that the policy further discriminated on the plaintiff's status as a transgender boy, noting that "[m]any courts ... have held that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Id.*

Looking to the language of the exclusion, it is clear that the exclusion discriminates on its face. The exclusion denies coverage for "transsexual surgery." This language refers explicitly to sex—one seeking a "transsexual surgery" seeks to change from their sex assigned at birth to the sex that more accurately reflects their gender identify. Only individuals who identify as transgender would seek "transsexual surgery," and as the Supreme Court reasoned in *Bostock v. Clayton County, Georgia*, one cannot consider the term "transgender" without considering sex. *Bostock*, 140 S. Ct. at 1746 ("[T]ry writing out instructions for who should check the [transgender] box [on a job application] without using the

words man, woman, or sex (or some synonym). It can't be done."). Following this reasoning, the Court finds that the exclusion references sex on its face. *See Kadel, ---F.Supp.3d at ------, 2022 WL 2106270, at \*19* (finding that the health plan's exclusions for sex changes or modifications and related care facially discriminate); *see also Fletcher v. Alaska, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020)* ("In sum, defendant's policy of excluding coverage for medically necessary surgery such as vaginoplasty and mammoplasty for employees, such a[s] plaintiff, whose natal sex is male while providing coverage for such medically necessary surgery for employees whose natal sex is female is discriminatory on its face and is direct evidence of sex discrimination.").

Defendants point to *Geduldig v. Aiello* to support their argument that the exclusion is facially neutral. 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In *Geduldig*, the Court found that a disability insurance program which exempted from coverage any work loss resulting from pregnancy did not discriminate based on sex. *Id. at 494, 94 S.Ct. 2485*. The Court reasoned that pregnancy was a physical condition divorced from gender, and while only women can get pregnant, the group of members who were not pregnant included both men and women. *Id. at 496, 94 S.Ct. 2485*. Here, the nonsuspect class—those not seeking surgical treatment for gender dysphoria—are treated more favorably, as their materially same surgeries are covered. This is unlike *Geduldig*, where men were not treated more favorably under the challenged policy. And, as the *Kadel* court found, the exclusion precludes a specific treatment that is connected to a person's sex and gender identity—not just a single "objectively identifiable physical condition with unique characteristics." *Kadel, ---F.Supp.3d at ------, 2022 WL 2106270, at \*21*.

Thus, it is the opinion of the Court that the exclusion at issue here facially discriminates on the basis of sex and transgender status. Thus, there is no need for Plaintiffs to show discriminatory intent or purpose.

### d. Heightened Scrutiny Analysis

Finding that the exclusion does discriminate on the basis of sex and transgender status, the Court must determine whether the exclusion survives heightened scrutiny. It does not.

Classifications based on sex and transgender status "fail[ ] unless [they are] substantially related to a sufficiently important governmental interest." *Grimm, 972 F.3d at 608* (citing *Cleburne, 473 U.S. at 441, 105 S.Ct. 3249*). The governmental interests that Defendants put forward to support the exclusion are unsupported by the evidence in the record.

#### 1. Cost

**\*9** Defendants assert cost considerations as a reason to justify the exclusion. However, as previously discussed, Defendant has not supported with any evidence in the record its concern about the costs of providing coverage for surgical treatments of gender dysphoria. In fact, Defendant stipulated to having not considered any documents, let alone any documents considering costs, in adopting this exclusion. *See ECF No. 258*. Further, all the evidence in the record point to the long-term cost-efficiency of providing this coverage, contradicting Defendants' assertion. Thus, cost considerations have not been established as an important governmental purpose that justifies the discrimination.

#### 2. Consistency with CMS policy

Next, Defendants claim that providing coverage consistent with what is required by the Centers for Medicare and Medicaid Services (CMS) is an important governmental purpose for the exclusion. CMS oversees Medicaid by maintaining the Medicaid regulations and approving state plans and state plan amendments. *See Sarah Young Dep.*, ECF No 252-1, at 42–43. The Medicaid Program bases "all of [its] policies and procedures within the confines of the federal regulation, the state code, state laws, and [it] ensure[s] that the covered services are available to members." *Id.* at 20. CMS communicates with the Medicaid Program to dictate changes to the program or clarify a policy. *Id.* at 21. Further, CMS generally has an active role in reviewing and approving of changes to Medicaid coverage. *Id.* at 17. CMS neither mandates nor prohibits coverage for the surgical care of gender dysphoria—this decision is left up to the individual states. *See id.* at 42.

Defendants assert that Secretary Crouch and Commissioner Beane have relied on guidance from CMS and the Department of Human Health Services (HHS) to determine required coverages. Since surgical treatment of gender dysphoria is not a mandated coverage dictated by CMS, Defendants assert that excluding this coverage is simply following CMS guidance and is an important governmental interest. Further, Defendants note that CMS has never notified the West Virginia Medicaid program that excluding this coverage is in violation of any law, thus, they argue, the Exclusion is not unlawful. *Id.* at 37.

Importantly, the lack of a mandate by CMS does not permit Defendants to ignore their obligations under the Constitution. CMS's lack of guidance on the matter does not give a green light for the states to enact discriminatory policies. Defendants' purported governmental interest in providing coverage consistent with what is required by CMS rings hollow in light of the fact that the West Virginia Medicaid Program covers other services which would be characterized as optional by CMS. *Tr. of Proceedings*, ECF No. 269, at 45.

Defendants also point to a 2016 study by HHS, discussed by Dr. Stephen Levine, where HHS refused to mandate coverage for transgender surgeries, leaving such decisions up to the individual states due to the lack of evidence regarding the long-term benefits of such surgeries. *Dr. Stephen Levine's Expert Report*, ECF No. 252-11, at 14. But this assertion regarding the long-term benefits is inconsistent with the body of literature on this topic. As Dr. Karasic points out in his rebuttal report, gender confirming surgery "has been studied extensively, with much evidence of the effectiveness of such treatment." *Dr. Karasic's Rebuttal Report*, ECF No. 250-21, at 16; *see also id.* at 14 (citing to a Cornell University study which found a "robust international consensus in the peer-reviewed literature that gender transition, including medical treatments such as hormone therapy and surgeries, improves the overall well-being of transgender individuals.). [7] Further, the underlying HHS study to which Dr. Levine references followed the agency's decision to eliminate a categorical ban on gender-affirming surgery, like the ban found in the West Virginia Medicaid Program. *See Dr. Loren Schechter's Rebuttal Report*, ECF No. 250-24, at 5.

**\*10** Thus, the Court does not find that the adherence to the required services as mandated by CMS to be a sincere or compelling governmental interest.

### 3. Question of medical necessity

Lastly, Defendants question the medical necessity of the surgical treatment of gender dysphoria. This assertion is without support in the record. Dr. Schechter directly addresses the medical necessity of surgical care to treat gender dysphoria. *See Dr. Schechter's Expert Report*, ECF No 250-23, at 12–13; *see Dr. Schechter's Rebuttal Report*, ECF No. 250-24, at 13. As Dr. Schechter points out, these procedures are "clinically indicated to treat the underlying medical condition of gender dysphoria." *Dr. Schechter's Expert Report*, ECF No. 250-23, at 13. Dr. Schechter discusses that the "prevailing consensus of the medical community recognizes 'that procedures used to treat gender dysphoria are reconstructive, not experimental, and are medically necessary.' " *see Dr. Schechter's Rebuttal Report*, ECF No. 250-24, at 13. The techniques used to perform these surgeries are well-established and used to perform many different surgeries, not just gender confirming surgeries. *Id.* Gender confirming surgeries have been performed "for decades" and have demonstrated benefits. *Id.*

There are Standards of Care promulgated by the World Professional Association of Transgender Health (WPATH) that provide clinical criteria for the medical interventions to treat gender dysphoria. *Dr. Karasic's Expert Report*, ECF No. 250-20, at 8. These Standards of Care are recognized by a number of leading medical professional entities, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the Pediatric Endocrine Society, the American College of Obstetrics and Gynecology, the American College of Physicians, and the World Medical Association, among others. *Id.* Similarly, the Endocrine Society has published a clinical practice guideline providing protocols for the medically necessary treatment of gender dysphoria. Further, many of the major medical organizations have opposed the blanket denial of this medically necessary care. *Id.* at 10. The medical treatments for gender dysphoria have been studied extensively, and have been shown to improve "quality of life and measures of mental health" for patients. *Id.* at 11–12 (citing to the Cornell University study that supported gender affirming "hormone and surgical treatment improved the well-being of transgender individuals").

Further, InterQual has developed clinical standards of care to determine the medical necessity of surgical treatment

for gender dysphoria. For example, the InterQual standards created for vaginoplasty for gender affirmation surgery note that "[d]elaying treatment for those with gender dysphoria is not a reasonable treatment option." *InterQual Composite*, ECF No. 250-30, at 36. These standards note that this procedure can be performed for medically necessary purposes and that the criteria found therein is intended to determine the medical appropriateness of the procedure. *Id.* at 38. The InterQual standards for the surgical care of gender dysphoria would be utilized by West Virginia Medicaid Program's Kepro system if the exclusion at issue here did not prohibit coverage of this treatment.

**\*11** The argument that surgical treatment of gender dysphoria is not medically necessary is wholly unsupported by the record, and importantly, is refuted by the majority of the medical community. Thus, the Court finds that concern for the medical necessity of this treatment is not a sufficiently important governmental interest.

### e. The exclusion does not survive heightened scrutiny, thus, violating Equal Protection

The Court has discussed Defendants' purported governmental interests that are upheld by the exclusion. None survive heightened scrutiny. Without a sufficiently important governmental interest, this exclusion must fail. Thus, the Court finds that the exclusion violates the Equal Protection Clause of the Fourteenth Amendment.

### 2. Violation of the Affordable Care Act

The Affordable Care Act (ACA) "aims to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). An important component of the ACA is the anti-discrimination mandate in section 1557. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Sup. 3d 1, 11 (D.D.C. 2020). This section provides that "[e]xcept as otherwise provided ... an individual shall not, on the ground prohibited under title VI of the Civil Rights Act ... [and] title IX ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistancev". 42 U.S.C. §

18116. Because the ACA explicitly incorporates Title VI and Title IX, and the Fourth circuit looks to Title VII to guide the evaluation of claims under Title IX, the test announced in *Bostock* is the appropriate test to determine whether a policy discriminates in violation of the ACA. *Kadel*, ––– F.Supp.3d at ––––, 2022 WL 2106270, at \*29.

To prevail on a section 1557 claim, a plaintiff most show that:

1. Defendant is a health program or activity that receives federal funds, and

2. Plaintiff was subjected to discrimination in healthcare services on the basis of sex.

*See id.*

BMS has already admitted that it is a "health program or activity" for purposes of Section 1557 analysis. *See Defs.' Answer to Am. Compl.*, ECF No 151, ¶ 15 ("These Defendants further admit that West Virginia Medicaid is jointly funded by the State of West Virginia and the federal government. These Defendants admit that BMS is a recipient of federal funds from the U.S. Department of Health and Human Services, including Medicaid funding."). Thus, the first element of the 1557 claim is met.

Pursuant to the Equal Protection analysis above, this Court has found that Plaintiffs were subjected to discrimination in healthcare services on the basis of sex. The exclusion precludes individuals who are seeking surgical treatment of gender dysphoria from coverage. As already noted by this Court, a transgender identity is inherent in an individual who suffers from gender dysphoria. Transgender status, and thus, this exclusion, cannot be understood without a reference to sex. *See Bostock*, 140 S. Ct. at 1746. Plaintiffs are subjected to discrimination on the basis of sex.

Defendants make the argument that, historically, the term "sex" has referred to the binary sexes of male and female. Gender identity, Defendants assert, is something entirely distinct from the sexes, and thus, for the purposes of the ACA, Defendants cannot be guilty of discrimination because transgender status does not implicate this binary categorization—*Bostock* rejects this limitation on the scope of discrimination.

**\*12**  Defendants also to *Hennessy-Waller v. Snyder* out of the District of Arizona to support their position. *529 F. Supp. 3d 1031 (D. Ariz. 2021)*. At the outset, the *Hennessy-Waller* court was deciding a motion for preliminary injunction, which requires a different standard than this Court deciding motions for summary judgment. In that case, the plaintiffs were transgender minors enrolled in the state Medicaid who were diagnosed with gender dysphoria. The Medicaid program covered other treatments for gender dysphoria but excluded coverage for gender reassignment surgeries. With respect to the plaintiffs' ACA claim, the court reasoned that the exclusion only precluded coverage for surgical treatment; other treatment was covered, so plaintiffs could not show that there was discrimination. *Id. at 1045*. Further, the District of Arizona also questioned the safety of these procedures for adolescents. *Id.* Defendants here made similar arguments. But as already discussed, this Court fundamentally disagrees with these positions. First, Defendants are not permitted to discriminate on one aspect of healthcare just because they do not discriminate across the board for all treatments. The issue here is narrow regarding the discrimination with respect to surgical care, and this Court found that the exclusion does discriminate. Second, the safety, effectiveness, and medical necessity have been clearly demonstrated by the expert evidence in the record and is confirmed by the many major health organizations supporting the safety and effectiveness of this treatment. The *Hennessy-Waller* court did not have the robust medical evidence in the record that this Court has before it; this case is unpersuasive here.

Thus, because this Court finds that Defendants are a "health program or activity" under the ACA, and that Plaintiffs have been subjected to discrimination on the basis of sex, Defendants have violated ACA section 1557.

### 3. Violation of Medicaid

Plaintiffs assert that the Exclusion violates the Availability and Comparability requirements of the Medicaid Act, because coverage for medically necessary treatments for gender dysphoria are excluded from coverage while the same treatments are covered for other medically necessary reasons.

The Medicaid Program is established in Title XIX of the Social Securities Act. *42 U.S.C. §§ 1396 et seq.* The purpose of this act is to enable "each State, as

far as practicable under the conditions in such state, to furnish ... medical assistance [to individuals] whose income and resources are insufficient to meet the costs of necessary medical services." *Id. § 1396-1*. Participation in Medicaid is optional—however, once a state elects to participate in the Medicaid program, it is subject to federal laws and regulations. *See Antrican v. Odom, 290 F.3d 178, 183 n.2 (4th Cir. 2002); Flack v. Wisconsin Dep't of Health Servs., 395 F. Supp. 3d 1001, 1015 (W.D. Wis. 2019)* (noting that a state Medicaid Program "must comply with all federal statutory and regulatory requirements").

Plaintiffs allege violations of both Medicaid's Availability and Comparability requirements. The Court will address each.

#### a. Violation of Medicaid's availability requirement

A state Medicaid Program "must ... provide ... for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a)." *42 U.S.C. § 1396a(a)(10)(A)*. A state must provide coverage for mandatory categories of treatment and must cover services when they (1) fall within a category of mandatory medical services or optional medical services that the state has elected to provide; and (2) are "medically necessary" for a particular participant. *See Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977)*. The state "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." *42 C.F.R. § 440.230*. "These limits must be 'reasonable' and 'consistent with the objectives of the [Medicaid] Act.'" *Flack, 395 F. Supp. 3d at 1015* (quoting *Rush v. Parham, 625 F.2d 1150, 1155 (5th Cir. 1980)*).

Plaintiffs here assert that BMS has either mandated or chosen to cover the same surgical procedures for non-gender-dysphoria related treatment and that the unrebutted evidence in the record demonstrates the medical necessity of surgical care. This Court agrees. The surgical care precluded by the exclusion is made available and covered by Medicaid when the surgical care is to treat diagnoses other than gender dysphoria. Indeed, the same CPT codes are used to document the surgeries, whether performed for gender dysphoria treatment or for treatment of another diagnosis. And, there is ample evidence in the record to support the

medical necessity of the treatments. *See Alvarez v. Betlach*, 572 F. App'x 519, 521 (9th Cir. 2014) (discussing that states are prohibited "from denying coverage of 'medically necessary' services that fall under a category covered in their Medicaid plans.") (quoting *Beal v. Doe*, 432 U.S. 438, 444, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977)); *see Bontrager v. Ind. Fam. Soc. Servs. Admin.*, 697 F.3d 604, 608 (7th Cir. 2012) ("[T]he State is required to provide Medicaid coverage for medically necessary in those service areas that the State opts to provide such coverage."); *see Beal*, 432 U.S. at 444, 97 S.Ct. 2366 ("[S]erious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage ...").

**\*13** Defendants point to *Casillas v. Daines* to support the contention that regulations permit a Medicaid Program to place limits on services, even when those services are required to be covered. 580 F. Supp. 2d 235, 245–46 (S.D.N.Y. 2008). Notably, *Casillas* is nonbinding on this Court, and was not even followed within the Southern District of New York. *See Cruz v. Zucker*, 116 F. Supp. 3d 334 (S.D.N.Y. 2015). And, while states are granted "discretion to choose the proper mix of amount, scope, and duration limitations on coverage," such choices must ensure that the "care and services are provided in 'the best interests of the recipients.' " *Alexander v. Choate*, 469 U.S. 287, 303, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (quoting 42 U.S.C. § 1396a(a)(19)). The limitations must also be consistent with the Medicaid Act. *Id.* at 303 n.23, 105 S.Ct. 712. When a state Medicaid Program does choose to limit services, it cannot limit a service it has elected to cover based on diagnosis—this Court finds that such a limitation would not be "appropriate." *See e.g.* *Bontrager*, 697 F.3d at 609 (finding that a budgetary cap on coverage for medically necessary procedures was not a proper utilization control procedure). The exclusion violates the availability requirement.

### b. Violation of Medicaid's comparability requirement

The State Medicaid Program provides coverage for both the "categorically needy" and "medically needy" participants. "Categorically needy" individuals receive some form of public assistance, *see* 42 U.S.C. § 1396a(a)(10)(A), while "medically needy" individuals are those "whose incomes are too large to qualify as categorically needy," yet "lack the funds to pay for medical expenses." *Benjamin H. v. Ohl*, No. Civ. A. 3:99-0338, 1999 WL 34783552, \*3 (S.D.W. Va. July 15, 1999) (citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981)).

The Medicaid statute provides that:

> The medical assistance made available to ... any individual described in subparagraph (A)—
>
> (i) Shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual and
>
> (ii) Shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A);

42 U.S.C. § 1396a(a)(10)(B). Further, the regulations promulgated pursuant to the Medicaid Act provide that:

> (a) The plan must provide that the services available to any categorically needy recipient under the plan are not less in amount, duration, and scope than those services available to a medically needy recipient; and
>
> (b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group:
>
> a. The categorically needy
>
> b. A covered medically needy group

42 C.F.R. § 440.240. The regulations also provide that "[t]he agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 U.S.C. § 440.230.

Plaintiffs assert that Defendants violate the comparability requirement of the Medicaid Act by providing particular services to some Medicaid participants but not others based solely on diagnosis. This Court has found that the surgeries, such as mastectomies, which are covered to treat non-gender dysphoria diagnoses are materially the same as the surgeries provided to treat gender dysphoria. Thus, the difference in treatment clearly violates the comparability requirement, which requires that all persons within a specific category be

treated equally. *See White v. Beal*, 555 F.2d 1146, 1151 (3d Cir. 1977) ("We find nothing in the federal statute that permits discrimination based upon etiology rather than need for the services.").

Defendants rely on *Rodriguez v. City of New York* to support their argument that, since surgical treatment for gender dysphoria is not covered for any Medicaid participant, there is no violation of the comparability requirement. 197 F.3d 611 (2d Cir. 1999). But their reliance on *Rodriguez* is misplaced. In *Rodriguez*, plaintiffs challenged the failure of New York City to provide personal-care services to Medicaid recipients. A key distinction in *Rodriguez* is that the benefit sought by Plaintiffs was provided to no one. *Id.* at 616. Here, the surgeries sought by Plaintiffs are materially the same to covered procedures that treat other diagnoses. The exclusion essentially denies services to some categorically needy persons while the same services are provided for other persons with similar needs. *See Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016) (discussing that an analysis under the comparability requirement must "entail some independent judicial assessment of whether a state has made its services available to all categorically needy individuals with equivalent medical needs").

**\*14** The exclusion "fails to make covered treatments available in sufficient amount, duration and scope" and discriminates on the basis of diagnosis. *Flack*, 395 F. Supp. 3d at 1019 (internal quotation omitted). Thus, it violates the comparability requirement of the Medicaid Act.

4. Standing

Lastly, Defendants argue that Plaintiffs lack the standing to bring this case because neither has suffered an injury in fact. To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Defendants argue that, because

Plaintiffs have not submitted a claim for and been denied gender-affirming care by Medicaid, they cannot show injury in fact, and thus, lack standing.

However, Defendants enacted a clear policy excluding coverage for surgical care of gender dysphoria with no exceptions. This caused an actual, concrete injury to Plaintiffs by essentially constructing a discriminatory barrier between them and health insurance coverage. This is not a hypothetical injury. Plaintiffs requesting coverage would have been futile due to the exceptionless exclusion, and the law does not require Plaintiffs to take such futile acts. *Townes v. Jarvis*, 577 F.3d 543, 547 n.1 (4th Cir. 2009). "In the context of applications for government benefits ... [the] threshold requirement ... may be excused ... where a plaintiff makes a substantial showing that the application for the benefit ... would have been futile." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1286 (D.C. Cir. 2016) (internal quotations omitted). Defendants' policy was clear—a request for coverage would have been denied under the exclusion. Thus, Plaintiffs have standing.

## CONCLUSION

The West Virginia Medicaid Program exclusion denying coverage for the surgical care for gender dysphoria invidiously discriminates on the basis of sex and transgender status. Such exclusion violates the Equal Protection clause of the Fourteenth Amendment, the Affordable Care Act, and the Medicaid Act. Defendants are enjoined from enforcing or applying the exclusion.

Thus, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 250) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 252).

The Court also **DENIES as MOOT** the Motion to Exclude Expert Testimony of Stephen B. Levine, M.D. ECF No. 254. Resolving the Motion for Summary Judgment in favor of Plaintiffs moots this Motion.

**All Citations**

--- F.Supp.3d ----, 2022 WL 3051015, Med & Med GD (CCH) P 307,443

## Footnotes

1    Defendants admit that there is no known reason as to why this Exclusion was ever adopted in the first place. *See Beane Dep.*, ECF No. 250-13, at 42–43.

2    Information about how other states apply policies regarding the coverage of surgical treatment for gender dysphoria could have been ascertained. *See Becker Tr.*, ECF No. 250-14, at 18 (discussing documents reviewed by Becker).

3    When considering whether a certain group constitutes a quasi-suspect class, the Fourth Circuit analyzed four factors:

> - Whether the class historically has been subject to discrimination

> - Whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society

> - Whether the class may be defined as a discrete group by obvious, immutable, or distinguishing characteristics

> - Whether the class lacks political power

*Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020) (internal citations omitted). [3]

The *Grimm* court discussed the history of discrimination of transgender peoples in education, employment, housing, healthcare access, and military service, in addition to the history of violence and harassment of transgender peoples. The court then opined that one's transgender status "bears no ... relation" to one's ability to "perform or contribute to society." *Id.* at 612 (internal quotation omitted). Moving on, the court discussed that a person's gender identity is "as natural and immutable as being cisgender," and that transgender people constitute a minority lacking political power, as only 0.6% of the United States population identify as transgender.

Many courts have held that discrimination against transgender persons is sex-based discrimination for Equal Protection purposes because such policies punish transgender persons for gender non-conformity, thus relying on sex stereotypes. *Id.* at 608. Thus, this Court follows *Grimm* and finds that the Plaintiffs in this case fall within a quasi-suspect class, necessitating the application of heightened scrutiny.

4    At the outset, the Court notes that Defendants have argued that *Grimm* should not apply to this analysis. Defendants argue that the matter before this Court is a case of first impression, entirely novel from the *Grimm* case, where the Fourth Circuit considered a challenge to a policy requiring students to use bathrooms based on their biological, or birth-assigned, sex. Here, in contrast, the Court is grappling with a Medicaid benefits case. But the context of the cases is immaterial to the application of the applicable level of scrutiny. Regardless of the specific set of facts under which each case arises, the Court must use the appropriate level of scrutiny to analyze each of the policies. The four-factor test enumerated in *Grimm* aids this Court's determination of whether a suspect class exists here.

Med & Med GD (CCH) P 307,443

5   *See* ⚐ *Grimm,* 972 F.3d at 609–10; *see* ⚑ *Kadel v. Folwell,* 1:19-cv-272, —— F.Supp.3d ——, ——, 2022 WL 2106270, \*21 (M.D.N.C. June 10, 2022); *see* ⚐ *Fletcher v. Alaska,* 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020).

6   The Court notes that this report and recommendation was denied in part by the District Court. *Toomey v. Arizona,* 19-cv-00035, 2021 WL 753721 (D. Ariz. Feb 26, 2021).

7   Dr. Karasic also points out the potential bias in Dr. Levine's testimony, as recognized by the Judge Jon Tigard in the Northern District of California. *See* ⚐ *Norsworthy v. Beard,* 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (where the court gave Dr. Levine's opinion very little weight due to his misrepresentations of the Standards of Care and illogical inferences).

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 28-C

2022 WL 2106270
United States District Court, M.D. North Carolina.

Maxwell KADEL, et al., Plaintiffs,
v.
Dale FOLWELL, et al., Defendants.

1:19CV272
|
Signed June 10, 2022

**Synopsis**

**Background:** Transgender individuals and parents of transgender individuals who received health insurance through North Carolina State Health Plan (NCSHP) for teachers and state employees brought action alleging that plan's categorical exclusion of coverage for treatments "leading to or in connection with sex changes or modifications" discriminated against them on basis of sex and transgender status, in violation of Equal Protection Clause, Affordable Care Act (ACA), Title IX, and Title VII. Plaintiffs moved to exclude expert testimony and to seal, and parties filed cross-motions for summary judgment.

**Holdings:** The District Court, Loretta C. Biggs, J., held that:

endocrinologist's testimony that parents were often manipulated and coerced by misinformed political activists was insufficiently reliable to warrant its admission;

endocrinologist's testimony regarding alleged conspiracy to silence public debate on risks and benefits of transgender medical procedures and political ideologies was inadmissible;

psychiatrist's testimony criticizing Diagnostic and Statistical Manual of Mental Disorders' (DSM) approach to gender dysphoria was not sufficiently relevant or reliable to warrant its admission;

psychiatrist's testimony that exponential growth of gender dysphoria was predicted and readily explained by social contagion theory was not sufficiently reliable to warrant its admission;

surgeon was qualified to opine as expert on risks associated with surgery used to treat gender dysphoria;

physician was qualified to offer expert testimony on treatment of gender dysphoria and efficacy and findings of research studies evaluating gender dysphoria treatments;

plan's categorical exclusion of coverage for treatments "leading to or in connection with sex changes or modifications" violated Equal Protection Clause;

order permanently enjoining plan from enforcing exclusion was appropriate remedy; and

privacy interests of plan's transgender participants outweighed public's limited interest in learning private medical details of their experiences with gender dysphoria.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Exclude Expert Report or Testimony; Motion to Seal Records; Motion for Summary Judgment.

**Attorneys and Law Firms**

Deepika H. Ravi, Evan R. Marolf, Grace H. Wynn, Harris, Wiltshire & Grannis LLP, Lauren H. Evans, McDermott Will & Emery LLP, Washington, DC, Noah E. Lewis, Ezra U. Cukor, David Brown, Transgender Legal Defense & Education Fund, Inc., Omar F. Gonzalez-Pagan, Alejandra L. Caraballo, Lambda Legal Defense And Education Fund, Inc., Dmitriy G. Tishyevich, Warren Haskel, Mcdermott Will & Emery LLP, New York, NY, Tara L. Borelli, Carl S. Charles, Lambda Legal Defense And Education Fund, Inc., Decatur, GA, Adam M. Safer, Michael W. Weaver, McDermott Will & Emery LLP, Chicago, IL, Lauren E. Snyder, Amy E. Richardson, Harris, Wiltshire & Grannis LLP, Raleigh, NC, for Plaintiff Maxwell Kadel.

Adam M. Safer, Michael W. Weaver, Mcdermott Will & Emery LLP, Chicago, IL, Alejandra L. Caraballo, David Brown, Ezra U. Cukor, Noah E. Lewis, Transgender Legal Defense And Education Fund, Dmitriy G. Tishyevich, Warren Haskel, Mcdermott Will & Emery LLP, Omar F. Gonzalez-Pagan, Lambda Legal Defense And Education Fund, Inc., New York, NY, Carl S. Charles, Lambda Legal Defense And Education Fund, Inc., Decatur, GA, Deepika H. Ravi, Evan R. Marolf, Grace H. Wynn, Harris, Wiltshire & Grannis LLP, Lauren H. Evans, McDermott Will & Emery LLP, Washington, DC, Lauren E. Snyder, Amy E. Richardson, Harris, Wiltshire & Grannis LLP, Raleigh, NC, Tara L.

Borelli, Lambda Legal Defense And Education Fund, Inc., Decatur, GA, for Plaintiffs Jason Fleck, Connor Thonen-Fleck, Julia Mckeown, Michael D. Bunting, Jr., C.B., Sam Silvanie, Dana Caraway.

John G. Knepper, Law Office Of John G. Knepper, LLC, Cheyenne, WY, James Benjamin Garner, North Carolina Department Of State Treasurer, Raleigh, NC, Kevin Guy Williams, Mark A. Jones, Bell Davis & Pitt, P.A., Winston-Salem, NC, for Defendants Dee Jones, North Carolina State Health Plan for Teachers and State Employees, Dale Folwell.

Alex R. Williams, James B. Trachtman, N. C. Department Of Justice Public Safety Section, Raleigh, NC, for Defendant State of North Carolina Department Of Public Safety.

### MEMORANDUM OPINION AND ORDER

Loretta C. Biggs, United States District Judge

**\*1** Plaintiffs are transgender individuals or the parents of transgender individuals who receive health insurance through the North Carolina State Health Plan for Teachers and State Employees ("NCSHP" or the "Plan"). (ECF No. 75 ¶¶ 1, 7–12.) They allege that the Plan's categorical exclusion of coverage for treatments "leading to or in connection with sex changes or modifications" discriminates against them on the basis of sex and transgender status in violation of the Equal Protection Clause and the Affordable Care Act ("ACA") and seek declaratory, injunctive, and monetary relief. (Id. ¶¶ 1, 139–53, 165–74.) Plaintiff Dana Caraway additionally alleges that NCSHP and her employer, the North Carolina Department of Public Safety ("DPS"), discriminated against her on the basis of sex by offering and administering the Plan in violation of Title VII of the Civil Rights Act of 1964. (Id. ¶¶ 175–188.) Before the Court are cross motions for summary judgment filed by DPS, NCSHP, and Plaintiffs, (ECF Nos. 132; 136; 178); Plaintiffs' motions to exclude expert testimony, (ECF Nos. 202; 204; 206; 208; 212); and Plaintiffs' motions to seal, (ECF Nos. 182; 210). [1]

For the reasons stated herein, the Court finds that the Plan's exclusion discriminates based on sex and transgender status in violation of the Equal Protection Clause and discriminates because of sex in violation of Title VII. The Court will reserve a ruling on claims alleged under the ACA pending further Order from this Court.

## I. BACKGROUND

### A. Plaintiffs' experiences with the Plan

Plaintiff Connor Thonen-Fleck is a 19-year-old man. (ECF No. 179-2 ¶ 2.) He is also transgender. (Id. ¶ 3.) Thonen-Fleck was "designated 'female' at birth" but identifies and lives his life as a man. (Id.) In his words, he "demonstrated stereotypically masculine tendencies and characteristics from a young age," and by 15 years old, "had socially transitioned and was living in [his] authentic male gender identity in all aspects of [his] life." (Id. ¶¶ 5–6.) His male identity is now reflected in his legal name, gender marker, birth certificate, and driver's license. (Id. ¶ 8.)

**\*2** Before Connor and his family understood what it meant to be transgender, Connor "was in serious and increasing distress" and suffered from depression and suicidal ideation. (Id. ¶ 5; ECF No. 179-3 ¶ 6.) His psychiatrist diagnosed him with gender dysphoria. (ECF No. 185-1 at 40–41; see ECF No. 179-2 ¶ 7.) Gender dysphoria is "a condition that is characterized by clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." (ECF No. 219 at 10; see ECF No. 197 at 13.) Treatments may include therapy, medications, or surgery to align the patient's physiology with their identity and "allow[ ] the individual to transition from his or her birth assigned sex to the sex associated with his or her gender identity." (ECF No. 219 at 10.) In Connor's case, his physicians recommended counseling, hormone therapy beginning in January 2018, and ultimately chest reconstruction surgery in May 2019 "to bring [his] body into better alignment with [his] gender identity and lived experience and further reduce [his] symptoms of gender dysphoria." (ECF Nos. 179-2 ¶¶ 7, 9–10; 179-3 ¶ 15.) In his father's words, "it was clear that being a teenage boy without a typically male chest was very painful for [Connor]." (ECF No. 179-3 ¶ 13.)

Connor has health insurance through his father, who is a state employee at the University of North Carolina, Greensboro and a member of the North Carolina State Health Plan for Teachers and State Employees ("NCSHP" or the "Plan"). (Id. ¶¶ 2–4.) When Connor was prescribed testosterone treatments in 2018, NCSHP denied coverage due to a categorical exception for "[t]reatment or studies to or in connection with sex changes or modifications and related care." (Id. at 22.) Connor's chest surgery also was not covered. (Id. ¶ 14.) As a consequence, the family had to delay the surgery, and Connor worked after school to help raise money for his healthcare.

(*Id.* ¶¶ 14–15; ECF No. 179-2 ¶ 14.) Eventually, the family saved enough to pay out of pocket. (ECF No. 179-3 ¶ 15.) Connor and his father testify that the treatments were "life-changing" and "critical for [his] ongoing development and functioning as a young adult." (*Id.* ¶ 16; ECF No. 179-2 ¶ 16.) Connor will need ongoing access to hormone therapy and anticipates requiring additional surgery to continue treatment of his gender dysphoria. (ECF No. 179-2 ¶ 17.)

Connor's experience is typical of remaining Plaintiffs. Plaintiffs are all current or former North Carolina state employees or dependents of state employees who receive health insurance through NCSHP. (ECF Nos. 179-1 ¶¶ 2, 5; 179-4 ¶¶ 2, 8; 179-5 ¶ 19; 179-6 ¶¶ 2, 5; 179-7 ¶¶ 5–6; 179-9 ¶¶ 2, 16.) Plaintiffs or their dependents identify as transgender. (ECF Nos. 179-1 ¶ 2; 179-4 ¶ 2; 179-5 ¶ 4; 179-7 ¶ 2; 179-9 ¶ 3.) These Plaintiffs each formed their gender identities early in childhood, (*see, e.g.*, ECF No. 179-5 ¶ 6 ("Ever since I was a young child, I have known that I am [a] boy.")); *see generally* ECF Nos. 179-1 ¶ 6; 179-4 ¶ 4–5; 179-6 ¶¶ 7–8; 179-9 ¶ 9), and have suffered from anxiety and depression caused by suppression of their gender identities, discrimination and harassment from peers, and living with physical features not typical of the gender with which they identify, (ECF Nos. 179-1 ¶ 8; 179-4 ¶ 4; 179-5 ¶¶ 13, 24; 179-7 ¶ 7; 179-9 ¶ 11). Each has been diagnosed with gender dysphoria. (ECF Nos. 179-1 ¶ 6; 179-4 ¶¶ 4, 5, 9; 179-5 ¶ 14; 179-7 ¶ 8; 179-9 ¶ 19; 185-1 at 31, 34, 37, 40–41, 43, 60.) And each has been denied coverage for procedures prescribed to treat gender dysphoria, to include puberty delaying medication, hormone therapy, mastectomy, mammaplasty, vaginoplasty, and vocal therapy. (ECF Nos. 179-1 ¶¶ 7, 9–15; 179-4 ¶¶ 9–10; 179-5 ¶¶ 20–22; 179-7 ¶¶ 13–17; 179-9 ¶¶ 20–21, 23–26.)

### B. The Exclusion

The basis for NCSHP's denial of coverage is an exclusion that dates back to the 1990s. (ECF No. 137-2 at 16:10-13.) The North Carolina General Assembly originally formed NCSHP to administer "one or more group health plans that are comprehensive in coverage" and tasked the State Treasurer, NCSHP Executive Administrator, and NCSHP Board of Trustees with certain "duties and responsibilities as fiduciaries for the Plan." N.C. Gen. Stat. § 135-48.2(a). The Plan is North Carolina's largest insurer with approximately 740,000 members. (ECF Nos. 137-1 at 35:9-12; 137-2 at 74:1-5.) Individual members pay a monthly premium with additional funding coming from

the state. (ECF Nos. 137-2 at 102:22-24, 105:22-24; 137-3 at 1.) From January to August 2018, NCSHP had collected approximately $2.4 billion in revenue and had a cash balance of approximately $1.1 billion. (ECF No. 184 at 132, 142.)

**\*3** The Plan only covers "medically necessary" services but does not cover all medically necessary services. (ECF No. 137-2 at 58:4-7.) "Medically necessary services or supplies" are defined by North Carolina statute as those services or supplies that are (1) "[p]rovided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease" and "not for experimental, investigational, or cosmetic purposes," (2) "[n]ecessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms," (3) [w]ithin generally accepted standard of medical care in the community," and (4) "[n]ot solely for the convenience of the insured, the insured's family, or the provider." N.C. Gen. Stat. § 58-3-200(b).

Each year, NCSHP adopts and publishes PPO Plan Benefit Booklets that list the healthcare that is and is not covered by the Plan. (*See* ECF No. 184 at 56–104.) The Plan's third-party administrators, Blue Cross/Blue Shield of North Carolina ("Blue Cross") and CVS/Caremark ("CVS"), then implement the booklet using the national billing practices and medical coding system of the healthcare industry. (ECF Nos. 137-1 at 119:9-10; 197-14 ¶ 11.) From the 1990s to 2016, the Plan contained two exclusions relevant to Plaintiffs' causes of actions. The 2016 Plan did not cover:

- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.

- Treatment or studies leading to or in connection with sex changes or modifications and related care.

(ECF No. 184 at 59–60.) According to Defendants, the first exception has never been implemented and is no longer part of the Plan. (*See* ECF Nos. 137 at 13 n.2; 137-4 ¶ 27.) Blue Cross and CVS do give effect to the second exclusion by identifying specific treatments that are not covered. (ECF No. 137-4 ¶¶ 20–21; *see, e.g.*, ECF No. 179-3 at 12–13.) According to Blue Cross, four procedures are not covered by the Plan "regardless of the diagnostic code," to include "Intersex Surgery, Male to Female," "Intersex Surgery, Female to Male," "Vaginoplasty for Intersex State," and "Clitoroplasty for Intersex State." (ECF No. 137-4 ¶ 20.) Two dozen other procedures are not covered when the procedural diagnostic code is for "Transsexualism" or "Personal history

Case 4:19-cv-00035-RM-LAB   Document 300-10   Filed 09/26/22   Page 39 of 79

of sex reassignment." (*Id.* ¶ 21.) CVS likewise may deny coverage for medication, such as puberty blockers or hormone treatments, due to the exclusion. (*See* ECF No. 179-3 at 13 (denying coverage for testosterone where the associated diagnosis was "Transsexualism").)

The Plan did briefly cover "*Medically necessary* services for the treatment of gender dysphoria" in 2017. (ECF No. 184 at 63.) On May 18, 2016, the U.S. Department of Health and Human Services ("HHS") promulgated a final rule prohibiting "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31375, 31471–72 (May 18, 2016). The NCSHP Board of Trustees acted to comply with the regulation and considered "remov[ing] the blanket exclusions that relate to treatment or studies leading to or in connection with sex changes or modifications and related care" and instead covering "medically necessary services for the treatment of gender dysphoria." (ECF No. 185-2 at 34.) At that time, the Board estimated that coverage would cost between $344,013 and $862,292 per year. (ECF No. 184 at 36.) Ultimately, the Board elected to remove the exclusion only for the 2017 year, and it went back into effect in 2018. (ECF No. 185-2 at 35; *see* ECF No. 184 at 66–67.) The total cost to NCSHP of removing the exclusion in 2017 was $404,609.26. (ECF No. 184 at 23.)

### C. Scientific background

**\*4** "The health care community's understanding of what it means to be transgender has advanced greatly over the past century." (ECF No. 219 at 2 (Brief of *Amici Curiae* the American Medical Association, *et al.*).) The health care community now understands that being transgender relates to a person's "internal sense" of gender and is not a psychiatric condition. (*Id.* at 7.) "Every person has a gender identity." (*Id.*) A "cisgender" person's internal gender aligns with their physiological, chromosomal, and birth-assigned sex. (*Id.* at 5.) But not all individuals who "depart from stereotypical male and female appearances and roles" identify as transgender; rather, transgender individuals are those who "consistently, persistently, and insistently" identify as a gender "different from the sex they were assigned at birth." (*Id.* at 8–9.) Being transgender "implies no impairment in a person's judgment, stability, or general social or vocational capabilities." (*Id.* at 2.)

While being transgender is not itself a psychiatric condition, many transgender individuals experience severe anxiety and distress as a result of having physiology or an assigned sex that does not match their "deeply felt, inherent sense of their gender." (*Id.* at 5, 10 (internal quotations omitted).) Like Plaintiffs, many of these transgender individuals have been diagnosed with gender dysphoria. (*Id.* at 10.) Gender dysphoria is "characterized by clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." (*Id.*) The Diagnostic and Statistical Manual of Mental Disorders, volume 5 ("DSM" or "DSM-5"), published by the American Psychiatric Association, provides diagnostic criteria for gender dysphoria in adults, to include "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration," plus "clinically significant distress or impairment in social, occupational, or other important areas of functioning." (*Id.* at 10–11 (quoting DSM-5).)

Gender dysphoria "can cause debilitating distress, depression, impairment of function, self-mutilation to alter one's genitals or secondary sex characteristics, other self-injurious behaviors, and suicide." (*Id.* at 11.) It is treated both through counseling and medical and surgical treatments to bring the patient's physiology in line with their gender identity. (*Id.* at 13.) The World Professional Association for Transgender Health ("WPATH") publishes Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People. (*Id.* at 12.) The current Standards of Care ("WPATH-7") recommended treatments "include[ ] assessment, counseling, and, as appropriate, social transition, hormone therapy, and surgical interventions." (*Id.* at 13.) These treatments are recommended on a case-by-case basis, and "each patient requires an individualized treatment plan that accounts for the patient's specific needs." (*Id.* at 14.)

Plaintiffs' experts testify that such medical and surgical treatment for gender dysphoria is "medically necessary treatment" for many individuals with gender dysphoria. (ECF No. 185-1 at 23, 238, 331, 333.) They testify that these are "safe and effective treatment[s] for gender dysphoria" that are governed by "well-established community standards." (*Id.* at 23, 192.) They report that such treatments are supported by "[d]ecades of methodologically sound and rigorous scientific research," and that "every relevant medical and behavioral health association agrees that gender-confirming care is a medically necessary treatment for individuals with gender dysphoria." (*Id.* at 238, 333.) Eight professional medical associations agree in their amicus brief with Plaintiffs' experts' assessment. (*See generally* ECF No. 219.)

Defendants' experts dispute this testimony. They testify that medical and surgical treatments have significant medical risks and consequences, and the research supporting such treatments is of "low quality." (ECF Nos. 215-1 at 49, 52, 53, 56; 215-2 at 10, 13; 215-3 at 7, 52–54; 215-4 at 17–19, 29–39.) They contest the efficacy of the DSM-5 and WPATH-7 and challenge the credibility and motivations of what they call the "Transgender Treatment Industry." (ECF Nos. 215-1 at 15, 36–40, 47; 215-2 at 6–9, 10–12; 215-3 at 8, 28–31, 36–39; 215-4 at 6–8, 12.) Some of Defendants' experts testify that gender dysphoria should be treated by counseling alone and medical or surgical interventions are not medically necessary, (*see, e.g.*, ECF No. 215-3 at 16–17, 50–52), while one testifies that physicians should proceed cautiously in prescribing medication and surgery on a case-by-case basis, (*see* ECF No. 213-3 at 152:20-25)

### D. Procedural history
**\*5** Plaintiffs filed their suit on March 11, 2019, against Defendant Dale Folwell, in his official capacity as State Treasurer of North Carolina, Defendant Dee Jones, in her official capacity as Executive Administrator of NCSHP, and NCSHP (collectively, "Health Plan Defendants"), and three public universities: the University of North Carolina at Chapel Hill, North Carolina State University, and the University of North Carolina, Greensboro (collectively, "University Defendants"). (ECF No. 1.) Plaintiffs initially alleged violations of the Equal Protection Clause, Title IX of the Education Amendments of 1972, and the ACA. (*Id.* ¶¶ 124–157.)

University Defendants moved to dismiss Plaintiffs' claims against them on July 8, 2019, for lack of standing and failure to state a claim under Title IX. (ECF No. 30.) Health Plan Defendants likewise filed a motion to dismiss on the same day, arguing that Plaintiffs failed to state claims under the Equal Protection Clause or the ACA. (ECF No. 32.) On March 10, 2020, the Court denied both motions. (ECF No. 45.) Health Plan Defendants filed an interlocutory appeal of their denial on April 8, 2020. (ECF No. 50.) The Fourth Circuit affirmed this Court's Order on September 1, 2021. (ECF Nos. 113; 114.) Health Plan Defendants filed a petition for certiorari in the U.S. Supreme Court on November 8, 2021, (ECF No. 127), which was denied on January 18, 2022, (ECF No. 195).

In the interim, Plaintiffs filed a motion to amend their complaint on August 3, 2020. (ECF No. 62.) Plaintiffs'

motion was granted on March 5, 2021. (ECF No. 74.) Plaintiff's First Amended Complaint (the "Complaint") added Dana Caraway as a Plaintiff, DPS as a Defendant, and a fourth cause of action arising under Title VII against NCSHP, DPS, and University Defendants. (ECF No. 75 ¶¶ 12, 18, 130–37.) University Defendants subsequently settled with Plaintiffs and have been dismissed from this suit. (ECF No. 112.)

DPS and Plan Defendants filed their motions for summary judgment on November 30, 2021. (ECF Nos. 132; 136.) Plaintiffs originally filed two summary judgment motions on the same day. (ECF Nos. 138; 152.) On December 10, 2021, the Court struck Plaintiffs' motions and allowed Plaintiffs to file a single dispositive motion with an accompanying memorandum not to exceed 9,000 words. (ECF No. 176.) Plaintiffs then filed their Motion for Summary Judgment on December 20, 2021. (ECF No. 178.) Plaintiffs simultaneously filed a Motion to Seal certain paragraphs of their expert's testimony that describe in detail Plaintiffs' medical history. (ECF No. 182.) Plaintiffs filed their motions to exclude Defendants' experts' testimony on February 2, 2022, along with a motion to seal portions of one expert's report which likewise details Plaintiffs' medical history. (ECF Nos. 202; 204; 206; 208; 210; 212.)

The American Medical Association ("AMA"), American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American Psychiatric Association ("APA"), Endocrine Society, North American Society for Pediatric and Adolescent Gynecology, National Association of Nurse Practitioners in Women's Health, and Society of OB/GYN Hospitalists, together filed an amicus brief with leave of the Court on April 11, 2022, in support of Plaintiffs' summary judgment motion. (ECF No. 219.)

Trial is set in this case for July 5, 2022. (ECF No. 115.) The parties have filed a Joint Motion to Specially Set Trial and Allow 8-10 Days for Proceedings. (ECF No. 225.)

## II. MOTIONS TO EXCLUDE TESTIMONY
The Court will first address Plaintiffs' motions to exclude expert testimony. The admissibility of expert opinion is governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's landmark ruling in 🔖 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that a witness "who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion or otherwise if:"

**\*6** (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, expert testimony is admissible only if: (1) the expert is qualified, (2) the testimony is relevant, and (3) the testimony is based on reliable scientific methodology. [2] *See Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786. The Court must find these elements "at the outset, ... by a preponderance of proof." *Id.* at 592, 113 S.Ct. 2786; *id.* 592 n.10, 113 S.Ct. 2786.

An expert is *qualified* if he or she has "specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue." *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019). A witness' qualifications are "liberally judged by Rule 702," and "a person may qualify to render expert testimony in any one of the five ways listed" by the Rule: "knowledge, skill, experience, training, or education." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *see Cooper v. Lab'y Corp. of Am. Holdings*, 150 F.3d 376, 380 (4th Cir. 1998). However, the expert must be qualified to testify "on the issue for which the opinion is proffered." *Kopf*, 993 F.2d at 377. "[G]eneral knowledge," skill, experience, training, or education is insufficient to qualify an expert, and an expert qualified in one field may be unqualified to testify in others." *Cooper*, 150 F.3d at 380–81 (finding that a witness who had "a general knowledge of chemistry" and "experience with breath alcohol testing" was not an expert in "the field of urine alcohol testing"); *see Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 199 (4th Cir. 2013) (finding that a Ph.D.-holding neuropsychologist and neurotoxicologist was not a medical doctor and therefore was "not qualified to diagnose the cause of [plaintiff's] alleged symptoms"); *see also Shreve v. Sears, Roebuck & Co.*, 166

F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.") (collecting cases).

An expert who is qualified must provide testimony that is relevant. An expert's opinion is *relevant* if it "fit[s]" the facts of the case, meaning it has "a valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92, 113 S.Ct. 2786. "This ensures that the expert 'helps the trier of fact to understand the evidence or to determine a fact in issue.' " *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)). An outmoded or inapplicable standard that "does not even apply to" the facts at issue "categorically lacks 'a valid scientific connection to the pertinent inquiry' " and is "the touchstone of irrelevancy." *Id.* at 289 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786). "Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Id.* at 281.

**\*7** Finally, relevant testimony must also by reliable. An expert's opinion is *reliable* if it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Id.* (emphasis omitted) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). While the subject of scientific testimony must not "be 'known' to a certainty," it must be "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Reliability is a "flexible" inquiry that must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95, 113 S.Ct. 2786. In *Daubert*, the Court outlined a non-exhaustive list of factors to guide lower courts in assessing reliability, including: (1) whether the theory can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) its potential rate of error; (4) whether standards exist to control the technique's operation; and (5) the degree of acceptance of the methodology within the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony,"

and courts have "broad latitude" in choosing which factors are "reasonable measures of reliability in a particular case."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

"One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments); *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 470 (M.D.N.C. 2006); see *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1008 (4th Cir. 2020) (Agee, J., concurring in part and dissenting in part). "An 'expert' opinion is considered unreliable and inadmissible under *Daubert* where ... the expert has developed the opinions expressly for purposes of testifying in the case ...." *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. 1998) (unpublished); *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014).

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge ... exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. Rule 702 "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis*, 10 F.4th at 281 (internal quotations omitted). A court cannot "abandon the gatekeeping function" by deferring its responsibility to the jury. *Id.* at 282 (quoting *Kumho*, 526 U.S. at 159, 119 S.Ct. 1167 (Scalia, J., concurring)). Ultimately, a district court's Rule 702 analysis "necessarily amount[s] to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019).

Although Rule 702 "is not intended to serve as a replacement for the adversary system," *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018), this Court takes seriously its gatekeeping role to protect lay jurors from "powerful and quite misleading" expert testimony, *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. The Court will address each of Plaintiffs' motions to exclude expert testimony in turn.

**A. Dr. Peter Robie (ECF No. 202)**

Dr. Peter Robie is a primary care physician and Assistant Professor and Clinical Associate Professor at the Department of Internal Medicine at Wake Forest School of Medicine. (ECF No. 215-5.) Robie is also a member of the NCSHP Board of Trustees and has provided medical knowledge during the Board's deliberations. (*Id.*) Defendants plan to call Robie only to testify (1) "to the medical knowledge he has shared with other Board members" and (2) that "physicians must know the chromosomal sex of patients" to provide competent medical care. (*Id.*) Robie "does not seek to provide testimony on the efficacy of gender dysphoria treatment or the lack thereof" and has not submitted an expert report. (ECF No. 215 at 15.)

**\*8** Regarding the medical knowledge Robie shared with other Boards members, Defendants do not plan to elicit Robie's expert opinion; rather, he plans to testify as a fact witness to information he provided to the Board. Rule 702 is therefore inapplicable. The Court expresses no opinion on the admissibility or relevance of the proffered testimony.

Regarding Robie's testimony concerning chromosomal sex, Defendants do not explain why they seek to introduce this opinion. Elsewhere, Defendants have argued that "[h]ealthcare providers must know a patient's sex for *every* medical diagnosis" to rebut a hypothetical argument that "*any* coverage decision is subject to heightened scrutiny if *the healthcare provider* considered the patient's biological sex as part of the diagnostic process." (ECF No. 197 at 32.) However, in Section III.A.i., *infra*, this Court finds that heightened scrutiny is appropriate in this case because the *Plan* discriminates based on sex on its face, not because Plaintiffs' medical providers considered their sexes. Thus, Robie's testimony is not relevant to any fact at issue. Regardless, Robie's failure to submit an expert report or provide any basis for his opinion other than a vague reference to his years of practice precludes this Court from finding that his expert opinion is based on a reliable methodology under Rule 702.

Accordingly, Plaintiffs' motion to exclude Robie as an expert witness will be granted. This Court expresses no opinion as to whether he may be called as a fact witness.

### B. Dr. Paul Hruz (ECF No. 204)

Dr. Hruz is a board-certified specialist in pediatric endocrinology, Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes and Associate Professor of Cellular Biology and Physiology in the Division of Biology and Biological Sciences at Washington University School of Medicine in St. Louis, Missouri. (ECF No. 215-3 ¶¶ 2–3.) He holds a Ph.D. and M.D. from the Medical College of Wisconsin. (*Id.* at ¶ 2.) He additionally served as chief of the Division of Pediatric Endocrinology and Diabetes at Washington University from 2012–2017 and Director of the Pediatric Endocrinology Fellowship Program from 2008–2016. (*Id.*) He has published 60 scholarly articles over two decades in the fields of metabolism, cardiology, HIV, and ethics. (*Id.* ¶ 4.) He was a founding member of Washington University's multidisciplinary Disorders of Sexual Development program and has participated in the care of hundreds of infants and children, including adolescents, with disorders of sexual development during his career. (*Id.* ¶ 6.)

Hruz offers a wide range of conclusions that fall into five main categories: mental healthcare, medical and surgical care, informed consent, criticism of medical associations, and political criticisms. First, he offers several opinions on the mental health treatment of gender dysphoria, to include that "[m]ental health care professionals are unreliable human 'lie detectors' [whose diagnoses are] 'often no better than flipping a coin,' " (*id.* ¶ 28); that the DSM is scientifically unreliable; (*see id.* ¶ 13.B); that gender dysphoria is caused by a "social contagion," (*id.* ¶ 41); that "the vast majority of children who report gender dysphoria" will "desist," meaning that "if left untreated, [they will] grow out of the problem ... and willingly accept their biological sex," (*id.* ¶¶ 8, 53); and that a "watchful waiting" approach whereby mental health providers "neither encourage nor discourage transgender identification" is the most effective form of treatment, (*id.* ¶¶ 52–53). Second, he will testify to the risks associated with hormone treatments and surgery to treat gender dysphoria, particularly in prepubescent children. (*Id.* ¶¶ 57, 58, 60.) Third, he will testify that healthcare providers often fail to obtain informed consent from patients by inaccurately describing the risks associated with hormone therapy or surgery. (*Id.* ¶ 36.) Fourth, he will criticize organizations that support gender affirming care, such as the AMA, WPATH,

and the American Psychiatric Association, as unscientific and politically motivated. (*See e.g. id.* ¶ 34.A.) Fifth, he will testify that "Cancel Culture," "transgender and allied political activists," and the "Transgender Treatment Industry" are attempting to "silence open public debate on the risks and benefits of transgender medical procedures and political ideologies." (*Id.* ¶¶ 64–66.)

**\*9**  Plaintiffs have offered evidence that calls Hruz's motivations—and thereby, his reliability—into serious question. Hruz admits a connection to the Alliance Defending Freedom ("ADF"), a political organization with both "moral objections" and scientific objections to the treatments at issue. (ECF Nos. 205-2 at 241:10–242:15; 209-3 at 81:5-13.) Early in his research of gender dysphoria, Hruz told a fellow doctor that he had "a significant problem with the entire issue" and "whole idea of transgender." (ECF No. 205-10 ¶ 11–13 (testifying that Hruz's concerns about the relevant treatments were not "based on science" but rather were "a matter of [his] faith").) Hruz does not recall making these statements. (ECF No. 205-2 at 249:19–251:6.) Hruz also met with parents of transgender children early in his research "to understand the unique difficulties experienced by this patient population." (ECF No. 215-3 ¶ 7.) One such parent testifies that the conversation had a "religious tone" and was not "based on science," and that Hruz "kept insisting that [her] child was not normal and would never be normal," that "the idea of doing surgeries on transgender people is—is wrong," and in response to her assertion that transgender children without supportive parents are at an increased risk of suicide, that "[s]ome children are born in this world to suffer and die." (ECF No. 205-11 at 27:17-24, 28:20-23, 29:21–30:1, 37:13-19.) Plaintiffs argue that this evidence shows Hruz's "expert" testimony did not grow naturally from his work as an endocrinologist; rather, he manufactured his opinions expressly for purposes of testifying against medical care against which he has moral and political objections.

Based on the preponderance of the evidence, this Court finds the following:

First, Hruz is not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will "desist," or the efficacy of mental health treatments. Hruz is not a psychiatrist, psychologist, or mental healthcare professional. He has never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria

diagnosis or its causes, or published any scientific, peer-reviewed literature on gender dysphoria. (ECF Nos. 205-2 at 35:5–36:11, 42:14–49:23, 88:18–90:6; 205-4 at 24:11-14, 25:20-23, 61:17–64:7.) Merely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert. See 🔖 *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Second, Hruz is qualified as an endocrinologist to testify to the risks associated with puberty blocking medication and hormone therapy. This testimony is broadly relevant to assessing whether the Plan's exclusion is substantially related to the state's interest in protecting employees and the public from ineffective medical treatments. It also appears sufficiently reliable, as it is based on Hruz's long career treating patients and conducting academic research on the effects of hormone treatments. However, Hruz's testimony that focuses on the risks associated with providing hormone therapy to prepubescent children—children who have not begun puberty—is not relevant. (*See, e.g.*, ECF No. 215-3 ¶ 54.) By his own admission, "no medical and surgical interventions are initiated until after the onset of puberty" under any model of treatment, (ECF No. 205-2 at 125:23–126:5), and Plaintiffs appear to concede that hormone treatment is not medically necessary to treat gender dysphoria in prepubescent children, (ECF No. 205 at 11–12). In this case, the youngest Plaintiff received puberty blocking medication when puberty began around age 12. (*See* ECF No. 179-5 ¶¶ 13–14.) Thus, a discussion of risks to prepubescent children is irrelevant to this case and would likely serve only to confuse the jury. Additionally, Hruz is not a surgeon and has no experience with surgery for gender dysphoria and, therefore, is not qualified to testify to the risks associated with surgery or the standard of care used by surgeons for obtaining informed consent for surgery.

Third, Hruz provides no scientific basis to his conclusion that "parents are often manipulated and coerced by misinformed political activists or providers who threaten them with dire warnings that the only two options are 'treatment or suicide' " or that endocrinologists generally do not obtain informed consent from their gender dysphoric patients. Hruz is not a statistician and does not discuss in his report how he came to those conclusions, what data he relied upon, or what methodology he applied to that data. This testimony will therefore be excluded as unreliable.

**\*10** Fourth, it does not appear that Hruz has any experience with the AMA, WPATH, or American Psychological Association upon which to base his criticisms. (*See* ECF No. 215-3 ¶ 34.) He is therefore not qualified to testify about the credibility of those organizations. Moreover, Hruz's criticism of the AMA appears largely based on its historical support of eugenics procedures not at issue in this case, and Hruz has not explained what scientific methodology if any he used to compare and contrast treatment of gender dysphoria with the eugenics movement. (*See id.* ¶ 34.A.) Hruz is not qualified to opine on the deficiencies of the DSM and the American Psychological because he is not a mental health professional. (*See id.* ¶ 34.C.) Given that other of Defendants' experts are intimately familiar with the "consensus building" method employed by WPATH, the AMA, and similar organizations, the Court finds that Hruz has not offered any reliable testimony on this subject that will help the trier of fact.

Finally, it does not appear that his repeated references in his report to a "Gender Transition Industry," "Cancel Culture," and political activists working to "silence open public debate" has any basis, scientific or otherwise. (*See id.* ¶ 65.) He provides no evidence of such a conspiracy or any reliable methodology supporting his opinion as required by Rule 702. Rather, his conspiratorial intimations and outright accusations sound in political hyperbole and pose a clear risk of inflaming the jury and prejudicing Plaintiffs. It is the Federal Rules of Evidence, not some "Cancel Culture," that excludes this portion of Hruz's testimony. Since these claims are not based in any methodology and will not assist the trier of fact, this testimony is inadmissible.

Accordingly, Plaintiffs' motion will be granted in part and denied in part, and Hruz is limited in his testimony to a discussion of the risks associated with prescribing hormone treatments to adolescents and adults.

### C. Dr. Paul R. McHugh (ECF No. 206)

Dr. Paul R. McHugh is a licensed psychiatrist and Distinguished Service Professor of Psychiatry at Johns Hopkins University School of Medicine with more than fifty years of experience. (ECF No. 215-2 at 1–2.) He holds an M.D. from Harvard Medical School and was qualified in both Psychiatry and Neurology by the American Board of Psychology and Neurology. (*Id.*) He served as director of the Department of Psychiatry and Behavioral Science at Johns Hopkins Medical School and psychiatrist-in-chief at Johns Hopkins Hospital for nearly 30 years and served as Chairman

Kadel v. Folwell, Slip Copy (2022)
118 Fed. R. Evid. Serv. 1398

Case 4:19-cv-00035-RM-LAB   Document 300-10   Filed 09/26/22   Page 45 of 79

of the Medical Board of Johns Hopkins University Hospital from 1984–1989. (*Id.* at 2.) He has published several books and numerous peer reviewed articles in scientific journals. (*Id.* at 3.) He was elected to the Institute of Medicine of the National Academies of Science in 1992 and is a Distinguished Life Fellow of the American Psychiatric Association. (*Id.* at 4.)

McHugh's fifteen-page report offers cursory opinions on a wide range of topics. According to their brief, Defendants primarily seek to elicit from McHugh testimony that the DSM is unreliable and was not scientifically formed, and that no rigorous scientific research proves that medical or surgical treatments for gender dysphoria will improve the wellbeing of patients. (ECF No. 215 at 28–31.) His report also contains several "Summary Opinions" on the causes of gender dysphoria, rates of desistence, and acceptance of treatments within the medical community. (ECF No. 215-2 at 12–14.)

Based on the preponderance of the evidence, the Court finds that McHugh is qualified as an expert in the field of psychiatry by his more than fifty years of experience as a psychiatrist and academic. Further, his general description of the process by which the current edition of the DSM was created and opinion about the scientific limitations of such a process are broadly relevant to rebut Plaintiffs' expert testimony, as Plaintiffs' experts use and rely on the DSM's definition of gender dysphoria. This testimony is based in McHugh's personal knowledge and experience and is sufficiently reliable to be admissible.

**\*11**  However, Defendants have failed to show that McHugh's more specific criticisms of the DSM's approach to gender dysphoria are relevant or based on reliable science. McHugh's primary criticisms of the DSM come from his work on various "Psychiatric Misadventures," to include "lobotomies," "repressed memory therapy," and "multiple personality disorder"—issues that are not relevant to this case. (*See id.* at 5–6, 9–10.) To the extent he offers this testimony to show that treatment for gender dysphoria is "yet another Psychiatric Misadventure," (*id.* at 10–11), his argument-by-analogy does not appear to be based on any reliable scientific methodology. Instead, he simply suggests that, because the DSM was wrong before, it might be wrong again. Such speculation is inadmissible under Rule 702.

Next, he testifies that "national research reviews in England, Sweden, and Finland as well [as] a Chochrane Review

and studies by multiple researchers have concluded that the evidentiary base for these experimental treatments [for gender dysphoria] is weak and demonstrates few benefits or actually shows this procedures [sic] can cause more harm than good." (*Id.* at 10.) But his report does not cite to any such reviews or studies, (*id.*), and when questioned about them at deposition, he could not recall if the "national reviews" in England or Finland were peer-reviewed or published in scientific journals, and admitted that the Swedish "national review" was not a national review at all, but rather an academic scientific study by Swedish researchers, (ECF No. 207-3 at 300:19–301:20, 302:20–303:6). The Court therefore finds that McHugh's discussion of such studies is not based on reliable science.

Similarly, he testifies without any definition, explanation, or supportive methodology that "the exponential growth [of gender dysphoria] in patients was indeed predicted and is readily explained by a social contagion theory." (ECF No. 215-2 at 11 ("[S]ocial contagion *seems* more likely." (emphasis added)).) He supports this claim with a citation to his own article coauthored by Hruz and published in *The New Atlantis*, (*id.*), which he admits is neither a peer-reviewed nor a scientific publication, (ECF No. 207-3 at 264:1-19). He readily concedes that the number of gender dysphoric patients who have been influenced by a social contagion is "currently unknown" and that his opinion is "a hypothesis and not a statement of fact"; he fails to address whether his "social contagion" hypothesis has been tested or peer-reviewed, if there is a known error rate, or what standards exist to measure its reliability; and it is clear that his theory has not been accepted by relevant scientific community. (ECF Nos. 207-3 at 299:14–300:5; 215-2 at 13.) Instead, he advocates that research be done on this theory. (*See* ECF No. 215-2 at 12 ("The Transgender Treatment Industry has failed to conduct competent research on the social contagion theory."), 13 ("Detailed psycho-social investigations of such patients [who were manipulated by a source of social contagion] may be necessary.").) Thus, the Court finds that McHugh's speculative opinions on "social contagion" hypotheses are inadmissible.

Finally, he testifies that his views on the DSM "is generally accepted by the relevant scientific community." (*Id.* at 8.) His support for this assertion is based on blog posts and an inaccurate claim that the National Institute of Mental Health ("NIMH") withdrew support from the DSM. (*Id.* at 7–8.) He acknowledged during deposition, however, that "[t]he National Institute of Mental Health has not changed its

position on DSM-5" and still considers the DSM to be "the best information currently available for clinical diagnosis of mental disorders." (ECF No. 207-2 at 116:10–117:17, 119:3–122:11.) Further, McHugh gives no explanation or reasoning to support the "summary opinions" tacked on to the end of his report, giving the Court no meaningful way to assess their reliability. Thus, the Court finds that these opinions are likewise unreliable and inadmissible.

**\*12** Accordingly, Plaintiffs' motion will be granted in part and denied in part, and McHugh is limited to testifying about the process by which the DSM was formed and his opinion about the limited scientific reliability of such a process generally.

### D. Dr. Patrick W. Lappert (ECF No. 208)

Dr. Patrick W. Lappert is a retired plastic and reconstructive surgeon with experience in the United States Navy and Marine Corps, university teaching hospitals, and private practice. (ECF Nos. 215-4 at 1–3; 209-3 at 475:11-19.) During his 24 years of military service, he served in a number of roles, to include flight surgeon, Chairman of the Department of Plastic and Reconstructive Surgery at the Naval Hospital in Portsmouth, Virginia, and Specialty Leader for Plastic Reconstructive Surgery for the Surgeon General of the Navy. (ECF No. 215-4 at 2–3.) He also served during this period as Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery. (*Id.* at 2.) He has several publications in peer-reviewed medical journals and one medical textbook, the most recent of which was published in 2000. (*Id.* at 3.) He retired from the Navy in 2002 and entered private practice as a solo practitioner. (*Id.* at 3–4; ECF No. 209-3 at 475:11-19.) He was board certified in surgery from 1992–2002 and in plastic surgery from 1997–2018. (ECF Nos. 215-4 at 2; 209-3 at 23:10-18.) He retired from active surgical practice in August 2020. (ECF No. 209-3 at 24:22–25:11.) During his career, he treated thousands of patients, performed many of the surgeries at issue in this case to treat ailments other than gender dysphoria, and treated transgender patients during transition and de-transition. (ECF No. 215-4 at 4.)

Lappert primarily seeks to offer opinions that surgical treatments for gender dysphoria are not supported by rigorous scientific study and pose severe health risks. (*See id.* at 5–10, 17–20, 29–39.) He additionally offers opinions on the reliability of the DSM, WPATH, and professional medical organizations; the frequency of desistance or "de-transitioning"; requirements of informed consent; and

acceptance of gender dysphoria treatments by the relevant scientific community. (*Id.* at 15–17, 21–25, 40.) Finally, he offers specific opinions about the medical care received by Plaintiffs based on their medical records. (ECF No. 211-2 at 49–57.)

As with Hruz, Plaintiffs offer evidence that calls Lappert's bias and reliability into serious question. Like Hruz, Lappert has worked closely with ADF. Lappert attended an ADF-sponsored conference in which a speaker lamented the "poverty of [experts] who are willing to testify" against the treatments at issue in this case, and where attendees "were asked whether they would be willing to participate as expert witnesses." (ECF No. 209-2 at 90:13–91:13.) Prior to attending this conference, he had not been published on gender dysphoria or the risks of hormone blockers or served as an expert witness, although he had spoken publicly about gender dysphoria. (*Id.* at 84:3–85:4.) Since attending, he has "actively lobbied" for laws that would prohibit doctors from offering medical or surgical treatments for gender dysphoria to adolescents in Alabama, Arkansas, Texas, and Utah, and agreed in deposition that doctors offering these treatments should be "criminally prosecute[d]." (*Id.* at 52:4-18, 54:7–55:2, 57:8-15, 61:16–64:20.) And he has stated publicly that parents who "discuss[ ] gender identity issues with children" are "sexualizing them" and "grooming a generation." (*Id.* at 461:1–462:5). As with Dr. Hruz, Plaintiffs argue that Lappert's testimony did not grow naturally from his research, but was instead crafted at ADF's request for purposes of litigation.

**\*13** Based on the preponderance of the evidence, the Court finds the following:

#### i. Qualifications

Lappert is qualified as an expert in plastic surgery. He is thus qualified to opine on the risks associated with surgery used to treat gender dysphoria, the role surgeons play in treating gender dysphoria under the WPATH standards, the standard of care of informed consent among surgeons, the perspective of the relevant plastic surgeon community, and whether the surgeons obtained informed consent in Plaintiffs' specific cases. Plaintiffs argue that he is not qualified because he has not performed any of the procedures at issue in this case within the last three years as required of experts by the Code of Ethics of the American Society of Plastic Surgeons ("ASPS"). (ECF Nos. 209 at 8; 209-5 §§ 2.IV1, VII.F.)

Although Lappert's failure to qualify as an expert under the ASPS requirements weighs against his qualification, the preponderance of evidence, including his extensive career and relatively recent retirement, supports that he is qualified to offer expert testimony in the field of plastic surgery.

Lappert is not qualified to render opinions about the diagnosis of gender dysphoria, its possible causes, the efficacy of the DSM, the efficacy of puberty blocking medication or hormone treatments, the appropriate standard of informed consent for mental health professionals or endocrinologists, or any opinion on the non-surgical treatments obtained by Plaintiffs. Lappert is not a psychiatrist, psychologist, or mental health professional, nor has he ever diagnosed a patient with gender dysphoria. He is not an endocrinologist, nor has he ever treated a patient with hormone therapies. By his own admission, he "do[es] not hold [himself] out as an expert in diagnosing mental health conditions outside, potentially, of body dysmorphic disorder" and does not have any "expertise in treating mental health conditions." (ECF No. 209-3 at 75:7-16.)

Lappert is also not qualified to opine on the efficacy of randomized clinical trials, cohort studies, or other longitudinal, epidemiological, or statistical studies of gender dysphoria. He is not a statistician or epidemiologist, and there is no evidence in his report or deposition that he has any experience, specialized training, or knowledge about crafting a research study, analyzing data, or conducting a clinical trial. (*See generally id.* at 129:13–134:19.) His publications appear to include case reports and opinion essays, and he has not published any original research in two decades. (*Id.*) His brief academic career appears limited to teaching and overseeing clinic practitioners, not conducting research. (ECF No. 215-4 at 2–4.) Just as an epidemiologist or statistician would not be qualified to perform surgery, a surgeon with little to no research experience is not qualified to opine on the veracity of statistical studies.

Last, Lappert is qualified to testify to his personal, anecdotal experience treating patients who sought treatment to, in Lappert's words, "de-transition." He is not qualified, however, to offer expert opinions on the rates of desistance and "de-transitioning" among gender dysphoric patients generally for the reasons above.

ii. Relevance

*14 Lappert's testimony concerning surgical risks, the role of the surgeon under WPATH, the plastic surgeon community, and anecdotal experience with "de-transitioning" are all relevant to assessing whether the Plan's exclusion is substantially related to the state's interest in protecting employees and the public from ineffective medical treatments. His testimony concerning informed consent, however, is irrelevant. First, his testimony that Plaintiff Thonen-Fleck was incapable of giving informed consent is based on his age, history with mental illness, and lack of medication. (ECF No. 211-2 at 53–54.) Even if true, Lappert does not dispute that Thonen-Fleck's father was able to (and did) give informed consent. (*See* ECF No. 179-3 ¶ 13 ("Based on medical advice, I understand this surgery to have been medically necessary.").) Lappert's broader discussion of informed consent merely sets up his conclusion that surgeons are not adhering to that standard of care generally—a speculative conclusion that is not supported by any survey or data, scientific or otherwise. Thus, Lappert's discussion of informed consent is not admissible.

iii. Reliability

First, Lappert's testimony concerning the risks associated with certain surgeries appears to be based on his professional experience and training and sufficiently reliable to be admitted under Rule 702. Additionally, his anecdotal testimony concerning "de-transitioning" is admissible but is not a reliable basis for any broader opinion about the rates of desistance, the likelihood that gender dysphoric patients will later "de-transition," or the general efficacy of surgical treatment for gender dysphoria.

Second, his testimony concerning the role of the surgeon under the WPATH guidelines, and more specifically his criticism that surgeons are not able or required to verify a gender dysphoria diagnosis, appears to arise from his extensive experience as a plastic surgeon and is admissible. However, his broader criticism of WPATH-7 appears to be unscientific opinion and speculation. (ECF No. 209-3 at 184:3-6, 186:23–187:5, 188:15-18 (conceding that he has "not been involved with the development" of WPATH-7, does not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" WPATH-7, and is "not an expert on how Version 7 of the WPATH was developed").) Likewise, in addition to not being qualified in endocrinology or psychiatry, he has not shown the reliability of his criticisms of the Endocrine Society's Guidelines for

Treatment of Gender Dysphoria, (*id.* at 200:12-18 (agreeing that he is "not an expert in how the Endocrine Society developed" its guidelines)); the DSM-5, (*id.* at 193:14-18 (agreeing that he "do[es] not have expert firsthand knowledge of how the DSM-5 was developed"); the AMA's position on these treatments, (*id.* at 47:13-18 (stating he does not have "personal knowledge" of "how the AMA came to issue [its] consensus statement")); or the American Academy of Pediatrics' position, (*id.* at 48:14-23 (admitting he has no "personal knowledge" of how the position was adopted)). And as with Dr. Hruz and Dr. McHugh, Lappert's analogy of treatments of gender dysphoria to eugenics efforts in the early and mid-twentieth century lack any reference to what scientific methodology he used to compare and contrast the treatments.

Third, Lappert has provided the Court with no data or methodology used to draw his conclusion that surgical treatment for gender dysphoria has "never been generally accepted by the relevant scientific community." (*See* ECF No. 215-4 at 22.) Lappert agrees that "every major expert medical association disagrees with [him]" and have "all taken [the] position that this treatment is in fact medically necessary," (ECF No. 209-2 at 40:15-22), and virtually every major health insurer agrees, (*id.* at 384:21–385:3, 427:4–428:7, 430:12–431:6, 434:17–434:20; *see* ECF Nos. 209-10 at 2; 209-11 at 1–4; 209-12 at 3–8; 209-13 at 2–3)). There is no evidence that he has conducted any surveys that would support his repeated conclusory claims concerning the "<u>relevant scientific communities</u> (biology, genetics, neonatolgy [sic] medicine, psychology, etc.)." (ECF No. 215-4 at 40.) Thus, Defendants have failed to meet their burden to show that this testimony is based on reliable science.

**\*15** Finally, Lappert makes repeated references in his report to a "Transgender Treatment Industry ('TTI')." (*See id.* at 12.) He opines that "[m]embers of the TTI have a vested interest in believing that science has already justified their existence," asks "[w]ill one day the medical profession look at support for transitioning youth in the same manner the eugenics movement is now regarded?", and hypothesizes that healthcare providers "want the patient to suffer depression and anxiety [because] *such untreated suffering motivates vulnerable patients* to undergo the often painful and damaging experimental 'transitioning' process." (*Id.* at 12, 15.) In his deposition, however, he made clear that he does not "know where [the term TTI] came from" does not "know who originated it," and doesn't "know even if it was me that

originated it, actually." (ECF No. 209-3 at 19:19–20:2.) He is not aware of any peer-reviewed scientific article that has used that term. (*Id.* at 20:17-21.) Thus, the Court finds that references to a Transgender or Gender Treatment Industry and related conspiratorial accusations are nothing more than rank speculation designed to distract or inflame the jury and has no business in expert testimony.

Accordingly, Plaintiffs' motion will be granted in part and denied in part, and Lappert is limited to testifying to (1) the risks associated with the surgeries at issue in this case; (2) his anecdotal experience treating patients seeking to "de-transition"; and (3) the WPATH recommended role of the surgeon in treating gender dysphoria as compared to the role of the surgeon in other surgical contexts.

### E. Stephen B. Levine, M.D. (ECF No. 212)

Dr. Stephen B. Levine is a licensed physician and Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine. (ECF No. 215-1 ¶ 1.) He holds an M.D. from Case Western and has received numerous grants for scientific research and program development. (*Id.*) He maintains an active private clinical practice and specializes in treatment of "psychological problems and conditions relating to sexuality and sexual relations including sexual identity issues, therapies for sexual problems, and the relationship between love and intimate relationships and wider mental health." (*Id.* ¶¶ 1–2.) He is the recipient of the Masters and Johnson Lifetime Achievement Award from the Society of Sex Therapy and Research and is a Distinguished Life Fellow of the American Psychiatric Association. (*Id.* ¶ 2.) He serves as Co-Director of the Gender Diversity Clinic, which he founded at Case Western in 1974. (*Id.* ¶ 3.) He has treated dozens of transgender patients through the clinic and supervised other therapists. (*Id.*) He was an early member of the organization now called WPATH and served as the Chairman of the WPATH Standards of Care Committee that developed WPATH-5. (*Id.*)

Levine's testimony primarily falls into three categories: the risks of medical and surgical treatment to children, the function of WPATH, and the quality of research supporting medical and surgical care for gender dysphoria. First, he testifies that "active affirmation of transgender identity in young children ... raises ethical and public health concerns." (*Id.* ¶ 8(e).) He testifies that healthcare providers should "delay any transitions [until] after the onset of puberty," that "*encouraging social transition in children remains controversial*," that a majority of prepubescent

children diagnosed with gender dysphoria will desist, and that mental health professionals should employ psychotherapy and a "watchful waiting approach" in treating children with gender dysphoria. (*Id.* ¶¶ 29, 38, 54, 62.) Second, he "provide[s] some context concerning" WPATH, which he calls a "private, activist, non-science, organization." (*Id.* ¶¶ 45–53.) Finally, he testifies that the scientific research demonstrating the benefits of medical and surgical treatments of gender dysphoria are of "low quality." (*Id.* ¶ 68(g).)

Notably, Levine does not testify that medical and surgical care for gender dysphoria is categorically inappropriate. (*See, e.g., id.* ¶ 43 ("In my opinion, it is not possible to make a single, categorical statement about the proper treatment of children presenting with gender dysphoria or other gender-related issues.") Despite his view that only "low quality" evidence supports the efficacy of these treatments, he does not advocate for "denying endocrine treatment or surgical treatment" to all transgender people, a position he calls "draconian," (ECF No. 213-3 at 73:4-7, 84:21–85:11, ("I'm not advocating denying endocrine treatment or surgical treatment."), 152:1-6, 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").) He concedes that he does not know how often medical or surgical care helps alleviate symptoms of gender dysphoria and does not offer an opinion as to the portion of these procedures that are necessary and unnecessary. (*Id.* at 67:24–68:3 ("It is not our [clinic's] knowledge base to know who's going to do better and who's going to do worse and who is not going to have any difference at all with hormones or with surgery.").) He testifies that this lack of high-quality evidence should encourage physicians treating gender dysphoria to be "cautious" and that transgender patients "have a right to be more fully informed" about the risks and rewards of such care, but ultimately agrees that "doctor[s] need to decide" when medical and surgical care is necessary on "a case-by-case basis." (*Id.* at 152:20-25; ECF No. 215-1 ¶ 126 ("Science not politics needs to drive trans care.").) In his own practice, Levine adheres to the WPATH Standards of Care and personally provides letters of authorization for medical and surgical treatments for his gender dysphoric patients after advising them on the risks associated with those treatments. (ECF No. 213-3 at 55:13-17, 56:2-5, 112:16-21, 176:8-16, 225:24–226:17.) Levine testifies anecdotally that "[i]n [his] experience," mental health providers "too often encourage or permit decision based on a great deal of patient and professional blind optimism" and fail to adequately inform patients of the inadequacies in the research supporting treatments for gender dysphoria. (ECF No. 215-1 ¶ 105.) He

does not offer any quantifiable metrics to identify how many doctors provide informed consent and proceed with caution, and how many do not.

**\*16** Based on the preponderance of the evidence, the Court finds that Levine is qualified as both a mental health provider and researcher. He is qualified to offer expert testimony on the treatment of gender dysphoria and the efficacy and findings of research studies evaluating gender dysphoria treatments. His personal work treating transgender patients, extensive experience conducting scientific research, review of the relevant literature, and thorough discussion of relevant scientific studies in his report qualify him as an expert witness. The Court additionally finds the following:

First, Levine's testimony concerning the risks of medical and surgical treatment for adolescents is relevant to assessing whether the Plan's exclusion is substantially related to Defendants' governmental interest in protecting employees and the public from ineffective medical treatments. However, Levine's criticism of medical or surgical treatment of gender dysphoria in prepubescent children is not relevant, as Plaintiffs have conceded that such treatments are not medically necessary until the onset of puberty. *See* Section II.B, *supra.* Likewise, Levine's opinions on mental health approaches to social transition are irrelevant as well, as Defendants maintain that the Plan's exclusion of coverage for mental health treatments of gender dysphoria has never been given effect and is no longer part of the Plan. (*See* ECF Nos. 137 n.2; 137-4 ¶ 27.)

Second, Levine is qualified by his personal experience with WPATH to provide background and critique the WPATH Standards of Care. This testimony is relevant to rebut Plaintiffs' experts who appear to use and rely in part on the WPATH-7 and is reliably based on Levine's expert knowledge and personal experience with the organization.

Third, Levine's analysis of the relevant scientific research supporting gender affirming medical care is relevant to assessing whether the Plan's exclusion is substantially related to Defendants' governmental interest in protecting employees and the public from ineffective medical treatments. Further, his opinion that the available scientific research is of "low quality" appears reliably based on his review of the relevant literature, experience conducting scientific research, and a "widely accepted hierarchy of reliability" that distinguishes between case studies on the "low" end and randomized double-blind clinical trials on the "high" end. (*See* ECF No.

215-1 ¶ 68.) His criticism of the methodology of some of these studies similarly appears reliable. [3] (*Id.* ¶¶ 74–79.)

However, Levine's testimony regarding desistance rates does not appear to be based on reliable methodology. During deposition, Levine was unable to recall many of the studies that purportedly support his conclusion. (ECF No. 213-3 at 191:20-192:14.) His anecdotal testimony concerning adults and adolescents who regret their transitions appears to be based on a misreading of an article that reviewed entries on the website Reddit. (*See* ECF No. 215-1 ¶¶ 35, 56, 98.) He admitted during deposition that the article referred to 16,000 entries—not 60,000, as he repeatedly stated in his report—and that he had no knowledge of the content of those entries or whether any of the authors actually de-transitioned or regret their transitions. (*Id.* at 196:3-7, 201:12-25)

**\*17** Fourth, as discussed, it does not appear that he offers any categorical opinion as to the medical necessity of medical and surgical treatments of gender dysphoria, nor does he testify that healthcare providers are prescribing such treatment without due caution and informed consent beyond his anecdotal "experience." To the extent that Defendants seek to introduce testimony from Levine to that effect, he has not provided the Court with any data or methodology from which such claims could be made. Levine has conducted no research to identify which physicians are proceeding as he does and which do not, rendering any broader opinion about the practice of such healthcare providers pure speculation.

Finally, for the same reasons identified regarding Dr. Lappert, *supra*, Levine's reference to a "Transgender Treatment Industry" does not appear to be based on any science whatsoever and is not admissible.

In sum, Plaintiffs' motion will be granted in part and denied in part, and Levine's testimony will be limited to (1) identifying risks associated with prescribing medication and surgery to adolescents, (2) discussing WPATH, and (3) criticizing the quality of the research on treatments for gender dysphoria.

## III. MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs argue that they are entitled to summary judgment on their three claims arising under the Equal Protection Clause, Title VII, and the ACA. (ECF No. 179.) DPS argues that it is entitled to summary judgment on Plaintiff Caraway's Title VII claim. (ECF No. 133.) Plan Defendants argue that NCSHP is entitled to summary judgment on Plaintiff's Title VII and

ACA claims. (ECF No. 136.) The Court will address each claim in turn.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.,* 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman,* 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs,* 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs,* 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2,* 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather,* 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of ... the record" or "showing that the materials cited do not establish the absence ... of a genuine dispute." *Fed. R. Civ. P. 56(c)(1); see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Expert testimony must be admissible to create a genuine issue of material fact. *See Cavallo v. Star Enter.,* 100 F.3d 1150, 1159 (4th Cir. 1996).

**A. Equal Protection Clause**

**\*18** The Fourteenth Amendment to the U.S. Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). When considering an equal protection claim, a court must determine (1) "what level of scrutiny applies" and (2) "whether the law or policy at issue survives such scrutiny." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir.), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

i. The Plan facially discriminates
based on sex and transgender status

"In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons." *Id.* (citing *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). Generally, a state policy "is presumed to be valid and will be sustained if the classification drawn by the [policy] is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. This general rule "gives way," however, when the policy discriminates based on membership in certain suspect classes. *Id.* In the Fourth Circuit, laws that discriminate based on sex or transgender status receive intermediate scrutiny. *Grimm*, 972 F.3d at 608, 610. Such policies are unconstitutional "unless [they are] substantially related to a sufficiently important governmental interest.' " *Id.* at 608 (quoting *Cleburne*, 473 U.S. at 441, 105 S.Ct. 3249).

To show that a policy discriminates based on sex or transgender status, a plaintiff must show discriminatory intent and disproportionate impact. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "No inquiry into legislative purpose is necessary," however, when the suspect classification "appears on the face" of the policy. *Shaw v. Reno*, 509 U.S.

630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). A policy that facially discriminates based on membership in a suspect class is "immediately suspect because, '[a]bsent searching judicial inquiry ..., there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate' " governmental objectives. *Id.* at 642–43, 113 S.Ct. 2816 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion));

*see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination.").

A facial inquiry is what it sounds like: a review of the language of the policy to see whether it is facially neutral or "deal[s] in explicitly racial [or gendered] terms." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (citing *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969)). A policy that uses racial or gendered terms "falls into an inherently suspect category" even if it creates classifications that are not "obviously pernicious." *Id.* at 485, 487, 102 S.Ct. 3187. The "crucial difference" between facially discriminatory and facially neutral laws is that the former "plainly rests on distinctions based on" a suspect classification. *Id.* at 485, 102 S.Ct. 3187 (internal quotations omitted).

In *Grimm*, the Fourth Circuit held that a school policy limiting students to use of the restroom and locker room facility that corresponded to their "biological genders" discriminated on its face based on sex. *Grimm*, 972 F.3d at 608–10. First, it reasoned that the policy "necessarily rests on a sex classification" and "cannot be stated without referencing sex." *Id.* at 608. Second, the court found that the policy "subjected [plaintiff] to sex discrimination because he was viewed as failing to conform to the sex stereotype propagated by the Policy." *Id.* at 608. Thus, the Fourth Circuit applied intermediate scrutiny. *Id.* at 609.

**\*19** Additionally, the court held that the bathroom policy facially discriminated against plaintiff based on his status

as a transgender boy. *Id.* at 613. The court identified transgender individuals as a quasi-suspect class consisting of those "who consistently, persistently, and insistently express a gender that, on a binary, we would think of as opposite to their assigned sex." *Id.* at 594, 613 (internal quotations omitted). The court then held that the policy—which provided "alternative appropriate private facilit[ies]" for students "with gender identity issues"— facially discriminated against plaintiff based on his membership in this class. *Id.* at 609, 613.

Here, the Plan excludes "[t]reatment or studies leading to or in connection with *sex* changes or modifications and related care." (ECF No. 184 at 67 (emphasis added).) This exception does not identify any diagnoses or treatments. Instead, the broad language of the Plan distinguishes between medically necessary [4] treatments that align with the member's biological sex and medically necessary treatments—often the *same* medically necessary treatments—that do not align with his sex.

These exclusions facially discriminate based on sex and transgender status. First, like in *Grimm*, this exclusion "necessarily rests on a sex classification" because it cannot be stated or effectuated "without referencing sex." *See Grimm*, 972 F.3d at 608; *c.f. Hunter*, 393 U.S. at 391, 89 S.Ct. 557. As reasoned by the U.S. Supreme Court, "try writing out instructions" for which treatments are excluded "without using the words man, woman, or sex (or some synonym). It can't be done." *Bostock v. Clayton Cty.*, ––– U.S. ––––, 140 S. Ct. 1731, 1746, 207 L.Ed.2d 218 (2020). It is impossible to determine whether a particular treatment is connected to "sex changes or modifications and related care"—and thus, whether the exclusion applies—without comparing the member's biological sex before the treatment to how it might be impacted by the treatment.

Second, the Plan overtly discriminates against members for "failing to conform to the sex stereotype propagated by the [Plan]." *See Grimm*, 972 F.3d at 608. The Plan expressly limits members to coverage for treatments that align their physiology with their biological sex and prohibits coverage for treatments that "change or modify" physiology to conflict with assigned sex. For example, puberty suppressing medication may be covered if medically necessary. (*See, e.g.*, ECF Nos. 201-1 at 4–22.) But a transgender boy will not receive coverage for such medication —even if medically necessary—because, in the language of the Plan, it would "change or modify" his physiology in a way that does not match his female biological sex. (*See id.*) This is textbook sex discrimination. *Grimm*, 972 F.3d at 608; *see generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (holding that employers who "insist[ed] that [individuals] matched the stereotype associated with their group" committed sex discrimination under Title VII); *Bostock*, 140 S. Ct. at 1741 ("[A]n employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in *both* cases the employer fires an individual in part because of sex.").

**\*20** Third, the Plan also transparently discriminates against its transgender members. As mentioned, the quasi-suspect class identified by the Fourth Circuit is defined as those "who consistently, persistently, and insistently express a gender that, on a binary, we would think of as opposite to their assigned sex." *Grimm*, 972 F.3d at 594. Transgender men are men; transgender women are women. *Id.* at 610 ("[Plaintiff] did not question his gender identity at all; he knew he was a boy."). This holding by the Fourth Circuit is likewise supported by the undisputed evidence in this case. (*See, e.g.*, ECF Nos. 179-2 ¶¶ 2–3 ("I am a 19-year-old man. I am also transgender."); 179-5 ¶¶ 2, 4 ("I am a boy.... I am transgender, which means that I was designated 'female' at birth, even though I am and identify as male."); 137-2 at 85:10–87:22 (stating that NCSHP members may align their sex identification marker in NCSHP's records with their gender identity without proof of their physical anatomy, DNA, or chromosomal make up); *see also* ECF No. 219 at 6 ("A transgender man is a man. A transgender woman is a woman.").) Under the Plan, however, transgender members are classified as seeking to "change or modify" their gender or sex while cisgender members are not. So, a cisgender man who receives medically necessary testosterone is covered, while a transgender man who receives medically necessary testosterone is not. Like in *Grimm*, the Plan "privileges sex-assigned-at-birth over [Plaintiffs'] medically confirmed, persistent and consistent gender identity." *Grimm*, 972 F.3d at 610. Thus, it will receive intermediate scrutiny.

Case 4:19-cv-00035-RM-LAB    Document 300-10    Filed 09/26/22    Page 53 of 79

Defendants raise four arguments against finding that the Plan discriminates based on sex or transgender status.

First, Defendants argue that the Plan does not discriminate based on sex or transgender status but based on diagnosis. (ECF No. 197 at 28.) Specifically, they characterize the Plan as covering medically necessary treatments for some ailments but not for others, such as gender dysphoria. (*Id.*) Some Plan administrators do consider the exclusions to be "blanket exclusions for the treatment of gender dysphoria." (*See, e.g.*, ECF No. 185-2 at 34.) However, whether a policy is facially discriminatory is determined with reference to the language of the policy, not the underlying intent of its adopters or administrators. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect."). Thus, Defendants' evidence does not create a genuine issue of material fact as to whether the Plan discriminates *on its face.*[5]

Further, even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria, it would still receive intermediate scrutiny. Discrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status. As with the Plan's exclusions, one cannot explain gender dysphoria "without referencing sex" or a synonym. *See Grimm,* 972 F.3d at 608. A hypothetical from the Supreme Court is directly on point:

> Suppose an employer asked homosexual or transgender applicants to tick a box on its application form. The employer then had someone else redact any information that could be used to discern sex. The resulting applications would disclose which individuals are homosexual or transgender without revealing whether they also happen to be men or women. Doesn't that possibility indicate that the employer's discrimination against homosexual or transgender persons cannot be sex discrimination?
>
> No, it doesn't.... There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words man, woman, or sex (or some synonym). It can't be done.

**\*21** *Bostock,* 140 S. Ct. at 1746. The same is true here. Even if Plan administrators see only a box checked "gender dysphoria," the diagnostician cannot know whether to check that box without considering sex.[6] Defendants' first argument is unpersuasive.

Second, Defendants argue that Plaintiffs are not similarly situated to members who receive similar treatments for different diagnoses. (ECF No. 197 at 29.) Members who receive hormone therapy, testosterone, or a mastectomy for gender dysphoria, they argue, are not similarly situated to members who seek those same treatments for prostate, testicular, or breast cancer. (*Id.*) This argument, however, is a *justification* for Defendants' facial sex and transgender discrimination, not an argument that the exclusions are facially neutral. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 62–64, 73, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) (conducting "similarly situated" analysis of a facially discriminatory law in its application of intermediate scrutiny rather than to determine what level of scrutiny applied). It is sufficient at this stage that those affected and unaffected by the exclusion are all members of the Plan who seek similar or identical treatments. The factor used by the Plan to distinguish between covered and uncovered treatments is that the later "change or modify" the patient's assigned sex. Other factors not evidenced on the face of the Plan that may distinguish the two groups are not proper for consideration at this stage in the Court's analysis. *See Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group *for purposes of the challenged government action....* [It] depends on what government action the plaintiffs are challenging." (emphasis added)).

Third, Defendants argue that the Plan does in fact cover many over-the-counter pharmaceuticals regardless of transgender status because neither the Plan nor its administrators "*ever know* the reason" for such purchases. (ECF No. 197 at 26.) But a policy that makes coverage turn on sex or transgender status receives heightened scrutiny even if administrators do not actually know members' sex or transgender status in practice. *Cf. Bostock,* 140 S. Ct. at 1746 ("By intentionally setting out a rule that makes hiring turn on [sex], the employer violates the law, whatever he might know or not know about individual applicants."). A facially discriminatory policy likewise receives heightened scrutiny even if it is not applied

Kadel v. Folwell, Slip Copy (2022)
118 Fed. R. Evid. Serv. 1398

Case 4:19-cv-00035-RM-LAB   Document 300-10   Filed 09/26/22   Page 54 of 79

in all cases. *See, e.g.,* 🚩 *Fisher v. Univ. of Tex. at Austin,* 579 U.S. 365, 384, 136 S.Ct. 2198, 195 L.Ed.2d 511 (2016) (applying heightened scrutiny to a race-conscious admissions policy even though "race consciousness played a role in only a small portion of admissions decisions").

Fourth, Defendants analogize this case to 🚩 *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In 🚩 *Geduldig,* the Supreme Court held that a state health program that denied coverage for pregnancy did not discriminate based on sex. 🚩 *Id.* at 494, 94 S.Ct. 2485. The Court reasoned that the program did "not exclude anyone from benefit eligibility because of gender but merely remove[d] one physical condition—pregnancy—from the list of compensable disabilities." 🚩 *Id.* at 496 n.20, 94 S.Ct. 2485. "Normal pregnancy is an objectively identifiable physical condition with unique characteristics," and while "only women can become pregnant," the group of members who are not pregnant "includes members of both sexes." 🚩 *Id.* But the same cannot be said here. The Plan does not merely exclude one "objectively identifiable physical condition with unique characteristics" from coverage; rather, it excludes *treatments* that lead or are connected to *sex* changes or modifications. Pregnancy can be explained without reference to sex, gender, or transgender status. [7] The same cannot be said of the exclusion at issue here.

**\*22** In sum, there is no genuine issue of material fact about the language of the Plan: it facially discriminates based on sex and transgender status. The Court will accordingly apply intermediate scrutiny.

### ii. Defendants have not established a genuine issue of material fact as to whether the Plan is substantially related to an important governmental interest

Policies that discriminate based on sex or transgender status are unconstitutional "unless [they are] substantially related to a sufficiently important governmental interest." 🚩 *Grimm,* 972 F.3d at 608 (quoting 🚩 *Cleburne,* 473 U.S. at 441, 105 S.Ct. 3249). To survive intermediate scrutiny, the state bears the burden to "provide an 'exceedingly persuasive justification' for its classification." *Id.* (quoting 🚩 *United*

States v. Virginia, 518 U.S. 515, 534, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)).

Defendants raise two justifications for the relevant exclusions. First, they argue that the exclusions limit health care costs. (ECF No. 197 at 40.) Until 2018, North Carolina provided free health insurance to its public employees. (ECF No. 137-2 at 106:2-4.) When the North Carolina General Assembly limited increases in its contribution to the Plan in 2016 to 4% per year, however, NCSHP was unable to keep up with the rapid 7% annual increase in healthcare costs. (*Id.* at 102:22-24.) At Defendant Folwell's direction, NCSHP cut benefits and charged employees premiums for the first time. (*Id.* at 102:19-21, 106:2-4.) Now, "a whole lot of employees have to work one week out of a month just to cover their Health Plan for their family." (*Id.* at 105:22-24.)

While such a justification may be sufficient under the rational basis test, *see* 🚩 *Geduldig,* 417 U.S. at 496, 94 S.Ct. 2485, a state may not "protect the public fisc by drawing an invidious distinction between classes of its citizens" under heightened scrutiny. 🚩 *Mem'l Hosp. v. Maricopa Cnty.,* 415 U.S. 250, 263, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). That is especially true here, as the estimated $300,000–$900,000 saved by the exclusion per year pales in comparison to NCSHP's billion-dollar cash balance and saves each of the Plan's 740,000 members about one dollar each. Such a paltry limit on health care costs is not an important governmental interest.

Second, Defendants argue that the relevant treatments excluded by the Plan are not effective. (ECF No. 197 at 11–17.) Viewed in the abstract, the Court finds that withholding Plan funds from ineffective medical treatments serves an important governmental interest. The state has an obvious interest in protecting its employees and their families from ineffective medical treatments and a derivative interest in reducing the prevalence of such treatments generally by cutting them off from access to the Plan's considerable resources. (*See* ECF No. 137-1 at 35:7-12 (stating that the Plan is the largest purchaser of healthcare and pharmaceuticals in North Carolina)). Protecting public health is an important governmental interest. *Eline v. Town of Ocean City,* 7 F.4th 214, 222 n.8 (4th Cir. 2021), *cert. denied,* —— U.S. ——, 142 S. Ct. 1117, 212 L.Ed.2d 12 (2022).

Thus, the remaining issue is whether the exclusions are substantially related to Defendant's interest in protecting its employees and the public from ineffective medical

treatments. [8] Defendants attempt to establish this substantial relationship via their experts' testimony. However, as found in Part II, *supra*, much of this testimony is inadmissible. Inadmissible testimony cannot establish a genuine issue of material fact for purposes of summary judgment. *See* 🔖 *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).

**\*23** Defendants' admissible expert testimony, even when taken in the light most favorable to Defendants, does not support that the Plan's exclusion substantially excludes treatments that are ineffective. First, while Dr. Hruz and Dr. Lappert testify that the medicines and surgeries used to treat gender dysphoria can have serious health risks and consequences, it is also undisputed that gender dysphoria is a serious diagnosis that, if left untreated, can lead to self-mutilation and suicide. NCSHP covers many of these same treatments for other serious illnesses notwithstanding their risks and side effects. Without evidence that the treatments are ineffective to treat gender dysphoria, Defendants cannot meet their burden to show that the risks substantially outweigh the benefits so as to justify their sex- and transgender-based policy.

Second, Defendants point to Dr. Levine's testimony to argue that these treatments are categorically ineffective. But that is not Levine's testimony. He testifies that the available research is not sufficiently reliable to prove that treatments are effective, but repeatedly and emphatically testifies that this lack of high-level research is *not* reason to justify withholding treatment from all gender dysphoric patients. Rather, he testifies that *doctors and patients*, when fully aware of the risks and elusive benefits of available treatments, should decide if medicine or surgery is necessary *as he does in his own practice*. This is Plaintiffs' request: that they and their doctors, not their sex or transgender status, determine when their treatments are appropriate. Levine does not and cannot reliably testify as to how often doctors prescribe unnecessary treatments or fail to obtain informed consent. Thus, Levine's testimony also does not create a genuine issue of material fact as to whether the Plan's exclusion substantially excludes ineffective treatments.

Finally, anecdotal recounting of individual patient experiences and wholesale criticism of WPATH, the DSM, and various professional associations, even when taken as true, is insufficient to meet Defendants' burden of showing that the Plan's discriminatory exclusion is substantially related to an important governmental interest. At most, this evidence challenges the credibility of some—but not all—of Plaintiffs' evidence showing that medical and surgical treatments for gender dysphoria are effective.

Moreover, Defendants have a clear, sex- and transgender-neutral alternative to the exclusion. In 2017, the Plan covered "medically necessary services for the treatment of gender dysphoria," and NCSHP's third-party administrators, Blue Cross and CVS, appear able to distinguish between medically necessary and unnecessary treatments. (*See, e.g.*, 185-2 at 89–99 (distinguishing in the Blue Cross Corporate Medical Policy between medically necessary and unnecessary treatments for gender dysphoria). To the extent that Defendants can anecdotally establish that *some* treatments for gender dysphoria are ineffective, they have not offered any admissible evidence to show that the Plan's categorical exclusion better protects members from ineffective treatments than the more narrow exclusion of medically *unnecessary* treatments for gender dysphoria. Thus, Defendants cannot meet their burden under intermediate scrutiny. *See* 🔖 *Caban v. Mohammed*, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (invalidating an adoption law where "the State's interest ... can be protected by means that do not draw such an inflexible gender-based distinction."); 🔖 *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 650, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (invalidating a maternity policy where a more "narrow method of protecting the school board's interest in teacher fitness" was available); *see also* 🔖 *Cleburne*, 473 U.S. at 476, 105 S.Ct. 3249 (Marshall, J., concurring in the judgment in part and dissenting in part) ("When statutes rest on impermissibly overbroad generalizations, our cases [applying intermediate scrutiny] have invalidated the presumption on its face.") (collecting cases).

**\*24** Thus, Plaintiffs are entitled to summary judgment on their Equal Protection Claim.

### B. Title VII

The Court next addresses Plaintiff Caraway's Title VII claims against DPS and NCSHP.

It is a violation of Title VII for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 🔖 42 U.S.C. § 2000e-2(a)(1). "Health insurance and other fringe benefits are 'compensation, terms, conditions, or privileges

of employment' " under Title VII.[9]  🚩 *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983).

DPS, NCSHP, and Plaintiffs each move for summary judgement on Plaintiff Caraway's Title VII claims. (ECF Nos. 132; 136; 178.) NCSHP argues it is not Caraway's employer. (ECF No. 137 at 25–33.) DPS argues that Caraway lacks standing and cannot show that DPS caused her injury. (ECF No. 133 at 21–22.) Caraway argues that no genuine issue of material fact exists as to her Title VII claim and she is entitled to judgment as a matter of law as to liability, "reserving issues of damages ... for trial." (ECF No. 179 at 4, 32–37.) The Court will address these arguments in turn.

### i. Plaintiff Caraway

Caraway is a transgender woman and corrections officer for DPS. (ECF No. 179-9 ¶¶ 5, 8.) She is required to maintain health insurance by DPS given the nature of her job and is a member of NCSHP. (*Id.* ¶ 16.) She was diagnosed with gender dysphoria and began hormone replacement therapy in mid-2018, and underwent "intersex surgery" and a "mammaplasty" on August 5, 2020. (*Id.* ¶¶ 19–20; *id.* at 13.) Due to the exclusion, NCSHP has only occasionally covered her hormone therapy and did not cover her surgery. (*Id.* ¶¶ 21, 24, 28; *see id.* at 13.) She consequently delayed surgery approximately nine months until she could pay the $27,000 bill out of pocket. (*Id.* ¶¶ 23–25.) Caraway is still employed with DPS. (*Id.* ¶ 6.) Although the treatment she has received "has helped" relieve symptoms from her gender dysphoria "up to a point," she anticipates requiring continued hormone treatments and additional surgery. (*Id.* ¶¶ 29–33.)

### ii. NCSHP is not Caraway's employer

NCSHP argues that it is not liable to Caraway under Title VII because it is not her employer. (ECF No. 137 at 25–28.) It is undisputed that Caraway is employed by DPS. (*See* ECF No. 179-9 ¶ 5.) Caraway argues that NCSHP is also her employer—and therefore liable under Title VII—because (1) it is DPS's agent and (2) DPS and NCSHP jointly employ her. (ECF No. 188 at 15–18.)

### 1. NCSHP is not DPS's agent

Title VII defines "employer" as either "a person engaged in an industry affecting commerce" that employs fifteen or more employees and "any agent of such a person." 🚩 42 U.S.C. § 2000e(b). An "employer," in turn, is prohibited from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of her sex. 🚩 § 2000e-2(a)(1). "Title VII's purpose [is to] eliminat[e] discrimination in employment based on race, color, religion, sex, or national origin." 🚩 *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 409 (4th Cir. 2015) (internal quotations omitted). "Title VII should be liberally construed in light of its remedial purpose ... [and] such liberal construction is also to be given to the definition of 'employer.' " 🚩 *Id.* (internal quotations omitted).

**\*25** Title VII "does not define the term 'agent.' " 🚩 *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998). In 🚩 *Lissau*, the Fourth Circuit held that "individual supervisors are not liable under Title VII." 🚩 *Id.* at 181. Rejecting an argument that an individual supervisor may be held liable as the "agent" of the employer, the court "interpret[ted] the inclusion of agent in Title VII's definition of employer simply to establish a limit on an employer's liability for its employees' actions." 🚩 *Id.* at 180; *see also* 🚩 *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994) (reading an identical provision in the Age Discrimination in Employment Act to be "an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer").

The Fourth Circuit has not addressed the present situation where a plaintiff alleges that an entity, rather than an individual supervisor, is liable under Title VII by virtue of being an agent. (*See* ECF No. 74 at 22–24.) Other circuits have held "that Title VII plaintiffs may maintain a suit directly against an entity acting as the agent of an employer, but only under certain circumstances." 🚩 *Alam v. Miller Brewing Co.*, 709 F.3d 662, 668–69 (7th Cir. 2013) (citations omitted). These circuits recognize agency liability where the agent "exercise[s] control over an important aspect of [the

plaintiff's] employment," *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17 (1st Cir. 1994); where the agent "significantly affects access of any individual to employment opportunities," *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982), *vacated and remanded on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983); or where "an employer delegates sufficient control of some traditional rights over employees to a third party," *Nealey v. Univ. Health Servs., Inc.*, 114 F. Supp. 2d 1358, 1367 (S.D. Ga. 2000) (quoting *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999)).

Here, even if the Court were to assume that entities may be held liable as agents under Title VII in the Fourth Circuit, Caraway has failed to show that NCSHP operates as DPS's agent. [10] At common law, "[a]n agent is one who consents to act on behalf on another and subject to the other's control." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 (6th Cir. 1997) (citing Restatement (Second) of Agency § 1 (1958)); *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (interpreting Title VII's definition of "employer" and use of the term of "agent" against a common law backdrop). Plaintiffs have submitted no evidence that NCSHP is subject to DPS's control. On the contrary, it appears undisputed that "state law delegates control over employee health coverage to NCSHP." (ECF No. 188 at 18 (citing N.C. Gen. Stat. § 135-48.2(a)).) Although DPS provides the Plan to its employees and assists in its implementation, *see* Section III.B.iii, *infra*, DPS has no legal control over NCSHP or the Plan, *see generally* §§ 135-48.1–48.62, and Carraway has failed to produce any evidence to show that DPS has control over NCSHP in fact.

### 2. NCSHP is not a joint employer

**\*26** An individual may have more than one employer within the meaning of Title VII. *Butler*, 793 F.3d at 408. The "principal guidepost" to observe in determining an employee's employers is " 'the common-law element of control,' drawn from the law of agency." *Id.* at 409 (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448, 123 S.Ct. 1673, 155 L.Ed.2d 615

(2003)). In *Butler*, the Fourth Circuit adopted a nine-factor test to determine whether a Title VII plaintiff "is jointly employed by two or more entities." *Id.* at 414. These factors are:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* "[N]one of these factors are dispositive and ... courts can modify the factors to the specific industry context." *Id.* Generally, however, the first three of these factors will be "most important," and the ninth factor will be "of minimal consequence." *Id.* at 414, 414 n.12.

Here, there is no evidence that NCSHP has authority to hire, fire, supervise, or discipline Plaintiff Caraway (factors one and two). (ECF Nos. 137-12 at 101:6–102:11, 104:1-15, 105:20-25; 137-13 at 34:4-18, 39:16-18.) NCSHP does not provide her with any equipment or workplace (factor three), (ECF Nos. 137-12 at 102:9-10, 111:4-19; 137-13 at 45:9-16), or training (factor six), (ECF Nos. 137-12 at 99:10-20; 137-13 at 37:12-16, 48:8-13). Caraway has never been assigned to perform work for NCSHP (factors five and eight), (ECF No. 137-12 at 93:7-16), and as a prison guard, her duties are not akin to duties of NCSHP's employees, which include managing implementation of the Plan (factor seven), (*see,*

*e.g.*, ECF No. 137-2 at 69:23–70:8). There is no evidence NCSHP or Caraway intended to enter into an employment relationship (factor nine). (*See* ECF No. 137-12 at 93:7-16 ("The only employer I worked for in the last 27 years ... was [DPS].").) Finally, while it is possible that NCSHP possessed some of Caraway's insurance records (factor four), she has failed to identify evidence in the record to support this inference.

Plaintiffs argue that NCSHP is an employer because it exercises " 'control' over the health coverage relevant to this case." (ECF No. 188 at 18.) The guidepost identified in *Clackamas* and *Butler*, however, is not control over one aspect of employment, but rather "practical control of the employee." *Butler*, 793 F.3d at 414; *see Clackamas*, 538 U.S. at 448, 123 S.Ct. 1673 ("[T]he relevant factors defining the master-servant relationship focus on the master's control *over the servant*." (emphasis added)). A joint employer need not have total control over all aspects of the employment; however, Plaintiffs have cited no legal authority to support that an entity's control over an individual's employment-based health insurance renders it the individual's employer where all nine factors identified in *Butler* weigh against finding joint employment.

**\*27** Even taking all evidence in the light most favorable to Plaintiffs, they have failed to create a genuine issue of material fact as to whether NCSHP is Plaintiff Caraway's employer. Accordingly, NCSHP will be granted summary judgment on Caraway's Title VII claim, and Caraway's motion for summary judgment will be denied as to this claim.

### iii. DPS is liable under Title VII
### for providing the Plan to Caraway

DPS argues that it is entitled to summary judgment because (1) Caraway does not have standing to sue DPS and (2) Caraway cannot show that DPS caused her injuries under Title VII. (ECF No. 133.)

### 1. Caraway has standing to sue DPS

DPS first argues that Caraway's injuries are not fairly traceable to its conduct as required for standing because, pursuant to state law, DPS has no power to establish or implement the Plan. (ECF No. 133 at 8–22.)

Parties invoking federal jurisdiction bear the burden of establishing that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Traceability requires a causal connection between the defendant's conduct and the plaintiff's injury, such that "there is a genuine nexus" between the two. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). "[T]he 'fairly traceable standard is not equivalent to a requirement of tort causation.' " *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018) (quoting *Friends*, 204 F.3d at 161). At the summary judgment stage, "the plaintiff can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quoting Fed. R. Civ. P. 56(e)).

On March 10, 2020, this Court found that Plaintiffs had standing at the motion to dismiss stage to sue University Defendants notwithstanding standing arguments similar to those raised by DPS here. (ECF No. 45 at 7–10.) Although University Defendants could not dictate the Plan's terms, benefits, or exclusions under North Carolina law, this Court held that Plaintiffs' allegations that University Defendants hired Plaintiffs, offered the Plan to them, and participate in its availability provided a sufficient nexus between the alleged injuries and University Defendants to establish standing. (*Id.* at 8.) This traceability was "further bolstered" by allegations that University Defendants funded the Plan in part and played an active role in collecting erroneous payments and settling claims regarding health benefits. (*Id.* at 8–9.)

Here, Plaintiffs have submitted evidence that DPS is similarly involved in providing and administering the Plan. First, it appears undisputed that DPS "provides health care coverage to its employees through the NCSHP." (ECF Nos. 75 ¶ 18; 96 ¶ 18; 184 at 205:20-22; *see also* ECF No. 133 at 14 (arguing that DPS was "*require[d]* ... to offer the [Plan] to [its] current and former employees." (citing § 135-48.42(a)).) Defendants agree that DPS "play[s] a role in getting eligible employees enrolled in the Plan" by providing employees

with electronic registration forms and making available a Health Benefit Representative to help the employee enroll. (ECF No. 184 at 178:9–179:18 (NCSHP dep.), 220:7–221:16 (DPS dep.).) DPS then reviews an applicant's eligibility to confirm that she is either a new hire or has become a full-time employee. (*Id.* at 179:1-5.) A DPS employee can make changes to her health insurance benefits by filing a qualifying life event, which DPS must review and approve. (*Id.* at 211:15–212:22.) DPS additionally contributes $521.96 per month per employee to help cover the cost of the Plan. (*Id.* at 54, 205:25–206:3, 207:6-10.) Plaintiff Caraway was made eligible for the Plan by virtue of her employment with DPS. (*Id.* at 177:10-19.) And Plaintiff was required by DPS to have health insurance and received coverage under the Plan as part of her compensation. (ECF Nos. 179-9 ¶ 16; 187-1 at 5–6.)

**\*28** DPS argues that it "did not make the decision to exclude gender-confirming healthcare coverage" from the Plan nor has "any authority to choose a healthcare coverage option for its employees other than what was offered through the Plan." (ECF No. 133 at 17–18.) It describes the contacts with the Plan outlined above as "ministerial duties," the majority of which "are strictly dictated by statute." (*Id.* at 18.) As Plaintiffs correctly contend, however, there is no "ministerial" exception to the standing doctrine. (ECF No. 187 at 12 (citing *Nelson v. Warner*, 12 F.4th 376, 385 (4th Cir. 2021)).) In *Nelson*, the Fourth Circuit held that candidates who were placed second on election ballots based on party affiliation pursuant to West Virginia law suffered an injury that was fairly traceable to the conduct of state election officials who prepared the ballots in accordance with the statute. *Nelson*, 12 F.4th at 385; *see also* *Strickland v. Alexander*, 772 F.3d 876, 886 (11th Cir. 2014) ("[T]he fact that '[defendant's] duties are ministerial in nature' [does not] somehow render [plaintiff's] injury not fairly traceable to [defendant].""). Similarly here, DPS administers the Plan by providing it to its employees as part of their compensation, enrolling employees in the Plan, confirming their eligibility, approving qualifying life events, and partially funding the Plan. Thus, Plaintiff's injuries are fairly traceable to DPS's conduct, notwithstanding its contention that its role in administering the Plan is merely ministerial.

Additionally, the Court finds that Caraway has submitted sufficient evidence to demonstrate injury and redressability at the summary judgment stage. As this Court previously found with regard to Plaintiffs' Title IX claims, a favorable ruling on Caraway's Title VII claim could redress Caraway's injury through monetary or declaratory relief. (*See* ECF No. 45 at

9–10.) Thus, Caraway has sufficiently established standing to sue DPS.

#### 2. Caraway was denied coverage because of her sex

To prevail under Title VII, a plaintiff must typically show that "the defendant's conduct did in fact cause the plaintiff's injury," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013), meaning plaintiff's injury "would not have happened 'but for' the purported cause," *Bostock*, 140 S. Ct. at 1739. *But see id.* at 1740 (noting that "liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision" under the "motivating factor test"). The but-for test directs courts "to change one thing at a time and see if the outcome changes." *Id.* at 1739. But-for causation "can be a sweeping standard" because "[o]ften, events have multiple but-for causes." *Id.* "[A] defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Id.*

Discrimination against a transgender employee violates Title VII. *Id.* at 1741. The Supreme Court reasoned that an employer who "fires a transgender employee who was identified as a male at birth but now identifies as a female" but "retains an otherwise identical employee who was identified as female at birth ... intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" in violation of Title VII. *Id.* Like with discrimination based on sexual orientation, "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741–42.

Here, a straightforward application of the but-for test supports that Caraway's birth-assigned sex was a but-for cause of her injury. Caraway received hormone treatments and surgery that aligned her physiology more closely with that of a stereotypical woman. Because Caraway was identified as a male at birth, the Plan and its administrators considered these treatments to be "leading to or in connection with sex changes or modifications and related care." (ECF No. 179-9 at 13.) If she was not assigned the sex of male of birth, then the treatments would not "change" or "modify" her sex,

and they would not fall within the exclusion. Defendants have not submitted any admissible evidence to refute that these treatments were "medically necessary," and it appears both NCSHP and Blue Cross agree that they would have been covered in absence of the exclusion. (ECF Nos. 137-2 at 58:4-23, 72:4-6 (Jones dep.); 185-2 at 89–99; *see also* ECF No. 179-9 at 13 (citing only the exclusion as the reason Caraway's surgery was not covered).) Since the Plan covers some hormone treatments, (*see* ECF No. 197-9), and may cover breast augmentation, vaginal repair, or vaginal construction surgery that is not to treat "transsexualism" or "personal history of sex reassignment," (ECF No. 137-4 ¶ 21), it appears that Caraway would be able to receive the same or similar surgery if she had been identified as female at birth.

**\*29** DPS does not dispute this straightforward application of the but-for test. Instead, it argues (similar to its standing argument above) that it did not "establish [or] implement" the Plan, and therefore its actions are not a but-for cause of Caraway's injury. (ECF No. 133 at 11.) But as discussed above, it is undisputed that DPS "provided" Plaintiff Caraway with health insurance under the Plan as part of her compensation and performed various tasks to help implement the Plan. The fact that DPS did not create the Plan or decide what it covered is not dispositive. Put simply, if DPS had not provided Caraway with discriminatory health insurance, she would not have been injured. DPS's conduct is therefore a but-for cause of her injury.

DPS counters: but we had no choice! State law required DPS to provide Plaintiff with insurance under the Plan and forbade it from providing other or supplemental health insurance. But compliance with state law is no defense to a federal violation. U.S. Const. art. VI cl. 2; Arizona v. United States, 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ("[S]tate laws are pre-empted ... where compliance with both federal and state regulations is a physical impossibility.") (internal quotations omitted); *see, e.g.*, Green v. Sch. Bd. of New Kent Cty., 391 U.S. 430, 432–33, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (prohibiting school boards from complying with state laws that mandated racial segregation in public schools in conflict with the Fourteenth Amendment). Moreover, the statutes creating the Plan expressly contemplated such a conflict and instructed DPS to eschew state law for federal law. *See* N.C. Gen. Stat. §§ 135-48.4 ("If any provision of this Article is in conflict with applicable federal law, federal law shall control to the extent of the conflict."),

135-48.42(a) ("*Except as otherwise required by applicable federal law*, new employees must be given the opportunity to enroll....") (emphasis added)).

Thus, Caraway will be granted summary judgment on her Title VII claim against DPS, and DPS's motion for summary judgment will be denied as to this claim. The remaining issue of damages will be reserved for trial.

### C. ACA

Lastly, NCSHP moves for summary judgment on Plaintiffs' claims arising under the ACA. (ECF No. 136.) Plaintiffs move for partial summary judgment on this claim, reserving the issue of damages for trial. (ECF Nos. 178; 179 at 4.)

The ACA provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 [or] title IX of the Education Amendments of 1972, ... be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). The ACA explicitly incorporates Title VI and Title IX, and "[t]he Fourth Circuit looks to Title VII ... to guide the 'evaluation of claims under Title IX.' " *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021), *reconsideration denied*, No. CV DKC 20-2088, 2021 WL 4951921 (D. Md. Oct. 25, 2021) (quoting Grimm, 972 F.3d at 616). The test announced in Bostock is therefore the appropriate test to determine whether a policy discriminates in violation of the ACA. *See id.* Thus, for the reasons identified in Section III.B.ii.2, *supra*, there is no genuine issue of material fact disputing that the Plan discriminated against Caraway on the basis of her sex.

NCSHP argues instead that it is not liable under the ACA because it is not a "health program or activity." (ECF No. 137 at 33–37.) The term is not defined in the statute. The U.S. Department of Health and Human Services ("HHS")—the federal agency tasked with promulgating regulations to implement this prohibition, *see* 42 U.S.C. § 18116(c)—initially interpreted "health program or activity" to include entities "principally engaged in providing or administering ... health insurance coverage," among others. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31467 (May 18, 2016). In June 2020, however, HHS revised its rules. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37244–45 (June 19, 2020)

(codified at 45 C.F.R. § 92.3(b), (c)). Its current interpretation expressly excludes "entit[ies] principally or otherwise engaged in the business of providing health insurance" from the definition of "health program or activity." 45 C.F.R. § 92.3(c).

**\*30** Various litigants have challenged HHS's changed interpretation of the statute as arbitrary and capricious, and the question remains pending in multiple federal courts. *See, e.g., Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 237–39 (D. Mass. 2021). These courts have stayed proceedings as "HHS's efforts to reconsider the 2020 Rule are underway," the Department "intends to issue a Notice of Proposed Rulemaking in early 2022," and its actions "provide every indication that it is preparing to initiate a wholesale revision of the 2020 Rule." *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 20-1630 (JEB), 2021 WL 4033072, at \*3 (D.D.C. Sept. 3, 2021).

It appearing to the Court that the agency interpretation at issue may change or be enjoined before trial is set to commence in this case on July 5, 2022; that resolution of this issue in this case could have nation-wide implications; that Plaintiffs will receive the declaratory and injunctive relief they seek by virtue of this Order and will therefore not be prejudiced by a delay in resolving this issue; and that discovery has closed and motion practice has ended, meaning NCSHP will not be prejudiced by a delay in resolving this issue; the Court, therefore, will reserve judgment on this portion of Defendant's motion pending further Order from this Court.

### D. Permanent injunction

Plaintiffs seek a permanent injunction. (ECF No. 75 ¶ B.) "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). Plaintiffs must demonstrate: (1) irreparable injury; (2) inadequacy of available remedies at law, such as monetary damages; (3) an injunction is warranted after "considering the balance of hardships between the plaintiff and defendant"; and (4) "that the public interest would not be disserved by a permanent injunction." *Id.* at 156–57, 130 S.Ct. 2743. Permanent injunctions are particularly appropriate in discrimination cases to prevent continued discrimination. *See Albemarle*

*Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (noting that the "primary objective" of Title VII "was a prophylactic one" to "remove barriers that have operated in the past").

Here, Plaintiffs have shown that they will require continued medical care to treat their gender dysphoria and that, barring judicial or legislative intervention, NCSHP intends to maintain the exclusion. (ECF No. 185-2 at 83 (Folwell) (vowing to maintain the exclusion "[u]ntil the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers' money on sex change operations").) The exclusion has and will continue to force Plaintiffs and others delay or forgo medically necessary treatments, since most do not have funds available to pay for treatments out of pocket and then be reimbursed through monetary damages. These significant hardships faced by Plaintiffs outweigh the minimal hardship on Defendants, particularly given that Defendants and their third-party administrators were able to identify and cover medically necessary care in 2017. Finally, an injunction is likely to cost the public substantially less than awarding damages after-the-fact, since NCSHP can negotiate lower prices than individual members can negotiate while paying out of pocket.

Prohibitory injunctions that "aim to maintain the status quo and prevent irreparable harm" are favored over mandatory injunctions that "alter the status quo." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235–36 (4th Cir. 2014) (discussing preliminary injunctions). The status quo is "the last uncontested status between the parties which preceded the controversy." *Id.* at 236 (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). A plaintiff who seeks to enjoin enforcement of a new policy and "require a party who has recently disturbed the status quo to reverse its actions" seeks a prohibitory injunction, not a mandatory one. *Id.*; *see also Disability Rts. S.C. v. McMaster*, 564 F. Supp. 3d 413, § IV.A (D.S.C. 2021) (finding that the status quo in was "the position of the parties prior to the enactment of" the challenged policy), *vacated in part on other grounds*, 24 F.4th 893 (4th Cir. 2022).

**\*31** Here, the last uncontested status between the parties existed during 2017, when Defendants covered medically necessary services for the treatment of gender dysphoria. Thus, Plaintiffs' request to enjoin enforcement of the exclusion and reimpose the uncontested 2017 rule seeks a

prohibitory injunction. This Court finds that reimposing the 2017 rule is the appropriate remedy.

Accordingly, the Court will permanently enjoin NCSHP from enforcing the Plan's exclusion and order NCSHP to reinstate coverage for "medically necessary services of treatment for gender dysphoria."

## IV. MOTIONS TO SEAL

Finally, Plaintiffs seek to seal portions of expert reports that describe in detail Plaintiffs' experiences with gender dysphoria and transition, to include portions of Dr. George Richard Brown's report, filed in support of their motion for summary judgment, (ECF No. 182), and portions of Dr. Lappert's report, filed in support of their Daubert motion to exclude his testimony, (ECF No. 210).

A motion to seal "presents the seeming tension between several legitimate interests." Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 574 (4th Cir. 2004). On one hand, the public has a right, derived from both common law and the First Amendment, "of public access to documents or materials filed in a district court." Id. at 575. On the other hand, individuals have an interest in keeping sensitive medical information private. Watson v. Lowcountry Red Cross, 974 F.2d 482, 487 (4th Cir. 1992); Boone v. Bd. of Governors of Univ. of N.C., 395 F. Supp. 3d 657, 665 (M.D.N.C. 2019), aff'd, 858 F. App'x 622 (4th Cir. 2021). Congress and the State of North Carolina have recognized the significance of an individual's interest in keeping medical information private, see 42 U.S.C. § 1320d-6(a); N.C. Gen. Stat. § 58-2-105(a), and the Fourth Circuit has held that such information "should receive scrupulously confidential treatment" when it concerns subject matter that faces public stigma, Watson, 974 F.2d at 487.

### A. Dr. Brown's report (ECF No. 182)

When the subject of the motion to seal is documents attached to a summary judgment motion in a civil case, "the more rigorous First Amendment standard" governs the court's analysis. Washington Post, 386 F.3d at 576 (quoting Rushforth v. New Yorker Mag., Inc., 846 F.2d 249, 253 (4th Cir. 1988)). Under this standard, "a district court may restrict access 'only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest.' " Id. at 575 (quoting Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988)). "Public access serves to promote the trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." Doe v. Pub. Citizen, 749 F.3d 246, 266 (4th Cir. 2014). "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like a fiat and requires rigorous justification." Id. Thus, before granting a motion to seal, a court must "(1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) ... state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives." Id. at 272.

**\*32** Here, Plaintiffs' motion to seal has been publicly docketed since its date of filing on December 20, 2021. (ECF No. 182.) Thus, the public has had ample notice and opportunity to oppose the motion. Plaintiffs seek to seal medical information of the most intimate and sensitive nature concerning their struggles with, and treatment of, gender dysphoria, often during adolescence. (Id.) Gender dysphoria and transition remains highly stigmatized, lending greater weight to Plaintiffs' argument that there is a compelling interest to keep this information private. Watson, 974 F.2d at 487. The Court is also concerned that denying Plaintiffs' motion could have a chilling effect on future litigants who want to challenge unlawful discrimination but do not want their personal and private medical history put on display. Defendants, who have full access to an unredacted copy of Brown's report, will not be prejudiced by granting Plaintiffs' motion, and no member of the public has requested access. Further, the only piece of evidence relied upon by this Court in this Order which Plaintiffs seek to seal is Brown's testimony that each Plaintiff has been diagnosed with gender dysphoria—a fact that is repeated in Plaintiffs' unredacted declarations, discussed in this Order, and not disputed by Defendants. Thus, the Court finds that Plaintiffs' privacy interest outweighs the public's limited interest in learning the private medical details of Plaintiffs' experiences with gender dysphoria. Finally, the Court finds that there are no alternatives to closure, and Plaintiffs' request to seal only small portions of Browns' testimony is narrowly tailored to the compelling interest discussed herein.

Plaintiffs' motion will be granted.

**B. Dr. Lappert's report (ECF No. 210)**
When the motions sought to be sealed are in connection with an evidentiary motion rather than a motion seeking dispositive relief, "the right of access at issue arises under the common law." *Lord Corp. v. S & B Tech. Prods., Inc.*, No. 5:09-CV-205-D, 2012 WL 895947, at *1 (E.D.N.C. Mar. 15, 2012); *see generally* 🚩 *Washington Post*, 386 F.3d at 576–77 (holding that the First Amendment attached to dispositive motions in civil cases). "The common law presumes a right of the public to inspect and copy all judicial records and documents." 🚩 *Washington Post*, 386 F.3d at 575 (internal quotations omitted) (citing 🚩 *Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). However, "[t]he distinction between the rights of access afforded by the common law and the First Amendment is 'significant.'" 🚩 *Id.* (quoting 🚩 *In re Baltimore Sun Co.*, 886 F.2d 60, 64 (4th Cir. 1989)). The common law "does not afford as much substantive protection to the interests of the press and the public" or "as much access ... as does the First Amendment." 🚩 *Id.* Thus, the presumption of access "can be rebutted if countervailing interests heavily outweigh the public interest in access." 🚩 *Id.* "[T]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." 🚩 *Id.* (quoting 🚩 *Rushford*, 846 F.2d at 253).

Here, the information contained in Lappert's report is marked "CONFIDENTIAL" and is similar to the sensitive medical information discussed by Brown. Lappert does not state any expert opinions in this section that are admissible, *see* Section II.D.ii, *supra*, further reducing the public's right of access. And, as above, no member of the public has requested access, and Defendants have access to an unredacted copy of their own expert's report. Thus, the Court finds that, under the more deferential common law standard, Plaintiffs' interest in privacy heavily outweighs the public's interest in access.

Thus, Plaintiffs motions to seal will be granted.

**CONCLUSION**

Issues surrounding transgender healthcare evoke strong emotional and political opinions. *See* 🚩 *Grimm*, 972 F.3d at 594 ("[M]any of us carry heavy baggage into any discussion of gender and sex."). But politics and emotion are not admissible as evidence in a court of law. Plaintiffs' doctors, their experts, every major medical association, and Defendants' own third-party administrators all agree that, in certain cases, gender affirming medical and surgical care can be medically necessary to treat gender dysphoria. Defendants attempt to create scientific controversy in this uniform agreement through experts who mix their scientific analysis with hypothetical speculation and political hyperbole. Only science that is relevant, reliable, and offered by a qualified expert is admissible, however, and the admissible portions of Defendants' expert's testimony, even when taken in the light most favorable to Defendants, do not justify the exclusion at issue. Defendants' belief that gender affirming care is ineffective and unnecessary is simply not supported by the record. Consequently, their categorical sex-and transgender-based exclusion of gender affirming treatments from coverage unlawfully discriminates against Plaintiffs in violation of the U.S. Constitution and Title VII.

**ORDER**

**\*33** **IT IS THEREFORE ORDERED** that DPS's Motion for Summary Judgment, (ECF No. 132), is **DENIED.**

**IT IS FURTHER ORDERED** that Plan Defendants' Partial Summary Judgment, (ECF No. 136), is **GRANTED** in part and **JUDGMENT IS RESERVED** in part. It is **GRANTED** as to Plaintiff Caraway's claim arising under Title VII against NCSHP. **JUDGMENT IS RESERVED** regarding Plaintiffs' claims arising under the ACA pending further Order from this Court.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment, (ECF No. 178), is **GRANTED** in part, **DENIED** in part, and **JUDGMENT IS RESERVED** in part. It is **GRANTED** with respect to Plaintiffs' claims arising under the Equal Protection Clause and Plaintiff Caraway's claim arising under Title VII against DPS. It is **DENIED** as to Caraway's Title VII claim against NCSHP. **JUDGMENT IS RESERVED** regarding Plaintiffs' claims arising under the ACA pending further Order from this Court. Defendants are **PERMANENTLY ENJOINED** from enforcing the Plan's exclusion and are **ORDERED** to reinstate coverage for

"medically necessary services for the treatment of gender dysphoria." The issue of damages is reserved for trial.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Seal Exhibits to Plaintiffs' Motion for Summary Judgment, (ECF No. 182), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie, (ECF No. 202), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul W. Hruz, (ECF No. 204), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul R. McHugh, (ECF No. 206), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, (ECF No. 208), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal portions of Dr. Lappert's report, (ECF No. 210), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., (ECF No. 212), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

**All Citations**

Slip Copy, 2022 WL 2106270, 118 Fed. R. Evid. Serv. 1398

---

### Footnotes

1   These include: a Motion for Summary Judgment filed by Defendant North Carolina Department of Public Safety, (ECF No. 132); a Motion for Partial Summary Judgment filed by Defendants Dale Folwell, Dee Jones, and NCSHP, (ECF No. 136); Plaintiffs' Motion for Summary Judgment, (ECF No. 178); Plaintiffs' Motion to Seal Exhibits to Plaintiffs' Motion for Summary Judgment, (ECF No. 182); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie, (ECF No. 202); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul W. Hruz, (ECF No. 204); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul R. McHugh, (ECF No. 206); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, (ECF No. 208); Plaintiff's Motion to Seal portions of Dr. Lappert's report, (ECF No. 210); and Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., (ECF No. 212).

2   Although Daubert interpreted an earlier version of Rule 702, "the standard of review that was established for Daubert challenges is still appropriate" to assess the admissibility of expert testimony. United States v. Parra, 402 F.3d 752, 758 (7th Cir. 2005); see In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig., 424 F. Supp. 3d 781, 789 (N.D. Cal. 2020) ("[N]o obvious conflict arises between [Rule 702] as amended and Daubert, at least as relevant to the issues in this case."); see also Sardis v. Overhead Door Corp., 10 F.4th 268, 282 (4th Cir. 2021) ("Rule 702 was amended specifically to affirm the trial courts role as gatekeeper." (internal quotations omitted)).

3   Contrary to Plaintiffs' characterization, Levine does not testify that medical or surgical treatment of gender dysphoria *increases* a patient's chance of negative mental health outcomes, but rather that, in his view, no reliable studies show that such treatments *reduce* the likelihood of such outcomes. (ECF No. 215-1 ¶¶ 74–79.)

4    Defendants dispute that the treatments excluded by the Plan are medically necessary in fact. However, the Plan already limits coverage to treatments that are medically necessary. (ECF No. 137-2 at 58:4-7.) Thus, for purposes of this facial inquiry alone, the exclusion only applies to treatments that are otherwise considered medically necessary.

5    Moreover, undisputed evidence shows the exclusions do not simply attach to treatments related to a diagnosis of gender dysphoria in practice. As discussed, preauthorization for some surgeries is denied due to the exclusion "regardless of the diagnostic code," and preauthorization for others is denied if the procedural code accompanying the treatment is "transsexualism" or "personal history of sex reassignment." (ECF No. 197-14 ¶¶ 20–21.)

6    Defendants argue that "[h]ealthcare providers must know a patient's sex for *every* medical diagnosis," (ECF No. 197 at 32), but this argument misstates the issue. Gender dysphoria cannot be explained at all without reference to sex, while most other diagnoses—even those that are specific to members of only one sex—can be explained neutrally.

7    *Pregnancy*, Dorland's Illustrated Medical Dictionary (33d ed. 2020) ("[T]he condition of having a developing embryo or fetus in the body, after union of an oocyte and spermatozoon."); *Pregnant*, American Heritage Medical Dictionary (2d ed. rev. 2007) ("Carrying developing offspring within the body); *see Pregnant*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pregnant (last updated May 25, 2022) ("containing a developing embryo, fetus, or unborn offspring within the body"). *But see Pregnancy*, Stedman's Medical Dictionary (28th ed. 2006) ("The state of a female after conception and until the termination of the gestation.").

8    Plaintiffs argue "[b]inding circuit precedent recognizes that ... medical treatments for gender dysphoria 'are safe, effective, and often medically necessary.' " (ECF No. 201 at 3 (quoting *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 428 (4th Cir.), *as amended* (Dec. 2, 2021), *cert. denied sub nom. N.C. Health Plan for Tchrs. & State Emps. v. Kadel*, ––– U.S. ––––, 142 S. Ct. 861, 211 L.Ed.2d 568 (2022)).) However, the relevant quote comes from the Fourth Circuit's background discussion of gender dysphoria. *See Kadel*, 12 F.4th at 428. This Court does not read the Fourth Circuit's ruling in *Kadel*—which concerned a jurisdictional issue—to resolve this consequential issue as a matter of fact or law. Thus, the effectiveness of these treatments remains an issue of fact that must be resolved in the first instance.

9    Whether a benefit is "compensation" under Title VII is a question of federal law, not state law. Defendants' contention that the Plan does not constitute compensation under state law is therefore inapposite.

10    In its March 5, 2021, Order, this Court concluded that 🔖 *Lissau* nor 🔖 *Birkbeck* control this case, as those cases concern individual supervisors sued in their individual capacities. (ECF No. 74 at 22–24.) Consequently, the Court held that Caraway's Title VII claims against NCSHP were not futile and allowed Plaintiffs to amend their Complaint. (*Id.* at 24.) The Court does not disturb that reasoned conclusion here. Rather, the Court finds that Plaintiffs have not submitted sufficient evidence at the summary judgment stage to create a genuine issue of material fact as to whether NCSHP is DPS's agent.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 28-D

2020 WL 6875208
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Oliver Bruce MORRIS, Plaintiff,

v.

Michael L. POMPEO, Defendant.

Case No.: 2:19-cv-00569-GMN-DJA
|
Signed 11/23/2020

**Synopsis**

**Background:** Applicant for passport, a transgender male, brought an action against United States Secretary of State, alleging that denial of his application based on Secretary's policy requiring him to submit verification of his gender from a physician before issuing his passport reflecting his gender identity violated the Administrative Procedure Act (APA) and his Fifth Amendment equal protection and due process rights. Secretary moved for summary judgment on applicant's APA claims and moved to dismiss his Fifth Amendment claims, and applicant moved for summary judgment.

**Holdings:** The District Court, Gloria M. Navarro, J., held that:

applicant's claim that policy violated his substantive due process right to refuse medical treatment was subject to rational basis review;

policy was rationally related to legitimate government interest in using passports to accurately verify the identities of citizens, and thus did not violate applicant's substantive due process right to refuse medical treatment;

Secretary could not demonstrate that policy survived heighten scrutiny at the motion-to-dismiss stage, and thus could not prevail on his motion to dismiss; and

Secretary failed to show exceedingly persuasive justification for policy, such that policy's application to transgender passport applicant violated equal protection.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment; Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

Christena Georgas-Burns, David A. Olshan, Nevada Legal Services, Las Vegas, NV, for Plaintiff.

Benjamin Thomas Takemoto, U.S. Department of Justice, Washington, DC, for Defendant.

**ORDER**

Gloria M. Navarro, District Judge

**\*1** Pending before the Court are the Motion to Dismiss, (ECF No. 25), and the Motion for Summary Judgment, (ECF No. 26), filed by Defendant Michael L. Pompeo, United States Secretary of State ("Defendant"). Plaintiff Oliver Bruce Morris ("Plaintiff") filed a Response, (ECF No. 28), and Defendant filed a Reply, (ECF No. 30).

Also pending before the Court is Plaintiff's Motion for Summary Judgment, (ECF No. 27). Defendant filed a Response, (ECF No. 29), and Plaintiff filed a Reply, (ECF No. 31).

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion to Dismiss. The Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Summary Judgment. The Court **DENIES as moot** Defendant's Motion for Summary Judgment.

**I. BACKGROUND**

This case arises from Defendant's denial of Plaintiff's passport application because of Plaintiff's failure to submit a doctor's certification of his gender. (*See generally* Am. Compl., ECF No. 13). Plaintiff, previously named Chanesse Olivia Morris, was born in Modesto, California in 1993; his birth certificate states his birth sex as female. (Am. Compl. ¶ 15); (Birth Certificate, AR 4). Plaintiff is a transgender male who began identifying as male in January of 2015, and he legally changed his name to Oliver Bruce Morris on August 21, 2018. (Am. Compl. ¶ 16); (Court Ordered Name Change, AR 5–6). Plaintiff alleges that he has health insurance under a policy with Anthem Health Insurance, but the policy does not cover gender reassignment surgery. (Am. Compl. ¶¶ 17–18). As an alternative, Plaintiff alleges that he receives hormone therapy treatment provided by a nurse practitioner, which his

health insurance covers; however, he allegedly cannot afford additional gender transition treatment. (*Id.* ¶¶ 17–18, 20, 23).

Plaintiff applied for a 10-year United States Passport on or about October 13, 2018. (*See* Am. Compl. ¶ 19); (Passport Application, AR 1–6). On the application's checkbox for "Sex," Plaintiff checked the "M" box, indicating male. (*Id.* at 1). Plaintiff included three identity documents in his application: a Nevada driver's license, which indicates his sex is male; an original copy of his birth certificate, which indicates his sex is female; and a court-ordered name change, indicating that he legally changed his name from "Chanesse Olivia Morris" to "Oliver Bruce Morris" on June 27, 2018. (*Id.* at 3–6).

U.S. citizens generally must have a passport to travel internationally. 8 U.S.C. § 1185(b). Passports both serve as an official travel identification document and a diplomatic "letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer." *Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *see also* 22 C.F.R. § 51.1 (defining "Passport"). The Executive Branch has broad authority to regulate the issuance of passports, which the President has delegated to the Secretary of State. *See* *Zemel v. Rusk,* 381 U.S. 1, 10, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); 22 U.S.C. § 211a; Exec. Order No. 11295, 31 Fed. Reg. 10,603 (Aug. 9, 1966); 22 C.F.R. §§ 51.1–51.74.

**\*2** Before a U.S. passport can be issued, a citizen seeking a first-time passport or changing a gender on an existing passport must complete the four-page Application for a U.S. Passport, Form DS-11 (06-2016) ("Application"). The applicant "shall subscribe to and submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." 22 U.S.C. § 213. Each applicant "has the burden of establishing his or her identity .... by the submission of a previous passport, other state, local, or federal government officially issued identification with photograph, or other identifying evidence which may include an affidavit of an identifying witness." 22 C.F.R. § 51.23(a)–(b). The State Department may also require "additional evidence of identity as it deems necessary." 22 C.F.R. § 51.23(c). The many facets of "identity" included within the Application comprise one's: name, date of birth, sex, place of birth, social security number, parents' names and places of birth, marital status, employment, height, hair color, and eye color. (*See* Passport Application, AR 1–3).

Relevant to this case is the sex identifier on the Application, which, according to the State Department's Foreign Affairs Manual ("FAM"), also describes the applicant's gender. [1] *See* FAM 403.3-2. If an applicant requests a gender designation different than the sex of his birth, the applicant must submit a doctor's certification that indicates, "the applicant has had appropriate clinical treatment for gender transition to the new gender of either male or female." 8 FAM 403.3-2(A)(b); 8 FAM 403.3-2(B)(d)(5). For applicants "who have just begun and may be in the initial stages of the gender transition process, a two year limited validity passport" will be available. 8 FAM 403.3-2(B)(f).

On October 24, 2018, the State Department sent a letter in response to Plaintiff's passport application, requesting that Plaintiff verify his sex. (October 24, 2018 Letter, AR 7–8). The letter explained, "[i]n order to issue you a passport card reflecting a sex different from the one on some or all of your citizenship and/or identity evidence, please send us a signed original statement on office letterhead from your attending medical physician." (*Id.*). The letter enumerated the information Plaintiff's physician would have to certify under penalty of perjury, including, "[l]anguage stating that you have had appropriate clinical treatment for transition to the new sex[.]" (*Id.* at 7). On January 24, 2019, the State Department sent another letter, labeled "FINAL REQUEST," seeking the same certification. (January 24, 2019 Letter, AR 9–10). Plaintiff, through counsel, replied to the letter by explaining he would not provide the requested certification because he could not afford gender transition treatment, and the requirement violated his constitutional rights. (Nevada Legal Services Letter, AR 11). On March 26, 2019, the State Department sent Plaintiff another "FINAL REQUEST," again reiterating its certification requirement. (March 26, 2019 Letter, AR 12–13). On May 21, 2019, the State Department sent Plaintiff a letter denying his passport application because of his failure to provide a doctor's certification of his sex. (Denial Letter, AR 28).

On April 5, 2019, Plaintiff commenced this action by filing the Complaint against Defendant. (*See* Compl., ECF No. 1). Plaintiff later amended his Complaint as a matter of right. (*See* Am. Compl., ECF No. 13); *see also* Fed. R. Civ. P. 15(a)(1)(B). The Amended Complaint alleges that Defendant denied Plaintiff's passport application in violation of the Administrative Procedure Act ("APA") and Plaintiff's

Fifth Amendment equal protection and due process rights. (*See generally* Am. Compl., ECF No. 13). On November 12, 2019, Defendant moved for summary judgment on Plaintiff's APA claims and moved to dismiss Plaintiff's Fifth Amendment claims. (*See* Def.'s Mot. Summ. J. ("MSJ"), ECF No. 26); (Mot. Dismiss ("MTD"), ECF No. 25). Plaintiff seeks summary judgment on each of the claims raised in the Amended Complaint. (Pl.'s MSJ, ECF No. 27).

## II. LEGAL STANDARD

### A. 12(b)(6)

**\*3** Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In considering whether the complaint is sufficient to state a claim, the Court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

The Court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion ... However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not

physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgement." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgement. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

### B. Summary Judgment

#### i. Rule 56

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United*

*States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*4** In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505.

### ii. APA

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. In APA actions, however, the court's review is based on the agency's administrative record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883–84, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The court's role is to determine whether the agency's record supports the agency's decision as a matter of law under the APA's arbitrary and capricious standard of review. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of this matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record...."); *see also Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## III. DISCUSSION

Plaintiff's Amended Complaint alleges that Defendant's denial of Plaintiff's passport application: (1) was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A); (2) exceeded Defendant's authority in violation of the APA, 5 U.S.C. § 706(2)(C); (3) violates Plaintiff's substantive due process rights guaranteed under the Fifth Amendment of the United States Constitution; and (4) violates Plaintiff's equal protection rights guaranteed under the Fifth Amendment of the United States Constitution. (Am. Compl. ¶¶ 29–54). Specifically, Plaintiff's challenge concerns

8 FAM 403.3-2(B) (the "Policy"), which requires a doctor to certify a transgender passport applicant's change of gender before the State Department will issue the applicant a passport with a gender different from the sex noted on the applicant's original birth certificate. (*Id.* ¶¶ 10–12, 31, 41, 48–50, 51, 53–54). Defendant moves to dismiss Plaintiff's constitutional claims, arguing that the Amended Complaint does not sufficiently allege that Defendant burdened a fundamental right of Plaintiff or discriminated against Plaintiff on the basis of his transgender status, and the Policy survives under rational basis review or heightened scrutiny. (MTD 15:21–22:16, ECF No. 25). Defendant moves for summary judgment on Plaintiff's APA claims, arguing that the facts in the record indicate that Defendant's decision is neither arbitrary and capricious, nor outside the purview of his delegated authority. (Def.'s MSJ 8:1–22, 9:11–12:7, ECF No. 26). The Court begins its discussion with Plaintiff's due process claim.

**A. Due Process**

 **\*5**  Plaintiff's Amended Complaint alleges Defendant violated Plaintiff's substantive due process right to refuse medical treatment by requiring Plaintiff to receive treatment from a physician before issuing him a passport that reflects his gender identity. (Am. Compl. ¶¶ 47, 50). [2] Defendant moves to dismiss Plaintiff's due process claim because the Amended Complaint fails to plausibly allege that the Policy violates Plaintiff's right to refuse medical treatment. (MTD 15:19–18:7). The Court finds that Plaintiff's claim fails to allege that the Policy violates a fundamental right and that the Policy would fail to survive rational basis review.

The Constitution's substantive guarantee to due process of law protects "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed[.]" *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotations and citations omitted) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) and *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). The party asserting the due process violation must provide a "careful description" of the asserted liberty interest, and "vague generalities ... will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 775–76, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (internal quotations omitted) (quoting *Glucksberg*, 521 U.S. at 721, 117 S.Ct. 2258).

Here, Plaintiff alleges that he has a fundamental right to refuse medical treatment, which Defendant violated by refusing to issue Plaintiff a passport reflecting Plaintiff's gender identity without a corroborating doctor's certification. (Am. Compl. ¶¶ 47, 50). Defendant argues that he has not forced Plaintiff to seek medical treatment; rather, he is refusing to grant Plaintiff a passport indicating that Plaintiff's gender is male without appropriate evidence corroborating his gender identity. (MTD 16:14–19:9). The Court finds that the State Department's Policy does not implicate Plaintiff's right to refuse medical treatment.

Even if a "careful description" of the right at issue is the right to refuse medical treatment [3], Plaintiff is not required to undergo medical treatment to receive a passport. Each of the cases Plaintiff relies upon in his Motion addresses whether the Government may force an individual to undergo a medical procedure without the individual's consent. (*See* Pl.'s MSJ 9:10–15:22); (Pl.'s MTD Resp. 5:7–7:2, ECF No. 28); *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258 (explaining that individuals generally have a fundamental right to refuse life-saving medical treatment); *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 279, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (explaining that competent individuals generally have a fundamental right to refuse life-saving hydration and nutrition); *Union P.R. Co. v. Botsford*, 141 U.S. 250, 251–55, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) (denying a physician examination of a non-party in a civil case without statutory authority authorizing the examination); *Fong Sik Leung v. Dulles*, 226 F.2d 74, 76–77 (9th Cir. 1955) (holding that a Court cannot compel a blood test from either a party or non-party in the absence of a physical examination ordered under Federal Rule of Civil Procedure 35); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (assessing the permissibility of stop-and-frisk policies under the Fourth Amendment); *McKay v. Bergstedt*, 106 Nev. 808, 801 P.2d 617, 622 (1990) (finding an individual has a due process right to refuse life-saving medical treatment).

 **\*6**  There is no forced medical procedure at issue in this case. Rather, the State Department requires that a physician verify a person's gender identity once the person *elects* to identify by his or her gender—if the gender diverges from

the sex of the person's birth—before issuing the individual official government identification reflecting the gender as the person's sex. *See* 8 FAM 403.3-1(b). The record indicates that a transgender person may otherwise receive a passport that reflects the anatomical sex listed on his birth certificate instead of his gender identity. *See generally* 8 FAM 403.3 (entitled "Gender Change" and implying that the policy only applies if the applicant requests identification by the "new gender"); (*see* Denial Letter, AR 28) (explaining the sex-certification requirement applies where the requested sex differs from that listed on one's birth certificate); (*see also* Am. Compl. ¶ 24) (alleging that, "[i]n a phone conversation on March 25, 2019, the State Department ... verified that, if Oliver requested a passport card with a female sex/gender, he would receive it."). Accordingly, given that Plaintiff may receive a passport without a doctor's certification, the Policy does not implicate Plaintiff's fundamental right to refuse medical treatment implicit in the Fifth Amendment's Due Process Clause.

Therefore, because Plaintiff has not shown that the Policy implicates a fundamental right, Plaintiff's due process claim is subject to rational basis review. *See* 🚩 *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997). Under rational basis review, "[i]f a statute is not arbitrary, but implements a rational means of achieving a legitimate governmental end, it satisfies due process." 🚩 *Id.* (internal quotations omitted) (quoting 🚩 *United States v. Alexander*, 48 F.3d 1477, 1491 (9th Cir. 1995)). Here, Defendant asserts an interest in using passports to accurately verify the identities of U.S. citizens to foreign sovereigns. (MTD 20:14–21:14). The Policy is rationally related to that end because doctors often play an important role in gender transition treatment, and doctors therefore can verify an individual's gender identity after overseeing transition treatment. (*See* The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, Sixth Ed., AR 43–64) (emphasizing physicians' roles in treating transgender individuals with gender dysphoria) (Letter from Brenda S. Sprague, Deputy Asst. Sec'y for Passport Serv. to Harper Jean Tobin, Dir. Of Policy, Nat'l Ctr. For Transgender Equal., AR 86) (explaining that the length of transition is a decision between a doctor and transitioning patient, which shows the doctor's need to certify that an individual has completed his or her transition to the new gender). The Court therefore finds that the Policy is rationally related to a legitimate government interest. Given that the Court concludes the Policy does not offend the right to refuse medical treatment

implied within the Fifth Amendment's Due Process Clause, the Court dismisses the claim with prejudice and denies Plaintiff summary judgment with respect to the claim. The Court next addresses Plaintiff's equal protection claim.

**B. Equal Protection**

Plaintiff argues that the State Department's Policy violates his Fifth Amendment equal protection rights by subjecting him to an increased burden to verify his gender that similarly situated cisgender passport applicants do not face. (*See* Am. Compl. ¶¶ 51, 53); (Pl.'s MSJ 19:4–21:5). Plaintiff asserts both a facial and as-applied challenge to the State Department's gender certification Policy. (*Id.*). Defendant, moving to dismiss, argues that: (1) the Court should dismiss the claim because Plaintiff has not plausibly alleged discriminatory intent against transgender applicants; and (2) even if Plaintiff has sufficiently alleged discriminatory intent, the Policy survives under either rational basis review or heightened scrutiny. (MTD 12:19–15:12, 19:1–22:16). The Court first addresses Defendant's Motion to Dismiss the claim.

i. Defendant's Motion to Dismiss

Defendant argues that Plaintiff's equal protection claim should be dismissed because the Amended Complaint fails to allege sufficient facts indicating that Defendant promulgated the policy to intentionally discriminate against transgender applicants. (MTD 12:19–15:12). Defendant argues that if the Court reaches the constitutional analysis regarding the claim, rational basis review should apply and save the Policy. (*Id.* 19:1–20:5). The Court denies Defendant's Motion to Dismiss because the Policy's text categorically treats transgender and cisgender passport applicants differently, and the Court cannot grant dismissal because Defendant bears the burden to establish that the Policy survives heightened scrutiny.

**\*7** While the Fifth Amendment does not contain an explicit admonition that the federal government shall deprive no person of equal protection of the laws, "th[e] [Supreme] Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *See* 🚩 *Adarand Constructors v. Pena*, 515 U.S. 200, 217, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (quoting 🚩 *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975)). "The Equal Protection Clause of the Fourteenth Amendment

commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted). If a law categorically treats a suspect class differently from other similarly situated persons, then the court applies heightened scrutiny to the law and the plaintiff need not prove intentional discrimination. *See Craig v. Boren,* 429 U.S. 190, 197–98, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). However, if a policy appears facially neutral, the plaintiff must present evidence of discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 239–40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis and citation omitted).

The Policy plainly distinguishes between transgender passport applicants and cisgender passport applicants. While the policy itself does not use the term "transgender," it requires a doctor's certification of the applicant's gender if the individual "has had appropriate clinical treatment for gender transition to the new gender of either male or female." 8 FAM 402.3-2(B). Any person who has undergone a "gender transition" to a new gender is, by definition, transgender. Therefore, the policy only applies to transgender passport applicants. [4], [5] As applied to Plaintiff, the Policy discriminates against Plaintiff because he is a transgender man who cannot supply the required physician certification as he has undergone hormone therapy administered by a nurse practitioner, and there is no indication his transition has been overseen by a physician. (*See* Nevada Legal Services Letter, AR 11). If Plaintiff were cisgender, he would not have to verify his gender identity beyond the submission of consistent identification corroborating his gender. [6] 8 FAM 403.3-2(A)(b). Therefore, the policy discriminates against Plaintiff on the basis of his transgender status, and the policy is thus subject to "something more than rational basis but less than strict scrutiny[.]" *Karnoski v. Trump,* 926 F.3d 1180, 1201 (9th Cir. 2019) (analyzing a ban on military service for transgender persons or persons suffering from gender dysphoria and finding that discrimination against transgender persons qualifies as discrimination on the basis of sex that triggers heightened scrutiny).

**\*8** Under heightened scrutiny, Defendant bears the burden of establishing that "the policy 'significantly furthers' the government's important interests, and that is not a trivial burden." *Id.* at 1202 (internal quotations omitted) (quoting *Witt v. Dept. of the Air Force,* 527 F.3d 806, 821 (9th Cir. 2008)). Given that the Court only assesses a motion to dismiss based upon the sufficiency of the facts alleged in a plaintiff's complaint, but Defendant cannot satisfy his burden to demonstrate that the Policy survives heightened scrutiny at the motion to dismiss stage, the Court cannot grant dismissal of Plaintiff's Amended Complaint. *See, e.g., Hassan v. City of New York,* 804 F.3d 277, 306 (3d Cir. 2015) ("But because heightened scrutiny applies in this case, we cannot accept the City's invitation to dismiss Plaintiffs' Complaint based on its assurance that the Program is justified by national-security and public-safety concerns. Rather, the burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality is that of the City, and must be met *after* its Motion to Dismiss.") (emphasis original) (internal quotation and citation omitted). Thus, the Court denies Defendant's Motion to Dismiss with respect to Plaintiff's equal protection claim. The Court next assesses Plaintiff's Motion for Summary Judgment regarding his as-applied equal protection challenge.

### ii. Plaintiff's Motion for Summary Judgment

The remaining question for the Court is whether Defendant has met his burden to demonstrate that the Policy survives intermediate scrutiny. The Court finds that Defendant has provided no evidence demonstrating that the State Department has an important interest in verifying a passport applicant's gender identity or that the Policy significantly furthers the interest.

At summary judgment, the Court cannot assume that the Government has a substantial interest in a policy that discriminates against a suspect class; rather, the Government "must establish 'an exceedingly persuasive justification'" for the classification." *United States v. Virginia,* 518 U.S. 515, 523, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)). The justification may not rely upon "overbroad generalizations" about the legitimate differences between the suspect class and similarly situated persons. *Id.* at 533,

116 S.Ct. 2264. Instead, facts in the record—as opposed to the proponent's assertions—must demonstrate that the classification is exceedingly persuasive. *See* 📁 *id.* at 562, 116 S.Ct. 2264 (Rehnquist, C.J., Concurring) ("I agree with the Court that there is scant evidence in the record that [diverse options in education, including single-sex institutions] was the real reason that Virginia decided to maintain VMI as men only.").

This Court's decision is one based on the law and not policy: in this specific case, Defendant has failed to meet his burden at summary judgment. As explained above, Defendant has a burden to *present evidence* demonstrating the importance of its interest, and that the Policy significantly furthers that interest. Although the Court ultimately rules for Plaintiff in this case, the Court's decision should in no way be construed to mean that the State Department cannot meet its burden to justify the Policy requiring a doctor's certification of gender for transgender passport applicants. Rather, only with respect to this Plaintiff's equal protection challenge, the Government has failed to meet its burden in this case.

Here, the Government frames its purported interest too broadly and fails to provide evidence that the interest is exceedingly persuasive. Defendant asserts interests in verifying passport applicants' identities and "[i]ssuing passports that accurately state the bearer's identity[.]" (MTD 19:27–20:2, 20:14–16). There is little doubt that the State Department has an interest in accurately representing the identities of U.S. citizens to foreign nations. However, the only facet of identity at issue here is a passport applicant's sex or gender. Defendant has provided no explanation, let alone any evidence, of why the State Department has an important interest in verifying a transgender passport applicant's gender identity, nor a cogent explanation of why the Policy requiring a physician's certification increases the accuracy of issued passports. Assuming, *arguendo*, that Defendant has a substantial interest in verifying transgender applicants' gender identities, he has not shown why a doctor's certification substantially furthers the interest with respect to transgender applicants given that not all transgender persons receive or require physician treatment. (*See* Memorandum from Jean Tobin, Director of Policy for the National Center for Transgender Equality, Recommended Revisions to 7 FAM 1300 Appendix M, Gender Change, AR 87–89) (explaining that "[p]ermitting certifications from licensed non-physician providers is particularly important because many transgender people do not have regular access to a doctor — and those who

do often find it much more difficult to discuss transgender-related issues with their doctor than with a mental health provider."). Therefore, as Defendant has failed to meet his burden to demonstrate that verifying transgender passport applicants' gender identities is an important government interest, the Court must grant Plaintiff summary judgment.

**\*9** Given that Plaintiff has prevailed on his equal protection claim, the Court orders Defendant to review Plaintiff's passport application without requiring a physician's certification of Plaintiff's gender. If Plaintiff's application is otherwise sufficient under the relevant State Department regulations, Defendant shall issue Plaintiff a 10-year passport. As the Plaintiff has succeeded on his as-applied challenge, the Court declines to address whether the Policy is facially unconstitutional. The Court next addresses Plaintiff's APA claims.

### C. APA

The Court need not reach a conclusion regarding Plaintiff's APA claims. Were the Court to grant Plaintiff relief, the remedy would instruct the Department of State to reconsider Plaintiff's passport application based on the Court's guidance regarding the deficiencies of the Department's previous reasoning. Here, given that the remedy ordered under Plaintiff's equal protection claim is essentially the same as a remedy ordered under the APA, the Court's Order renders Plaintiff's APA claims moot. The Court therefore denies the parties' Cross-Motions for Summary Judgment regarding the claims.

### IV. CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, (ECF No. 25), is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 26), is **DENIED as moot**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 27), is **GRANTED in part** and **DENIED in part**.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6875208

## Footnotes

1    The Court notes that while passports themselves designate only a "Sex" identifier and not gender, the State Department's Foreign Affairs Manual discusses passport applicants' change of gender rather than change of sex. *See* 8 FAM 403.3-3 (titled "Adjudicating Gender Change or Transition"). While sex and gender are distinct concepts, the distinction—and the State Department's conflation of the concepts—has no impact on the Court's analysis in this Order. *Contra* ▭ *Doe v. Shanahan,* 917 F.3d 694, 696 (D.C. Cir. 2019) (defining sex and gender while noting that the distinction is "critically important" to the court's analysis).

2    Plaintiff's Amended Complaint also asserts that Defendant's gender certification requirement interferes with Plaintiff's fundamental dignity and autonomy to express his personal identity. (Am. Compl. ¶¶ 49–50). Defendant moves to dismiss this incarnation of Plaintiff's due process claim as well. (MTD 16:8–18:25). However, the Court need not reach this version of the claim, as Plaintiff waived it by failing to raise it in his Motion for Summary Judgment. *See, e.g., Desert Protective Council v. United States DOI,* 927 F. Supp. 2d 949, 978 (S.D. Cal. 2013) ("Since Plaintiffs have failed to raise these issues in their motion for summary judgment and do not oppose or address this issue, these claims should be considered abandoned.").

3    A more careful description of the right at issue more aptly seems to be the right of a passport applicant to have his gender identity on his passport without a doctor's certification. Irrespective of the description of the right, the Court finds that Plaintiff's due process challenge proceeds under rational basis review.

4    More specifically, the policy only applies to transgender passport applicants who have received some form of clinical treatment for gender transition. Transgender passport applicants who have received no such treatment apparently have no mechanism for their passports to reflect their gender identities.

5    Defendant argues that similarly situated passport applicants—cisgender individuals whose sex is misidentified on their birth certificate—have a similar burden to prove their sex or gender identity, which demonstrates that the Policy is not facially discriminatory. (*See* MTD 19:9–17). Even if Defendant has correctly identified the class of similarly situated persons, his argument is unpersuasive for several reasons. First, misgendered cisgender applicants have a far lower burden than transgender applicants to verify their identities. They can submit a corrected birth certificate, but transgender persons may not submit an amended birth certificate if the issuing state allows such an amendment. *Compare* 8 FAM 403.3-7(b); *with* Note to 8 FAM 403-3-2(A)(a). If the cisgender person's departure is imminent and there is not time for the state to correct his or her birth certificate, he or she may receive a one-year limited validity passport without a physician's corroboration of gender, but there is no similar policy for transgender applicants. 8 FAM 403.3-7(b). Critically, at no point do cisgender persons require a doctor's certification of their gender even if misgendered on their identification. Second, even if misidentified cisgender persons are subject to some requirements to verify their gender identities, the requirements are not constitutionally dubious because there is no suspect classification raised by the requirements.

6    Here, Plaintiff has a birth certificate identifying his sex as male, but the State Department will not accept birth certificates issued after a person has undergone a gender transition. (*See* Court Ordered Name Change, AR 5) (checking the box that a new birth certificate shall be issued); Note to 8 FAM 303.3-2(A)(a) ("An amended birth certificate in the new gender is not acceptable evidence of gender change[.]")

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    9

# Exhibit 28-E

2017 WL 2486080
Only the Westlaw citation is currently available.
United States District Court, M.D.
Georgia, Columbus Division.

Alisha COLEMAN, Plaintiff,
v.
BOBBY DODD INSTITUTE, INC., Defendant.

CASE NO.4:17-CV-29
|
Signed 06/08/2017

**Attorneys and Law Firms**

John W. Roper, Columbus, GA, for Plaintiff.

Julia Christine Glasgow, Leslie Kali Eason, Gordon & Rees LLP, Atlanta, GA, for Defendant.

ORDER

CLAY D. LAND, CHIEF U.S. DISTRICT COURT JUDGE

**\*1**  Plaintiff Alisha Coleman is a former employee of Defendant Bobby Dodd Institute, Inc. ("the Institute"). The Institute terminated Coleman after she accidently soiled company property due to heavy pre-menopausal menstruation. Coleman claims that this constitutes sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The Institute moves to dismiss Coleman's claim. As discussed below, the Court grants that motion (ECF No. 6). [1]

STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). The factual allegations must be sufficient "to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555. Thus, "a well-pleaded complaint may

proceed even if it strikes a savvy judge that actual proof of those facts is improbable." Id. at 556.

FACTUAL BACKGROUND

Coleman alleges the following facts, which the Court accepts as true for purposes of determining the present motion.

Coleman began work as an E-911 call taker for the Institute on June 13, 2007. During her employment, Coleman, a female, became pre-menopausal and experienced periods of uncontrollably heavy menstrual bleeding. The onset of heavy menstrual bleeding was unpredictable. Coleman kept feminine hygiene products with her at work and discussed her situation with her supervisors.

On two occasions, Coleman was unable to control the menstrual bleeding while at work. In August 2015, Coleman accidently soiled an office chair. Coleman was disciplined for soiling the chair. Additionally, Coleman's supervisor and a representative from human resources warned Coleman that if she soiled company property again, she would be terminated. Coleman took precautions to avoid a second accident. Nevertheless, on April 22, 2016, Coleman accidently soiled the carpet. After Coleman cleaned the carpet, she was terminated for failing to maintain high standards of personal hygiene.

DISCUSSION

Coleman does not attempt to make out a prima facie case of sex discrimination under the usual burden-shifting framework. Cf. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (establishing the framework for Title VII cases where the plaintiff presents only circumstantial evidence of discrimination). Rather, she purports to allege facts that if proven are direct evidence of sex discrimination. See Pl.'s Resp. to Def.'s Mot. to Dismiss 5, ECF No. 9. The Court must therefore determine whether terminating a female employee for soiling company property on two occasions due to a uniquely feminine condition constitutes sex discrimination under Title VII. As discussed below, the Court finds that it does not.

**\*2**  Title VII provides that an employer may not discharge or otherwise discriminate against any individual because of

the individual's sex. 42 U.S.C. § 2000e-2 (a) (1). With regards to uniquely feminine conditions, the Supreme Court originally held that excluding pregnancy from otherwise comprehensive employee benefits did not violate Title VII, as long as the employer provided the same benefits to male and female employees. *See* *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 145 (1976), *superseded by statute as recognized by* *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983). Congress rejected this interpretation by passing the Pregnancy Discrimination Act ("PDA"). The PDA amended Title VII to include the following definition: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; ...." 42 U.S.C. § 2000e(k).

"The [PDA] makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Newport News Shipbuilding & Dry Dock Co.*, 462 U.S. at 684. And early Supreme Court precedent interpreting the PDA could be construed to extend this protection to uniquely feminine conditions beyond pregnancy, such as pre-menopausal menstruation. *See* *id.* at 676 ("[B]y enacting the Pregnancy Discrimination Act, [Congress] not only overturned the specific holding in *General Electric v. Gilbert, supra,* but also rejected the test of discrimination employed by the Court in that case."). Thus, a non-frivolous argument can be made that it is unlawful for an employer to treat a uniquely feminine condition, such as excessive menstruation, less favorably than similar conditions affecting both sexes, such as incontinence. But Coleman does not claim that her excessive menstruation was treated less favorably than similar conditions affecting both sexes. Rather, she argues that the fact that her termination would not have occurred but for a uniquely feminine condition is alone sufficient to show that she was terminated because of her sex. The Court disagrees.

Nothing in the text of Title VII, the PDA, or case law interpreting these Acts supports such a broad interpretation of the law. Coleman appears to rely on *EEOC v. Houston Funding II Ltd.*, 717 F.3d 425 (5th Cir. 2013), a nonbinding Fifth Circuit case that is distinguishable from the facts she alleges. In *EEOC v. Houston Funding II*, the Fifth Circuit held that an employer cannot terminate a female employee based on the fact that she is lactating and wants to express breast milk at work. *Id.* at 430. The Court found that "lactation is a related medical condition of pregnancy for purposes of the PDA" and that terminating an employee because she is lactating "clearly imposes upon women a burden that male employees need not—indeed, could not—suffer." *Id.* at 428.

Here, Coleman's excessive menstruation was related to pre-menopause, not pregnancy or childbirth. And Coleman was not terminated simply because she was pre-menopausal or menstruating. Coleman was terminated for being unable to control the heavy menstruation and soiling herself and company property. There is no allegation that male employees who soiled themselves and company property due to a medical condition, such as incontinence, would have been treated more favorably. Thus, Coleman fails to allege facts from which the Court can reasonably infer that she was terminated because she is female. She therefore fails to state a Title VII claim for sex discrimination.

CONCLUSION

For the reasons discussed above, the Court grants the Institute's motion to dismiss (ECF No. 6).

IT IS SO ORDERED, this 8th day of June, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2486080

---

**Footnotes**

1    In her complaint, Coleman also purports to bring a retaliation claim. But she does not allege that she complained of discrimination or engaged in other statutorily protected conduct before her termination. And she fails to respond to the Institute's arguments for dismissal of her retaliation claim. To the extent that

**Coleman v. Bobby Dodd Institute, Inc., Not Reported in Fed. Supp. (2017)**

Case 4:19-cv-00035-RM-LAB   Document 300-10   Filed 09/26/22   Page 79 of 79

Coleman has not abandoned this claim, *see* 🚩 *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."), she fails to allege sufficient facts to support it. Accordingly, the Court also grants the Institute's motion to dismiss as to Coleman's retaliation claim.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.