1   FENNEMORE CRAIG, P.C.
    Timothy J. Berg (No. 004170)
2   Amy Abdo (No. 016346)
    Ryan Curtis (No. 025133)
3   Shannon Cohan (No. 034429)
    2394 E. Camelback Road, Suite 600
4   Phoenix, Arizona 85016
    Telephone: (602) 916-5000
5   Email: tberg@fennemorelaw.com
    Email: amy@fennemorelaw.com
6   Email: rcurtis@fennemorelaw.com
    Email: scohan@fennemorelaw.com
7
    *Attorneys for Defendants*
8   *State of Arizona, Andy Tobin, and Paul Shannon*

9                   UNITED STATES DISTRICT COURT

10                        DISTRICT OF ARIZONA

11  Russell B. Toomey,                  | CV-19-00035-TUC-RM

12              Plaintiff,              | **DEFENDANTS STATE OF ARIZONA'S, ANDY TOBIN'S, AND**
13          v.                          | **PAUL SHANNON'S OPPOSITION TO PLAINTIFF'S MOTION FOR**
14  State of Arizona, *et al.*          | **SUMMARY JUDGMENT**
15              Defendants.             | **(ORAL ARGUMENT REQUESTED)**

16

17

18

19

20

21

22

23

24

25

26

27

28

Fennemore Craig, P.C.
Attorneys at Law
Phoenix

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND ............................................................ 1

II.   THE COURT SHOULD DENY PLAINTIFF'S MOTION ............................. 4

    A.   Plaintiff's Count I—Violation Of Title VII Fails. ..................................... 4

        1.   The Exclusion Is Not Facially Discriminatory. .................................. 4

        2.   Plaintiff Does Not Satisfy The *McDonnell Douglas* Framework ... 11

            a.   <u>Plaintiff Cannot Prove Discrimination</u>. .................................... 11

            b.   <u>State Defendants' Legitimate, Non-Discriminatory Reasons</u> ... 13

            c.   <u>State Defendants' Reasons Are Not A Pretext</u>. ......................... 16

    B.   Plaintiff's Count II—Violation Of Equal Protection Clause Fails. ......... 18

        1.   The Exclusion Is Not Facially Discriminatory. ............................... 18

        2.   The Exclusion Rationally Relates To A Legitimate State Interest.. 23

        3.   The Exclusion Substantially Relates To An Important Interest. ..... 24

III.   CONCLUSION ........................................................................... 25

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

1

# TABLE OF AUTHORITIES

2

3

**CASES**                                                  **PAGES**

*Am. Coll. of Pediatricians v. Becerra*, No. 1:21–cv–00195
(E.D. Tenn. Aug. 27, 2021) .............................................................. 15

*Am. Fed'n of State, Cnty., & Mun. Employees, AFL-CIO (AFSCME) v.
State of Wash.*, 770 F.2d 1401 (9th Cir. 1985) .................................. 25

*Anderson v. S. Dakota Ret. Sys.*, 924 N.W.2d 146 (S.D. 2019) .............................. 7

*Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020) .......................... 7,8,15

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) .......................... 9,10,22

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ...................... 21

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ......................................... 18

*Califano v. Goldfarb*, 430 U.S. 199 (1977) .......................................... 24

*Christian Emp'rs All. v. EEOC*, No. 21–cv– 00195 (D.N.D. Oct. 18, 2021) ........ 15

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................... 23

*City of Los Angeles, Dept. of Water & Power v. Manhart*, 435 U.S. 702 (1978).. 16

*D.T. v. Christ*, 552 F. Supp. 3d 888 (D. Ariz. Aug. 5, 2021) ................................ 22

*Davis v. Guam*, 932 F.3d 822 (9th Cir. 2019) ................................... 20,21

*Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728
(9th Cir. 2011) ............................................................... 16

*Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011) ................................... 23,24

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ................. 7,19,23

*Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007) ............................ 14

*Fain v. Crouch*, CV 3:20-0740, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022) 9,22

*Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931 (W.D. Wis. 2018) ... 9,21

*Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020) ........................ 9,10,11

*Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) .............. 15

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ....................................5,6,18,19,20,22,23

*Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976)................................... 5,6,7

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998) ....................... 11,16

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Hammons v. Univ. of Maryland Med. Sys. Corp.*, 551 F. Supp. 3d 567
(D. Md. 2021) ................................................................................................. 8,9

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ........................................ 4

*Harris v. Lexington-Fayette Urban County Gov't*, 685 Fed. App'x 470
(6th Cir. 2017) ............................................................................................. 23,24

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) .................................... 11

*Heller v. Doe by Doe*, 509 U.S. 312 (1993) ............................................... 23

*IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010) .................... 23,24

*Jenkins v. McKeithen*, 395 U.S. 411 (1969) ............................................. 9

*Johnston v. Univ. Pittsburgh*, 97 F.Supp. 3d 657 (W.D. Penn 2015) .............. 14,15

*Kadel v. Folwell*, 446 F. Supp. 3d 1 (M.D.N.C. 2020) ........................ 8,9,10,21

*Kadel v. N. Carolina State Health Plan for Teachers & State Employees*,
12 F.4th 422 (4th Cir. 2021) ..................................................................... 8,10

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ................................. 24

*Lange v. Houston Cnty., Georgia*, 5:19-CV-392 (MTT), 2022 WL 1812306
(M.D. Ga. June 2, 2022) ....................................................................... 9,10,16,19

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................ 11,14,16

*McGowan v. State of Md.*, 366 U.S. 420 (1961) ..................................... 23

*Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250 (1974) ......................... 25

*Moran v. Selig*, 447 F.3d 748 (9th Cir. 2006) ......................................... 13

*Munoz v. Mabus*, 630 F.3d 856 (9th Cir. 2010) ................................. 16,17

*Neese v. Becerra*, No. 2:21–cv–00163–Z (N.D. Tex. Aug. 25, 2021) ............ 15

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669 (1983).. 16

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) .......... 4

*Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp. 3d 791
(W.D. Wash. 2021) ..................................................................................... 8,9

*Romer v. Evans*, 517 U.S. 620 (1996) .................................................... 23

*Stone v. Trump*, 356 F. Supp. 3d 505 (D. Md. 2018) ........................... 22

*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) ............ 15

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) .............. 25

*Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018) .......................... 8,9

*In re Union Pac. R.R. Emp. Practices Litig.*, 479 F.3d 936
 (8th Cir. 2007) ................................................................................. 5,6,7,13

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ..................... 25

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) ..................... 16

*Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859, at *10
 (E.D.N.Y. Aug. 17, 2020) ................................................................... 15

*Wallace v. Pyro Min. Co.*, 789 F. Supp. 867 (W.D. Ky. 1990) ................................ 7

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ..................................................... 25

*Wood v. City of San Diego*, 678 F.3d 1075 (9th Cir. 2012) .................................... 25


## **RULES**

FRCP 56(a) ............................................................................................................ 9,21

Rule 12(b)(6) ............................................................................................................. 9

## **OTHER**

45 CFR § 92.207(b)(4) (2016) ................................................................................ 14

45 CFR § 92.207(d) ................................................................................................ 14

20 U.S.C. § 1681 .................................................................................................... 14

42 U.S.C. § 18116(A) .......................................................................................... 1,14

42 U.S.C.A. § 2000e(k) ........................................................................................... 6

Pursuant to Federal Rule of Civil Procedure 56, Defendants State of Arizona (the "State"), Andy Tobin, and Paul Shannon (collectively, "State Defendants") oppose Plaintiff's Motion For Summary Judgment (the "Motion") (Doc. 298).

This case is about whether the State's self-funded health plan (the "Plan") is required to cover "gender reassignment surgery." To comply with rules enforcing Section 1557 of the Affordable Care Act ("ACA") issued in 2016,[1] State Defendants *expanded* coverage under the Plan to include counseling services and hormone treatment for gender dysphoria. The 2016 Rules disallowed categorical exclusions of all care for gender transition services, but did not require plans to cover any particular services. Due to cost concerns and based on the 2016 Rules, State Defendants retained an exclusion for "gender reassignment surgery" (the "Exclusion").

Plaintiff seeks summary judgment that the Exclusion violates Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment on the ground that the Exclusion is facially discriminatory. Plaintiff's claims fail because the Exclusion is plainly facially neutral. It applies to all individuals regardless of their sex or gender. All members of the Plan can receive the same coverage and are subject to the same exclusions. In addition to the fact that the Exclusion is not facially discriminatory, State Defendants have legitimate, non-pretextual, and non-discriminatory reasons for the Exclusion—controlling costs. After extensive discovery seeking evidence of any form of discriminatory motive by State Defendants towards transgender persons, Plaintiff offers none. The Exclusion does not violate either Title VII or the Equal Protection Clause. Plaintiff is not entitled to judgment in his favor on his claims as a matter of law nor to the requested declaration or injunction.

## I.   FACTUAL BACKGROUND

The Plan is administered by the Arizona Department of Administration ("ADOA"). Prior to 2004, ADOA provided health insurance to State employees through a fully-insured

---

[1] ACA Section 1557 prohibits certain health plans from discriminating on the basis of race, color, national origin, sex, age, and disability. *See* 42 U.S.C. § 18116(A).

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

health plan provided by Cigna. (Controverting Statement of Facts ("CSOF"), filed concurrently, ¶ 88.) In October 2004, the State instituted a self-funded health plan. (*Id.*, ¶ 90.) At that time, the State copied the plan document terms, which its insurance carrier Cigna previously used. (*Id.*, ¶ 32.) That plan document included an exclusion for "transsexual surgery including medical or psychological counseling and hormonal therapy in preparation for, or subsequent to, any such surgery." (*Id.*, ¶ 89.) Such exclusions were common in health plans on the rationale that the treatments were cosmetic or experimental. (*Id.*, ¶ 32.)

ADOA reevaluates its plan design every year. (*Id.*, ¶ 83.) ADOA conducts annual meetings with the medical directors of its insurance vendors to discuss potential revisions to the Plan. (*Id.*, ¶ 86.) ADOA considers: (1) Recommendations from its insurance vendors; (2) Market trends; (3) Interests of the Plan members; (4) Cost; (5) Legal requirements; and (6) Clinical effectiveness. (*Id.*, ¶ 84.) Cost is one of the most important factors. (*Id.*, ¶ 85.) ADOA generally only removes exclusions if legally required or the revision would not increase cost. (*Id.*, ¶¶ 20–21.)

Beginning in September 2015, ADOA contacted its insurance vendors to research coverage for gender dysphoria[2]. (*Id.*, ¶ 93.) On September 8, 2015, the U.S. Department of Health and Human Services ("HHS") issued a proposed rule on Section 1557 of the ACA, which prohibits discrimination in certain health plans on the basis of race, color, national origin, sex, age, and disability. (*Id.*, ¶ 92.) Those proposed rules disallowed categorical exclusions or limitations of all services for gender dysphoria but did not require that plans cover any particular procedure or treatment. ADOA contacted its insurance vendors to research how the proposed rule would affect the Plan. (*Id.*, ¶ 93.) ADOA also reviewed whether other states and governmental entities provided coverage for gender dysphoria. (*Id.*, ¶ 97.) ADOA considered the cost of removing the exclusion for "transsexual surgery."

---

[2] "Gender dysphoria" is the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender identity with their sex as determined at birth and bodily developments associated with that sex. (*Id.*) The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). (*See id.*)

1   (*Id.*, ¶¶ 94–96.) ADOA's research indicated that removing the exclusion for "transsexual

2   surgery" would increase costs. (*Id.*, ¶ 95.)

3       HHS issued final Section 1557 rules on May 18, 2016 (the "2016 Rules"). (*Id.*, ¶ 98.)

4   ADOA contacted its insurance vendors to research how the 2016 Rules would affect the

5   Plan. (*Id.*, ¶ 99.) ADOA also reviewed publicly available information about the 2016 Rules,

6   including news bulletins, legal presentations, and articles. (*Id.*, ¶ 100.)

7       In March and September 2016, ADOA discussed coverage of gender dysphoria with

8   the medical directors of its insurance vendors. (*Id.*, ¶ 101.) This discussion included the cost

9   associated with such coverage. (*Id.*) Cost reductions and efficiencies are one of the State's

10  primary focuses. (*Id.*, ¶ 108.) When there is an increase to the Plan, ADOA must increase

11  employee premiums. (*Id.*, ¶ 111.) Cost weighed into most decisions by ADOA, including

12  those relating to the Plan. (*See id.*, ¶ 40(d).)

13      ADOA's consideration of coverage for gender dysphoria was no different than its

14  consideration of other exclusions. (*Id.*, ¶ 102.) No one at ADOA or the Governor's Office

15  has expressed a negative opinion about transgender persons. (*Id.*, ¶¶ 105–106.)

16      Ultimately, ADOA decided to *expand* coverage for gender dysphoria—removing the

17  Plan's exclusion for hormone therapy and medical or psychological counseling. (*Id.*, ¶ 103.)

18  Beginning in plan year 2017, the Plan's exclusion was revised to exclude only "gender

19  reassignment surgery." (*Id.*, ¶ 104.) ADOA made this decision to minimize increased Plan

20  costs and because the 2016 Rules did not mandate coverage for any procedure or treatment

21  but only prohibited a categorical exclusion of all gender transition-related care.[3] (*See id.*,

22  ¶ 74.)

23      This case involves Plaintiff Russell B. Toomey, Ph.D's request for a hysterectomy.

24  Dr. Toomey is employed as an Associate Professor at the University of Arizona, and is

25  enrolled in the Plan. (Plaintiff's Statement of Undisputed Material Facts ("PSOF") (Doc.

26  299), at ¶¶ 9–11, 64–65; CSOF, ¶ 76.) Dr. Toomey is a transgender man diagnosed with

27

28  ───────────────
    [3] Pursuant to this Court's Order (Doc. 278 (Order granting Motion for Reconsideration)),
    State Defendants will not argue that their good-faith understanding of the law is a defense.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

gender dysphoria. (*See* PSOF, ¶¶ 1, 66.) A transgender man is a natal female who has a male gender identity. (*Id.*, ¶ 1.)

Transgender persons may experience gender dysphoria. (CSOF, ¶ 2.) If a transgender person experiences gender dysphoria, the person may seek medical treatment, including surgery. (*Id.*, ¶ 75) Not all transgender persons require, want, or receive gender reassignment surgery. (*Id.*, ¶ 82.)

In July 2018, Dr. Toomey requested a hysterectomy from his physician to treat his gender dysphoria. (*Id.*, ¶ 78.) BlueCrossBlueShield of Arizona ("BCBS") initially approved Dr. Toomey's hysterectomy. (*Id.*, ¶ 69.) After Dr. Toomey contacted BCBS to notify it that the hysterectomy was to treat gender dysphoria, BCBS denied pre-authorization based on the Exclusion. (*Id.*) Dr. Toomey wanted a denial letter from BCBS to use as evidence in this litigation. (*Id.*, ¶ 70.) Dr. Toomey could receive coverage for a hysterectomy for other medically necessary reasons, including all the same reasons for which a cisgender person could receive coverage for a hysterectomy. (*Id.*, ¶ 81.)

## II.     THE COURT SHOULD DENY PLAINTIFF'S MOTION

### A.     Plaintiff's Count I—Violation Of Title VII Fails.

#### 1.     The Exclusion Is Not Facially Discriminatory.

A facially discriminatory policy is one that explicitly treats persons differently based on a suspect category. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (*citing Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 24 (1993) (Ginsburg, J., concurring)).

The Exclusion does not facially discriminate based on sex, gender nonconformity, or sex stereotyping. The Plan excludes "gender reassignment surgery." (PSOF, ¶ 25.) This Exclusion does not explicitly reference any one sex, gender, or other suspect classification. (*Id.*; *see also* Doc. 296 (Declaration of Ryan Curtis ("Curtis Decl.")), Ex. 1 (Deposition of

Russell Toomey, Ph.D. ("Toomey Depo.")) at 61:6–17, 120:16–17 (admitting that the Exclusion is not specific to transgender persons and does not identify a particular sex).) The Plan excludes gender reassignment surgery for all Plan participants. (*See* PSOF, ¶ 25; *see also* Doc. 296 (Curtis Decl.), Ex. 1 (Toomey Depo.) at 61:6–9, 61:18–21, 120:24–121:2.) The Plan does not penalize any employee for a characteristic or trait that it tolerates in another employee; it simply does not provide coverage for "gender reassignment surgery" for any Plan member, regardless of their gender, sex, or diagnosis. This is characteristic of facially neutral health plans. *See, e.g., Geduldig v. Aiello*, 417 U.S. 484, 497 n.20 (1974); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 139 (1976); *In re Union Pac. R.R. Emp. Practices Litig.*, 479 F.3d 936, 945 (8th Cir. 2007).

In *Geduldig*, the Supreme Court held an insurance policy that excluded coverage for certain pregnancy-related disabilities did not discriminate on the basis of sex. 417 U.S. at 495–97. Rather, the Supreme Court found that the insurance policy merely created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively female," the Court reasoned "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.* The Court noted that there was "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496. Similarly, here, there is a lack of identity between gender reassignment surgery and sex or gender. There is no difference in the application of the Exclusion against any particular Plan participant.

In *Gilbert*, the Supreme Court held a private employer's disability insurance plan that excluded coverage for pregnancy-related disabilities did not discriminate on the basis of sex. 429 U.S. at 136. The Supreme Court held that "[w]hile it is true that only women can become pregnant," without more, the fact that the employer excluded from coverage a condition that only affects one sex is not proof that the exclusion was discriminatory. *Id.* at 134 (citing *Geduldig*, 417 U.S. at 496–97 n.20). The most that could be said is that the exclusion discriminated against pregnant people. *Id.* Similarly, the most that can be said is that the Exclusion denies coverage to people who want gender reassignment surgery.

In *Union Pac. R.R.*, the Eighth Circuit held that a private employer's health plan that excluded coverage for oral contraceptives did not discriminate on the basis of sex. 479 F.3d at 944–45. Recognizing the fact that only women can utilize oral contraception, the Eighth Circuit focused its analysis on the fact that the health plan did not cover any contraception utilized by women or men. *Id.* "Therefore, the coverage provided to women is not less favorable than that provided to men [and] there is no violation of Title VII." *Id.*

Applying the logic of *Geduldig*, *Gilbert*, and *Union Pac. R.R.*, the Exclusion is not facially discriminatory. Plaintiff has the same coverage under the Plan as all other State employees because the Exclusion applies equally to men and women, or males and females. At most, the Exclusion creates two groups—those that want gender reassignment surgery and those that do not. Just as not all women are pregnant, not all transgender persons seek "gender reassignment surgery." (CSOF, ¶ 82.) Indeed, not all transgender persons have gender dysphoria. (*See* DSM-V S2H14.) As a result, a transgender person could fall within either group (*see* CSOF, ¶ 82), and a "lack of identity" exists between the Exclusion and transgender status. *See Geduldig*, 417 U.S. at 496–97 n.20; *Gilbert*, 429 U.S. at 135. Thus, the Exclusion does not facially discriminate on the basis of sex.

This Court previously found this reasoning persuasive. On November 30, 2020, Magistrate Judge Bowman recommended denying Plaintiff's Motion for Preliminary Injunction because the Exclusion was facially neutral. (Doc. 134.) Magistrate Judge Bowman relied on *Gilbert* in her recommendation and found that *Gilbert*'s "analysis[] is still controlling." (*Id.* at 4–6.) Plaintiff criticizes the Court's prior reliance on *Gilbert* because Congress later decided to enact the Pregnancy Discrimination Act of 1978, which expanded the scope Title VII to include "pregnancy, childbirth, or related medical conditions." (Doc. 298, 16:15–17:1.) 42 U.S.C.A. § 2000e(k). The enactment of the Pregnancy Discrimination Act, however, did not overrule the reasoning in *Gilbert* and did not mandate that health plans provide coverage for conditions which affect only one sex or gender. Indeed, several courts, including this one, have continued to apply the logic of *Gilbert* after the Pregnancy Discrimination Act. (*See* Doc. 134 at 5.) *See Union Pac. R.R.*,

479 F.3d 936; *Anderson v. S. Dakota Ret. Sys.*, 924 N.W.2d 146, 152 (S.D. 2019) (noting that "discrimination based upon sex does not result simply because an employer's disability benefits plan is less than all-inclusive" in relation to retirement benefits); *Wallace v. Pyro Min. Co.*, 789 F. Supp. 867, 868 (W.D. Ky. 1990), *aff'd*, 951 F.2d 351 (6th Cir. 1991) (no Title VII violation for refusal to grant personal leave for breastfeeding); *see also Dobbs v. Jackson Women's Health Org.*, ___ U.S. ___, 142 S. Ct. 2228, 2245–46 (2022) ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'"). If anything, Congress's enactment of the Pregnancy Discrimination Act after *Gilbert* illustrates that an act of Congress is the appropriate method for expanding Title VII protections to new groups or traits of individuals. Indeed, although Congress enacted ACA Section 1557 and the 2016 Rules address transgender people, the 2016 Rules do not require that health plans cover any specific treatment or service.

Bostock v. Clayton Cnty., Georgia*, ___ U.S. ___, 140 S. Ct. 1731 (2020), does not alter this analysis. In *Bostock*, the Supreme Court decided Title VII prohibits firing an employee based on sexual orientation or transgender status. *Id.* at 1737. *Bostock* relied on the traditional meaning of "sex" as "only [] biological distinctions between male and female." *Id.* at 1739. *Bostock*, thus, restates the well-established understanding that Title VII protects employees from discrimination if they are treated differently based on their sex, and further states that it is impossible to separate an employee's sex as a factor when considering their sexual orientation or transgender status. *Id.* at 1741–42. "[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id.* at 1741. However, Justice Alito's dissent in *Bostock* identified several areas of Title VII law that remain unsettled. *Id.* at 1778–1783 (Alito, J., dissenting). As to healthcare, Justice Alito noted that "healthcare benefits may emerge as an intense battleground." *Id.* at 1781 (Alito, J., dissenting). Indeed, Justices Alito and Thomas specifically referenced this litigation. *Id.* at 1781, n.56. Neither the dissent nor the majority

suggest that the provision of any specific healthcare benefit to transgender persons is conclusively determined by *Bostock*.

Consistent with *Bostock*, the Plan does not treat any Plan participant differently based on their sex or transgender status. The Plan excludes various treatments for all Plan participants. (CSOF, ¶ 16.) One such excluded treatment is "gender reassignment surgery." (PSOF, ¶ 16.) All Plan participants are subject to the Exclusion. Simply, gender reassignment surgery is excluded for any person who seeks it, regardless of their sex or gender. Specifically as to this matter, Plaintiff requested a hysterectomy to treat his gender dysphoria. (PSOF, ¶¶ 66–68; CSOF, ¶ 78.) The Plan does not provide coverage for hysterectomies to treat gender dysphoria for any Plan participant, regardless of their sex, gender, or gender identity. However, the Plan provides coverage for hysterectomies for other conditions and diagnoses. (CSOF, ¶¶ 79–81.) Transgender individuals, including Plaintiff, can obtain coverage for a hysterectomy for any of the same conditions that a cisgender person can receive coverage for a hysterectomy. (*Id.*, ¶ 81.) As a result, a person's sex or gender identity has no effect on the ultimate outcome. The determining factor is the *reason* for the surgery, not the employee's sex, gender, or gender identity. Under *Bostock*'s reasoning, therefore, the Plan does not discriminate on the basis of sex. The Court should rule consistent with *Bostock* and deny Plaintiff's Motion.

Plaintiff's cited cases do not alter this conclusion. In addition to the fact that each of the listed cases is a non-binding District Court decision, they are distinguishable from the instant dispute for several reasons. First, several of the cases consider a motion to dismiss, not a motion for summary judgment. *See Hammons v. Univ. of Maryland Med. Sys. Corp.*, 551 F. Supp. 3d 567, 572 (D. Md. 2021), *reconsideration denied*, CV DKC 20-2088, 2021 WL 4951921 (D. Md. Oct. 25, 2021); *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp. 3d 791, 793 (W.D. Wash. 2021); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 7 (M.D.N.C. 2020), *aff'd sub nom. Kadel v. N. Carolina State Health Plan for Teachers & State Employees*, 12 F.4th 422 (4th Cir. 2021), *as amended* (Dec. 2, 2021), *cert. denied*, 211 L. Ed. 2d 568, 142 S. Ct. 861 (2022) ("*Kadel I*"); *Tovar v. Essentia Health*, 342

F. Supp. 3d 947, 951 (D. Minn. 2018). The standard for assessing a motion to dismiss is drastically different than the standard for a motion for summary judgment.[4] *Compare Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (on motion to dismiss, a "complaint is to be liberally construed in favor of plaintiff") *with* FRCP 56(a). Similarly, *Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 934 (W.D. Wis. 2018), considers a motion for preliminary injunction, not a motion for summary judgment. Contrary to Plaintiff's suggestion, none of these cases found that an exclusion for "gender reassignment surgery" is facial discrimination on the basis of sex as a matter of law. At most, these cases stand for the proposition that claims relating to transgender healthcare are not so insubstantial as to be subject to dismissal under Rule 12(b)(6).

Second, many of the listed cases do not actually analyze a Title VII claim. *See Fain v. Crouch*, CV 3:20-0740, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022) (claims for violation of Equal Protection Clause, ACA, and Medicaid Act); *Hammons*, 551 F. Supp. 3d at 572 (claims for violation of Establishment Clause, Equal Protection Clause, and ACA); *Pritchard*, 536 F. Supp. 3d at 793 (claim for violation of ACA); *Tovar*, 342 F. Supp. 3d at 951 (claim for violation of ACA); *Flack*, 328 F. Supp. 3d at 934 (claim for violation of Equal Protection Clause and ACA); *Kadel I*, 446 F. Supp. 3d at 7 (analyzing claim for violation of Equal Protection Clause and ACA). Importantly, Plaintiff made no claim or argument that the Exclusion violates the ACA.

The only cases which address a Title VII claim on a motion for summary judgment are: *Kadel v. Folwell*, 1:19CV272, 2022 WL 2106270 (M.D.N.C. June 10, 2022); *Lange v. Houston Cnty., Georgia*, 5:19-CV-392 (MTT), 2022 WL 1812306 (M.D. Ga. June 2, 2022); *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018); and *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1026 (D. Alaska 2020). Each of these cases is distinguishable.

The health plan exclusions at issue in *Kadel*, *Lange*, and *Boyden* are much broader than the Exclusion here. In *Kadel*, the health plan at issue excluded "Psychological

---

[4] For this same reason, Plaintiff's repeated reliance on the Court's statements in its Order denying State Defendants' Motion to Dismiss is misplaced.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

assessment and psychotherapy treatment in conjunction with proposed gender transformation; [and] Treatment or studies leading to or in connection with sex changes or modifications and related care." *Kadel v. Folwell*, 1:19CV272, 2022 WL 3226731, at *3 (M.D.N.C. Aug. 10, 2022) ("*Kadel II*").[5] As a result, transgender members of the health plan could not receive coverage for counseling, hormone therapy, or surgery. *Id.* Similarly, in *Lange*, the health plan at issue excluded "coverage for drugs for sex change surgery and services and supplies for a sex change and/or the reversal of a sex change." 2022 WL 1812306, at *2. Again, in *Boyden*, the health plan at issue excluded "procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment." 341 F. Supp. 3d at 988. In contrast to each of these cases, the Exclusion here only applies to "gender reassignment surgery" and coverage is available for all other treatments for gender dysphoria. As a result, *Kadel*, *Lange*, and *Boyden* do not mandate that this Court find a Title VII violation here.

In *Fletcher*, the District of Alaska considered an exclusion for "[s]urgical procedures to alter the appearance or function of the body" relating to "changing sex or sexual characteristics." 443 F. Supp. 3d at 1027. Although the court ultimately determined that the exclusion at issue did violate Title VII, it did so based on a detailed analysis of the application of the exclusion to "the individual." *Id.* at 1030. Specifically, the court stated:

> Under the provisions of AlaskaCare, a natal female born without a vagina qualifies for coverage of a vaginoplasty, but not the plaintiff here because her natal sex is male. . . . If plaintiff's natal sex were female and it was medically necessary for her to have a vaginoplasty to correct a congenital defect, coverage would have been available under AlaskaCare. But, because plaintiff's natal sex is male and she was seeking to transition to a female, coverage was not available. Plainly, defendant treated plaintiff differently in terms of health coverage because of her sex, irrespective of whether "sex" includes gender identity.

*Id.* (citation omitted). Here, however, Plaintiff can receive coverage for a hysterectomy under the Plan regardless of his natal sex. Plaintiff—a natal female—can receive coverage for a hysterectomy for multiple reasons, including injury or cancer. (CSOF, ¶¶ 79–81.)

---

[5] *Kadel*, 2022 WL 2106270, was superseded by *Kadel II*.

1   Natal males can also receive coverage for a hysterectomy, for example, to treat Persistent

2   Mullerian Duct Syndrome. (*Id.*, ¶ 80; *see also* Doc. 298, 15, n.7.) The Plan excludes

3   surgeries to treat gender dysphoria, but that is excluded regardless of natal sex or gender

4   identity. Therefore, contrary to the plaintiff in *Fletcher*, Plaintiff has not been "treated []

5   differently in terms of health coverage because of [his] sex," gender, or transgender status.

### 2.   Plaintiff Does Not Satisfy The *McDonnell Douglas* Framework.

7   A plaintiff asserting a disparate treatment claim[6] may prove that claim in two ways:

8   with evidence of discrimination, or through the *McDonnell Douglas* framework. Here,

9   Plaintiff cannot demonstrate any direct evidence of discrimination and apparently intends

10  to proceed under the *McDonnell Douglas* framework. (*See* Doc. 298, at 18:21–19:4.)

11  Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of

12  demonstrating discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

13  (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). The burden

14  then shifts to the defendant to provide a legitimate, nondiscriminatory purpose for the

15  alleged conduct. *Id.* Finally, the burden then shifts back to the plaintiff to show that the

16  defendant's stated purpose is merely pretext for prohibited discrimination. *Id.* at 804.

### a.   Plaintiff Cannot Prove Discrimination.

18  Plaintiff's Motion skips the first crucial step in the *McDonnell Douglas* framework—

19  proving discrimination. To do so, Plaintiff must demonstrate that he: (1) is in a protected

20  class; (2) met his employer's legitimate job performance expectations; (3) suffered an

21  adverse employment action; and (4) another similarly situated employee outside of his

22  protected class received better treatment. *See* 411 U.S. at 802; *Godwin v. Hunt Wesson, Inc.*,

23  150 F.3d 1217, 1220 (9th Cir. 1998), *as amended* (Aug. 11, 1998).

24  Here, Plaintiff cannot demonstrate that cisgender employees receive better treatment

25  under the Plan.[7] The Exclusion is one of many limitations under the Plan. (CSOF, ¶ 16.) All

---

[6] Until his Motion for Summary Judgment, Plaintiff never disclosed a disparate treatment claim. (*See* Doc. 86 (Amended Complaint), ¶¶ 60–64; Doc. 296 (Curtis Decl.), Ex. 5 (MIDR) at 14:7–15:7.) For this reason alone, the Court should deny Plaintiff's Motion.

[7] State Defendants assume solely for this motion that Plaintiff can adequately demonstrate that he is a member of a quasi-suspect class, met his job expectations, and suffered an

Plan participants are subject to every exclusion in the Plan, regardless of their gender, sex, or diagnosis. Simply, gender reassignment surgery is excluded for any person who seeks it, man or woman. The Plan does not treat any participant differently based on sex, gender, or transgender status. Transgender persons can receive coverage for surgeries under the Plan for all the same reasons as cisgender persons. (*Id.*, ¶¶ 79–81.) For example, Plaintiff may be eligible to receive coverage for his requested hysterectomy under the Plan due to abnormal pap smear results or an increased risk of cancer. (*Id.*) The Plan provides the same coverage to all persons.

Plaintiff may argue that cisgender persons receive better treatment because they can receive coverage for medically necessary treatments or because the Plan provides coverage for hysterectomies for other conditions, such as cancer. Both arguments fail. First, the Plan does not cover all procedures a Plan participant (or even a doctor) may consider "medically necessary." Under the Plan, a "Covered Service" is "a service which is Medically Necessary *and* eligible for payment under the Plan." (CSOF, ¶ 16.) The term "Medically Necessary" is defined in the Plan and each of ADOA's insurance vendors have guidelines for determining medical necessity. (*Id.*; Doc. 296 (Curtis Decl.), Ex. 13 (Deposition of Elizabeth Schafer ("Schafer Depo.")) at 215:22–216:14.) Even if a procedure is deemed "Medically Necessary" under the Plan and by insurance vendors, it may still be excluded. Indeed, several medically necessary treatments are excluded. (*Id.*) Thus, neither transgender nor cisgender persons receive coverage for all treatments they believe are "medically necessary" just because a physician recommends it as medically necessary. (CSOF, ¶ 16; Doc. 296 (Curtis Decl.), Ex. 13 (Schafer Depo.) at 209:18–210:4 (just because a doctor recommends a procedure does not mean that it is considered medically necessary under the Plan); *id.*, Ex. 2 (Deposition of Loren Schechter, M.D. ("Schechter Depo.")) at 116:8–15 (whether a procedure is "medically necessary" from a doctor's perspective is not always the same as from an insurer's perspective).) Plaintiff's suggestion that cisgender persons get all medically-necessary care, so transgender persons should likewise be entitled to any

adverse employment action (i.e., denial of his requested hysterectomy).

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

medically-necessary care they want, is incorrect.

Second, Plan participants suffering from cancer and gender dysphoria are not similarly situated "in all material respects," as required for a Title VII comparator analysis. *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) ("In order to show that the 'employees' allegedly receiving more favorable treatment are similarly situated . . . , the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects."). The Eighth Circuit applied a narrow rationale to comparator conditions when analyzing health insurance benefits under Title VII. In *Union Pac. R.R.*, a health plan exclusion for contraceptives was challenged by female plaintiffs as discrimination based on sex. 479 F.3d at 943-45. The district court looked at the plan's coverage of "medicines or medical services [that] prevent employees from developing diseases and found that the health plans treated men more favorably because the plans covered preventive medicines and services for male-pattern baldness, routine physical exams, tetanus shots, and drug and alcohol treatments." *Id*. at 944. The Eighth Circuit reversed, holding that the comparison category—preventative medicines—was too broad. *Id.* Instead, the proper comparison was the provision of the medical benefit in question— contraception—and because the plan also excluded contraceptives used by men, it was not discriminatory. *Id*. at 944–45. Similarly, here, the appropriate comparator analysis is persons seeking "gender reassignment surgery," not persons seeking hysterectomies. "Gender reassignment surgery" encompasses several different surgical procedures and a hysterectomy is only one of such surgeries. (CSOF, ¶ 27.) Plaintiff's suggested comparator of hysterectomies to treat other conditions is not appropriate, similar to the comparison category of "preventative medicines" in *Union Pac. R.R*. Therefore, providing coverage for hysterectomies in some circumstances but not for gender reassignment surgery does not make the Plan discriminatory.

   b.   <u>State Defendants' Legitimate, Non-Discriminatory Reasons.</u>

Plaintiff wrongly argues that cost is State Defendants' only rationale for maintaining the Exclusion. (Doc. 298, 18:23–24.) The undisputed evidence shows that State Defendants

maintained the Exclusion for two reasons: (1) the 2016 Rules did not require ADOA to provide such coverage; and (2) to control cost increases to the Plan. State Defendants are precluded from arguing as a defense in this litigation that they had a good-faith belief that the Exclusion was legal. (*See* Doc. 278.) Nevertheless, the State Defendants' cost rationale is sufficient under the *McDonnell Douglas* framework.

In 2016, ADOA reviewed and *expanded* coverage for gender dysphoria shortly after new rules had been issued by the Office of Civil Rights ("OCR") of HHS. HHS issued the 2016 Rules, which implemented non-discrimination provisions under ACA Section 1557 on May 18, 2016. (CSOF, ¶ 98.) Notably, the 2016 Rules prohibited entities subject to the rules from including categorical exclusions or limitations for health services related to "gender transition." 45 CFR § 92.207(b)(4) (2016). However, the 2016 Rules did not affirmatively require coverage of any particular procedure or treatment for gender transition-related care. *Id*. at § 92.207(d) ("Nothing in this section is intended to determine, or restrict a covered entity from determining, whether a particular health service is medically necessary or otherwise meets applicable coverage requirements in any individual case"). Further, even if the 2016 Rules required that all "gender reassignment" surgeries be covered, they were challenged in court to determine if they were valid or whether they exceeded what is meant by "on the basis of sex" under the law.

The language of Section 1557 is concise. Regarding discrimination on different bases, Section 1557 incorporates different federal discrimination laws. *See* 42 U.S.C. § 18116(A). For discrimination on the basis of sex, Section 1557 incorporates Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq*.). *Id*.[8] Challenges to the validity of the 2016 Rules occurring when the State Defendants were considering changes to the Plan focused on whether the 2016 Rules improperly exceeded the scope of what is meant by discrimination on the basis of sex in Title IX.[9]

---

[8] Section 1557 does not incorporate Title VII's definition of "on the basis of sex."
[9] Discrimination on the basis of sex under Title IX originally meant male and female under traditional binary concepts of sex. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007). For many years, courts held that discrimination on the basis of gender identity was not covered by Title IX. *See, e.g.*, *Johnston v. Univ. Pittsburgh*, 97 F.Supp. 3d 657

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

On December 31, 2016, the United States District Court for the Northern District of Texas granted a motion for preliminary injunction enjoining HHS from enforcing Section 1557 prohibitions against discrimination on the basis of gender identity because the definition of sex under the 2016 Rules exceeded the scope of Title IX. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016).[10] *Franciscan All.* and related similar cases were pending when the ADOA was evaluating how it would address Section 1557. In fact, the day *after* the Texas District Court's ruling, the State Health Plan *expanded* transgender benefits to include hormone therapy and counseling.[11]

However, ADOA needed to balance expanding coverage under the Plan with increasing costs. It is undisputed that adding coverage for gender reassignment surgery would increase costs. (CSOF, ¶ 95.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in costs to the Plan annually. (*Id.*) These costs calculations must be qualified, however, because it is unknown how many Plan members are transgender or would seek "gender reassignment surgery," or what specific surgical procedures transgender Plan participants would seek. (*Id.*, ¶ 96.)

Further complicating this analysis is the fact that, in 2016, the State had a large budget deficit and was focused on reducing costs. (*Id.*, ¶¶ 107–108.) At that time, the Plan was "under water" and ADOA had to utilize reserve funds to pay Plan expenses. (*Id.*, ¶¶ 109–110; Doc. 296 (Curtis Decl.), Ex. 32 (Corieri Depo.) at 66:14-23.) ADOA did not

---

(W.D. Penn 2015).

[10] Other cases challenging the meaning of "on the basis of sex" under Title IX were also occurring in 2016. *See Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016).

[11] Uncertainty regarding Section 1557 continues. HHS issued rules under Section 1557 on June 19, 2020. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020). Enforcement of those rules was enjoined. *Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020). On May 10, 2021, HHS announced OCR would begin enforcing Section 1557 and Title IX's prohibition on discrimination based on gender identity in light of *Bostock*. HHS's May 10, 2021 Notice was also challenged. *See Neese v. Becerra*, No. 2:21–cv–00163–Z (N.D. Tex. Aug. 25, 2021); *Am. Coll. of Pediatricians v. Becerra*, No. 1:21–cv–00195 (E.D. Tenn. Aug. 27, 2021); *Christian Emp'rs All. v. EEOC*, No. 21–cv– 00195 (D.N.D. Oct. 18, 2021). On August 4, 2022, HHS issued new proposed rules regarding Section 1557 ("2022 Rules"). *See* Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. No. 149 (August 4, 2022). The 2022 Rules do not require coverage for specific procedures. *Id.* at p. 47871–72.

remove exclusions from the Plan if there was any cost increase, unless revision was legally required. ADOA complied with the rules under Section 1557 by removing the categorical exclusion, while minimizing cost increases.[12] In sum, State Defendants' cost concerns are a legitimate, non-discriminatory reason for the Exclusion.

Plaintiff's cited cases do not alter this conclusion because each of those cases considers cost as a defense to a claim of facial discrimination, not in the *McDonnell Douglas* framework. *See Lange*, 2022 WL 1812306, at \*13 n.15; *City of Los Angeles, Dept. of Water & Power v. Manhart*, 435 U.S. 702, 716 (1978); *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 685 n.26 (1983). Plaintiff cites no case stating that cost is an insufficient justification in the *McDonnell Douglas* framework.

### c. <u>State Defendants' Reasons Are Not A Pretext.</u>

Plaintiff must show "specific, substantial" evidence that State Defendants' cost rationale is pretextual either directly—showing that discrimination more likely motivated State Defendants—or indirectly—showing that State Defendants' explanation is unworthy of credence. *Godwin*, 150 F.3d at 1220–22; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). Denying the credibility of the cost rationale is insufficient. *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010); *see also Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011). It does not matter if an employer's stated rationale is objectively false, foolish, trivial, or baseless; rather, courts only require that the employer honestly believed its reasons for its actions. *Villiarimo*, 281 F.3d at 1063. Plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* An argument that a cost rationale is pretextual must be sufficiently specific and substantial to show discriminatory motive because "it is the employer's prerogative to determine how best to allocate its

---

[12] Plaintiff's repeated portrayal of the Exclusion for gender transition surgeries as "categorical" is misleading. The 2016 Rules and the 2022 proposed rules prohibit categorical exclusions of all treatments. Consistent with the Rule, the Plan does not have such a categorical exclusion for all treatments. It only excludes surgeries.

limited . . . funds." *Munoz*, 630 F.3d at 865.

There is no dispute that removing the Exclusion would increase costs to the Plan. (CSOF, ¶ 95.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in costs to the Plan annually. (*Id*.) These cost calculations must be qualified, however, because it is unknown how many Plan members are transgender, how many would seek "gender reassignment surgery," or what specific surgical procedures transgender Plan participants would seek. (*Id.*, ¶ 96.)

Plaintiff's argument that ADOA has added other benefits to the Plan without regard to cost misstates State Defendants' witnesses' testimony. First, as to bariatric surgery, ADOA removed an exclusion for laparoscopic sleeve gastrectomy based on recommendations from its insurance administrators and because it resulted in fewer surgical complications than other bariatric surgical procedures. (CSOF, ¶ 23(b).) As a result, extending coverage for bariatric surgery to laparoscopic sleeve gastrectomy would *decrease* total costs to the Plan. Second, as to 3D mammograms, ADOA did not remove an exclusion for 3D mammograms. (CSOF, ¶ 23(e).) Instead, ADOA's insurance administrators revised their coverage guidelines to recognize 3D mammograms as not experimental. (*Id.*) Moreover, ADOA's contemporaneous research indicated that the cost of a 3D mammogram was the same as a standard mammogram. (*Id.*) Finally, as to the hepatitis-C medication, ADOA's coverage of that drug significantly reduced total cost to the Plan. (CSOF, ¶ 23(g).) The medication *cures* hepatitis-C, thereby reducing the cost of future healthcare claims for that member. (*Id.*) There is no evidence that State Defendants approved coverage for additional treatments or services without regard to increased costs. Instead, all available evidence indicates that State Defendants were very concerned about cost reductions.

Plaintiff has no evidence that ADOA did not honestly believe its cost rationale. Indeed, all available evidence demonstrates that the State was very concerned about costs in 2016. (CSOF, ¶ 108.) ADOA conducted research on every Plan revision it considered. (*Id*., ¶ 84.) ADOA considered cost as a factor in every decision it made, including revisions it was considering making to the Plan. (*See id*., ¶¶ 40, 84, 94.) Generally, ADOA did not

1   expand coverage unless legally required or if there is no cost increase. (*Id.*) It is undisputed

2   that ADOA conducted cost analyses relating to the Exclusion and relied upon those

3   calculations during its deliberations. (*Id.*, ¶¶ 94–95.)

4       Moreover, any argument that State Defendants' stated rationale is a pretext is

5   implausible and contradicted by the evidence. It is undisputed ADOA actually **expanded**

6   coverage for gender dysphoria in 2016. Prior to 2016, the Plan excluded all treatment for

7   gender dysphoria, including hormone therapy and counseling. (*Id.*, ¶ 89.) In 2016, ADOA

8   made the decision to modify the Exclusion and *add* coverage to hormone therapy and

9   counseling. (*Id.*, ¶¶ 103–104.) If ADOA's cost concerns were pretext, ADOA would not

10   have *expanded* coverage and increased plan costs to treat gender dysphoria.

11       Plaintiff is not entitled to summary judgment in his favor on Count I.

12   **B.    Plaintiff's Count II—Violation Of Equal Protection Clause Fails.**

13       **1.    The Exclusion Is Not Facially Discriminatory.**

14       "A facial challenge is really just a claim that the law or policy at issue is

15   unconstitutional in all its applications." *Bucklew v. Precythe*, __ U.S. __, 139 S. Ct. 1112,

16   1127 (2019). Courts look to the language of the policy to determine facial discrimination.

17       For example, in *Geduldig*, the Supreme Court held a state insurance policy that

18   excluded coverage for a medical procedure that only one sex can undergo did not classify

19   on the basis of sex. 417 U.S. at 495–97. Rather, the classification was based on a medical

20   condition. *Id*. at 496–97. The classification created two groups—pregnant and non-pregnant

21   people. *Id*. at 496 n.20. Although "the first group is exclusively female," the Court reasoned

22   "the second includes members of both sexes," which revealed a "lack of identity" between

23   pregnancy and sex. *Id*. The Court noted that there was "no risk from which men are

24   protected and women are not. Likewise, there is no risk from which women are protected

25   and men are not." *Id*. at 496.

26       *Geduldig* is still instructive and has been cited in numerous recent opinions. *See*

27   *Dobbs*, 142 S. Ct. at 2246; *Lange*, 2022 WL 1812306, at *8. For example, in *Lange*, the

28   court relied upon *Geduldig* to find that a health plan exclusion for "drugs for sex change

surgery and services and supplies for a sex change and/or the reversal of a sex change" was not discriminatory. 2022 WL 1812306, at *2, *8. The court ultimately concluded that this exclusion was not facially discriminatory under the Equal Protection Clause:

> Lange does not argue the Exclusion facially discriminates on the basis of sex. [] Understandably so, *the Supreme Court has foreclosed that argument*. *Geduldig* . . . . In *Geduldig*, the Supreme Court held a state insurance policy that excluded coverage for a medical procedure that only one sex can undergo did not classify on the basis of sex. *Id.* at 495-97[]. Rather, the classification was based on a medical condition. *Id.* at 496-97[]. The classification created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20[]. Although "the first group is exclusively female," the Court reasoned "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.* The Court noted that there was "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496[].
>
> According to [] *Geduldig*, Lange has the same coverage as other employees because the Exclusion applies equally to a male seeking to become a woman or a woman seeking to become a man. And even if transgender individuals are entitled to protection under the Equal Protection Clause as a separate and distinct class from that of males and females, the same logic would apply. In other words, the Exclusion creates two groups—those that want a "sex change" and those that do not. Both groups contain transgender members and non-transgender members, so a "lack of identity" exists between the policy and transgender status. Thus, *in the context of the Equal Protection Clause, the Exclusion does not facially discriminate on the basis of sex*.

*Id.*, at *8 (emphasis added).

Similar to *Geduldig* and *Lange*, the Exclusion does not facially discriminate based on sex, gender nonconformity, or sex stereotyping. The Exclusion is just one of *many* different exclusions in the Plan that apply to all participants. (CSOF, ¶ 16.) The text of the Exclusion—"gender reassignment surgery"—does not reference a single sex, gender, or transgender status. (PSOF, ¶ 25.) All individuals enrolled in the Plan are subject to the Exclusion, regardless of gender or sex. Similar to *Lange*, at most, the Exclusion creates two groups—those who seek gender reassignment surgery and those who do not. Both groups contain transgender members. (CSOF, ¶ 82.)

Plaintiff argues that this Court should disregard *Geduldig* for several reasons, each

of which fails. First, Plaintiff argues that the Exclusion has "explicit sex classifications." (Doc. 298, 21:8–18.) A simple reading of the Exclusion dispels this argument. The Exclusion does not reference any sex, gender, or transgender status. (PSOF, ¶ 25.) The Exclusion is not facially discriminatory on the basis of sex just because the word "gender" can be found in the language excluding gender reassignment surgeries. It is neutral as it applies equally to males and females.

Second, Plaintiff argues that the Exclusion denies coverage to transgender persons that it provides to cisgender persons. (Doc. 298, 21:19–22:1.) This is inaccurate. The Plan does not cover all procedures a Plan participant may want or a doctor may order. Under the Plan, a "Covered Service" is "a service which is Medically Necessary *and* eligible for payment under the Plan." (CSOF, ¶ 16.) The term "Medically Necessary" is defined in the Plan and each of ADOA's insurance vendors have guidelines for determining medical necessity. (*Id.*; Doc. 296 (Curtis Decl.), Ex. 13 (Deposition of Elizabeth Schafer ("Schafer Depo.")) at 215:22–216:14.) Even if a procedure is deemed "Medically Necessary" under the Plan and by insurance vendors, it may still be excluded. Indeed, several medically necessary treatments are not eligible for coverage under the Plan, including certain bariatric procedures, treatment for erectile and sexual dysfunction, orthotics, compression garments, dentures, hair transplants and treatment for alopecia, surgery to treat hyperhidrosis (excessive sweating), phase 3 cardiac rehabilitation, infertility, sensory integration therapy, and LOVAAS therapy. (Doc. 296 (Curtis Decl.), Ex. 6 at AZSTATE.01048–51.) Thus, neither transgender nor cisgender persons receive coverage for all treatments they believe are "medically necessary."

Third, the Exclusion is not proxy discrimination. Proxy discrimination occurs when "the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019). For example, in *Davis*, the court found that a regulation that targeted "Native Inhabitants of Guam" was a proxy for race discrimination

because there was a "near identity of the definitions for 'Native Inhabitants of Guam' and '[a distinct racial category],' the lack of other substantive changes [to a prior, racially-motivated law], and the timing of the [l]aw's enactment." *Id.* However, in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), the Supreme Court found that regulation of abortion was not a proxy for discrimination against women because "there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class."

Here, the Exclusion is not a proxy for discrimination against transgender persons. First, not all transgender persons have gender dysphoria (*see* DSM-V S2H14) or seek "gender reassignment surgery" (CSOF, ¶ 82). As a result, not all transgender persons are affected by the Exclusion. Second, ADOA actually *expanded* coverage for gender dysphoria in 2016. Prior to 2016, the Plan excluded all treatment for gender dysphoria, including hormone therapy and counseling. (*Id.*, ¶ 89.) In 2016, ADOA modified the Exclusion to add coverage for hormone therapy and counseling. (*Id.*, ¶ 103.) Third, there are legitimate reasons for maintaining the Exclusion, including cost concerns.

Plaintiff additionally cites a few non-binding District Court cases to support his argument that the Exclusion is facially discriminatory, but each of these cases are inapposite here.[13] As noted above, in *Kadel II*, the health plan at issue excluded "Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation; [and] Treatment or studies leading to or in connection with sex changes or modifications and related care." 2022 WL 3226731, at *3. As a result, transgender members of the health plan could not receive coverage for any treatment for gender dysphoria. *See id.* Similarly, in *Boyden*, the health plan at issue excluded "procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment." 341 F.

---

[13] Plaintiff also cites *Flack v. Wis. Dept. of Health Servs.*, which considered a motion for preliminary injunction, not a motion for summary judgment. 328 F. Supp. 3d at 934. The standard for a preliminary injunction is materially different than for a motion for summary judgment. *Compare id.* at 946 (plaintiff "must only show that his chances to succeed on his claims are 'better than negligible'") *with* FRCP 56(a). Contrary to Plaintiff's suggestion, *Flack* did not rule that an exclusion for "gender reassignment surgery" is facial discrimination on the basis of sex as a matter of law. 328 F. Supp. 3d at 951–53.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

Supp. 3d at 988. In contrast to each of these cases, the Exclusion here only applies to "gender reassignment surgery" and coverage is available for all other treatments for gender dysphoria. (PSOF, ¶ 25; CSOF, ¶¶ 103–104.)

In *Stone v. Trump*, 356 F. Supp. 3d 505, 512–13 (D. Md. 2018), *amended on reconsideration*, 402 F. Supp. 3d 153 (D. Md. 2019), the policy expressly referenced "transgender persons" and prohibited them from participation in the military in certain circumstances. In contrast, here, the Exclusion does not reference a single sex or gender. (PSOF, ¶ 25.) Although *D.T. v. Christ*, 552 F. Supp. 3d 888, 894–98 (D. Ariz. Aug. 5, 2021), involved language similar to the Exclusion, that case considered a motion to dismiss, not a motion for summary judgment. The *D.T.* court did not hold that the birth certificate policy facially discriminated based on transgender status, but merely found that "[t]aking Plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor, Plaintiffs state Equal Protection and Due Process claims." *Id.* at 897–98.

In *Fain*, the Southern District of West Virginia agreed that *Geduldig* was binding and applicable, but found that under the subject health plan, cisgender persons were treated more favorably than transgender persons.[14] 2022 WL 3051015, at *8. Such is not the case here. All Plan participants are subject to many exclusions in the Plan, regardless of their gender, sex, or diagnosis. The Plan does not treat any Plan participant differently based on sex, gender, or transgender status. Transgender persons can receive coverage for surgeries under the Plan for all the same reasons as cisgender persons. (*See* CSOF, ¶¶ 79–81.) For example, Plaintiff may be eligible to receive coverage for his requested hysterectomy under the Plan to treat other conditions. (*Id.*, ¶ 81.) The Plan provides the same coverage to all persons.

Therefore, the Exclusion is not facially discriminatory.

### 2.     The Exclusion Rationally Relates To A Legitimate State Interest.

The regulation of a medical procedure that may affect only one sex or gender does

---

[14] *Fain* considered a non-suspect class of those not seeking surgical treatment for gender dysphoria. 2022 WL 3051015, at *8. It is worth noting that such a class would include both cisgender and transgender persons. (*See* CSOF, ¶ 82.)

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

not trigger heightened constitutional scrutiny unless the regulation is a "mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other." *Dobbs*, 142 S. Ct. at 2245–46; *see also Geduldig*, 417 U.S. at 496, n. 20. As outlined above, the Exclusion is not a "mere pretext" for discrimination. (*Supra*, § III.B.2.b.3.)

"[L]egislation is presumed to be valid and will be sustained if the classification [] is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Romer v. Evans*, 517 U.S. 620, 631 (1996). There must be "a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993).

The burden rests with the party attacking the classification to "negative every conceivable basis which might support it." *Id.* A classification "is accorded a strong presumption of validity." *Id.* at 319. "State legislatures are presumed to have acted within their constitutional power" and a law "will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. State of Md.*, 366 U.S. 420, 425 (1961).

State Defendants' interests in cost containment and reducing health costs are legitimate state interests. (*See* Doc. 69 (Order denying Motion to Dismiss) at 16:12–14.) *See, e.g., Harris v. Lexington-Fayette Urban County Gov't*, 685 Fed. App'x 470, 473 (6th Cir. 2017); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010) (state has a "substantial interest" in lowering health care costs). Plaintiff's reliance on *Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011), is misplaced. In *Diaz*, the Ninth Circuit considered the trial court's granting of a preliminary injunction and ruled that the plaintiffs had a likelihood of success on their claim that a statute which restricted insurance coverage to "spouses" and excluded same-sex domestic partners did not overcome rational basis review because the characterization was "arbitrary." *Id.* at 1013. The Ninth Circuit did not hold that cost concerns were insufficient or did not meet rational basis review; indeed, the defendant did not even challenge the trial court's rejection of its cost rationale in the appeal. *Id.*[15]

---

[15] The dispute in *Diaz* was never substantively resolved but was ultimately dismissed as moot after an Arizona law prohibiting same-sex marriages was declared unconstitutional. *Diaz v. Brewer*, 2:09-CV-02402 JWS, 2015 WL 3555282, at *1 (D. Ariz. June 5, 2015).

The Exclusion is rationally related to State Defendants' interests in cost containment. ADOA's consideration of coverage for gender dysphoria was no different than its consideration of other exclusions. (CSOF, ¶ 102.) It is undisputed that ADOA researched the cost associated with removing the Exclusion, and determined that removing the Exclusion would increase Plan costs. (PSOF, ¶¶ 37–40; CSOF, ¶¶ 94–96.) Those costs would primarily be paid by the Plan participants, through premium increases. (CSOF, ¶ 111.) For that reason, ADOA generally only removes exclusions from the Plan if legally required or if there is no cost associated with the revision to the Plan. (*Id.*, ¶¶ 20–21.) This is especially so because, in 2016, the Plan was "under water" and ADOA had to utilize reserve funds to pay Plan expenses. (*Id.*, ¶ 109; Doc. 296 (Curtis Decl.), Ex. 32 (Corieri Depo.) at 66:14-23.) ADOA furthered its legitimate interests in cost containment and reducing costs to the Plan by maintaining the Exclusion.

### 3.    The Exclusion Substantially Relates To An Important Interest.

If the Court applies intermediate scrutiny, State Defendants can meet this burden. A classification of a quasi-suspect class fails unless it is "substantially related to the achievement of an important governmental interest." *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019). An "exceedingly persuasive" justification is required. *Id.* at 1200.

State Defendants' interests in cost containment and reducing health costs are an important state interest. (Doc. 69 at 16:12–14.) *See, e.g., Harris*, 685 Fed. App'x at 473; *IMS Health*, 630 F.3d at 276. Plaintiff argues that costs are not a sufficient interest under intermediate scrutiny. (Doc. 298, 24:1–8.) Plaintiff's cited cases, however, do not support this argument. In *Califano v. Goldfarb*, 430 U.S. 199, 217 (1977), the Supreme Court stated that an unverified assumption that a policy would "save the Government time, money, and effort" was insufficient. In contrast, here, State Defendants' cost analyses were thoroughly researched and have not been disputed in this litigation.[16] (CSOF, ¶¶ 94–96; PSOF, ¶¶ 37–40.) In *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 254 (1974), the Supreme Court

---

[16] Plaintiff also cites *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975). (Doc. 298 at 24:5–6.) However, *Weinberger* does not discuss cost concerns and is otherwise inapplicable.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

applied strict scrutiny, not intermediate scrutiny.

State Defendants' cost concerns are legitimate and were not invented *post hoc*.[17] ADOA considered the cost of removing the Exclusion in 2016. (CSOF, ¶¶ 94–96.) It is undisputed that adding coverage for gender reassignment surgery would increase costs. (*Id.*, ¶ 95; *see* PSOF, ¶¶ 37–40.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in costs to the Plan annually. (CSOF, ¶ 95.) Cost reductions and efficiencies are one of the State's primary focuses. (*Id.*, ¶ 108.) When there is an increase to the Plan, ADOA must increase employee premiums. (*Id.*, ¶ 111.) Cost weighed into most decisions by ADOA, including those relating to the Plan. (*See id.*, ¶ 40.) This is because in 2016, the State had a large budget deficit and was focused on reducing costs. (*Id.*, ¶¶ 108–110.) At that time, the Plan was "under water" and ADOA had to utilize reserve funds to pay Plan expenses. (*Id.*, ¶ 109; Doc. 296 (Curtis Decl.), Ex. 32 (Corieri Depo.) at 66:14-23.) ADOA did not remove exclusions from the Plan if there was any cost increase, unless revision was legally required.

Therefore, Plaintiff is not entitled to summary judgment on his Count II.

## III.   **CONCLUSION**

For these reasons, Plaintiff is not entitled to judgment as a matter of law on his Claim I – Violation of Title VII or Claim II – Violation of Equal Protection Clause. State Defendants request that the Court deny Plaintiff's Motion for Summary Judgment.

---

[17] Plaintiff includes factual discussion about a post-litigation cost analysis for removing the Exclusion completed by ADOA. (Doc. 298 at 8:25–9:20.) Plaintiff does not include this post-litigation cost analysis in his legal argument. (*See generally* Doc. 298.) Rightly so because a cost analysis completed three years after ADOA's decision regarding the Exclusion cannot have "actually motivated" the decision. Therefore, any such evidence is irrelevant to discrimination or discriminatory motive. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Am. Fed'n of State, Cnty., & Mun. Employees, AFL-CIO (AFSCME) v. State of Wash.*, 770 F.2d 1401, 1405 (9th Cir. 1985); *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012). The Court should disregard the irrelevant evidence regarding the 2019 cost analysis.

DATED this 26th day of October, 2022.

FENNEMORE CRAIG, P.C.

By: *s/ Ryan Curtis*

Timothy J. Berg
Amy Abdo
Ryan Curtis
Shannon Cohan
Attorneys for Defendants State of
Arizona, Andy Tobin, and Paul
Shannon

28245767