FENNEMORE CRAIG, P.C.
Timothy J. Berg (No. 004170)
Amy Abdo (No. 016346)
Ryan Curtis (No. 025133)
Shannon Cohan (No. 034429)
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: tberg@fennemorelaw.com
Email: amy@fennemorelaw.com
Email: rcurtis@fennemorelaw.com
Email: scohan@fennemorelaw.com

*Attorneys for Defendants*
*State of Arizona, Andy Tobin, and Paul Shannon*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Russell B. Toomey, | CV-19-00035-TUC-RM |
|---|---|
| Plaintiff, | **DEFENDANTS STATE OF ARIZONA'S, ANDY TOBIN'S, AND PAUL SHANNON'S CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| State of Arizona, *et al.* | |
| Defendants. | |

Pursuant to LRCiv 56.1, Defendants State of Arizona, Andy Tobin, and Paul Shannon (collectively, "State Defendants") submit this controverting statement of facts in support of their Opposition to Plaintiff's Motion for Summary Judgment.

I.   **RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF FACTS**

1.   Undisputed

2.   Objection; Rule 703. Dr. Schechter does not have experience or training in the treatment of mental health conditions. (Doc. 300 (Declaration of Christine Wee ("Wee Decl.")), Ex. 1 (Expert Report of Loren Schechter, M.D. ("Schechter Report")) at ¶¶ 1, 7–8.) Disputed. Some transgender persons experience "gender dysphoria." (Doc. 86 (Amended Complaint), ¶ 27.) "Gender dysphoria" is the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender identity with their sex as determined at birth and bodily developments associated with that

1  sex. (*Id.*) The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and
2  Statistical Manual of Mental Disorders. (*Id.*; Gender Dysphoria, Diagnostic & Statistical
3  Manual of Mental Disorders, 5th ed. S2H14.)

4        3.      Objection; Rule 703. Dr. Schechter does not have experience or training in
5  the treatment of mental health conditions. (Doc. 300 (Wee Decl.), Ex. 1 (Schechter Report)
6  at ¶¶ 1, 7–8.) Disputed. The World Professional Association for Transgender Health
7  ("WPATH") standards are not widely accepted or utilized by all providers, and are designed
8  to be individualized for each patient. (Declaration of Ryan Curtis ("Curtis Decl."), filed
9  concurrently, Ex. A (Deposition Transcript of Russell B. Toomey, Ph.D. ("Toomey
10  Depo.")) at 20:6–8; *Id.*, Ex. B (Deposition Transcript of Loren Schechter, M.D. ("Schechter
11  Depo.")) at 19:20–20:18, 53:3–14.)

12        4.      Disputed. Under the State of Arizona's healthcare plan (the "Plan"), a service
13  is "Medically Necessary" if it meets "all of the following criteria: (1) Ordered by a
14  physician; (2) Not more extensive than required to meet the basic health needs; (3)
15  Consistent with the diagnosis of the condition for which they are being utilized; (4)
16  Consistent in type, frequency and duration of treatment with scientifically based guidelines
17  by the medical-scientific community in the United States of America; (5) Required for
18  purposes other than the comfort and convenience of the patient or provider; (6) Rendered
19  in the least intensive setting that is appropriate for their delivery; and (7) Have demonstrated
20  medical value." (Doc. 296 (Curtis Decl.), Ex. 6 at AZSTATE.010192–93; *see also* Doc. 86
21  (Amended Complaint), ¶ 34.)

22        5.      Disputed. Under the Plan, a service is "Medically Necessary" if it meets "all
23  of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required
24  to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which
25  they are being utilized; (4) Consistent in type, frequency and duration of treatment with
26  scientifically based guidelines by the medical-scientific community in the United States of
27  America; (5) Required for purposes other than the comfort and convenience of the patient
28  or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery;

1  and (7) Have demonstrated medical value." (Doc. 296 (Curtis Decl.), Ex. 6 at
2  AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.)

3      6.    Disputed. Under the Plan, a service is "Medically Necessary" if it meets "all
4  of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required
5  to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which
6  they are being utilized; (4) Consistent in type, frequency and duration of treatment with
7  scientifically based guidelines by the medical-scientific community in the United States of
8  America; (5) Required for purposes other than the comfort and convenience of the patient
9  or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery;
10 and (7) Have demonstrated medical value." (Doc. 296 (Curtis Decl.), Ex. 6 at
11 AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.) The third-party
12 insurance administrators utilized by the Arizona Department of Administration ("ADOA")
13 in 2018 identified several procedures or treatments that were always considered "cosmetic"
14 or which are never "medically necessary." (Curtis Decl., Ex. C (AETTOOM000023–39) at
15 AETTOOM000031–32; *Id.*, Ex. D (BCBSAZ00002137–52) at BCBSAZ00002140,
16 BCBSAZ00002148; *Id.*, Ex. E (AZSTATE.153283–96) at AZSTATE.153285–87; *Id.*, Ex.
17 F (AZSTATE.153297–310) at AZSTATE.153298.)

18     7.    Disputed. Under the Plan, a service is "Medically Necessary" if it meets "all
19 of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required
20 to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which
21 they are being utilized; (4) Consistent in type, frequency and duration of treatment with
22 scientifically based guidelines by the medical-scientific community in the United States of
23 America; (5) Required for purposes other than the comfort and convenience of the patient
24 or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery;
25 and (7) Have demonstrated medical value." (Doc. 296 (Curtis Decl.), Ex. 6 at
26 AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.)

27     8.    Undisputed.
28     9.    Undisputed.

1        10.      Undisputed.

2        11.      Undisputed.

3        12.      Undisputed.

4        13.      Undisputed.

5        14.      Undisputed.

6        15.      Undisputed.

16. Disputed. The Plan defines "Covered Expenses" as "expenses incurred by or on behalf of a person, if they are incurred after he [or she] becomes insured for these benefits and prior to the date coverage ends." (Doc. 296 (Curtis Decl.), Ex. 6 at AZSTATE.010121.) "Covered Expenses" are available to Plan participants "only if: (1) they are Medically Necessary and not specifically excluded in this Article or any other Article; and (2) Pre-Certification/Prior Authorization is obtained from the Plan by the Member or provider, for those services that require Pre-Certification/prior Authorization." (*Id.*, Ex. 6 at AZSTATE.010121; *see also id.*, Ex. 6 at AZSTATE.010186 ("COVERED SERVICE shall mean a service which is Medically Necessary and eligible for payment under the Plan.").) Under the Plan, a service is "Medically Necessary" if it meets "all of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which they are being utilized; (4) Consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; (5) Required for purposes other than the comfort and convenience of the patient or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery; and (7) Have demonstrated medical value." (*Id.*, Ex. 6 at AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.) The Plan also contains several Exclusions and Limitations. (Doc. 296 (Curtis Decl.), Ex. 6 at AZSTATE.01048–51.)

26        17.      Undisputed.

27        18.      Undisputed.

28        19.      Undisputed.

1   20.   Disputed. ADOA only removed exclusions from the Plan if it was legally required or if the revision would not increase the cost of the Plan. (*See id.*, Ex. 10 (Bender Depo.) at 116:24–117:9, 167:12-24.)

21.   Disputed. ADOA only removed exclusions from the Plan if it was legally required or if the revision would not increase the cost of the Plan. (*Id.*)

22.   Undisputed.
   a.   Undisputed
   b.   Undisputed
   c.   Undisputed.

23.   Undisputed
   a.   Undisputed.
   b.   Objection; Rule 1002. Disputed. In 2014, ADOA removed an exclusion for laproscopic sleeve gastrectomy based on recommendations from its insurance administrators. (Curtis Decl., Ex. G (Deposition Transcript of Marie Isaacson ("Isaacson Depo.")) at 98:16–99:25, 100:16–101:25.) The laproscopic sleeve gastrectomy resulted in fewer surgical complications. (*Id.*, 136:16–137:5.) ADOA completed a cost analysis for coverage of laproscopic sleeve gastrectomy. (*See id.*, 138:11–14, 190:3–10.)
   c.   Undisputed.
   d.   Objection; Rule 701.
   e.   Objection; Rule 1002. Disputed. From 2015-2021, ADOA removed only five exclusions for treatments or services from the Plan: 2015—compression garments for treatment of burns; 2017—manipulations under anesthesia, counseling and hormone therapy for the treatment of gender dysphoria; 2018—midwife services; 2021—treatment for benign gynecomastia. (Doc. 294 (Declaration of Paul Shannon ("Shannon Decl.")) at ¶ 5.) ADOA did not remove an exclusion for 3D

|   |   |   |
|---|---|---|
| 1 | | mammograms; rather, ADOA's insurance administrators revised their coverage guidelines to recognize 3D mammograms as not experimental. (Curtis Decl., Ex. H (Deposition Transcript of Scott Bender ("Bender Depo.")) at 117:10–118:17.) Coverage for 3D mammograms did not add cost to the Plan. (*Id.* at 124:5–14.) |
| 6 | f. | Objection; Rule 701. |
| 7 | g. | Objection; Rule 1002. Disputed. ADOA completed a cost analysis for coverage of the new hepatitis-C drug. (*Id.*, Ex. I (Deposition of Elizabeth Schafer ("Schafer Depo.")) at 161:8–162:10.) The hepatitis-C drug cures a person from the disease. (*Id.*) As a result, by approving the hepatitis-C drug, ADOA significantly reduced the cost of future healthcare claims from that member. (*Id.*) |
| 13 | 24. | Undisputed. |
| 14 | 25. | Undisputed. |

15. 26. Disputed. Transgender persons can receive coverage for medically-necessary surgeries under the Plan, including for all the same medically necessary reasons for which a cisgender person could receive coverage for a surgery under the Plan. (*See* Doc. 296 (Curtis Decl.), Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2, 168:8–13.)

27. Disputed. The term "gender reassignment surgery" encompasses multiple surgeries. (*Id.*, Ex. 2 (Schechter Depo.) at 79:24-80:7, 84:22-85:19, 87:1-6.) Many of those surgeries would not be performed on a cisgender person. (*See id.*, Ex. 2 (Schechter Depo.) at 103:5-9, 105:15-18, 113:15-21.) Many other of those surgeries would not be eligible for coverage under the Plan because they are cosmetic. (*See id.*, Ex. 6 at AZSTATE.010149; *id.*, Ex. 2 (Schechter Depo.) at 29:8-19, 35:4-10, 35:24-36:5.)

    a. Objection; Rule 703. Dr. Schechter testified that gynecologists perform hysterectomies. (Curtis Decl., Ex. B (Schechter Depo.) at 67:12–20.) Dr. Schechter's only experience with performing hysterectomies is in the context of medical research into uterine

|   |   |
|---|---|
| 1 | transplants. (*Id.* at 64:20–67:11.) |
| 2 | b.  Undisputed. |
| 3 | c.  Disputed. Some surgical procedures of the genitalia would not be performed on a cisgender person. (*See* Doc. 296 (Curtis Decl.), Ex. 2 (Schechter Depo.) at 103:5-9, 105:15-18, 113:15-21.) |

28. Disputed. Under the Plan, a service is "Medically Necessary" if it meets "all of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which they are being utilized; (4) Consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; (5) Required for purposes other than the comfort and convenience of the patient or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery; and (7) Have demonstrated medical value." (*Id.*, Ex. 6 at AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.)

29. Undisputed.

30. Objection; Rule 703. Dr. Schechter does not have training or experience with billing insurers for reimbursement of surgical procedures. (Doc. 300 (Wee Decl.), Ex. 1 (Schechter Report) at ¶¶ 1, 7–8.) Disputed. Certain CPT codes do identify treatments for transgender individuals. (Curtis Decl., Ex. C (AETTOOM000023–39) at AETTOOM000030, AETTOOM000033; *Id.*, Ex. E (AZSTATE.153283–96) at AZSTATE.153285, AZSTATE.153290; *Id.*, Ex. F (AZSTATE.153297–310) at AZSTATE.153302.) In addition, CPT codes are submitted with ICD-10 diagnosis codes that identify gender dysphoria as the diagnosis. (*Id.* Ex. C (AETTOOM000023–39) at AETTOOM000032; *Id.*, Ex. E (AZSTATE.153283–96) at AZSTATE.153291–92; *Id.*, Ex. F (AZSTATE.153297–310) at AZSTATE.153303.)

31. Undisputed.

32. Disputed. In the past, both public and private institutions excluded healthcare coverage for gender dysphoria on the rationale that such treatments were cosmetic or

1 experimental. (*See* Doc. 86 (Amended Complaint), ¶ 3; Doc. 296 (Curtis Decl.), Ex. 1 (Toomey Depo.) at 146:3–13.) At that time, the State copied the plan document and terms previously provided by its insurance companies, including Cigna. (*Id.*, Ex. 8 (Isaacson Depo.) at 195:16–20, 197:7–15, 200:11–15.)

      a. Undisputed.

      b. Undisputed.

      c. Undisputed.

      d. Undisputed.

33. Undisputed.

34. Undisputed.

35. Undisputed.

36. Undisputed.

37. Undisputed.

38. Undisputed.

39. Undisputed.

40. Objection; Rules 701, 702.

      a. Objection; Rules 802, 701, 702.

      b. Objection; Rules 701, 702.

      c. Undisputed.

      d. Objection; Rules 701, 702. Disputed. Cost weighed into most decisions by ADOA. (*Id.*, Ex. 9 (Shannon Depo.) at 128:22–129:22; *id.*, Ex. 13 (Schafer Depo.) at 83:7-10, 101:19–102:2.) Cost was one of the most important factors in decisions regarding the Plan. (*See id.*, Ex. 10 (Bender Depo.) at 56:2–10, 58:4–14; *id.*, Ex. 9 (Shannon Depo.) at 128:22–129:22.)

      e. Undisputed.

41. Undisputed.

42. Undisputed.

|     |     |     |
| --- | --- | --- |
| 1   | 43. | Undisputed. |
| 2   |     | a. Objection; Rule 802. |
| 3   |     |    i. Objection; Rule 802. |
| 4   |     | b. Objection; Rule 802. |
| 5   |     |    i. Objection; Rule 802. |
| 6   |     |    ii. Objection; Rule 802. |
| 7   | 44. | Undisputed. |
| 8   | 45. | Undisputed. |
| 9   | 46. | Undisputed. |
| 10  | 47. | Undisputed. |
| 11  | 48. | Undisputed. |
| 12  | 49. | Undisputed. |
| 13  | 50. | Undisputed. |

51. Disputed. ADOA made the decision to maintain the Exclusion in order to minimize increased costs to the Plan and because it believed that the modified exclusion was legal.[1] (*Id.*, Ex. 10 (Bender Depo.) at 167:12-24.)

52. Undisputed.

53. Undisputed.

54. Undisputed.

55. Disputed. ADOA consults with the Governor's Office regarding proposed revisions to the Plan. (*Id.*, Ex. 8 (Isaacson Depo.) at 119:11–120:15; *id.*, Ex. 10 (Bender Depo.) at 71:7–11, 81:4–20.) The Governor's Office was always involved in determining the contribution strategy for the Plan. (Curtis Decl., Ex. G (Deposition Transcript of Marie Isaacson ("Isaacson Depo.")) at 120:1-15.)

   a. Undisputed.

   b. Undisputed.

---

[1] Pursuant to this Court's Order (Doc. 278 (Order granting Motion for Reconsideration)), State Defendants will not argue that their good-faith understanding of the law is a defense in this litigation.

- 9 -

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

|   |   |   |
|---|---|---|
| 1 | | c. Undisputed. |
| 2 | 56. | Objection; Rule 402. |
| 3 | 57. | Objection; Rule 402. |
| 4–6 | 58. | Objection; Rule 402. Disputed. Mr. Meisner testified that he relied on several sources for the 2019 Analysis, including a Pew Research study. (*Id.*, Ex. I (Deposition Transcript of Michael Meisner ("Meisner Depo.") at 224:3–229:23.) |
| 7 | 59. | Objection; Rule 402. |
| 8 | 60. | Objection; Rule 402. |
| 9 | 61. | Objection; Rule 402. |
| 10 | 62. | Objection; Rule 402. |
| 11 | 63. | Objection; Rule 402. |
| 12 | 64. | Undisputed. |
| 13 | 65. | Undisputed. |
| 14 | 66. | Undisputed. |
| 15 | 67. | Undisputed. |
| 16 | 68. | Undisputed. |

69. Disputed. BCBS initially notified Dr. Toomey's healthcare provider that the hysterectomy would be "covered 100% after a $100 co-pay." (Doc. 296 (Curtis Decl.), Ex. 3 (TOOMEY000378–79).) On August 10, 2018, after Dr. Toomey contacted BCBS to notify BCBS that the sought hysterectomy was for the treatment of gender dysphoria, BCBS denied pre-authorization for the requested hysterectomy based on the Exclusion. (*Id.*, Ex. 3 (TOOMEY000378–79); *id.*, Ex. 4 (Transcript of Phone Call between Plaintiff and BCBS) at 3:7–24; *see also* Doc. 86 (Amended Complaint), ¶ 43 & Ex. G; Doc. 296 (Curtis Decl.), Ex. 5 (Plaintiff's Amended Initial Discovery Responses ("MIDR")) at 13:11–14.)

70. Disputed. Dr. Toomey contacted BCBS in order to obtain a denial letter that could be used as evidence in this litigation. (Curtis Decl., Ex. A (Toomey Depo.) at 62:16–22.)

71. Disputed. In 2018, the third-party insurance administrators utilized by ADOA

had coverage guidelines to determine when a requested procedure would be covered under their insurance plans. (*Id.*, Ex. C (AETTOOM000023–39); *Id.*, Ex. D (BCBSAZ00002137–52); *Id.*, Ex. E (AZSTATE.153283–96); *Id.*, Ex. F (AZSTATE.153297–310).) Under the Plan, a service is "Medically Necessary" if it meets "all of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which they are being utilized; (4) Consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; (5) Required for purposes other than the comfort and convenience of the patient or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery; and (7) Have demonstrated medical value." (Doc. 296 (Curtis Decl.), Ex. 6 at AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.)

72.    Undisputed.

73.    Undisputed.

74.    Disputed. ADOA made the decision to maintain the Exclusion in order to minimize increased costs to the Plan and because it believed that the modified exclusion was legal.[2] (Doc. 296 (Curtis Decl.), Ex. 10 (Bender Depo.) at 167:12-24.)

## II.    ADDITIONAL FACTS THAT ESTABLISH A GENUINE ISSUE OF MATERIAL FACT

### A.    Gender Dysphoria and Plaintiff's Request for Surgery

75.    If a transgender person experiences "gender dysphoria," the person may seek medical treatment, including "gender reassignment surgery." (Doc. 86 (Amended Complaint), ¶¶ 27–28.)

76.    In 2018, Dr. Toomey was enrolled in the Plan. (*Id.*, ¶ 33.)

77.    In 2018, Dr. Toomey's healthcare coverage claims under the Plan were administered by BlueCrossBlueShield of Arizona ("BCBS"). (*Id.*)

---

[2] Pursuant to this Court's Order (Doc. 278), State Defendants will not argue that their good-faith understanding of the law is a defense in this litigation.

78. In July 2018, Dr. Toomey requested a hysterectomy from his physician to treat his gender dysphoria. (*See id.*, ¶ 39 & Ex. G.)

79. Dr. Toomey could potentially receive coverage for a hysterectomy under the Plan for other medically-necessary reasons. (*See* Doc. 296 (Curtis Decl.), Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2, 168:8–13.)

80. The Plan provides coverage for hysterectomies for other conditions and diagnoses, including cancer. (*See generally id.*, Ex. 6 (AZSTATE.010093).)

81. Dr. Toomey can receive coverage for a hysterectomy for all the same medically necessary reasons for which a cisgender female could receive coverage for a hysterectomy under the Plan. (*Id.*, Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2.) For example, Dr. Toomey indicated that he has received abnormal pap smear results, which could justify coverage for a hysterectomy under the Plan. (*See id.* at 40:2–11, 49:25–50:2, 50:20–24.) In addition, Dr. Toomey may be eligible for coverage for a hysterectomy under the Plan to treat an increased risk of cervical, uterine, or ovarian cancers due to his long-term hormone treatment for gender dysphoria. (*See id.* at 49:4–21, 75:1–3).

82. Not all transgender persons want or receive "gender reassignment surgery." (*Id.* at 124:16–18; *id.*, Ex. 2 (Schechter Depo.) at 30:12-16, 32:1-12, 39:1–5.)

**B. Process for Revising the Plan**

83. ADOA reevaluates its plan design every year. (*Id.*, Ex. 10 (Deposition of Scott Bender ("Bender Depo.")) at 37:11-23.)

84. When reevaluating its plan design, ADOA considered:
   a. Recommendations from its insurance vendors (*Id.*, Ex. 8 (Isaacson Depo.) at 100:1–5; *Id.*, Ex. 9 (Deposition of Paul Shannon ("Shannon Depo.")) at 124:1-21; *Id.*, Ex. 11 (Deposition Transcript of Kelly Sharritts ("Sharritts Depo.")) at 56:11–14; *Id.*, Ex. 12 (Deposition Transcript of Craig Brown ("Brown Depo.")) at 178:24-179:19);
   b. Market trends (*Id.*, Ex. 13 (Schafer Depo.) at 54:8–14; *Id.*, Ex. 10 (Bender Depo.) at 41:18–42:7; *Id.*, Ex. 14 (Deposition of Yvette

Medina ("Medina Depo.")) at 84:15–85:1);

    c.   Interests of the Plan members (*Id.*, Ex. 13 (Schafer Depo.) at 54:15–20; *Id.*, Ex. 11 (Sharritts Depo.) at 149:25–150:10; *Id.*, Ex. 10 (Bender Depo.) at 37:24–38:9);

    d.   Cost (*Id.*, Ex. 9 (Shannon Depo.) at 124:1-21; *Id.*, Ex. 13 (Schafer Depo.) at 53:10-12, 55:9–14, 101:19–102:2; *Id.*, Ex. 10 (Bender Depo.) at 37:24–38:9);

    e.   Legal requirements (*Id.*, Ex. 9 (Shannon Depo.) at 124:1-21); and

    f.   Clinical effectiveness (*Id.*).

85.   Of these, cost is one of the most important factors. (*See id.*, Ex. 10 (Bender Depo.) at 56:2–10, 58:4–14; *Id.*, Ex. 9 (Shannon Depo.) at 128:22–129:22.)

86.   ADOA conducted annual meetings with the medical directors of its insurance vendors to discuss potential revisions to the Plan design. (*Id.*, Ex. 10 (Bender Depo.) at 103:12–104:6; *Id.*, Ex. 9 (Shannon Depo.) at 138:16–24.)

87.   ADOA did not often remove exclusions from the Plan. (*Id.*, Ex. 10 (Bender Depo.) at 116:24–117:9.)

**C.**   **History of the Exclusion**

    **1.**   **Origination of the Exclusion**

88.   Prior to 2004, ADOA provided health insurance to State employees through a fully-insured health insurance plan provided by Cigna. (*Id.*, Ex. 15 (AZSTATE.244065) at AZSTATE.244071.)

89.   That plan document included an exclusion for "transsexual surgery including medical or psychological counseling and hormonal therapy in preparation for, or subsequent to, any such surgery." (*See id.*, Ex. 16 (AZSTATE.010905) at AZSTATE.010973.)

90.   In October 2004, the State instituted a self-funded health insurance plan. (*Id.*, Ex. 15 at AZSTATE.244071.)

    **2.**   **The 2017 Expansion of Coverage for Transgender Persons**

91.   In 2015, the majority of ADOA's insurance vendors did not provide coverage

for transgender benefits. (*Id.*, Ex. 8 (Isaacson Depo.) at 26:13–17, 29:15–19; *Id.*, Ex. 14 (Medina Depo.) at 119:17–120:4; *Id.*, Ex. 18 (AZSTATE.006325); *Id.*, Ex. 19 (AZSTATE.006198); *Id.*, Ex. 20 (AZSTATE.006129); *see also id.*, Ex. 7 (Deposition of Joan C. Barrett ("Barrett Depo.")) at 28:1–6.)

92.  On September 8, 2015, the United States Department of Health and Human Services ("HHS") issued a proposed rule on Section 1557 of the Affordable Care Act ("ACA"). (Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 92, 54172-01 (September 8, 2015).)

93.  ADOA contacted its insurance vendors to research how the proposed rule would affect that Plan. (Doc. 296 (Curtis Decl.), Ex. 21 (AZSTATE.000637).)

94.  ADOA also considered the cost of removing the exclusion for transgender benefits. (*Id.*, Ex. 8 (Isaacson Depo.) at 30:6-13; *Id.*, Ex. 13 (Schafer Depo.) at 102:23–25; *Id.*, Ex. 11 (Sharritts Depo.) at 78:14-20.

95.  Providing coverage for transgender benefits under the Plan would increase costs to the Plan. (*See id.*, Ex. 22 (AZSTATE.006095); *Id.*, Ex. 20 (AZSTATE.006129); *Id.*, Ex. 23 (ABOR-TOOMEY003459); *Id.*, Ex. 7 (Barrett Depo.) at 103:3-6.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in annual costs to the Plan. (*Id.*, Ex. 24 (AZSTATE.151707); *Id.*, Ex. 22 (AZSTATE.006095).)

96.  It is unknown how many Plan members are transgender, how many would seek "gender reassignment surgery," or what specific surgical procedures transgender Plan participants would seek. (*See id.*, Ex. 10 (Bender Depo.) at 158:7–159:1; *Id.*, Ex. 24 (AZSTATE.151707).)

97.  ADOA also reviewed whether other states and governmental entities provided coverage for gender reassignment surgery for their employees. (*Id.*, Ex. 25 (AZSTATE.004345); *Id.*, Ex. 8 (Isaacson Depo.) at 60:25-61:4.)

98.  HHS issued its final rule on Section 1557 on May 18, 2016 (the "2016 Rules"). (Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 96, 31376

1 (May 18, 2016) (codified at 45 C.F.R. pt. 92).)

2    99. Again, ADOA contacted its insurance vendors to research how the 2016 Rules would affect the Plan. (Doc. 296 (Curtis Decl.), Ex. 26 (AZSTATE.005674); *Id.*, Ex. 27 (AZSTATE.136334); *Id.*, Ex. 28 (AZSTATE.009210).)

    100. ADOA also reviewed publicly available information about the 2016 Rules, including news bulletins. (*Id.*, Ex. 29 (AZSTATE.005677).)

    101. In March and September 2016, ADOA discussed coverage of gender reassignment surgery with the medical directors of its insurance vendors. (*Id.*, Ex. 30 (AZSTATE.000385); *Id.*, Ex. 31 (AZSTATE.144146).) This discussion included the cost associated with coverage for gender reassignment surgery. (*Id.*)

    102. ADOA's consideration of coverage for transgender benefits was no different than its consideration of other procedures or conditions. (*See id.*, Ex. 9 (Shannon Depo.) at 231:20–24; *Id.*, Ex. 11 (Sharritts Depo.) at 90:24-91:12.)

    103. Ultimately, ADOA decided to expand coverage for transgender benefits under the Plan—removing the exclusion for hormone therapy and medical or psychological counseling—effective for the Plan year beginning January 1, 2017. (*See id.*, Ex. 6 at AZSTATE.01049.)

    104. Beginning in plan year 2017, the Plan only excludes "gender reassignment surgery" and does not exclude counseling or hormone therapy for gender dysphoria. (*Id.*)

    105. No one at ADOA has expressed a negative opinion about transgender persons. (*Id.*, Ex. 9 (Shannon Depo.) at 98:1–5, 224:12–15, 243:24–244:9; *Id.*, Ex. 13 (Schafer Depo.) at 181:9–20, 184:10–185:7, 185:24–186:6; *Id.*, Ex. 10 (Bender Depo.) at 98:19-21, 286:9-14.)

    106. No one at the Governor's Office has expressed a negative opinion about transgender persons. (*See Id.*, Ex. 8 (Isaacson Depo.) at 43:4-6; *Id.*, Ex. 9 (Shannon Depo.) at 224:16–21, 243:24–244:9; *Id.*, Ex. 32 (Deposition of Christina Corieri ("Corieri Depo.") at 55:21–56:8.)

. . .

### D. The State's Cost Concerns

107. In 2016, the State had a large budget deficit. (*Id.*, Ex. 33 (FY 2016 JLBC Baseline Summary); *see also id.*, Ex. 32 (Corieri Depo.) at 35:12–36:10.)

108. Cost reductions and efficiencies are one of the State's primary focuses. (*Id.*, Ex. 12 (Brown Depo.) at 47:20–49:4.)

109. In 2016, the Plan's expenses exceeded its revenues, and ADOA had to pay Plan expenses from a reserve fund. (*Id.*, Ex. 15 at AZSTATE.244074–75.)

110. In 2017, the Plan's expenses exceeded its revenues, and ADOA had to pay Plan expenses from a reserve fund. (*Id.*, Ex. 34 (AZSTATE.244113) at AZSTATE.244121–23.)

111. When there is an increase to the Plan, ADOA must increase employee premiums. (*Id.*, Ex. 8 (Isaacson Depo.) at 331:11–13.)

DATED this 26th day of October, 2022.

FENNEMORE CRAIG, P.C.

By: *s/ Ryan Curtis*
Timothy J. Berg
Amy Abdo
Ryan Curtis
Shannon Cohan
*Attorneys for Defendants State of Arizona, Andy Tobin, and Paul Shannon*

28249563