# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Russell B. Toomey,          )Case No.CV19-0035-TUC-RM (LAB)
                            )
            Plaintiff,      )
                            )
                vs.         )
                            )
State of Arizona, et al.,)
                            )
            Defendants.     )
_____)


DEPOSITION OF RUSSELL B. TOOMEY, Ph.D.


Phoenix, Arizona
May 26, 2021
9:00 a.m.


REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165


PREPARED FOR:
CONDENSED/ASCII

(Certified Copy)

1    Q.    And why did you think it was important to be in

2  compliance with WPATH's standards?

3    A.    Because those are the standards of care.

4    Q.    Put out by WPATH; correct?

5    A.    Yes.

6    Q.    And do you believe that the entire medical

7  community follows WPATH?

8    A.    No.

9    Q.    How did you find EJ Millstone?

10    A.    I found her when I was looking for a counselor

11  who was knowledgeable about trans populations in 2016.

12    Q.    Did you find her yourself or did someone give

13  you a referral?

14    A.    I believe I was given a referral.

15    Q.    Who gave you the referral?

16    A.    I cannot recall.

17    Q.    And how about Kate Kincaid?  How did you find

18  Kate Kincaid?

19    A.    She was referred to me by my counselor

20  EJ Millstone.

21    Q.    And did you ask EJ for a referral so that you

22  would have two diagnoses that you were after to comply

23  with or meet the WPATH standards?

24    A.    Yes.

25    Q.    And for purposes of this lawsuit -- well, let

62

1      Q.      Sure.  As I understand, you wanted to have a

2  denial from BlueCross/BlueShield in hand for purposes of

3  this lawsuit; correct?

4      A.      No.

5      Q.      Why did you want to get a denial in hand from

6  BlueCross/BlueShield?

7      A.      After I received the preauthorization, I wanted

8  the denial to know that I wouldn't receive a very large

9  bill after the procedure was done.

10     Q.      But you haven't had the procedure; correct?

11     A.      Correct.

12     Q.      Did you believe having a denial from

13 BlueCross/BlueShield would help your case against your

14 employer?

15     A.      Can you specify what you mean by "help"?

16     Q.      Did you believe a denial from

17 BlueCross/BlueShield would advance your claims against

18 your employer?

19     A.      I believed it would provide evidence for the

20 claim.

21     Q.      For the claim in the lawsuit?

22     A.      Yes.

23     Q.      And did anyone suggest that you seek a denial

24 from BlueCross/BlueShield?

25     A.      I had discussed that with my attorneys.

1  debt.

2          MS. ABDO:  We very much appreciate your

3  time and patience with us today.  I don't know if anyone

4  else has questions.

5          Josh, do you?

6          MR. BLOCK:  Austin, do you have anything

7  further?

8          MR. YOST:  No questions.  Thank you for

9  your time, Dr. Toomey.

10          MR. BLOCK:  I have no questions.

11  Dr. Toomey would like to read and review the transcript.

12          MS. ABDO:  All right.  No problem.  Thank

13  you so much.

14          (4:04 p.m.)

15

16

17

18          _____

19                  RUSSELL B. TOOMEY, Ph.D.

20

21

22

23

24

25

189

1  STATE OF ARIZONA    )
                          )  ss.
2  COUNTY OF MARICOPA  )

3        BE IT KNOWN that the foregoing proceedings were
taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
foregoing pages are a full, true and accurate record of
5  the proceedings, all done to the best of my skill and
ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
direction.

7

8        I CERTIFY that I am in no way related to any of
the parties hereto nor am I in any way interested in
9  the outcome hereof.

10         [X]  Review and signature was requested.
         []   Review and signature was waived/not
11  requested.

12

13        I CERTIFY that I have complied with the ethical
obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14  J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 7th
of June, 2021.

15                /s/ Jennifer Hanssen

16                Jennifer Hanssen, RPR
                Certified Reporter
17                Arizona CR No. 50165

18            *        *        *        *

19        I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
complied with the ethical obligations set forth in ACJA
20  7-206 (J)(1)(g)(1) through (6).

21

22                _____
                GRIFFIN GROUP INTERNATIONAL
                Registered Reporting Firm
23                Arizona RRF No. R1005

24
                25

# EXHIBIT B

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3

   Russell B. Toomey,     )Case No.CV19-0035-TUC-RM (LAB)

4                  )

       Plaintiff,    )

5                  )

          vs.      )

6                  )

   State of Arizona, et al.,)

7                  )

       Defendants.   )

8  _____)

9

10

11         VIDEOCONFERENCE DEPOSITION OF

           LOREN S. SCHECHTER, M.D.

12

13

           Highland Park, Illinois

14           June 15, 2021

            11:00 a.m. CDT

15

16

17

18

19

20  REPORTED BY:

   JENNIFER HANSSEN, RPR

21  Certified Reporter

   Certificate No. 50165

22

23  PREPARED FOR:

   ASCII/CONDENSED

24

   (Certified Copy)

25



19

1    Q.    And so my question is you use the term with the

2  WPATH document, you use the term "guideline"?

3    **A.    Yes.**

4    Q.    So am I correct that the WPATH document that's

5  attached to your report is really a set of guidelines,

6  but not something that you would testify creates a

7  binding standard of care that must be followed by

8  physicians?

9    **A.    I would say that the document I'm now referring**

10 **to, the document, the Standards of Care, refers to**

11 **guidelines as to treatment for individuals with --**

12 **transgender individuals suffering from gender dysphoria,**

13 **gender diverse.**

14   Q.    Is it your opinion that the standard of care

15 that governs physicians practicing in -- let me ask you

16 this:  You're licensed in Illinois; correct?

17   **A.    I am.**

18   Q.    Are you licensed in other states?

19   **A.    No.**

20   Q.    Okay.  So is it your testimony that a doctor

21 licensed to practice in the state of Illinois, the

22 standard of care governing that doctor as a matter of

23 state law requires the involvement and concurrence of

24 two mental health professionals before a surgeon could

25 perform a hysterectomy with bilateral



Toomey vs.
State of Arizona

Loren Schechter
June 15, 2021

20

1   salpingo-oophorectomy to alleviate gender dysphoria?

2        A.    The guidelines -- these guidelines are designed

3   to be individualized, so the particulars of a treatment

4   of a particular patient would depend upon the specifics

5   involved in that case.

6        Q.    And just so I'm clear -- well, let me ask you

7   this question:  Is it your opinion that to comply with

8   the standard of care governing physicians in the state

9   of Illinois, that the surgeon must consult with and

10  obtain concurrence of at least one mental health

11  professional before conducting a hysterectomy with

12  bilateral salpingo-oophorectomy to alleviate gender

13  dysphoria in a transgender male?

14       A.    So, again, these are guidelines that are

15  designed to be individual, depending on the particulars

16  of the case.  So if there's a specific incident, a

17  specific case, I can discuss that, but other than that,

18  these are individualized guidelines.

19       Q.    And I'm not sure that I got my question

20  answered.  Is it your opinion that a surgeon performing

21  a hysterectomy with bilateral salpingo-oophorectomy to

22  alleviate gender dysphoria in a transgender male would

23  be required under Illinois state law to consult with and

24  obtain concurrence of a mental health professional in

25  order to comply with the legal standard of care?



53

1    A.    We haven't made final determinations yet, so I

2  can't speak to whether or not there will be changes.

3    Q.    And back to my question, I understand there's

4  not one definitive, authoritative source in this area at

5  least, but if a doctor -- a surgeon who is considering

6  performing a surgical procedure on a transgender

7  individual for gender dysphoria, are the WPATH

8  guidelines something that you would consider that person

9  could use as a reliable authority on the topic?

10    A.    Well, as I said, I don't consider any one

11  document as authoritative.  This document is a

12  guideline.  The guidelines are individualized and

13  flexible and apply to the circumstances of the

14  individual person.

15    Q.    Doctor, I wanted to close the loop before we

16  went on about your billings, which are Exhibit 2.  I

17  think we have concluded that when you say in the work

18  "review of draft," that that mostly was preparing the

19  report in this case, and that your best estimate was

20  around 30 minutes of your total time was spent reviewing

21  the Arizona plan.

22           Was there anything besides those two items

23  of work, preparing the report and reviewing the Arizona

24  plan, that would be included with "review of draft"?

25    A.    That would be editing and reviewing the draft,



64

1   though, that Dr. Toomey is seeking the hysterectomy,

2   bilateral salpingo-oophorectomy for the treatment of

3   gender dysphoria?

4       **A.**     **I'm just going to look at the Amended Complaint**

5   **again before I answer. Yes, it is.**

6       Q.     And so the deferral, the voluntary deferral

7   under my hypothetical of this treatment for gender

8   dysphoria, regardless of how long that deferral is, if

9   it was even just for the sole purpose of being a

10   plaintiff in this lawsuit does not affect your opinion

11   as to whether or not it is medically necessary?

12               MR. BLOCK: Objection.

13       **A.**     **That is correct.**

14       Q.     BY MR. NORTHUP: Now, I know you haven't spoken

15   with Dr. Toomey. My understanding is it's never been,

16   as far as you know, the intention that if Dr. Toomey has

17   the hysterectomy, bilateral salpingo-oophorectomy, that

18   you would be the surgeon doing it; is that right?

19       **A.**     **Correct.**

20       Q.     Do you actually, Doctor, perform

21   hysterectomies, bilateral salpingo-oophorectomy?

22       **A.**     **Under an IRB protocol, in which I participate,**

23   **I am involved in the provision of surgical services for**

24   **hysterectomy and salpingo-oophorectomy.**

25       Q.     And what role -- you say an IRP protocol?



65

1    A.    IRB, as in boy, Institutional Review Board.

2    Q.    And what is IRB, Institutional Review Board?

3    A.    We have a -- I have a research interest in

4  uterine transplantation.

5    Q.    And so what role under that IRB protocol do you

6  play as part of your involvement with the provision of

7  services with a hysterectomy or an oophorectomy?

8    A.    Procuring the donor uterus and implanting the

9  donor uterus.

10   Q.    Have you ever done -- been involved in that

11  procuring and implanting the donor uterus in a

12  transsexual --

13   A.    Well, I assume you mean transgender.

14   Q.    Transgender, I'm sorry.  Transgender.

15   A.    That is the purpose of our IRB.

16   Q.    Is the purpose that that procedure would be

17  done on a transgender female?

18   A.    Ultimately, that the uterine procurement, the

19  donation, would be from a transgender man, and the

20  recipient would be a transgender woman.

21   Q.    Is it always from, the donor, a transgender

22  man?

23   A.    Is what?

24   Q.    In other words, is the donor, in your

25  experience, always a transgender man as opposed to a



66

1    cisgender woman?

2        A.    No, the uterine procurement may be from

3    altruistic donors.  Those may be cisgender women who are

4    voluntarily donating the uterus.  It may be performed

5    from heart beating, brain deceased, cisgender

6    individuals, and it may be performed from a transgender

7    man seeking hysterectomy and/or salpingo-oophorectomy.

8        Q.    And I take it the purpose of that surgery is

9    to -- is it to try to impart fertility on the recipient

10   or is it simply just to give them the organs that a

11   cisgender woman would have been born with?

12       A.    Ultimately, the goal would be to experience

13   live birth.

14       Q.    Is the technology -- has that ever happened?

15       A.    It has happened in cisgender women with the

16   condition of absolute uterine infertility.  Our plan is

17   to perform the procedure for transgender women.

18       Q.    And so back to, I guess, my original question,

19   other than the involvement of procuring and implanting a

20   uterus under the IRB protocol, does your practice

21   involve performing hysterectomies or

22   salpingo-oophorectomies?

23       A.    I assist in the procedure.  So, for example, as

24   of last week or the week before, I'll work with our

25   gynecologist, who is the primary surgeon, and then I



67

1    will assist in that procedure.  I'm not the primary

2    surgeon, however, for that procedure.

3        Q.    Right.  And when you're talking about assisting

4    and not being the primary surgeon, that is in the

5    provision and implantation of a donor uterus under the

6    IRB protocol?

7        A.    No, no, now I'm not discussing the research

8    protocol.  For the provision of clinical services for

9    transgender men, I will assist the gynecologist

10   performing the hysterectomy, although I am not the

11   primary surgeon for that.

12       Q.    And in a situation -- you understand

13   Dr. Toomey, the procedure that he wants to have, which

14   is the hysterectomy, bilateral salpingo-oophorectomy,

15   would there be a reason in that surgery for a plastic

16   surgeon such as yourself to be involved or would it just

17   be a gynecologist?

18       A.    It would typically be a gynecologist unless an

19   additional procedure on the genitalia was also -- was

20   performed concurrently.

21       Q.    So if it was just the hysterectomy with

22   bilateral salpingo-oophorectomy, normally, you wouldn't

23   expect to have a plastic surgeon there?

24       A.    I would not typically be involved in that case.

25       Q.    And is it your understanding that Dr. Toomey



130

1  follow-up questions that counsel might ask you, that's

2  all I have.

3      **A.    Thank you.**

4              MR. NORTHUP:  Are we done?

5              (Discussion off the record.)

6              MS. COHAN:  Austin, do you have any

7  questions for Dr. Schechter?

8              MR. YOST:  I do not have any questions.

9              (Discussion off the record.)

10             MR. NORTHUP:  Okay.  So looks like no

11  questions.  He said you'll read and sign.  Doctor, I

12  appreciate your time.

13     **A.    Thank you very much.  Appreciate it.**

14             (3:40 p.m.)

15

16

17

18     _____

19             LOREN SCHECHTER, M.D.

20

21

22

23

24

25

131

```
 1   STATE OF ARIZONA      )
                           )  ss.
 2   COUNTY OF MARICOPA    )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.

 7

 8        I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in
 9   the outcome hereof.

10             [X]  Review and signature was requested.
               []   Review and signature was waived/not
11   requested.

12

13        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
     J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 28th
14   of June, 2021.

15                  /s/ Jennifer Hanssen
                    Jennifer Hanssen, RPR
16                  Certified Reporter
                    Arizona CR No. 50165
17
                    *       *       *       *
18
          I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
19   complied with the ethical obligations set forth in ACJA
     7-206 (J)(1)(g)(1) through (6).

20

21                  /s/ Pamela A. Griffin
                    _____
22                  GRIFFIN GROUP INTERNATIONAL
                    Registered Reporting Firm
23                  Arizona RRF No. R1005

24

25
```



# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3
    Russell B. Toomey,         )Case No.CV19-0035-TUC-RM (LAB)
4                              )
            Plaintiff,         )
5                              )
                  vs.          )
6                              )
    State of Arizona, et al.,)
7                              )
            Defendants.        )
8   _____)

9

10

11          VIDEOCONFERENCE DEPOSITION OF
              LOREN S. SCHECHTER, M.D.
12

13

                  Highland Park, Illinois
14                June 15, 2021
                  11:00 a.m. CDT
15

16

17

18

19

20  REPORTED BY:
    JENNIFER HANSSEN, RPR
21  Certified Reporter
    Certificate No. 50165
22

23  PREPARED FOR:
    ASCII/CONDENSED
24
    (Certified Copy)
25



**Griffin Group International**
888.529.9990 | 602.264.2230

19

1    Q.    And so my question is you use the term with the

2    WPATH document, you use the term "guideline"?

3    **A.    Yes.**

4    Q.    So am I correct that the WPATH document that's

5    attached to your report is really a set of guidelines,

6    but not something that you would testify creates a

7    binding standard of care that must be followed by

8    physicians?

9    **A.    I would say that the document I'm now referring**

10   **to, the document, the Standards of Care, refers to**

11   **guidelines as to treatment for individuals with --**

12   **transgender individuals suffering from gender dysphoria,**

13   **gender diverse.**

14   Q.    Is it your opinion that the standard of care

15   that governs physicians practicing in -- let me ask you

16   this:  You're licensed in Illinois; correct?

17   **A.    I am.**

18   Q.    Are you licensed in other states?

19   **A.    No.**

20   Q.    Okay.  So is it your testimony that a doctor

21   licensed to practice in the state of Illinois, the

22   standard of care governing that doctor as a matter of

23   state law requires the involvement and concurrence of

24   two mental health professionals before a surgeon could

25   perform a hysterectomy with bilateral



20

1   salpingo-oophorectomy to alleviate gender dysphoria?

2       A.   The guidelines -- these guidelines are designed

3   to be individualized, so the particulars of a treatment

4   of a particular patient would depend upon the specifics

5   involved in that case.

6       Q.   And just so I'm clear -- well, let me ask you

7   this question:  Is it your opinion that to comply with

8   the standard of care governing physicians in the state

9   of Illinois, that the surgeon must consult with and

10  obtain concurrence of at least one mental health

11  professional before conducting a hysterectomy with

12  bilateral salpingo-oophorectomy to alleviate gender

13  dysphoria in a transgender male?

14      A.   So, again, these are guidelines that are

15  designed to be individual, depending on the particulars

16  of the case.  So if there's a specific incident, a

17  specific case, I can discuss that, but other than that,

18  these are individualized guidelines.

19      Q.   And I'm not sure that I got my question

20  answered.  Is it your opinion that a surgeon performing

21  a hysterectomy with bilateral salpingo-oophorectomy to

22  alleviate gender dysphoria in a transgender male would

23  be required under Illinois state law to consult with and

24  obtain concurrence of a mental health professional in

25  order to comply with the legal standard of care?



53

1      A.      We haven't made final determinations yet, so I

2  can't speak to whether or not there will be changes.

3      Q.      And back to my question, I understand there's

4  not one definitive, authoritative source in this area at

5  least, but if a doctor -- a surgeon who is considering

6  performing a surgical procedure on a transgender

7  individual for gender dysphoria, are the WPATH

8  guidelines something that you would consider that person

9  could use as a reliable authority on the topic?

10      A.      Well, as I said, I don't consider any one

11  document as authoritative.  This document is a

12  guideline.  The guidelines are individualized and

13  flexible and apply to the circumstances of the

14  individual person.

15      Q.      Doctor, I wanted to close the loop before we

16  went on about your billings, which are Exhibit 2.  I

17  think we have concluded that when you say in the work

18  "review of draft," that that mostly was preparing the

19  report in this case, and that your best estimate was

20  around 30 minutes of your total time was spent reviewing

21  the Arizona plan.

22              Was there anything besides those two items

23  of work, preparing the report and reviewing the Arizona

24  plan, that would be included with "review of draft"?

25      A.      That would be editing and reviewing the draft,



64

1    though, that Dr. Toomey is seeking the hysterectomy,

2    bilateral salpingo-oophorectomy for the treatment of

3    gender dysphoria?

4        **A.    I'm just going to look at the Amended Complaint**

5    **again before I answer.  Yes, it is.**

6        Q.    And so the deferral, the voluntary deferral

7    under my hypothetical of this treatment for gender

8    dysphoria, regardless of how long that deferral is, if

9    it was even just for the sole purpose of being a

10   plaintiff in this lawsuit does not affect your opinion

11   as to whether or not it is medically necessary?

12              MR. BLOCK:  Objection.

13       **A.    That is correct.**

14       Q.    BY MR. NORTHUP:  Now, I know you haven't spoken

15   with Dr. Toomey.  My understanding is it's never been,

16   as far as you know, the intention that if Dr. Toomey has

17   the hysterectomy, bilateral salpingo-oophorectomy, that

18   you would be the surgeon doing it; is that right?

19       **A.    Correct.**

20       Q.    Do you actually, Doctor, perform

21   hysterectomies, bilateral salpingo-oophorectomy?

22       **A.    Under an IRB protocol, in which I participate,**

23   **I am involved in the provision of surgical services for**

24   **hysterectomy and salpingo-oophorectomy.**

25       Q.    And what role -- you say an IRP protocol?



65

1    A.    IRB, as in boy, Institutional Review Board.

2    Q.    And what is IRB, Institutional Review Board?

3    A.    We have a -- I have a research interest in

4    uterine transplantation.

5    Q.    And so what role under that IRB protocol do you

6    play as part of your involvement with the provision of

7    services with a hysterectomy or an oophorectomy?

8    A.    Procuring the donor uterus and implanting the

9    donor uterus.

10   Q.    Have you ever done -- been involved in that

11   procuring and implanting the donor uterus in a

12   transsexual --

13   A.    Well, I assume you mean transgender.

14   Q.    Transgender, I'm sorry.  Transgender.

15   A.    That is the purpose of our IRB.

16   Q.    Is the purpose that that procedure would be

17   done on a transgender female?

18   A.    Ultimately, that the uterine procurement, the

19   donation, would be from a transgender man, and the

20   recipient would be a transgender woman.

21   Q.    Is it always from, the donor, a transgender

22   man?

23   A.    Is what?

24   Q.    In other words, is the donor, in your

25   experience, always a transgender man as opposed to a



66

1  cisgender woman?

2      A.    No, the uterine procurement may be from

3  altruistic donors.  Those may be cisgender women who are

4  voluntarily donating the uterus.  It may be performed

5  from heart beating, brain deceased, cisgender

6  individuals, and it may be performed from a transgender

7  man seeking hysterectomy and/or salpingo-oophorectomy.

8      Q.    And I take it the purpose of that surgery is

9  to -- is it to try to impart fertility on the recipient

10 or is it simply just to give them the organs that a

11 cisgender woman would have been born with?

12     A.    Ultimately, the goal would be to experience

13 live birth.

14     Q.    Is the technology -- has that ever happened?

15     A.    It has happened in cisgender women with the

16 condition of absolute uterine infertility.  Our plan is

17 to perform the procedure for transgender women.

18     Q.    And so back to, I guess, my original question,

19 other than the involvement of procuring and implanting a

20 uterus under the IRB protocol, does your practice

21 involve performing hysterectomies or

22 salpingo-oophorectomies?

23     A.    I assist in the procedure.  So, for example, as

24 of last week or the week before, I'll work with our

25 gynecologist, who is the primary surgeon, and then I



Toomey vs.
State of Arizona

Loren Schechter
June 15, 2021

67

1  will assist in that procedure.  I'm not the primary

2  surgeon, however, for that procedure.

3      Q.    Right.  And when you're talking about assisting

4  and not being the primary surgeon, that is in the

5  provision and implantation of a donor uterus under the

6  IRB protocol?

7      A.    No, no, now I'm not discussing the research

8  protocol.  For the provision of clinical services for

9  transgender men, I will assist the gynecologist

10  performing the hysterectomy, although I am not the

11  primary surgeon for that.

12      Q.    And in a situation -- you understand

13  Dr. Toomey, the procedure that he wants to have, which

14  is the hysterectomy, bilateral salpingo-oophorectomy,

15  would there be a reason in that surgery for a plastic

16  surgeon such as yourself to be involved or would it just

17  be a gynecologist?

18      A.    It would typically be a gynecologist unless an

19  additional procedure on the genitalia was also -- was

20  performed concurrently.

21      Q.    So if it was just the hysterectomy with

22  bilateral salpingo-oophorectomy, normally, you wouldn't

23  expect to have a plastic surgeon there?

24      A.    I would not typically be involved in that case.

25      Q.    And is it your understanding that Dr. Toomey



130

1  follow-up questions that counsel might ask you, that's

2  all I have.

3      **A.      Thank you.**

4              MR. NORTHUP:  Are we done?

5              (Discussion off the record.)

6              MS. COHAN:  Austin, do you have any

7  questions for Dr. Schechter?

8              MR. YOST:  I do not have any questions.

9              (Discussion off the record.)

10              MR. NORTHUP:  Okay.  So looks like no

11  questions.  He said you'll read and sign.  Doctor, I

12  appreciate your time.

13      **A.      Thank you very much.  Appreciate it.**

14              (3:40 p.m.)

15

16

17

18              _____

19                   LOREN SCHECHTER, M.D.

20

21

22

23

24

25

131

```
1  STATE OF ARIZONA    )
                       )  ss.
2  COUNTY OF MARICOPA  )

3        BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   foregoing pages are a full, true and accurate record of
5  the proceedings, all done to the best of my skill and
   ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
   direction.

7

8        I CERTIFY that I am in no way related to any of
   the parties hereto nor am I in any way interested in
9  the outcome hereof.

10           [X]  Review and signature was requested.
             []   Review and signature was waived/not
11 requested.

12

         I CERTIFY that I have complied with the ethical
13 obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
   J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 28th
14 of June, 2021.

15               /s/ Jennifer Hanssen
                 Jennifer Hanssen, RPR
16               Certified Reporter
                 Arizona CR No. 50165

17               *        *        *        *

18
         I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
19 complied with the ethical obligations set forth in ACJA
   7-206 (J)(1)(g)(1) through (6).

20

21               /s/ Pamela A. Griffin
                 _____
22               GRIFFIN GROUP INTERNATIONAL
                 Registered Reporting Firm
23               Arizona RRF No. R1005

24

25
```



# Exhibit C
# LODGED
# UNDER SEAL

# Exhibit D
# LODGED
# UNDER SEAL

# EXHIBIT E

**Medical Coverage Policy**



| | |
|---|---|
| Effective Date | 4/15/2019 |
| Next Review Date | 3/15/2020 |
| Coverage Policy Number | 0266 |

# Treatment of Gender Dysphoria

## Table of Contents

Overview ................................................................. 1
Coverage Policy ..................................................... 1
General Background ............................................... 5
Coding/Billing Information ..................................... 8
References ............................................................ 12

## Related Coverage Resources

Blepharoplasty, Reconstructive Eyelid Surgery, and Brow Lift
Breast Reconstruction Following Mastectomy or Lumpectomy
Dermabrasion and Chemical Peels
Endometrial Ablation
Infertility Services
Male Sexual Dysfunction Treatment: Non-pharmacologic
Panniculectomy and Abdominoplasty
Preventive Care Services
Reduction Mammoplasty
Rhinoplasty, Vestibular Stenosis Repair, and Septoplasty
Redundant Skin Surgery
Speech Therapy

---

***INSTRUCTIONS FOR USE***
*The following Coverage Policy applies to health benefit plans administered by Cigna Companies. Certain Cigna Companies and/or lines of business only provide utilization review services to clients and do not make coverage determinations. References to standard benefit plan language and coverage determinations do not apply to those clients. Coverage Policies are intended to provide guidance in interpreting certain standard benefit plans administered by Cigna Companies. Please note, the terms of a customer's particular benefit plan document [Group Service Agreement, Evidence of Coverage, Certificate of Coverage, Summary Plan Description (SPD) or similar plan document] may differ significantly from the standard benefit plans upon which these Coverage Policies are based. For example, a customer's benefit plan document may contain a specific exclusion related to a topic addressed in a Coverage Policy. In the event of a conflict, a customer's benefit plan document always supersedes the information in the Coverage Policies. In the absence of a controlling federal or state coverage mandate, benefits are ultimately determined by the terms of the applicable benefit plan document. Coverage determinations in each specific instance require consideration of 1) the terms of the applicable benefit plan document in effect on the date of service; 2) any applicable laws/regulations; 3) any relevant collateral source materials including Coverage Policies and; 4) the specific facts of the particular situation. Coverage Policies relate exclusively to the administration of health benefit plans. Coverage Policies are not recommendations for treatment and should never be used as treatment guidelines. In certain markets, delegated vendor guidelines may be used to support medical necessity and other coverage determinations.*

## Overview

This Coverage Policy addresses treatment of gender dysphoria. Gender dysphoria is defined as discomfort or distress that is caused by a discrepancy between a person's gender identity and the person's assigned sex at birth (World Professional Association for Transgender Health, [WPATH], 2012).

## Coverage Policy

**Coverage for treatment of gender dysphoria varies across plans. Refer to the customer's benefit plan document for coverage details. Coverage for treatment of gender dysphoria, including gender reassignment surgery and related may be governed by state and/or federal mandates.**

AZSTATE.153283

**Unless otherwise specified in a benefit plan, the following conditions of coverage apply for treatment of gender dysphoria and/or gender reassignment surgery and related procedures, including all applicable benefit limitations, precertification, or other medical necessity criteria.**

<u>**SERVICES MEDICALLY NECESSARY**</u>
**Medically necessary treatment for an individual with gender dysphoria may include ANY of the following services, when services are available in the benefit plan:**

- Behavioral health services, including but not limited to, counseling for gender dysphoria and related psychiatric conditions (e.g., anxiety, depression)
- Hormonal therapy, including but not limited to androgens, anti-androgens, GnRH analogues, estrogens, and progestins.
- Laboratory testing to monitor prescribed hormonal therapy
- Age-related, gender-specific services, including but not limited to preventive health, as appropriate to the individuals biological anatomy (e.g., cancer screening [e.g., cervical,  breast,  prostate]; treatment of a prostate medical condition)
- Gender reassignment and related surgery (see below).

<u>**Gender Reassignment Surgery**</u>

**Gender reassignment surgery (see Table 1) is considered medically necessary treatment of gender dysphoria when the individual is age 18 years or older and when the following criteria are met:**

- **For initial mastectomy:** one letter of support from a qualified mental health professional

  <u>**NOTE:**</u> The Women's Health and Cancer Rights Act (WHCRA), 29 U.S. Code § 1185b requires coverage of certain post-mastectomy services related to breast reconstruction and treatment of physical complications from mastectomy including nipple-areola reconstruction.

- **For hysterectomy, salpingo-oophorectomy, orchiectomy:**
  - ➢ documentation of at least 12 months of continuous hormonal sex reassignment therapy AND
  - ➢ recommendation for sex reassignment surgery (i.e., genital surgery) by two qualified mental health professionals with written documentation submitted to the physician performing the genital surgery. If the first referral is from the individual's psychotherapist, the second referral should be from a person who has only had an evaluative role with the individual. Two separate letters, or one letter signed by both [for example, if practicing within the same clinic] are required.

- **For reconstructive genital surgery:**
  - ➢ documentation of at least 12 months of continuous hormonal sex reassignment therapy AND
  - ➢ recommendation for sex reassignment surgery (i.e., genital surgery) by two qualified mental health professionals with written documentation submitted to the physician performing the genital surgery (If the first referral is from the individual's psychotherapist, the second referral should be from a person who has only had an evaluative role with the individual. Two separate letters, or one letter signed by both [for example, if practicing within the same clinic] are required AND
  - ➢ documentation the individual has lived for at least 12 continuous months in a  gender role that is congruent with their gender identity.

<u>**Table 1:**</u> **Gender Reassignment Surgery**

| Procedure | CPT / HCPCS codes (This list may not be all inclusive) |
|---|---|
| Initial mastectomy*, nipple-areola reconstruction (related to mastectomy or post mastectomy reconstruction) | 19303, 19304, 19350 |
| Hysterectomy and salpingo-oophorectomy | 58150, 58260 58262  58291, 58552, 58554, |

AZSTATE.153284

| | 58571, 58573, 58661 |
|---|---|
| Female to male reconstructive genital surgery which may include any of the following: | 55980 |
| Vaginectomy**/colpectomy | 57110 |
| Vulvectomy | 56625 |
| Metoidioplasty | 58999 |
| Phalloplasty | 58999 |
| Electrolysis of donor site tissue to be used for phalloplasty | 17380 |
| Penile prosthesis (noninflatable / inflatable), including surgical correction of malfunctioning pump, cylinders, or reservoir | 54400, 54401, 54405, C1813, C2622 |
| Urethroplasty /urethromeatoplasty | 53430, 53450 |
| Orchiectomy | 54520, 54690 |
| Male to female reconstructive genital surgery, which may include any of the following: | 55970 |
| Vaginoplasty**, (e.g, construction of vagina with/without graft,  colovaginoplasty) | 57291, 57292, 57335 |
| Electrolysis of donor site tissue to be used to line the vaginal canal for vaginoplasty | 17380 |
| Penectomy | 54125 |
| Vulvoplasty, (e.g.,  labiaplasty, clitoroplasty, penile skin inversion) | 56620, 56805 |
| Repair of introitus | 56800 |
| Coloproctostomy | 44145, 55899 |

**\*Note:** Please reference the Cigna Medical Coverage Policy 0152 Reduction Mammoplasty for conditions of coverage related to breast reduction.

**\*\*Note:** For individuals considering hysterectomy/salpingo-oophorectomy, orchiectomy, vaginectomy or vaginoplasty procedures a total of 12 months continuous hormonal sex reassignment therapy is required.  An additional 12 months of hormone therapy is not required for vaginectomy or vaginoplasty procedures.

**NOT MEDICALLY NECESSARY SERVICES**
**Gender reassignment surgery is considered not medically necessary when the applicable medical necessity criteria for the procedure(s) has not been met.**

**Each of the following is excluded under many benefit plans and/or considered not medically necessary as part of gender reassignment for preservation of fertility (see Table 2):**

**Table: 2** Excluded and/or Not Medically Necessary- Fertility Preservation

| Procedure | CPT/HCPCS Code |
|---|---|
| Cryopreservation of embryo, sperm, oocytes | 89258, 89259, 89337 |
| Procurement of embryo, sperm, oocytes | S4030, S4031 |
| Storage of embryo, sperm, oocytes | 89342, 89343, 89346, S4027, S4040 |

**EXPERIMENTAL /INVESTIGATIONAL/UNPROVEN SERVICES**
**Each of the following is considered experimental, investigational or unproven as part of gender reassignment for the preservation of fertility (see Table 3):**

AZSTATE.153285

**Table: 3 Experimental, Investigational or Unproven - Fertility Preservation**

| Procedure | CPT/HCPCS Code |
|---|---|
| Cryopreservation of immature oocytes | 0357T |
| Cryopreservation of reproductive tissue (i.e., ovaries, testicular tissue) | 89335, 0058T |
| Storage of reproductive tissue (i.e., ovaries, testicular tissue) | 89344 |
| Thawing of reproductive tissue (i.e., ovaries, testicular tissue) | 89354 |

## COSMETIC SERVICES
**Each of the following services (see Table 4) is considered cosmetic and/or not medically necessary for the purpose of improving or altering appearance or self-esteem related to one's appearance, including gender specific appearance for an individual with gender dysphoria:**

**Table 4:  Cosmetic and/or Not Medically Necessary (Unless coverage is specifically listed as available in the applicable benefit plan document)**

| Facial Feminization/Masculinization Procedures | CPT/HCPCS Code |
|---|---|
| Blepharoplasty | 15820, 15821, 15822, 15823 |
| Cheek/malar implants | 17999 |
| Chin/nose implants | 21210, 21270, 30400, 30410, 30420, 30430 30435, 30450 |
| Collagen injections | 11950, 11951, 11952, 11954 |
| Face/forehead lift | 15824, 15825, 15826, 15828, 15829, 21137 |
| Facial bone reduction (osteoplasty) | 21209 |
| Hair removal/hair transplantation | 15775, 15776, 17380 |
| Jaw reduction | 21120, 21121, 21122, 21223, 21125, 21127 |
| Laryngoplasty | 31599 |
| Rhinoplasty | 21210, 21270, 30400, 30410, 30420, 30430, 30435, 30450 |
| Skin resurfacing (e.g., dermabrasion, chemical peels) | 15780, 15781, 15782, 15783, 15786, 15787, 15788, 15789, 15792, 15793 |
| Thyroid reduction chondroplasty | 31750 |
| Neck tightening | 15825 |

| Chest Reconstruction Procedures | CPT/HCPCS Code |
|---|---|
| Breast augmentation with implants | 19324, 19325, 19340, 19342, C1789 |
| Mastopexy | 19316 |
| Nipple/areola reconstruction (unrelated to mastectomy or post mastectomy reconstruction) | 19350 |
| Pectoral Implants | L8600, 17999 |

| Voice Modification Therapy/Procedures | CPT/HCPCS Code |
|---|---|
| Voice modification surgery | 31599, 31899 |
| Voice therapy/voice lessons | 92507 |

| Other Miscellaneous Procedures | CPT/HCPCS Code |
|---|---|
| Abdominoplasty | 15847 |

AZSTATE.153286

| Calf implants | 17999 |
|---|---|
| Electrolysis, other than when performed pre-vaginoplasty as outlined above | 17380 |
| Insertion of testicular prosthesis | 54660 |
| Removal of redundant skin | 15830, 15832, 15833, 15834, 15835, 15836 15837, 15838, 15839 |
| Replacement of tissue expander with permanent prosthesis testicular insertion | 11970 |
| Scrotoplasty | 55175, 55180 |
| Suction assisted lipoplasty, lipofilling, and/or liposuction | 15830, 15832, 15833, 15834, 15835, 15836, 15837, 15838, 15839, 15876, 15877, 15878, 15879 |
| Testicular expanders, including replacement with prosthesis, testicular prosthesis | 11960, 11970, 11971, 54660 |

## General Background

The causes of gender dysphoria and the developmental factors associated with them are not well-understood. Treatment of individuals with gender dysphoria varies, with some treatments involving a change in gender expression or body modifications.  The term "transsexual" refers to an individual whose gender identity is not congruent with their genetic and/or assigned sex and usually seeks hormone replacement therapy (HRT) and possibly gender-affirmation surgery to feminize or masculinize the body and who may live full-time in the crossgender role. Transsexualism is a form of gender dysphoria. Other differential diagnoses include, but are not limited to, partial or temporary disorders as seen in adolescent crisis, transvestitism, refusal to accept a homosexual orientation, psychotic misjudgments of gender identity and severe personality disorders (Becker, et al., 1998). Individuals that are transsexual, transgender, or gender nonconforming (i.e., gender identity differs from the cultural norm) may experience gender dysphoria.

Treatment of gender dysphoria is unique to each individual and may or may not involve body modifications. Some individuals require only psychotherapy, some require a change in gender roles/expression, and others require hormone therapy and/or surgery to facilitate a gender transition.

**Behavioral Health Services**
Licensing requirements and scope of practice vary by state for healthcare professionals. WPATH has defined recommended minimum credentials for a mental health professional to be qualified to evaluate or treat adult individuals with gender dysphoria. In addition to general licensing requirements, WPATH includes a minimum of a Master's or more advanced degree from an accredited institution, an ability to recognize and diagnose coexisting mental health concerns, and an ability to distinguish such conditions from gender dysphoria. Mental health professionals play a strong role in working with individuals with gender dysphoria as they need to diagnose the gender disorder and any co-morbid psychiatric conditions accurately, counsel the individual regarding treatment options, and provide psychotherapy (as needed) and assess eligibility and readiness for hormone and surgical therapy. For children and adolescents, the mental health professional should also be trained in child and adolescent developmental psychopathology.

Once the individual is evaluated, the mental health professional provides documentation and formal recommendations to medical and surgical specialists. Documentation for hormonal and/or surgery should be comprehensive and include the extent to which eligibility criteria have been met (i.e., confirmed gender dysphoria, capacity to make a fully informed decision, age ≥ 18 years or age of majority, and other significant medical or behavioral health concerns are well-controlled), in addition to the following:

- individual's general identifying characteristics
- the initial and evolving gender, sexual and psychiatric diagnoses
- details regarding the type and duration of psychotherapy or evaluation the individual received
- the mental health professional's rationale for hormone therapy or surgery
- the degree to which the individual has followed the standards of care and likelihood of continued compliance

AZSTATE.153287

- whether or not the mental health professional is a part of a gender team

For breast surgery WPATH Standards of Care Version 7 require one referral from a qualified mental health professional, as defined above. For genital surgery WPATH requires two referrals from qualified mental health professionals indicating criteria for surgery has been met.  In contrast, the Endocrine Society Clinical Practice Guidelines (Hembree, et al., 2009) recommend both an endocrinologist responsible for endocrine transition therapy and a mental health professional certify the individual is eligible and meets WPATH criteria for gender reassignment surgery.

Psychiatric care may need to continue for several years after gender reassignment surgery, as major psychological adjustments may continue to be necessary. Other providers of care may include a family physician or internist, endocrinologist, urologist, plastic surgeon, general surgeon and gynecologist. The overall success of the surgery is highly dependent on psychological adjustment and continued support.

After diagnosis, the therapeutic approach is individualized but generally includes three elements: sex hormone therapy of the identified gender, real life experience in the desired role, and surgery to change the genitalia and other sex characteristics.

<u>Hormonal Therapy</u>
For both adults and adolescents, hormonal treatment for gender dysphoria must be administered and monitored by a qualified healthcare practitioner as therapy requires ongoing medical management, including physical examination and laboratory evaluation studies to manage dosage, side effects, etc. Lifelong maintenance is usually required.

**Adults:** Prior to and following gender reassignment surgery, individuals undergo hormone replacement therapy, unless medically contraindicated. Biological males are treated with estrogens and anti-androgens to increase breast size, redistribute body fat, soften skin, decrease body hair, and decrease testicular size and erections. Biological females are treated with androgens such as testosterone to deepen voice, increase muscle and bone mass, decrease breast size, increase clitoris size, and increase facial and body hair. In both sexes hormone replacement therapy (HRT) may be effective in reducing the adverse psychologic impact of gender dysphoria. Hormone therapy is usually initiated upon referral from a qualified mental health professional or a health professional competent in behavioral health and gender dysphoria treatment specifically. Twelve months of continuous hormone therapy (gender appropriate) is required prior to hysterectomy and salpingo-oophorectomy and orchiectomy.

**Adolescents:** Puberty-suppressing hormones (e.g., GnRH analogues) for adolescents may be provided to individuals who have reached at least Tanner stage 2 of sexual development. The Endocrine Society supports puberty suppression and has developed criteria for a subset of individuals who fulfill and meet eligibility readiness for gender reassignment (Hembree, et al., 2009).  WPATH clinical recommendations also support puberty suppression (WPATH, 2012) for a similar subset of individuals. Consistent with adult hormone therapy, treatment of adolescents involves a multidisciplinary team, however when treating an adolescent a pediatric endocrinologist should be included as a part of the team. Pre-pubertal hormone suppression differs from hormone therapy used in adults and may not be without consequence; some pharmaceutical agents may cause negative physical side effects (e.g., height, bone growth).

<u>Gender Reassignment Surgery</u>
The term "gender reassignment surgery," also known as sexual reassignment surgery, gender confirming surgery or gender affirmation surgery, may be part of a treatment plan for gender dysphoria. The terms may be used to refer to either the reconstruction of male or female genitalia specifically, or the reshaping by any surgical procedure of a male body into a body with female appearance, or vice versa.

Gender identity disorder does not persist into adolescence in most children (Hembree, et al., 2009). Evidence suggests that 75-80% of prepubertal children do not turn out to be transsexual in adolescence (Hembree, et al., 2009). According to WPATH (2007) persistence of gender dysphoria from adolescence into adulthood is much higher. Performing gender reassignment surgery prior to age 18, or the legal age to give consent, is not recommended by professional societies (American College of Obstetricians and Gynecology [ACOG], 2017;

AZSTATE.153288

WPATH, 2012; American Psychiatric Association (APA), 2012, Endocrine Society, 2009). Gender reassignment surgery is intended to be a permanent change (non-reversible), establishing congruency between an individual's gender identity and physical appearance. Therefore, a careful and accurate diagnosis is essential for treatment and can be made only as part of a long-term diagnostic process involving a multidisciplinary specialty approach that includes an extensive case history; gynecological, endocrine and urological examination, and a clinical psychiatric/psychological examination. Individuals who choose to undergo gender reassignment surgery must be fully informed regarding treatment options with confirmation from the mental health professional that the individual is considered a candidate for surgical treatment.

Twelve months of continuous hormone therapy is required prior to irreversible genital surgery. In addition, prior to surgery the individual identified with gender dysphoria must undergo a "real life experience," in which he/she adopts the new or evolving gender role and lives in that role for at least 12 continuous months as part of the transition pathway. This process assists in confirming the person's desire for gender role change, ability to function in this role long-term, as well as the adequacy of his/her support system. During this time, a person would be expected to maintain their baseline functional lifestyle, participate in community activities, and provide an indication that others are aware of the change in gender role.

## Other Associated Surgical Procedures
**Services Otherwise Medically Necessary:** Age appropriate gender-specific services that would otherwise be considered medically necessary remain medically necessary services for transgender individuals, as appropriate to their biological anatomy. Examples include (but are not limited to):
- for female to male transgender individuals who have not undergone a mastectomy, breast cancer and cervical cancer screening
- for male to female transgender individuals who have retained their prostate cancer screening or treatment of a prostate condition.

**Reversal of Gender Reassignment:** Gender reassignment surgery is considered an irreversible intervention (WPATH, 2012). Although infrequent, surgery to reverse a partially or fully completed gender reassignment (reversal of surgery to revise secondary sex characteristics), may be necessary as a result of a complication (i.e., infection) or other medical condition necessitating surgical intervention.

**Fertility Preservation**: Both hormone therapy and gender reassignment surgery limits fertility, and individuals should be informed of sperm preservation options and other cryopreservation services prior to starting hormone therapy. Reproductive options should also be discussed prior to surgery for individuals who are of child-bearing age. However, procedures aimed at preservation of fertility (e.g., procurement, cryopreservation, and storage of sperm, oocytes and/or embryos) performed prior to gender reassignment surgery are considered not medically necessary. Please refer to the applicable benefit plan document for terms, conditions, and limitations, and applicable Cigna Medical Coverage Policy for conditions of coverage.

**Cosmetic Procedures:** Various other surgical procedures may be performed as part of gender reassignment surgery. Although WPATH does not define medical necessity criteria for masculinization and feminization procedures, referral by a qualified mental health professional is recommended. When performed as part of gender reassignment surgery such procedures, aimed primarily at improving personal appearance (i.e., masculinization, feminization), are performed to assist with improving culturally appropriate male or female appearance characteristics and are therefore considered cosmetic and are not medically necessary. Please refer to the applicable benefit plan document for terms, conditions, and limitations, and applicable Cigna Medical Coverage Policy for conditions of coverage.

## Professional Society/Organization
**American College of Obstetricians and Gynecologists (ACOG):** ACOG published a Committee Opinion in 2017 for the care of transgender adolescents. Within this document regarding surgical management ACOG notes transgender male patients may undergo phalloplasty when one reaches the age of majority, and a transgender female patient may undergo vaginoplasty when one reaches the age of majority.  In addition the authors acknowledge the Endocrine Society guidelines (Hembree, et al., 2009) which state that an individual is at least age 18 years for genital reconstructive surgery (ACOG, 2017).

AZSTATE.153289

**American Psychiatric Association (APA):** In 2012 the APA published a task force report on treatment of gender identity disorder.  Within this document, regarding adolescents specifically, the authors state the evidence is inadequate to develop a guideline regarding the timing of sex reassignment surgery. However the task force acknowledges the Endocrine Society guidelines (Hembree, et al., 2009) and  that given the irreversible nature of surgery, for adolescents most clinicians advise waiting until the individual has attained the age of legal consent and a degree of independence (APA, 2012).

**WPATH Standards of Care:** The World Professional Association for Transgender Health (WPATH) promotes standards of health care for individuals through the articulation of "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People" (WPATH, 2012, Version 7).  WPATH standards of care are based on scientific evidence and expert consensus and are commonly utilized as clinical recommendations for individuals seeking treatment of gender disorders.

**Endocrine Society**: In 2009 the Endocrine Society published a clinical practice guideline for endocrine treatment of transsexual persons (Hembree, et al., 2009). As part of this guideline, the endocrine society recommends that transsexual persons consider genital sex reassignment surgery only after both the physician responsible for endocrine transition therapy and the mental health professional find surgery advisable; that surgery be recommended only after completion of at least one year of consistent and compliant hormone treatment; and that the physician responsible for endocrine treatment medically clear the individual for sex reassignment surgery and collaborate with the surgeon regarding hormone use during and after surgery.

**Centers for Medicare & Medicaid Services (CMS**
- National Coverage Determination (NCD): No NCD found.
- Local Coverage Determination (LCD): No LCD found.

**Use Outside of the US:**  Several other countries including the United Kingdom offer treatment options for individuals with gender dysphoria. Treatments are similar to those offered in the United States.

## Coding/Billing Information

**Note:** 1) This list of codes may not be all-inclusive.
　　　2) Deleted codes and codes which are not effective at the time the service is rendered may not be eligible for reimbursement.

**Intersex Surgery: Male to Female**

**Considered Medically Necessary when criteria in the applicable policy statements listed above are met:**

| CPT®* Codes | Description |
|---|---|
| 55970† | Intersex surgery; male to female |
| | †**Includes only the following procedures:** |
| 44145 | Colectomy, partial; with coloproctostomy (low pelvic anastomosis) |
| 54125 | Amputation of penis; complete |
| 54520 | Orchiectomy, simple (including subcapsular), with or without testicular prosthesis, scrotal or inguinal approach |
| 54690 | Laparoscopy, surgical; orchiectomy |
| 55899†† | Unlisted procedure, male genital system |
| 56620 | Vulvectomy simple; partial |
| 56800 | Plastic repair of introitus |
| 56805 | Clitoroplasty for intersex state |
| 57291 | Construction of artificial vagina; without graft |
| 57292 | Construction of artificial vagina; with graft |
| 57335 | Vaginoplasty for intersex state |

AZSTATE.153290

††**Note:  Considered medically necessary when used to report Coloproctostomy.**

**Intersex Surgery: Female to Male**

**Considered Medically Necessary when criteria in the applicable policy statements listed above are met:**

| CPT®* Codes | Description |
|---|---|
| 55980† | Intersex surgery, female to male |
|  | †**Includes only the following procedures:** |
| 19303 | Mastectomy, simple, complete |
| 19304 | Mastectomy, subcutaneous |
| 19350†† | Nipple/areola reconstruction |
| 53430 | Urethroplasty, reconstruction of female urethra |
| 53450 | Urethromeatoplasty, with mucosal advancement |
| 54400 | Insertion of penile prosthesis; non-inflatable (semi-rigid) |
| 54401 | Insertion of penile prosthesis; inflatable (self-contained) |
| 54405 | Insertion of multi-component, inflatable penile prosthesis, including placement of pump, cylinders, and reservoir |
| 56625 | Vulvectomy simple; complete |
| 57110 | Vaginectomy, complete removal of vaginal wall |
| 58150 | Total abdominal hysterectomy (corpus and cervix), with or without removal of tube(s), with or without removal of ovary(s) |
| 58260 | Vaginal hysterectomy, for uterus 250 g or less |
| 58262 | Vaginal hysterectomy, for uterus 250 g or less; with removal of tube(s), and/or ovary(s) |
| 58291 | Vaginal hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58552 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58554 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58571 | Laparoscopy, surgical, with total hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58573 | Laparoscopy, surgical, with total hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58661 | Laparoscopy, surgical; with removal of adnexal structures (partial or total oophorectomy and/or salpingectomy) |
| 58999††† | Unlisted procedure, female genital system (nonobstetrical) |

††**Note: Considered medically necessary when performed as part of a mastectomy or breast reconstruction procedure following a mastectomy.**

†††**Note:  Considered medically necessary when used to report metoidioplasty with phalloplasty.**

| HCPCS Codes | Description |
|---|---|
| C1813 | Prosthesis, penile, inflatable |
| C2622 | Prosthesis, penile, non-inflatable |

| ICD-10-CM Diagnosis Codes | Description |
|---|---|
| F64.0 | Trans-sexualism |

AZSTATE.153291

| F64.1 | Dual role transvestism |
|---|---|
| F64.2 | Gender identity disorder of childhood |
| F64.8 | Other gender identity disorders |
| F64.9 | Gender identity disorder, unspecified |
| Z87.890 | Personal history of sex reassignment |

**Generally Excluded/Not Medically Necessary:**

| CPT®* Codes | Description |
|---|---|
| 89258 | Cryopreservation; embryo(s) |
| 89259 | Cryopreservation; sperm |
| 89337 | Cryopreservation, mature oocyte(s) |
| 89342 | Storage (per year); embryo(s) |
| 89343 | Storage (per year); sperm/semen |
| 89346 | Storage (per year); oocyte(s) |

| HCPCS Codes | Description |
|---|---|
| S4027 | Storage of previously frozen embryos |
| S4030 | Sperm procurement and cryopreservation services; initial visit |
| S4031 | Sperm procurement and cryopreservation services; subsequent visit |
| S4040 | Monitoring and storage of cryopreserved embryos, per 30 days |

**Considered Experimental/Investigational/Unproven:**

| CPT®* Codes | Description |
|---|---|
| 89335 | Cryopreservation, reproductive tissue, testicular |
| 89344 | Storage (per year); reproductive tissue, testicular/ovarian |
| 89354 | Thawing of cryopreserved; reproductive tissue, testicular/ovarian |
| 0058T | Cryopreservation; reproductive tissue, ovarian |
| 0357T | Cryopreservation; immature oocyte(s) |

**Considered Cosmetic and/or not medically necessary when performed as a component of gender reassignment, even when coverage for gender reassignment surgery exists unless subject to a coverage mandate:**

| CPT®* Codes | Description |
|---|---|
| 11950 | Subcutaneous injection of filling material (eg, collagen); 1 cc or less |
| 11951 | Subcutaneous injection of filling material (eg, collagen); 1.1 to 5.0 cc |
| 11952 | Subcutaneous injection of filling material (eg, collagen); 5.1 to 10.0 cc |
| 11954 | Subcutaneous injection of filling material (eg, collagen); over 10.0 cc |
| 11960 | Insertion of tissue expander(s) for other than breast, including subsequent expansion |
| 11970 | Replacement of tissue expander with permanent prosthesis |
| 11971 | Removal of tissue expander(s) without insertion of prosthesis |
| 15775 | Punch graft for hair transplant; 1 to 15 punch grafts |
| 15776 | Punch graft for hair transplant; more than 15 punch grafts |
| 15780 | Dermabrasion; total face (eg, for acne scarring, fine wrinkling, rhytids, general keratosis) |
| 15781 | Dermabrasion; segmental, face |
| 15782 | Dermabrasion; regional, other than face |
| 15783 | Dermabrasion; superficial, any site (eg, tattoo removal) |
| 15786 | Abrasion; single lesion (eg, keratosis, scar) |
| 15787 | Abrasion; each additional 4 lesions or less (List separately in addition to code for primary |

AZSTATE.153292

| | procedure) |
|---|---|
| 15788 | Chemical peel, facial; epidermal |
| 15789 | Chemical peel, facial; dermal |
| 15792 | Chemical peel, nonfacial; epidermal |
| 15793 | Chemical peel, nonfacial; dermal |
| 15820 | Blepharoplasty, lower eyelid |
| 15821 | Blepharoplasty, lower eyelid with extensive herniated fat pad |
| 15822 | Blepharoplasty, upper eyelid |
| 15823 | Blepharoplasty, upper eyelid; with excessive skin weighting down lid |
| 15824 | Rhytidectomy, forehead |
| 15825 | Rhytidectomy; neck with platysmal tightening (platysmal flap, P-flap) |
| 15826 | Rhytidectomy; glabellar frown lines |
| 15828 | Rhytidectomy; cheek, chin, and neck |
| 15829 | Rhytidectomy; superficial musculoaponeurotic system (SMAS) flap |
| 15830 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); abdomen, infraumbilical panniculectomy |
| 15832 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); thigh |
| 15833 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); leg |
| 15834 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); hip |
| 15835 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); buttock |
| 15836 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); arm |
| 15837 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); forearm or hand |
| 15838 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); submental fat pad |
| 15839 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); other area |
| 15847 | Excision, excessive skin and subcutaneous tissue (includes lipectomy), abdomen (eg, abdominoplasty) (includes umbilical transposition and fascial plication) (List separately in addition to code for primary procedure) |
| 15876 | Suction assisted lipectomy; head and neck |
| 15877 | Suction assisted lipectomy; trunk |
| 15878 | Suction assisted lipectomy; upper extremity |
| 15879 | Suction assisted lipectomy; lower extremity |
| 17380 | Electrolysis epilation, each 30 minutes |
| 17999† | Unlisted procedure, skin, mucous membrane and subcutaneous tissue |
| 19316 | Mastopexy |
| 19324 | Mammaplasty, augmentation; without prosthetic implant |
| 19325 | Mammaplasty, augmentation; with prosthetic implant |
| 19340 | Immediate insertion of breast prosthesis following mastopexy, mastectomy or in reconstruction |
| 19342 | Delayed insertion of breast prosthesis following mastopexy, mastectomy or in reconstruction |
| 19350†† | Nipple/areola reconstruction |
| 21120 | Genioplasty; augmentation (autograft, allograft, prosthetic material) |
| 21121 | Genioplasty; sliding osteotomy, single piece |
| 21122 | Genioplasty; sliding osteotomies, 2 or more osteotomies (eg, wedge excision or bone wedge reversal for asymmetrical chin) |
| 21123 | Genioplasty; sliding, augmentation with interpositional bone grafts (includes obtaining autografts) |
| 21125 | Augmentation, mandibular body or angle; prosthetic material |
| 21127 | Augmentation, mandibular body or angle; with bone graft, onlay or interpositional (includes obtaining autograft) |
| 21137 | Reduction forehead; contouring only |
| 21209 | Osteoplasty, facial bones; reduction |
| 21210 | Graft, bone; nasal, maxillary or malar areas (includes obtaining graft) |
| 21270 | Malar augmentation, prosthetic material |
| 30400 | Rhinoplasty, primary; lateral and alar cartilages and/or elevation of nasal tip |

AZSTATE.153293

| 30410 | Rhinoplasty, primary; complete, external parts including bony pyramid, lateral and alar cartilages, and/or elevation of nasal tip |
| 30420 | Rhinoplasty, primary; including major septal repair |
| 30430 | Rhinoplasty, secondary; minor revision (small amount of nasal tip work) |
| 30435 | Rhinoplasty, secondary; intermediate revision (bony work with osteotomies) |
| 30450 | Rhinoplasty, secondary; major revision (nasal tip work and osteotomies) |
| 31599††† | Unlisted procedure, larynx |
| 31750 | Tracheoplasty; cervical |
| 31899†††† | Unlisted procedure, trachea, bronchi |
| 40799††††† | Unlisted procedure, lips |
| 54660 | Insertion of testicular prosthesis (separate procedure) |
| 55175 | Scrotoplasty; simple |
| 55180 | Scrotoplasty; complicated |
| 92507 | Treatment of speech, language, voice, communication, and/or auditory processing disorder; individual |

| HCPCS Codes | Description |
| --- | --- |
| C1789 | Prosthesis, breast (implantable) |
| L8600 | Implantable breast prosthesis, silicone or equal |

†**Note:  Cosmetic and/or not medically necessary when used to report calf, cheek, malar or pectoral implants or fat transfers performed in conjunction with gender reassignment surgery, even when coverage for gender reassignment surgery exists.**

††**Note: Cosmetic and/or not medically necessary when not performed as part of a mastectomy or breast reconstructive procedure.**

†††**Note:  Cosmetic and/or not medically necessary when used to report laryngoplasty performed in conjunction with gender reassignment surgery, even when coverage for gender reassignment surgery exists.**

††††**Note: Cosmetic and/or not medically necessary when used to report voice modification surgery performed in conjunction with gender reassignment surgery, even when coverage for gender reassignment surgery exists.**

†††††**Note: Cosmetic and/or not medically necessary when used to report lip reduction/enhancement performed in conjunction with gender reassignment surgery, even when coverage for gender reassignment surgery exists.**

**\*Current Procedural Terminology (CPT®) ©2018 American Medical Association: Chicago, IL.**

## References

1. American Academy of Pediatrics (AAP). Ensuring Comprehensive care and support for transgender and gender diverse children and adolescents. Policy statement. Pediatrics. Volume 142(4):October 2018.

2. American College of Obstetricians and Gynecologists (ACOG). Healthcare for Transgender Individuals. Committee Opinion. Number 512, December 2011. Obstet Gynecol 2011:118:1454-8

3. American Psychiatric Association (APA). Report of the APA task force on treatment of gender identity disorder. Am J Psychiatry 169:8, August 2012.

4. Becker S, Bosinski HAG, Clement U, Eicher WM, Goerlich TM, Hartmann U, et al. (1998) German standards for the treatment and diagnostic assessment of transsexuals. IJT 2/4. Accessed November

AZSTATE.153294

19, 2014. Available at URL address: http://www.iiav.nl/ezines/web/IJT/97-03/numbers/symposion/ijtc0603.htm

5. Centers for Medicare and Medicaid Services. Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N). June 2016. Accessed March 5, 2019. Available at URL address: https://www.cms.gov/medicare-coverage-database/details/nca-proposed-decision-memo.aspx?NCAId=282

6. Committee on Adolescent Health Care. Committee Opinion No. 685: Care for Transgender Adolescents. Obstet Gynecol. 2017 Jan;129(1):e11-e16.

7. Day P. Trans-gender Reassignment Surgery. Tech Brief Series. New Zealand Health Technology Assessment. NZHTA Report February 2002, Volume 1, Number 1. Accessed March 5, 2019. Available at URL address: http://nzhta.chmeds.ac.nz/index.htm#tech

8. Diagnostic and Statistical Manual of Mental Disorders Fourth Edition. Text Revision (DSM-IV -TR). American Psychiatric Association. American Psychiatric Association, Incorporated. July 2000.

9. Hayes, Inc. Hayes Medical Technology Directory Report. Sex Reassignment Surgery for the Treatment of Gender Dysphoria. Landsdale, PA: Hayes, Inc.; August 2018

10. Hayes, Inc. Hayes Medical Technology Directory Report. Ancillary Procedures and Services for the Treatment of Gender Dysphoria. Landsdale, PA: Hayes, Inc.; May 2014.

11. Hayes, Inc. Hayes MedicalTechnology Directory Report. Hormone Therapy for the Treatment of Gender Dysphoria. Landsdale, PA: Hayes, Inc. August 2018.

12. Hayes, Inc. Search and Summary. Suppression of Puberty in Adolescents with Gender Dysphoria. Landsdale, PA: Hayes, Inc.; March 2017.

13. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ 3rd, Spack NP, Tangpricha V, Montori VM; Endocrine Society. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab. 2009 Sep;94(9):3132-54.

14. Landen M, Walinder J, Hambert G, Lundstrom B. Factors predictive of regret in sex reassignment. Acta Psychiatr Scand. 1998 Apr;97(4):284-9.

15. Lawrence AA. Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. Arch Sex Behav. 2003 Aug;32(4):299-315.

16. Maharaj NR, Dhai A, Wiersma R, Moodley J. Intersex conditions in children and adolescents: surgical, ethical, and legal considerations. J Pediatr Adolesc Gynecol. 2005 Dec;18(6):399-402.

17. Milrod C, Karasic DH. Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States. J Sex Med. 2017 Apr;14(4):624-634.

18. Moore E, Wisniewski A, Dobs A. Endocrine treatment of transsexual people: a review of treatment regimens, outcomes, and adverse effects. J Clin Endocrinol Metab. 2003 Aug;88(8):3467-73.

19. Smith YL, van Goozen SH, Cohen-Kettenis PT. Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: a prospective follow-up study. J Am Acad Child Adolesc Psychiatry. 2001 Apr;40(4):472-81.

AZSTATE.153295

20. Sutcliffe PA, Dixon S, Akehurst RL, Wilkinson A, Shippam A, White S, Richards R, Caddy CM. Evaluation of surgical procedures for sex reassignment: a systematic review. J Plast Reconstr Aesthet Surg. 2009 Mar;62(3):294-306; discussion 306-8.

21. The Women's Health and Cancer Rights Act of 1998 (WHCRA), 29 U.S. Code § 1185b - Required coverage for reconstructive surgery following mastectomies.

22. World Professional Association for Transgender Health (WPATH). Position on rapid onset gender dysphoria. 9/4/2018. Accessed June 20, 2019. Available at URL Address: https://www.wpath.org/publications/soc

23. World Professional Association for Transgender Health (WPATH). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People. 7th version. Approved September 14, 2011. Accessed January 26, 2018. Available at URL address: https://www.wpath.org/publications/soc

24. World Professional Association for Transgender Health (WPATH).The Harry Benjamin International Gender Dysphoria Association. Standards of Care for Gender Identity Disorders. 6th version. 2001 Feb. Accessed November 30, 2010. Available at URL address: https://www.wpath.org/publications/soc

25. Zucker KJ. Intersexuality and gender identity disorder. J Pediatr Adolesc Gynecol. 2002 Feb;15(1):3-13.

"Cigna Companies" refers to operating subsidiaries of Cigna Corporation. All products and services are provided exclusively by or through such operating subsidiaries, including Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Behavioral Health, Inc., Cigna Health Management, Inc., QualCare, Inc., and HMO or service company subsidiaries of Cigna Health Corporation. The Cigna name, logo, and other Cigna marks are owned by Cigna Intellectual Property, Inc. © 2019 Cigna.

AZSTATE.153296

# EXHIBIT F

# UnitedHealthcare®
Community Plan

UnitedHealthcare® Community Plan
**Medical Policy**

# GENDER DYSPHORIA TREATMENT

**Policy Number**: CS145.F                          **Effective Date**: January 1, 2020

Instructions for Use ⓘ

| Table of Contents | Page |
| --- | --- |
| APPLICATION | 1 |
| COVERAGE RATIONALE | 1 |
| DEFINITIONS | 3 |
| APPLICABLE CODES | 3 |
| DESCRIPTION OF SERVICES | 7 |
| BENEFIT CONSIDERATIONS | 8 |
| CLINICAL EVIDENCE | 8 |
| U.S. FOOD AND DRUG ADMINISTRATION | 12 |
| CENTERS FOR MEDICARE AND MEDICAID SERVICES | 12 |
| REFERENCES | 12 |
| POLICY HISTORY/REVISION INFORMATION | 14 |
| INSTRUCTIONS FOR USE | 14 |

**Related Community Plan Policies**
- Blepharoplasty, Blepharoptosis and Brow Ptosis Repair
- Botulinum Toxins A and B
- Cosmetic and Reconstructive Procedures
- Gonadotropin Releasing Hormone Analogs
- Panniculectomy and Body Contouring Procedures
- Rhinoplasty and Other Nasal Surgeries
- Speech Language Pathology Services

**Commercial Policy**
- Gender Dysphoria Treatment

## APPLICATION

This policy does not apply to the state of Tennessee.

## COVERAGE RATIONALE

See Benefit Considerations ⓘ

**Note**: This Medical Policy does not apply to individuals with ambiguous genitalia or disorders of sexual development.

**Gender reassignment surgery may be indicated for individuals who provide the following documentation**:
- A written psychological assessment from at least one qualified behavioral health provider experienced in treating Gender Dysphoria is needed for breast surgery. The assessment must document that an individual meets **all** of the following criteria:
  - Persistent, well-documented Gender Dysphoria
  - Capacity to make a fully informed decision and to consent for treatment
  - Must be at least 18 years of age (age of majority)
  - If significant medical or mental health concerns are present, they must be reasonably well controlled
- A written psychological assessment from at least two qualified behavioral health providers experienced in treating Gender Dysphoria, who have independently assessed the individual, are required for genital surgery. The assessment must document that an individual meets **all** of the following criteria:
  - Persistent, well-documented Gender Dysphoria
  - Capacity to make a fully informed decision and to consent for treatment
  - Must be at least 18 years of age (age of majority)
  - If significant medical or mental health concerns are present, they must be reasonably well controlled
  - Complete at least 12 months of successful continuous full-time real-life experience in the desired gender
  - Complete 12 months of continuous cross-sex hormone therapy appropriate for the desired gender (unless medically contraindicated)
- Treatment plan that includes ongoing follow-up and care by a qualified behavioral health provider experienced in treating Gender Dysphoria.

*See the Optum Coverage Determination Guideline titled *Gender Dysphoria* for provider qualification criteria (to access this guideline, go to: Optum Provider Express > Clinical Resources > Guidelines/Policies/Manuals > Coverage Determination Guidelines).

AZSTATE.153297

**When the above criteria are met, the following gender reassignment surgical procedures are medically necessary and covered as a proven benefit**:

- **Male-to-Female (MtF)**:
  - Clitoroplasty (creation of clitoris)
  - Labiaplasty (creation of labia)
  - Orchiectomy (removal of testicles)
  - Penectomy (removal of penis)
  - Urethroplasty (reconstruction of female urethra)
  - Vaginoplasty (creation of vagina)
  - Laser or electrolysis hair removal in advance of genital reconstruction prescribed by a physician for the treatment of gender dysphoria
- **Female-to-Male (FtM)**:
  - Bilateral mastectomy or breast reduction*
  - Hysterectomy (removal of uterus)
  - Metoidioplasty (creation of penis, using clitoris)
  - Penile prosthesis
  - Phalloplasty (creation of penis)
  - Salpingo-oophorectomy (removal of fallopian tubes and ovaries)
  - Scrotoplasty (creation of scrotum)
  - Testicular prostheses
  - Urethroplasty (reconstruction of male urethra)
  - Vaginectomy (removal of vagina)
  - Vulvectomy (removal of vulva)
  - Laser or electrolysis hair removal in advance of genital reconstruction prescribed by a physician for the treatment of gender dysphoria

*Bilateral mastectomy or breast reduction may be done as a stand-alone procedure, without having genital reconstruction procedures. In those cases, the individual does not need to complete hormone therapy prior to procedure.

**Certain ancillary procedures, including but not limited to the following, are considered cosmetic and not medically necessary when performed as part of gender reassignment**:

- Abdominoplasty (also see the Coverage Determination Guideline titled Panniculectomy and Body Contouring Procedures)
- Blepharoplasty (also see the Coverage Determination Guideline titled Blepharoplasty, Blepharoptosis and Brow Ptosis Repair)
- Body contouring (e.g., fat transfer, lipoplasty, panniculectomy) (also see the Coverage Determination Guideline titled Panniculectomy and Body Contouring Procedures)
- Breast enlargement, including augmentation mammaplasty and breast implants
- Brow lift
- Calf implants
- Cheek, chin and nose implants
- Face/forehead lift and/or neck tightening
- Facial bone remodeling for facial feminization
- Hair transplantation
- Injection of fillers or neurotoxins (also see the Medical Benefit Drug Policy titled Botulinum Toxins A and B)
- Laser or electrolysis hair removal not related to genital reconstruction
- Lip augmentation
- Lip reduction
- Liposuction (suction-assisted lipectomy) (also see the Coverage Determination Guideline titled Panniculectomy and Body Contouring Procedures)
- Mastopexy
- Pectoral implants for chest masculinization
- Rhinoplasty (also see the Coverage Determination Guideline titled Rhinoplasty and Other Nasal Surgeries)
- Skin resurfacing (e.g., dermabrasion, chemical peels, laser)
- Thyroid cartilage reduction/reduction thyroid chondroplasty/trachea shave (removal or reduction of the Adam's apple)
- Voice modification surgery (e.g., laryngoplasty, glottoplasty or shortening of the vocal cords)
- Voice lessons and voice therapy

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153298

## DEFINITIONS

**Gender Dysphoria in Adolescents and Adults**: A disorder characterized by the following diagnostic criteria (Diagnostic and Statistical Manual of Mental Disorders, 5th edition [DSM-5]):

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by **at least two** of the following:
   1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
   2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
   3. A strong desire for the primary and/or secondary sex characteristics of the other gender
   4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender)
   5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender)
   6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender)
B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

**Gender Dysphoria in Children**: A disorder characterized by the following diagnostic criteria (Diagnostic and Statistical Manual of Mental Disorders, 5th edition [DSM-5]):

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by **at least six** of the following (**one of which must be criterion A1**):
   1. A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender)
   2. In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing
   3. A strong preference for cross-gender roles in make-believe play or fantasy play
   4. A strong preference for the toys, games or activities stereotypically used or engaged in by the other gender
   5. A strong preference for playmates of the other gender
   6. In boys (assigned gender), a strong rejection of typically masculine toys, games and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games and activities
   7. A strong dislike of one's sexual anatomy
   8. A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender
B. The condition is associated with clinically significant distress or impairment in social, school or other important areas of functioning.

## APPLICABLE CODES

The following list(s) of procedure and/or diagnosis codes is provided for reference purposes only and may not be all inclusive. Listing of a code in this policy does not imply that the service described by the code is a covered or non-covered health service. Benefit coverage for health services is determined by federal, state or contractual requirements and applicable laws that may require coverage for a specific service. The inclusion of a code does not imply any right to reimbursement or guarantee claim payment. Other Policies and Coverage Determination Guidelines may apply.

| CPT Code | Description |
| --- | --- |
| 11950 | Subcutaneous injection of filling material (e.g., collagen); 1 cc or less |
| 11951 | Subcutaneous injection of filling material (e.g., collagen); 1.1 to 5.0 cc |
| 11952 | Subcutaneous injection of filling material (e.g., collagen); 5.1 to 10.0 cc |
| 11954 | Subcutaneous injection of filling material (e.g., collagen); over 10.0 cc |
| 14000 | Adjacent tissue transfer or rearrangement, trunk; defect 10 sq cm or less |
| 14001 | Adjacent tissue transfer or rearrangement, trunk; defect 10.1 sq cm to 30.0 sq cm |
| 14041 | Adjacent tissue transfer or rearrangement, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet; defect 10.1 sq cm to 30.0 sq cm |
| 15734 | Muscle, myocutaneous, or fasciocutaneous flap; trunk |
| 15738 | Muscle, myocutaneous, or fasciocutaneous flap; lower extremity |

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153299

| CPT Code | Description |
| --- | --- |
| 15750 | Flap; neurovascular pedicle |
| 15757 | Free skin flap with microvascular anastomosis |
| 15758 | Free fascial flap with microvascular anastomosis |
| 15769 | Grafting of autologous soft tissue, other, harvested by direct excision (e.g., fat, dermis, fascia) |
| 15771 | Grafting of autologous fat harvested by liposuction technique to trunk, breasts, scalp, arms, and/or legs; 50 cc or less injectate |
| 15772 | Grafting of autologous fat harvested by liposuction technique to trunk, breasts, scalp, arms, and/or legs; each additional 50 cc injectate, or part thereof (List separately in addition to code for primary procedure) |
| 15773 | Grafting of autologous fat harvested by liposuction technique to face, eyelids, mouth, neck, ears, orbits, genitalia, hands, and/or feet; 25 cc or less injectate |
| 15774 | Grafting of autologous fat harvested by liposuction technique to face, eyelids, mouth, neck, ears, orbits, genitalia, hands, and/or feet; each additional 25 cc injectate, or part thereof (List separately in addition to code for primary procedure) |
| 15775 | Punch graft for hair transplant; 1 to 15 punch grafts |
| 15776 | Punch graft for hair transplant; more than 15 punch grafts |
| 15780 | Dermabrasion; total face (e.g., for acne scarring, fine wrinkling, rhytids, general keratosis) |
| 15781 | Dermabrasion; segmental, face |
| 15782 | Dermabrasion; regional, other than face |
| 15783 | Dermabrasion; superficial, any site (e.g., tattoo removal) |
| 15788 | Chemical peel, facial; epidermal |
| 15789 | Chemical peel, facial; dermal |
| 15792 | Chemical peel, nonfacial; epidermal |
| 15793 | Chemical peel, nonfacial; dermal |
| 15819 | Cervicoplasty |
| 15820 | Blepharoplasty, lower eyelid |
| 15821 | Blepharoplasty, lower eyelid; with extensive herniated fat pad |
| 15822 | Blepharoplasty, upper eyelid |
| 15823 | Blepharoplasty, upper eyelid; with excessive skin weighting down lid |
| 15824 | Rhytidectomy; forehead |
| 15825 | Rhytidectomy; neck with platysmal tightening (platysmal flap, P-flap) |
| 15826 | Rhytidectomy; glabellar frown lines |
| 15828 | Rhytidectomy; cheek, chin, and neck |
| 15829 | Rhytidectomy; superficial musculoaponeurotic system (SMAS) flap |
| 15830 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); abdomen, infraumbilical panniculectomy |
| 15832 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); thigh |
| 15833 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); leg |
| 15834 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); hip |
| 15835 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); buttock |
| 15836 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); arm |
| 15837 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); forearm or hand |
| 15838 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); submental fat pad |
| 15839 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); other area |

Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.

AZSTATE.153300

| CPT Code | Description |
| --- | --- |
| 15847 | Excision, excessive skin and subcutaneous tissue (includes lipectomy), abdomen (e.g., abdominoplasty) (includes umbilical transposition and fascial plication) (List separately in addition to code for primary procedure) |
| 15876 | Suction assisted lipectomy; head and neck |
| 15877 | Suction assisted lipectomy; trunk |
| 15878 | Suction assisted lipectomy; upper extremity |
| 15879 | Suction assisted lipectomy; lower extremity |
| 17380 | Electrolysis epilation, each 30 minutes |
| 17999 | Unlisted procedure, skin, mucous membrane and subcutaneous tissue |
| 19303 | Mastectomy, simple, complete |
| 19316 | Mastopexy |
| 19318 | Reduction mammaplasty |
| 19324 | Mammaplasty, augmentation; without prosthetic implant |
| 19325 | Mammaplasty, augmentation; with prosthetic implant |
| 19340 | Immediate insertion of breast prosthesis following mastopexy, mastectomy or in reconstruction |
| 19342 | Delayed insertion of breast prosthesis following mastopexy, mastectomy or in reconstruction |
| 19350 | Nipple/areola reconstruction |
| 21120 | Genioplasty; augmentation (autograft, allograft, prosthetic material) |
| 21121 | Genioplasty; sliding osteotomy, single piece |
| 21122 | Genioplasty; sliding osteotomies, 2 or more osteotomies (e.g., wedge excision or bone wedge reversal for asymmetrical chin) |
| 21123 | Genioplasty; sliding, augmentation with interpositional bone grafts (includes obtaining autografts) |
| 21125 | Augmentation, mandibular body or angle; prosthetic material |
| 21127 | Augmentation, mandibular body or angle; with bone graft, onlay or interpositional (includes obtaining autograft) |
| 21137 | Reduction forehead; contouring only |
| 21138 | Reduction forehead; contouring and application of prosthetic material or bone graft (includes obtaining autograft) |
| 21139 | Reduction forehead; contouring and setback of anterior frontal sinus wall |
| 21172 | Reconstruction superior-lateral orbital rim and lower forehead, advancement or alteration, with or without grafts (includes obtaining autografts) |
| 21175 | Reconstruction, bifrontal, superior-lateral orbital rims and lower forehead, advancement or alteration (e.g., plagiocephaly, trigonocephaly, brachycephaly), with or without grafts (includes obtaining autografts) |
| 21179 | Reconstruction, entire or majority of forehead and/or supraorbital rims; with grafts (allograft or prosthetic material) |
| 21180 | Reconstruction, entire or majority of forehead and/or supraorbital rims; with autograft (includes obtaining grafts) |
| 21208 | Osteoplasty, facial bones; augmentation (autograft, allograft, or prosthetic implant) |
| 21209 | Osteoplasty, facial bones; reduction |
| 21210 | Graft, bone; nasal, maxillary or malar areas (includes obtaining graft) |
| 21270 | Malar augmentation, prosthetic material |
| 21899 | Unlisted procedure, neck or thorax |
| 30400 | Rhinoplasty, primary; lateral and alar cartilages and/or elevation of nasal tip |
| 30410 | Rhinoplasty, primary; complete, external parts including bony pyramid, lateral and alar cartilages, and/or elevation of nasal tip |
| 30420 | Rhinoplasty, primary; including major septal repair |

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153301

| CPT Code | Description |
|---|---|
| 30430 | Rhinoplasty, secondary; minor revision (small amount of nasal tip work) |
| 30435 | Rhinoplasty, secondary; intermediate revision (bony work with osteotomies) |
| 30450 | Rhinoplasty, secondary; major revision (nasal tip work and osteotomies) |
| 31599 | Unlisted procedure, larynx |
| 31899 | Unlisted procedure, trachea, bronchi |
| 53410 | Urethroplasty, 1-stage reconstruction of male anterior urethra |
| 53430 | Urethroplasty, reconstruction of female urethra |
| 54125 | Amputation of penis; complete |
| 54400 | Insertion of penile prosthesis; non-inflatable (semi-rigid) |
| 54401 | Insertion of penile prosthesis; inflatable (self-contained) |
| 54405 | Insertion of multi-component, inflatable penile prosthesis, including placement of pump, cylinders, and reservoir |
| 54406 | Removal of all components of a multi-component, inflatable penile prosthesis without replacement of prosthesis |
| 54408 | Repair of component(s) of a multi-component, inflatable penile prosthesis |
| 54410 | Removal and replacement of all component(s) of a multi-component, inflatable penile prosthesis at the same operative session |
| 54411 | Removal and replacement of all components of a multi-component inflatable penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54415 | Removal of non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis, without replacement of prosthesis |
| 54416 | Removal and replacement of non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis at the same operative session |
| 54417 | Removal and replacement of non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54520 | Orchiectomy, simple (including subcapsular), with or without testicular prosthesis, scrotal or inguinal approach |
| 54660 | Insertion of testicular prosthesis (separate procedure) |
| 54690 | Laparoscopy, surgical; orchiectomy |
| 55175 | Scrotoplasty; simple |
| 55180 | Scrotoplasty; complicated |
| 55970 | Intersex surgery; male to female |
| 55980 | Intersex surgery; female to male |
| 56625 | Vulvectomy simple; complete |
| 56800 | Plastic repair of introitus |
| 56805 | Clitoroplasty for intersex state |
| 57110 | Vaginectomy, complete removal of vaginal wall |
| 57335 | Vaginoplasty for intersex state |
| 58150 | Total abdominal hysterectomy (corpus and cervix), with or without removal of tube(s), with or without removal of ovary(s) |
| 58180 | Supracervical abdominal hysterectomy (subtotal hysterectomy), with or without removal of tube(s), with or without removal of ovary(s) |
| 58260 | Vaginal hysterectomy, for uterus 250 g or less |
| 58262 | Vaginal hysterectomy, for uterus 250 g or less; with removal of tube(s), and/or ovary(s) |
| 58290 | Vaginal hysterectomy, for uterus greater than 250 g; |
| 58291 | Vaginal hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |

Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.

AZSTATE.153302

| CPT Code | Description |
|---|---|
| 58541 | Laparoscopy, surgical, supracervical hysterectomy, for uterus 250 g or less; |
| 58542 | Laparoscopy, surgical, supracervical hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58543 | Laparoscopy, surgical, supracervical hysterectomy, for uterus greater than 250 g; |
| 58544 | Laparoscopy, surgical, supracervical hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58550 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus 250 g or less; |
| 58552 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58553 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus greater than 250 g; |
| 58554 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58570 | Laparoscopy, surgical, with total hysterectomy, for uterus 250 g or less; |
| 58571 | Laparoscopy, surgical, with total hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58572 | Laparoscopy, surgical, with total hysterectomy, for uterus greater than 250 g; |
| 58573 | Laparoscopy, surgical, with total hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58661 | Laparoscopy, surgical; with removal of adnexal structures (partial or total oophorectomy and/or salpingectomy) |
| 58720 | Salpingo-oophorectomy, complete or partial, unilateral or bilateral (separate procedure) |
| 58940 | Oophorectomy, partial or total, unilateral or bilateral; |
| 64856 | Suture of major peripheral nerve, arm or leg, except sciatic; including transposition |
| 64892 | Nerve graft (includes obtaining graft), single strand, arm or leg; up to 4 cm length |
| 64896 | Nerve graft (includes obtaining graft), multiple strands (cable), hand or foot; more than 4 cm length |
| 67900 | Repair of brow ptosis (supraciliary, mid-forehead or coronal approach) |
| 92507 | Treatment of speech, language, voice, communication, and/or auditory processing disorder; individual |
| 92508 | Treatment of speech, language, voice, communication, and/or auditory processing disorder; group, 2 or more individuals |

*CPT® is a registered trademark of the American Medical Association*

| ICD-10 Diagnosis Code | Description |
|---|---|
| F64.0 | Transsexualism |
| F64.1 | Dual role transvestism |
| F64.2 | Gender identity disorder of childhood |
| F64.8 | Other gender identity disorders |
| F64.9 | Gender identity disorder, unspecified |
| Z87.890 | Personal history of sex reassignment |

## DESCRIPTION OF SERVICES

Gender Dysphoria is a condition in which there is a marked incongruence between an individual's experienced/expressed gender and assigned gender (DSM-5). Treatment options include behavioral therapy, psychotherapy, hormone therapy and surgery for gender reassignment, which can involve genital reconstruction surgery and breast/chest surgery. For the FtM patient, surgical procedures may include mastectomy, hysterectomy, salpingo-oophorectomy, vaginectomy, vulvectomy, scrotoplasty, urethroplasty, placement of testicular and/or penile prostheses and phalloplasty or metoidioplasty (alternative to phalloplasty). For the MtF patient, surgical procedures may include penectomy, vaginoplasty, clitoroplasty, labiaplasty, orchiectomy and urethroplasty.

Other terms used to describe surgery for Gender Dysphoria include sex transformation surgery, sex change, sex reversal, gender change, transsexual surgery, transgender surgery and sex reassignment.

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153303

## BENEFIT CONSIDERATIONS

### Coverage Information

Unless otherwise specified, if a plan covers treatment for gender dysphoria, coverage includes psychotherapy, cross-sex hormone therapy, puberty suppressing medications and laboratory testing to monitor the safety of hormone therapy. This benefit also includes certain surgical treatments listed in the Coverage Rationale section. See the Medical Benefit Drug Policy titled Gonadotropin Releasing Hormone Analogs.

### Limitations and Exclusions

Certain treatments and services are not covered. Examples include, but are not limited to:
- Treatment received outside of the United States
- Reproduction services, including, but not limited to, sperm preservation in advance of hormone treatment or gender dysphoria surgery, cryopreservation of fertilized embryos, oocyte preservation, surrogate parenting, donor eggs, donor sperm and host uterus (please check the federal, state or contractual requirements for benefit coverage)
- Transportation, meals, lodging or similar expenses
- Cosmetic procedures (see Coverage Determination Guideline titled Cosmetic and Reconstructive Procedures and the Coverage Rationale section)
- Reversal of genital surgery or reversal of surgery to revise secondary sex characteristics

Benefits are limited to one sex transformation reassignment per lifetime which may include several staged procedures.

Coverage does not apply to members who do not meet the indications listed in the Coverage Rationale section.

## CLINICAL EVIDENCE

An ECRI special report systematically reviewed the clinical literature to assess the efficacy of treatments for gender dysphoria. The authors identified limited evidence from mostly low-quality retrospective studies. Evidence on gender reassignment surgery was mostly limited to evaluations of MtF individuals undergoing vaginoplasty, facial feminization surgery and breast augmentation. Outcomes included mortality, patient satisfaction, physical well-being, psychological-related outcomes, quality of life, sexual-related outcomes, suicide and adverse events. Concluding remarks included the need for standardized protocols and prospective studies using standardized measures for correct interpretation and comparability of data (ECRI, 2016).

A Hayes report concluded that, overall, the quality of the evidence on gender reassignment surgery for gender dysphoria was very low (Hayes, 2014a; updated 2018). The evidence suggests positive benefits, but because of serious limitations, permits only weak conclusions. Limitations include small sample sizes, retrospective data, lack of randomization and control and a lack of objective and validated outcome measures.
- Patients who underwent chest/breast or genital surgery were generally pleased with the aesthetic results.
- Following gender reassignment surgery, patients reported decreased gender dysphoria, depression and anxiety and increased quality of life.
- The majority of gender reassignment surgery patients were sexually active, but the ability to orgasm varied across studies.
- Complications of surgery following gender reassignment surgery were common and could be serious.
- Rates of regret of surgery and suicide were very low following gender reassignment surgery.
- Data were too sparse to draw conclusions regarding whether gender reassignment surgery conferred additional benefits to hormone therapy alone.
- Data were too sparse to draw conclusions regarding whether outcomes vary according to which surgeries were performed.

A separate Hayes report concluded that, overall, the quality of the evidence on ancillary procedures for the treatment of gender dysphoria was very low (Hayes, 2014b; updated 2018). There is some evidence that transgender patients are satisfied with the results of rhinoplasty and facial feminization surgery, but patient satisfaction with vocal cord surgery and voice training was mixed. The evidence has serious limitations, and the effect of these procedures on overall individual well-being is unknown.
- Patients who had rhinoplasty or facial feminization surgery were generally pleased with the results.
- Vocal cord procedures and voice training had variable outcomes. Although the fundamental frequency was reduced by all treatment methods, patient satisfaction with the outcome was mixed.
- Most of the studies did not report complications; however, there was a low rate of bone nonunion following facial surgery, and moderate rates of dysphagia or throat pain following cricothyroid approximation.

Mahfouda et al. (2019) conducted a systematic review of the the available published evidence on gender-affirming cross-sex hormone (CSH) and surgical interventions in transgender children and adolescents, amalgamating findings on mental health outcomes, cognitive and physical effects, side-effects, and safety variables. The small amount of available data suggest that when clearly indicated in accordance with international guidelines, gender-affirming CSHs and chest wall masculinisation in transgender males are associated with improvements in mental health and quality of life. Evidence regarding surgical vaginoplasty in transgender females younger than age 18 years remains extremely scarce and conclusions cannot yet be drawn regarding its risks and benefits in this age group. Further research on an international scale is urgently warranted to clarify long-term outcomes on psychological functioning and safety.

Dreher et al. (2018) conducted a systematic review and meta-analysis to evaluate the epidemiology, presentation, management, and outcomes of neovaginal complications in the MtF transgender reassignment surgery patients. Selected studies reported on 1,684 patients with an overall complication rate of 32.5% and a reoperation rate of 21.7% for non-esthetic reasons. The most common complication was stenosis of the neo-meatus (14.4%). Wound infection was associated with an increased risk of all tissue-healing complications. Use of sacrospinous ligament fixation (SSL) was associated with a significantly decreased risk of prolapse of the neovagina. The authors concluded that gender-affirmation surgery is important in the treatment of gender dysphoric patients, but there is a high complication rate in the reported literature. Variability in technique and complication reporting standards makes it difficult to assess the accurately the current state of MtF gender reassignment surgery. Further research and implementation of standards is necessary to improve patient outcomes.

Manrique et al (2018) conducted a systematic review of retrospective studies on the outcomes of MtF vaginoplasty to minimize surgical complications and improve patient outcomes for transgender patients. Forty-six studies met the authors eligibility criteria. A total of 3716 cases were analyzed. The results showed the overall incidence of complications as follows: 2% fistula, 14% stenosis and strictures, 1% tissue necrosis, and 4% prolapse. Patient-reported outcomes included a satisfaction rate of 93% with overall results, 87% with functional outcomes, and 90% with esthetic outcomes. Ability to have orgasm was reported in 70% of patients. The regret rate was 1%. The authors concluded that multiple surgical techniques have demonstrated safe and reliable means of MtF vaginoplasty with low overall complication rates and with a significant improvement in the patient's quality of life. Studies using different techniques in a similar population and standardized patient-reported outcomes are required to further analyze outcomes among the different procedures and to establish best-practice guidelines.

Van Damme et al. (2017) conducted a systematic review of the effectiveness of pitch-raising surgery performed in MtF transsexuals. Twenty studies were included: eight using cricothyroid approximation, six using anterior glottal web formation and six using other surgery types or a combination of surgical techniques. A substantial rise in postoperative frequency was identified. The majority of patients seemed satisfied with the outcome. However, none of the studies used a control group and randomization process. Further investigation regarding long-term results using a stronger study design is necessary.

Morrison et al. (2016) conducted a systematic review of the facial feminization surgery literature. Fifteen studies were included, all of which were either retrospective or case series/reports. The studies covered a variety of facial feminization procedures. A total of 1121 patients underwent facial feminization surgery, with seven complications reported, although many studies did not explicitly comment on complications. Satisfaction was high, although most studies did not use validated or quantified approaches to address satisfaction. The authors noted that further studies are needed to better compare different techniques to more robustly establish best practices. Prospective studies and patient-reported outcomes are needed to establish quality of life outcomes for patients.

Frey et al. (2016) conducted a systematic review of metoidioplasty and radial forearm flap phalloplasty (RFFP) in FtM transgender genital reconstruction. Eighteen studies were included: 7 for metoidioplasty and 11 for RFFP. The quality of evidence was low to very low for all included studies. In studies examining metoidioplasty, the average study size and length of follow-up were 54 patients and 4.6 years, respectively (1 study did not report [NR]). Eighty-eight percent underwent a single-stage reconstruction, 87% reported an aesthetic neophallus (3 NR) and 100% reported erogenous sensation (2 NR). Fifty-one percent of patients reported successful intercourse (3 NR) and 89% of patients achieved standing micturition (3 NR). In studies examining RFFP, the average study size and follow-up were 60.4 patients and 6.23 years, respectively (6 NR). No patients underwent single-stage reconstructions (8 NR). Seventy percent of patients reported a satisfactorily aesthetic neophallus (4 NR) and 69% reported erogenous sensation (6 NR). Forty-three percent reported successful penetration of partner during intercourse (6 NR) and 89% achieved standing micturition (6 NR). Compared with RFFP, metoidioplasty was significantly more likely to be completed in a single stage, have an aesthetic result, maintain erogenous sensation, achieve standing micturition and have a lower overall complication rate. The authors reported that, although the current literature suggests that metoidioplasty is more likely to yield an "ideal" neophallus compared with RFFP, any conclusion is severely limited by the low quality of available evidence.

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153305

Using a retrospective chart review, Buncamper et al. (2016) assessed surgical outcome after penile inversion vaginoplasty. Outcome measures were intraoperative and postoperative complications, reoperations, secondary surgical procedures and possible risk factors.  Of 475 patients who underwent the procedure, 405 did not have additional full-thickness skin grafts while 70 did have grafts. Median follow-up was 7.8 years. The most frequently observed intraoperative complication was rectal  injury (2.3 percent). Short-term postoperative bleeding that required transfusion (4.8 percent), reoperation (1.5 percent) or both (0.4 percent) occurred in some cases. Major complications were three (0.6 percent) rectoneovaginal fistulas, which were successfully treated. Revision vaginoplasty was performed in 14 patients (2.9 percent). Comorbid diabetes was associated with a higher risk of local infection, and use of psychotropic medication predisposed to postoperative urinary retention. Successful vaginal construction without the need for secondary functional reoperations was achieved in the majority of patients.

Bouman et al. (2016) prospectively assessed surgical outcomes of primary total laparoscopic sigmoid vaginoplasty in 42 transgender women with penoscrotal hypoplasia. Mean follow-up time was 3.2 ± 2.1 years. The mean operative duration was 210 ± 44 minutes. There were no conversions to laparotomy. One rectal perforation was recognized during surgery and immediately oversewn without long-term consequences. The mean length of hospitalization was 5.7 ± 1.1 days. One patient died as a result of an extended-spectrum beta-lactamase-positive necrotizing fasciitis leading to septic shock, with multiorgan failure. Direct postoperative complications that needed laparoscopic reoperation occurred in three cases (7.1 percent). In seven cases (17.1 percent), long-term complications needed a secondary correction. After 1 year, all patients had a functional neovagina with a mean depth of 16.3 ± 1.5 cm.

Despite the significant increase in genital gender affirming surgery (GAS) within the past 50 years, there is limited data regarding hair removal practices in preparation for genital GAS. Genital gender affirming surgery (GAS) involves reconstruction of the genitals to match a patient's identified sex. The use of hair-bearing flaps in this procedure may result in postoperative intra-vaginal and intra-urethral hair growth and associated complications, including lower satisfaction with genital GAS. In 2016 Zhang et al conducted a literature review, recommendations from experience, and a practical laser hair removal (LHR) approach to hair removal prior to genital GAS.

Gaither et al. (2017) retrospectively reviewed the records of 330 MtF patients from 2011 to 2015, to assess surgical complications related to primary penile inversion vaginoplasty. Complications included granulation tissue, vaginal pain, wound separation, labial asymmetry, vaginal stenosis, fistula formation, urinary symptoms including spraying stream or dribbling, infection, vaginal fissure or vaginal bleeding. Median age at surgery was 35 years, and median followup in all patients was 3 months. The results showed that 95 of the patients presented with a postoperative complication with the median time to a complication being 4.4 months. Rectoneovaginal fistulas developed in 3 patients, and 30 patients required a second operation. Age, body mass index and hormone replacement therapy were not associated with complications. The authors concluded that penile inversion vaginoplasty is a relatively safe procedure. Most complications due to this surgery develop within the first 4 months postoperatively. Age, body mass index and hormone replacement therapy are not associated with complications and, thus, they should not dictate the timing of surgery.

Horbach et al. (2015) conducted a systematic review of vaginoplasty techniques in MtF individuals with gender dysphoria. Twenty-six studies were included (mostly retrospective case series of low to intermediate quality). Outcome of the penile skin inversion technique was reported in 1,461 patients and bowel vaginoplasty in 102 patients. Neovaginal stenosis was the most frequent complication in both techniques. Sexual function and patient satisfaction were overall acceptable, but many different outcome measures were used. Quality of life was only reported in one study. Comparison between techniques was difficult due to the lack of standardization. The authors concluded that the penile skin inversion technique is the most researched surgical procedure. Outcome of bowel vaginoplasty has been reported less frequently but does not seem to be inferior. The available literature is heterogeneous in patient groups, surgical procedure, outcome measurement tools and follow-up. There is a need for prospective studies with standardized surgical procedures, larger patient groups and longer follow-up periods. Uniformity in outcome measurement tools such as validated questionnaires and scores for sexual function and quality of life is mandatory for correct interpretation and comparability of data.

Bouman et al. (2014) conducted a systematic review of surgical techniques and clinical outcomes of intestinal vaginoplasty. Twenty-one studies were included (n=894). All studies had a retrospective design and were of low quality. Prevalence and severity of procedure-related complications were low. The main postoperative complication was introital stenosis, necessitating surgical correction in 4.1% of sigmoid-derived and 1.2% of ileum-derived vaginoplasties. Neither diversion colitis nor cancer was reported. Sexual satisfaction rate was high, but standardized questionnaires were rarely used. Quality of life was not reported. The authors concluded that prospective studies, using standardized measures and questionnaires, are warranted to assess functional outcomes and quality of life.

Murad et al. (2010) conducted a systematic review to evaluate the effects of hormone therapy on patients undergoing gender reassignment surgery. The authors identified 28 eligible studies, all of which were observational and most lacked controls. These studies enrolled 1833 participants with gender dysphoria (1093 MtF; 801 FtM). After gender

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153306

reassignment surgery, individuals reported improvement in gender dysphoria (80%), psychological symptoms (78%), sexual function (72%) and quality of life (80%). The authors concluded that very low quality evidence suggests that gender reassignment, that includes hormonal interventions, is likely to improve gender dysphoria, psychological functioning and comorbidities, sexual function and overall quality of life.

Sutcliffe et al. (2009) systematically reviewed five individual procedures for MtF gender reassignment surgery: clitoroplasty, labiaplasty, orchiectomy, penectomy and vaginoplasty. Further evaluations were made of eight surgical procedures for FtM gender reassignment surgery: hysterectomy, mastectomy, metoidioplasty, phalloplasty, salpingo-oophorectomy, scrotoplasty/placement of testicular prostheses, urethroplasty and vaginectomy. Eighty-two published studies (38 MtF; 44 FtM) were included in the review. For MtF procedures, the authors found no evidence that met the inclusion criteria concerning labiaplasty, penectomy or orchiectomy. A large amount of evidence was available concerning vaginoplasty and clitoroplasty procedures. The authors reported that the evidence concerning gender reassignment surgery in both MtF and FtM individuals with gender dysphoria has several limitations including lack of controlled studies, lack of prospective data, high loss to follow- up and lack of validated assessment measures. Some satisfactory outcomes were reported, but the magnitude of benefit and harm for individual surgical procedures cannot be estimated accurately using the current available evidence.

Djordjevic et al. (2013) evaluated 207 patients who underwent single-stage metoidioplasty, comparing two different surgical techniques of urethral lengthening. The procedure included lengthening and straightening of the clitoris, urethral reconstruction and scrotoplasty with implantation of testicular prostheses. Buccal mucosa graft was used in all cases for dorsal urethral plate formation and joined with one of the two different flaps: longitudinal dorsal clitoral skin flap (n=49) (group 1) and labia minora flap (n=158) (group 2). The median follow-up was 39 months. The total length of reconstructed urethra ranged from 9.1 to 12.3 cm in group 1 and from 9.4 to 14.2 cm in group 2. Voiding while standing was significantly better in group 2 (93%) than in group 1 (87.82%). Urethral fistula occurred in 16 patients in both groups. Overall satisfaction was noted in 193 patients. The authors concluded that combined buccal mucosa graft and labia minora flap was the method of choice for urethroplasty in metoidioplasty, minimizing postoperative complications.

A single-arm study by Weigert et al. (2013) evaluated patient satisfaction with breasts and psychosocial, sexual and physical well-being after breast augmentation in MtF individuals with gender dysphoria. Thirty-five patients were asked to complete the BREAST-Q Augmentation module questionnaire before surgery, at 4 months and later after surgery. A prospective cohort study was designed and postoperative scores were compared with baseline scores. Responses indicated significant improvements in satisfaction with surgery (+59 points), psychosocial well-being (+48 points) and sexual well-being (+34 points). No significant changes were reported for physical well-being. This study has several limitations including lack of a control group and subjective measures.

In a non-randomized study, Dhejne et al. (2011) evaluated mortality, morbidity and criminal rates after gender reassignment surgery in 324 individuals (MtF n=191; FtM n=133). Random population controls (10:1) were matched by birth year and birth sex or reassigned final sex. The authors reported substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts and psychiatric hospitalizations in sex-reassigned individuals (both MtF/FtM) compared to a healthy control population. FtMs had a higher risk for criminal convictions.

### World Professional Association for Transgender Health (WPATH)
WPATH, formerly known as the Harry Benjamin International Gender Dysphoria Association, is an advocacy group devoted to transgender health. WPATH guidelines (2012) present eligibility and readiness criteria for transition-related treatment, as well as competencies of health care providers.

WPATH describes the transition from one gender to another in the following three stages:
• Living in the gender role consistent with gender identity
• The use of cross-sex hormone therapy after living in the new gender role for a least three months
• Gender-affirmation surgery after living in the new gender role and using hormonal therapy for at least 12 months

### Professional Societies
#### American College of Obstetrics and Gynecology (ACOG)
An ACOG committee opinion (2017) provides guidance on health care for transgender adolescents. The document makes the following recommendations regarding surgery:
• Obstetrician-gynecologists should understand gender identity and be able to treat transgender patients or refer them appropriately for medical and surgical therapeutic options.
• Surgical management for transgender male patients is typically reserved for patients 18 years and older.
• For transgender male patients, phalloplasty may be performed when the patient reaches the age of majority.
• Transgender female patients who choose to undergo surgery for a neovagina may have vaginoplasty after the age of majority.
• Transgender patients should be counseled about fertility and fertility preservation prior to surgical treatment.

AZSTATE.153307

A separate ACOG committee opinion (2011) provides guidance on health care for transgender individuals. The document makes the following recommendations regarding surgery:

- Obstetrician-gynecologists should assist or refer transgender individuals for routine treatment and screening as well as hormonal and surgical therapies.
- Hormonal and surgical therapies should be managed in consultation with health care providers with expertise in specialized care and treatment of transgender persons.

### Endocrine Society

Endocrine Society practice guidelines (Hembree et al., 2017) addressing endocrine treatment of gender-dysphoric/gender-incongruent persons makes the following recommendations regarding surgery for sex reassignment and gender confirmation:

- Suggest that clinicians delay gender-affirming genital surgery involving gonadectomy and/or hysterectomy until the patient is at least 18 years old or legal age of majority in his or her country (Recommendation based on low quality evidence).
- A patient pursue genital gender-affirming surgery only after the mental health practitioner (MHP) and the clinician responsible for endocrine transition therapy both agree that surgery is medically necessary and would benefit the patient's overall health and/or well-being ( Strong recommendation based on low quality evidence).
- Surgery is recommended only after completion of at least one year of consistent and compliant hormone treatment unless hormone therapy is not desired or medically contraindicated (Ungraded Good Practice Statement).
- The physician responsible for endocrine treatment medically clears individual for surgery and collaborates with the surgeon regarding hormone use during and after surgery (Ungraded Good Practice Statement).
- Recommend that clinicians refer hormone treated transgender individuals for genital surgery when (Strong recommendation based on very low quality evidence):
    - The individual has had a satisfactory social role change
    - The individual is satisfied about the hormonal effects
    - The individual desires definitive surgical changes
- Suggest that clinicians determine the timing of breast surgery for transgender males based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement (Recommendation based on very low quality evidence).

### American Academy of Pediatrics (AAP)

In a 2018 policy statement entitled Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents, the AAP states the following regarding surgery: Surgical approaches may be used to feminize or masculinize features, such as hair distribution, chest, or genitalia, and may include removal of internal organs, such as ovaries or the uterus (affecting fertility). These changes are irreversible. Although current protocols typically reserve surgical interventions for adults, they are occasionally pursued during adolescence on a case-by case basis, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family.

## U.S. FOOD AND DRUG ADMINISTRATION (FDA)

This section is to be used for informational purposes only. FDA approval alone is not a basis for coverage.

Gender reassignment surgeries are procedures, and therefore, not subject to FDA regulation. However, medical devices, drugs, biologics or tests used as a part of these procedures may be subject to FDA regulation. See the following website to search by product name: http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm. (Accessed June 4, 2019)

## CENTERS FOR MEDICARE AND MEDICAID SERVICES (CMS)

Medicare does have a National Coverage Determination (NCD) for Gender Dysphoria and Gender Reassignment Surgery (140.9). Local Coverage Articles (LCAs) also exist; refer to the LCAs for Gender Reassignment Services for Gender Dysphoria.
(Accessed June 4, 2019)

## REFERENCES

American Academy of Pediatrics. Policy Statement. Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. October 2018.

American College of Obstetricians and Gynecologists (ACOG). Committee Opinion #512. Health care for transgender individuals. Obstet Gynecol. 2011 Dec;118(6):1454-8.

Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.

AZSTATE.153308

American College of Obstetricians and Gynecologists (ACOG). Committee Opinion #685. Care for transgender adolescents. Obstet Gynecol. 2017 Jan;129(1):e11-e16.

American Psychological Association. Guidelines for psychological practice with transgender and gender nonconforming people. Am Psychol. 2015 Dec;70(9):832-64.

American Psychological Association. Report of the task force on appropriate therapeutic responses to sexual orientation. Washington, DC: 2009.

American Psychological Association. Report of the task force on gender identity and gender variance. Washington, DC: 2009.

Bouman MB, van der Sluis WB, Buncamper ME, et al. Primary total laparoscopic sigmoid vaginoplasty in transgender women with penoscrotal hypoplasia: a prospective cohort study of surgical outcomes and follow-up of 42 patients. Plast Reconstr Surg. 2016 Oct;138(4):614e-23e.

Bouman MB, van Zeijl MC, Buncamper ME, et al. Intestinal vaginoplasty revisited: a review of surgical techniques, complications, and sexual function. J Sex Med. 2014 Jul;11(7):1835-47.

Buncamper ME, van der Sluis WB, van der Pas RS, et al. Surgical outcome after penile inversion vaginoplasty: a retrospective study of 475 transgender women. Plast Reconstr Surg. 2016 Nov;138(5):999-1007.

Byne W, Bradley SJ, Coleman E, et al. Report of the American Psychiatric Association task force on treatment of gender identity disorder. Am J Psychiatry. 2012 Aug;169(8):875-6.

Dhejne C, Lichtenstein P, Boman M, et al. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PLoS One. 2011 Feb 22;6(2):e16885.

Diagnostic and statistical manual of mental disorders (5th ed.). 2013. Washington, DC: American Psychiatric Association.

Dreher PC, Edwards D, Hager S, et al. Complications of the neovagina in male-to-female transgender surgery: A systematic review and meta-analysis with discussion of management. Clin Anat. 2018 Mar;31(2):191-199.

Djordjevic ML, Bizic MR. Comparison of two different methods for urethral lengthening in female to male (metoidioplasty) surgery. J Sex Med. 2013 May;10(5):1431-8.

ECRI Institute. Special Report. Gender dysphoria. January 2016.

Frey JD, Poudrier G, Chiodo MV, Hazen A. A systematic review of metoidioplasty and radial forearm flap phalloplasty in female-to-male transgender genital reconstruction: is the "ideal" neophallus an achievable goal? Plast Reconstr Surg Glob Open. 2016 Dec 23;4(12):e1131.

Gaither TW, Awad MA, Osterberg EC, et al.  Postoperative Complications following Primary Penile Inversion Vaginoplasty among 330 Male-to-Female Transgender Patients. J Urol. 2017 Oct 12 pii: S0022-5347(17)77717-8. doi: 10.1016/j.juro.2017.10.013. [Epub ahead of print].

Gooren LJ. Clinical practice. Care of transsexual persons. N Engl J Med. 2011 Mar 31;364(13):1251-7.

Hayes, Inc. Hayes Directory Report. Ancillary procedures and services for the treatment of gender dysphoria. Lansdale, PA: Hayes, Inc.; May 2014b; updated April 2018.

Hayes, Inc. Hayes Directory Report. Sex reassignment surgery for the treatment of gender dysphoria. Lansdale, PA: Hayes, Inc.; May 2014a; updatedApril 2018.

Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. 2017 Nov 1;102(11):3869-3903. https://academic.oup.com/jcem/article/102/11/3869/4157558.

Horbach SE, Bouman MB, Smit JM, et al. Outcome of vaginoplasty in male-to-female transgenders: a systematic review of surgical techniques. J Sex Med. 2015 Jun;12(6):1499-512.

Kanhai RC, Hage JJ, Mulder JW. Long-term outcome of augmentation mammaplasty in male-to-female transsexuals: a questionnaire survey of 107 patients. Br J Plast Surg. 2000 Apr;53(3):209-11.

Kuhn A, Bodmer C, Stadlmayr W, Kuhn P, Mueller MD, Birkhäuser M. Quality of life 15 years after sex reassignment surgery for transsexualism. Fertil Steril. 2009 Nov;92(5):1685-1689.e3.

Mahfouda S, Moore JK, Siafarikas A, Hewitt T, Ganti U, Lin A, Zepf FD. Gender-affirming hormones and surgery in transgender children and adolescents. Lancet Diabetes Endocrinol. 2019 Jun;7(6):484-498.

Manrique OJ, Adabi K, Martinez-Jorge J, et al. Complications and Patient-Reported Outcomes in Male-to-Female Vaginoplasty-Where  We Are Today: A Systematic Review and Meta-Analysis. Ann Plast Surg. 2018 Jun;80(6):684-691.

Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.

AZSTATE.153309

Morrison SD, Vyas KS, Motakef S, et al. Facial feminization: systematic review of the literature. Plast Reconstr Surg. 2016 Jun;137(6):1759-70.

Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. Clin Endocrinol (Oxf). 2010 Feb;72(2):214-31.

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376 (May 18, 2016) (codified at 45 C.F.R. pt. 92).

Sutcliffe PA, Dixon S, Akehurst RL, et al. Evaluation of surgical procedures for sex reassignment: a systematic review. J Plast Reconstr Aesthet Surg. 2009 Mar;62(3):294-306; discussion 306-8.

Van Damme S, Cosyns M, Deman S, et al. The effectiveness of pitch-raising surgery in male-to-female transsexuals: a systematic review. J Voice. 2017 Mar;31(2):244.e1-244.e5.

Weigert R, Frison E, Sessiecq Q, et al. Patient satisfaction with breasts and psychosocial, sexual, and physical well-being after breast augmentation in male-to-female transsexuals. Plast Reconstr Surg. 2013 Dec;132(6):1421-9.

World Professional Association for Transgender Health (WPATH). Standards of care for the health of transsexual, transgender and gender nonconforming people. 7th edition. 2012.

Zhang WR, Garrett GL, Arron ST, Garcia MM. Laser hair removal for genital gender affirming surgery. Transl Androl Urol. 2016 Jun;5(3):381-7.

## POLICY HISTORY/REVISION INFORMATION

| Date | Action/Description |
| --- | --- |
| 01/01/2020 | **Applicable Codes**<br>• Updated list of applicable CPT codes to reflect annual code edits:<br>  ○ Added 15769, 15771, 15772, 15773, and 15774<br>  ○ Removed 19304 and 20926<br>**Supporting Information**<br>• Archived previous policy version CS145.E |

## INSTRUCTIONS FOR USE

This Medical Policy provides assistance in interpreting UnitedHealthcare standard benefit plans. When deciding coverage, the federal, state or contractual requirements for benefit plan coverage must be referenced as the terms of the federal, state or contractual requirements for benefit plan coverage may differ from the standard benefit plan. In the event of a conflict, the federal, state or contractual requirements for benefit plan coverage govern. Before using this policy, please check the federal, state or contractual requirements for benefit plan coverage. UnitedHealthcare reserves the right to modify its Policies and Guidelines as necessary. This Medical Policy is provided for informational purposes. It does not constitute medical advice.

UnitedHealthcare may also use tools developed by third parties, such as the MCG™ Care Guidelines, to assist us in administering health benefits. The UnitedHealthcare Medical Policies are intended to be used in connection with the independent professional medical judgment of a qualified health care provider and do not constitute the practice of medicine or medical advice.

**Proprietary Information of UnitedHealthcare. Copyright 2020 United HealthCare Services, Inc.**

AZSTATE.153310

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                )
                                  )
                Plaintiff,        )
                                  )
vs.                               )        4:19-cv-00035
                                  )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,    )
                                  )
                Defendants.       )
                                  )

VIDEOTAPED DEPOSITION OF MARIE FRANCES ISAACSON

Via Zoom videoconference
March 26, 2021
8:21 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue         Prepared by:
Phoenix, Arizona 85020
                                    Jill Marnell, RPR
602.266.6535                        Arizona Certified
www.glennie-reporting.com           Reporter No. 50021

1    Q.   And what about -- what is it about bariatric

2    surgery that sticks out in your mind?

3    A.   Just what type of procedure -- there are

4    different types -- there are different ways of conducting

5    it, and we wanted to cover the gastric sleeve.  We wanted

6    to add that as a benefit.

7    Q.   And when was that work?

8    A.   2013 maybe.

9    Q.   And was it -- was that work almost all in 2013 or

10   did it go on for a number of years?

11   A.   It -- it was for the plan design for the

12   following year.

13   Q.   So in 2013 you recall working on what coverage

14   the plan provided for bariatric surgery?

15   A.   That's right.

16   Q.   Do you recall ever working on any other -- And to

17   clarify, did the plan exclude coverage for bariatric

18   surgery at that point?

19   A.   I didn't exclude it, but I think it covered

20   specific types of bariatric surgery.  It may have excluded

21   it.  I honestly don't remember.  As I recall, it was to

22   include that type of bariatric surgery.

23   Q.   How did that process begin?

24   A.   Two of the managers in the benefits division came

25   to me with the recommendation to include gastric sleeve.

99

1      Q.    And is gastric sleeve the type of bariatric

2   surgery the plan was considering covering?

3      A.    Adding, yes.

4      Q.    Is that typically how extensions of benefits come

5   to your -- came to your attention?

6      A.    Yes.

7      Q.    So someone working in the benefit services

8   division would come to you and say the plan should cover a

9   particular type of service or treatment?

10      A.    Yes.

11      Q.    Did you ever -- did you ever get such requests

12   top down, say, from a supervisor?

13      A.    No.

14      Q.    And do you know where those two -- So speaking

15   specifically -- speaking with respect to the bariatric

16   surgery -- and I think it was a type of sleeve, gastric

17   sleeve -- do you know where those two managers got the

18   idea that the plan might -- should cover or should

19   consider extending coverage for gastric sleeves?

20      A.    I'm guessing from the health plans.

21      Q.    And what do you mean by the health plans?

22      A.    Aetna, Cigna, United, Blue Cross Blue Shield.

23      Q.    And why would that be your guess?

24      A.    Just knowing the functioning of benefits and how

25   it works.

1       Q.   Is it typical for the health plans to come to the

2    ADOA recommending that coverage be extended for treatment?

3       A.   I -- I would say it's typical that the health

4    plans come to DOA with various recommendations:  what to

5    cover, what not to cover, changes to make.

6       Q.   How often would you say, in your time working at

7    ADOA, this happened?

8       A.   That they recommended changes?

9       Q.   Yes.

10      A.   We met -- we met regularly.  We met -- I -- I

11   can't remember how often.  Quarterly at least with the

12   health plans.  I can't say that each of those meetings

13   resulted in recommendations of change.  It was more how

14   the -- how the plan was doing, a review of -- of the plan

15   and utilization.

16      Q.   So continuing to focus on this gastric sleeve for

17   bariatric surgery, do you recall the outcome of that

18   inquiry?

19      A.   It was added as a benefit.

20              Or I should say, to be clear, extended a

21   benefit.  So for the type of surgery.

22      Q.   Does that make a difference, whether a benefit is

23   being added or extended?

24      A.   I just wanted to be clear.  It wasn't new, it was

25   just an extension of the type of surgery we would cover.

**Marie Frances Isaacson - 03/26/2021**

1    Q.   Thank you for clarifying that, Ms. Isaacson.   But

2 my question remains, does it make a difference whether the

3 ADOA is considering whether to add a benefit or extend

4 benefits?

5    A.   I'm not sure I'm following your question.

6    Q.   Sure.   Is -- is there a standard process for when

7 the insurers bring a recommendation on whether the plan

8 should cover a benefit?

9    A.   The process is that they bring the -- the

10 recommendation and then we discuss it amongst ourselves --

11 we discussed it amongst ourselves, and then we would raise

12 it to the director's office.

13    Q.   And how long would that process typically take?

14    A.   I'd say plan design started in June and was ready

15 in -- I'm sorry, let me backtrack.

16        I would say it starts -- in the beginning of

17 the plan year is when you start looking at your plan and

18 what happens.   And it results in a plan design change by

19 June.   So six months.

20    Q.   Do you recall if it took -- Do you recall with

21 respect to this gastric sleeve or bariatric surgery

22 whether it took the six months?

23    A.   I don't recall specifically, but that's about the

24 time frame.   I'm not sure how long the plans brought that

25 idea forward.

120

1    Q.   Were there any changes to the plan that the

2   director's office can make themselves?

3    A.   You know, there -- As an example, a pharmacy

4   change, to change from one type of drug to a different

5   drug to save money, that would be recommended by the

6   pharmacy benefit manager.  And that -- that wasn't,

7   though, a contribution strategy discussion.  That was --

8   that could have been midyear.  And that -- I would have

9   brought that to the director's office and they would make

10   a determination as to whether or not the governor's office

11   would be notified of that.  I'm not sure when they did or

12   didn't notify the governor's office of those types of

13   decisions.

14         For plan design and the contribution

15   strategy the governor's office was always involved.

16    Q.   So to be clear, yes, there were some decisions

17   that the director's office can make themselves.

18    A.   I -- I don't know because I don't know every

19   decision that was run by the governor's office or not.

20    Q.   But do you know whether the governor -- the

21   director's office could make a decision, for example, on

22   pharmacy benefits by themselves?

23    A.   I don't know the answer to that.

24    Q.   Was there anyone else beyond the director's

25   office and the governor's office who was involved in

Marie Frances Isaacson - 03/26/2021

136

1    her through the -- when you were at the ADOA?

2        A.   I -- Yeah, I -- Yes.

3        Q.   Has there ever been a conflict of interest in

4    your work with the Arizona governor's office because of

5    your prior work at the ADOA?

6        A.   No.

7        Q.   So just to be clear, there's never been a matter

8    that you didn't feel like you could approach the

9    governor's office because of your prior work with the

10   ADOA?

11       A.   Correct.

12       Q.   And are you aware whether the Isaacson Law Firm

13   ever screened you off from anything because of your work

14   at the ADOA?

15       A.   No.

16       Q.   So -- And, again, we're going to pivot to your --

17   to your work as the benefits director, you know, in the

18   last role -- your last role in the ADOA.  But just before

19   that, on the bariatric surgery and gastric sleeve

20   procedure we've been discussing, I believe you said

21   earlier that procedure was ultimately approved.

22       A.   Correct.

23       Q.   Was that procedure legally required?

24       A.   No.

25       Q.   Why was it approved?

1      A.   Best interest of the plan and members.

2      Q.   When you say the best interest of the plan what

3  do you mean by that?

4      A.   It was a preferred type of surgery with less

5  complications, fewer complications for the patient.

6      Q.   And who made that assessment?

7      A.   I'm assuming we got it from the medical directors

8  of the plans.

9      Q.   So does the ADOA have an interest in -- When you

10  say it's a preferred type of surgery with less

11  complications, fewer complications for the patient, does

12  the plan or the ADOA I guess, whichever it is, have an

13  interest in making it -- making services less complicated?

14      A.   When I say "less complicated" I meant medically

15  less complicated.  So better outcomes, better for the

16  patient.

17      Q.   And --

18      A.   (Indecipherable) complications.

19           THE COURT REPORTER:  I'm sorry?

20           THE WITNESS:  Fewer complications.

21      Q.   BY MR. WALL:  And is the welfare of the patients

22  a priority for the ADOA?

23      A.   Yes.

24      Q.   And forgive me, you might have testified to this

25  earlier.  But was there a cost analysis of providing for

1    gastric sleeves done?

2        A.   I don't recall.

3        Q.   Do you have any reason to doubt that there would

4    have been one?

5        A.   I just don't know one way or the other.

6        Q.   Now, just to be clear, is your answer that you

7    don't -- you don't know or you just don't recall?  Like

8    you might have known at one point but you can no longer

9    remember?

10       A.   I no longer remember.

11       Q.   Would you ever present a treatment like the

12   gastric sleeve to the director's office without a cost

13   analysis?

14       A.   Probably not.

15       Q.   And what -- would you ever present a cost

16   analysis to the director's office that hadn't been

17   certified by an actuary?

18       A.   There may have been.

19       Q.   So the answer is yes, you might present to the

20   director's office a cost analysis that wasn't certified.

21       A.   Unlikely, but perhaps.

22       Q.   Why is that unlikely?

23       A.   Because there was always -- because the plan was

24   self-funded there was always a concern for what impact it

25   would have on the plan, the health of the plan, and the

1    than what is -- what we consider in the best interest of

2    the patient.  That's what I was trying to get to.

3        Q.  BY MR. WALL:  And Ms. Isaacson, I think you might

4    have answered this but to be clear, do you recall whether

5    there was an actuarial analysis of the cost of covering

6    this gastric sleeve procedure?

7        A.  I don't recall.

8        Q.  Would you be surprised if there was not an

9    actuarial cost analysis?

10       A.  Yes.

11       Q.  Other than the best interest of the plan and the

12   patient and an actuarial cost analysis, do you recall any

13   other criteria that was evaluated in deciding to remove

14   this exclusion from the plan?

15       A.  No.

16       Q.  Was the legal necessity of this surgery a factor

17   in deciding to remove this exclusion from the plan?

18       A.  No.

19       Q.  And why not?

20       A.  It was already -- the procedure was already

21   covered.  It was just the type of procedure.  The -- the

22   method of the procedure, the gastric sleeve was one method

23   of gastric bypass surgery.

24       Q.  So when you say the procedure was already

25   covered, do you mean that there were -- So let me -- let

343

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF YAVAPAI       )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7        I CERTIFY that I am in no way related to, nor
     employed by any of the parties hereto, and have no
 8   interest in the outcome thereof.

 9        [X] Review and signature was requested.
          [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
     this 8th day of April, 2021.

13

14

15

16                  _____
                        JILL MARNELL
17                    Certified Reporter #50021
                    Registered Professional Reporter

18              *     *     *     *     *     *

19        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
     complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22

23                  _____
                      GLENNIE REPORTING SERVICES, LLC
24                      Registered Reporting Firm
                        Arizona RRF No. R1035
25
```

344

1                          SIGNATURE OF WITNESS

2

3      I, MARIE FRANCES ISAACSON, the witness in the above
    deposition, do hereby certify that I have read the
4   foregoing deposition, and that the said deposition is a
    true and correct record of my testimony, with such
5   corrections and changes, if necessary, listed below.

6   _____
                            WITNESS

7   PAGE: LINE: SHOULD READ:          REASON FOR CHANGE:

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24

25

# EXHIBIT H

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


RUSSELL B. TOOMEY,                    )
                                      )
                Plaintiff,            )
                                      )
vs.                                   ) 4:19-CV-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD       )
OF REGENTS, d/b/a UNIVERSITY OF       )
ARIZONA, a governmental body of       )
the State of Arizona; et al.,         )
                                      )
                Defendants.           )
_____)




VIDEOTAPED DEPOSITION OF SCOTT BENDER

Via Zoom Videoconference
March 31, 2021
8:00 a.m.
Phoenix, Arizona




Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535                      Prepared by:
www.glennie-reporting.com         Robin L. B. Osterode
                                  CSR, RPR
                                  CA CSR No. 7750
                                  AZ CR No. 50695

Scott Bender, Videotaped - 03/31/2021

117

1  how often does that occur?

2      A.    Not very frequently.

3      Q.    Twice a year?

4      A.    No, not even that often.

5      Q.    Once every two years?

6      A.    I'd say that's probably more -- more likely.

7  And, typically, it's done in conjunction with change in

8  law that we have to, you know, cover something in

9  particular.

10     Q.    Was the removal of the plan's exclusion of 3-D

11 mammography the last plan exclusion you dealt with?

12     A.    No, it was the -- the clinical cancer trial.

13 And that was something that we had to cover.  3-D

14 mammography was more of a change in medical coverage

15 guidelines.

16     Q.    So what do you mean it -- what do you mean by

17 it was a "change in medical coverage guidelines"?

18     A.    The vendors themselves determine what is

19 considered a medically necessary service.  As I

20 mentioned, Aetna was the first organization to make the

21 determination that 3-D mammography was an appropriate

22 service and not experimental.  They had seen enough

23 evidence to determine that that is something that should

24 be covered.  And they were covering it on their -- on

25 their medical guidelines.  And slowly, but surely, the

Scott Bender, Videotaped - 03/31/2021

118

1   others evolved.  And my recollection is that that had

2   previously been listed as an exclusion, and that was

3   taken off.

4       Q.    When you say the others evolved, are you

5   referring to the then-network providers?

6       A.    Yes.  So Cigna and Blue Cross Blue Shield and

7   United Healthcare, their coverage guidelines ultimately

8   went under the same sort of review of medical compendia

9   and data, and they determined that that should be more a

10  standard service than an experimental service.

11      Q.    Over how long a period did this occur?  For

12  instance, when did Aetna add in 3-D mammography to its --

13  to its guidelines?

14      A.    I don't know when they added it.  I want to say

15  it was in 2018.  And over a period of probably about a

16  year, is my recollection, the other vendors came to the

17  same determination.

18          I lost video of them.

19      Q.    Oh, can you see me?

20      A.    No, I -- we seem to have a little --

21          MR. CURTIS:  Can we go off the record for a

22  moment?

23          THE WITNESS:  -- mousepad here.  I don't even

24  have a mouse; it's moving on its own.

25          THE REPORTER:  Do you want to go off the

Scott Bender, Videotaped - 03/31/2021

124

1  who is not, and what is the basis for that.

2      Q.    Did you ask Ms. Medina to do a cost analysis of

3  covering the treatment?

4      A.    I don't recall.  I don't believe so.

5      Q.    Would you have likely asked her to do a cost

6  analysis?

7      A.    Very likely.  Either her or our actuary.  But

8  my recollection was the cost is fairly similar, so it

9  wouldn't have been an extreme cost burden to the plan.

10     Q.    Fairly similar to what?

11     A.    Excuse me, similar to a standard mammogram.  So

12  the standard mammogram that was replaced by a 3-D

13  mammography.  And the standard is still being used out

14  there very broadly, even though 3-D's available.

15     Q.    And it was important that the cost of the 3-D

16  mammography was similar to a service the plan was already

17  covering?

18     A.    Any time you're considering additional costs,

19  it's important to understand what that is.  My

20  recollection was that the cost for a 3-D mammography was

21  very similar to the cost of a standard mammogram.

22     Q.    And the fact that it was similar meant that it

23  would be less impactful?

24     A.    Correct.

25     Q.    Now, Mr. Bender, you said earlier you expect

298

1                          SIGNATURE PAGE

2

3          I, SCOTT BENDER, a deponent exercising my
right to read and sign my deposition taken on March 31,
4  2021, place my signature hereon and make the following
changes on this _____day of_____, 2021.
5
           (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                    _____

8                         SCOTT BENDER

9

10     PAGE      LINE      READS        CHANGE TO         REASON

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____     _____

24     _____     _____     _____

25     _____     _____     _____

299

1   STATE OF ARIZONA      )
    COUNTY OF MARICOPA    )
2
            BE IT KNOWN that the foregoing proceedings
3   were taken before me; that the witness before testifying
    was duly sworn by me to testify to the whole truth; that
4   the foregoing pages are a full, true, and accurate record
    of the proceedings all done to the best of my skill and
5   ability; that the proceedings were taken down by me in
    shorthand and thereafter reduced to print under my
6   direction.

7           [X] Review and signature was requested.

8           [ ] Review and signature was waived.

9           [ ] Review and signature not required.

10          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in the ACJA 7-206(F)(3)
11  and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
    Arizona, this 13th day of April, 2021.

12

13

14

15   _____
16          ROBIN L. B. OSTERODE, RPR
            CA CSR No. 7750
17          AZ CR No. 50695

18          *    *    *    *    *

19          I CERTIFY that Glennie Reporting Services,
    LLC, has complied with the ethical obligations set forth
20  in ACJA 7-206(J)(1)(g)(1) through (6).

21

22

23
    _____
24  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
25  Arizona RRF No. R1035

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


RUSSELL B. TOOMEY,                    )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )      4:19-cv-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,       )
                                      )
                    Defendants.       )
                                      )


VIDEOTAPED DEPOSITION OF ELIZABETH MARIE SCHAFER

Via Zoom videoconference
April 28, 2021
8:33 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

Elizabeth Schafer, Videotaped - 04/28/2021

161

1   that are more expensive than that.

2        Q.   BY MR. GARBACZ:  Do you know if ADOA has added

3   things that are more expensive than that or that added

4   benefits that are more expensive than that in your tenure

5   at the ADOA?

6        A.   No.  I'm sure they added stuff but I wouldn't

7   know the cost of each addition.

8        Q.   Can you think of an example of something that

9   might have cost more than that that ADOA added in your

10  time at ADOA?

11       A.   I know we add -- like we added the drugs to take

12  care of hepatitis C, which is an extremely expensive drug,

13  because it cured people.  So I know we added things like

14  that.

15       Q.   Let's take that example for a minute.  Do you

16  remember what the name of that drug was?

17       A.   No.

18       Q.   But it's a hepatitis -- hepatitis C drug?

19       A.   Right.  And it -- it actually cures the person of

20  the disease so we -- then we stop getting claims from that

21  person.  So it's worth the large expense.

22       Q.   So if a procedure cures someone of a disorder,

23  that's a reason to cover it.  Yes?

24       A.   Yes.

25       Q.   Do you remember generally what the cost was for

1   covering -- I know you said it was expensive, but do you

2   have any -- any detail about how much it may have cost?

3       A.   I think it's over a million dollars for one

4   member.

5       Q.   Do you remember whether the trend was to cover

6   that?  Were other -- were other self-funded plans covering

7   that drug?

8       A.   Yeah, it's very common.  A lot of people added it

9   because down the road it cuts down your claims.  So you

10  want to cure people of hepatitis C if you can.

11              THE COURT REPORTER:  And you're saying

12  hepatitis C, as in cat?

13              THE WITNESS:  Correct.

14      Q.   BY MR. GARBACZ:  Okay.  Other than this drug for

15  hepatitis C, are there any other instances of a -- of a

16  benefit that comes to mind, specifically a benefit that

17  has added more than 17 cents per employee per month?

18      A.   I honestly don't really remember, you know, the

19  cost of every change that was made to the plan, so I can't

20  think of anything else.

21      Q.   Let's take just a couple of examples of things

22  that we had spoken about earlier.  We talked about 3D

23  mammography.

24      A.   Uh-huh.

25      Q.   Right?

225

```
1   STATE OF ARIZONA          )
                              )  ss.
2   COUNTY OF YAVAPAI         )

3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true, and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.
7        I CERTIFY that I am in no way related to, nor
    employed by any of the parties hereto, and have no
8   interest in the outcome thereof.

9        [X] Review and signature was requested.
         [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11       I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
    this 10th day of May, 2021.

13

14

15                           _____
16                                 JILL MARNELL
                                Certified Reporter #50021
17                           Registered Professional Reporter

18            *      *      *      *      *      *

19       I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
    complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22

23                           _____
24                             GLENNIE REPORTING SERVICES, LLC
                                  Registered Reporting Firm
                                  Arizona RRF No. R1035
25
```

226

1                          SIGNATURE OF WITNESS

2

3      I, ELIZABETH MARIE SCHAFER, the witness in the above
    deposition, do hereby certify that I have read the
4    foregoing deposition, and that the said deposition is a
    true and correct record of my testimony, with such
5    corrections and changes, if necessary, listed below.

6    _____
                           WITNESS

7    PAGE: LINE: SHOULD READ:           REASON FOR CHANGE:

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24

25

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                    )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )      4:19-cv-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,   )
                                      )
                Defendants.           )
                                      )

VIDEOTAPED DEPOSITION OF MICHAEL MEISNER

Via Zoom videoconference
March 16, 2021
8:38 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

1          So are you on Tab 53?

2      A.   Yes.

3      Q.   Okay.  And at the bottom of Tab 53 I'm just going

4  to read the Bates, AZSTATE.151009.  Are you on that page?

5      A.   151099.

6      Q.   Yes.

7      A.   Yes.

8      Q.   Okay.  And what I want to refer you to is the

9  Footnote Number 1 that has the Website

10  www.cheatsheet.com/money-career -- I'm not going to read

11  the whole thing --

12      A.   Right.

13      Q.   Okay.  If you could take a look at that.  And

14  then on the share screen see if that appears to be the

15  same Website address and if that Website that's shown

16  there looks familiar to you.

17      A.   It looks correct.

18      Q.   Okay.  So that, from your observation, is the

19  correct cheatsheet.com Website that you relied on in

20  building the chart that's in Tab 53, marked as Exhibit 6?

21      A.   Yes.

22      Q.   Okay.  Can you read that first paragraph that's

23  on the screen there?  Go ahead and read it out loud if you

24  can see it.

25      A.   Oh.  [As read]:  More -- more employers than ever

Michael Meisner, Videotaped - 03/16/2021

225

1  are embracing health coverage for transgender employees,

2  as well as nondiscrimination protections.  This is largely

3  a result of the proven low cost of providing transgender,

4  hyphen, inclusive care, comma, since transgender adults

5  represent just 0.3 percent of the US adult population.

6      Q.   And is that the source for this chart where you

7  used the number that .3 percent of the adult population is

8  transgender in the United States?

9      A.   Yes, this looks correct.

10             MR. CURTIS:  Okay.  Could I have Amanda

11  click on that link?  It looks like a hyperlink, the

12  .3 percent of -- Yes.  Could you click on that.

13      Q.   BY MR. CURTIS:  And Mr. Meisner, are you familiar

14  with cheatsheet.com?  Is that something that you --

15      A.   No --

16      Q.   Okay.

17      A.   -- I'm not.  I don't regularly look at it or --

18  or subscribe or --

19      Q.   And do you -- do you know if they conduct their

20  own research or if they just share sources from --

21  information from other sources?

22      A.   Oh, I -- No, this -- they -- they share

23  information from other sources, from my understanding.

24      Q.   Okay.

25      A.   Yeah.

Michael Meisner, Videotaped - 03/16/2021

226

1    Q.   So the link that was just clicked on while we

2  watched redirected us to another Website.  Are you able to

3  read -- That looks pretty small for you --

4    A.   Yeah.

5    Q.   -- but are you able to read the Web address

6  there?  Or at least the beginning so that we know the

7  source of that?

8    A.   Maybe on this one.  Sorry.  Oh, shoot, the mouse

9  is on that so I can't see it here.

10             I think it -- I believe it says

11  pewresearch.org/fact -- and sorry --

12    Q.   Okay.

13    A.   -- I'm failing on my eye exam here.

14    Q.   Okay.  Wasn't that --

15    A.   That's pew -- pew.org.

16    Q.   Okay.

17    A.   pewresearch.org.

18    Q.   Yeah, it wasn't intended to be an eye test,

19  but --

20    A.   Yeah.

21    Q.   -- really to see what the ultimate source of the

22  data was that said --

23    A.   Right.

24    Q.   -- .3 percent of adults in the United States may

25  be transgender.

Michael Meisner, Videotaped - 03/16/2021

227

1       Do you recall when you did this research if

2   you would have followed a link like that?

3       A.   Oh, absolutely.  Yeah.

4       Q.   And in your testimony earlier you made reference

5   to Pew.  So is it your recollection that that figure

6   actually came from Pew Research?

7       A.   Right, yes.  It is my --

8            MR. CURTIS:  Okay.  I only have one more

9   link, if Amanda could click in that first paragraph.  And

10  let me just read because it's probably easier for me.

11  About halfway through the paragraph [as read]:  By one

12  reputable estimate, transgender adults represent about

13  .3 percent of the US adult population, and about

14  five percent of the adult lesbian, gay, bisexual,

15  transgender population identifies primarily as

16  transgender.

17           If -- Amanda, as you are driving, could you

18  click on that that says point -- above that, .3 percent of

19  the US adult population.

20       Q.   BY MR. CURTIS:  Do you -- do you recall if,

21  Mr. Meisner, if you had gone this far looking at some of

22  the results cited by Pew Research?

23       A.   Yeah, so this is the study that I was talking

24  about.  So this is --

25       Q.   Are you able to see the Web address at the top of

1   that or at least who the -- what the source is?

2       A.   I'm sorry, I can't.  If I moved I could, but I

3   can't see it from here.  Sorry.

4       Q.   Okay.  I -- I could read it to you, but I -- I

5   don't know if you could verify just because I read it to

6   you.

7       A.   Right.

8       Q.   So I'll --

9       A.   William Institute.  I believe it says

10  williaminstitute.law, dot -- is that -- I'm sorry, I

11  can't -- I'm --

12      Q.   Okay.  My apologies to everyone for making this a

13  little bit tricky, not realizing that Mr. Meisner

14  wouldn't -- it is far on the screen --

15      A.   I can't see.

16      Q.   -- and it's very small print.

17              It's williamsinstitute.law@UCLA.edu and --

18      A.   Okay.

19      Q.   -- some additional --

20              But you do recall going that far and looking

21  at that study?

22      A.   Right.  And -- Yeah.  So this is really -- You

23  know, we have the executive summary, the key findings, and

24  then I think there's some -- also their methodology is in

25  here as well.

1      Q.   Okay.  So can you see there where it says "key
2   findings"?
3      A.   Yes.
4      Q.   Okay.  And it also -- I'm going to just read the
5   first bullet.  [As read]:  An estimated 3.5 percent of
6   adults in the United States identify as gay -- excuse me,
7   identify as lesbian, gay or bisexual and an estimated
8   point -- 0.3 percent of adults are transgender.
9            Can you see that?
10     A.   Yes.
11     Q.   Okay.  So just -- just to clarify, this is the
12  ultimate source of the data in the cheatsheet.com article
13  that you refer to in your chart?
14     A.   Yes.
15     Q.   But that research was not cheatsheet.com
16  research, it was rather from a Pew report; correct?
17     A.   Yeah, it's from this -- from this and that, from
18  this report.
19     Q.   Okay.  So -- Yeah.  So to connect the dots,
20  cheatsheet was citing the Pew report.  And the Pew report
21  was citing what it claimed was a reputable, which was this
22  williamsinstitute.law@UCLA?
23     A.   Yes.
24            MR. CURTIS:  Okay.  And with that I don't
25  have any other questions on redirect for Mr. Meisner,

274

1   STATE OF ARIZONA        )
                            )  ss.
2   COUNTY OF YAVAPAI       )

3        BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true, and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.
7        I CERTIFY that I am in no way related to, nor
    employed by any of the parties hereto, and have no
8   interest in the outcome thereof.

9        [X] Review and signature was requested.
         [ ] Review and signature was waived.
10       [ ] Review and signature not requested.

11       I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206(F)(3) and ACJA
12  7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
    this 30th day of March, 2021.

13

14

15                        _____

16                              JILL MARNELL
                           Certified Reporter #50021
17                      Registered Professional Reporter

18          *     *     *     *     *     *

19       I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
    complied with the ethical obligations set forth in ACJA
20  7-206(J)(1)(g)(1) through (6).

21

22

23                        _____
                          GLENNIE REPORTING SERVICES, LLC
24                          Registered Reporting Firm
                             Arizona RRF No. R1035
25

275

1                          SIGNATURE OF WITNESS

2

3      I, MICHAEL MEISNER, the witness in the above deposition,
    do hereby certify that I have read the foregoing
4   deposition, and that the said deposition is a true and
    correct record of my testimony, with such corrections and
5   changes, if necessary, listed below.

6                    _____
                                WITNESS

7   PAGE: LINE: SHOULD READ:              REASON FOR CHANGE:

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24

25