**Christine K. Wee – 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
*Admitted pro hac vice*

**Wesley R. Powell***
**Matthew S. Freimuth***
**Jordan C. Wall***
**Justin Garbacz***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
E-Mail: wpowell@willkie.com
E-Mail: mfreimuth@willkie.com
E-Mail: jwall@willkie.com
E-Mail: jgarbacz@willkie.com
*Admitted pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B. Toomey,<br><br>                    Plaintiff,<br><br>          v.<br><br>**State of Arizona; Arizona Board of Regents, D/B/A University of Arizona**, a governmental body of the State of Arizona; et al.,<br><br>                    Defendants. | Case No.19-cv-00035-TUC-RM (LAB)<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Dr. Russell B. Toomey, on behalf of himself and the certified classes ("Plaintiff" or "Dr. Toomey"), submits the following Response ("Response") to State Defendants' Motion for Summary Judgment ("Motion" or "Mot.") (Doc. 293). This Response is accompanied by the Transmittal Declaration of Christine K. Wee and the exhibits thereto, Plaintiff's Countervailing Statement of Facts ("PCSOF") to Defendants' Separate Statement of Facts in Support of Motion for Summary Judgment (Doc. 295), which includes Plaintiff's Separate Statement of Facts In Support of Dr. Toomey's Response ("SSOF").

## INTRODUCTION

State Defendants are not entitled to judgment as a matter of law. First, the undisputed facts regarding the "Gender Reassignment Surgery" Exclusion establish that it facially discriminates on the basis of sex and transgender status in violation of Title VII. Second, even if the Exclusion were determined to be facially neutral, State Defendants are not entitled to summary judgment because there are genuine issues of material fact as to whether discriminatory motive played a role in the State's decision to maintain the Exclusion, and that the State's sole asserted rationale for the Exclusion, cost concerns, is pretextual. Third, State Defendants fail to establish that the Exclusion survives heightened scrutiny, or even rational basis review. The Motion should be denied.

## BACKGROUND

Dr. Toomey incorporates here the background provided in his Motion for Summary Judgment ("Plaintiff's Motion").[1] Doc. 298. In certain instances, Dr. Toomey has repeated, and supplemented with additional facts and testimony, topics covered in Plaintiff's Motion, as necessary to respond to State Defendants' Motion.

## I.      THE STATE'S DECISION TO MAINTAIN THE EXCLUSION DEPARTS FROM ORDINARY DECISION-MAKING

### A.      The State's Ordinary Decision-Making Regarding Plan Coverage

---

[1] Capitalized terms used below and not otherwise defined share the same meaning with such identical terms in Plaintiff's Motion.

### 1. Ordinary Procedure for Coverage Determinations

The State's Plan is administered by the Arizona Department of Administration (the "ADOA"). Doc. 310 (Statement Of Undisputed Material Facts In Support Of Plaintiff's Motion For Summary Judgment ("PSOF")) ¶ 9. Healthcare policy decisions are customarily delegated to the Benefits Services Division, the sub-agency of the ADOA that is specifically tasked with maintaining and administering the State's Plan. *Id*. ¶ 12. Substantive determinations regarding Plan design are typically made by administrative professionals at the ADOA. *Id*. ¶ 13. While ADOA's proposed changes to the Plan are occasionally discussed with the Arizona governor's office (the "Governor's Office"), the Governor's Office's approval of such changes is not technically required, and is generally considered to be ceremonial. SSOF ¶ 1. Under normal circumstances, the ADOA makes recommendations for Plan changes to the Director of the ADOA based on the analysis of professionals within the Benefits Services Division, and then the Governor's Office and joint legislative budget committee sign off on them. *Id*. ¶ 2. "In the ordinary course of business," coverage determinations are made using a "bottom-up" approach. *Id*. ¶ 3.

### 2. Ordinary Substantive Considerations

In assessing whether or not to extend coverage for a benefit or to remove a prior Plan exclusion, the ADOA Benefit Services Division usually considers objective criteria such as (i) estimated cost and (ii) market trends. SSOF ¶ 4. Benefits Services Division professionals collect cost information from ADOA's four third-party administrators—Blue Cross Blue Shield, Aetna, United Healthcare, and Cigna[2]—which maintain their own fully funded plans, and which are large repositories for healthcare cost information. *Id*. ¶ 5. Additionally, cost information is sometimes collected from other self-funded plans, like the plans of other States that have already adopted the benefit, and accumulated cost data. *Id*. ¶ 6. When the projected cost of coverage is minimal, that weighs in favor of coverage. *Id*. ¶ 9.

---

[2] These were ADOA's four third-party administrators in 2016. SSOF ¶ 5(a). Self-funded plans like ADOA's Plan utilize third-party administrators to provide operations services, such as claims processing. *Id*. ¶ 5(b).

2

Benefits Services Division employees also usually consider market trends: specifically, whether the trend among other health insurance providers is to cover or to exclude the benefit. *Id*. ¶ 7. For this market-trend assessment, ADOA generally turns to its own third-party administrators: if all four of ADOA's third-party administrators are adding coverage for a benefit, that favors ADOA also extending coverage. *Id* ¶ 7(a). This is particularly true where the projected cost of a benefit is low. *Id*. ¶ 9. As ADOA Plan Administration Manager Scott Bender testified during his deposition, "where all four [third-party administrators] are aligned that [a new benefit] is now a standard course of treatment," and where the "cost is reasonable," it is "a fairly easy decision, and we don't necessarily need to run to the [Governor's Office] or the director [of ADOA] to make those decisions." *Id*.

### 3.   Recent Expansions of Coverage Under the Plan

ADOA has recently *added* coverage for previously excluded medical procedures once they became accepted by insurers as standard care, despite the cost increase associated with them. PSOF ¶ 23 (summarizing new benefits recently added to Plan). For example, in 2014, the ADOA voluntarily added coverage for a new type of bariatric surgery for weight-loss. *Id.* ¶ 23(b)-(d). Between 2016 and 2019—around the same time that the Exclusion was finalized in 2017—ADOA added coverage for 3-D Mammography. *Id*. ¶ 23(e)-(f). Both of these new benefits imposed some additional cost, and neither was required by law. *Id*. As another example, ADOA Plan Administrator Elizabeth Schafer testified that before her departure in 2018, ADOA added coverage for a new hepatitis-C drug, which is "extremely expensive." *Id*. ¶ 23(g).

### B.   The State's Decision to Maintain the Exclusion in 2016

### 1.   ADOA's Professional Assessment of Objective Criteria in 2015-16

In the 2015-16 timeframe, in response to inquiries from transgender employees at the State's universities and regulatory developments under Section 1557 of the Affordable Care Act, Benefits Services Division professionals considered whether or not to extend coverage for gender-affirming care, which was categorically excluded under the Plan. PSOF ¶¶ 33-

3

34.   After collecting cost information from its third-party administrators and other self-funded plans, ADOA's Budget Manager Kelly Sharritts estimated that the Plan would experience between ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Id*. ¶¶ 37, 39.   ADOA employees deposed in this litigation, including Kelly Sharritts—the only ADOA employee who conducted a cost analysis in 2016—agreed that in light of the Plan's size and the cost of other covered benefits, this estimated cost was insignificant.  *Id*. ¶ 40 (ADOA witnesses describing estimated cost as "low," "miniscule" or "not significant").[3]  Marie Isaacson, who was director of the ADOA's Benefit Services Division in 2015 and 2016, testified that the cost estimated for gender-affirming care was so low that it would not "have mattered" to the ADOA, and that it would "not have been a factor that ADOA considered." *Id*. ¶ 40(d).  When later, as a part of this litigation, Ms. Isaacson was questioned about ADOA's decision to maintain the Exclusion in 2016, she confirmed that it was "not a cost issue," and that cost was not what motivated the decision to maintain the Exclusion.  *Id*. ¶ 51.

The ADOA Benefits Services Division also considered market trends by asking their third-party administrators whether they would be extending coverage.  SSOF ¶ 10.  All four third-party administrators confirmed that they would be covering gender-affirming care, including gender-affirming surgery.  *Id*. ¶ 11.

2.   The Governor's Office's Top-Down Mandate to Maintain the Exclusion

Despite its own findings that the costs of coverage would be immaterial, and that all four of ADOA's vendors were extending coverage for gender-affirming care, including surgery, ADOA ultimately maintained its Exclusion after a closed-door meeting with the

---

[3]   ADOA's estimate of immaterial cost is also substantiated by the unrebutted expert report of Joan Barrett, a certified healthcare actuary who testified that the cost increase associated with covering gender affirming surgery in 2016 was less than 0.1%, an "amount so small that it would be considered immaterial from an actuarial perspective," meaning that it would not impact the ordinary decision-making of a health insurance provider.  PSOF ¶ 44.

Governor's Office in the fall of 2016.  PSOF ¶ 45.  The meeting was attended by Ms. Isaacson and Christina Corieri (Healthcare Policy Advisor in the Governor's Office), and legal counsel, among others.  *Id.* ¶ 46.  Ms. Isaacson testified that "[t]here wasn't really a discussion" at the meeting.  *Id.* ¶ 47.  Ms. Isaacson did not provide a recommendation about whether ADOA should remove the Exclusion because she did not think the decision was hers to make.  *Id.* ¶ 48.

After reviewing the advice of legal counsel, Ms. Corieri announced that ADOA would cover gender-affirming hormones and counseling, but would continue to exclude gender-affirming surgery.  *Id.* ¶ 50.  The decision was not based on cost, but on the purported conclusion that coverage for surgery was not legally mandated.  *Id.* ¶ 51.[4]  Ms. Corieri testified at her deposition that she did not recall being presented with ADOA's cost analysis, and that she did not recall asking for or receiving any cost-assessment related to the Exclusion.  *Id.* ¶ 49.  Another ADOA employee testified that ADOA did not make the decision to maintain the Exclusion, but that it was "communicated to us to implement," from "up the food chain" at the Governor's Office.  SSOF ¶ 13(b).  After the closed-door meeting, Ms. Corieri approved the new language of the Exclusion on behalf of the Governor's Office. PSOF ¶ 53.  The Exclusion (as modified) went into effect for the 2017 Plan year.  *Id.* ¶ 54.

When questioned about the circumstances surrounding the 2016 closed-door meeting, State witnesses testified that it was rare for the Governor's Office to provide a coverage determination before considering ADOA's recommendation.  *Id.* ¶ 55(a) (current Benefits Services Division Director Paul Shannon confirming that it "doesn't happen very often" that he even meets with anyone in the Governor's Office); *see also id.* ¶ 55(b) (Plan

---

[4]   As part of discovery, Dr. Toomey filed a motion to compel production of documents regarding the legal advice that formed the basis of ADOA's 2016 decision not to provide coverage for "gender reassignment surgery."  Doc 195.  After Defendants disclaimed reliance on any advice-of-counsel defense, this Court denied the motion to compel but precluded Defendants "from arguing that they held a good-faith subjective belief that their decision to maintain the exclusion for gender reassignment surgery was legal." Doc. 278.

Administration Manager Scott Bender unable to recall a single instance in which the Governor's Office was involved in a Plan change before the ADOA made a recommendation).   ADOA's Lead Plan Administrator Yvette Medina only recalls two instances in which the Governor's Office proposed Plan language: "same-sex or domestic partners" and "the nondiscrimination transgender item."  *Id.* ¶ 55(c).

### C.   The State's Bias Against Transgender Individuals and Gender Transition

Discovery in connection with this lawsuit has revealed evidence that the State's ultimate decision-makers regarding the Exclusion—particularly actors at the Governor's Office—were motivated not by cost, but by bias against transgender individuals and against State funding for gender transition.  In 2013, Christina Corieri—who would later announce the Governor's Office's decision to maintain the Exclusion in 2016—made a social media post stating "advocates now demanding taxpayer dollars for gender reassignment surgery under Medicare–bet Medicaid is next."  SSOF ¶ 15.   Document production from the Governor's Office also revealed that Ms. Corieri subscribes to anti-transgender publications, including ones that deny the existence of transgender individuals, and that characterize gender-affirming surgeries as "Frankenstein Hack Job[s]" and "Genital Mutilation."  *Id* ¶ 16.

The decision to maintain the Exclusion appears part of a pervasive state-wide policy against gender transition.  As ADOA reevaluates the Plan design every year, the State has maintained the Exclusion through every reevaluation since its institution of the self-funded Plan in 2004 (18 years to date).  *Id.* ¶ 18.  The ADOA's maintenance of the Exclusion over 18 years coincides with other State entities' maintenance of similar exclusions under health plans administered by those entities, including by the State's Medicaid agency, the Arizona Health Care Cost Containment System ("AHCCCS"), and by the State's Department of Corrections.  *Id*. ¶ 19.   The Exclusion's exact wording was modeled on AHCCCS's exclusion of gender-affirming surgery.  PSOF ¶ 53.

ADOA witnesses testified that, in performing their cost assessment for gender-affirming care in 2015-16, they were pressured from "above" to alter cost information, so as

to hide the fact that coverage would have an immaterial cost. SSOF ¶ 20. Specifically, ADOA Plan Administrator Elizabeth Schafer—who was responsible for collecting and maintaining information about "transgender benefits"—testified that she was directed to delete a sentence in ADOA's cost analysis that described the cost of coverage as "relatively low." *Id*. ¶ 20(a). Ms. Schafer explained that "someone didn't want it in black and white" that the cost of coverage was immaterial. *Id*. ¶ 20(b).

ADOA witnesses further testified that the State's decision-making regarding the Exclusion was a "sensitive" topic. *Id*. ¶ 21. When questioned why the Governor's Office might directly insert itself into ADOA's Plan-related decision-making, Plan Administration Manager Scott Bender testified that, except for when a benefit poses significant cost, the Governor's Office would generally only be involved where "anyone in leadership has a particular feeling one way or the other about it." *Id*. ¶ 22. Budget Manager Kelly Sharritts testified that to her knowledge in 2016 the State "w[as]n't ready to make that change [*i.e.* coverage of gender-affirming surgery] to the plan." *Id*. ¶ 23. Ms. Sharritts further testified that, because the cost of gender-affirming care was "minuscule" it "d[id]n't seem like [there was] an obvious reason not to cover it other than what the State feels on it." *Id*. ¶ 24.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment foreclosing employee discrimination cases is not "too readily" granted because of "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1112 (9th Cir. 2004). Indeed, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis,*

1   *Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (citation omitted).

2                                    **ARGUMENT**

3   **I.   THE "GENDER REASSIGNMENT SURGERY" EXCLUSION FACIALLY
         DISCRIMINATES BASED ON SEX AND TRANSGENDER STATUS**

5          As explained in Plaintiff's Motion (Doc. 298 at 11-25), the "Gender Reassignment

6   Exclusion" facially discriminates on the basis of sex and transgender status under both Title

7   VII and the Equal Protection Clause.[5]  State Defendants repeat the same arguments that this

8   Court already rejected when it denied their motion to dismiss (Doc. 69), and, further, fail to

9   follow or even acknowledge contrary precedent, asking this Court to reject the well-reasoned

10  opinions of virtually every other court to address the issue.

11         **A.    The Exclusion Facially Discriminates Under Title VII Based on Sex**

12         As virtually every other court to consider the question has recognized, excluding

13  insurance coverage for medically necessary surgery because the surgery is performed for

14  purposes of "gender reassignment" facially discriminates on the basis of "sex" in violation

15  of Title VII and other civil rights statutes.  *See* Plaintiff's Motion at fn. 6 (collecting cases).

16         State Defendants contend that the "Gender Reassignment Surgery" Exclusion is

17  neutral because it "does not explicitly reference one sex, gender, or other suspect

18  classification," and because it "excludes Gender Reassignment Surgery for all Plan

19  participants regardless of their gender, sex, or diagnosis."  Mot. at 6.  But equal application

20  of an exclusion to all sexes is irrelevant when an explicit "sex-based rule" is *built into* the

22  [5]   State Defendants argue that Dr. Toomey "may lack standing to both bring his claims and
         act as a class representative" because he may be able to obtain a hysterectomy—the
23       medically necessary treatment he seeks in treatment for gender dysphoria, but which the
         Plan denies as "gender reassignment surgery"—as medically necessary treatment for
24       another diagnosis, against which the Plan does not discriminate. Mot. at 3, n. 1.  State
         Defendants' assertions lack any evidentiary support.  PCSOF ¶ 12.  Even if Dr. Toomey's
25       claims were mooted, a justiciable controversy would still exist as to the Exclusion's
         violation of Title VII and the Equal Protection Clause that would not moot the claims of
26       the class members.  *Bell v. Wolfish*, 441 U.S. 520, 526 n.5 (1979) (holding that the
         termination of the class representative's claim does not moot the claims of the unnamed
27       class members).

28  

                                          8

exclusion itself. *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1745 (2020).  Under the Plan, a particular procedure is defined as "gender reassignment surgery" if the purpose of the surgery is to align a person's physical characteristics with their gender identity instead of their sex assigned at birth.  *See* Mot. at 9 (conceding that "the determining factor is the *reason* for the surgery") (emphasis in original).  Because the definition of "gender reassignment surgery" requires the insurance provider to treat (a) people with a male sex assigned at birth who require hysterectomies, mastectomies, and phaloplasties to masculinize their appearance for medically necessary reasons differently from (b) people with a female sex assigned at birth who require those procedures to masculinize their appearance for medically necessary reasons, the "Gender Reassignment Surgery" Exclusion necessarily requires the insurance provider to treat individuals differently based in part on their sex assigned at birth.[6]

*Bostock* explained this principle over and over again.  Like the "Gender Reassignment Surgery" Exclusion, a policy of firing employees based on sexual orientation or based on transgender status also "does not explicitly reference one sex [or] gender" and also applies to all employees "regardless of their gender [or] sex."  Mot. at 6.  But *Bostock* explained that a person's sex assigned at birth is still an essential ingredient of determining their "sexual orientation" and "transgender status."  Sexual orientation = an individual's sex

---

[6]  For example, if Dr. Toomey had been assigned a male sex at birth and had been born with a uterus and fallopian tubes as a result of Persistent Mullerian Duct Syndrome ("PMDS"), the Plan would cover the medically necessary surgery to align his anatomy with his identity as a man.  *See* Doc. 86-1 (Amended Complaint, Ex. A) at 55 (exclusion of coverage for "cosmetic surgery" does not exclude "necessary care and treatment of medically diagnosed congenital defects and birth abnormalities" or "surgery required to repair bodily damage a person receives from an injury").  But because Dr. Toomey was assigned a female sex at birth, his surgery to align his anatomy with his identity as a man is excluded as "gender reassignment."  *Cf. Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020), *aff'd sub nom. Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) (explaining that similar exclusion was discriminatory because "a cisgender woman born without vagina may qualify for a vaginoplasty (the surgical creation of a vagina) to correct that congenital defect; however, a transgender woman (whose natal sex is male) would not be able to seek the same procedure, even if deemed medically necessary to treat gender dysphoria").

+ the sex of the people they are attracted to.  Transgender status = sex assigned at birth + a gender identity that differs from sex assigned at birth.  Thus, "there is no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex."  *Bostock*, 140 S. Ct. at 1746.  "By discriminating against homosexuals, the employer intentionally penalizes men for being attracted to men and women for being attracted to women.  By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today."  *Id.*  There is similarly no way the insurance provider can deny coverage for a particular procedure based on the "Gender Reassignment Surgery" Exclusion without discriminating against an individual in part based on their sex, which is an essential ingredient of their gender dysphoria diagnosis and transgender status.

*Bostock* also made clear—repeatedly—that when a particular policy incorporates a person's sex as one of the elements, that policy discriminates on the basis of sex even when the employer applies the discriminatory policy equally to men and women.  *See id.* at 1741 ("[A]n employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in both cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it."); *id.* at 1748 ("Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups; an employer who fires both lesbians and gay men equally doesn't diminish but doubles its liability.")  Title VII evaluates discrimination based on the level of the individual, not the group.

*Bostock* also shows why it doesn't matter that the "Gender Reassignment Surgery" Exclusion doesn't affect *all* men or *all* women or *all* transgender people.  A policy preventing people from marrying a same-sex partner does not discriminate against *all* men or *all* women—since not every man or women wants to marry a same-sex partner—but every person who is affected by the policy is still discriminated against because of that individuals' sex.  Similarly, a policy preventing people from marrying a same-sex partner

also does not discriminate against *all* gay or bisexual people—since not every gay or bisexual person chooses to marry, or even chooses to be sexually active—but every gay or bisexual person affected by the policy is still discriminated against because of that individual's sex. Each one is treated in a manner that, but for their sex, would be different.

State Defendants ask this Court to ignore everything the Supreme Court has said since 1976 about how Title VII prohibits discrimination against individuals, not groups, and resolve this case based on the reasoning of *General Electric Co. v. Gilbert*, 429 U.S. 125, 139 (1976), which applied *Geduldig v. Aiello*, 417 U.S. 484 (1974), to Title VII. But when Congress passed the Pregnancy Discrimination Act ("PDA") and overruled *Gilbert*, "it unambiguously expressed its disapproval of both the holding *and the reasoning* of the Court in the *Gilbert* decision." *Newport News*, 462 U.S. at 678 (emphasis added). State Defendants' assertion that "courts have continued to apply the logic of *Geduldig* and *Gilbert* after the PDA" to Title VII claims is simply false. Mot at 7 n.4. State Defendants have not identified a single case doing so. Indeed, the only court that has ever applied *Geduldig* to equal protection claims involving coverage for gender-affirming surgery has emphatically stated that when Congress passed the PDA, it "made clear that its *Geduldig*-based reasoning had no place in Title VII analysis." *See Lange v. Houston Cty., Ga.*, No. 5:19-CV-392 (MTT), 2022 WL 1812306, at *13 n.14 (M.D. Ga. June 2, 2022). "The suggestion that an employer with a single health insurance plan could fill the plan with discriminatory exclusions and avoid Title VII liability because the employer offered that one 'coverage package' to all employees lacks any merit." *Id.* at *13.

Despite State Defendants' assertion to the contrary, *In re Union Pacific Railroad Employment Practices Litigation*, 479 F.3d 936 (8th Cir. 2007), is not an example of a court applying *Gilbert*'s reasoning. The Eighth Circuit in *Union Pacific* upheld an insurance policy that excluded all coverage for contraception for both men and women. The court discussed the PDA only in the context of determining that contraception does not qualify as a treatment "related to pregnancy" under the PDA because "[c]ontraception is not a medical treatment that occurs when or if a woman becomes pregnant; instead, contraception prevents

11

pregnancy from even occurring." *Id.* at 942.

After determining that contraception is not "related to pregnancy" under the PDA, the Eighth Circuit did not then resolve the case based on "the logic of *Geduldig* and *Gilbert.*" Mot. at 4. Rather, the court held that the policy's exclusion of coverage for contraception was gender neutral because it excluded all forms of contraception for both men and women: it did "not cover any contraception used by women such as birth control, sponges, diaphragms, intrauterine devices or tubal ligations or any contraception used by men such as condoms and vasectomies." *In re Union Pac. R.R.*, 479 F.3d at 944. If *Union Pacific* had followed "the logic of *Geduldig* and *Gilbert*" (Mot. at 7 n.4), then it would not have mattered whether the policy covered contraceptive methods for men too. The court would simply have concluded that exclusion of coverage for oral contraceptives does not classify based on sex because not all women choose to take oral contraceptives: while the group of people who take oral contraceptives includes only women, the group of people who don't take oral contraceptives includes both men and women. Instead of applying that reasoning, the Eighth Circuit upheld the exclusion because it applied to all methods of contraception, including both methods used by men and methods used by women and did not incorporate any explicit sex classification.

State Defendants also repeat their previous argument that the "Gender Reassignment Surgery" Exclusion is not facially discriminatory because there are also other exclusions in the Plan that exclude coverage for other health care regardless of medical necessity. But as this Court already explained, the government may engage "in line-drawing in order to contain health care costs," but cannot draw those lines "based on sex or gender." (Doc. 69 at 11.) The other exclusions in the Plan exclude certain treatments, but do not do so based on facially discriminatory criteria. Thus, "[t]he fact that not all medically necessary procedures are covered, therefore, does not relieve defendants of their duty to ensure that the insurance coverage offered to state employees does not discriminate on the basis of sex or some other protected status." *Boyden v. Conlin*, 341 F. Supp. 3d 979, 999 n.15 (W.D. Wis. 2018) (emphasis omitted).

**B.     The Exclusion Facially Discriminates Under the Equal Protection Clause Based on Sex and Transgender Status**

As explained in Plaintiff's Motion, the Exclusion is also facially discriminatory under the Equal Protection Clause.  *See* Doc. 298 at 19-25.  As this Court explained, by excluding coverage based on whether a particular procedure is being performed for purposes of "gender reassignment," the Exclusion "is directly connected to the incongruence between Plaintiff's natal sex and his gender identity . . . . which transgender individuals by definition experience and display."  Doc. 69 at 10-11.

In arguing that the Exclusion is facially neutral, State Defendants rely exclusively on *Geduldig*, which held that an exclusion of coverage for pregnancy did not discriminate based on sex.  Mot. at 23.  Dr. Toomey has already explained why the "Gender Reassignment Surgery" Exclusion is critically different from restrictions related to pregnancy or abortion for at least four reasons, which Dr. Toomey incorporates here by reference.  Doc. 298 at 21-23; *see also Kadel v. Folwell*, No. 1:19CV272, 2022 WL 11166311, at *3 (M.D.N.C. Oct. 19, 2022) (denying motion for stay pending appeal, rejecting analogy to *Geduldig*, and reiterating that the court "is not persuaded by the single district court that Defendants point to as holding the contrary").

*First*, unlike pregnancy and abortion, the "Gender Reassignment Surgery" Exclusion incorporates explicit sex classifications.  Doc. 298 at 21.  "[T]he Plan does not merely exclude a physical condition from coverage—it excludes treatments that are directly connected to sex—sex changes and modifications cannot be explained without reference to sex, gender, or transgender status."  *Kadel*, 2022 WL 11166311, at *3.

*Second*, the "Gender Reassignment Surgery" Exclusion does not merely "regulat[e] a medical procedure that only [transgender people] can undergo[.]"  *Dobbs*, 142 S. Ct. at 2245.  The Plan provides coverage for the same surgeries when used to treat medical conditions experienced by cisgender people, but denies coverage for the same procedures when provided for "gender reassignment."  Doc. 298 at 21-22.

*Third*, unlike abortion or pregnancy, discrimination based on "gender reassignment"

13

or gender dysphoria is facially discriminatory as a form of proxy discrimination under *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019), and *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013).  Doc. 298 at 22-23.

*Fourth*, the "Gender Reassignment Surgery" Exclusion also facially discriminates based on gender nonconformity and sex stereotypes, which independently constitutes sex discrimination under the Equal Protection Clause.  Doc. 298 at 23.

## II.  A GENUINE ISSUE OF MATERIAL FACT REGARDING THE STATE'S MOTIVATION FOR MAINTAINING THE EXCLUSION PRECLUDES SUMMARY JUDGMENT

### A.  Issues of Fact Preclude Summary Judgment on Title VII Claim

Because the Plan is facially discriminatory, it is not necessary to demonstrate that State Defendants acted with any additional discriminatory intent.  But even if the Plan were deemed to be facially neutral, State Defendants would still not be entitled to summary judgment because the overwhelming weight of evidence shows that State Defendants' purported rationale for maintaining the Exclusion—cost control—amounts to nothing more than pretext, a mere guise for animus towards transgender individuals and disapproval of gender transition.  At minimum, the evidence demonstrates that there are genuine issues of material fact regarding the State's motivation for maintaining the Exclusion that preclude summary judgment.  *See Weil v. Citizens Tel. Servs. Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019) (internal citations omitted). ("[V]ery little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder.")

A Title VII plaintiff may defeat an employer's summary judgment motion by "using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the defendant]." *McGinest*, 360 F.3d at 1122; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  "[I]t is not particularly significant whether [a plaintiff] relies on the *McDonnell Douglas* presumption, or whether he [or she] relies on direct or

circumstantial evidence of discriminatory intent" provided a plaintiff produces "some evidence suggesting that the defendant's adverse employment action was 'due in part or whole to discriminatory intent . . . ." *Williams v. Alhambra Sch. Dist. No. 68*, CV-16-00461-PHX-GMS, 2018 WL 3209441, at *2 (D. Ariz. June 29, 2018) (internal citations omitted); *Godwin*, 150 F.3d at 1220 (noting that the degree of proof "to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." (quotation and citation omitted)). State Defendants' Motion fails under either approach for the same reasons.[7]

"A plaintiff may demonstrate pretext in either of two ways: '(1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable.'" *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112–13 (9th Cir. 2011) (internal citation omitted). The record is replete

---

[7] State Defendants' claim that Dr. Toomey cannot satisfy the *McDonnell Douglas* framework is incorrect. Mot. at 16. State Defendants assert no facts rebutting, and concede for purposes of their Motion, that Dr. Toomey satisfies three of the four elements of a prima facie Title VII case, *i.e.*, that he "is a member of a quasi-suspect class, met his job expectations, and suffered an adverse employment action." Mot. at 16 (citing, among other things, *Godwin*, 150 F.3d at 1220). The fourth factor, that "another similarly situated employee outside of his protected class received better treatment from the employer[,]" *id.*, is evident based on the very nature of the "Gender Reassignment Surgery" Exclusion, which applies sex-based rules and enforces sex stereotypes that transgender people should maintain physical features consistent with their sex assigned at birth. Due to the Exclusion, the Plan denies Dr. Toomey coverage for the very same medically necessary care other Plan participants can obtain, such as a hysterectomy, for medical diagnoses *other* than gender dysphoria. Dr. Toomey seeks the same care that cisgender Plan participants seek, but is denied it only because of the Exclusion and its sex-based rules and stereotypes that can apply *only* to transgender individuals. State Defendants admit as much, arguing that "[t]ransgender individuals, including Plaintiff, can obtain coverage for a hysterectomy for any of the same conditions that a cisgender person can receive coverage for a hysterectomy." Mot. at 9. For the same reasons elaborated upon below in Section II.A regarding the direct and indirect evidence of discriminatory animus, State Defendants also fail to provide a legitimate, nondiscriminatory purpose for the Exclusion, and re-shift the burden back to Dr. Toomey to establish pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Motion should therefore be denied under the *McDonnell Douglas* framework too.

with both direct and indirect evidence demonstrating that State Defendants' purported cost rationale for the Exclusion is pretextual.

### 1.   Direct Evidence of Pretext and Animus

The direct evidence that discriminatory animus towards transgender individuals and gender transition played a part in the State's decision-making is unambiguous and should preclude summary judgment. *Godwin*, 150 F.3d at 1221. *First*, contrary to State Defendants' claim that "there is no direct evidence of discriminatory animus" from anyone at "ADOA or the Governor's Office," Mot. at 13, discovery yielded evidence of anti-transgender bias. Christina Corieri—who announced the 2016 decision to maintain the Exclusion on behalf of the Governor's Office—publicly tweeted her disapproval for state funding of gender-affirming care just a few years prior, in 2013, stating: "advocates now demanding taxpayer dollars for gender reassignment surgery under Medicare–bet Medicaid is next." SSOF ¶ 15. Ms. Corieri also subscribes to ardently anti-transgender publications, which disparage gender-affirming surgery as "genital mutilation." *Id.* ¶ 16.

*Second*, State witnesses testified that they felt pressure not to fully eliminate the Exclusion. ADOA Plan Administrator Elizabeth Schafer, who was responsible for consolidating all of the ADOA's cost research into a summary chart, testified that she was directed to remove a note in ADOA's analysis that described the cost of gender-affirming care as "relatively low." *Id.* ¶ 20(a). When questioned about why she was directed to make this change, Ms. Schafer responded that someone "above" didn't want it "in black and white" that the cost of covering gender-affirming care was minimal. *Id.* ¶ 20(b). State witnesses also testified that they perceived political sensitivity surrounding the elimination of the Exclusion due to potential pressure from voters and policymakers who disapproved of gender transition. *Id.* ¶ 21. The State's decision to maintain the Exclusion based on the "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate government interest." *Romer v. Evans*, 517 U.S. 620, 634 (1996) (quotations and citation omitted); *see also In re Levenson*, 560 F.3d 1145, 1149-50 (9th Cir. 2009) ("The denial of federal benefits to same-sex spouses cannot be justified simply by a distaste for or

disapproval of same-sex marriage or a desire to deprive same-sex spouses of benefits available to other spouses . . . .")

### 2.   Indirect Evidence of Pretext and Animus

Indirect evidence overwhelmingly supports that discriminatory animus towards transgender individuals and gender transition informed the State's decision-making with respect to the Exclusion in 2016.  State Defendants attempt to obfuscate the circumstances of their decision-making first by setting up straw-man arguments,[8] and then by omitting critical details about their decision-making process.

*First*, State Defendants sole *stated* rationale for maintaining the Exclusion—cost concerns—is directly contradicted[9] by the undisputed facts and the testimony of State witnesses.[10]  ADOA's internal analysis from 2016 concluded that the cost of coverage for gender-affirming care was between ███████████ per employee per month, which was immaterial relative to other benefits and the size of the Plan.  PSOF ¶¶ 39-40.  When Dr. Toomey's counsel questioned State witnesses regarding the decision to maintain the Exclusion, they testified that cost was *not* what motivated the decision in 2016.  *Id.* ¶ 51.

---

[8]   State Defendants set out "six points of purported circumstantial evidence" that they assert Dr. Toomey relies on to prove discriminatory intent.  Mot. at 13.  The first two points—"(1) ADOA allegedly understood that the Exclusion would affect transgender persons; (2) ADOA maintained the Exclusion without knowing the reason(s) for the original iteration of the Exclusion"—are straw-man arguments or largely beside the point.  *Id.*  Dr. Toomey has never asserted that State Defendants' awareness that the Exclusion affects transgender individuals is, sitting alone, conclusively establishes animus.  But "[t]he impact of the official action whether it bears more heavily on one race than another may provide an important starting point."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (internal quotation marks and citation omitted). Further, State Defendants' ignorance of the original rationale is largely beside the point given their supposed reevaluation of the Plan every year, Doc. 295 (Statement of Facts In Support of State Defendants' Motion for Summary Judgment ("SDSOF")) ¶ 19, and maintenance of the Exclusion every year absent any legitimate rationale for doing so, as discussed below.

[9]   This is not only indirect evidence of discriminatory motive, but direct evidence of pretext.

[10]   All of the State witnesses that Dr. Toomey deposed as part of discovery were listed by State Defendants in their lay witness disclosure.  Doc. 146.

17

Marie Isaacson, who lead the ADOA Benefits Services Division in 2015 and 2016, testified that coverage of gender-affirming care was "not a cost issue." *Id*. Rather, the decision to maintain the Exclusion allegedly turned strictly on what was legally required of the State. *Id*.[11] Because the ADOA's internal cost estimate for coverage was so low, Ms. Isaacson further testified that such costs would not "have mattered" to ADOA's decision-making in 2016. *Id*. ¶ 40(d). Ms. Isaacson's testimony is consistent with the testimony of other ADOA administrative professionals, who universally described ADOA's cost projection of between ███████████ per employee per month as "low," "minuscule" and "not significant." *Id.* ¶ 40. This testimony is also consistent with Joan Barrett's unrebutted expert opinion that the cost of coverage in 2016 was immaterial from an actuarial perspective, meaning that it would not impact the ordinary decision-making of a health insurance provider. *Id*. ¶ 44.

State Defendants do not credibly rebut these facts and testimony. They cite generalized cost concerns about the overall Plan—for example, "[i]n 2016, cost was a factor in most decisions made by ADOA[,]" and "cost was one of the most important factors in any decision to revise coverage under the Plan"—and then falsely assert that the Exclusion can be explained by a broader policy of denying coverage to any prospective benefit "that resulted in any cost increase, unless it was legally required." Mot at 14-16. This argument is not only a red herring, but flatly contradicted by the factual record. State Defendants admit that between 2015 and 2021, ADOA removed five exclusions from the Plan. Mot. at 15.[12] Yet they do not state, or provide evidence supporting that the elimination of these exclusions came at zero cost to the Plan. Even if State Defendants had done so, this argument does not provide a complete picture regarding their typical decision-making on

---

[11] As noted above, *supra* Background Section I.(B)(2) n. 4, State Defendants are precluded from arguing that the Exclusion is non-discriminatory based on their purported understanding of what was legally required of the Plan. Doc. 278. By referencing this defense here, and throughout the Response, Dr. Toomey does not concede that it is relevant for the Court's consideration, but does so only to highlight that it is the only other asserted rationale for the Exclusion aside from costs.

[12] State Defendants do not explain how removing "only" five exclusions is evidence of a strict policy against extending coverage.

expanding the Plan because: (i) removing exclusions is not the only way that ADOA expanded coverage for new benefits (PCSOF ¶ 24, PSOF ¶ 23); and (ii) the 2015-2021 timeframe does not capture a number of new benefits added in the years leading up to the 2015-16 decision to maintain the Exclusion.  PSOF ¶ 23.  State Defendants' support for the pervasiveness of the State's general cost concerns in 2016 is also paltry.[13]  In all events, general cost concerns do not refute the ADOA's internal analyses indicating a minimal cost for coverage for gender-affirming care, or Ms. Isaacson's and other State witnesses' testimony that cost was not a factor in the State's decision-making regarding the Exclusion in 2016.

*Second*, State Defendants claim that "ADOA did not depart from its traditional decision-making process . . . ."  Mot. at 14.  Again, the facts flatly contradict State Defendants here.  State Defendants detail the steps the ADOA typically takes to evaluate revisions to the Plan's coverage, including considering "insurance vendor recommendations, market and industry trends, the interest of Plan participants, cost, legal requirements, and clinical effectiveness."  Mot. at 14.  They then assert that they in fact completed each with respect to the State's evaluation of the Exclusion.  *Id*.  But State Defendants paint only half the picture.  They gathered the necessary facts, but then *ignored* those facts when they made their ultimate decision.

Almost every factor the ADOA considered in 2015-16 favored elimination of the Exclusion: (1) ADOA professionals' internal analysis had concluded that the cost of removing the Exclusion would be immaterial (PCSOF ¶ 20(d)); (2) all four of the then third-party administrators of the Plan, when consulted by the ADOA, had communicated that they

---

[13]  For example, in support of the point that "[c]ost reductions and efficiencies are one of the State's primary focuses[,]" State Defendants cite the testimony of former ADOA Director Craig Brown that the State at one point reduced the number of cars it owned by 20%.  SDSOF" ¶ 52 (citing Brown Depo. at 47:20-49:4).  The State's effort to reduce expenditure on vehicle ownership, or other general budget initiatives, do not explain whether costs was actually a factor in its decision-making regarding the Exclusion in 2016.

would be including coverage for gender-affirming surgery (*id*. ¶ 20(a)); (3) ADOA had consulted with counterparts in other U.S. states with self-funded health plans, all of whom covered gender-affirming surgery (*id*. ¶ 20(b)); (4) ADOA had been advised by Mercer, a consulting firm it worked with, that the trend among private insurers had shifted to coverage (*id*. ¶ 20(e)); (5) ADOA had considered reports from the Williams Institute, which set out the favorable evolution of thinking on the clinical effectiveness of gender-affirming care (PSOF ¶ 43 (a)); and (6) ADOA had been made aware of requests from plan participants, including from the University of Arizona, for coverage.  PSOF ¶ 33.  Asked about their typical decision-making process, State witnesses testified that, hypothetically, given such positive considerations for coverage, it would normally be "a fairly easy decision" to extend coverage to that procedure.  SSOF ¶ 9.  Yet State Defendants ignored the substantive considerations favoring elimination of the Exclusion.  They imposed instead a strict limitation, deciding to cover no more than what they allegedly believed was legally required. PCSOF ¶¶ 20-21.  But the State does not have a general policy of covering only what it believes it is legally mandated to cover; it has extended coverage to new benefits despite the costs associated therewith.  PSOF ¶ 21-22.  The State's decision to maintain the Exclusion, despite the overwhelmingly positive considerations favoring elimination, was clearly inconsistent with its typical decision-making, which is indicative of the pretext of its sole justification, cost, if not animus.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 267 (1977) ("Substantive departures too may be relevant, particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached.")[14]

State Defendants also departed procedurally from their usual decision-making process.  A "[d]eparture[] from the normal procedural sequence" can constitute indirect

---

[14]  Although *Village of Arlington Heights* concerns an Equal Protection claim, the "same standards" for evaluating employer motivation are used in evaluating Title VII and Equal Protection claims.  *See Lowe v. City of Monrovia*, 775 F.2d 998, 1011 (9th Cir. 1985), *amended*, 784 F.2d 1407 (9th Cir. 1986).

evidence that "improper purposes are playing a role" in decision-making.   *Village of Arlington Heights*, 429 U.S. at 267; *Pham v. City of Seattle*, 7 Fed. Appx. 575, 577–78 (9th Cir. 2001) (unpublished) (evidence that defendant did not follow its own normal procedures in selecting employees was sufficient to establish a genuine issue of material fact concerning pretext).   Typically, ADOA administrative professionals within the Benefits Services Division analyze objective criteria, such as cost and market trends, and then provide a recommendation regarding coverage to ADOA's director, who has ultimate decisional authority.   SSOF ¶ 4.   Recommendations on changes in coverage under the Plan may be presented to the Governor's Office, but approval from the Governor's Office is not required. *Id*. ¶ 1.   To the extent the Governor's Office is involved in Plan design, its involvement is typically limited to ceremonial sign-off on what ADOA recommends.   *Id.*   Yet, with respect to gender-affirming care, this "bottom-up" process was turned on its head.   ADOA was dictated from "up the food chain" at the Governor's Office to cover no more than what was strictly required.   *Id*. ¶ 13(b).   At a closed-door meeting with ADOA leadership (including Ms. Isaacson, then ADOA's Benefit Services Director), Ms. Corieri, on behalf of the Governor's Office, announced the decision that gender-affirming surgery would continue to be excluded under the Plan.   PSOF ¶¶ 45, 50.[15]   Tellingly, neither Ms. Isaacson nor any other ADOA professional made a recommendation on whether to maintain or eliminate the Exclusion at that meeting because Ms. Isaacson did not think it was ADOA's place to do so. *Id*. ¶ 48.[16]   The Governor's Office's top-down mandate that ADOA maintain the Exclusion stands in stark contrast to the State's ordinary decision-making process.   In fact, other State witnesses stated that they could recall only two instances in which the Governor's Office co-opted ADOA's decision-making on plan design in this manner—with respect to same-

---

[15]   Notably, this decision was announced without the benefit of any cost analysis, including ADOA's internal analysis, which was never presented to the Governor's Office.   PSOF ¶ 52.

[16]   Ms. Isaacson later sought final approval for the language of the Exclusion (which remains today), from the Governor's Office, including Ms. Corieri.   PSOF ¶ 53.

sex benefits and gender-affirming care.  *Id.* ¶ 55(c).

      *Third*, State Defendants assert that "the fact that ADOA does not know the rationale for the original iteration of the Exclusion has no impact on its motive."  Mot. at 13.  State Defendants' ignorance of the origins of the Exclusion is largely beside the point, as noted above, *supra* at Section II.(A)(2) n. 8, but the historical context is relevant.  As State Defendants admit, the State inherited the Exclusion as part of its institution of the self-funded Plan in 2004.  Mot. at 3.  State Defendants further admit that the ADOA "reevaluates its plan design every year."  Mot. at 14.  The State's maintenance of the Exclusion in 2016, and in every year the State has reevaluated the Plan since 2004 (18 years to date), demonstrates a continuous extension of their pervasive policy against gender transition.[17]  In plain, State Defendants offer no legitimate justification for the Exclusion in years prior to 2016 or after.  Further, State Defendants cannot credibly bolster their assertion of non-discriminatory motive by saying that the State "*expanded* transgender benefits to include hormone therapy and counseling" in 2016. Mot. at 20 (emphasis added).   By State Defendants' own account, the State provided coverage for hormone therapy only because they allegedly understood that such coverage was all that was "legally required."  Mot at 16.  Deciding to cover the bare minimum they believe to be strictly required does not constitute evidence of their non-discriminatory intent.  As Judge Clifton observed during oral argument before the Ninth Circuit in this matter:

> [T]hat's not a reason to maintain the exclusion.  To say that you don't have to do something doesn't mean you don't do something. It just says it's an option available.  You can do it or you can not do it for whatever reason. But that you don't have to do it isn't, by itself, an explanation for why you don't do it.

Wee Decl., Ex. 49 (unofficial transcript of argument before the Ninth Circuit).

      *Fourth*, State Defendants make only passing reference to the 2019 cost analysis

---

[17] The State's Medicaid agency, AHCCCS, as well as the State's Department of Corrections maintain similar exclusions for coverage of gender-affirming surgery under health plans that they respectively administer.  SSOF ¶ 19.

22

prepared by the ADOA's actuary Michael Meisner in response to Dr. Toomey's lawsuit (the "Meisner Analysis"), claiming that their *own* "evidence is irrelevant to discriminatory motive." Mot. at 13, n.8. The Meisner Analysis is relevant because it constitutes a post-hoc rationalization, which not only fails to support that the State had a legitimate cost concern here, but is itself evidence of pretext. *Vulpis v. Republic Servs. of Arizona Hauling*, *LLC*., No. CV 07-092-TUC-RCC, 2008 WL 11338813, at *5 (D. Ariz. July 9, 2008) ("Pretext may be established by showing that the nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the litigation.") (quotations and citation omitted); *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) ("Post-hoc justifications for [adverse employer action] constitute evidence of pretext.") The State's own witnesses corroborated the improper motive animating the Meisner Analysis, stating that Mr. Meisner was determined to "prove himself correct in his viewpoints," and that he "really wanted to show that [gender-affirming care] w[as] going to be too costly," despite the fact that the State's 2015-16 analysis "showed otherwise." SSOF ¶ 25.

**B.    Issues of Fact Preclude Summary Judgment on Equal Protection Claim**

For the same reasons outlined above in Section II.A, there is a genuine issue of fact regarding the State's motivation for the Exclusion, which precludes summary judgment on Dr. Toomey's Equal Protection claims. A plaintiff's Equal Protection claims, like Title VII claims, should survive summary judgment where there is a genuine issue of fact regarding the state actor's motivation. *Lowe v. City of Monrovia*, 775 F.2d 998, 1011 (9th Cir. 1985), *amended*, 784 F.2d 1407 (9th Cir. 1986) (finding that where issue of fact existed regarding Title VII claims, same issues of fact precluded summary judgment on EP claims.) "In the equal protection context, just as in a Title VII disparate treatment case, discriminatory intent need not be proved by direct evidence. [D]etermining the existence of a discriminatory purpose demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* (quotation and citation omitted). Further, in order to establish discriminatory purpose in the Equal Protection context, a plaintiff is "not require[d] . . . to prove that the challenged action rested solely on . . . discriminatory purposes," or even that

23

discrimination was the "dominant" or "primary" motivation. *Arlington Heights*, 429 U.S. at 265. A plaintiff only needs to demonstrate that discrimination was "a motivating factor" in the decision in order to establish an Equal Protection violation. *Id*. at 266. The facts and testimony adduced through discovery strongly support that discriminatory animus towards transgender individuals and gender transition played a role in the State's decision-making on the Exclusion, precluding summary judgment here.

## III. THE EXCLUSION DOES NOT SURVIVE HEIGHTENED SCRUTINY OR EVEN RATIONAL BASIS REVIEW

State Defendants fail to carry their burden that the "Gender Reassignment Surgery" Exclusion survives heightened scrutiny. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017). Despite accepting for purposes of their Motion that Dr. Toomey is a member of a "quasi-suspect class," Mot. at 16, triggering heightened scrutiny, State Defendants do not credibly rebut that heightened scrutiny applies. *See Doe v. Snyder*, 28 F.4th 103, 113 (9th Cir. 2022) ("the level of scrutiny applicable to discrimination based on transgender status is 'more than rational basis but less than strict scrutiny'") (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019)). State Defendants' sole argument in defense of the Exclusion under heightened scrutiny is that their "interest in cost containment and reducing health costs are an important state interest" that "are substantially related to the Exclusion." Mot. at 25. The United States Supreme Court has flatly rejected cost concerns as a legitimate governmental interest under heightened scrutiny. Plaintiff's Motion at 24 (citing *Califano v. Goldfarb*, 430 U.S. 199, 217 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 647 (1975); *Meml. Hosp. v. Maricopa County*, 415 U.S. 250, 263 (1974)).

State Defendants likewise fail to establish that the Exclusion survives even under rational basis review. For the reasons stated above, including ADOA's internal cost analysis showing that the cost of coverage would be minimal, and testimony from State witnesses that costs was *not* a factor in the State's decision-making in 2016, *supra* Background Section I.B, State Defendants cannot credibly argue that the Exclusion is "rationally related to State

Defendants' interest in cost containment" as they claim.  Mot. at 24.  Even if it was, the State may not reduce costs by arbitrarily discriminating between two similarly situated groups. *See Diaz v. Brewer*, 656 F.3d 1008, 1014-15 (9th Cir. 2011) (holding that cost concerns could not justify denying insurance coverage to same-sex couples under rational basis review).  State Defendants have offered no legitimate explanation for why *any* costs related to covering gender transition, in 2016 or in any other year in which they have reevaluated the Plan, warrants excluding coverage, yet the Plan has expanded coverage to other benefits despite associated costs.

## CONCLUSION

For the reasons stated above, the Motion should be denied.

Respectfully submitted this 26th day of October, 2022.

ACLU FOUNDATION OF ARIZONA

By /s/ *Christine K. Wee*
Christine K. Wee
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block*
Leslie Cooper*
125 Broad Street, Floor 18
New York, New York 10004

WILLKIE FARR & GALLAGHER LLP
Wesley R. Powell*
Matthew S. Freimuth*
Jordan C. Wall*
Justin Garbacz*
787 Seventh Avenue
New York, New York 10019

*Admitted pro hac vice

*Attorneys for Plaintiff Russell B. Toomey and the certified classes*

25

1

2

### CERTIFICATE OF SERVICE

3

I hereby certify that on October 26, 2022, I electronically transmitted the attached

4

document to the Clerk's office using the CM/ECF System for filing. Notice of this filing

5

will be sent by email to all parties by operation of the Court's electronic filing system.

6

7

            */s/ Christine K. Wee*
            Christine K. Wee

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28