**Christine K Wee– 028535**
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email: **vlopez@acluaz.org**
Email: **cwee@acluaz.org**

**Joshua A. Block\***
**Leslie Cooper\***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail:**jblock@aclu.org**
E-Mail: **lcooper@aclu.org**

**Wesley R. Powell\***
**Matthew S. Freimuth\***
**Jordan C. Wall\***
**Justin Garbacz\***
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-Mail: **wpowell@willkie.com**
E-Mail: **mfreimuth@willkie.com**
E-Mail: **jwall@willkie.com**
E-Mail: **jgarbacz@willkie.com**

\*Admitted pro hac vice

*Attorneys for Plaintiff Russell B. Toomey*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B. Toomey,<br><br>    Plaintiff,<br><br>  v.<br><br>State of Arizona, *et al.*<br><br>    Defendants. | CV-19-00035-TUC-RM<br><br>**PLAINTIFF RUSSELL B. TOOMEY'S COUNTERVAILING STATEMENT OF FACTS TO DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Russell B. Toomey ("Plaintiff" or "Mr. Toomey") submits the following Countervailing Statement of Facts ("PCSOF") to Defendant State of Arizona's (the "State"), Andy Tobin's, and Paul Shannon's (collectively, the "Defendants") Separate Statement of Facts in Support of Motion for Summary Judgment ("Defendants' SOF") (Doc. 295).

**Gender Dysphoria and Plaintiff's Request for Surgery**

1. **Defendants' Assertion:** Plaintiff Russell B. Toomey, Ph.D. is employed as an Associate Professor at the University of Arizona. (Doc. 86 (Amended Complaint), ¶ 4.)

  **Plaintiff's Response:** Undisputed.

2. **Defendants' Assertion:** As an employee of the State of Arizona (the "State"), Dr. Toomey is eligible for health coverage through a self-funded health insurance plan (the "Plan") administered by the Arizona Department of Administration ("ADOA"). (*See id.*, ¶ 1.)

  **Plaintiff's Response:** Undisputed.

3.    **Defendants' Assertion:** In 2018, Dr. Toomey was enrolled in the Plan. (*See id.*, ¶ 33.) In 2018, Dr. Toomey's health coverage claims under the Plan were administered by BlueCrossBlueShield of Arizona ("BCBS"). (*Id.*)

**Plaintiff's Response:** Undisputed.  However, Plaintiff clarifies that the correct record cite is Doc. 86 (Amended Complaint) ¶¶ 32, 43.

4.    **Defendants' Assertion:** Dr. Toomey is a transgender man who has been diagnosed with "gender dysphoria." (*See id.*, ¶¶ 4, 38; Declaration of Ryan Curtis ("Curtis Decl."), filed concurrently, at Ex. 1 (Deposition of Russell B. Toomey, Ph.D. ("Toomey Depo.")) at 18:11-14.)

**Plaintiff's Response:** Undisputed.

5.    **Defendants' Assertion:** A transgender man is a natal female who has a male gender identity. (*See* Doc. 86 (Amended Complaint), ¶ 25.)

**Plaintiff's Response**: Disputed. The cited paragraph of the amended complaint states: "Transgender men are men who were assigned "female" at birth, but have a male gender identity."  The term "natal female" does not reflect current terminology among health care professionals.

6.    **Defendants' Assertion:** Transgender persons may experience "gender dysphoria." (Doc. 86 (Amended Complaint), ¶ 27.) "Gender dysphoria" is the diagnostic term for the clinically significant emotional distress experienced as a result of the incongruence of one's gender identity with their assigned sex and bodily developments associated with that sex. (*Id.*; *see also* Curtis Decl., Ex. 2 (Deposition of Loren Schechter, M.D. ("Schechter Depo.")) at 31:8- 13.) The criteria for diagnosing gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). (*Id.*; Gender Dysphoria, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H14.) If a transgender person experiences "gender dysphoria," he or she may seek medical treatment, including "gender reassignment surgery." (Doc. 86 (Amended Complaint), ¶¶ 27–28.)

**Plaintiff's Response:** Undisputed.

7.    **Defendants' Assertion:** In July 2018, Dr. Toomey requested a hysterectomy

from his physician to treat his gender dysphoria. (*See* Doc. 86 (Amended Complaint), ¶ 39 & Ex. G.)

      **Plaintiff's Response:** Disputed.   The cited paragraph at exhibit of the Amended Complaint reflects that Dr. Toomey's physician recommended that he receive a hysterectomy as a medically necessary treatment for his gender dysphoria, not that Dr. Toomey "requested" it.  *See* Doc. 86 (Amended Complaint), ¶ 39 & Ex. G.

    8.    **Defendants' Assertion:** BCBS initially notified Dr. Toomey's healthcare provider that the hysterectomy would be "covered 100% after a $100 co-pay." (Curtis Decl., at Ex. 3 (TOOMEY000378–79).)

      **Plaintiff's Response:** Undisputed.

    9.    **Defendants' Assertion:** On August 10, 2018, after Dr. Toomey contacted BCBS to notify BCBS that the sought hysterectomy was for the treatment of gender dysphoria, BCBS denied pre- authorization for the requested hysterectomy based on an exclusion for "gender reassignment surgery." (*Id.*; Curtis Decl., Ex. 4 (Transcript of Phone Call between Plaintiff and BCBS) at 3:7–24; *see also* Doc. 86 (Amended Complaint), ¶ 43 & Ex. G; Curtis Decl., Ex. 5 (Plaintiff's Amended Initial Discovery Responses ("MIDR")) at 13:11–14.)

      **Plaintiff's Response:** Plaintiff does not dispute the facts in Paragraph 9, but clarifies that the reason Dr. Toomey informed BCBS about the exclusion was to later avoid having a large medical bill sent after the surgery, once BCBS realized the reason for the surgery was for treatment of gender dysphoria.  Wee Decl., Ex. 29 (Toomey Depo. Tr.) at 26:20-27:6.[1]

    10.    **Defendants' Assertion:** Although BCBS denied Dr. Toomey's request for pre-authorization, Dr. Toomey could potentially receive coverage for a hysterectomy under

---

[1] For references to Exhibits to the Wee Declaration, Exhibits 1-28 refer to the Exhibits filed alongside Doc. 300, the Wee Declaration accompanying Plaintiff's Motion for Summary Judgment, and Exhibits 29-49 refer to the Exhibits attached to the Wee Declaration filed concurrently with this PCSOF, and Plaintiff's Response in Opposition to State Defendants' Motion for Summary Judgment.

the Plan for other medically-necessary reasons. (*See* Curtis Decl., Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2, 168:8–13.)

**Plaintiff's Response:** Disputed. The cited portions of Dr. Toomey's transcript do not contain any testimony from Dr. Toomey indicating that he has other health conditions requiring a hysterectomy, and Defendants do not submit any other evidence supporting their assertions. Nor can Defendants provide this evidence, because Dr. Toomey does not have any other medical necessity to receive a hysterectomy. *See* Wee Decl., Ex. 29 (Toomey Depo. Tr.) at 46:25-47:2 (testifying that the pap smear results did not find pre-cancerous cells); *id.* at 48:17-24 (testifying that he has never had a physician tell him that he is at a higher risk for cervical cancer as a result of the hormones he is taking); *id.* at 50:25-51:5 (testifying that the pap smear results did not warrant a hysterectomy). Additionally, there is no increased risk of ovarian, uterine, or cervical cancer as a result of masculinizing hormone treatment. *See id.*, Ex. 30 (WPATH Standard of Care Version 7) at pg. 40 (explaining that gender-affirming hormones for transgender men does not increase risk of cancer).

11. **Defendants' Assertion:** The Plan provides coverage for hysterectomies for other conditions and diagnoses, including cancer. (*See generally* Curtis Decl., Ex. 6 (AZSTATE.010093).)

**Plaintiff's Response:** Undisputed.

12. **Defendants' Assertion:** Dr. Toomey can receive coverage for a hysterectomy for all the same medically necessary reasons for which a cisgender female could receive coverage for a hysterectomy under the Plan. (Curtis Decl., Ex. 1 (Toomey Depo.) at 75:14–20, 98:4–8, 121:22–122:2.) For example, Dr. Toomey indicated that he has received abnormal pap smear results, which could justify coverage for a hysterectomy under the Plan. (*See* Curtis Decl., Ex. 1 (Toomey Depo.) at 40:2–11, 49:25–50:2, 50:20–24.) In addition, Dr. Toomey may be eligible for coverage for a hysterectomy under the Plan to treat an increased risk of cervical, uterine, or ovarian cancers due to his long-term hormone treatment for gender dysphoria. (*See* Curtis Decl., Ex. 1 (Toomey Depo.) at 49:4–

21, 75:1–3).

**Plaintiff's Response:** Disputed. The cited portions of Dr. Toomey's transcript do not contain any testimony from Dr. Toomey indicating that he has other health conditions requiring a hysterectomy, and Defendants do not submit any other evidence supporting their assertions. Nor can Defendants provide this evidence, because Dr. Toomey does not have any other medical necessity to receive a hysterectomy. *See* Wee Decl., Ex. 29 (Toomey Depo. Tr.) at 46:25-47:2 (testifying that the pap smear results did not find pre-cancerous cells); *id.* at 48:17-24 (testifying that he has never had a physician tell him that he is at a higher risk for cervical cancer as a result of the hormones he is taking); *id.* at 50:25-51:5 (testifying that the pap smear results did not warrant a hysterectomy). Additionally, there is no increased risk of ovarian, uterine, or cervical cancer as a result of masculinizing hormone treatment. *Id.,* Ex. 30 (WPATH Standard of Care Version 7) at pg. 40.

13. **Defendants' Assertion:** Not all transgender persons want or receive "gender reassignment surgery." (Curtis Decl., Ex. 1 (Toomey Depo.) at 124:16–18; Curtis Decl., Ex. 2 (Schechter Depo.) at 30:12-16, 32:1-12, 39:1–5.)

**Plaintiff's Response:** Undisputed.

**The Plan**

14. **Defendants' Assertion:** The Plan is self-funded. (Curtis Decl., Ex. 6 at AZSTATE.010183; Curtis Decl., Ex. 8 (Deposition of Marie Isaacson ("Isaacson Depo.")) at 46:16–19; Curtis Decl., Ex. 9 (Deposition of Paul Shannon ("Shannon Depo.")) at 38:5–39:4.)

**Plaintiff's Response:** Undisputed.

15. **Defendants' Assertion:** The Plan defines "Covered Expenses" as "expenses incurred by or on behalf of a person, if they are incurred after he [or she] becomes insured for these benefits and prior to the date coverage ends." (Curtis Decl., Ex. 6 at AZSTATE.010121.)

**Plaintiff's Response:** Undisputed.

16.     **Defendants' Assertion:** "Covered Expenses" are available to Plan participants "only if: (1) they are Medically Necessary and not specifically excluded in this Article or any other Article; and (2) Pre-Certification/Prior Authorization is obtained from the Plan by the Member or provider, for those services that require Pre-Certification/prior Authorization." (*Id.*; *see also id.* at AZSTATE.010186 ("COVERED SERVICE shall mean a service which is Medically Necessary and eligible for payment under the Plan.").)

          **Plaintiff's Response:** Undisputed.

17.     **Defendants' Assertion:** A service is "Medically Necessary" if it meets "all of the following criteria: (1) Ordered by a physician; (2) Not more extensive than required to meet the basic health needs; (3) Consistent with the diagnosis of the condition for which they are being utilized; (4) Consistent in type, frequency and duration of treatment with scientifically based guidelines by the medical-scientific community in the United States of America; (5) Required for purposes other than the comfort and convenience of the patient or provider; (6) Rendered in the least intensive setting that is appropriate for their delivery; and (7) Have demonstrated medical value." (*Id.* at AZSTATE.010192–93; *see also* Doc. 86 (Amended Complaint), ¶ 34.)

          **Plaintiff's Response:** Undisputed.

18.     **Defendants' Assertion:** The Plan contains several Exclusions and Limitations. (Curtis Decl., Ex. 6 at AZSTATE.01048–51.)

          **Plaintiff's Response:** Undisputed.

**Process for Revising the Plan**

19.     **Defendants' Assertion:** ADOA reevaluates its plan design every year. (Curtis Decl., Ex. 10 (Deposition of Scott Bender ("Bender Depo.")) at 37:11-23.)

          **Plaintiff's Response:** Undisputed.

20.     **Defendants' Assertion:** When reevaluating its plan design, ADOA considered:

          a.     Recommendations from its insurance vendors (Curtis Decl., Ex. 8 (Isaacson Depo.) at 100:1–5; Curtis Decl., Ex. 9 (Shannon Depo.) at 124:1-21; Curtis

Decl., Ex. 11 (Deposition Transcript of Kelly Sharritts ("Sharritts Depo.")) at 56:11–14; Curtis Decl., Ex. 12 (Deposition Transcript of Craig Brown ("Brown Depo.")) at 178:24- 179:19);

b.   Market trends (Curtis Decl., Ex. 13 (Deposition of Elizabeth Schafer ("Schafer Depo.")) at 54:8–14; Curtis Decl., Ex. 10 (Bender Depo.) at 41:18–42:7; Curtis Decl., Ex. 14 (Deposition of Yvette Medina ("Medina Depo.")) at 84:15–85:1);

c.   Interests of the Plan members (Curtis Decl., Ex. 13 (Schafer Depo.) at 54:15–20; Curtis Decl., Ex. 11 (Sharritts Depo.) at 149:25–150:10; Curtis Decl., Ex. 10 (Bender Depo.) at 37:24–38:9);

d.   Cost (Curtis Decl., Ex. 9 (Shannon Depo.) at 124:1-21; Curtis Decl., Ex. 13 (Schafer Depo.) at 53:10-12, 55:9–14, 101:19–102:2; Curtis Decl., Ex. 10 (Bender Depo.) at 37:24–38:9);

e.   Legal requirements (Curtis Decl., Ex. 9 (Shannon Depo.) at 124:1-21); and

f.   Clinical effectiveness (*Id.*).

**Plaintiff's Response:** Plaintiff does not dispute the facts in Paragraph 20 reflect ADOA's normal consideration process, but does dispute that the decision to maintain the "Gender Reassignment Exclusion" was based on those considerations. The "deciding factor" for the decision to exclude gender affirming surgery at the Fall 2016 meeting between the ADOA and the Governor's office where it was decided to maintain the Exclusion was not cost, but: "what was required by law. What was required by law for [the State] to cover." Wee Decl., Ex. 31 (Isaacson Depo. Tr.) at 31:8-18; *accord id.* 58:4-7 (testifying that it was "not a cost issue" but instead an "issue of whether it was legally required").

Plaintiff also asserts that each of the considerations referenced in Paragraph 20(a)-(f) weighed in favor of eliminating the Exclusion. Specifically:

a.   When ADOA evaluated its Plan design in 2015-16, its insurance vendors informed ADOA that they were moving toward covering costs of gender

affirming care due to anticipated changes to the Affordable Care Act.  Curtis Decl., Ex. 24 (ADOA Research Summary Chart) at AZSTATE.151712-15. By the time Dr. Toomey sought gender affirming care in 2018, all of the third party administrators for the Plan had adopted internal coverage guidelines recognizing hysterectomies and other gender affirming surgeries as medically necessary treatment for gender dysphoria.  *See* Doc. 86-3 (Ex. C to Am. Compl.) (Aetna Guidelines); Doc. 86-4 (Ex. C to Am. Compl.) (BCBS Guidelines); Doc. 86-5 (Ex. E to Am. Compl.) (Cigna Guidelines); Doc. 86-6 (Ex. F to Am. Compl.) (United Healthcare Guidelines).

b. Market trends indicated that more states and insurers would cover gender affirming surgery.  *See id.*; Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 170:22-171:2.

c. Typically, ADOA removed exclusions when it was in the best interest of Plan members.  Wee Decl., Ex. 31 (Isaacson Depo. Tr.) at 184:11-12. It is in the best interests of Plan members to cover medically necessary procedures.  *Id.* at 187:20-188:1.

d. When evaluating whether to remove the Exclusion in 2015-16, ADOA estimated that the cost would ███████████████████████ ██████  which is "immaterial." Curtis Decl., Ex. 24 (ADOA Research Summary Chart) at AZSTATE.151718-19; Wee Decl., Ex. 19 (Barrett expert report) at ¶¶ 9, 45 (confirming that the estimated cost of covering gender affirming surgery in 2016 was less than 0.1%, an "amount so small that it would be considered immaterial from an actuarial perspective"). ADOA's review of external analyses supported its internal cost projection. *See* Wee Decl., Ex. 18 (Williams Institute Cost Report) (concluding that "Employers report very low costs, if any, from adding transition-related coverage to their health plans or from actual utilization of the benefit after it has been added – with many employers reporting no costs at all."); Curtis

Decl., Ex. 24 (ADOA Research Summary Chart) at AZSTATE.151718-19 (State of Washington reported to ADOA that ███████████████████████ ██████████████████████ *id.* (State of Colorado reported to ADOA that it was █████████████████████████████████████████████████" and that their self-insured plans ████████████████████ Wee Decl., Ex. 33 (email showing the State of Oregon was "pretty confident that the coverage [of transgender benefits] did not any increase in the premiums.").

 e. ADOA does not have a general policy of covering only what is required by law.  Wee Decl., Ex. 31 (Isaacson Depo. Tr.) at Tr.41:14-17.  In fact, the Plan covers services that are not required by law.  *Id.*  at 41:1-11; *id.*, Ex. 32 (Schafer Depo. Tr.) at 42:20-23.  Moreover, ADOA received guidance from multiple sources that the Exclusion was likely impermissible from a legal perspective.  *See id.*, Ex. 34 (Shannon Depo. Tr.) at 159:17-160:13 (noting that all of its carriers directed ADOA to remove the Exclusion if it wanted to comply with section 1557 of the Affordable Care Act); *id.*, Ex. 32 (Schafer Depo. Tr.) at 95:4 – 24 (Mercer advised ADOA that it may be implicated by section 1557 of the Affordable Care Act); *id.*, Ex. 35 (Cigna informing ADOA that "[e]xcluding [gender affirming] services will very likely be considered discriminatory for employers under Title VII of the Civil Rights Act by the Equal Employment Opportunity Commission (EEOC)").

 f. Every major medical organization to address the issue has recognized that transition-related care is effective, safe and medically necessary for treatment of gender dysphoria.  Am. Compl. ¶ 3.

 21. **Defendants' Assertion:** Of these, cost is one of the most important factors. (*See* Curtis Decl., Ex. 10 (Bender Depo.) at 56:2–10, 58:4–14; Curtis Decl., Ex. 9 (Shannon Depo.) at 128:22– 129:22.)

**Plaintiff's Response:** Plaintiff does not dispute the fact that cost may be one of the factors considered as described in Paragraph 21, but disputes that cost was an important factor considered by the ADOA when deciding whether to maintain the Exclusion. *Supra* ¶¶ 20, 20 (d). Christina Corieri, a representative of the Governor's Office, does not recall cost being discussed at the Fall 2016 meeting where it was decided to maintain the Exclusion. Wee Decl., Ex. 36 (Corieri Depo. Tr.) 29-31, 35:1-4. Instead, the purpose of the Fall 2016 Meeting was to "discuss the ADOA exclusion on gender reassignment surgery, and making sure that it was compliant with the regulations that came down under the ACA." *Id*. at 32:4-7, 34:20-21 (the "purpose of that meeting was to seek legal advice regarding the exclusion"). Beyond discussion of legal advice, Ms. Corieri testified that she did not recall "anything else [being] discussed" at the Fall 2016 Meeting. *Id.* at 34:23-25. In fact, the State did not even prepare an actuarial analysis of the cost issue until 2019, after this lawsuit was filed. *Id.*, Ex. 37 (Meisner Depo. Tr.) at 142:3-24 (Michael Meisner, ADOA's current actuary, did not perform a cost analysis for transgender benefits in 2015, 2016, or 2017, and only performed a cost analysis later, in 2019). Plaintiff further asserts that the contemplated cost increases were immaterial. *Supra* ¶ 20(d).

22.   **Defendants' Assertion:** ADOA conducted annual meetings with the medical directors of its insurance vendors to discuss potential revisions to the Plan design. (Curtis Decl., Ex. 10 (Bender Depo.) at 103:12–104:6; Curtis Decl., Ex. 9 (Shannon Depo.) at 138:16–24.)

**Plaintiff's Response:** Undisputed.

**Defendants' Assertion:** On occasion, ADOA will consult with the Governor's Office regarding proposed revisions to the Plan. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 119:11–120:15; Curtis Decl., Ex. 10 (Bender Depo.) at 71:7–11, 81:4–20.)

**Plaintiff's Response:** Plaintiff does not dispute the facts in Paragraph 23, but clarifies that the occasions in which the Governor's Office and the ADOA meet with respect to Plan design and revisions were reportedly infrequent. Mr. Shannon stated that it "doesn't happen very often" that he meets with anyone in the Governor's Office

1    regarding a coverage decision.  Wee Decl., Ex. 34 (Shannon Depo. Tr.) at 89:9-20.  Mr.

2    Bender testified that he could not remember a case where the Governor's Office got

3    involved in the decision-making process before the ADOA presented the proposed

4    coverage change to them.  *Id.*, Ex. 38 (Bender Depo. Tr.) at 97:19-22.  The ADOA's Lead

5    Plan Administrator Yvette Medina could only recall two instances in which the Governor's

6    Office proposed Plan language: "same-sex or domestic partners" and "the

7    nondiscrimination transgender item."  *Id.*, Ex. 39  (Medina Depo. Tr.) at 52:1-21.

8        23.    **Defendants' Assertion:** ADOA did not often remove exclusions from the

9    Plan. (Curtis Decl., Ex. 10 (Bender Depo.) at 116:24–117:9.)

10            **Plaintiff's Response:** Disputed.  First, Plaintiff points to State Defendants

11   Paragraph 25, which lists out 5 exclusions that have been removed in the last five years.

12   Additionally, Plaintiff points to the following instances where the ADOA has added

13   coverage for new medical services, even when they were not legally required to do so and

14   when doing so would likely have increased cost to the Plan:

15        a.  A Plan change log produced by State Defendants shows ADOA added coverage

16            for orthognathic surgery in 2012.  Wee. Decl., Ex. 10 (ADOA Plan Change Log

17            2012) at AZSTATE.111909;  *see also id.*, Ex. 39 (Medina Depo. Tr.) at 63:1-

18            65:21 (confirming that ADOA added coverage for orthognathic surgery in 2012

19            by removing a prior Plan exclusion).

20        b.  In the 2013/ 2014 time period, the ADOA added coverage for a type of bariatric

21            surgery.  Wee Decl., Ex. 31 (Isaacson Depo. Tr.) at 98:13-99:3, 100:16-19.

22        c.  A plan change log produced by State Defendants also shows that the exclusion

23            for this type of bariatric surgery, called laproscopic sleeve gastrectomy, was

24            removed from the Plan in 2014.  Wee Decl., Ex. 9 (2014 ADOA Change Log)

25            at AZSTATE.124801.  ADOA was not under any legal requirement or mandate

26            to add coverage for laproscopic sleeve gastrectomy in 2014.  Wee Decl., Ex. 31

27            (Isaacson Depo. Tr.) at 136:16-24.

28        d.  Between 2017 and 2019, ADOA decided to add coverage for 3-D

                                         11

Mammography, which was not previously covered under the Plan.  *See* Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 80:9-81:2; *id.*, Ex. 38 (Bender Depo. Tr.) at 119:10-120:3; *id.*, Ex. 40 (Sharritts Depo. Tr.) at 114:13-23.  ADOA was not under any legal requirement or mandate to add coverage for 3-D Mammography.  *Id.*, Ex. 38 (Bender Depo. Tr.) at 137:3-8; *id.*, Ex. 2 (Sharritts Depo. Tr.) at 114:13-23.

    e.  In 2018, ADOA added coverage for a new hepatitis-C drug, which was "extremely expensive."  Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 20:14-20, 161:8-14.

24.  **Defendants' Assertion:** From 2015-2021, ADOA removed only five exclusions for treatments or services from the Plan, including:

    a.  2015 – compression garments for treatment of burns;

    b.  2016 – none:

    c.  2017 – manipulations under anesthesia, counseling and hormone therapy for the treatment of gender dysphoria;

    d.  2018 – midwife services;

    e.  2019 – none;

    f.  2020 – none; and

    g.  2021 – treatment for benign gynecomastia. (Declaration of Paul Shannon ("Shannon Decl.") at ¶ 5.)

      **Plaintiff's Response:** Plaintiff does not dispute the facts in Paragraph 25, but clarifies that in addition to the exclusions listed above, in the time period from 2015-2021 the ADOA also added coverage for medical services including 3-D mammography and treatment for hepatitis C. *Supra* ¶ 24 (d)-(e).  Additionally, in 2014, just one year prior to this time period, State Defendants also removed an exclusion for bariatric surgery. *Supra* ¶ 24(b).

25.  **Defendants' Assertion:** ADOA only removed exclusions from the Plan if it was legally required or if the revision would not increase the cost of the Plan. (*See* Wee

Decl., Ex. 38 (Bender Depo.) at 116:24–117:9, 167:12-24.)

**Plaintiff's Response:** Disputed. First, Defendants have not included any evidence in their briefing to substantiate that the exclusions they removed since 2016 (*See supra* 25(a)-(g)) were removed solely because they were legally required to do so. Additionally, Bender testified that "typically" proposals to remove exclusions occur when there has been a change in the law, but did not state that this was the only reason these changes were made. *See* Curtis Decl., Ex. 10 (Bender Depo.) at 116:24–117:9. Moreover, the record indicates that ADOA does not have a policy of removing exclusions only when mandated by law. Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 218:20-219:6; *Id.*, Ex. 31 (Isaacson Depo. Tr.) at 41:1-13; *see id.*, Ex. 38 (Bender Depo. Tr.) at 130:8-131:3 (stating it is a "fairly easy decision" to remove an exclusion when all of ADOA's providers are aligned that the procedure is "a standard course of treatment" so long as "the cost is reasonable"); *see also* Wee Decl., Ex. 31 (Isaacson Depo Tr.) at 139:17-25, 184:9-12, (noting that exclusions are typically removed when they are in the best interest of the plan and its members and citing that as "the most important factor" for ADOA's decision to remove exclusion for bariatric surgery).

**History of the Exclusion**

    **2.    Origination of the Exclusion**

26.    **Defendants' Assertion:** Prior to 2004, ADOA provided health insurance to State employees through a fully-insured health insurance plan provided by Cigna. (Curtis Decl., Ex. 15 (AZSTATE.244065) at AZSTATE.244071.)

    **Plaintiff's Response:** Undisputed.

27.    **Defendants' Assertion:** In October 2004, the State instituted a self-funded health insurance plan. (Curtis Decl., Ex. 15 at AZSTATE.244071.)

    **Plaintiff's Response:** Undisputed.

28.    **Defendants' Assertion:** At that time, the State copied the plan document and terms previously provided by its insurance companies, including Cigna. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 195:16–20, 197:7–15, 200:11–15.)

**Plaintiff's Response:** Undisputed.

29.   **Defendants' Assertion:** That plan document included an exclusion for "transsexual surgery including medical or psychological counseling and hormonal therapy in preparation for, or subsequent to, any such surgery." (*See* Curtis Decl., Ex. 16 (AZSTATE.010905 at AZSTATE.010973.))

**Plaintiff's Response:** Undisputed.

30.   **Defendants' Assertion:** In the past, both public and private institutions excluded healthcare coverage for gender dysphoria on the rationale that such treatments were cosmetic or experimental. (*See* Doc. 86 (Amended Complaint), ¶ 3; Curtis Decl., Ex. 1 (Toomey Depo.) at 146:3–13.)

**Plaintiff's Response:** Undisputed.

**3.     The 2017 Expansion of Coverage for Transgender Persons**

31.   **Defendants' Assertion:** Beginning in September 2015, ADOA contacted its insurance vendors specifically to research industry standards for coverage of transgender benefits. (Curtis Decl., Ex. 17 (AZSTATE.000639); *see also* Curtis Decl., Ex. 11 (Sharritts Depo.) at 45:3- 6; Curtis Decl., Ex. 14 (Medina Depo.) at 119:6-16.)

**Plaintiff's Response:** Undisputed.

32.   **Defendants' Assertion:** In 2015, the majority of ADOA's insurance vendors did not provide coverage for transgender benefits. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 26:13–17, 29:15–19; Curtis Decl., Ex. 14 (Medina Depo.) at 119:17–120:4; Curtis Decl., Ex. 18 (AZSTATE.006325); Curtis Decl., Ex. 19 (AZSTATE.006198); Curtis Decl., Ex. 20 (AZSTATE.006129); *see also* Curtis Decl., Ex. 7 (Deposition of Joan C. Barrett ("Barrett Depo.")) at 28:1–6.)

**Plaintiff's Response:** Plaintiff does not dispute the facts in Paragraph 33, but clarifies that when ADOA reached out to its insurance vendors in 2015, they informed ADOA that they were moving toward covering costs of gender affirming care due to anticipated changes to the Affordable Care Act by the end of 2016 or early 2017.  Curtis Decl., Ex. 24 (ADOA Research Summary Chart) at AZSTATE.151712-15; Wee Decl., Ex.

41 (United Healthcare to remove exclusions); *id.*, Ex. 42 (BlueCrossBlue Shield to remove exclusions); *id.*, Ex. 43 (Cigna to remove exclusions).  By the time Dr. Toomey sought gender affirming care in 2018, all of the third-party administrators for the Plan had adopted internal coverage guidelines recognizing hysterectomies and other gender-affirming surgeries as medically necessary treatment for gender dysphoria.  See Doc. 86-3 (Ex. C to Am. Compl.) (Aetna Guidelines); Doc. 86-4 (Ex. D to Am. Compl.) (BCBS Guidelines); Doc. 86-5 (Ex. E to Am. Compl.) (Cigna Guidelines); Doc. 86-6 (Ex. F to Am. Compl.) (United Healthcare Guidelines).

33.     **Defendants' Assertion:** On September 8, 2015, the United States Department of Health and Human Services ("HHS") issued a proposed rule on Section 1557 of the Affordable Care Act ("ACA"). (Nondiscrimination in Health Programs and Activities, 80 Fed. Reg. 92, 54172- 01 (September 8, 2015).)

**Plaintiff's Response:** Undisputed.

34.     **Defendants' Assertion:** ADOA contacted its insurance vendors to research how the proposed rule would affect that Plan. (Curtis Decl., Ex. 21 (AZSTATE.000637).)

**Plaintiff's Response:** Undisputed.

35.     **Defendants' Assertion:** ADOA also considered the cost of removing the exclusion for transgender benefits. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 30:6-13; Curtis Decl., Ex. 13 (Schafer Depo.) at 102:23–25; Curtis Decl., Ex. 11 (Sharritts Depo.) at 78:14-20.

**Plaintiff's Response:** Disputed.  ADOA collected information about cost, but did not consider that information when making its ultimate decision.  *See Supra* ¶¶ 20, 21.

ADOA's contemporaneous cost analyses in 2015 and 2016 indicated that removing the Exclusion *could* add $130,000-582,000 in annual costs to the Plan, but that such analysis was an informed estimate and not definitive.  *See Infra* ¶ 37.  In all events, this cost was immaterial.  *Supra* ¶ 20(d); Wee Decl., Ex. 40 (Sharritts Depo. Tr.) at 123:21-124:18 (Ms. Sharritts testifying that the cost was "minuscule" as it was "potentially

pennies, to the plan on a per-person basis"); *id.*, Ex. 44 (Brown Depo. Tr.) at 227:6-15 (Mr. Brown testifying that a $0.17 - $0.77 per month per employee increase was not significant); *id.*, Ex. 38 (Bender Depo. Tr.) at 190:12-191:7 (Plan Administration Manager Scott Bender testifying that a dollar per month per employee, or 50 cents per month per employee was "not a high cost[.]"); *id.*, Ex. 31 (Isaacson Depo. Tr.) at 279:9-23 (Ms. Isaacson testifying that Ms. Sharritts' cost estimate was "not significant," that it would not "have mattered" to the ADOA, and that it would not "have been a factor that ADOA considered.")

36.     **Defendants' Assertion:** Providing coverage for transgender benefits under the Plan would increase costs to the Plan. (*See* Curtis Decl., Ex. 22 (AZSTATE.006095); Curtis Decl., Ex. 20 (AZSTATE.006129); Curtis Decl., Ex 23 (ABOR-TOOMEY003459); Curtis Decl., Ex. 7 (Barrett Depo.) at 103:3-6.) ADOA's contemporaneous cost analyses indicated that removing the Exclusion would add $130,000-$582,000 in annual costs to the Plan. (Curtis Decl., Ex. 24 (AZSTATE.151707); Curtis Decl., Ex. 22 (AZSTATE.006095).)

**Plaintiff's Response:** Undisputed.

37.     **Defendants' Assertion:** It is unknown how many Plan members are transgender, how many would seek "gender reassignment surgery," or what specific surgical procedures transgender Plan participants would seek. (*See* Curtis Decl., Ex. 10 (Bender Depo.) at 158:7–159:1; Curtis Decl., Ex. 24 (AZSTATE.151707).)

**Plaintiff's Response:** Disputed.   The ADOA research summary which Defendants cite shows that in fact, ████████████████████████████████ ████████████████████████████████████████████████████ ███████████   Curtis Decl., Ex. 24 (AZSTATE.151707).  Defendants estimated that the "utilization estimates range from 1-11 claims per year[.]"   *Id.* A report by the Williams Institute similarly supported this conclusion.  Wee Decl., Ex. 17 (Williams Institute Report and related email)(Sharritts concluding, "it supports a very low utilization and cost associated with adding this benefit and no real impact.")

38.     **Defendants' Assertion:** ADOA also reviewed whether other states and

governmental entities provided coverage for gender reassignment surgery for their employees. (Curtis Decl., Ex. 25 (AZSTATE.004345); Curtis Decl., Ex. 8 (Isaacson Depo.) at 60:25-61:4.)

**Plaintiff's Response:** Undisputed.

39. **Defendants' Assertion:** HHS issued its final rule on Section 1557 on May 18, 2016 (the "2016 Rules"). (Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 96, 31376 (May 18, 2016) (codified at 45 C.F.R. pt. 92).)

**Plaintiff's Response:** Undisputed.

40. **Defendants' Assertion:** Again, ADOA contacted its insurance vendors to research how the 2016 Rules would affect the Plan. (Curtis Decl., Ex. 26 (AZSTATE.005674); Curtis Decl., Ex. 27 (AZSTATE.136334); Curtis Decl., Ex. 28 (AZSTATE.009210).)

**Plaintiff's Response:** Plaintiff does not dispute the facts in Paragraph 41, but clarifies that ADOA's insurance vendors informed ADOA that it should remove the Exclusion to comply with the 2016 Rules. *See* Wee Decl., Ex. 34 (Shannon Depo. Tr.) at159:17-160:13 (noting that all of ADOA's carriers directed it to remove the Exclusion if it wanted to comply with section 1557 of the ACA); *see also id*., Ex. 32 (Schafer Depo. Tr.) at 95:4 – 24 (Mercer, an insurance consultant utilized by the ADOA, advised ADOA that it may be implicated by section 1557 of the ACA).

41. **Defendants' Assertion:** ADOA also reviewed publicly available information about the 2016 Rules, including news bulletins. (Curtis Decl., Ex. 29 (AZSTATE.005677).)

**Plaintiff's Response:** Disputed. In this document one ADOA employee merely forwards a news bulletin to another ADOA employee with no context or indication of whether this was considered or reviewed.

42. **Defendants' Assertion:** ADOA compiled all of this information into a coverage summary chart. (Curtis Decl., Ex. 24 (AZSTATE.151707).)

**Plaintiff's Response:** Undisputed.

43.   **Defendants' Assertion:** In March and September 2016, ADOA discussed coverage of gender reassignment surgery with the medical directors of its insurance vendors. (Curtis Decl., Ex. 30 (AZSTATE.000385); Curtis Decl., Ex. 31 (AZSTATE.144146).) This discussion included the cost associated with coverage for gender reassignment surgery. (*Id.*)

**Plaintiff's Response:** Undisputed.

44.   **Defendants' Assertion:** ADOA's consideration of coverage for transgender benefits was no different than its consideration of other procedures or conditions. (*See* Curtis Decl., Ex. 9 (Shannon Depo.) at 231:20–24; Curtis Decl., Ex. 11 (Sharritts Depo.) at 90:24-91:12.)

**Plaintiff's Response:** Disputed.   First, the Sharritts testimony cited by Defendants shows that this process *did* in fact differ from other benefits in that the focus was on whether maintaining the Exclusion would be discriminatory. Wee Decl., Ex. 40 (Sharritts Depo.) at 90:24-91:12.   Additionally, although ADOA gathered relevant information as it normally did when analyzing whether to cover a benefit, the information gathered was not taken into account, because, as described above, all considerations weighed in favor of the ADOA removing the Exclusion. *Supra* ¶ 20; *see* Wee Decl., Ex. 38 (Bender Depo. Tr.) at 155:2-9. ("In the ordinary course of business," coverage determinations are made using a "bottom-up" approach, this clearly was not").   The only factor considered when determining whether to remove the Exclusion was whether coverage was legally required. *See Supra* ¶¶ 20, 21, 26.

The Governor's Office also played an outsized and atypical role in determining whether to remove the Exclusion.   *See* Wee Decl., Ex. (Bender Depo. Tr. at 155:2-9) ("in the ordinary course of business, [evaluation of an exclusion] would have been a bottom-up approach, and this clearly was not"); *id..* at 97:19-22 (testifying that he could not remember a case where the Governor's Office got involved in the decision making process before ADOA presented a change to them); *id.* at 161:18-162:9 (stating his belief that "someone up the food chain from ADOA" from "the governor's office" would have

made the decision to maintain the Exclusion); *id.* at 181:17-23 (testifying that he was not aware of any other instances in which the Plan covered a medically necessary procedure in some instances but not others); *id.*, Ex. 34 (Shannon Depo. Tr.) at 89:9-20 (confirming that it "doesn't happen very often" that he meets with anyone in the Governor's Office regarding a coverage decision); *id.*, Ex. 39 (Medina Depo. Tr.) at 52:1-21 (recalling only two instances in which the Governor's Office proposed Plan language: "same-sex or domestic partners" and "the nondiscrimination transgender item").

45.     **Defendants' Assertion:** Ultimately, ADOA decided to expand coverage for transgender benefits under the Plan—removing the exclusion for hormone therapy and medical or psychological counseling—effective for the Plan year beginning January 1, 2017. (*See* Curtis Decl., Ex. 6 at AZSTATE.01049.)

        **Plaintiff's Response:** Disputed.  By State Defendants' own account, the State provided coverage for hormone therapy only because they allegedly understood that such coverage was all that was "legally required." *See Supra* ¶¶ 20, 21.

46.     **Defendants' Assertion:** ADOA made this decision in order to minimize increased costs to the Plan and because it believed that the modified exclusion was legal. (Wee Decl., Ex. 38 (Bender Depo.) at 167:12-24.)

        **Plaintiff's Response:** Disputed.  ADOA was aware the cost of removing the Exclusion from the Plan was immaterial.  *Supra* ¶¶ 20(d), 36.  Moreover, cost was not a fact that was considered when determining whether to remove the Exclusion, the only consideration was whether it was "legally required" to cover the benefits.  *Supra* ¶¶ 20, 21.

47.     **Defendants' Assertion:** Beginning in plan year 2017, the Plan only excludes "gender reassignment surgery" and does not exclude counseling or hormone therapy for gender dysphoria.  (Curtis Decl., Ex. 6 at AZSTATE.01049.)

        **Plaintiff's Response:** Undisputed.

48.     **Defendants' Assertion:** No one at ADOA has expressed a negative opinion about transgender persons. (Curtis Decl., Ex. 9 (Shannon Depo.) at 98:1–5, 224:12–15, 243:24–244:9; Curtis Decl., Ex. 13 (Schafer Depo.) at 181:9–20, 184:10–185:7, 185:24–

186:6; Curtis Decl., Ex. 10 (Bender Depo.) at 98:19-21, 286:9-14.)

**Plaintiff's Response:** Disputed.  First, a limited subset of individuals were deposed in this litigation, and therefore it is impossible to conclude that "no one  at the ADOA has expressed a negative opinion about transgender persons."  Second, at least one ADOA employee has insinuated that because the cost of covering transgender benefits was "minuscule" it "d[id]n's seem like [there was] an obvious reason not to cover it other than what the ***State feels on it***." Wee Decl., Ex. 40 (Sharritts Depo. Tr.) at 124:5-9 (emphasis added).  Moreover, in describing conversations regarding whether to cover the exclusion Sharritts testified that managers at the ADOA were trying to determine whether this treatment was a personal choice, a matter of opinion, or whether it was actually medically necessary.  *Id.* at 48:3-18; 50:7-19; Tr. 184:3-15.  State witnesses also testified that they perceived political sensitivity surrounding the elimination of the Exclusion due to potential pressure from voters and policymakers who disapproved of gender transition.  *Id.*, Ex. 38 (Bender Depo. Tr.) at Tr. 157:19-25 (agreeing that the decision about covering transgender benefits "wasn't an easy decision because of the political considerations around it."); *Id.* at 156:22-157:3 (noting removing the Exclusion may have been "viewed more along political lines, if you will, different ideologies. And, obviously, in a political environment, that's – many people consider those things."); *Id.*, Ex. 40 (Sharritts Depo. Tr.) at 169:16-22; *id.* at 170:17-21.  Additionally Sharritts also testified that Mr. Meisner was determined to "prove himself correct in his viewpoints," and that he "really wanted to show that [gender-affirming care] w[ere] going to be too costly," despite the fact that that the State's 2015-16 analysis "showed otherwise." *Id.,* Ex. 40 (Sharritts Depo. Tr.) at 97:1-17.

49.    **Defendants' Assertion:** No one at the Governor's Office has expressed a negative opinion about transgender persons. (*See* Curtis Decl., Ex. 8 (Isaacson Depo.) at 43:4-6; Curtis Decl., Ex. 9 (Shannon Depo.) at 224:16–21, 243:24–244:9; Curtis Decl., Ex. 32 (Deposition of Christina Corieri ("Corieri Depo.") at 55:21–56:8.)

**Plaintiff's Response:** Disputed.  Ms. Corieri tweeted her personal disapproval for expanding healthcare for transgender benefits before joining the

Governor's office. Wee Decl., Ex. 45 ("advocates now demanding taxpayer dollars for gender reassignment surgery under Medicare – bet Medicaid is next").

**The State's Cost Concerns**

50.   **Defendants' Assertion:** In 2016, the State had a large budget deficit. (Curtis Decl., Ex. 33 (FY 2016 JLBC Baseline Summary); *see also* Curtis Decl., Ex. 32 (Corieri Depo.) at 35:12–36:10.)

   **Plaintiff's Response:**  Undisputed.

51.   **Defendants' Assertion:** Cost reductions and efficiencies are one of the State's primary focuses. (Curtis Decl., Ex. 12 (Brown Depo.) at 47:20–49:4.)

   **Plaintiff's Response:** Plaintiff disputes the facts in Paragraph 52.  The evidence cited by State Defendants does not support this assertion as cost reductions (not necessarily relating to healthcare), were one of former ADOA Director Craig Brown's personal goals for the agency, but did not speak for the agency's or State's goals as a whole. (Curtis Decl., Ex. 12 (Brown Depo.) at 47:20–49:4)

52.   **Defendants' Assertion:** In 2016, the Plan's expenses exceeded its revenues, and ADOA had to pay Plan expenses from a reserve fund. (Curtis Decl., Ex. 15 (AZSTATE.24465) at AZSTATE.244074–75)

   **Plaintiff's Response:** Undisputed.

53.   **Defendants' Assertion:** In 2017, the Plan's expenses exceeded its revenues, and ADOA had to pay Plan expenses from a reserve fund. (Curtis Decl., Ex. 34 (AZSTATE.244113) at AZSTATE.244121–23.))

   **Plaintiff's Response:** Undisputed.

54.   **Defendants' Assertion:** When there is an increase to the Plan, ADOA must increase employee premiums. (Curtis Decl., Ex. 8 (Isaacson Depo.) at 331:11–13.)

   **Plaintiff's Response:** Disputed.  It is unclear what "an increase to the Plan" is.  For example, if ADOA removes an exclusion, they may offset any increased costs with other reductions of benefits instead of increasing premiums. Moreover, Plaintiff asserts that ADOA estimated the cost of removing the Exclusion to be $.17 to $.77 per employee

per month, as a cost that was described as immaterial by State Defendant witnesses and testimony.  *Supra* ¶¶ 20(d), 36.

55.    **Defendants' Assertion:**  Cost weighed into most decisions by ADOA. (Curtis Decl., Ex. 9 (Shannon Depo.) at 128:22–129:22; Curtis Decl., Ex. 13 (Schafer Depo.) at 83:7-10, 101:19–102:2.)

**Plaintiff's Response:**  Plaintiff disputes this fact to the extent that cost was not a factor in Defendants' decision to maintain the Exclusion.  *Supra* ¶¶ 20(d), 36.

## SEPARATE STATEMENT OF FACTS IN SUPPORT OF DR. TOOMEY'S RESPONSE TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dr. Toomey submits the following Separate Statement of Facts ("SSOF") in support of its Response in Opposition to State Defendants' Motion for Summary Judgment.  Dr. Toomey incorporates and relies on Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment (Doc. 310).

## I.   THE STATE'S DECISION TO MAINTAIN THE EXCLUSION DEPARTS FROM ORDINARY DECISION-MAKING

### A.    The State's Ordinary Decision-Making Regarding Plan Coverage

#### 1.    *Ordinary Procedure for Coverage Determinations*

1.    While ADOA's Plan recommendations are occasionally discussed with the Arizona governor's office (the "Governor's Office"), the Governor's Office's approval is not technically required, and is generally considered to be merely ceremonial.  Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 28:5-10 (testifying that the Governor's Office did not have to approve changes to the plan).

2.    Under normal circumstances, ADOA makes recommendations for Plan changes to the Director of the ADOA based on the analysis of professionals within the Benefits Services Division, and then the Governor's Office and the joint legislative budget committee sign off on them.  Wee Decl., Ex. 32 (Schafer Depo. Tr. at 24:8-21)("It's not

required that [the JLBC] say yes, but it's a good thing for them to approve any of the changes you are making to the plan." If the JLBC "are not happy with the decisions being made they can make it much more difficult for the benefits department." For example "[s]ometimes they put in a new statute or rule and – or they make sure the director of the department knows that they don't approve.")

3.      "In the ordinary course of business," coverage determinations are made using a "bottom-up" approach. Wee Decl., Ex. 38 (Bender Depo. Tr.) at 155:2-9.

### *2.      Ordinary Substantive Considerations*

4.      In assessing whether or not to extend coverage for a benefit or to remove a prior Plan  exclusion, the ADOA Benefit Services Division considers objective criteria such as (i) estimated cost and (ii) market trends. Wee Decl., Ex. 38 (Bender Depo. Tr.) at 54:24-55:14 (noting that the general process that includes: cost analysis; market analysis; and consideration of members well-being).

5.      Benefits Services Division professionals collect cost information from ADOA's four third-party administrators which maintain their own fully funded plans, and which are large repositories for healthcare cost information. Wee Decl., Ex. 34 (Shannon Depo. Tr.) at 140:1-141:22.

      a.      Blue Cross Blue Shield, Aetna, United Healthcare, and Cigna were the third-party administrators in 2016, but the administrators sometimes change. Wee Decl., Ex. 34 (Shannon Depo. Tr.) at 141:15-22.

      b.      Self-funded plans like ADOA's Plan utilize third-party administrators to provide operations services, such as claims processing. Doc. 86-1 (2018 EPO Plan) at pg. 69 § 12.1; 12.2.

6.      Additionally, cost information is sometimes collected from other self-funded plans, like the plans of other States that have already adopted the benefit, and accumulated cost data. Wee Decl., Ex. 31 (Isaacson Depo. Tr.) at 114:10-115:19.

7.      Benefits Services Division employees consider market trends: specifically, whether the trend among other health insurance providers is to cover or to exclude the

benefit.  For example:

    a.    Paul Shannon confirmed that, "[i]f the experts from the fully insured book of business carriers were recommending that the ADOA cover a certain benefit, it's very likely that the ADOA would cover that benefit." Wee Decl., Ex. 34 (Shannon Depo. Tr.) at 140:16-20.

8.    In particular, the Benefits Services Division looks at the coverage trend among the fully-funded plans of its third party administrators. Paul Shannon, the current Benefits Services Division Director, explained that if all of ADOA's third party administrators, (e.g. UHC, Blue Cross, and previously Aetna or Cigna), cover a benefit in their fully funded plans, then the ADOA would "very likely" extend coverage to that benefit.  Wee Decl., Ex. 34 (Shannon Depo. Tr.) at 141:23-142:3.

9.    This is particularly true where the projected cost of a benefit is low. As ADOA Plan Administration Manager Scott Bender testified during his deposition, "where all four [third-party administrators] are aligned that [a new benefit] is now a standard course of treatment," and where the "cost is reasonable," it is "a fairly easy decision, and we don't necessarily need to the [Governor's Office] or the director [of ADOA] to make those decisions."  Wee Decl., Ex. 38 (Bender Depo. Tr.) at 130:18-131:3.

A.    **The State's Decision to Maintain the Exclusion in 2016**

1.    *ADOA's Professional Assessment of Objective Criteria in 2015-16*

10.    In addition to cost, the ADOA Benefits Services Division also considered market trends by asking their four third-party administrators whether they would be extending coverage.   Curtis Decl., Ex. 24 (ADOA Research Summary Chart) at AZSTATE.151712-15.

11.    All four third-party administrators confirmed that they would be covering transgender benefits, including gender affirming surgery.  Curtis Decl., Ex. 24 (ADOA Research Summary Chart) at AZSTATE.151712-15 (reflecting four carriers to remove exclusions); Wee Decl., Ex. 41 (email correspondence showing United Healthcare to remove exclusions); *id.*, Ex. 42 (BlueCrossBlue Shield to remove exclusions); *id.*, Ex. 43

1    (Cigna to remove exclusions).

2             2.     *The Governor's Office's Mandate to Maintain the Exclusion*

3        12.    ADOA ultimately maintained its Exclusion after a closed-door meeting with

4    the Governor's Office in the fall of 2016.  Wee Decl., Ex. 31 (Isaacson Depo. Tr.) at 19:6-

5    15, 37:20-40:1, 52:15-24.

6        13.    The decision was not based on cost, but on the purported conclusion that

7    coverage for surgery was not legally mandated.  For example:

8            a.    Corieri does not recall cost being discussed at the Fall 2016 Meeting.  Wee

9                   Decl., Ex. 36 (Corieri Depo. Tr.) 29-31, 35:1-4.  Instead, the purpose of the

10                  Fall 2016 Meeting was to "discuss the ADOA exclusion on gender

11                  reassignment surgery, and making sure that it was compliant with the

12                  regulations that came down under the ACA."  *Id*. at 32:4-7, 34:20-21 (the

13                  "purpose of that meeting was to seek legal advice regarding the exclusion").

14                  Beyond discussion of legal advice, Ms. Corieri testified that she did not

15                  recall "anything else [being] discussed" at the Fall 2016 Meeting.  *Id*. at

16                  34:23-25.

17           b.    Another ADOA employee testified that ADOA did not make the decision to

18                  maintain the Exclusion, but that it was "communicated to us to implement,"

19                  from "up the food chain" at the Governor's Office.  Wee Decl., Ex. 38

20                  (Bender Depo. Tr.) at 161:18-162:9.

21   **B.**    **The State's Bias Against Transgender Individuals and Gender**

22          **Transition**

23       14.    Only transgender individuals can experience gender dysphoria. Wee Decl.,

24   Ex. 1 (Schechter expert report) at ¶¶ 20-21.

25       15.    In 2013, Christina Corieri—who would later announce the Governor's

26   Office's decision to maintain the Exclusion in 2016—posted a tweet saying "advocates

27   now demanding taxpayer dollars for gender reassignment surgery under Medicare–bet

28   Medicaid is next."  Wee Decl., Ex. 45 (Corieri Tweet).

16.     Document production from the Governor's Office also revealed that Ms. Corieri subscribes to anti-transgender publications, including ones that deny the existence of transgender individuals, and that characterize gender affirming surgeries as "Frankenstein Hack Job[s]" and "Genital Mutilation."  Wee Decl., Ex. 46 (Daily Signal Articles sent to Christina Corieri); *Id*., Ex. 47  (Daily Signal Articles sent to Christina Corieri).

17.     The decision to maintain the Exclusion appears part of a pervasive state-wide policy against gender transition. Wee Decl., Ex. 48 (Corieri emails stating, ████ ███████████████████████████████████████████ referring to legislation to end taxpayer funding for gender reassignment surgery); *Id.*, Ex. 36 (Corieri Depo. Tr.) at 112:14-20.

18.     As ADOA reevaluates the Plan design every year, the State has maintained the Exclusion through every reevaluation since it its institution of the self-funded Plan in 2004 (18 years to date).  *See* Doc. 295 (Defendants' SOF) at ¶ 19;  Doc. 89 (Answer to Am. Compl.) at 2:2-3:4.

19.     The ADOA's maintenance of the Exclusion over 18 years coincides with other State entities' maintenance of similar exclusions under health plans administered by those entities, including by the State's Medicaid agency, the Arizona Health Care Cost Containment System ("AHCCCS"), and well as by the State's Department of Corrections. Wee Decl., Ex. 48 (Corieri email stating, ███████████████████████████ ██████████████████ referring to legislation to end taxpayer funding for gender reassignment surgery); Wee Decl., Ex. 36 (Corieri Depo. Tr.) at 112:14-20.

20.     ADOA witnesses testified that, in performing their cost assessment for transgender benefits in 2015-16, they were pressured from "above" to alter cost information, so as to hide the fact that coverage for gender affirming surgery would have an immaterial cost.  Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 172:19.  Specifically:

    a.     ADOA Plan Administrator Elizabeth Schafer—who was responsible for collecting and maintaining information about transgender benefits—

testified that she was directed to delete a sentence in ADOA's cost analysis that described the cost of coverage as "relatively low." Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 150:22-152:1.

b.   Ms. Schafer explained that "someone didn't want it in black and white" that the cost of coverage was immaterial.  Wee Decl., Ex. 32 (Schafer Depo. Tr.) at 151:15-152:1.

21.   ADOA witnesses further testified that the State's decision-making regarding the Exclusion was a "sensitive" topic. Wee Decl., Ex. 38 (Bender Depo. Tr.) at 156:7-16. *Id.* at Tr. 157:19-25 (agreeing that the decision about covering transgender benefits "wasn't an easy decision because of the political considerations around it."); *Id.* at 156:22-157:3 (noting removing the Exclusion may have been "viewed more along political lines, if you will, different ideologies. And, obviously, in a political environment, that's – many people consider those things." Wee Decl., Ex. 40 (Sharritts Depo. Tr.) at 169:16-22; Tr. 170:17-21.

22.   When questioned why the Governor's Office might directly insert itself in ADOA's Plan-related decision-making, Plan Administration Manager Scott Bender testified that, except for when a benefit poses significant cost, the Governor's Office would generally only be involved where "anyone in leadership has a particular feeling one way or the other about it."  Wee Decl., Ex. 38 (Bender Depo. Tr.) at 77:3-25.

23.   Budget Manager Sharritts testified that in 2016 the State "w[as]n't ready to make that change [*i.e.* coverage of gender affirming surgery] to the plan." Wee Decl., Ex. 40 (Sharritts Depo. Tr.) at 169:16-22.

24.   Sharritts further testified that, because the cost of covering transgender benefits was "minuscule" it "d[id]n's seem like [there was] an obvious reason not to cover it other than what the State feels on it." Wee Decl., Ex. 40 (Sharritts Depo. Tr.) at 124:5-9.

25.   Additionally a State witness testified that Mr. Meisner was determined to "prove himself correct in his viewpoints," and that he "really wanted to show that [gender-affirming care] w[ere] going to be too costly," despite the fact that that the State's 2015-16

27

1    analysis "showed otherwise."  Wee Decl., Ex. 40 (Sharritts Depo. Tr.) at 97:1-17.

2

3            DATED this 26th day of October, 2022.

4                                            ACLU FOUNDATION OF ARIZONA

5                                            By /s/ *Christine K. Wee*
                                             Christine K. Wee
6                                            3707 North 7th Street, Suite 235
                                             Phoenix, Arizona 85014
7

8                                            AMERICAN CIVIL LIBERTIES UNION
                                             FOUNDATION
9                                            Joshua A. Block*
                                             Leslie Cooper*
10                                           125 Broad Street, Floor 18
                                             New York, New York 10004
11

12                                           WILLKIE FARR & GALLAGHER LLP
                                             Wesley R. Powell*
13                                           Matthew S. Freimuth*
                                             Jordan C. Wall*
14                                           Justin Garbacz*
                                             787 Seventh Avenue
15                                           New York, New York 10019
16

17                                           *Admitted pro hac vice
18
                                             *Attorneys for Plaintiff Russell B. Toomey and the*
19                                           *certified classes*

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on October 26, 2022, I electronically transmitted the attached

3   document to the Clerk's office using the CM/ECF System for filing. Notice of this filing

4   will be sent by email to all parties by operation of the Court's electronic filing system.

5
                                    */s/ Christine K. Wee*
6                                   Christine K. Wee

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28