# Exhibit 29

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Russell B. Toomey,        )Case No.CV19-0035-TUC-RM (LAB)
                          )
          Plaintiff,      )
                          )
             vs.          )
                          )
State of Arizona, et al.,)
                          )
          Defendants.     )
_____)


DEPOSITION OF RUSSELL B. TOOMEY, Ph.D.


Phoenix, Arizona
May 26, 2021
9:00 a.m.


REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165


PREPARED FOR:
CONDENSED/ASCII

(Certified Copy)

24

1   around gender -- transgender-related care.

2      Q.    Did Kent State provide any benefits for

3   transgender-related care?

4      A.    I cannot recall.

5      Q.    But you do recall that it prohibited any gender

6   reassignment surgery?

7      A.    Yes.

8      Q.    When you went to see Dr. Karsten and she

9   recommended a hysterectomy for you, did she schedule you

10  for a hysterectomy?

11     A.    I did receive a call for scheduling, yes.

12     Q.    And did you schedule?

13     A.    No.

14     Q.    Why not?

15     A.    The correspondence I received suggested that I

16  would only have a $100 co-pay and so I decided to call

17  the insurance company to confirm that prior to

18  scheduling.

19     Q.    So was it your understanding that Dr. Karsten's

20  office reached out to your carrier for precertification

21  on your behalf?

22     A.    Yes.

23     Q.    And was that BlueCross/BlueShield?

24     A.    Yes.

25     Q.    And did Dr. Karsten's office inform you that

25

1  you had been approved for coverage for the hysterectomy

2  and you would be required to pay out of pocket a $100

3  co-pay?

4      A.    They stated that my insurance company did not

5  require preauthorization.

6      Q.    And they informed you that they were informed

7  you would be required to only pay a $100 co-pay;

8  correct?

9      A.    Yes.

10     Q.    Were you surprised when you received that

11  information?

12     A.    Yes.

13     Q.    Were you happy?

14     A.    Yes.

15     Q.    Yet you didn't go forward to schedule the

16  hysterectomy?

17     A.    No.

18     Q.    And was that because you were expecting a

19  denial of coverage?

20     A.    Yes.

21     Q.    And you thought the denial of coverage would be

22  helpful for your lawsuit?

23     A.    No.

24     Q.    Did you think it was necessary for your

25  lawsuit?

1    A.    Yes.

2    Q.    And you wanted to move forward with the

3  lawsuit, didn't you?

4    A.    I don't feel like I can answer a yes or no

5  answer to that because I knew that I would be getting a

6  bill down the road for the hysterectomy if I proceeded.

7    Q.    And how did you know that?

8    A.    Because it's listed as an exclusion.

9    Q.    You called BlueCross/BlueShield; correct?

10    A.    I did.

11    Q.    When you first called, they told you that you

12  were approved for the procedure, didn't they?

13    A.    I can't recall the specifics of that

14  conversation.

15    Q.    You're the one that brought to

16  BlueCross/BlueShield's attention that you were getting a

17  hysterectomy for purposes of gender dysphoria; right?

18    A.    I believe that my doctor had sent over the

19  code.

20    Q.    You believe your doctor sent the code over for

21  gender dysphoria?

22    A.    Yes.

23    Q.    And why do you believe that?

24    A.    Because that was the reason for the procedure.

25    Q.    Do you recall you providing that information to

27

1   BlueCross/BlueShield?

2       A.      I recall asking them to check that.

3       Q.      And why did you ask them to check it?

4       A.      Because I was very fearful of, in the end,

5   getting a very, very large medical bill at the end of

6   surgery.

7       Q.      Did you also ask them to check it because you

8   wanted to have in hand a denial of benefits letter?

9       A.      No.

10      Q.      Did you request such a letter from

11  BlueCross/BlueShield?

12      A.      I cannot recall.

13      Q.      Did anyone instruct you to contact

14  BlueCross/BlueShield after your doctor's office told you

15  that the pay would simply be $100 out of pocket?

16      A.      I cannot recall.

17      Q.      You don't remember?

18      A.      (Shakes head.)

19      Q.      So you don't remember if it was your idea or

20  someone else's?

21      A.      I believe it was mine.

22      Q.      You recorded the conversation with BlueCross;

23  correct?

24      A.      I did.

25      Q.      Did anyone recommend that you do that?

28

1     A.     No.

2     Q.     Why did you record it?

3     A.     I wanted to have proof for myself going forward

4  that it would be denied.

5     Q.     And when you say proof for yourself, do you

6  mean for purposes of the lawsuit that brings us here

7  today?

8     A.     Yes.

9     Q.     How did you do the recording?

10     A.     I recorded on my cellphone.

11     Q.     Through an app or how did you do it?

12     A.     Through an app.

13     Q.     What app did you use?

14     A.     I think it was the basic, like, recording app

15  that was on all phones at that time.

16     Q.     Okay.  And have you provided that recording to

17  anyone?

18     A.     Yes.

19     Q.     Who?

20     A.     My legal team.

21     Q.     And when did you provide it to them?

22     A.     In the past few weeks.

23     Q.     So you had it on your -- did you have it on

24  your phone or somewhere else?

25     A.     I had it saved somewhere else.

46

1  cost analysis of removing the exclusion that's at issue

2  in this case?

3      A.    I cannot recall from this conversation.

4      Q.    Okay.  Do you know whether there's been a cost

5  analysis performed if the exclusion were removed under

6  the plan?

7      A.    No.

8      Q.    So as you sit here today, you don't have any

9  knowledge of whether a cost analysis has been performed

10 and what the results were.  Is that a fair statement?

11     A.    Yes.

12     Q.    I'm finished with that exhibit.

13            Is it your understanding that at the

14 present time, you could get a hysterectomy paid for

15 under the plan for reasons other than gender dysphoria,

16 for example, risk of cancer?

17            MR. BLOCK:  Objection to form.

18     A.    Can you rephrase the question?

19     Q.    BY MS. ABDO:  Sure.  Is it your understanding

20 at the present time that you could get a hysterectomy

21 that would be paid for by your plan for reasons other

22 than gender dysphoria such as risk of cancer?

23     A.    With a formal diagnosis of precancerous cells,

24 yes.

25     Q.    And on your examination, did they find

1  precancerous cells?

2      A.    No.

3      Q.    So if I understand, they did a biopsy.  And did

4  it come back negative for precancerous cells?

5      A.    Yes.

6      Q.    And do you know what was the reason the biopsy

7  was performed?

8      A.    Yes.

9      Q.    What was the reason?

10     A.    I had an abnormal Pap smear result.

11     Q.    And was there any more detail to the abnormal

12  Pap smear result, in other words, presence of

13  precancerous cells or anything else?

14     A.    No.

15             MS. ABDO:  I know we've been going a

16  little over an hour.  Do you need a break?

17     A.    Yes.

18             MS. ABDO:  Okay.  Why don't we go ahead

19  and take 10 minutes.

20             (Recessed from 10:17 a.m. until

21  10:32 a.m.)

22     Q.    BY MS. ABDO:  Dr. Toomey, is it your

23  understanding that a hysterectomy would be covered under

24  the plan for things such as uterine prolapse?

25     A.    I do not know.

1    Q.    Is it your understanding that with certain

2  indications -- well, let me just ask this.  And I

3  apologize if I asked this before.  I'm not trying to ask

4  you again.  Is it your understanding that a hysterectomy

5  would be covered under the plan, for example, if you had

6  cancer in some of the organs involved with a

7  hysterectomy?

8    A.    Yes.

9    Q.    And is it your understanding that there are

10  other indications for which a hysterectomy would be

11  covered under the plan if they were present for you?

12  What I'm referring to is other medical indications, for

13  example, perhaps excessive bleeding or other problems

14  that were being experienced with the organs involved in

15  a hysterectomy.

16    A.    Yes.

17    Q.    And as I understand, you've had a physician

18  tell you that you're at higher risk for cervical cancer

19  due to the hormones that you have been taking; correct?

20    A.    No.

21    Q.    Have you had a physician tell you that one of

22  the potential risks of the hormones that you take is a

23  higher incidence of cervical cancer?

24    A.    It was not specified which type of cancer.

25    Q.    Was it your understanding, though, that it was

50

1    Pap smear; correct?

2       A.    Yes.

3       Q.    Have you sought a second opinion as to whether

4    those indicators I'll call them, the potential risk of

5    cancer due to hormones and an abnormal Pap and a biopsy,

6    would entitle you to a hysterectomy under your BlueCross

7    benefit plan?

8       A.    I'm not sure I understand your question.

9       Q.    Have you sought an opinion from any physician

10   as to whether your current health status, which includes

11   the potential risk of cancer due to hormone therapy,

12   history of an abnormal Pap and your recent biopsy, would

13   indicate that a hysterectomy would be appropriate for

14   you?

15              MR. BLOCK:   Objection to form.

16      A.    Is the question about the second opinion or the

17   physician that I saw?

18      Q.    BY MS. ABDO:  Well, it was about a second

19   opinion, but we can start with the physician that you

20   saw.  Did you discuss with that physician whether the

21   history that I've just described would indicate that

22   you're a candidate for a hysterectomy?

23      A.    She discussed that when she was discussing the

24   options that would come back with a diagnosis.

25      Q.    And since you received the results of your

51

1    biopsy, have you had any discussion with the physician

2    about whether you would be a candidate for a

3    hysterectomy at this time?

4        A.    The results of my test did not warrant a

5    hysterectomy based on her medical opinion.

6        Q.    Was that based on -- is that what you concluded

7    based on what she told you in advance of your results or

8    did you have a follow-up conversation?

9        A.    I had a follow-up conversation with her.

10       Q.    And have you sought a second opinion as to

11   whether your history would make you a candidate for a

12   hysterectomy?

13       A.    I have not.

14       Q.    Do you intend to?

15       A.    Not at this time.

16       Q.    Why not?

17       A.    Because I trust the judgment of my medical

18   provider.

19       Q.    Have you been told affirmatively by a physician

20   that you are not at higher risk for cancer due to the

21   hormone therapy that you're on?

22       A.    Can you clarify what you mean by

23   "affirmatively"?

24       Q.    Has any physician told you that hormone therapy

25   does not put you at higher risk for cancer?

# Exhibit 30



**WPATH** WORLD PROFESSIONAL ASSOCIATION for TRANSGENDER HEALTH

# Standards of Care

for the Health of Transsexual, Transgender, and Gender Nonconforming People

The World Professional Association for Transgender Health





# Standards of Care

## for the Health of Transsexual, Transgender, and Gender Nonconforming People

The World Professiona Association for Transgender Health

7th Version[1] | www.wpath.org

1  This is the seventh version of the Standards of Care. The original SOC were published in 1979. Previous revisions were in 1980, 1981, 1990, 1998, and 2001.

# Table of Contents

I. Purpose and Use of the Standards of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II. Global Applicability of the Standards of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

III. The Difference between Gender Nonconformity and Gender Dysphoria . . . . . . . . . . . . .4

IV. Epidemiologic Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

V. Overview of Therapeutic Approaches for Gender Dysphoria . . . . . . . . . . . . . . . . . . . . . .8

VI. Assessment and Treatment of Children and Adolescents with Gender Dysphoria . . . . .10

VII. Mental Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

VIII. Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

IX. Reproductive Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

X. Voice and Communication Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

XI. Surgery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

XII. Postoperative Care and Follow-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

XIII. Lifelong Preventive and Primary Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

XIV. Applicability of the *Standards of Care* to People Living in Institutional Environments . . .67

XV. Applicability of the *Standards of Care* to People With Disorders of Sex Development . . .69

## References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

## Appendices:

A. Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95

B. Overview of Medical Risks of Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . .97

C. Summary of Criteria for Hormone Therapy and Surgeries . . . . . . . . . . . . . . . . . . . . . .104

D. Evidence for Clinical Outcomes of Therapeutic Approaches . . . . . . . . . . . . . . . . . . . .107

E. Development Process for the *Standards of Care, Version 7* . . . . . . . . . . . . . . . . . . . . . .109

# Risks of Hormone Therapy

All medical interventions carry risks. The likelihood of a serious adverse event is dependent on numerous factors: the medication itself, dose, route of administration, and a patient's clinical characteristics (age, co-morbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual patient.

The risks associated with feminizing/masculinizing hormone therapy for the transsexual, transgender, and gender nonconforming population as a whole are summarized in Table 2. Based on the level of evidence, risks are categorized as follows: (i) likely increased risk with hormone therapy, (ii) possibly increased risk with hormone therapy, or (iii) inconclusive or no increased risk. Items in the last category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Additional detail about these risks can be found in Appendix B, which is based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (Dahl, Feldman, Goldberg, & Jaberi, 2006; Ettner, Monstrey, & Eyler, 2007).

TABLE 2: RISKS ASSOCIATED WITH HORMONE THERAPY. BOLDED ITEMS ARE CLINICALLY SIGNIFICANT

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | **Venous thromboembolic disease**[A]<br><br>Gallstones<br><br>Elevated liver enzymes<br><br>Weight gain<br><br>**Hypertriglyceridemia** | **Polycythemia**<br><br>**Weight gain**<br><br>**Acne**<br><br>**Androgenic alopecia (balding)**<br><br>**Sleep apnea** |
| Likely increased risk with presence of additional risk factors[B] | Cardiovascular disease | |
| Possible increased risk | **Hypertension**<br><br>Hyperprolactinemia or prolactinom[A] | Elevated liver enzymes<br><br>**Hyperlipidemia** |
| Possible increased risk with presence of additional risk factors[B] | Type 2 diabetes[A] | **Destabilization of certain psychiatric disorders**[C]<br><br>**Cardiovascular disease**<br><br>**Hypertension**<br><br>**Type 2 diabetes** |
| No increased risk or inconclusive | Breast cancer | Loss of bone density<br><br>**Breast cancer**<br><br>**Cervical cancer**<br><br>**Ovarian cancer**<br><br>**Uterine cancer** |

[A]  Risk is greater with oral estrogen administration than with transdermal estrogen administration.
[B]  Additional risk factors include age.
[C]  Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

Exhibit 31

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
RUSSELL B. TOOMEY,                )
                                  )
                Plaintiff,        )
                                  )
vs.                               )     4:19-cv-00035
                                  )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,     )
                                  )
                Defendants.       )
                                  )
```

VIDEOTAPED DEPOSITION OF MARIE FRANCES ISAACSON

Via Zoom videoconference
March 26, 2021
8:21 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

Marie Frances Isaacson - 03/26/2021

19

1        Q.   And am I correct in assuming that if it wasn't

2   required the Arizona Department of Administration and

3   others making the decision weren't going to implement

4   those other services?

5        A.   I don't know that to be true.  I don't know.

6        Q.   Did you determine that it was required to add the

7   services that were added in 2015?

8        A.   We sought legal counsel and that -- with the

9   legal counsel's recommendation and meeting with the

10  governor's office there was a decision made -- a

11  conclusion made to cover some services.

12       Q.   What services were covered and what services were

13  not covered?

14       A.   The counseling and hormone therapy were covered.

15  And surgery was not covered.

16       Q.   Was there an explanation given as to why surgery

17  was not covered?

18       A.   The -- the discussion -- the discussion was that

19  the requirement was that some services are going -- are

20  required to be covered, and the services that we are going

21  to cover are hormone therapy and counseling.

22       Q.   Was it determined by anyone that surgery was not

23  required to be covered?

24       A.   Yes.

25       Q.   And who determined that?  Your counsel?

1     A.    Helena -- I can't remember her last name.  Maybe

2  Rodrigues.

3     Q.    Just one person?

4     A.    There was somebody that worked with her, Staci.

5  I can't remember Staci's last name.  And there was a --

6  there was an additional person that I -- that I remember

7  from reviewing the email strings with Ryan Curtis.

8     Q.    You knew from your discussions with the folks at

9  the University of Arizona that the university was

10 interested in having ADOA's plan provide better healthcare

11 coverage for transgender people; correct?

12    A.    Yes.

13    Q.    And they were pushing for basic benefits before

14 they were implemented; correct?

15    A.    Yes.

16    Q.    And they also were pushing for benefits to cover

17 transgender gender dysphoria surgery; correct?

18    A.    I think so.

19    Q.    Well, didn't you have a number of meetings with

20 people at the University of Arizona where they pointed out

21 that professors and other staff at the University of

22 Arizona were interested in having that coverage?

23    A.    I wouldn't say -- Well, phone conversations.

24 There were a number of phone conversations.

25    Q.    Oh, okay.  And let's include phone conversations

Marie Frances Isaacson - 03/26/2021

1    with face-to-face conversations.  There were a number of

2    those; correct?

3        A.   Yes.

4        Q.   And they made clear that they wanted coverage for

5    surgery for gender dysphoria; correct?

6        A.   Yes.

7        Q.   And ultimately, at least while you were at ADOA,

8    that was not provided; correct?

9        A.   Yes.

10       Q.   Did the University of Arizona folks you talked

11   with tell you why they wanted to have the coverage for

12   surgery for gender dysphoria for their professors and

13   staff?

14       A.   Helena said that there was a meeting with the

15   U of A president and that there was concern because

16   there -- transgender studies was offered at the University

17   of Arizona and there were concerns that our health plan

18   didn't cover transgender reassignment surgery, didn't

19   cover it -- didn't cover that at all, and that -- In

20   particular I remember that there were professors with

21   children and they were paying for treatment out of pocket

22   and it was very expensive.

23       Q.   So they made it clear that it was an important

24   issue.

25       A.   Yes.

26

1     Q.   And what did you say in response to those

2  conversations?

3     A.   Currently not covered by our plan.

4     Q.   Did you tell them ADOA was exploring the

5  possibility of covering surgery for gender dysphoria?

6     A.   I said we were researching it.

7     Q.   And did you research it?

8     A.   Yes.

9     Q.   And I think the research took place around this

10  time, starting in September of 2015 and went through -- at

11  least through November of 2015.  We can look at the

12  documents, and will, as time allows.

13            What did the research tell you about

14  coverage for gender dysphoria surgery?

15     A.   I think the majority of our plans said that it

16  was not covered and, you know, confirmation that some

17  states did cover it.

18     Q.   So were you looking to see whether other states

19  covered it to determine whether the ADOA should cover it?

20     A.   I was researching what -- what existed as far as

21  in the benefits world, reached out to Mercer, reached out

22  to all of our health plans, trying to gather as much

23  information as possible about it to help inform a

24  decision.

25     Q.   Well, one of the things that the ADOA health plan

Marie Frances Isaacson - 03/26/2021

31

1    under a dollar per plan.

2        A.   I --

3                 MR. CURTIS:  Objection.

4                 MR. ECKSTEIN:  Per employee.  Per employee

5    per plan.

6                 THE WITNESS:  I -- I -- I don't remember,

7    Paul.

8        Q.   BY MR. ECKSTEIN:  Okay.  Well, we'll -- we'll

9    take a look.

10                Thinking back, did you believe that the --

11   the cost that was estimated was -- was too high to justify

12   providing that benefit?

13       A.   I don't remember that being -- We discussed cost,

14   but I don't remember that being the driving factor in the

15   discussion.

16       Q.   What was the deciding factor?

17       A.   What was required by law.  What was required by

18   law for us to cover.

19       Q.   So as you recall it, if the -- Strike that.

20                As you recall it, the persons making the

21   decisions were focused on what was legally required.  And

22   if it wasn't legally required, surgery for gender

23   dysphoria was not going to be offered in the plan.

24       A.   What I recall is that there was a decision that

25   had to be made, and reaching out to the health plans,

32

1    doing research ourselves to -- to gather as much

2    information as possible to make a decision.

3        Q.   Do you consider yourself part of the group that

4    made that decision?

5        A.   I would say no.

6        Q.   Who was in the group that made the decision?

7        A.   Legal counsel and the governor's office and the

8    director's office.

9        Q.   Did you consult with anyone in the legislature,

10   particularly the Joint Legislative Budget Committee, JLBC,

11   as to the wisdom of covering surgery for gender dysphoria?

12       A.   No.

13       Q.   Did anyone from the legislature weigh in and tell

14   you their thoughts?

15       A.   No.

16       Q.   Did you ever hear that anyone from the

17   legislature had weighed in and given thoughts on that?

18       A.   No.

19       Q.   Was this considered a political issue of any

20   kind?

21       A.   Not that anyone raised to me, no.

22       Q.   Did you hear secondhand that there was concern

23   about the politics of including surgery for gender

24   dysphoria?

25       A.   No.

Marie Frances Isaacson - 03/26/2021

1      Q.    No one ever told you that it was not politically

2   acceptable to provide that coverage if it wasn't required

3   by law?

4      A.    No.

5      Q.    None of your discussions with anyone within ADOA

6   or the governor's office indicated that the political heat

7   was not worth it to cover surgery for gender dysphoria?

8      A.    Not that I recall.

9      Q.    Did you hear it secondhand?

10     A.    Not that I recall.

11     Q.    Do you believe -- Strike that.

12            Did you believe at the time that there were

13  political costs for expanding the plan to cover surgery

14  for gender dysphoria?

15     A.    I don't remember having an opinion about it.

16     Q.    Did anyone in ADOA or elsewhere express an

17  opinion to you about that?

18     A.    Not that I recollect.

19     Q.    You understood, didn't you, that none of the

20  universities -- strike that -- that the University of

21  Arizona -- neither the University of Arizona nor Arizona

22  State University could provide health benefits that

23  covered surgery for transgender people?

24     A.    Yes.

25     Q.    And why was that?

1      A.   It was an exclusion in the plan.

2      Q.   It was also in the statute.  Do you recall a

3  statutory provision that said that you had to use the --

4  the State-offered plan?

5      A.   I -- I know that the universities had wanted to

6  not use our plan, to have their own plan.  And I -- I do

7  recall that there is a statute that said -- now that

8  you're saying it it does refresh my mind that there is a

9  statute that says the universities have to use the DOA

10  plan.

11      Q.   But there was one university, Northern Arizona,

12  that came within an exclusion because they had coverage

13  beforehand.  They had their own -- their own plan and they

14  were able to provide that coverage.  And by "that

15  coverage" I mean coverage for surgery, transgender

16  dysphoria surgery.

17      A.   I was aware that U -- that the -- NAU had a

18  grandfathered plan, a Blue Cross Blue Shield plan.  I was

19  not aware they covered that.

20      Q.   That never came up in your research?

21      A.   Not that I recall.

22      Q.   Would you describe the reaction of -- How would

23  you describe the reaction of the University of Arizona

24  when you told them that surgery for gender dysphoria was

25  not going to be covered?

35

1     A.   I don't remember -- I'm assuming I contacted

2   Helena, but I don't remember -- I don't remember her

3   reaction.

4     Q.   You don't remember that they were extremely

5   unhappy?

6     A.   I'm not surprised if you tell me that, but I

7   don't remember the reaction.

8     Q.   Well, you did know that it was a big issue on the

9   University of Arizona campus.

10    A.   Yes.

11    Q.   They made that clear to you.

12    A.   Yes.

13    Q.   On more than one occasion.

14    A.   Yes.

15    Q.   Do you know how many employees of the State of

16  Arizona were covered by the plan when you left in April of

17  2018?

18    A.   I don't remember.

19    Q.   Approximately?

20    A.   I know we had 133,000 lives.  That's -- that's

21  what I recall.

22    Q.   And do you recall roughly the percentage that

23  were represented by employees at the University of Arizona

24  and Arizona State University?

25    A.   No.  But I would say it's about 70,000.  I'm

1   just -- I remember for each employee it was about two --

2   two people.  So it was about 70,000.  And then the

3   universities would have been the other 133 -- Or the

4   difference between 133 and the 70,000 is -- is an

5   approximation.

6       Q.   So if I -- my math is correct, more than half of

7   the people covered by the plan were employees of the

8   University of Arizona and Arizona State University;

9   correct?

10      A.   I'd say a little bit less than half because it

11  was 70,000 that were State and then 63,000 were ASU,

12  U of A, and NAU.

13      Q.   Okay.  I got it -- I got it, just reversed.

14              On how many occasions did you have

15  discussions with representatives of the governor's office

16  about coverage for surgery for gender dysphoria?

17      A.   I don't know.  I don't have an exact number.  A

18  few times.  Several times.

19      Q.   Well, let's start with Tab 36, if you can find

20  that.  Should be the last exhibit in the book.  And we

21  will mark that as Exhibit 101.  We'll call these A --

22  ABOR 100 and ABOR 101.

23              On the screen I'll identify it as a string

24  of emails starting with an email from Erica Emmons dated

25  July 21, 2016.  And then the middle item in the string is

1   an email from Scott Bender to Erica Emmons.  And it says

2   that -- and I'm summarizing -- that you had a meeting with

3   the governor's office on transgender issues tomorrow,

4   meaning September 2, 2016, and Scott was asking for

5   additional information, I guess from Cigna, that would

6   help you with the meeting.

7              Is that a fair summary of that?

8      A.   Yes.

9      Q.   You're not listed as getting a copy on that.  Do

10  you recall getting a copy?

11     A.   No.

12     Q.   Is this one of the exhibits you looked at?  When

13  was it, last Sunday you were looking at exhibits, or more

14  recently?

15     A.   I know that we looked at exhibits with Erica's

16  name on it.  I don't know if this was one of them or not.

17     Q.   Okay.  Did you tell Scott that you had this

18  meeting coming up?

19     A.   Based on the email I'm assuming I did.

20     Q.   Do you recall the meeting?

21     A.   I know that I met with the governor's office.  I

22  can't tell you that I recall this specific meeting, no.

23     Q.   Do you recall more than one meeting with the

24  governor's office?

25     A.   There's one meeting that sticks out in my mind.

38

1      Q.   And do you recall when that meeting took place?

2      A.   I don't.  I'm assuming it was around 2016, around

3   this time frame, but I don't really recall.

4      Q.   And why does that stand out?

5      A.   The meeting with the governor's office?

6      Q.   Yes.  You said there was one meeting that stood

7   out and I was asking why that particular meeting, whenever

8   it took place, perhaps around September of '16, why does

9   that stick out in your mind?

10      A.   Because that is when the resolution of what we

11   would cover, in my mind, was made.

12      Q.   Who was in that meeting?

13      A.   I think Christina Corieri, Mike Liburdi, Ryan

14   Curtis, myself, I think John Fry from the Attorney

15   General's Office.  That's who I recall.  Maybe Nicole Ong.

16      Q.   Does Nicole have a last name?

17      A.   Ong, O-N-G.

18      Q.   Okay.  And what was her position?

19      A.   She was a general counsel at Arizona Department

20   of Administration.

21      Q.   Were you the only two employees from ADOA who

22   were there?

23      A.   I can't remember if the director was there or

24   not, Craig Brown.

25      Q.   Do you recall what you said at that meeting?

1      A.    No.

2      Q.    Were you asked to give a report on what other

3  states provided coverage for gender dysphoria surgery?

4      A.    If it's the meeting that I'm recalling, I just

5  remember talking about advice from legal counsel and --

6  and, you know, what we need to do moving forward, what

7  we're going to do moving forward.

8      Q.    And you had met with legal counsel who told you

9  what was legally required; correct?

10      A.    I don't know if we met or we just communicated

11  via email or phone.  Or both.

12      Q.    And you repeated that to the governor's office

13  even though counsel were there?

14      A.    No.  I think in advance of the meeting -- again,

15  if it's the same meeting -- I shared the legal advice.  It

16  was written.  I shared that with Christina Corieri, maybe

17  Mike Liburdi, John Fry, Nicole.

18      Q.    And Mike Liburdi was the counsel for the governor

19  at the time; correct?

20      A.    That's right.

21      Q.    Do you recall how long that meeting lasted?

22      A.    No.

23      Q.    But your recollection is at the end of that

24  meeting you understood that surgery for gender -- gender

25  dysphoria was not going to be covered.

40

1      A.   Correct.

2      Q.   And was it based on the fact that it was not

3  legally required?

4      A.   I remember that the discussion was services have

5  to be covered, not specifically surgery, so you could

6  cover counseling and hormone replacement therapy -- or not

7  replacement, hormone therapy, and that that is what we

8  would cover.

9      Q.   Was hormone therapy covered by -- required by the

10 law?

11     A.   I don't remember.

12     Q.   Do you remember discussion about that?

13     A.   Like I said, I just remember that the law

14 requires that services are covered.  No specific services

15 are outlined.  That's what I recall the discussion being.

16     Q.   I don't understand that answer.  Maybe you can

17 help me a little bit.  When you say no specific services

18 were -- Did you say out -- outlined or outlawed?

19     A.   What I'm saying is that what I recall is the

20 discussion of what the law requires is that you cover some

21 services, plural, related to transgender gender dysphoria,

22 but nothing -- no specific service is outlined.  That's

23 what I recall the discussion --

24     Q.   Okay.

25     A.   -- being.

41

1     Q.   Did the plan during the time you had involvement

2  with it cover any services, health services, that were not

3  required by law?

4     A.   I don't know.  I mean, I'm sure there are

5  services that aren't required by law that were part of the

6  plan description.  The plan was adopted from when we were

7  fully insured.  So, you know, I'm assuming there are

8  things that are covered that aren't required.

9     Q.   Do you recall what they might be?

10    A.   I think some plans offered healthy back.  You

11 know, that's the one that comes to my mind.

12    Q.   But that was not required by law?

13    A.   Not to my knowledge.

14    Q.   So there was no general policy at ADOA to cover

15 health benefits only if they were required by law; isn't

16 that correct?

17    A.   I would say that's correct.

18    Q.   Other than coverage for healthy backs, can you

19 recall any other services that were not required by law

20 that were offered in the plan?

21    A.   Not off the top of my head, no.

22    Q.   You say that this one meeting took place and may

23 or may not have been around this time in September.  We'll

24 look at other documents to see if we can pin it down.  Do

25 you recall how many times you did meet with the governor's

1      A.   I -- I don't remember the -- the context of the
2   email.
3      Q.   Well, let me ask it a different way.
4           When you went into the meeting with the
5   governor's office you were of the view, were you not, that
6   the exclusion for transgender surgery should be
7   maintained?
8      A.   When I went into the governor's office meeting
9   that we've talked about previously with Christina Corieri
10   and Mike Liburdi and John Fry and Nicole, that, to me, was
11   when the decision was made.  I didn't go into the meeting
12   with the decision.
13      Q.   No, I know that.  But did you go in with a view
14   that it should be excluded?
15      A.   It wasn't my decision to make.
16      Q.   I understand that.  But you were the person in
17   charge of the plan.  Surely they asked for your view on
18   this and your opinion, did they not?
19      A.   They asked me to -- Or I don't even know that I
20   can say they asked me.  I researched it and gave them all
21   the information based on the research that I conducted.
22      Q.   And never once --
23      A.   It wasn't about my opinion.
24      Q.   And never once did they say, Marie, even though
25   it not required, what's your opinion on this?

52

1  material that is struck out?

2      A.   Yes.

3      Q.   And that's the same as appears on Page 5568.  The

4  language you came up with.

5      A.   Yes.

6      Q.   Why was that modification of the language

7  necessary?

8      A.   Because we were not excluding hormone therapy and

9  counseling.

10     Q.   So do you take from this that until January 1,

11 2017, hormone therapy was excluded, and by changing this

12 language you meant to cover hormone therapy but not gender

13 reassignment surgery?

14     A.   Yes.

15     Q.   Was one of the topics at the meeting in the

16 governor's office whether hormone therapy should be

17 covered or was the discussion solely focused on covering

18 the gender reassignment surgery?

19     A.   The discussion, again, was around the

20 interpretation of what services were -- were -- which

21 services were required to be covered.  And the conclusion

22 was that not -- not everything had to be covered.  That

23 you had to provide some services, but it wasn't specified

24 as to which services were required.

25     Q.   Take this a little out of order, but could you

58

1  gender reassignment surgery?

2       A.   I don't know that we ever landed on an exact

3  number.

4       Q.   Okay.  But as I understand your testimony this

5  was not a cost issue.  This was an issue of whether it was

6  legally required; correct?

7       A.   Correct.

8       Q.   Okay.  Did you ever have an actuary determine the

9  cost?

10      A.   Michael Meisner was an actuary.  He worked for

11  Kelly.  I'm not sure if he got involved in that or not.

12      Q.   Okay.  Let's take a look at Tab 17.  This will be

13  Exhibit 109.  You were copied on the email indirect -- in

14  the second email indirectly.  You see that there was an

15  email that Scott Bender sent you on August 22nd, 2016,

16  which attaches an email from Stephanie Martin of

17  UnitedHealth; correct?

18      A.   Yes.

19      Q.   And so this was what UnitedHealth costs were?

20      A.   Do you want me to read the email?

21      Q.   Sure.

22                Just so you know, my question --

23                THE COURT REPORTER:  Who is speaking,

24  please?

25                MR. ECKSTEIN:  Paul Eckstein.

98

1      Q.   And what about -- what is it about bariatric

2   surgery that sticks out in your mind?

3      A.   Just what type of procedure -- there are

4   different types -- there are different ways of conducting

5   it, and we wanted to cover the gastric sleeve.  We wanted

6   to add that as a benefit.

7      Q.   And when was that work?

8      A.   2013 maybe.

9      Q.   And was it -- was that work almost all in 2013 or

10  did it go on for a number of years?

11     A.   It -- it was for the plan design for the

12  following year.

13     Q.   So in 2013 you recall working on what coverage

14  the plan provided for bariatric surgery?

15     A.   That's right.

16     Q.   Do you recall ever working on any other -- And to

17  clarify, did the plan exclude coverage for bariatric

18  surgery at that point?

19     A.   I didn't exclude it, but I think it covered

20  specific types of bariatric surgery.  It may have excluded

21  it.  I honestly don't remember.  As I recall, it was to

22  include that type of bariatric surgery.

23     Q.   How did that process begin?

24     A.   Two of the managers in the benefits division came

25  to me with the recommendation to include gastric sleeve.

1      Q.   And is gastric sleeve the type of bariatric

2   surgery the plan was considering covering?

3      A.   Adding, yes.

4      Q.   Is that typically how extensions of benefits come

5   to your -- came to your attention?

6      A.   Yes.

7      Q.   So someone working in the benefit services

8   division would come to you and say the plan should cover a

9   particular type of service or treatment?

10      A.   Yes.

11      Q.   Did you ever -- did you ever get such requests

12   top down, say, from a supervisor?

13      A.   No.

14      Q.   And do you know where those two -- So speaking

15   specifically -- speaking with respect to the bariatric

16   surgery -- and I think it was a type of sleeve, gastric

17   sleeve -- do you know where those two managers got the

18   idea that the plan might -- should cover or should

19   consider extending coverage for gastric sleeves?

20      A.   I'm guessing from the health plans.

21      Q.   And what do you mean by the health plans?

22      A.   Aetna, Cigna, United, Blue Cross Blue Shield.

23      Q.   And why would that be your guess?

24      A.   Just knowing the functioning of benefits and how

25   it works.

Marie Frances Isaacson - 03/26/2021

100

1    Q.   Is it typical for the health plans to come to the
2    ADOA recommending that coverage be extended for treatment?
3    A.   I -- I would say it's typical that the health
4    plans come to DOA with various recommendations:  what to
5    cover, what not to cover, changes to make.
6    Q.   How often would you say, in your time working at
7    ADOA, this happened?
8    A.   That they recommended changes?
9    Q.   Yes.
10   A.   We met -- we met regularly.  We met -- I -- I
11   can't remember how often.  Quarterly at least with the
12   health plans.  I can't say that each of those meetings
13   resulted in recommendations of change.  It was more how
14   the -- how the plan was doing, a review of -- of the plan
15   and utilization.
16   Q.   So continuing to focus on this gastric sleeve for
17   bariatric surgery, do you recall the outcome of that
18   inquiry?
19   A.   It was added as a benefit.
20        Or I should say, to be clear, extended a
21   benefit.  So for the type of surgery.
22   Q.   Does that make a difference, whether a benefit is
23   being added or extended?
24   A.   I just wanted to be clear.  It wasn't new, it was
25   just an extension of the type of surgery we would cover.

1      Q.   Thank you for clarifying that, Ms. Isaacson.  But

2  my question remains, does it make a difference whether the

3  ADOA is considering whether to add a benefit or extend

4  benefits?

5      A.   I'm not sure I'm following your question.

6      Q.   Sure.  Is -- is there a standard process for when

7  the insurers bring a recommendation on whether the plan

8  should cover a benefit?

9      A.   The process is that they bring the -- the

10  recommendation and then we discuss it amongst ourselves --

11  we discussed it amongst ourselves, and then we would raise

12  it to the director's office.

13      Q.   And how long would that process typically take?

14      A.   I'd say plan design started in June and was ready

15  in -- I'm sorry, let me backtrack.

16          I would say it starts -- in the beginning of

17  the plan year is when you start looking at your plan and

18  what happens.  And it results in a plan design change by

19  June.  So six months.

20      Q.   Do you recall if it took -- Do you recall with

21  respect to this gastric sleeve or bariatric surgery

22  whether it took the six months?

23      A.   I don't recall specifically, but that's about the

24  time frame.  I'm not sure how long the plans brought that

25  idea forward.

1    generally I would say, yes, he would be involved.

2        Q.   Why was it important to have Mr. Meisner

3    involved?  Sorry.  Let me -- let me actually clarify that.

4             Was it important to have Mr. Meisner

5    involved --

6        A.   Yes.

7        Q.   -- in the analysis of whether the plan should

8    cover a particular treatment?

9        A.   Yes.

10       Q.   Why is that?

11       A.   To estimate the impact to the plan regarding

12   costs.

13       Q.   And for those -- for those same reasons would it

14   be important to have an external consultant, actuarial

15   consultant?

16       A.   I don't know that we always had an outside

17   actuarial consultant look at -- I don't -- I can't say

18   they were always involved in every decision, every

19   analysis.

20       Q.   How was it decided when you would involve an

21   outside actuarial consultant?

22       A.   We didn't have any specific -- I think it was

23   reviewing the decision at the time and what we thought was

24   needed.

25       Q.   When you say "we," are you referring to yourself?

Marie Frances Isaacson - 03/26/2021

1      A.   I'm assuming from the plans, the doctors -- the

2   medical directors from the health plans.

3      Q.   But you don't know?

4      A.   No, I don't.

5      Q.   Were there any other cat -- were there any other

6   categories of data or information that the managers

7   brought to you with respect to this gastric sleeve

8   procedure?

9      A.   Not that I remember.

10      Q.   In general, when a new treatment is proposed are

11   there categories of information aside from actuarial

12   analysis that are brought to you, that were brought to

13   you?

14      A.   I would say just the recommendation from the

15   plan, from the medical directors.

16      Q.   Anything else?

17      A.   Not that I recall.

18      Q.   What about information about how other states

19   cover a particular treatment?

20      A.   Yes, that's part of the research.

21      Q.   That's part of the research generally done?

22      A.   I think it depends on what it is that we're

23   talking about.

24      Q.   Why does it depend on what -- what -- Let me

25   clarify.

1          What do you mean by what we're talking

2     about?  Do you mean by what treatment is proposed?

3          A.   What change is being proposed, yes.

4          Q.   And when you say what change is being proposed,

5     this goes back to my earlier question, does it matter

6     whether it's an addition of a benefit, a new benefit or,

7     say, the removal of a plan exclusion?

8          A.   As to whether or not there's an actuarial

9     analysis or where it's coming from?  I'm sorry.

10         Q.   Sorry.  Let me --

11         A.   Could you rephrase that.

12         Q.   -- clarify.  So I believe you said that generally

13    the ADOA would collect information about how other states

14    cover a particular treatment that's being considered for

15    coverage.

16         A.   No.  What I -- It's not unusual to look and see

17    how other states handle something.  That's not unusual.

18    But I can't say that it was standard practice to say what

19    were other states doing.

20         Q.   Was it typical to look at what other states were

21    doing?

22         A.   Again, I think it just depended on what it was

23    that we were looking at, who recommended it.  If a -- if

24    the plans -- if all medical directors were recommending

25    something, and that it was, you know, the general practice

1    her through the -- when you were at the ADOA?

2        A.   I -- Yeah, I -- Yes.

3        Q.   Has there ever been a conflict of interest in

4    your work with the Arizona governor's office because of

5    your prior work at the ADOA?

6        A.   No.

7        Q.   So just to be clear, there's never been a matter

8    that you didn't feel like you could approach the

9    governor's office because of your prior work with the

10   ADOA?

11       A.   Correct.

12       Q.   And are you aware whether the Isaacson Law Firm

13   ever screened you off from anything because of your work

14   at the ADOA?

15       A.   No.

16       Q.   So -- And, again, we're going to pivot to your --

17   to your work as the benefits director, you know, in the

18   last role -- your last role in the ADOA.  But just before

19   that, on the bariatric surgery and gastric sleeve

20   procedure we've been discussing, I believe you said

21   earlier that procedure was ultimately approved.

22       A.   Correct.

23       Q.   Was that procedure legally required?

24       A.   No.

25       Q.   Why was it approved?

1    cost of administering the plan.

2        Q.   So you said you don't recall whether there was a

3    cost analysis.  From your experience do you know what the

4    cost is generally of gastric sleeve -- of this gastric

5    sleeve procedure?

6        A.   I don't.

7        Q.   And do you recall, aside from a cost analysis,

8    any other information that you would have presented to the

9    director's office in connection with this gastric sleeve

10   procedure?

11       A.   I don't.

12       Q.   If you had to guess, what other information would

13   you have presented?

14       A.   Perhaps if there were other types of gastric

15   bypass surgery, and maybe the complications of that in

16   comparison to the gastric sleeve.

17       Q.   So just to sum up, I just want to make sure I'm

18   understanding correctly.  You recall that the treatment

19   was approved because it was in the best interest of the

20   plan and the patients.

21       A.   Yes.

22       Q.   And would you say that's the most important

23   factor you remember in the approval of this gastric bypass

24   procedure?

25       A.   Yes.

Marie Frances Isaacson - 03/26/2021

1          THE COURT REPORTER:  I'm sorry, can I
2  clarify, I don't think I got an answer to, how often do
3  you recall the ADOA adjusting an exclusion of coverage?
4          THE WITNESS:  Not often.
5          THE COURT REPORTER:  Thank you.
6     Q.   BY MR. WALL:  And do you -- Is there a general
7  reason or a circumstance in which such coverage is usually
8  added in to the plan or an ex -- Let me clarify.
9          Is there -- is there a reason for why an
10  exclusion is typically removed from the plan?
11     A.   Again, I would say the best interest of the plan,
12  the best interest of its members.
13     Q.   Does the medical necessity of a particular
14  treatment or coverage factor into its removal, the removal
15  of an exclusion?
16     A.   I don't think medical necessity was taken into
17  consideration for this.
18     Q.   Does medical necessity factor in to the ADOA's
19  analysis of whether to maintain or remove exclusions
20  generally?
21     A.   When you say medical necessity, are you saying
22  required by law or -- What do you mean by medical
23  necessity?
24     Q.   What do you understand medical necessity to mean?
25     A.   There are certain things that you have to cover

Marie Frances Isaacson - 03/26/2021

187

1   maintain an exclusion, we didn't get to medical necessity.

2   What we got to was, what is -- you know, what the doctors

3   were seeing in the field as far as the best -- best care

4   when it came to gastric bypass surgery.

5       Q.   So is the answer, no, that the medical necessity

6   of a particular procedure does not impact the ADOA's

7   analysis of whether to maintain an exclusion of that

8   procedure?

9       A.   Yes, the answer is no.

10      Q.   Would you say the best -- Earlier you testified

11  that this gastric sleeve surgery was -- this change in

12  coverage of gastric sleeve surgery was approved because it

13  was in the best interest of the plan and the patients.

14  Correct?

15      A.   Yes.

16      Q.   Is there a connection between the best interest

17  of a patient and a procedure claimed to be medically

18  necessary?

19      A.   Can you say that again.

20      Q.   Is there a connection between the best interest

21  of a patient and a procedure claimed to be medically

22  necessary?

23      A.   Yes.

24      Q.   Would you say that a procedure deemed to be

25  medically necessary is in the best interest of a patient?

1      A.   There -- Yes.  Yes.

2      Q.   So was the approval of this gastric sleeve

3  procedure because such procedure was deemed medically

4  necessary?

5      A.   I don't recall that being part of the

6  conversation.  What I recall is that we provided gastric

7  bypass surgery and that this procedure was better than the

8  other procedures or resulted in better results than the

9  other procedures.

10     Q.   Do you know if the AD -- Let me clarify.

11          Did the ADOA need to know whether the

12  procedure was medically necessary to assess whether it

13  should maintain the exclusion or not?

14     A.   Gastric bypass surgery wasn't excluded, it was

15  just that type of gastric bypass surgery.

16     Q.   Did the ADOA need to know whether this type of

17  gastric bypass surgery was medically necessary or not to

18  decide whether to maintain the exclusion?

19     A.   No.

20     Q.   And so this type of gastric bypass surgery could

21  be in the best interest of a patient and that would be

22  enough for the ADOA to remove the exclusion.

23     A.   Best interest in the patient and best interest

24  for the plan, both.

25     Q.   Can you recall any instance in which the best

1      A.    It could go as long as February.

2      Q.    And would you have had -- would you, as the

3  benefits director, have had final sign off on the language

4  of this document?

5      A.    Yes.

6      Q.    Would you turn for me to Page 67 of this

7  document.  The Bates number in the bottom right-hand

8  corner reading AZSTATE.010973.  And actually, would you

9  turn the page -- turn it back one page to Page 65.  And so

10  this is "Article 9, Exclusions and General Limitations";

11  is that right, Ms. Isaacson?

12     A.    Yes.

13     Q.    And does this document accurately reflect the

14  exclusions to the plan for the year 2016?

15     A.    Yes.

16     Q.    So I am looking at Paragraph 16 under this

17  Section 9.1, "Exclusions and General Limitations."  And

18  that's on Page 67, which I had you turn to first.  And

19  this Paragraph 16 reads [as read]:  Transsexual surgery

20  including medical or psychological counseling, hormonal

21  therapy in preparation for, or subsequent to any such

22  surgery.

23           Did I read that accurately, Ms. Isaacson?

24     A.    Yes.

25     Q.    So when we were talking about the plan's

Marie Frances Isaacson - 03/26/2021

200

1  exclusion of transgender benefits in 2016, is this what

2  you have -- is this what you have in mind when we talk

3  about that topic?

4      A.   Yes.

5      Q.   And is this the language you believe was in place

6  when the plan went self-funded?

7      A.   I believe so.

8      Q.   You don't recall any other version of this

9  exclusion prior to 2016, do you?

10      A.   No.

11      Q.   Do you know the original rationale for this

12  exclusion, Ms. Isaacson?

13      A.   I think the State -- My understanding is the

14  State just adopted the plan that was the fully insured

15  plan design.

16      Q.   Did the State undertake any review of the plan

17  design when it adopted it?

18      A.   I was not involved in that decision.  I don't

19  know.

20      Q.   Did the ADOA undertake any review while you were

21  the benefits director of the plan design?

22      A.   Those -- Yes.

23      Q.   Did it -- did it review -- How did it go about

24  that review?

25      A.   Based on recommendations on an annual basis

Marie Frances Isaacson - 03/26/2021

276

1      Q.   And then it says estimated cost per utilization

2   is $10,884.  Would you have considered that high for a

3   cost per utilization?

4      A.   No.

5      Q.   And so finally the average annual cost it says

6   $130,419.  Would you have considered that a high annual

7   cost?

8      A.   No.

9      Q.   Ms. Isaacson, would you turn to Tab 5 in this

10  binder.  And we'll ask the madam reporter to mark that as

11  Exhibit 5.  The first page of which is Bates stamped

12  AZSTATE.006152.

13            Ms. Isaacson, do you recognize this

14  document?

15     A.   Yes.

16     Q.   And what is it?

17     A.   It's an email from Kelly Sharritts to me, copying

18  Michael Meisner, regarding transgender coverage.

19     Q.   And did you review this document in preparation

20  for your deposition?

21     A.   Yes.

22     Q.   Did you recall the contents of this document even

23  before that preparation?

24     A.   No.

25     Q.   Do you recall receiving this -- this email from

277

 1   Ms. Sharritts?

 2        A.   I don't specifically recollect it, no, but I

 3   don't doubt its existence or that it happened.

 4        Q.   Well, what about the information contained in

 5   here?  Is this -- Do you recall this information?

 6        A.   Generally, yes.

 7        Q.   What do you recall about it generally?

 8        A.   That she prepared an estimate of what the cost

 9   would be.  That we had UHC -- I -- I didn't specifically

10   recall that UHC was the outlier, but that there were

11   varied estimates.

12        Q.   So Ms. Isaacson, are you saying that you -- you

13   generally recall the summary, the bolded summary here?

14        A.   I generally recall that Kelly prepared -- you

15   know, was doing research and preparing documents.

16        Q.   And Ms. Sharritts estimated here that the

17   utilizations estimates range from one to 11 claims per

18   year; is that right?

19        A.   Yes.

20        Q.   And that the average annual cost was 130,000 to

21   582,000; is that right?

22        A.   Yes.

23        Q.   And that this would have been 0.02 percent to

24   0.08 percent of the 711 million in medical costs; is that

25   right?

278

1      A.    Yes.

2      Q.    Is that 711 million in medical costs the average

3  cost -- medical cost of the plan per year?

4      A.    That sounds about right.

5      Q.    So do you believe Ms. Sharritts was referencing

6  here that the average cost of providing -- of removing the

7  exclusion for transsexual surgery would be about 0.02

8  percent to 0.08 percent of the plan's average medical

9  cost?

10     A.    Yes.

11     Q.    And then you referenced earlier that you recall

12 that UHC had been an outlier in estimating a cost of

13 3.6 million.

14     A.    I -- I remembered there was an outlier.  Not

15 until I looked at the memo did I remember that it was UHC.

16     Q.    But UH -- Even with that outlier at 3.6 million

17 in annual cost, Ms. Sharritts estimated here that that

18 would work out to 0.17 to 0.77 dollars per month per

19 employee; is that right?

20     A.    I -- I -- I'm not sure that she's including it at

21 the 3.6 million.  But I -- her conclusion is that the per

22 month increase to cover these costs for 60,000 employees

23 we currently have would range from 17 cents to 77 cents

24 per month per employee.

25     Q.    So that range -- is that range for per month per

1    employee, would you consider that high?

2        A.   No.

3        Q.   Is it a significant increase over an estimate --

4    and I'm referring back to what was Exhibit 4, the per

5    member per month cost increase, estimated increase of

6    86 cents?

7        A.   I'm sorry, were you asking if Exhibit 4 --

8        Q.   Yeah.  So let me clarify.

9            So I'm asking -- This estimate here is on a

10   per month per employee basis.  Whereas in Exhibit 4 in the

11   chart we looked at there was an estimate on a per member

12   per month estimate.

13       A.   Yes.

14       Q.   Is -- does that difference -- Would that

15   difference have mattered or would that have been a factor

16   the ADOA considered?

17       A.   No, I don't think so.  I mean, they would have

18   considered it.  They consider all costs.  But if it was

19   significant, if that was what you -- I thought you were

20   asking if it was significant.

21       Q.   And it -- And that estimate for per month per

22   employee is not significant; correct?

23       A.   Right.

24       Q.   Ms. Isaacson, did you read Ms. Sharritts' summary

25   when she sent it to you?

Marie Frances Isaacson - 03/26/2021

280

```
1        A.    Yes.
2        Q.    And what did you do with this information?
3        A.    Added it to the accumulation of what we had.
4        Q.    Would you have forwarded it to anyone, such as
5   the director of the ADOA?
6        A.    I don't know.  I don't think so.
7        Q.    At what point would you have decided to share
8   this information with the director of the ADOA?
9        A.    I'm not sure I would have shared this email with
10  him.
11       Q.    Why not?
12       A.    Just a level of detail that I'm not sure he would
13  have read, needed.
14       Q.    So would you have shared this information with
15  the governor's office?
16       A.    Probably not.
17       Q.    And is that for the same reasons, that it's at a
18  level of detail that you think they would not need?
19       A.    Correct.
20       Q.    Did you -- Do you have any reason to doubt the
21  accuracy of which Ms. Sharritts is -- is summarizing here?
22       A.    No.
23       Q.    And did the ADOA do -- Did anyone else at the
24  ADOA do as in depth an analysis of the coverage of
25  transgender -- transsexual surgery as Ms. Sharritts did
```

324

1     A.   Not that I recall.

2     Q.   So what was the decision -- the decision -- In

3 that meeting where the decision was made, what was that

4 decision based off of?

5     A.   We -- we reviewed the legal advice and -- and I

6 don't -- I can't -- like I said, I can't remember if we

7 covered any of the summary information or not, and -- and

8 then a decision was made.

9     Q.   And who made the decision?

10    A.   The -- the decision was voiced by Christina

11 Corieri.

12    Q.   And who were the decision-makers in reaching it?

13    A.   That I don't know.

14    Q.   Was there a vote?

15    A.   No.

16    Q.   So did Christina Corieri announce the decision or

17 was there a conference about the decision?

18    A.   I took it as an announcement.

19    Q.   Was there a discussion in that meeting about it

20 or was -- did you attend this meeting and you were told

21 what the decision was?

22    A.   There wasn't really a discussion.

23    Q.   So who do you understand to be the ultimate

24 decision-makers on the decision of whether to continue the

25 plan's exclusion of gender reassignment surgery?

Exhibit 32

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                     )
                                       )
                    Plaintiff,         )
                                       )
vs.                                    )        4:19-cv-00035
                                       )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,   )
                                       )
                    Defendants.        )
                                       )

VIDEOTAPED DEPOSITION OF ELIZABETH MARIE SCHAFER

Via Zoom videoconference
April 28, 2021
8:33 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                         Arizona Certified
www.glennie-reporting.com            Reporter No. 50021

Elizabeth Schafer, Videotaped - 04/28/2021

20

1     A.   I was a -- became a plan adviser in October 2016
2  I believe.
3     Q.   And what was your job responsibility in that role
4  as plan adviser?
5     A.   Plan adviser or plan administrator?
6     Q.   I'm sorry, I may have gotten that wrong.  So in
7  2010 your role was plan adviser or plan administrator?
8     A.   Plan administrator.
9     Q.   Okay.
10    A.   I managed -- To be honest, I don't really
11 remember very well anymore.  But I had the life contracts.
12 I always had flexible spending.  I always had the dental
13 contracts.  And I handled one medical contract with Aetna.
14    Q.   And how long were you -- were you a plan
15 administrator?
16    A.   I was a plan administrator until I left in
17 January of 2018.
18    Q.   So to summarize, you worked at the ADOA from
19 October 2006 until January of 2018?
20    A.   Correct.
21    Q.   And more specifically, you started working at --
22 in the benefit services division in the ADOA in April of
23 2007; is that correct?
24    A.   Yes.
25    Q.   And you worked in the benefit service division

Elizabeth Schafer, Videotaped - 04/28/2021

21

```
 1     from April of 2007 until you left the ADOA in January of
 2     2018; is that correct?
 3         A.   That is correct.
 4         Q.   And in your various roles in the benefit service
 5     division did you work with the State of Arizona's
 6     healthcare plan?
 7         A.   I did.
 8         Q.   Would you say you became familiar with the State
 9     of Arizona's healthcare plan?
10         A.   Yes.
11         Q.   And were you involved in administering the State
12     of Arizona's healthcare plan?
13         A.   Yes.
14         Q.   Were you involved in making changes to the plan?
15         A.   I was not a decision maker on making changes, but
16     I was involved in -- in meetings that involved, you know,
17     what are the possibilities?  Any suggestions of what could
18     be changed?  Things like that.
19         Q.   So is it fair to say you were involved in the
20     process of making changes to the plan but you were not
21     yourself a decision maker?
22         A.   Correct.
23         Q.   And who were the decision makers?
24         A.   Scott Bender is the director of benefits so
25     ultimately it usually was Marie who was the director of
```

1   benefits, or the director of ADOA, and sometimes it went

2   above that.

3       Q.   Okay.  So I have Scott Bender, I have Marie

4   Isaacson, and then who would have been above Marie

5   Isaacson?

6       A.   I don't remember the guy's name, to be honest,

7   when I was there.  So if you threw him out I'm sure I

8   would remember but I don't remember the director.  We had

9   a couple changes, especially when Governor Ducey took

10  over, so I don't remember all the changes there.

11      Q.   So to be clear, Marie Isaacson was for a time the

12  director of the benefit services division of the ADOA?

13      A.   Correct.

14      Q.   And above her there was a director -- there were

15  various directors of the ADOA?

16      A.   Correct.

17      Q.   And Marie Isaacson reported to the director of

18  the ADOA?

19      A.   Yes.

20      Q.   Does the name Craig Brown sound familiar to you?

21      A.   Yes.

22      Q.   Is it possible that he was the director or one of

23  the directors of the ADOA?

24      A.   Yes.

25      Q.   And about when do you remember him being a

24

1   Legislative -- It's the -- the committee within the

2   legislature that handles the financial stuff.  And I don't

3   remember what -- I'm really horrible with acronyms.  I am

4   so sorry.

5       Q.   Would it be the Joint Legislative Budget

6   Committee?

7       A.   It would.  Yes.

8       Q.   And what is your understanding of what the joint

9   legislative budget committee's role was?

10      A.   You have to get their approval.  It's not

11  required that they say yes, but it's a good thing for them

12  to approve any of the changes you are making to the plan.

13      Q.   What do you mean by it's a good thing to get

14  their approval?

15      A.   If they are not happy with the decisions being

16  made they can make it much more difficult for the benefits

17  department.

18      Q.   And how would they make it more difficult?

19      A.   Sometimes they put in a new statute or rule

20  and -- or they make sure the director of the department

21  knows that they don't approve.

22      Q.   Can you recall any instances where the Joint

23  Legislative Budget Committee got involved and expressed

24  its interest in a particular benefit?

25      A.   This is not an area I was deeply involved with.

**Elizabeth Schafer, Videotaped - 04/28/2021**

28

1      Q.   And what was the governor's office role?

2      A.   Again, never been involved in the meetings.  I

3   don't know.  I just know that most everything had to be

4   run through the governor's office.

5      Q.   Did the governor's office have to approve changes

6   to the plan?

7      A.   I would say no.

8      Q.   So to your knowledge the governor's office did

9   not have to approve changes to the plan?

10     A.   Correct.

11     Q.   And the Joint Legislative Budget Committee did

12   not have to approve changes to the plan?

13     A.   Correct.  We just had to present it to them.

14     Q.   So both the -- the Joint Legislative Budget

15   Committee and the governor's office were involved in

16   decision-making about the plan, but to your knowledge it

17   was not required to get either entity's approval to make a

18   change to the plan?

19     A.   Correct.

20     Q.   Whose approval was required, to your knowledge,

21   to make a change to the plan?

22     A.   That's a really good question.  I would probably

23   say the benefits director and ADOA's director.

24          But, again, wasn't in the room for any of

25   those -- that.

1      Q.   Okay.  And just to be clear, I want to go back to

2  the Joint Legislative Budget Committee and the governor's

3  office briefly.  You don't think that the governor's

4  office had to approve changes to the plan; right?

5      A.   They -- Were they required by law to approve it?

6  No.

7      Q.   But you're not sure whether or not the governor's

8  office had to approve a change to the plan.  So it's

9  possible that the governor could have expressed an

10  interest in not covering a benefit and then the ADOA would

11  have not covered that benefit; is that correct?

12      A.   It is possible, yes.

13      Q.   Who did you report to at the ADOA?

14      A.   You want my entire tenure or just at the end?

15      Q.   Let's -- let's -- That's a good question.

16           Let's stick for now to the period of 2015

17  and 2016.

18      A.   When I first started as a plan administrator I

19  reported to Yvette Medina, and then I reported I think

20  like the last year and a half to Scott Bender.

21      Q.   So you reported at various times to both Yvette

22  Medina and Scott Bender?

23      A.   Correct.

24      Q.   And what was Yvette Medina's position at the

25  ADOA?

Elizabeth Schafer, Videotaped - 04/28/2021

42

1    A.    It is.

2    Q.    And it covers cosmetic surgery when that surgery

3  constitutes necessary care; is that correct?

4    A.    Correct.

5    Q.    Okay.  I would like to go to -- Well, actually,

6  let me ask this question.

7          To your knowledge was the ADOA required by

8  law or regulation to cover cosmetic surgery?

9    A.    To my knowledge?

10   Q.    Yeah, sorry.  To your knowledge was the ADOA

11 required to cover any cosmetic surgery?

12   A.    You have to realize I retired and forgot a lot of

13 stuff.  But yes, there is -- there are times -- there have

14 been some very specific laws where it is required.  So,

15 yes, like I believe reconstruction surgery after breast

16 cancer and that kind of stuff.  Children's and -- the

17 women's and children's act or something to that effect.

18   Q.    I would like to turn to, on the same page,

19 Section 8.17, which is chiropractic care services.  So we

20 won't read all of this, but is it fair to say that in some

21 circumstances the ADOA covers chiropractic care services?

22   A.    It is.

23   Q.    And to your knowledge was the ADOA required by

24 law or regulation to cover chiropractic care services?

25   A.    No.

1      Q.    Okay.  I would like you to take a couple minutes

2   and flip through.  And the question I want to get at here

3   is -- and I'll put it this way.  Does ADOA only cover

4   things when it is required to cover them?

5               MR. CURTIS:  Objection; form of the

6   question.

7               MR. GARBACZ:  You can answer, Ms. Schafer.

8               THE WITNESS:  Can you give me the question

9   again.

10      Q.   BY MR. GARBACZ:  Sure.  I'll make it more clear.

11   So we'll -- we'll use chiropractic care services.

12               You said that the ADOA was not required to

13   cover chiropractic care services, and yet it covers

14   chiropractic care services as evidenced by Section 8.17 of

15   the plan; is that correct?

16      A.    Correct.

17      Q.    So ADOA covers some benefits even when it is not

18   required by law or regulation to cover them.

19      A.    Yes.

20      Q.    And there may be some benefits that ADOA covers

21   only because law or regulation requires them to cover it;

22   is that right?

23      A.    Yes.

24      Q.    I would like you to take a minute and just flip

25   through this section Article 8, and see if you can point

Elizabeth Schafer, Videotaped - 04/28/2021

44

1   out any other benefits here that you know the ADOA was not

2   required by law or regulation to cover, but it covered

3   voluntarily.

4              MR. CURTIS:  Objection to the form of the

5   question.

6              THE WITNESS:  Yeah, and I -- I mean, I can

7   look through, but I'm no expert on law of what has to be

8   covered by the plans.  And because a lot of stuff is

9   required under ERISA and stuff and -- and the State plan

10  was not a ERISA plan, it gets kind of hazy sometimes.

11             I mean, dental, some plans will cover more

12  dental than others.  Diabetic, some -- some plans will

13  cover a lot more in diabetic because it's one of the

14  larger killers and drivers of medical costs in the United

15  States.  So almost everything you could cover more of.  I

16  mean --

17       Q.   BY MR. GARBACZ:  So -- so let's -- let's just

18  take dental for -- as an example.

19       A.   Uh-huh.

20       Q.   To your knowledge is ADOA required to cover any

21  dental coverage?

22       A.   Not to my knowledge, no.

23       Q.   Okay.  Let's turn to Page 40.  And in the bottom

24  right-hand corner you should see AZSTATE.008982.

25             Do you see that?

47

1           Do you see that?

2     A.   I do.

3     Q.   So this article, Article 9, describes

4   prescription drug benefits that are covered under the

5   plan; is that right?

6     A.   Correct.

7     Q.   And we won't go into a whole lot of detail here

8   but I just want to get your sense of what prescription

9   drugs are covered by the ADOA.  Can you think of any

10  examples of prescription drugs that the ADOA covers?

11             MR. CURTIS:  Objection to the form of the

12  question.

13             You can answer.

14             THE WITNESS:  Huge, most drugs.

15    Q.   BY MR. GARBACZ:  Can you think of any examples

16  just to familiarize me?

17    A.   With things -- the drugs that are covered?

18    Q.   Yes, a prescription drug that the ADOA would

19  cover.

20    A.   I would say 90 percent of drugs that are used

21  to -- for most medical conditions as long as it's been --

22  it's recognized by the FDA.  It's easier to ask the

23  opposite question.

24    Q.   Got it.

25             Is the ADOA required to cover, as you say,

**Elizabeth Schafer, Videotaped - 04/28/2021**

48

```
 1    90 percent of prescription drugs or are some of those
 2    drugs covered voluntarily?
 3              MR. CURTIS:  Objection to the form of the
 4    question.
 5              THE WITNESS:  Yes, they are -- Yes.
 6         Q.  BY MR. GARBACZ:  Sorry.  Let me make my question
 7    more clear.
 8              So ADOA you said covers about 90 percent of
 9    prescription drugs; is that right?
10         A.  That percentage is really just me grabbing
11    something out of the air.  I --
12         Q.  So that -- I mean, that -- that estimate is based
13    on your knowledge.  You would ballpark that ADOA covers
14    something like 90 percent of prescription drugs; is that
15    right?
16         A.  I -- What I can tell you from working not only
17    with the ADOA plan and then I have worked with -- my last
18    employer was the County, that ADOA's plan is very generous
19    on the types of medication that they cover.  They have a
20    very wide formulary.
21         Q.  And when you say very generous, do you mean that
22    the ADOA covers things that other providers do not -- or
23    other self-funded plans do not cover?
24         A.  Not -- no, not necessarily but it covers a wider
25    range of medication.  Usually you try and only cover --
```

49

1   you know, you have to have a minimum of, you know, a

2   certain number of drugs for a certain condition.  ADOA has

3   a very broad number usually.

4       Q.   So it might have more than one drug available for

5   any given condition; is that right?

6       A.   Correct.  Like if you had high cholesterol a lot

7   of plans would require you to use the generic version of a

8   certain plan -- medication.  So ADOA has a very large -- a

9   very broad formulary.

10      Q.   And is that -- is it required to have a very

11  broad coverage or is it -- does it elect to have very

12  broad coverage?

13      A.   It has elected to have it in the past.  Again, I

14  left in 2018.  And the pharmacy is the largest spend for

15  medical plans, so I am sure that they are tightening that

16  baby down as fast as they can because the expenses are so

17  huge.

18      Q.   But it's fair to say that ADOA covers some

19  prescription drugs that it is not required to cover.

20      A.   Probably --

21      Q.   Is that right?

22      A.   -- yes.  Probably.

23      Q.   I'm going to use Humira as an example.  Do you

24  know whether ADOA covers the prescription drug Humira?

25      A.   I would have to ask you what Humira is treatment

1    for.  I don't -- I'm going to say probably yes, but -- and
2    I know that's a very common name but, again, my mind has
3    gone blank on what Humira is used for.
4        Q.   That's okay.
5             You had mentioned that ADOA is very generous
6    with prescription drugs under the plan.  What did you mean
7    by that exactly?
8        A.   A lot of times you will work for employers that
9    formulary is as tight as can be, which means they will
10   offer just the minimum amount of coverage that they have
11   or they will -- if there is a generic they will require
12   you use the generic.  And ADOA in the past has been very
13   generous in allowing you to use the brand.  That's just an
14   example.  But, you know, there can be 20 different
15   medications to -- to handle, you know, high blood pressure
16   and, you know, one plan may say you can use one -- one of
17   these ten; another plan will say you can use all 20.  And
18   ADOA has a -- a very generous formulary.  I don't know how
19   else to say it.
20       Q.   So there are -- there are other self-funded plans
21   that will only cover the -- the minimal amount, say, for
22   example, they will only cover the generic version of a
23   specific drug, whereas ADOA will oftentimes cover the
24   generic drug and certain name-brand drugs which are more
25   expensive; is that right?

1     A.    Yes.

2     Q.    Other than prescription drugs can you think of

3  any other area in the plan where ADOA is generous?

4  Meaning, are there any other areas where ADOA -- ADOA's

5  self-funded plan covers more than other self-funded plans?

6     A.    Again, that's a huge question.  Nothing is like

7  standing out.  I mean, they try and -- and remain very

8  competitive.  So they're going to try and make sure

9  they're meeting the market, what most people are getting

10  from their plan.

11     Q.    What do you mean by competitive?  What does that

12  mean?

13     A.    Well, benefits is a way to retain employees.  So

14  as a State employee you don't get a lot of benefits other

15  than your retirement or your health insurance.  So you

16  try -- we -- At least when I worked for the benefits

17  department we tried very hard to make sure we were

18  meeting -- you know, we met most of the book of business

19  coverages and things like that.

20     Q.    So would that mean if the trend is to cover a

21  particular benefit, that ADOA, in order to be competitive,

22  would want to cover that benefit?

23     A.    In some cases, yes.  It depends on how expensive

24  it is, but yes.  I mean, you always have to -- We always

25  had to look at the -- the -- the cost as a whole.  Are you

Elizabeth Schafer, Videotaped - 04/28/2021

59

1          MR. CURTIS:  Objection; form of the

2  question.

3          THE WITNESS:  I am not an expert.  But yes,

4  it sounds -- What I know of the subject, yes.

5     Q.  BY MR. GARBACZ:  Okay.  Do you know if

6  hysterectomy, for example, is a type of surgery that might

7  constitute gender reassignment surgery?

8     A.  Sounds like something that could, yes.

9     Q.  Okay.  Ms. Schafer, I will represent to you that

10  the plaintiff in this case, Dr. Toomey, who's a member

11  under the plan, was seeking to have a hysterectomy and the

12  hysterectomy was denied under this exclusion.  So I'm

13  representing to you that a hysterectomy is one of several

14  surgeries, as you alluded to, that might constitute gender

15  reassignment surgery.

16          With that in mind, does ADOA generally cover

17  hysterectomies?

18     A.  If they're medically necessary, yes.

19     Q.  Okay.  So if a hysterectomy -- So ADOA does not

20  cover all hysterectomies.  It only covers hysterectomies

21  that are determined by a third-party administrator to be

22  medically necessary; is that right?

23          MR. CURTIS:  Objection; form of the

24  question.

25          THE WITNESS:  Correct.

60

1    Q.   BY MR. GARBACZ:  But there's an exception to

2  that.  So there's an exception to the exception.  Which

3  is, ADOA covers hysterectomies when they are medically

4  necessary, but not if the medical necessity is due to the

5  patient's need -- or the patient's gender dysphoria?

6              MR. CURTIS:  Objection; form of the

7  question.

8              THE WITNESS:  I'm not sure, but yes.

9    Q.   BY MR. GARBACZ:  So let me -- let me -- I know

10  this is a little complicated, so I'll try to make it a

11  little more clear.

12              So a hysterectomy is a procedure; correct?

13    A.   Yes.

14    Q.   And are you aware of -- have you heard of a CPT

15  code before?

16    A.   Yes.

17    Q.   Have you heard of a diagnosis code before?

18    A.   Yes.

19    Q.   So when something is being covered, someone goes

20  to their doctor, their doctor generally gives a diagnosis

21  code and a CPT code, a procedure code; is that right?

22    A.   Yes.

23    Q.   So say, for example, a woman has ovarian cancer.

24  She goes to her doctor.  The doctor says you -- I am --

25  I'm prescribing -- or I order that you have a hysterectomy

61

1    and there's two codes.  The diagnosis code would be

2    whatever the diagnosis code is for ovarian cancer.  And

3    the procedure code would be hysterectomy; is that right?

4                    MR. CURTIS:  Objection; form of the

5    question.

6                    THE WITNESS:  That sounds correct.

7        Q.   BY MR. GARBACZ:  And is it your understanding

8    that if someone went to their doctor and the diagnosis was

9    ovarian cancer and the procedure that was prescribed to

10   treat that ovarian cancer was a hysterectomy, that that

11   would be determined -- the procedure would qualify as

12   medically necessary?  The hysterectomy would be medically

13   necessary; is that right?

14                   MR. CURTIS:  Objection; form of the

15   question.

16                   THE WITNESS:  The TPA or your medical

17   directors would have to determine that.  I -- I'm sorry,

18   I'm hung up on the fact that you're saying ovarian and

19   hysterectomy, and they are not exactly the same organ.

20       Q.   BY MR. GARBACZ:  Okay.  So I have that off.  So

21   let's step back to the particular type of cancer and let's

22   just say you have cancer -- or the patient has cancer and

23   the diagnosis code is cancer and the procedure code is

24   hysterectomy.  In other words, the doctor is prescribing a

25   hysterectomy to treat the diagnosis which is cancer.

Elizabeth Schafer, Videotaped - 04/28/2021

62

1     A.   Yes.

2     Q.   Is it your understanding that that would qualify

3  as medically necessary?

4               MR. CURTIS:  Objection; form of the

5  question.

6               THE WITNESS:  It certainly sounds like

7  something that should, but again, that's why we have a

8  medical vendor.

9     Q.   BY MR. GARBACZ:  Okay.  So let's suppose that it

10  was -- Let's say that the third-party administrator does

11  determine that this procedure is medically necessary.

12  Would it be covered under the ADOA's plan?

13     A.   Yes.

14     Q.   Because it is -- because the ADOA covers

15  hysterectomies when they are medically necessary; is that

16  correct?

17     A.   Correct.

18               MR. CURTIS:  Objection; form of the

19  question.

20               THE WITNESS:  Correct.

21     Q.   BY MR. GARBACZ:  Okay.  Now I'm going to change

22  only one variable in that hypothetical.  Let's say you go

23  to your doctor and the doctor prescribes hysterectomy for

24  you so the procedure -- so the procedure code is

25  hysterectomy.  But the doctor is not prescribing a

**Elizabeth Schafer, Videotaped - 04/28/2021**

63

1   hysterectomy because you have cancer, the doctor is

2   prescribing a hysterectomy because you have gender

3   dysphoria and a hysterectomy is being used to treat your

4   gender dysphoria.

5            Do you follow my hypothetical so far?

6       A.   I do.

7       Q.   And let's take it one step further and suppose

8   that the third-party administrator looks at that and

9   determines that the procedure is medically necessary.  In

10  other words, the hysterectomy is medically necessary to

11  treat gender dysphoria for this particular patient.

12           Does that make sense?

13      A.   Yes.

14      Q.   Now, my question for you is, would that procedure

15  be covered or denied under the ADOA's plan?

16      A.   The exact scenario you just -- I'm sorry, are we

17  still on the exact hysterectomy one or is this a more

18  generic question?

19      Q.   We're on the hysterectomy.  So --

20      A.   Yeah.

21      Q.   -- I know there's a lot of variables here.  So a

22  hysterectomy is a type of surgery that can constitute

23  gender -- gender reassignment surgery.  In this

24  hypothetical, hysterectomy is being used to treat gender

25  dysphoria.  In other words, it's being used as a gender

Elizabeth Schafer, Videotaped - 04/28/2021

64

1  reassignment surgery.

2       A.    Uh-huh.

3       Q.    Because it constitutes gender reassignment

4  surgery, would it be excluded under the plan under this

5  Number 16, gender reassignment surgery?

6       A.    Yes.

7       Q.    Okay.  So that was -- I wanted to go through that

8  exercise to -- to point out the disparity here between a

9  hysterectomy which is covered in some situations but not

10 others.  And in both situations it's medically necessary,

11 right?  It's medically necessary for the patient who has

12 sought -- who was prescribed a hysterectomy because they

13 have cancer and over here it's necessary because it was

14 medically necessary to treat gender dysphoria.  But in one

15 situation it's covered and in the other situation it's

16 not.

17            Do you see the difference?

18      A.    Yes.

19      Q.    So the difference there depends on the diagnosis

20 code; right?  The difference -- it's -- it's not that ADOA

21 doesn't cover hysterectomies.  As we just established,

22 ADOA covers hysterectomies when they are medically

23 necessary; isn't that right?

24      A.    Correct.

25      Q.    But if the reason for the medical necessity is

Elizabeth Schafer, Videotaped - 04/28/2021

1   area.

2        Q.   And are you referring to changes that came down

3   in 2015 and 2016 and specifically changes under

4   Section 1 -- 1557 of the ACA?

5        A.   Yes.

6        Q.   Okay.  We're going to get there in a minute.

7   We're going to turn -- we're going to turn to some

8   documents from 2015 and '16.  But for now I want to be a

9   little bit more specific.

10                  Prior to 2015 and '16 when there was a

11  change regarding 1557 of the ACA, prior to that were you

12  aware of this exclusion for transsexual surgery?

13       A.   I -- To be honest, I don't think we ever had

14  any -- anything came across my desk, so we weren't getting

15  complaints or anything about that.  At -- at least sent to

16  me.

17       Q.   So were you aware that the plan excluded

18  transsexual surgery prior to 2015?

19       A.   Actually, I don't think I was.  I -- I didn't --

20  I don't remember it being talked about much.

21       Q.   Do you know why the exclusion was in the policy?

22  What was the rationale for the exclusion?

23       A.   I have no idea.

24       Q.   Do you have any idea when the exclusion was first

25  introduced into the plan?

Elizabeth Schafer, Videotaped - 04/28/2021

72

1      A.   If I were to guess, as long as I was at ADOA it

2   was there.  But I don't actually know for a fact.

3      Q.   Okay.  So to your knowledge this exclusion for

4   transsexual surgery was in the plan for as long as you can

5   remember and you're not aware of the rationale for why

6   that exclusion was in the plan?

7      A.   Correct.

8      Q.   Okay.  You mentioned that you hadn't heard any

9   complaints.  So I just want to be very clear about that.

10  You never -- You don't remember any instances where any

11  member or employee raised an issue with the transsexual

12  surgery exclusion prior to 2015?

13     A.   No.  I mean, it could have been something that

14  was once we told them it was excluded, we -- we -- you

15  know, we didn't spend much time on it but -- but I don't

16  remember it.

17     Q.   If there was a complaint from an employee, for

18  example, or another member, would you have known about it

19  necessarily or is it possible that the exclusion -- or

20  that complaint would not have come to your attention?

21     A.   It's possible that it would not have come to my

22  attention.  Kind of depends on how it came.

23     Q.   So what things generally came to your attention?

24     A.   It would have had to have been, you know, like

25  (indecipherable) was really pushing it and they had gone

1    that added coverage to the policy, for example, removing

2    an exclusion or adding a new benefit.  Can you think of

3    any other instances where, in your time at the ADOA, the

4    plan was modified to remove an exclusion or to add a

5    benefit?

6        A.   I mean, changes were made every single year on

7    those plans.  But, no, I can't -- I don't remember

8    anything sticking out as to suddenly being covered, no.

9        Q.   Do you remember a change in the plan to cover 3D

10   mammography?

11       A.   Yes.

12       Q.   What do you remember about the change to cover 3D

13   mammography?

14       A.   And that was like right before I left so I'm

15   assuming it was around 2017.  I just know that the vendors

16   recommended that it be covered and that then we had -- we

17   have what's called medical directors meetings.  They used

18   to be quarterly but they were down to maybe once a year by

19   the time I left, and I believe most of the medical

20   directors for the vendors felt that a 3D was more

21   appropriate.

22       Q.   And so the ADOA ultimately modified the plan so

23   that it would cover 3D mammography?

24       A.   Yes.

25       Q.   And that, to your recollection, happened likely

1  in 2017?

2      A.   Yes, or it could have been '18.

3      Q.   And I want to go over exactly why the ADOA made

4  that change.  So why -- why in your view did the ADOA

5  modify the plan to cover 3D mammography?

6      A.   I, again, don't really remember a lot of

7  specifics about it.  I do think on the -- The ADOA plan

8  had four vendors.  So we were always struggling to make

9  sure the coverages were very consistent across and it

10  didn't matter which plan you were on, you should have

11  gotten the same exact coverages.  And I seem to remember

12  one vendor started covering 3D before the others so we had

13  to try and figure out if it was appropriate.  But I don't

14  really have a lot of memories about that.

15      Q.   Okay.  So would you say that recommendation of

16  the vendors is one of the reasons why ADOA decided to

17  cover 3D mammography?

18      A.   Yes.

19      Q.   What other factors or criteria did ADOA consider

20  when deciding whether or not to cover 3D mammography?  So

21  I have recommendation of the vendors.  Was there anything

22  else that influenced the decision?

23      A.   I seem to remember there might have been some

24  analysis of you have to get a 3D anyways if the 2D showed

25  certain things, so you ended up having to go back in and

83

1     Q.   So sitting here today you do not know whether 3D

2  mammography was considered an expensive benefit to the

3  ADOA?

4     A.   My assumption is it's probably more expensive

5  than a 2D, but I don't think it was hugely more expensive

6  but I do not know.  I've never looked at the claim.

7     Q.   So to your knowledge did cost weigh into the

8  decision-making at all?

9     A.   Cost usually weighed into most decisions at ADOA.

10  So I would say it probably did.

11     Q.   What about trend; was the trend to cover 3D

12  mammography?

13     A.   It was becoming more common in the industry, yes.

14     Q.   And do you think that that might have had an

15  influence on the ADOA's decision?

16     A.   Possibly, yes.

17     Q.   But you're not sure?

18     A.   No.

19     Q.   Okay.  Medical necessity; do you think or is it

20  your understanding that a 3D mammography can be medically

21  necessary?

22     A.   Yes.

23     Q.   And did the fact that a 3D mammography can be

24  medically necessary weigh into the decision-making, to

25  your knowledge?

1   this -- or the first email, so you can turn to the base

2   email which is on little Bates AZSTATE.006076.

3                Do you see that?

4       A.   I do.

5       Q.   This is an email from Yvette Medina to Jay Dash

6   at Aetna, Colette Severns at Blue Cross Blue Shield, Amy

7   Clatterbuck at UHC, and others, and you and Marie Isaacson

8   are copied on the email.

9                Do you see that?

10      A.   I do.

11      Q.   So take a minute to review this email.

12      A.   Okay.

13      Q.   And so Yvette Medina is reaching out to the four

14  vendors in this email regarding transgender reassignment;

15  is that correct?

16      A.   Correct.

17      Q.   Why in your -- To your knowledge, why is Yvette

18  Medina reaching out to ADOA's vendors about transgender

19  reassignment?

20      A.   She's probably looking for their experience with

21  the book of business.  So we're trying to figure out what

22  are, you know, other health plans doing and how are they

23  covering the procedure.

24      Q.   And what prompted, to your knowledge, Yvette

25  Medina to do that?

87

1     A.   Back in 2015, I -- I'm not sure.  I know the

2  Affordable Care Act prompted a lot of it.

3     Q.   So this likely could have had something to do

4  with the Affordable Care Act?

5     A.   Yes.

6     Q.   If we look at the next email which is from Marie

7  to the vendors on October 25th, 2015, Marie says [as

8  read]:  All, as you are probably aware, the HHS issued a

9  proposed rule on Section 1557 of the ACA.  Section 1557

10  prohibits discrimination but is open for comment through

11  November.  For your convenience the link to the proposed

12  rule is below.

13           And then Marie says [as read]:  Please

14  advise how you believe this rule, if passed as proposed,

15  will impact your business and its impact to the State

16  under our current contracts with your organization.

17           Do you see that?

18     A.   I do.

19     Q.   So does this refresh your memory as to why ADOA

20  was reaching out in 2015 regarding transgender

21  reassignment?

22     A.   Yes.

23     Q.   And why was ADOA reaching out in 2015 in --

24  specifically in October of 2015 regarding transgender

25  reassignment?

Elizabeth Schafer, Videotaped - 04/28/2021

88

1     A.    Because they -- we were being notified that this

2  change was coming and I believe they were going to ask for

3  comments or something, the federal government.  So she

4  wanted to know if it would impact us at the State.

5     Q.    So there was a proposed rule under Section 1557

6  of the ACA.  And Marie Isaacson was trying to understand

7  how that rule would impact the ADOA.

8     A.    Correct.

9     Q.    Is that right?

10    A.    Correct.

11    Q.    Okay.  If we look at the next email, which kind

12  of cuts off to the next page, it starts on the page

13  with -- the first page of the exhibit with little Bates

14  AZSTATE.006074.

15              See that?

16    A.    Yes.

17    Q.    So this one is from you to Amy Clatterbuck and

18  Heather Gallegos at U -- UnitedHealthcare.  You're

19  following up on Marie's request.  And at the end you say

20  [as read]:  Does UHC feel that UHC would not be able to

21  exclude transgender reassignment no matter if the State

22  plan excludes the benefit or not?

23              Do you see that?

24    A.    I do.

25    Q.    Why are you sending this email?

**Elizabeth Schafer, Videotaped - 04/28/2021**

89

1      A.    Because Marie said to, I'm sure.  But I am

2    trying -- I have a feeling UHC didn't return their

3    information within the time frame.  And then based on some

4    information we got she was trying to figure out whether

5    the plans could administer the plan no matter what the

6    decision was on what was covered.

7      Q.    So did Marie ask you to send the email?

8      A.    Because it starts with Marie, I'm going to say

9    yes, but I don't have any memory of this.

10     Q.    Without regard to this email and -- specifically,

11   do you remember being asked to look into this issue or

12   having any role in this issue?

13     A.    My role in this particular issue was Marie was

14   gathering a lot of information from a lot of different

15   sources so she kind of wanted a centralized person or, you

16   know, a place -- one place to go to be able to get all

17   this different information that would be in one place.  So

18   I -- my big -- my big assignment was a chart.  I had this

19   chart where I took all this different information from all

20   these different sources and I put the chart together for

21   her and we would -- she -- so she could have an easy to

22   kind of understand document to look at in one place

23   instead of having to jump around in a million different

24   places to look at stuff.

25     Q.    So Marie wanted someone to keep all of the

1    information that was being collected centralized.

2        A.    Yes.

3        Q.    Is that correct?

4        A.    To kind of take it and put it into something that

5    a normal person might be able to understand.

6        Q.    And was that your role, to take the information

7    that was being collected and to centralize it?

8        A.    Yeah.  I -- I made the chart and did a lot of

9    cutting and pasting as I recall.

10       Q.    So you were involved in coordinating and

11   centralizing all the research that the ADOA was doing

12   regarding this issue in particular?

13       A.    Yeah.  Correct.

14       Q.    Did you do any analysis of this issue or were you

15   just collecting information and analysis that other people

16   were doing?

17       A.    I was pretty much just collecting the

18   information.

19       Q.    And where was the information being collected

20   from?

21       A.    The vendors, the HHS website, as I recall.  I

22   remember Googling and finding things from different -- a

23   lot of different agencies.  Different -- I mean, we

24   gathered information from different states, universities.

25       Q.    Okay.  So I have vendors, the HHS website, and

1  and centralizing information in response to the proposed

2  rule on Section 1557 of the ACA; correct?

3      A.   Correct.

4      Q.   Okay.  That is clear to me.  If we go --

5  Actually, let's stick with this same email.  And if we

6  turn to the first page, so the email that Marie is

7  forwarding to you and others, Marie is describing

8  Section 1557 of the ACA.  Or sorry, this is -- this email

9  is from Leena Bhakta at Mercer to Marie Isaacson and Chris

10  Giammora -- Giammona.

11              Do you see that?

12      A.   Yes.

13      Q.   Take a second to -- or take a minute to review

14  this email.

15      A.   Okay.

16      Q.   And what is your understanding of -- of what this

17  email is saying?

18      A.    It's a very consultant answer.  Basically

19  saying -- Well, to me it's not a very good answer, but --

20  (reading sotto voce) insured options they sell on the

21  exchange, ADOA would be impacted.  It's basically saying

22  we could be impacted.

23      Q.   It's saying you could be impacted by 1557 --

24      A.   Yes.

25      Q.   -- of the ACA?

**Elizabeth Schafer, Videotaped - 04/28/2021**

120

1    Q.   Do you remember how or if at all Marie Isaacson

2  reacted to this assessment of cost?

3    A.   No.

4    Q.   We discussed earlier that generally when cost is

5  minimal or when a -- a new benefit has an inexpensive

6  cost, that ADOA is more likely to cover the benefit.  Is

7  that right?

8    A.   That I think it would be safe to say the odds go

9  up.

10    Q.   So the fact that Oregon and Washington are seeing

11  that in their experience the cost associated with covering

12  transgender benefits is minimal, should that have made the

13  odds go up that ADOA would cover transgender benefits?

14    A.   I think it would be something that would be

15  important to know.

16    Q.   So it would be a factor that would weigh in favor

17  of covering transgender benefits?

18    A.   Yes.

19    Q.   Okay.  If we turn to Exhibit 24.  This has been

20  premarked as Schafer Exhibit 24.  We can enter it into the

21  record as Schafer Exhibit 24.  In the bottom right-hand

22  corner you should see Bates AZSTATE.009183.

23        Do you see that?

24    A.   Yes.

25    Q.   And this is an email chain including you, Scott

Elizabeth Schafer, Videotaped - 04/28/2021

147

1      A.   Very much so.

2      Q.   Okay.  I want to look at the chart.  The first

3  page in particular which has a little -- well, big Bates

4  number 004484.  And the little Bates is the same.

5           Do you see that?

6      A.   Yes.

7      Q.   If you look at under costs, the first bullet

8  says:  ADO -- ADOA analysis estimated the overall impact

9  to cost to be relatively low.

10          Do you see that?

11     A.   Yes.

12     Q.   Do you know who wrote that?

13     A.   Probably me.

14     Q.   So this is your bullet point summarizing the

15  research that had been done on cost?

16     A.   Yes.

17     Q.   And your impression at the time based on that

18  research was that the cost would be relatively low.

19     A.   Yes.

20     Q.   Is that right?

21     A.   Correct.

22     Q.   If you look at the third bullet point it mentions

23  that employers have found it to be less expensive because

24  the benefit is not as utilized as expected.

25          Do you see that?

Elizabeth Schafer, Videotaped - 04/28/2021

150

1          Do you see that?

2     A.   Yes.

3     Q.   Let's talk about Kelly first.  Do you know

4  which -- Or who is Kelly?  Who are you referring to?

5     A.   It's the finance manager.

6     Q.   Is that Kelly Sharritts?

7     A.   Yes.

8     Q.   So you had gotten with Kelly Sharritts to talk

9  about the difference between per employee and per member

10  statements; is that right?

11     A.   Well, based on the earlier email we just looked

12  at, that was one of my first questions, was, were we

13  talking per member per -- or per employee?  So obviously I

14  had to go to her to try and get clarification on that.

15     Q.   And did Kelly give you clarification on that?

16     A.   She must have.

17     Q.   What do you remember about the clarification

18  Kelly gave you?

19     A.   I remember nothing about that conversation except

20  for what's in front of me.  So I'm assuming she said it

21  was per employee.

22     Q.   Okay.  In the email you say [as read]:  I made

23  the changes we discussed.

24          If we look at the chart, you notice that the

25  first bullet point that was in the previous version of the

1   chart which had mentioned the cost being, quote,

2   relatively low is no longer there.

3          Do you see that?

4     A.   I do.

5     Q.   Did Marie Isaacson direct you to make that

6   change?

7     A.   I have no memory of that, but I would guess that,

8   yes, she probably did.

9     Q.   And so as we mentioned before, Marie Isaacson was

10   ultimately directing what this chart looked like and what

11   it contained.  Is that right?

12     A.   I needed to please Marie, yes.

13     Q.   And in needing to please Marie, one of the

14   changes that you made or likely made was removing this

15   bullet point that said the overall impact to cost would be

16   relatively low.

17     A.   Yes.

18     Q.   Do you remember or do you know why Marie wanted

19   you to remove that bullet point?

20     A.   No.

21     Q.   Do you have a guess based on your interactions

22   with Marie Isaacson and based on circumstances of this

23   chart why she might have wanted you to delete that bullet

24   point?

25     A.   If I had to guess, someone didn't want it in

152

1    black and white.

2         Q.   And who would that someone might have been?

3         A.   I have no idea.

4         Q.   And to be clear, what they didn't want in black

5    and white was that the cost to ADOA would be relatively

6    low.

7         A.   Yeah, the way it was -- it makes it sound like

8    it's not a lot of money.

9         Q.   Okay.  We can turn to Tab 30.  This has been

10   premarked as Schafer Exhibit 30.  And we can enter it into

11   the record as Schafer Exhibit 30.  In the bottom

12   right-hand corner you should see AZSTATE.151707.

13              Do you see that?

14        A.   I do.

15        Q.   And this is another version of the chart that you

16   were working on; correct?

17        A.   Yes.

18        Q.   I will represent to you that this document is a

19   stand-alone document, meaning it's not attached to any

20   email.  Does that make sense?

21        A.   Yes.

22        Q.   I will also represent to you that unlike the

23   other charts that we had previously looked at this one

24   does not have a draft watermark.  I don't know if you

25   noticed but the other ones had a draft watermark

Elizabeth Schafer, Videotaped - 04/28/2021

1    underneath.

2        A.    Yes.

3        Q.    This one does not.

4              Does it make sense that this would be a

5    final version of the chart?

6        A.    Yes.

7        Q.    What is the significance of it being the final

8    version of the chart?

9        A.    No more people were going to be looking at it and

10   making changes.

11       Q.    So no more changes were made.  But was it

12   presented to anyone?

13       A.    My assumption would be yes.

14       Q.    Who do you assume it was likely presented to?

15       A.    Either the director or the governor's office.

16       Q.    But you don't know for sure whether this was

17   presented to the director's office or the governor's

18   office; is that right?

19       A.    Correct.

20       Q.    Is it possible that it was also presented to the

21   Joint Legislative Budget Committee?

22       A.    It's possible, but I think it seems unlikely.

23       Q.    Why does it seem unlikely?

24       A.    Because it's -- it's not the type of thing that

25   usually went before them.

154

1      Q.   Is it fair to say that the -- the Joint

2   Legislative Budget Committee is generally not in the weeds

3   about, for example, per member per month cost?

4      A.   Right.  I mean, normally when you go before them

5   you've got your plans.  You know, this is the changes

6   we're going to make, dot, dot, dot, dot, dot.  And you're

7   just looking for their blessing.

8      Q.   And is it fair to say that the J -- the Joint

9   Legislative Budget Committee cares about the headline, the

10  ultimate decision, and not necessarily the details?

11     A.   (Indecipherable.)

12               THE COURT REPORTER:  Did you say no?

13               THE WITNESS:  I said yes.

14     Q.   BY MR. GARBACZ:  Okay.  If we look at the first

15  page, the first page is what appears to be a summary of

16  all of the information that follows.  Is that right?  Does

17  that seem right?

18     A.   Well, it's really not a summary.  Yeah, I guess,

19  yes.

20     Q.   If we look at the first page, and just based on

21  the headings, it looks like there are really three topics

22  of information gathering here.  The first topic is vendor

23  and A-H-C-C-C-S current coverage.  Is that right?

24     A.   Yes.

25     Q.   And the second category of information is on

155

1   Section 1557 and whether or not it requires coverage;

2   right?

3        A.   Correct.

4        Q.   And the third category of information is costs.

5        A.   Yes.

6        Q.   Is that correct?

7        A.   Yes.

8        Q.   If we look down at the last bullet point on costs

9   it says [as read]:  Vendor/ADOA research.

10  UnitedHealthcare estimates an approximate .5 increase in

11  cost or approximately 3.6 million annually.  ADOA research

12  indicates a range of 17 cents to 77 cents per employee per

13  month increase or approximately an annual increase of

14  130,552 to 582,720 annual increase in cost.

15            Do you see that?

16       A.   Yes.

17       Q.   So 17 cents to 77 cents per employee per month,

18  is it fair to say that that cost is low?

19       A.   Yes.

20       Q.   Did you have any involvement in interfacing with

21  UnitedHealthcare about their projection?

22       A.   About how they got the number?

23       Q.   Yes, about the number that they have here,

24  .5 increase in cost.

25       A.   I don't remember -- I don't remember anything

158

1    coverage for such services, we nonetheless must remove

2    exclusionary language.  We are concerned that this may be

3    misleading to consumers and how State DOIs may interpret

4    no specific exclusionary language when a claim is denied.

5              It goes on to say N -- [as read]:  The NPRM

6    would require insurers to cover services for gender

7    dysmorphia as we would for other medical conditions.  For

8    instance, hysterectomy, mastectomy, et cetera.

9              Do you see that?

10   A.   Yes.

11   Q.   So based on what Cigna was telling you -- or was

12   telling ADOA, under 1557 ADOA would have to cover

13   hysterectomies for gender reassignment just like it

14   covered hysterectomies for other medically necessary

15   reasons; is that right?

16   A.   Yes.

17   Q.   But as we discussed earlier, ADOA does not cover

18   a hysterectomy when the purpose is for gender reassignment

19   surgery; is that right?

20   A.   Yes.

21   Q.   Okay.  If we turn now to Page 10, which is in the

22   bottom right-hand corner AZSTATE.151716, little Bates, up

23   at the top there is a title here which is "ADOA Analysis."

24             Do you see that?

25   A.   Yes.

Elizabeth Schafer, Videotaped - 04/28/2021

1     Q.    Does this look familiar to you?

2     A.    Yes.

3     Q.    Have you reviewed it before?

4     A.    I'm sure I have, yes.

5     Q.    Is this one of the documents you remember from

6   preparing for this deposition?

7     A.    Yes.

8     Q.    Prior to that do you remember seeing this?

9           Let me be more clear.  Do you know where

10  this -- this information in the chart came from?

11    A.    It came from that information that Kelly

12  provided.

13    Q.    Okay.  So in the email that we had previously

14  discussed where Marie Isaacson forwarded you Kelly

15  Sharritts' research, this is Kelly Sharritts' research --

16  Kelly Sharritts' analysis, I should say.

17    A.    Correct.

18    Q.    And if we look at the first column, which is "Max

19  Utilization and Cost," is it fair to say that this column

20  projects what cost would be under sort of a worst-case

21  highest utilization and highest cost scenario?

22    A.    Yes.

23    Q.    And if we look at the bottom under the max

24  utilization and cost approach, it says that the per

25  employee per month cost is 71 cents.

Elizabeth Schafer, Videotaped - 04/28/2021

161

1   that are more expensive than that.

2       Q.   BY MR. GARBACZ:  Do you know if ADOA has added

3   things that are more expensive than that or that added

4   benefits that are more expensive than that in your tenure

5   at the ADOA?

6       A.   No.  I'm sure they added stuff but I wouldn't

7   know the cost of each addition.

8       Q.   Can you think of an example of something that

9   might have cost more than that that ADOA added in your

10  time at ADOA?

11      A.   I know we add -- like we added the drugs to take

12  care of hepatitis C, which is an extremely expensive drug,

13  because it cured people.  So I know we added things like

14  that.

15      Q.   Let's take that example for a minute.  Do you

16  remember what the name of that drug was?

17      A.   No.

18      Q.   But it's a hepatitis -- hepatitis C drug?

19      A.   Right.  And it -- it actually cures the person of

20  the disease so we -- then we stop getting claims from that

21  person.  So it's worth the large expense.

22      Q.   So if a procedure cures someone of a disorder,

23  that's a reason to cover it.  Yes?

24      A.   Yes.

25      Q.   Do you remember generally what the cost was for

1      Q.   BY MR. GARBACZ:  I think earlier you had

2   mentioned that, you know, if cost is minimal that that's

3   one of several factors.  But if we're looking just at that

4   factor and that factor alone, the fact that cost is

5   minimal is one thing that would weigh in favor of covering

6   a benefit; is that right?

7      A.   Yes.

8      Q.   So in this particular instance the fact that the

9   cost of covering gender reassignment was low should have

10   weighed in favor -- I understand there's other factors,

11   but just looking at the cost factor, that cost should have

12   weighed in favor of covering the benefit; right?

13      A.   If you're just looking at cost, you're looking at

14   how many people it impacts, it may not have much bang.

15      Q.   So and then if we talk about the other factor,

16   the trend -- I know you mentioned that when you started

17   doing the research there were more states that did not

18   cover the benefit than did.  But as we have discussed,

19   there were vendors and states and other employers who were

20   changing their coverage; right?

21      A.   Correct.

22      Q.   So would you say the trend was to cover the

23   benefit?  Or the trend was to modify your plan to cover

24   the benefit?  In other words, other states and other

25   providers were changing their plans to cover gender

171

1    reassignment surgery; right?

2         A.    Yes.

3         Q.    Should that have weighed in favor of covering

4    gender reassignment surgery or against covering gender

5    reassignment surgeries?

6         A.    I would say it usually is considered.

7         Q.    Was it considered here?

8         A.    I don't know.  I assume since we got all the

9    information it was.

10        Q.    So ultimately what I'm trying to get at is,

11   why -- why did ADOA maintain its exclusion for gender

12   reassignment surgery if -- And I understand that you were

13   not in the room when the decision was made.  But if it

14   doesn't seem like cost was the reason and the trend was

15   that providers were changing their coverage, what reason

16   or what rationale, what factors did -- was ADOA looking at

17   that might have caused them to not cover gender

18   reassignment surgery?

19              MR. CURTIS:  Objection; form of the

20   question.

21              THE WITNESS:  I do not know.

22        Q.    BY MR. GARBACZ:  So sitting here today you cannot

23   say one way or another why ADOA ultimately decided not to

24   cover gender reassignment surgery?

25        A.    Correct.

172

1    Q.   Based on your experience at ADOA and the research
2  that you did in your involvement in this process, if you
3  had to guess, what do you think might have motivated ADOA
4  to maintain the exclusion for gender reassignment surgery?
5             MR. CURTIS:  Objection; form of the
6  question.
7             THE WITNESS:  Sorry, your question is
8  what -- what did I think motivated the decision?
9             MR. GARBACZ:  Yes.
10             THE WITNESS:  I don't know.
11    Q.   BY MR. GARBACZ:  Earlier, Ms. Schafer, I think
12  you had alluded to Ms. Isaacson making changes or
13  suggesting that changes be made to the chart because it
14  didn't look -- or it didn't want to put in black and white
15  that the cost was low.
16             Do you remember that?
17    A.   Yes.
18    Q.   Where would that pressure have been coming from?
19    A.   Above.
20    Q.   By above is it fair to say the governor's office?
21    A.   Or her director.
22    Q.   Or the Joint Legislative Budget Committee?
23    A.   Again, I don't think they would have been
24  involved at that point.
25    Q.   Why don't you think that the Joint Legislative

Elizabeth Schafer, Videotaped - 04/28/2021

218

1    the plan can just, you know, like exclude bariatric

2    surgery.  You would -- may find many people that would

3    find that medically necessary but the plan excludes it.

4    They don't have to cover it.

5       Q.   You mentioned that a doctor might prescribe

6    something to be medically necessary but that might not

7    actually mean that it's medically necessary.  Is that

8    correct?

9       A.   Correct.

10      Q.   Did ADOA view transgender benefits as one of

11   those things that a doctor might prescribe as medically

12   necessary but weren't actually medically necessary?

13      A.   I remember no discussions about whether it's

14   really medically necessary or not.

15      Q.   So sitting here today you have no recollection of

16   whether anyone at the ADOA ever expressed an opinion

17   regarding whether transgender benefits are medically

18   necessary or not?

19      A.   Correct.

20      Q.   Okay.  You mentioned that generally as a

21   self-funded plan ADOA covers things not because it's

22   required by law to cover them but because it elects to

23   cover them.  Right?

24      A.   Okay.

25      Q.   Is that correct?

219

1      A.   Yes.  I -- The wording is a little weird, but

2  yes.

3      Q.   So most benefits that are in the plan are

4  benefits that ADOA has decided to cover, not ones that it

5  has determined it is legally required to cover.

6      A.   Correct.

7      Q.   And you mentioned some reasons why ADOA elects to

8  cover benefits.  One of those reasons I -- you mentioned

9  was that it might be nice to have.  Is that right?

10      A.   I believe I threw that out, yes.

11      Q.   Was gender reassignment surgery considered a nice

12  to have by the ADOA?

13              MR. CURTIS:  Objection; form of the

14  question.

15              THE WITNESS:  I couldn't answer that

16  question.

17      Q.   BY MR. GARBACZ:  Do you consider gender

18  reassignment surgery a nice to have?

19      A.   No.

20      Q.   Why not?

21      A.   Nice to have is -- I'm more -- it's -- To me it's

22  a more carefree kind of thing, just things that are not

23  quite as serious as that.

24      Q.   So you don't view gender -- you don't view gender

25  reassignment surgery as serious as other procedures?

Exhibit 33

Message

| | |
|---|---|
| **From:** | Elizabeth Schafer [Elizabeth.Schafer@azdoa.gov] |
| on behalf of | Elizabeth Schafer <Elizabeth.Schafer@azdoa.gov> [Elizabeth.Schafer@azdoa.gov] |
| **Sent:** | 8/9/2016 4:50:09 PM |
| **To:** | Marie Isaacson [Marie.Isaacson@azdoa.gov]; Scott Bender [Scott.Bender@azdoa.gov]; Yvette Medina [Yvette.Medina@azdoa.gov] |
| **Subject:** | Transgender - Washington |

I talked with Lou McDermott, Public Employee Benefits Director for the State of Washington.  He basically said that he does not have any specific figures regarding Transgender coverage.  They truly believe it to be nominal.  He stated for their plan many of the claims were covered prior to the Transgender coverage that started in 2015.  Specifically he mentioned Mental Health Therapy Claims.  He stated that would have been covered before so really the only increases would be in the Hormone Therapies which he believes to be minimal.  The surgeries would be an increase but very few people actually get the surgery so that is not a huge expense.  Because the decision was made to provide Transgender coverage they do not feel it is appropriate to go and try and figure out exactly what the expenses tided to the coverage are.  Basically he said they wouldn't want to open the discussion again since the decision has been made.

Summary - the costs do not matter to them as they have to cover it but they are confident that the costs are nominal.

---

**From:** Marie Isaacson
**Sent:** Tuesday, August 02, 2016 9:21 AM
**To:** Elizabeth Schafer; Scott Bender; Yvette Medina
**Subject:** RE: Transgender - Oregon

Thank you Elizabeth.  I do recall that information from our original research.  Oregon has a separate law for non-discrimination which was the basis for the lawsuit.

---

**From:** Elizabeth Schafer
**Sent:** Tuesday, August 02, 2016 9:19 AM
**To:** Marie Isaacson; Scott Bender; Yvette Medina
**Subject:** Transgender - Oregon

I talked to Bobbie Barrott, Plan Design Manager for the Oregon Public Employees Benefit Board.   She said Oregon does not have any separated out data on the transgender coverage but she is going to check with her finance people to verify that.  She did say that they cover it because they lost a lawsuit about 3 years ago and had to add the coverage.  She states that is pretty confident that the coverage did not add to any increase in the premiums.  Ms. Barrott added that it is difficult to pull the data because some procedures are not marked as transgender procedures such as a hysterectomy or mastectomy.   She did indicate that the main motivation of Oregon was to make sure the requirements of the court case were met.

I'll let you all know if she calls me back with any more information.

**Elizabeth Schafer, CEBS**
Plan Administrator
ADOA – Benefit Services Division | State of Arizona
100 North 15th Avenue, Suite 260, Phoenix AZ  85007
p: 602.364.1388 | f: 602.542.4048 | elizabeth.schafer@azdoa.gov

**How am I doing?  Please take a few moments to answer a few questions.**
https://www.surveymonkey.com/r/BenPlanAdmin

AZSTATE.004283

AZSTATE.004283

AZSTATE.004284

Exhibit 34

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                    )
                                      )
                 Plaintiff,           )
                                      )
vs.                                   )      4:19-cv-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,   )
                                      )
                 Defendants.          )
                                      )


VIDEOTAPED DEPOSITION OF PAUL JAMES SHANNON
(EXCLUDING CONFIDENTIAL FOR ATTORNEYS' EYES ONLY PORTION)

Via Zoom videoconference
June 25, 2021
8:30 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue        Prepared by:
Phoenix, Arizona 85020
                                   Jill Marnell, RPR
602.266.6535                       Arizona Certified
www.glennie-reporting.com          Reporter No. 50021

38

```
 1  problems, but yes.

 2      Q.   And lots of huddles also --

 3      A.   Right.

 4      Q.   -- sounds like.

 5           Do you typically interact with insurers in

 6  your role?

 7      A.   So you are using a term and I don't know how

 8  you're using it.  We refer to them as carriers.  We are a

 9  self-insured program.  So what we purchase from a carrier,

10  which is what you probably would call an insurer, and --

11  and I'll use UnitedHealthcare as an example.

12           We have a contract with UnitedHealthcare

13  that pays on a per member, per month administrative basis.

14  Access to UnitedHealthcare's network of providers and

15  access to their claims processing systems, which is -- You

16  know, those are -- those are extremely complicated and

17  robust systems, okay?  We -- The actual claims that are

18  incurred by our members are paid out of what's called the

19  special Employee Health Insurance Trust Fund.  And it's

20  a -- it's a State fund that accumulates all the premiums

21  that -- that, you know, State employees, the State

22  agencies, the retirees, and COBRA people pay into the --

23  into this fund, and then from that fund we pay the claims

24  as they are submitted to us by the carrier, okay?

25           So we are not actually insured by anyone.
```

39

1    And we do not maintain any -- any other kind of stop-loss

2    insurance.  We are fully self-insured and all the claims

3    are our responsibility to pay.  But we use the systems

4    that are provided by the carrier to do that.

5        Q.   I see.

6             So you mentioned UHC being one of the

7    carriers.  Is Aetna another carrier?

8        A.   Aetna and Cigna were carriers up until

9    January 1st of this year.  They did -- we did a

10   procurement, a very lengthy procurement to do a new

11   medical carrier contract, and Aetna and Cigna were not

12   successful.  Blue Cross and UnitedHealthcare were, were

13   successful.

14       Q.   So the current carriers are UnitedHealthcare and

15   Blue Cross Blue Shield of Arizona?

16       A.   That's correct.

17       Q.   Any others?

18       A.   We have other carriers for dental insurance.  We

19   have a fully insured dental product.  We have a life

20   insurance.  We have vision insurance.  And those are also

21   fully insured.  We have short-term disability insurance;

22   we have long-term disability insurance which are also

23   fully insured.

24       Q.   But for medical benefits, UHC and Blue Cross?

25       A.   That's correct.

Paul Shannon, Videotaped - 06/25/2021

40

1    Q.   What about -- how does Mercer fit in, if at all?

2    A.   Mercer is a -- an insurance consultancy.  So they

3  provide experts upon request to -- to assist in the

4  management of, you know, whatever kind of insurance topic,

5  you know, we need assistance with.

6    Q.   Prior to January 1st of this year when UHC and

7  Blue Cross became the only carriers for medical benefits,

8  who were the prior carriers and how long had they been

9  carriers with the ADOA?

10   A.   The previous set of contracts were -- ended after

11 six years.  So that was -- those were the contracts that

12 ended on December 31st of 2020.  And for medical carriers

13 it was United, Blue Cross, Aetna, and Cigna.

14   Q.   And you mentioned that when the six-year

15 contracts were up on the last day of last year Aetna and

16 Cigna didn't -- weren't successful in their bids.  And why

17 was that?

18   A.   Well, the procurement committee made a decision

19 not to award those contracts based on the -- on the -- the

20 way they awarded points in the procurement.

21   Q.   In your understanding did it have any --

22 Rephrase.

23           In your understanding did the decision not

24 to continue to use Aetna and Cigna as carriers have

25 anything to do with the decision of whether to cover

89

1    items and correspond with her.

2              She's -- she's very interested in -- in

3    telework of employees, and my -- my data scientist was

4    able to capture that data out of the human resources

5    information system to describe, on a payroll-by-payroll

6    basis, how many -- how many employees were teleworking

7    versus how many were -- were working at the physical

8    location.

9              So that's one example.  But it's not very

10   common that I meet with -- with her or -- or really anyone

11   else in the governor's office.

12   Q.   So would you say it's uncommon -- you just

13   said -- for you to take a meeting with Christina Corieri

14   or others in the governor's office on benefit decisions?

15   Is that right?

16   A.   Well, uncommon -- uncommon is one way of saying

17   it.  Another way of saying it, it doesn't happen very

18   often, but it's not -- it's not particularly surprising

19   when it does happen.  And -- and there are always, you

20   know, reasons why that would happen.

21   Q.   And what are the types of reasons?  Why some

22   (indecipherable due to Zoom connection)?

23              THE COURT REPORTER:  Why what, I'm sorry?

24              MS. SHEETS:  Something would rise to that

25   level.

140

1    Q.   So to be clear, if experts from the fully insured

2    book of business carriers recommended covering a benefit,

3    the ADOA would be inclined to cover that benefit; is that

4    right?

5    A.   That's correct.

6    Q.   And you mentioned earlier you couldn't recall

7    specific thresholds or costs.  But can you think of, in

8    the context we're speaking now, any benefit that the

9    medical directors and fully insured book of business

10   recommended covering which the ADOA chose not to cover on

11   the basis of cost?

12   A.   I can't remember any -- anything like that.  I --

13   I attended -- My first medical directors meeting was 2018.

14   My second one was in 2019.  The medical directors meeting

15   in 2020 was almost exclusively about COVID.

16   Q.   So basically if the experts from the fully

17   insured book of business carriers were recommending that

18   the ADOA cover a certain benefit, it's very likely that

19   the ADOA would cover that benefit; right?

20   A.   Yes.

21   Q.   And cost, in all the time that you've been at the

22   ADOA, has not been a reason to go against what the fully

23   insured book of business carrier experts have recommended,

24   has it?

25   A.   Well, no, but that's not really saying very much.

141

1    Remember, they're medical directors for a fully insured

2    book of business.  So they're -- they're tasked with that

3    same consideration.  By the time it's gotten to us it's

4    been discussed, you know, quite -- probably quite robustly

5    within the carriers' fully insured actuary -- you know,

6    the actuaries for their fully insured business, because

7    they -- you know, the survival of their business is

8    dependent on making good cost decisions.

9        Q.   Understood.

10            So when the experts from the fully insured

11   book of business carriers recommends covering a benefit,

12   you understand that to include a consideration for costs

13   already; is that right?

14       A.   Yes.  I think that's implied.

15       Q.   And to be clear, the fully insured book of

16   business carriers we're talking about is who -- which

17   carriers are those?

18       A.   Well, you know, up until this year it was UHC,

19   Blue Cross, Aetna, and Cigna.  And now -- and now -- I

20   mean, we'll have -- we'll have that meeting this summer

21   again and it will just be UHC and Cigna.  Or excuse me,

22   UHC and Blue Cross.

23       Q.   So to be clear, when, you know, UHC and Blue

24   Cross, and previously Aetna or Cigna, recommended that the

25   ADOA cover a certain benefit, the ADOA would very likely

142

1  cover that benefit; is that right?

2      A.   We would very likely consider it and probably

3  cover it, yes.

4      Q.   And you testified that to you it's implied that

5  the consideration for costs is already baked into the

6  recommendation by the carriers that the ADOA cover a

7  certain benefit; right?

8      A.   Right.  But you are leaving out one of the other

9  considerations that they have to make, their actuaries

10  have to make, is, does the law compel me to provide this

11  benefit?

12      Q.   And does the ADOA consider the carriers'

13  recommendation when it's based on their evaluation that a

14  law compels them to provide a benefit?

15      A.   Because the ADOA is a self-insured plan we are

16  not compelled to provide the same benefits.  So we may

17  have a different calculus as to whether or not to provide

18  that benefit.

19      Q.   But does the ADOA take into consideration that

20  the rest of the fully insured book of business is deciding

21  to cover that benefit on the basis that in their view it's

22  required under the law?

23      A.   We would understand that if the law compelled our

24  fully insured -- you know, our carriers, who have a fully

25  insured book of business, were compelled to provide a

Paul Shannon, Videotaped - 06/25/2021

147

1  an exclusion for gender reassignment surgery?

2      A.   So this -- this document that we're looking at

3  here was not in consideration of whether or not to offer

4  it.  It was to understand what the benefit cost.  And it

5  was not part of the decision-making other than to be --

6  other than to do my due diligence should we provide that

7  benefit.  For whatever reason, okay?  We asked all of the

8  carriers for that information and we asked Michael for

9  that information.  And, you know, some of that -- This is

10  definitely falling into the art area, right, where we

11  didn't have previous experience, so -- and -- You know,

12  and I don't think that this benefit was widely offered

13  prior to the Affordable Care Act.

14              THE COURT REPORTER:  I'm sorry, did you say

15  you don't think that this benefit was widely offered?

16              THE WITNESS:  Yes.  I -- I don't think that

17  this benefit was widely offered prior to the Affordable

18  Care Act.

19      Q.   BY MS. SHEETS:  So you asked Michael Meisner to

20  do a cost analysis, but you also reached out to carriers

21  who had done cost analyses of their own based on their

22  data; is that right?

23      A.   That's correct.

24      Q.   Was there any reason to discount the analyses

25  done by carriers who were already covering this benefit?

159

1    to do is remove the exclusion for gender reassignment

2    surgery?

3         A.    That -- that's how we would conform to that

4    section, yes, if we chose to do that.

5         Q.    I think you mentioned earlier that it was a

6    simple task of removing the exclusion and changing the

7    plan language.  Right?

8         A.    That's correct.

9         Q.    And you mentioned earlier that this would be a

10   relatively easy thing to do; right?

11        A.    From an administrative standpoint, yes, it would

12   be a relatively easy thing to do.

13        Q.    But the ADOA, as of the date of this deposition,

14   has chosen not to remove the gender reassignment surgery

15   exclusion; right?

16        A.    That's correct.  That's why we're here.

17        Q.    So when Scott Bender -- turning to the very

18   beginning of this document, when Scott Bender forwarded

19   this email to you in November of 2019, he says [as read]:

20   This seems to be in line with the info that Aetna sent

21   over this morning.

22              Do you remember whether there were any

23   carriers who said that the ADOA could be compliant with

24   1557 if it chose to do so while maintaining the gender

25   reassignment surgery exclusion?

160

1      A.   I don't remember anyone ever -- or any of the

2  carriers saying that, no.

3      Q.   Did all of the carriers that the ADOA reached out

4  to say that to conform with 1557 the ADOA would need to

5  remove the exclusion for gender reassignment surgery?

6      A.   What we asked them was, if we were going to be

7  complying with 1557, what we would need to do?  And they

8  all said the same thing, remove the --

9      Q.   And that --

10     A.   -- exclusion, yeah.

11     Q.   They all said the same thing, to remove the

12 exclusion for gender reassignment surgery; right?

13     A.   Correct.

14     Q.   Could you turn to Tab 18.  This has been marked

15 as Shannon Exhibit 18 previously.  And in the bottom

16 right-hand corner it has the Bates number AZSTATE.129678.

17          Do you see that?

18     A.   Yes, I do.

19          MS. SHEETS:  And could we mark this as

20 Shannon Exhibit 18.

21          THE COURT REPORTER:  Yes.

22     Q.   BY MS. SHEETS:  So Mr. Shannon, take a minute to

23 look through this document.

24          Was this a document that you were shown in

25 preparation for this deposition?

174

1     A.    That's correct.

2     Q.    Would you -- or who would have been most likely

3   to have asked that a chart like this be made in their --

4   their role at the time in 2016?

5               MR. CURTIS:  Objection; form.

6               THE WITNESS:  I don't know.  Marie was in --

7   Marie was the benefits director so she would instruct

8   people on their work.

9     Q.    BY MS. SHEETS:  And during your time as the

10  budget director up through August of 2016 were you ever

11  asked to conduct a cost analysis on the impact of covering

12  gender reassignment surgery?

13    A.    I do not recall ever being asked that, no.

14    Q.    What about coverage for any transgender benefits,

15  including hormone therapy?

16    A.    No, I don't recall that.

17    Q.    If you look at the last bullet on this first page

18  of AZSTATE.118313 it says that [as read]:  ADOA research

19  indicates a range of 17 cents to 77 cents per employee per

20  month increase for coverage of gender reassignment

21  surgery.

22              Is that a cost that in your experience would

23  prohibit the ADOA from considering covering a benefit?

24    A.    As I mentioned previously, the absolute dollar

25  amount is not the only factor in determining whether or

178

1  nobody else has to pay $58,000 if they want residential

2  treatment for their daughter.  That's just one way that

3  people want coverage.

4            You can understand how my job is so

5  difficult, because there are so many competing demands.

6      Q.   BY MS. SHEETS:  I do appreciate that context and,

7  as you said, being the monkey in the middle on a lot of

8  these issues that everyone wants covered.

9            But just to bring it back to the specific

10 point of gender reassignment surgery, would you agree with

11 the statement that the cost of covering gender

12 reassignment surgery, in your view, is the reason that

13 ADOA is not covering gender reassignment surgery?

14     A.   I do not know the reason why ADOA is not covering

15 gender reassignment surgery.  It was that way when I got

16 there.

17     Q.   Has anyone explained to you since you came back

18 to the ADOA in 2018 why the ADOA continues to maintain an

19 exclusion for gender reassignment surgery?

20     A.   No.

21     Q.   Have you asked?

22     A.   I don't think I have.

23     Q.   If you were going to ask, who would you ask to

24 find out the answer to that question?

25     A.   I suppose I would ask the director or one of my

179

1   bosses, the deputy or Emily.

2       Q.   So Andy Tobin or Emily?

3       A.   Rajakovich.

4       Q.   Thank you.  So you --

5       A.   Or Elizabeth Thorson, yeah.  Those three.

6       Q.   And you have reason to believe that they would

7   know the reasoning behind the ADOA's decision to --

8       A.   No, you asked me who I would ask.  I would ask

9   them.  I'm not sure that they would know.

10      Q.   Well, someone must know; right?

11      A.   I -- All I know is I don't know.

12      Q.   Is there any strong reason in your estimation

13  that you can think of why the ADOA would continue to

14  maintain the exclusion for gender reassignment surgery?

15      A.   When I say I don't know it means that I don't

16  know.  Just why [sic] I don't know why we don't cover

17  residential treatment.

18      Q.   But in the context for coverage for gender

19  reassignment surgery has there been any reason that you've

20  heard of since becoming benefits director in 2018 for

21  maintaining the exclusion for gender reassignment surgery?

22      A.   I have not heard a good reason why we exclude it.

23      Q.   If you turn to the second page of this

24  document -- And you might have to turn the binder because

25  it's landscape.  But on the left-hand side there's a

191

1    understanding what the potential coverage would cost.

2        Q.   Let's turn to Tab 32.  So this has been marked

3    Shannon Exhibit 32, Bates number AZSTATE.151099.

4                 Do you see that?

5        A.   Yes, I do.

6                 MS. SHEETS:  Let's mark this as Exhibit 32.

7        Q.   BY MS. SHEETS:  Do you recognize this?

8        A.   Yes.

9        Q.   Is this the analysis by Michael Meisner that we

10   were just talking about?

11       A.   Yes, it is.

12       Q.   And there is a date here, 9/23/2019.

13       A.   Yes.

14       Q.   Does that seem like the right date that Michael

15   Meisner would have completed this analysis?

16       A.   I trust that it is.  It -- Usually our documents

17   are dated correctly.

18       Q.   And it's titled estimated annual costs to

19   included transgender benefits.  Did you ask Michael

20   Meisner to perform this analysis?

21       A.   I think I did.

22       Q.   Was it in response to this lawsuit?

23       A.   Yes, it was -- it was in line with all of our

24   investigations.

25       Q.   When you say -- I mean -- Excuse me.  What do you

Exhibit 35

Message

| | |
|---|---|
| **From**: | Scott Bender [Scott.Bender@azdoa.gov] |
| on behalf of | Scott Bender <Scott.Bender@azdoa.gov> [Scott.Bender@azdoa.gov] |
| **Sent**: | 9/1/2016 7:11:54 PM |
| **To**: | Marie Isaacson [Marie.Isaacson@azdoa.gov] |
| **Subject**: | RE: Additional information on Cigna policy on transgender coverage |

Yes, they intend to cover all services for their fully insured products.

**From:** Marie Isaacson
**Sent:** Thursday, September 01, 2016 6:05 PM
**To:** Scott Bender <Scott.Bender@azdoa.gov>
**Subject:** RE: Additional information on Cigna policy on transgender coverage

In quickly reviewing the link, it looks like the document focuses on reassignment surgery. Since this is likely the most costly, I would assume the coverage for HRT, counseling, etc. would also be covered.

**From:** Scott Bender
**Sent:** Thursday, September 01, 2016 5:54 PM
**To:** Marie Isaacson <Marie.Isaacson@azdoa.gov>
**Subject:** FW: Additional information on Cigna policy on transgender coverage

Here's the latest guidance from Cigna on transgender benefits, Erica just confirmed that there has been no change since this was issued.

**From:** Emmons, Erica 654 [mailto:Erica.Emmons@Cigna.com]
**Sent:** Thursday, July 21, 2016 4:39 PM
**To:** Scott Bender <Scott.Bender@azdoa.gov>; Yvette Medina <Yvette.Medina@azdoa.gov>; Elizabeth Schafer <Elizabeth.Schafer@azdoa.gov>
**Cc:** Gillum, Alicia M HHHH <Alicia.Gillum@Cigna.com>
**Subject:** Additional information on Cigna policy on transgender coverage

Hi Scott, Yvette, and  Elizabeth –
As promised, as I get more information on the recent non-discrimination regulations and how Cigna is reacting regarding transgender coverage, I am keeping you updated. Below are a few questions and answers we were able to get from our legal and compliance team. I would encourage you to consider these changes for the 1/1/17 plan year and discuss with your legal counsel.

1.      With the enhancement in regulations, will we include Transgender Reassignment services to our fully insured products?  Yes.  And if so, what services specifically?  Coverage will be consistent with the below linked Coverage Policy:

https://cignaforhcp.cigna.com/public/content/pdf/coveragePolicies/medical/mm_0266_coveragepositioncriteria_gender_reassignment_surgery.pdf

2.      Same as above, but for an ASO client  – might we 'suggest' they add this coverage at renewal?  Yes. And if so, what services specifically? Same as above Coverage Policy.  What exactly are their legal requirements – if any – should this scenario arise where they are approached about coverage?
We expect ASO clients to elect to cover transgender services on renewal after 1/1/17 and are making that our new standard Cigna benefit offering.  The ACA § 1557 nondiscrimination rules do not apply to ASO accounts unless the plan receives federal funding or assistance from HHS which is unusual.  However, other federal non-discrimination laws do apply to ASO employers.  For instance, employers need to be concerned with employment discrimination which extends

AZSTATE.005658

AZSTATE.005658

to employee benefits.  Excluding these services will very likely be considered discriminatory for employers under Title VII of the Civil Rights Act by the Equal Employment Opportunity Commission (EEOC).   If an ASO client wishes to maintain such an exclusion, we recommend they consult with their own attorney.

I hope this information is helpful to you and ADOA. If you have additional questions, please let me know.

Thanks!

**Erica Emmons** | Strategic Account Executive | Government and Education | Cigna | 5310 East High Street, Suite 200 | Phoenix, AZ 85054 | Direct: 480.426.6761 | Mobile: 480.622.0899 | erica.emmons@cigna.com



*Confidential, unpublished property of Cigna. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel. © Copyright 2016 Cigna.*

------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information.  This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2016 Cigna
==============================================================================

AZSTATE.005659

AZSTATE.005658

Exhibit 36

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


| | |
|---|---|
| RUSSELL B. TOOMEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 4:19-CV-00035 |
| | ) |
| STATE OF ARIZONA; ARIZONA BOARD | ) |
| OF REGENTS, d/b/a UNIVERSITY OF | ) |
| ARIZONA, a governmental body of | ) |
| the State of Arizona; et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |




VIDEOTAPED DEPOSITION OF CHRISTINA CORIERI

(Via Zoom Videoconference)
July 13, 2022
8:30 a.m.
Phoenix, Arizona






Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020               Robin L. B. Osterode
602.266.6535                         CSR, RPR
www.glennie-reporting.com            CA CSR No. 7750
                                     AZ CR No. 50695

Christina Corieri - 07/13/2022

29

1   me.

2       Q.    Were you reporting to Mr. Liburdi about new

3   policy concerns?

4           MS. LAMM:  Same objection if this relates to

5   attorney-client privileged communication, then I would

6   instruct the witness not to answer.  But if it -- I mean,

7   she can certainly say the general subject matter, but if

8   it -- if it gets to specific information requested by

9   Mr. Liburdi or provided in an effort to seek legal

10  advice, then witness cannot answer.

11          THE WITNESS:  Mr. Liburdi came to me to ask me

12  to participate in a meeting.

13  BY MR. ECKSTEIN:

14      Q.    Okay.  And you weren't seeking legal advice

15  from Mr. Liburdi, were you?

16      A.    At that point, Mr. Liburdi was just asking if I

17  would attend a meeting.

18      Q.    Okay.  And that was your first -- that was the

19  sum and substance of your first meeting with Mr. Liburdi?

20      A.    Yes.

21      Q.    Is it --

22      A.    He --

23      Q.    Not that it matters a whole lot, but was that

24  on the phone, e-mail, or in person?

25      A.    It was in person.  I believe he caught me in

30

1    the hallway or it was at the end of a discussion on

2    something else, basically said he was having a meeting

3    with ADOA, and outside counsel, and asked if I would

4    participate in that meeting.

5        Q.    Okay.  And you did participate in that second

6    meeting -- in that meeting?

7        A.    Yes, I participated in a meeting.

8        Q.    How long after your -- Mr. Liburdi requested

9    your presence at that second meeting did the second

10   meeting take place?

11       A.    To the best of my recollection, it was a couple

12   days, I don't -- I don't remember how many.

13       Q.    Do you remember where it was?

14       A.    Yes.

15       Q.    Mr. Liburdi's office.  Right?

16       A.    No.

17       Q.    Whose office?

18       A.    It was in a conference room.

19       Q.    On the 9th floor?

20       A.    No.

21       Q.    8th floor?

22       A.    Yes.

23       Q.    How many people were there?

24       A.    I don't recall the exact number.

25       Q.    Approximately how many?

31

1    A.    Less than 10, I think.

2    Q.    Okay.  Please tell us the names of the people

3  you remember being there.

4          Do you remember Marie Isaacson being there.

5  Correct?

6    A.    Yes, Marie was there.

7    Q.    And you remember Mike Liburdi being there?

8    A.    Yes.

9    Q.    And you remember you were there?

10   A.    Yes.  I --

11   Q.    And -- go ahead.

12   A.    There was outside counsel.

13   Q.    From -- from Fennemore Craig?

14   A.    Yes.  I don't remember how many or what their

15  names were.  And Marie may have brought somebody else

16  from ADOA, but I don't remember for sure if she did.

17   Q.    Okay.  And approximately when did this

18  discussion take place in 2016?

19   A.    It was in August of 2016.  I don't -- I don't

20  remember exactly when in August.

21   Q.    Okay.  Did Mr. Liburdi tell you either before

22  this meeting or at the meeting what the meeting was

23  about?

24   A.    Yes.

25   Q.    When did he tell you what the meeting was

32

1  about?

2      A.     When he asked me to join the meeting.

3      Q.     And what did he say?

4      A.     He said that it was a meeting to discuss the

5  ADOA exclusion on gender reassignment surgery, and making

6  sure that it was compliant with the regulations that came

7  down under the ACA.

8      Q.     Did you have a personal position on whether it

9  was a good idea, from a policy perspective, to cover

10  gender reassignment surgery or not?

11     A.     I had not ever thought about this issue with

12  the State plan before.

13     Q.     Your Tweet back in 2013 was different,

14  obviously, you were talking about Medicare and Medicaid.

15  Are you saying that it didn't occur to you that it could

16  possibly be part of the State plan?

17             MS. LAMM:  Object to the form of the question.

18             THE WITNESS:  In 2013, I had never worked for

19  the State government and I don't believe I had given any

20  thought to the State health insurance plan.

21  BY MR. ECKSTEIN:

22     Q.     Okay.  You knew in August of 2016, that

23  coverage in the State healthcare plan for gender

24  reassignment surgery was not popular in the Republican

25  party, didn't you?

33

1           MS. LAMM:  Object to the form of the question.

2           THE WITNESS:  Again, I'm not sure that I ever

3    had any conversations or had given that any thought prior

4    to -- prior --

5    BY MR. ECKSTEIN:

6        Q.    I didn't ask for conversations.  I asked for

7    what you knew.  And it could be that someone told you

8    that.  It could be that some -- that you read that.  It

9    could be that others in the governor's office said that

10   gender reassignment surgery, Christina, is not something

11   that's very popular in the Republican party.

12           You understood that.  Right?

13       A.    Nobody ever --

14           MS. LAMM:  Object to the form of the question.

15           THE WITNESS:  Nobody in the governor's office

16   ever said that to me.

17   BY MR. ECKSTEIN:

18       Q.    Did you hear them say that to anyone else?

19       A.    I have not said that to anyone else.  I don't

20   recall any conversations about this issue prior to that

21   meeting.

22       Q.    Okay.  But there was conversation about this

23   issue at that meeting?

24       A.    At that meeting, yes.

25       Q.    Okay.  So would you please -- who -- who

1    chaired the meeting?

2        A.    I -- I don't know that there was an official

3    chair to the meeting.

4        Q.    Do you recall someone opening the meeting

5    saying the purpose of this meeting is?

6        A.    I don't.  It wasn't me.  I don't remember if

7    somebody did that, maybe Mike or Marie, but I don't know.

8        Q.    Okay.  But as best you can now recall, tell us

9    what -- what was said and by whom at that meeting?

10            MS. LAMM:  Objection; this is Betsy.  I'm going

11   to object to the question to the extent the meeting

12   involved or was for the purposes of obtaining legal

13   advice, then I'm going to instruct the witness not to

14   disclose any attorney-client privileged communications

15   that would have occurred at that meeting.  If there were

16   communications that fall outside of the privilege or

17   that -- that were not for the purpose of seeking legal

18   advice, then she may answer.

19            MS. COHAN:  The defendants join.

20            THE WITNESS:  The -- the purpose of that

21   meeting was to seek legal advice regarding the exclusion.

22   BY MR. ECKSTEIN:

23       Q.    Was anything else discussed at that meeting

24   besides legal advice?

25       A.    Not that I recall.

35

1      Q.    For example, was the cost of including gender

2   reassignment surgery discussed at that meeting?

3      A.    I do not recall it being discussed at that

4   meeting.

5      Q.    Did you discuss the cost of gender reassignment

6   surgery with anyone at any time during the time you have

7   been at the Office of the Governor?

8          MS. LAMM:  Object to the form of the question.

9          THE WITNESS:  I -- I don't recall specific

10   discussions about the cost.

11   BY MR. ECKSTEIN:

12      Q.    Did anyone -- anyone ever tell you that gender

13   reassignment surgery was not going to be covered by the

14   State of Arizona, by the Arizona Department of

15   Administration healthcare plan because of its cost?

16      A.    I know that cost is something that we look at

17   for everything.  Especially in the context of adding cost

18   to the State Health Insurance Trust Fund or to State

19   employees.  So our position, in general at that time, was

20   that the State was in a very bad economic situation.  In

21   2015, we had something like a billion dollar deficit and

22   had to cut across the board in agencies.  The State

23   health insurance plan was in trouble and had to be bailed

24   out.  We still had to put dollars into the health

25   insurance trust fund because it's under water, our State

63

1   during the meetings, if anything?

2           MS. LAMM:  Again, to the extent this would

3   entail or would require Ms. Corieri to disclose

4   attorney-client privileged communications, then I'm going

5   to instruct her not to answer, but -- but to the extent

6   she can answer without disclosing attorney-client

7   privileged communications, she can do so.

8           MS. COHAN:  Join.

9           THE WITNESS:  I -- again, I don't remember

10  specific discussions about costs in that meeting.

11  BY MR. POWELL:

12      Q.    Did you ask anyone who participated in this

13  meeting to provide you with cost information?

14      A.    I do not recall asking that, because I knew

15  that, again, adding a benefit, any benefit, adds cost.

16      Q.    But you didn't know what the costs would be?

17      A.    I don't recall asking for that specific cost.

18  I don't -- I don't remember if someone said it or not.

19      Q.    Did you ever, in the context of this

20  decision-making process, with respect to the exclusion of

21  gender reassignment surgery, did you -- did anyone

22  provide you a written analysis of the cost of eliminating

23  the surgery exclusion?

24      A.    I don't recall receiving a written analysis of

25  that.

64

1        Q.    Did you ask anyone to provide you with a

2   written analysis of what the cost implications would be

3   of eliminating the exclusion for surgery?

4        A.    No.

5        Q.    In any of these meetings that you have

6   described, and we'll get to specifics about them later,

7   did you hear anyone request an assessment, written or

8   otherwise, of the cost implications of eliminating the

9   exclusion for surgery?

10       A.    I don't recall if that was brought up in

11  this -- in this meeting.

12       Q.    And in this context or otherwise, have you ever

13  asked anyone within the governor's office, or otherwise,

14  for a quantification of the cost of covering gender?

15  re- -- reassignment surgery?

16       A.    I have not, no.

17       Q.    And has anyone in any context ever given you an

18  estimate of what the cost is for gender reassignment

19  surgery?

20            MS. LAMM:  Object to the form of the question.

21            THE WITNESS:  Not that I can recall.

22  BY MR. POWELL:

23       Q.    Did -- apart from what you've just described as

24  a general comment concerning the fact that any new

25  benefit might carry some cost to it, did -- did anyone

112

```
 1   Corrections of Arizona had its own healthcare coverage

 2   policy that also addressed the scope of gender -- gender

 3   dysphoria care; is that correct?

 4       A.    That's correct.

 5       Q.    And what was the scope of the coverage at the

 6   Department of Corrections?

 7             MS. LAMM:  Foundation.

 8             THE WITNESS:  I don't believe they covered that

 9   either.

10   BY MR. POWELL:

11       Q.    And the "that" being gender reassignment

12   surgery?

13       A.    Correct.

14       Q.    So as of the time of this meeting in

15   August 2016, divisions of Arizona government, the

16   Medicaid agency, and the Department of Corrections had in

17   place an exclusion of coverage for gender reassignment

18   surgery?

19       A.    That's correct.  All of which predated Governor

20   Ducey's administration.

21       Q.    And so the decision to modify the plan

22   effective July -- sorry, January 1, 2017, to also exclude

23   gender reassignment surgery, was consistent with the

24   provisions of the Medicaid program and the Department of

25   Corrections program with respect to gender dysphoria; is
```

Exhibit 37

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
RUSSELL B. TOOMEY,                   )
                                     )
                Plaintiff,           )
                                     )
vs.                                  )      4:19-cv-00035
                                     )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,   )
                                     )
                Defendants.     )
                                     )
```

VIDEOTAPED DEPOSITION OF MICHAEL MEISNER

Via Zoom videoconference
March 16, 2021
8:38 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue        Prepared by:
Phoenix, Arizona 85020
                                   Jill Marnell, RPR
602.266.6535                       Arizona Certified
www.glennie-reporting.com          Reporter No. 50021

**Michael Meisner, Videotaped - 03/16/2021**

1   to the contribution strategy document; is that right?

2       A.   That's correct.  Our benefits -- our benefits --

3   If there's a change in benefits, if there's a change in

4   vendors, all that gets communicated through that document.

5       Q.   Okay.

6       A.   Now, there could be a process -- there could be a

7   process that I'm unaware of and there could be

8   communications, but I'm unaware of, outside of that

9   process that I just described.  But I -- I -- I don't have

10  any personal knowledge of those -- those communications.

11                  MS. SHEETS:  Okay.  I think it's time for a

12  break.

13                  MR. GARBACZ:  Time for a lunch break.

14                  MS. SHEETS:  Yeah.  And if it's -- Could we

15  go off the record, please.

16                  THE VIDEOGRAPHER:  Off the record at

17  11:58 a.m.

18                  (Recess.)

19                  THE VIDEOGRAPHER:  Back on the record at

20  12:41 p.m.

21                  Please proceed when you're ready.

22      Q.   BY MS. SHEETS:  Mr. Meisner, there were a series

23  of digital copies of files that were sent over to your

24  counsel.  Do -- do you have those files in front of you?

25      A.   Yes, I do.

Michael Meisner, Videotaped - 03/16/2021

109

1   is that right?

2       A.   That's correct, yes.

3       Q.   Had you seen any version of this document?

4       A.   I have not.

5       Q.   Do you know what this document is?

6       A.   It appears to be -- I mean, it appears to be --

7   to be a side-by-side comparison of what -- maybe some

8   analysis done on the cost of transgender surgery.  But

9   there could -- it also looks like there's -- it's relating

10  to some external documents as well that were initially

11  embedded in this document that is not coming through here.

12  So those -- those documents that were embedded might be in

13  the list of -- of -- of the other documents that we have.

14  But that's what I'm looking at.

15      Q.   Have you ever seen a chart like this one

16  comparing how insurers have approached coverage before?

17      A.   Yes.  So this is fairly typical of what we would

18  do, plan administration would do, is if -- if -- if there

19  was going to be some copy change or text change within the

20  plan guide, the plan document, we would reach out to our

21  medical vendors, and in this case it looks like they

22  reached out to the four medical vendors plus Mercer for a

23  copy, for some text.

24      Q.   And when you say copy what do you mean by that?

25      A.   Letters, words, sentence, descriptions, and, you

110

1   know, so -- so this -- this is what -- this is what it

2   looks like to me what's here.

3       Q.   And so when you -- it's fairly typical -- So let

4   me rephrase.

5            When you reach out to these insurers for

6   copy, words, sentences, what are you looking for

7   specifically?  Like what do those words and sentences mean

8   to the ADOA?

9       A.   So, you know, to -- to use -- I guess so I'm --

10  I'm not sure if I -- if I -- I can't really speak to what

11  plan administration uses this document for, but this is

12  really plan administration's tool to -- to look at various

13  text, if you will, and -- and maybe through this is some

14  discovery of what the text should look like in our plan

15  document.  This is --

16      Q.   Okay.

17      A.   But, you know, this is -- this is my

18  understanding of what they use this document for.

19      Q.   Do you typically contribute?

20      A.   No.  This -- So this is purely from the four

21  insurers and Mercer.  So I -- I wouldn't -- this would

22  be -- Going back to our analogy of reaching out

23  externally, this is a very good example of what I was

24  talking about.  So they reached out externally to the four

25  medical and Mercer.

142

1    this analysis at all?

2         A.   Not that I recall, no.  Not at all.

3         Q.   Now, I want to talk about the analysis that you

4    have performed on gender reassignment surgery.  You -- you

5    established that you were not involved in this analysis on

6    Pages 10 and 11.  Were you involved in any gender

7    reassignment surgery analysis --

8         A.   Yes.

9         Q.   -- in 2015?

10        A.   Not in 2015, no.

11        Q.   What about in 2016?

12        A.   No.

13        Q.   2017?

14        A.   No.

15        Q.   I'm -- I -- I've asked you this kind of area

16   again, but we're going to move toward what you -- we're

17   going to move toward the analysis that you did do on

18   gender reassignment surgery for ADOA.  How many

19   analysis -- Excuse me.  How many cost analyses have you

20   performed for ADOA on the coverage of gender reassignment

21   surgery?

22        A.   I believe only two.

23        Q.   And what were those?

24        A.   Those were in 2019.

25        Q.   Okay.  And why two separate analyses in 2019?

Michael Meisner, Videotaped - 03/16/2021

143

1      A.   Oh, I continued my research and refined my

2  analysis.

3      Q.   Do you remember when the regulation concerning

4  the ACA came down that would have required coverage of

5  gender reassignment surgery?

6      A.   Well, I recall that there was quite a few years

7  that the final rules were to come out about that issue.

8      Q.   And do you remember when those rules were

9  finalized?

10      A.   I believe they were finalized in -- I don't --

11  No, I don't.  Maybe 2018.  I don't.

12      Q.   When you performed your analysis in 2019, the

13  first analysis --

14      A.   Uh-huh.

15      Q.   -- what was the reason for doing the analysis on

16  gender reassignment surgery in the first place?

17      A.   It was at the request of our attorneys.

18      Q.   Do you know why they would have requested you to

19  perform the analysis in 2019?

20      A.   We were being sued.

21      Q.   What was the nature of the lawsuit?

22      A.   It was Toomey versus the State of Arizona.

23      Q.   So am I hearing correctly the first time that you

24  dug in and did an analysis on whether the ADOA should

25  cover gender reassignment surgery was in 2019 in response

Michael Meisner, Videotaped - 03/16/2021

170

1    Q.   Just going back briefly to the -- the articles

2  that you have cited here, did you do an analysis of which

3  article to rely on when you were citing them as the -- the

4  sole article for the estimation for --

5    A.   I believe -- The second article I believe is from

6  John Hopkins.  And that was based on a federal -- a study

7  of federal employees.  And it looked to be extremely

8  credible to me and very -- It just looked very credible,

9  the study itself.  And the study had been published.

10   Q.   Did you look at other studies or articles and

11 determine that this was the best one or --

12   A.   No.  This looked -- you know, this looked to be a

13 very good, credible study to me.

14   Q.   So did you -- How did you find this article?

15   A.   Yahoo.com.

16   Q.   So you got on yahoo.com and you typed in -- Well,

17 what did you type in, if you remember?

18   A.   I don't.  Maybe transgender cost estimates or

19 transgender benefits.  But it -- it turns out that there's

20 very little -- very little credible -- in my opinion,

21 credible information out there.  And -- and this looked to

22 be a study that was at least published and -- and made --

23 made publicly to all.

24            The other ones, such as like the

25 San Francisco study, was never published.  It did -- The

Michael Meisner, Videotaped - 03/16/2021

183

```
 1       A.    Yeah.  I would have never done this analysis.

 2       Q.    So if there was no lawsuit against ADOA you would

 3   have never done this --

 4       A.    Yeah.

 5       Q.    -- estimated cost analysis on the coverage for

 6   gender reassignment surgery; right?

 7       A.    Unless there was a -- you know, here again, if --

 8   if there was -- you know, maybe there was a question from

 9   the governor's office, or -- or maybe the universities

10   would ask us to do this analysis.  I would have done that.

11   I would have done exactly what I did here.  But -- but

12   this is -- this was from the attorney from -- from last

13   year -- or from 2019.  This is why I did this.

14       Q.    Which attorney was that?

15             MR. CURTIS:  I'm -- I'm going to state

16   that's attorney/client privileged communication

17   (indecipherable).

18             THE COURT REPORTER:  Privileged

19   communication what?

20             MR. CURTIS:  That that's a privileged

21   attorney/client -- attorney/client privileged

22   communication that we're not going to get into.

23             THE WITNESS:  I don't remember -- I don't

24   remember the individual's name.

25             MR. CURTIS:  You don't need to answer.
```

Exhibit 38

# In The Matter Of:

*Toomey vs.*
*State of AZ*

---

*Scott Bender, Videotaped*
*March 31, 2021*

---

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office     877.266.6535 Toll Free*
*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 033121SB.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


RUSSELL B. TOOMEY,                    )
                                      )
              Plaintiff,              )
                                      )
vs.                                   ) 4:19-CV-00035
                                      )
STATE OF ARIZONA; ARIZONA BOARD       )
OF REGENTS, d/b/a UNIVERSITY OF       )
ARIZONA, a governmental body of       )
the State of Arizona; et al.,         )
                                      )
              Defendants.             )
_____)




VIDEOTAPED DEPOSITION OF SCOTT BENDER

Via Zoom Videoconference
March 31, 2021
8:00 a.m.
Phoenix, Arizona




Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535                    Prepared by:
www.glennie-reporting.com       Robin L. B. Osterode
                                CSR, RPR
                                CA CSR No. 7750
                                AZ CR No. 50695

54

1      Q.    So, Mr. Bender, you said that the process was

2   similar at Sprouts Farmers Market as well as at Amkor

3   Tech and as at Dial Soap.  Is it fair to say that there

4   is a general process to, you know, facilitating the

5   implementation of a plan change?

6      A.    I would say so, yeah.  Just not any official

7   documented process, but the -- the annual cycle of things

8   that happen, is pretty much the same in most

9   organizations that I've been part of.

10     Q.    And when you say there's no official process,

11  you mean there's nothing written down anywhere that tells

12  you how to go about facilitating the implementation of a

13  plan change?

14     A.    Not for those organizations, no.

15     Q.    Is there anything written down for any

16  organization you worked at?

17     A.    There are different requirements for the State

18  of Arizona.  We're required to, for example, any plan

19  changes that are recommended would need to be presented

20  to the Joint Legislative Budget Committee, the

21  legislature.  So it's just a little bit different, and

22  obviously, with the size of the state, there's more

23  layers of leadership to consider.

24     Q.    So appreciating those differences with respect

25  to the ADOA and its health plan, would you say that

55

1    general process includes -- and I'm going to name things

2    and I'd like you to tell me if I'm right -- so would the

3    general process for, you know, assessing a proposed

4    change to the plan include a cost analysis?

5         A.    Yes.

6         Q.    And would it include market analysis?

7         A.    Yes.

8         Q.    What about the impact to members', let's say,

9    health and well-being?

10        A.    Yes.

11        Q.    Is there anything else it would include?

12        A.    Off the top of my head, I can't think of really

13   anything else.  But you have to consider all factors,

14   so --

15        Q.    And to go back, when we were talking about how

16   this isn't written down or at least it wasn't written

17   down at places you've worked at --

18        A.    Right.

19        Q.    -- are there general professional standards

20   with respect to this process?

21        A.    I'm -- I don't know if there are general

22   standards.  I know how it's worked everywhere I've been,

23   and it's -- it's been sort of the -- what we call it at

24   the State is the contribution strategy, sort of lays out

25   what are -- what are the benefits going to be and who is

1    decision-making?

2        A.    It may be.

3        Q.    But the governor's office is not always

4    involved in the decision making when there's a change

5    that is optional to the plan?

6        A.    Correct.  Anything that would potentially have

7    a significant cost to the plan, we -- we need to consult

8    the governor's budget office.

9        Q.    If something didn't have a significant cost to

10   the plan, would you expect the governor's office to be

11   involved in the decision making?

12       A.    I would say it depends on what it is.

13       Q.    And what is it exactly that depends?

14       A.    I think is there anything that's, aside from

15   the cost, is there -- is there something that the

16   governor's office has a particular feeling one way or the

17   other about.

18       Q.    So you would expect the governor's office's

19   position -- when you say "feeling," what do you mean by

20   that?

21       A.    If anyone has a -- anybody in leadership has a

22   particular feeling one way or another.

23       Q.    And a feeling one way or another, do you mean

24   political position on an issue?

25       A.    Could be political, personal views.

82

1   And we need to make decisions each year as to how we're

2   going to spend that money.  And, unfortunately, it sort

3   of ends up in an erosion of benefits for the employees

4   and more cost sharing to the employees.  That's just the

5   nature of this business, unfortunately.

6        Q.    Would the removal of a plan exclusion affect

7   the contribution strategy?

8        A.    It could, depending upon the cost.

9        Q.    At what point would the removal of a plan

10  exclusion affect the contribution strategy?

11       A.    I can't give you a number.

12       Q.    Is there a thre -- is there a ballpark

13  threshold?

14       A.    There's not a stated threshold that I'm aware

15  of, no.

16       Q.    What about an unstated threshold?

17       A.    I'm not aware of that either.  But I am --

18       Q.    Practically --

19             I'm sorry, go ahead.

20       A.    What I am aware of is that there's insufficient

21  funds to manage the plan as it is, and there is not much

22  appetite for any additional changes that would increase

23  costs.

24       Q.    Practically, in your experience working at the

25  ADOA, what cost would cause a change to the contribution

Scott Bender, Videotaped - 03/31/2021

83

1   strategy?

2      A.    The biggest focus lately is around specialty

3   medications and how do we handle those challenges.  I

4   mean, you can't watch TV without seeing three ads for new

5   specialty drugs that are coming to the market.  They've

6   become an extremely expensive part of the plan.  That is

7   a focus of ours.

8          We follow recommendations of a pharmacy and

9   therapeutics committee with our pharmacy benefit manager

10  with those.  But at some point we're going to have to

11  have the realistic conversation of what do we exclude and

12  are we going to continue to add everything that comes

13  down the pike.

14         There are therapies that cost hundreds of

15  thousands of dollars a year.  For one person.  And we

16  need to make hard decisions as to are we going to

17  continue to cover these things, or are we going to put

18  limits on them.

19     Q.    What are the costs of those specialty

20  medications?

21     A.    The -- first of all, the definition of what's

22  considered a specialty varies from organization to

23  organization.  We sort of view it as over 500 or a

24  thousand dollars a month or at least our PBM does.  And

25  they can go, you know, up to $500,000 a year or more.

Scott Bender, Videotaped - 03/31/2021

97

1          When might the removal -- when might the

2    removal of a plan exclusion not impact the contribution

3    strategy?  And actually, let me clarify, I think we're

4    getting hung up on the word "impact."

5          When might the removal of a plan exclusion not

6    change the contribution strategy?

7    A.    I think it would not change if it were a

8    minimal cost.  And I believe we discussed between, you

9    know, more than $500,000.

10   Q.    Oh, okay.  So I think that's -- so if a cost

11   were around a million, I think that's where we landed, or

12   above, that would impact the contribution strategy?

13   A.    That could impact the contribution strategy,

14   and it's something noteworthy.

15   Q.    It's more likely to impact the contribution

16   strategy than not at a million?

17   A.    It's more likely at a million than it is at

18   500,000.

19   Q.    Does the governor's office ever get involved in

20   the decision-making process about a plan change before

21   you've presented the change to them?

22   A.    I can't think of a case like that.

23   Q.    So, for instance, if you don't know -- say

24   you're -- the network providers come to you with a

25   proposed change to the plan, and you don't know the cost

116

1  her on.  Gosh, I can't remember.  It was right when I

2  started.  We had conversations with her on something.

3  I'm sorry, I don't remember.  And I know that she was

4  involved in the discussion in our redesign of our new

5  wellness program, and what the governor's office would be

6  interested in from the perspective of a new vendor and

7  what kind of capabilities they wanted for the wellness

8  program, but my -- my interaction with her is very

9  limited.

10      Q.    Have you ever interacted with her with respect

11  to the plan's coverage of transgender benefits?

12      A.    I have not, no.

13      Q.    So I think I understand now, you know, the

14  structure of who reports to who.  I'd like to understand

15  it better, the decision-making process at the ADOA.  So

16  with respect to the plan's exclusion, a change to a plan

17  exclusion, a removal of a plan exclusion, which is what

18  is at issue in this case, how would you first

19  learn -- how would it come to the ADOA's attention a

20  proposal about removing a plan exclusion?

21      A.    I'm trying to -- could you rephrase your

22  question?  I think -- this is not something that happens

23  often.

24      Q.    Sure.  Well, let me ask you about that.  How

25  often does -- is a proposal to remove a plan exclusion,

117

1    how often does that occur?

2         A.    Not very frequently.

3         Q.    Twice a year?

4         A.    No, not even that often.

5         Q.    Once every two years?

6         A.    I'd say that's probably more -- more likely.

7    And, typically, it's done in conjunction with change in

8    law that we have to, you know, cover something in

9    particular.

10        Q.    Was the removal of the plan's exclusion of 3-D

11   mammography the last plan exclusion you dealt with?

12        A.    No, it was the -- the clinical cancer trial.

13   And that was something that we had to cover.  3-D

14   mammography was more of a change in medical coverage

15   guidelines.

16        Q.    So what do you mean it -- what do you mean by

17   it was a "change in medical coverage guidelines"?

18        A.    The vendors themselves determine what is

19   considered a medically necessary service.  As I

20   mentioned, Aetna was the first organization to make the

21   determination that 3-D mammography was an appropriate

22   service and not experimental.  They had seen enough

23   evidence to determine that that is something that should

24   be covered.  And they were covering it on their -- on

25   their medical guidelines.  And slowly, but surely, the

119

1   record?

2           MR. WALL:  Sorry, could you take us off the

3   record while we fix this?  And this actually might be a

4   good time to take another break.

5           THE VIDEOGRAPHER:  Off the record at 11:20 a.m.

6           (Recessed from 11:20 a.m. until 11:31 a.m.)

7           THE VIDEOGRAPHER:  Back on the record at

8   11:31 a.m.  Please proceed when ready.

9   BY MR. WALL:

10      Q.    So, Mr. Bender, before we went on break, we

11  were discussing the most recent changes to plan

12  exclusions that you've encountered.

13          Do you recall that?

14      A.    Yes.

15      Q.    And so I think you said the most recent one was

16  the clinical cancer trials.

17      A.    Yes.

18      Q.    And when was that -- when was that change to

19  the plan?  Well, let me ask, was the plan exclusion for

20  that removed?

21      A.    It was, yes.

22      Q.    And when was that?

23      A.    It was within the last six months.

24      Q.    And then prior to that you'd spoke about 3-D

25  mammography treatment?

Scott Bender, Videotaped - 03/31/2021

120

1      A.    Right.

2      Q.    And when was that exclusion removed?

3      A.    That was probably two years ago.  Maybe 2019.

4      Q.    And then before that, was there anything

5  else -- was the transgender benefits exclusion the last

6  modification before that?

7      A.    I believe so, yes.

8      Q.    And that was in 2017?

9      A.    Yes.

10     Q.    Or, rather, I should say --

11     A.    Move forward to 2017, yes.

12     Q.    So just to be clear, the plan was changed in

13  2017, the transgender benefits covered or excluded were

14  changed in 20 -- for the 2017 plan year?

15     A.    Correct.

16     Q.    So let's take the 3-D mammography as an

17  example, for instance.  So there, Aetna came forward and

18  said that they're going to start covering 3-D

19  mammography.  Correct?

20     A.    Right.

21     Q.    And then Blue Cross Blue Shields, UHC, and

22  Cigna about a year later decided that they were going to

23  start covering that service?

24     A.    Right.

25     Q.    So this was presented to the ADOA how?  How did

130

1   than that, we typically query our health plans to

2   determine, you know, is this a standard service.  And

3   that's all part of that medical director meeting.

4       Q.    Okay.  So the ADOA doesn't affirmatively

5   consider, you know, guideline or standards of care for

6   treatment; it relies on its network providers?

7       A.    Correct.

8       Q.    So once Ms. Medina had collected or did this

9   research for the team, she -- what does she then do with

10  it?

11      A.    We would have a discussion -- and this is just

12  my assumption in how we did this; I don't recall

13  specifically -- we would have a discussion as to, you

14  know, this is now an appropriate service, according to

15  our -- according to our vendors.  It's not necessarily a

16  high cost driver.  We present it to our director and the

17  decision would be made whether to include or exclude.

18          Something like that, where all four programs

19  are aligned that this is now a standard course of

20  treatment, and it's zero -- you know, limited cost to the

21  plan.  That's, I think, a fairly easy decision, and we

22  don't necessarily need to run to the governor's office or

23  to the director to make those decisions.

24      Q.    So where the -- all four network providers are

25  aligned, you think it's an easy decision on whether to

 1  extend coverage?

 2       A.    Correct.  That's if -- that's if -- and I'll

 3  caveat that with if the cost is reasonable.

 4       Q.    So when you say this is a discussion, would you

 5  and Ms. Medina have a discussion first?

 6       A.    Yes, just to review her findings.

 7       Q.    And let me be more specific.  On the 3-D

 8  mammography treatment, did you and Ms. Medina have a

 9  discussion first about the findings of her research?

10       A.    I -- I don't recall -- I presume we did.  I

11  don't recall it specifically, but that's typically how

12  things happen.  She researches and updates me on what she

13  finds.

14       Q.    And so once you and Ms. -- once you and

15  Ms. Medina have that discussion, do you all form a

16  recommendation that you take to the -- to Mr. Shannon or

17  did you?

18       A.    That's typically how it works, yes.  I don't

19  recall specifically in that case.

20       Q.    And so when you say "typically," you mean when

21  you're assessing whether to remove a plan exclusion, you

22  and your team come to a recommendation, and then you take

23  that to the benefit services director?

24       A.    And not necessarily just removing a plan

25  exclusion, which is fairly rare.  But just any -- any

137

1   it as such and it is their recommendation that we -- we

2   include it, so we did.

3       Q.    And the 3-D mammography treatment, that wasn't

4   required by law, was it?

5       A.    Not that I'm aware of, no.  It is a

6   preventative service, and we're required to offer

7   mammograms, but I don't believe that particular type of

8   mammogram is required by law.

9       Q.    So on the 3-D mammography, you don't recall the

10  governor's office being involved, but hypothetically say

11  they were involved, once the governor's office makes the

12  decision, do they then advance that to the JLBC for their

13  favorable or disfavorable vote?

14      A.    Something on a one-off like that, typically

15  not.  The JLBC is more concerned about, since they are a

16  budget agency, they're more concerned about things that

17  are going to have a material impact to the budget.  And

18  the treatment of one mammogram versus another would not

19  have a material impact on the budget.

20      Q.    What impact did that extension of that

21  treatment have on the budget?

22      A.    I don't recall.  But I know that the pricing

23  was close between 3-D and the standard.

24      Q.    Was the additional cost of 3-D mammography

25  below a million per year to the plan?

Scott Bender, Videotaped - 03/31/2021

155

1      A.     Correct.

2      Q.     And so you cannot recall whether you made a

3  recommendation that you would, in the ordinary course

4  make, about transgender benefits?

5      A.     In the ordinary course of business, it would

6  have been a bottom-up approach, and this clearly was not.

7  She brought this to us.  So there was obviously some

8  concern by someone somewhere about this program and these

9  specific benefits.

10      Q.     And so -- so -- so because this is -- this was

11  not a bottom-up approach, you can't remember whether you

12  made a recommendation to Ms. Isaacson of whether the plan

13  should cover transgender benefits?

14      A.     Correct.

15      Q.     Now, are those two things connected?  The fact

16  that it was not a bottom-up approach and your memory of

17  whether you made a recommendation?

18          MR. CURTIS:  Objection; form of the question.

19          You can answer.

20  BY MR. WALL:

21      Q.     You can answer, Mr. Bender.

22      A.     So can you reask that?

23      Q.     Sure.  Are those two things connected, the fact

24  that it was not a bottom-up approach, and your memory of

25  whether you made a recommendation?

156

1     A.    Are they connected?  I don't really know how to
2  respond to that question.  I --
3     Q.    Well, I do want to be clear, Mr. Bender, is it
4  that you do not remember whether you made a
5  recommendation or you did not make a recommendation to
6  Ms. Isaacson?
7     A.    I do not remember if I made a recommendation.
8  I don't believe I did.  It was clear that this was a
9  sensitive topic.
10    Q.    Why was it clear that this was a sensitive
11  topic?
12    A.    Just in the amount of work that was put into
13  it, and we were -- my team was not really included in any
14  discussions outside of our office.  We were not included
15  in any discussions with the governor's office.  Which
16  made me think that this was very sensitive.
17    Q.    And your team not being included in any of
18  those discussions was out of the ordinary.  Correct?
19    A.    As we discussed, yes, for a benefit change or a
20  significant benefit issue that this is, it seemed
21  unusual.
22    Q.    Why was the plan's exclusion of transgender
23  benefits a significant benefit issue?
24    A.    It's -- well, I -- I know that -- I believe it
25  was viewed -- it may have been viewed more along

Scott Bender, Videotaped - 03/31/2021

157

1   political lines, if you will, different ideologies.  And,
2   obviously, in a political environment, that's -- many
3   people consider those things.
4       Q.   Was the plan's exclusion of transgender
5   benefits viewed along political lines?
6       A.   That was my sense, but I don't know for sure.
7       Q.   What was that sense based on?
8       A.   Well, my sense is based on where we were a
9   fairly conservative state with conservative leadership,
10  in the legislature and governor, and transgender benefits
11  are not necessarily something that's a super important
12  factor to many conservatives.
13      Q.   And, Mr. Bender, earlier you mentioned that
14  there were obviously some concerns about this topic.
15  Correct?
16      A.   Yes, just in my discussion and interaction with
17  Marie Isaacson, it was clearly something that was being
18  seriously debated.
19      Q.   Did you hear from anyone else about these
20  concerns?
21      A.   I -- I sensed that our team was well aware that
22  this was not necessarily an easy decision.
23      Q.   And it wasn't an easy decision because of the
24  political considerations around it?
25      A.   Correct.  That was my sense.

Scott Bender, Videotaped - 03/31/2021

161

1    are referring to gender reassignment surgery, as well as

2    hormone therapy and counseling in connection therewith.

3    Correct?

4        A.    Correct.

5        Q.    So the network -- so to back up, the ADOA asked

6    the network providers to provide you with a cost-impact

7    analysis; is that right, Mr. Bender?

8        A.    Yes.

9        Q.    And that cost-impact analysis showed that the

10   marketplace and industry were going to cover tran --

11   gender reassignment surgery, as well as counseling and

12   hormone therapy in connection therewith?

13       A.    That's correct.  And their estimates were

14   varied.  Some gave us an estimate of per employee per

15   month cost, additional to our -- our current plans,

16   others gave a percentage of cost increase is my

17   recollection.

18       Q.    So with this information available, the ADOA

19   decided to maintain the exclusion on gender reassignment

20   surgery.  Correct?

21       A.    I don't know that that was the ADOA's decision,

22   but that was the decision that was communicated to us to

23   implement.

24       Q.    If not the ADOA's decision, whose decision

25   would it have been?

162

1      A.      Someone up the food chain from ADOA.  I'm not

2  certain who made that decision.

3      Q.      When we're referring to someone up the food

4  chain, to whom are you referring, Mr. Bender?

5      A.      Could be anyone in the governor's office.

6      Q.      Is there anyone else outside of the governor's

7  office who could have made that decision?

8      A.      No.  ADOA bears responsibility for managing the

9  program, and we report to the governor's office, so no.

10     Q.      So just to back up a bit.  So once the decision

11 was made, Ms. Isaacson informed you of that decision.

12 Correct?

13     A.      She asked us to -- I'm sorry --

14     Q.      I'm sorry, let me clarify.  Once the decision

15 was made on whether to continue the plan's exclusion of

16 transgender benefits, Ms. Isaacson communicated to you

17 that the plan would continue its exclusion of gender

18 reassignment surgery, but not counseling or --

19             THE REPORTER:  I'm sorry, Mr. Wall, can you

20 repeat that, please?

21             MR. WALL:  Sure.

22     Q.      So once a decision was made on whether the plan

23 would continue its exclusion of transgender benefits,

24 Ms. Isaacson communicated that decision to you and your

25 team.  Correct?

Scott Bender, Videotaped - 03/31/2021

167

1   or deleted the exclusions and absorbed the costs

2   associated with that, for sure.

3   BY MR. WALL:

4      Q.    So if the ADOA had removed the exclusion listed

5   in paragraph 16, would there have been any other question

6   about the ADOA's compliance with Section 1557?

7      A.    From a compliance standpoint, no.  If we

8   voluntarily opted in, there's no compliance issue.

9      Q.    So why didn't the ADOA remove the exclusion for

10   all transgender benefits under the plan?

11      A.    Can you rephrase?

12      Q.    Why didn't the ADOA remove the plan's exclusion

13   of transgender benefits, inclusive of gender reassignment

14   surgery?

15      A.    I believe there are several reasons, one being

16   cost and the other being we didn't feel it was required

17   for us to include -- or to eliminate the exclusion for.

18      Q.    So the ADOA did not remove the plan's exclusion

19   of gender reassignment surgery because of cost, and it

20   didn't feel it was required to remove that exclusion?

21      A.    Those are both reasons.  I think, primarily, is

22   we weren't required to, and if we're not required to,

23   then we weren't interested in taking on additional costs

24   in a plan that's already under water.

25      Q.    The ADOA's primary reason for not removing the

181

1   and if you don't understand, you can let me know.  Okay?

2       A.    Okay.

3       Q.    So except when a medically necessary

4   hysterectomy is sought in connection for the treatment of

5   gender dysphoria.

6       A.    It's excluded if it's in connection with a

7   transgender surgery.

8       Q.    So but for being in connection with a

9   transgender surgery, a medically necessary hysterectomy

10  would be covered under the plan?

11          MR. CURTIS:  Objection; form of the question.

12          THE WITNESS:  Correct.

13  BY MR. WALL:

14      Q.    You can answer.

15          Under --

16      A.    That's correct.

17      Q.    Are you aware of any procedures that are

18  medically necessary that are covered -- of any procedures

19  that are covered -- uh -- let me restate this.

20          Are you aware of any other instances under the

21  plan where a medically necessary procedure is covered in

22  some instances, but not others?

23      A.    Off the top of my head, I'm not aware.

24      Q.    Mr. Bender, would you turn for me to Exhibit --

25  Tab 1 in this binder, which is premarked as Bender

Scott Bender, Videotaped - 03/31/2021

190

1   different estimates from the four different health plans,

2   and just anecdotally from our actuary as to what he felt

3   our exposure was, based on what he was seeing in the

4   marketplace.

5        Q.    So just to sum up, the ADOA had numerous

6   different estimates of the cost from the various -- from

7   the four network providers?

8        A.    Right.

9        Q.    And also, the in-house actuary, Mr. Meisner,

10  had a different calculation of the cost?

11       A.    Correct.

12       Q.    So now I'm looking at the bottom-most bullet in

13  this box on cost, that says, "Based on input from the

14  vendors and ADOA's research, ADOA feels it can" safe --

15  "it can be safely say if transgender coverage is

16  implemented, the cost would be under a dollar per

17  employee per month.  Approximately 50 cents per employee

18  per month seems to be an agreed-upon amount based on

19  ADOA's research."

20            Did I read that correctly, Mr. Bender?

21       A.    Yes.

22       Q.    So appreciating that you saw different

23  estimates and a different estimate from Mr. Meisner

24  later, would you consider this estimate here to be high?

25       A.    A dollar per employee per month, is

191

1    approximately $60,000 [sic] a month, so $120,000 a year.

2    In the overall scheme of the plan, I -- I would not say

3    that that is a high cost.

4        Q.    And if a dollar per month is not a high cost,

5    then you would agree 50 cents per employee per month is

6    also not a high cost?

7        A.    That's right.

8        Q.    When the ADOA is assessing the cost of a

9    particular treatment, does it matter whether it's being

10   calculated on a per employee per month basis or a per

11   member per month basis?

12       A.    I don't know that it necessarily matters.  Both

13   of them will get you to sort of an annual cost.

14       Q.    And what about calculating as a percentage of

15   total plan cost?

16       A.    Same.  We know what our annual plan costs, and

17   if the recommendations are in various methodologies, we

18   can account for that and convert everything to an annual

19   total impact.

20       Q.    So if you turn now, Mr. Bender, to the fourth

21   physical page of this document, Bates number

22   AZSTATE.009272.

23       A.    Got it.

24       Q.    Do you see that bottom box that says

25   A-H-C-C-C-S?

Exhibit 39

# In The Matter Of:

*Toomey vs.*
*State of Arizona*

---

*Yvette Medina, Videotaped*
*February 18, 2021*

---

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office    877.266.6535 Toll Free*
*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 021821YM_1.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


RUSSELL B. TOOMEY,                )
                                  )
                Plaintiff,        )
                                  )
vs.                               )  4:19-CV-00035
                                  )
STATE OF ARIZONA; ARIZONA BOARD   )
OF REGENTS, d/b/a UNIVERSITY OF   )
ARIZONA, a governmental body of   )
the State of Arizona; et al.,     )
                                  )
                Defendants.       )
_____ )




VIDEOTAPED DEPOSITION OF YVETTE MEDINA

Via Zoom Videoconference
February 18, 2021
8:30 a.m. (MST)
Phoenix, Arizona




Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535                    Prepared by:
www.glennie-reporting.com       Robin L. B. Osterode
                                CSR, RPR
                                CA CSR No. 7750
                                AZ CR No. 50695

52

1        Q.    So there are instances in which the governor's

2   office provides you, ADOA, with language that ends up in

3   the plan change log?

4        A.    Yeah.   There could be instances, and this

10:17:57  5   was -- this -- I don't know if this was one of them, but

6   there -- yes, there could be instances.

7        Q.    Do you remember any specific instances?

8        A.    No -- well, it's -- I can say that it was not

9   often that they would give us information unless there

10:18:23 10   was something like this kind of situation where there was

11   a court case happening that affects our plan.   There

12   could have been throughout the -- you know, each

13   different plan year, but other than -- so we had this

14   instance and -- I'm trying to think of other -- we had --

10:18:55 15   sometimes when the ACA would pass things or there was

16   changes being made, like, federally and they would

17   actually -- they would look at everything.   So like our

18   same-sex or domestic partners, they did -- they did for

19   the -- the nondiscrimination transgender item and -- I'm

10:19:28 20   trying to think if they had feedback on ACA.   I -- those

21   are probably the only two.

22        Q.    So when you say "they," do you mean the

23   governor's office?

24        A.    Yes.

10:19:45 25        Q.    So would you say that the governor's office

61

         1    limitation.  Any experimental -- what's considered

         2    experimental or not medically necessary type of services.

         3    We have, gosh, lots of exclusions -- sorry, do you want

         4    me to name all the exclusions, because there are quite a

10:36:15 5    few?

         6         Q.    Let me make this easier on both of us.

         7         A.    Okay.

         8         Q.    So you mentioned experimental.  Would you say

         9    cosmetic surgeries also fall broadly under the

10:36:31 10   exclusions?

        11         A.    It does.  I -- I believe -- I would say that

        12    was a limitation.  So we don't cover cosmetic surgery,

        13    but we would cover any -- someone that had cosmetic

        14    surgery, but it went -- it did not go so well, so they

10:36:53 15   needed to get it fixed, because it could have been a

        16    medically necessary situation for, like, an emergency

        17    type of situation.  So that would have been a limitation.

        18          So we don't -- we don't cover cosmetic surgery

        19    for, you know, changing, like, a feature in the face, but

10:37:13 20   if there was something happening that was causing medical

        21    issues, we would cover that to be treated.

        22         Q.    Would it be fair to say that you don't cover

        23    cosmetic surgeries, but if it's medically necessary, then

        24    you do?

10:37:34 25          MR. CURTIS:  Objection; form of the question.

Yvette Medina, Videotaped - 02/18/2021

62

1    BY MS. SHEETS:

2         Q.    You can answer.

3         A.    Medically necessary, yeah, as deemed by the --

4    the plan with the vendors themselves.  So, yes, if they

10:37:47  5   consider it to be medically necessary, then yes.

6         Q.    So if cosmetic surgery is found under the plan

7    to be medically necessary, then it would be covered?

8         A.    Yes.

9         Q.    And experimental surgery, is there any process

10:38:06 10   for determining whether that's medically necessary?

11        A.    The process wouldn't fall on the plan, the

12   process would fall onto the actual medical vendor

13   themselves, because they have medical guidelines that

14   they follow.  So they have to follow their medically

10:38:23 15   necessarily -- so -- excuse me -- their medically

16   necessary guidelines to follow it.

17        Q.    And if those guidelines are followed and a

18   procedure is deemed medically necessary, would it then be

19   covered even if it was considered experimental?

10:38:51 20        A.    It would if the language said this is

21   experimental, or it's not covered unless it's medically

22   necessary.

23        Q.    So it sounds like the keywords here are "unless

24   it's medically necessary"; is that right?

10:39:07 25        A.    Correct.  Yes.

**Yvette Medina, Videotaped - 02/18/2021**

63

```
 1        Q.    So moving back to the document here, item 51.
 2   So we're going to walk through an example of an
 3   exclusion, because I really want to understand how the
 4   process works for developing these and changing them.  So
```
10:39:38  5   for item 51, in the "Proposed Change" column, we have,
```
 6   "Remove exclusion as the plan will cover services, if
 7   approved by medical management as medically necessary."
 8          Do you see that?
 9        A.    Yes.
```
10:39:54 10        Q.    And what does that mean?
```
11        A.    So this is for orthognathic surgery or
12   treatment.  We had it as an exclusion, but when we remove
13   it from the exclusions, if someone were to go get that
14   treatment and it was considered medically necessary by
```
10:40:18 15   the medical vendor, then it would be covered.  If it --
```
16        Q.    And -- sorry.  Please complete your answer,
17   Ms. Medina.
18        A.    If the language stayed, then it would be
19   excluded.
```
10:40:34 20        Q.    So if the current language listed under
```
21   "Current Plan Language" stayed for orthognathic treatment
22   or surgery, then the exclusion would hold?
23        A.    Correct.
24        Q.    Is that -- and by the exclusion holding, I mean
```
10:40:57 25   any orthognathic surgery, whether or not it was medically

64

```
 1   necessary, would be excluded from the plan; is that
 2   right?
 3       A.    Not necessarily.  Our plan does say that we
 4   will only cover medically necessary services.
 5       Q.    So as the current plan language for item 51
 6   lists orthognathic surgery before including -- let me
 7   back up.
 8             As the item 51, "Current Plan Language" stands,
 9   orthognathic surgery is excluded under the plan; is that
10   right?
11       A.    That's correct.
12       Q.    Under this "Current Plan Language" for item 51,
13   is there an opportunity for someone to prove the
14   orthognathic surgery medically necessary?
15       A.    Because this is specifically excluded, even if
16   it was medically necessary, it would not be covered
17   because we specifically exclude it.
18       Q.    So under this language, in the current plan
19   language for item 51, even if orthognathic surgery was
20   medically necessary, it would be excluded under the plan?
21       A.    Yes.
22       Q.    And just so I understand, feel free to say you
23   don't know, if you don't know, but what is orthognathic
24   surgery?
25       A.    I don't know the full details of it, but I know
```

Timestamps in left margin: 10:41:14 (line 5), 10:41:49 (line 10), 10:42:12 (line 15), 10:42:35 (line 20), 10:42:53 (line 25)

65

1    it does have something to do with the jaw and the face

2    and -- and that particular area of -- and dental.

3        Q.    Would it -- like an underbite fall under

4    orthognathic surgery?

10:43:16  5            MR. CURTIS:  Objection; form.

6            THE WITNESS:  Yeah, I don't know.

7    BY MS. SHEETS:

8        Q.    That's fine.  But let's say an underbite did

9    fall into orthognathic surgery, if someone needed surgery

10:43:31 10  and it was deemed medically necessary for an underbite

11   and this current plan language stood, would that be

12   covered under the plan?

13       A.    No.

14       Q.    Let's move on to the proposed plan language.

10:44:00 15  So for item 51, it appears to be the same language but

16   crossed out in red.

17            Do you see that?

18       A.    Yes.

19       Q.    What does that mean?

10:44:12 20      A.    That means that we are removing that language

21   from the plan.

22       Q.    And if you recall, what does that mean in this

23   particular instance, in item 51, to have removed the

24   exclusion for orthognathic surgery?

10:44:37 25      A.    So that means if someone presented with that

66

1    type of treatment in the next plan year, the 2012 plan

2    year, it would be covered on the plan if it was medically

3    necessary.

4        Q.    And if for some reason under the new plan

10:45:05  5    language getting rid of the exclusion for orthognathic

6    surgery, and orthognathic surgery was found to be not

7    medically necessary in the first instance, would the

8    person seeking coverage have an opportunity to appeal

9    that decision?

10:45:23 10        A.    Yes, they would.

11        Q.    Are you familiar with the appeals process if

12    someone is denied coverage?

13        A.    Yes, I am.

14        Q.    In what capacity?  What is your role in that

10:45:51 15    process, if any?

16        A.    So the appeals process goes through our

17    vendors.  They have the first, second, third -- we have

18    three levels of appeal, and they all go through our

19    medical plan vendor.  So your first level of -- you get

10:46:09 20    three levels, the first two are with the actual appeals

21    team at the medical plan.  So an appeals team reviews

22    level one, and if it's still denied, then they go to a

23    level two and a different appeals team reviews the

24    information in the appeal.  And if that's denied, then

10:46:31 25    you -- you have a third level, which is an external

# Exhibit 40

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,              )
                               )
                Plaintiff,     )
                               )
vs.                            )       4:19-cv-00035
                               )
STATE OF ARIZONA; ARIZONA BOARD )
OF REGENTS, D/B/A UNIVERSITY OF )
ARIZONA, a governmental body of )
the State of Arizona; et al.,  )
                               )
                Defendants.    )
                               )


VIDEOTAPED DEPOSITION OF KELLY SHARRITTS

Via Zoom videoconference
April 22, 2021
8:34 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue       Prepared by:
Phoenix, Arizona 85020
                                  Jill Marnell, RPR
602.266.6535                      Arizona Certified
www.glennie-reporting.com         Reporter No. 50021

37

1    the one involved in doing that.

2        Q.    Why would your assumption be that they were

3    shared with the governor's office?

4        A.    It was for the point of it going up to the

5    legislature for it to pass in the budgeting and all that

6    process that the government goes through.

7        Q.    What types of decisions, if any, were required to

8    be reviewed by the State legislature?

9        A.    I would not be able to clearly tell you that.

10   That's up to the government laws.

11       Q.    What types of content was usually in the

12   presentations that you were preparing to ultimately be

13   shared with the State legislature?

14       A.    We would put in plan design changes, plan premium

15   costs, employer or -- I say employer, but State-funded by

16   area -- by the different divisions, plan design structure,

17   wellness initiatives.  That's all I recall at the moment.

18       Q.    You mentioned plan design changes.  Do you

19   remember any changes to the plan that did not involve you

20   creating a presentation to be shared with the State

21   legislature?

22       A.    Not that I can recall today.

23       Q.    Did you ever prepare a report or presentation on

24   the coverage of transgender benefits?

25       A.    I know I -- I did a lot of research and emails

44

1      Q.    Are you familiar with this exclusion?

2      A.    Yes.

3      Q.    Do you remember how you first learned of the

4    exclusion?

5      A.    I believe that only -- when it got brought to my

6    attention was when one of the universities reached out for

7    information on it and so Marie asked me to research it to

8    see if we were being discriminatory in our plan design or

9    not.  And so we had to research it and figure out what the

10   rules were and what it would mean.

11     Q.    Do you remember which university reached out to

12   the ADOA about this exclusion?

13     A.    I don't recall.  I get the two mixed up all the

14   time.

15     Q.    Which two do you mean?

16     A.    Is it Arizona State University and -- U of A,

17   ASU.  Those two.

18     Q.    Is U of A the University of Arizona?

19     A.    Yes.

20     Q.    And ASU would be Arizona State University?

21     A.    Yes.

22     Q.    So you think one of these universities reached

23   out to Marie Isaacson; is that right?

24     A.    Someone reached out from the university to

25   someone and Marie reached out to me.  So it got -- I don't

45

1    know what the exact trickle was.  But Marie reached out to

2    our department -- or to our team to look into it.

3        Q.   Do you remember around when Marie Isaacson

4    reached out to your team to look into coverage of this

5    exclusion?

6        A.   It was, I would say, mid to late 2015.

7        Q.   Do you remember how long you had been working at

8    the ADOA when you were first approached about this issue?

9        A.   I would say roughly six months.  Somewhere in

10   that range.

11       Q.   Now -- Oh, before we move on, do you remember

12   learning about the history of how this exclusion first

13   came to exist in the ADOA plan?

14       A.   I don't recall knowing how it started.  I just

15   was looking at does it stay.

16       Q.   Did you know how long it had been part of the

17   ADOA plan?

18       A.   I don't recall that answer.

19       Q.   Did it seem like something that had just been

20   added, from the conversations you were having?

21       A.   I wouldn't be able to infer that.  I don't know.

22       Q.   And when Marie Isaacson reached out to your team

23   to assess whether the ADOA should maintain this exclusion

24   as written in the 2016 plan, what specifically did you

25   take her to be asking for?

48

1   benefits was a more sensitive topic?

2       A.    Yes.

3       Q.    What do you remember about conversations you had

4   around this Number 16 exclusion for transgender benefits

5   that make you say it was more sensitive?

6       A.    It definitely was more of a headline-test topic

7   than a vision exam would be.  So it was making sure that

8   we were making the best, most informed decision, and

9   making sure that we had all the information we needed to

10  before just kind of making a -- an -- making an answer to

11  it.

12            There's also a lot of discussion,

13  especially -- we've come a long way in the last whatever

14  many years it's been -- on whether it is a actual mental

15  health situation or is it an option, is it an opinion, is

16  it a choice.  And so there was just a lot more

17  controversial discussion around it.  And probably today

18  there still is.

19      Q.    When you say there were discussions about whether

20  the decision to maintain this exclusion affected something

21  that was just an opinion or a choice, what do you mean?

22      A.    I guess I -- There's a generic, I will say

23  overall, I think society-wise on whether it's medically

24  necessary to do these steps to actually change your sexual

25  orientation or if it's more of a decision that you want to

50

1   it?  And I believe their advice to us at the time was we

2   didn't have to cover it.  That we could and it could be

3   considered medically necessary if we chose to go that

4   route, but it wasn't discrimination if we excluded it.  If

5   we did include it it would be covered under a medical

6   necessity to get done.

7        Q.   So when you previously said there was discussion

8   about whether the need for the transgender benefits

9   covered under Number 16 in the exclusions was a choice or

10  an opinion instead of being medically necessary, who was

11  having that discussion?

12       A.   It was I would say all of the -- the managers

13  under Marie and Marie a well [sic] -- as long as -- in

14  addition to Mercer and our health plans and asking them

15  what -- what it was.  We just -- we aren't educated to

16  know and so we were trying to get that information.

17            And I would say the discussion was more of

18  the societal discussion of whether it was or not, not

19  someone's specific opinion on it.

20       Q.   So you testified earlier that it's your

21  recollection that resources you typically relied on said

22  that these benefits could be considered medically

23  necessary if the ADOA chose to cover it.

24       A.   They could be considered covered if we chose to

25  and people were covering it.  So I guess I should clarify.

72

1  knee-jerk decision and that they have committed to this

2  lifestyle.

3              MS. SHEETS:  I'd like to propose that we

4  take about a ten-minute break at this point.  Could we go

5  off the record.

6              THE VIDEOGRAPHER:  Off the record at

7  10:53 a.m.

8              (Recess.)

9              THE VIDEOGRAPHER:  Back on the record at

10  11:11 a.m.

11              Please proceed when ready.

12              Did she hear me?

13              MR. CURTIS:  We are --

14      Q.   BY MS. SHEETS:  Ms. Sharritts --

15              MR. CURTIS:  Oh, sorry.  Go ahead.

16      Q.   BY MS. SHEETS:  Ms. Sharritts, would you please

17  turn to Tab 28 in your binder.  This has been marked as

18  Sharritts Exhibit 28 and in the bottom right-hand corner

19  is AZSTATE.151707.  So Ms. Sharritts, this is a chart

20  labeled "Transgender Reassignment Surgery."  Do you

21  recognize this document?

22      A.   It's a format of documents that is familiar to

23  me.  I personally can't recall this specific one.

24      Q.   Were you shown this document in preparation for

25  the deposition today?

Kelly Sharritts - 04/22/2021

73

1     A.   No.

2               Doesn't mean I didn't see it when I worked

3     there, but I don't recall seeing it.

4     Q.   Would you turn to Pages 10 and 11 of this chart.

5     Do you recognize this section on Pages 10 and 11 that

6     reads "ADOA Analysis"?

7     A.   This looks like a format I would have put

8     together.  I may have done this one.

9     Q.   Do you know whether or not you put this ADOA

10    analysis section together?

11    A.   I feel like it was me that did this.  It's been a

12    long time.  I've done a lot of spreadsheets.

13    Q.   If you could turn to Tab 5.  This has been marked

14    as Sharritts Exhibit 5 and the Bates reads AZSTATE.006152.

15    A.   Yes.

16    Q.   Ms. Sharritts, this is an email that you sent to

17    Marie Isaacson, copying Michael Meisner.  Subject

18    "Transgender Coverage," that attaches what looks to be an

19    Excel sheet labeled "Transgender Coverage Analysis."

20              Do you see that?

21    A.   Yes.

22    Q.   And if you flip to that attachment behind the

23    blue slip sheet do you see --

24    A.   That was mine.

25    Q.   -- do you see what appears to be the same chart

74

1    that was on Pages 10 and 11 of Sharritts 28, the document
2    we previously looked at?
3        A.   Yes.
4        Q.   Does this look to be your work?
5        A.   Yes.  If that's what was attached to this, that
6    is my work.
7        Q.   Does this look similar to Pages 10 and 11 of the
8    Sharritts 28 chart that we previously looked at?
9        A.   Yes.
10       Q.   If you flip the page you'll see -- Now, in the
11   Excel this is labeled, quote, summary of research.  It's a
12   separate tab and it starts [as read]:  From the sources
13   quickly available on the internet, most studies --
14              Do you see that?
15       A.   Yes.  I do see that.
16       Q.   And the rest of that sentence is [as read]:  Most
17   studies find that utilization and cost of covering
18   transgender hormones, surgery, medication, and/or mental
19   health have an immaterial impact on health plans.  Is that
20   right?
21       A.   Correct.
22       Q.   Did you write this summary of research?
23       A.   Yes.  This was my research that I did.
24       Q.   Do you remember sending this research to Marie
25   Isaacson and Michael Meisner?

1      A.    Yes.

2      Q.    In the bottom of the summary it states that [as

3   read]:  Utilization estimates range from one to 11 claims

4   per year.

5            Do you see that?

6      A.    Yes.

7      Q.    Do you remember how you came to that conclusion?

8      A.    I would have to say it's probably in the detail

9   that was in here at the time, (indecipherable) research.

10            THE COURT REPORTER:  I'm sorry, at the time

11   something research?

12            THE WITNESS:  Based on the research.

13            I'd have to go back through all my research

14   to know where exactly I pulled that from.

15      Q.    BY MS. SHEETS:  So I'll give you a minute to look

16   back through this summary of research.  Just give it a --

17   a read and see if you remember what research led you to

18   these conclusions.

19      A.    So it looks like I got the one to seven claims

20   per year from the San Francisco data.  And at the

21   University of California there was an estimated 11 claims,

22   so that's probably where I got the one through 11.  That

23   was the minimum and the maximum that I had found.

24      Q.    How could you be sure that the estimates from

25   San Francisco and University of California would be

90

1      A.    Yes.

2      Q.    And do you remember what the conclusion was on

3   the first question of whether or not the ADOA was required

4   to cover transgender benefits?

5      A.    I believe from the documents that we looked at

6   today that Mercer had come back and said that there was

7   not a -- it did not fall under the -- the -- Can't think

8   of the word.  That we weren't required to.  That it wasn't

9   legally required.  That we weren't being discriminatory by

10  not covering it, therefore there wasn't a requirement to

11  have to.  Things evolved I think, as we saw from that

12  email that Marie sent, that HCC or HHS was trying to push

13  that that law was clarifying that it was discriminatory.

14  I think at the end of the day it was resolved that it was

15  a grey area and no one really had a clear answer on yes or

16  no.  And we believed, since others were not, it wasn't

17  something that was a clear black-and-white we had to do

18  it.

19     Q.    You say others were not.  Do you mean other state

20  plans were not covering transgender benefits?

21     A.    Correct.  There were state plans out there not

22  covering it.

23     Q.    Did Ms. Isaacson -- Let me rephrase.

24           In approaching this analysis where the first

25  question was, are we required to cover this or not, is

Kelly Sharritts - 04/22/2021

91

1  that approach unique to this exclusion?

2      A.    No.  Only in the sense that when other things

3  would come up, like dental plans and seeing your dentist

4  every six months, are you required to have that coverage

5  or not, it was more of what's required in the standard

6  treatment in the field.  And we would get that advice from

7  UHC and Aetna and Blue Cross and the other health plans

8  and their physicians on what was typically required and

9  should be done and we should be doing.  This was more

10  specific to is it discriminatory to not.  And so, what is

11  our legal obligation on the discrimination front on

12  whether it's required for discrimination purposes?

13      Q.    And when you say this decision on whether or not

14  to maintain the exclusion was more specific to whether it

15  was discriminatory or not, was that a unique approach in

16  deciding coverage?

17      A.    Yes.  In my time there.

18      Q.    And why do you think there was such emphasis on

19  approaching this exclusion with the question of whether

20  ADOA was required to cover these benefits?

21      A.    Because it was such a grey area and had such a --

22  I mean, it was a big topic in society at the time and it

23  was a big change to things.  That before we just changed

24  something in the State plan and State tax dollars we

25  wanted to make sure it was fully understood and vetted.

92

1    And we wanted to make sure we weren't doing something

2    wrong in the plan and discriminating.  If we were, it was

3    an immediate we have to fix it and change it.  If we

4    weren't being discriminatory, then it was more of a

5    discussion on do we feel like it should be covered or not.

6        Q.   When you say that the reason this approach of

7    figuring out what the ADOA was required to cover was

8    because this was a big topic in society at the time, what

9    do you mean by that?

10       A.   It was becoming -- I guess the topic itself with

11   gay marriage and gay rights and transgenders was something

12   that was evolving in society at the time and was becoming

13   much more comfortable and much more commonplace than it

14   had historically.  And so it was trying to understand

15   something that personally I don't understand because I

16   don't have those experiences to empathize and understand.

17   I do on dental work, so I can empathize and understand on

18   those things.  So it was more of trying to really

19   understand what was out there and learning about it and

20   educating ourselves on it.

21              I think the world --

22       Q.   I think --

23              Go ahead.

24              THE COURT REPORTER:  I'm sorry?

25              THE WITNESS:  The world -- the world was

97

1      A.   I would say Michael's approach to most of his

2  analysis, in my opinion, were always kind of extreme.  And

3  so -- or -- I'm trying to think how to say it.

4           He liked to pull the data that supported

5  his -- his case.  He's an actuary who can pull stats.

6  And -- and you can make stats anything you want them to

7  be.  And in any analysis, not just this one, I think he

8  definitely liked to prove himself correct in his

9  viewpoints.

10     Q.   You say that Mr. Meisner would pull stats to help

11 his case.  In this scenario what did you take his overall

12 case to be on transgender benefits?

13     A.   I believe, and I think it was just a -- a gut

14 opinion of his, that it would be too costly to the plan

15 and it shouldn't be covered.  My analysis showed

16 otherwise, and so he really wanted to show that it was

17 going to be too costly.

18     Q.   And when Mr. Meisner first raised this idea that

19 it would be too costly to the plan to cover transgender

20 benefits, was that before he had gone back and done

21 actuarial analysis?

22     A.   I don't know.  I honestly can't remember the

23 timing.  I just -- from the mush of time and my

24 recollection of this, that was the sense I got, that he

25 just felt it was going to be and so he -- I think that's

98

1  why he leaned on the UHC study.  Because that supported

2  him in the fact that it would be really expensive and

3  support in the fact that we should be very, very

4  conservative in the cost analysis just to make sure we

5  were covering ourselves.

6     Q.  Did Michael Meisner have a personal view

7  unrelated to cost on whether transgender benefits should

8  be covered by the ADOA?

9           MR. CURTIS:  Objection; form of the

10  question.

11           You can answer.

12           MS. SHEETS:  You can answer.

13           THE WITNESS:  I honestly don't recall what

14  his personal opinion on it is.  If it was said, I don't

15  remember.

16     Q.  BY MS. SHEETS:  To be clear, you don't remember

17  Michael Meisner making any statements about his opinion on

18  whether transgender benefits should be covered generally?

19     A.  I don't remember if he did.  He may have.  I

20  don't recall it.  I -- I couldn't quote to say that he

21  did.

22     Q.  Did you have the impression that he wanted

23  transgender benefits to be covered under the plan?

24     A.  I got the impression that it was not something

25  that was felt to be necessary in the plan.

114

1    wrong, that the ADOA decided this was a grey area and then

2    moved on to the second question.  So taking aside whether

3    or not they were legally required to cover these benefits,

4    the ADOA considered, as you stated, do we want to?  Should

5    we or should we not cover the benefits?  And I want to be

6    clear that that's the portion of the analysis that we're

7    talking about now.

8              So in that second part of the analysis, so

9    put aside whether or not it was legally required, what

10   factors were considered by the ADOA?

11       A.   I would say costs and what the trend of other

12   states and public sectors were.

13       Q.   Ms. Sharritts, were you -- do you remember

14   discussion about coverage of 3D mammography while you were

15   at the ADOA?

16       A.   I have a vague recollection -- recollection.  I

17   can't say that word.  I have a vague memory of that.

18       Q.   And do you remember that the ADOA decided to

19   cover 3D mammography?

20       A.   I believe so, yes.

21       Q.   Do you remember that -- There was no legal

22   requirement to cover 3D mammography; right?

23       A.   Correct.

24       Q.   So the ADOA's approach to deciding whether or not

25   it would cover 3D mammography is different from the

123

1    defined response.  And over time we all came to accept it

2    and -- and to cover those things.

3            That's -- I feel like transgender benefits

4    are going to do the same thing.  It's just something new

5    and unknown to a large population of people and it's going

6    to take time for that to evolve to become generally

7    accepted.

8        Q.   We talked about the perception of others

9    generally in society.  And now I want to talk about the

10   perception of those people who you were working with at

11   the ADOA at the time this decision was made.

12           You were working with Marie Isaacson; is

13   that right?

14       A.   Yes.

15       Q.   Do you remember any conversations with Marie

16   Isaacson in which she expressed her personal opinion on

17   whether it was necessary to cover transgender benefits in

18   her view?

19       A.   I don't believe I ever got her personal opinion

20   on the topic.

21       Q.   Do you remember a conversation with Marie

22   Isaacson that Michael Meisner would have been present for

23   in your office when Marie Isaacson popped her head in and

24   then you told her your view of the ADOA covering

25   transgender benefits?

124

1          MR. CURTIS:  Objection; form of the
2     question.

3          MS. SHEETS:  You can answer.

4          THE WITNESS:  I don't specifically recall
5     that.  But I also know I am open with my opinion and so I
6     probably would have shared that I thought the cost was
7     minuscule and it doesn't seem like there's an obvious
8     reason not to cover it other than what the State feels on
9     it.

10    Q.   BY MS. SHEETS:  When you say that cost was
11    minuscule, can you say more about that?

12    A.   From my analysis, it was less than a dollar per
13    member for their premium to cover it.  Yes, the cost was a
14    lot, but you have 136,000 members that you can spread that
15    cost around.  It ended up being less than a dollar,
16    potentially pennies, to the plan on a per-person basis.
17    So I didn't feel like that was a driver to make a decision
18    on.

19    Q.   So the cost, as you calculated it, didn't make
20    sense to rely on as a driving factor for why not to cover
21    transgender benefits; is that right?

22    A.   Correct.  And from the other resources, the other
23    states I talked to, most of them said it was a negligible
24    impact to their plan when it came to cost.

25    Q.   What was Marie Isaacson's response to your

169

1   cost factor in that decision and I didn't see why we

2   needed to make a stance on not covering it, when other

3   states had started.  It was, there wasn't really a reason

4   to stop or to not do it.

5       Q.  Why, in your opinion, do you think ADOA decided

6   not to do it?  Not to cover transgender benefits?

7       A.  I don't think they were ready to.

8       Q.  And what do you mean by ready to?

9       A.  Similar -- I think I said before is the state of

10  Arizona has not been on the forefront of any major changes

11  in things.  We tend to follow and watch what other states

12  do first and then we get on board with it.  So I think

13  that's just -- they wanted to see more of an adaption --

14  adoption of this nationwide before Arizona was going to do

15  it.

16      Q.  Would you say that this was more of a political

17  decision on ADOA's part?

18      A.  I don't know how you would define if it was a

19  political decision, so I don't want to say yes to that.  I

20  think it was more of a -- I don't know.  It was just they

21  weren't ready to make that change to the plan.  So I guess

22  that would be political.

23      Q.  So we can define political, but would you say the

24  ADOA saw the decision not to cover or to cover transgender

25  benefits as different from, say, dental benefits, because

170

1  this was more of a hot-topic issue?

2      A.   It was something that was not widely accepted at

3  the time.  Dental benefits are widely accepted.  This was

4  not.  And so they weren't ready to take on something that

5  wasn't widely adopted already.

6      Q.   And the decision of states to adopt something

7  that was not universally accepted is political; right?

8      A.   I could see --

9           MR. CURTIS:  Objection; form of the

10  question.

11           THE WITNESS:  I guess you could say that.

12     Q.   BY MS. SHEETS:  Would you say that?

13           (Brief interruption off the record.)

14           THE WITNESS:  I didn't say that.

15           Yes, I would -- I guess I would agree with

16  that, yes.  It was a -- it was political.

17     Q.   BY MS. SHEETS:  So the ADOA's decision not to

18  cover transgender benefits was a political one?

19     A.   In my personal opinion.

20     Q.   In your personal opinion --

21     A.   Yes.

22     Q.   -- the ADOA's decision not to cover transgender

23  benefits was a political one; right?

24     A.   Yes.

25           MS. SHEETS:  At this point we're going to

184

```
 1      Q.   -- was a headline topic when you were employed by
 2   ADOA; right?
 3      A.   It was -- it potentially could have been a
 4   headline topic.
 5      Q.   It was a sensitive topic; right?
 6      A.   It was definitely a sensitive topic.
 7      Q.   And it was a controversial topic; right?
 8      A.   Absolutely.
 9      Q.   And the reason it was, when you were employed by
10   ADOA, a sensitive and controversial topic is because it
11   was not generally accepted in Arizona whether the coverage
12   of -- whether transgender healthcare benefits are
13   medically necessary or a personal choice.  Is that a fair
14   summary of your testimony earlier?
15      A.   I would say that that is a fair summary, yes.
16      Q.   And because it wasn't generally accepted in
17   Arizona whether transgender healthcare benefits were
18   medically necessary or a personal choice, I -- ADOA was
19   concerned about how it would be perceived if it provided
20   coverage for transgender healthcare benefits; right?
21      A.   Correct.  And I -- I would say the ADOA probably
22   wouldn't have used the word personal choice.  That's my --
23   I don't think it's a personal choice, but it was my
24   abbreviation of the thought.
25      Q.   Sure.  And the thought is the -- What's the
```