# Exhibit 41

Message

| | |
|---|---|
| **From:** | Scott Bender [Scott.Bender@azdoa.gov] |
| **on behalf of** | Scott Bender <Scott.Bender@azdoa.gov> [Scott.Bender@azdoa.gov] |
| **Sent:** | 8/22/2016 4:08:46 PM |
| **To:** | Marie Isaacson [Marie.Isaacson@azdoa.gov]; Elizabeth Schafer [Elizabeth.Schafer@azdoa.gov]; Michael Meisner [Michael.Meisner@azdoa.gov] |
| **Subject:** | FW: Nondiscrimination Section 1557 Gender Transformation Coverage |

Below is final guidance from UHC on their treatment for transgender health services.

**From:** Martin, Stephanie A [mailto:stephanie_martin@uhc.com]
**Sent:** Thursday, August 18, 2016 4:18 PM
**To:** Yvette Medina <Yvette.Medina@azdoa.gov>; Scott Bender <Scott.Bender@azdoa.gov>
**Cc:** Gallegos, Heather K <heather_gallegos@uhc.com>
**Subject:** Nondiscrimination Section 1557 Gender Transformation Coverage

Hi All,

Our organization recently announced how we will be handling the requirements of Section 1557 of the Affordable Care Act (ACA).  As an overview, Section 1557 is the civil rights provision of the Affordable Care Act (ACA) of 2010. Section 1557 prohibits discrimination on the grounds of race, color, national origin, sex, age, or disability in certain health programs and activities.

Protection against sex discrimination include:
- Individuals cannot be denied health care or health coverage based on their sex, including their gender identity and sex stereotyping.
- Women must be treated equally with men in the health care they receive and the insurance they obtain.
- Categorical coverage exclusions or limitations for all health care services related to gender transition are discriminatory.
- Individuals must be treated consistent with their gender identity. Treatment may not be denied or limited for any health services that are ordinarily or exclusively available to individuals of one gender based on the fact that a person seeking such services identifies as belonging to another gender.
- While the recent guidance prohibits broad categorical exclusion of gender transformation, it does not mandate coverage of specific medical services. However, when any benefits are covered, they may not be administered in a discriminatory manner.

I had previously mentioned that I would provide information related to how UnitedHealthcare would be handling our risk-based business (Fully Insured).  That is something that most Self-Funded clients will use as a guideline. However, I also need to advise that for our Self-Funded (ASO) customers it is up to the plan sponsor to consult with your legal department to determine whether or not you are a covered entity under Section 1557 and to review your plan for any changes that may be necessary.

For **fully insured plans**, UnitedHealthcare's 2017 Certificate of Coverage (COC) will include the following benefits and exclusions/limitations. Standard benefits for the treatment of gender dysphoria are limited to the following services when clinical criteria for eligibility are met:
- **Psychotherapy** and mental health services for gender dysphoria and associated co-morbid psychiatric diagnoses.
- **Certain drug therapies, including cross-sex hormone therapy,** administered by a medical provider during an office visit or dispensed from a pharmacy.
  o **Puberty suppressing medications** for treatment of gender dysphoria, such as Lupron and Supprelin® LA, which are administered in the physician's office, have been added under the medical benefit.
- **Laboratory testing** to monitor the safety of continuous cross-sex hormone therapy.
- **Specified surgeries** including genital surgery for the treatment of gender dysphoria and breast surgery including bilateral mastectomies and breast reduction.
- **The exclusion for gender transformation surgery has been removed.**

Specific documentation and written psychological assessments from one or more qualified behavioral health providers experienced in treating gender dysphoria are required prior to approval for a bilateral mastectomy, breast reduction surgery or genital surgery.

Exclusions and limitations include surgeries and/or related services that are considered cosmetic, unproven and not medically necessary.

I am providing you with the Material Modification Update (MMU)/ Summary of Material Modifications that we are providing to our Self-Funded customers wishing to adopt UnitedHealthcare's standard benefit coverage. It's important to note that UnitedHealthcare's standard coverage aligns with scientifically-based clinical evidence and WPATH guidelines. WPATH is the **World Professional**

AZSTATE.005664

AZSTATE.005664

**Association for Transgender Health.**  We can also support your custom program requests as well and they are identified in the sample MMU as Plan Design Variable.  Keep in mind this includes Rx language which may fall under your PBM contract for medications dispensed by the pharmacy.

**Expected costs from our actuaries are as follows:**
Medical coverage
$.09 per member per month (PMPM) / Based on UHC covered lives: Approximately $86K per year.

Let me know if you have any questions.

Thanks,
Stephanie

**Stephanie A. Martin**
Strategic Client Executive, Client Management
UnitedHealthcare National Accounts
1 E. Washington St., Suite 1700, AZ009-17TE, Phoenix, AZ 85004
(w) 602-255-8497 (m) 602-770-4711
stephanie_martin@uhc.com

**Helping People Live Healthier Lives**®
■ Integrity ■ Compassion ■ Relationships ■ Innovation ■ Performance

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

## UnitedHealthcare Material Modification Updates
## January 2017 - Gender Dysphoria

Your Summary Plan Description is the core of the benefit plan informing participants as to what is and is not considered a covered treatment or service under your plan. This Summary of Material Modification (SMM) will serve as a resource to you in preparing and updating benefit plan information. Please take the time to think about adding applicable clarifications to your Summary Plan Description. This information is not intended nor should it be construed as legal advice. Consult your own legal counsel for advice on your Plan and the proper timing for notice of material modifications, including material reductions in benefits, to plan members.

Identified in the attached SMM is sample language from UnitedHealthcare's most current product templates. If not stated, the language below applies to all standard products. Disregard bracketed text for treatments, services and programs that do NOT pertain to your plan designs.

### What is in this SMM?

This SMM provides model language describing Benefits for the treatment of Gender Dysphoria consistent with UnitedHealthcare Coverage Determination Guidelines. Plans may cover, or exclude, surgical or non-surgical treatment for gender dysphoria. Note: Plan specific benefits may differ greatly from the standard benefit plan provided in this SMM.

This model language is provided for informational purposes. It does not constitute medical advice.

AZSTATE.005666

AZSTATE.005666

January 2017 SMM Gender Dysphoria

# SUMMARY OF MATERIAL MODIFICATIONS
## To the Summary Plan Description for [ERISA Plan Name]
Plan change effective on: [effective date of this SMM]
Group Number: [XX]

A Summary Plan Description (SPD) was published effective [date of Summary Plan Description to be amended]. The following are modifications and clarifications that are effective [effective date of amendment]. These modifications and clarifications are intended as a summary to supplement the SPD. It is important that you keep this summary with your SPD since this material plus the SPD is your complete SPD.

**In the event of any discrepancy between this Summary of Material Modifications (SMM) and the SPD, the provisions of this SMM shall govern.**

**A. This SMM provides Benefits for the treatment of Gender Dysphoria. Certain capitalized words have special meanings. [UnitedHealthcare][The Claims Administrator] has defined these words in the Summary Plan Description (SPD) in Section 14, Glossary and in this SMM below. The words "you" and "your" are referring to people who are Covered Persons, as the term is defined in the SPD in Section 14, Glossary.**

## SECTION 5 - PLAN HIGHLIGHTS

**B. The provision below for Gender Dysphoria is added to the Schedule of Benefits [and replaces Treatment of Gender Dysphoria in its entirety]:**

### Schedule of Benefits

| Covered Health Services | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | **Network** | **Non-Network** |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits*[.][ and in Section 15, *Outpatient Prescription Drugs*.] [ and in [Carve-out RX | [Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* [.][ and in Section 15, *Outpatient Prescription Drugs*.] [ and in [Carve-out |

AZSTATE.005667

AZSTATE.005666

January 2017 SMM Gender Dysphoria

| Covered Health Services | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | Network | Non-Network |
| | Plan name variable.] | RX Plan name variable.] ] [Non-Network Benefits are not available] ] |

| Covered Health Services | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* |
|---|---|
| | Network |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category the *Schedule of Benefits* [.][ and in Section 15, *Outpatient Prescription Drugs*.] [ and in [Carve-out RX Plan name variable.] |

## SECTION 6 - ADDITIONAL COVERAGE DETAILS

**C.  The following provision is added to the SPD, Section 6, Additional Coverage Details, as a Covered Health Service [and replaces Treatment of Gender Identity Disorder/Dysphoria in its entirety]:**

### Gender Dysphoria

Benefits for the treatment of Gender Dysphoria limited to the following services:

Plan Design Variable for ASO

- [Psychotherapy for Gender Dysphoria and associated co-morbid psychiatric diagnoses are provided as described under *Mental Health Services* in your SPD].

- Cross-sex hormone therapy:
  - Cross-sex hormone therapy administered by a medical provider [(for example during an office visit) is provided as described under *Pharmaceutical Products – Outpatient* in your SPD].

Plan Design Variable for ASO

  - [Cross-sex hormone therapy dispensed from a pharmacy is provided as described under [Section 15, *Outpatient Prescription Drugs*.][Carve-out RX Plan Name Variable.]]

2

AZSTATE.005668

AZSTATE.005666

January 2017 SMM Gender Dysphoria

- Puberty suppressing medication injected or implanted by a medical provider in a clinical setting.

- Laboratory testing to monitor the safety of continuous cross-sex hormone therapy.

- [Surgery for the treatment for Gender Dysphoria, including the surgeries listed below:

    *Male to Female:*

    - Clitoroplasty (creation of clitoris)

    - Labiaplasty (creation of labia)

    - Orchiectomy (removal of testicles)

    - Penectomy (removal of penis)

    - Urethroplasty (reconstruction of female urethra)

    - Vaginoplasty (creation of vagina)

    *Female to Male:*

    - Bilateral mastectomy or breast reduction

    - Hysterectomy (removal of uterus)

    - Metoidioplasty (creation of penis, using clitoris)

    - Penile prosthesis

    - Phalloplasty (creation of penis)

    - Salpingo-oophorectomy (removal of fallopian tubes and ovaries)

    - Scrotoplasty (creation of scrotum)

    - Testicular prosthesis

    - Urethroplasty (reconstruction of male urethra)

    - Vaginectomy (removal of vagina)

    - Vulvectomy (removal of vulva)]

Plan Design Variable for ASO

**[Genital Surgery and Bilateral Mastectomy or Breast Reduction Surgery Documentation Requirements:**

The Covered Person must provide documentation of the following for breast surgery:

- A written psychological assessment from at least one qualified behavioral health provider experienced in treating Gender Dysphoria. The assessment must document that the Covered Person meets all of the following criteria:

    - Persistent, well-documented Gender Dysphoria.

    - Capacity to make a fully informed decision and to consent for treatment.

    - Must be 18 years or older.

3

AZSTATE.005669

AZSTATE.005666

January 2017 SMM Gender Dysphoria

- If significant medical or mental health concerns are present, they must be reasonably well controlled.

The Covered Person must provide documentation of the following for genital surgery:

- A written psychological assessment from at least two qualified behavioral health providers experienced in treating Gender Dysphoria, who have independently assessed the Covered Person. The assessment must document that the Covered Person meets all of the following criteria.

  - Persistent, well-documented Gender Dysphoria.

  - Capacity to make a fully informed decision and to consent for treatment.

  - Must 18 years or older.

  - If significant medical or mental health concerns are present, they must be reasonably well controlled.

  - Complete at least 12 months of successful continuous full-time real-life experience in the desired gender.

  - Complete 12 months of continuous cross-sex hormone therapy appropriate for the desired gender (unless medically contraindicated).]

Plan Design Variable for ASO. The following bullet contains language to satisfy a portion of the Corporate Equality Index (CEI) survey.

- [The treatment plan is based on identifiable external sources including the *World Professional Association for Transgender Health (WPATH)* standards, and/or evidence-based professional society guidance.]


## SECTION 8 – EXCLUSIONS AND LIMITATIONS: WHAT THE MEDICAL PLAN WILL NOT COVER

**D.  The exclusion for sex transformation operations and related services in the SPD under Section 8, Exclusions and Limitations, Procedures and Treatments is deleted. In addition, the following exclusions apply:**

Plan Design Variable for ASO.

- [Cosmetic Procedures, including the following:

  - [Abdominoplasty.]

  - [Blepharoplasty.]

  - [Breast enlargement, including augmentation mammoplasty and breast implants.]

  - [Body contouring, such as lipoplasty.]

  - [Brow lift.]

  - [Calf implants.]

  - [Cheek, chin, and nose implants.]

  - [Injection of fillers or neurotoxins.]

4

January 2017 SMM Gender Dysphoria

- [Face lift, forehead lift, or neck tightening.]

- [Facial bone remodeling for facial feminizations.]

- [Hair removal.]

- [Hair transplantation.]

- [Lip augmentation.]

- [Lip reduction.]

- [Liposuction.]

- [Mastopexy.]

- [Pectoral implants for chest masculinization.]

- [Rhinoplasty.]

- [Skin resurfacing.]

- [Thyroid cartilage reduction; reduction thyroid chondroplasty; trachea shave (removal or reduction of the Adam's Apple).]

- [Voice modification surgery.]

- [Voice lessons and voice therapy.] **]**

## SECTION 14 – GLOSSARY

### E.  *The following definition of Gender Dysphoria is added to the SPD under Section 14, Glossary[:][and replaces Gender Identity Disorder:]*

**Gender Dysphoria** - A disorder characterized by the following diagnostic criteria classified in the current edition of the *Diagnostic and Statistical Manual of the American Psychiatric Association*:

■  *Diagnostic criteria for adults and adolescents:*

-  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:

♦  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

♦  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

♦  A strong desire for the primary and/or secondary sex characteristics of the other gender.

♦  A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5

AZSTATE.005671

AZSTATE.005666

January 2017 SMM Gender Dysphoria

- ♦ A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
- ♦ A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
- The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

■ *Diagnostic criteria for children:*
- A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least six of the following (one of which must be criterion as shown in the first bullet below):
  - ♦ A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).
  - ♦ In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.
  - ♦ A strong preference for cross-gender roles in make-believe play or fantasy play.
  - ♦ A strong preference for the toys, games or activities stereotypically used or engaged in by the other gender.
  - ♦ A strong preference for playmates of the other gender.
  - ♦ In boys (assigned gender), a strong rejection of typically masculine toys, games and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games and activities.
  - ♦ A strong dislike of ones' sexual anatomy.
  - ♦ A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

■ The condition is associated with clinically significant distress or impairment in social, school or other important areas of functioning.

[UnitedDocID] DRAFT SET X – MM/DD/YEAR

6

AZSTATE.005672

AZSTATE.005666

Exhibit 42

Message

| | |
|---|---|
| **From:** | Elliott, Noel [Noel.Elliott@azblue.com] |
| on behalf of | Elliott, Noel <Noel.Elliott@azblue.com> [Noel.Elliott@azblue.com] |
| **Sent:** | 9/15/2016 3:31:35 PM |
| **To:** | 'Scott Bender' [Scott.Bender@azdoa.gov] |
| **CC:** | Muth, Ken [Ken.Muth@azblue.com]; Tucker, Sharon [Sharon.Tucker@azblue.com] |
| **Subject:** | RE: Transgender benefits |

Hi Scott,

I reached out to our legal department and here is their response:

It is important for self-insured employer groups to consult their legal counsel to determine if they are a covered entity under the Section 1557 non-discrimination provisions and, if so, to review the plan coverage to determine if changes are necessary.  Beginning in Jan. 2017, the standard options BCBSAZ administers for self-insured employer group plans will not contain blanket exclusions for transgender surgery and medications related to transition.  These services, as with all services, are reviewed against applicable medical necessity criteria.

Thanks!
Noel Elliott
Supervisor, Client Implementation Management
Blue Cross® Blue Shield® of Arizona
(602) 864-4555  |  cell: (480) 215-0266
noel.elliott@azblue.com

---

**From:** Scott Bender [mailto:Scott.Bender@azdoa.gov]
**Sent:** Tuesday, September 13, 2016 5:05 PM
**To:** Elliott, Noel
**Subject:** Transgender benefits

**\*\*We're keeping security a top priority. Review this email carefully before responding or opening attachments\*\***

Hi Noel, I believe you were working with Elizabeth Schafer on the transgender benefits question and whether ADOA would have to cover the benefit if 1557 became effective or if we had flexibility as a self insured plan.  Attached is proposed language you had sent to her last year, and below is a summary of the correspondence on the topic:



Proposed Language
Changes 10 30 15 - F

We are presently analyzing the current proposed regulations

11.10.15
attached you will find a redline of the language changes BCBSAZ is proposing to make to our benefit plans to take into account the latest round of Q&As.  This does not take into account if the government finalizes the proposed non-

AZSTATE.009634

AZSTATE.009634

discrimination regulations to require coverage of transgender transition surgery and related services. This proposed language is still being reviewed but should give the ADOA some idea of the changes we are making to both insured and self-funded group plans.



Proposed Language
Changes 10 30 15 - F

That said, if the ADOA determines that the current exclusion will stand, BCBSAZ can continue to administer the exclusion & we ask that the final decision be provided to us in writing.

1.11.16
As the final regulations have not yet been issued, I wanted to pass along an update as to the direction BCBSAZ will take in regard to the proposed rule on Section 1557 of the ACA .... BCBSAZ has made a decision to remove all gender edits for preventive services in its insured individual and small group non-grandfathered products for 2016.   In addition, those products will continue to exclude transgender surgery and medications pending final regulations but will no longer exclude services related to gender dysphoria (such as counseling for gender dysphoria).

Generally speaking, some self-funded clients choose to adopt the changes being made to the BCBSAZ business while other self-funded clients do not.   As the State continues to evaluate the proposed regulations, please let us know if you want to make changes to your benefit plans.

Please let me know if BCBS has any different or additional guidance on this topic now that 1557 has been decided.  This is a heavily scrutinized topic in state leadership and we need to ensure all of our plan administrators' stance and whether we can continue to operate our plan as it is today or if we must adopt the new rules.  If the former, please advise if BCBS can continue to administer our plan as it exists today.

Thanks,
Scott

**Scott Bender**
Plan Administration Manager
ADOA – Benefit Services Division | State of Arizona
100 North 15th Avenue, Suite 260, Phoenix, AZ  85007
p: 602-542-4958 | f: 602-542-4048 | Scott.Bender@azdoa.gov
http://benefitoptions.az.gov/



NOTICE: This e-mail and any attachments to it may contain information that is PRIVILEGED and CONFIDENTIAL under State and Federal law and is intended only for the use of the specific individual(s) to whom it is addressed. This information may only be used or disclosed in accordance with law, and you may be subject to penalties under law for improper use or further disclosure of the information in this e-mail and its attachments. If you have received this e-mail in error, please immediately notify the person named above by reply e-mail, and then delete the one you received.

The information in this email message is confidential and for the sole use of the intended recipient. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this information is strictly prohibited. If you received this communication in error, please notify the sender

AZSTATE.009635

AZSTATE.009634

immediately. Blue Cross and Blue Shield of Arizona, Inc. and its subsidiaries and affiliates are not responsible for errors, omissions or personal comments in this email message.

AZSTATE.009636

AZSTATE.009634

# Exhibit 43

Message

| | |
|---|---|
| **From**: | Yvette Medina [Yvette.Medina@azdoa.gov] |
| on behalf of | Yvette Medina <Yvette.Medina@azdoa.gov> [Yvette.Medina@azdoa.gov] |
| **Sent**: | 12/8/2016 1:41:48 PM |
| **To**: | Emmons, Erica 654 [Erica.Emmons@Cigna.com]; Scott Bender [Scott.Bender@azdoa.gov] |
| **CC**: | Gillum, Alicia M HHHH [Alicia.Gillum@Cigna.com] |
| **Subject**: | RE: Transgender benefits |

Erica,
We will be covering the counseling and hormonal therapy but not the surgery.

**From:** Emmons, Erica 654 [mailto:Erica.Emmons@Cigna.com]
**Sent:** Monday, October 17, 2016 2:26 PM
**To:** Scott Bender <Scott.Bender@azdoa.gov>; Yvette Medina <Yvette.Medina@azdoa.gov>
**Cc:** Gillum, Alicia M HHHH <Alicia.Gillum@Cigna.com>
**Subject:** Transgender benefits

Hi Scott and Yvette –
Has ADOA decided whether transgender benefits will be covered under your plans beginning 1/1/17? My last notes were that this was a pending item. We are in need of confirmation as soon as possible in order to get our systems set up correctly.

I wanted to provide you an update to Cigna's stance on this topic. Beginning 1/1/17, all insured AND self-insured plans will remove the exclusion for transgender benefits to comply with Section 1557. Self-insured plans may provide in writing to Cigna their decision to not remove the exclusion from the plan. In the case that confirmation is provided in writing, Cigna will administer the plans with those benefits excluded.

Please let me know where this stands for your plans.

Thanks!

**Erica Emmons** | Strategic Account Executive | Government and Education | Cigna | 5310 East High Street, Suite 200 | Phoenix, AZ 85054 | Direct: 480.426.6761 | Mobile: 480.622.0899 | erica.emmons@cigna.com



*Confidential, unpublished property of Cigna. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel. © Copyright 2016 Cigna.*

---------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information. This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly.  Please delete it from your files if you are not the intended recipient.  Thank you for your compliance.  Copyright (c) 2016 Cigna
================================================================================

Exhibit 44

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                    DISTRICT OF ARIZONA
 3
       RUSSELL B. TOOMEY,
 4
             Plaintiff,
 5
       v.
 6
       STATE OF ARIZONA; ARIZONA BOARD
 7     OF REGENTS, D/B/A UNIVERSITY OF
       ARIZONA, a governmental body of
 8     the State of Arizona; RON             Cause No.
       SHOOPMAN,in his official
 9     capacity as chair of the Arizona     No.
       Board Of Regents; LARRY PENLEY,
10     in his official capacity as          4:19-cv-00035
       Member of the Arizona Board of
11     Regents; RAM KRISHNA, in his
       official capacity as Secretary
12     of the Arizona Board of Regents;
       BILL RIDENOUR,in his official
13     capacity as Treasurer of the
       Arizona Board of Regents; LYNDEL
14     MANSON, in her official capacity
       as Member of the Arizona Board
15     of Regents; KARRIN TAYLOR
       ROBSON, in her official capacity
16     as Member of the Arizona Board
       of Regents; JAY HEILER, in his
17     official capacity as Member of
       the Arizona Board of Regents;
18     FRED DUVAL, in his official
       capacity as Member of the
19     Arizona Board of Regents; ANDY
       TOBIN, in his official capacity
20     as Director of the Arizona
       Department of Administration;
21     PAUL SHANNON, in his official
       capacity as Acting Assistant
22     Director of the Benefit Services
       Division of the Arizona
23     Department of Administration,
24                  Defendants.
25
```

Page 2

1

2

3

4

5

6

7

8

9          VIDEOTAPED VIDEOCONFERENCE DEPOSITION

10               OF CRAIG BROWN

11

12     BE IT REMEMBERED, the Deposition Under Oath of CRAIG

13  BROWN was taken by MR. JORDAN C. WALL, Attorney at Law,

14  for the Plaintiff, at the offices of Hazlett Reporting &

15  Legal Video Services at 140 Second Avenue West, Suite B,

16  Kalispell, Montana, on Tuesday, June 22, 2021, beginning

17  at the hour of 9:35 A.M.  Reported by Stacy M. Baldwin,

18  Registered Merit Reporter and Notary Public.

19

20

21

22

23

24

25

Page 88

1    that.  But in this one it's clearly Marie Isaacson and

2    the plan sponsor.

3         Q   Mr. Brown, what do you understand the Benefit

4    Services Division of the ADOA's obligations under the

5    plan to be as plan sponsor?

6         A   Well, I think we talked about that already,

7    which was to take the plan benefits as designed, get

8    suppliers to make available that capability, the

9    insurance providers, set the rate for which employees

10   need to donate at and then fill the gap with the JLBC's

11   legislative bucket to make the plan work.  And then

12   monitor, collect payments and all of the above.  Right?

13   So, those are the things that got to come together.

14        Q   Do you understand that, as the Benefit Services

15   Division, the ADOA's responsibility as plan sponsor to --

16   among the responsibilities include establishing the

17   policies, interpretations, practices and procedures of

18   this plan and issuing interpretations thereof?

19        A   I guess that would be part of the scope too,

20   yes.

21        Q   And so, just to be clear, you agree that would

22   be part of the work of the Benefit Services Division as

23   plan sponsor of the plan?

24        A   Specifically restating those set policy -- what

25   other elements did you say?

1      Q    Establishing the policies, interpretations,

2   practices and procedures of this plan, issuing

3   interpretations thereof.

4      A    Yes.

5      Q    Would that --

6      A    I don't know about the interpretations thereof.

7   But, yes, the policy and that would be part of their role

8   to do that as well.

9      Q    Would turn to Page 75 of this document, Exhibit

10   2 that we're in, ending in Bates No. 010169.

11      A    Got it.

12      Q    And I'm looking -- and this is Article 13,

13   Administration.  I'm looking under Section 13.1, Plan

14   Sponsor's Responsibilities, and specifically Item 2.  Do

15   you see that?

16      A    Yes.

17      Q    Do you see that it states that among the plan

18   sponsor's responsibilities are "establishing the

19   policies, interpretations, practices and procedures of

20   this plan and issuing interpretations thereof"?

21      A    Yes.

22      Q    And do you have any reason to doubt that the

23   Benefit Services Division of the ADOA as plan sponsor,

24   that that was among its responsibilities?

25      A    I think this makes it clear it's part of their

Page 90

```
 1   responsibility.

 2       Q    And also I'm looking -- and would that include,

 3   then, decisions on whether to maintain or remove a plan's

 4   exclusion?

 5       A    I suppose so.

 6       Q    When you say "suppose so," are you agreeing,

 7   Mr. Brown, or do you have reason to doubt that?

 8       A    Well, I don't know if -- I mean, I think legal

 9   needs to be part of -- I mean, the Benefit Services can't

10   just make up all the rules and what they want to do.  I

11   think they also have some rule and law boundaries that

12   have been put around their role, and legal would have

13   need to buy off on that kind of stuff.

14            So, they don't have cart blanche to do whatever

15   they want, if it's written in the rules otherwise.  I

16   haven't seen the rules.  I'm just saying they don't --

17   they have limits around what they can do, perhaps, is

18   what I'm saying.

19       Q    What rules are you referring to, Mr. Brown?

20       A    No specific rule.  I know that each division

21   would have rules about what is required for them to

22   execute their performance of their role.

23       Q    Would these rules be written down anywhere?

24       A    Should be.  I don't know where they would be.

25       Q    Have you ever seen these rules for the Benefit
```

1            THE WITNESS:  There that's better.  Yes.

2    BY MR. WALL:

3        Q    Great.  So, as you can see here, this is

4    Article 9 of the 2015 EPO Plan document, Exclusions and

5    General Limitations.  And in particular, I'm reading that

6    very first section, 9.1; Exclusions and General

7    Limitations, which reads:  "Any services and supplies

8    which for not described as covered or are specifically

9    excluded in any other Article in this plan description

10   are excluded.  In addition, the following are

11   specifically excluded services and supplies."

12           Do you see that?

13       A    Yes.

14       Q    And do you see what follows is a numbered list?

15       A    Yes.

16       Q    All right.  We're going to go back to Page 69,

17   and look at number, what is 16, on this list.

18           So, I'm reading at exclusion No. 16, in the

19   2015 EPO Plan document:  "Transsexual surgery including

20   medical or psychological counseling and hormonal therapy

21   in preparation for, or subsequent, to any such surgery."

22           Did I read that accurately?

23       A    Yes.

24       Q    Does this language in exclusion 16, comport

25   with your understanding of the plan's exclusion of

Page 157

1    transgender benefits in 2015, when you began as the

2    director of ADOA?

3        A    I didn't have any conversation or knowledge of

4    this topic in 2015, when I started at DOA.  My first

5    introduction was in the introduction of the claim from

6    Marie, more mid 2016, where she talked about these three

7    terms.  The first time I'd known that this was an issue

8    within the state.

9        Q    So to clarify, Mr. Brown, you didn't know about

10   this exclusion when you started as director in

11   September 2015 --

12       A    Correct.

13       Q    -- correct?

14       A    Yes, correct.

15       Q    But at some point in 2016, you spoke with

16   Ms. Isaacson and she informed you that the plan contained

17   this exclusion, correct?

18       A    Yes.

19       Q    All right.  So, for purposes of our

20   conversation, when I refer to transgender benefits going

21   forward, I'm going to be referring to this particular

22   definition or variations thereof, as we'll see in later

23   plan documents.  Okay?

24       A    Okay.

25       Q    Now, do you recall, Mr. Brown, whether this

Case 4:19-cv-00035-RM-LAB   Document 323-2   Filed 10/26/22   Page 25 of 87

Page 227

1      Q   Is this your first time learning that someone

2   at the ADOA did an analysis of the potential cost of

3   covering transgender benefits, such as this, and with

4   these results?

5      A   Yes.

6      Q   Would you consider an average annual cost of

7   $130,000 to $582,000, or .02 percent to .08 percent, of

8   the then 71 million estimated medical cost to the plan to

9   be significant?

10     A   From a raw cost standpoint, that is not a

11   significant increase.

12     Q   And would you consider the $0.17 to $0.77

13   increase in cost per month, per employee, to be

14   significant?

15     A   No.

16          MR. WALL:  Would you, Mr. Villa, now open

17   up what is labelled Tab 37B, in the electronic record

18   circulated before the deposition.

19          (Whereupon, Mr. Villa complied

20           with the request.)

21          MR. WALL:  And I would ask the Madame

22   Reporter to mark this down at Exhibit 14.

23          (Exhibit 14 marked for identification.)

24          MR. WALL:  And I will represent that the

25   Bates Number for this document, although it's not stamped

Veritext Legal Solutions

212-267-6868                    www.veritext.com                    516-608-2400

Exhibit 45



Exhibit 46

**Date:** Monday, November 18 2019 02:40 AM

**Subject:** 1 Year After Sex Change, This Teen Regrets His 'Frankenstein Hack Job'

**From:** The Daily Signal <morningbell@heritage.org>

**To:** ccorieri@az.gov;

Nov 18, 2019

*Good morning from Washington, where House Democrats' impeachment hearings continue tomorrow. Among Republicans insisting on fairness to President Trump is a new face on the Intelligence Committee: Rep. Jim Jordan. We tell why he bears watching. On the podcast, a Texas pastor talks about why many young Americans don't need to attend college right after high school to succeed. Plus: a web designer is punished for her views on*

AZ_GOV_00000022
AZ_GOV_OFFICE_00000004

*marriage, some in Congress want to revive ideologically motivated science at the EPA, and one teen's transgender nightmare. On this date in 1863, President Abraham Lincoln takes a train to Gettysburg, Pennsylvania, to deliver a short speech that lives on.*

COMMENTARY

## 1 Year After Sex Change, This Teen Regrets His 'Frankenstein Hack Job



**By Walt Heyer**
Less than a year after having gender surgery, Nathaniel now says, "This whole thing was a bad idea. I am 19 years old, and I feel as though I have ruined my life."

More

COMMENTARY

## You'll Be Surprised Who Is Trying to Empower the Deep State at EPA



**By Steve Milloy**
In a nutshell, a bill requires that federal agencies set up formalized grievance procedures for federal scientists who claim they are being silenced by senior bureaucrats and political appointees.

More

NEWS

## 7 Things to Know About Rep. Jim Jordan as He Leads GOP's Defense of Trump



**By Aaron Credeur**
Rep. Jim Jordan is temporarily reassigned to the House committee driving the impeachment process. The Ohio Republican already is questioning witnesses

AZ_GOV_00000023
AZ_GOV_OFFICE_00000004

sharply and voicing his party's frustration with the partisan process.

More

---

COMMENTARY

## This Web Designer Shouldn't Have to Wait to Be Free to Create



**By Joanna Duka**
The fact that Lorie Smith wants to make artistic decisions consistent with her faith makes her a target for punishment by the Colorado Civil Rights Commission.

More

---

ANALYSIS

## New Program Aims to Help Young Adults Grow in Faith, Maturity Before College



**By Virginia Allen**
Tommy Nelson, a pastor, has created GAP, a nine-month leadership program where high school graduates can learn theology, life skills, job skills, and more before attending a university.

More

---

COMMENTARY

## We Hear You: Oberlin College's 'Lawsuit Mess' With a Local Bakery



**By Ken McIntyre**
"I am an alumna of Oberlin College, class of '92, and have watched with dismay, but not surprise, the lawsuit mess with Gibson's Bakery. I have received Oberlin's emails and letters on the subject, which were very one-sided," writes Keely A. Dien, Fountain Valley, Calif.

More

AZ_GOV_00000024
AZ_GOV_OFFICE_00000004

The Daily Signal is brought to you by more than half a million members of The Heritage Foundation.

Donate to The Daily Signal

Find us on Facebook

Follow us on Twitter

**How are we doing?**
We welcome your comments, suggestions, and story tips. Please reply to this email or send us a note at comments@dailysignal.com.

**The Daily Signal**
214 Massachusetts Avenue, NE
Washington, DC 20002
(800) 546-2843

Add morningbell@heritage.org to your address book to ensure that you receive emails from us.

You are subscribed to this newsletter as ccorieri@az.gov. If you want to receive other Heritage Foundation newsletters, or opt out of this newsletter, please click here to update your subscription.

AZ_GOV_00000025
AZ_GOV_OFFICE_00000004

Exhibit 47

| **Date:** | Friday, February 26 2021 02:53 AM |
| **Subject:** | It's Not a COVID-19 Relief Bill. It's Christmas for Democrats. |
| **From:** | The Daily Signal <morningbell@heritage.org> |
| **To:** | ccorieri@az.gov; |

February 26 2021

*Happy Friday from Washington, where liberals hope to ram through a COVID-19 bill packed with spending that has nothing to do with the pandemic. David Harsanyi objects. Sen. Rand Paul demonstrates that common sense may still be brought to bear against the transgender agenda, Jared Eckert writes. On the podcast, a former prison inmate shares his vision for criminal justice reform. Plus: a Virginia congressman exposes the Equality Act, and the loss of talk radio's happy warrior for conservatism. Nine years ago today,*

*neighborhood watch volunteer George Zimmerman, 28, fatally shoots 17-year-old Trayvon Martin in a confrontation at a Florida townhouse community, creating a racially charged case that gives rise to the Black Lives Matter movement.*

COMMENTARY

## It's Not a COVID-19 Relief Bill. It's Christmas for Democrats.



**By David Harsanyi**

The Biden plan provides $852 million for lefty-approved civic volunteer agencies that have zero to do with COVID-19 relief or stimulus. Why?

More

COMMENTARY

## Rand Paul Is Right: Transgender Interventions for Kids Can Include 'Genital Mutilation'



**By Jared Eckert**

Liberals seem to have no hesitation about injecting America's children full of life-altering drugs that are not FDA-approved for treatment of gender dysphoria.

More

COMMENTARY

## Standing Up to the Intolerant Equality Act



**By Rep. Robert Good**

For years, Big Tech, Hollywood elites, and Democrats in power have stretched their reach to gain control over our speech and our culture. The Equality Act is just one chapter in this saga.

More

ANALYSIS

# He Spent 14 Years in Prison. Here's Why He's Fighting for Criminal Justice Reform



**By Rachel del Guidice**

While in federal prison, "I had an unapologetic transformation of my mind, having adopted the Christian principles and philosophies of Jesus," says Louis Reed.

More

---

COMMENTARY

# How the Gig Economy Helps American Workers, Explained



**By Video Team**

Gig work provides opportunity for many Americans who might not otherwise be able to work.

More

---

COMMENTARY

# We Have Lost an American Genius



**By Victor Davis Hanson**

Limbaugh's canon was never to talk down to or insult the base. Deplorables and clingers trusted him to stay Rush. They were assured there would never be a sudden about-face, confessional, or sellout.

More

---

NEWS

# ICYMI: Read Sen. Rand Paul's Exchange With Biden Nominee Over Transgender Treatment for Kids

**By Video Team**

"Do you support the government intervening to override the parent's consent to give a child puberty blockers, cross-sex hormones, and/or amputation surgery of breasts and genitalia?" Paul asks.

More

Donate to The Daily Signal

Find us on Facebook

Follow us on Twitter

**How are we doing?**
We welcome your comments, suggestions, and story tips. Please reply to this email or send us a note at letters@dailysignal.com.

**The Daily Signal**
214 Massachusetts Avenue, NE
Washington, DC 20002
(800) 546-2843

Add morningbell@heritage.org to your address book to ensure that you receive emails from us.

You are subscribed to this newsletter as ccorieri@az.gov. If you want to receive other Heritage Foundation newsletters, or opt out of this newsletter, please click here to update your subscription.

AZ_GOV_00001709

Exhibit 49

```
                                              Page 1
 1            UNITED STATES COURT OF APPEALS

 2                 FOR THE NINTH CIRCUIT

 3   -------------------------------------------------x

 4   No. 21-71312

 5   -------------------------------------------------x

 6   In re: STATE OF ARIZONA; et al.,

 7

 8   STATE OF ARIZONA; et al.,

 9             Petitioners,

10   v.

11   UNITED STATES DISTRICT COURT FOR

12   THE DISTRICT OF ARIZONA, TUCSON,

13             Respondent,

14   RUSSELL B. TOOMEY; et al.,

15             Real Parties in Interest.

16   -------------------------------------------------x

17                    Oral Argument

18                   March 10, 2022

19

20

21

22   B E F O R E :

23   HON. PAUL J. WATFORD

24   HON. RICHARD A. PAEZ

25   HON. RICHARD CLIFTON
```

                                          Page 2

1            MR. BERG:  May it please the Court.

2    I'm Timothy Berg of Fennemore Craig, representing

3    Petitioner, State of Arizona, Andy Tobin, and

4    Paul Shannon.

5            The issue presented here is whether the

6    Petitioners waived their attorney/client

7    privilege by stating in answers to

8    interrogatories that they consulted Counsel with

9    respect to the policy at issue here, by

10   identifying those Counsel, and by identifying

11   attorney/client privileged documents, but not

12   disclosing the contents of the communications or

13   documents, or raising an advice of counsel

14   defense.  The answer has to be no, there has been

15   no waiver here, and the District Court committed

16   clear error.

17           As then-Judge, later Justice Ginsburg

18   stated in United States versus White, implied

19   waiver in sum is not appropriately invoked when a

20   client has gone to an attorney in good faith,

21   seeking an opinion as to the legality of certain

22   conduct in an area where legal boundaries may be

23   difficult for the layman to discern.  I think the

24   clear lesson of the White case is, simply because

25   someone says, I didn't have intent to commit a

1   crime, or I didn't have intent to discriminate,

2   and as part of the discovery they reveal that

3   they talked to their lawyer, that isn't a waiver

4   of the attorney/client privilege.  It takes

5   something more.  Again, as Justice Ginsburg said,

6   it has to be specific -- then-Judge Ginsburg,

7   pardon me said it has to be specific in a

8   positive waiver, and that hasn't happened here.

9            HON. MIDDLE:  Can I change the facts

10  here just -- only slightly?  What if the

11  Plaintiff sues, says, you know, we've

12  discriminated against us in not providing this

13  coverage, and you -- your clients say, well, the

14  reason we didn't provide the coverage has nothing

15  to do with discrimination?  We consulted with our

16  lawyers, and they told us the law prohibited us

17  from offering that coverage.

18           MR. BERG:  Well, I think, Your Honors,

19  if what we say is, we didn't have bad intent here

20  because we relied on the advice of our lawyers in

21  deciding we didn't have bad intent, that is a

22  waiver.  But that isn't what happened here.

23           HON. PAUL WATFORD:  Okay.  And, just to

24  stop --

25           MR. BERG:  Okay.

1            HON. PAUL WATFORD:  -- that is, though,
2    what the District Court thought you had done.  Is
3    that right?
4            MR. BERG:  Yes.  But I think the
5    District Court is in error, and I think --
6            HON. PAUL WATFORD:  Okay.
7            MR. BERG:  -- this is something this
8    Court can decide itself de novo, because you have
9    in front of you the materials the District Court
10   looked at, the interrogatory answers.
11           HON. PAUL WATFORD:  Right.
12           MR. BERG:  Unlike a typical case, where
13   we might put a witness on and there's a
14   credibility issue, this Court has in front of it
15   the specific interrogatory answers the District
16   Court relied on --
17           HON. PAUL WATFORD:  Right.
18           MR. BERG:  -- in concluding there was a
19   waive.  So, it seems to me, what you have in
20   front of you isn't a fact question.  You have a
21   legal question of whether those interrogatory
22   answers are sufficient to create a waiver.
23           HON. PAUL WATFORD:  Okay.  So, why is
24   what happened here different from the
25   hypothetical I posed?

Page 5

1              MR. BERG:  Because we didn't say, we

2      had no intent here.  Our lawyers told us we could

3      do this legally, and therefore, we thought it was

4      legal.  What we said is, we had no intent.  We

5      were asked, what are the reasons that you did

6      this?  We said, well, we talked to our lawyers,

7      and we also had cost concern and cost containment

8      issues.  It is different.

9              I think that the attorney/client

10     privilege is important, and drawing this line is

11     really important.  And it may seem subtle, but I

12     think there's a significant difference between

13     saying, I talked to my lawyer.  I had no intent

14     to discriminate.  I looked at other things, which

15     is true here -- again, the record reflects that

16     our client went out to its insurance brokers, it

17     gathered legal opinions from legal periodicals,

18     it did all sorts of other things other than just

19     talk to its lawyers -- and say, we had no

20     malintent, and saying, the reason I can prove I

21     didn't have discriminatory intent here is that I

22     talked to my lawyer, and my lawyer told me it was

23     legal to do this.  And that isn't what happened

24     here.

25              And that's the kind of defense that I

1    think, if you found in the White, case would be a

2    waiver.  Just, again, Judge Ginsburg in that case

3    makes the distinction between saying, generally,

4    I had no -- I think in that case, it was intent

5    to commit a crime rather than discriminatory, but

6    I had no mis intent, and oh, by the way, part of

7    what I did was walk to my lawyer, and saying, the

8    reason I can defend and I didn't have mis intent

9    is I relied on the advice of my Counsel in making

10   this decision.  And because I relied on advice of

11   counsel, the Court can't find that I had bad

12   intent.

13          HON. PAUL WATFORD:  So, the reason I

14   put the hypothetical the way I did is that I'm

15   not sure I see a huge difference between what you

16   actually said.  So, instead of saying, we

17   consulted with our lawyers, and we were told it's

18   prohibited to offer this coverage, when asked,

19   give us the reasons why you didn't offer the

20   coverage, you say, well, we consulted with our

21   lawyers, and they told us we didn't have to.  And

22   that's our reason, and that's why there's no

23   discrimination, because they told us we didn't

24   have to offer it.  And it seems to me, isn't it

25   just half-dozen of one and six of the other?

```
 1              MR. BERG:  Your Honor, Your Honor,
 2    you've taken it a step further than I think the
 3    interrogatory answer does.
 4              HON. PAUL WATFORD:  Okay.
 5              MR. BERG:  We have not said -- the
 6    interrogatory answers said, what considerations
 7    did you take into account in deciding not to
 8    offer this?
 9              HON. PAUL WATFORD:  It said, what are
10    the reasons why you didn't.  Okay?
11              MR. BERG:  Right.
12              HON. PAUL WATFORD:  So, and one of the
13    reasons given --
14              MR. BERG:  One of them was, we talked
15    to our -- we talked to our lawyers --
16              HON. PAUL WATFORD:  -- and they told us
17    we didn't have to do it.
18              MR. BERG:  Okay.  That isn't what the -
19    - I don't think that's what the interrogatory
20    answer says, Your Honor.
21              HON. PAUL WATFORD:  Okay.  Well, let's
22    look at the interrogatory.  Pull it up and you
23    can quote it to me.
24              MR. BERG:  Let me -- I don't think I
25    have the exact words of the interrogatory answer
```

Page 8

```
 1   in front of me.  I have it back over there.  But
 2   I don't believe we said, and therefore, we didn't
 3   do it.  I think we said, we talked to our lawyer,
 4   we -- and we were told -- you're right -- we were
 5   told it was not legally required.  We also looked
 6   at cost containment and cost (indiscernible).
 7              HON. PAUL WATFORD:  Right.  Two
 8   reasons.
 9              MR. BERG:  Again -- okay.
10              HON. PAUL WATFORD:  You gave two
11   reasons, and that's why you said there was no
12   discrimination.
13              MR. BERG:  But -- but no, that -- there
14   is -- you're making a -- you're making a step
15   we're not making.
16              HON. PAUL WATFORD:  Okay.
17              MR. BERG:  What we said is, this is why
18   we did it.  We haven't said, those reasons in and
19   of themselves aren't discriminatory.  Again, we
20   relied on our lawyer's advice in deciding we
21   could legally do this, and therefore, we had no
22   malintent.  Plaintiff is still entitled to prove
23   that our intent was bad or that -- or if they can
24   prove without intent that we've discriminated in
25   some way, they can do that.
```

```
 1            The defense -- because the
 2   attorney/client privilege is so important, I
 3   think the Court has to be careful in how broadly
 4   you read waivers.  And to me, if you read the
 5   White case, if you read the other cases in the
 6   circuit, the -- what a client does to waive the
 7   defense is to say, you can't find me guilty, or
 8   you can't find me liable, because I relied on my
 9   lawyer's advice.  And that isn't what --
10            HON. RICHARD CLIFTON:  Are you saying
11   that there was no reliance on the Counsel's
12   advice?
13            MR. BERG:  What I'm saying, Your Honor,
14   is that the interrogatory response doesn't
15   reflect --
16            HON. RICHARD CLIFTON:  Other question.
17            MR. BERG:  Okay.
18            HON. RICHARD CLIFTON:  What is the
19   State's position as to whether or not it relied
20   upon advice of counsel?  Would it disclaim
21   reliance upon advice of counsel as a defense?
22            MR. BERG:  I think it would disclaim
23   reliance on advice of counsel as a defense, Your
24   Honor, yes.  If you're asking me, what did the
25   State consider, I think the interrogatory
```

1   reflects that we talked to our lawyers, we talked

2   to insurance brokers --

3            HON. RICHARD CLIFTON:  Let me be more

4   focused --

5            MR. BERG:  Okay.  I'm sorry.

6            HON. RICHARD CLIFTON:  -- because I

7   don't want to lose all your time.  What role does

8   advice of counsel play in this case, from your

9   perspective?

10           MR. BERG:  I don't think it plays any

11   role unless we raise advice of counsel as a

12   defense, and we haven't done that.  So --

13           HON. RICHARD CLIFTON:  And are you

14   prepared to disclaim raising advice of counsel as

15   a defense?

16           MR. BERG:  Yes, Your Honor, we are.  We

17   are not sitting here, saying -- we are not saying

18   to the Court -- obviously, the issue before this

19   Court is privilege and not liability for whether

20   or not the plan is invalid.  But I think what we

21   are saying is, no one is claiming we -- that

22   advice of counsel is a defense to the underlying

23   claim here, which is of course what is not in

24   front of the Court today.  What's in front of the

25   Court today is a privilege question and a

1    mandamus question.

2            HON. PAUL WATFORD:  Okay.  So, I think

3    that's helpful, but let me -- and we'll have to

4    ask your opponents and see what they say about

5    this.  But as I understand, what you're saying is

6    that you've provided these interrogatory

7    responses.  You're saying that the District Court

8    and the Plaintiffs misinterpreted what you were

9    trying to say there.  And you're saying now, to

10   the extent that any of you all thought that we

11   were trying to raise some kind of an advice of

12   counsel defense, we are not doing so.  We are,

13   you know, assuming this case were to go to a jury

14   or whatever, we are not going to be arguing that.

15   And I guess, if we or the District Court were to

16   hold you to that, then there'd be no reason for

17   them to get access to these documents?  Is that

18   what you're saying?

19           MR. BERG:  Correct, Your Honor.

20   Exactly.  That's precisely the argument we're

21   making.

22           HON. RICHARD PAEZ:  Is that what you

23   told the District Court?

24           MR. BERG:  Your Honor, I believe so.  I

25   was not --

1           HON. RICHARD PAEZ:  But did you tell

2    the District Court you were not going to rely on

3    a advice of counsel defense?

4           MR. BERG:  I don't -- I do not believe

5    -- I don't know the answer to that question.

6           HON. RICHARD PAEZ:  So, why -- how can

7    we say that the District Court clearly erred?

8           MR. BERG:  Because --

9           HON. RICHARD PAEZ:  This is a -- you

10   know, mandamus, we don't go around issuing writs

11   of mandamus against the District Court very

12   often.  They have to -- there has to be clear

13   error.  There has to be, you know, a case that

14   they've just disregarded.  It's pretty tough.

15          MR. BERG:  It would be my position,

16   Your Honor, that the interrogatory answers, even

17   without the concession I just made -- and I'm

18   sorry I hit the microphone; I know I'm not

19   supposed to touch it.  Even if -- even without

20   the concession that I just made in response to

21   Judge Clifton, it is still clear we were not

22   raising an advice of counsel defense, and the

23   Court's finding that we were is a clear legal

24   error, based on what's in the interrogatories.

25          HON. RICHARD PAEZ:  It's a legal error,

```
                                              Page 13
 1   or a factual error?
 2           MR. BERG:  Legal error.  I think it's -
 3   - I think the question here is whether what is in
 4   these interrogatory answers is sufficient as a
 5   legal matter --
 6           HON. RICHARD PAEZ:  I thought you -- I
 7   thought one of the bases for the District Court's
 8   ruling was that they found a waiver by
 9   implication.
10           MR. BERG:  Yes, Your Honor.  And the
11   waiver by implication would be if we'd raised an
12   advice of counsel defense.  That is -- that is
13   waiver by implication.
14           HON. RICHARD PAEZ:  Well, I mean, you
15   didn't raise it in your answer.
16           MR. BERG:  Well, Your Honor, if we
17   raised it in these interrogatory answers, that
18   would be a waiver by -- I think an explicit
19   waiver would say, we're waiving our
20   attorney/client privilege.  Nobody suggests we
21   did that.  Nobody suggests we disclosed the
22   content of attorney -- or at least the District
23   Court didn't find we disclosed the content.
24           What it found was an implied waiver,
25   based on its interpretation of these
```

1  interrogatory answers as legally meeting the

2  provisions of an advice of counsel defense.  And

3  our position is, they do not do that, that if you

4  read the interrogatory answers, we are not

5  saying, we are relying on advice of counsel as a

6  defense in this case, and we're waiving our

7  attorney/client privilege by doing so.  It simply

8  isn't here.

9            HON. PAUL WATFORD:  Well, it took me a

10  little while, but I have it in front of me.

11            MR. BERG:  Okay.

12            HON. PAUL WATFORD:  So let me just

13  quote it and make sure you're on board with this.

14  So, Interrogatory Number 1 -- let's forget about

15  4 and 7.  Those other ones didn't seem --

16            MR. BERG:  Okay.  I agree with Your

17  Honor, the key one is 1.

18            HON. PAUL WATFORD:  Okay.  So,

19  Interrogatory 1 asks you to identify and describe

20  all reasons why the plan excludes coverage for

21  gender reassignment surgery.  And then, what your

22  clients say is, the State of Arizona's self-

23  funded health plan excludes coverage for gender

24  reassignment surgery because the State concluded

25  under the law that it was not legally required to

1    change its health plan to provide such coverage

2    under Title 7, blah, blah, blah.  And then,

3    later, you say, hey, by the way, that legal

4    advice we got is privileged.

5                MR. BERG:  Yeah.

6                HON. PAUL WATFORD:  So, that seems to

7    be -- okay, well, you respond to that, then.

8    That's what you said.

9                MR. BERG:  Okay.  To me, that is not

10   saying, we are defending based on that advice of

11   counsel, and we're arguing we didn't have intent,

12   based on the fact we got advice from our counsel

13   on that.  And that is what I'm suggesting to you

14   in light of the United States versus White would

15   be required to be a waiver here.  It takes

16   something more than us saying, we talked to our

17   lawyers about this, and one of the reasons we

18   took into account in making our decision was that

19   we talked to our lawyers.

20                If we had said, you cannot prove we had

21   intent here because we went and talked to our

22   lawyers, and they told us it was legal, and we

23   went ahead and did it anyway, that would be an

24   advice of counsel defense.  That would be

25   sufficient to be an implied waiver.  That would

1   permit the discovery order here.

2          HON. RICHARD PAEZ:  To prevail, do the

3   Plaintiffs have to prove intent?

4          MR. BERG:  I think, Your Honor, that

5   certainly, on at least some of their theories,

6   they do.  I do think intent is an issue here.  I

7   wouldn't quarrel with that proposition.  But I

8   don't think that what we -- I don't think that

9   that interrogatory answer says we have a defense

10  to intent based on advice of counsel, and I think

11  that's what it would need to do.

12         HON. RICHARD PAEZ:  So, what would one

13  of your witnesses say, just that they determined

14  that it wasn't -- it wasn't illegal?

15         MR. BERG:  Deposition testimony was

16  taken, Your Honor.  In this case, it was

17  deposition testimony of people who did not have

18  the ability to waive the privilege.  They don't

19  have the authority to waive the privilege.  I

20  think frankly, one of the reasons the District

21  Court focused on the interrogatory responses is

22  that, if you get into the deposition testimony,

23  you have to worry about whether a former employee

24  can, at a time of a deposition when she no longer

25  works for our client, waive their privilege.  And

1    so, I think that's why the focus here was on the

2    interrogatory answers, Your Honor.

3              HON. RICHARD PAEZ:  I don't think that

4    answers my question.

5              MR. BERG:  Okay.  I believe if you look

6    at the -- if you look at --

7              HON. RICHARD PAEZ:  What would a

8    witness say on the stand about intent or about

9    counsel?  Would they --

10             MR. BERG:  Oh, I --

11             HON. RICHARD PAEZ:  Is it your -- does

12   your concession mean that no witness is going to

13   get up there and say, we consulted with a lawyer?

14   That's not going to be -- you're not going to do

15   that.

16             MR. BERG:  I think what my concession

17   means is no witness is going to get up there and

18   said, because we had legal advice that we could

19   do this, we didn't have the intent.  What they're

20   going to get up and say is, we looked at a whole

21   bunch of things, and here was what we decided to

22   do, and one of the reasons was cost containment.

23   And one of the reasons is, when we looked at all

24   this stuff, including stuff from our insurance

25   company and outside periodicals, we didn't think

Page 18

1   we had to cover them, and we didn't think we had

2   bad intent.

3            But that's not, in my -- again, I think

4   if you read the White case, a waiver, even an

5   implied waiver, has to be positive and specific,

6   and we don't get there here.

7            HON. RICHARD PAEZ:  Okay.

8            MR. BERG:  I'd like to save a little

9   bit of time for rebuttal, if I may, Your Honor.

10  Thank you.

11           HON. PAUL WATFORD:  We'll make sure you

12  have time for rebuttal.

13           MR. BERG:  Okay.

14           HON. PAUL WATFORD:  Okay.  Let's hear

15  from Counsel for the Respondent.

16           MR. BERG:  I'll just get out of your

17  way here.

18           MR. WALL:  Good morning, Your Honors.

19  May it please the Court, Jordan Wall, Wilkie Farr

20  & Gallagher, on behalf of the real party in

21  interest, Dr. Russell B. Toomey.  Thank you for

22  this opportunity to be heard.

23           As the Court has noted, a petition for

24  a writ of mandamus is indisputably a drastic and

25  extraordinary remedy that is granted in the case

                                          Page 19

1    of extraordinary causes involving exceptional

2    circumstances.  As this Court has consistently

3    recognized, and including in in re Van Dusen,

4    this is not an instance where the mandamus is

5    warranted because it is not a case of

6    extraordinary circumstances.  Yes, Your Honor?

7              HON. PAUL WATFORD:  Yeah, yeah, and you

8    -- I don't want to cut off the rest of your

9    argument, but maybe can you just respond, like,

10   the concession you just heard on -- from the

11   lectern today?  That's good enough, not good

12   enough?  Tell us your response to that.

13             MR. WALL:  Your Honor, it's not good

14   enough, and it was not an argument that was

15   presented to the District Court, and I think

16   there are several reasons for that.  Backing out,

17   the Petitioners claim that it is all focused on

18   Interrogatory Number 1 is plainly incorrect.  The

19   record is replete with instances in which the

20   Petitioners put forward affirmatively the advice

21   of counsel.  You can look -- we've already

22   discussed Interrogatory Number 1, which they were

23   responding to the question as to, why do you

24   maintain the exclusion?  And the answer, that we

25   reached a legal conclusion that we were not

Page 20

```
 1   required to provide such care, and the legal

 2   advice we received on this --

 3            HON. PAUL WATFORD:  Okay.  Right, we

 4   just went through that.  And so, then, your

 5   opponent stands up and says, to the extent there

 6   was any confusion on that, I'm going to clear it

 7   up right now.  We were not trying to interject

 8   the advice we got from our lawyers, and we are

 9   not going to interject, going forward, the advice

10   of our lawyers as a defense to the -- you know,

11   the intent element of your claims.  Why doesn't

12   that eliminate the need for you now -- as a

13   matter of fairness, because that's the basis on

14   which the District Court ruled -- why doesn't

15   that eliminate the need for you to get access to

16   these privileged documents?

17            MR. WALL:  Well, Your Honor, because

18   the involvement of Counsel here has now become a

19   factual point in the case.  And so, even though

20   Petitioners have disclaimed that they will rely

21   on this, it is the burden of Dr. Toomey to

22   establish an evidentiary record refuting their

23   defense.  For instance, in response to

24   Interrogatory Number 4 and Number 7, which I

25   heard Your Honor say you didn't think mattered, I
```

Page 21

1  would point to Petitioner's own cases, Hernandez

2  versus Canyon.  They have miscited those for

3  different reasons about, you know, a blanket

4  waiver of --

5          HON. PAUL WATFORD:  Can I tell you why

6  I don't think those are relevant?  It's because

7  they're just -- you asked them questions that

8  they have to give truthful answers to.  Tell us

9  all the people you consulted with.  Okay, well, I

10 can't lie and not mention my lawyer, so you can't

11 possibly predicate a waiver of attorney/client

12 privilege on a truthful -- you're just asking for

13 truthful factual information.  If the person

14 doesn't intend in the litigation to interject

15 advice of counsel as any kind of defense, the

16 mere answering your question truthfully can't be

17 a waiver.  That's why I just think you've got to

18 put everything on the response to Interrogatory

19 Number 1, right?

20          MR. WALL:  And I understand your point,

21 Your Honor.  And what I would say is that the

22 Petitioners fundamentally misunderstand the

23 nature of an implied waiver in the at-issue

24 doctrine.  As the Court established in Chevron

25 Corp v. Pennzoil, what undergirds the at-issue

Page 22

```
 1  doctrine is the fairness principle.  By putting
 2  forward the advice of counsel both in
 3  Interrogatory Number 1, but also noting the
 4  involvement of counsel in the decision making
 5  here at Interrogatory Number 4, these are issues
 6  of fact that now Dr. Toomey needs to establish an
 7  evidentiary record on.  In Hernandez, what the
 8  Court noted was that the involvement of counsel -
 9  -
10          HON. RICHARD CLIFTON:  Well, let me --
11  why?  I mean, if the question of whether this
12  constitutes discrimination is a legal question as
13  to which advice of counsel you have to assume
14  happened.  If they thought that they had to, they
15  presumably would have provided the coverage
16  that's being sought.  But the Court's going to
17  decide whether the law requires the provision of
18  that coverage, and the Court, to be polite about
19  it, really doesn't care very much about what the
20  advice of counsel some years before was.  So, why
21  does it matter?  Is the advice of counsel really
22  an issue in the underlying case?
23          MR. WALL:  Your Honor, I think it
24  matters for two reasons.  The first is because
25  the advice of counsel is the stated reason why
```

Page 23

1   the government has maintained this --

2               HON. RICHARD CLIFTON:  You have to

3   assume that's the case.  I mean, even if they had

4   never mentioned lawyer, I think you would accept

5   that if they'd been told by their lawyers, you

6   don't have a prayer, this is clearly covered as -

7   - this would be discriminatory not to cover this.

8   So, I just take as a given that's out there.  I

9   don't think it's going to be passionately

10  disputed.  On your point, you don't think you

11  have to persuade the Court that the State's

12  lawyers gave them advice that they didn't follow.

13  You're interested in what the state of the law

14  is, which the Court will decide.  So, why is it

15  you have to prove something about advice of

16  counsel if it's not offered as a defense beyond

17  this interpretation of the law?

18              MR. WALL:  Well, Your Honor, because

19  t's been offered as a defense both by the witness

20  -- by numerous witnesses that the Petitioners

21  have put forward as persons with knowledge about

22  the decision making here.  And so, we have to

23  establish a record to be able to refute this

24  defense.

25              HON. RICHARD CLIFTON:  Well, but what

Page 24

1  are you going to refute?

2          MR. WALL:  Well, that's what we're

3  looking for the discovery, Your Honor.  We want

4  to be able to examine the advice that was

5  provided, because one of the reasons Petitioners

6  have claimed that they have -- they decided to

7  main the exclusion is because of the legal

8  reasoning.

9          HON. RICHARD CLIFTON:  But well, but

10  still, the Court's not going to be persuaded by

11  whatever legal reasoning was offered by counsel

12  to the State some years before.  You're not going

13  to argue to the Court that it has to accept

14  whatever the Arizona lawyer said to the State.

15  You're going to argue to the Court the law

16  requires these services to be provided;

17  otherwise, you're violating -- it constitutes sex

18  discrimination.  So, why is advice of counsel

19  relevant?

20          MR. WALL:  Well, Your Honor, because

21  intent is a factor in this case.

22          HON. RICHARD CLIFTON:  How is intent a

23  factor?

24          MR. WALL:  Well, Your Honor, Dr.

25  Toomey's alleged claims under both it's a

Page 25

1   violation of the Equal Protection Clause of the

2   14th Amendment and Title VII.  Under Title VII,

3   Dr. Toomey is pleading a case based on disparate

4   treatment or disparate impact, of which this may

5   be supporting evidence as to animus or

6   discriminatory intent on the part of the

7   government.  For instance, if the documents

8   corroborate that the Petitioners were informed

9   that, yes, this exclusion is illegal, we think

10  that would be a relevant fact as part of the

11  record to present before the District Court.

12          We also think the involvement of

13  counsel in the actual decision making here puts

14  their involvement as a factual point in the

15  record to be developed.  We cannot simply accept

16  Petitioner's representation that we received

17  legal advice and everything is, you know, okay.

18  Dr. Toomey, again, has the burden of establishing

19  that evidentiary record.

20          What I would also say is, the Court

21  asks fairly, you know, when we get to trial, what

22  will witnesses say?  And I think, as you look

23  through the record -- and it's established in all

24  of our papers, as we had cited the deposition

25  testimony itself -- that all the witnesses have

Page 26

```
 1   repudiated, now, that cost was a significant
 2   factor in the Court -- in the Petitioner's
 3   decision making.  They have all uniformly pointed
 4   to the legal advice they received about his
 5   decision making, and that was the basis for the
 6   Petitioner's decision to maintain the exclusion.
 7            HON. RICHARD CLIFTON:  Okay, but I
 8   don't really understand that.  I mean, the fact
 9   that the -- a lawyer says you don't have to do it
10   doesn't explain why you don't do it.  It just
11   says that's a permissible course.  And if they
12   disclaim cost, is there any other reason offered
13   for not providing the service that your client
14   seeks to obtain?
15            MR. WALL:  Well, yes, Your Honor,
16   because I believe Dr. Toomey -- it's incumbent
17   upon him to be able to examine that record if
18   that is now, as we believe through discovery, the
19   only reason why they maintained the exclusion.
20            HON. RICHARD CLIFTON:  But that's not a
21   reason to maintain the exclusion.  To say that
22   you don't have to do something doesn't mean you
23   don't do something.  It just says it's an option
24   available.  You can do it or you can not do it
25   for whatever reason.  But that you don't have to
```

```
 1   do it isn't, by itself, an explanation for why
 2   you don't do it.  Cost is what I anticipated the
 3   response to be, and that's what I'd understood
 4   until you just said they disclaimed cost, so...
 5            MR. WALL:  Well, Your Honor, I would
 6   say that we have to think in the context of how
 7   this response from Petitioners came about.  And
 8   the answer, Petitioners averred that there are
 9   legitimate nondiscriminatory and non-pretextual
10   reasons why they maintain the exclusion.  When
11   they were asked what those reasons were, the very
12   first thing they pointed to was, we are -- the
13   legal conclusion was that we are not required to
14   do so.  It is their explanation as to -- and they
15   have affirmatively (indiscernible) into this case
16   that the legitimate reason why they do not have
17   to cover it -- they can maintain the exclusion is
18   legal advice.
19            HON. PAUL WATFORD:  I mean, I think I
20   understand your argument if they said in response
21   to your assertion that you acted with
22   discriminatory intent, and they said, no, no, no.
23   We weren't trying to discriminate.  Our policy is
24   always to do the bare minimum that the law, you
25   know, requires, and we went to our lawyers, and
```

Page 28

```
 1    they told us, no, the law doesn't require it.
 2    And so, we said, okay, well, that settles it.  I
 3    mean, that wouldn't negate intent, I suppose.  It
 4    would be a nondiscriminatory, you know, neutral
 5    reason for why they took the course of action
 6    they did.
 7              But I guess my problem still, and I
 8    wanted to come back to your response on this, if
 9    they now come forward and say that is not -- that
10    is most definitely not the defense we are going
11    to assert, the advice we got from Counsel is
12    never going to be interjected as a basis to
13    defend against the intent element of your claims,
14    I guess I'm still struggling to understand why
15    you need, and as a matter of fairness, access to
16    these documents. I just -- maybe if there's
17    another -- you can take another run at answering
18    that, because I'm still not clear on how this
19    concession doesn't eliminate this problem.
20              MR. WALL:  True, Your Honor.  And I
21    think the reason for that is because the Court
22    understood that even if Petitioners will sit here
23    and disclaim that they're going to rely on the
24    advice of counsel, it's not so much that there
25    are magic words as to the assertion of that
```

Page 29

1    defense.  It's not that you have to say, we're
2    asserting advice of counsel defense or that we
3    relied on certain evidence.  The Court
4    established in Chevron Corp v. Pennzoil that once
5    a party has placed its knowledge of the law at
6    issue, it also places the basis of its
7    understanding of what the law requires at issue.
8              And so, everything is relevant to our
9    ability to develop the record.  That includes the
10   newspaper articles; that includes consultation
11   with other governmental entities, as well as the
12   legal advice they relied upon on forming that
13   understanding of the law, which they cite as
14   their chief reason for maintaining the exclusion.
15   We need all of that evidence to be able to refute
16   this defense that there were legitimate reasons
17   to maintaining the exclusion.
18              HON. PAUL WATFORD:  And is it your
19   understanding from our cases that once you've put
20   at issue legal advice you got from counsel, it's
21   kind of -- it's just a one-way street?  You can
22   never take that back?  Do you know what I mean?
23   Because they're kind of saying, this was all a
24   mistake.  To the extent that the way we drafted
25   the interrogatory response that led you and the

                                                    Page 30

1    District Court to think that we were trying to
2    put at issue the legal advice, that was just --
3    it was all a big misunderstanding, we're ready to
4    step back from that; you're basically saying, as
5    I hear you, nope, that's not an option.  Once
6    you've kind of, you know, gone down that road,
7    you're stuck, and we now get access to all these
8    documents, whether you like it or not.  So --
9              MR. WALL:  Well, Your Honor, I think
10   this goes to your question of whether this is a
11   legal question for determination or a factual
12   question.  And that's my point in saying that
13   it's not just Interrogatory Number 1.  It's the
14   involvement of counsel which is the factual point
15   in this case in that decision making.
16             HON. RICHARD CLIFTON:  How could
17   counsel not be involved?  I mean, just by nature,
18   your argument is that the law requires.  Anybody
19   looking at it would say, well, the first
20   question, does the law require?  So, the fact
21   that they consulted with counsel doesn't strike
22   me as very meaningful here.  If they hadn't
23   consulted with counsel, that might be meaningful.
24   But that's the -- this is the dog that barked.
25             MR. WALL:  Well, Your Honor, I would

1   say that it's not the mere consultation with

2   counsel.  And that's why I think Petitioner's

3   concerns that somehow, allowing the District

4   Court's order to stand will entail a parade of

5   horribles for every instance in which the

6   Government says it consulted counsel, is that the

7   specific reason they explained for maintaining

8   this exclusion is the legal rationale.  You can

9   imagine that the Government might have other

10  legitimate bases for maintaining exclusion, such

11  as costs, such as a facially neutral policy that

12  they only was the bare minimum, which discovery

13  has now repudiated as the case.  They did not

14  have that policy, and they do treat -- cover

15  other policies that -- or other benefits that are

16  not legally required.

17          But the reason the -- the reason the

18  Petitioners asserted for maintaining the

19  exclusion is the advice of counsel.  And so, that

20  is an entirely relevant fact that we need to be

21  able to explore.

22          HON. RICHARD PAEZ:  Let me ask you

23  this.  I was not expecting the concession that

24  Counsel offered during his argument.  That wasn't

25  in my, you know, on my radar screen at the time.

Page 32

```
 1   It seems to me, though, that it's significant
 2   enough that the District Court should be able to
 3   consider that and maybe rethink whether or not
 4   she -- ordering disclosure is the appropriate
 5   thing.
 6            MR. WALL:  Well, Your Honor, I would --
 7   I would say that, you know, the club of mandamus,
 8   as we've all noted, is extraordinary, and the
 9   fact that --
10            HON. RICHARD PAEZ:  I'm reluctant --
11   you know, the concession was made in front of us,
12   and I'm just reluctant to say, you know, the
13   concession, and therefore, District Court, you
14   clearly erred.  Mandamus; set aside that order.
15   I'm not sure that that -- well, I'm not sure that
16   I'm prepared to do that just because we got a
17   concession here today.
18            It seems like the District Court should
19   be able to consider that and to think through
20   some of the questions that I was asking, because,
21   you know, when I asked him about what would a
22   witness testify to, and he said, well, we can --
23   you know, we determined that it was lawful or
24   whatever, and we considered this -- we consulted
25   with people.  Well, the first thing the cross-
```

Page 33

```
 1   examination is going to be, who did you consult
 2   with?
 3            MR. WALL:  You're right, Your Honor,
 4   and I would say that --
 5            HON. RICHARD PAEZ:  And it seems to me
 6   that those kinds of issues that relate to the
 7   litigation itself ought to be explored by the
 8   District Court, not by -- I mean, this is -- I
 9   wasn't expecting this.
10            MR. WALL:  Well, Your Honor, that's
11   exactly why I would say the petition of mandamus
12   should not warn here.  If you consider the other
13   Bauman factors, particularly the first factor
14   about the availability of other adequate means of
15   relief, Petitioners certainly could have failed
16   to comply with the Court's discovery order, and
17   they would have had available to them post-
18   judgment relief, where a court could have
19   reviewed this and said, you know, they didn't
20   actually put this at issue, that, you know, could
21   remand it for a new trial and have this evidence
22   excluded.  But they didn't do that.  They --
23            HON. RICHARD PAEZ:  Well, they could
24   file a motion for reconsideration and say, hey,
25   look, Judge, you got it all wrong.  We're not
```

Page 34

```
 1   going to raise this as a defense.
 2              MR. WALL:  Well, Your Honor, they
 3   didn't file a motion for reconsideration.
 4              HON. RICHARD PAEZ:  Oh, I know.  I'm
 5   saying, but there's ways they could have brought
 6   this to the District Court's attention, and they
 7   didn't do it.
 8              MR. WALL:  Exactly, and that's why the
 9   petition does not lie.  Because they could have
10   failed to comply with the order, and the District
11   Court could have entered a discovery sanction
12   saying that you cannot assert this defense,
13   exactly what Petitioners have conceded here
14   before.  And that's why the petition should lie.
15   None of the Bauman factors, specifically the
16   clear error that we've discussed already, support
17   granting this petition.  The District Court did
18   not err.  It certainly got this right.  And it
19   certainly did not commit clear error.
20              HON. PAUL WATFORD:  Okay.
21              MR. WALL:  Thank you, Your Honors.
22              HON. PAUL WATFORD:  Thank you very much
23   for your argument.  Let's put two minutes on the
24   clock for rebuttal.
25              MR. BERG:  Let me start with the last
```

Page 35

1    point.  To argue that the State of Arizona should
2    have disobeyed an order of the District Court,
3    permitted itself to be found in contempt, and
4    then proceed to litigate this issue is something
5    this Court has rejected in a couple -- in several
6    cases we've cited in our reply, but also, I
7    think, ignores the reality that to say it's an
8    adequate remedy to violate a court order seems to
9    me to be inappropriate.
10            HON. RICHARD PAEZ:  Well, you could
11   have gone back and filed a motion for
12   reconsideration, saying, hey, Judge, you know,
13   there's been a -- there's been a mistake here.
14            MR. BERG:  Well, what we did do is,
15   first we were in front of the magistrate judge.
16   We made our argument.  Then we went to the
17   District Court, and we made our argument.  I
18   don't think --
19            HON. RICHARD PAEZ:  You didn't make
20   this concession in front of the District Court,
21   did you?
22            MR. BERG:  Your Honor, I didn't argue
23   this.  I don't know exactly what was said in
24   front of the District Court on oral --
25            HON. RICHARD PAEZ:  Right, but

1   something --

2            MR. BERG:  There wasn't any oral

3   argument --

4            HON. RICHARD PAEZ:  But wait a minute.

5   Something clicked along the way, and you decided,

6   well, you know, I've got to make it clear.  I'm

7   going to make it clear to the Ninth Circuit that

8   this is not -- that the District Court

9   misunderstood, and I'm going to concede in front

10  of the District Court that we will not raise an

11  advice of counsel defense.  It's all a

12  misconstruction.  And now you're asking us, on

13  that basis, to issue a writ of mandamus against

14  the District Court.

15           MR. BERG:  Yes, because we think it was

16  clear from the interrogatory answer that we

17  weren't raising that defense, Your Honor.  I

18  mean, it may be clearer because I got asked the

19  specific question today and I answered it

20  specifically.  But remember, in this case,

21  neither the magistrate judge nor the district

22  judge had oral argument.  We didn't have a

23  dialogue like we've had here today.  We filed

24  papers.  We took our position, which we still

25  stand by, which is that the interrogatory answer

Page 37

```
 1   to Interrogatory Number 1, which is the only one
 2   I think that is even close, isn't sufficient to
 3   raise an advice of counsel defense, and
 4   therefore, there wasn't a waiver.
 5             Now, had we had oral argument, and had
 6   we had a chance to have the kind of exchange
 7   we've had here, it may have -- it may have been
 8   clear.  The attorney/client privilege is an
 9   incredibly important privilege.  It is the oldest
10   privilege known to the law, and --
11             HON. RICHARD CLIFTON:  Let me ask you
12   about that.
13             MR. BERG:  Yes.
14             HON. RICHARD CLIFTON:  And we're --
15             MR. BERG:  Sure, Your Honor.
16             HON. RICHARD CLIFTON:  -- I'm going to
17   beg your indulgence and my colleagues'.  We've
18   all lived with the attorney/client privilege.  We
19   understand its importance.  In this particular
20   case, how does it really matter?  I mean, unless,
21   in fact, it turns out that, as your colleague
22   suggested, maybe the advice was, you can't do
23   this, and they decided to disregard it.  I don't
24   expect that's the case.  I expect you have your
25   usual lawyer qualifications and so forth, but --
```

Page 38

1    I used to write those letters myself.

2              But in practical terms, okay, suppose

3    those documents are produced.  How does it

4    matter?

5              MR. BERG:  Well, I think -- first of

6    all, I think going forward, it may chill the

7    State in how it uses its lawyers.  And that's a

8    harm that revises -- I think when the

9    attorney/client privilege for government agencies

10   is undermined.

11             Secondly, without -- without -- there

12   may well be information in those attorney/client

13   confidences about, like for example, future

14   litigation strategy, I don't know -- I am

15   speculating -- that you would not want to turn

16   over to the other side in litigation.  I mean,

17   there are lots of reasons why there's an

18   attorney/client privilege and a work product

19   privilege, and one of them is to prevent one side

20   from going to school in their case on the other

21   side's legal theories and legal thought, Your

22   Honor.

23             HON. PAUL WATFORD:  Okay.  Thank you

24   very much.

25             MR. BERG:  Thank you very much, Your

Page 39

1   Honors.

2            HON. PAUL WATFORD:   We appropriate it.

3   The case just argued is submitted, and we are

4   adjourned for the day.

5            CLERK:   All rise.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8    _Sonya M. Ledanski Hyde_

9    _____

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date: May 2, 2022

17

18

19

20

21

22

23

24

25

**&**

**&** 18:20

**1**

**1** 14:14,17,19 19:18,22 21:19 22:3 30:13 37:1
**10** 1:18
**11501** 40:14
**12151** 40:8
**14th** 25:2

**2**

**2** 40:16
**2022** 1:18 40:16
**21-71312** 1:4

**3**

**300** 40:13
**330** 40:12

**4**

**4** 14:15 20:24 22:5

**7**

**7** 14:15 15:2 20:24

**a**

**ability** 16:18 29:9
**able** 23:23 24:4 26:17 29:15 31:21 32:2,19
**accept** 23:4 24:13 25:15
**access** 11:17 20:15 28:15 30:7
**account** 7:7 15:18
**accurate** 40:4
**acted** 27:21
**action** 28:5
**actual** 25:13
**adequate** 33:14 35:8

**adjourned** 39:4
**advice** 2:13 3:20 6:9,10 8:20 9:9,12 9:20,21,23 10:8,11 10:14,22 11:11 12:3,22 13:12 14:2,5 15:4,10,12 15:24 16:10 17:18 19:20 20:2,8,9 21:15 22:2,13,20 22:21,25 23:12,15 24:4,18 25:17 26:4 27:18 28:11 28:24 29:2,12,20 30:2 31:19 36:11 37:3,22
**affirmatively** 19:20 27:15
**agencies** 38:9
**agree** 14:16
**ahead** 15:23
**al** 1:6,8,14
**alleged** 24:25
**allowing** 31:3
**amendment** 25:2
**andy** 2:3
**animus** 25:5
**answer** 2:14 7:3 7:20,25 12:5 13:15 16:9 19:24 27:8 36:16,25
**answered** 36:19
**answering** 21:16 28:17
**answers** 2:7 4:10 4:15,22 7:6 12:16 13:4,17 14:1,4 17:2,4 21:8
**anticipated** 27:2
**anybody** 30:18

**anyway** 15:23
**appeals** 1:1
**appropriate** 32:4 39:2
**appropriately** 2:19
**area** 2:22
**argue** 24:13,15 35:1,22
**argued** 39:3
**arguing** 11:14 15:11
**argument** 1:17 11:20 19:9,14 27:20 30:18 31:24 34:23 35:16,17 36:3,22 37:5
**arizona** 1:6,8,12 2:3 24:14 35:1
**arizona's** 14:22
**articles** 29:10
**aside** 32:14
**asked** 5:5 6:18 21:7 27:11 32:21 36:18
**asking** 9:24 21:12 32:20 36:12
**asks** 14:19 25:21
**assert** 28:11 34:12
**asserted** 31:18
**asserting** 29:2
**assertion** 27:21 28:25
**assume** 22:13 23:3
**assuming** 11:13
**attention** 34:6
**attorney** 2:6,11,20 3:4 5:9 9:2 13:20 13:22 14:7 21:11 37:8,18 38:9,12,18

**authority** 16:19
**availability** 33:14
**available** 26:24 33:17
**averred** 27:8

**b**

**b** 1:14,22 18:21
**back** 8:1 28:8 29:22 30:4 35:11
**backing** 19:16
**bad** 3:19,21 6:11 8:23 18:2
**bare** 27:24 31:12
**barked** 30:24
**based** 12:24 13:25 15:10,12 16:10 25:3
**bases** 13:7 31:10
**basically** 30:4
**basis** 20:13 26:5 28:12 29:6 36:13
**bauman** 33:13 34:15
**beg** 37:17
**behalf** 18:20
**believe** 8:2 11:24 12:4 17:5 26:16 26:18
**benefits** 31:15
**berg** 2:1,2 3:18,25 4:4,7,12,18 5:1 7:1,5,11,14,18,24 8:9,13,17 9:13,17 9:22 10:5,10,16 11:19,24 12:4,8,15 13:2,10,16 14:11 14:16 15:5,9 16:4 16:15 17:5,10,16 18:8,13,16 34:25 35:14,22 36:2,15 37:13,15 38:5,25

**beyond** 23:16
**big** 30:3
**bit** 18:9
**blah** 15:2,2,2
**blanket** 21:3
**board** 14:13
**boundaries** 2:22
**broadly** 9:3
**brokers** 5:16 10:2
**brought** 34:5
**bunch** 17:21
**burden** 20:21
  25:18

**c**

**c** 40:1,1
**canyon** 21:2
**care** 20:1 22:19
**careful** 9:3
**case** 2:24 4:12 6:1
  6:2,4 9:5 10:8
  11:13 12:13 14:6
  16:16 18:4,25
  19:5 20:19 22:22
  23:3 24:21 25:3
  27:15 30:15 31:13
  36:20 37:20,24
  38:20 39:3
**cases** 9:5 21:1
  29:19 35:6
**causes** 19:1
**certain** 2:21 29:3
**certainly** 16:5
  33:15 34:18,19
**certify** 40:3
**chance** 37:6
**change** 3:9 15:1
**chevron** 21:24
  29:4
**chief** 29:14
**chill** 38:6

**circuit** 1:2 9:6
  36:7
**circumstances**
  19:2,6
**cite** 29:13
**cited** 25:24 35:6
**claim** 10:23 19:17
**claimed** 24:6
**claiming** 10:21
**claims** 20:11 24:25
  28:13
**clause** 25:1
**clear** 2:16,24
  12:12,21,23 20:6
  28:18 34:16,19
  36:6,7,16 37:8
**clearer** 36:18
**clearly** 12:7 23:6
  32:14
**clerk** 39:5
**clicked** 36:5
**client** 2:6,11,20
  3:4 5:9,16 9:2,6
  13:20 14:7 16:25
  21:11 26:13 37:8
  37:18 38:9,12,18
**clients** 3:13 14:22
**clifton** 1:25 9:10
  9:16,18 10:3,6,13
  12:21 22:10 23:2
  23:25 24:9,22
  26:7,20 30:16
  37:11,14,16
**clock** 34:24
**close** 37:2
**club** 32:7
**colleague** 37:21
**colleagues** 37:17
**come** 28:8,9
**commit** 2:25 6:5
  34:19

**committed** 2:15
**communications**
  2:12
**company** 17:25
**comply** 33:16
  34:10
**concede** 36:9
**conceded** 34:13
**concern** 5:7
**concerns** 31:3
**concession** 12:17
  12:20 17:12,16
  19:10 28:19 31:23
  32:11,13,17 35:20
**concluded** 14:24
**concluding** 4:18
**conclusion** 19:25
  27:13
**conduct** 2:22
**confidences** 38:13
**confusion** 20:6
**consider** 9:25 32:3
  32:19 33:12
**considerations** 7:6
**considered** 32:24
**consistently** 19:2
**constitutes** 22:12
  24:17
**consult** 33:1
**consultation** 29:10
  31:1
**consulted** 2:8 3:15
  6:17,20 17:13
  21:9 30:21,23
  31:6 32:24
**containment** 5:7
  8:6 17:22
**contempt** 35:3
**content** 13:22,23
**contents** 2:12

**context** 27:6
**corp** 21:25 29:4
**correct** 11:19
**corroborate** 25:8
**cost** 5:7,7 8:6,6
  17:22 26:1,12
  27:2,4
**costs** 31:11
**counsel** 2:8,10,13
  6:9,11 9:20,21,23
  10:8,11,14,22
  11:12 12:3,22
  13:12 14:2,5
  15:11,12,24 16:10
  17:9 18:15 19:21
  20:18 21:15 22:2
  22:4,8,13,20,21,25
  23:16 24:11,18
  25:13 28:11,24
  29:2,20 30:14,17
  30:21,23 31:2,6,19
  31:24 36:11 37:3
**counsel's** 9:11
**country** 40:12
**couple** 35:5
**course** 10:23
  26:11 28:5
**court** 1:1,11 2:1
  2:15 4:2,5,8,9,14
  4:16 6:11 9:3
  10:18,19,24,25
  11:7,15,23 12:2,7
  12:11 13:23 16:21
  18:19,23 19:2,15
  20:14 21:24 22:8
  22:18 23:11,14
  24:13,15 25:11,20
  26:2 28:21 29:3
  30:1 32:2,13,18
  33:8,18 34:11,17
  35:2,5,8,17,20,24

36:8,10,14
**court's**  12:23 13:7
  22:16 24:10 31:4
  33:16 34:6
**cover**  18:1 23:7
  27:17 31:14
**coverage**  3:13,14
  3:17 6:18,20
  14:20,23 15:1
  22:15,18
**covered**  23:6
**craig**  2:2
**create**  4:22
**credibility**  4:14
**crime**  3:1 6:5
**cross**  32:25
**cut**  19:8

**d**

**date**  40:16
**day**  39:4
**de**  4:8
**decide**  4:8 22:17
  23:14
**decided**  17:21
  24:6 36:5 37:23
**deciding**  3:21 7:7
  8:20
**decision**  6:10
  15:18 22:4 23:22
  25:13 26:3,5,6
  30:15
**defend**  6:8 28:13
**defending**  15:10
**defense**  2:14 5:25
  9:1,7,21,23 10:12
  10:15,22 11:12
  12:3,22 13:12
  14:2,6 15:24 16:9
  20:10,23 21:15
  23:16,19,24 28:10
  29:1,2,16 34:1,12

**36:11,17 37:3**
**definitely**  28:10
**deposition**  16:15
  16:17,22,24 25:24
**describe**  14:19
**determination**
  30:11
**determined**  16:13
  32:23
**develop**  29:9
**developed**  25:15
**dialogue**  36:23
**difference**  5:12
  6:15
**different**  4:24 5:8
  21:3
**difficult**  2:23
**discern**  2:23
**disclaim**  9:20,22
  10:14 26:12 28:23
**disclaimed**  20:20
  27:4
**disclosed**  13:21,23
**disclosing**  2:12
**disclosure**  32:4
**discovery**  3:2 16:1
  24:3 26:18 31:12
  33:16 34:11
**discriminate**  3:1
  5:14 27:23
**discriminated**
  3:12 8:24
**discrimination**
  3:15 6:23 8:12
  22:12 24:18
**discriminatory**
  5:21 6:5 8:19 23:7
  25:6 27:22
**discussed**  19:22
  34:16

**disobeyed**  35:2
**disparate**  25:3,4
**disputed**  23:10
**disregard**  37:23
**disregarded**  12:14
**distinction**  6:3
**district**  1:11,12
  2:15 4:2,5,9,15
  11:7,15,23 12:2,7
  12:11 13:7,22
  16:20 19:15 20:14
  25:11 30:1 31:3
  32:2,13,18 33:8
  34:6,10,17 35:2,17
  35:20,24 36:8,10
  36:14,21
**doctrine**  21:24
  22:1
**documents**  2:11
  2:13 11:17 20:16
  25:7 28:16 30:8
  38:3
**dog**  30:24
**doing**  11:12 14:7
**dozen**  6:25
**dr**  18:21 20:21
  22:6 24:24 25:3
  25:18 26:16
**drafted**  29:24
**drastic**  18:24
**drawing**  5:10
**dusen**  19:3

**e**

**e**  1:22,22 40:1
**element**  20:11
  28:13
**eliminate**  20:12,15
  28:19
**employee**  16:23
**entail**  31:4

**entered**  34:11
**entirely**  31:20
**entities**  29:11
**entitled**  8:22
**equal**  25:1
**err**  34:18
**erred**  12:7 32:14
**error**  2:16 4:5
  12:13,24,25 13:1,2
  34:16,19
**establish**  20:22
  22:6 23:23
**established**  21:24
  25:23 29:4
**establishing**  25:18
**et**  1:6,8,14
**evidence**  25:5 29:3
  29:15 33:21
**evidentiary**  20:22
  22:7 25:19
**exact**  7:25
**exactly**  11:20
  33:11 34:8,13
  35:23
**examination**  33:1
**examine**  24:4
  26:17
**example**  38:13
**exceptional**  19:1
**exchange**  37:6
**excluded**  33:22
**excludes**  14:20,23
**exclusion**  19:24
  24:7 25:9 26:6,19
  26:21 27:10,17
  29:14,17 31:8,10
  31:19
**expect**  37:24,24
**expecting**  31:23
  33:9

explain  26:10
explained  31:7
explanation  27:1
    27:14
explicit  13:18
explore  31:21
explored  33:7
extent  11:10 20:5
    29:24
extraordinary
    18:25 19:1,6 32:8

**f**

f  1:22 40:1
facially  31:11
fact  4:20 15:12
    22:6 25:10 26:8
    30:20 31:20 32:9
    37:21
factor  24:21,23
    26:2 33:13
factors  33:13
    34:15
facts  3:9
factual  13:1 20:19
    21:13 25:14 30:11
    30:14
failed  33:15 34:10
fairly  25:21
fairness  20:13
    22:1 28:15
faith  2:20
farr  18:19
fennemore  2:2
file  33:24 34:3
filed  35:11 36:23
find  6:11 9:7,8
    13:23
finding  12:23
first  22:24 27:12
    30:19 32:25 33:13
    35:15 38:5

focus  17:1
focused  10:4 16:21
    19:17
follow  23:12
foregoing  40:4
forget  14:14
former  16:23
forming  29:12
forth  37:25
forward  19:20
    20:9 22:2 23:21
    28:9 38:6
found  6:1 13:8,24
    35:3
frankly  16:20
front  4:9,14,20 8:1
    10:24,24 14:10
    32:11 35:15,20,24
    36:9
fundamentally
    21:22
funded  14:23
further  7:2
future  38:13

**g**

gallagher  18:20
gathered  5:17
gender  14:21,23
generally  6:3
ginsburg  2:17 3:5
    3:6 6:2
give  6:19 21:8
given  7:13 23:8
go  11:13 12:10
goes  30:10
going  11:14 12:2
    17:12,14,14,17,20
    20:6,9,9 22:16
    23:9 24:1,10,12,15
    28:10,12,23 33:1
    34:1 36:7,9 37:16

38:6,20
good  2:20 18:18
    19:11,11,13
government  23:1
    25:7 31:6,9 38:9
governmental
    29:11
granted  18:25
granting  34:17
guess  11:15 28:7
    28:14
guilty  9:7

**h**

half  6:25
happened  3:8,22
    4:24 5:23 22:14
harm  38:8
health  14:23 15:1
hear  18:14 30:5
heard  18:22 19:10
    20:25
helpful  11:3
hernandez  21:1
    22:7
hey  15:3 33:24
    35:12
hit  12:18
hold  11:16
hon  1:23,24,25 3:9
    3:23 4:1,6,11,17
    4:23 6:13 7:4,9,12
    7:16,21 8:7,10,16
    9:10,16,18 10:3,6
    10:13 11:2,22
    12:1,6,9,25 13:6
    13:14 14:9,12,18
    15:6 16:2,12 17:3
    17:7,11 18:7,11,14
    19:7 20:3 21:5
    22:10 23:2,25
    24:9,22 26:7,20

27:19 29:18 30:16
    31:22 32:10 33:5
    33:23 34:4,20,22
    35:10,19,25 36:4
    37:11,14,16 38:23
    39:2
honor  7:1,1,20
    9:13,24 10:16
    11:19,24 12:16
    13:10,16 14:17
    16:4,16 17:2 18:9
    19:6,13 20:17,25
    21:21 22:23 23:18
    24:3,20,24 26:15
    27:5 28:20 30:9
    30:25 32:6 33:3
    33:10 34:2 35:22
    36:17 37:15 38:22
honors  3:18 18:18
    34:21 39:1
horribles  31:5
huge  6:15
hyde  40:3
hypothetical  4:25
    6:14

**i**

identify  14:19
identifying  2:10
    2:10
ignores  35:7
illegal  16:14 25:9
imagine  31:9
impact  25:4
implication  13:9
    13:11,13
implied  2:18 13:24
    15:25 18:5 21:23
importance  37:19
important  5:10,11
    9:2 37:9

**inappropriate**
  35:9
**includes**   29:9,10
**including**   17:24
  19:3
**incorrect**   19:18
**incredibly**   37:9
**incumbent**   26:16
**indiscernible**   8:6
  27:15
**indisputably**
  18:24
**indulgence**   37:17
**information**   21:13
  38:12
**informed**   25:8
**instance**   19:4
  20:23 25:7 31:5
**instances**   19:19
**insurance**   5:16
  10:2 17:24
**intend**   21:14
**intent**   2:25 3:1,19
  3:21 5:2,4,13,21
  6:4,6,8,12 8:23,24
  15:11,21 16:3,6,10
  17:8,19 18:2
  20:11 24:21,22
  25:6 27:22 28:3
  28:13
**interest**   1:15 18:21
**interested**   23:13
**interject**   20:7,9
  21:14
**interjected**   28:12
**interpretation**
  13:25 23:17
**interrogatories**
  2:8 12:24
**interrogatory**
  4:10,15,21 7:3,6

7:19,22,25 9:14,25
11:6 12:16 13:4
13:17 14:1,4,14,19
16:9,21 17:2
19:18,22 20:24
21:18 22:3,5
29:25 30:13 36:16
36:25 37:1
**invalid**   10:20
**invoked**   2:19
**involved**   30:17
**involvement**   20:18
  22:4,8 25:12,14
  30:14
**involving**   19:1
**issue**   2:5,9 4:14
  10:18 16:6 21:23
  21:25 22:22 29:6
  29:7,20 30:2
  33:20 35:4 36:13
**issues**   5:8 22:5
  33:6
**issuing**   12:10

**j**

**j**   1:23
**jordan**   18:19
**judge**   2:17 3:6 6:2
  12:21 33:25 35:12
  35:15 36:21,22
**judgment**   33:18
**jury**   11:13
**justice**   2:17 3:5

**k**

**key**   14:17
**kind**   5:25 11:11
  21:15 29:21,23
  30:6 37:6
**kinds**   33:6
**know**   3:11 11:13
  12:5,10,13,18

20:10 21:3 25:17
25:21 27:25 28:4
29:22 30:6 31:25
32:7,11,12,21,23
33:19,20 34:4
35:12,23 36:6
38:14
**knowledge**   23:21
  29:5
**known**   37:10

**l**

**law**   3:16 14:25
  22:17 23:13,17
  24:15 27:24 28:1
  29:5,7,13 30:18,20
  37:10
**lawful**   32:23
**lawyer**   3:3 5:13,22
  5:22 6:7 8:3 17:13
  21:10 23:4 24:14
  26:9 37:25
**lawyer's**   8:20 9:9
**lawyers**   3:16,20
  5:2,6,19 6:17,21
  7:15 10:1 15:17
  15:19,22 20:8,10
  23:5,12 27:25
  38:7
**layman**   2:23
**lectern**   19:11
**led**   29:25
**ledanski**   40:3
**legal**   2:22 4:21 5:4
  5:17,17,23 12:23
  12:25 13:2,5 15:3
  15:22 17:18 19:25
  20:1 22:12 24:7
  24:11 25:17 26:4
  27:13,18 29:12,20
  30:2,11 31:8
  38:21,21 40:11

**legality**   2:21
**legally**   5:3 8:5,21
  14:1,25 31:16
**legitimate**   27:9,16
  29:16 31:10
**lesson**   2:24
**letters**   38:1
**liability**   10:19
**liable**   9:8
**lie**   21:10 34:9,14
**light**   15:14
**line**   5:10
**litigate**   35:4
**litigation**   21:14
  33:7 38:14,16
**little**   14:10 18:8
**lived**   37:18
**longer**   16:24
**look**   7:22 17:5,6
  19:21 25:22 33:25
**looked**   4:10 5:14
  8:5 17:20,23
**looking**   24:3 30:19
**lose**   10:7
**lots**   38:17

**m**

**magic**   28:25
**magistrate**   35:15
  36:21
**main**   24:7
**maintain**   19:24
  26:6,21 27:10,17
**maintained**   23:1
  26:19
**maintaining**   29:14
  29:17 31:7,10,18
**making**   6:9 8:14
  8:14,15 11:21
  15:18 22:4 23:22
  25:13 26:3,5
  30:15

**malintent** 5:20
8:22
**mandamus** 11:1
12:10,11 18:24
19:4 32:7,14
33:11 36:13
**march** 1:18
**materials** 4:9
**matter** 13:5 20:13
22:21 28:15 37:20
38:4
**mattered** 20:25
**matters** 22:24
**mean** 13:14 17:12
22:11 23:3 26:8
26:22 27:19 28:3
29:22 30:17 33:8
36:18 37:20 38:16
**meaningful** 30:22
30:23
**means** 17:17 33:14
**meeting** 14:1
**mention** 21:10
**mentioned** 23:4
**mere** 21:16 31:1
**microphone** 12:18
**middle** 3:9
**mineola** 40:14
**minimum** 27:24
31:12
**minute** 36:4
**minutes** 34:23
**mis** 6:6,8
**miscited** 21:2
**misconstruction**
36:12
**misinterpreted**
11:8
**mistake** 29:24
35:13

**misunderstand**
21:22
**misunderstanding**
30:3
**misunderstood**
36:9
**morning** 18:18
**motion** 33:24 34:3
35:11

**n**

**n** 40:1
**nature** 21:23
30:17
**need** 16:11 20:12
20:15 28:15 29:15
31:20
**needs** 22:6
**negate** 28:3
**neither** 36:21
**neutral** 28:4 31:11
**never** 23:4 28:12
29:22
**new** 33:21
**newspaper** 29:10
**ninth** 1:2 36:7
**non** 27:9
**nondiscriminatory**
27:9 28:4
**nope** 30:5
**noted** 18:23 22:8
32:8
**noting** 22:3
**novo** 4:8
**number** 14:14
19:18,22 20:24,24
21:19 22:3,5
30:13 37:1
**numerous** 23:20
**ny** 40:14

**o**

**o** 1:22 40:1
**obtain** 26:14
**obviously** 10:18
**offer** 6:18,19,24
7:8
**offered** 23:16,19
24:11 26:12 31:24
**offering** 3:17
**oh** 6:6 17:10 34:4
**okay** 3:23,25 4:6
4:23 7:4,10,18,21
8:9,16 9:17 10:5
11:2 14:11,16,18
15:7,9 17:5 18:7
18:13,14 20:3
21:9 25:17 26:7
28:2 34:20 38:2
38:23
**old** 40:12
**oldest** 37:9
**once** 29:4,19 30:5
**ones** 14:15
**opinion** 2:21
**opinions** 5:17
**opponent** 20:5
**opponents** 11:4
**opportunity** 18:22
**option** 26:23 30:5
**oral** 1:17 35:24
36:2,22 37:5
**order** 16:1 31:4
32:14 33:16 34:10
35:2,8
**ordering** 32:4
**ought** 33:7
**outside** 17:25

**p**

**paez** 1:24 11:22
12:1,6,9,25 13:6

13:14 16:2,12
17:3,7,11 18:7
31:22 32:10 33:5
33:23 34:4 35:10
35:19,25 36:4
**papers** 25:24
36:24
**parade** 31:4
**pardon** 3:7
**part** 3:2 6:6 25:6
25:10
**particular** 37:19
**particularly** 33:13
**parties** 1:15
**party** 18:20 29:5
**passionately** 23:9
**paul** 1:23 2:4 3:23
4:1,6,11,17,23
6:13 7:4,9,12,16
7:21 8:7,10,16
11:2 14:9,12,18
15:6 18:11,14
19:7 20:3 21:5
27:19 29:18 34:20
34:22 38:23 39:2
**pennzoil** 21:25
29:4
**people** 16:17 21:9
32:25
**periodicals** 5:17
17:25
**permissible** 26:11
**permit** 16:1
**permitted** 35:3
**person** 21:13
**persons** 23:21
**perspective** 10:9
**persuade** 23:11
**persuaded** 24:10
**petition** 18:23
33:11 34:9,14,17

**petitioner** 2:3
**petitioner's** 21:1
  25:16 26:2,6 31:2
**petitioners** 1:9 2:6
  19:17,20 20:20
  21:22 23:20 24:5
  25:8 27:7,8 28:22
  31:18 33:15 34:13
**placed** 29:5
**places** 29:6
**plainly** 19:18
**plaintiff** 3:11 8:22
**plaintiffs** 11:8
  16:3
**plan** 10:20 14:20
  14:23 15:1
**play** 10:8
**plays** 10:10
**pleading** 25:3
**please** 2:1 18:19
**point** 20:19 21:1
  21:20 23:10 25:14
  30:12,14 35:1
**pointed** 26:3 27:12
**policies** 31:15
**policy** 2:9 27:23
  31:11,14
**polite** 22:18
**posed** 4:25
**position** 9:19
  12:15 14:3 36:24
**positive** 3:8 18:5
**possibly** 21:11
**post** 33:17
**practical** 38:2
**prayer** 23:6
**precisely** 11:20
**predicate** 21:11
**prepared** 10:14
  32:16

**present** 25:11
**presented** 2:5
  19:15
**presumably** 22:15
**pretextual** 27:9
**pretty** 12:14
**prevail** 16:2
**prevent** 38:19
**principle** 22:1
**privilege** 2:7 3:4
  5:10 9:2 10:19,25
  13:20 14:7 16:18
  16:19,25 21:12
  37:8,9,10,18 38:9
  38:18,19
**privileged** 2:11
  15:4 20:16
**problem** 28:7,19
**proceed** 35:4
**proceedings** 40:5
**produced** 38:3
**product** 38:18
**prohibited** 3:16
  6:18
**proposition** 16:7
**protection** 25:1
**prove** 5:20 8:22,24
  15:20 16:3 23:15
**provide** 3:14 15:1
  20:1
**provided** 11:6
  22:15 24:5,16
**providing** 3:12
  26:13
**provision** 22:17
**provisions** 14:2
**pull** 7:22
**put** 4:13 6:14
  19:20 21:18 23:21
  29:19 30:2 33:20
  34:23

**puts** 25:13
**putting** 22:1

**q**

**qualifications**
  37:25
**quarrel** 16:7
**question** 4:20,21
  9:16 10:25 11:1
  12:5 13:3 17:4
  19:23 21:16 22:11
  22:12 30:10,11,12
  30:20 36:19
**questions** 21:7
  32:20
**quote** 7:23 14:13

**r**

**r** 1:22 40:1
**radar** 31:25
**raise** 10:11 11:11
  13:15 34:1 36:10
  37:3
**raised** 13:11,17
**raising** 2:13 10:14
  12:22 36:17
**rationale** 31:8
**reached** 19:25
**read** 9:4,4,5 14:4
  18:4
**ready** 30:3
**real** 1:15 18:20
**reality** 35:7
**really** 5:11 22:19
  22:21 26:8 37:20
**reason** 3:14 5:20
  6:8,13,22 11:16
  22:25 26:12,19,21
  26:25 27:16 28:5
  28:21 29:14 31:7
  31:17,17

**reasoning** 24:8,11
**reasons** 5:5 6:19
  7:10,13 8:8,11,18
  14:20 15:17 16:20
  17:22,23 19:16
  21:3 22:24 24:5
  27:10,11 29:16
  38:17
**reassignment**
  14:21,24
**rebuttal** 18:9,12
  34:24
**received** 20:2
  25:16 26:4
**recognized** 19:3
**reconsideration**
  33:24 34:3 35:12
**record** 5:15 19:19
  20:22 22:7 23:23
  25:11,15,19,23
  26:17 29:9 40:5
**reflect** 9:15
**reflects** 5:15 10:1
**refute** 23:23 24:1
  29:15
**refuting** 20:22
**rejected** 35:5
**relate** 33:6
**relevant** 21:6
  24:19 25:10 29:8
  31:20
**reliance** 9:11,21
  9:23
**relied** 3:20 4:16
  6:9,10 8:20 9:8,19
  29:3,12
**relief** 33:15,18
**reluctant** 32:10,12
**rely** 12:2 20:20
  28:23

relying  14:5
remand  33:21
remedy  18:25 35:8
remember  36:20
replete  19:19
reply  35:6
representation  25:16
representing  2:2
repudiated  26:1 31:13
require  28:1 30:20
required  8:5 14:25 15:15 20:1 27:13 31:16
requires  22:17 24:16 27:25 29:7 30:18
respect  2:9
respond  15:7 19:9
respondent  1:13 18:15
responding  19:23
response  9:14 12:20 19:12 20:23 21:18 27:3,7,20 28:8 29:25
responses  11:7 16:21
rest  19:8
rethink  32:3
reveal  3:2
reviewed  33:19
revises  38:8
richard  1:24,25 9:10,16,18 10:3,6 10:13 11:22 12:1 12:6,9,25 13:6,14 16:2,12 17:3,7,11 18:7 22:10 23:2 23:25 24:9,22

26:7,20 30:16 31:22 32:10 33:5 33:23 34:4 35:10 35:19,25 36:4 37:11,14,16
right  4:3,11,17 7:11 8:4,7 20:3,7 21:19 33:3 34:18 35:25
rise  39:5
road  30:6 40:12
role  10:7,11
ruled  20:14
ruling  13:8
run  28:17
russell  1:14 18:21

**s**

sanction  34:11
save  18:8
saying  5:13,20 6:3 6:7,16 9:10,13 10:17,17,21 11:5,7 11:9,18 14:5 15:10,16 29:23 30:4,12 34:5,12 35:12
says  2:25 3:11 7:20 16:9 20:5 26:9,11,23 31:6
school  38:20
screen  31:25
secondly  38:11
see  6:15 11:4
seeking  2:21
seeks  26:14
self  14:22
service  26:13
services  24:16
set  32:14
settles  28:2

sex  24:17
shannon  2:4
side  38:16,19
side's  38:21
signature  40:8
significant  5:12 26:1 32:1
simply  2:24 14:7 25:15
sit  28:22
sitting  10:17
six  6:25
slightly  3:10
solutions  40:11
sonya  40:3
sorry  10:5 12:18
sorts  5:18
sought  22:16
specific  3:6,7 4:15 18:5 31:7 36:19
specifically  34:15 36:20
speculating  38:15
stand  17:8 31:4 36:25
stands  20:5
start  34:25
state  1:6,8 2:3 9:25 14:22,24 23:13 24:12,14 35:1 38:7
state's  9:19 23:11
stated  2:18 22:25
states  1:1,11 2:18 15:14
stating  2:7
step  7:2 8:14 30:4
stop  3:24
strategy  38:14
street  29:21

strike  30:21
struggling  28:14
stuck  30:7
stuff  17:24,24
submitted  39:3
subtle  5:11
sues  3:11
sufficient  4:22 13:4 15:25 37:2
suggested  37:22
suggesting  15:13
suggests  13:20,21
suite  40:13
sum  2:19
support  34:16
supporting  25:5
suppose  28:3 38:2
supposed  12:19
sure  6:15 14:13 18:11 32:15,15 37:15
surgery  14:21,24

**t**

t  40:1,1
t's  23:19
take  7:7 23:8 28:17 29:22
taken  7:2 16:16
takes  3:4 15:15
talk  5:19
talked  3:3 5:6,13 5:22 7:14,15 8:3 10:1,1 15:16,19,21
tell  12:1 19:12 21:5,8
terms  38:2
testify  32:22
testimony  16:15 16:17,22 25:25
thank  18:10,21 34:21,22 38:23,25

**theories** 16:5
38:21
**thing** 27:12 32:5
32:25
**things** 5:14,18
17:21
**think** 2:23 3:18
4:4,5 5:9,12 6:1,4
7:2,19,24 8:3 9:3
9:22,25 10:10,20
11:2 13:2,3,18
16:4,6,8,8,10,20
17:1,3,16,25 18:1
18:3 19:1,5 20:25
21:6,17 22:23
23:4,9,10 25:9,12
25:22 27:6,19
28:21 30:1,9 31:2
32:19 35:7,18
36:15 37:2 38:5,6
38:8
**thought** 4:2 5:3
11:10 13:6,7
22:14 38:21
**time** 10:7 16:24
18:9,12 31:25
**timothy** 2:2
**title** 15:2 25:2,2
**tobin** 2:3
**today** 10:24,25
19:11 32:17 36:19
36:23
**told** 3:16 5:2,22
6:17,21,23 7:16
8:4,5 11:23 15:22
23:5 28:1
**toomey** 1:14 18:21
20:21 22:6 25:3
25:18 26:16
**toomey's** 24:25

**touch** 12:19
**tough** 12:14
**transcript** 40:4
**treat** 31:14
**treatment** 25:4
**trial** 25:21 33:21
**true** 5:15 28:20
40:4
**truthful** 21:8,12
21:13
**truthfully** 21:16
**trying** 11:9,11
20:7 27:23 30:1
**tucson** 1:12
**turn** 38:15
**turns** 37:21
**two** 8:7,10 22:24
34:23
**typical** 4:12

**u**

**undergirds** 21:25
**underlying** 10:22
22:22
**undermined** 38:10
**understand** 11:5
21:20 26:8 27:20
28:14 37:19
**understanding**
29:7,13,19
**understood** 27:3
28:22
**uniformly** 26:3
**united** 1:1,11 2:18
15:14
**uses** 38:7
**usual** 37:25

**v**

**v** 1:10 21:25 29:4
**van** 19:3

**veritext** 40:11
**versus** 2:18 15:14
21:2
**vii** 25:2,2
**violate** 35:8
**violating** 24:17
**violation** 25:1

**w**

**wait** 36:4
**waive** 4:19 9:6
16:18,19,25
**waived** 2:6
**waiver** 2:15,19 3:3
3:8,22 4:22 6:2
13:8,11,13,18,19
13:24 15:15,25
18:4,5 21:4,11,17
21:23 37:4
**waivers** 9:4
**waiving** 13:19
14:6
**walk** 6:7
**wall** 18:18,19
19:13 20:17 21:20
22:23 23:18 24:2
24:20,24 26:15
27:5 28:20 30:9
30:25 32:6 33:3
33:10 34:2,8,21
**want** 10:7 19:8
24:3 38:15
**wanted** 28:8
**warn** 33:12
**warranted** 19:5
**watford** 1:23 3:23
4:1,6,11,17,23
6:13 7:4,9,12,16
7:21 8:7,10,16
11:2 14:9,12,18
15:6 18:11,14
19:7 20:3 21:5

27:19 29:18 34:20
34:22 38:23 39:2
**way** 6:6,14 8:25
15:3 18:17 29:21
29:24 36:5
**ways** 34:5
**we've** 3:11 8:24
19:21 32:8 34:16
35:6 36:23 37:7
37:17
**went** 5:16 15:21
15:23 20:4 27:25
35:16
**white** 2:18,24 6:1
9:5 15:14 18:4
**wilkie** 18:19
**witness** 4:13 17:8
17:12,17 23:19
32:22
**witnesses** 16:13
23:20 25:22,25
**words** 7:25 28:25
**work** 38:18
**works** 16:25
**worry** 16:23
**writ** 18:24 36:13
**write** 38:1
**writs** 12:10
**wrong** 33:25

**x**

**x** 1:3,5,16

**y**

**yeah** 15:5 19:7,7
**years** 22:20 24:12