# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

RUSSELL B. TOOMEY,                      )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     ) 4:19-CV-00035
                                        )
STATE OF ARIZONA; ARIZONA BOARD         )
OF REGENTS, d/b/a UNIVERSITY OF         )
ARIZONA, a governmental body of         )
the State of Arizona; et al.,           )
                                        )
            Defendants.                 )
_____ )

VIDEOTAPED DEPOSITION OF CHRISTINA CORIERI

(Via Zoom Videoconference)
July 13, 2022
8:30 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020               Robin L. B. Osterode
602.266.6535                         CSR, RPR
www.glennie-reporting.com            CA CSR No. 7750
                                     AZ CR No. 50695

                                                                    55

1     A.    No.
2     Q.    What do you disagree with?
3           MS. LAMM:  Object to the form of the question.
4           THE WITNESS:  Well, some of it I don't even
5  know what she's referring to.  I don't know what the mass
6  resistance is.  I don't know what the Alfred Kinsey
7  occultic faux science is.  I don't even know what she's
8  talking about.
9  BY MR. ECKSTEIN:
10    Q.    Okay.  You've never heard of Alfred Kinsey?
11    A.    I think I have vaguely heard of him as a
12 university professor.  I've never read anything --
13    Q.    I guess --
14    A.    I'm sorry?
15    Q.    I guess that's the difference -- the difference
16 in our generations.  You've never heard of the Kinsey
17 Reports --
18    A.    I never --
19    Q.    -- in the 1940s?
20          All right.  That's fine.
21          I want to ask you, do you agree that gender
22 reassignment surgery was not welcome in the governor's
23 office?
24          MS. LAMM:  Object to the form of the question.
25          THE WITNESS:  We -- we have never had a

56

1  conversation about this, so I have no objection to
2  decisions that -- that people make.
3  BY MR. ECKSTEIN:
4      Q.   Okay.  And so you don't know whether it was
5  welcome or not welcome.  Correct?
6      A.   We don't have a position on this.
7      Q.   Or -- no position at all?
8      A.   No, this is an individual decision.
9      Q.   All right.  When you're saying individual
10 decision, what do you mean by that?
11     A.   I mean it's a decision for somebody to make for
12 themselves.  I -- I do not have a position on feelings on
13 whether or not somebody, you know, gets it or not.  It
14 just doesn't --
15     Q.   But if a person is employed by the State of
16 Arizona, say by the University of Arizona and wants to
17 have gender reassignment surgery, that person could not
18 have it at any time during the time you've been employed
19 by that office.  Correct?
20          MS. COHAN:  Form.
21          MS. LAMM:  Object to the form of the question.
22          THE WITNESS:  That's not true.
23 BY MR. ECKSTEIN:
24     Q.   Oh, tell me why it's not true.
25     A.   Because you can always get it if you are

1     A.    Okay.

2     Q.    Okay.  Thank you.

3           I want to take you back to the September 2016

4  time frame.  And I'm just going to paraphrase what you

5  said about that.  I'm not trying to put words in your

6  mouth, but you described recalling two meetings that

7  occurred generally in the early September 2016 time frame

8  concerning a potential change to the ADOA plan as it

9  relates to gender reassignment surgery.

10         Do you recall that discussion?

11         MS. LAMM:  Object to -- object to the form of

12  the question.

13         THE WITNESS:  I want to correct.  I said

14  August 2016.  I was actually out of the country for most

15  of September 2016.

16  BY MR. POWELL:

17     Q.    Okay.  So the August time frame, then.

18     A.    The August time frame was the first

19  conversation, the meeting, the follow-up conversations,

20  e-mails, happened after September of -- of 2016.  So

21  those were more like the, I think November-ish time

22  frame.

23     Q.    Okay.  We'll get to some of those documents and

24  we'll be precise about the dates of them.  But I wanted

25  just to address a couple threshold issues.  You and

1  meeting or the lead-up to the meeting?
2      A.   I don't know leading up to the meeting in
3  August, because I was invited to it by Mike Liburdi.
4      Q.   Okay.  So this e-mail -- and, finally, please
5  tell us who Jill Metzinger is who is cc'd here.
6      A.   Jill Metzinger was my assistant, and she
7  confirmed this call for me.  However, Jill did not
8  realize or look and see that at the time of this call, I
9  would have been at the airport preparing to board a
10 flight out of the country.
11     Q.   Did the call go forward at the time proposed,
12 which was for tomorrow, which would be September 2nd?
13 Did you end up not participating in this call?
14     A.   So I do not remember participating in this
15 call.  On Friday, September 2nd, I had a ticket to Rome,
16 I was -- my flight was leaving before 11:00 a.m.  My
17 father had left me in charge of my youngest sister, who
18 has development disabilities, so I was trying to deal
19 with boarding a plane and taking care of my youngest
20 sister.  I don't recall if I called in and listened to
21 part of this call, or if I skipped this call, but I have
22 no memory of it, other than that I remember being
23 incredibly hectic and stressed that morning dealing with
24 my youngest sister.
25     Q.   Okay.  And let me just go back to the beginning

1   services e-mail.  There was no e-mail to me on that.  I
2   was not aware of that e-mail until Mr. Eckstein showed
3   that to me.  So the only time I typically get ones
4   forwarded to me is if there is a problem with an agency
5   that we have to get fixed in regards to, I like this
6   bill, I don't like this bill.
7           They could get thousands of e-mails or phone
8   calls on any given bill and some of them are, you know,
9   not bills that you -- that you would think are going to
10  be the ones that get the high areas.  I think maybe our
11  highest was related to Salt River horses of all things.
12      Q.  And, by the way, I didn't mean to imply that
13  you had received that e-mail.  Just give me a moment
14  here.
15          Ms. Corieri, would you turn to Tab 35 in our
16  binder.
17      A.  I have to change binders, hold on.
18          MR. POWELL:  Take your time.
19          THE WITNESS:  Okay.
20          (Marked for identification Exhibit 103.)
21  BY MR. POWELL:
22      Q.  Exhibit Corieri -- sorry, this is the -- the
23  Tab 35, is an e-mail that was sent from something called
24  The Daily Signal to what appears to be your e-mail
25  address at the governor's office, Ms. Corieri, dated

119

1  January 20, 2018.  And it has a long subject line, but
2  one part of which says, "This man received 167 sex change
3  surgeries and he lives in a world of regret."
4          What is this document, Ms. Corieri?
5      A.  I don't recall this document, but I receive
6  many e-mails from many different lists that end up in my
7  e-mail box every day.  Everything from POLITICO to ones
8  from right-leaning groups like Heritage, ones from
9  liberal-leaning groups like the Center for Budget and
10 Policy, and the Brookings Institute, ones from AEI and
11 Cato.  I have my ones I read more often than others.  And
12 I get probably 30 to 40 e-mail lists a day.
13     Q.  Is this something --
14     A.  Some are on things like marijuana and all sorts
15 of stuff.
16     Q.  And is this something that, this Daily Signal,
17 which appears to be a product of the Heritage Foundation,
18 did you subscribe for this?
19     A.  I don't remember signing up for this.  I may
20 have, but a lot of times other people sign us up for
21 their group lists, because they want us to see the
22 e-mails that they send.  The only ones I specifically
23 remember subscribing to are POLITICO, because you select
24 the topics that you want.
25     Q.  Do you recall in this time frame receiving from

120

1    The Daily Signal -- or receiving versions of the -- or
2    issues of The Daily Signal, I should say, that raised
3    issues about sex change surgeries?
4        A.    This one obviously did.  I don't recall reading
5    this one.  And I will tell you that, generally, during
6    legislative session I don't have time to read lists that
7    come to me.  This particular one is January 20th.  That
8    means we're at the beginning of session.  That is likely
9    budget week.  It is an incredibly busy time in our
10   office, and you don't read things that are not
11   immediately necessary at that time.
12       Q.    Do you -- for how long back in time have you
13   been receiving The Daily Signal, do you know?
14       A.    I would guess that this goes back fairly far
15   in -- in my -- but I would guess that all of them go back
16   fairly far.
17       Q.    Back as far as 2016?
18       A.    Very likely, but I don't know.
19             (Marked for identification Exhibit 104.)
20   BY MR. POWELL:
21       Q.    If you could look now at Tab 33, and this is
22   also from The Daily Signal to your e-mail address.  This
23   one is dated Saturday, September 2nd, 2017, at 11:03 a.m.
24   And it -- the second item that shows up on the first page
25   says, "My sex change was a myth.  Why trying to change

1  one's sex will always fail."
2           Do you recall receiving an article from The
3  Daily Signal on that topic?
4       A.   I don't recall this.  This obviously was in
5  my -- in my e-mail box.  I would have been on vacation at
6  this point, as I went away for Labor Day that year.  So I
7  certainly didn't read it then and it would not be on my
8  high level of important things to read when I got back,
9  so I don't recall reading this.  I doubt that I did.
10          MR. POWELL:  Why don't we take -- we may well
11 be done, but if we could take another five-minute break,
12 we'll take a look at where we are and get back to you.
13          THE VIDEOGRAPHER:  Off the record at 12:19 p.m.
14          (Recessed from 12:19 p.m. until 12:27 p.m.)
15          THE VIDEOGRAPHER:  We are on the record at
16 12:27 p.m.
17          Please proceed when ready.
18          MR. ECKSTEIN:  In the Ninth Circuit argument in
19 this case, Mr. Berg represented to the Ninth Circuit and
20 then Fennemore, I think also represented to the district
21 court that it would not assert an attorney-client
22 privilege.
23          Shannon, is that correct?
24          MS. COHAN:  No, that is not accurate.  We -- we
25 said we would not assert the advice of counsel defense.

137

1                     SIGNATURE PAGE

2

3      I, CHRISTINA CORIERI, a deponent exercising my right to read and sign my deposition taken on July 13,
4 2022, place my signature hereon and make the following changes on this _____day of_____, 2022.
5
        (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                     _____

8                     CHRISTINA CORIERI

9

10 PAGE    LINE    READS    CHANGE TO    REASON

11 _____   _____   _____

12 _____   _____   _____

13 _____   _____   _____

14 _____   _____   _____

15 _____   _____   _____

16 _____   _____   _____

17 _____   _____   _____

18 _____   _____   _____

19 _____   _____   _____

20 _____   _____   _____

21 _____   _____   _____

22 _____   _____   _____

23 _____   _____   _____

24 _____   _____   _____

25 _____   _____   _____

```
 1   STATE OF ARIZONA      )
     COUNTY OF MARICOPA    )
 2
             BE IT KNOWN that the foregoing proceedings
 3   were taken before me; that the witness before testifying
     was duly sworn by me to testify to the whole truth; that
 4   the foregoing pages are a full, true, and accurate record
     of the proceedings all done to the best of my skill and
 5   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 6   direction.

 7       [X] Review and signature was requested.

 8       [ ] Review and signature was waived.

 9       [ ] Review and signature not required.

10           I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in the ACJA 7-206(F)(3)
11   and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
     Arizona, this 23rd day of July, 2022.
12

13

14
                    _____
15                  ROBIN L. B. OSTERODE, RPR
16                  CA CSR No. 7750
                    AZ CR No. 50695
17
                    *   *   *   *   *
18           I CERTIFY that Glennie Reporting Services,
     LLC, has complied with the ethical obligations set forth
19   in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23   _____
24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035
```