**Christine K Wee** – 028535
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
Email**:** cwee@acluaz.org

**Joshua A. Block***
**Leslie Cooper***
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: (212) 549-2650
E-Mail: jblock@aclu.org
E-Mail: lcooper@aclu.org
**Admitted pro hac vice*

Wesley R. Powell*
Matthew S. Freimuth*
Jordan C. Wall*
Justin Garbacz*
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
E-Mail: wpowell@willkie.com
E-Mail: mfreimuth@willkie.com
E-Mail: jwall@willkie.com
E-Mail: jgarbacz@willkie.com
**Admitted pro hac vice*

*Attorneys for Plaintiff Russell B. Toomey*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Russell B. Toomey,<br><br>          Plaintiff,<br><br>v.<br><br>State of Arizona; Arizona Board of Regents, D/B/A University of Arizona, a governmental body of the State of Arizona; et al.,<br><br>          Defendants. | No.19-cv-00035-TUC-RM (LAB)<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

Plaintiff Dr. Russell B. Toomey, on behalf of himself and the certified classes ("Dr. Toomey"), submits the following Reply in Support of Plaintiff's Motion for Summary Judgment ("Reply") to Defendants State of Arizona's, Andy Tobin's, and Paul Shannon's Opposition to Plaintiff's Motion for Summary Judgment (Doc. 315).[1] This Reply is accompanied by the Transmittal Declaration of Christine K. Wee, and exhibits thereto.[2]

## ARGUMENT

### I. THE "GENDER REASSIGNMENT SURGERY" EXCLUSION VIOLATES TITLE VII.

#### A. The "Gender Reassignment Surgery" Exclusion is Facially Discriminatory.

*1. The Court's reasoning for denying State Defendants' Motion to Dismiss applies equally here.*

In resolving Dr. Toomey's Motion for Summary Judgment, the Court should employ the same reasoning it employed in denying the Motion to Dismiss. Doc. 69. As this Court previously explained, in evaluating whether the Exclusion is facially discriminatory, the question is not whether the Plan makes certain procedures available to men, but not to women (or makes certain procedures available to women but not to men). Rather, the question is whether the "harm occurred because [Dr. Toomey's] natal sex does not match his gender identity." Doc. 69 at 10. Exclusions that are based on the incongruence between sex assigned at birth and gender identity are—by definition—facially sex-based because "[t]he characteristics of sex and gender are directly implicated; it is impossible to refer to

---

[1] Capitalized terms used below and not otherwise defined have the same meaning given to them in Dr. Toomey's opening brief. Doc. 298.

[2] Immediately prior to the submission of this Reply, State Defendants filed a Response to Plaintiff's Countervailing Statement of Facts (Doc. 335). This is plainly improper. L. R. Civ. P. 56.1(b) ("No reply statement of facts may be filed."); *Am. Express Co. v. Ponnambalam*, No. CV-18-03237-PHX-SMM, 2020 WL 13442489, at *4 (D. Ariz. Apr. 7, 2020) ("Any objections to the admissibility of Plaintiffs' evidence should have been included in Defendants' reply in support of their motion for summary judgment, not in a separate filing.") Plaintiff has requested that State Defendants immediately withdraw the submission. If State Defendants will not do so, Plaintiff will move to strike as soon as reasonably possible in light of the intervening Thanksgiving holiday. Plaintiff reserves all rights otherwise.

the Exclusion without referring to them." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 18 (M.D.N.C. 2020). And when an exclusion applies sex-based rules, those sex-based rules remain facially sex-based even when they are applied both to men and to women. *See Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1741 (2020).

State Defendants assert that the "Gender Reassignment Surgery" Exclusion is facially neutral, yet they make no attempt to reconcile their arguments with this Court's prior decisions. Doc. 315 at 1. Instead, State Defendants repeat the same arguments contained in previous Reports and Recommendations that this Court rejected twice. Doc. 69 (Order Denying Motion to Dismiss); Doc. 162 (Order Denying Motion for Preliminary Injunction). When State Defendants filed a Motion to Dismiss (Doc. 24), the Magistrate Judge issued a Report and Recommendation (Doc. 46) (the "MTD R&R") erroneously concluding that the motion should be granted with respect to the Title VII claim. Relying on *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the MTD R&R concluded that Dr. Toomey had failed to state a claim by alleging that "he is being discriminated against because his sex [assigned at birth] and gender identity do not match." Doc. 46 at 5-7. According to the MTD R&R, Dr. Toomey had to allege that "the Plan exclusion would not apply if his sex were different," and, since the Exclusion applied to both men and women, Dr. Toomey could not make that showing. *Id.*

This Court expressly rejected that reasoning and concluded that Dr. Toomey had adequately alleged that the Exclusion discriminated based on sex *both* because (a) it treated him in a manner that, but for his sex assigned at birth, would have been different, *and* (b) because it discriminated based on gender nonconformity. Doc. 69 at 10-11. *First*, this Court explained that discrimination based on the incongruence between Dr. Toomey's sex assigned at birth and his gender identity *is* discrimination that would not occur if his sex assigned at birth were different: "[H]ad Plaintiff been born a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery." *Id.* at 10; *accord Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 591 (D. Md. 2021) (explaining that "gender dysphoria [is] a condition inextricably linked to

2

being transgender," and the plaintiff was denied a hysterectomy "specifically because it [is] linked to this condition") (emphasis added). *Second*, this Court explained that "[t]his narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity," which "implicates the gender stereotyping prohibited by Title VII." *Id.* at 10-11; *accord Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018) (explaining that excluding transition-related care "implicates sex stereotyping by . . . requiring transgender individuals to maintain the physical characteristics of their natal sex").

When Dr. Toomey filed a Motion for a Preliminary Injunction (Doc. 115), the Magistrate Judge issued another Report and Recommendation (the "PI R&R") again relying on *Gilbert* and erroneously concluding that the Exclusion is facially neutral. Doc. 134. In doing so, the PI R&R failed to apply—or even acknowledge—the Court's reasoning on the Motion to Dismiss. When it reviewed the PI R&R, the Court again rejected the reasoning contained in that portion of the report. Doc. 162 at 11; *see also Fain v. Crouch*, No. CV 3:20-0740, 2022 WL 3051015, at *7 (S.D.W. Va. Aug. 2, 2022) (noting that the reasoning in the PI R&R was rejected by the district court). This Court should adhere to its reasoning when it denied the Motion to Dismiss and, once again, reject State Defendants' assertion that the "Gender Reassignment Surgery" Exclusion is facially neutral.

*2. Every court to consider the question has rejected State Defendants' position.*

Eight other district courts have held that similar exclusions of coverage for gender-affirming surgery discriminate based on sex, in violation of Title VII (or Section 1557 of the Affordable Care Act). Doc. 309 at 14 n.6. By contrast, State Defendants are unable to identify *any* case applying *Gilbert* to exclusions of gender-affirming care, or any case otherwise accepting their argument that excluding gender-affirming surgery is facially neutral under Title VII. And State Defendants utterly fail to respond to the cases cited by Dr. Toomey explaining why *Gilbert* is irrelevant here. *See, e.g., Lange v. Houston Cty, Ga.*, No. 5:19-CV-392 (MTT), 2022 WL 1812306, at *13 n.14 (M.D. Ga. June 2, 2022) (refusing to apply *Gilbert* to Title VII claim because Congress "not only overturned *Gilbert*, but it

3

also made clear that its *Geduldig*-based reasoning had no place in Title VII analysis").³

Faced with a unanimous body of precedent rejecting their position, State Defendants attempt to whittle down the number of adverse district court rulings to "only" four cases based on a series of irrelevant distinctions. Doc. 315 at 9. *First*, State Defendants note that *Hammons*, *C.P. v. Blue Cross Blue Shield of Illinois*, 536 F. Supp. 3d 791, 793 (W.D. Wash. 2021), *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 951 (D. Minn. 2018), and *Flack v. Wisconsin Dept. of Health Services*, 328 F. Supp. 3d 931, 934 (W.D. Wis. 2018), were motions to dismiss or for preliminary injunction—not motions for summary judgment. Doc. 315 at 8-9. But whether the plain text of the policy facially discriminates based on sex is a question of law that does not depend on subsequent factual development. *See* Doc. 315 at ("Courts look to the language of the policy to determine facial discrimination.")

*Second*, State Defendants note that *Fain*, *Hammons*, *C.P.*, and *Tovar* involved claims under Section 1557 of the ACA, but they do not explain why this renders the cases inapplicable. Doc. 315 at 9. *Fain*, *Hammons*, and *Pritchard* all based their analysis on the Supreme Court's decision in *Bostock*, which is the same standard that applies to Title VII claims. Those decisions did not depend on the presence or absence of any ACA

---

³ State Defendants offer two additional cases that purportedly continue to apply *Gilbert*. Doc. 315 at 7. One is a South Dakota state-law case about whether *Obergefell* applied retroactively to provide survivor benefits to someone whose same-sex partner died before they were able to legally marry. *Anderson v. S. Dakota Ret. Sys.*, 924 N.W.2d 146, 152 (S.D. 2019). State Defendants do not explain how this is relevant to Dr. Toomey's Title VII claim. The second case held that Title VII and the PDA did not require an employer to grant personal leave to an employee who needed more time to breastfeed before returning to work. *Wallace v. PyroMin. Co.*, 789 F. Supp. 867, 868 (W.D. Ky. 1990), *aff'd*, 951 F.2d 351 (6th Cir. 1991). Yet, the Sixth Circuit did not adopt that reasoning and instead affirmed on the alternative grounds that plaintiff failed to establish that her breast feeding was medically necessary. 1991 WL 270823, at *1 (6th Cir. 1991) (unpublished). To the extent that *Wallace* reasoned that lactating and breastfeeding are not conditions related to childbirth under the PDA, that reasoning has not been adopted by courts in the District of Arizona. *Behan v. Lolo's Inc.*, No. CV-17-02095-PHX-JJT, 2019 WL 1382462, at *6 (D. Ariz. Mar. 27, 2019); *Shelton v. Tucson Unified Sch. Dist.*, No. CV-18-00187-TUC-JGZ, 2019 WL 2193736, at *3 n.7 (D. Ariz. May 3, 2019), *aff'd*, 804 F. App'x 770 (9th Cir. 2020).

implementing regulations. And this Court relied on Section 1557 cases when it denied the Motion to Dismiss Dr. Toomey's Title VII claim. *See* Doc. 69 at 9 (citing *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017)).

*Third*, State Defendants blatantly misrepresent the policies at issue in *Lange* and *Boyden* to argue that those cases, unlike this one, involved a complete ban on all types of gender-affirming care. Doc. 315 at 9-10. That is false. In *Lange*, the employer wrongly believed that the exclusion covered all treatments for gender dysphoria, but the exclusion actually covered only "sex change surgery and drugs related to sex change surgery." 2022 WL 1812306, at *11. Similarly, in *Boyden*, it was undisputed "that the Exclusion [did] *not* apply to hormone therapy or mental health counseling when used to treat gender dysphoria unless specifically made a course of treatment leading to or involving gender confirming surgery." 341 F. Supp. 3d at 988.[4]

In any event, even if State Defendants could show that some illegal exclusions were broader than others across these precedents, the cases did not turn on the breadth of the exclusions, but on the fact that the exclusions explicitly classified based on sex-based criteria such as "gender reassignment" or "sex change." *See Lange*, 2022 WL 1812306, at *14 (rejecting argument that precedent from other courts "turn[ed] on the blanket exclusion of benefits" and emphasizing that "Title VII does not exempt 'partial' violations"); *Fain*, 2022 WL 3051015, at *7 (rejecting argument that surgery exclusion is not facially discriminatory because other gender dysphoria treatments are covered). State Defendants offer no response.

*Fourth*, State Defendants attempt to distinguish *Fletcher v. Alaska*, 443 F. Supp.3d 1024 (D. Alaska 2020), by noting that in that case, a transgender woman who required a vaginoplasty as part of medically necessary gender-affirming surgery would have been eligible for a vaginoplasty if her sex assigned birth had been female instead of male. Doc.

---

[4] State Defendants assert that the policy in *Kadel* also excluded psychotherapy (Doc. 315 9-10), but that portion of the exclusion "ha[d] never been implemented and [was] no longer part of the Plan." *Kadel*, 2022 WL 3226731, at *3.

5

315 at 10. But the same is true here. The Plan covers medically necessary masculinizing reconstructive surgery (including hysterectomies) for people with a male sex assigned at birth, but not for people who have a female sex assigned at birth. To use the same language excerpted by State Defendants: "If [Dr. Toomey's] natal sex were [male] and it was medically necessary for [him] to have a [hysterectomy] to correct a congenital defect, coverage would have been available under [the Plan]. But, because [Dr. Toomey's] natal sex is [female] and [he] was seeking to transition to a [male], coverage was not available." *Fletcher*, 443 F. Supp. 3d at 1027; *accord Kadel*, 2022 WL 3226731, at *19 ("[T]he broad language of the Plan distinguishes between medically necessary treatments that align with the member's biological sex and medically necessary treatments—often the same medically necessary treatments—that do not align with his sex") (footnote and emphasis omitted).

Moreover, as other decisions have made clear, exclusions of coverage for gender-affirming surgery are discriminatory because the diagnosis and surgery at issue are defined by the incongruity between gender identity and sex assigned at birth—not because surgeries are offered to one sex but not another. Although State Defendants repeatedly note that the Plan would provide a hysterectomy to Dr. Toomey if it were medically necessary for a different condition (Doc. 315 at10-11), that does not somehow make the Plan facially neutral. Rather, as this Court explained in its ruling on the Motion to Dismiss, the availability of hysterectomies for other medical conditions shows that Dr. Toomey's "harm occurred because his natal sex does not match his gender identity." Doc. 69 at 10. "Had Plaintiff required a hysterectomy for any medically necessary purpose other than gender reassignment, the Plan would have covered the procedure. This narrow exclusion of coverage for 'gender reassignment surgery' is directly connected to the incongruence between Plaintiff's natal sex and his gender identity." *Id.* And—as explained above—that is all that is necessary to establish that the Exclusion facially discriminates based on sex.[5]

---

[5] State Defendants object to the admissibility of Dr. Schechter's expert testimony that the surgeries that are used to treat gender dysphoria (like hysterectomies) are utilized in similar or identical fashion to treat other diagnoses, such as cancer. Doc. 316 ¶ 27(a) (citing FRE

6

### B. Dr. Toomey's Summary Judgment Motion Does Not Depend on Alleged Factual Disputes Regarding Defendants' Discriminatory Intent.

As explained in Dr. Toomey's opening brief, because the "Gender Reassignment Surgery" Exclusion facially discriminates on the basis of sex, Dr. Toomey does not have to independently prove that Defendants were motivated by discriminatory intent to win summary judgment. Doc. 298 at 13-14. However, "there is more than sufficient evidence for a reasonable factfinder to conclude that Defendants maintained the 'Gender Reassignment Surgery' Exclusion because of dislike and disapproval of gender transition" although he did not seek summary judgment on that basis. *Id*. at 13-14 n.5. For reasons articulated in Dr. Toomey's Response in Opposition to State Defendants' Motion for Summary Judgment (Doc. 321), these facts likewise preclude summary judgment in State Defendants' favor. Moreover, although the *McDonnell Douglas* framework is not the only method of proving discriminatory intent, Dr. Toomey easily satisfies *McDonnell Douglas* here. Doc. 321 at 16 n.7.[6]

## II. THE "GENDER REASSIGNMENT SURGERY" EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE.

### A. The Exclusion Facially Discriminates Based On Sex and Transgender Status, Automatically Triggers Heightened Scrutiny.

State Defendants argue that the Exclusion is not facially discriminatory because it targets a service, "gender reassignment surgery," rather than transgender individuals. Doc. 315 at 19. This Court has already rejected that argument: "[T]ransgender individuals are

---

703). State Defendants suggest that Dr. Schechter cannot testify about hysterectomies because his "experience with performing hysterectomies is in the context of medical research into uterine transplants." *Id*. To the contrary, Dr. Schechter's expert testimony meets the requirements of Evidentiary Rule 703 as it is based on his extensive and broad-ranging experience as a surgeon and medical researcher. Doc. 300-1 at Exhibit 1 (Schechter Report) at ¶ 4, 6-19. *See Fain*, 2022 WL 3051015, at *4 (admitting similar testimony from Dr. Schechter).

[6] State Defendants wrongly allege that Dr. Toomey's Motion asserts a disparate treatment claim that he did not assert before. Doc. 315 at 11, n. 6. Dr. Toomey has always argued that the Exclusion is facially discriminatory under Title VII and the Equal Protection Clause.

7

1   the only people who would ever seek gender reassignment surgery. No cisgender person
2   would seek, or medically require, gender reassignment. Therefore, as a practical matter, the
3   Exclusion singles out transgender individuals for different treatment." Doc. 69 at 11. Courts
4   in the Ninth Circuit have employed precisely the same reasoning to conclude that
5   classifications targeting gender non-conformity facially discriminate against transgender
6   people. *See D.T. v. Christ*, 552 F.Supp.3d 888, 895-96 (D. Ariz. 2021); *Morris v. Pompeo*,
7   No. 219-CV-00569, 2020 WL 6875208, at *7 (D. Nev. Nov. 23, 2020). State Defendants
8   ignore these cases, as well as this Court's prior reasoning, arguing that that the Exclusion is
9   facially neutral under *Geduldig v. Aiello*, 417 U.S. 484 (1974). Doc. 315 at 19. Yet, State
10  Defendants are able to identify one—and only one—decision applying *Geduldig* to equal
11  protection claims regarding exclusions of gender-affirming care, while ignoring that at least
12  three *other* district courts have expressly rejected that reasoning. *See Fain*, 2022 WL
13  3051015, at *8; *Kadel*, 2022 WL 3226731, at *20-21; *Boyden*, 341 F. Supp. 3d at 999-1000.

14  The "Gender Reassignment Surgery" Exclusion is different from discrimination
15  based on pregnancy or abortion for at least four reasons. Doc. 298 at 20-23. *First*, the
16  Exclusion incorporates explicit classifications based on sex and gender as part of the
17  definition of "gender reassignment." State Defendants say the Exclusion is neutral because
18  it applies equally to males and females. Doc. 315 at 20. But the policies in *Bostock* also
19  applied equally to males and females. They nevertheless violated Title VII because they
20  explicitly classified based on the incongruence between gender identity and sex-assigned at
21  birth, and thus "unavoidably discriminate[d] against persons with one sex identified at birth
22  and another today." *Bostock,* 140 S. Ct. at 1746. State Defendants offer no response.

23  *Second*, the Exclusion does not merely regulate a medical procedure available for
24  only one sex; it provides coverage for surgeries to treat other health conditions but denies
25  coverage for the same surgeries when performed for the purpose of gender reassignment.
26  Doc. 298 at 21-22. State Defendants state that "neither transgender nor cisgender persons
27  receive coverage for all treatments they believe are 'medically necessary.'" Doc. 315 at 20.
28  But the discrimination alleged in this case in not that State Defendants fail to cover all

8

medically necessary procedures for transgender people. The discrimination flows from State Defendants' refusal to cover particular surgical procedures for transgender people based on criteria directly connected to their transgender status, while providing the same surgical procedures to treat medical conditions not connected to transgender status.

*Third*, the Exclusion facially discriminates as a form of proxy discrimination. Doc. 298 at 22-23. When a "defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group," the discrimination is treated as a facial classification. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). Just as discrimination based on wearing yarmulkes is a proxy for discrimination against Jews, *see Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), discrimination based on the need for gender-affirming surgery is a proxy for discrimination against transgender people. State Defendants assert there is no proxy discrimination because not every transgender person requires gender-affirming surgery. Doc. 315 at 21. But that is not the test. Not every Jewish person wears a yarmulke either. Nevertheless, proxy discrimination exists in both instances because the bases for the discrimination are "criteria that are almost exclusively indicators of membership in [a] disfavored group." *Pac. Shores Props.*, 730 F.3d at 1160 n.23.

*Fourth*, the Exclusion enforces gender stereotypes by covering medically necessary reconstructive procedures to align a person's body with their sex assigned at birth, while excluding coverage for the same medically necessary reconstructive procedures to align a person's body with a gender identity different from the person's sex assigned at birth. Doc. 298 at 23. State Defendants fail to provide any response to this argument.

**B. The Exclusion Does Not Survive Heightened Scrutiny.**

State Defendants have failed to meet their burden under heightened scrutiny. State Defendants' only purported justification for maintaining the Exclusion is cost containment. Doc. 315 at 13-14. Tellingly, State Defendants do not cite a single equal protection case for the proposition that this justification can withstand heightened scrutiny. This is not surprising as the Supreme Court has repeatedly rejected vague and unsubstantiated claims

of cost containment such as State Defendants' as a sufficient governmental interest when heightened scrutiny applies. *See* Doc. 298 at 24.

Further, the undisputed record belies State Defendants' assertions that costs were a factor here: State Defendants' own internal analysis and external research showed that the cost of coverage would be immaterial to the Plan. Doc. 298 at 6-9, 24. State witnesses also testified that costs were not the deciding factor in maintaining the Exclusion and that the associated cost increase "would not have mattered" to their decision-making. *Id*. at 24 (internal quotations omitted). State Defendants also failed to challenge Joan Barrett's undisputed expert testimony that the projected cost increase posed by covering gender reassignment surgery was less than 0.1%, "an amount so low that it would be considered immaterial from an actuarial perspective." *Id.* State Defendants' cost concerns plainly fails under heightened scrutiny.[7]

---

[7] State Defendants' various evidentiary objections are meritless. State Defendants assert that testimony from their *own witnesses* about the projected cost of covering gender affirming surgery should be excluded as inadmissible expert opinion testimony. *See, e.g.*, Doc. 316 ¶ 40. But, despite State Defendants' assertions to the contrary, ADOA employees' testimony is admissible lay-opinion testimony under Federal Rule of Evidence 701. "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position [at the ADOA]." *In re ComUnity Lending, Inc.*, No. C 08-00201 JW, 2011 WL 7479165, at *5 (N.D. Cal. June 6, 2011) (permitting lay testimony from employees regarding specialized issues such as the defendant entity's financial condition and solvency (citing advisory committee note to Rule 701)); *Slaughter-Payne v. Principi*, 03-2300-PHX-ROS, 2006 WL 8422927, at *3 (D. Ariz. Sept. 14, 2006) (rejecting Rule 701 objection and permitting VA employees to testify re "VA policies, rules, regulations and practices" and how they "apply to [the plaintiff's] allegations").

State Defendants also object to the evidence regarding the cost assessments from other states and other outside sources as inadmissible hearsay. *See, e.g.*, Doc. 316 ¶ 43. This evidence is not offered to prove the truth of the matter asserted, but instead to establish State Defendants' subjective *understanding* of potential costs at the time of their decision-making in 2016. Moreover, the cited estimates were incorporated into the ADOA Research Summary, which State Defendants themselves have cited and relied on. *See id*. ¶¶ 95-96.

State Defendants also ask this Court to disregard their *own* cost analysis, which was requested for purposes of this litigation and calculated by ADOA actuary Michael Meisner,

**C. The Exclusion Does Not Survive Even Rational Basis Review.**

The Exclusion fails even rational basis review. While this Court has held that limiting health care costs is a legitimate state interest, "that interest cannot be furthered by arbitrary classifications." Doc. 69 at 16; *see also Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (finding state's purported cost savings rationale "cannot survive rational basis review" because "the savings depend upon distinguishing between homosexual and heterosexual employees [who are] similarly situated").[8]

As noted above, State Defendants have offered no support that cost actually factored into their decision-making, and the record firmly establishes that it did not. State Defendants also offer no explanation for why the ADOA has added coverage (either by adding benefits or removing prior exclusions) for other treatments despite the potential cost-increase associated with them, yet maintained the Exclusion, supposedly, on the same ground. *Compare* Doc. 299 ¶ 23 (a)-(g), *with* Doc. 316 ¶ 23(a)-(g) (either not disputing that other benefits were added, or labeling as "disputed," but then going on to admit that respective benefit was added, or that exclusion was removed). State Defendants admit that between 2012 and 2021, ADOA removed exclusions for orthonagnic surgery, laproscopic sleeve

---

as "irrelevant evidence." Doc. 315 at 25 n.17. But State Defendants specifically relied upon Mr. Meisner's cost analysis in their responses to Dr. Toomey's interrogatories. Wee Decl. Ex. 50 at 14. The utter strangeness of State Defendants attacking their own evidence is precisely why this Court must consider it—Mr. Meisner's analysis, and its deep flaws, represents a post-hoc rationalization, that not only fails to support that the State had any legitimate cost concerns, but is itself evidence of pretext. Doc. 321 at 22-23 (*citing Vulpis v. Republic Servs. of Arizona Hauling*, *LLC*., No. CV 07-092-TUC-RCC, 2008 WL 11338813, at *5 (D. Ariz. July 9, 2008)).

[8] Despite State Defendants' assertion to the contrary, the defendants in *Diaz* absolutely *did* "challenge the trial court's rejection of its cost rationale in the appeal." Doc. 315 at 28. As the Ninth Circuit stated: "Defendants . . . contend on appeal that this law is rationally related to the state's interests in cost savings and reducing administrative burdens." *Diaz*, 656 F.3d at 1014. The Ninth Circuit rejected that argument because "the savings depend upon distinguishing between homosexual and heterosexual employees, similarly situated, and such a distinction cannot survive rational basis review." *Id.*

11

gastrectomy, compression garments for treatment of burns, manipulations under anesthesia, midwife services, and treatment for benign gynecomastia, and 3D mammograms (because 3D mammograms were no longer deemed experimental). Doc. 316 ¶ 23.[9]  These additions of coverage—which were not mandatory, and which inevitably imposed some additional cost to the Plan—belie State Defendants' suggestion that the Exclusion can be explained by a strict policy of only adding coverage for benefits that were mandatory. The record shows that, to the extent ADOA maintained such a strict policy (of adding benefits only when absolutely mandatory), the policy was applied only to "transgender benefits."

## CONCLUSION

Plaintiff's Motion for Summary Judgment should be granted.

Respectfully submitted this 23rd day of November, 2022.

    ACLU FOUNDATION OF ARIZONA

    By /s/ Christine K. Wee
        Christine K. Wee
        3707 North 7th Street, Suite 235
        Phoenix, Arizona 85014

    AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
        Joshua A. Block*
        Leslie Cooper*
        125 Broad Street, Floor 18
        New York, New York 10004

---

[9] State Defendants falsely assert that ADOA completed a cost analysis in connection with removing the exclusion for the laproscopic sleeve gastrectomy. Doc. 316 ¶ 23(b). In fact, the cited portion of Ms. Isaacson's testimony actually states that she did "not recall" whether a cost analysis was prepared and did not "know one way or the other." Similarly, Mr. Bender did not testify that removing the exclusion for 3D mammograms "did not add cost to the plan." Doc. 316 ¶ 23(e).  He testified that the "cost [was] fairly similar" to the cost of traditional mammograms and "wouldn't have been an extreme cost burden to the plan." Wee Decl., Ex. 51 (Bender Depo Tr.) at 124:5-14. Of course, removing the exclusion of coverage for "gender reassignment surgery" would not have been an extreme burden either.

12

| | |
|---|---|
| 1 | WILLKIE FARR & GALLAGHER LLP |
| 2 | Wesley R. Powell* |
|   | Matthew S. Freimuth* |
| 3 | Jordan C. Wall* |
|   | Justin Garbacz* |
| 4 | 787 Seventh Avenue |
| 5 | New York, New York 10019 |
| 6 | *Admitted pro hac vice |
| 7 | *Attorneys for Plaintiff Russell B. Toomey and the certified classes* |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2022, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

*/s/ Christine K. Wee*
Christine K. Wee

14