# Exhibit 50

FENNEMORE CRAIG, P.C.
Timothy J. Berg (No. 004170)
Amy Abdo (No. 016346)
Ryan Curtis (No. 025133)
Shannon Cohan (No. 034429)
2394 E. Camelback Road
Suite 600
Phoenix, Arizona  85016
Telephone:  (602) 916-5000
Email:  tberg@fennemorelaw.com
Email:  amy@fennemorelaw.com
Email:  rcurtis@fennemorelaw.com
Email:  scohan@fennemorelaw.com

*Attorneys for Defendants*
*State of Arizona, Andy Tobin, and Paul Shannon*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B. Toomey, | No. 4:19-cv-00035 |
| Plaintiff, | **DEFENDANTS STATE OF ARIZONA'S, ANDY TOBIN'S, AND PAUL SHANNON'S RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Propounding Party:  Russell B. Toomey
Answering Parties:   State of Arizona, Andy Tobin, and Paul Shannon
Set No.:             Two

## **PRELIMINARY STATEMENT**

Defendants State of Arizona, Andy Tobin, and Paul Shannon (collectively, the "State Defendants") have not fully completed their investigation of the facts relating to this case, discovery is underway, and the State Defendants have not begun preparing for trial.  All answers contained herein are based only upon the information presently available to and specifically known by the State Defendants and they disclose only those conclusions and contentions which presently occur to them.  Further investigation, legal research and

analysis may supply additional facts, add meaning to the known facts, and may establish entirely new factual conclusions and legal contentions, all of which may lend substantial additions to, changes, and variations from the responses herein set forth.

The following answers are given without prejudice to or waiver of the State Defendants' right to introduce evidence of subsequently discovered and developed conclusions or contentions. The answers contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is presently known, but in no way should be to the prejudice of the State Defendants in relation to discovery, research or analysis. The State Defendants specifically reserve the right to supplement, amend and/or modify any or all of the answers contained herein as discovery progresses.

## **GENERAL OBJECTIONS**

1.     The State Defendants object that the Interrogatories require a response within 14 days of service, which is in conflict with Federal Rule of Civil Procedure 33(b)(2).

2.     The State Defendants object to each interrogatory to the extent that it is vague and/or ambiguous and agrees to respond to Plaintiff's interrogatories based solely on their interpretation of any vague or ambiguous language.

3.     The State Defendants object to each interrogatory to the extent that it is overly broad, unduly burdensome, or oppressive.

4.     The State Defendants object to each interrogatory to the extent that it seeks privileged information.

5.     The State Defendants object to each interrogatory to the extent that it seeks information that is irrelevant to Plaintiff's claims or any defendants' defense and is not reasonably calculated to lead to the discovery of admissible evidence.

6.     The State Defendants object to each interrogatory to the extent that it requires any action or response beyond that required by the Federal Rules of Civil Procedure, the

1  Scheduling Order, or the Local Rules.

2  **ANSWERS TO INTERROGATORIES**

3  **INTERROGATORY NO. 9:**  Defendants' Opposition to Plaintiffs' *(sic)* Motion

4  for Preliminary Injunction (Doc. 123 at p.7) states that "the Plan excludes several

5  procedures, any of which might be considered 'medically necessary, including certain

6  bariatric procedures, surgery to treat hyperhidrosis (excessive sweating), and phase 3

7  cardiac rehabilitation, among other."  Please identify and describe all medical procedures

8  that you contend are (as opposed to merely "might be considered") "medically necessary"

9  as that term is defined by the Plan (Doc. 86-1 at p.58) but are nevertheless categorically

10  excluded from coverage.

11  **ANSWER TO INTERROGATORY NO. 9**:   The State Defendants object to

12  Interrogatory No. 9 on the ground that it is vague and ambiguous as to the term "medically

13  necessary."  The term "medically necessary" is not defined on page 58 of Doc. 86-1.  In

14  addition, "medically necessary" is a fluid standard, which depends on the individual facts

15  of each situation.  The State Defendants further object that the Interrogatory is vague and

16  ambiguous as to the term "medical procedure."  The term "medical procedure" is undefined.

17  Some of the exclusions in the Plan do not relate to specific medical procedures, but rather

18  exclude coverage of any procedure or treatment to address specific conditions or in specific

19  situations.  The State Defendants further object that the Interrogatory is overly broad and

20  unduly burdensome to the extent that it does not include a relevant timeframe.  The State

21  Defendants further object to the Interrogatory to the extent that it seeks information that is

22  equally in the Plaintiff's possession.   Subject to and without waiving the foregoing

23  objections, the State Defendants respond as follows:

24      The "medically necessary" procedures, meaning procedures or treatments that may

25  be medically necessary under certain facts and circumstances to treat various conditions,

26  that are currently excluded from coverage are as follows:

| No. | Excluded Procedure | Description |
|---|---|---|
| 1. | Services and Supplies which are experimental, investigational, or unproven. | These services may be related to medical, surgical, diagnostic, psychiatric, substance abuse or other health care technologies, supplies, treatments, procedures, drug therapies or devices that are determined by the Plan to be: a. Not approved by the U.S. Food and Drug Administration (FDA) to be lawfully marketed for the proposed use and not recognized for the treatment of the particular indication in one of the standard reference compendia (The United States Pharmacopoeia Drug Information, The American Medical Association Drug Evaluations; or the American Hospital Formulary Service Drug Information) or in medical literature. Medical literature means scientific studies published in a peer-reviewed national professional medical journal; b. The subject of review or approval by an Institutional Review Board for the proposed use; c. The subject of an ongoing clinical trial that meets the definition of a phase I, II or III Clinical Trial as set forth in the FDA regulations, regardless of whether the trial is subject to FDA oversight (except as set forth in the Cancer Clinical Trials provision of this Plan under Covered Services and Supplies); or d. Not demonstrated, through existing peer reviewed literature, to be safe and effective for treating or diagnosing the condition or illness for which its use is proposed. |
| 2. | Open Vertical Banded Gastroplasty | Vertical banded gastroplasty, also called stomach stapling, is surgery that divides the stomach into 2 parts to treat obesity. It causes weight loss by decreasing the amount of food a person can eat. |
| 3. | Laparoscopic Vertical Banded Gastroplasty | Vertical banded gastroplasty, also called stomach stapling, is surgery that divides the stomach into 2 parts to treat obesity. It causes weight loss by decreasing the amount of food a person can eat. |
| 3. | Open Sleeve Gastrectomy | During sleeve gastrectomy, about 80% of the stomach is removed, leaving a tube-shaped stomach about the size and shape of a banana. |
| 4. | Open Adjustable Gastric Banding | Adjustable gastric banding, also known as "Lap Band" or "Realize band," involves placing an implant, a soft silicone ring with an expandable balloon in the center, around the top part of the |

FENNEMORE CRAIG, P.C.

PHOENIX

|  |  | stomach. It effectively creates a two-compartment stomach, with a much smaller top part above the band. |
|---|---|---|
| 5. | Gender Reassignment Surgery | Gender reassignment surgery. |
| 6. | Treatment of erectile dysfunction and sexual dysfunction. | Treatment of erectile dysfunction and sexual dysfunction. |
| 7. | Foot Orthotics (unless provided in the Diabetic Services and Supplies provision) | An orthotic is a shoe insert that supports the abnormal movement of a foot. |
| 8. | Corrective Orthopedic Shoes (unless provided in the Diabetic Services and Supplies provision) | Corrective shoes are recommended for people with chronic foot injuries, deformities, and medical conditions like diabetes that put them at a higher risk of developing foot problems.  Corrective shoes are designed to address trouble areas on the feet. |
| 9. | Arch Supports (unless provided in the Diabetic Services and Supplies provision) | Orthotic arch supports are shoe insoles that feature either a cushioned (completely flexible), a semi-rigid (semi-flexible) or a rigid (completely inflexible) arch support plate to prevent the arch of the foot from collapsing. |
| 10. | Elastic/compression Garments (except for treatment of lymphedema and burns) | Elastic/compression garments are made of breathable elastic fabrics such as nylon, cotton, spandex or natural rubber.  They are occasionally referred to as "graduated compression garments."  Compression garments are available in various degrees of pressure, or classes of compression. |
| 11. | Garter Belts | Garter Belts are used to keep compression stockings from bunching, slipping down the leg, and causing discomfort. |
| 12. | Corsets | A corset is a device that is used to support a person's lower back.  A corset is made of soft material.  It is usually tightened with laces that may tie in the back, front, or side.  There may also be metal pieces that keep the corset from bending easily. |
| 13. | Dentures | A denture is a removable replacement for missing teeth and surrounding tissues. |
| 14. | Wigs/Hair pieces (except when indicated for coverage on Section 7.25) | A covering for the head made of real or artificial hair, typically worn by people for adornment or by people trying to conceal their baldness. |

| 15. | Hair Transplants | A hair transplant is a procedure in which a plastic or dermatological surgeon moves hair to a bald area of the head. |
| 16. | Treatment of alopecia or hair loss | The most common form of alopecia treatment is the use of corticosteroids, powerful anti-inflammatory drugs that can suppress the immune system.  Other medications that can be prescribed that either promote hair growth or affect the immune system include Minoxidil, Anthralin, SADBE, and DPCP. |
| 17. | Alternative Treatments | Acupressure, acupuncture, aromatherapy, health spas, hypnotism, massage therapy, mineral baths, rolfing, saunas; and art therapy, music therapy, dance therapy, horseback therapy and other forms of alternative treatment as defined by the National Center for Complementary and Alternative Medicine (NCCAM) of the National Institutes of Health. |
| 18. | Phase 3 Cardiac rehabilitation | Phase 3 cardiac rehabilitation involves engaging in more intensive exercise and activity.  The main treatment during phase 3 cardiac rehabilitation is group exercise and therapy. |
| 19. | Hyperhidrosis (excessive sweating) | Surgery for correction of Hyperhidrosis |
| 20. | Infertility | Any medical treatment and/or prescription related to infertility once diagnosed |
| 21. | Sensory Integration Therapy | Sensory integration therapy is designed to help children with sensory-processing problems to cope with the difficulties they have processing sensory input. |
| 22. | LOVAAS Therapy | LOVAAS Therapy is a form of Applied Behavioral Analysis that is used in early intervention programs for children who have developmental delays or who have been identified as autistic.  The therapy consists of breaking skills down into the simplest components and rewarding children positively and then "generalizing" the skills into a natural environment. |

**INTERROGATORY NO. 10:**  For each of the medically necessary procedures identified in response to Interrogatory No. 9, please identify and describe the reason why the medically necessary procedure is excluded from coverage.

**ANSWER TO INTERROGATORY NO. 10**:  The State Defendants object to

Interrogatory No. 10 on the ground that it exceeds the maximum number of interrogatories permitted under Rule 33. Each requested explanation equates to a discrete subpart and, therefore, a separate interrogatory. FRCP 33(a)(1); *Reed v. Barcklay*, No. CV111339PHXJATBSB, 2013 WL 12177162, at *2 (D. Ariz. Apr. 30, 2013). The State Defendants further object that the Interrogatory is vague and ambiguous as to timeframe. The State Defendants further object that the Interrogatory is vague and ambiguous as to the term "procedure." The term "procedure" is undefined. Some of the exclusions in the Plan do not relate to specific medical procedures, but rather exclude coverage of any procedure or treatment to address specific conditions or in specific situations. The State Defendants further object that the Interrogatory is overly broad and unduly burdensome to the extent that it does not include a relevant timeframe. Subject to and without waiving the foregoing objections, the State Defendants respond as follows:

| No. | Excluded Procedure | Reason for Exclusion |
|-----|--------------------|----------------------|
| 1. | Services and Supplies which are experimental, investigational, or unproven. | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 2. | Open Vertical Banded Gastroplasty | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 3. | Laparoscopic Vertical Banded Gastroplasty | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 3. | Open Sleeve Gastrectomy | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |

| 4. | Open Adjustable Gastric Banding | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
|---|---|---|
| 5. | Gender Reassignment Surgery | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion.<br><br>In 2015-2016, the State of Arizona undertook a review of this exclusion in light of proposed regulations under Section 1557 of the Affordable Care Act. The State modified the prior exclusion so as to provide coverage for therapy and hormone treatment, but determined that it was not required to cover surgery. |
| 6. | Treatment of erectile dysfunction and sexual dysfunction. | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 7. | Foot Orthotics (unless provided in the Diabetic Services and Supplies provision) | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 8. | Corrective Orthopedic Shoes (unless provided in the Diabetic Services and Supplies provision) | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 9. | Arch Supports (unless provided in the Diabetic Services and Supplies provision) | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 10. | Elastic/compression Garments (except for treatment of lymphedema and burns) | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included an exclusion for all elastic/compression garments. |

| 11. | Garter Belts | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
|-----|--------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 12. | Corsets | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 13. | Dentures | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 14. | Wigs/Hair pieces (except when indicated for coverage on Section 7.25) | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included an exclusion for all wigs/hair pieces. |
| 15. | Hair Transplants | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 16. | Treatment of alopecia or hair loss | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 17. | Alternative Treatments | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included an exclusion for "alternative treatments." In 2021, the State of Arizona revised the exclusion to identify what specific "alternative treatments" are excluded. |
| 18. | Phase 3 Cardiac rehabilitation | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including |

FENNEMORE CRAIG, P.C.

PHOENIX

|  |  | the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
|---|---|---|
| 19. | Hyperhidrosis | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 20. | Infertility | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included an exclusion for "counseling, diagnosis, and any medical and/or prescription" for infertility.  In 2012, the State of Arizona evaluated and revised the exclusion to expand coverage for counseling and diagnosis of infertility based on recommendations from health plan vendors and as needed to align with standard medical coverage guidelines. |
| 21. | Sensory Integration Therapy | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |
| 22. | LOVAAS Therapy | At the time that the State of Arizona moved its healthcare coverage to a self-funded health plan, the State maintained the same plan documents, including the same exclusions, as was utilized by the prior insurance providers, which included this exclusion. |

**INTERROGATORY NO. 11:**  Please identify and describe all procedures that have been removed from the Plan's list of exclusions with in the past 10 years.

**ANSWER TO INTERROGATORY NO. 11**:  The State Defendants object to Interrogatory No. 11 on the ground that it exceeds the maximum number of interrogatories permitted under Rule 33, as noted in State Defendants' objections to Interrogatory 10.  Each requested explanation equates to a discrete subpart and, therefore, a separate interrogatory. FRCP 33(a)(1); *Reed v. Barcklay*, No. CV111339PHXJATBSB, 2013 WL 12177162, at *2 (D. Ariz. Apr. 30, 2013).  The State Defendants further object that the Interrogatory is vague

and ambiguous as to the term "procedure."  The term "procedure" is undefined.  Some of the exclusions in the Plan do not relate to specific medical procedures, but rather exclude coverage of any procedure or treatment to address specific conditions or in specific situations.  Subject to and without waiving the foregoing objections, the State Defendants respond as follows:

| No. | Excluded Procedure | Description |
|---|---|---|
| 1. | Benign Gynecomastia | A benign proliferation of glandular breast tissue in men. |
| 2. | Orthognathic treatment/surgery, including but not limited to treatment/surgery for mandibular or maxillary prognathism, microprognathism or malocclusion, surgical augmentation for orthodontics, or maxillary constriction and dental, orthodontic services and/or appliances that are orthodontic in nature or change the occlusion of the teeth (external or intra-oral). | Treatment designed to correct conditions of the jaw and lower face related to structure, growth, airway issues including sleep apnea, TMJ disorders, malocclusion problems primarily arising from skeletal disharmonies, other orthodontic dental bite problems that cannot be easily treated with braces, as well as the broad range of facial imbalances, disharmonies, asymmetries and malproportions where correction can be considered to improve facial aesthetics and self esteem. |
| 3. | Laparoscopic sleeve gastrectomy | During sleeve gastrectomy, about 80% of the stomach is removed, leaving a tube-shaped stomach about the size and shape of a banana. |
| 4. | Medical or psychological counseling and hormonal therapy for the treatment of gender dysphoria | Medical or psychological counseling and hormonal therapy for the treatment of gender dysphoria |
| 5. | Elastic/compression garments used for treatment of lymphedema and burns | Elastic/compression garments are made of breathable elastic fabrics such as nylon, cotton, spandex or natural rubber.  They are occasionally referred to as "graduated compression garments."  Compression garments are available in various degrees of pressure, or classes of compression. |
| 5. | Wigs/Hair pieces when indicated for coverage on Section 7.25 | A covering for the head made of real or artificial hair, typically worn by people for adornment or by people trying to conceal their baldness. |

| 7. | Services rendered by a midwife for the purpose of home delivery. | Services rendered by a midwife for the purpose of home delivery. |
|----|----|----|
| 9. | Charges made by any covered provider who is a member of your family or your Dependent's family. | Charges made by any covered provider who is a member of your family or your Dependent's family. |
| 10. | Manipulations under anesthesia. | A noninvasive stretching and manipulative technique used to offer relief from chronic and recurrent back pain and other types of pain that have not responded to long-term conservative (i.e., nonsurgical) care. |
| 11. | Counseling and diagnosis related to infertility | Counseling and diagnosis related to infertility |

**INTERROGATORY NO. 12:**  For each of the procedures identified in response to Interrogatory 11. *(sic)* Please identify the reasons why the procedure was removed from the Plan's list of exclusions and identify and *(sic)* analysis or calculations Defendants made with respect to the cost of removing the procedure from the list of exclusions.

**ANSWER TO INTERROGATORY NO. 12**:  The State Defendants object to Interrogatory No. 12 on the ground that it exceeds the maximum number of interrogatories permitted under Rule 33, as noted above.  Each requested explanation equates to a discrete subpart and, therefore, a separate interrogatory.  FRCP 33(a)(1); *Reed v. Barcklay*, No. CV111339PHXJATBSB, 2013 WL 12177162, at *2 (D. Ariz. Apr. 30, 2013).  The State Defendants further object that the Interrogatory is vague and ambiguous as to the term "procedure."  The term "procedure" is undefined.  Some of the exclusions in the Plan do not relate to specific medical procedures, but rather exclude coverage of any procedure or treatment to address specific conditions or in specific situations.  Subject to and without waiving the foregoing objections, the State Defendants respond as follows:

| No. | Excluded Procedure | Reason for Removal |
|----|----|----|
| 1. | Benign Gynecomastia | The Arizona Department of Administration ("ADOA") evaluated and revised the exclusion based on recommendations from its health plan |

| | | |
|---|---|---|
| | | vendors. ADOA elected to keep the exclusion for cosmetic surgery, but to expand coverage to provide treatment for benign gynecomastia.  No independent cost analysis was completed by ADOA related to  this change. |
| 2. | Orthognathic treatment/surgery, including but not limited to treatment/surgery for mandibular or maxillary prognathism, microprognathism or malocclusion, surgical augmentation for orthodontics, or maxillary constriction and dental, orthodontic services and/or appliances that are orthodontic in nature or change the occlusion of the teeth (external or intra-oral). | The ADOA evaluated and removed the exclusion based on recommendations from its health plan vendors.  No independent cost analysis was completed by ADOA related to  this change. |
| 3. | Laparoscopic sleeve gastrectomy | ADOA evaluated and revised the exclusion. ADOA elected to keep the exclusion for certain bariatric procedures, but decided  to expand coverage to laparoscopic sleeve gastrectomy.  No independent cost analysis was completed by ADOA related to this change. |
| 4. | Medical or psychological counseling and hormonal therapy for the treatment of gender dysphoria | In 2015-2016, the State of Arizona undertook a review of this exclusion in light of proposed regulations under Section 1557 of the Affordable Care Act.  The State modified the prior exclusion so as to expand coverage to therapy and hormone treatment, but determined that it was not required to cover surgery.<br><br>Cost analysis and calculations have already been produced, including, but not limited to, ABOR-TOOMEY003460, AZSTATE.004283, AZSTATE.004291, AZSTATE.085480, AZSTATE.004350, AZSTATE.086167, AZSTATE.006077, AZSTATE.006081, AZSTATE.006090, AZSTATE.006091, AZSTATE.006095, |

FENNEMORE CRAIG, P.C.

PHOENIX

| | | |
|---|---|---|
| | | AZSTATE.006097, AZSTATE.006136, AZSTATE.006137, AZSTATE.006141, AZSTATE.006143, AZSTATE.006145, AZSTATE.006152, AZSTATE.006154, AZSTATE.006155, AZSTATE.006159, AZSTATE.006323, AZSTATE.006538, AZSTATE.129513, AZSTATE.006694, AZSTATE.006704, AZSTATE.006709, AZSTATE.008022, AZSTATE.010326, AZSTATE.011523, AZSTATE.011544, AZSTATE.146155, AZSTATE.151091, AZSTATE.151092, AZSTATE.151093, AZSTATE.151094, AZSTATE.151099, AZSTATE.151707, AZSTATE.151720, AZSTATE.151721, AZSTATE.151737, and AZSTATE.151748. |
| 5. | Elastic/compression garments used for treatment of lymphedema and burns | ADOA evaluated and revised the exclusion based on recommendations from its health plan vendors and as necessary to conform with standard coverage guidelines.  ADOA elected to keep the exclusion of compression garments but to expand coverage for such garments as needed to treat burns. No independent cost analysis was completed by ADOA related to this change. |
| 6. | Wigs/Hair pieces when indicated for coverage on Section 7.25 | ADOA evaluated and revised the exclusion based on recommendations from its health plan vendors and as necessary to conform with standard coverage guidelines.  ADOA elected to keep the exclusion, but to expand coverage as provided on Section 7.25. No independent cost analysis was |

| | | completed by ADOA related to this change. |
|---|---|---|
| 8. | Services rendered by a midwife for the purpose of home delivery. | ADOA evaluated and removed the exclusion based on recommendations from its health plan vendors to remove the reference to midwives.  ADOA further revised the exclusion to refer to "birth," rather than "delivery."  No independent cost analysis completed by ADOA related to this change. |
| 10. | Charges made by any covered provider who is a member of your family or your Dependent's family. | ADOA evaluated and elected to remove exclusion due to changes under Arizona law, which allows treatment by family members. No independent cost analysis was completed by ADOA related to this change. |
| 11. | Manipulations under anesthesia. | ADOA evaluated and elected to revise the exclusion to expand coverage to manipulation under anesthesia when considered medically necessary.  No independent cost analysis was completed by ADOA related to this change. |
| 12. | Counseling and diagnosis related to infertility | ADOA evaluated and revised the exclusion based on recommendations from its health plan vendors and as necessary to comply with standard coverage guidelines.  ADOA elected to keep the exclusion, but to expand coverage to treatments  for the underlying cause.  No independent cost analysis was completed by ADOA related to this change. |

DATED this 12th day of April, 2021.

FENNEMORE CRAIG, P.C.


By: _s/ Ryan Curtis_
Timothy J. Berg
Amy Abdo
Ryan Curtis
Shannon Cohan
*Attorneys for Defendants State of Arizona, Andy Tobin, and Paul Shannon*

1   COPY of the foregoing e-mailed this
    12th day of April, 2021 to:
2
    Victoria Lopez
3   Christine K. Wee
    ACLU FOUNDATION OF ARIZONA
4   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85014
5   *Attorneys for Plaintiff*

6   Joshua A. Block
    Leslie Cooper
7   AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
8   125 Broad Street, Floor 18
    New York, New York 10004
9   *Attorneys for Plaintiff*

10  Wesley R. Powell
    Matthew S. Friemuth
11  Nicholas Reddick
    Jordan Wall
12  Victoria Sheets
    WILLKIE FARR & GALLAGHER LLP
13  787 Seventh Avenue
    New York, New York 10019
14  *Attorneys for Plaintiff*

15  Paul F. Eckstein
    Austin C. Yost
16  Perkins Coie LLP
    2901 North Central Ave., Suite 2000
17  Phoenix, Arizona 85012-2788
    *Attorneys for Defendants Arizona*
18  *Board of Regents d/b/a University of*
    *Arizona; Ron Shoopman; Larry*
19  *Penley; Ram Krishna; Bill Ridenour;*
    *Lyndel Manson; Karrin Taylor*
20  *Robson; Jay Heiler; and Fred Duval*

21  */s/ Lynn Marble*

22  18286470

23

24

25

26

Exhibit 51

# In The Matter Of:

*Toomey vs.*
*State of AZ*

*Scott Bender, Videotaped*
*March 31, 2021*

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office     877.266.6535 Toll Free*
*www.glennie-reporting.com    office@glennie-reporting.com*

Original File 033121SB.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


| | |
|---|---|
| RUSSELL B. TOOMEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 4:19-CV-00035 |
| | ) |
| STATE OF ARIZONA; ARIZONA BOARD | ) |
| OF REGENTS, d/b/a UNIVERSITY OF | ) |
| ARIZONA, a governmental body of | ) |
| the State of Arizona; et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |



VIDEOTAPED DEPOSITION OF SCOTT BENDER

Via Zoom Videoconference
March 31, 2021
8:00 a.m.
Phoenix, Arizona




Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535                    Prepared by:
www.glennie-reporting.com       Robin L. B. Osterode
                                CSR, RPR
                                CA CSR No. 7750
                                AZ CR No. 50695

54

1      Q.    So, Mr. Bender, you said that the process was

2  similar at Sprouts Farmers Market as well as at Amkor

3  Tech and as at Dial Soap.  Is it fair to say that there

4  is a general process to, you know, facilitating the

5  implementation of a plan change?

6      A.    I would say so, yeah.  Just not any official

7  documented process, but the -- the annual cycle of things

8  that happen, is pretty much the same in most

9  organizations that I've been part of.

10     Q.    And when you say there's no official process,

11  you mean there's nothing written down anywhere that tells

12  you how to go about facilitating the implementation of a

13  plan change?

14     A.    Not for those organizations, no.

15     Q.    Is there anything written down for any

16  organization you worked at?

17     A.    There are different requirements for the State

18  of Arizona.  We're required to, for example, any plan

19  changes that are recommended would need to be presented

20  to the Joint Legislative Budget Committee, the

21  legislature.  So it's just a little bit different, and

22  obviously, with the size of the state, there's more

23  layers of leadership to consider.

24     Q.    So appreciating those differences with respect

25  to the ADOA and its health plan, would you say that

55

1    general process includes -- and I'm going to name things

2    and I'd like you to tell me if I'm right -- so would the

3    general process for, you know, assessing a proposed

4    change to the plan include a cost analysis?

5         A.    Yes.

6         Q.    And would it include market analysis?

7         A.    Yes.

8         Q.    What about the impact to members', let's say,

9    health and well-being?

10        A.    Yes.

11        Q.    Is there anything else it would include?

12        A.    Off the top of my head, I can't think of really

13   anything else.  But you have to consider all factors,

14   so --

15        Q.    And to go back, when we were talking about how

16   this isn't written down or at least it wasn't written

17   down at places you've worked at --

18        A.    Right.

19        Q.    -- are there general professional standards

20   with respect to this process?

21        A.    I'm -- I don't know if there are general

22   standards.  I know how it's worked everywhere I've been,

23   and it's -- it's been sort of the -- what we call it at

24   the State is the contribution strategy, sort of lays out

25   what are -- what are the benefits going to be and who is

77

1  decision-making?

2      A.    It may be.

3      Q.    But the governor's office is not always

4  involved in the decision making when there's a change

5  that is optional to the plan?

6      A.    Correct.  Anything that would potentially have

7  a significant cost to the plan, we -- we need to consult

8  the governor's budget office.

9      Q.    If something didn't have a significant cost to

10  the plan, would you expect the governor's office to be

11  involved in the decision making?

12      A.    I would say it depends on what it is.

13      Q.    And what is it exactly that depends?

14      A.    I think is there anything that's, aside from

15  the cost, is there -- is there something that the

16  governor's office has a particular feeling one way or the

17  other about.

18      Q.    So you would expect the governor's office's

19  position -- when you say "feeling," what do you mean by

20  that?

21      A.    If anyone has a -- anybody in leadership has a

22  particular feeling one way or another.

23      Q.    And a feeling one way or another, do you mean

24  political position on an issue?

25      A.    Could be political, personal views.

Scott Bender, Videotaped - 03/31/2021

82

1  And we need to make decisions each year as to how we're

2  going to spend that money.  And, unfortunately, it sort

3  of ends up in an erosion of benefits for the employees

4  and more cost sharing to the employees.  That's just the

5  nature of this business, unfortunately.

6      Q.    Would the removal of a plan exclusion affect

7  the contribution strategy?

8      A.    It could, depending upon the cost.

9      Q.    At what point would the removal of a plan

10  exclusion affect the contribution strategy?

11      A.    I can't give you a number.

12      Q.    Is there a thre -- is there a ballpark

13  threshold?

14      A.    There's not a stated threshold that I'm aware

15  of, no.

16      Q.    What about an unstated threshold?

17      A.    I'm not aware of that either.  But I am --

18      Q.    Practically --

19            I'm sorry, go ahead.

20      A.    What I am aware of is that there's insufficient

21  funds to manage the plan as it is, and there is not much

22  appetite for any additional changes that would increase

23  costs.

24      Q.    Practically, in your experience working at the

25  ADOA, what cost would cause a change to the contribution

Scott Bender, Videotaped - 03/31/2021

83

1   strategy?

2        A.    The biggest focus lately is around specialty

3   medications and how do we handle those challenges.  I

4   mean, you can't watch TV without seeing three ads for new

5   specialty drugs that are coming to the market.  They've

6   become an extremely expensive part of the plan.  That is

7   a focus of ours.

8              We follow recommendations of a pharmacy and

9   therapeutics committee with our pharmacy benefit manager

10  with those.  But at some point we're going to have to

11  have the realistic conversation of what do we exclude and

12  are we going to continue to add everything that comes

13  down the pike.

14             There are therapies that cost hundreds of

15  thousands of dollars a year.  For one person.  And we

16  need to make hard decisions as to are we going to

17  continue to cover these things, or are we going to put

18  limits on them.

19       Q.    What are the costs of those specialty

20  medications?

21       A.    The -- first of all, the definition of what's

22  considered a specialty varies from organization to

23  organization.  We sort of view it as over 500 or a

24  thousand dollars a month or at least our PBM does.  And

25  they can go, you know, up to $500,000 a year or more.

97

1            When might the removal -- when might the
2    removal of a plan exclusion not impact the contribution
3    strategy?  And actually, let me clarify, I think we're
4    getting hung up on the word "impact."
5            When might the removal of a plan exclusion not
6    change the contribution strategy?
7        A.    I think it would not change if it were a
8    minimal cost.  And I believe we discussed between, you
9    know, more than $500,000.
10        Q.    Oh, okay.  So I think that's -- so if a cost
11   were around a million, I think that's where we landed, or
12   above, that would impact the contribution strategy?
13        A.    That could impact the contribution strategy,
14   and it's something noteworthy.
15        Q.    It's more likely to impact the contribution
16   strategy than not at a million?
17        A.    It's more likely at a million than it is at
18   500,000.
19        Q.    Does the governor's office ever get involved in
20   the decision-making process about a plan change before
21   you've presented the change to them?
22        A.    I can't think of a case like that.
23        Q.    So, for instance, if you don't know -- say
24   you're -- the network providers come to you with a
25   proposed change to the plan, and you don't know the cost

116

1    her on.  Gosh, I can't remember.  It was right when I

2    started.  We had conversations with her on something.

3    I'm sorry, I don't remember.  And I know that she was

4    involved in the discussion in our redesign of our new

5    wellness program, and what the governor's office would be

6    interested in from the perspective of a new vendor and

7    what kind of capabilities they wanted for the wellness

8    program, but my -- my interaction with her is very

9    limited.

10        Q.    Have you ever interacted with her with respect

11   to the plan's coverage of transgender benefits?

12        A.    I have not, no.

13        Q.    So I think I understand now, you know, the

14   structure of who reports to who.  I'd like to understand

15   it better, the decision-making process at the ADOA.  So

16   with respect to the plan's exclusion, a change to a plan

17   exclusion, a removal of a plan exclusion, which is what

18   is at issue in this case, how would you first

19   learn -- how would it come to the ADOA's attention a

20   proposal about removing a plan exclusion?

21        A.    I'm trying to -- could you rephrase your

22   question?  I think -- this is not something that happens

23   often.

24        Q.    Sure.  Well, let me ask you about that.  How

25   often does -- is a proposal to remove a plan exclusion,

117

1    how often does that occur?

2        A.    Not very frequently.

3        Q.    Twice a year?

4        A.    No, not even that often.

5        Q.    Once every two years?

6        A.    I'd say that's probably more -- more likely.

7    And, typically, it's done in conjunction with change in

8    law that we have to, you know, cover something in

9    particular.

10       Q.    Was the removal of the plan's exclusion of 3-D

11   mammography the last plan exclusion you dealt with?

12       A.    No, it was the -- the clinical cancer trial.

13   And that was something that we had to cover.  3-D

14   mammography was more of a change in medical coverage

15   guidelines.

16       Q.    So what do you mean it -- what do you mean by

17   it was a "change in medical coverage guidelines"?

18       A.    The vendors themselves determine what is

19   considered a medically necessary service.  As I

20   mentioned, Aetna was the first organization to make the

21   determination that 3-D mammography was an appropriate

22   service and not experimental.  They had seen enough

23   evidence to determine that that is something that should

24   be covered.  And they were covering it on their -- on

25   their medical guidelines.  And slowly, but surely, the

119

1    record?

2           MR. WALL:  Sorry, could you take us off the

3    record while we fix this?  And this actually might be a

4    good time to take another break.

5           THE VIDEOGRAPHER:  Off the record at 11:20 a.m.

6           (Recessed from 11:20 a.m. until 11:31 a.m.)

7           THE VIDEOGRAPHER:  Back on the record at

8    11:31 a.m.  Please proceed when ready.

9    BY MR. WALL:

10       Q.    So, Mr. Bender, before we went on break, we

11   were discussing the most recent changes to plan

12   exclusions that you've encountered.

13           Do you recall that?

14       A.    Yes.

15       Q.    And so I think you said the most recent one was

16   the clinical cancer trials.

17       A.    Yes.

18       Q.    And when was that -- when was that change to

19   the plan?  Well, let me ask, was the plan exclusion for

20   that removed?

21       A.    It was, yes.

22       Q.    And when was that?

23       A.    It was within the last six months.

24       Q.    And then prior to that you'd spoke about 3-D

25   mammography treatment?

120

1      A.    Right.

2      Q.    And when was that exclusion removed?

3      A.    That was probably two years ago.  Maybe 2019.

4      Q.    And then before that, was there anything

5  else -- was the transgender benefits exclusion the last

6  modification before that?

7      A.    I believe so, yes.

8      Q.    And that was in 2017?

9      A.    Yes.

10     Q.    Or, rather, I should say --

11     A.    Move forward to 2017, yes.

12     Q.    So just to be clear, the plan was changed in

13 2017, the transgender benefits covered or excluded were

14 changed in 20 -- for the 2017 plan year?

15     A.    Correct.

16     Q.    So let's take the 3-D mammography as an

17 example, for instance.  So there, Aetna came forward and

18 said that they're going to start covering 3-D

19 mammography.  Correct?

20     A.    Right.

21     Q.    And then Blue Cross Blue Shields, UHC, and

22 Cigna about a year later decided that they were going to

23 start covering that service?

24     A.    Right.

25     Q.    So this was presented to the ADOA how?  How did

Scott Bender, Videotaped - 03/31/2021

124

1   who is not, and what is the basis for that.

2       Q.    Did you ask Ms. Medina to do a cost analysis of

3   covering the treatment?

4       A.    I don't recall.  I don't believe so.

5       Q.    Would you have likely asked her to do a cost

6   analysis?

7       A.    Very likely.  Either her or our actuary.  But

8   my recollection was the cost is fairly similar, so it

9   wouldn't have been an extreme cost burden to the plan.

10      Q.    Fairly similar to what?

11      A.    Excuse me, similar to a standard mammogram.  So

12  the standard mammogram that was replaced by a 3-D

13  mammography.  And the standard is still being used out

14  there very broadly, even though 3-D's available.

15      Q.    And it was important that the cost of the 3-D

16  mammography was similar to a service the plan was already

17  covering?

18      A.    Any time you're considering additional costs,

19  it's important to understand what that is.  My

20  recollection was that the cost for a 3-D mammography was

21  very similar to the cost of a standard mammogram.

22      Q.    And the fact that it was similar meant that it

23  would be less impactful?

24      A.    Correct.

25      Q.    Now, Mr. Bender, you said earlier you expect

130

1   than that, we typically query our health plans to

2   determine, you know, is this a standard service.  And

3   that's all part of that medical director meeting.

4       Q.    Okay.  So the ADOA doesn't affirmatively

5   consider, you know, guideline or standards of care for

6   treatment; it relies on its network providers?

7       A.    Correct.

8       Q.    So once Ms. Medina had collected or did this

9   research for the team, she -- what does she then do with

10  it?

11      A.    We would have a discussion -- and this is just

12  my assumption in how we did this; I don't recall

13  specifically -- we would have a discussion as to, you

14  know, this is now an appropriate service, according to

15  our -- according to our vendors.  It's not necessarily a

16  high cost driver.  We present it to our director and the

17  decision would be made whether to include or exclude.

18          Something like that, where all four programs

19  are aligned that this is now a standard course of

20  treatment, and it's zero -- you know, limited cost to the

21  plan.  That's, I think, a fairly easy decision, and we

22  don't necessarily need to run to the governor's office or

23  to the director to make those decisions.

24      Q.    So where the -- all four network providers are

25  aligned, you think it's an easy decision on whether to

131

1   extend coverage?

2       A.    Correct.  That's if -- that's if -- and I'll

3   caveat that with if the cost is reasonable.

4       Q.    So when you say this is a discussion, would you

5   and Ms. Medina have a discussion first?

6       A.    Yes, just to review her findings.

7       Q.    And let me be more specific.  On the 3-D

8   mammography treatment, did you and Ms. Medina have a

9   discussion first about the findings of her research?

10      A.    I -- I don't recall -- I presume we did.  I

11  don't recall it specifically, but that's typically how

12  things happen.  She researches and updates me on what she

13  finds.

14      Q.    And so once you and Ms. -- once you and

15  Ms. Medina have that discussion, do you all form a

16  recommendation that you take to the -- to Mr. Shannon or

17  did you?

18      A.    That's typically how it works, yes.  I don't

19  recall specifically in that case.

20      Q.    And so when you say "typically," you mean when

21  you're assessing whether to remove a plan exclusion, you

22  and your team come to a recommendation, and then you take

23  that to the benefit services director?

24      A.    And not necessarily just removing a plan

25  exclusion, which is fairly rare.  But just any -- any

137

1    it as such and it is their recommendation that we -- we

2    include it, so we did.

3        Q.    And the 3-D mammography treatment, that wasn't

4    required by law, was it?

5        A.    Not that I'm aware of, no.  It is a

6    preventative service, and we're required to offer

7    mammograms, but I don't believe that particular type of

8    mammogram is required by law.

9        Q.    So on the 3-D mammography, you don't recall the

10   governor's office being involved, but hypothetically say

11   they were involved, once the governor's office makes the

12   decision, do they then advance that to the JLBC for their

13   favorable or disfavorable vote?

14       A.    Something on a one-off like that, typically

15   not.  The JLBC is more concerned about, since they are a

16   budget agency, they're more concerned about things that

17   are going to have a material impact to the budget.  And

18   the treatment of one mammogram versus another would not

19   have a material impact on the budget.

20       Q.    What impact did that extension of that

21   treatment have on the budget?

22       A.    I don't recall.  But I know that the pricing

23   was close between 3-D and the standard.

24       Q.    Was the additional cost of 3-D mammography

25   below a million per year to the plan?

Scott Bender, Videotaped - 03/31/2021

155

1    A.    Correct.

2    Q.    And so you cannot recall whether you made a

3  recommendation that you would, in the ordinary course

4  make, about transgender benefits?

5    A.    In the ordinary course of business, it would

6  have been a bottom-up approach, and this clearly was not.

7  She brought this to us.  So there was obviously some

8  concern by someone somewhere about this program and these

9  specific benefits.

10   Q.    And so -- so -- so because this is -- this was

11  not a bottom-up approach, you can't remember whether you

12  made a recommendation to Ms. Isaacson of whether the plan

13  should cover transgender benefits?

14   A.    Correct.

15   Q.    Now, are those two things connected?  The fact

16  that it was not a bottom-up approach and your memory of

17  whether you made a recommendation?

18        MR. CURTIS:  Objection; form of the question.

19        You can answer.

20  BY MR. WALL:

21   Q.    You can answer, Mr. Bender.

22   A.    So can you reask that?

23   Q.    Sure.  Are those two things connected, the fact

24  that it was not a bottom-up approach, and your memory of

25  whether you made a recommendation?

156

1     A.    Are they connected?  I don't really know how to

2   respond to that question.  I --

3     Q.    Well, I do want to be clear, Mr. Bender, is it

4   that you do not remember whether you made a

5   recommendation or you did not make a recommendation to

6   Ms. Isaacson?

7     A.    I do not remember if I made a recommendation.

8   I don't believe I did.  It was clear that this was a

9   sensitive topic.

10    Q.    Why was it clear that this was a sensitive

11   topic?

12    A.    Just in the amount of work that was put into

13   it, and we were -- my team was not really included in any

14   discussions outside of our office.  We were not included

15   in any discussions with the governor's office.  Which

16   made me think that this was very sensitive.

17    Q.    And your team not being included in any of

18   those discussions was out of the ordinary.  Correct?

19    A.    As we discussed, yes, for a benefit change or a

20   significant benefit issue that this is, it seemed

21   unusual.

22    Q.    Why was the plan's exclusion of transgender

23   benefits a significant benefit issue?

24    A.    It's -- well, I -- I know that -- I believe it

25   was viewed -- it may have been viewed more along

157

1   political lines, if you will, different ideologies.  And,

2   obviously, in a political environment, that's -- many

3   people consider those things.

4       Q.    Was the plan's exclusion of transgender

5   benefits viewed along political lines?

6       A.    That was my sense, but I don't know for sure.

7       Q.    What was that sense based on?

8       A.    Well, my sense is based on where we were a

9   fairly conservative state with conservative leadership,

10   in the legislature and governor, and transgender benefits

11   are not necessarily something that's a super important

12   factor to many conservatives.

13       Q.    And, Mr. Bender, earlier you mentioned that

14   there were obviously some concerns about this topic.

15   Correct?

16       A.    Yes, just in my discussion and interaction with

17   Marie Isaacson, it was clearly something that was being

18   seriously debated.

19       Q.    Did you hear from anyone else about these

20   concerns?

21       A.    I -- I sensed that our team was well aware that

22   this was not necessarily an easy decision.

23       Q.    And it wasn't an easy decision because of the

24   political considerations around it?

25       A.    Correct.  That was my sense.

161

1   are referring to gender reassignment surgery, as well as

2   hormone therapy and counseling in connection therewith.

3   Correct?

4       A.    Correct.

5       Q.    So the network -- so to back up, the ADOA asked

6   the network providers to provide you with a cost-impact

7   analysis; is that right, Mr. Bender?

8       A.    Yes.

9       Q.    And that cost-impact analysis showed that the

10  marketplace and industry were going to cover tran --

11  gender reassignment surgery, as well as counseling and

12  hormone therapy in connection therewith?

13      A.    That's correct.  And their estimates were

14  varied.  Some gave us an estimate of per employee per

15  month cost, additional to our -- our current plans,

16  others gave a percentage of cost increase is my

17  recollection.

18      Q.    So with this information available, the ADOA

19  decided to maintain the exclusion on gender reassignment

20  surgery.  Correct?

21      A.    I don't know that that was the ADOA's decision,

22  but that was the decision that was communicated to us to

23  implement.

24      Q.    If not the ADOA's decision, whose decision

25  would it have been?

Scott Bender, Videotaped - 03/31/2021

162

1      A.     Someone up the food chain from ADOA.  I'm not

2   certain who made that decision.

3      Q.     When we're referring to someone up the food

4   chain, to whom are you referring, Mr. Bender?

5      A.     Could be anyone in the governor's office.

6      Q.     Is there anyone else outside of the governor's

7   office who could have made that decision?

8      A.     No.  ADOA bears responsibility for managing the

9   program, and we report to the governor's office, so no.

10     Q.     So just to back up a bit.  So once the decision

11  was made, Ms. Isaacson informed you of that decision.

12  Correct?

13     A.     She asked us to -- I'm sorry --

14     Q.     I'm sorry, let me clarify.  Once the decision

15  was made on whether to continue the plan's exclusion of

16  transgender benefits, Ms. Isaacson communicated to you

17  that the plan would continue its exclusion of gender

18  reassignment surgery, but not counseling or --

19          THE REPORTER:  I'm sorry, Mr. Wall, can you

20  repeat that, please?

21          MR. WALL:  Sure.

22     Q.     So once a decision was made on whether the plan

23  would continue its exclusion of transgender benefits,

24  Ms. Isaacson communicated that decision to you and your

25  team.  Correct?

1   or deleted the exclusions and absorbed the costs

2   associated with that, for sure.

3   BY MR. WALL:

4        Q.    So if the ADOA had removed the exclusion listed

5   in paragraph 16, would there have been any other question

6   about the ADOA's compliance with Section 1557?

7        A.    From a compliance standpoint, no.  If we

8   voluntarily opted in, there's no compliance issue.

9        Q.    So why didn't the ADOA remove the exclusion for

10  all transgender benefits under the plan?

11       A.    Can you rephrase?

12       Q.    Why didn't the ADOA remove the plan's exclusion

13  of transgender benefits, inclusive of gender reassignment

14  surgery?

15       A.    I believe there are several reasons, one being

16  cost and the other being we didn't feel it was required

17  for us to include -- or to eliminate the exclusion for.

18       Q.    So the ADOA did not remove the plan's exclusion

19  of gender reassignment surgery because of cost, and it

20  didn't feel it was required to remove that exclusion?

21       A.    Those are both reasons.  I think, primarily, is

22  we weren't required to, and if we're not required to,

23  then we weren't interested in taking on additional costs

24  in a plan that's already under water.

25       Q.    The ADOA's primary reason for not removing the

181

1   and if you don't understand, you can let me know.  Okay?

2       A.     Okay.

3       Q.     So except when a medically necessary

4   hysterectomy is sought in connection for the treatment of

5   gender dysphoria.

6       A.     It's excluded if it's in connection with a

7   transgender surgery.

8       Q.     So but for being in connection with a

9   transgender surgery, a medically necessary hysterectomy

10  would be covered under the plan?

11          MR. CURTIS:  Objection; form of the question.

12          THE WITNESS:  Correct.

13  BY MR. WALL:

14      Q.     You can answer.

15          Under --

16      A.     That's correct.

17      Q.     Are you aware of any procedures that are

18  medically necessary that are covered -- of any procedures

19  that are covered -- uh -- let me restate this.

20          Are you aware of any other instances under the

21  plan where a medically necessary procedure is covered in

22  some instances, but not others?

23      A.     Off the top of my head, I'm not aware.

24      Q.     Mr. Bender, would you turn for me to Exhibit --

25  Tab 1 in this binder, which is premarked as Bender

190

1   different estimates from the four different health plans,

2   and just anecdotally from our actuary as to what he felt

3   our exposure was, based on what he was seeing in the

4   marketplace.

5        Q.    So just to sum up, the ADOA had numerous

6   different estimates of the cost from the various -- from

7   the four network providers?

8        A.    Right.

9        Q.    And also, the in-house actuary, Mr. Meisner,

10  had a different calculation of the cost?

11       A.    Correct.

12       Q.    So now I'm looking at the bottom-most bullet in

13  this box on cost, that says, "Based on input from the

14  vendors and ADOA's research, ADOA feels it can" safe --

15  "it can be safely say if transgender coverage is

16  implemented, the cost would be under a dollar per

17  employee per month.  Approximately 50 cents per employee

18  per month seems to be an agreed-upon amount based on

19  ADOA's research."

20            Did I read that correctly, Mr. Bender?

21       A.    Yes.

22       Q.    So appreciating that you saw different

23  estimates and a different estimate from Mr. Meisner

24  later, would you consider this estimate here to be high?

25       A.    A dollar per employee per month, is

Scott Bender, Videotaped - 03/31/2021

191

1    approximately $60,000 [sic] a month, so $120,000 a year.

2    In the overall scheme of the plan, I -- I would not say

3    that that is a high cost.

4         Q.    And if a dollar per month is not a high cost,

5    then you would agree 50 cents per employee per month is

6    also not a high cost?

7         A.    That's right.

8         Q.    When the ADOA is assessing the cost of a

9    particular treatment, does it matter whether it's being

10   calculated on a per employee per month basis or a per

11   member per month basis?

12        A.    I don't know that it necessarily matters.  Both

13   of them will get you to sort of an annual cost.

14        Q.    And what about calculating as a percentage of

15   total plan cost?

16        A.    Same.  We know what our annual plan costs, and

17   if the recommendations are in various methodologies, we

18   can account for that and convert everything to an annual

19   total impact.

20        Q.    So if you turn now, Mr. Bender, to the fourth

21   physical page of this document, Bates number

22   AZSTATE.009272.

23        A.    Got it.

24        Q.    Do you see that bottom box that says

25   A-H-C-C-C-S?