**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Russell B Toomey,<br><br>    Plaintiff,<br><br>v.<br><br>State of Arizona, et al.,<br><br>    Defendants. | No. CV-19-00035-TUC-RM (MAA)<br><br>**ORDER** |

      Pending before the Court is Plaintiff's Consent Motion for Approval of Consent Decree. (Doc. 353.) Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of the Certified Classes and with Defendants'[1] consent, requests that the Court approve the parties' proposed Consent Decree. (*Id.*) Also pending is a Motion for Leave to File a Brief as *Amicus Curiae* submitted by Speaker of the Arizona House of Representatives Ben Toma and Arizona Senate President Warren Petersen. (Doc. 354.) For the following reasons, the Court will grant Plaintiff's Consent Motion for Approval of Consent Decree and deny the Motion for Leave to File a Brief as *Amicus Curiae*.

. . . .

. . . .

---

[1] "Defendants" refers collectively to Defendants State of Arizona, Andy Tobin, and Paul Shannon, in their official capacities (the "State Defendants"), and the Arizona Board of Regents, d/b/a University of Arizona, Ron Shoopman, Larry Penley, Cecilia Mata, Bill Ridenour, Lyndel Manson, Robert Herbold, Jessica Pacheco, and Fred DuVal, in their official capacities (the "ABOR Defendants"). (Doc. 353 at 2-3.) Pursuant to Federal Rule of Civil Procedure 25(d), Ron Shoopman and Bill Ridenour have been substituted with their successors in office, Doug Goodyear and Gregg Brewster, and Andy Tobin has been substituted by his successor in office, Elizabeth Alvarado-Thorson. (*Id.* at 3, n.1.)

## I. Background

### A. Procedural History

The State of Arizona offers a health plan to its employees that is administered by the Arizona Department of Administration (the "Plan"). (Doc. 86 at 3.)[2] The Plan generally covers medically necessary treatment, but it categorically excludes all coverage for "gender reassignment surgery" (the "Exclusion"). (*Id.*) The Exclusion applies even in cases where gender reassignment surgery is medically necessary. (*Id.*) Plaintiff filed his original Complaint on January 23, 2019, challenging as discriminatory the Plan's categorical exclusion of gender reassignment surgery. (Doc. 1.) State Defendants subsequently filed a Motion to Dismiss Complaint (Doc. 24), which the Court denied after full briefing from the parties (Doc. 69).

On March 2, 2020, Plaintiff filed the operative Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. (Doc. 86 at 3.) As relief, Plaintiff sought a declaratory judgment and a permanent injunction requiring Defendants to remove the Plan's Exclusion and "evaluate whether transgender individuals' surgical care for gender dysphoria is 'medically necessary' in accordance with the Plan's generally applicable standards and procedures." (*Id.* at 4.)

The Court certified the following class for the Title VII claim:

> Current and future employees of the Arizona Board of Regents who are or will be enrolled in the self-funded Plan controlled by the Arizona Department of Administration, and who have or will have medical claims for transition-related surgical care.

(Docs. 105, 108.) The Court certified the following class for the Equal Protection claim:

> Current and future individuals (including Arizona State employees and their dependents), who are or will be enrolled in the self-funded Plan controlled by the Arizona Department of Administration, and who have or will have medical claims for transition-related surgical care.

(Docs. 105, 108.) The Court certified the classes for injunctive and declarative relief only

---

[2] All record citations herein refer to the page numbers generated by the Court's electronic filing system.

pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. (Doc. 105 at 2, 9.)

In July 2020, the parties engaged in settlement negotiations that were ultimately unsuccessful. (Doc. 353 at 4; *see also* Doc. 110 at 3.) Two years of extensive motion practice, discovery, and discovery disputes followed, including State Defendants' unsuccessful petition for writ of mandamus to the Ninth Circuit. (Doc. 260.) On September 26, 2022, State Defendants and Plaintiffs moved for summary judgment. (Docs. 293, 298.) Full briefing concluded on November 23, 2022 (*see* Docs. 337, 338), and oral argument was scheduled for January 9, 2023 (Doc. 340). On January 4, 2023, the parties jointly moved to postpone oral argument, as the parties had begun discussion of a potential settlement. (Doc. 346.)

Plaintiff avers that since January 5, 2023, the parties have engaged in settlement negotiations to remove the Exclusion. (Doc. 353 at 5.) On June 27, 2023, independent of the parties' negotiations, Arizona Governor Katie Hobbs issued Executive Order 2023-12, directing the ADOA to remove the Exclusion. (*Id.*) The Exclusion's removal from the Plan became effective August 11, 2023. (*Id.*) As a result of the parties' settlement negotiations, the parties jointly agreed to a Consent Decree for the Court's approval that, among other stipulations, permanently enjoins Defendant from reinstating the Exclusion. (*Id.* at 6.)

### B. The Consent Decree

The jointly agreed upon Consent Decree has four major provisions. First, Defendants are "permanently enjoined from providing or administering a health plan for employees of ABOR or the State of Arizona and their beneficiaries that categorically excludes coverage of medically necessary surgical care to treat gender dysphoria." (Doc. 353-1 at 5-6.) Second, Defendants' health plans will "evaluate health care claims for surgical care to treat gender dysphoria pursuant to the health plan's generally applicable standards and procedures." (*Id.* at 6.) ABOR agreed to advise all currently enrolled ABOR employees of the plan change, and the State of Arizona agreed to notify all other eligible State employees. (*Id.* at 4-5.) Third, State Defendants are "permanently enjoined from

enforcing or applying ARS § 38-656(E)[3] to the extent that it is inconsistent with [the] Consent Decree." (*Id.* at 6.) Fourth, State Defendants agree to pay Plaintiff's counsel $500,000.00 in attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988. (*Id.*) The Consent Decree does not call for an incentive award to the named plaintiff (Doc. 353 at 13), nor does it require class members to release any claims for damages.

**II.     Applicable Law**

    **A.     Class Settlement**

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class…may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The Ninth Circuit has long demonstrated a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992))). Nonetheless, a court may approve a proposed class settlement only if it is "'fair, reasonable, and adequate,' accounting for the interests of absent class members." *Briseno v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)).

Rule 23(e)(2) instructs the Court to consider the following factors to determine whether a proposed class settlement is fair, reasonable, and adequate:

    (A) the class representatives and class counsel have adequately represented the class;

    (B) the proposal was negotiated at arm's length;

    (C) the relief provided for the class is adequate, taking into account:

---

[3] ARS § 38-656(E) provides that:
    A governing body of a city or town, a county board of supervisors, a community college district governing board, a special taxing district, an authority or any public entity organized pursuant to the laws of this state that opts to participate in the state health and accident insurance coverage shall agree to accept the benefit level, plan design, insurance providers, premium level and other terms and conditions determined by the department of administration and shall accept any other contractual arrangements made by the department of administration with health and accident insurance providers.

       (i) the costs, risks, and delay of trial and appeal;

       (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

       (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

       (iv) any agreement required to be identified under Rule 23(e)(3); and

   (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### B. Attorneys' Fees

Rule 23(h) of the Federal Rules of Civil Procedure provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). A district court must examine a proposed attorneys' fee award pursuant to a class settlement to ensure that it is free from "unfair collusion in the distribution of funds between the class and their counsel." *Briseno* 998 F.3d at 1019. To that end, the Ninth Circuit has identified three factors, known as the *Bluetooth* factors, to help scrutinize settlement agreements for hallmarks of collusion:

   (1) when counsel receives a disproportionate distribution of the settlement;

   (2) when the parties negotiate a 'clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and

   (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class.

*Id.* at 1023 (internal quotation marks and citation omitted). In sum, the Court must "balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021) (quoting *Briseno* 998 F.3d at 1024).

District courts have "an independent obligation to ensure that [any attorneys' fee] award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Briseno* 998 F.3d at 1022 (quoting *In re Bluetooth Headset Products Liability*

- 5 -

*Litigation*, 654 F.3d 935, 941 (9th Cir. 2011)).  The Ninth Circuit allows "two methods of calculating attorneys' fee awards in class actions: (1) the 'lodestar' method and (2) the 'percentage-of-recovery' method."  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019)).  The lodestar method is especially appropriate "in class actions brought under fee-shifting statutes…where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized."  *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 941.  In cases where the value to the class is not easily quantified, district courts may award fees based on a lodestar calculation, "without needing to perform a crosscheck in which they attempt to estimate how this compares to the recovery for the class."  *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1126 (9th Cir. 2020) (internal quotation marks and citation omitted).

The lodestar method is a two-step process.  *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016).  First, to calculate the lodestar figure, the court must determine "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  "Second, the court determines whether to modify the lodestar figure, upward or downward, based on factors not subsumed in the lodestar figure."  *Kelly*, 822 F.3d at 1099.  These factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Carter v. Caleb Brett LLC*, 757 F.3d 866, 869 (9th Cir. 2014) (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1976), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992)); *see also* LRCiv 54.2(c)(3).

### III. Analysis

#### A. Class Settlement

Under Rule 23(e)(2)(A), the Court must consider whether the class representative and class counsel adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). As an initial matter, the Court certified this class for the purposes of obtaining injunctive and declarative relief only under Rule 23(b)(2) of the Federal Rules of Civil Procedure. (Doc. 105 at 2, 9.) Plaintiff sought in his operative Complaint a declaratory judgment and a permanent injunction requiring Defendants to remove the Plan's Exclusion and "evaluate whether transgender individuals' surgical care for gender dysphoria is 'medically necessary' in accordance with the Plan's generally applicable standards and procedures." (Doc. 86 at 4.) Plaintiff states that "[a]s a Rule 23(b)(2) case, injunctive relief prohibiting Defendants' policy and practice of excluding transition-related surgical care, not monetary relief, has always been Plaintiff's goal." (Doc. 353 at 8.)

Thus, the Consent Decree essentially achieves complete relief for Plaintiffs by permanently enjoining Defendants "from providing or administering a health plan for employees of ABOR or the State of Arizona and their beneficiaries that categorically excludes coverage of medically necessary surgical care to treat gender dysphoria." (Doc. 353 at 5-6.) Further, the Consent Decree provides that Defendants must evaluate health claims for surgical care to treat gender dysphoria according to the Plan's generally applicable standards and procedures. (Doc. 353 at 14.) Notably, the Consent Decree does not require class members to relinquish monetary claims against Defendants. Plaintiff avers that "[a]t all times, Plaintiffs' counsel has placed the interests of the Certified Classes ahead of their own, scrutinizing the settlement details to ensure the most appropriate form of relief for the Certified Classes as a whole." (Doc. 353 at 9-10.) Based on these circumstances, the Court finds that the class representative and counsel adequately represented the class.

Under Rule 23(e)(2)(B), the Court assesses whether the parties negotiated the Consent Decree at arm's length. Fed. R. Civ. P. 23(e)(2)(B). The parties achieved a

settlement after an extensive procedural history, including State Defendants' unsuccessful Motion to Dismiss, failed settlement negotiations, efforts to certify the classes over Defendants' opposition, voluminous discovery and discovery disputes, including a Ninth Circuit appeal, and the full briefing of summary judgment. (*See* Doc. 353 at 15.) This extensive procedural history provided the parties adequate opportunity to evaluate the strengths and weaknesses of their respective positions and to negotiate the Consent Decree on a fully informed basis. Plaintiff avers that "[a]t all times, the negotiations were adversarial, non-collusive, and at arm's length." (*Id.* at 5.) Plaintiff further avers that the parties engaged in settlement negotiations over several weeks and exchanged "numerous offers and counter-offers" regarding the appropriate remedy for removing the Exclusion. (*Id.* at 9.) Given this case's extensive procedural history and the parties' considerable settlement negotiations, the Court concludes that the Consent Decree was negotiated at arm's length.

Under Rule 23(e)(2)(C), the Court evaluates whether the relief provided for the class is adequate, taking into account four distinct factors that the Court will address in turn. Fed. R. Civ. P. 23(e)(2)(C). The first factor requires the Court to consider whether the relief is adequate in light of the "costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). As relevant to this factor, Plaintiff argues that "the fairness and the adequacy of the Consent Decree far outweigh the risks (and costs) of pursuing the litigation to judgment, as the Certified Classes have obtained full relief." (Doc. 353 at 14.) The Court agrees with Plaintiff's assessment. Any possible benefit to the class from continued litigation is uncertain and would require more expense, delay, and the ordinary risks of litigating on a class-wide basis. Furthermore, because the Consent Decree affords Plaintiffs near total relief with a permanent injunction, it is unclear what further benefit the class could obtain if the case proceeded. Furthermore, if this case continued and Defendants prevailed on summary judgment, the class would not receive the permanent injunctive relief provided in the Consent Decree, even though it would still benefit from the Exclusion's repeal effectuated by Governor Hobbs' Executive Order. Thus, the Court

finds that the relief provided for the class is adequate considering the costs, risks, and delay of trial and appeal. The relief provided by the Consent Decree is also adequate considering the effectiveness of any proposed method of distributing relief to the class, because the Consent Decree provides injunctive relief to each class member. Fed. R. Civ. P. 23(e)(2)(C)(ii). As described in detail below, the Court finds that the relief provided to class members is adequate considering the terms of the proposed award of attorneys' fees. Fed. R. Civ. P. 23(e)(2)(C)(iii). The Court also finds that the relief is adequate considering all agreements made in connection with the proposed Consent Decree. Fed. R. Civ. P. 23(e)(2)(C)(iv).

Finally, under Rule 23(e)(2)(D), the Court finds that the proposal treats class members equitably relative to each other because all class members are entitled to the same injunctive relief. Fed. R. Civ. P. 23(e)(2)(D). The Court notes that Plaintiff chose to forgo an incentive award, which is "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publg. Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). Furthermore, no monetary damages were sought in this case. Therefore, the Consent Decree provides no monetary relief to Plaintiff or any individual members of the Certified Classes. Based on the preceding, the Court concludes that the Rule 23(e)(2) factors favor the approval of the Consent Decree.

**B.     Attorneys' Fees**

**i.     No Collusion**

The first *Bluetooth* factor requires that the Court consider whether counsel will receive a disproportionate distribution of the settlement. It is difficult to assign a dollar amount to the Consent Decree and compare it to the requested attorneys' fees because relief is in the form of an injunction and not monetary. However, the permanent injunction achieved by the Consent Decree and through this litigation has substantial value and serves the interests of the class members. Further, as an injunctive class only under Rule 23(b)(2),

the class members were never positioned to receive a monetary judgment.

It is true that the initial relief obtained by the class—the removal of the Exclusion from the Plan—was the result of Governor Hobbs' Executive Order rather than a result of settlement negotiations. In *Campbell*, an objecting class member challenged the district court's approval of a settlement between Facebook and a class certified for injunctive relief on the basis that Facebook had "acknowledged in the settlement agreement that it had already made several changes to the practices challenged in [the] action" and that Facebook agreed not to contest class counsel's request for $3.89 million in attorney's fees. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1111 (9th Cir. 2020). The Ninth Circuit held that the district court did not clearly err in finding that the settlement's injunctive relief was valuable despite Facebook's voluntary changes because the settlement also required Facebook to make a disclosure on its Help Center page regarding its monitoring practices. *Id.* at 1123. The Court clarified that "the relief provided to the class cannot be assessed in a vacuum" but must be "considered by comparison to what the class actually gave up by settling." *Id.* After highlighting the fact that the class did not relinquish its right to seek monetary damages, the Court concluded that "the class did not need to receive much for the settlement to be fair because the class gave up very little." *Id.*

Here, Plaintiff acknowledges that the Governor issued the Executive Order effectively repealing the Exclusion "separate from the settlement discussions." Thus, as in *Campbell*, at least some of the relief Plaintiffs sought was achieved for reasons other than a court-or settlement-imposed obligation. However, in this case, the value of the Consent Decree's injunctive relief is arguably more significant than that provided in *Campbell*. Because Governor Hobbs effectively repealed the Exclusion with an executive order, as it currently stands, her administration or a future administration may reinstate it at any time. *See, e.g., Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1038 (9th Cir. 2018) (explaining that while statutory change is usually enough to moot a case, "an executive action that is not governed by any clear or codified procedures cannot moot a claim"); *Cooper v. Newsom*, 13 F.4th 857, 863 (9th Cir.2021) (explaining that governor's executive

order amending execution protocols did not moot claim because "[n]othing prevents Governor Newsom, or a future Governor, from withdrawing the Executive Order and proceeding with preparations for executions").

Thus, the Consent Decree provides further relief to the class beyond the change effectuated by the Executive Order by making the Exclusion's removal permanent. Furthermore, the Consent Decree explicitly provides that coverage of gender reassignment surgery shall be assessed based on the Plan's generally applicable standards. Under these circumstances, the Consent Decree offers substantial benefits to the class, who give up very little, if anything, in return. Accordingly, the Court finds that counsel will not receive a disproportionate distribution of the settlement, and the first *Bluetooth* factor weighs against a finding of collusion.

Although the parties have reached an agreement regarding the attorneys' fee award, there is no "clear sailing" provision as there are no signs that "class counsel gave up valuable injunctive relief in exchange for a defendant's promise not to contest class counsel's fee application." *Campbell* 951 at 1127. Thus, the second *Bluetooth* factor does not support a finding of collusion. Finally, the third factor—whether the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class—is not present because "[a]n injunctive-relief-only class settlement, by definition, has no fund into which any fees not awarded by the court could possibly revert." *Id.* Based on the foregoing, the Court finds no sign of collusion.

### ii. Reasonableness of Fee Award

The Certified Classes and Defendants have agreed upon $500,000 in attorneys' fees, which Plaintiff avers is "a mere fraction" of the fees incurred by counsel. (Doc. 353 at 6.) Class counsel contends they would have been entitled to a fully compensatory fee award because Plaintiff achieved complete success in this litigation. (*Id.* at 7.) However, they have accepted a substantially discounted amount in the interest of settlement. (*Id.*) Plaintiff submitted billing records showing the accounting of attorneys' fees and costs

incurred in this matter from Willkie Farr & Gallagher LLP ("Willkie")[4]; Joshua Block, lead counsel for this matter at the American Civil Liberties Union ("ACLU"), and the ACLU of Arizona, which served as Plaintiff's local counsel. (Doc. 360).

Plaintiff retained Willkie, a large, New York-based international law firm, to complement the expertise of the ACLU due to its extensive experience litigating complex class actions and transgender civil rights cases. (*Id.* at 7-8.) The Willkie Billing Records reflect that the ten Willkie lawyers who devoted the most time to this case "collectively recorded 6,634.10 hours, totaling $6,167,507.30 in attorney's fees." (*Id.* at 3.) The rates for Willkie lawyers range from $1,805 for a partner who graduated law school in 1994 to $460 for a law clerk who graduated law school in 2020.[5] (*Id.* at 4-5.) Joshua Block, a 2005 law school graduate and lead counsel for this matter at the ACLU in New York, billed 191 hours at a rate of $750, for a total of $143,250.[6] The ACLU of Arizona Billing Records reflect that two attorneys and one paralegal recorded 168.4 hours, totaling $74,336.00 in fees. (*Id.* at 6.) The rates listed for the ACLU of Arizona are $450 and $400 for attorneys who graduated in 2001 and 2004, respectively, and $256 for a paralegal. (*Id.*) Plaintiff specifies that the work performed by attorneys over the three-year course of this litigation includes, but is not limited to:

> (i) successfully obtaining class certification, (ii) briefing and arguing numerous successful motions to compel discovery, (iii) briefing and arguing appeals of rulings on those motions (including an appeal to the Ninth Circuit), (iv) engaging in protracted document discovery with defendants and third parties, (v) preparing for and taking depositions of ten state employees and third-party witnesses, (vi) preparing expert reports, (vii) preparing for and engaging in expert depositions and (viii) fully briefing and cross opposing summary judgment prior to settlement.

---

[4] Plaintiff specifies that to streamline Plaintiff's presentation, "the Willkie Billing Records include time records for only the ten Willkie lawyers who devoted the most time to this case and exclude time incurred by non-lawyers." (Doc. 360 at 3.)
[5] Plaintiff appears to argue that Willkie's hourly rates are reasonable based on New York's market rates, and the skill, experience, and reputation of comparable legal services. (Doc. 360 at 6-8.) In support of Willkie's out-of-state rates, Plaintiff avers that the ACLU sought, but was unable to recruit, an Arizona law firm with the necessary expertise, capacity, and willingness to take on this case. (*Id.* at 7; Doc. 360-4 ¶¶ 8-11.)
[6] Plaintiff calculated Mr. Block's hourly rate at $750, which is the hourly rate Mr. Block was awarded in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), his most recent case involving a fee petition. (Doc. 360 at 5 n.5; Doc. 360-2 ¶ 13.)

(*Id.* at 4.)

The Court finds that the hourly rates charged by Plaintiff's New York lawyers are much higher than the customary rates charged in this district by lawyers of comparable skill, experience, and reputation. The parties' proposed fee award, however, represents a substantial discount over the figure that would be obtained by multiplying the attorneys' hourly rates by their hours expended. As Plaintiff explains, even if Plaintiff had engaged only local counsel, his fees would be approximately $2,952,000, based on local counsel's average hourly rate of $425 and the 6,945 hours of work performed by Willkie attorneys. (Doc. 360 at 8); s*ee also S.W. Fair Hous. Council v. WG Scottsdale LLC*, No. CV-19-00180-TUC-RM, 2022 WL 16715613, at *5 (D. Ariz. Nov. 4, 2022) (finding $425 per hour a reasonable rate for an attorney practicing law for twenty years). Courts have found attorneys' fees reasonable when class counsel has agreed to accept a significant "lodestar discount." *See Campbell v. Facebook Inc.*, No. 13-CV-05996-PJH, 2017 WL 3581179, at *7 (N.D. Cal. Aug. 18, 2017), *aff'd*, 951 F.3d 1106 (9th Cir. 2020) (granting approval of a $3.89 million attorneys' fee award and noting that any concern regarding the lack of more detailed billing records "is mooted by plaintiffs' agreement to accept a very significant lodestar discount"). Based on Plaintiff's Memorandum Regarding Attorneys' Rates and Fees (Doc. 360) and the declarations submitted by Plaintiff's litigation team (Docs. 360-1, 360-2, 360-3, 360-4), the Court will accept the party's proposed fee award of $500,000 as a lodestar figure.

However, the Court will modify the lodestar figure downward because a significant portion of the relief obtained by the class—removing the Exclusion from the Plan—was achieved by Executive Order, independently of class counsel's efforts in this case. *See Kerr*, 526 F.2d at 70. The Court recognizes that Plaintiff's counsel worked diligently for over three years on this matter and achieved a successful result for the class beyond the Executive Order by making the Exclusion's removal permanent. However, because such a significant portion of the relief obtained cannot be attributed to class counsel's efforts in this matter, the Court will reduce the attorneys' fee award to $375,000. The remaining

*Kerr* factors do not weigh in favor of any other adjustments to the lodestar figure. The Court has recognized that Plaintiff's "counsel have a demonstrated history of representing the interests of transgender individuals and prosecuting civil rights class actions." (Doc. 105 at 7.) Counsel's skill, experience, reputation, and ability, as well as the time limitations and preclusion of other employment attributable to counsel's work on this case, all support an award without further adjustments. Accordingly, the Court will award attorneys' fees in the amount of $375,000.

## IV. Preliminary Notice and Approval

Plaintiff argues that preliminary notice to class members and preliminary approval are not required because "(1) the settlement provides near complete relief to the plaintiffs; (2) the settlement provides for only injunctive relief; (3) there is no evidence of collusion between the parties; and (4) the cost of notice is excessive." (Doc. 353 at 8.) Rule 23(c)(2) provides that, "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court *may* direct appropriate notice to the class." Fed. R. Civ. P 23(c)(2) (emphasis added); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) (Rule 23 "provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action").

Courts within the Ninth Circuit have held that notice is not required in injunctive relief only class actions certified under Rule 23(b)(2). *See, e.g., Jeanne Stathakos v. Columbia Sportswear Co.*, No. 4:15-CV-04543-YGR, 2018 WL 582564, at *3 (N.D. Cal. Jan. 25, 2018) (listing cases and concluding that "notice to the Rule 23(b)(2) class is not required" where "the terms of the Agreement provide for injunctive relief only and further expressly preserve the rights of the class to bring claims for monetary relief"). In *Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2015 WL 1248027, at *8 (N.D. Cal. Mar. 18, 2015), the district court considered the plaintiff's argument that notice to class members was not required because the settlement provided for injunctive relief only, and the settlement class members would not release any of their monetary claims. *Id.* The court reasoned that "even if notified of the settlement, the settlement class would not have the

right to opt out from the injunctive settlement and the settlement does not release the monetary claims of class members." *Id.* at 9. The court, therefore, held that class notice was unnecessary. *Id.* Because this class action was certified for injunctive relief only, Plaintiffs obtained near total relief, and class members lack the right to opt out, the Court finds that preliminary notice to class members and preliminary approval are not required. Accordingly, the Court approves the parties' settlement and Consent Decree (Doc. 353).

## V. Amicus Curiae

District Courts have broad discretion to grant or refuse prospective *amicus* participation. *See Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 (1995). The classic role of *amici* is threefold: (1) assist in a case of general public interest, (2) supplement the efforts of counsel, and (3) draw the court's attention to law that escaped consideration. *Miller-Wohl Co., Inc. v. Commr. of Lab. and Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982). The Court has reviewed the Motion for Leave to File a Brief as *Amicus Curiae* (Doc. 354) and Plaintiff's Opposition (Doc. 355) and finds that although the case is of general public interest, the Motion does not supplement the efforts of counsel or draw the court's attention to law that escaped consideration. Therefore, the Court will deny the Motion for Leave (Doc. 354).

**IT IS ORDERED** that Plaintiff's Consent Motion for Approval of Consent Decree (Doc. 353) is **granted in part and denied in part**. State Defendants shall pay Plaintiff $375,000.00 in attorneys' fees. The Court otherwise approves the parties' Consent Decree. The Clerk of Court is directed to enter judgment accordingly and close this case.

**IT IS FURTHER ORDERED** that the Motion for Leave to File a Brief as *Amicus Curiae* (Doc. 354) is **denied**.

**IT IS FURTHER ORDERED** that Defendant State of Arizona's Motion for Summary Judgment (Doc. 293) is **denied as moot**.

. . . .

. . . .

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Docs. 298, 309) is **denied as moot**.

Dated this 28th day of September, 2023.

_____
Honorable Rosemary Márquez
United States District Judge